# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-md-2724 |
| | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | Civil Action Nos. |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc. et al.* | 18-2641<br>18-2401<br>18-3299 |
| *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc.* | 18-2533<br>18-284<br>18-4137<br>17-3768 |
| *Humana Inc. v. Actavis Elizabeth, LLC et al.* | |
| *West Val Pharm., et al. v. Actavis Holdco U.S., Inc.* | **ORAL ARGUMENT REQUESTED** |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc.* | |
| *Marion Diagnostic Center, LLC, et al. v. McKesson Corp., et al.* | |
| *The State Attorneys General Litigation* | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR JOINT MOTION TO DISMISS
## PLAINTIFFS' OVERARCHING CONSPIRACY CLAIMS

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................... 1

II.    ARGUMENT ............................................................................................... 5

    A.    Plaintiffs must plead facts, not just offer speculative theories or conclusory allegations, to support their overarching conspiracy claims. ................................. 5

    B.    Plaintiffs fail to plead facts connecting each Defendant to the overarching conspiracy they allege. ........................................................................................ 10

        1.    Plaintiffs must plead facts showing that each Defendant was aware of and committed to the common goal of the alleged overarching conspiracy. ......................................................... 10

        2.    Plaintiffs fail to plead facts showing that each Defendant was aware of and committed to the common goal of the alleged overarching conspiracy. ......................................................... 12

            a.    Plaintiffs' speculation that Defendants might be "ostensible competitors" in any drug market does not support the existence of a common goal .................................................. 15

            b.    Plaintiffs' speculative "fair share" allegations do not suggest the existence of a common goal .................................... 18

    C.    Plaintiffs fail to plead facts showing interdependence among each of the individual drug conspiracies ............................................................... 20

        1.    Plaintiffs must allege that the alleged individual drug conspiracies either benefitted or furthered each other. ................................................. 20

        2.    Plaintiffs have not alleged facts showing that the alleged individual drug conspiracies either benefitted or furthered each other. .................... 24

    D.    Plaintiffs fail to plead facts showing sufficient overlap to demonstrate connection among the individual drug conspiracies. ........................................... 25

    E.    In failing to allege a common purpose, interdependence, or meaningful overlap in participants, Plaintiffs fail to allege the existence of an overarching conspiracy. ...................................................................................... 27

III.    CONCLUSION ........................................................................................... 28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Andrx Pharm., Inc. v. Biovail Corp. Int'l,*
    256 F.3d 799 (D.C. Cir. 2001) ............................................................15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................1, 5

*In re Auto. Parts Antitrust Litig.,*
    No. 12-md-02311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016) .............................. *passim*

*Bd. of Trustees of Galveston Wharves v. Treleborg, AB,*
    No. 10-2319, 2010 WL 11508414 (C.D. Cal. Nov. 22, 2010) .............................17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................... *passim*

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    No. 94-897, 1995 WL 221853 (N.D. Ill. Apr. 11, 1995) ...................................7

*In re Elevator Antitrust Litig.,*
    502 F.3d 47 (2d Cir. 2007) (per curiam) ...........................................18

*Hinds Cty. v. Wachovia Bank N.A.,*
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) ...........................................9

*In re Ins. Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010) ....................................................... *passim*

*In re Insurance Brokerage Antitrust Litig.,*
    No. 04-cv-5184 (D.N.J. June 29, 2007) .........................................18, 22, 27

*In re Iowa Ready-Mix Concrete Antitrust Litig.,*
    768 F. Supp. 2d 961 (N.D. Iowa 2011) ...........................................13

*Jung v. Ass'n of Am. Med. Colls.,*
    300 F. Supp. 2d 119 (D.D.C. 2004) ...........................................10

*In re K-Dur Antitrust Litig.,*
    No. 01-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) .............................6, 14, 20

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008) .......................................................5

*In re Lipitor Antitrust Litig.,*
    855 F.3d 126 (3d Cir. 2017) ....................................................15

*In re Musical Instruments and Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .............................................................5

*Mylan Pharms., Inc. v. FDA*,
  454 F.3d 270 (4th Cir. 2006) ..............................................................15

*In re Optical Disk Drive Antitrust Litig.*,
  No. 3:10–md–2143 RS, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ............................13, 22

*In re Polyurethane Foam Antitrust Litig.*,
  152 F. Supp. 3d 968 (N.D. Ohio 2015)....................................................20

*Precision Assocs. v. Panalpina World Transport (Holding) Ltd.*,
  No. 08-CV-42, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ......................................... *passim*

*In re Processed Eggs Antitrust Litig.*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) .....................................................10

*R.E. Davis Chem. Corp. v. Nalco Chem. Co.*,
  757 F. Supp. 1499 (N.D. Ill. 1990) ........................................................9

*Roxane Labs., Inc. v. SmithKline Beecham Corp.*,
  No. 09-CV-1638, 2010 WL 331704 (E.D. Pa. Jan. 26, 2010)................................15

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)....................................................21

*Talley v. Christiana Care Health Sys.*,
  17-926, 2018 WL 4938566 (D. Del. Oct. 11, 2018).........................................15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................10

*United States v. Kelly*,
  892 F.2d 255 (3d Cir. 1989)................................................................6, 25

*United States v. Malik*,
  No. 08-614, 2009 WL 4641706 (E.D. Pa. Dec. 7, 2009), *aff'd*, 424 F. App'x
  122 (3d Cir. 2011).........................................................................20

*United States v. Sargent Elec. Co.*,
  785 F.2d 1123 (3d Cir. 1986)...............................................................26

*United States v. Smith*,
  82 F.3d 1261 (3d Cir. 1996)................................................................13

*In re Vitamins Antitrust Litig.*,
  320 F. Supp. 2d 1 (D.D.C. 2004) ...........................................................18, 19

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop.*,
   No. 15-6480, 2019 WL 130535 (E.D. Pa. Jan. 8, 2019) ........................................................11

**Rules**

Fed. R. Civ. P. 10(b) ......................................................................................................12

Fed. R. Civ. P. 12(b)(6) ...............................................................................................4, 15

Defendants submit this Memorandum of Law in Support of their Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims (the "Motion").  This Motion seeks targeted relief consistent with the faithful application of the Supreme Court's decisions in *Twombly* and *Iqbal*, as well as the efficient management of this action.  In this regard, it seeks dismissal of the claims asserting the existence of an "overarching conspiracy" in the following pleadings (collectively, the "Overarching Complaints"):  Direct Purchaser Plaintiffs' Amended Class Action Compl. ¶¶ 108-121; End Payor Plaintiffs' First Amended Class Action Compl. ¶¶ 99-181; Indirect Reseller Plaintiffs' Amended Class Action Compl. ¶¶ 65-72; The Kroger Plaintiffs' Amended Compl. ¶¶ 813-32; The Marion Plaintiffs' First Amended Compl., ¶¶ 51-59; Humana, Inc's Amended Compl. ¶¶ 261-72; Plaintiff States' Consolidated Amended Compl. ¶¶ 89-109.

## I.      PRELIMINARY STATEMENT

In the Overarching Complaints, each group of Plaintiffs seeks to impose sweeping joint and several liability on each Defendant for allegedly fixing prices and allocating markets, not only for the specific drug(s) that it sold, but for dozens of additional drugs that it did not sell.  None, however, pleads facts sufficient to show the basic elements necessary to create the potential for such massive liability: (1) that each Defendant was aware of, and committed to, a broad, all-encompassing conspiracy that involved fixing the prices of, or allocating markets for, drugs that it did not sell, and (2) that the alleged individual-drug conspiracies—each of which involves different Defendants and distinct drugs used to treat entirely different conditions—were somehow connected into a single, overarching whole.

The Plaintiffs' various overarching conspiracy claims differ in their specifics, including (among other things) the individual drugs and Defendants allegedly involved in the overarching

conspiracy claimed.[1]   They share, however, a few common features that, together, require dismissal:

*First*, they seek to hold each Defendant jointly and severally liable, not just for alleged individual conspiracies involving the drug(s) that it actually sold, but for ***all*** of the alleged individual drug conspiracies, without offering any facts that connect each Defendant to alleged conspiracies involving drugs it did not sell.  None of the Overarching Complaints purports to claim, much less pleads supporting facts, that the absence of any Defendant from any particular drug market was the result of an unlawful agreement, rather than the normal consequence of regulation, capacity, expertise, or the many other legitimate reasons why firms make some products but not others.

*Second,* they each claim (with no support) that the series of individual-drug conspiracies alleged (which differ among the various Overarching Complaints as to the specific drugs, Defendants, and time periods) were somehow connected into a single, overarching agreement (which differs among the Complaints as to scope), without offering any facts that connect them. None of the Overarching Complaints proffers facts that would establish that any of the various alleged individual-drug conspiracies could not have succeeded on its own, independent of the others.

To establish the existence of an overarching conspiracy based on a series of separate, individual conspiracies, Third Circuit law requires a plaintiff to plead facts sufficient to establish

---

[1]   The charts attached as Exhibit A identify, by Overarching Complaint, the different Defendants and drugs identified in each action.  In summary, the State Plaintiff Complaint names 20 Defendants and identifies 15 different drugs; the Kroger Complaint names 29 Defendants and identifies 40 different drugs; the Humana Complaint names 36 Defendants and identifies 27 different drugs; collectively, the Class Complaints name 21 Defendants and identify 24 different drugs; and the Marion Complaint names 16 Defendants and purports to claim a conspiracy covering "all generic drugs."

that the overarching conspiracy had a common goal that was known and shared by all, and that the individual conspiracies were *interdependent*—i.e., that the success of each individual conspiracy depended on the success of the others.  The Court will search the Overarching Complaints in vain for such facts.

It is axiomatic that a defendant cannot be held liable for participation in a conspiracy absent facts plausibly establishing that it was aware of, and committed to, the common goals of that conspiracy.  None of the Overarching Complaints, however, pleads facts showing that any such common goal existed, let alone that any Defendant was aware of, or committed to, conspiracies involving dozens of drugs that it did not sell.  And the Overarching Complaints similarly offer no facts from which it could be inferred that any Defendant's absence from the alleged market(s) for any drug(s) was itself the result of an agreement with any other Defendants.  Although certain Plaintiffs offer a handful of allegations that a few Defendants sparingly used common business jargon such as "fair share," or that a couple of Defendants allegedly discussed a pricing agreement for a drug that one of them did not sell, such allegations hardly constitute facts plausibly suggesting an overarching conspiracy involving dozens of other Defendants and drugs.

Nor does any Overarching Complaint plead facts sufficient to support a plausible inference that each of the individual drug conspiracies was connected to, much less dependent on the success of the others.  For example, Plaintiffs plead no facts explaining how an alleged conspiracy to fix the price of nimodipine, a drug used to treat bleeding in the brain, in any way contributed to or related to the success of another alleged conspiracy involving glyburide, a drug sold by different Defendants and used to treat Type 2 diabetes.  It does not matter which drugs are used in this example.  The point remains the same.

Plaintiffs try to compensate for the absence of such facts by offering speculative theories and conclusory assertions. *Twombly*, however, demands more: *allegations of actual facts*. And requiring Plaintiffs to satisfy that standard is particularly important here, where they seek to tie together alleged conspiracies across different time periods in entirely separate alleged drug markets and subject each and every Defendant to the risk of "super-joint and several liability"— that is, liability not only for any alleged individual drug conspiracy which that Defendant is alleged to have joined, but also for the dozens of other alleged individual conspiracies involving drugs that Defendant did not even sell.

To be clear, this Motion is not about whether, under certain circumstances, one could speculate that an overarching conspiracy involving multiple drugs and markets could *possibly* occur.[2] Nor is it about the sufficiency of the Plaintiffs' pleadings regarding the alleged individual drug conspiracies.[3] Rather, this Motion is focused on Plaintiffs' failure to plead any facts sufficient to suggest that each Defendant participated in a conspiracy involving drugs that it did not sell or as to which it is not alleged to have conspired, particularly given the lack of any facts suggesting that any Defendant's absence from any alleged market was itself the result of an unlawful agreement. Without well-pled factual allegations of this sort, the massive overarching conspiracies that Plaintiffs assert here are a bridge too far.

---

[2]     It is for this reason that the Court concluded, under Rule 15's "liberal[ ]" standard, that a pleading amendment would not be futile. Dkt. 603 at 7. Granting the State Plaintiffs' motion to amend, however, does not answer the question here: whether, under Rule 12(b)(6), Plaintiffs have alleged sufficient facts to plausibly suggest that the purported overarching agreements existed, not just that they could have theoretically existed.

[3]     Defendants here do not concede that Plaintiffs have sufficiently pled these claims. Per Pretrial Order No. 61, Dkt. 775, the sufficiency of individual conspiracy claims will be addressed, where appropriate, by individual Defendants in their own motions.

For the reasons described below, the overarching conspiracy claims in each of the Overarching Complaints should be dismissed.

## II.     ARGUMENT

### A.     Plaintiffs must plead facts, not just offer speculative theories or conclusory allegations, to support their overarching conspiracy claims.

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Mere "labels and conclusions" do not suffice. *Twombly*, 550 U.S. at 555. Nor do speculative theories, absent supporting facts. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 556 U.S. at 555-57. Moreover, to state a claim under Section 1 of the Sherman Act, it is not enough to allege, in conclusory fashion, that Defendants participated in a conspiracy. *Twombly* 550 U.S. at 570. "Conspiracy is a legal conclusion." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)). "A bare allegation of conspiracy is almost impossible to defend against, particularly where the defendants are large institutions . . . ." *Kendall*, 518 F.3d at 1047.

In addition, to satisfy *Twombly*'s pleading standard, plaintiffs must plead facts that demonstrate "with precision" the scope of the conspiracy claimed. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 339 (3d Cir. 2010). Where, as here, plaintiffs claim an overarching conspiracy supposedly involving multiple products, it is insufficient to allege a series of separate, parallel agreements among different manufacturers in different markets within the same industry. *Id.* at 350-51 (dismissing global conspiracy claim and explaining that allegedly similar "pernicious practices" among different groups of defendants did not "plausibly imply an industry-wide conspiracy"). Even if the alleged existence of multiple, discrete conspiracies "may evidence a widespread problem in the industry," that does not show that they were part of some overarching

-5-

whole.  *Precision Assocs. v. Panalpina World Transport (Holding) Ltd.*, No. 08-CV-42, 2011 WL 7053807, at *27-30 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, No. 08-CV-42, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).

Rather, plaintiffs must plead facts showing that (1) each alleged conspirator was aware of, and committed to, a common goal that transcended the individual agreements in which it is specifically alleged to have participated; (2) the alleged agreement contemplated a result "that will not continue without the cooperation of the conspirators"—i.e., that the individual conspiracies were interdependent; and (3) there was sufficient overlap among the participants in the individual conspiracies.  *United States v. Kelly*, 892 F.2d 255, 258-59 (3d Cir. 1989); *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 348–51; *In re K-Dur Antitrust Litig.*, No. 01-1652, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016).  None of the Plaintiffs comes close to satisfying any of these elements.

Nevertheless, Plaintiffs seek to subject each Defendant to the potential risk of unwarranted "super-joint and several liability"—that is, joint and several liability, not just for the individual drug conspiracy(ies) in which it is alleged to have participated, but for all of the alleged individual drug conspiracies, regardless of whether that Defendant sold, intended to sell, or could have sold the drugs at issue, or whether that Defendant is alleged to have engaged in a conspiracy as to those drugs.  Plaintiffs seek this broad liability without alleging any facts to support an inference that any Defendant's—much less every Defendant's—absence from a market was in any way part of a broader conspiracy, and without offering any facts to support a connection among alleged conspiracies.

For example, the Kroger Plaintiffs allege that Defendant Mayne Pharma Inc. ("Mayne") sold a single drug identified in their Overarching Complaint: doxycycline DR ("Doxy DR"). Kroger Compl. Ex. 2.  Under Kroger's overarching conspiracy theory, Mayne would face potential

liability not only for damages associated with an alleged conspiracy to fix the price of Doxy DR, but also for alleged damages associated with the alleged conspiracies to fix the price of 30 other drugs that are identified in the Kroger Complaint, but that Mayne did not sell or intend to sell. *See id.* Yet the Complaint offers no facts supporting an inference that Mayne could have entered any other drug market or that its failure to do so was in any way related to a conspiracy, and no facts connecting Mayne to any of the other alleged conspiracies or to drugs other than Doxy DR. Nor, for that matter, does it offer any facts suggesting that the success or failure of the alleged Doxy DR conspiracy depended in any way on the success or failure of any other conspiracy involving any other product. And Mayne, of course, is only one example.

Humana similarly seeks to hold Defendant Epic Pharma, LLC ("Epic") jointly and severally liable for the sales of 26 generic pharmaceuticals by 29 companies, even though Epic manufactured a ***single*** drug at issue: ursodiol, a product manufactured by only three Defendants. *See* Humana Compl. ¶¶ 57, 109, 686-95. Like the Kroger Plaintiffs, Humana also fails to allege facts showing either that Epic's absence from other markets was part of any conspiracy, or that the success or failure of the alleged conspiracy as to ursodiol depended in any way upon the success or failure of a conspiracy regarding any other drug.

And the Direct Purchasers seek to hold Defendant Zydus jointly and severally liable for the sale of 21 drugs by 18 Defendant families—even though it manufactured only one drug at issue, acetazolamide capsules. *See* DPP Compl. ¶¶ 150-69. But of course, the Direct Purchasers allege no connection between the alleged acetazolamide conspiracy and the individual conspiracies involving 20 other drugs and no basis on which to conclude that Zydus ever considered selling those drugs, let alone that it did not do so as the result of any agreement. The list could go on.

Any other Defendant from any other Overarching Complaint could be used to illustrate this same point.

Of course, defendants in an antitrust conspiracy case are generally subject to the risk of joint and several liability. Courts have recognized, however, that even in ordinary antitrust cases, joint and several liability coupled with treble damages can have a substantial *in terrorem* effect, creating risks disproportionate to the actual merits of a case. *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94-897, 1995 WL 221853, at *2 (N.D. Ill. Apr. 11, 1995). Thus, in any antitrust conspiracy case, the potential scope of any joint and several liability must be commensurate with, and bounded by, well-pleaded factual allegations regarding the scope of, and a defendant's participation in, the claimed conspiracy. Moreover, this is no ordinary antitrust case, involving a single market or relatively few markets, in which each defendant is alleged to have participated. The Overarching Complaints involve at least 40 different drugs, each of which is alleged to comprise a separate market, and the vast majority of Defendants are alleged to have sold very few of those drugs. It is therefore particularly critical that Plaintiffs be required to meet their pleading burdens here.

In addition, allowing Plaintiffs to proceed with their overarching conspiracy claims would introduce unwarranted complications into an already immensely complex multi-district litigation. Given the risk of joint and several liability across all of the identified drugs, each Defendant will be forced to participate actively in the defense of each alleged individual drug conspiracy— including immersing itself in the record related to each alleged conspiracy, attending and taking

fact and expert depositions,[4] and participating in motion practice, among other things—regardless of whether Plaintiffs allege any facts connecting that Defendant to a particular alleged conspiracy.

*Twombly* teaches that courts must take care "to require allegations that reach the level suggesting conspiracy" before subjecting defendants to the extensive scope and unusually high cost of discovery in antitrust cases, otherwise "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings." 550 U.S. at 558–59; *see also In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2016 WL 8200512, *2 (E.D. Mich. Apr. 13, 2016) (finding that it would be prejudicial to many defendants who were parties in only one or two of the multiple separate conspiracy claims to consolidate those claims into "a massive conspiracy, involving dozens of other products that [the] Defendant has not even been alleged to make").  Here, none of the overarching conspiracy claims satisfies *Twombly*.  None alleges the facts necessary to connect any Defendant to a conspiracy related to a drug that it did not sell.  Nor does any allege the facts necessary to connect the alleged individual drug conspiracies into an interdependent, overarching whole.

---

[4]     If Plaintiffs' overarching conspiracy claims proceed, each Defendant will be required to develop a record at each deposition of every other Defendant concerning its lack of involvement in any alleged conspiracy, making the depositions unwieldy and interminable.  For example, in order to create a record for summary judgment, Defendant Upsher-Smith would be required to question witnesses from the 28 other companies in the Kroger action and create a record regarding 40 drugs, 38 of which Upsher-Smith is not being sued for.  This would not only exponentially magnify the costs and burden to be borne by each Defendant, but would also impede the orderly management of the pre-trial process itself.  The risks, in this respect, are even greater if Plaintiffs add allegations related to "hundreds" of additional drugs as they have suggested they intend to do.

**B.     Plaintiffs fail to plead facts connecting each Defendant to the overarching conspiracy they allege.**

    **1.     Plaintiffs must plead facts showing that each Defendant was aware of and committed to the common goal of the alleged overarching conspiracy.**

An allegation of conspiracy requires a showing of common purpose among alleged participants in that conspiracy. *Kelly*, 892 F.2d at 258-59; *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 348-51. A defendant cannot be subject to the risk of joint and several liability for allegedly participating in a conspiracy absent factual allegations demonstrating that it was aware of, and committed to, that common purpose. *See Hinds Cty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("To state a claim against each Defendant," a plaintiff "must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy"); *R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F. Supp. 1499, 1515 (N.D. Ill. 1990) ("In order to properly plead a conspiracy, the plaintiff must allege facts which evince each defendant's agreement to participate in what he or it knew to be a collective venture toward a common goal." (internal quotation marks omitted)); *see also Twombly*, 550 U.S. at 556 (explaining that plaintiffs must allege "enough factual matter (taken as true) to suggest an agreement was made"). To state a claim for an ***overarching*** conspiracy, Plaintiffs must allege facts showing that "each of the defendants was aware of and agreed to the essential purpose of the ***overarching*** conspiracy." *Precision Assocs.* 2011 WL 7053807, at *30 (emphasis added); *Auto. Parts*, 2016 WL 8200512, at *4 ("Only after a defendant agrees to the common purpose [of the overarching conspiracy] may it be held responsible for the conduct of co-conspirators.").

In *Auto Parts*, the plaintiffs alleged an overarching "megaconspiracy" covering 18 different auto parts. The court explained that, to state a claim for such an overarching conspiracy, the plaintiffs "must allege facts creating at least an inference as to *each Defendant's* knowing

participation in a conspiracy to raise, fix, maintain, or stabilize the price of auto parts, *not just the parts it makes or sells*." *Id.* (emphasis added). The court held that the plaintiffs had failed to do so because there were "no allegations . . . of deals between makers of different component parts, and no inference arises of knowledge outside of each Defendants' own specific deals." *Id.* As a result, the court held that the *Auto Parts* plaintiffs merely alleged conspiracies that were "multiple, separate, and product-specific." *Id.*

Plaintiffs cannot meet their burden through vague "group pleading"—that is, general, sweeping allegations attributing awareness, conduct, and motivations to unidentified "Defendants" as a group. *See In re Processed Eggs Antitrust Litig.*, 821 F. Supp. 2d 709, 719-20 (E.D. Pa. 2011) (collecting cases); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("[T]he complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a ***conscious decision by each defendant to join it***." (emphasis added) (internal quotation marks omitted)). Rather, to state a claim that a Defendant participated in a conspiracy, Plaintiffs must plead "allegations specific to [the Defendant] alleging [the Defendant's] role in the alleged conspiracy," and "that plausibly suggest that [the Defendant] participated in th[at] conspiracy." *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2014 WL 3378336, at *4 (N.D. Cal. July 10, 2014) (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010)); *see also Precision Assocs.*, 2011 WL 7053807, at *30; *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 161 (D.D.C. 2004) (holding that plaintiffs must allege, "in the context of the larger conspiracy alleged," that "***each defendant knowingly joined or agreed to participate in the conspiracy***" (emphasis added)); *Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop.*, No. 15-6480, 2019 WL 130535, at *3-5 (E.D. Pa. Jan. 8, 2019)

-11-

(dismissing claim where plaintiffs alleged only that "defendants" participated in a conspiracy but did not provide "further factual matter specifying [each defendant's] participation in the alleged scheme").

      **2.**      **Plaintiffs fail to plead facts showing that each Defendant was aware of and committed to the common goal of the alleged overarching conspiracy.**

None of the Plaintiffs pleads facts showing that any Defendant was aware of, or consciously committed to, a common goal involving drug(s) that it did not sell.  Even assuming, for purposes of this Motion, that Plaintiffs have sufficiently pled facts showing that each Defendant participated in individual conspiracy(ies) related to the drug(s) it *sold*, that does not show that each Defendant shared the common goal of an overarching conspiracy involving other drugs sold by other Defendants.  Plaintiffs allege no facts demonstrating that, by purportedly agreeing to fix the price of one drug that it sold, a Defendant understood it was agreeing to participate in a much larger conspiracy encompassing dozens of other drugs that that Defendant did not sell and from which it would derive no alleged profit or benefit.

Take, as an example, certain Plaintiffs' allegations that Citron, in a phone call, agreed to follow Heritage's price increases on both Fosinopril HCTZ and Glyburide.  *See* Kroger Compl. ¶ 559; *see also* DPP Compl. ¶¶ 209-15; IRP Compl. ¶ 203; EPP Compl. ¶¶ 482-83; State Compl. ¶¶ 320-21.  The Kroger Plaintiffs also allege that Heritage secured Citron's agreement not to disturb a forthcoming price increase on a third drug, Glyburide-Metformin.  Kroger Compl. ¶ 593.[5]

---

[5]      The Kroger Plaintiffs group their allegations into 31 counts.  But five of those counts improperly combine allegations concerning multiple alleged conspiracies, each naming a distinct set of Defendants and a distinct formulation of that drug.  *See* Kroger Compl. Counts Two (two conspiracies); Twelve (three conspiracies); Twenty-Three (four conspiracies); Twenty-Five (three conspiracies); Twenty-Eight (two conspiracies).  By adopting the Kroger Plaintiffs' groupings for the convenience of the Court in this Motion, no Defendant concedes that these allegations are properly combined under Fed. R. Civ. P. 10(b).

These are the ***only*** three drugs as to which Citron is alleged to have participated in a conspiracy. No allegations indicate that Citron was aware of alleged conspiracies concerning the other 37 drugs identified in the Kroger Complaint and no allegations indicate that it had any expectation of benefit from those 37 other alleged conspiracies, let alone that it consciously committed to an alleged broader 40-drug conspiracy. And of course, nothing about the allegations as to Citron has any bearing whatsoever on the other Defendants who are alleged to have participated in an overarching conspiracy.

By way of further example, the Plaintiff States allege that Heritage and Mylan, in discussing an alleged agreement on Doxy DR, referenced a prior agreement related to a different, unidentified drug. State Compl. ¶¶ 103, 188. This alleged communication involved only two companies and drugs that each sold. Setting aside that the allegation is conclusory and fails to identify the drug in question, it does not support an inference that either Mylan or Heritage was aware of, or committed to, a conspiracy larger than those two drugs. Nor can it support the sweeping inference that other Defendants that did not sell those drugs were somehow aware of, and committed to, a conspiracy to fix their prices or allocate their market share. This communication provides no basis for inferring an overarching conspiracy involving dozens of Defendants and dozens of other drugs. *See Auto. Parts*, 2016 WL 8200512, at *3-4 (factual allegations as to "the existence of some agreements among some Defendants" were not enough to support an overarching conspiracy allegation where there were "no facts supporting a single agreement among all of them"). These same points apply with equal force to any of the bilateral communications alleged in the Overarching Complaints.

None of the Plaintiffs pleads facts showing that any Defendant would even have an interest in an agreement to fix prices in markets in which it did not compete. *See United States v. Smith*,

82 F.3d 1261, 1269–70 (3d Cir. 1996) (quoting *Blumenthal v. United States,* 332 U.S. 539, 558 (1947)) (finding that two kickback schemes constituted two conspiracies rather than one where one scheme in no way benefitted from the existence of a similar scheme in another state)); *Auto. Parts*, 2016 WL 8200512, at *4 (rejecting overarching conspiracy claim because "[t]he [Consolidated Amended Complaints] merely advance allegations of separate conspiratorial conduct between different Defendants making different parts"); *see also In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 976 (N.D. Iowa 2011) (dismissing an overarching conspiracy claim where plaintiffs did not "allege the geographical market in which any of the defendants operated or any overlap among their geographical markets"); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10–md–2143 RS, 2011 WL 3894376, at *7 (N.D. Cal. Aug. 3, 2011) (dismissing an overarching conspiracy claim involving different optical disk drive devices and markets).  Indeed, Plaintiffs do not even offer conclusory allegations, save one isolated instance involving one Defendant, *see, e.g.*, Kroger Compl. ¶ 593, that any Defendant was even aware of any agreement to fix prices or allocate "fair share" for any drug that the Defendant did not sell.[6]

Some Plaintiffs try to plug this hole by speculating that Defendants shared an interest in markets in which they did not compete because they might potentially be competitors in the future, by making the unsupported claim that the effectiveness of any agreement on any single drug might

---

[6]      At most, one complaint alleges in conclusory fashion that one Defendant communicated "the terms of an agreement" to two other Defendants. *See* Kroger Compl. ¶ 593.  Even if this one conclusory allegation could be construed as sufficient to allege some "awareness," "awareness of a competitor's actions is not enough to create an inference of a conspiracy."  *In re K-Dur Antitrust Litig.*, No. 01-1652, 2016 WL 755623, at *80 (D.N.J. Feb. 25, 2016) (citing *Ins. Brokerage*, 618 F.3d at 349-50).

be "unstable" without a broader agreement encompassing other drugs.[7]  *See, e.g.*, EPP Compl. ¶ 102.   Plaintiffs also offer conclusory assertions that some Defendants shared an interest in furthering a vague and undefined "fair share" understanding across all the drugs identified in the Overarching Complaints.   (The Marion Plaintiffs take this to its extreme, suggesting that the supposed understanding covered ***all*** generic drugs.)  Plaintiffs, however, offer no facts to support these speculative theories and conclusory assertions.

> a. *Plaintiffs' speculation that Defendants might be "ostensible competitors" in any drug market does not support the existence of a common goal.*

Plaintiffs' theory that an overarching conspiracy existed because Defendants *might* compete for sales of some other product in the future is pure speculation.  No Plaintiff alleges any facts showing that a Defendant participated in an alleged individual drug conspiracy based on the potential for future competition with other manufacturers in other drug markets.  And no Plaintiff offers any facts showing that any Defendant had the intent and preparedness to enter any of the generic drug markets in which it did not compete, as required to be considered a potential competitor in any of those markets.  *See Roxane Labs., Inc. v. SmithKline Beecham Corp.*, No. 09-CV-1638, 2010 WL 331704, at *3 (E.D. Pa. Jan. 26, 2010) ("To demonstrate intention and preparedness, a plaintiff 'must show not only that it had the background, experience and financial ability to make a viable entrance, but even more important, that it took affirmative actions to pursue the new line of business.'" (quoting *Out Front Prods., Inc. v. Magid*, 748 F.2d 166, 170 (3d Cir. 1984)); *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807 (D.C. Cir. 2001).  Indeed, Plaintiffs' own allegations undermine this theory.  While Plaintiffs' theory of potential competition

---

[7]      Others do not even go that far.  *See* State Compl. ¶ 101 (speculating that "competitors ***might*** allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs" (emphasis added)).

depends on ready access to individual drug markets, Plaintiffs elsewhere allege that "the presence of significant barriers to entry makes [competition] more difficult and helps to facilitate the operation of a cartel." *Compare* EPP Compl. ¶¶ 112-13 *with id*. ¶ 645.[8]

Moreover, Plaintiffs cannot use the mere fact that most of the Defendants sold very few of the drugs identified in the Overarching Complaints to suggest that Defendants *agreed* not to compete for those drugs. Such a suggestion would be rank speculation. First, the generic pharmaceutical industry is heavily regulated. Before entering a new marketplace, a generic pharmaceutical company must not only navigate the relevant patent landscape, but also must also comply with the intensive regulations as to drug "safety and effectiveness," including under the Federal Food, Drug, and Cosmetic Act, as amended by the Hatch-Waxman Amendments of 1984. *See* EPP Compl. ¶ 646 (acknowledging the "time consuming and expensive" regulatory process); *see also In re Lipitor Antitrust Litig.*, 855 F.3d 126, 134-36 (3d Cir. 2017); *Mylan Pharms., Inc. v. FDA*, 454 F.3d 270, 271-73 (4th Cir. 2006). Plaintiffs' suggestion that each Defendant has the ability, at will, to "access the markets for" all "Drugs at Issue," EPP Complaint ¶¶ 114, 116, ignores the patent landscape and governing regulatory framework. Moreover, there are myriad other legitimate and independent commercial reasons a Defendant might have for choosing not to enter a particular marketplace, including the existence of more profitable uses for its capacity and/or financial resources, limitations related to financial or other resources, concerns regarding reliable sourcing of the necessary raw materials, difficulty of design or manufacturing process for a particular molecule, or the high barriers to entry alleged by Plaintiffs, among others.

---

[8]     "While the Court must accept as true all well-pleaded facts at the Rule 12(b)(6) stage, it need not accept allegations that are contradicted by other allegations in the [complaint]." *Talley v. Christiana Care Health Sys.*, 17-926, 2018 WL 4938566, at *5 n.4 (D. Del. Oct. 11, 2018).

It is Plaintiffs' burden to allege facts showing that a particular Defendant's absence from a particular drug market was the result of a conspiracy rather than a legitimate business reason, or even mere happenstance.  They fail to do so.  Put another way, Plaintiffs allege no facts showing that, if not for an alleged overarching conspiracy, any Defendant could have or would have entered the market for any drug that it did not already sell.[9]

*Twombly* itself emphasized that plaintiffs cannot state a conspiracy claim against a defendant based on speculation that it might have entered other markets, absent the alleged conspiracy.  550 U.S. at 567-70 (rejecting plaintiff's argument that defendants' failure to enter each other's markets, despite "especially attractive business opportunities," was "strongly suggestive of conspiracy").  As the Court explained in *Twombly*, because there are a variety of legitimate reasons that competitors do not enter other markets, failure to do so cannot create an inference of conspiracy.[10]  *Id.* ("firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets").  Rather, to base a conspiracy claim on a defendant's failure to enter a market, plaintiffs must "present[] sufficient factual allegations" demonstrating that, but for the alleged conspiracy,

---

[9]     Notably, Plaintiffs have not alleged how many Defendants would manufacture and sell any particular drug in the absence of the alleged conspiracies.  In their allegations purporting to describe individual markets before the alleged conspiracy, there is not a single drug with anything close to 25-30 companies marketing it.  *See, e.g.*, DPP Compl. ¶¶ 136-39, 151, 267, 276, 281, 287, 294, 307, 326, 337, 341, 373, 403, 425.  Nor have Plaintiffs alleged facts demonstrating **which** Defendants would have been among the unidentified number of competitors to enter a particular market for a given drug in the absence of the claimed conspiracies.  The Plaintiffs therefore fail to show that each Defendant is a potential competitor for each of the individual drugs identified in the Overarching Complaints.

[10]     For this reason, the alleged fact that certain Defendants may have had FDA approval for some drugs that they did not sell does not advance Plaintiffs' claims.  Consistent with the Supreme Court's observation in *Twombly*, there are a variety of reasonable business reasons why such Defendants did not launch these products, or for some reason could not launch them (e.g. supply restraints), and Plaintiffs offer no facts suggesting that it was due to an alleged conspiracy.

-17-

the defendant would have entered.  *See id.*; *see also Bd. of Trustees of Galveston Wharves v. Treleborg, AB*, No. 10-2319, 2010 WL 11508414, at *8 (C.D. Cal. Nov. 22, 2010) ("[U]nadorned speculation that a company 'acted against its own interest' when it failed to enter a market does not suffice under *Twombly*.").  No Plaintiff has offered any such factual allegations here.

b.   *Plaintiffs' speculative "fair share" allegations do not suggest the existence of a common goal.*

Plaintiffs also allege, in conclusory fashion, that Defendants shared a common goal to further a vague and undefined "fair share" understanding.  *See, e.g.*, State Compl. ¶ 99.  But, although Plaintiffs allege that "Defendants all had a common understanding of what 'fair share' means in different circumstances," Humana Compl. ¶ 264, they never allege what, exactly, that common understanding was or offer any facts suggesting that each of the Defendants shared that (undefined) understanding.  *See, e.g.*, DPP Compl. ¶ 100.  And nowhere do Plaintiffs allege how "fair share" operated across the alleged markets for dozens of different drugs.

To the contrary, Plaintiffs allege only a handful of instances in which a few Defendants used this term in connection with ***individual*** drugs, which hardly supports the inference of a far broader "fair share" agreement involving dozens of other Defendants and different drugs.  *See In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 20 (D.D.C. 2004) (denying summary judgment as to two defendants linked by employee statements to an "all-vitamins" conspiracy, and granting summary judgment to a defendant who was not similarly implicated).  Specifically, Plaintiffs allege that only three of the Defendants used the "fair share" phrase, and even then on only ***two occasions***.  *See, e.g.*, State Compl. ¶¶ 102, 119-20, 153.  And on those two occasions, the particular Defendants involved used this phrase in relation to only three specific individual drugs, which is not indicative of some collective overarching understanding.  *See, e.g.*, State Compl. ¶ 99; EPP Compl. ¶ 103; Marion Compl. ¶¶ 52–54; Humana Compl. ¶¶ 261-62.

-18-

Moreover, the use of a common term by some industry participants falls well short of the allegations necessary to demonstrate that all Defendants shared a common goal to fix prices of, or allocate markets for, multiple drugs, much less all drugs across the industry.  In *Insurance Brokerage*, the Third Circuit refused to find an overarching conspiracy based on allegations that the defendants used the same terminology in "substantially similar" disclosure statements.  618 F.3d at 349-50.  The court held that even if the statements reflected some common "pernicious industry practice," the "common adoption" of industry-wide terminology is not enough to state an overarching conspiracy claim.  *Id.*; *accord In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (*per curiam*).

Common sense dictates that industries will frequently develop a common lexicon, without compromising the ability of its participants to act independently.  *See Ins. Brokerage*, 618 F.3d at 349 (explaining that allegations that brokers used common contractual language, did not "plausibly imply that each broker acted other than independently").  Absent any allegations that each Defendant actually used these phrases to further an industry-wide conspiracy, or to implement a common methodology, the existence of a "common lexicon" does not support the existence of an overarching conspiracy.

That is especially true when the common terminology is so ordinary.[11]  Indeed, there is nothing inherently nefarious about the term "fair share."  It is nothing more than business shorthand

---

[11]     Indeed, the so-called common terminology is not just used in the pharmaceutical industry; it is textbook economic and business terminology used across industries and throughout academia. *See, e.g.*, Matt Rosoff, "Pandora Wants Its 'Fair Share' of Ad Dollars," *Business Insider* (Nov. 17, 2011), available at https://www.businessinsider.com/pandora-should-be-making-480-million-a-year-in-ad-revenue-2011-11; "Ford Seeks Fair Share of Canada Utility Vehicle," *Automotive News Canada* (Feb. 17, 2017) available at https://canada.autonews.com/article/20170217/CANADA/170219834/ford-seeks-fair-share-of-canadian-utility-vehicle-market  That these terms would appear in marketing and sales analyses is entirely unsurprising and says nothing about whether the parties conspired.

for how much share each firm competing in a market for a specific product would expect to achieve based on normal economic considerations, such as how many firms compete in the market and the order in which they entered. Thus, allegations regarding certain Defendants' alleged use of common terminology such as "fair share" do not support the inference of a common goal among all of the Defendants. *See, e.g.*, *In re Vitamins*, 320 F. Supp. 2d at 20 (on summary judgment, declining to give weight to allegations that a defendant used the conspiracy's "terminology calling the choline component the 'club,'" or that it "followed the same model that was used throughout the conspiracy in setting prices and adhering to market allocation").

### C. Plaintiffs fail to plead facts showing interdependence among each of the individual drug conspiracies.

Plaintiffs' failure to allege sufficient facts to show that each Defendant was aware of, and committed to, the claimed overarching conspiracies is sufficient, by itself, to require dismissal of the overarching conspiracy claims. As explained below, however, they also have failed to allege facts demonstrating the necessary interdependence among the alleged individual drug conspiracies.

#### 1. Plaintiffs must allege that the alleged individual drug conspiracies either benefitted or furthered each other.

Plaintiffs must plead facts showing that the individual drug conspiracies supposedly constituting the alleged overarching conspiracies were "interdependent"—i.e., that the success of an alleged conspiracy involving one drug depended on the success of separate and independent alleged conspiracies among other companies involving other drugs sold by other companies. Such interdependence is the touchstone of the overarching conspiracy analysis. *In re K-Dur Antitrust Litig.*, No. 01-1652, 2016 WL 755623, at *21 (D.N.J. Feb. 25, 2016) (in evaluating interdependence, the court engages in an inquiry focused on "the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other");

*accord In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 996-97 (N.D. Ohio 2015) ("Interdependence among the participants simply means that activities of one aspect of the scheme (slabstock coordination) were 'necessary or advantageous' to the activities of another aspect of the scheme (underlay coordination)."); *United States v. Malik*, No. 08-614, 2009 WL 4641706, at *13 (E.D. Pa. Dec. 7, 2009) ("There must be some interdependence among the members of a single conspiracy so that each member depends upon, is aided by, or has an interest in the success of the others."), *aff'd*, 424 F. App'x 122 (3d Cir. 2011).

Merely asserting, as Plaintiffs do here, the existence of an alleged "series" of numerous individual conspiracies in the same industry does not demonstrate interdependence.  Although multiple, discrete conspiracies "may evidence a widespread problem in the industry," that is not interdependence.  *Precision Assocs.* 2011 WL 7053807, at *30; *see also Ins. Brokerage*, 618 F.3d at 348-51 (dismissing global conspiracy claim and explaining that allegedly similar "pernicious practices" among different groups of defendants did not "plausibly imply an industry-wide conspiracy"); *Auto Parts*, 2016 WL 8200512, at *4 (rejecting overarching conspiracy claim based on 18 individual conspiracies involving different auto parts because "the fact that so many Defendants are alleged to have conducted their business in [a similar] manner does not create one conspiracy"); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 546 n.11 (S.D.N.Y. 2017) (noting that the "complaint did not plausibly allege that these two alleged patterns of manipulation were part of the same conspiracy" because "there is no indication that the two conspiracies were part of one interwoven plot, as opposed to two separate sets of misconduct allegedly committed by the same entities").  Rather, to state a claim for an overarching conspiracy, a complaint must allege facts demonstrating "how, when, or where" the individual

conspiracies became connected to each other in a single, overarching conspiracy. *Precision Assocs.* 2011 WL 7053807, at *27.

Nor do Plaintiffs' allegations that certain of the alleged individual drug conspiracies had similar "designs and methods" (for example, that they allegedly contemplated some type of "fair share" arrangement) suffice to show the requisite interdependence. *Ins. Brokerage*, 618 F.3d at 350-51 (concluding that the "similar nature" of each individual conspiracy "may allege a 'pernicious industry practice,' but they do not plausibly imply an industry-wide conspiracy"); *Precision Assocs.* 2011 WL 7053807, at *27 (finding no overarching conspiracy and "nothing unique" about plaintiffs' allegations that the conspiracies "involved the same designs and methods because they used in person meetings, conference calls, and email communications to form and monitor the conspiracies and because these meetings often involved local trade associations"); *see also In re Optical Disk Drive Antitrust Litig.*, No. 10-2143, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) ("Even assuming [certain] auctions, and perhaps others, were rigged, that is a far cry from establishing plausibility for a broad six year continuing agreement among all defendants to fix the prices of all ODDs sold through innumerable other channels.").

The Third Circuit's decision in *Insurance Brokerage* is particularly illustrative. Plaintiffs in that case alleged a series of "broker-centered conspiracies" in which individual insurance brokers steered clients to different insurers in exchange for payments (so-called "contingent commissions"). *Ins. Brokerage*, 618 F.3d at 311. In addition to bringing claims based on the individual broker-centered conspiracies, the plaintiffs attempted to implicate all defendants in a single "global" conspiracy. *Id.* at 313.

In support of their overarching conspiracy allegations, the plaintiffs in *Insurance Brokerage* alleged several similarities among the series of broker-centered conspiracies, namely

that: (1) each broker-centered conspiracy was "structured by similar contingent commission agreements," *id.* at 348; (2) the brokers made misleading disclosure statements that were "substantially similar" to hide the existence of the commission agreements from public view, *id.* at 349; (3) the brokers "exchanged information about how they accounted for, and reported" the contingent commissions, *id.* at 350; (4) the brokers incorporated "similar standardized confidentiality provisions into their respective contingent commission agreements with insurers," *id.* at 313; and (5) the brokers belonged to and participated in the same trade organization, which "afforded them many opportunities" to conspire, *id.* The plaintiffs further alleged that each broker knew about the other brokers' agreements with different insurers but said nothing. *Id.* at 348. The insurers, meanwhile, were alleged to be "complicit" in the brokers' nondisclosure. *Id.*

Notwithstanding these alleged similarities, the Third Circuit affirmed the district court's dismissal of the overarching conspiracy claim. The Third Circuit held that the plaintiffs had merely alleged individual broker-centered conspiracies with similar features, but had not alleged facts sufficient to show that the individual parallel conspiracies interconnected such that they were part of an overarching agreement. The court explained that plaintiffs could not satisfy their pleading burden by merely asserting that an overarching conspiracy existed without alleging specific facts showing that the brokers and insurers worked across individual conspiracies in service of an industry-wide conspiracy. The court emphasized that individual conspiracies of a "similar nature" were not enough, even if they demonstrated a "pernicious industry-wide practice." *Ins. Brokerage*, 618 F.3d at 350-51.

Here, as explained below, Plaintiffs fail to plead facts showing that the success of the alleged conspiracy among the sellers of each individual drug had anything to do with the success or failure of the alleged conspiracies involving companies selling other drugs. *Id.* at 374 (all

defendants in alleged global conspiracy must "associate[] together for a common purpose of engaging in a course of conduct").

> ### 2. Plaintiffs have not alleged facts showing that the alleged individual drug conspiracies either benefitted or furthered each other.

None of the Overarching Complaints offers any facts showing that the alleged individual drug conspiracies were interdependent. Even assuming that Plaintiffs have pleaded a series of parallel individual drug conspiracies, that is not enough to demonstrate interdependence as a matter of law.

Plaintiffs theorize (with no supporting factual allegations) that, absent an agreement across a Defendant's entire portfolio of drugs, each individual drug conspiracy would fall apart. *See* Humana Compl. ¶ 262; *see also* Kroger Compl. ¶¶ 817-26. Putting aside the complete lack of well-pled facts in support of this theory, Plaintiffs fail to allege facts demonstrating why an agreement as to all drugs would be necessary to reach agreement on one drug. Price competition among two Defendants on one drug has no bearing on whether they can successfully fix prices or allocate market shares on another drug, unless the two drugs actually compete with one another in the same relevant market. For example, vigorous price competition for albuterol, a medicine used to treat wheezing and shortness of breath caused by asthma and chronic obstructive pulmonary disease, has no bearing on an agreement to fix the price of amitriptyline (an antidepressant), a drug made by different Defendants that faces entirely different competitive dynamics.

Similarly, Plaintiffs' other efforts to show interdependence fail because they are based on nothing more than speculation. For example, some Plaintiffs hypothesize that Defendants "might" have either "traded customers" or entered into "quid pro quo" agreements across individual drugs. *See, e.g.*, Marion Compl. ¶ 59, State Compl. ¶ 101 ("competitors *might* allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on

different drugs" (emphasis added)).   Speculative imaginings regarding how individual drugs conspiracies "might" have, in theory, been connected is insufficient to plead the requisite interdependence.[12]

Nor can Plaintiffs hide behind conclusory allegations with no factual predicate.  *See, e.g.*, EPP Compl. ¶ 125 ("[C]ustomers in one generic drug market were sometimes traded for customers in a different generic drug market so that fair share could be allocated across the larger market."). Importantly, no Overarching Complaint contains a single well-pled factual allegation that any customer in any drug market was traded for any customer in a different drug market.   And no Overarching Complaint contains a single well-pled factual allegation that any Defendant reached any agreement—quid pro quo or otherwise—with respect to any drug it did not sell.   At most, Plaintiffs purport to provide a couple of examples of alleged agreements between two Defendants that they would forego price competition on more than one drug that they both sold.   Such allegations do not state a claim that would allow Plaintiffs to impose on each Defendant the threat of joint and several liability for the alleged individual conspiracies involving dozens of drugs that it did not sell.

> **D.   Plaintiffs fail to plead facts showing sufficient overlap to demonstrate connection among the individual drug conspiracies.**

In addition to awareness and commitment, and interdependence, Plaintiffs must allege sufficient overlap among the alleged participants in the individual conspiracies to suggest

---

[12]      By way of an additional example, the Kroger Complaint purports to explain how a conspiracy spanning dozens of drugs and Defendants was administered by arbitrarily assigning Defendants who allegedly manufactured five or more of the individual drugs to a group called "Core Conspirators," while naming the Defendants who made fewer drugs the "Additional Conspirators."  Kroger Compl. ¶ 817.  But there are no factual allegations describing actions taken by specific "Core Conspirators" to direct the overarching conspiracy Plaintiffs purport to allege. Allegations about what the "Core Conspirators" did are just as inadequate as allegations about what all Defendants did.

concerted action among the participants to further the goal of the overarching conspiracies alleged (not just each of the individual conspiracies). *See Kelly*, 898 F.2d at 259-60. Here, no Overarching Complaint alleges a sufficient overlap among participants in the alleged individual conspiracies to support the claimed overarching conspiracy. Indeed, none of the Private Plaintiffs alleges that any single Defendant participated in each of the individual drug conspiracies, and the State Plaintiffs allege that only one Defendant participated in each of the 15 individual drug conspiracies alleged in the State Complaint.[13] *See, e.g.*, Kroger Compl. Ex. 2; DPP Compl. Ex. A.

To the contrary, the vast majority of the Defendants are alleged to have participated in relatively few of the alleged individual conspiracies. *See* Kroger Compl. Ex. 2 (no Defendant alleged to have participated in more than half of the alleged individual conspiracies, and eight of the 29 Defendants alleged to have been involved in only one); EPP Compl. ¶¶ 106, 622; DPP Compl. ¶¶ 274, 280, 286, 292 (more than half of the 21 named Defendants sold only one or two drugs at issue, and two-thirds sold three or fewer); *see generally* Humana Compl. (sixteen of the 29 Defendant families are accused of participating in only one or two of the 27 individual drug conspiracies, and 20 Defendant families in only five or fewer drugs). Moreover, the number of alleged conspirators varies widely from drug-to-drug: ranging from only two conspirators, *see, e.g.*, acetazolamide capsules, to up to nine, *see, e.g.*, pravastatin.

Where, as here, there is limited overlap among alleged participants in an "overarching" conspiracy, common sense counsels against concluding they were part of a single, common conspiracy—as opposed to alleged individual conspiracies. *See, e.g., Precision Assocs.*, 2011 WL

---

[13]     Under the Plaintiff States' theory, Heritage was allegedly at the center of each of the 15 individual drug conspiracies—but the States have failed to allege any facts connecting the other individual Defendants across the alleged individual drug conspiracies in which Heritage participated. *See United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1131 (3d Cir. 1986).

7053807, at \*27 (dismissing overarching conspiracy claim premised on individual conspiracies that involved "different (albeit somewhat overlapping) groups of defendants").  "[W]hile perfect overlap of parties is not necessary" to allege an overarching conspiracy, "the mere overlap of some of defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement." *Auto. Parts*, 2016 WL 8200512, at \*4.

The overlap among the alleged co-conspirators here is far less significant than in *Insurance Brokerage*, where the Third Circuit affirmed dismissal of the overarching conspiracy claims against insurers even though many of the same insurers were allegedly involved in different broker-centered conspiracies.  *See, e.g.*, Second Consolidated Amended Commercial Class Action Compl., *In re Insurance Brokerage Antitrust Litig.*, No. 04-cv-5184 (D.N.J. June 29, 2007) (Dkt. 1240) ¶¶ 95, 157, 201, 236, 262, 326 (implicating many of the same insurer-defendants in multiple broker-centered conspiracies).  The same result is warranted here.

**E.     In failing to allege a common purpose, interdependence, or meaningful overlap in participants, Plaintiffs fail to allege the existence of an overarching conspiracy.**

Notwithstanding their ambitious undertaking, Plaintiffs have failed to allege facts sufficient to support an inference of an overarching conspiracy connecting the discrete and varying single-drug conspiracies they also purport to assert.  They have failed to specify how the success or failure of any individual alleged conspiracy was dependent on the success or failure of any other alleged conspiracy, or all of the other conspiracies.  Similarly, they allege no facts explaining why or how a Defendant that sold only a few drugs would have any interest in an alleged conspiracy to fix prices or allocate customers with respect to products it did not or could not sell.  Nor is there a single well-pled factual allegation supporting an inference that any Defendant was absent from any alleged markets because of an agreement with other defendants, rather than by virtue of not having regulatory clearance, manufacturing capability, or the countless other legitimate reasons

-27-

why any business is in some markets but not others.   Any inference of such an overarching agreement can only, at this point, rest on rank speculation of the type that *Twombly* expressly rejects.

### III.    CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Court dismiss the conspiracy claims in each Overarching Complaint as specified in the Motion to Dismiss and Proposed Order.

Dated:  February 21, 2019


Respectfully submitted,

/s/ Sheron Korpus                                    /s/ Anthony C. Porcelli
Sheron Korpus                                        Anthony C. Porcelli
Seth A. Moskowitz                                    POLSINELLI PC
KASOWITZ BENSON TORRES LLP                           150 N. Riverside Plaza, Suite 3000
1633 Broadway                                        Chicago, IL  60606
New York, New York 10019                             Tel : (312) 819-1900
Tel: (212) 506-1700                                  Fax : (312) 819-1910
Fax: (212) 506-1800                                  aporcelli@polsinelli.com
skorpus@kasowitz.com
smoskowitz@kasowitz.com                              Amy D. Fitts
                                                     POLSINELLI PC
*Counsel for Actavis Pharma, Inc.,*                  900 W. 48th Place, Suite 900
  *Actavis Holdco U.S., Inc.*                        Kansas City, MO 64112
                                                     Tel: (816) 753-1000
                                                     Fax: (816) 222-0425
                                                     afitts@polsinelli.com

                                                     *Counsel for Defendants Akorn, Inc. and*
                                                       *Hi-Tech Pharmacal Co. Inc.*

/s/ James W. Matthews
James W. Matthews
Katy E. Koski
John F. Nagle
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
jmatthews@foley.com
kkoski@foley.com
jnagle@foley.com


James T. McKeown
Elizabeth A. N. Haas
Kate E. Gehl
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Tel: (414) 271-2400
Fax: (414) 297-4900
jmckeown@foley.com
ehaas@foley.com
kgehl@foley.com


Terry M. Henry
Melanie S. Carter
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Tel: (215) 569-5644
Fax: (215) 832-5644
THenry@blankrome.com
MCarter@blankrome.com


*Counsel for Defendant Apotex Corp.*

/s/ W. Gordon Dobie
W. Gordon Dobie
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
wdobie@winston.com


/s/ Irving Wiesen
Irving Wiesen
LAW OFFICES OF IRVING L. WIESEN,
  P.C.
420 Lexington Avenue - Suite 2400
New York, NY 10170
Tel: (212) 381-8774
Fax: (646) 536-3185
iwiesen@wiesenlaw.com


*Counsel for Defendant Ascend Laboratories,
LLC*

/s/  *Wayne A. Mack*
Wayne A. Mack
Sean P. McConnell
Sarah O'Laughlin Kulik
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
Tel: (215) 979-1152
wamack@duanemorris.com
spmcconnell@duanemorris.com
sckulik@duanemorris.com

*Counsel for Defendant*
   *Aurobindo Pharma USA, Inc.*


/s/ *Steven E. Bizar*
Steven E. Bizar
John P. McClam
Tiffany E. Engsell
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
steven.bizar@dechert.com
john.mcclaim@dechert.com
tiffany.engsell@dechert.com

*Counsel for Defendant Citron Pharma LLC*


/s/ *Jeffrey D. Smith*
Jeffrey D. Smith
Thomas A. Abbate
DeCOTIIS, FITZPATRICK, COLE &
GIBLIN, LLP
Glenpointe Centre West
500 Frank W. Burr Blvd.
Teaneck, NJ 07666
Tel: (201) 907-5228
Fax: (201) 928-0588
jsmith@decotiislaw.com
tabbate@decotiislaw.com

*Counsel for Defendant Epic Pharma, LLC*


/s/ *Stacey Anne Mahoney*
Stacey Anne Mahoney
Charles Reitmeyer
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6930
Fax: (212) 309-6001
stacey.mahoney@morganlewis.com
charles.reitmeyer@morganlewis.com

*Counsel for Defendant Breckenridge*
   *Pharmaceutical, Inc.*


/s/ *Roger Kaplan*
Roger Kaplan
Aaron Van Nostrand
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Tel:  (973) 360-7900
Fax: (973) 295-1257
kaplanr@gtlaw.com
vannostranda@gtlaw.com

*Counsel for Defendant*
   *Dr. Reddy's Laboratories, Inc.*


/s/ *Marguerite M. Sullivan*
Marguerite M. Sullivan
Anna M. Rathbun
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com

*Counsel for Defendant G&W Laboratories.*

-31-

/s/  *Steven A. Reed*
Steven A. Reed
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Tel: (215) 963-5603
Fax: (215) 963-5001
steven.reed@morganlewis.com

*Counsel for Defendant*
  *Glenmark Pharmaceuticals Inc., USA*

/s/ *D. Jarrett Arp*
D. Jarrett Arp
Daniel W. Nelson
Melanie L. Katsur
Christopher B. Leach
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., NW
Washington, D.C. 20036-5306
Tel: (202) 955-8678
Fax: (202) 530-9527
jarp@gibsondunn.com
dnelson@gibsondunn.com
mkatsur@gibsondunn.com
cleach@gibsondunn.com

Eric J. Stock
Indraneel Sur
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel:  (212) 351-2474
Fax: (212) 716-0875
estock@gibsondunn.com
isur@gibsondunn.com

*Counsel for Defendant Heritage*
  *Pharmaceuticals Inc.*

/s/ *Raymond A. Jacobsen, Jr.*
Raymond A. Jacobsen, Jr.
Paul M. Thompson (Pa. Bar No. 82017)
Lisa A. Peterson
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, D.C. 20001
Tel. (202) 756-8000
rayjacobsen@mwe.com
pthompson@mwe.com
lpeterson@mwe.com

David L. Hanselman Jr.
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60605
Tel. (312) 984-3610
dhanselman@mwe.com

Nicole L. Castle
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173
Tel. (212) 547-5400
ncastle@mwe.com

*Counsel for Defendant*
   *Impax Laboratories, Inc.*

/s/ *Leiv Blad*
Leiv H. Blad
Zarema A. Jaramillo
Katie R. Glynn
LOWENSTEIN SANDLER LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 753-3800
Fax: (202) 753-3838
lblad@lowenstein.com
zjaramillo@lowenstein.com
kglynn@lowenstein.com

*Counsel for Defendant*
   *Lupin Pharmaceuticals, Inc.*

/s/  *Gerald E. Arth*
Gerald E. Arth
Ryan T. Becker
Evan R. Luce
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Tel: (215) 299-2000
Fax: (215) 299-2150
garth@foxrothschild.com
rbecker@foxrothschild.com
eluce@foxrothschild.com

George G. Gordon
Stephen D. Brown
Julia Chapman
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-2000
Fax: (215) 994-2222
george.gordon@dechert.com
stephen.brown@dechert.com
julia.chapman@dechert.com

*Counsel for Defendant*
*Lannett Company, Inc.*

/s/ *Robert J. Cleary*
Robert J. Cleary
Dietrich L. Snell
David A. Munkittrick
Edward Canter
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
Tel: (212) 969-3000
rjcleary@proskauer.com
dsnell@proskauer.com
dmunkittrick@proskauer.com
ecanter@proskauer.com

*Counsel for Defendant Rajiv Malik*

/s/ Michael Martinez
Michael Martinez
Steven Kowal
Lauren Norris Donahue
Brian J. Smith
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Tel: (312) 372-1121
Fax: (312) 827-8000
michael.martinez@klgates.com
steven.kowal@klgates.com
lauren.donahue@klgates.com
brian.j.smith@klgates.com

*Counsel for Defendant Mayne Pharma Inc.*

/s/ Chul Pak
Chul Pak
Jeffrey C. Bank
WILSON SONSINI GOODRICH & ROSATI, PC
1301 Avenue of the Americas
40th Floor
New York, New York  10019
Tel: (212) 497-7726
Fax: (212) 999-5899
cpak@wsgr.com
jbank@wsgr.com

Seth C. Silber
WILSON SONSINI GOODRICH & ROSATI, PC
1700 K Street, NW
Fifth Floor
Washington, DC  20006
Tel: (202) 973-8824
Fax: (202) 973-8899
ssilber@wsgr.com

Adam K. Levin
Benjamin F. Holt
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
adam.levin@hoganlovells.com
benjamin.holt@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendants Mylan Inc,.
Mylan Pharmaceuticals, Inc., UDL
Laboratories, Inc., and Mylan N.V*

-34-

/s/ John E. Schmidtlein
_____
John E. Schmidtlein (admitted *pro hac vice*)
Sarah F. Teich (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
jschmidtlein@wc.com
steich@wc.com

*Counsel for Defendant*
  *Par Pharmaceutical, Inc.*

/s/ Scott A. Stempel
_____
Scott A. Stempel
J. Clayton Everett, Jr.
Tracey F. Milich (Pa. ID No. 316753)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: (202) 739-3000
Fax: (202) 739-3001
scott.stempel@morganlewis.com
clay.everett@morganlewis.com
tracey.milich@morganlewis.com

Harvey Bartle IV. (Pa. ID No. 91566)
Francis A. DeSimone, (Pa. ID No. 320837)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
harvey.bartle@morganlewis.com
frank.desimone@morganlewis.com

*Counsel for Defendant Perrigo New York, Inc.*

/s/ Saul P. Morgenstern
Saul P. Morgenstern
Margaret A. Rogers
Alice C.C. Huling
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
saul.morgenstern@apks.com
margaret.rogers@apks.com
alice.huling@apks.com

Laura S. Shores
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 942-5000
Fax: (202) 942-5999
laura.shores@apks.com

Abby L. Sacunas (200081)
Peter M. Ryan (81816)
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA  19103
Tel: (215) 665-4785
Fax: (215) 701 2472
asacunas@cozen.com
pryan@cozen.com

*Counsel for Defendants Sandoz Inc. and
  Fougera Pharmaceuticals Inc.*

/s/  J. Douglas Baldridge
J. Douglas Baldridge
Lisa Jose Fales
Danielle R. Foley
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Tel: (202) 344-4000
jbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com

Thomas J. Welling, Jr.
Benjamin P. Argyle
VENABLE LLP
1270 Avenue of the Americas
24th Floor
New York, New York 10020
Tel: (212) 307-5500
tjwelling@venable.com
bpargyle@venable.com

*Counsel for Defendants
  Sun Pharmaceutical Industries, Inc., Taro
  Pharmaceuticals U.S.A., Inc., Taro
  Pharmaceutical Industries Ltd., and Mutual
  Pharmaceutical Company, Inc.*

/s/  *Heather K. McDevitt*
_____
Heather K. McDevitt
Bryan D. Gant
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 819-8200
Fax: (212) 354-8113
hmcdevitt@whitecase.com
bgant@whitecase.com

*Counsel for Defendant Teligent, Inc.*

*s/ J. Gordon Cooney, Jr.*
_____
J. Gordon Cooney, Jr.
John J. Pease, III
Alison Tanchyk
William T. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
jgcooney@morganlewis.com
john.pease@morganlewis.com
alison.tanchyk@morganlewis.com
william.mcenroe@morganlewis.com

Amanda B. Robinson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 739-3000
Fax: (202) 739-3001
amanda.robinson@morganlewis.com

*s/ Jan P. Levine*
_____
Jan P. Levine
Robin P. Sumner
Michael J. Hartman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:  (215) 981-4000
Fax:  (215) 981-4750
levinej@pepperlaw.com
sumnerr@pepperlaw.com
hartmanm@pepperlaw.com

*Counsel for Defendant*
  *Teva Pharmaceuticals USA, Inc*

| | |
|---|---|
| */s/ Devora W. Allon* | s/  *Robin D. Adelstein* |
| Jay P. Lefkowitz, P.C. | Robin D. Adelstein |
| Devora W. Allon | Mark A. Robertson |
| Alexia R. Brancato | Gerald A. Stein |
| Erin H. Ogburn | Matthew C. Lamb |
| KIRKLAND & ELLIS LLP | NORTON ROSE FULBRIGHT US LLP |
| 601 Lexington Avenue | 1301 Avenue of the Americas |
| New York, NY 10022-4611 | New York, NY 10019-6022 |
| Tel:  (212) 446-4800 | Tel:  (212) 318-3000 |
| Fax:  (212) 446-6460 | Fax:  (212) 318-3400 |
| jay.lefkowitz@kirkland.com | robin.adelstein@nortonrosefulbright.com |
| devora.allon@kirkland.com | mark.robertson@nortonrosefulbright.com |
| alexia.brancato@kirkland.com | gerald.stein@nortonrosefulbright.com |
| erin.ogburn@kirkland.com | matthew.lamb@nortonrosefulbright.com |

*Counsel for Defendant Upsher-Smith
   Laboratories, LLC*

*Counsel for Defendants Valeant
   PharmaceuticalsNorth America LLC,
   Valeant Pharmaceuticals International, and
   Oceanside Pharmaceuticals, Inc.*

*/s/ Jan P. Levine*
Jan P. Levine
Robin P. Sumner
Michael J. Hartman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:  (215) 981-4000
Fax:  (215) 981-4750
levinej@pepperlaw.com
sumnerr@pepperlaw.com
hartmanm@pepperlaw.com


Keith J. Harrison
Shari Ross Lahlou
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
Tel. (202) 624-2500
Fax. (202) 624-5116
kharrison@crowell.com
slahlou@crowell.com


*Counsel for Defendant West-Ward*
   *Pharmaceuticals Corp.*


*/s/ Jason R. Parish*
Jason R. Parish
Bradley J. Kitlowski
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW
Washington, D.C. 20006
Tel:  (202) 452-7900
Fax:  (202) 452-7989


*Counsel for Defendant Zydus Pharmaceuticals*
*(USA), Inc.*

*/s/ William A. Escobar*
William A. Escobar
Damon W. Suden
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897
wescobar@kelleydrye.com
dsuden@kelleydrye.com


*Counsel for Defendants Wockhardt USA LLC*
   *and Morton Grove Pharmaceuticals Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 21st day of February 2019, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's ECF System.  Notice of this filing will be sent to all counsel of record by operation of the ECF System.

/s/  *Julia Chapman*
Julia Chapman

Dated:        February 21, 2019

1