# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:** | **Civil Action Nos.** |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc., et al.* | **18-CV-02641** |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | **18-CV-00284** |
| *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | **18-CV-3299** |
| | **ORAL ARGUMENT REQUESTED** |

**DEFENDANT IMPAX LABORATORIES, INC.'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO DISMISS DIRECT PURCHASERS'
FIRST AMENDED CLASS ACTION COMPLAINT AND COUNT
TWENTY-THREE OF KROGER PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

SUMMARY OF ALLEGATIONS ........................................................................ 2

ARGUMENT ....................................................................................................... 4

    I.     DPPS FAIL TO AVER FACTS FROM WHICH THE COURT MAY
          PLAUSIBLY INFER IMPAX'S PARTICIPATION IN AN ALLEGED
          INDUSTRY-WIDE MARKET ALLOCATION CONSPIRACY ........................ 4

    II.    DPPS' AND KROGER PLAINTIFFS' CLAIMS RELATING TO
          METRONIDAZOLE JELLY FAIL AS A MATTER OF LAW. .......................... 9

        A.     DPPs and Kroger Plaintiffs Fail To Sufficiently Plead That Impax
                Joined an Alleged Conspiracy To Increase the Price of
                Metronidazole Jelly. ............................................................................ 10

               1.     Impax's Alleged Pricing Conduct Was Consistent with
                        Competition. .......................................................................... 10

               2.     Plaintiffs Do Not Plausibly Allege Facts Implying a
                        Traditional Conspiracy. ......................................................... 12

        B.     Plaintiffs' Metronidazole Jelly Claims Are Barred by the Statute of
                Limitations. ......................................................................................... 13

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................ *passim*

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
  239 F. Supp. 2d 550 (E.D. Pa. 2002) ........................................................5

*City of Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256, 259 (3d Cir. 1998) ............................................................15

*In re Aspartame Antitrust Litig.*,
  416 F. App'x 208 (3d Cir. 2011) .......................................................13, 14

*In re Automotive Parts Antitrust Litig.*,
  2016 WL 8200512 (E.D. Mich. April 13, 2016) .......................................7

*In re Generic Pharm. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ....................................4, 11, 12, 13

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) .................................................7, 8, 10, 12

*In re Processed Egg Prods. Antitrust Litig.*,
  821 F. Supp. 2d. 709 ................................................................................6

*In re Processed Egg Prods. Antitrust Litig.*,
  2011 WL 5980001 (E.D. Pa. Nov. 30, 2011) ...................................13, 14

*In re Publ'n Paper Antitrust Litig.*,
  2005 WL 2175139 (D. Conn. Sept. 7, 2005) ..........................................14

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ...................................................................10

*In re Wellbutrin SR/Zyban Antitrust Litig.*,
  281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) .......................................15

*Mathews v. Kidder, Peabody & Co.*,
  260 F.3d 239 (3d Cir. 2001) ....................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 587 (1986) ............................................................................5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
  38 F.3d 1380 (3d Cir. 1994)..................................................................13

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .......................................7, 8

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*,
  738 F. Supp. 2d 505 (D. Del. 2010), *amended on other grounds by* 2010 WL
  11470613 (D. Del. Dec. 1, 2010)...........................................................13

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017)...................................................................10

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) ...............................................................................13

**Rules**

Fed. R. Evid. 201(b)(2) ...............................................................................15

**Statutes**

15 U.S.C. § 15b............................................................................................13

**Other Authorities**

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed.
  2005) .....................................................................................................10

Don E. Waldman & Elizabeth J. Jensen, *Industrial Organization Theory and
  Practice* (3d ed. 2007)...........................................................................10

Frederic M. Scherer & David Ross, *Industrial Market Structure and Economic
  Performance* (3d ed. 1990) ...................................................................10

Michael J. de la Merced, *Novartis to Buy Fougera Pharmaceuticals for $1.5
  billion*, N.Y. TIMES (May 2, 2012, 5:17 PM).........................................12

Michael L. Katz & Harvey S. Rosen, *Microeconomics* (1991) .........................5

Novartis AG, ___ F.T.C. ___ (2012), 2012 FTC LEXIS 148 .................................3, 12

## INTRODUCTION

Impax Laboratories, Inc. files this brief to highlight why Direct Purchaser Plaintiffs' allegation that Impax participated in a broad conspiracy to allocate markets in the generic pharmaceutical industry is implausible and inadequate. A few basic questions make this evident. Why would Impax conspire with 18 other Defendants to divvy up markets for a host of drugs that Impax did not and legally could not sell? Why would other manufacturers agree to conspire with Impax, which could not offer a quid pro quo because it lacked the regulatory approval to sell nearly all of the drugs named in DPPs' complaint? When and where did Impax join the alleged conspiracy? With which other Defendants did it conspire? In which markets did Impax agree not to compete? None of these questions is answered in DPPs' complaint, which contains only a handful of allegations relating to Impax.

To satisfy their burden under Rule 12(b)(6), DPPs must plead specific facts to show that Impax's agreement to participate in the alleged megaconspiracy is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). There is no case to Impax's knowledge that supports maintaining a cause of action against Impax based on such a broad conspiracy. Taken as a whole, DPPs' complaint alleges separate conspiracies involving different products, different suppliers, and different time periods. But the factual allegations against Impax are limited to a single drug – metronidazole jelly. Regarding that drug, Impax's alleged conduct undermines any inference that it joined an industry-wide market allocation agreement. Impax *entered* the metronidazole jelly market through a Federal Trade Commission divestiture ■ months after three other Defendants increased their prices. Its entry enabled the market to retain the same number of competitors and, as a result, was pro-competitive. Impax entered the market at prevailing market prices, just as economic theory would predict, and after Impax entered, prices ███████████.

Even if DPPs had plausibly alleged a conspiracy as to that one drug, it strains credulity to say that that agreement was part of a larger conspiracy involving manufacturers and drugs that had no bearing on Impax's business. There are no allegations that Impax allocated markets across multiple drugs. There are no allegations that Impax communicated with any other Defendant regarding any drug, let alone multiple drugs. Apart from their sweeping statement that "Defendants" participated in "an industry-wide, overarching 'fair-share' conspiracy," DPPs' complaint does not provide a single specific allegation as to Impax's alleged conduct in furtherance of such a conspiracy. In short, even if a conspiracy this complex were theoretically possible, DPPs' complaint is devoid of any facts sufficient to show that Impax agreed and adhered to a code of conduct to allocate markets across multiple drugs. Because DPPs' allegations that Impax participated in a broader conspiracy are not even conceivable, let alone plausible, they fall far short of meeting DPPs' burden under *Twombly* and must be dismissed.

## SUMMARY OF ALLEGATIONS

DPPs allege that Impax and 18 other generic pharmaceutical companies entered into an "industry-wide, overarching 'fair share' conspiracy" to fix prices and allocate markets for 21 generic drugs. DPP Compl. ¶¶ 3-4, 9. According to DPPs, under the alleged agreement, "each generic drug manufacturer was entitled to its fair share of the generic drug industry 'sandbox.'" *Id.* ¶ 9. DPPs do not define what was in the alleged "sandbox" or specify what Impax's share of the alleged sandbox was. Rather, they allege that, "[g]enerally speaking," each Defendant's share was determined by the timing of market entry, the number of competitors, and relationships between Defendants concerning other drugs. *Id.* ¶ 10. The alleged agreement was governed by "rules of the road." *Id.* ¶ 15. The complaint does not describe the rules or allege that Impax agreed to or was aware of them.

The complaint's allegations against Impax are limited to a single drug – metronidazole

-2-

jelly. *Id.* ¶¶ 280-85.[1] Metronidazole is a generic antibiotic offered in several different formulations. DPP Compl. ¶ 273; Kroger Compl. ¶ 655. ████████████████████ ███████████████████████████████████████ DPP Compl. ¶ 280; Kroger Compl. ¶ 659. According to Plaintiffs, in ██████████████████████████████████ ████████████████████████ DPP Compl. ¶ 281; Kroger Compl. ¶ 660. Plaintiffs acknowledge that Impax was not in the market at the time, but rather ████████████████████ DPP Compl. ¶ 281; Kroger Compl. ¶ 660. In fact, Impax acquired the right to sell metronidazole jelly, along with a package of ten other products, on July 16, 2012, pursuant to an FTC divestiture order when Novartis AG acquired Fougera Holdings, Inc. Novartis AG, ___ F.T.C. ___ (2012), 2012 FTC LEXIS 148.[2] Impax began selling metronidazole jelly in █████████. *See* DPP Compl. ¶ 281. Plaintiffs do not allege that Impax was part of the alleged agreement that resulted in the price increase in ████████ Rather, they allege only that Impax ████████████ the prices that existed when it started selling metronidazole jelly █ months later. DPP Compl. ¶ 281; Kroger Compl. ¶ 660. Following Impax's entry, metronidazole jelly prices █████████ ████████. DPP Compl. ¶ 281.

DPPs allege that the metronidazole jelly price increase occurred shortly after trade association meetings where representatives from G&W, Impax, Sandoz, and Teva were in attendance. DPP Compl. ¶ 283. But of the six trade association meetings DPPs list, five took place before Impax was legally permitted to sell metronidazole jelly or even knew it would be

---

[1]   DPPs have withdrawn their allegations that Impax sold glyburide-metformin.

[2]   *See also* Press Release, Impax Laboratories, Inc., Impax Laboratories Enters Into Development, Supply and Distribution Agreement with TOLMAR, Inc. (June 26, 2012) https://investors.impaxlabs. com/news/press-releases/press-release-details/2012/Impax-Laboratories-Enters-Into-Development-Supply-and-Distribution-Agreement-with-TOLMAR-Inc/default.aspx (noting that Impax and Tolmar, Inc. entered into an agreement to commercialize 11 approved and pending products).

acquiring the rights to the product. *Id*. As to the sixth, an NACDS Pharmacy and Technology Conference in August 2012, the only individual from Impax that DPPs allege attended this meeting was Doug Boothe. *Id*. Ex. D. However, Mr. Boothe did not start working for Impax until August 1, 2016.[3] DPPs also do not allege that G&W attended this meeting. *Id*. Kroger Plaintiffs allege that the price increases on all formulations of metronidazole took place through in-person discussions at a different series of trade association meetings. Kroger Compl. ¶¶ 672-78. Of the meetings that Kroger Plaintiffs claim facilitated the price increases on metronidazole, Impax is only alleged to have attended one such meeting prior to entering the market for metronidazole jelly. *Id*. ¶¶ 673-75. This meeting took place before Impax acquired the right to sell the product, *id*. ¶ 675, and the representative that allegedly attended on Impax's behalf did not work at Impax until four years later. *See supra* note 3.

## ARGUMENT

## I.      DPPS FAIL TO AVER FACTS FROM WHICH THE COURT MAY PLAUSIBLY INFER IMPAX'S PARTICIPATION IN AN ALLEGED INDUSTRY-WIDE MARKET ALLOCATION CONSPIRACY.

DPPs allege that 19 generic drug suppliers, all of which sold different portfolios of drugs, entered into a single, industry-wide agreement to allocate the markets for an even greater number of drugs. Impax joins in and incorporates by reference Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims. DPPs' complaint must also be dismissed as to Impax because it lacks any well-pleaded facts tying *Impax* to any such conspiracy. The complaint suffers from five fundamental deficiencies.

---

[3]     *See* Impax Labs., Inc., Current Report (Form 8-K) (July 21, 2016); *see also* DPP Compl. Ex. E (alleging that Mr. Boothe represented Actavis on the Generic Pharmaceutical Association (GPhA) board in "2012 and prior" and represented Perrigo on that board in "2013 and after"); *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 444 (E.D. Pa. 2018) (stating same).

*First*, neither DPPs' industry-wide market allocation theory nor Impax's alleged participation in it is "plausible on its face." *Twombly*, 550 U.S. at 570. DPPs allege a conspiracy involving 19 different generic drug suppliers and 21 drugs. Some Defendants sold as many as 13 different drugs. *See* DPP. Compl. ¶¶ 150, 171, 194, 218, 232, 247, 261, 302, 347, 379, 392, 410, 431 (alleging that Heritage sold 13 different generic drugs). Others, like Zydus, Glenmark, Apotex, Impax, and Valeant, sold only one. *See id.* ¶¶ 150, 194, 247, 280, 292. As DPPs admit, pharmaceutical pricing is complex. *See, e.g.*, *id.* ¶ 98 (alleging that, unlike a typical consumer product, prescription drug pricing "is often set in reference to reimbursement agreements between . . . health plans and their prescription benefit managers[] and the pharmacies that dispense drugs to the payers' insured customers"); *id.* ¶ 103 (alleging "MAC pricing is neither uniform nor transparent, and it may be subject to frequent changes"). A market allocation conspiracy involving this many diverse competitors, non-overlapping products, and complex pricing mechanisms is not economically plausible. *See, e.g.*, Michael L. Katz & Harvey S. Rosen, *Microeconomics* 563, 565 (1991) (observing that "[t]he more firms in a market, the less likely is cooperation" and "the more complex the collusive agreement has to be, the less likely it is to succeed").

Against this economic landscape, it would have made "no economic sense" for Impax to participate in the industry-wide market allocation agreement alleged in the DPP complaint. *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563 (E.D. Pa. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 587 (1986)). For example:

- DPPs allege that the industry-wide market allocation agreement was in effect by 2011. DPP Compl. ¶ 122. Impax is not alleged to have sold *any* of the drugs in the DPP complaint in 2011.

- Impax is only alleged to have sold *one drug* that was the subject of the 21-drug market allocation agreement. *Id*. ¶ 280. The suppliers of drugs that Impax did not sell (15 of the 19 Defendants in the case) would have no economic motive to enter into a market allocation agreement with Impax.

- The complaint alleges that Impax was a market *entrant*. *Id*. ¶¶ 280-81. Its conduct was the opposite of market allocation.

- Impax was not legally or physically capable of manufacturing all or even a small proportion of the other products that were the subject of the alleged conspiracy.[4]

**Second**, the complaint fails to "plausibly suggest that [Impax] actually joined and participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011). DPPs' complaint mentions Impax in just 10 of its 515 paragraphs. DPP Compl. ¶¶ 4, 29, 56, 130, 272, 280 & n.49, 281, 283, 285, 296. The allegations against Impax involve only *single-drug conduct*. *Id*. ¶¶ 280 & n.49, 281, 283, 285. Of the handful of paragraphs that mentions Impax, not a single one contains factual allegations regarding Impax's involvement in the purported "Fair Share Agreement." In fact, there are no allegations against Impax pertaining to *any* drug other than metronidazole jelly. DPPs attempt to tie an alleged price-fixing conspiracy involving that single drug into an overarching conspiracy through the boilerplate allegation that it "was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs," DPP Compl. ¶ 279. DPPs must plead more than this to create a plausible inference that Impax joined the alleged agreement to allocate markets for 21 drugs. *See*

---

[4]    While DPPs' drug-specific complaints describe in detail the regulatory and economic barriers to entering new markets, *see, e.g.*, DPP Digoxin Compl. ¶ 218(3), this factor is conspicuously absent from this complaint. *See* DPP Compl. Ex. F (summarizing economic factors in generic drug industry but omitting barriers to entry).

*Processed Egg Prods.*, 821 F. Supp. 2d at 720 ("The Court properly looks for more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy. . . . Conclusory, collective language is too convenient, too undisciplined, and too unfocused in light of exposures to litigation expense and disruption (even without ultimate liability) that are so great in antitrust (and other) cases."). Rather, to state a multi-drug conspiracy claim, DPPs must allege facts showing Impax "was aware of and agreed to the essential purpose *of the overarching conspiracy*." *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *30 (E.D.N.Y. Jan. 4, 2011) (emphasis added) (citation omitted). They have not done so.

In this regard, *In re Automotive Parts Antitrust Litigation,* 2016 WL 8200512 (E.D. Mich. April 13, 2016), is on point. That case involved a motion by a class of indirect purchasers to file an amended complaint alleging a "'macro,' industry-wide conspiracy" involving 18 different auto parts and 28 different groups of defendants. *Id*. at *2-3. The court denied the motion, noting that plaintiffs "must allege facts creating at least an inference as to each Defendant's knowing participation in a conspiracy to raise, fix, maintain or stabilize the price of auto parts, not just the parts it makes or sells." *Id.* at *4. The court found that plaintiffs had not met this burden, where "[t]here are no allegations in the [complaints] of deals between makers of different component parts, and no inference arises of knowledge outside of each Defendant['s] own specific deals [; t]here are no allegations that Defendants competed for the sales of all eighteen parts[; and t]here are no allegations to support that each Defendant knew of other Defendants' conduct for other products." *Id.* In ruling on plaintiffs' accompanying motion to consolidate, the court noted that "[c]onsolidation would be unfairly prejudicial to the eighteen Defendants who are parties in

only one or two of the eighteen Relevant Cases." *Id.* at \*2.

      *Third*, the complaint's statements of facts do not "suggest an entitlement to relief *under the legal theory invoked*." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 320 n.18 (3d Cir. 2010) (emphasis added). According to DPPs' theory, "if a generic manufacturer is the first to enter with a particular generic drug then it is entitled to a larger share of the market; conversely, generic manufacturers that enter later are typically entitled to a smaller share." DPP Compl. ¶ 10. DPPs attempt to turn this theory into an industry-wide conspiracy spanning dozens of drugs by alleging that "achieving a fair share as to one generic drug *could* involve horse trading across other generic drugs." *Id.* ¶ 17 (emphasis added). For instance, they say that a "generic drug manufacturer[] *might* give up customers on one generic drug based as a quid pro quo for customers from other generic drug manufacturers on a different generic drug." *Id.* (emphasis added). The Federal Rules authorize pleading in the alternative, not in the hypothetical. DPPs do not allege any facts to suggest that Impax actually engaged in this conduct. For example, the complaint fails to allege that Impax gave up market share on another drug to G&W, Sandoz, or Teva in exchange for market share on metronidazole jelly. DPPs' allegation that Impax *entered* into the metronidazole jelly market is inconsistent with a market allocation theory, absent an allegation that Impax's entry was conditioned upon its agreement to forego sales or customers on other drugs. DPPs' complaint contains no such allegation involving Impax.

      *Fourth*, given the implausibility of the alleged conspiracy, DPPs' claims "demand relatively more factual detail to satisfy [*Twombly*'s pleading] standard." *Ins. Brokerage*, 618 F.3d at 320 n.18. But the complaint fails to describe when or where Impax joined the alleged industry-wide market allocation agreement, which Impax employee entered into the alleged agreement, who Impax communicated with, which drugs the agreement covered, or what the terms of the

agreement were. *See Twombly*, 550 U.S. at 565 n.10 ("[T]he complaint here furnishes no clue as to which of the four [Incumbent Local Exchange Carriers] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."); *Precision Assocs.*, 2011 WL 7053807, at *27 ("The Complaint is silent as to how, when, or where these sixty-five defendants or the conduct identified in the 10 local conspiracy claims became connected to each other into one global conspiracy connected by common actors, methods and goals.").

*Fifth*, DPPs' complaint – like State Plaintiffs' complaint on which it is based – arises out of the guilty pleas of former Heritage executives Jeffrey Glazer and Jason Malek. DPP Compl. ¶¶ 3, 5. The complaint even refers to itself as "DPPs' Heritage-Related Multi-Drug Complaint." *Id*. ¶ 3. Yet State Plaintiffs do not name Impax as a defendant. The reason for this is that Heritage sold *every* drug in State Plaintiffs' complaint, while Impax did not sell *any*. Not surprisingly then, DPPs' complaint does not allege that Impax and Heritage ever agreed to stay out of each other's markets or that Impax and Heritage communicated at all. Impax, quite simply, does not belong in this complaint.

## II.    DPPS' AND KROGER PLAINTIFFS' CLAIMS RELATING TO METRONIDAZOLE JELLY FAIL AS A MATTER OF LAW.

In an effort to implicate Impax in the purported "Heritage-Related" conspiracy, DPPs added the generic drug metronidazole to their complaint. The fundamental problem DPPs face, however, is that Heritage did not sell any formulation of metronidazole. DPP Compl. ¶¶ 272. With the exception of Kroger Plaintiffs, *see* Kroger Compl. ¶¶ 659-62, 1002-09, no other plaintiff has sued Impax with regard to this drug. *See* DPP Compl. Ex. A. The reasons why no other plaintiff has sued Impax regarding metronidazole are obvious – first, there is no factual basis for the claim that Impax conspired to increase the price of this drug, and second, any claim based upon the alleged price increase is time-barred.

A.     **DPPs and Kroger Plaintiffs Fail To Sufficiently Plead That Impax Joined an Alleged Conspiracy To Increase the Price of Metronidazole Jelly.**

1.     **Impax's Alleged Pricing Conduct Was Consistent with Competition.**

"*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *Ins. Brokerage*, 618 F.3d at 326 (internal quotations omitted). In this case, Plaintiffs admit that Impax was not in the market when ███████████████ allegedly increased prices. DPP Compl. ¶¶ 280-81; Kroger Compl. ¶¶ 659-60. In fact, it did not enter the market until ██ months later. *See* DPP Compl. ¶ 281. When it entered the market, Impax ███████ ████████ then-prevailing prices. *Id.*; Kroger Compl. ¶ 660.

The DPP and Kroger complaints fail as a matter of law because Impax did what any entrant would do in a concentrated market. When a fringe firm enters a market with a dominant price setter (or price setters) in a highly concentrated market, it will enter the market as a "price taker" at the then-established market price, rather than upset the prices established by the dominant firms. Don E. Waldman & Elizabeth J. Jensen, *Industrial Organization Theory and Practice* 143-49 (3d ed. 2007); Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 110 (4th ed. 2005); Frederic M. Scherer & David Ross, *Industrial Market Structure and Economic Performance* 221-26, 356-57 (3d ed. 1990); *see also, e.g.*, *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017) ("A firm is unlikely to lower its price in an effort to win market share because its competitors will quickly learn of that reduction and match it, causing the first mover's profits to decline and a subsequent decline in the overall profits of the industry.") (citation omitted). If anything, Impax's entry was pro-competitive. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874 (7th Cir. 2015) (observing that

penalizing "entry into concentrated markets [at] . . . the prevailing market price" under the Sherman Act would be a "perverse . . . antitrust doctrine" that would "discourage[] new entry into highly concentrated markets"). DPPs' own pricing data confirms this: metronidazole jelly prices ███████ after Impax entered the market. *See* DPP Compl. ¶ 281.

"[G]iven the time lapse" between the price increases of the other Defendants and Impax's entry, the pricing allegations against Impax are "insufficient to aver parallel conduct." *Generic Pharm.*, 338 F. Supp. 3d at 444. In its order on the Group 1 motions to dismiss, the Court considered whether "'late' Defendants' pricing behavior [that] essentially matched that of . . . other Defendants" was sufficient to plead parallel conduct and found that this was a "close[] question" in the case of Perrigo and Actavis. *Id*. at 443. The pricing allegations against Impax are weaker than those involving Perrigo and Actavis in several respects and merit a different outcome. First, unlike Perrigo, Impax was a new entrant. *Compare* DPP Compl. ¶ 281 (Impax entered the market at prices previously established by incumbent competitors) *with* DPP Clobetasol Compl. ¶ 72 (Perrigo sold clobetasol gel for years before prices increased). Second, although Actavis was a new entrant, in Impax's case the time interval between the alleged price increase and entry was nearly double. *Compare* DPP Compl. ¶ 281 (Impax entered the market for metronidazole jelly ██ months after three other Defendants increased prices) *with* DPP Clobetasol Compl. ¶ 72 (Actavis entered the market for clobetasol cream nine months after incumbents increased prices). Third, Impax entered the market at a price that was ███████ ████████████████████████████████████████████████ ███████████████ what it considered to be the established market price. *Compare* DPP Compl. ¶ 281 *with* DPP Clobetasol Compl. ¶ 72.[5] Fourth, in contrast to Perrigo and Actavis, which had

---

[5]    This fact is important because it implies that Impax did not communicate with the existing suppliers of metronidazole jelly about price.

their own ANDAs and could control their entry, Impax had little discretion regarding its entry for metronidazole jelly, which occurred pursuant to an FTC divestiture order. The divestiture was heavily regulated and included an interim monitor to ensure compliance with the order.[6] Fifth, in contrast to Perrigo and Actavis, neither DPPs nor Kroger Plaintiffs allege that "representatives from [Impax] attended GPhA, NACDS, and other meetings during the time of the [metronidazole jelly] price increases." *Generic Pharm.*, 338 F. Supp. 3d at 444; *supra* note 3.

### 2. Plaintiffs Do Not Plausibly Allege Facts Implying a Traditional Conspiracy.

DPPs' and Kroger Plaintiffs' complaints fail to allege facts "implying a traditional conspiracy" that involved Impax. *Ins. Brokerage*, 618 F.3d at 322 (citation omitted). First, "[t]here are no allegations that [Impax] representatives attended any industry-sponsored social gatherings." *Generic Pharm.*, 338 F. Supp. 3d at 451. DPPs allege only that Impax attended three trade association meetings before it started selling metronidazole jelly. DPP Compl. ¶ 283 & Ex. D. Kroger Plaintiffs allege only that Impax attended one. Kroger Compl. ¶ 675 & Ex. 3. But both complaints mistakenly name Doug Boothe, who did not work for Impax until 2016, as the only Impax representative in attendance at these meetings. *See supra* note 3. The alleged meetings are insufficient to draw an inference of conspiracy for an independent reason – Impax could not legally sell metronidazole jelly until after July 16, 2012.[7]

---

[6]   *See* Press Release, FED. TRADE COMM'N, FTC Puts Conditions on Novartis AG's Acquisition of Fougera Holdings, Inc. (July 16, 2012), https://www.ftc.gov/news-events/press-releases/2012/07/ftc-puts-conditions-novartis-ags-acquisition-fougera-holdings-inc.

[7]   *See* Novartis AG, ___ F.T.C. ___ (2012), 2012 FTC LEXIS 148; *see also supra* note 2. Impax could not even have known that this product was available until May 2, 2012, at the earliest, when Novartis publicly announced its agreement to buy Fougera. *See, e.g.*, Michael J. de la Merced, *Novartis to Buy Fougera Pharmaceuticals for $1.5 billion*, N.Y. TIMES, (May 2, 2012, 5:17 PM), https://dealbook.nytimes.com/2012/05/02/novartis-to-buy-fougera-pharmaceuticals-for-1-5-billion/. This renders irrelevant five of the six trade association meetings alleged by DPPs and the only trade association meeting alleged by Kroger Plaintiffs. DPP Compl. ¶ 283; Kroger Compl. ¶ 675.

Second, the Court should not draw any inferences against Impax from Plaintiffs'
"government investigation and guilty plea allegations," *Generic Pharm.*, 338 F. Supp. 3d at 451,
because all of the government's requests for information from Impax pertained to drugs other
than metronidazole jelly. DPP Digoxin Compl. ¶¶ 197 & nn.59-60, 198 & n.61 (noting that the
Connecticut Attorney General subpoena was limited to digoxin, while the Department of Justice
subpoena concerned four drugs but not metronidazole jelly). Under these circumstances, even at
the motion to dismiss stage, "proof of the mere occurrence of the [government] investigation[s]
is equally consistent with [Impax's] innocence." *Superior Offshore Int'l, Inc. v. Bristow Grp.,
Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) (citation omitted), *amended on other grounds by*
2010 WL 11470613 (D. Del. Dec. 1, 2010). The alleged "web of connection between Heritage
and other . . . Defendants," *Generic Pharm.*, 338 F. Supp. 3d at 453, is irrelevant as to Impax,
which is not alleged to have sold any products that Heritage sold or had any communications
with Heritage.

### B.      Plaintiffs' Metronidazole Jelly Claims Are Barred by the Statute of Limitations.

A district court can dismiss a claim on statute of limitations grounds under Rule 12(b)(6)
"where the complaint facially shows noncompliance with the limitations period and the
affirmative defense clearly appears on the fact of the pleading." *In re Processed Egg Prods.
Antitrust Litig.*, 2011 WL 5980001, at *2 (E.D. Pa. Nov. 30, 2011) (quoting *Oshiver v. Levin,
Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)). Sherman Act claims are
subject to a four-year statute of limitations. 15 U.S.C. § 15b. In a price-fixing case, the cause of
action accrues at the time of the alleged price increase. *Zenith Radio Corp. v. Hazeltine
Research, Inc.*, 401 U.S. 321, 338 (1971) ("Generally, a cause of action accrues and the statute
begins to run when a defendant commits an act that injures a plaintiff's business.") (internal

citations omitted); *In re Aspartame Antitrust Litig.*, 416 F. App'x 208, 211 (3d Cir. 2011) ("A plaintiff suffers antitrust injury by purchasing a product whose price was anticompetitively fixed.") (citation omitted).

Here, Plaintiffs allege that ███████████████ increased prices on metronidazole jelly in 2011, with Impax ███████████. DPP Compl. ¶ 280-81; Kroger Compl. ¶¶ 659-60. DPPs did not file their complaint until June 22, 2018, and Kroger Plaintiffs did not include metronidazole jelly in their complaint until December 21, 2018, each well more than four years after the alleged price increases. Plaintiffs' metronidazole claims are therefore time-barred.

DPPs allege that the statute of limitations was tolled because "Plaintiffs had no actual or constructive knowledge of . . . the collusion herein, or of the facts sufficient to place them on inquiry notice of the claims" until "Defendants' disclosures of the existence of government investigations and subpoenas." DPP Compl. ¶ 495. Similarly, Kroger Plaintiffs allege that they "did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims." Kroger Compl. ¶ 804. Neither allegation tolls the statute of limitations in an antitrust case. *See Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 246 n.8 (3d Cir. 2001) (noting that RICO claims benefit from the more lenient "injury discovery" rule, while antitrust claims are governed by "the less plaintiff-friendly 'injury occurrence' accrual rule"); *Processed Egg Prods.*, 2011 WL 5980001, at *11 (rejecting allegations similar to Plaintiffs' here as "essentially conclusory" and granting motion to dismiss on statute of limitations grounds). Further, since Plaintiffs were ***direct purchasers*** of metronidazole jelly, this allegation is implausible. *See, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *4 (D. Conn. Sept. 7, 2005) (dismissing claims as time-barred because

"there is nothing in the complaint that indicates why the plaintiffs, on hearing the price increase announcements, would have been misled"). The alleged price increases occurred in plain sight, and Plaintiffs knew what they were paying for metronidazole at each moment in time. *See Aspartame*, 416 F. App'x at 212 ("Although these warnings were not particularly ominous, they certainly required plaintiffs to do *something*.").[8]

## CONCLUSION

To survive a motion to dismiss, DPPs must sufficiently plead *both* that Impax was involved in a drug-specific conspiracy as to metronidazole jelly *and* that this conspiracy was part of a larger overarching conspiracy as to the entire generic drug industry. DPPs have not done either. Impax is aware of no case that would permit a defendant to be held liable for market allocation involving dozens of products in the absence of an allegation that it entered into an agreement with other defendants not to sell those products. Because Impax's alleged conduct with respect to metronidazole jelly was consistent with competition, not market allocation, the Court should dismiss the DPP complaint in its entirety and Count 23 of the Kroger complaint, with prejudice, as to Impax.

---

[8]    DPPs' complaint makes clear that DPPs had notice of the alleged "dramatic and unprecedented acquisition price spikes for generic drugs" more than four years before they filed their complaint. Letter from B. Douglas Hoey, CEO, NCPA, to Sens. Tom Harkin & Lamar Alexander and Reps. Fred Upton & Henry Waxman (Jan. 8, 2014), https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf (referenced in *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say,* NCPA (Jan. 8, 2014), *cited in* DPP Compl. Ex. B at 1 n.1). At least one DPP, Rochester Drug Co-Operative, was a member of the National Community Pharmacists Association in 2014. *See* https://web.archive.org/web/20140402135827/http://ncpanet.org/index.php/the-ncpa-corporate-membership-program/corporate-roster/wholesaler; https://web.archive.org/web/20130829192813/ https://www. ncpanet.org/index.php/the-ncpa-corporate-membership-program/corporate-roster/wholesaler. The Court can take judicial notice of facts that are not subject to reasonable dispute at the motion to dismiss stage if they can be determined accurately and readily from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998); *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003). Impax respectfully requests that the Court take judicial notice of the facts set forth in the public documents cited in footnotes 2, 3, 6, 7, and 8 of this brief.

Dated: February 21, 2019                    Respectfully submitted,

                                            /s/ *Raymond A. Jacobsen, Jr.*
                                            Raymond A. Jacobsen, Jr.
                                            Paul M. Thompson (Pa. No. 82017)
                                            Lisa A. Peterson
                                            MCDERMOTT WILL & EMERY LLP
                                            500 North Capitol Street, NW
                                            Washington, DC 20001
                                            Telephone: (202) 756-8000
                                            rayjacobsen@mwe.com
                                            pthompson@mwe.com
                                            lpeterson@mwe.com

                                            David L. Hanselman Jr.
                                            MCDERMOTT WILL & EMERY LLP
                                            444 West Lake Street
                                            Suite 4000
                                            Chicago, IL 60605
                                            Telephone: (312) 372-2000
                                            dhanselman@mwe.com

                                            Nicole L. Castle
                                            MCDERMOTT WILL & EMERY LLP
                                            340 Madison Avenue
                                            New York, NY 10173
                                            Telephone: (212) 547-5400
                                            ncastle@mwe.com

                                            *Counsel for Impax Laboratories, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify on this 21st day of February 2019, a true and correct copy of the

foregoing was filed electronically and is available for viewing and downloading from the Court's

ECF System. Notice of this filing will be sent to all counsel of record by operation of the ECF

System.

/s/ *Raymond A. Jacobsen, Jr.*
Raymond A. Jacobsen, Jr.
