UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION _____ THIS DOCUMENT RELATES TO: *State Attorneys General Litigation* *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc., et al.* 2:18-cv-2641 *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco U.S., Inc.* 2:18-cv-2401 *Humana Inc. v. Actavis Elizabeth, LLC et al.* 2:18-cv-3299 *West Val Pharm., et al. v. Actavis Holdco U.S., Inc.* 2:18-cv-2533 *The Kroger Co., et al. v. Actavis Holdco U.S., Inc.* 2:18-cv-284 | MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE |

**PLAINTIFFS' JOINT RESPONSE IN OPPOSITION
TO DEFENDANTS' JOINT MOTION TO DISMISS
PLAINTIFFS' OVERARCHING CONSPIRACY CLAIMS**

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   ARGUMENT ................................................................................................. 6

    A.    Plaintiffs Have Sufficiently Pled Defendants' Participation in the
         Overarching Fair Share Agreement. ........................................................ 6

    B.    Plaintiffs Allege That Defendants Shared a Common Goal of
         Artificially Maintaining and Raising the Prices of Their Generic
         Drug Portfolios. .................................................................................... 9

    C.    Plaintiffs Also Have Alleged Facts That Allow the Court to
         Plausibly Infer Defendants' Commitment to the Overarching "Fair
         Share" Agreement. ............................................................................... 12

         1.    The "Fair Share" Agreement Was Universal and Anything
              but Benign. ............................................................................. 16

         2.    Plaintiffs' Complaints Do Not Rely on "Group Pleading." ...................... 18

    D.    The Defendants' Agreements Concerning Individual Drugs Are
         Advantageous to the Overall Success of the Overarching
         Conspiracy. .......................................................................................... 19

    E.    The Defendants Involved in the Individual Agreements
         Sufficiently Overlap. ............................................................................. 23

III.  CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .......................................... 7

*Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240 (D. Maine 2008) ................................... 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 2, 7

*Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119 (D. Mass. 2013) ................ 5, 13, 14, 23

*In re Automotive Parts Antitrust Litig.*, No. 12-md-02311, 2016 WL 8200512
    (E.D. Mich. Apr. 13, 2016) ........................................................................... 14, 15, 23

*In re Elevator Antitrust Litig.*, 502 F. 3d 47, 51 (2d Cir. 2007) ................................................... 18

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789,
    2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ............................................................ 16

*In re Generic Pharma. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018) ........... 4, 19

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.42 (3d Cir. 2010) ...................... passim

*In re K-Dur Antitrust Litig.*, Civ. A. no. 01-cv-1652, 2016 WL 755623
    (D.N.J. Feb. 25, 2016) ........................................................................................ 4, 8, 9, 23

*In re New Jersey Tax Sales Certificates Antitrust Litig.*, Civ. A. No. 12–1893,
    2014 WL 5512661 (D.N.J. Oct. 31, 2014) ................................................................. 12

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) ............... 16, 19

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224
    (3d Cir. 1993) ................................................................................................................ 10

*Philips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ...................................................... 7

*Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*,
    No. 08-CV-42, 2011 WL 7053807 (S.D.N.Y. Jan. 4, 2011) ................................... 22, 23

*Roxane Labs, Inc. v. SmithKline Beecham Corp.*, No. 09-CV-1638, 2010 WL 331704
    (E.D. Pa Jan. 26, 2010) ................................................................................................. 12

*United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989) ............................................................ passim

*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007) .................................................................. 19

*United States v. Padilla*, 982 F.2d 110 (3d Cir. 1992).................................................................. 23

*United States v. Perez*, 489 F.2d 51 (5th Cir. 1973) .................................................................... 10

*United States v. Vastola*, 670 F. Supp. 1244 (D.N.J. 1987)........................................................... 5

*W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85 (3d Cir. 2010)............................. 6, 9

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*,
   No. 15-6480, 2019 WL 130535 (E.D. Pa. Jan. 8, 2019).......................................................... 19

## **Rules**

Fed. R. Civ. P. 8(a)(2)..................................................................................................................... 6

Fed. R. Civ. P. 12(b)(6)....................................................................................................... 2, 3, 4, 7

The State Plaintiffs, Direct Purchaser Plaintiffs, End-Payer Plaintiffs, Indirect-Reseller Plaintiffs, Kroger and Humana (collectively, "Plaintiffs") submit this Joint Response to Defendants' Joint Memorandum of Law in Support of Their Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims ("Joint Memorandum") pursuant to Pretrial Order 71.  (*See* Dkt. 2:16-md-02724-CMR, Entry No. 846, ¶ 3(b).)  This Joint Response sets forth the case law relevant to Defendants' challenge to Plaintiffs' overarching conspiracy claims of Defendants' broad agreement that formed the structure of every market allocation and price-fixing scheme in which they participated.   Each Plaintiff group or individual Plaintiff has addressed the sufficiency of the allegations in its Multidrug Complaint in a separate brief, filed contemporaneously with this Response.[1]

## I.      PRELIMINARY STATEMENT

Plaintiffs' Multidrug Complaints explain the broad conspiracy linking the various market allocation and price-fixing agreements reached by overlapping subsets of generic drug manufacturer Defendants.  Because the specific factual allegations of each Multidrug Complaint differ (such as some of the individual drugs and Defendants named), the sufficiency of each Complaint is addressed in Plaintiffs' individual responses.  However, the main thrust of the alleged overarching conspiracy remains consistent across the Multidrug Complaints, and this Joint Response explains the relevant law and how it applies to that common theory of liability.

---

[1] This Response uses the term "Multidrug Complaints" to refer to the following:  State Plaintiffs' Consolidated Amended Complaint (Dkt. 2:17-cv-03768-CMR, Entry No. 15); Direct Purchasers' First Amended Class Action Complaint (Dkt. 2:18-cv-02641-CMR, Entry No. 11); End-Payer Plaintiffs' Complaint (Dkt. 2:18-cv-02401-CMR, Entry No. 1); Indirect Reseller Plaintiffs' Amended Overarching Complaint (Dkt. 2:18-cv-02533-CMR, Entry No. 4); Humana's First Amended Complaint (Dkt. 2:18-cv-03299-CMR, Entry No. 29); and Kroger's Amended Complaint (Dkt. 2:18-cv-00284-CMR, Entry No. 37.)

As explained in the Multidrug Complaints, Defendants pursued a common goal through their overarching "fair share" agreement:  to achieve artificially-inflated generic drug prices through the allocation of markets, which prevented price erosion through competition, and through price-fixing agreements.  Their agreement was made possible because Defendants are repeat players who have overlapping generic drug portfolios, with new generic drug markets opening as branded drugs fall off patent.  Rather than compete, Defendants coordinate with each other according to their overarching, agreed-upon "fair share" code of conduct.  First, the would-be competitors allocate customers so that each company has roughly its proportionate share of the market, with possible adjustments based on factors such as the timing of the company's entry.  Second, once companies reach that stable "fair share" allocation in a drug market, Defendants do not compete on price and may, among other collusive conduct, agree to significantly raise prices.  This overarching agreement among Defendants undergirds each of the drug-specific market allocation and price-fixing agreements detailed in the Multidrug Complaints.

A claim is sufficient under Rule 12(b)(6) if a plaintiff has pled facts demonstrating that the claim is "plausible."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  The Court has already had an opportunity to evaluate the Plaintiffs' theory of Defendants' participation in an overarching conspiracy under this standard.  The Court – applying the pleading standard of plausibility set forth in *Twombly* – ruled that the States' Consolidated Amended Complaint sufficiently pleads the overarching conspiracy, stating that "from the facts alleged in the [Plaintiff States' Consolidated Amended Complaint] … it is *plausible* to infer that there was a

broader conspiracy." (Dkt. 2:16-md-02724-CMR, Entry No. 603, 6-7 (emphasis added).)[2]

Though this decision only considered the allegations in the Plaintiff States' Complaint, it

demonstrates that the general theory of the "fair share" overarching conspiracy set forth in each

Multidrug Complaint is plausible. Defendants' present motion to dismiss does not raise

"different issues or qualifying matters" in the form of new case law or argument that provide any

reason why the Court's well-reasoned conclusion should be reconsidered. (November 20, 2018

Status Conference Transcript, 13:17-13:18.) Nor could they: the Multidrug Complaints

sufficiently plead abundant facts allowing a plausible inference that Defendants participated in

an industry-wide scheme covering many drugs.

Faced with this reality, Defendants resort to their timeworn method of dividing the

alleged "fair share" scheme into various components and challenging the sufficiency of the

isolated parts. For example, Defendants choose an agreement about one generic drug and then

posit that no fact in the Complaints specifically links that agreement to another specific-drug

agreement. (*See*, *e.g.*, Joint Memo., 6-8.) Defendants do the same with the allegations of

connective tissue in the Complaints – an interlocking web of communications and agreements;

and an overarching methodology discussed between them privately and at industry events –

arguing that no one fact on its own nudges the overarching conspiracy claim across the line from

---

[2] Defendants attempt to rewrite the Court's Opinion – and their own previous briefing – by arguing that the Court only determined that an "overarching conspiracy involving multiple drugs and markets could *possibly* occur" under Rule 15's "'liberal[]' standard." (Joint Memo., 4, 4 n.2) In reality, Defendants previously argued that the States' motion to amend should be evaluated using "the same standard of legal sufficiency that governs a motion to dismiss under Rule 12(b)(6)" and advocated for application of *Twombly*'s standard that a complaint must plead "enough facts to state a claim to relief that is plausible on its face." (Dkt. 2:16-md-02724-CMR, Entry No. 542, 13-14 (internal quotations omitted).) The plain language in the Court's decision applied this plausibility standard and cited to cases applying Rule 12(b)(6) when it found that the Plaintiff States' overarching conspiracy was sufficiently pled. (Dkt. 2:16-md-02724-CMR, Entry No. 603, 6-7)

"possible" to "plausible."  This reductive method of parsing the Complaints ignores that "[t]he allegations in [each] Complaint must be viewed as a whole."  *In re Generic Pharma. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 436 (E.D. Pa. 2018) (quoting *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010)).  It is the totality of the allegations in the Complaints – the combination of each Defendants' participation in collusive conduct as to individual drugs with the specific facts plead evincing the existence of the overarching "fair share" agreement – that sufficiently links all the conspirators in the overarching agreement.

Defendants' arguments that Plaintiffs have failed to plead facts satisfying each of the three factors set out in *United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989), fare no better.  As an initial matter, Defendants overstate the importance of these factors on a Rule 12(b)(6) motion, arguing that a plaintiff "must" satisfy all three *Kelly* factors.  (Joint Memo, 6.)  Like other courts examining the issue, the Third Circuit does not require that a claim of overarching conspiracy mechanically check all these boxes to survive a challenge under Rule 12(b)(6).  Even at summary judgment, "[t]he absence of one [*Kelly*] factor does not necessarily defeat an inference of the existence of a single conspiracy."  *In re K-Dur Antitrust Litig.*, Civ. A. No. 01-cv-1652, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016) (quoting *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992)).[3]  Instead, the courts have noted that "while the analysis of 'common goals,' 'interdependence,' and 'overlap' is useful for resolving the sufficiency of the evidence … [the courts have] looked beyond any such list of factors to 'the totality of the evidence' in

---

[3] Defendants cite *In re K-Dur* in their recitation of the *Kelly* factors, so they are clearly aware of the holding in that case and in *Padilla*, which *In re K-Dur* cites.  (Joint Memo, 6)

determining whether there is factual support for a finding of a single conspiracy." *Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119, 136 (D. Mass. 2013).[4]

In any event, the Multidrug Complaints contain ample factual material that satisfies each *Kelly* factor at the pleading stage. The Complaints demonstrate that Defendants shared a commitment to the common purpose of making artificially high profits from the sale of their overlapping generic drug portfolios. Their overarching agreement to work together to allocate markets using their "fair share" principles and fix prices enabled them to reach out to whatever combination of competitors were manufacturing, or planned to manufacture, a particular drug and come to an agreement. As such, each drug-specific understanding was "advantageous to the success of another aspect of the scheme or to the overall success of the venture." *Kelly*, 892 F. 2d at 259 (quoting *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989)). Defendants are repeat players who ostensibly compete against each other – absent their agreements not to do so – in various combinations across multiple drug markets. They often discussed or agreed to conspiratorial conduct across multiple drugs at the same time and were in constant contact with each other. Refusing to "play fair" with a competitor when it reached out to allocate a market or fix prices in one drug market would risk retribution not just on that drug, but potentially other drugs that the companies shared or could share. The Complaints also demonstrate sufficient overlap between the participants through their different combinations conspiring about various drugs.

Finally, Defendants incorrectly raise some observations about their potential liability and the litigation burden they might face if the overarching conspiracy claims are allowed to proceed,

---

[4] *Cf. United States v. Vastola*, 670 F. Supp. 1244, 1260 (D.N.J. 1987) ("The ultimate question of whether there was a single conspiracy, multiple conspiracies, or no conspiracy at all, will be resolved at trial.").

stating that it is "particularly critical that Plaintiffs be required to meet their pleading burdens here." (Joint Memo., 8.)  But there is no sliding *Twombly*-scale that requires a plaintiff to meet a higher pleading standard depending on the defendant's potential liability or litigation inconvenience.  *See Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240, 245-46 (D. Maine 2008) ("*Twombly* is not to be construed to create a sliding scale of heightened review, depending on the complexity and potential expense of the underlying litigation."); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) ("We conclude that it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases.").  *Twombly*'s "plausibility" standard applies to all complaints.  Taken to its logical conclusion, Defendants' invented heightened pleading requirement would insulate those whose conduct does the most harm from being held to account for that conduct; certainly, that is not what *Twombly* and its progeny intended.

In sum, the overarching conspiracy pled in each Multidrug Complaint is not some unmoored attempt to impose "unwarranted 'super-joint and several liability,'" as Defendants claim.  (Joint Memo., 6)  Plaintiffs' Complaints cogently describe the Defendants' shared scheme, and, as explained below, other cases have allowed overarching conspiracy claims to proceed when supported by similar – or fewer – factual allegations than found here.  Therefore, under the applicable legal standards, Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims should be denied.

## II.    ARGUMENT

### A.    Plaintiffs Have Sufficiently Pled Defendants' Participation in the Overarching Fair Share Agreement.

Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A well-pled

complaint "'give[s] the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). When evaluating the sufficiency of a complaint under Rule 12(b)(6), the courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Philips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

A complaint is sufficient under Rule 12(b)(6) if the claims asserted, accepting the factual allegations as true, are at least "plausible." *See Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Twombly* "does not require as a general matter that the plaintiff plead facts supporting an inference of defendant's liability more compelling than the opposing inference." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.42 (3d Cir. 2010). In other words, "[t]he question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012). Ultimately, on a motion to dismiss, because the plausibility requirement does not impose a probability requirement, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation omitted).

While *Twombly* and *Iqbal* supply the general pleading standard that Plaintiffs must satisfy, the parties agree that *Kelly* supplies the substantive law with which Plaintiffs'

overarching conspiracy allegations should be evaluated. *Kelly* adopted a "three-step inquiry to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies," considering (1) "whether there was a common goal among the conspirators"; (2) "whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators"; and (3) "the extent to which the participants overlap in the various dealings." 893 F.2d at 259 (internal citation omitted). Though *Kelly* considered the appeal of a criminal sentence imposed after conviction at trial, its three factors have been used by Courts as a framework to evaluate whether a plaintiff has sufficiently pled an overarching conspiracy in the civil context. *See*, *e.g.*, *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *18.

Thus, considering *Twombly*, *Iqbal* and *Kelly* together, the question before this Court – viewing all of Plaintiffs' allegations as a whole, and drawing all inferences in Plaintiffs' favor – is whether Plaintiffs have plausibly alleged facts that Defendants joined an overarching conspiracy. The allegations in Plaintiffs' Complaints readily meet this standard. Plaintiffs' Complaints lay out "with precision" the elements that make up the overarching conspiracy: (1) Defendants' common purpose of artificially fixing, maintaining and/or raising prices in their generic drug portfolios; (2) Defendants' commitment to that common purpose, demonstrated by their participation in specific-drug collusion in accordance their agreed-upon "fair share" code of conduct; (3) the specific-drug conspiracies were advantageous to each other and the overall success of the "fair share" venture by making continued and future compliance with the "fair share" code of conduct more likely, stable, effective and successful; and (4) Defendants' web-like overlap across the various specific-drug conspiracies.

**B.      Plaintiffs Allege That Defendants Shared a Common Goal of Artificially Maintaining and Raising the Prices of Their Generic Drug Portfolios**.

When determining whether "a set of events comprises a single conspiracy or separate, unrelated conspiracies," the courts first consider "whether there was a common goal among the conspirators." *In re K-Dur*, 2016 WL 755623, at \*18 (citing *Kelly*, 892 F.2d at 259).   This common goal need not be complex or detailed; in *Kelly*, "the common goal of all the participants was simply to make money selling 'speed.'"   *Kelly*, 892 F. 2d at 259; *see also W. Penn Allegheny Health Sys.,* 627 F.3d at 99 ("An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme.").   Similarly, the common goal of Defendants here was to make artificially high profits from selling generic drugs.   The operation of the Defendant's open-ended "fair share" code of conduct enabled them to do this by ensuring any one of them could reach out to its would-be competitors on any individual drug and arrange a proportional allocation of customers in that drug's market, knowing it would receive support from the other participants.[5]

Defendants seek to obscure this common goal, insisting that Plaintiffs' overarching conspiracy claims fail because any given individual defendant would have no interest in conspiracies involving "dozens of other drugs that Defendant did not sell and from which it would derive no alleged profit or benefit." (Joint Memo., 12.)[6]  Plaintiffs are not required to

---

[5] Defendants mostly ignore the allegations concerning their common interest in the "fair share" code of conduct by calling the agreement "vague and undefined" or made up of "speculative theories and conclusory assertions." (Joint Memo., 15.) As further explained in Plaintiffs' individual responses, and broadly here, Plaintiffs have adequately pled facts that describe the operation of Defendants' "fair share" agreement, as well as facts that show its obvious plausibility as an explanation for Defendants' actions and parallel price increases.

[6] For example, Defendants argue that because Defendant Citron has been alleged to participate in conspiracies to fix the prices of "***only*** three drugs" in the Kroger Complaint, there is no indication "that Citron was aware of alleged conspiracies concerning the other 37 drugs identified in the Kroger Complaint and no allegations indicate that it had any expectation of

plead that each Defendant participated in or directly profited from every agreement undertaken as part of the "fair share" conspiracy.  *See*, *e.g.*, *Kelly*, 892 F.3d at 260 ("'the government need not prove that each defendant knew all the details, goals, or other participants' in order to find a single conspiracy" (quoting *United States v. Theodoropoulos*, 866 F.2d 587, 587 (3d Cir. 1989)); *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973) ("… there is no requirement that every defendant must participate in every transaction in order to find a single conspiracy"); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1243 (3d Cir. 1993) ("… we have made it clear that the defendants need not share the *same* motive.  Rather, all that is required is that they each have a motive to conspire." (citations omitted)).  Even if a Defendant did not derive supracompetitive profits from a particular single-drug agreement into which others entered according to the "fair share" code, that Defendant knew it would stand to benefit the next time it entered a generic drug market or the next time a would-be competitor entered a market it already participated in.  Therefore, each Defendant had a general interest in everyone playing by the established "fair share" rules until its "turn" to receive supracompetitive profits as to a different drug or drugs.

Defendants also attempt to narrowly interpret the operation of the "fair share" code of conduct by arguing that Plaintiffs fail to show that any Defendant "participated in an alleged individual drug conspiracy based on the potential future competition with other manufacturers in other drug markets," and fail to show "that any Defendant had the intent and preparedness to enter any of the generic drug markets in which it did not compete."  (Joint Memo., 15.)  This again misstates the common interest Defendants shared in the "fair share" agreement.  A

---

benefit from those other 37 alleged conspiracies."  (Joint Memo., 13.  *See also id.* ("None of the Plaintiffs pleads facts showing that any Defendant would even have an interest in an agreement to fix prices in markets which it did not compete.").)

Defendant, at any given time as to any given drug, did not know exactly which other generic drug manufacturers it might compete against. Thus, the common interest in the "fair share" agreement, and the shared benefit to each Defendant, was that *no matter the identity* of those current or future would-be competitors, there was an understanding that Defendants would allocate customers proportionally and maintain artificially high prices and/or raise prices rather than compete.[7]

This kind of "open-ended" agreement was part of a sufficiently-pled, single conspiracy in *In re Insurance Brokerage Antitrust Litigation*, where individual instances of bid-rigging – orchestrated by a broker – were found to sufficiently plead a broader agreement among defendant insurers to refuse to compete for each other's incumbent business. 618 F.3d 300, 340. Obviously, each individual insurer – just like each individual Defendant here – did not directly benefit from or participate in every individual instance of bid-rigging, but there was an understanding, as here, that when necessary, another insurer that was part of the broader agreement – even if not involved in the last bid-rig – would cooperate with the overarching agreement. *Id.* (describing the agreement as "insurer X provides 'protection' of Y's 'renewal' or 'incumbent' account in exchange for an assurance of similar assistance from some other insurer (not necessarily Y)").

Defendants often cite to the portion of the Third Circuit's decision in *In re Insurance Brokerage* regarding whether the plaintiffs' allegations that multiple vertical agreements between various brokers and insurers, concerning the payment of commissions, also evidenced a

---

[7] Additionally, various Multidrug Complaints allege that subsets of Defendants reached trade-off agreements over multiple drugs concurrently. But the allegations as to these multi-drug *quid pro quo* situations does not mean that an explicit *quid pro quo* was always necessary for the "fair share" agreement to operate across various drugs.

horizontal agreement between brokers not to disclose the terms of the vertical agreements.  The court agreed with the district court's conclusion that plaintiffs failed to make any allegations showing that the failure to disclose "was more than brokers adopting sub-par disclosure methods to protect their own, lucrative agreements."  *In re Insurance Brokerage*, 618 F.3d at 351 (quotation omitted).  Thus, the allegations in *Insurance Brokerage* – vertical conspiracy arrangements between brokers and insurers that the plaintiffs attempted to link together into an overarching non-disclosure horizontal conspiracy across the brokers – have little in common with the more standard horizontal conspiracy allegations found in the Complaints here.

In short, Plaintiffs need not allege that each Defendant entered into each individual drug conspiracy based on a belief that it expected to later conspire with specific Defendants concerning specific drugs.[8]

### C.   Plaintiffs Also Have Alleged Facts That Allow the Court to Plausibly Infer Defendants' Commitment to the Overarching "Fair Share" Agreement.

The Complaints set forth a pattern of allegations in support of the "fair share" overarching conspiracy that has been found sufficient in other cases:  well-pled individual instances of collusion and parallel price increases *in addition to* factual material that demonstrates the plausible existence of an overall agreement linking them.  *See In re New Jersey Tax Sales Certificates Antitrust Litig.*, Civ. A. No. 12–1893, 2014 WL 5512661, at *8 (D.N.J. Oct. 31, 2014) ("The allegations of collusion at the individual auctions can be considered in

---

[8] Defendants' invocation of the fact that a potential competitor "must demonstrate intention and preparedness to enter the market in order to show [the] injury" required to establish antitrust standing when bringing a lawsuit in *Roxane Labs, Inc. v. SmithKline Beecham Corp.*, No. 09-CV-1638, 2010 WL 331704 (E.D. Pa. Jan. 26, 2010) is a *non sequitur*.  (Joint Memo., 15.)  Again, the main premise of the overarching conspiracy is not that any given Defendant would have begun manufacturing a given drug absent the overarching agreement; it is that when a Defendant did decide to sell a drug, it could do so knowing that any other Defendant that made the same decision would allocate the market according to the conspiracy's "fair share" code of conduct.

establishing the larger overarching conspiracy.  Indeed, the Third Circuit has held that

allegations of bid rigging among defendants can provide the necessary support in establishing a

larger horizontal conspiracy.") (internal citations omitted); *see also In re Ins. Brokerage Antitrust

Litig.*, 618 F.3d at 340 (finding that instances of bid-rigging among insurers, orchestrated by a

broker, for individual clients "plausibly supports the inference that the bid rigging was in service

of a broader [horizontal] agreement [among insurers] not to compete for one another's

incumbent business").

Plaintiffs' allegations of conspiracy are more detailed and support a more robust

inference of an industry conspiracy than the fully discovered record in *Dahl v. Bain Capital

Partners, LLC*, 937 F. Supp. 2d 119 (D. Mass. 2013), where only three contested facts were

sufficient to defeat a motion for summary judgment.  In *Dahl*, plaintiffs alleged that eleven

defendant financial firms had conspired in a number of ways concerning a series of twenty-seven

leveraged buyout transactions.  *Id.* at 123-24.  As part of those transactions, once a defendant

completed an initial deal to purchase the target, the target could seek a better offer from other

defendant firms during a "go-shop" period before the final closing.  *Id.* at 125.  Plaintiffs claimed

that there was an overarching agreement between defendants across these 27 transactions not to

"jump" each other's deals during the "go-shop" periods.  *Id.* at 128-29.  In denying summary

judgment for the defendants, the court concluded that the following evidence "tend[ed] to

exclude the possibility of independent action" and that therefore the plaintiffs could proceed "on

an alleged overarching agreement between the Defendants to refrain from 'jumping' each other's

announced proprietary deals":

- None of the announced deals at issue were ever "jumped";

13

- One defendant's employee statement, relating to one transaction, that "[a specific defendant] has agreed not to jump our deal since no one in private equity ever jumps an announced deal"; and

- A statement by another defendant's employee that "club etiquette prevail[ed]" with respect to the same transaction.

*Id.* at 137-38.  While the court stated the first two pieces of evidence only "tend[ed] to show that such conduct was the practice in the industry" on their own, when combined with the third allegation, they "suggest[ed] the practice was not the result of mere independent conduct" because "the term 'club etiquette' denotes an accepted code of conduct between the Defendants." *Id.* at 138.[9]

The *Dahl* court's reasoning demonstrates the flaws in Defendants' refusal to consider the "totality" of the allegations in the Complaints and how they, in sum, result in a plausible inference that the individual drug agreements were linked through Defendants' overarching agreement.  Applying *Dahl*'s reasoning here, the Defendants' persistent collusive conduct, when taken together with facts supporting the existence of an agreed-to "fair share" code, is enough to plausibly allege an overarching conspiracy.

Defendants lean heavily on *In re Automotive Parts Antitrust Litigation*, No. 12-md-02311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016), but the allegations and procedural posture in that case differ significantly from those found in the Multidrug Complaints here.  In *Auto Parts*, the court stated that to "support the megaconspiracy," the plaintiffs alleged that "each Defendant 'willingly agreed to and did conspired [*sic*] with DENSO and by doing so, conspired

---

[9] It is worth noting, with reference to Defendants' argument discussed above that Plaintiffs fail to allege "that any Defendant had the intent and preparedness to enter any of the generic drug markets in which it did not compete," (Joint Memo., 15), that *Dahl* makes no mention of requiring plaintiffs to show that any other defendant would have been prepared to "jump" any particular future deal absent the overarching conspiracy.  It was sufficient to allege facts showing the agreement not to "jump" those deals.

with each other.'"  2016 WL 8200512, at *4.  The court found that the complaint contained no allegations "of deals between makers of different component parts, [] no inference[] of knowledge outside of each Defendants' own specific deals," and "no allegations to support that each Defendant knew of the other Defendants' conduct for other products."  *Id.*

In sharp contrast, the Multidrug Complaints here contain allegations that plausibly show that the Defendants were acting according to their common agreement around "fair share."  As explained above, Defendants are generic drug manufacturers with overlapping generic drug portfolios.  They have the ability and know-how to obtain Abbreviated New Drug Applications and launch generic drugs – as seen time and again in the Complaints – with new drug markets continuing to open up over time as branded drugs fall off patent.  The *In re Auto Parts* allegations –  which relied on the common participant, DENSO, to connect the conspiracies relating to each automobile part – lacked the connective tissue that runs through the Defendants' agreements about specific drugs here.  For example, unlike the Plaintiffs' description here of the generic drug industry, the *In re Auto Parts* decision does not suggest that the various defendants in that case were constantly entering new automotive part markets in different combinations, and therefore would have had the same motivation to have a general baseline understanding.

This Court, in its June 18th decision, also distinguished *In re Auto Parts* from the current case by noting that the motion to amend in that case came "six years into the litigation, and represented a claimed 'evolution of the facts as they unfolded during discovery,' an evolution that the court found unsupported and contradicted by the investigation of the Department of Justice, which concluded that the conspiracies were separate, not overarching."  (Dkt. 2:16-md-02724-CMR, Entry No. 603, 7.).

15

1.      **The "Fair Share" Agreement Was Universal and Anything but Benign.**

Defendants attempt to downplay their use of the "fair share" concept by objecting that "Plaintiffs allege that only three Defendants used the 'fair share' phrase, and even then on only ***two occasions*** … in relation to only three specific individual drugs."  (Joint Memo., 18 (emphasis in original).)  But the law does not require that Plaintiffs allege that each Defendant explicitly uttered the words "fair share" to allow a plausible inference that their activities with respect to individual drugs were pursuant to the broad "fair share" agreement.  In *Dahl*, *only one defendant's employee* used the "club etiquette" language with respect to *one transaction*. Additionally, Defendants conveniently ignore other allegations of similar language, connoting the same conceptual agreement, such as "play fair."  *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa. 2011) ("Plaintiffs are not obliged to have the same quality or quantity of allegations as to one defendant as unto another. … The [complaint] need not aver even similar allegations as to each applicable defendant in identical form or number.") (internal citations omitted); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase.").  What is required is enough factual allegations, taken as true, to allow the court to reasonably infer the overarching conspiracy that Defendants agreed to and acted upon when carrying out the individual drug agreements. Plaintiffs' allegations go well beyond what was found sufficient in *Dahl* at the *summary judgment phase*, as described in detail in their individual Responses.

Defendants' attempt to brush away the use of "fair share" or similar terminology to define the terms of their overarching agreement as simply a benign "common term [used] by

16

some industry participants" also fails.  (Joint Memo., 19.)  They cite two cases for their assertion

that "'common adoption' of industry-wide terminology is not enough to state an overarching

conspiracy claim."  (*Id.*)  As noted above, however, Plaintiffs' allegations go well beyond the

simple adoption of a term.  In any event, the context around the common language in

Defendants' cases differs wildly from the common "fair share" language here; while those cases

attempted to prove the existence of an agreement by alleging the simple use of the same

terminology to describe something, Plaintiffs have alleged facts demonstrating each Defendants'

commitment to the conceptual agreement represented by the "fair share" code of conduct as to

one of more specific drugs.

 First, as noted above, in the section of *Insurance Brokerage* cited by Defendants, the

plaintiffs alleged the existence of multiple *vertical* broker-insurance agreements where brokers

"funneled unwitting clients to their co-conspirator insurers, which were insulated from

competition" in exchange for contingent commission payments.  618 F.3d at 308.  The *Insurance*

*Brokerage* plaintiffs' overarching "global conspiracy" claim was premised on the idea that the

brokers also had entered into a *horizontal* "naked restraint on informational output" not to tell

customers about any other broker's supra-competitive commissions.  *Id.* at 348-49.  It was in this

context that the court noted that the decision not to disclose was fully in line with an

"independent motive to avoid disclosure" because "no broker could expose its competitors'

contingent commission agreements without drawing unwelcome attention to its own golden-egg-

laying goose."  *Id.* at 348.  In trying to allege facts that might push their global horizontal theory

from possible to plausible considering the brokers' independent self-interest in keeping the

vertical agreements secret, the plaintiffs alleged that the defendants use of similar language –

recommended by their trade association – in certain disclosure documents as evidence that they

had agreed to keep the commissions secret.  The court found this argument unpersuasive, stating that although the use of similar language "indicate[d] that the brokers had an opportunity to conspire, [plainitffs] do not plausibly imply that each broker acted other than independently when it decided to incorporate the CIAB's proposed approach as the best means of protecting its lucrative arrangements from hostile scrutiny."  *Id.* at 349.  Those allegations are nothing like the allegations here.

Second, in *In re Elevator Antitrust Litigation*, the common "terminology" was "similar contract language" that the court found "[did] not constitute 'plausible grounds to infer an agreement' … [because it] can reflect the copying of documents that may not be secret."  502 F.3d 47, 51 (2d Cir. 2007) (dismissing claims because, without additional allegations, similar contract language and pricing of the defendants did not suggest more than possibility – as opposed to plausibility – of relief).  There is much more than "similar contract language" alleged here.

In short, the Multidrug Complaints here explain that *"fair share" is the actual language used to describe the operation of the overarching agreement* between Defendants when Defendants were conspiring – similar to "club etiquette" in *Dahl*.  The "fair share" language was not incidental to or vaguely suggestive of a possible agreement, as was the "similar" language used by the companies in standard business documents in *Insurance Brokerage* and *Elevator*; it is the operative language of the overarching agreement.  Further, like "club etiquette," the Complaints explain that it only makes economic sense for each Defendant to follow those rules if its ostensible competitors have made an interdependent commitment to reciprocity.

### 2.    Plaintiffs' Complaints Do Not Rely on "Group Pleading."

Defendants' references to "group pleading" are also inapposite.  (Joint Memo, 11.)  As explained in *In re Processed Egg Products*, which Defendants initially cite for this proposition,

the courts "properly look[] for more than a mere repetitive generic reference to 'Defendants' tacked onto a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy." 821 F. Supp. 2d at 720.[10]  Plaintiffs' Complaints here do not rely on such rote invocations of generic conspiratorial conduct by all Defendants.  Instead, they rely on the kind of combination of allegations that was found sufficient in *Processed Eggs*, namely allegations "that explicitly name [each defendant] and its specific conduct, as well as those that cite specific facts and detailed circumstances concerning the nature and context of the entire conspiracy."  *See id.* at 730-31.  It is the *combination* of each Defendant's participation in the individual drug conspiracies with the specific facts plead about the overarching "fair share" code of conduct that plausibly allege that each Defendant was a participant in the broader scheme.  *In re Generic Pharma. Pricing*, 338 F. Supp. 3d at 438 ("Plaintiffs are not required to plead each defendant's involvement in the alleged conspiracy in elaborate detail[.]") (internal quotation omitted).

> **D.**    **The Defendants' Agreements Concerning Individual Drugs Are Advantageous to the Overall Success of the Overarching Conspiracy.**

Defendants' conduct as to individual drugs was advantageous to other aspects of the overarching conspiracy and the entire conspiracy overall.  *See Kelly*, 892 F. 3d at 259.  When evaluating interdependence, courts "consider how helpful one individual's contribution is to another's goals."  *United States v. Kemp*, 500 F.3d 257, 289 (3d Cir. 2007).  The allegations relating to the specific-drug conspiracies show a crisscrossing web of agreements,

---

[10] *See also Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*, No. 15-6480, 2019 WL 130535, at*3 (E.D. Pa. Jan. 8, 2019) ("Plaintiffs' Complaint [is] specific [with respect to agricultural cooperative's role] in the alleged price fixing and supply control schemes that underlie their Section 1 claims, but it does not otherwise identify any specific Defendant's role therein.  Instead, [plaintiffs] assert that each Defendant (other than the [cooperative]) 'participated in the improper conduct alleged' … This is not enough.").  This is a far cry from the detail contained in the Complaints presently at issue.

communications and cooperation that demonstrate their interdependence.  Plaintiffs do not

"merely assert[]," as Defendants argue, that a "'series' of numerous individual conspiracies in

the same industry" (Joint Memo., 21) or that the conspiracies' similar "designs and methods"

(Joint Memo., 22) are sufficient, standing alone, to demonstrate interdependence.  As explained

in the Multidrug Complaints, the conspiracy for any one drug aided conspiracies for other drugs

– and therefore the overarching conspiracy – when Defendants were working together, either in

different markets at the same time, or entering new individual agreements based upon previous

shared, anti-competitive conduct.

Defendants suggest that Plaintiffs must show a strict correlation between the "success or

failure" of every individual drug conspiracy to some other branch of the overarching conspiracy.

(*See* Joint Memo., 7 (arguing the Kroger Complaint "does [not] offer any facts suggesting that

the success or failure of the alleged Doxy DR conspiracy depended any any way on the success or

failure of any other conspiracy involving any other product").)  But that is not the law.  Plaintiffs

may show interdependence by alleging each action was "advantageous to the success of another

aspect of the scheme or to the overall success of the venture."  *Kelly*, 892 F.2d at 259 (quoting

*DeVarona*, 872 F.2d at 118).  While Defendants' massive web of interlocking market allocation

and price-fixing agreements might not have completely unraveled if one strand had to come

apart, the Complaints contain multiple examples of how the agreements fit together and

reinforced each other, allowing for easy collaboration and policing.

Defendants, in the face of the individual drug agreements' clear interdependence, again

attempt to stretch the holding of *Insurance Brokerage* beyond its bounds with respect to its

holding concerning "pernicious industry practice[s]."  (Joint Memo., 22-23.)  The court found

that even if the defendants "collaborated in crafting … allegedly misleading disclosures" within

their trade association, this would only "plausibly show that defendants agreed to work together to determine the best way of disguising activity in which each engaged."  *In re Insurance Brokerage*, 618 F.3d at 349.  It would not show an *agreement* to disguise the activity, "not, at least, in the face of the complaints' many allegations that each defendant had ample independent motive to conceal its own contingent commission arrangements."  *Id*. at 350.  The court concluded that "[a] contrary holding would be tantamount to finding that any collaborative effort to refine a 'pernicious industry practice' … plausibly suggests a conspiracy among all industry participants not to reveal the fact that other participants engage in the same practice."  *Id.* (internal citation omitted).

Plaintiffs' overarching conspiracy claims here are not premised on the idea that, by entering into their constant and overlapping market allocation and price-fixing conspiracies, it should be inferred those conspiracies are linked by an unstated agreement not to reveal their existence to the public.  Here, the market allocation and price-fixing practices themselves are the substance of the overarching conspiracy.  Defendants' constant "collaboration" in the specific-drug conspiracies had dual purposes: (1) to increase profits on each drug; and (2) to ensure that the "fair share" agreement held with respect to other existing drugs and expanded over new drugs in a continuous cycle.

Additionally, other than the defendants' shared interest in not having their vertical agreements disclosed in *In re Insurance Brokerage*, the plaintiffs in that case did not offer any allegations beyond the "similar nature of each broker-centered conspiracy" and "similar confidentiality agreements" the defendants used.   618 F.3d at 350-51.  By contrast, Plaintiffs here have explained the exact reasons that the various horizontal antitrust agreements between Defendant manufacturers reinforced each other and were advantageous to each other and the

overarching conspiracy.  Defendants knew that they would need to enter into future agreements with other combinations of would-be competitors (in their existing markets or new markets), and therefore had a vested interest in everyone "playing fair" according to their shared code of conduct.  They often discussed or agreed to conspiratorial conduct across multiple drugs at the same time; Defendants constantly contacted each other concerning their various agreements.  A refusal to "play fair" with a competitor in one drug market would risk retribution not just on that one drug, but potentially other drugs that the companies shared.  The more specific-drug conspiracies a Defendant was involved in, the stronger its incentive was to maintain the stability of every other specific-drug conspiracy, and therefore the overarching conspiracy, to protect their supracompetitive profits over multiple products.

Defendants' reliance on *Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 08-CV-42, 2011 WL 7053807 (S.D.N.Y. Jan. 4, 2011) does not fare any better.  In that case, plaintiffs argued that "10 local conspiracies" that "relate[d] to different routes, in different countries on different continents" and were "logically, temporally, and geographically distinct" nonetheless "joined in a single global conspiracy."  2011 WL 7053807, at *27.  The court rejected this theory, stating that "[w]hile there are some overlapping parties in the conspiracy, there are no allegations in the [c]omplaint that lead to the conclusion that the various local conspiracies were formulated pursuant to an overarching scheme to raise prices generally."  *Id.* at *29.  The Multidrug Complaints, by contrast, concern the same geographic area (the United States), the same general time period, and contain allegations that allow the Court to plausibly infer that each specific-drug conspiracy "was formulated" according the Defendants' "overarching ['fair share'] scheme to raise prices generally" and/or to avoid the price erosion that would result from actual competition.

**E.     The Defendants Involved in the Individual Agreements Sufficiently Overlap.**

The third *Kelly* factor examines "the extent to which the participants overlap in the

various dealings."  892 F.2d at 259 (citing *DeVarona*, 872 F.2d at 118).  Defendants are vague

about how much overlap is enough, only stating that "no Overarching Complaint alleges

sufficient overlap among participants in the alleged individual conspiracies to support the

claimed overarching conspiracy."  (Joint Memo., 26.)  Defendants suggest that the defect is that

Private Plaintiffs do not allege that any one Defendant participated in every individual

conspiracy, and that the State Plaintiffs allege that only one Defendant participated in every

individual conspiracy.  (*Id.*)  However, no specific amount of overlap is required as part of an

overarching conspiracy recipe.[11]  Indeed, the Third Circuit has found that an accused drug

distributor was part of a single conspiracy with other members of a cocaine distribution operation

even though that defendant's "only connection to the conspiracy shown by the government was

through … the central figure … in the scheme."  *Padilla*, 982 F.2d at 115.  Most case law –

including that cited by Defendants[12] – that discusses the "sufficient overlap" factor of *Kelly*

stands for the proposition that "*mere overlap* of some of the defendants in some of the

transactions ... *on its own*, [is not sufficient] to establish an overarching agreement."  *Dahl*, 937

F. Supp. 2d at 135 (emphasis added) (citing *Precision Assoc.*, 2011 WL 7053807, at *29).  As

discussed above, and in their individual responses, Plaintiffs claims rest on far more than the

---

[11] As noted above, overlap is not even a required element.  It is one factor to be considered with the other *Kelly* factors in determining the sufficiency of the allegations of an overarching conspiracy.  *In re K-Dur*, 2016 WL 755623, at *18 (quoting *Padilla*, 982 F.2d at 115).

[12] *See Precision Associates*, 2011 WL 7053807, at *28 ("But again, plaintiffs *have not provided the court with anything more than* the overlap of some of the sixty-five defendants in some of the ten alleged local conspiracies.") (emphasis added); *In re Auto. Parts*, 2016 WL 8200512, at *4 ("the mere overlap of some of the defendants in some of the transactions is, *on its own*, insufficient to establish an overarching agreement") (citing *Dahl*, 937 F. Supp. 2d at 135) (emphasis added).

"mere overlap" of some Defendants in the interlocking conspiracies alleged.  Here, there is more than sufficient overlap among a number of Defendants.

## III.    CONCLUSION

For the reasons stated above, and provided in more detail in Plaintiffs' individual responses, Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims should be denied.

Dated:  May 2, 2019                                          Respectfully submitted,

PLAINTIFF STATE OF CONNECTICUT              PLAINTIFF COMMONWEALTH
WILLIAM TONG                                                OF MASSACHUSETTS
ATTORNEY GENERAL                                       MAURA HEALEY
                                                                           ATTORNEY GENERAL

BY:    */s/ W. Joseph Nielsen*                            BY:    */s/ William Matlack*
          W. Joseph Nielsen                                              William Matlack
          Federal Bar No. ct20415                                    Assistant Attorney General
          Assistant Attorney General                              Chief, Antitrust Division
          55 Elm Street                                                    Michael MacKenzie
          P.O. Box 120                                                     Assistant Attorney General
          Hartford, CT 06141-0120                               Deputy Chief, Antitrust Division
          Tel: (860) 808-5040                                        One Ashburton Place, 18th Floor
          Fax: (860) 808-5391                                       Boston, MA 02108
          Joseph.Nielsen@ct.gov                                  Tel: (617) 962-2414
                                                                                Fax: (617) 722-0184
**Liaison Counsel for the State Plaintiffs**                william.matlack@mass.gov
                                                                                michael.mackenzie@mass.gov
          */s/ Laura J. Martella*
          Laura J. Martella
          Assistant Attorney General
          Federal Bar No. ct27380
          55 Elm Street
          P.O. Box 120
          Hartford, CT 06141-0120
          Tel: (860) 808-5224
          Fax: (860) 808-5391
          laura.martella@ct.gov

/s/ Dianne M. Nast
Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
215-923-9300
dnast@nastlaw.com

**Liaison and Lead Counsel for the Direct Purchaser Plaintiffs**

/s/ Jonathan W. Cuneo
Jonathan W. Cuneo
CUNEO, GILBERT & LADUCA LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
202-789-3960
jonc@cuneolaw.com

**Lead Counsel for the Indirect Reseller Plaintiffs**

/s/ Peter D. St. Phillip, Jr.
Peter D. St. Phillip, Jr.
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com

/s/ Todd M. Schneider
Todd M. Schneider
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel.: 415-421-7100
tschneider@schneiderwallace.com

**Counsel for Humana, Inc.**

/s/ Roberta D. Liebenberg
Roberta D. Liebenberg
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
215-567-6565
rliebenberg@finekaplan.com

**Liaison and Lead Counsel for the End-Payer Plaintiffs**

/s/ William J. Blechman
William J. Blechman
KENNY NACHWALTER, P.C.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
305-373-1000
wblechman@knpa.com

**Counsel for Kroger Direct Action Plaintiffs**