## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>Case No. 16-md-2724 |
| THIS DOCUMENT RELATES TO:<br><br>*The Kroger Co., et al v. Actavis Holdco U.S. Inc., et al*, No: 2:18-cv-00284 (CMR) | HON. CYNTHIA M. RUFE |

### KROGER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' OVERARCHING CONSPIRACY CLAIM

In their Joint Memorandum in Support of their Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims ("Motion"), Defendants offer a number of sweeping legal conclusions that misstate the applicable law governing Plaintiffs' conspiracy claims at this early juncture. As Plaintiffs make clear in their Joint Opposition to Defendants' Motion ("Joint Opposition"),[1] applying the correct legal standard, all Plaintiffs' overarching conspiracy claims survive, because each Plaintiff has plausibly alleged an industry-wide "fair share" market allocation scheme that facilitated individual pricing agreements on numerous drugs.

Additionally, Defendants also offer a number of sweeping conclusions that Plaintiffs plead "no facts" in support of their overarching conspiracy claims. But Defendants make these conclusions without making any attempt at all to grapple with the many allegations in the Kroger Plaintiffs'[2] operative Complaint detailing the interdependent nature of Defendants' unlawful agreements to raise the prices of many different drugs.

---

[1]     ECF No. 129 in Case No. 18-cv-284.

[2]     The "Kroger Plaintiffs" are defined to include The Kroger Co., Albertsons Companies, LLC, and H.E. Butt Grocery Company L.P.

As the Kroger Plaintiffs detail in this Opposition, the Kroger Plaintiffs' Complaint establishes that the industry-wide market allocation agreement facilitated the individual drug conspiracies.

From the introduction of their Motion, it is apparent that Defendants ignore these many detailed allegations.

For example, Defendants contend that "none of the overarching Complaints purports to claim, much less pleads supporting facts, that the absence of any Defendant from any particular drug market was the result of an unlawful agreement ...."  Motion at 2.

Although not legally necessary to allege an overarching conspiracy, *see* Joint Opposition at 10–12, the Kroger Plaintiffs make several such allegations.  For example, in ¶ 712 of their operative Complaint,[3] the Kroger Plaintiffs allege that, during an April 22, 2014 phone call between Susan Knoblauch of Sun and Anne Sather of Heritage, "it was agreed between the two companies that Sun would exit the market for Paromomycin."  In exchange for exiting the market, "Heritage agreed to concede market share to Sun on another generic drug."

Similarly, in ¶ 602 of their Complaint, the Kroger Plaintiffs observe that Teva's exit from the Leflunomide market occurred after the collusive price increase on that drug was successful, an action that was against Teva's self-interest.  Based on this fact, the Kroger Plaintiffs allege that "Heritage induced Teva's exit by agreeing to concede market share to Teva on other drugs."

Defendants also contend that Plaintiffs fail to "plead facts sufficient to support a plausible inference that each of the individual drug conspiracies was connected to, much less dependent on the success of the others."  Once again, Defendants are wrong on both the facts and the law.  As

---

3       *See* Amended Complaint, Case No. 18-cv-284, ECF Nos. 36 (sealed version) & 37 (redacted version); hereinafter "Complaint."

explained in the Joint Opposition, interdependence does not require a showing that two separate

acts in furtherance of a conspiracy literally depend on each other.  Joint Opposition at 21–22.  *See*

*also United States v. Salmon*, 944 F.2d 1106, 1117–18 (3d Cir. 1991) (holding that an overarching

conspiracy existed because, "although Salmon's involvement as a cocaine supplier apparently was

not crucial to the continuing operations because Washington had several sources, Salmon's

supplying the cocaine nevertheless was 'advantageous to the ... overall success of the venture.'").[4]

Moreover, Defendants' argument ignores the numerous factual allegations in the Kroger

Plaintiffs' Complaint detailing how the individual drug agreements were connected.  As just one

example – the Kroger Plaintiffs discuss many others below – the Complaint details how Sandoz

and Mylan coordinated their price increases on Amitriptyline and Levothyroxine in order to allow

the Defendants to successfully implement and conceal their collusion on both drugs:

> For Levothyroxine, Mylan increased its prices on April 25, 2014, and
> Sandoz increased its matching price increase on May 23, 2014.  That same
> day, Sandoz increased its price for Amitriptyline, an increase that Mylan
> matched on July 16, 2014.  By staggering these price increases in a "my
> turn, your turn" fashion, Sandoz and Mylan were able to ensure that each
> would follow through with its promise to increase prices (as they had
> unlawfully agreed), while avoiding announcing price increases on the same
> day or extremely close in time.

Complaint, ¶ 823.  And this collusion across multiple drugs by Mylan and Sandoz also benefitted

Lannett, which only manufactured Levothyroxine, and Par, which only manufactured

Amitriptyline, as both companies were able to raise their prices in reliance upon the choreographed

scheme.  *Id.*

---

[4]     In *United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013), the Third
Circuit abrogated *Salmon* because the Court determined that *Salmon* applied too high of a standard
in evaluating the sufficiency of the evidence.

As explained extensively in Plaintiffs' Joint Opposition, Defendants' arguments in support

of dismissal rely entirely on criminal cases evaluating the sufficiency of the evidence after trial

and on summary judgment cases that apply an inapposite standard.[5]  *See* Joint Opposition at 1–5.

But regardless of what standard applies, the Kroger Plaintiffs' Complaint pleads – without the

benefit of any meaningful discovery from Defendants – each of the *Kelly* factors with more than

sufficient detail to support the inference that Defendants participated in the fair share industry-

wide agreement.

Next, Defendants point out that Mayne – which plausibly conspired on Doxycycline DR,

as the Court has determined in its initial Order denying Defendants' Group 1 motions to dismiss[6]

– is subject to joint and several liable for the damages the Kroger Plaintiffs incurred on the

---

[5]     Defendants argue in footnote five of their brief that certain of individual drug conspiracies alleged in the Kroger Plaintiffs' Complaints need to be replead as separate counts. Specifically, Defendants argue that five of the Kroger Plaintiffs' 31 counts (Counts 2 (Acetazolamide), 12 (Doxycycline), 23 (Metronidzaole), 25 (Nystatin), and 28 (Propranolol)) improperly combine allegations concerning multiple alleged conspiracies.  *See* Motion at 12, and Ex. A to Motion at 7.  Defendants fail to put forth any authority for the proposition that the Court should require the Kroger Plaintiffs to replead the five counts to allege multiple formulation-specific conspiracies rather than single-drug conspiracies.  In fact, Courts have held that "the mere fact that the Defendants have a different case theory should not deprive the plaintiffs of the opportunity to prove theirs."  *In re Air Cargo Shipping Services Antitrust Litigation*, No. 06-MD-1175, 2014 WL 7882100, at \*28 (E.D.N.Y. Oct. 15, 2004).  The scope of the conspiracies (*i.e.*, whether the five counts should be broken down into formulation-specific conspiracies) is a question of fact that should not be resolved at this early stage of the proceeding.  *In re Animation Workers Antitrust Litigation*, 123 F.Supp.3d 1175, 1213 (N.D. Cal. 2015) ("Though Defendants may disagree with plaintiffs' theory of the case, Defendants have failed to put forth any authority for the proposition that the Court should, at this stage of the proceeding [*i.e.*, Motion to Dismiss], determine whether Plaintiffs have really alleged one conspiracy or two.") (citation omitted); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265 (D.D.C. 2002) ("The plaintiffs have not alleged multiple conspiracies – they have alleged a single price fixing conspiracy … [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing it as separate parts but only by looking at it as a whole.") (citation omitted).

[6]     *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 440 (E.D. Pa. 2018) ("*Generics I*") ("Plaintiffs have plausibly alleged the existence of a Doxy DR conspiracy based on direct evidence and may proceed to discovery with respect to their Doxy DR claims.").

approximately thirty drugs that Mayne did not manufacture.  Motion at 6–7.  Based on this, Defendants argue that the Kroger Plaintiffs' "Complaint offers no facts supporting an inference that Mayne could have entered any other drug market or that its failure to do so was in any way related to a conspiracy, and no facts connecting Mayne to any of the other conspiracies or to drugs other than Doxy DR."  Motion at 7.

Once again, Defendants' straw-man argument takes an intentionally myopic view of the conspiracy.  The Kroger Plaintiffs do not allege that the generic drug manufacturers conspired *not to enter* certain drug markets.[7]  To the contrary, the conspiracy that the Kroger Plaintiffs allege (indeed that all Plaintiffs allege) involved the commitment of each Defendant to a set of rules that would govern their behavior *after they entered* the market for various drugs. Specifically, "[m]anufacturers implemented the 'fair share' agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful.  This prevented prices from declining even when a new 'competitor' joined the market."  Complaint, ¶ 9.

Thus, "Defendants reached agreements as to specific drugs and ... groups of Defendants entered into agreements to allocate market share as competitors entered the market for a particular drug."  *In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) ("*Generics II*") (concluding that the overarching conspiracy asserted by the State AGs was plausible under *Twombly* and granting leave to amend on that basis).  With this market allocation scheme, Defendants were able to thwart the traditional pattern of the generic drug industry that, "as more manufacturers market a particular generic pharmaceutical, the more the average price falls in relation to the price of the branded drug ...."  *Generics II*, 315 F. Supp. 3d at 853.

---

[7]      This does not foreclose the possibility that such agreements were reached.

Mayne's behavior, as alleged in the Kroger Plaintiffs' Complaint, exemplifies this overarching "fair share" agreement and demonstrates that Mayne was committed to this agreement.  As the Complaint alleges, Mayne contacted Heritage and Mylan in January 2014, one month before Mayne entered the Doxy DR market, to discuss "making room for Mayne in the market allocation agreement between Heritage and Mylan."  Complaint, ¶ 466.  Over the next two years, Mayne, Mylan, and Heritage engaged in a number of collusive acts, including discussions of "market and customer allocation concerning Doxycycline" and multiples instances of bid rigging.  Complaint, ¶ 470.  Thus, by reaching out to Mylan and Heritage before it entered the Doxy DR market so that it could receive its "fair share," Mayne ensured that the three Defendants could maintain the supracompetitive market price on Doxy DR, and perpetuate that high price for years.  Complaint, ¶ 471.

Based on the historical pattern in the generic drug industry where prices fall as new generic manufacturers enter the market, the price for Doxy DR should have been 44% of the branded drug price after Mayne entered the market.  Complaint, ¶ 469.  Instead, based on the rules of the "fair share" conspiracy, Mayne did not have to offer a lower price to compete for new customers despite starting with no market share.  Instead, Mayne took actions that would have been against its self-interest in the absence of collusion – and directly contrary to the observed economics of the generic drug industry over the last 30 years – by entering the market at the prevailing supracompetitive price.  Complaint, ¶¶ 469 & 471.

Mayne's behavior before and after entering the Doxy DR market clearly supports the inference that it knew the rules of the "fair share" conspiracy and that it committed to that scheme.  The fact that Mayne reached out to Heritage and Mylan before entering the market in order to discuss unlawful market allocation agreements clearly supports the inference that Mayne was

aware of this "fair share" conspiracy.  And the fact that Mayne submitted rigged bids to customers after entering the Doxy DR market demonstrates its commitment to the unlawful scheme.  More generally, the Mayne example vividly illustrates how the Kroger Plaintiffs' Complaint alleges an overarching "fair share" agreement to enable the collusion that occurred on Doxy DR (and all other drugs in the Complaint).

Defendants also assert in their Motion that the Kroger Plaintiffs' Complaint does not "offer any facts suggesting that the success or failure of the alleged Doxy DR conspiracy depended in any way on the success or failure of any other conspiracy involving any other product."  Motion at 7.  Again, Defendants make this sweeping condemnation of the Kroger Plaintiffs' Complaint without making any attempt whatsoever to confront the allegations that address this precise example.

Specifically as to Doxy DR and Mayne, the Kroger Plaintiffs allege two concrete examples of how the overarching conspiracy facilitated the collusion.  First, as Plaintiffs allege in ¶ 464 of their Complaint, "Mylan agreed to concede market share for Doxycycline to Heritage in consideration for Heritage conceding market share to Mylan for a second generic drug."  This agreement between Heritage and Mylan – which necessitated collusion across multiple drugs – inured to the benefit of Mayne when it entered the market for Doxy DR at a supracompetitive prevailing price.  And this prevailing supracompetitive price on Doxy DR "allowed [Mylan and Heritage] to reach an agreement that allocated to Mayne a percentage of the market and prevented price competition that would have disturbed the [collusive agreement between Mylan and Heritage]."  Complaint, ¶ 820.

Second, the existence of the overarching conspiracy and its "fair share" rules benefitted Mayne because it disincentivized cheating on the cartel, by building trust among conspirators and

instilling faith among Defendants that their counterparts would follow through with their

agreements:

> The overarching conspiracy enhanced Defendants' ability to enforce the
> conspiracy, both for conspirators that manufactured many Price-Fixed
> Generic Drugs, and for those that manufactured just one. For example,
> Mayne (which manufactured only Doxycycline) knew that Mylan and
> Heritage had an added incentive to follow through on the unlawful
> agreements on Doxycycline, which helped to ensure that Mayne also
> committed to the conspiracy. Indeed, Mylan and Heritage shared a strong
> incentive to reward Mayne for its adherence to the overarching conspiracy.

Complaint, ¶ 822. And just as Mayne was incentivized to follow the conspiracy on Doxycycline,

the overarching conspiracy's "fair share" rules also provided Mayne with confidence that, if other

manufacturers entered the Doxy DR market, their entry would not disrupt the supracompetitive

pricing.

As Defendants further point out, "Mayne, of course, is only one example." Motion at 7.

On this point, the Kroger Plaintiffs wholeheartedly agree. Just as their Complaint links Mayne to

the overarching conspiracy with these specific examples, it does so as to all Defendants that

collusively increased or maintained prices on generic drugs through the "fair share" overarching

agreement. Indeed, although not legally necessary at this early juncture, the Kroger Plaintiffs

establish that (1) each Defendant was aware of the overarching conspiracy and committed to it;

(2) that the individual drug conspiracy agreements were interdependent in a number of respects

(*i.e.*, that the individual agreements benefitted each other); and (3) that there was sufficient overlap

by the Defendants across the individual drug conspiracies. *See United States v. Kelly*, 892 F.2d

255 (3d Cir. 1989).

    1.    <u>Each Defendant Was Aware of the Conspiracy and Committed to It</u>

Plaintiffs' Joint Opposition explains how each Plaintiffs' Complaint satisfies the first *Kelly*

factor. *See* Joint Opposition at 9–25. As with the example of Mayne, *supra*, the Kroger Plaintiffs'

Complaint demonstrates each Defendants' awareness of, and commitment to, the overarching conspiracy through each Defendant's participation in the individual drug conspiracies.

Indeed, Defendants largely concede that the Kroger Plaintiffs' Complaint (and all Plaintiffs' Complaints in this MDL) plausibly allege individual conspiracies under *Twombly*. Of the twenty-nine Defendants that participated in the overarching conspiracy alleged in the Kroger Plaintiffs' Complaint, only four (Breckenridge, Valeant, G&W, Teligent), have filed motions challenging whether Plaintiffs' individual drug conspiracies are plausible under *Twombly*. As explained in Plaintiffs' responses to these motions, these challenges are without merit.

Accordingly, given that Plaintiffs have plausibly implicated every Defendant in their Complaint into at least one individual conspiracy, it stands to reason that those same Defendants are also plausibly linked to the overarching conspiracy.

Defendants also take issue with the "group pleading" convention that the Kroger Plaintiffs have used to satisfy this *Kelly* factor in ¶¶ 814–815 of the Complaint, where Plaintiffs allege that "each Defendant consciously committed to a common scheme," and that "each Defendant had knowledge of the conspiracy to increase prices." But in light of the more than 800 extremely detailed paragraphs that precede these two allegations, Defendants' argument is baseless.

As the Eleventh Circuit recently recognized in an opinion that otherwise dismissed all of the plaintiffs' antitrust claims (for reasons wholly inapplicable here), there is nothing wrong with alleging that "each Defendant" committed an act, provided that the complaint otherwise puts those defendants on fair notice of the conduct attributable to each individual company. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1275 (11th Cir. 2019) (*en banc*) ("the named Defendants in each complaint had fair notice that 'each and every' one of them

is alleged to have improperly steered its own insureds away from the named Body Shops in each complaint").

Here, the Kroger Plaintiffs provide each Defendant with more than 800 paragraphs of allegations detailing specific meetings, specific communications, and specific agreements that were reached by each individual company in furtherance of the overarching conspiracy.  Plaintiffs further allege that Defendants became aware of the overarching conspiracy through these meetings and communications, and that their collusive price-fixing, bid-rigging, and market allocation agreements in furtherance that conspiracy demonstrate their commitment to that common scheme. Complaint, ¶¶ 814–815.  Given this substantial detail, no Defendant makes even a colorable suggestion that the Kroger Plaintiffs' Complaint fails to provide fair notice of the conduct that subjects each individual company to liability.

2.      The Individual Drug Agreements Were Interdependent

The Kroger Plaintiffs' Complaint identifies six examples of how the individual drug conspiracies were interdependent.  The Kroger Plaintiffs have already discussed three examples of interdependence above.

First, as the example of Sandoz and Mylan demonstrates, the overarching conspiracy allowed Defendants to coordinate their collusive price increases across multiple drugs, which helped Defendants to police the conspiracy and prevent its detection.  Sandoz and Mylan staggered their price increases on Levothyroxine and Amitriptyline, with Mylan increasing its Levothyroxine first, followed by Sandoz increasing its prices on both drugs, and then culminating with Mylan increasing its prices on Amitriptyline.  And by facilitating and concealing their price increases on both drugs, this coordinated collusion across drug markets benefitted Lannett, which only manufactured Levothyroxine, and Par, which only manufactured Amitriptyline.  Indeed, both these

10

Defendants were able to raise their prices on the drugs that they did manufacture with the demonstrated assurance that Mylan and Sandoz would both follow through with their ends of the collusive bargain. *See* Complaint, ¶ 823.

Second, as explained above with regard to Mayne, each individual drug conspiracy was beneficial to the others by creating trust among the conspirators that prevented cheating and allowed the conspiracy's leaders (Defendants such as Heritage, Mylan, Teva, Actavis, Sun, and Sandoz) to induce the cooperation of companies that only manufactured one drug. As the Complaint explains, the individual drug conspiracies involved truly massive price increases that typically involved multiples of each drug's original price, rather than a mere percentage increase. Thus, the "fair share" rules of the overarching conspiracy allowed, for example, Breckenridge to lead a price increase on Propranolol by announcing that it was doubling its price on the drug. In a competitive market, such a massive price increase would be catastrophic. But Breckenridge knew that Actavis – one of the conspiracy's leaders – would follow this price increase, just as Actavis did on numerous other generic drugs, and this knowledge was enough to permit Breckenridge to take an act that could have been fatal absent collusion. *See* Complaint, ¶¶ 744, 821. This same logic applies to each of the Defendants that multiplied their prices on generic drugs in furtherance of the conspiracy.

Third, also as detailed above with respect to Mayne, Mylan, and Heritage, the overarching conspiracy created additional mechanisms that allowed Defendants to settle disputes by negotiating across multiple drug markets. Thus, "market share itself became a fungible commodity that could be traded," as evidence by the example of Mylan conceding market share to Heritage on Doxy DR based on Heritage's concessions to Mylan on a second generic drug. And because

Defendants could better avoid price wars, this benefitted all Defendants, including those that conspired on only one drug.  *See* Complaint, ¶¶ 819–821.

Fourth, the individual drug conspiracies were interdependent because each successful conspiracy price increase reduced the quantity of that drug that was ultimately produced and sold. (Although demand for generic drugs is highly inelastic, it is not perfectly inelastic, and massive price increases such as the ones implemented by Defendants will have the effect of reducing demand).  "Because all of the drugs involved in the conspiracy shared common inputs such as binding agents," each successful price increase had the effect of reducing the demand for those inputs.  Complaint, ¶ 824.  As a result, each individual drug conspiracy benefitted the others by allowing Defendants to better control not just the prices at which they sold their price-fixed drugs, but also the prices that Defendants paid to their own suppliers for the ingredients necessary to manufacture generic drugs.

In *In re: Cathode Ray Tube (CRT) Antitrust Litig.*,[8] this feature of two individual conspiracies was enough, by itself, to establish at summary judgment that "two (at least nominally) separate conspiracies were actually one."  In that case, the two individual conspiracies involved the monitors that went into televisions (cathode picture tubes or "CPTs") and the monitors used for computers (cathode display tubes or "CDTs").  "Because CDTs and CPTs were used in different products and had different customers, CDTs and CPTs competed in different markets. The products were not demand-side substitutes ... a producer of finished CRT products seeking to reduce its costs could not switch from CDTs to CPTs, or vice-versa."  *Id.* at *1.

One defendant, Thomson, manufactured only CPTs, and moved for summary judgment on claims against it related to the CDT conspiracy.  Notwithstanding the fact that Thomson did not

---

[8]      MDL No. 1917, 2016 WL 5848702, at *2 (N.D. Cal. Oct. 6, 2016).

manufacture or sell CDTs, the Court determined that there was sufficient evidence to create an issue of fact on whether Thomson had an interest in, or benefitted from, the CDT conspiracy. The Court made this determination based on evidence that Thomson was aware of collusion related to CDTs and benefitted from it. The Court explained that, "although Thomson Consumer did not manufacture or sell CDTs or CDT products, it had reason to be interested in the impact of the CDT market on the supply of glass, which is a crucial component of both CDTs and CPTs." *Id.* at *4. And because the collusion on a separate but related product benefitted Thomson by reducing its input prices, this established interdependence. *Id.*

*CRT* is instructive here, given that the only common goal among the conspirators in those separate markets was the desire to lower their input costs, which the Court determined sufficient to create a triable issue of fact. And as Defendants concede, the Kroger Plaintiffs do allege – without the basis of any meaningful discovery – communications between Sun and Heritage about a drug that Sun did not manufacture. Motion at 14 (citing Complaint, ¶ 593). Defendants do not offer any innocent explanation for why Heritage would brief Sun about its collusion on a drug that only Heritage manufactured. But Plaintiffs' overarching conspiracy offers an explanation for this behavior that the Court has already determined to be plausible. *See Generics II.*

Fifth, because the substantial price increases incentivized other generic drug manufacturers to enter the cartelized markets, "it was necessary for Defendants to implement the numerous conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supracompetitive profits." *See* Complaint, ¶ 825. In other words, the individual drug conspiracies were interdependent because, if there were only a few successful collusive price increases, the supracompetitive pricing achieved by those conspirators could not have endured. By way of example, suppose that the conspiracy involved only one

13

massive price increase on a single drug.  In that scenario, generic manufacturers would flock to that drug market, and the supracompetitive price would eventually collapse due to excess manufacturing capacity.  Indeed, this is the pricing pattern that all drugs follow when they come off patent.  *See Generics II*, at \*2; *see also* Complaint, ¶¶ 115–119.

Further, the Complaint alleges that "in the instances, if any, that the Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug.  For example, Fougera stopped production of Fluocinonide in January 2015, after the collusive price increase had been implemented on the drug.  Similarly, Teva discontinued production of Doxy Hyclate in May 2013, after the collusive price increase had been implemented on the drug."  Complaint, ¶ 825.  These instances where certain Defendants stopped manufacturing drugs *after* the massive price increases were implemented make no economic sense in isolation.  Moreover, these examples cannot be explained based only on the individual drug conspiracies.  Instead, the overarching market-wide conspiracies alleged by Plaintiffs offer the most plausible explanation for why manufacturers would exit a market *after* they successfully raised their prices by more than 2500% (in the case of Doxycycline) and by more than 200% (in the case of Fluocinonide).

Sixth, the Complaint alleges that "certain of the Price-Fixed Generic Drugs are subject to a degree of long-run demand-side substitution.  For example, the topical corticosteroids – Fluocinonide, Desonide, and Clobetasol – are all used for similar purposes.  The same is true of the oral diabetes drugs (Glipizide, Glyburide, and Glyburide-Metformin).  Accordingly, the success of certain of the conspiratorial price increases for the Price-Fixed Generic Drugs were relevant to the long-term success of other of the conspiratorial price increases."  Complaint, ¶ 826.  Thus, the individual drug conspiracy on Desonide benefitted the individual drug conspiracy on

14

Clobetasol, and vice versa.  If the price of Desonide increased substantially (as it did) without the price of Clobetasol increasing, some consumers would eventually have switched to the lower priced drug.  But by increasing prices on both drugs, the conspirators ensured that both collusive price increases could endure.

Defendants' complete failure to address any of these allegations detailing how the individual drug conspiracies were advantageous to industry-wide fair share agreement – all supported by specific allegations and examples from the Kroger Plaintiffs' Complaint – is revealing.  The Kroger Plaintiffs' Complaint easily clears the low bar necessary to allege interdependence under *Twombly*, and Defendants cannot offer a single argument to the contrary that actually engages with these allegations.

3.      There Was Substantial Overlap Between the Co-Conspirators

The Kroger Plaintiffs' Complaint satisfies the third *Kelly* factor – overlap – by establishing that a small group of Core Conspirators participated in all the individual drug conspiracies identified in the Complaint.[9]

As Exhibit 2 to the Kroger Plaintiffs' Complaint demonstrates, there is substantial overlap by the Defendants across the individual drug conspiracies.  Twenty-one out of the twenty-nine Defendants named in the Complaint manufactured more than one of the price-fixed generic drugs.  Additionally, a core group of six conspirators manufactured every drug identified in the Complaint.  These Defendants – Heritage, Mylan, Teva, Actavis, Sun/Taro, and the Sandoz Defendants – are identified in the Complaint as the "Core Conspirators."  Moreover, for all but three drugs

---

[9]      Again, Defendants' argument addressing overlap confuses the governing standard.
*See* Joint Opposition at 24–25.

(Meprobamate, Lidocaine, and Zoledronic Acid), two of the Core Conspirators participated in the collusion. *See* Complaint, Ex. 2.

As the Third Circuit has long recognized, a single conspirator need not participate in every individual agreement in order for there to be a single overarching conspiracy, provided that there is sufficient overlap by the core members of that conspiracy. *See United States v. Smith,* No. 15-cr-180, 2018 WL 3459869, at \*22 (E.D. Pa. July 18, 2018) (quoting *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978)) ("even if a small group of co-conspirators [is] at the heart of an unlawful agreement, others who knowingly participate with the core members and others to achieve a common goal may be members of a single conspiracy."). Defendants do not offer any argument why the extent of overlap across the individual drug conspiracies is insufficient under this binding precedent.[10]

But even if the Kroger Plaintiffs' Complaint did not allege sufficient overlap, this defect would not be fatal to the Complaint. As the Third Circuit further recognizes, an overarching conspiracy can exist even where all three of the *Kelly* factors are not satisfied. *See United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992) ("To the extent Padilla has implied the absence of any of the Kelly factors, for example, by asserting there was insufficient overlap between members, we note that the Kelly factors are most useful to show the existence of a single conspiracy, but that the absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy.").

---

[10]   In their discussion of overlap, Defendants do not even cite to *Boyd*, much less try to distinguish this binding precedent. *See* Motion, at 25–28.

Accordingly, the significant degree of overlap by Defendants across the individual drug conspiracies as detailed in the Kroger Plaintiffs' Complaint is more than sufficient to satisfy the third *Kelly* factor.

## Conclusion

The Kroger Plaintiffs' Complaint alleges that Defendants cartelized more than 30 individual drug markets and implemented massive collusive price increases on these drugs by adhering to the rules of the "fair share" conspiracy.  The Complaint further establishes that each Defendant was aware of, and committed to, the individual agreements reached through this overarching conspiracy.  Additionally, the Complaint demonstrates – with substantial detail that is ignored entirely by Defendants – that these individual drug conspiracies benefitted each other and were therefore interdependent.  Finally, the Complaint alleges that there was substantial overlap by the Defendants across the individual drug conspiracies.

For these reasons, the Kroger Plaintiffs' Complaint meets the *Twombly* standard and Plaintiffs should be permitted to proceed to discovery based on their overarching conspiracy.

Dated:  May 2, 2019

Respectfully submitted,

By:  _____

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Scott E. Perwin, Esquire
Anna T. Neill, Esquire
Samuel J. Randall, Esquire
Brandon S. Floch, Esquire
Joshua B. Gray, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:   (305) 373-1000
Fax:   (305) 372-1861
E-mail: rarnold@knpa.com
        wblechman@knpa.com
        sperwin@knpa.com
        aneill@knpa.com
        srandall@knpa.com
        bfloch@knpa.com
        jgray@knpa.com

***Counsel for Kroger Plaintiffs***

597210.2

18