# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc., et al.* | No. 18-2641 |
| *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc., et al.* | No. 18-2401 |
| *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | No. 18-3299 |
| *West Val Pharm., et al. v. Actavis Holdco U.S., Inc., et al.* | No. 18-2533 |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | No. 18-284 |
| *The State Attorneys General Litigation* | No. 17-3768 |

## PLAINTIFFS' OPPOSITION TO APOTEX CORP.'S MOTION TO DISMISS PLAINTIFFS' OVERARCHING CONSPIRACY CLAIMS

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ........................................................................................................................1

FACTS .........................................................................................................................................1

ARGUMENT ...............................................................................................................................6

      I.      Plaintiffs plausibly allege an overarching conspiracy ............................................6

      II.     Plaintiffs plausibly allege that Apotex participated in a conspiracy that extends beyond Pravastatin and Leflunomide.......................................................................8

      III.    Even under the *Kelly* factors, Plaintiffs plausibly allege an overarching conspiracy. ...............................................................................................................11

            A.     Common Goal .............................................................................................11

            B.     Continuous Cooperation ............................................................................12

            C.     Overlapping Participants............................................................................13

CONCLUSION...........................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ...................................................6, 7

*Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962)..........................9

*Finkelman v. NFL,* 810 F.3d 187 (3d Cir. 2016) ..........................................................10

*GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799 (E.D. Mich. 2018)..........................................7

*In re: Auto. Parts Antitrust Litig.,* MDL 2311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016)....7

*In re Generic Pharms. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848 (E.D. Pa. 2018)....6, 7, 12, 13

*In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018).......... *passim*

*In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300 (3d Cir. 2010)................................................9

*In re Optical Disk Drive Antitrust Litig.*, MDL 2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ........................................................................................................................10

*In re Optical Disk Drive Antitrust Litig.,* MDL 2143, 2014 WL 3378336 (N.D. Cal. July 10, 2014) ........................................................................................................................10

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) ....................10

*U.S. v. Ashland-Warren, Inc.*, 537 F. Supp. 433 (M.D. Tenn. 1982) ...........................................10

*U.S. v. Bobb*, 471 F.3d 491 (3d Cir. 2006) ...................................................................................11

*U.S. v. DeVarona*, 872 F.2d 114 (5th Cir. 1989) ..........................................................................13

*U.S. v. Fattah*, 914 F.3d 112 (3d Cir. 2019) ........................................................................11, 12, 13

*U.S. v. Kelly*, 892 F.2d 255 (3d Cir. 1989) ...............................................................8, 11, 12, 13

*U.S. v. Keystone Biofuels*, 350 F. Supp. 3d 310 (M.D. Pa. 2018)............................................8, 11

*U.S. v. Padilla*, 982 F.2d 110 (3d Cir. 1992) ......................................................................11, 13

*U.S. v. Perez*, 280 F.3d 318 (3d Cir. 2002)....................................................................................9

*U.S. v. Rigas*, 605 F.3d 194 (3d Cir. 2010)...................................................................................12

- ii -

*Zachair, Ltd. v. Driggs,* 965 F. Supp. 741 (D. Md. 1997) ............................................................10

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................................8

Fed. R. Civ. P. 15 ......................................................................................................................14

## INTRODUCTION

Apotex Corp. ("Apotex") has moved to dismiss the Plaintiffs' overarching conspiracy claims because it argues that Plaintiffs' complaints have insufficiently linked its anticompetitive conduct concerning at least its sales of Leflunomide and Pravastatin "to each other or to any other drug in the MDL."[1] Apotex is incorrect. In the years before the alleged conspiracies, the pricing of Apotex's generic drugs, along with the pricing of the MDL drugs as a whole, is evidence of the overarching conspiracy in which Apotex joined. Both Leflunomide and Pravastatin, as well as all the other MDL Drugs, should have exhibited the stable and low pricing typical of a mature, commodity generic pharmaceutical. And yet between the Summer of 2011 and the Spring of 2015, each MDL Drug experienced a sudden reduction of competition: often manifested in drastic and unprecedented price increases and effectuated by communications among a close-knit and overlapping group of industry players. Of the 31 drugs that have been targeted in MDL 2724 to date, all but 4 involve conspiracies alleged to have been joined by one or more of the Defendants named with regard to Pravastatin or Leflunomide.

As set forth below, Apotex's conduct has been amply linked to the overarching conspiracy, and its motion to dismiss should be denied.

## FACTS

Plaintiffs allege that Apotex participated in an overarching conspiracy to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs.[2] That conspiracy began no later than 2011.[3] And it implicates Leflunomide and Pravastatin, as well as

---

[1] Apotex Br. at 1.

[2] *See, e.g.,* State CAC ¶¶ 1-15; IRP CAC ¶¶ 1-2, 65-72; DPP CAC ¶¶ 1-24; EPP CAC ¶¶ 1-20; Kroger Compl. ¶¶ 1-23; Humana Compl. ¶¶ 1-16.

[3] *See, e.g.,* IRP CAC ¶; DPP CAC ¶ 122; EPP CAC ¶ 101; Kroger Compl. ¶¶ 813, 833.

numerous other drugs for which Apotex has an ANDA.[4] The States have found that the

methodology underlying the conspiracy "has evolved over time during the numerous in-person

meetings, telephone communications and other interactions . . . over the course of several years,

but general rules of the road have been in place since at least 2006."[5]

      In their recently upheld complaints concerning Pravastatin, Private Class Plaintiffs allege

Apotex's involvement in a broader conspiracy, including that Apotex was a member of and had

leadership roles in trade organizations where Defendants had an opportunity to meet and discuss

pricing.[6] In the overarching complaints currently before the Court, Private Class Plaintiffs

alleged that the separately pleaded anticompetitive conduct concerning Pravastatin was part of

the "larger conspiracy or series of conspiracies involving many generic pharmaceutical

manufacturers and many generic pharmaceuticals."[7] In their Amended Complaints now before

the Court, Kroger and Humana have included allegations pertaining to Pravastatin that parallel

those allegations already upheld by the Court.[8] While the States have not included Pravastatin-

related claims in their Consolidated Amended Complaint, they have specifically alleged that

their drug-specific claims are not intended to be comprehensive.[9] Instead, the States' claims were

---

[4] According to a recent filing by Apotex in this MDL (*see* Dkt No. 742 at 6 n.10), Apotex holds ANDAs, but has not entered the market for at least the following drugs: Albuterol, Benazepril-Hydrochlorothiazide, Clobetasol, Divalproex ER, Glipizide-Metformin, Zoledronic Acid, and Verapamil. *See also* EPP CAC ¶¶ 112-17.

[5] State CAC ¶ 91. *Accord* Humana Compl. ¶ 264.

[6] DPPs' Pravastatin Complaint ("DPP PV CC") ¶¶ 103, 114-34, No. 16-PV-27241, Dkt. No. 67; EPPs' Pravastatin Complaint ("EPP PV CC"), ¶¶ 135-71, No. 16-PV-27242, Dkt. No. 79; IRPs' Pravastatin Complaint ("IPP PV CC"), ¶¶ 131-33, No. 16-PV-27243, Dkt. No. 10.

[7] DPP CAC ¶ 8 (quoting *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 411 (E.D. Pa. 2018) ("*Generics I*")); *see also* IRP CAC ¶ 2; EPP CAC ¶¶ 3, 146, 163.

[8] Kroger Compl. ¶¶ 716-41; Humana Compl. ¶¶ 632-44.

[9] *See, e.g.,* State CAC ¶¶ 3, 11, 92-93.

pleaded as "part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition."[10]

In their overarching complaints, each concerning many drugs, including Leflunomide, the Plaintiffs alleged that:

> Defendants and their co-conspirators' anticompetitive conduct as to the Named Generic Drugs is part of an industry-wide, overarching "fair share" conspiracy (Fair Share Agreement) involving at least the Named Generic Drugs and the numerous generic drugs previously-filed on. Under this Fair Share Agreement, each generic drug manufacturer was entitled to its fair share of the generic drug industry "sandbox."[11]

Under the Fair Share Agreement, inflated prices could be established, among other things, by (i) limiting the number of competitors vying for market share for each drug; and (ii) an agreement among the "competitors" that no market participant would undercut another manufacturer's price increase.[12] Thus, for example, there was a general understanding among Defendants that the first entrant to sell a particular generic drug was entitled to the largest share of sales. Future entrants, who may have obtained their ANDAs later, could be enticed to refrain from meaningful competition by promises of a larger share of another generic drug market.[13] The goal was to maintain an equilibrium among the Defendants that dissuaded price competition, and the agreement was premised on the understanding that Defendants were current or future competitors with each other across numerous drugs.[14]

Plaintiffs allege that the conspiracy was facilitated by the frequent interaction between "repeat players," who communicated at industry trade events, as well as via telephone, email and

---

[10] *Id.* at ¶ 11.

[11] *See, e.g.,* DPP CAC ¶ 9. *Accord* State CAC ¶ 14; Kroger Compl. ¶ 139; IRP CAC ¶ 66; EPP CAC ¶ 103; Humana Compl. ¶ 262.

[12] *See, e.g.,* EPP CAC ¶¶ 102-27; State CAC ¶¶ 89-109; DPP CAC ¶¶ 9-17; IRP CAC ¶¶ 65-72; Kroger Compl. ¶¶ 137-39, 813-32; Humana Compl. ¶¶ 261-71.

[13] *Id.*

[14] *Id.*

texting.[15] Indeed, many of the key employees had personal connections from their prior

employment at competitor firms, and these connections helped facilitate the conspiracy.[16] Beth

Hamilton, for example, was a key conspirator at Apotex until she left to join Mayne.[17] In this

insular world, these repeat players were able to establish "rules of the road" that over time came

to govern the overarching conspiracy and were manifested in higher prices experienced across

the generic pharmaceutical industry.[18]

Apotex and its executives were such repeat players. For example, Apotex's Jeff Watson

sat on the board of the Generics Pharmaceutical Association ("GPhA") (now known as the

Association for Accessible Medicine) in 2012, along with Heritage's former CEO Jeffrey Glazer

and other high-level executives of other Defendants, including Teva.[19] Indeed, all three

Leflunomide co-conspirators sat on the GPhA board from 2012 through 2015. All but one of

nine Pravastatin co-conspirators sat on the GPhA board during some or all of the relevant

period.[20]

Glazer and Heritage's former President Jason Malek both have pled guilty to price-fixing.

In Spring 2014, they used their relationships that were developed from their frequent

participation in trade associations, including the GPhA, to reduce competition and increase or

maintain prices for many drugs, including Leflunomide.[21] Plaintiffs allege that in the spring of

---

[15] *See, e.g.,* DPP CAC *¶¶* 12-15; EPP CAC ¶¶ 109-11, 134-44*;* IRP CAC ¶¶ 2, 69-72; Kroger Compl. ¶¶ 19-21, 135, 147-76; Humana Compl. ¶¶ 173-203.

[16] *See, e.g.*, IRP CAC ¶ 71; DPP CAC ¶ 13.

[17] IRP CAC ¶ 71.

[18] *See, e.g.,* DPP CAC ¶ 15; EPP CAC ¶ 103; State CAC ¶ 91.

[19] *See, e.g.,* DPP CAC Exh. E; Kroger Compl. ¶ 157; Humana Compl. ¶¶ 181-82.

[20] *Id.*

[21] DPP CAC ¶¶ 245-58; EPP CAC ¶¶ 560-81; IRP CAC ¶¶ 263-80; State CAC ¶¶ 283, 380-90; Kroger Compl. ¶¶ 598-603; Humana Compl. ¶¶ 548-67. Apotex was also a member of the

2014, Malek assigned Heritage's National Account Manager Matt Edelson to coordinate with Apotex regarding Leflunomide pricing. In June 2014, Edelson, in turn, reached out to Apotex's Debbie Veira and Beth Hamilton, with the ultimate result that both companies raised the price of Leflunomide, as the only other competitor (Teva) left the market.[22]

That Edelson chose Hamilton to reach out to is unsurprising. Hamilton was a regular and frequent attendee at no fewer than 29 trade events from June 2010 through 2015.[23] Many of these same events were also attended by Edelson, Malek, and Glazer, making it very likely that a relationship had formed at these venues. For example, Edelson attended 12 such events over the same time period and attended his first event with Hamilton in August 2010.[24]

Apotex communicated by phone with Teva since at least July 2013, the earliest month for which the States had obtained records at the time they filed their operative complaint.[25] The pattern of phone communications shows that while Apotex is part of an industry-wide network that is far wider than the two specific drugs that it has so far been accused on. For example, Plaintiffs allege that Apotex conspired with Teva (Leflunomide and Pravastatin) and Heritage (Leflunomide). During a one-year period, Heritage executives with pricing authority had at least 513 known contacts with employees at 13 different Defendants, including Apotex. Teva executives with pricing authority had 1,501 contacts with 13 Defendants, including Apotex.[26]

---

HDMA and was a frequent attendee of NACDS, GPhA, ECRM and HDMA meetings. Kroger Compl. ¶ 159, Exh. 3; DPP CAC Exh. D; EPP CAC Exh. 1; Humana Compl. ¶ 184.

[22] DPP CAC ¶¶ 245-58; EPP CAC ¶¶ 560-81; IRP CAC ¶¶ 263-80; Kroger Compl. ¶¶ 598-603; Humana Compl. ¶¶ 548-67; State CAC ¶¶ 283, 380-90.

[23] *See* DPP CAC Exh. D; Kroger Compl. Exh. 3. *Accord* EPP CAC ¶¶ 153, 161, 168, 172, 176-78, 350, 355, 390, Exh. 1; Humana Compl. Exh. A. Ms. Veira was also a frequent trade association attendee. *Id.*

[24] DPP CAC Exh. D.

[25] State CAC ¶ 95.

[26] EPP CAC ¶¶ 141-43; Humana Compl. ¶ 201. *Accord* Kroger Compl. ¶¶ 173-76.

This communication scheme shows that negotiations about one drug could quickly expand to cover many. For example, Heritage's Jason Malek and Teva's Nisha Patel are alleged to have begun speaking by phone in February 2014 about fixing prices on Nystatin oral tablets; by April 2014, they had expanded their discussion to cover seven drugs, including Leflunomide.[27] Indeed, Teva and Heritage have been named as Defendants regarding more than a dozen drugs each in this MDL, respectively.[28] As noted above, all but 4 of the 31 drugs targeted in this MDL to date involve conspiracies alleged to have been joined by one or more of the Defendants named with regard to Pravastatin or Leflunomide.[29]

## **ARGUMENT**

## I. **Plaintiffs plausibly allege an overarching conspiracy**

"An antitrust complaint is sufficient if it contains 'enough factual matter (taken as true) to suggest that an agreement was made.' As long as the facts pleaded provide 'plausible grounds to infer an agreement,' a well-pleaded complaint may proceed even if it seems that 'actual proof of those facts is improbable. . . .'"[30] Applying this standard, this Court denied Apotex and its Co-Defendants' motions to dismiss Private Class Plaintiffs' Pravastatin complaints, holding that they "alleged sufficiently *similar* price increases for Defendants' Pravastatin within a few months of each other" to support parallel conduct[31] and "made sufficient allegations of evidence implying a traditional conspiracy to permit their Sherman Act claims to withstand dismissal."[32]

---

[27] EPP CAC ¶¶ 228-32; 560-81; IRP CAC ¶¶ 76-80, 263-80; DPP CAC ¶¶ 125, 245-58; Kroger Compl. ¶¶ 598-603; Humana Compl. ¶¶ 548-67; State CAC ¶¶ 283, 380-90.

[28] DPP CAC Exh. A.

[29] *Id.*

[30] *In re Generic Pharms. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) ("*Generics II*") (footnotes omitted, quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

[31] *Generics I*, 338 F. Supp. 3d at 446 (emphasis in original).

[32] *Id.* at 454.

The Court also overruled Apotex and its Co-Defendants' objection to the States' amendment of their complaint to allege an overarching conspiracy involving 15 drugs and 20 Defendants, finding a broad conspiracy "plausible" in this context. Specifically, this Court held that it was "not prepared to rule at this time that it is implausible that pharmaceutical manufacturers agreed for anticompetitive reasons how the broader market for generic pharmaceuticals will be divided," given the ongoing "state and federal investigations" and the States' allegations "that Defendants were coordinating more than one drug at a time and thereby influencing the broader generic drug market."[33] This Court further stated that Defendants would not be prejudiced by the amendments, noting that "this is not a case where there is 'no reasonably founded hope that the discovery process will reveal relevant evidence to support' the antitrust and other claims."[34]

The *In re: Automotive Parts Antitrust Litigation*[35] decision ("*Auto Parts*"), which the Court declined to follow on the States' motion to amend, likewise does not support dismissal of Plaintiffs' overarching conspiracy complaints. The *Auto Parts* court "relied in part on the assessment of the U.S. Department of Justice," after a six-year investigation, that the auto part suppliers "'engaged in various and separate and independent conspiracies.'"[36] Here, however, the States (who spearheaded this investigation into Apotex and its Co-Defendants' conduct) reached the opposite conclusion – that multiple Defendants, including Apotex, "participated in an overarching conspiracy to 'minimize if not thwart competition across the generic drug industry' through a series of specific conspiracies."[37] And unlike the *Auto Parts* decision, both the Private

---

[33] *Generics II*, 315 F. Supp. 3d at 854.

[34] *Id.* (quoting *Twombly,* 550 U.S at 559).

[35] MDL 2311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016).

[36] *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 811 (E.D. Mich. 2018).

[37] *Generics II*, 315 F. Supp. 3d at 852.

Plaintiffs and the States allege that individual Defendants had knowledge of the conduct of other Defendants regarding products that individual Defendants did not sell; further, Plaintiffs allege that Defendants struck deals to allocate the market of different drugs. The conspiracy depended on an understanding across Defendants that it was in everyone's interest to "play nice in the sandbox" – refrain from competing for share in one drug market – to yield rewards in another drug market; consequently, all Defendants benefited from the broader generic pharmaceutical market they created with markedly higher prices and less competition than the norm.

## II.   Plaintiffs plausibly allege that Apotex participated in a conspiracy that extends beyond Pravastatin and Leflunomide.

Plaintiffs are not aware of any decision applying the factors identified in *United States v. Kelly*,[38] which Apotex relies on, to test the sufficiency of allegations supporting an overarching conspiracy under Rule 12(b)(6). *Kelly*, which sets forth a three-factor, post-conviction test to determine "whether there [is] sufficient evidence from which the jury could have concluded that the government proved the single conspiracy alleged in the indictment,"[39] serves a markedly different purpose than the Court's plausibility analysis under Rule 12(b)(6). Courts have rejected its application in motions to dismiss criminal charges.[40] *Twombly* "does not require heightened fact pleading of specifics and expressly disclaimed an approach focusing on the probability that a complaint's allegations will ultimately be vindicated."[41] For purposes of Rule 12(b)(6), "'Plaintiffs are not obliged to have the same quality or quantity of allegations as to one defendant

---

[38] 892 F.2d 255 (3d Cir. 1989).

[39] *Id.* at 258.

[40] *U.S. v. Keystone Biofuels*, 350 F. Supp. 3d 310, 320 (M.D. Pa. 2018) ("[T]hat test cannot be dispositive of whether a defendant's pre-trial motion to dismiss based upon the purported duplicity of a conspiracy count in an indictment should be granted; particularly because, at the pretrial stage of a prosecution, this Court's standard of review requires us to accept as true all of the allegations in the Superseding Indictment.").

[41] *Generics I*, 338 F. Supp. 3d at 451.

as unto another.'"[42] Therefore, this Court should reject Defendants' invitation to raise the threshold pleading standard.

As the Supreme Court held in *Continental Ore Company v. Union Carbide and Carbon Corporation*, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[43] Further the Third Circuit has stated:

> Multiple conspiracies are separate networks operating independently of each other. However, a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies . . . . Thus, the relatedness of the activities of the co-conspirators in support of the overall illegal scheme can defeat a claim of multiple conspiracies.[44]

Plaintiffs have plausibly alleged related activities by Apotex and Co-Defendants to support an overall illegal scheme to raise generic drug prices carried out at least through multiple conspiracies involving specific generic drugs. None of the cases Apotex cites requires Plaintiffs to allege that every defendant competed with every other defendant or that they engaged in *quid pro quo* arrangements with every defendant with whom they do not directly compete. In any event, Plaintiffs do allege that Apotex was a competitor of each of its Co-Defendants.[45]

*In re Insurance Brokerage Antitrust Litigation*, upon which Apotex heavily relies, is distinguishable. In that case, for example, the plaintiffs failed to allege overlapping participants among the multiple, broker-centered vertical conspiracies or a common enterprise as opposed to mere parallel conduct.[46] Other cases are easily distinguishable as well.

---

[42] *Id.* at 450 (quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa. 2011)).

[43] 370 U.S. 690, 699 (1962).

[44] *U.S. v. Perez*, 280 F.3d 318, 346 (3d Cir. 2002).

[45] *See, e.g.,* EPP CAC ¶¶ 112-17. *Accord* DPP CAC ¶¶ 16-19; IRP CAC ¶ 68.

[46] 618 F.3d 300, 350-51 (3d Cir. 2010).

*Processed Egg Products*[47] and *In re Optical Disk Drive Antitrust Litigation*[48] merely require non-conclusory allegations about the defendant's involvement in the conspiracy, which Plaintiffs have satisfied in this case.

In *Finkelman v. NFL*,[49] the only issue before the court was whether the plaintiffs had standing to bring their claims, an issue not asserted by Apotex.

In *Zachair, Ltd. v. Driggs*, the court ruled that the plaintiff had not alleged a plausible bid-rigging conspiracy because the significance of the bid-rigging defendants to the allegations of the complaint remained "something of a mystery."[50] *United States v. Ashland-Warren, Inc.*, held that "price-fixing by means of bidrigging is flatly impossible when the alleged conspirators are not also competitors."[51] Here, Plaintiffs have not merely alleged bid-rigging: Plaintiffs also allege agreements to fix prices, allocate the market shares for drugs, and allocate customers.

Finally, in *In re Optical Disk Drive Antitrust Litigation*, the court stated that "there is no rule that a conspiracy to fix prices" between defendants that do not compete directly against each other (manufacturers of a particular component and manufacturers of finished product containing that component) "can never exist or be successfully pleaded."[52] Thus, the issue is whether there is a "plausible factual basis for contending that" such defendants "were in fact in conspiracy together."[53] Plaintiffs have met this burden by pleading, for example, that each of the MDL

---

[47] 821 F. Supp. 2d at 720.

[48] MDL 2143, 2014 WL 3378336, at *4 (N.D. Cal. July 10, 2014).

[49] 810 F.3d 187 (3d Cir. 2016).

[50] 965 F. Supp. 741, 744 (D. Md. 1997).

[51] 537 F. Supp. 433, 445 (M.D. Tenn. 1982).

[52] MDL 2143, 2011 WL 3894376, at *8 (N.D. Cal. Aug. 3, 2011).

[53] *Id.*

Defendants were potential competitors for MDL drugs that they had not yet launched, and that abiding by the "fair share" agreement would benefit all in the long run.[54]

## III.     <u>Even under the *Kelly* factors, Plaintiffs plausibly allege an overarching conspiracy.</u>

Even if the Court were to apply *Kelly*, the factors do not support dismissal. *Kelly* holds that "a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies."[55] To prove involvement in an overarching conspiracy, it is not necessary to "prove that each defendant knew all the details, goals, or other participants."[56] Indeed, courts bypass *Kelly's* "three-step inquiry" (*i.e.*, common goal, continuous cooperation, and overlapping participants) when evidence exists that the defendant "knew he [she, it] was part of a larger operation."[57] Here plausible allegations exist that Apotex conferred and coordinated with Heritage and others regarding a broad proposition of increasing the prices of generic drugs, including but not limited to drugs that Apotex supplies and distributes, which are sufficient allegations to establish the existence and participation in an overarching conspiracy.

### A.   Common Goal

"Although its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives."[58] In determining whether "conspirators shared a common goal," the Third Circuit looks "'to the underlying purpose of the alleged criminal activity' in a fairly broad sense."[59] For example, in one criminal

---

[54] *See* n.14, *supra*.

[55] 892 F.2d at 258.

[56] *U.S. v. Padilla*, 982 F.2d 110, 114 (3d Cir. 1992).

[57] *Id.* ("Padilla's reliance on the *Kelly* inquiry is premised in part on his assertion that the government failed to prove any conspiracy to distribute cocaine, an assertion we have rejected above.").

[58] *Keystone Biofuels*, 350 F. Supp. 3d at 320 (quoting *U.S. v. Bobb*, 471 F.3d 491, 494-95 (3d Cir. 2006)).

[59] *U.S. v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019).

conspiracy case, the Third Circuit "described the common goal of the defendants as 'enriching [themselves] through the plunder of [their corporate employer].'"[60] "[A] common goal may exist even when conspirators individually or in groups perform different tasks in pursuing the common goal, and a single conspiracy may attract[ ] different members at different times or involve[ ] different sub-groups committing acts in furtherance of the overall plan."[61]

This Court previously rejected Apotex and its Co-Defendants' contention that an overarching conspiracy is implausible.[62] It also previously held that Private Class Plaintiffs plausibly alleged that Apotex and its Co-Defendants are commonly motivated to enter into a price-fixing conspiracy by structural restraints, which "limits the ability of a generic pharmaceutical manufacturer to unilaterally lead the market in a price increase absent collusion," and in the absence of substantial shifts in supply or demand.[63] Minimizing or thwarting competition throughout an otherwise stable industry is thus a plausibly alleged common goal, "in which everyone made a gluttonous profit."[64] Apotex has not identified any allegations that would suggest that its conduct was inconsistent with this alleged common goal.

### B. Continuous Cooperation

The requirement of continuous cooperation is met when "the activities of one group were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture."[65] Here, Plaintiffs plausibly allege that Apotex was part of a common enterprise, "coordinating more than one drug at a time and thereby influencing the broader

---

[60] *Id.*

[61] *Id.* (internal quotation marks omitted).

[62] *Generics II*, 315 F. Supp. 3d at 852.

[63] *Generics I*, 338 F. Supp. 3d at 448-49.

[64] *Kelly*, 892 F.2d at 259.

[65] *U.S. v. Rigas*, 605 F.3d 194, 214 (3d Cir. 2010).

generic drug market."[66] Plaintiffs plausibly allege that agreeing to raise prices for generic drugs, bid rigging, and *quid pro quo* arrangements were done in coordination with other Defendants and each supported the overarching goal of thwarting or minimizing competition across the generic drug industry. *Kelly* does not require Plaintiffs to prove that Apotex individually benefited from every act or "sub-scheme," as long they can plausibly allege, as they have, that Apotex and its Co-Defendants worked in concert in furtherance of this overarching goal.[67]

### C.  Overlapping Participants

To satisfy the overlap requirement, "a single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times. A single conspiracy finding does not require every member to participate in every transaction."[68] Plaintiffs plausibly allege that Heritage and Teva were pivotal figures in several of the individual drug schemes, and all but 4 of the 31 drugs targeted in this MDL to date involve conspiracies alleged to have been joined by one or more of the Defendants named with regard to Pravastatin or Leflunomide.[69]

---

[66] *Generics II*, 315 F. Supp. 3d at 854.

[67] *Kelly*, 892 F.2d at 259; *Fattah*, 914 F.3d at 169.

[68] *Padilla*, 982 F.2d at 115 (quoting *U.S. v. DeVarona*, 872 F.2d 114, 119 (5th Cir. 1989) (quotations omitted)).

[69] *See* p. 1, *supra*.

## **CONCLUSION**

Apotex's motion should be denied. Plaintiffs plausibly allege an overarching conspiracy, consisting of multiple schemes to raise generic drug prices, rig bids and allocate markets across a broad generic drug market.[70]

Dated:  May 2, 2019                                       Respectfully,

/s/  Roberta D. Liebenberg                             /s/  Dianne M. Nast
Roberta D. Liebenberg                                  Dianne M. Nast
FINE, KAPLAN AND BLACK, R.P.C.                         NASTLAW LLC
One South Broad Street, 23rd Floor                     1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107                       Philadelphia, Pennsylvania 19107
215-567-6565                                           215-923-9300
rliebenberg@finekaplan.com                             dnast@nastlaw.com

**Liaison and Lead Counsel for End-**                  **Liaison and Lead Counsel for Direct Purchaser**
**Payer Plaintiffs**                                   **Plaintiffs**

/s/ W. Joseph Nielsen                                  /s/  Jonathan W. Cuneo
W. Joseph Nielsen                                      Jonathan W. Cuneo
Assistant Attorney General                             CUNEO GILBERT & LADUCA LLP
55 Elm Street                                          4725 Wisconsin Avenue, NW
P.O. Box 120                                           Suite 200
Hartford, Connecticut 06141-0120                       Washington, District of Columbia 20016
860-808-5040                                           202-789-3960
Joseph.Nielsen@ct.gov                                  jonc@cuneolaw.com

**Liaison Counsel for Plaintiff States**               **Lead Counsel for Indirect-Reseller    Plaintiffs**

---

[70] If the Court concludes that Plaintiffs' allegations are insufficient to sustain their claims against Apotex, Plaintiffs request leave to amend their respective complaints under the liberal pleading standard of Rule 15(a)(2).

/s/ William J. Blechman      /s/ Peter D. St. Phillip, Jr.    
William J. Blechman, Esquire     Peter D. St. Phillip, Jr.
KENNY NACHWALTER, P.A.    LOWEY DANNENBERG, P.C.
1441 Brickell Avenue, Suite 1100   44 South Broadway, Suite 1100
Miami, Florida  33131      White Plains, New York 10601
305-373-1000        914-997-0500
wblechman@knpa.com     PStPhillip@lowey.com

**Counsel for the Kroger Direct Action**  **Counsel for Humana, Inc.**
**Plaintiffs**