# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | **MDL 2724** <br> **16-MD-2724** |
| THIS DOCUMENT RELATES TO: <br><br> *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* <br> No. 18-cv-00285 <br><br> *Humana Inc. v. Actavis Elizabeth, LLC*, et al., <br> No. 18-cv-03299 | |

**PLAINTIFF HUMANA INC.'S AND THE KROGER PLAINTIFFS' JOINT OPPOSITION TO THE MOTIONS TO DISMISS BY (1) LUPIN PHARMACEUTICALS, INC., (2) BRECKENRIDGE PHARMACEUTICAL, INC., AND (3) TELIGENT, INC.**

## TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................1

II.  ARGUMENT ..........................................................................................................2

    A.  Humana and Kroger Allege Plausible Single-Drug Conspiracy Claims Against Breckenridge and Teligent. .............................................................................2

        1.  Legal Standard ...........................................................................................3

        2.  Humana and Kroger Sufficiently Allege the Three Plus Factors as to Breckenridge. ............................................................................................4

            a.  Breckenridge was Motivated to Conspire and Led the Price Increases in Furtherance of the Propranolol Conspiracy Against its Own Self-Interest. ............................................................................................5

            b.  Breckenridge Participated in a Traditional Propranolol Conspiracy. ..5

        3.  Plaintiffs Sufficiently Allege Parallel Pricing and the Plus Factors as to Teligent. .....................................................................................................8

            a.  Teligent and its Econazole Co-Conspirators Engaged in Parallel Pricing ................................................................................................8

            b.  Teligent was Motivated to Fix the Price of Econazole and Acted Against its Self-Interest. ...................................................................10

            c.  Plaintiffs Allege Evidence Implying a Traditional Conspiracy. ..........12

    B.  Humana and Kroger Plausibly Allege That Breckenridge, Teligent, and Lupin Participated in the Overall Conspiracy to Increase the Prices of Generic Pharmaceuticals ......................................................................................15

        1.  Legal Standard .........................................................................................15

        2.  Humana and Kroger's Allegations Connect Breckenridge, Teligent and Lupin to the Overarching Conspiracy ......................................................16

            a.  The Totality of Allegations is Sufficient to Connect all Defendants to an Industry-Wide Conspiracy .........................................................16

        3.  Even under the *Kelly* factors, Humana and Kroger Plausibly Allege an Overarching Conspiracy. ........................................................................19

            a.  Defendants Committed to a Common Goal .......................................20

            b.  Each of the Individual Drug Conspiracies were Interdependent on the Overall Conspiracy ..........................................................................22

            c.  The Individual Conspiracies Sufficiently Overlap ...............................25

III.    REQUEST FOR LEAVE TO AMEND ...................................................................................27

IV.    CONCLUSION ..........................................................................................................................28

# TABLE OF AUTHORITIES

*Ala. Elec. Pension Fund. v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016) ................................................................................14

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ............................................................................... 17, 25

*Alvord–Polk, Inc. v. F. Schumacher & Co.*,
    37 F.3d 996 (3d Cir. 1994) ........................................................................................16

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ......................................................................................16

*Bell Atlantic Corporation v. Twombly*,
    550 U.S. 544 (2007) ........................................................................... 9, 15, 24

*Beltz Travel Service, Inc. v. International Air Transport Ass'n*,
    620 F.2d 1360 (9th Cir 1980) ............................................................................ 20, 25

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
    974 F.2d 1358 (3d Cir. 1992) ....................................................................................16

*Dahl v. Bain Capital Partners, LLC*,
    937 F. Supp. 2d 119 (D. Mass. 2013) .................................................................. 20, 27

*Foman v. Davis*,
    371 U.S. 178 (1962) ...................................................................................................28

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) .......................................................................................5

*In re Blood Reagents Antitrust Litig.*,
    756 F. Supp. 2d 623 (E.D. Pa. 2010) ................................................................8, 9, 16, 20

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) .........................................................................9

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    No. 13 CIV. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ....................16

*In re Generic Pharms. Pricing Antitrust Litig.*,
    315 F. Supp. 3d 848 (E.D. Pa. 2018) .........................................................................15

*In re Generic Pharm. Pricing Antitrust Litig.,*
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ..................................................................... passim

*In re High-Tech Employee Antitrust Litig.,*
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) .......................................................................... 16

*In re Ins. Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010) ................................................................................... 12, 16

*In re Linerboard Antitrust Litig.,*
    504 F. Supp. 2d 38 (E.D. Pa. 2007) ............................................................................... 9

*In re Lithium Ion Batteries Antitrust Litig.,*
    No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ........................ 16

*In re London Silver Fixing, Ltd., Antitrust Litig.,*
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ........................................................................... 16

*In re New Jersey Tax Sales Certificates Antitrust Litig.,*
    Civ. A. No. 12–1893, 2014 WL 5512661 (D.N.J. Oct. 31, 2014) .............................. 16

*In re OSB Antitrust Litig.,*
    No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ............................................ 24

*In re Polyurethane Foam Antitrust Litig.,*
    152 F. Supp. 3d 968 (N.D. Oh. 2015) ........................................................................... 23

*In re Processed Egg Products Antitrust Litig.,*
    821 F. Supp. 2d 709 (E.D. Pa. 2011) ............................................................................ 24

*In re Propranolol Antitrust Litig.,*
    249 F. Supp. 3d 712 (S.D.N.Y. 2017) ..................................................................... passim

*In re Southeastern Milk Antitrust Litig.,*
    555 F. Supp. 2d 934 (E.D. Tenn. 2008) ........................................................................ 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................................................ 24

*In re Vitamins Antitrust Litig.,*
    320 F. Supp. 2d 1 (D.D.C. 2004) .................................................................................. 23

*In re Zoran Corp. Derivative Litig.,*
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ............................................................................ 9

*Interstate Circuit v. U.S.*,
    306 U.S. 208 (1939) .................................................................................................... 9

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
    998 F.2d 1224 (3d Cir. 1993) .................................................................................. 22

*Phillips v. Cty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) .................................................................................... 28

*Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*,
    No. 08cv42, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .......................................... 27

*Shane v. Fauver*,
    213 F.3d 113 (3d Cir. 2000) .................................................................................... 28

*Spectators' Comm'n Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) .................................................................................. 22

*U.S. v. Boyd*,
    595 F.2d 120 (3d Cir. 1978) .................................................................................... 22

*United States v. Fattah*,
    914 F.3d 112 (3d Cir. 2019) .............................................................................. 21, 22

*United States v. Greenidge*,
    495 F.3d 85 (3d Cir. 2007) ...................................................................................... 21

*United States v. Kelly*,
    892 F.2d 255 (3d Cir. 2010) .............................................................................. 19, 23

*U.S. v. Kemp*,
    500 F.3d 257 (3d Cir. 2007) .................................................................................... 22

*U.S. v. Patten*,
    226 U.S. 525 (1913) ................................................................................................ 20

*U.S. v. Portela*,
    167 F. 3d 687 (1st Cir. 1999) ............................................................................. 20, 26

*U.S. v. Shanahan*,
    No. 4:07-cr-175, 2008 WL 2225731 (E.D. Mo. May 28, 2008) ................................. 9

*U.S. v. Smith*,

v

320 F.3d 647 (6th Cir. 2003) .......................................................................................................... 26

*Valspar Corp. v. E. I. du Pont de Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017) ......................................................................................................... 3

**RULES**

FED. R. CIV. P. 15(a)(2) ..................................................................................................................... 28

Plaintiff Humana Inc. ("Humana") and Plaintiffs The Kroger Co., Albertsons Companies, LLC, and H.E. Butt Grocery Company L.P. ("Kroger") (collectively "Plaintiffs") jointly submit this Opposition to the February 21, 2019 Motions to Dismiss by Defendants (1) Lupin Pharmaceuticals, Inc. ("Lupin") (ECF No. 72), (2) Breckenridge Pharmaceuticals, Inc. ("Breckenridge") (ECF No. 76), and (3) Teligent, Inc. ("Teligent") (ECF No. 81).

## I.        INTRODUCTION

All generic pharmaceuticals are subject to regulatory safeguards, including Maximum Allowable Cost ("MAC") pricing, and substitution requirements. For this reason, prior to 2011, generic drugs sold in the United States exhibited declining or stable and low prices typical of a mature, commodity marketplace.[1] While these regulatory safeguards helped to drive price competition for years, generic pharmaceutical industry collusion reversed their beneficial effect. Between the Summer of 2011 and the Spring of 2015, each MDL Drug experienced a sudden reduction of competition effectuated by communications among a close-knit and overlapping group of industry executives.  This sea-change in the prices of generic pharmaceuticals is the salient factual context for both the single-drug and overarching conspiracy claims addressed by this Opposition.

Breckenridge and Teligent separately move to dismiss Plaintiffs' claims that each conspired to elevate the prices of, respectively, Propranolol and Econazole above competitive levels.  In addition, they and Lupin separately move to dismiss Humana and Kroger's overarching conspiracy claims contending that the contemporaneous – and concededly well pleaded – single-drug conspiracies were connected by a common and continuous illegal conspiracy among all the MDL

---

[1] As this Court has noted, MAC pricing "acts as a ceiling for what a pharmacy may seek as reimbursement for a pharmacy benefits manager, [and] limits the ability of a generic pharmaceutical manufacturer to unilaterally lead the market in a price increase absent collusion." *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 448–49 (E.D. Pa. 2018) ("*Group 1 Decision*").

Defendants to profit from the collusive elevation of generic drug prices. The Complaints establish the plausibility of these well-pleaded and factually supported claims.

## II.    ARGUMENT

### A.  Humana and Kroger Allege Plausible Single-Drug Conspiracy Claims Against Breckenridge and Teligent.

As a result of generic pharmaceutical industry collusion, Breckenridge increased the price of all dosages of its Propranolol in November 2013, by 88% to 140%.[2] Then, in September 2013, Teligent commenced sales of Econazole at a pre-announced price above its competitors' prices, and then in 2014 led price increases of over 600%.[3] Plaintiffs allege that these unprecedented price increases were a product of an agreement to fix the prices for Propranolol and Econazole.

This Court already upheld allegations of an Econazole conspiracy as to Defendants other than Teligent.[4] Humana and Kroger's Complaints, which contain amended, robust allegations against Teligent, should likewise be upheld. Judge Rakoff, in the Southern District of New York, reached the same conclusion as to Breckenridge and its co-conspirators concerning the Propranolol conspiracy.[5] Notably, of the Propranolol conspirators, only Breckenridge has asked this Court to reconsider Judge Rakoff's decision. Breckenridge and Teligent ignore these well-reasoned opinions and contest whether the allegations establish that each participated in the well-pleaded conspiracies concerning Propranolol and Econazole.[6]

---

[2] Humana Compl. ¶¶ 647-650, 658, 660; Kroger Compl. ¶ 744.

[3] Humana Compl. ¶¶ 529, 533; Kroger Compl. ¶¶ 482, 486-488.

[4] *Group 1 Decision*, 338 F. Supp. 3d at 458.

[5] *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 731 (S.D.N.Y. 2017).

[6] Notably, with only four exceptions (Breckenridge, G&W, Valeant, and Teligent), no other Defendants have moved to dismiss Plaintiffs' complaints on the basis that the dramatic price increases at issue in this MDL are the result of individual, unilateral business decisions in an industry context where a small number of manufacturers necessarily take account of their competitors' actions when setting price and output.

1.      **Legal Standard**

"Plaintiffs may withstand dismissal by relying on allegations" of "parallel conduct" and "plus factors that serve as proxies for direct evidence of an agreement."[7] First, to satisfy the parallel-conduct element, Plaintiffs need only "allege price increases that are 'reasonably proximate in time and value.'"[8] The context and value of the price increase informs the strength of the conspiracy inference. For example, courts recognize that large price increases or price increases that sharply depart from historical patterns are more probative of collusion because "a radical or abrupt change" in price is a stronger indication of a secret underlying conspiracy than is an "uptick in . . .a pre-established industry practice."[9]

Second, this Court has identified three plus factors that, if satisfied, supply the "factual enhancement that is necessary for . . . claims to withstand dismissal."[10] Those factors are "(1) evidence that the defendant had a motive to enter into a conspiracy to allocate markets and customers, rig bids, and fix prices; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."[11]

As discussed below, Plaintiffs' allegations against Breckenridge and Teligent plainly meet this standard and set forth robust and compelling circumstantial evidence that they joined their respective Propranolol and Econazole conspiracies.

---

[7] *Group 1 Decision*, 338 F. Supp. 3d at 441 (internal quotations omitted).

[8] *Id.* (citing, *inter alia*, *In re Propranolol Antitrust Litig.*, 338 F. Supp. 3d at 441 (holding that "[i]t is also immaterial at this stage of the litigation that Defendant Mylan raised its prices of Propranolol tablets slightly later than its alleged co-conspirators.")).

[9] *Valspar Corp. v. E. I. du Pont de Nemours & Co.*, 873 F.3d 185, 196 (3d Cir. 2017). *See* cases cited *infra* note 40.

[10] *Group 1 Decision*, 338 F. Supp. 3d at 448.

[11] *Id.*

> 2.    **Humana and Kroger Sufficiently Allege the Three Plus Factors as to Breckenridge.**

Breckenridge's argument that Plaintiffs' Complaints fail to allege the plus factors necessary to sustain a Sherman Act claim based on indirect evidence ignores Judge Rakoff's well-reasoned decision in the Southern District of New York which held allegations like those in Humana and Kroger's Complaints *meet* the plus factors necessary to plausibly establish that Breckenridge and others illegally conspired to fix the prices of Propranolol between 2013 and 2015.[12]

Breckenridge also ignores this Court's *Group 1 Decision*, which found that allegations like those in Humana and Kroger's Complaints establish both motive and actions contrary to self-interest as to all MDL Defendants.[13] Specifically, this Court held: (1) defendants had a "common motive to set drug prices" because the generic pharmaceutical industry operates in a "highly concentrated" and "high barriers to entry" marketplace with "a regulatory regime that could reduce" any defendant's "profits by driving down generic drug prices over time"; (2) the practice of "dramatically increase[ing] [its] prices" without any "correlated" "changes in demand or manufacturing costs" "would be irrational in a competitive market"; and (3) MAC pricing "limits the ability of a generic pharmaceutical manufacturer to unilaterally lead the market in a price increase absent collusion."[14] Humana and Kroger's Complaints also sufficiently allege these facts.[15]

Breckenridge fails to suggest why the rationale of the *Group 1 Decision* does not equally apply to Humana and Kroger's Complaints. Nonetheless, Plaintiffs sufficiently allege all three plus factors.[16]

---

[12] *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d at 724.

[13] *Group 1 Decision,* 338 F. Supp. 3d at 448–49.

[14] *Id.* at 447-449.

[15] *E.g.*, Humana Compl. ¶¶ 116-22, 136, 245, 259-60; Kroger Compl. ¶¶ 16, 230-234, 786-796.

[16] It is unclear whether Breckenridge is challenging Plaintiffs' allegations of parallel conduct. Its brief states "Plaintiffs plead neither" parallel conduct nor plus factors; yet its discussion concerns only the

>    *a.  Breckenridge was Motivated to Conspire and Led the Price Increases in Furtherance of the Propranolol Conspiracy Against its Own Self-Interest.*

Breckenridge *led* the first in a series of extraordinary price increases for Propranolol[17] that resulted in a "more than 1700%" total increase.[18] The fact that Breckenridge led such a large and unprecedented price increase supports a particularly strong inference of conspiracy.[19] These actions were clearly against Breckenridge's unilateral self-interest. As Judge Rakoff observed, "no company 'in its right mind' would raise prices by as much as 1,700% relying on nothing but industry data that the company itself claims is flawed (the present situation)."[20]  Moreover, since Judge Rakoff's 2017 decision, Plaintiffs have learned more about the conspiracy, and the factual allegations in these Complaints now describe Breckenridge's conduct as a facet of pervasive generic pharmaceutical industry collusion.[21]

>    *b.  Breckenridge Participated in a Traditional Propranolol Conspiracy.*

The third plus factor is satisfied if the complaint alleges that (1) a defendant had the "opportunity to conspire," which can be demonstrated by the allegation that the defendants "had

---

third plus factor. Breckenridge Br. at 13 and n.7 (acknowledging that the alleged Propranolol tablet price increases followed Breckenridge's by one and three months).

[17] Humana Compl. ¶ 648; Kroger Compl. ¶ 744.

[18] Further, Breckenridge's incorrectly suggests that the relevant legal standard is different in the Second Circuit. Breckenridge's Memorandum of Law in Support of Breckenridge Pharmaceutical, Inc.'s Motion to Dismiss the Federal Claims in the DPP, EPP, and IRP Propranolol Complaints at 23 (Breckenridge adopted its arguments from this brief against Kroger and Humana).  In fact, Judge Rakoff distinguished the cited Third Circuit case on its facts and reached conclusions essentially identical to the *Group 1 Decision*. "The pleadings here, on the other hand, set forth in detail a regulatory regime that has historically pushed the price of Propranolol downwards and gradually reduced defendants' profits, thereby giving them a common motive to conspire." *Propranolol Antitrust Litig.*, 249 F. Supp. 3d at 720 (distinguishing on the facts, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999)).

[19] Notably, Breckenridge's Propranolol co-conspirators Actavis, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith *followed* Breckenridge's extraordinary price increase, and do not challenge the sufficiency of the allegations of collusion with respect to Propranolol.

[20] *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d at 720 n.10.

[21] Humana Compl. ¶¶ 13, 192-196, 262, 648, 651; Kroger Compl. ¶¶  17, 817.

occasion to connect with each other, to engage in strategic business discussions, and to gain awareness of their competitors' current and future business plans," and (2) that the defendant is implicated in an ongoing "government investigation," which can be demonstrated by the fact that "at least one manufacturer" of the generic drug "has received a subpoena seeking information regarding [its] generic drug pricing practices."[22] Courts weigh allegations of traditional conspiracy along with the other plus factors, and complaints are not required "to have the same quality or quantity of allegations as to one defendant as unto another."[23]

First, Breckenridge had ample opportunities to conspire with *numerous* of its alleged Propranolol co-conspirators, including Actavis and Upsher-Smith, when executives from all three conspirators simultaneously attended trade association meetings.[24] The timing of these meetings corresponded to the start of the abrupt and extraordinary price increases that Breckenridge led. For example, executives from Breckenridge and its co-conspirators attended the June 4-5, 2013 GPhA CMC Workshop and the October 28-30, 2013 GPhA Fall Technical Conference.[25] Immediately after the October conference, Breckenridge led a price increase for Propranolol beginning in November 2013.[26]

Second, the state and federal investigations implicate Propranolol and Breckenridge. Breckenridge argues that it is "not involved in any governmental investigation or litigation regarding

---

[22] *Group 1 Decision,* 338 F. Supp. 3d at 449-50, 453.

[23] *Id.* at 450.

[24] Humana Compl. ¶¶ 647-51, 658, Ex. A; Kroger Compl. ¶ 745, Ex. 3.

[25] Humana Compl., Ex. A at pp. 5-6, 10; Kroger Compl., Ex. 3 at pp. 10, 11, 39-40, 45-46. Representatives of core conspirators Mylan and Heritage also attended the June CMC Workshop. *See* Humana Compl., Ex. A at pp. 5-6; Kroger Compl., Ex. 3 at pp. 39-40.

[26] Humana Compl. ¶¶ 649-51, 658, 660; Kroger Compl. ¶¶ 744-45. Moreover, as discussed in Section II.B.2.a., Breckenridge also had many opportunities to communicate with core conspirators in addition to Actavis. For example, it attended 13 trade associations meetings with representatives of Mylan, and 15 with representatives of Heritage. Humana Compl., Ex. A; Kroger Compl., Ex. 3.

alleged excessive pricing."[27] It does not, however, acknowledge that alleged co-conspirator Actavis

received both state and federal subpoenas, as did four other makers of Propranolol: Defendants

Heritage, Mylan, Par, and Teva.[28] Those facts alone are sufficient to sustain the claim as to the

manufacturer that led the price increases.[29] Yet, there is more. The federal guilty pleas also implicate

Breckenridge. The *Group 1 Decision* aptly summarized Judge Rakoff's "holding that while the

Heritage executives' guilty pleas do 'not concern Propranolol, they provide circumstantial evidence

of motive, actions against interest, and interfirm communications' where the plaintiffs had alleged

facts to 'establish a plausible link between the conduct to which [they] plead guilty and the

conspiracies alleged' in the Propranolol complaint."[30]  The Complaints also draw this plausible

---

[27] Breckenridge Br. at 13.

[28] *See* Humana Compl. ¶¶ 149; Kroger Compl. ¶¶ 17, 127. In addition, at the time of the States' investigation, both Breckenridge and Westward were private companies. As such, they may not have been subject to the SEC disclosure rules that required the other defendants to make pubic reports of the subpoenas. Kroger Compl. ¶ 17.

[29] *Group 1 Decision*, 338 F. Supp. 3d at 448-449. Because Heritage did not sell Propranolol capsules (only tablets), no inference can be drawn from the fact that the states did not name Breckenridge in their amended complaint, which they expressly limited to drugs sold by Heritage.

[30] *Id.* at 453 & n.294 (quoting *In re Propranolol*, 249 F. Supp. 3d at 723-24). *In re Propranolol* explained:

> Malek and Glazer enacted their price fixing scheme contemporaneously with the alleged conspiracies and, by virtue of their high-level corporate positions, were plausibly responsible for setting prices of Propranolol. Moreover, the Government has represented that the Direct Purchasers have propounded document requests on Malek and Glazer, in addition to the corporate defendants, and, "[e]ven if these requests were limited to propranolol ... they would overlap directly with the United [States'] criminal investigation." These facts establish a plausible link between the conduct to which Malek and Glazer plead guilty and the conspiracies alleged in the present case.

249 F. Supp. 3d at 723-24 (Apr. 6, 2017 S.D.N.Y.) (quoting Government's Mot. for Recons. at 4–5).

connection, which is consistent with this Court's analysis of the implications of the Heritage guilty pleas to the Group 1 drugs.[31]

### 3. Plaintiffs Sufficiently Allege Parallel Pricing and the Plus Factors as to Teligent.

Humana and Kroger sufficiently allege that Teligent, along with Fougera, Perrigo, Sandoz, and Taro (the "Econazole Defendants"), conspired to anticompetitively set the prices for Econazole between September 2013 and the summer of 2014.[32] Plaintiffs demonstrate that the Econazole Defendants engaged in parallel pricing, whereby at least Fougera, Perrigo, Teligent, and Taro raised their WAC prices in quick succession, each a few months after one another, with the first starting on July 24, 2014. This parallel conduct paired with evidence of "plus factors" satisfies the *Twombly* standard.

#### a. *Teligent and its Econazole Co-Conspirators Engaged in Parallel Pricing*

As discussed above, Plaintiffs must show that Teligent engaged in parallel conduct established by proximate price increases. While parallel conduct does imply a type of similar conduct, the conduct need not be identical.[33] Nor must it be simultaneous.[34] As this Court previously held, price increases effectuated over a span of "several months," or increases that "did not precisely match" do not provide a basis for dismissal.[35]

---

[31] Kroger Compl. ¶ 4 ("as alleged in this Complaint, Heritage, through Messrs. Glazer and Malek, conspired to fix prices of not just Glyburide and Doxycycline, but also Propranolol – which Teva and Mylan also manufactured.").

[32] Humana Compl. ¶¶ 100, 522-536; Kroger Compl. ¶¶ 472-517.

[33] *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) ("Plaintiffs are not required to plead simultaneous price increases – or that the price increases were identical- in order to demonstrate parallel conduct.") (internal citation omitted).

[34] *Id.*

[35] *Group 1 Decision*, 338 F. Supp. 3d at 446.

Beginning on July 24, 2014, the Econazole Defendants began an orchestrated scheme to dramatically increase the WAC prices of Econazole. Within four months, Teligent, Perrigo, and Taro implemented an extraordinary 610% increase in price.[36]  By November 2014, Fougera also increased its WAC prices to the same exact levels.[37] As this Court previously held, Econazole Defendants' price increases taken within four months of each other to the exact same level is sufficient to indicate parallel pricing.[38]

Moreover, conduct that is inconsistent with standard market practices may be indicative of collusive efforts.[39] A substantial price increase that sharply departs from historical patterns is probative and sufficient to support an inference of conspiracy when paired with plus factors.[40] In *Bell Atlantic Corporation v. Twombly*, the Supreme Court provided guidance that "complex and historically unprecedented changes in pricing…made at the very same time by multiple competitors, and made for no discernable reason" suffices under the plausibility standard.[41]

---

[36] Humana Compl. ¶ 529; Kroger Compl. ¶ 487.

[37] Humana Compl. ¶ 530; Kroger Compl. ¶ 487.

[38] *Group 1 Decision*, 338 F. Supp. 3d at 446.

[39] *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, (E.D. Pa. 2007) (holding that defendant manufacturers unusual practices inconsistent with market norms supports the existence of a price-fixing conspiracy).

[40] *Interstate Circuit v. U.S.*, 306 U.S. 208, 223-224 (1939) (holding that it "taxes credulity" to believe competitors would substantially and unanimously implement sharp departures from norms "without some understanding that all were to join."). *See also U.S. v. Shanahan*, No. 4:07-cr-175, 2008 WL 2225731 at *4 (E.D. Mo. May 28, 2008) (citing *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 996 (N.D. Cal. 2007) (holding that "sharp price increases" "'could not be the product of chance'").

[41] 550 U.S. 544, 556 n.4 (2007). *See also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d at 628 (E.D. Pa. 2010); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 793 (N.D. Ill. 2017) ("Rather, such 'historically unprecedented changes' suggest a conspiratorial agreement, not mere parallel conduct.") (internal citation omitted).

On February 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC.[42] In that same month, Teligent's CEO attended trade conferences with Perrigo and Taro, "where the three Defendants had an opportunity to discuss Teligent's entry into the market."[43] This was the beginning of Teligent's plan that would put it in direct competition with Taro on seventeen drugs and Perrigo on fifteen drugs.[44] Upon entering the market in September 2013, rather than compete on price, Teligent "irrationally increased prices immediately."[45] This type of price increase sharply departs from conventional pricing in the generic pharmaceutical industry.[46] Moreover, the subsequent price increases Teligent and its Econazole co-conspirators engaged in "cannot be explained by supply shortages or other market events."[47] These increases resulted in more than a 600% increase between July 2014 to March 2015[48]—an anomalous occurrence in an industry created and regulated to exert downward pressure on price.

> b.   *Teligent was Motivated to Fix the Price of Econazole and Acted Against its Self-Interest*

Like Breckenridge, Teligent ignores, and thus fails to address, the *Group 1 Decision* holding that allegations like Humana and Kroger's establish both motive and actions contrary to self-interest.[49] As to motive, the first of the plus factors, the *Group 1 Decision* held that Econazole

---

[42] Humana Compl. ¶ 532; Kroger Compl. ¶ 478.

[43] Kroger Compl. ¶ 478. *See* Humana Compl., Ex. A at p.2.

[44] Humana Compl. ¶ 535; Kroger Compl. ¶ 480.

[45] Humana Compl. ¶¶ 532-33; Kroger Compl. ¶ 482.

[46] Humana Compl. ¶ 2 ("generic drug entry predictably and typically results in increased price competition, which reduced the price of drugs for wholesalers, retailers, consumers, and third-party payers such as Humana."); Kroger Compl. ¶ 482 ("In a competitive, generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.").

[47] Humana Compl. ¶¶ 259-260, 531; Kroger Compl. ¶ 477.

[48] Humana Compl. ¶¶ 528-29; Kroger Compl. ¶ 487.

[49] *Group 1 Decision*, 338 F. Supp. 3d at 448-49.

allegations "plausibly outline a regulatory regime that could reduce Group 1 Defendants' profits by driving down generic drug prices over time and which would give them a common motive to set drug prices."[50] Like the complaints at issue there, Humana and Kroger's Complaints also sufficiently allege a common motive to fix the price of Econazole.

Plaintiffs allege that the market for Econazole was susceptible to collusion due to a high concentration of manufacturers, the presence of barriers to entry, inelastic demand, and standardization of product.[51] Plaintiffs also allege that over time, the price of generic pharmaceuticals nears ever closer to marginal cost.[52] As the Court recognized, "[d]eclining prices or profits in a market make 'price competition more than unusually risky and collusion more than usually attractive.'"[53] It is certainly plausible, within the backdrop of a regulatory regime that exerts constant downward pressure on generic drug prices, that a generic manufacturer, even of one MDL drug, would be motivated to suppress competition among themselves so that they could fix, stabilize, and raise prices of generic pharmaceuticals.

The *Group 1 Decision* also held that the plaintiffs "plausibly alleged that [Teligent's] pricing practices would be irrational in a competitive market."[54] Like the complaints at issue in the *Group 1 Decision*, Humana and Kroger's Complaints also plausibly allege that Teligent dramatically increased its Econazole prices, and these price increases were not correlated with corresponding changes in demand or manufacturing costs.[55] Plaintiffs assert that no rational generic manufacturer acting alone

---

[50] *Id.*

[51] Humana Compl. ¶ 136; Kroger Compl. ¶ 787.

[52] Humana Compl. ¶¶ 14, 136; Kroger Compl. ¶ 788.

[53] *Group 1 Decision,* 338 F. Supp. 3d at 448 (internal citation omitted).

[54] *Id.*

[55] Humana Compl. ¶¶ 259-260, 526-531; Kroger Compl. ¶¶ 230, 477.

would implement price increases, such as the one Econazole exhibited, in the absence of changes in demand or cost.[56] This is sufficient to meet the second prong of the plus factor inquiry.[57]

       *c.   Plaintiffs Allege Evidence Implying a Traditional Conspiracy.*

The third plus factor, evidence implying a traditional conspiracy, consists of "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown."[58] These allegations include opportunities to conspire and ongoing enforcer investigations into generic drug pricing.[59]

Occasion to connect with other defendants, to engage in strategic business decisions, and gain awareness of competitors' current and future business plans demonstrates an opportunity to conspire.[60] Plaintiffs' Complaints detail at least eight instances where senior executives from Teligent (at least six involving Teligent's President and CEO Jason Grenfell-Gardner) attended trade conferences along with representatives from alleged Econazole co-conspirators Fougera, Perrigo, Sandoz, and Taro.[61] Notably, Teligent's Ann Howard, a Senior Regulatory Affairs Associate attended the GPhA CMC Workshop on June 3-4, 2014 with a Perrigo Vice President, a Taro Vice President and Director of Regulatory Affairs, and representatives from Fougera and Sandoz.[62]

---

[56] Humana Compl. ¶ 259; Kroger Compl. ¶ 482.

[57] *Group 1 Decision*, 338 F. Supp. 3d at 448.

[58] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010) (internal quotation markets omitted).

[59] *Group 1 Decision*, 338 F. Supp. 3d at 449-53.

[60] *Id.* at 450.

[61] Humana Compl., Ex. A; Kroger Compl., Ex. 3. Of these eight meetings, at least three additional Econazole co-conspirators attended each of these meetings with Teligent. All five Econazole co-conspirators attended at least three of these meetings.

[62] Humana Compl., Ex. A. at p. 18; Kroger Compl., Ex. 3 at pp. 56-57.

Shortly after the June 2014 conference, Perrigo initiated its more than 600% price increase across its Econazole products on July 24, 2014; Teligent followed, increasing its prices more than 600% a mere 39 days later on September 1, 2014; and Taro increased its prices more than 700% in November 2014.[63] Plaintiffs also allege Fougera, a subsidiary of Sandoz, implemented "simultaneous and identical price increases in their generic Econazole."[64]

Plaintiffs specifically allege significant price increases shortly followed or occurred at about the time of several industry trade conferences, including: June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22- 25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL. Key executives from Defendants Fougera, Perrigo, Sandoz, Taro, and Teligent all attended.[65]

Teligent's attendance and participation in at least nine trade association meetings that coincide with Plaintiffs' allegations regarding the timing of price increases demonstrates Teligent had the opportunity to conspire. For all the reasons detailed in Plaintiffs' Memorandum of Law in Opposition to Teligent's Motion to Dismiss the Class Plaintiffs' Amended Econazole Complaints ("Class Opposition to Teligent"), the Humana and Kroger Complaints sufficiently allege a conspiracy as to Teligent.[66]

---

[63] Humana Compl. ¶ 528-29; Kroger Compl. ¶¶ 487.

[64] Humana Compl. ¶ 530; Kroger Compl. ¶ 488.

[65] Humana Compl. ¶ 534, Ex. A; Kroger Compl. ¶¶ 491-510, Ex. 3.

[66] Humana and Kroger incorporate by reference the arguments of the Class Opposition to Teligent, and specifically at pp. 2-7 and 17-20.

Government investigations may implicate and bolster the plausibility of a conspiracy.[67] "The mere existence of such investigations is a circumstance that, 'when combined with parallel behavior, might permit a jury to infer the existence of an agreement.'"[68]

This Court already held that Heritage executives Malek and Glazer's guilty pleas are "not 'entirely separate' from [Econazole Defendants'] conduct."[69] This is because as Plaintiffs Humana and Kroger allege, the markets for generic drugs share similar structural characteristics and generic drug manufacturers participate in overlapping industry events that create a web of interactions and connections.[70]

Moreover, all of Teligent's Econazole co-conspirators have been the targets of government investigations themselves. A plaintiff may rely on government investigations as a plus factor, even if one specific defendant is not subject to any current government action.[71] Teligent's Econazole co-conspirators, Perrigo, Fougera, Sandoz, and Taro have admitted to receiving a grand jury subpoena from the DOJ.[72] Novartis, Sandoz and Fougera's parent company stated that the subpoena related to "communications with competitors" and that "it believes [the investigation] to be a part of a broader inquiry."[73] Taro's subpoena also related to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products,

---

[67] *Group 1 Decision*, 338 F. Supp. 3d at 452.

[68] *Ala. Elec. Pension Fund. v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (citation omitted).

[69] *Group 1 Decision*, 338 F. Supp. 3d at 452.

[70] Humana Compl. ¶¶ 135-136, 176-198; Kroger Compl. ¶¶ 144-172.

[71] *Group 1 Decision*, 338 F. Supp. 3d at 453.

[72] Humana Compl. ¶¶ 149, 153, 156, 157; Kroger Compl. ¶¶ 17, 122, 127.

[73] Humana. Compl. ¶¶ 149, 153; Kroger Compl. ¶¶ 17, 127.

and certain other related matters."[74] The DOJ also executed a search warrant on Teligent's Econazole co-conspirator Perrigo, relating to "drug pricing in the pharmaceutical industry."[75]

Parallel pricing, together with motive, attendance of senior executives including Teligent's President and CEO at at least eight trade conferences that were followed shortly thereafter by consecutive price-increases, and enforcer investigations into all of Teligent's Econazole co-conspirators satisfies the *Twombly* standard.

**B. Humana and Kroger Plausibly Allege That Breckenridge, Teligent, and Lupin Participated in the Overall Conspiracy to Increase the Prices of Generic Pharmaceuticals.**

### 1. Legal Standard

As discussed in Plaintiffs' Joint Response to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims, ("Joint Response")[76] a claim is sufficient under Rule 12(b)(6) if a plaintiff has pleaded facts demonstrating that a claim is "plausible".[77] In assessing the sufficiency of an antitrust complaint, the court should not question whether there are other plausible or even more plausible alternatives to the Plaintiffs' theory; rather, an antitrust complaint is sufficient if it contains "enough factual matter (taken as true) to suggest that an agreement was made."[78] "As long as the facts pleaded provide 'plausible grounds to infer an agreement,' a well-pleaded complaint may proceed even if it seems that 'actual proof of those facts is improbable....'"[79] At the pleading stage,

---

[74] Humana. Compl. ¶ 157; Kroger Compl. ¶ 128.

[75] Humana. Compl. ¶¶ 149, 156; Kroger Compl. ¶¶17, 126.

[76] Plaintiffs incorporate by reference the arguments made in the Joint Response.  Plaintiffs also incorporate by reference the arguments made in Plaintiff Humana Inc.'s Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claim and the Kroger Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claim.

[77] *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 556.

[78] *In re Generic Pharms. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556.

[79] *Id.*

the appropriate question is "not whether there is a plausible alterative to the plaintiffs' theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible."[80]

All of the well-pleaded individual drug conspiracies are "critical to establishing the overarching" industry-wide conspiracy.[81] If, together with the other connective allegations, the series of contemporaneous single drug conspiracies demonstrates the plausible existence of an overarching agreement linking them, courts do not resolve on a motion to dismiss factual questions concerning the nature or scope of the conspiracy.[82]

### 2. Humana and Kroger's Allegations Connect Breckenridge, Teligent and Lupin to the Overarching Conspiracy

#### a. *The Totality of Allegations is Sufficient to Connect all Defendants to an Industry-Wide Conspiracy*

Humana and Kroger's Complaints sufficiently plead facts allowing a plausible inference that Defendants Breckenridge, Lupin, and Teligent participated in the "fair share" overarching conspiracy. Defendants ignore critical allegations and segment others, hoping to convince the Court that no single fact definitively shows the existence of an overarching conspiracy; however, "[t]he allegations in [each] Complaint must be viewed as a whole." [83] Thus, Plaintiffs need only establish that the existence of an overarching conspiracy is plausible; yet the factual allegations of an industry-

---

[80] *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012).

[81] *In re New Jersey Tax Sales Certificates Antitrust Litig.*, Civ. A. No. 12–1893, 2014 WL 5512661, at *8 (D.N.J. Oct. 31, 2014) (following *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1003 n.5 (3d Cir. 1994); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1364 (3d Cir. 1992); *In re Ins. Brokerage*, 618 F.3d at 336–37).

[82] *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1119–20 (N.D. Cal. 2012*); In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 903–04 (S.D.N.Y. 2018) (because "bilateral or group chats" were "plausible … evidence of a broader agreement" court did not decide on motion to dismiss whether they were "merely opportunistic attempts at collusion—rather than a part of an overarching conspiracy"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) (similar); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) (similar).

[83] *Group 1 Decision*, 338 F. Supp. 3d at 436 (quoting *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d at 630).

wide anticompetitive agreement are considerably stronger.  In the face of these allegations, Defendants' motions necessarily ask this Court to make impermissible inferences in their favor.[84]

First, despite the fact that Breckenridge, Teligent and Lupin each sold only one of the MDL Drugs,[85] each has a vast portfolio of generic drugs, some of which are in this MDL, that allowed them to further participate in the "fair share" agreement. As Humana and Kroger allege, the full scope of the conspiracy is still unknown.[86]

Second, Humana and Kroger allege facts that, taken in totality, establish that Defendant Breckenridge participated in an overarching conspiracy. In November 2013, a mere eight months after launching Propranolol, Breckenridge led an extraordinary price increase immediately after attending a GPhA conference in Maryland with its alleged co-conspirators.[87] Instead of losing customers to lower priced competitors, which would happen in a competitive market,  Breckenridge suffered no harm as its co-conspirators followed the price increase, together raising the price of Propranolol by 174-181% between December 2013 to mid-2014.[88] This, together with Breckenridge's participation in HDMA with numerous other Defendants, including Propranolol Defendants that also sell in competition with makers of every drug in the MDL; Breckenridge's ANDAs for drugs other than Propranolol; and the existence of the "fair share" code of conduct – a code alleged to protect and reward precisely such price increases − is more than enough to plausibly allege Breckenridge's participation in the overarching conspiracy.[89]

---

[84] *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79 (1st Cir. 2002) (holding that district court erred in "drawing inferences in defendant's favor" under Rule 12(b)(6)).

[85] Lupin Br. at 5-6; Breckenridge Br. at 9-11; Teligent Br. at 11-12

[86] Humana Compl. ¶¶ 112-113; Kroger Compl. ¶¶99-101.

[87] Humana Compl. ¶¶ 646-50; Kroger Compl. ¶ 744, Ex. 3.

[88] Humana Compl. ¶ 650; Kroger Compl. ¶¶ 742-744.

[89] Breckenridge misconstrues Humana's complaint in asserting that Humana has conceded that the overarching conspiracy cannot work for single-drug Defendants like Breckenridge. *See* Breckenridge

Humana and Kroger also allege sufficient facts that taken in totality, establish Defendant Lupin participated in an overarching conspiracy. Key pricing representatives from all Pravastatin Defendants, including Lupin, attended the October 1-3, 2012 GPhA Fall Technical Conference in Bethesda, Maryland; February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida; and the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland.[90] Shortly after these conferences, starting in May 2013, the price of Pravastatin rose more than 500% across all Pravastatin Defendants.[91] Lupin was no ordinary attendee at GPhA conferences either; Lupin's at-large director, Paul McGarty, was the GPhA Board of Director President from 2014 to 2016, along with various other representatives from twelve additional Defendants serving as Board of Director members during those three years.[92] Lupin's leadership participation in GPhA with twelve other Defendants, Lupin's ANDAs for drugs beyond Pravastatin, and the existence of the "fair share" code of conduct, is enough to plausibly allege Lupin's participation in the overarching conspiracy.

Last, Humana and Kroger allege sufficient facts that taken in totality establish that Defendant Teligent participated in an overarching conspiracy. In February of 2013, Teligent obtained an ANDA for Econazole, which instead of driving the prices down, ironically paved the way for a dramatic price increase.[93] Immediately after obtaining the Econazole ANDA, Teligent's CEO, Jason Grenfell-Gardner attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in

---

Br. at 4 (citing Humana Compl. ¶ 262). Instead, Humana alleges that if the drugs involved in the overarching conspiracy were limited to just one or two drugs among *all* Defendants, a "fair-share" agreement would be more difficult to attain. However, that is *not* what is alleged here. Humana has alleged an overarching conspiracy involving 21 drugs and 35 Defendants. Under these facts, an overarching conspiracy is more than plausibly pleaded even for single-drug Defendants like Breckenridge.

[90] Humana Compl. ¶ 643; Kroger Compl. ¶¶ 724, 727, Ex. 3.

[91] Humana Compl. ¶ 637; Kroger Compl. ¶¶ 718-720.

[92] Humana Compl. ¶ 182; Kroger Compl. ¶ 157, Ex. 3.

[93] Humana Compl. ¶ 532; Kroger Compl. ¶ 478.

Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with Perrigo and Taro.[94] Particularly, the CEOs of Perrigo (Joseph Papa) and Taro (Kal Sundaram) joined Teligent's CEO at the 2013 GPhA Annual Meeting.[95] The price of Econazole rose suspiciously following Teligent's attendance at several industry conferences with key executives from multiple Defendants, including the June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona, June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland, October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD, February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL,  and February 22- 25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL.[96] The price increase started with Perrigo in July of 2014, followed by Teligent in September of 2014, then by Taro in November of 2014, all by strikingly similar 600-900%.[97] All of Teligent's price increases taken in coordination with firms that sell over a dozen drugs in the MDL and the pattern of increases, again, reflected industry-wide agreement.

Together, Teligent's coordinated price increase in Econazole, Teligent executives' participation in industry conferences, and the existence of the "fair share" code of conduct, is more than enough to plausibly allege Teligent's participation in the overarching conspiracy.

### 3. Even under the *Kelly* factors, Humana and Kroger Plausibly Allege an Overarching Conspiracy.

Defendants mistakenly argue that Plaintiffs must satisfy each of the three factors discussed in *United States v. Kelly*, 892 F.2d 255, 258-59 (3d Cir. 2010) to survive a Rule 12(b)(6) motion. But *Kelly*, which considered whether the government *proved at trial* that an overarching conspiracy exists,

---

[94] Humana Compl. ¶ 532, Ex. A at pp. 2-3; Kroger Compl., Ex. 3 at p. 34.

[95] Humana Compl. ¶ 532; Kroger Compl. ¶ 478, Ex. 3.

[96] Humana Compl. ¶ 534; Kroger Compl. ¶¶ 491,502, 504-506.

[97] Humana Compl. ¶ 529; Kroger Compl. ¶ 487.

is not applicable at the pleading stage. Applying *Kelly* here would unfairly burden Plaintiffs with *proving* their claim at the pleading stage, rather than adhering to the well-established plausibility standard.

Even if *Kelly* applies at the pleading stage, courts look beyond its list of factors "to 'the totality of the evidence' in determining whether there is factual support for a finding of a single conspiracy."[98] The inquiry is whether the totality of Humana and Kroger's allegations is indicative of a single conspiracy to artificially inflate the price of generic pharmaceuticals. While Defendants prefer the Court to think otherwise, "a conspiracy (is) not to be judged by dismembering it and viewing it its separate parts, but only by looking at it as a whole."[99]

Humana and Kroger's allegations unquestionably satisfy each of the *Kelly* factors.

### a. *Defendants Committed to a Common Goal*

Defendants argue that Humana and Kroger failed to satisfy *Kelly's* first factor, whether there was a common goal among the conspirators.[100] Their common goal, however, was the same one that motivated the dozens of single-drug conspiracies. Humana and Kroger's Complaints demonstrate that all Defendants, including the movants here, shared a commitment to the common goal of realizing artificially high profits from the sale of their generic drugs.[101] They effectuated this goal by

---

[98] *Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119, 136 (D. Mass. 2013) (citing *U.S. v. Portela*, 167 F. 3d 687, 696 (1st Cir. 1999) ("Ultimately, while the analysis of 'common goals,' 'interdependence,' and 'overlap' is useful for resolving challenges to the sufficiency of the evidence on appeal, this court has looked beyond any such lists of factors to 'the totality of the evidence' in determining whether there is factual support for a finding of a single conspiracy.") (internal citation omitted)).

[99] *Beltz Travel Service, Inc. v. International Air Transport Ass'n,* 620 F.2d 1360, 1366 (9th Cir 1980) (citing *U.S. v. Patten,* 226 U.S. 525 (1913)). *See also, In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d at 629 ("[T]he allegations in the Complaint[s] must be viewed as a whole and, in order to survive a motion to dismiss, 'must be placed in a context that raises a suggestion of a preceding agreement.'") (internal citation omitted)).

[100] Breckenridge Br. at 8; Lupin Br. at 3,5; Teligent Br. at 11.

[101] Humana Compl. ¶¶ 1, 2, 12, 41 ("Defendants' sinister scheme is composed of two main conduct areas with the grand objective being to avoid price erosion, increase prices for targeted products, and

joining an overarching conspiratorial undertaking to suppress competition among themselves, so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation on generic drugs. Breckenridge and Teligent's contention that Humana and Kroger must allege that they "would have needed to−much less wanted to− conspire to fix the prices of numerous products it does not sell"[102] ignores the actual allegations as well as Third Circuit authority.[103]

Defendants ask this Court to ignore the allegation that all conspirators desired "to make money" on their own generic drug portfolio through price fixing, bid rigging, and customer and market allocation in an industry-wide conspiracy. They also ignore allegations that even single-drug conspirators, like themselves, benefited from the profits their co-conspirators made from other drug conspiracies because those profits augmented their incentives to maintain the overall scheme.   A common goal need not be complex or detailed and it can be established without tracing the financial benefit of each act or transaction back to each individual conspirator.[104] Rather, the Third Circuit recognizes that the common goal may be "fairly general," and includes "to make money" by various means.[105]

Teligent's argument that it is a "peripheral" player in the scheme[106] conflates *Kelly*'s "general" common goal requirement with centrality. Even if true, this provides no immunity, as the Third Circuit has elaborated that a common goal may exist even when conspirators have different tasks

---

maintain these artificially inflated prices across their respective product portfolios without triggering a 'fight to the bottom' among competitors."); Kroger Compl. ¶¶ 813-26.

[102] Teligent Br. at 11; Breckenridge Br. at 5

[103] *See* cases cited *infra* note 105.

[104] *See* Joint Response at 10-11.

[105] *United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019) ("[W]e have similarly articulated the common goal in fairly general terms elsewhere.") (citing *United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir. 2007) ("There was certainly evidence of a common goal among these co-conspirators: to make money by depositing stolen and altered corporate checks into business accounts.").

[106] Teligent Br. at 4.

and perform different functions, if those actions go towards pursuit of a common goal.[107] Here, that common goal is profiting off of artificially priced generic drugs; Teligent's actions in leading a price increase decisively advanced that common goal.

Breckenridge also argues that as a seller of one drug, it lacked any incentive to join an overarching conspiracy involving other drugs it did not sell.[108] This argument again ignores the allegation of shared benefit because the overarching conspiracy made all the individual drug conspiracies more likely, stable, and effective. Moreover, the law is clear -- Defendants do not need the same precise motivation. Plaintiffs need allege only that each has some motive to conspire.[109]

As discussed above, Breckenridge's motive to conspire is clear and obvious – to profit via artificially fixing the price of Propranolol. Breckenridge is alleged to have achieved that goal by joining an industry-wide agreement and understanding, not that it could not directly profit from generic drugs it did not sell. It had motive to increase its profits just like every other Defendant here. And it endeavored to do so, again just like every other Defendant here, by joining an overarching conspiracy.

  b. *Each of the Individual Drug Conspiracies were Interdependent on the Overall Conspiracy*

Courts analyzing the second *Kelly* factor typically evaluate "how helpful one individual's contribution is to another's goals."[110] As the Joint Response and the Complaints explain, the conspiracy for one drug often aided the conspiracy for another drug because Defendants were

---

[107] *U.S. v. Fattah*, 914 F.3d at 168 (citing *U.S. v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978)).

[108] Breckenridge Br. at 2, 8.

[109] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1243 (3d Cir. 1993) ("However, we have made it clear that the defendants need not share the same motive. Rather, all that is required is that they each have a motive to conspire."); *Spectators' Comm'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) ("The Third Circuit rejected the idea that parties to a conspiracy must share an identical anti-competitive motive").

[110] *U.S. v. Kemp*, 500 F.3d 257, 289 (3d Cir. 2007).

working together to give effect to a common plan described by their shorthand "fair share". To satisfy this factor, the Third Circuit merely requires plaintiffs to allege the drug-specific conspiracies were "advantageous to the success of another aspect of the scheme."[111] Because of the economic interdependence of these overlapping illegal antitrust conspiracies, this standard is more easily established here than in other civil or criminal overarching conspiracy cases.

Defendants' contention that they cannot be tied to the overarching conspiracy involving drugs they did not sell because they sold only one of the MDL Drugs fails because Defendants misstate the law and ignore key allegations.[112]

One conspiracy is not required to be wholly dependent on other individual conspiracies to amount to an overarching conspiracy. Courts require only "fairly minimal" evidence of interdependence, which may be demonstrated where each aspect of a conspiracy helped co-conspirators to pass inflated prices on to purchasers.[113] "It need not be the case that [the individual drug conspiracy] could not occur without [an overarching or other drug conspiracy]."[114] Therefore, the Complaints' allegations regarding how the agreements fit together and complement one another are sufficient. As Plaintiffs allege, Defendants understood that to most effectively implement a price-fixing agreement on one drug, the conspiracy would extend beyond that specific drug.[115] Humana specifically highlights that "an agreement between two Defendants to raise or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous

---

[111] *Kelly*, 892 F.2d at 259.

[112] Lupin Br. at 5-6; Breckenridge Br. at 9-11; Teligent Br. at 11-12.

[113] *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 16 (D.D.C. 2004) (expressly rejecting on summary judgment defendants' argument that plaintiffs must show that "price fixing activities in Vitamin B5 were somehow necessary for manufacturers of choline chloride to successfully raise prices.").

[114] *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 997 (N.D. Oh. 2015).

[115] Humana Compl. ¶ 262; Kroger Compl. ¶¶ 22, 798, 814-817.

price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price."[116]

For example, if Teligent's Econazole co-conspirators Sandoz and Taro conspired to set the price of Clobetasol, which Plaintiffs allege they did, the Clobetasol conspiracy would struggle to hold if those two Defendants did not conspire on other drugs that they both manufacture, including Econazole. Likewise, an Econazole conspiracy between two manufacturers would be most effective if the five manufacturers representing 99% of the Econazole market participated, as alleged in Plaintiffs' Complaints.[117] Thus, any Defendant that solely participated in one drug-specific conspiracy, inherently contributed to, benefitted from, and cooperated in bringing about an overarching conspiracy. Moreover, for Teligent particularly, it could not have entered the Econazole market at pre-announced supracompetitive prices and gain market share absent the "fair share" overarching agreement.[118]

While the movants may argue these allegations are not specific enough as to them, a plaintiffs' allegations "need not be detailed on a defendant-by-defendant basis," and "[p]laintiffs are not obliged to have the same quality or quantity of allegations as to one defendant as unto another," particularly in conspiracy cases where collusion is cloaked in secrecy.[119]  Movants sweeping

---

[116] Humana Compl. ¶ 262; Kroger Compl. ¶ 22.

[117] Humana Compl. ¶ 523; Kroger Compl. ¶ 481.

[118] Humana Compl. ¶ 266; Kroger Compl. ¶ 481.

[119] *In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa. 2011); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ("[P]laintiffs need not plead each defendant's involvement in the alleged conspiracy in elaborate detail, but must simply include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy."); *See also In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant."); *see generally Bell Atl. Corp. v. Twombly*, 550 U.S. at 555 (discussing fair notice of a claim to a defendant.);. Movants also make much of the brevity and concise allegations regarding them in Humana and Kroger's complaints, but brevity does not absolve a conspirator from liability. *In re Southeastern Milk Antitrust*

arguments for detailed allegations ask the Court to improperly draw inferences in their favor by overlooking the wholly  plausible inference of overarching conspiracy that links the set of similar, simultaneous, and plausibly-related illegal conspiracies.[120]

Further, Breckenridge argues that as a single-drug conspirator, it "is incapable of participating in th[e] *quid pro quo* exchange" wherein Defendants "traded market share or customers for one drug in exchange for market share or customers for another drug."[121] This argument ignores the allegation that Breckenridge benefited from "the *quid pro quo*," as other makers of Propranolol allowed it to gain its "fair share" precisely because they could recoup any lost profits on their sales of other drugs.  For this reason, participating in the *quid pro quo* exchange described above is sufficient, but not necessary to be interdependent. While each Defendant must play some role in the conspiracy, each conspirator does not have to equally and identically contribute. Minimal participation that aids in bringing about the desired result is all that is required.[122]

### c.  The Individual Conspiracies Sufficiently Overlap

This Court already found in the *Group 1 Decision* that there exists "a web of connections"[123] among Defendants. Breckenridge's argument that Plaintiffs cannot satisfy the third *Kelly* factor because it sold only one drug misconstrues the overlap factor to require Plaintiffs to allege that Breckenridge has a high degree of overlap with non-drug-specific conspirators.[124] But Plaintiffs need

---

*Litig.*, 555 F. Supp. 2d 934, 949 (E.D. Tenn. 2008) ("That [plaintiffs] require only a few paragraphs or sentences to [plead the requisite contours of a claim] is of no consequence.").

[120] *Aldridge*, 284 F.3d at 79 (holding that district court erred in "drawing inferences in defendant's favor" under Rule 12(b)(6)).

[121] Breckenridge Br. at 9.

[122] *Beltz Travel Service, Inc. v. International Air Transport Ass'n,* 620 F.2d at 1367 ("Participation by each conspirator in every detail in the execution of the [antitrust] conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result.").

[123] *Group 1 Decision*, 338 F. Supp. 3d at 453.

[124] Breckenridge Br. at 11-12.

only show the "pervasive involvement of a single 'core conspirator'" to satisfy the overlap requirement.[125] This they do.

Plaintiffs allege that Breckenridge's Propranolol co-conspirator, Actavis, is a participant in at least eleven drug-specific conspiracies.[126] Actavis' affiliate, Teva, is alleged to conspire on nine drugs, at least five of which are different drugs than the products Actavis is alleged to have conspired on. Thus, the Teva/Actavis family of manufacturers allegedly colluded on sixteen conspiracies, with dozens of other manufacturers, including Breckenridge, on at least Propranolol.

Lupin and Teligent do not contest that Plaintiffs' allegations meet the overlap factor. But Humana and Kroger also sufficiently allege overlap with respect to them, again, due to the pervasiveness of certain core conspirators that Lupin and Teligent colluded with regarding Pravastatin and Econazole, respectively. Lupin conspired to set the price of Pravastatin along with Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Mylan, Teva, and Zydus.[127] Of its Pravastatin co-conspirators, Actavis and Teva are alleged to have conspired on sixteen unique drugs, and Mylan on at least twelve drugs. Humana and Kroger further allege Teligent conspired to set the price of Econazole along with Defendants Fougera, Perrigo, Sandoz, and Taro.[128] Sandoz and Fougera conspired on at least twelve drug-specific conspiracies, and Taro, along with its affiliate Sun conspired on at least twelve drug-specific conspiracies.  Teligent's Econazole co-conspirators are

---

[125] *U.S. v. Portela*, 167 F.3d at 695 (internal citation omitted); *see also U.S. v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003) (holding "the overlapping of the participants" is one of the principal considerations in determining the number of conspiracies; the court did not require every participant to have overlap).

[126] Actavis is an alleged conspirator for the following drug-specific conspiracies: Clobetasol, Desonide, Doxycycline Regular Release, Fluocinonide, Nystatin Cream, Nystatin Ointment, Pravastatin, Propranolol, Ursodiol, and Verapamil.

[127] Humana Compl. ¶¶ 106, 632-44; Kroger Compl. ¶¶ 719, 723.

[128] Humana Compl. ¶¶ 100, 522-536; Kroger Compl. ¶ 473.

inarguably "core conspirators," thereby satisfying the overlap requirement for any Econazole conspirator.

Moreover, in *Dahl*, the court denied a rehearing of defendants' previously denied motion for even summary judgment on antitrust overarching conspiracy claims, noting that "evidence of the [d]efendants' conduct during those four years shows a ***kaleidoscope*** of interactions among an ***ever-rotating***, overlapping cast of [d]efendants…"[129] While noting that there was no single defendant involved in every transaction, the *Dahl* court found that the presence of an "accepted code of conduct between the Defendants" suggests an adherence to an agreed upon conduct, and permitted the overarching conspiracy claim to go forward.[130]

Here, Plaintiffs allege that nearly every conspirator involved in the conspiracy was conspiring on multiple drugs.[131] While Breckenridge, Lupin, and Teligent may or may not have been "core" conspirators, they were "rotating" parts of the Defendants kaleidoscopic web of interactions that created the large overarching conspiracy to raise the price floor of generic drugs.

## III.   REQUEST FOR LEAVE TO AMEND

If the Court concludes that the Plaintiffs' Complaints are insufficient to sustain any claim against Lupin, Breckenridge, or Teligent, Plaintiffs respectfully request leave to amend their respective complaints under the liberal pleading standard of Rule 15(a)(2).[132] A plaintiff should be

---

[129] *Dahl*, 937 F. Supp. 2d at 125 (emphases added).

[130] *Id.*

[131] This is not a case where only "some" of the conspirators are overlapping. *Cf. Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 08cv42, 2011 WL 7053807, at *29 (E.D.N.Y. Jan. 4, 2011) (finding that only having "some overlapping parties" is insufficient to show an overarching conspiracy.). Here, at least nine Defendants are alleged to be a co-conspirator in at least five or more drug-specific conspiracies.

[132] FED. R. CIV. P. 15(a)(2) (courts should freely give parties leave to amend their pleadings "when justice so requires."); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("this mandate is to be heeded").

afforded the opportunity to amend its complaint to address pleading deficiencies identified by the court unless amendment is in bad faith, is futile or will cause undue delay or prejudice.[133] Amendment here will not cause bad faith, undue delay, prejudice or futility.[134]

## IV.    CONCLUSION

For the reasons discussed above, Lupin's, Breckenridge's and Teligent's Motions to Dismiss should each be denied.

---

[133] *See e.g., Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) ("a district court must permit a curative amendment, unless an amendment would be inequitable or futile.") (citations omitted); *Shane v. Fauver*, 213 F.3d 113, 117 (3d Cir. 2000) ("Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility.").

[134] Contrary to Teligent's assertion that "Kroger and Humana have had two solid bites at the apple," (Teligent Br. at 12), this is Teligent's first motion to dismiss Kroger and Humana's complaints.

Dated: May 2, 2019

**LOWEY DANNENBERG, P.C.**

By:   */s/ Peter D. St. Phillip*
Peter D. St. Phillip
Jennifer Risener
Lee Yun Kim
44 South Broadway, Suite 1100
White Plains, New York 10601
T: 914-997-0500
PStPhillip@lowey.com
JRisener@lowey.com
LKim@lowey.com

Laura K. Mummert
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
T: 215-399-4770
LMummert@lowey.com

**SCHNEIDER WALLACE COTTRELL**
**KONECKY WOTKYNS LLP**

Todd Schneider
Jason Kim
Kyle Bates
2000 Powell Street, Suite 1400
Emeryville, California 94608
T: 415-421-7100
Tschneider@schneiderwallace.com
Jkim@schneiderwallace.com
Kbates@schneiderwallace.com

*Counsel for Humana Inc.*

**KENNY NACHWALTER, P.A.**

By:   */s/ William J. Blechman*
Richard Alan Arnold
William J. Blechman
Scott E. Perwin
Anna T. Neill
Samuel J. Randall
Joshua Gray
Brandon Floch
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
T: 305-373-1000
Rarnold@knpa.com
Wblechman@knpa.com
Sperwin@knpa.com
Aneill@knpa.com
Srandall@knpa.com
Jgray@knpa.com

*Counsel for The Kroger Co., Albertsons*
*Companies, LLC, and H.E. Butt Grocery*
*Company L.P.*