IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL NO. 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO: | HON. CYNTHIA M. RUFE |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc. et al.* | No. 18-2641 |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | No. 18-284 |

**PLAINTIFFS' OPPOSITION TO
DEFENDANT G&W LABORATORIES INC.'S MOTION TO DISMISS
DIRECT PURCHASER AND KROGER PLAINTIFFS' COMPLAINTS**

FILED WITH REDACTIONS – PUBLIC VERSION

# TABLE OF CONTENTS

|  | Page(s) |
|---|---|

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 1

ARGUMENT .................................................................................................................................... 4

    I.    Under this Court's standards, Plaintiffs plead plausible Sherman Act claims against G&W. ............................................................................................. 4

        A.    Plaintiffs' allegations satisfy the "Parallel Conduct" element. .................... 4

        B.    Plaintiffs' allegations establish the existence of certain "Plus Factors." ............................................................................................................. 5

            1.    Plaintiffs' "Motive" allegations are consistent and well-pled. ............................................................................................................. 5

            2.    Plaintiffs' allegations of "Actions Against Self-Interest" are well-pled. ....................................................................................... 6

            3.    Plaintiffs allege sufficient "Facts Implying a Traditional Conspiracy." ............................................................................................ 6

    II.    G&W's remaining plausibility arguments are duplicative of Defendants' joint brief and without merit. ................................................................................. 8

    III.    Plaintiffs' claims are timely. ............................................................................... 11

CONCLUSION ............................................................................................................................. 14

FILED WITH REDACTIONS – PUBLIC VERSION

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berkey Photo Inc. v. Eastman Kodak Co.*,
603 F. 2d 263 (2d Cir. 1979) .................................................................................................. 11

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2015) ....................................................................................... 11

*In re Aspartame Antitrust Litig.*,
416 F. App'x 208 (3d Cir. 2011) ............................................................................................. 13

*In re Blood Reagents Antitrust Litig.*,
266 F. Supp. 3d 750 (E.D. Pa. 2017) ....................................................................................... 13

*In re Buspirone Patent Litig.*,
185 F. Supp. 2d 363 (S.D.N.Y. 2002) ..................................................................................... 12

*In re Generic Pharms. Pricing Antitrust Litig.*,
338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................................................................*passim*

*In re K–Dur Antitrust Litig.*,
338 F. Supp. 2d 517 (D.N.J. 2004) .......................................................................................... 12

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) ..................................................................................... 12

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ......................................................................................... 12

*In re Pre-Filled Propane Tank Antitrust Litig.*,
860 F.3d 1059 (8th Cir. 2017) ................................................................................................. 11

*In re K-Dur Antitrust Litig.*,
No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ...................................................... 9

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ................................................................................................................. 11

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
198 F.3d 823 (11th Cir. 1999) ................................................................................................. 13

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014) ................................................................................................. 11

FILED WITH REDACTIONS – PUBLIC VERSION

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  MDL 2373, 2013 WL 2181185 (E.D. Tenn. May 20, 2013) .................................................... 12

*U.S. v. Kelly*,
  892 F.2d 255 (3d Cir. 1989) ................................................................................................ 9

**Rules**

Fed. R. Civ. P. 15 ............................................................................................................................14

FILED WITH REDACTIONS – PUBLIC VERSION

## INTRODUCTION

At the pleading stage, Plaintiffs[1] have alleged sufficient facts to state plausible antitrust claims against G&W Laboratories, Inc. ("G&W") for its participation in the "fair share" code of conduct among Defendants to allocate customers and markets, rig bids, and fix prices for generic drugs including Metronidazole. A straightforward comparison of the Court's prior motion to dismiss opinion - *In re Generic Pharmaceuticals Pricing Antitrust Litigation* - to the current allegations demonstrates that this is the case.[2] In short, Plaintiffs' allegations are equivalent to those that the Court previously found sufficient with respect to parallel conduct and plus factors, including "motive," "actions against self-interest" and "facts implying a traditional conspiracy."

G&W's motion to dismiss should be denied.

## FACTUAL BACKGROUND

Metronidazole, an antibiotic, is among the 31 generic drugs that are currently at issue in MDL 2724.[3] Plaintiffs' Complaints contain allegations concerning different formulations of Metronidazole: cream, jelly/gel,[4] lotion, and vaginal.[5]

Like with other generic drugs and other formulations of Metronidazole, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[6] In 2011, there were three primary manufacturers of Metronidazole cream - MDL Defendants G&W, Sandoz, Inc. ("Sandoz") and Teva Pharmaceuticals USA, Inc. ("Teva") - as well as three primary manufacturers of

---

[1] Direct Purchaser Plaintiffs and Kroger Direct Action Plaintiffs (together, "Plaintiffs").
[2] 338 F. Supp. 3d 404 (E.D. Pa. 2018).
[3] DPP CAC Exh. A.
[4] Metronidazole jelly is also referred to as Metronidazole gel.
[5] DPP CAC Exh. A.
[6] DPP CAC ¶¶ 276 (cream), 282 (jelly).

1

Metronidazole jelly—G&W, Sandoz and Taro Pharmaceuticals U.S.A., Inc ("Taro").[7] Their collective market dominance permitted them to collude, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were similar.[8] In 2012, Impax Laboratories, Inc. ("Impax")[9] entered with Metronidazole jelly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[10]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[7] Although Pricing Chart 5 lists Defendant Taro as a manufacturer of Metronidazole jelly, the following four paragraphs of the Direct Purchaser Complaint incorrectly name Teva. DPP CAC ¶¶ 280-81, 283, and 285. At the appropriate time, Plaintiffs will amend to correct these paragraphs.

[8] *See* DPP CAC ¶¶ 275, 281; Kroger Compl. ¶¶ 655–62.

[9] Impax is sometimes referred to as "Global Pharm Corp" in the IMS data pricing charts.

[10] DPP CAC ¶ 280; Kroger Compl. ¶¶ 659–60.



Plaintiffs have pled that there were no non-collusive market factors (*e.g.*, product shortages) that can explain Defendants' artificially inflated prices for Metronidazole.[11]

These Metronidazole price increases were part of a larger understanding among generic drug manufacturers, such as G&W, each of which has overlapping generic drug portfolios spanning many drugs.[12] G&W manufactures many other generic drug products, and its headquarters are located just a short drive from other generic drug manufacturers in northern

---

[11] DPP CAC ¶¶ 278, 284.
[12] DPP CAC ¶¶ 14–19; Kroger Compl. at Exh. 2 (detailing the interrelated web of generic drug fixing).

FILED WITH REDACTIONS – PUBLIC VERSION

New Jersey.[13] Plaintiffs have alleged that it was an active participant in generic drug trade associations and other gatherings where generic drug manufacturers had opportunities to meet and conspire, including in the months leading up to the Metronidazole price increases.[14] Former G&W senior sales employees (*e.g.*, National Account Managers ("NAMs")) are also alleged to have held positions at other MDL Defendants, and this interwoven nature of the generic drug industry helped facilitate the overarching "fair share" understanding.[15] For example, for many years Jan Bell worked at G&W as a NAM before going on to work at Mylan in a similar role.[16]

## ARGUMENT

### I. Under this Court's standards, Plaintiffs plead plausible Sherman Act claims against G&W.

Plaintiffs' conspiracy claims against G&W rest on allegations of "circumstantial evidence (and the reasonable inferences that may be drawn therefrom)."[17] As this Court explained, "Plaintiffs may withstand dismissal by relying on allegations" of "parallel conduct" and "plus factors that serve as proxies for direct evidence of an agreement."[18]

For the reasons stated below, the allegations against G&W satisfy these requirements.

#### A. Plaintiffs' allegations satisfy the "Parallel Conduct" element.

To satisfy the parallel-conduct element, "Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical . . . . Rather, they [need only] allege price increases that are 'reasonably proximate in time and value.'"[19] G&W does not dispute that

---

[13] DPP CAC ¶¶ 12, 53; G&W Br. at 1 (noting that G&W "specializes in the manufacture of topical dermatology treatments").
[14] DPP CAC ¶ 297 & Exh. D.
[15] DPP CAC ¶¶ 13, 130.
[16] DPP CAC ¶¶ 130, 447 & n.55.
[17] *Generic Pharms. Pricing*, 338 F. Supp. 3d at 440.
[18] *Id.* at 440-41.
[19] *Id.* at 441.

4

it engaged in parallel pricing for Metronidazole.[20] Nor could it, as this element is satisfied by the allegations that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

### B. Plaintiffs' allegations establish the existence of certain "Plus Factors."

Under the Court's framework, the next step is to examine the "plus factors"—*i.e.*, "circumstances in which the inference of independent action is less likely than that of concerted action."[21] This Court identified three plus factors that, if satisfied, supplied the "factual enhancement that is necessary for . . . claims to withstand dismissal."[22] Those factors are "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."[23]

#### 1. Plaintiffs' "Motive" allegations are consistent and well-pled.

G&W argues that "DPPs and Kroger Plaintiffs do not allege a single fact regarding G&W's goals and objectives."[24] But G&W's assertion is contradicted by the plain language of the Complaints, which plausibly outline how G&W operates in "a regulatory regime that could reduce" G&W and its co-conspirators' "profits by driving down generic drug prices over time," and thus they had the "common motive to set drug prices."[25] Notably, G&W's motive is pled via

---

[20] G&W Br. at 6-8.
[21] *Generic Pharms. Pricing*, 338 F. Supp. 3d at 448 (citation and quotation omitted).
[22] *Id.*
[23] *Id.* (citation and quotation omitted).
[24] G&W Br. at 4.
[25] *Generic Pharms. Pricing*, 338 F. Supp. 3d at 448.

5

allegations that mirror those upon which the Court based its prior ruling.[26] G&W's argument that Plaintiffs have not pled a common motive should be rejected.

### 2. Plaintiffs' allegations of "Actions Against Self-Interest" are well-pled.

G&W does not address this plus factor, presumably because—as with the motive plus factor—the operative Complaints demonstrate it through allegations that are nearly identical to those upon which the Court previously relied. Here, as with the Group 1 Defendants, G&W and its ostensible competitors' practice of "dramatically increas[ing] prices" without any "correlated" "changes in demand or manufacturing costs" "would be irrational in a competitive market."[27] The Court further noted that MAC pricing "limits the ability of a generic pharmaceutical manufacturer to unilaterally lead the market in a price increase absent collusion."[28] Ultimately G&W may show that it "had legitimate economic reasons for [its] pricing decisions . . . but [] Plaintiffs are not required to rebut those reasons in order to withstand dismissal."[29]

### 3. Plaintiffs allege sufficient "Facts Implying a Traditional Conspiracy."

The third plus factor is satisfied if the complaint alleges that (1) a defendant had the "opportunity to conspire," which can be demonstrated by the allegation that the defendants "had occasion to connect with each other, to engage in strategic business discussions, and to gain awareness of their competitors' current and future business plans,"[30] and (2) that the Defendant is implicated in the ongoing "government investigation," which can be demonstrated by the fact

---

[26] *Compare id.* (finding motive for all Group 1 Defendants), *with* DPP CAC ¶¶ 90–107 (asserting the same allegations against G&W and its co-conspirators), *and* Kroger Compl. ¶¶ 658, 115–20, 230–35, & 786–96 (same).

[27] *Generic Pharms. Pricing*, 338 F. Supp. 3d at 448. *Compare* 338 F. Supp. 3d at 448–49 (finding all Group 1 Defendants committed actions against self-interest), *with* DPP CAC ¶¶ 14–24, 90–131, & 270–85 (asserting the same allegations against G&W and its co-conspirators), *and* Kroger Compl. ¶¶ 658, 115–20, 230–35, & 786–96 (same).

[28] *Generic Pharms. Pricing*, 338 F. Supp. 3d at 448-49.

[29] *Id.* at 449.

[30] *Id.* at 450.

that "at least one manufacturer" of Metronidazole "has received a subpoena seeking information regarding [its] generic drug pricing practices."[31] Plaintiffs are not required "to have the same quality or quantity of allegations as to one defendant as unto another."[32]

Here, G&W's "opportunity to conspire" is demonstrated by the allegations that identify approximately a dozen G&W employees (including former employee Jan Bell) who met with multiple co-conspirator employees at many trade-association meetings.[33] These meetings occurred before, and continued for years after, the conspiracy began.

Notably, the allegations as to the number of meetings attended and the number of specific employees in attendance are greater than, or equivalent to, the allegations previously deemed sufficient to satisfy this factor. For example, Group 1 Defendants Mayne Pharma USA Inc. ("Mayne") and Lupin Pharmaceuticals, Inc. ("Lupin")—each of which is a Defendant that produced only one drug currently at issue in the MDL—are alleged to have had ▌▌▌▌▌ ▌▌▌▌▌, respectively, attend trade association meetings and other gatherings.[34] Moreover, the allegations at issue here are more detailed than the allegations against Teligent, Inc. ("Teligent"), the sole Group 1 Defendant that the Court dismissed, noting that only a handful

---

[31] *Id.* at 453.
[32] *Id.* at 450.
[33] G&W employees who attended meetings include: ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ *See* DPP CAC at Exh. D; Kroger Compl. at Exh. 3.
[34] *See* DPP CAC at Exh. D; Kroger Compl. at Exh. 3.

of its employees—including "unnamed Teligent representatives"—were alleged to have attended a small number of meetings.[35]

Finally, G&W's conduct has been implicated by the ongoing government investigations and the Glazer and Malek guilty pleas, as demonstrated by the fact that Sandoz, Teva, Taro, and Impax each received subpoenas regarding their generic drug pricing practices.[36] Thus, several manufacturers of Metronidazole have been implicated in a government investigation, which is a level greater than the Court's prior requirement of "at least one."[37]

In sum, parallel pricing and plus factors indicate that a plausible conspiracy has been alleged.

## II. G&W's remaining plausibility arguments are duplicative of Defendants' joint brief and without merit.

G&W advances duplicative arguments regarding the plausibility of the overarching conspiracy that are contrary to both case law and the facts of this case.

*First*, G&W argues that Plaintiffs have not sufficiently alleged that G&W shared a common goal with other Defendants.[38] However, as discussed above: "The common understanding and goal of the Fair Share Agreement is for generic drug manufacturers to achieve artificially inflated prices because no generic manufacturer is incentivized to compete for

---

[35] *Generic Pharms. Pricing*, 338 F. Supp. 3d at 451 ("two specifically named Teligent representatives attended three meetings of one group . . . unnamed Teligent representatives attended six GPhA meetings").

[36] DPP CAC at Exh. C; Kroger Compl. ¶ 127.

[37] *See Generic Pharms. Pricing*, 338 F. Supp. 3d at 453 ("Although there are no allegations that the Hi-Tech Defendants, Wockhardt, West-Ward, Teligent, Apotex, Glenmark or Lupin received subpoenas, there are allegations that at least one manufacturer of each of the Group 1 drugs . . . has received a subpoena seeking information regarding their generic drug pricing practices.").

[38] G&W Br. at 4-5.

8

additional market share by eroding price."[39] G&W cites to *In re K-Dur Antitrust Litigation* as an example of a case where a court held that plaintiffs did not plead sufficient facts to suggest that defendants entered into a single conspiracy regarding two separately-negotiated, so-called "reverse payment" settlement agreements.[40] G&W claims that the "same reasoning applies here," even though the facts of *K-Dur* bear little resemblance to the facts here. This litigation does not concern reverse-payment settlement agreements.

*Second*, G&W argues that the Complaints should be dismissed because "DPPs and Kroger Plaintiffs do not plead any facts that plausibly suggest that G&W participated in an industry-wide conspiracy designed to achieve 'a continuous result' through G&W's 'continuous cooperation' with the other alleged conspirators."[41] But *Kelly* held *inter alia* that a conspirator can be found to have engaged in an overarching conspiracy designed to achieve "a continuous result" through "continuous cooperation" so long as the actions of "one group . . . were . . . advantageous to the success of another aspect of the scheme or to the overall success of the venture."[42] Here, G&W's years-long agreement to charge at least supracompetitive Metronidazole prices benefited the overarching fair share agreement, as demonstrated in part by the fact that each of G&W's direct co-conspirators are alleged to have allocated markets and customers, fixed prices, and rigged bids for many other generic drugs.[43]

---

[39] DPP CAC ¶ 10; *see also id.* ¶ 111 ("Defendants and their co-conspirators sought to avoid competition within the generic drug industry, instead maintaining the stability of the relative market shares assigned to each competitor.").

[40] G&W Br. at 5 (discussing *K-Dur*, No. 01-cv-1652, 2016 WL 755623, *18-22 (D.N.J. Feb. 25, 2016)).

[41] *Id.* (emphasis omitted) (quoting *U.S. v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989)).

[42] 892 F.2d at 259 (internal quotes omitted).

[43] DPP CAC ¶¶ 14–19, 130-31; Kroger Compl. at Exh. 2 (detailing the interrelated web of generic drug fixing).

*Third*, G&W argues that the Complaints should be dismissed because "DPP and Kroger Plaintiffs have not alleged any overlap between G&W's dealings and those of the other Defendants," and thus "[t]here is no plausible basis to infer from that fact alone that G&W conspired to raise prices regarding 38 other products."[44] But this is incorrect, and the Court has already rejected this argument by refusing to dismiss multiple Group 1 Defendants only currently named as to one drug—*e.g.*, Mayne and Lupin.[45] As detailed in the Complaints, there is a web of connections between Defendants.[46] G&W was a repeat participant at trade association events with the other MDL Defendants. For example, G&W employees including Jan Bell attended meetings along with employees of at least MDL Defendants Actavis, Apotex, Aurobindo, Dr. Reddy's, Fougera, Glenmark, Heritage, Impax, Lannett, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teva, Valeant, West-Ward and Zydus.[47] Additionally, as noted above, generic drug industry employees tend to move from generic drug manufacturer to generic drug manufacturer, which further enhances the overlap and tight-knit nature of the industry.[48] In short, Plaintiffs have more than sufficiently alleged overlap,

Accordingly, G&W's duplicative plausibility arguments should be rejected.

---

[44] G&W Br. at 6.

[45] *Generic Pharms. Pricing*, 338 F. Supp. 3d at 411 (noting that the allegations included a claim for an "overarching anticompetitive scheme"); *id.* at 454 (finding that the alleged conspiracy was plausible with respect to *inter alia* Mayne and Lupin); *cf. id.* at 453 (refusing to compartmentalize evidence of conspiracy because of the "web of connections" between Defendants).

[46] Kroger Compl. at Exh. 2 (detailing the interrelated web of anticompetitive activity); DPP CAC ¶¶ 12-19, 130-31 (describing tight-knit nature of the generic drug industry); DPP CAC Exhs. A, B, C, D, E.

[47] DPP CAC Exh. D.

[48] *See, e.g.*, DPP CAC ¶ 130 (Jan Bell worked at Defendant G&W before working at Defendant Mylan); *see also id.* ¶ 447 (specific allegations as to Jan Bell's conduct during her tenure at Mylan).

### III. Plaintiffs' claims are timely.

G&W also argues that the statute of limitations bars Plaintiffs' claims. Not so. Two well settled exceptions render Plaintiffs' claims timely.

*First*, under the continuing-violation exception, a separate cause of action accrues each time a purchaser pays an unlawfully high price. As the Supreme Court has explained,

> [a]ntitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, *each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.*[49]

Notably, the application of this rule to scenarios such as G&W's is well settled, as the Eighth Circuit recently opined: "[e]very other circuit to consider this issue applies *Klehr*, holding that each sale in a price-fixing conspiracy is an overt act that restarts the statute of limitations."[50]

Thus, by focusing solely on the 2011 events, G&W omits the fact that it is ***currently*** illegally overcharging Plaintiffs and has thus committed multiple acts that have restarted the statute of limitations.[51] Moreover, the continuing-violation exception is also triggered by the

---

[49] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (emphasis added) (internal quotation marks and citations omitted); *see also Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F. 2d 263, 295 (2d Cir. 1979) ("Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. . . . *So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide.*" (emphasis added)).

[50] *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065 (8th Cir. 2017) (analyzing issue and collecting relevant cases); *see also Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) ("Turning first to the continuing violation exception, the Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act.").

[51] Notably, at least six courts have applied this to the pharmaceutical context, and each found that the statute of limitations is restarted by a new sale. *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 238 (D. Conn. 2015) ("Courts in other districts and circuits have used the same

fixing of the price of each new generic drug, as each of these new conspiracies acted as both a new drug specific conspiracy and a continuation of the overarching conspiracy.

*Second*, "the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs."[52] Specifically, "Defendants' and co-conspirators' affirmative and fraudulent concealment of their conspiratorial acts prevented Plaintiffs from discovering their causes of action and thereby tolled the statute of limitations on Plaintiffs' claims" until—at the "earliest"—the release of the redacted version of the States' Heritage-Related Multi-Drug Complaint.[53]

Notwithstanding the concealed nature of its conspiracy, G&W contends that "[Plaintiffs] were on notice of their claims" from the moment that G&W imposed the "price increases for metronidazole jelly and metronidazole cream."[54] But this is wrong as a matter of antitrust law, as courts consistently find that price increases are not tantamount to notice. For example, this Court found in *In re Blood Reagents Antitrust Litigation*, that price increases did not provide notice

---

reasoning . . . a purchaser suing a monopolist for overcharges is injured anew by each overcharge."); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 746–47 (E.D. Pa. 2014) ("Every court to have considered this issue in the pay-for-delay context has held that a new cause of action accrues to purchasers upon each overpriced sale of the drug."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 400 (D. Mass. 2013) ("Indulging all inferences in the Plaintiffs' favor, then, it is reasonable to assume here that, every time the Direct Purchasers were overcharged for brand Nexium, they suffered a cognizable injury."); *In re Skelaxin (Metaxalone) Antitrust Litig.*, MDL 2343, 2013 WL 2181185, at *29 (E.D. Tenn. May 20, 2013) (holding that the plaintiffs' claims were timely because they were "overcharged for metaxalone well into the limitations period"); *In re K–Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004) ("Plaintiffs' claims are not barred by the statute of limitations to the extent that they bought and overpaid for K–Dur within the applicable time limitations."); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings.").
[52] DPP CAC ¶¶ 501–06; *accord* Kroger Compl. ¶ 803.
[53] DPP CAC ¶¶ 499–502.
[54] G&W Br. at 9.

because the limited number of competitors in the market "diminished the impact of the price increases and contract cancellations as warnings of collusive behavior that would merit greater investigation."[55] Here, as in *Blood Reagents*, the complexity of the pharmaceutical market "diminish[es] the impact of the price increases . . . as warnings of collusive behavior that would merit greater investigation."[56] In any event, G&W's argument—that G&W's conspiracy should have been discovered at the moment it occurred—is improper at the motion-to-dismiss stage, as it requires a developed factual record.[57]

---

[55] 266 F. Supp. 3d 750, 786 (E.D. Pa. 2017). *Cf. In re Aspartame Antitrust Litig.*, 416 F. App'x 208, 212 (3d Cir. 2011) ("The District Court identified three 'storm warnings' that, ***taken together***, triggered a duty to exercise due care: (1) in the mid–1990s, plaintiffs believed that the purchase price of Aspartame was 'out of sight,' and defendant NutraSweet was the sole supplier in the market; (2) several anti-competition suits were filed in foreign jurisdictions naming some of the above-captioned defendants and alleging price-fixing in the Aspartame market; and (3) [the publication of an academic study of the market]." (emphasis added)).

[56] 266 F. Supp. 3d at 786; *see also* Kroger Compl. ¶ 107 (explaining that the market is "characterized by a 'disconnect' between the payment obligation and the product selection"); DPP CAC ¶ 101 ("PBMs usually do not disclose publicly which drugs they subject to MAC pricing, what the MAC price is, or what factors they apply to set MAC prices"); *see also* Kroger Compl. ¶ 109 ("The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up."); DPP CAC ¶¶ 93–107 (describing market complexity).

[57] *See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) (holding that in an antitrust case the "issue of when a plaintiff is on 'notice' of his claim is a question of fact for the jury" and collecting supporting circuit court cases).

13

## CONCLUSION

For the foregoing reasons, G&W's motion to dismiss should be denied.[58]

Dated: May 2, 2019               Respectfully submitted,

/s/ William J. Blechman                    /s/ Dianne M. Nast
William J. Blechman                        Dianne M. Nast
KENNY NACHWALTER, P.A.                     NASTLAW LLC
1441 Brickell Avenue, Suite 1100           1101 Market Street, Suite 2801
Miami, Florida 33131                       Philadelphia, Pennsylvania 19107
305-373-1000                               215-923-9300
wblechman@knpa.com                         dnast@nastlaw.com

**Counsel for the Kroger Direct Action**       **Liaison and Lead Counsel for Direct**
**Plaintiffs**                                 **Purchaser Plaintiffs**

---

[58] If the Court concludes that Plaintiffs' allegations are insufficient to sustain their claims against G&W, Plaintiffs request leave to amend their respective complaints under the liberal pleading standard of Rule 15(a)(2).

14

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2019, an unredacted copy of the foregoing document was served via electronic mail on Defendants' Liaison Counsel and Counsel for G&W Laboratories, Inc. A redacted version was filed via the Court's ECF system, which will provide service to all registered counsel.

_____
William J. Blechman