IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-md-2724 |
| | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO:<br><br>*The State Attorneys General Litigation*<br><br>*Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc., et al.*<br><br>*1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc., et al.*<br><br>*West Val Pharm., et al. v. Actavis Holdco U.S., Inc., at al.*<br><br>*The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.*<br><br>*Humana Inc. v. Actavis Elizabeth, LLC, et al.* | Civil Action Nos.<br>17-3768<br>18-2641<br>18-2401<br>18-2533<br>18-284<br>18-3299 |

**PLAINTIFFS' OPPOSITION TO DEFENDANT
GLENMARK PHARMACEUTICALS INC., USA'S
<u>INDIVIDUAL MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................................. 1

II. PLAINTIFFS' COMPLAINTS MUST BE VIEWED HOLISTICALLY .......................... 2

III. PLAINTIFFS HAVE PLAUSIBLY ALLEGED GLENMARK'S
PARTICIPATION IN A MULTI-DRUG CONSPIRACY .................................................. 3

    A. The Alleged Multi-Drug Conspiracy Is Plausible ................................................... 4

    B. Glenmark Is Plausibly Implicated in the Alleged
       Multi-Drug Conspiracy ............................................................................................. 5

       1. Glenmark's Drug-Specific Conduct Supports an
          Inference of Agreement to a Multi-Drug Conspiracy ......................................... 5

       2. Glenmark's Extensive Overlap with Co-Defendants
          Supports an Inference of Agreement to a Multi-Drug Conspiracy ................... 12

IV. PLAINTIFFS HAVE PLAUSIBLY ALLEGED GLENMARK'S
PARTICIPATION IN A FOSI-HCTZ CONSPIRACY ..................................................... 14

V. CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Bell Atlantic Corp. v. Twombly*,
   550 US 544 (2007) .................................................................................................... 14

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) .................................................................................................... 3

*In re Generic Pharm. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................................................... passim

*In re Generic Pharm. Pricing Antitrust Litig.*,
   315 F.Supp. 3d 848 (E.D. Pa. 2018) ........................................................................... 1

*In re K-Dur Antitrust Litig.*
   No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ........................................ 4

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ........................ 2

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................................... 3, 4

*Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ..................................................................................... 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................................... 9

*Szabo Food Serv., Inc. v. Canteen Corp.*,
   823 F.2d 1073 (7th Cir. 1987) .................................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................................... 3

*United States v. Kelly*,
   892 F.2d 255 (3d Cir. 1989) ....................................................................................... 5

*Valspar Corp. v. E.I. Du Point De Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017) ....................................................................................... 9
.

I.     **INTRODUCTION**

Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") argues that Plaintiffs have failed to plausibly allege that it joined the overarching conspiracy set forth in the Plaintiffs' Complaints.[1] Glenmark argues that the allegations as to its own anticompetitive activity— which, with respect to Fosinopril-HCTZ ("Fosi-HCTZ") are supported by powerful evidence of anticompetitive conduct uncovered in the State Attorneys General investigation, and, with respect to Pravastatin have already been deemed plausible by this Court in its ruling on the Group 1 motions to dismiss—cannot support an inference that Glenmark participated in a multi-drug conspiracy or even that it participated in a single drug conspiracy for Fosi-HCTZ. Glenmark's arguments are based on mischaracterizations of the law and a distortion of Plaintiffs' Complaints.

As described below and in Plaintiffs' joint memorandum in opposition to Defendants' joint motion to dismiss Plaintiffs' Complaints, Plaintiffs have alleged a plausible multi-drug conspiracy. Indeed, the Court already has suggested as much. *In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) ("it is plausible to infer that there was a broader conspiracy."). Plaintiffs' allegations plausibly suggest that Glenmark knew about, assented to, took actions in furtherance of and benefited from the overarching conspiracy. Plaintiffs' Complaints contain extensive allegations explaining the contours, operation and economic rationale of the alleged multi-drug conspiracy (including as it relates to the drugs sold

---

[1] States' Consolidated Amended Complaint ("State CAC"), No. 17-cv-3768, Dkt. No. 15 (June 18, 2018); DPP First Amended Class Action Complaint ("DPP CAC"), No. 18-cv-2641, Dkt. No. 12 (Dec. 21, 2018); EPP Class Action Complaint ("EPP CAC"), No. 18-cv-2401, Dkt. No. 2 (June 7, 2018); IRP Amended Overarching Complaint ("IRP CAC"), No. 18-cv-2533, Dkt. No. 4 (Dec. 21, 2018); Kroger Amended Complaint ("Kroger Compl."), No. 18-cv-284, Dkt. No. 36 (Dec. 21, 2018); Humana Amended Complaint ("Humana Compl."), No. 18-cv-3299, Dkt. No. 30 (Dec. 21, 2018).

by Glenmark).  The Complaints present the extensive web of connections, interactions, communications and competitive overlap between Glenmark and its co-defendants—including between Glenmark and Defendants that did not sell Fosi-HCTZ or Pravastatin.  Plaintiffs also allege with extraordinary detail Glenmark's individual anticompetitive conduct, which was consistent with and in furtherance of the goals not only of the overarching conspiracy, but also with drug-specific agreements for Fosi-HCTZ and Pravastatin.[2]

Based on all of Plaintiffs' allegations and drawing all inferences in Plaintiffs' favor, a reasonable juror could conclude that the scope of Glenmark's anticompetitive agreement was not limited to Fosi-HCTZ and Pravastatin, but extended to include all of the drugs identified in Plaintiffs' complaints, including drugs that Glenmark did not sell.  *See, e.g., In re Lithium Ion Batteries Antitrust Litig.,* No. 13-MD-2429 YGR, 2014 WL 309192, *2 (N.D. Cal. Jan. 21, 2014) ("The question in this case is not whether any conspiracy existed, only how far it reached.  That question is ultimately one of fact, and cannot be resolved in the present procedural posture").

Glenmark's motion should be denied.

## II.   PLAINTIFFS' COMPLAINTS MUST BE VIEWED HOLISTICALLY

Glenmark asks this Court to consider each allegation in the Plaintiffs' complaints separately, or at best, in a piecemeal fashion wherein allegations about certain aspects of the alleged overarching conspiracy are considered independent of related allegations.  This is not the proper standard of review.  "[T]he court's job is not to scrutinize each allegation in isolation but

---

[2] Glenmark suggests that only the States and Kroger assert drug-specific Fosi-HCTZ claims against Glenmark and that the other plaintiffs merely allege that Glenmark participated in a Fosi-HCTZ conspiracy as part of a broader multi-drug conspiracy.  *See* Glenmark's Memorandum Of Law In Support Of Its Individual Motion to Dismiss Plaintiffs' Sherman Act Claims In the Multi-Drug Complaints ("Glenmark Brief") at 12 n.8.  This is incorrect.  *See, e.g.*, EPP CAC ¶¶ 704(c); 716(c); 753(c); 786(c) (providing that each Count "is also brought against Defendant-participants in each of the drug-specific conspiracies alleged" including against Glenmark for Fosi-HCTZ); IRP CAC ¶¶ 359; 372; 376; 413 (same).

to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 326 (2007). This principle applies with full force to price-fixing allegations. *See Continental Ore Co., et al. v. Union Carbide and Carbon Corp., et al.*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."). And, post-*Twombly* antitrust decisions have routinely rejected attempts to compartmentalize factual allegations and to consider them piecemeal. *See, e.g., In re Processed Egg Products Antitrust Litig.*, 902 F.Supp.2d 704, 710 (E.D. Pa. 2012).

Accordingly, the allegations of Glenmark's actions both in furtherance of drug-specific conspiracies and the overarching conspiracy must be considered as a whole and in conjunction with all of Plaintiffs' allegations relating to Glenmark and its co-Defendants.

### III. PLAINTIFFS HAVE PLAUSIBLY ALLEGED GLENMARK'S PARTICIPATION IN A MULTI-DRUG CONSPIRACY

The Complaints include numerous allegations that, viewed altogether, plausibly suggest that Glenmark joined an overarching multi-drug conspiracy. First, Plaintiffs allege the existence of a multi-drug conspiracy that makes practical and economic sense and which is supported by numerous detailed allegations implicating the conduct of all Defendants and spanning all drugs. The alleged overarching conspiracy exhibits the interdependence among co-conspirators that the Third Circuit has identified as a hallmark of overarching conspiracies. Second, Plaintiffs allege in detail the drug-specific conduct by Glenmark that was consistent with and in furtherance of a multi-drug conspiracy. Third, Plaintiffs allege an extensive web of connections, interactions, communications (including anticompetitive communications) and competitive overlap between Glenmark and its co-defendants that support an inference that Glenmark joined an overarching conspiracy that was not limited to the drugs that Glenmark sold.

3

A. **The Alleged Multi-drug Conspiracy Is Plausible**

The States' Complaint alleges, based on extensive investigation, that Defendants—including Glenmark—have implemented a "collusive methodology" to allocate a "fair share" of customers and markets to each manufacturer and to raise the price of numerous generic pharmaceuticals above competitive levels. State CAC ¶ 91. This "common understanding… about what represents 'fair share'…has evolved over time during the numerous in-person meetings, telephonic communications and other interactions between generic manufacturers about specific drugs over the course of several years[.]" *Id*.

Plaintiffs' Complaints further elaborate on the economic rationale and need for Defendants' overarching multi-drug agreement:

> All of these Defendants market and sell multiple products. The effectiveness of an agreement on any one drug would be limited and unstable without a broader agreement that encompassed other drugs as well. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price. ***Therefore, Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.***

EPP CAC ¶ 102 (emphasis added). *See also* State CAC ¶¶ 90, 100-01; DPP CAC ¶ 15; IRP CAC ¶ 70.

In other words, the Complaints describe a conspiracy that involves interdependent participants and schemes; Plaintiffs allege a multi-drug conspiracy in which "the success or failure" of any single drug conspiracy depends on the "corresponding success or failure [of] the other" drug conspiracies. *In re K-Dur Antitrust Litig.*, No. 01–cv–1652, 2016 WL 755623, at *21 (D.N.J. Feb. 25, 2016) (quotes and citation omitted). Plaintiffs allege that Defendants shared "a common goal" of reduced competition across the generic industry and used the extensive "overlap…in the[ir] various dealings," to facilitate "the continuous cooperation of the

4

conspirators," and thus achieved a "continuous result" of supracompetitive prices for generic drugs. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (quotation marks and citations omitted).

Whether Plaintiffs ultimately will be able to prove at trial the full scope of the multi-drug conspiracy alleged in their Complaints is a fact question at the very core of this litigation. But there is nothing implausible about the existence of such a conspiracy, which is the relevant question at this juncture.[3] Moreover, as discussed below, it also is plausible to conclude that Glenmark joined such a conspiracy.

### B.  Glenmark Is Plausibly Implicated in the Alleged Multi-drug Conspiracy

Glenmark's suggestion that there are no specific allegations about Glenmark's participation in the multi-drug conspiracy is simply false. There are numerous factual allegations specific to Glenmark, which support a reasonable inference that Glenmark joined an overarching multi-drug agreement. The allegations of Glenmark's anticompetitive meetings, communications and actions, when viewed in the "entire context of the allegations" in Plaintiffs' Complaints are more than enough to infer that Glenmark was a member of the alleged overarching conspiracy. *In re Generic Pharms. Pricing Antitrust Litig.,* 338 F. Supp. 3d 404, 444 (E.D. Pa. 2018).

#### 1.  Glenmark's Drug-Specific Conduct Supports an Inference of Agreement to a Multi-drug Conspiracy

As the Court recognized in denying Glenmark's motion to dismiss the Pravastatin complaints, Plaintiffs' allegations of Glenmark's membership and frequent participation in trade associations,[4] connection to the ongoing government investigations,[5] and the web of connections

---

[3] The Complaints vary in scope, but all focus on the same core conduct of Defendants' "fair share" agreement.

[4] *See, e.g.*, DPP CAC Exh. D & E; EPP CAC Exh. 1; Kroger Compl. Exh. 3.

5

and interactions between Glenmark and alleged co-conspirators,[6] all supported an inference of anticompetitive agreement. *In re Generic*, 338 F. Supp. 3d at 452–53. This conclusion should apply with even more force to Plaintiffs' multi-drug complaints, which include those same allegations and more to implicate Glenmark. In particular, Plaintiffs identify in surprising detail not only numerous opportunities to conspire, but specific, direct and private anticompetitive communications between Glenmark and its co-conspirators that were made in furtherance of the alleged conspiracy.

The States' investigation has uncovered considerable evidence of anticompetitive conduct, including by Glenmark, relating to Fosi-HCTZ. State CAC ¶¶ 306-328. The Private Plaintiffs' allegations track the States' allegations. *See* DPP CAC ¶¶ 192-215; EPP CAC ¶¶ 453-493; IRP CAC ¶¶ 189-207; Kroger Compl. ¶¶ 546-565. From April through July of 2014, Glenmark, along with Heritage, Aurobindo, Citron and Sandoz, met in person multiple times and communicated numerous times about the pricing of Fosi-HCTZ. *Id.*

As described in detail in all of the Complaints, the CEO (Jeff Glazer) and the President (Jason Malek) of Heritage (who have now pleaded guilty to fixing the prices of at least Glyburide and Doxycycline) devised a plan to coordinate price increases on multiple drugs, including Fosi-HCTZ. They assigned people at Heritage to reach out to competitors. Dan

---

[5] Notably, Glenmark does not deny that it is being investigated by the Department of Justice ("DOJ"), but instead notes only that there "is no *allegation* that Glenmark is a focus of the DOJ's investigation." Glenmark Brief at 7 (emphasis added). Although Plaintiffs have not alleged that Glenmark received a criminal subpoena from the DOJ, *all* of its Fosi-HCTZ co-conspirators—Heritage, Aurobindo, Citron and Sandoz—have. And there is no doubt that the DOJ investigation covers Fosi-HCTZ. *See, e.g.*, EPP CAC ¶ 657(d) (quoting SEC disclosure from Aceto, the parent of Citron, admitting that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and **Fosinopril HCTZ** products.") (emphasis added).

[6] *See, e.g.*, EPP CAC ¶¶ 108-11 & 112-17. *See also infra* Sec. III.B.2.

Lukasiewicz was assigned to contact competitors **about Fosi-HCTZ**. *See, e.g.*, State CAC ¶¶ 268-69, 277-79; EPP CAC ¶ 464. Glazer pestered Lukaziewicz for updates on his Fosi-HCTZ pricing discussions with competitors. State CAC ¶ 278. Lukasiewicz finally connected with P.M. (his contact at Aurobindo) to discuss Fosi-HCTZ on May 8. Later that day, P.M. called J.G. at Glenmark, which prompted a second call between Aurobindo and Glenmark. *Id.* ¶ 309. The next day, T.G. at Aurobindo reached out directly to J.J. at Glenmark. *Id.* We know that Aurobindo's T.G. was **discussing Fosi-HCTZ price increases with competitors** during this time frame because the next week, he met in person with Ann Sather of Heritage and C.B. of Sandoz at a trade event, after which Sather confirmed to her bosses that they expressly discussed pricing for Fosi-HCTZ **and reached agreement**. *Id.* ¶¶ 287, 311.

Over the following weeks there was a "flurry" of communications between all of the Fosi-HCTZ manufacturers. *Id*. ¶¶ 316-26. During this period, Sather learned from discussions with a friend at Citron that Citron would be entering the Fosi-HCTZ market. This prompted a call from K.S. at Citron to Heritage's Lukasiewicz. Sather's notes from an internal meeting at Heritage reflect that K.S. informed Lukasiewicz that pricing discussions with Citron should never be in writing and should be directed to L.S. at Citron. *Id*. ¶ 320. After this, Citron's L.S. joined the flurry of communications among Fosi-HCTZ manufacturers, including phone calls with Heritage's Sather and Aurobindo's P.M. *Id*. ¶¶ 321 & 323. During these weeks of intense communications, at least Heritage and Citron increased their Fosi-HCTZ prices and were eventually followed by Sandoz. *Id*. ¶¶ 323, 326 & 327.

Glenmark is implicated in multiple communications during this period, including between (1) Glenmark's J.J. and Heritage's Lukasiewicz (who we know was tasked by Glazer with coordinating Fosi-HCTZ pricing), *Id*. ¶ 316; (2) Glenmark's J.G. and Lukasiewicz, *Id*. ¶

7

322; (3) Glenmark's J.J. and Aurobindo's T.G. (who we know spoke about Fosi-HCTZ price increases with Heritage and Sandoz at a trade event days later), *Id.* ¶ 309; (4) Glenmark's J.G. and Aurobindo's P.M. (who we know was Lukaseweicz's first contact about Fosi-HCTZ), *Id.* ¶ 324; and (5) Glenmark's J.G. and Citron's K.S. (who we know contacted Heritage's Lukasiewicz to open up a line of communications about drug pricing, including for Fosi-HCTZ). *Id.* ¶ 326. These allegations are not based on "information and belief" but on materials collected in the AG investigation. Although the precise content of Glenmark's communications may not be included in Plaintiffs' Complaints, the context of those communications makes it highly likely that they related to the pricing of Fosi-HCTZ. Glenmark's assertion that Plaintiffs "do not even attempt to link the timing of communications by Glenmark employees to the timing of alleged price increases" but instead merely allege that "Glenmark's employees had communications with employees of other generic drug manufacturers about something without any purported connection to any product or its price" is a blatant misreading of the Complaints. Glenmark clearly is implicated in anticompetitive conduct relating—at a minimum—to Fosi-HCTZ.

Glenmark has no real response to these allegations. Glenmark does not deny that these meetings and communications took place, or that Fosi-HCTZ was discussed. Instead, Glenmark highlights that Plaintiffs cannot (at least at this juncture) quote the content of the communications between and Glenmark and its Fosi-HCTZ conspirators. It argues that this purported shortcoming requires the Court to infer that these communications were "perfectly legitimate," and "were more likely than not purely social." Glenmark Br. at 9-10. Not only is Glenmark asking for inferences that are ***im***plausible (and in its favor), it is asking the Court to

8

apply a clearly improper legal standard.[7]  Under Rule 12, the Court must "accept[] the allegations as true and draw[] all logical inferences in favor of the non-moving parties." *In re Generic*, 338 F. Supp. 3d at 435–36.  Moreover, Plaintiffs need not supply direct evidence of conspiracy in their pleadings—*or ever*—to prevail on their claims, much less to sustain their Complaints.  *See Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 192 n.2 (3d Cir. 2017) (recognizing even at summary judgment that "direct evidence of conspiracy … is rare in price-fixing cases").

The somewhat harder question is whether Glenmark's anticompetitive conduct with respect to Fosi-HCTZ supports an inference that Glenmark joined a broader conspiracy.  It does.  It is plain from the Complaints that the anticompetitive conduct relating to Fosi-HCTZ did not occur in isolation.  For example, numerous inter-Defendant communications implicated multiple drugs—not solely Fosi-HCTZ.  *See, e.g.*, State CAC ¶ 318 (describing Heritage-Citron communications that started about Glyburide and expanded to include Fosi-HCTZ); *Id*. ¶ 287(describing discussions at trade event involving Heritage, Aurobindo, Sandoz and Lannett about price increases for Fosinopril-HCTZ, Glyburide, Glyburide-Metformin, and Doxy Mono).  Plaintiffs have plausibly alleged that Glenmark's efforts to raise the prices of the drugs it did sell was part of a collective effort to raise the prices of numerous drugs, including some that Glenmark did not sell.

---

[7] Glenmark suggests that Plaintiffs must "rule out the possibility that such communications were perfectly legitimate."  Glenmark Brief at 9.  This is an egregious mischaracterization of the law.  Even at summary judgment, Plaintiffs need only show that "the inference of conspiracy is reasonable in light of the competing inferences of independent action". *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  *See Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1082 (7th Cir. 1987) ("When counsel represent that something cleanly rejected by the Supreme Court is governing law, then it is appropriate to conclude that counsel…either are trying to buffalo the court or have not done their homework.").

Moreover, the Complaints explain how Glenmark's participation in the Fosi-HCTZ conduct implicated the "fair share" agreement at the core of the alleged overarching conspiracy. Glenmark, along with Aurobindo and Sandoz, were the manufacturers of Fosi-HCTZ in 2012. EPP CAC ¶ 456; IRP CAC ¶ 191. Although Heritage did not offer better pricing when it entered the Fosi-HCTZ market in 2012, it "quickly captured market share for Fosinopril-HCTZ, consistent with the 'fair share' agreement between Defendants." EPP CAC ¶¶ 456-57; IRP CAC ¶¶ 191-192. *See also* State CAC ¶ 100 ("This understanding regarding 'fair share' has been particularly effective when a new competitor enters the market – a time when, in a free-functioning competitive market, prices should go down."). Later, in 2014, when "Heritage significantly raised its prices for Fosinopril-HCTZ, it did not lose market share until at least 2016 (when it appears to have begun to exit the market). Maintaining a dominant share of the market was only possible because of the 'fair share' agreement between Heritage, Aurobindo, Citron, Glenmark and Sandoz." EPP CAC ¶ 490. Thus, as alleged by Plaintiffs, Glenmark's adherence to the "fair share" agreement was a necessary component of the drug-specific Fosi-HCTZ agreement.

Glenmark's conduct with respect to Fosi-HCTZ—ceding market share and then, in the face of a competitor's extraordinary price-increase, allowing that competitor to maintain significant market share for an extended period of time—was ***inconsistent*** with competitive behavior. It was, of course, totally ***consistent*** with Defendants' anticompetitive 'fair share' agreement. The same was true of Glenmark's Pravastatin conduct; as the Court already determined, Glenmark's Pravastatin "pricing practices would be irrational in a competitive market." *In re Generic*, 338 F. Supp. 3d at 448. Thus, in at least two instances, Glenmark's "irrational" conduct cannot be explained by competition; it can, however be explained by

10

Glenmark's participation in a multi-drug, "fair share" agreement among Defendants.[8] Ultimately, Glenmark asks the Court to ignore the context of Plaintiffs' allegations, to focus exclusively on Glenmark's conduct, and then to draw an inference that Glenmark's irrational and anticompetitive conduct with respect to Fosi-HCTZ and Pravastatin was totally unrelated to each other or to any of the other drugs at issue in the MDL. Here, it certainly is plausible to infer that Glenmark's anticompetitive conduct—which involved multiple drugs, occurred during the same time period, implicates overlapping co-conspirators, all in the context of repeated and sustained in-person meetings and direct communications—was part of a multi-drug conspiracy.

The crux of Glenmark's argument that Plaintiffs' allegations are insufficient to tie it to a broader conspiracy is that Plaintiffs have levelled even stronger allegations against some of Glenmark's co-Defendants. *See* Glenmark Brief at 6. But as this Court already has explained, "Plaintiffs are not obliged to have the same quality or quantity of allegations as to one defendant as unto another. [T]here is no requirement that allegations pertaining to one defendant mirror those against other defendants in terms of specific conduct or 'quantity' of alleged 'bad acts.'" *In re Generic*, 338 F. Supp. 3d at 450 (citations and internal quotation marks omitted). Indeed, the strength of the allegations against Glenmark's co-conspirators supports, rather than undermines, the inference that Glenmark joined a broader conspiracy.

---

[8] *See, e.g.*, State CAC ¶ 101 ("To maintain the artificial equilibrium, customers in one drug market might be traded for customers in another drug market in an effort to arrive at a more global 'fair share' outcome. Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a *quid pro quo* from other competitors on different drugs."); EPP CAC ¶ 103 ("Defendants developed the concept of 'fair share,' in which each market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to free and fair price competition. Because Defendants are repeat players who routinely enter new markets but face the same competitors, their basic agreement—to eschew price competition and seek only a 'fair share' of the market—became the 'rules of the road' that governed their overarching conspiracy."). *See also* Kroger Compl. ¶ 817.

11

### 2. Glenmark's Extensive Overlap with Co-Defendants Supports an Inference of Agreement to a Multi-drug Conspiracy

Just as the Court concluded in denying Glenmark's motion to dismiss the Pravastatin Complaints, the conduct and allegations concerning Glenmark's co-Defendants are not "entirely separate" but instead "are probative of broadly anticompetitive conduct in the generic pharmaceutical industry"—conduct in which Glenmark is squarely implicated. *In re Generic*, 338 F. Supp. 3d at 452. Glenmark's myopic (and improper) focus on Plaintiffs' allegations dissociated from the context of the Complaints obscures the extensive "web of connections" between Glenmark and its co-Defendants. *Id.* at 453.

First, Glenmark is a competitor or potential competitor of every one of its co-Defendants in the multi-drug Complaints, all of whom are in the business of selling a portfolio of generic drugs. *See, e.g.*, EPP CAC ¶¶ 112-17; State CAC ¶ 63. For example, although only five Defendants sold Fosi-HCTZ during the relevant period, nine Defendants have (or had) an approved Abbreviated New Drug Application ("ANDA") for Fosi-HCTZ (Actavis, Aurobindo, Citron, Glenmark, Heritage, Mylan, Sandoz, Sun and Teva). EPP CAC ¶ 115. At least two of these nine Defendants have an ANDA for each of the 15 drugs at issue in the multi-drug complaints filed by the States, EPPs and IRPs. *Id. See also id.* ¶ 116 (graphically depicting ANDA overlap among Defendants). In other words, "Defendants are repeat players who routinely enter new markets" and expect to and do "face the same competitors." *Id.* ¶ 103.

Second, Glenmark frequently met with all of its co-Defendants. In addition to being a regular member of the GPhA, *see In re Generic*, 338 F. Supp. 3d at 429, Glenmark attended at least 20 trade events, including at least two trade events with each of its co-Defendants, between 2012 and 2015—years during which numerous collusive price increases were implemented. *See* DPP CAC Exh. D; EPP CAC Exh. 1; Kroger Compl. Exh. 3. For example, every one of the

12

Fosi-HCTZ manufacturers attended the NACDS Annual Meeting in April 2014—which occurred right before the "flurry" of inter-Defendant communications about the pricing of Fosi-HCTZ discussed above. *See* Kroger Compl. Exh. 3 (identifying trade event attendees by Defendant and drug). They all also attended the June 2014 HDMA and August 2014 NACDS conferences—during which time Heritage and Citron announced Fosi-HCTZ price increases. *Id.* And the Fosi-HCTZ manufacturers were not alone; the vast majority of ***all*** Defendant manufacturers of ***every other drug at issue*** also attended these three conferences. *Id.* Nor were these trade events merely "opportunities" to conspire; the States have confirmed conspiratorial conduct by at least some Defendants at the June and August events. *See, e.g.*, State CAC ¶¶ 140, 288, 315. Similarly, Glenmark and the other Defendants involved with Pravastatin attended GPhA events in early-to-mid 2013, while they were imposing nearly simultaneous Pravastatin price increases. *See, e.g.,* Humana Compl. ¶¶ 639, 643. Notably, in this small window of time—between the spring and summer of 2014—at least 18 of the drugs at issue in this MDL were subject to anticompetitive conduct. *See* EPP CAC ¶ 145 (Table 5: Timeline).

<u>Third</u>, Glenmark communicated directly with (at least) Heritage, Aurobindo, Citron and Teva during the relevant period. For example, in addition to the collusive communications among Fosi-HCTZ Defendants described above, Glenmark communicated directly and privately via phone (call and text) with Teva at least 94 times between July 2013 and July 2014. *See* State CAC ¶¶ 94-95.[9] Indeed, Glenmark communicated with Teva (another of the Pravastatin Defendants) 15 times in July through August of 2013, around the time Teva joined the Pravatstin price increase. *See* State CAC ¶ 95 and Humana Compl. ¶ 639. Inter-Defendant communications were not limited to Glenmark, or to the Fosi-HCTZ and Pravastatin

---

[9] Teva sold Pravastatin during the relevant period; however, Teva had an ANDA for Fosi-HCTZ, but did not sell Fosi-HCTZ during the relevant period.

manufacturers, but were widespread. State CAC ¶¶ 94-95. And the allegations in the Complaints are likely the tip of the iceberg. *See id*. (describing the limitations of information available at the time of pleading).

Fourth, the DOJ's criminal investigation, which so far has resulted in the guilty pleas from two executives at Heritage, extends to at least 16 Defendants and encompasses Fosi-HCTZ. *See, e.g.*, EPP CAC ¶ 657 (identifying recipients of DOJ subpoenas). *See also supra* n.5.

In sum, it is clear that Glenmark is in the thick of the anticompetitive conduct at issue in this MDL.

## IV. PLAINTIFFS HAVE PLAUSIBLY ALLEGED GLENMARK'S PARTICIPATION IN A FOSI-HCTZ CONSPIRACY

Glenmark seeks not only to dismiss the overarching conspiracy claims against it, but also the drug specific claims relating to Fosi-HCTZ.[10] The entirety of Glenmark's argument is (again) premised on a mischaracterization of the law. Glenmark posits that there are only two ways to plead an antitrust conspiracy: (1) direct evidence; or (2) parallel conduct. Glenmark Brief at 12. That, of course, is not the pleading standard or the rule of law. Were Glenmark correct, no plaintiff could ever sufficiently plead the existence of an anticompetitive market-allocation agreement (which does not involve parallel pricing) in the absence of direct evidence. As this Court and the Supreme Court recognize: "To plead a Section 1 claim…Plaintiffs' complaints must include 'enough factual matter (taken as true) to suggest that an agreement was

---

[10] Glenmark curiously suggests that Kroger has not sufficiently alleged parallel Pravastatin pricing, notwithstanding the Court's resolution of this issue when it denied the motions to dismiss the Group 1 Pravastatin Complaints. Glenmark Brief at 14-15. Although Kroger expressly alleges parallel pricing "taken in stair-step fashion," Kroger Compl. ¶¶ 718-19, Glenmark suggests that "specific price data", presumably like the proprietary data in the class plaintiffs' Complaints, is required. Glenmark cites no case law for this technical (and silly) argument. In any event, at best it would require Kroger to amend its Complaint to conform with the already sustained DPP, EPP and IRP complaints.

made.'" *In re Generic*, 338 F. Supp. 3d at 437 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). As described in detail above, Plaintiffs' Complaints include numerous allegations that support a reasonable inference that Glenmark joined an anticompetitive agreement with respect to Fosi-HCTZ. That is all that is required.

It bears mention that Glenmark's characterization of Plaintiffs' Complaints in support of this argument is similarly unreasonable. For example, Glenmark asserts unequivocally that Plaintiffs have not alleged direct evidence of agreement with respect to Fosi-HCTZ. That is incorrect. Plaintiffs allege that Heritage's Sather—who, as discussed above, forged agreements with Aurobindo and Sandoz relating to Fosi-HCTZ at a trade meeting—confirmed those agreements in writing to her boss, Jason Malek, in a May 15, 2014 email. *See* State CAC ¶¶ 287, 311, 313; EPP CAC ¶ 469. In other words, Plaintiffs have alleged the existence of "a document or conversation explicitly manifesting the existence of the agreement in question[.]" *In re Generic*, 338 F. Supp. 3d at 439 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010)). Although this direct evidence does not directly inculpate Glenmark, it does—like the Glazer and Malek guilty pleas with respect to Doxycycline DR, *see id.* at 440—establish the plausibility of the alleged Fosi-HCTZ agreement. Plaintiffs' numerous other allegations specific to Glenmark easily support the inference that Glenmark joined that agreement. In any event, given the strength of the allegations against Glenmark, the Court need not resolve whether there is direct evidence or "merely" circumstantial evidence with respect to Fosi-HCTZ. Either way, Glenmark clearly is implicated in the Fosi-HCTZ agreement, as well as in the Pravastatin and overarching "fair share" agreements.

## V.   CONCLUSION

Accordingly, Glenmark's motion to dismiss should be denied in its entirety.

Dated: May 2, 2019                                     Respectfully submitted,

| | |
|---|---|
| */s/ Dianne M. Nast* <br> Dianne M. Nast <br> NASTLAW LLC <br> 1101 Market Street, Suite 2801 <br> Philadelphia, PA 19107 <br> 215-923-9300 <br> dnast@nastlaw.com <br><br> **Liaison and Lead Counsel for the Direct Purchaser Plaintiffs** | */s/ Roberta D. Liebenberg* <br> Roberta D. Liebenberg <br> FINE, KAPLAN AND BLACK, R.P.C. <br> One South Broad Street, 23rd Floor <br> Philadelphia, PA 19107 <br> 215-567-6565 <br> rliebenberg@finekaplan.com <br><br> **Liaison and Lead Counsel for the End-Payer Plaintiffs** |
| */s/ Jonathan W. Cuneo* <br> Jonathan W. Cuneo <br> CUNEO, GILBERT & LADUCA LLP <br> 4725 Wisconsin Ave. NW, Suite 200 <br> Washington, DC 20016 <br> 202-789-3960 <br> jonc@cuneolaw.com <br><br> **Lead Counsel for the Indirect Reseller Plaintiffs** | */s/ W. Joseph Nielsen* <br> W. Joseph Nielsen <br> Assistant Attorney General <br> 55 Elm Street <br> P.O. Box 120 <br> Hartford, CT 06141-0120 <br> 860-808-5040 <br> joseph.nielsen@ct.gov <br><br> **Liaison Counsel for the States** |
| */s/ William J. Blechman* <br> Richard Alan Arnold <br> William J. Blechman <br> KENNY NACHWALTER, P.C. <br> 1441 Brickell Avenue, Suite 1100 <br> Miami, FL 33131 <br> 305-373-1000 <br> rarnold@knpa.com <br> wblechman@knpa.com <br><br> **Counsel for Kroger Direct Action Plaintiffs** | /s/ *Peter D. St. Phillip, Jr.* <br> Peter D. St. Phillip, Jr. <br> LOWEY DANNENBERG, P.C. <br> 44 South Broadway, Suite 1100 <br> White Plains, NY 10601 <br> 914-997-0500 <br> pstphillip@lowey.com <br><br> */s/ Todd M. Schneider* <br> SCHNEIDER WALLACE COTTRELL <br>   KONECKY WOTKYNS LLP <br> 2000 Powell Street, Suite 1400 <br> Emeryville, CA 94608 <br> 415-421-7100 <br> tschneider@schneiderwallace.com <br><br> **Counsel for Humana, Inc.** |