IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL NO. 2724 <br> 16-MD-2724 |
| | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc. et al.* | No. 18-2641 |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | No. 18-284 |
| *Humana, Inc. v. Actavis Elizabeth, LLC, et al.* | No. 18-3299 |

**PLAINTIFFS' OPPOSITION TO
IMPAX LABORATORIES, INC.'S MOTION TO DISMISS
DIRECT PURCHASER, KROGER, AND HUMANA COMPLAINTS**

FILED WITH REDACTIONS – PUBLIC VERSION

## **TABLE OF CONTENTS**

Page(s)

TABLE OF CONTENTS .................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

FACTS ............................................................................................................................................. 2

ARGUMENT ................................................................................................................................... 4

    I.    Impax Ignores Allegations as to It and Rehashes the Defendants' Joint Brief ....... 4

    II.    Plaintiffs' Allegations as to Impax Relating to Metronidazole are Sufficient ........ 5

        A.    Impax's later entry does not make its participation in the conspiracy implausible and its other pricing-specific arguments are inappropriate for resolution at this stage of the proceedings. ................................................. 6

        B.    Impax's acquisition of Metronidazole following an "FTC divestiture" does not make its participation in the conspiracy any less plausible. ................. 8

    III.    Plaintiffs Allege Compliance with the Statute of Limitations. ............................... 9

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989)..................................................10

*Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261 (3d Cir. 2016) ...............................................8

*In re Aspartame Antitrust Litig.*, 416 Fed. Appx. 208 (3d Cir. 2011) ..............................................9

*In re Aspartame Antitrust Litig.*, No. 06-cv-1732, 2007 U.S. Dist. LEXIS 16995 (E.D. Pa. Jan. 18, 2007) ......................................................................................................................................10, 11

*In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148 (5th Cir. 1979) ....................................................11

*In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750 (E.D. Pa. 2017)..................................11

*In re Fasteners Antitrust Litig.*, MDL 1912, 2011 U.S. Dist. LEXIS 90076 (E.D. Pa. Aug. 12, 2011) ..............................................................................................................................................10

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999) ................................................11

*In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018) ........... *passim*

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ................................................9, 10

*In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 U.S. Dist. LEXIS 121373 (D.N.J. Oct. 20, 2011) ................................................................................................................................10

*In re Plasma Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011) ..........................................................................................................................................................8

*In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) .........................7

*Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239 (3d Cir. 2001) ........................................11

**Rules**

Fed. R. Civ. P. 15 ............................................................................................................................12

FILED WITH REDACTIONS – PUBLIC VERSION

**Other Authority**

Don E. Waldman & Elizabeth J. Jensen, *Industrial Organization Theory and Practice* (3d ed. 2007) ...................................................................................................................................8

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed. 2005) ............8

Frederic M. Scherer & David Ross, *Industrial Market Structure and Economic Performance* (3d ed. 1990) ............................................................................................................................8

Michael L. Katz & Harvey S. Rosen, *Microeconomics* (1991) .......................................................8

# INTRODUCTION

At the pleading stage, Plaintiffs'[1] Complaints allege sufficient facts to state plausible antitrust claims against Impax for its participation in the "fair share" code of conduct among Defendants to allocate customers and markets, rig bids, and fix prices for generic drugs. The Court has already concluded that Plaintiffs have alleged sufficient facts to state plausible antitrust claims as to Digoxin against Impax relating to a broader scheme within the generic drug industry.[2] Plaintiffs' MDL complaints also contain specific allegations of such conduct as to Impax relating to two additional drugs: Lidocaine-Prilocaine and Metronidazole.

Impax largely rehashes the arguments made in Defendants' joint brief, but does not demonstrate that Impax deserves special treatment. Like it did in its first individual motion to dismiss brief,[3] Impax recasts the facts in a light more favorable to it and asks the Court to consider its actions and statements in isolation. This is inappropriate as Plaintiffs' allegations must be viewed as a whole. Even setting aside the allegations that have already been sustained against Impax, Plaintiffs' Complaints plausibly allege Impax's participation in the overarching scheme.

Impax's individual motion to dismiss should be denied.

---

[1] This opposition is filed on behalf of the Direct Purchaser Plaintiffs ("DPPs"), the Kroger Direct Action Plaintiffs ("Kroger"), and Humana, Inc. ("Humana") (together, "Plaintiffs").

[2] *See In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 454 (E.D. Pa. 2018). *See also* Digoxin Consolidated DPP Class Action Complaint ("DPP Digoxin Compl.") ¶ 3, In re Digoxin Cases (Direct Purchaser), No. 16-DG-27241-CMR, ECF No. 73 (public), ECF No. 74 (under seal) ("Defendants' [including Impax's] anticompetitive conduct in the Digoxin market is part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and more than a dozen generic pharmaceuticals.").

[3] *See* Def. Impax Lab. Inc.'s Mot. to Dismiss, In re Digoxin Cases (Lead Case), No. 16-DG-27240, ECF No. 193 (public) and ECF No. 197 (under seal).

## FACTS

On October 16, 2018, the Court sustained price-fixing, market and customer allocation, and bid-rigging allegations as to Impax relating to Digoxin.[4] In doing so, the Court credited Plaintiffs' allegations that Impax belonged to relevant generic drug trade associations and that its representatives "participated to some degree on trade association boards and to have attended various industry meetings."[5] For example, Carole Ben-Maimon - a key executive at Impax responsible for its generic business - sat on the board of directors of the leading trade association (the GPhA) in at least 2012, 2013 and 2014 in addition to working at Par and Teva before coming to Impax.[6] The Court also acknowledged Plaintiffs' allegations regarding Impax's involvement in ongoing federal and state investigations as "probative of broadly anticompetitive conduct in the generic pharmaceutical industry."[7] Plaintiffs' Complaints provide many detailed examples of drug-specific conduct and of the broader "fair share" conspiracy in action.[8] This includes inter-Defendant communications and agreements that spanned multiple drugs.[9] Plaintiffs also allege that all manufacturers - including Impax - are current or potential competitors with every other Defendant in the MDL.[10]

---

[4] *Generic Pharm. Pricing*, 338 F. Supp. 3d at 454.

[5] *Id.* at 450.

[6] DPP Digoxin Compl. ¶ 101; DPP First Amended Class Action Compl. ("DPP CAC") ¶ 130, Ahold USA, Inc. v. Actavis Holdco U.S., Inc., No. 2:18-cv-02641-CMR, ECF No. 11; Humana Amended Complaint ("Humana Compl.") ¶ 182, Humana Inc. v. Actavis Elizabeth, LLC, No. 2:18-cv-03299-CMR, ECF No. 29 (public), ECF No. 30 (under seal).

[7] *Generic Pharm. Pricing*, 338 F. Supp. 3d at 452.

[8] *See, e.g.*, DPP CAC ¶¶ 103-26 (describing "fair share" conspiracy); Kroger Amended Complaint ("Kroger Compl.") ¶¶ 9, 17, 463, Kroger Co. v. Actavis Holdco U.S., Inc., No. 2:18-cv-00284-CMR, ECF No. 36 (under seal), ECF No. 37 (public) (same); Humana Compl. ¶¶ 262-88 (same).

[9] *See, e.g.*, DPP CAC ¶¶ 118-21; Humana Compl. ¶ 136(h).

[10] *See, e.g.*, DPP CAC ¶¶ 15-17; Humana Compl. ¶¶ 265-67.

There are 31 generic drugs that are currently at issue in MDL 2724.[11] The MDL complaints contain specific Impax allegations relating to: Digoxin (Oct. 2013 start date), Lidocaine-Prilocaine (March 2014 start date), and Metronidazole (Nov. 2012 start date).[12] The allegations concern different formulations and strengths of these drugs.[13]

For example, Metronidazole is a generic antibiotic that comes in cream, jelly (gel), and lotion form, each of which is used to treat various types of infections.[14] It has "been available in the United States since the 1970s,"[15] and is sold in a "mature" market characterized by no "supply shortages, demand spikes, [or] increased input costs."[16] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[17] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[18] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[19] Starting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[20] These drastic, market-wide increases occurred despite safeguards unique to the pharmaceutical industry that "limit[] the ability of a

---

[11] DPP CAC Exh. A.

[12] As Impax acknowledges, following meet and confers, DPPs voluntarily withdrew allegations as to Impax concerning Glyburide-Metformin. *See* Stipulation Withdrawing Certain Allegations, In re Generics Pharmaceuticals Pricing Antitrust Litig., No. 2:16-md-02724-CMR, ECF No. 910.

[13] DPP CAC Exh. A.

[14] *Id.* ¶ 270.

[15] Kroger Compl. ¶ 655.

[16] DPP CAC ¶ 270; Kroger Compl. ¶ 658.

[17] *See* DPP CAC ¶¶ 90–107; Kroger Compl. ¶¶ 658, 115–20, 230–35, and 786–96.

[18] Certain Plaintiffs included allegations of Taro's pricing conduct but incorrectly identified Teva, instead of Taro, as one of Impax's co-conspirators as to Metronidazole jelly in several paragraphs of their Complaints. At the appropriate time, Plaintiffs will amend to correct these paragraphs.

[19] DPP CAC Pricing Chart 5 and ¶ 280; Kroger Compl. ¶¶ 656, 659.

[20] *See* DPP CAC Pricing Chart 5 and ¶ 281; Kroger Compl. ¶¶ 655–62.

generic pharmaceutical manufacturer to unilaterally lead the market in a price increase absent collusion."[21] As a result of the "fair share" code of conduct, when Impax entered with Metronidazole jelly in or around the summer of 2012 - roughly a year after the price increases began - it did not disturb the artificially inflated pricing that was in place.[22]

This Metronidazole conduct took place while employees of the MDL Defendants - including Impax - were in attendance at trade association meetings and participating on trade association boards.[23] Further, as the Court has previously recognized, Impax received broad subpoenas relating to ongoing government investigations into anticompetitive conduct in the generic pharmaceutical industry.[24]

## ARGUMENT

### I. Impax Ignores Allegations as to It and Rehashes the Defendants' Joint Brief

As an initial matter, Impax continues to misstate the allegations against it. Impax repeatedly argues that the "factual allegations against Impax are limited to a single drug" - Metronidazole.[25] This is plainly incorrect. There are also factual allegations in the MDL as to Impax's involvement in anticompetitive conduct relating to at least two other drugs: Digoxin and Lidocaine-Prilocaine.[26]

---

[21] *Generic Pharm. Pricing*, 338 F. Supp. 3d at 448-49; DPP CAC ¶¶ 98–107.
[22] DPP CAC ¶¶ 280-81 and n.49.
[23] *Id.* ¶ 283 and Exhs. D (Trade Association Contacts as to the Named Generic Drugs), and E (Generic Pharmaceutical Association Board of Directors 2010 to 2017).
[24] *Id.* ¶¶ 29, 296 & Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry), Exh. C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry); Humana Compl. ¶ 149.
[25] Def. Impax Memo. of Law in Supp. of Its Mot. to Dismiss Direct Purchasers' First Amended Class Action Compl. ("Impax Br.") at 1, 2, 5, Humana Inc. v. Actavis Elizabeth, LLC, No. 2:18-cv-03299-CMR, ECF No. 82-1.
[26] DPP CAC Exh. A.

Plaintiffs allege that the Metronidazole price increases and Impax's entry at supracompetitive prices were part of a larger understanding among generic drug manufacturers each of whom has overlapping generic drug portfolios spanning many drugs.[27] In addition to Metronidazole, Digoxin, and Lidocaine-Prilocaine, Impax also sells "over 75 generic pharmaceutical products" and holds ANDAs for more.[28] Additionally, Impax was an active participant in generic drug trade associations and other gatherings where it had opportunities to meet and conspire with its ostensible competitors.[29] Indeed, Impax executives had leadership roles at a key industry trade association: the GPhA. Impax has also been subject to broad and ongoing government investigations.

In short, Plaintiffs allege that Impax shared a common purpose in effectuating the "fair share" agreement and that Impax was a repeat player in the generic drug industry where it routinely encountered the same ostensible competitors - Impax's MDL co-Defendants. Pursuant to this overarching scheme, the generic drug manufacturer Defendants, including Impax, agreed to suppress competition among themselves so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of many generic drugs.

## II. Plaintiffs' Allegations as to Impax Relating to Metronidazole are Sufficient

As to Metronidazole specifically, when Impax entered the market it did not disturb the artificial, anticompetitive pricing that was in place instead pricing similarly to other

---

[27] DPP CAC ¶¶ 14–19; Kroger Compl. Exh. 2 (detailing the interrelated web of generic drug fixing).

[28] Memo. of Law in Supp. of Def. Impax Lab., Inc.'s Mot. To Limit Discovery at 18 n.11, Ahold USA, Inc. v. Actavis Holdco U.S., Inc., No. 18-cv-02641, ECF No. 3-1 ("At the time the Private Plaintiffs filed their amended complaints, Impax sold over 75 generic pharmaceutical products.").

[29] DPP CAC ¶ 297 and Exh. D.

Metronidazole manufacturers.[30] In addition to parallel pricing, traditional indicia of conspiracy support Plaintiffs' conspiracy allegations. Impax's high-ranking executives sat on the GPhA board along with executives from other Defendants and Heritage's Glazer,[31] its employees attended trade association meetings,[32] and the company and its employees have received broad subpoenas "regarding the pricing and sale of Impax's pharmaceuticals and Impax's interactions with other generic pharmaceutical manufacturers."[33]

No matter how much Impax attempts to slice and dice these allegations, these are the same factors that the Court has already concluded plausibly plead a Defendant's involvement in the conspiracy. For example, Impax argues that one of the individuals Plaintiffs identified at one of six trade association meetings did not work for Impax at the time of one meeting that he is alleged to have attended.[34] This is of little matter. As Impax must be aware, the NACDS has produced in this MDL registration lists that indicate the same conference was attended by no fewer than eight other Impax employees. In addition, Plaintiffs allege Impax's attendance at other trade associations and its membership on the GPhA Board during the time period at issue.[35]

A. <u>Impax's later entry does not make its participation in the conspiracy implausible and its other pricing-specific arguments are inappropriate for resolution at this stage of the proceedings.</u>

---

[30] *Id.* ¶¶ 280-81 and Pricing Chart 5.
[31] *Id.* Exh. E (Generic Pharmaceutical Association Board of Directors 2010 to 2017); Humana Compl. ¶ 182.
[32] DPP CAC Exh. D; Humana Compl. Exh. A.
[33] DPP CAC ¶ 29.
[34] Impax Br. at 4.
[35] *Id.* at 9-12.

Impax recycles an argument made by several Defendants during the first round of motion to dismiss briefing in arguing that its later entry immunizes it from involvement in the conspiracy and that Impax's high pricing for Metronidazole is explained by its self-interest.[36]

The Court has already rejected Impax's "latecomer" argument.[37] Plaintiffs plausibly allege that, pursuant to the industry code of conduct, Impax charged supra-competitive prices that were similar to the other Defendants upon entering with Metronidazole, rather than competing.[38] Impax's "latecomer status" - roughly one year after the initial price increase - is not enough to undercut the overall allegations.[39] And while Impax argues that it entered the market in October 2012, 16 months after the price increase,[40] this is a dispute of fact, as Plaintiffs allege - and Impax does not dispute - that an agreement allowed Impax to market Metronidazole and Lidocaine-Prilocaine as early as perhaps June 2012.[41] Further, presumably Impax did not enter this agreement without doing its due diligence prior to June 2012.

Impax's "alternative explanation" - that charging high prices for its Metronidazole product was in line with Impax's individual self-interest[42] - also does not undermine Plaintiffs' explanation that Impax's high prices upon entry with Metronidazole were the result of a conspiracy.[43] Impax cites to three general sections of economic textbooks (which were not cited

---

[36] Impax Br. at 11-12.

[37] *Generic Pharm. Pricing*, 338 F. Supp. 3d at 444 (rejecting similar arguments from MDL Defendants who entered the market for Clobetasol "nearly ten months and one year, respectively, after the alleged . . . price increases"); *id.* at 445 (same as to Digoxin where "entry occurred months after the alleged . . . price increases.").

[38] DPP CAC ¶¶ 280-81 and Pricing Chart 5.

[39] *See In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 741 (E.D. Pa. 2011).

[40] Impax Br. at 10.

[41] DPP CAC ¶ 280 n.49.

[42] Impax Br. at 10-11.

[43] *Generic Pharm. Pricing*, 338 F. Supp. 3d at 445 (rejecting similar argument from MDL Defendant who asserted that "Plaintiffs' allegations with respect to its pricing conduct are

7

in the Complaints) in support of its alternative explanation that Impax's behavior was consistent with rational economic behavior.[44] This argument is contrary to the well-pleaded allegations and is inappropriate at this stage.[45] The DPP CAC, the Humana Complaint and the Kroger Complaint contain specific allegations concerning the nature of the generic pharmaceutical industry,[46] an industry with unique safeguards that the sections of the economic textbooks cited by Impax do not address at all (if it is even appropriate to consider the economic textbooks).[47]

Impax's argument that prices fell somewhat after Impax's entry is similarly recycled from the first round of motions to dismiss.[48] It should again be rejected. Nothing in the Sherman Act requires fixed prices to remain at the agreed rate in perpetuity - conspirators cheat and prices fluctuate over time; Plaintiffs allege that Metronidazole prices remained higher than their pre-conspiracy levels throughout the time period following Impax's entry into the market.[49]

B. Impax's acquisition of Metronidazole following an "FTC divestiture" does not make its participation in the conspiracy any less plausible.

---

insufficient because they 'merely describe[] behavior expected of any market entrant in this industry"); *In re Plasma Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 999 (N.D. Ill. 2011) ("The inference that plaintiffs ask the court to draw from the factual allegations need only be 'plausible' in light of alternative lawful explanations for the conduct.").

[44] Impax Br. at 10.

[45] *See Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).

[46] DPP CAC ¶¶ 90-107; Humana Compl. ¶¶ 116-36.

[47] Impax Br. at 5, 10 (citing Don E. Waldman & Elizabeth J. Jensen, *Industrial Organization Theory and Practice* 143-49 (3d ed. 2007) (discussing the steel industry); Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 110 (4th ed. 2005) (discussing photographic film and laser printers); Frederic M. Scherer & David Ross, *Industrial Market Structure and Economic Performance* 221-26, 356-57 (3d ed. 1990) (discussing general economic theory not particular to any industry); Michael L. Katz & Harvey S. Rosen, *Microeconomics* 563, 565 (1991) (discussing the airline industry)).

[48] *See, e.g.*, Defs.' Memo. in Supp. of Their Joint Mot. to Dismiss at 6, In re Digoxin Cases (Direct Purchaser), No. 2:16-DG-27241-CMR, ECF No. 81-1.

[49] DPP CAC Pricing Chart 5.

Citing no case law to support the inference, Impax contends that because it acquired Metronidazole following an "FTC divestiture," its conduct was under some sort of scrutiny by an FTC monitor and thus it is implausible it would have entered into a conspiracy to raise prices.[50] Here again, Impax cites to materials beyond the MDL complaints and misstates the facts. As discovery is likely to reveal at the appropriate time, the FTC's Order required Novartis to divest certain products to a company called TOLMAR. TOLMAR then *separately* entered into an agreement with Impax related to Metronidazole in June 2012. There is no reason to believe (let alone read into the pleadings) that Impax's transaction with TOLMAR would be under particular scrutiny, as Impax was not a party to the divestiture order and its conduct was not then at issue.

### III. Plaintiffs Allege Compliance with the Statute of Limitations.

As Impax acknowledges, dismissal on statute of limitations grounds is appropriate only if Plaintiffs failed to allege plausible allegations demonstrating compliance with the limitations period.[51] It is not appropriate here, where Plaintiffs plausibly allege that the statute of limitations was tolled by fraudulent concealment due to the self-concealing nature of the conspiracy and certain affirmative acts of concealment by Defendants.[52] Fraudulent concealment tolls the statute of limitations "when a plaintiff's cause of action has been obscured by the defendant's conduct."[53] A plaintiff must show "(1) fraudulent concealment; (2) failure on the part of the plaintiff to discover [its] cause of action notwithstanding such concealment; and (3) that such failure to discover occurred [notwithstanding] the exercise of due care on the part of the

---

[50] Impax Br. at 1, 3, 12.
[51] *Id.* at 13.
[52] *See* DPP CAC ¶ 502; Humana Compl. ¶¶ 755-59.
[53] *In re Aspartame Antitrust Litig.*, 416 Fed. Appx. 208, 211 (3d Cir. 2011) (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002)).

plaintiff."[54]

With respect to Defendants' conduct supporting fraudulent concealment, "under certain circumstances, an antitrust conspiracy may depend on its own concealment to the point that any act in furtherance thereof can also be said to conceal it."[55]

> It is immaterial to the unsuspecting plaintiff whether defendants have effectively concealed their illicit conduct through an elaborate and secret conspiracy or through affirmative acts of deceit. Similarly, a group of manufacturers who privately agree never to disclose that a secret collusive meeting has occurred are equally culpable as a group who publicly declares a pretextual motive for the meeting. To require affirmative acts in this context would "permit sophisticated defrauders to successfully conceal the details of their fraud" and escape liability.[56]

For example, in "a competitive, well-regulated industry it will often be the case that a price-fixing conspiracy, if not concealed, would immediately fail because of governmental or private legal action. In such circumstances, any announcement of a price increase will carry with it an implicit statement that the price increase is legitimate, *i.e.*, the result of competitive forces, not collusion."[57] Here, Plaintiffs plausibly allege a self-concealing conspiracy in a highly regulated industry with safeguards, *e.g.*, MAC pricing, to discourage unilateral price increases by generic manufacturers. "There exists no indication that indifference, fear, or the limited reach of our laws, rather than this conspiracy's natural secrecy, caused plaintiffs' delayed filing of this action."[58] Plaintiffs also plausibly allege that Defendants engaged in affirmative acts of

---

[54] *Linerboard,* 305 F.3d at 160 (quoting 70 A.L.R. Fed. 498 (1984)).
[55] *In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 U.S. Dist. LEXIS 121373, at *76 (D.N.J. Oct. 20, 2011).
[56] *In re Aspartame Antitrust Litig.*, No. 06-cv-1732, 2007 U.S. Dist. LEXIS 16995, at *18 (E.D. Pa. Jan. 18, 2007) (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)); *see also In re Fasteners Antitrust Litig.*, MDL 1912, 2011 U.S. Dist. LEXIS 90076, at *12-13 (E.D. Pa. Aug. 12, 2011) ("[F]or the most part courts in this Circuit have applied the 'self-concealing' standard to antitrust conspiracies.").
[57] *Magnesium Oxide*, 2011 U.S. Dist. LEXIS 121373, at *77.
[58] *Aspartame*, 2007 U.S. Dist. LEXIS 16995, at *20.

concealment, including making consistent efforts to avoid communicating in writing, *e.g.*, providing instructions not to communicate in writing, and deleting electronic communications.[59]

As to the diligence required of Plaintiffs to support fraudulent concealment, "[r]easonable due diligence does not require a plaintiff to exhaust all possible avenues of inquiry. Nor does it require the plaintiff to actually discover his injury."[60] "Although the statute of limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their potential claim, they cannot have notice of a potential claim unless they are aware of some evidence tending to support it."[61] For purposes of determining the "triggering event" that put Plaintiffs on notice of the existence of their claim,[62] "the issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the named plaintiffs and the members of each of the classes *knew of the alleged conspiracy* among defendants."[63]

Plaintiffs plausibly allege that they were unaware of Impax's involvement in the Metronidazole price-fixing scheme (and the broader scheme it was a part of) and could not have learned of this through a diligent investigation until the filing of the redacted Plaintiff States' Heritage-Related Multi-Drug Complaint ("States' complaint") on October 31, 2017.[64] Before then, Plaintiffs did not have knowledge of facts plausibly supporting Impax's alleged *collusion* in regard to Metronidazole and other drugs.[65] Subsequently, on June 22, 2018, after DPPs investigated price increases specific to Metronidazole, DPPs filed their complaint to allege

---

[59] *See* DPP CAC ¶ 502; Humana Compl. ¶ 757.
[60] *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 786 (E.D. Pa. 2017) (quoting *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 256 (3d Cir. 2001)).
[61] *Id.* at 785 (quoting *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979)).
[62] *Id.* at 786.
[63] *Id.* at 785 (emphasis added) (quoting *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999)).
[64] DPP CAC ¶ 500.
[65] *See id.* ¶ 496.

Impax's involvement in the scheme to raise Metronidazole jelly prices. Similarly, Kroger's complaint was filed on December 21, 2018, within a year of the filing of the States' complaint.

Plaintiffs therefore plausibly allege that the statute of limitations was tolled for their Sherman Act claims against Impax for alleged market division and price-fixing as to Metronidazole, among others.

## CONCLUSION

Impax's individual motion to dismiss should be denied because Plaintiffs have met their pleading burden as to Impax.[66]

Dated: May 2, 2019                                      Respectfully submitted,

/s/ William J. Blechman                                 /s/ Dianne M. Nast
William J. Blechman                                     Dianne M. Nast
KENNY NACHWALTER, P.A.                                  NASTLAW LLC
1441 Brickell Avenue, Suite 1100                        1101 Market Street, Suite 2801
Miami, Florida 33131                                    Philadelphia, Pennsylvania 19107
305-373-1000                                            215-923-9300
wblechman@knpa.com                                      dnast@nastlaw.com

**Counsel for the Kroger Direct Action Plaintiffs**     **Liaison and Lead Counsel for Direct Purchaser Plaintiffs**

                                                        /s/ Peter D. St. Phillip, Jr.
                                                        Peter D. St. Phillip, Jr.
                                                        LOWEY DANNENBERG, P.C.
                                                        44 South Broadway, Suite 1100
                                                        White Plains, New York 10601
                                                        914-997-0500
                                                        PStPhillip@lowey.com

                                                        **Counsel for Humana, Inc.**

---

[66] If the Court concludes that Plaintiffs' allegations are insufficient to sustain their claims against Impax, Plaintiffs request leave to amend their respective complaints under the liberal pleading standard of Rule 15(a)(2).

## CERTIFICATE OF SERVICE

      I hereby certify that on May 2, 2019, an unredacted copy of the foregoing document was served via electronic mail on Defendants' Liaison Counsel and Counsel for Impax Laboratories, Inc. A redacted version was filed via the Court's ECF system, which will provide service to all registered counsel.

_____
William J. Blechman