**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | MDL 2724 16-md-2724 |
| **THIS DOCUMENT RELATES TO:** | HON. CYNTHIA M. RUFE |
| *The State Attorneys General Litigation* | Civil Action Nos. 17-3768 18-2641 18-2401 |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc., et al.* | 18-2533 18-284 18-3299 |
| *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc., et al.* | |
| *West Val Pharm., et al. v. Actavis Holdco U.S., Inc., at al.* | |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | |
| *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | |

**PLAINTIFFS' OPPOSITION
TO DEFENDANT LANNETT'S INDIVIDUAL MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................ 1

II.    ARGUMENT .............................................................................................................. 2

    A.    Plaintiffs Plausibly Allege an Overarching Conspiracy Involving Lannett........... 3

    B.    Lannett's Role in Connection with Price Increases for Multiple Drugs Further
           Shows the Plausibility of Its Participation in the Overarching Conspiracy........... 6

        1.    Doxycycline Monohydrate......................................................................... 6

        2.    Acetazolamide Tablets, Digoxin, Levothyroxine,
              Baclofen and Ursodiol .............................................................................. 8

    C.    The *Kelly* Factors Further Support Plaintiffs' Allegations of an Overarching
           Conspiracy ......................................................................................................... 12

    D.    Lannett's Argument that Plaintiffs Fail to Allege Enough Facts About
           Drugs that Lannett Did Not Sell Is Unsupported by the Facts and the Law......... 13

III.    CONCLUSION....................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Bell Atlantic Corp.v. Twombly,*
   550 US 544 (2007) .................................................................................................... 2

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
   370 U.S. 690 (1962) ................................................................................................. 6

*In re Generic Pharm. Pricing Antitrust Litig.,*
   338 F. Supp. 3d 404 (E.D. Pa. 2018)............................................................. 9, 10, 13

*In re Generic Pharm. Pricing Antitrust Litig.,*
   315 F. Supp. 3d 848 (E.D. Pa. 2018)................................................................. 2, 14

*In re Lithium Ion Batteries Antitrust Litig.,*
   No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .................................... 14

*United States v. Fattah,*
   914 F.3d 112 (3d Cir. 2019) ...................................................................................... 12

*United States v. Kelly,*
   892 F.2d 255 (3d Cir. 1989) .................................................................................. 2, 12

*United States v. Padilla,*
   982 F.2d 110 (3d Cir. 1992) ................................................................................. 12, 13

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop.,*
   No. 15-cv-6480, 2019 WL 103535 (E.D. Pa. Jan. 8, 2019) ...................................... 6

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................. 2

Plaintiffs[1] respectfully submit this memorandum of law in opposition to Defendant Lannett Co. Inc.'s Individual Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.[2]

## I.   INTRODUCTION

In moving to dismiss Plaintiffs' overarching conspiracy complaints, Lannett ignores the comprehensive allegations against it that show Lannett's participation in an overarching conspiracy involving numerous generic drugs.[3] These allegations detail the meetings and conversations Lannett personnel had with their counterparts at other Defendants, including verbatim accounts of what was said, when, and by whom, and the extent of the resulting coordinated price increases. The detail in the averments concerning particular drugs strongly supports Plaintiffs' allegations that Lannett was a party to the "fair share" agreement that goes to the heart of the overarching conspiracy.

That Lannett did not sell every drug covered under the overarching conspiracy is irrelevant as a matter of law. Lannett's substantial price increases cover multiple products, were implemented in coordination with other Defendants' price increases, and hewed closely to its alleged "fair share" allocations. Precisely because of the alleged industry-wide conspiracy, Lannett and its competitors were, as Lannett's CEO made clear, "*less concerned about grabbing*

---

[1] This Response is filed on behalf of the State Attorneys General ("States"), the Direct Purchaser Plaintiffs ("DPPs"), the End-Payer Plaintiffs ("EPPs"), the Indirect Reseller Plaintiffs ("IRPs"), the Kroger Direct Action Plaintiffs ("Kroger"), and Humana Inc. ("Humana").

[2] States' Consolidated Amended Complaint ("State CAC"), No. 17-cv-3768, Dkt. No. 15 (June 18, 2018); DPP First Amended Class Action Complaint ("DPP CAC"), No. 18-cv-2641, Dkt. No. 12 (Dec. 21, 2018); EPP Class Action Complaint ("EPP CAC"), No. 18-cv-2401, Dkt. No. 2 (June 7, 2018); IRP Amended Overarching Complaint ("IRP CAC"), No. 18-cv-2533, Dkt. No. 4 (Dec. 21, 2018); Kroger Amended Complaint ("Kroger Compl."), No. 18-cv-284, Dkt. No. 36 (Dec. 21, 2018); Humana Amended Complaint ("Humana Compl."), No. 18-cv-3299, Dkt. No. 30 (Dec. 21, 2018).

[3] Lannett does not seek dismissal of the drug-specific claims against it in the Complaints listed above.

*market share [and instead] interested in making a profit [without regard to] how many units we sell.*" DPP CAC, Ex. G ¶ 31 (emphasis added).

In sum, Plaintiffs' Complaints plead facts against Lannett that go well beyond the requisite "short and plain statement of the claim showing that the pleader is entitled to relief," and allege specific facts against Lannett, well surpassing the "plausibility" required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Lannett's motion should be denied.

## II.    ARGUMENT

Plaintiffs allege that Lannett and other Defendants participated in an overarching conspiracy to raise prices and minimize competition in the generic drug industry for numerous generic drugs. *See, e.g.*, State CAC ¶¶ 12-15, 89-109 & Tables 1 & 2; DPP CAC ¶¶ 9-11, 108-21; EPP CAC ¶¶ 1-20, 109-110, 142-44 & Tables 3 & 4, 151-81, 338-68, 415-32; Humana Compl. ¶¶ 261-71; IRP CAC ¶¶ 2, 65-72; Kroger Compl. ¶¶ 5-10. "An antitrust complaint is sufficient if it contains 'enough factual matter (taken as true) to suggest that an agreement was made.' As long as the facts pleaded provide 'plausible grounds to infer an agreement,' a well-pleaded complaint may proceed even if it seems that 'actual proof of those facts is improbable. . . .'" *In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) (quoting *Twombly*, 550 U.S. at 556). Outside the context of a motion under Rule 12(b)(6), the Third Circuit has considered relevant to "whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies," *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989), (1) "whether there was a common goal among the conspirators"; (2) "whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators"; and (3) "the extent to which the participants overlap in the various dealings." *Id.* (internal quotation marks and citations omitted).

Plaintiffs' allegations more than satisfy this standard, especially when considered in light of the pleading requirements at the motion to dismiss stage.

### A.  Plaintiffs Plausibly Allege an Overarching Conspiracy Involving Lannett.

Against the heavy weight of all of the allegations against it—including the highly specific allegations about Lannett's trade association attendance, communications with competitors, and other conspiratorial conduct spanning a number of generic drugs—Lannett argues that Plaintiffs' allegations are insufficient. But Plaintiffs allege more than enough facts to show that Lannett was involved in an overarching agreement not to compete. Lannett was extensively involved in direct communications by email, telephone, and text messages, as well as in person, with other Defendants, and that these personal connections facilitated the formation and maintenance of the overarching conspiracy. *See*, *e.g*., State CAC ¶ 9; DPP CAC ¶ 131; EPP CAC ¶ 100; Kroger Compl. ¶ 19; Humana Compl. ¶ 3.

As for opportunities to conspire, Plaintiffs' complaints are replete with allegations concerning which of the numerous trade events Lannett attended with its relevant Defendants, after which coordinated price increases were implemented. *See* DPP CAC, Ex. D (detailing trade association meeting and industry events, including attendance by Lannett); EPP CAC, Ex. 1 ("Trade Association Attendance"). During the period from early 2010 to late 2016, Lannett attended nearly two dozen such meetings, *see id*., with its Vice President of Sales and Director of National Accounts,[4] among other Lannett executives, attending many such meetings. Thus,

---

[4] Implementation of the fair share scheme was often assigned to salespeople at the rank of "National Account Manager" ("NAM") or an equivalent position. *See* IRP CAC ¶ 71. Although NAMs at the various Defendants compete (or should compete) for the same customers, they also have developed close relationships and frequently met with each other in various social settings, which made it easy to exchange competitive information. EPP CAC ¶ 128. Lannett's Director of National Accounts was one such individual. *See, e.g.,* State CAC ¶¶ 254-61, 287-88; EPP CAC ¶¶ 349-50, 355-57, 362-66.

Defendants, including Lannett, had plentiful opportunities to speak in person about unlawful agreements, and Defendants used these meetings as opportunities to engage in anticompetitive conduct related to the Drugs at Issue. *See*, *e.g.*, EPP CAC ¶¶ 447-48. Lannett's in-person contacts with competitors also took place at "industry dinners" and "Women in the Industry" and "Girls Night Out" events. *See* State CAC ¶¶ 83, 85-86, 88; Humana Compl. ¶ 193 (describing a January 2014 "industry dinner" attended by Defendants' high-level executives, including Lannett's); *id*. ¶ 196 (quoting text messages between Lannett and Heritage regarding a "Women in the Industry" event); *id*. ¶ 198 ("Girls' Night Out" in which Lannett participated).

Contacts involving Lannett form a key part of the web of communications through which the conspiracy was implemented. During the crucial period of July 1, 2013 through July 30, 2014, Lannett personnel spoke to and/or texted with senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Heritage at least 113 times. State CAC ¶ 94 & Table 1. Moreover, during that same period, Lannett and Teva had at least 43 communications by phone call or text message. *Id. ¶* 95 & Table 2. Plaintiffs' allegations include an exceptional level of detail about Lannett's conspiratorial communications. *See*, *e.g.*, State CAC ¶¶ 248-52, 254-61, 284, 287-88.

Likewise, Plaintiffs have set forth an in-depth timeline of events surrounding the price increases that began in 2011 that show Lannett's significant involvement at nearly every step. *See*, *e.g.*, State CAC ¶¶ 243-94; EPP CAC ¶¶ 147-81. When events pertaining to the overarching conspiracy are summarized in chronological order, the extent of Lannett's participation in that conspiracy becomes especially clear. The following are illustrative, though by no means exhaustive:

- In the spring of 2012, Lannett and Taro "tested the waters" with a nearly simultaneous and identical price increase for Acetazolamide tablets (*see*, *e.g.*,

DPP CAC ¶ 139; EPP CAC ¶ 151; IRP CAC ¶ 173; Humana Compl. ¶ 291; Kroger Compl. ¶¶ 237-39), with other Defendants increasing prices for other drugs in subsequent months in 2012 (*see, e.g.*, EPP CAC ¶ 152).

- With a number of other Defendants, Lannett had the opportunity to discuss pricing at the October 2012 Generic Pharmaceutical Association ("GPhA") meeting. *Id.* ¶ 153. In late 2012 and early 2013, dramatic price increases followed on the heels of that meeting. *Id.* ¶ 154.

- As part of a pattern of continuing conspiratorial communication in the spring of 2013, Lannett spoke with Heritage, and also, separately, with Par. EPP CAC ¶ 159. Lannett attended several trade association meetings in 2013, including the NACDS Total Store Expo, which was attended by a number of individuals directly implicated in anticompetitive communications, including Lannett's Director of National Accounts. *Id*. ¶ 161; Humana Compl. ¶ 506; *see also* Kroger Compl. ¶ 403, Ex. 3. Again, price increases followed shortly thereafter, including from Lannett (Doxy Mono). EPP CAC ¶¶ 162-63.

- Following a GPhA conference at the end of October 2013, Lannett and Taro implemented large price increases for Acetazolamide tablets. *Id.* ¶ 165. Lannett also raised Digoxin prices along with its competitors. *Id.* ¶ 166; DPP CAC ¶ 144; Kroger Compl. ¶ 14; Humana Compl. ¶ 395.

- In January 2014, high-ranking executives of various generic drug manufacturers met at a steakhouse in Bridgewater, New Jersey. EPP CAC ¶ 169. Executives from Lannett were among them. State CAC ¶ 83. Not long after, Defendants, imposed additional price increases. EPP CAC ¶ 170; Kroger Compl. ¶ 286.

- After a series of trade events in the summer of 2014 attended by all Defendants, numerous price increases were imposed, including by Lannett (Baclofen, Ursodiol). EPP CAC ¶ 179.

The high degree of frequency of Lannett's communications with other Defendants, especially when coupled with its executives' regular participation in trade association meetings and viewed in light of the interconnected nature of the generic drug industry, makes it more than plausible that Lannett was a willing party to the overarching conspiracy.[5]

---

[5] Lannett has reported in a filing with the Securities and Exchange Commission that it received a Civil Investigative Demand ("CID") from the Department of Justice on May 14, 2018. *See, e.g.,* DPP CAC ¶ 31. Notably, Lannett's disclosure is not limited to any particular generic drug or drugs. Lannett has further disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." EPP CAC ¶ 657(h). The

**B.     Lannett's Role in Connection with Price Increases for Multiple Drugs Further Shows the Plausibility of Its Participation in the Overarching Conspiracy.**

Lannett argues that Plaintiffs' Complaints "try[] to sweep Lannett in under the cover of allegations regarding 'Defendants' in general." Lannett Br. at 3.[6] In advancing this argument, Lannett minimizes the significance of allegations it characterizes as "drug-specific conspiracies." Lannett Br. at 1. When viewed in their proper context, and not impermissibly in isolation, the allegations concerning Lannett's anti-competitive conduct involving specific drugs buttress the plausibility of Lannett's participation in the overarching conspiracy. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

**1.     Doxycycline Monohydrate**

As part of Defendants' overarching conspiracy, Plaintiffs allege that Lannett conspired to raise the prices of Doxycycline Monohydrate ("Doxy Mono"). *See generally* State CAC ¶¶ 246-67; DPP CAC *¶¶* 170-91; EPP CAC ¶¶ 338-68; IRP CAC ¶¶ 131-45; Humana Compl. ¶¶ 488-521; Kroger Compl. ¶¶ 449-61.

---

subpoena requested "corporate documents of the Company relating to *communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product*." *Id.* (emphasis added).

  [6] Lannett confronts a set of comprehensive allegations that is far different from the allegations dismissed in a recent case Lannett cites, *Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop.*, No. 15-CV-6480, 2019 WL 130535 (E.D. Pa. Jan. 8, 2019). There, the court analyzed a complaint that alleged a conspiracy involving an agricultural cooperative but did "*not* otherwise identify any specific Defendant's role therein." *Id.* at *3 (emphasis added). Here, in sharp contrast, Plaintiffs allege that Lannett engaged in unlawful conduct spanning a variety of drugs, and provide specific dates and times of meetings, identification of the Lannett personnel involved and with whom they communicated, and, indeed, in some instances, verbatim language from their specific conspiratorial communications. Lannett's suggestion that Plaintiffs' allegations are insufficiently specific to give rise to plausibility is baseless.

During the relevant time frame, Lannett—along with Heritage, Mylan, and Par—was a dominant player in the market for Doxy Mono tablets. *See*, *e.g.,* EPP CAC ¶ 340. Beginning in February 2013, while Heritage and Dr. Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, Heritage reached out to Lannett and other Doxy Mono manufacturers. *See*, *e.g.,* EPP CAC ¶ 341; Kroger Compl. ¶ 450. Heritage's and Lannett's national account manager counterparts spoke and emailed on a number of occasions during the subsequent months, culminating in an agreement to implement price increases for Doxy Mono in the late spring and summer of 2013. *See*, *e.g.,* State CAC ¶¶ 252, 254-61; EPP CAC ¶¶ 341-51.[7]

After increasing Doxy Mono prices to one customer in March 2014, Heritage focused on a much larger across-the-board price increase on Doxy Mono, as well as price increases on additional drugs. *See*, *e.g.*, State CAC ¶ 266; DPP CAC ¶¶ 185-86; EPP CAC ¶ 360. On April 22, 2014, Heritage's President held a teleconference with his sales team and dictated a price increase strategy for numerous generic drugs. *See, e.g.,* State CAC ¶¶ 268-69; DPP CAC ¶¶ 186; EPP CAC ¶ 361. Indeed, prior to the conference call, Heritage's President circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitors for each drug, and their respective market shares. State CAC ¶ 269.

Immediately after the Heritage conference call on April 22nd, Heritage's NAM communicated with three competitors—including a twenty-nine minute phone conversation with

---

[7] Plaintiffs' Complaints detail the means of communication, persons involved, and the specific dates of meetings and communications. *Id*.; *see also id.* ¶¶ 352-59 (detailing additional meetings and communications involving Lannett); DPP CAC ¶¶ 179-85 (same). Significantly, when Lannett's national accounts manager relayed to a counterpart for another Defendant an imminent conference call to discuss a "market wide increase," that counterpart sought clarification regarding whether the increase applied to Doxy Mono. *See, e.g.,* State CAC ¶ 255. That request for clarification, at a minimum, strongly suggests that the conspiracy extended beyond Doxy Mono and included other generic drugs.

her counterpart at Lannett about pricing for Doxy Mono. *See, e.g.,* EPP CAC ¶ 363. Through these conversations, Heritage's NAM reached pricing agreements covering Doxy Mono along with four other drugs. *Id*. Lannett confirmed its commitment to increasing prices in May at the MMCAP National Member Conference. *Id*. ¶ 366.

Lannett's unlawful agreement with its competitors with respect to Doxy Mono furthered Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of numerous generic drugs. Putting these price increases in place, including for Doxy Mono and the other drugs identified on Heritage's April 22nd conference call, entailed the work of multiple executives working in concert. *See*, *e.g.*, *id. ¶¶* 234-38. Consistent with how the overarching conspiracy operated, Lannett communicated with Heritage and other Defendants, often in connection with trade association meetings. *See, e.g., id*. State CAC ¶ 258; EPP CAC ¶¶ 349-50.

### 2.   Acetazolamide Tablets, Digoxin, Levothyroxine, Baclofen and Ursodiol

Lannett's role in other drugs conspiracies further shows that its alleged unlawful conduct was widespread and not tied to a particular drug.

*Acetazolamide Tablets*. The allegations concerning Lannett's collusive conduct in the Acetazolamide market further reinforce Lannett's participation in an overarching conspiracy. *See generally* DPP CAC ¶¶ 133-49; EPP CAC ¶¶ 151, 415-32; IRP CAC ¶¶ 170-76; Kroger Compl. ¶¶ 236-43; Humana Compl. ¶¶ 289-302.

With Taro, Lannett dominates the market for Acetazolamide tablets. EPP CAC ¶ 417. In April and May of 2012, Lannett and Taro imposed significant list price increases for Acetazolamide, which brought their price for the predominant dosage form of the drug, *i.e.,* the 250mg tablet, to identical levels. *Id*. ¶ 420. A number of Defendants, including Lannett and Taro,

met in person in 2013, including at an August 2013 NACDS Total Store Expo and the October 2013 GPhA Fall Tech Conference. *Id.* ¶¶ 165, 429, 430 & Ex. 1. At the end of 2013, Lannett and Taro imposed identical list price increases for Acetazolamide 250mg tablets of well over 200%. *Id.* ¶ 422. This corresponded with the timing of other price increases. *See id.* ¶ 146 and Table 5.

Throughout their coordinated price increases, Lannett and Taro captured remarkably stable market shares. Lannett and Taro claimed 56% and 44% of the share of the 250mg tablet market. When one includes the 125mg tablet sales, for which Taro was the sole manufacturer, the total dollar sales across both products was virtually even and remarkably stable. *Id.* ¶ 425. These lockstep price increases and nearly perfect market share split across two dosages powerfully illustrate Lannett's commitment to the "fair share" scheme. *See id.* ¶ 426.

***Digoxin***. Plaintiffs' allegations directed to Lannett in connection with the Digoxin price-fixing conspiracy are also fully consistent with Plaintiffs' broader "fair share" allegations.

Following trade association meetings attended by key pricing executives, as well as numerous inter-Defendant communications, Lannett and Impax led an extraordinary price increase. *See, e.g.,* Humana Compl. ¶¶ 395-96; see generally *In re Generic Pharm. Pricing Litig.*, 338 F. Supp. 3d 404, 444-45 (E.D. Pa. 2018). Plaintiffs' complaints further allege that numerous other drugs experienced price increases during this timeframe, in addition to the six "Group 1" drugs that were the subject of the Courts' October 16, 2018 Opinion. *See, e.g.,* DPP CAC ¶¶ 122-32; EPP CAC ¶¶ 145-81 & Table 5. *See also* 338 F. Supp. 3d at 444-45. In early 2015, when Mylan re-entered the Digoxin market, it priced Digoxin in parallel with the elevated pricing of Lannett and Impax. *Id.* at 445. Later, Par and West-Ward also joined or re-joined the Digoxin market, again selling at high prices. *Id.* This further buttresses the overarching conspiracy allegations against Lannett, as the "fair share" system allocated markets in order to avoid

depressing prices, s*ee, e.g.,* EPP CAC ¶ 122, which is what occurred as Mylan, Par, and West-Ward began (or resumed) selling Digoxin.

*Levothyroxine*. In coordination with Mylan and Sandoz, Lannett increased the price of Levothyroxine in mid-2013, around the same time as drug prices increased for at least a half dozen other generic drugs. *See* DPP CAC ¶ 122; EPP CAC ¶ 163; Kroger Compl. ¶ 607; Humana Compl. ¶¶ 568-579.

Plaintiffs allege that Defendants' public statements and admissions in their investor communications emphasize a commitment to increasing generic pharmaceutical prices and maintaining them at supracompetitive levels. Lannett's CEO is the source of many these communications. *See generally In re Generic*, 338 F. Supp. 3d at 432-33.

During a September 10, 2013 conference call, an analyst asked Lannett's CEO for his reaction to a competitor's recent and significant price increase on Levothyroxine. He responded: "*You mean after I sent them the thank you note*?**" Kroger Compl. ¶ 184 (emphasis added). On the same call, an investor asked Lannett's CEO whether he has any "expectations for any new competitors" in connection with Levothyroxine. *Id.* ¶ 185. In response, the CEO noted that "two possible competitors were in the wings... [b]ut hopefully, both companies turn out to be responsible companies and don't go into the marketplace," adding that "[w]e're seeing more responsibility on the part of all of our competitors." *Id.*; DPP CAC, Ex. G ¶ 26. These statements highlight that for Lannett, as for its co-conspirators, *entry* of competitors into a particular drug market was a significant concern, which was a key feature of their "fair share" agreement.

Also in connection with Levothyroxine price increases, Lannett's CEO commented during an investor call:

> I don't think Levo[thyroxine] and Digoxin are the only products
> that would sit here and tell you I could raise prices on, because I

> believe any of the products in our product line, including products
> that we may have just gotten approved have those same
> opportunities underlying them. We look at the market and
> sometimes we're the first ones to raise a price, sometimes we're
> not. But *we look at everything in line as a potential product to
> have a price increased on*.

DPP CAC, Ex. G ¶ 31 (emphasis added); Kroger Compl. ¶ 191. Similarly, on a November 7,

2013 call, Lannett's CEO explained that the "price increases that are going on in the industry, I

think they're going to stick for all the companies." DPP CAC, Ex. G ¶¶ 28-29.

Lannett's CEO continued to make statements in line with an overarching conspiracy in

2014 and 2015. For example, on a quarterly earnings call in November 2014, he predicted that

price increases would continue and expressed confidence that Lannett would not have to engage

in price competition generally for generic drugs, explaining that Lannett and its competitors were

"*less concerned about grabbing market share. We're all interested in making a profit, not how

many units we sell*." DPP CAC, Ex. G ¶ 31 (emphasis added). These statements from Lannett

further corroborate Lannett's knowing participation in the overarching conspiracy.

***Baclofen.*** A few months later, this time with Par, Teva, and Upsher-Smith, Lannett

increased prices for Baclofen by more than 550%. *See, e.g.,* Humana Compl. ¶¶ 328-338. This

price increase again followed a GPhA conference. *Id.* ¶ 337. *See also* EPP CAC ¶ 170 & 179.

***Ursodiol.*** Around this same time, with Activis and Epic, Lannett increased prices for

Ursodiol by close to 1500%. *See, e.g.,* Humana Compl. ¶¶ 687-693. *See also* EPP CAC ¶ 179.

In short, Lannett's participation in at least six drug-specific conspiracies involving at

least ten other Defendants provides additional allegations from which its involvement in the

overarching conspiracy can reasonably be inferred.

### C.   The *Kelly* Factors Further Support Plaintiffs' Allegations of an Overarching Conspiracy.

While Plaintiffs need only allege plausible grounds to infer an overarching agreement, the *Kelly* factors further support denying Lannett's motion. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989). There, the court found that whether there was a single conspiracy or multiple conspiracies depended on whether there was a "common goal among conspirators," whether the agreement between conspirators required "continuous cooperation," and whether the conspiracies' participants overlap. *Id.* at 259. The "absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy." *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992) (quotation marks and citation omitted). The overarching agreement alleged here was not confined to individual markets or specific drugs.

The common goal among the conspirators was to increase the prices for generic drugs as a whole. The Third Circuit advises that a court look "in a fairly broad sense" to the "underlying purpose of the alleged criminal activity." *United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019). Plaintiffs' allegations exceed this relatively modest standard. *See, e.g., Kelly*, 892 F.2d at 259 (finding single conspiracy supported where "the common goal of all the participants was simply to make money selling 'speed.'").

Continuous cooperation is demonstrated where the group's activities are "necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *Id.* at 259. Here, achievement of Defendants' common goal was enhanced by the continuous cooperation of the conspirators because a central tenet of the agreement was Defendants' understanding that they are current and future competitors across numerous drugs within the broader generic drug market. *See, e.g.,* EPP CAC ¶¶ 102-03; *see also* DPP CAC ¶¶

15-19. Because Lannett and its co-conspirators would not be able to maintain their inflated prices in the face of actual competition, this factor is easily satisfied.

Finally, the extent to which the participants overlap in their various dealings is staggering. This industry-spanning conspiracy encompassed subsidiary agreements among certain Defendants relating to individual Drugs at Issue. *See* EPP CAC ¶ 2; *see also* State CAC ¶ 90 ("The overarching conspiracy among generic manufacturers … ties together all of the agreements on individual drugs identified in this Complaint"). Throughout the conspiracy, Defendants communicated with each other to agree on the amount of market share each competitor would be allocated under their unlawful "fair share" agreement. EPP CAC ¶¶ 6-7. The "fair share" allocation was put into place to fix, maintain and stabilize prices—either for a particular generic drug or any number of generic drugs. EPP CAC ¶ 7. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug. *Id*.; *see also* DPP CAC ¶ 17.

### D.    Lannett's Argument that Plaintiffs Fail to Allege Enough Facts About Drugs that Lannett Did Not Sell Is Unsupported by the Facts and the Law.

Lannett questions whether Plaintiffs' allegations sufficiently show that it conspired to increase the price of multiple drugs, as opposed to pleading individual conspiracies about specific drugs. Lannett's argument ignores the governing pleading standards, as it effectively insists that Plaintiffs provide direct evidence as to each and every specific drug. But "[a] single conspiracy finding does not require every member to participate in every transaction." *Padilla*, 982 F.2d at 115. Neither direct evidence, nor specific evidence about each product, is required for Plaintiffs to state a claim against Lannett. *See In re Generic*, 338 F. Supp. at 440 ("Where a complaint does not allege direct evidence of a Section 1 violation … Plaintiffs may withstand dismissal by relying on allegations of circumstantial evidence (and the reasonable inferences that

may be drawn therefrom) to prove a conspiracy") (internal quotation marks and citation omitted). Ordinarily, the scope of an alleged conspiracy is not resolved on a motion to dismiss. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at \*2 (N.D. Cal. Jan. 21, 2014) ("The question in this case is not whether any conspiracy existed, only how far it reached. That question is ultimately one of fact, and cannot be resolved in the present procedural posture, where the Court tests only the sufficiency of the pleadings."). As set forth more fully in Plaintiffs' Joint Response to Defendants' Motion to Dismiss, Plaintiffs' allegations of an overarching conspiracy are more than plausible. Indeed, this Court has already observed that based on Plaintiffs' allegations "it is plausible to infer that there was a broader conspiracy" in the market for generic drugs. *In re Generic*, 315 F. Supp. 3d at 853.[8]

In focusing myopically on those drugs Lannett does not sell, Lannett fails to explain away the unusually high volume of communications and meetings it had with Heritage, Teva, and other Defendants that sell generic drugs that Lannett does not sell. *See, e.g.,* State CAC ¶¶ 94-95 & Tables 1 & 2; EPP CAC, Ex 1; Humana Compl., Ex. A. Such communications are consistent with Plaintiffs' allegations that, in addition to observed price hikes on some generic drugs, the "fair share" conspiracy also encompassed customer and/or market allocations across multiple generic drugs, including on generic drugs that a given conspiracy member may not sell. *See, e.g.,* IRP CAC ¶ 70.

Lannett also fails to address core allegations concerning Defendants' overarching agreement. Defendants are competitors or potential competitors with each other across product

---

[8] In its June 5, 2018 Opinion, this Court found that it would not be futile for the States to amend to include allegations of an overarching conspiracy. *Id.* at 854. In doing so, the Court rejected Defendants' argument "that the State Plaintiffs fail[ed] to address the critical question of why a price increase on a particular drug would benefit the Defendants that do not manufacture that drug, or why they would even care about the price of drugs that they do not sell." *Id.* at 853 (citation omitted).

markets, and Defendants could have obtained approval or otherwise acquired marketing rights to sell additional drugs, had they chosen to do so. EPP CAC ¶ 112. Because Defendants market and sell various generic products, the "foundational agreement between all Defendants was premised on the understanding that they are current or future competitors with each other across numerous generic drugs." *Id*. ¶ 102; *see also* DPP CAC ¶ 17. Absent collusion across numerous products, an agreement specific to any single drug would be limited and unstable. EPP CAC ¶ 102. Similarly, an agreement between Defendants to raise prices or to allocate market share on one drug would not likely hold where those same Defendants were engaged in vigorous price competition on another drug, or where another manufacturer not party to that agreement entered the market with an intent to compete on price. *Id*. ¶ 102.

Lannett offers no response to Plaintiffs' allegations that it did not behave in a competitive manner, and indeed, concedes that its conduct was *anticompetitive* (at least with respect to six drugs).  It is plausible to conclude that Lannett's anticompetitive agreement extended beyond those six drugs to include all of the drugs in Plaintiffs' Complaints.

## III.    CONCLUSION

Accordingly, Lannett's motion to dismiss should be denied in its entirety.

Dated:  May 2, 2019                                Respectfully submitted,

*/s/  Dianne M. Nast*                              */s/  Roberta D. Liebenberg*
Dianne M. Nast                                     Roberta D. Liebenberg
NASTLAW LLC                                        FINE, KAPLAN AND BLACK, R.P.C.
1101 Market Street, Suite 2801                     One South Broad Street, 23rd Floor
Philadelphia, PA 19107                             Philadelphia, PA 19107
215-923-9300                                       215-567-6565
dnast@nastlaw.com                                  rliebenberg@finekaplan.com

**Liaison and Lead Counsel for the Direct**       **Liaison and Lead Counsel for the End-**
**Purchaser Plaintiffs**                          **Payer Plaintiffs**

15

/s/ Jonathan W. Cuneo
Jonathan W. Cuneo
CUNEO, GILBERT & LADUCA LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
202-789-3960
jonc@cuneolaw.com

**Lead Counsel for the Indirect Reseller Plaintiffs**

/s/ William J. Blechman
Richard Alan Arnold
William J. Blechman
KENNY NACHWALTER, P.C.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
305-373-1000
rarnold@knpa.com
wblechman@knpa.com

**Counsel for Kroger Direct Action Plaintiffs**

/s/ W. Joseph Nielsen
W. Joseph Nielsen
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
860-808-5040
joseph.nielsen@ct.gov

**Liaison Counsel for the States**

/s/ Peter D. St. Phillip, Jr.
Peter D. St. Phillip, Jr.
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
914-997-0500
PStPhillip@lowey.com

/s/ Todd M. Schneider
SCHNEIDER WALLACE COTTRELL
   KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
415-421-7100
tschneider@schneiderwallace.com

**Counsel for Humana, Inc.**