**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |

| | |
|---|---|
| **THIS DOCUMENT RELATES TO:** | **ORAL ARGUMENT REQUESTED** |
| *The State of Connecticut, et al. v. Actavis Holdco U.S., Inc., et al.* | **17-CV-03768** |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | **18-CV-00284** |
| *1199SEIU National Benefit Fund, et al. v. Actavis Holdco U.S., Inc., et al.* | **18-CV-02401** |
| *West Val Pharmacy, et al. v. Actavis Holdco U.S., Inc., et al.* | **18-CV-02533** |
| *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | **18-CV-03299** |

**PLAINTIFFS' JOINT RESPONSE TO DEFENDANT MAYNE PHARMA INC.'S
MOTION UNDER FRCP 12(b)(6) TO DISMISS VARIOUS PLAINTIFFS' SO-CALLED
"OVERARCHING CONSPIRACY" COMPLAINTS[1]**

---

[1] The "So-Called 'Overarching Conspiracy' Complaints," or "Multi-Drug Complaints," that Mayne seeks to dismiss (State CAC, Kroger Complaint, EPP Complaint, IRP Complaint, Humana Complaint, and Marion Complaint) are identified in Mayne's Motion and in its Memorandum of Law in Support of Its Motion Under FRCP 12(b)(6) to Dismiss Various Plaintiffs' So-Called "Overarching Conspiracy" Complaints (17-CV-03768, ECF 65-1) ("Mayne's Memo.") at 1 n.1. This Joint Response is joined by each of the Plaintiff groups whose Multi-Drug Complaint Mayne challenges except Marion Diagnostic.

**TABLE OF CONTENTS**

I.    **Introduction.** .................................................................................................................. 1

II.    **Mayne's Motion with Respect to a Doxycycline Conspiracy Must Be Denied.** ............ 2

      A.    This Court Already Rejected Mayne's Argument that Plaintiffs Fail to Sufficiently Plead Mayne's Participation in *any* Doxycycline Conspiracy. ........... 2

      B.    Plaintiffs Adequately Plead that Mayne Was Part of a Doxy DR Conspiracy. ...... 4

      C.    Mayne's Assertions About the Lack of Allegations Concerning *Certain Forms* of Doxycycline or an Agreement Between Mayne and *Mylan* Do Not Change the Fact that Plaintiffs Plausibly Allege that Mayne Participated in a *Doxy DR* Conspiracy with *Heritage*. ...................................................................................... 5

      D.    The Absence of "Price-Fixing" Allegations Regarding Doxy DR Is Irrelevant. .... 6

III.    **Mayne's Motion Regarding Its Participation in the Overarching Conspiracy Must Be Denied.** ...................................................................................................................... 7

      A.    Plaintiffs Plead Sufficient Facts to Create a Plausible Inference that Mayne Participated in the Overarching Conspiracy. .......................................................... 7

      B.    Plaintiffs' Mayne-Specific Allegations Are Consistent with the Overarching Conspiracy. .............................................................................................................. 8

      C.    The Supposed "Limited" Allegations Against Mayne Do Not Prevent the Conclusion that Mayne Is Plausibly Part of the Overarching Conspiracy............ 11

      D.    Plaintiffs Are Not Required to Allege That Mayne Used Specific Language in Its Competitor Communications to Further the Conspiracy. .................................... 13

      E.    Plaintiffs Are Not Required to Allege that Every Form of the Overarching Conspiracy Was Part of the Mayne-Heritage Doxy DR Conspiracy.................... 14

IV.    **Conclusion.** ................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 4

*Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119 (D. Mass. 2013)................................. 14

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237 (3d Cir. 2010).................... 6

*In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623 (E.D. Pa. 2010).................................. 4

*In re Generic Pharma. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018) ...... 1, 3, 4, 6

*In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961 (N.D. Iowa 2011) ............. 6

*In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017) ............................................................. 4

*In re New Jersey Tax Sales Certificates Antitrust Litig.*, No. CIV. A. 12-1893 MAS, 2014 WL 5512661 (D.N.J. Oct. 31, 2014).................................................................................... 12, 13

*In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................... 12

*Schneyder v. Smith*, 709 F. Supp. 2d 368 (E.D. Pa. 2010)............................................................. 3

*United States v. Beaver*, 515 F.3d 730 (7th Cir. 2008)............................................................ 10, 11

*United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989)..................................................................... 11

*United States v. Padilla*, 982 F.2d 110 (3d Cir. 1992).................................................................. 13

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010).............................. 4, 5

**Statutes**

28 U.S.C. § 1292............................................................................................................................. 3

**Rules**

Local Rule E.D. Pa. 7.1.................................................................................................................. 3

## I.        Introduction.

This Court has already decided that "Plaintiffs have plausibly alleged the existence of a

Doxy DR conspiracy based on direct evidence" involving Mayne. *In re Generic Pharma. Pricing*

*Antitrust Litig.*, 338 F. Supp. 3d 404, 440 (E.D. Pa. 2018) (Rufe, J.).  For purposes of the *Twombly*

plausibility standard, the guilty pleas by senior executives (Glazer and Malek) of Heritage,

Mayne's competitor in the market for Doxy DR, put the existence of a conspiracy with Mayne

involving that drug beyond dispute.  At most, what is susceptible to challenge is how far beyond

that drug the scope of the conspiracy extends and the extent to which Mayne is implicated in that

broader, overarching conspiracy.

As to the relevant issue of whether the conspiratorial scope extends beyond Doxy DR,

Mayne ignores the fact that the DOJ's criminal investigation is *far* broader than Doxycycline.  *Id.*

at 423–26.  Mayne also does not address the fact that the DOJ and a federal grand jury empaneled

in the Eastern District of Pennsylvania have focused on as many as 16 or 17 generic drug

manufacturers, including Mayne, *id.* at 425, the majority of which did not produce Doxy DR, and

all of which, of course, sold generic drugs in addition to Doxy DR.  Moreover, the Malek and

Glazer guilty pleas, standing by themselves, establish that the conspiracy extended beyond

Doxycycline.  *See id.* at 452.

In denying Defendants' Group 1 motions to dismiss, this Court found that "Group 1

Plaintiffs plausibly allege a web of connections between Heritage and other Group 1 Defendants

that is sufficient to plead that the government investigations and the Glazer and Malek guilty pleas

are not 'entirely separate' from Group 1 Plaintiffs' claims pertaining to Group 1 drugs other than

Doxy DR." *Id.* at 453.  That "web of connections" includes communications between Mayne and

its ostensible competitors.  Significantly, Mayne attended several trade association events with

other Defendants, including the August 2014 NACDS Total Store Expo in Boston (in the middle

1

of the peak conspiracy period) with every other Defendant, including Heritage's Malek, who intended to reach anticompetitive agreements with competitors at that event.  EPP CAC, Ex. 1; State CAC ¶¶ 139–40; EPP CAC ¶¶ 279–80.  In addition to communications between Heritage and Mayne, there is evidence of frequent, direct communications between Mayne and Teva—even though Teva did not make or sell any form of Doxycycline.  State CAC ¶¶ 94–95 & Tables 1–2.

For its Motion, Mayne expressly "elect[ed] to cite and respond principally to the allegations in the States' Complaint," Mayne's Memo. at 3 n.3, and, with the exception of one footnote (*id.* at 6 n.4), Mayne does not discuss or cite to any portion of any other Multi-Drug Complaint.  Mayne thus has waived its ability to move to dismiss the Multi-Drug Complaints of the other Plaintiffs by not timely (per the Court's scheduling orders) and specifically challenging those Multi-Drug Complaints.  Even assuming the other Multi-Drug Complaints are appropriately considered to be subject to Mayne's Motion, given Mayne's deliberate failure to address them, the private Plaintiffs' Multi-Drug Complaints only serve to further confirm that the allegations against Mayne extend beyond Doxy DR and are detailed, extensive, and well-founded.  *See, e.g.*, EPP CAC, Ex. 1 (Mayne attended at least ten trade association events during the relevant period).  In particular, a detailed timeline of communications and activities uncovered to date pertaining to the overarching conspiracy shows that Mayne was an important actor in that sequence of events.  *See, e.g.*, EPP CAC ¶¶ 141–81.  A view of this web of connections as a whole, as detailed in the State CAC and the other Multi-Drug Complaints, readily permits the inference that the conspiracy extended to numerous drugs beyond Doxy DR and that *Mayne* is implicated in that overarching conspiracy.

II.     **Mayne's Motion with Respect to a Doxycycline Conspiracy Must Be Denied.**

A.      **This Court Already Rejected Mayne's Argument that Plaintiffs Fail to Sufficiently Plead Mayne's Participation in *any* Doxycycline Conspiracy.**

For its assertion that there are *no* factual allegations to support a claim that Mayne

participated in *any* Doxycycline conspiracy, Mayne's Memo. at 5–12, Mayne argues that there are no factual allegations: (1) connecting Mayne to Doxy RR or Doxy Mono, *id.* at 6; (2) supporting a Doxy DR conspiracy between Mayne and Mylan, *id.* at 6–8; or (3) supporting a Doxy DR conspiracy between Mayne and Heritage.  *Id.* at 8–12.  These are *the same* arguments that Mayne advanced when moving to dismiss the drug-specific complaints of the EPPs, IRPs, and DPPs.[2] Last time, this Court declined to accept Mayne's arguments, denied Mayne's motion,[3] and found that Plaintiffs had plausibly alleged—with direct evidence—that Mayne was part of a Doxy DR conspiracy with Heritage.  *In re Generic Pharma.*, 338 F. Supp. 3d at 440.  Accordingly, for the EPPs and IRPs, this Court's earlier Doxy DR holding is the law of the case, and this Court should reject Mayne's renewed attempt to relitigate whether they adequately allege that Mayne was part of a Doxycycline conspiracy.  *See Schneyder v. Smith*, 709 F. Supp. 2d 368, 383 (E.D. Pa. 2010) ("The law of the case doctrine provides that once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case." (internal quotation marks omitted)).[4]

For the other Multi-Drug Complaints that Mayne now challenges (the complaints of the States, Kroger, Humana, and Marion), there is no reason for this Court to come to a different conclusion regarding Mayne and Doxy DR this time—particularly where Mayne's arguments here *are the same as those previously rejected by this Court*.

---

[2] *See* Mayne's Memorandum of Law in Support of Its Motion Under FRCP 12(b)(6) to Dismiss the Class Plaintiffs' Consolidated Class Action Complaints (16-DX-27240, ECF 295-1) at 7–11.

[3] October 16, 2018 Order (16-MD-2724, ECF 722) ("October 16, 2018 Order") at 4.

[4] Mayne claims that it "reserves its right to move for reconsideration and/or leave to file an interlocutory appeal of that Order" regarding Mayne's involvement in a Doxy DR conspiracy.  Mayne's Memo. at 8 n.6. But, it is now far too late for Mayne to move for reconsideration or seek leave to file an interlocutory appeal. *See* Local Rule E.D. Pa. 7.1(g) ("Motions for reconsideration or reargument shall be served and filed within fourteen (14) days after the entry of the order concerned, other than those governed by Federal Rule of Civil Procedure 59(e)."); 28 U.S.C. § 1292(b) (requiring that an application for interlocutory appeal be made "within ten days after the entry of the order").  Mayne's "reservation" of its expired right is meaningless.

### B.      Plaintiffs Adequately Plead that Mayne Was Part of a Doxy DR Conspiracy.

Even a cursory review of the States'[5] allegations shows that Mayne is plausibly implicated

in a Doxy DR conspiracy with Heritage, especially when the proper standard for a Rule 12(b)(6)

motion to dismiss is applied: (1) Plaintiffs' allegations must be viewed *as a whole*, *In re Blood

Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010); (2) the allegations must be

*accepted as true*, with *all* logical inferences drawn *in favor of Plaintiffs*, *In re Generic Pharma.*,

338 F. Supp. 3d at 435–36; and (3) Plaintiffs' allegations simply need to make it *plausible* (not

probable) that Mayne was part of a conspiracy.  *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 260

(3d Cir. 2017).  *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding that a

plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").

To plead a Sherman Act Section 1 claim, Plaintiffs must allege "enough factual matter

(taken as true) to suggest that an agreement was made."  *Id.* at 556.  The agreement may be tacit

or express.  *Id.* at 553.  "An agreement exists when there is a unity of purpose, a common design

and understanding, a meeting of the minds, or a conscious commitment to a common scheme."  *W.

Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010).

The States plausibly allege, based on direct evidence, that Mayne participated in a Doxy

DR conspiracy with Heritage.  The States allege that Mayne and Heritage (1) engaged in several

specific communications with each other about Mayne's attempts to obtain share in the Doxy DR

market and (2) ultimately agreed about certain Doxy DR customers that each would get:

- When Mayne first entered the Doxy DR market, it "approached Heritage to discuss its plans."  State CAC ¶ 218.

- Mayne had numerous discussions with Heritage about its market-share goals as the

---

[5] Because Mayne addresses only the *States'* allegations, Mayne Memo. at 3 n.3, Plaintiffs limit their discussion herein to Mayne's specific arguments against the States' allegations and expressly reserve the right to respond to any argument that Mayne may subsequently make regarding supposed deficiencies of any other Multi-Drug Complaint.

two companies worked out the specific allocation of customers between them, *id.*
¶¶ 220–30—including that Mayne needed "one [l]arge account," *i.e.*, a "big
customer like Econdisc." *Id.* ¶¶ 226, 230.

- Based on several communications between them, Mayne and Heritage eventually
agreed that Heritage would give up a Doxy DR customer, Econdisc, to Mayne and
that Mayne would not compete with Heritage for McKesson. *Id.* ¶¶ 230–38.[6]

- Pursuant to the Mayne-Heritage agreement, Heritage refused to provide a requested
bid to a large nationwide pharmacy chain for which Mayne was the incumbent
Doxy DR supplier in exchange for Mayne's continued agreement with Heritage not
to compete and to avoid price erosion in the Doxy DR market. *Id.* ¶¶ 239–40.

These allegations are sufficient to make it plausible that Mayne and Heritage had an agreement,

*i.e.*, "a meeting of the minds," *W. Penn Allegheny*, 627 F.3d at 99, to allocate customers between

them.

       **C.**       **Mayne's Assertions About the Lack of Allegations Concerning *Certain Forms***
                     **of Doxycycline or an Agreement Between Mayne and *Mylan* Do Not Change**
                     **the Fact that Plaintiffs Plausibly Allege that Mayne Participated in a *Doxy DR***
                     **Conspiracy with *Heritage*.**

Mayne's argument about the lack of allegations regarding Mayne's involvement in a non-

Doxy DR Doxycycline conspiracy (*i.e.*, Doxy Mono or Doxy RR), Mayne's Memo. at 6, misses

the point. The same is true of Mayne's argument that the States did not allege a Doxy DR

agreement between Mayne and *Mylan*. *Id.* at 6–8. There is no requirement that, in order to plead

Mayne's involvement in a *Doxy DR* conspiracy with *Heritage*, Plaintiffs must plead that Mayne

participated in a single conspiracy covering *multiple* forms of Doxycycline or a single Doxy DR

---

[6] With respect to ¶ 230 in the State CAC, Mayne accuses the States of "omit[ting] exculpatory evidence
that the States had included in their original complaints" and claims that this "is a direct violation of the
States' ethical responsibilities and is sanctionable." Mayne's Memo. at 11 n.7. Plaintiffs do not understand
this argument. Whether or not a particular change from one version of a complaint to another is
sanctionable, *Mayne is flatly wrong about the facts*. Regarding the portion of ¶ 94 from the previous
complaint quoted by Mayne in its brief, ¶ 230 in the State CAC *says the same thing*: A Heritage employee
"floated the idea that Heritage may be willing to walk from Econdisc if Mayne would agree not to price
Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson." Mayne's
inflammatory accusation of ethical violations is without merit.

conspiracy involving *more than just Heritage and Mayne*.[7]  In short, the allegations regarding Mayne's agreement with *Heritage* to unlawfully allocate *Doxy DR* customers were sufficient for this Court to deny Mayne's prior motion to dismiss[8] and remain more than enough to defeat Mayne's arguments this time.

### D.      The Absence of "Price-Fixing" Allegations Regarding Doxy DR Is Irrelevant.

Mayne points out that Plaintiffs do not allege that Mayne "agreed to fix the price of Doxy DR" or exchanged "Doxy DR pricing information."  Mayne's Memo. at 3, 10.  However, the lack of "price-fixing" allegations is irrelevant.  The Mayne-Heritage Doxy DR conspiracy is alleged as a *customer-allocation*, not a price-fixing, conspiracy.[9]  Further, this Court found that the "failure to allege Doxy DR pricing data does not require dismissal of" the Doxy DR claims because "Plaintiffs' Doxy DR claims are . . . sufficient to withstand dismissal" based on Plaintiffs' plausible allegation of the existence of a Doxy DR conspiracy.  *In re Generic Pharma.*, 338 F. Supp. 3d at 446 n.243.

---

[7] To support its arguments, Mayne cites to hub-and-spoke cases, *see* Mayne's Memo. at 7 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d. Cir. 2010) and *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016)), incorrectly suggesting that Plaintiffs have (or should have) alleged a hub-and-spoke conspiracy.  A hub-and-spoke conspiracy "involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy.  The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes." *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (internal quotation marks omitted).  Because the alleged conspiracies involving Mayne (the Doxy DR conspiracy with Heritage and the overarching conspiracy) both implicate *horizontal* competitors—without any *vertical* relationships between or among the Defendants—it is improper to evaluate the alleged conspiracies using hub-and-spoke conspiracies cases. *See, e.g.*, *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) (noting that the hub-and-spoke theory was a "remarkably poor fit" where there was no vertical relationship between the hub and the spokes).

[8] *In re Generic Pharma.*, 338 F. Supp. 3d at 440; October 16, 2018 Order at 4.

[9] The States *have* alleged that, because of the unlawful Mayne-Heritage agreement, Doxy DR pricing "has been substantially higher than it would have been in a competitive market."  State CAC ¶ 241.

III.    **Mayne's Motion Regarding Its Participation in the Overarching Conspiracy Must Be Denied.**

Mayne incorrectly asserts that Plaintiffs plead *no* factual allegations to support the claim that Mayne was a participant in the overarching conspiracy.  Mayne's Memo. at 12–15.  Again, Mayne fails to: (1) view Plaintiffs' allegations *as a whole* and *as true*; (2) recognize that *all* logical inferences must be drawn *in favor of Plaintiffs*; and (3) acknowledge that the allegations merely need to create a *plausible* inference that Mayne was part of the overarching conspiracy.

A.      **Plaintiffs Plead Sufficient Facts to Create a Plausible Inference that Mayne Participated in the Overarching Conspiracy.**

A comparison of the States'[10] overarching conspiracy allegations with their Mayne-focused allegations shows that Mayne is plausibly linked to the larger conspiracy.  First, the States allege that generic drug makers, through communications among themselves, are aware of each other's "current and future business plans."  State CAC ¶ 89.  Consistent with this is the allegation that Mayne had many communications with Heritage and Teva.  *Id.* ¶¶ 94–95 & Tables 1–2.

Second, the States allege that the overarching conspiracy "was reinforced through phone calls and text messages between the Defendants," *id.* ¶ 93, and involved competitors "reach[ing] out to each other with the expectation that they would be able to reach an agreement on 'fair share,'" *id.* ¶ 97, "allocat[ing] the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market," *id.* ¶ 98, and "routinely communicat[ing] and shar[ing] information with each other about bids and pricing strategy."  *Id.* ¶ 108.  Regarding Mayne, the States allege that upon entering the Doxy DR market, Mayne "approached Heritage to discuss its plans" and then engaged in numerous phone, text, and in-person conversations with Heritage about the allocation of Doxy DR customers,

---

[10] Again, because Mayne does not address *anything* from any Multi-Drug Complaint other than the State CAC, Mayne Memo. at 3 n.3, Plaintiffs' discussion here is limited to the States' allegations.

including Mayne's desire to obtain a "big customer."  *Id*. ¶¶ 218, 220–38.

Third, the States allege that existing competitors in a generic drug market, after approaching or being approached by a new competitor, "will agree to 'walk away' from specific customers until the market reaches a new artificial equilibrium."  *Id.* ¶ 100.  *See also id.* ¶ 99. Then, "[o]nce the market is 'stable,' the competitors agree not to compete on price."  *Id*. Concerning Mayne, the States allege that Heritage walked away from a Doxy DR account in May 2014, leaving the account to Mayne.  *Id.* ¶ 227.  This "walking away" is also illustrated where Heritage and Mayne agreed, after a series of communications between them in late 2014, that Heritage would give up Econdisc's business to Mayne in exchange for Mayne agreeing not to compete for McKesson's business.  *Id*. ¶¶ 228–38.  Similarly, later in 2015, Heritage refused to provide the Doxy DR bid a large pharmacy chain requested—after Heritage found out that the incumbent supplier for the chain was Mayne and the two competitors communicated with each other about the requested bid.  *Id*. ¶¶ 239–40.  When Heritage sent a text message to Mayne confirming that it would not bid, Mayne's response was straightforward and telling: "Thank you." *Id*. ¶ 240.

Thus, with these allegations, Mayne is plausibly linked to the overarching conspiracy.

## B.      Plaintiffs' Mayne-Specific Allegations Are Consistent with the Overarching Conspiracy.

Mayne erroneously argues that it cannot be part of the overarching conspiracy because the allegations against it are supposedly "inconsistent with the 'fair share' conspiracy."  Mayne's Memo. at 13.[11]  This argument, however, makes sense only by ignoring the totality of the

---

[11] According to Mayne, Plaintiffs' "inconsistent" allegations include that Mayne "*aggressively competed* for Mylan's customers," engaged in "*strong and aggressive* price competition" in the Doxy DR market, and was "*foreclosed* from a 'fair share' entry into the Doxy DR market because of Mylan's and Heritage's competitive responses to Mayne's pricing."  Mayne's Memo. at 13–14 (emphasis added).

allegations and then by drawing inferences, from discrete allegations, in *Mayne's* favor.  Mayne

ignores that the States allege that the overarching scheme: involved "approximations" of fair share

that could vary based on the circumstances; did not have a "precise method for apportioning each

participant's 'fair share'"; and involved an iterative process to reach an agreed-upon estimated fair

or acceptable share:

- "'Fair share' is an *approximation* of how much market share each competitor is entitled to, based on a number of competitors in the particular drug market, with a *potential adjustment* based on the timing of their entry."  State CAC ¶ 90 (emphasis added).  *See also, e.g.*, *id.* ¶ 102 (alleging that, according to one defendant, the first entrant was entitled to 60% of a two-player market (instead of a proportional 50%)).

- "There is *no precise method* for apportioning each participant's 'fair share' because market share is obtained by winning the business of various customers, which is *inherently variable* in a given year."  *Id.* ¶ 97 (emphasis added).

- "Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains *an acceptable share* of the market."  *Id.* ¶ 98 (emphasis added).

- The conspiracy often involved multiple steps as "competitors . . . *continue to divide up customers until they reach an artificial equilibrium*."  *Id.* ¶ 99 (emphasis added).

Considering these features, it is not inconsistent with the "fair share" concept, or surprising, that:

(1) competitors could have different opinions about which competitor needed to give up which

customers and when; (2) it could take some time for competitors to agree what "fair share" meant

for their particular situation and how it would be achieved; or (3) the eventual customer allocation

could end up being somewhat different from a simple proportional share of the market.  With this

understanding of the overarching conspiracy, the allegations—that Mayne and Heritage engaged

in various communications, roughly from February 2014 to November 2014, as they discussed and

then eventually resolved how to allocate Doxy DR customers between them, *id.* ¶¶ 218–38—are

unmistakably *consistent* with the overarching conspiracy allegations.

In addition, when viewing Plaintiffs' allegations as a whole and drawing the logical

inferences in favor of Plaintiffs, the allegations do *not* show that Mayne: "*aggressively competed* for Mylan's customers," engaged in "*aggressive* price competition" for Doxy DR, or was "*foreclosed* from a 'fair share' entry into the Doxy DR market." Mayne's Memo. at 13–14 (emphasis added). Instead, the allegations illustrate how manufacturers, through communications with their competitors and in a back-and-forth process, reached agreement on an acceptable or fair share that each would get for a particular drug. Upon entering the Doxy DR market, Mayne "approached Heritage to discuss its plans," *id.* ¶ 218, and devised its initial strategy of "target[ing] Mylan" customers, since Mylan then had "roughly 60% of the Doxy DR market." *Id.* ¶ 219. When Mayne realized that Mylan had already "'given up several large customers to Heritage and [was] not giving any more,'" Mayne concluded that it "'need[ed] to go after business at Heritage also." *Id.* Mayne then had numerous discussions with Heritage about its market-share goals as the two companies worked out the specific allocation of customers between them. *Id.* ¶¶ 220–40. Mayne and Heritage ultimately reached an acceptable Doxy DR agreement where Heritage would give up Econdisc to Mayne, and Mayne would not compete with Heritage for McKesson. *Id.* ¶¶ 230–38. *None* of these allegations show that Mayne "aggressively" competed in the Doxy DR market.

Mayne's argument (that Plaintiffs' allegations show that Mayne's conduct was inconsistent with the overarching conspiracy) is incorrect for another reason: Plaintiffs are not required to plead that the overarching conspiracy worked perfectly or even smoothly with respect to Mayne's entry into the Doxy DR market. "[Section] 1 of the Sherman Antitrust Act does not outlaw only perfect conspiracies to restrain trade." *United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008). In *Beaver*, the defendant argued that the price-fixing defendants' "occasional cheating" showed that "no agreement was ever reached." *Id.* However, because "[i]t is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating

10

certainly does not, by itself, prevent the government from proving a conspiracy," the Seventh Circuit rejected the argument, holding that it could not "say that the [defendants'] occasional cheating prevented the government from sufficiently proving that they conspired." *Id. Cf. United States v. Kelly*, 892 F.2d 255, 260 (3d Cir. 1989) ("Kelly cites the infighting among the conspirators after entry of the [organized crime syndicate] as evidence that the participants were only looking out for themselves and not working in concert. Disputes between participants do not necessarily fracture a single conspiracy."). Accordingly, even if Mayne's entry into the Doxy DR market was not perfectly or immediately "smooth" (as the allegations do not say that Mayne reached out to Mylan or reached an agreement on fair share with Mylan or instantly with Heritage), this does *not* mean that Mayne was not part of the overarching conspiracy.

Finally, to plausibly link Mayne to the overarching conspiracy through its unlawful agreement with Heritage, Plaintiffs are *not* required to plead that Mayne participated in a Doxy DR conspiracy with *any other maker of Doxy DR* (*i.e.*, Mylan). The States' allegations are that Mayne, by participating in a conspiracy with Heritage, was part of the overarching "fair share" conspiracy—*not* that Mayne was part of a *broader Doxy DR* conspiracy that included *Mylan*. Moreover, with respect to an overarching conspiracy, Plaintiffs are not required to plead or "prove that each defendant knew all the details, goals, *or other participants* in order to find a single conspiracy." *Kelly*, 892 F.2d at 260 (emphasis added) (internal quotation marks omitted).

**C.    The Supposed "Limited" Allegations Against Mayne Do Not Prevent the Conclusion that Mayne Is Plausibly Part of the Overarching Conspiracy.**

Mayne's argument that it cannot be part of the overarching conspiracy because the allegations against Mayne are, in its view, "extremely limited," Mayne's Memo. at 1,[12] is contrary

---

[12] *See also* Mayne's Memo. at 15 (asserting that "Plaintiffs' specific factual allegations are extraordinarily limited and deficient as to Mayne"). Regarding Plaintiffs' allegations, Mayne claims that "Plaintiffs allege [that Mayne] only sold one drug." *Id.* at 14. It is more accurate to simply say that Plaintiffs have not

to relevant authority. There is no requirement that Plaintiffs "have the same quality or quantity of allegations as to one defendant as unto another. . . . The [complaint] need not aver even similar allegations as to each applicable defendant in identical form or number." *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa. 2011) (internal citations omitted). Applicable case law also shows that it *is* plausible for a defendant to be part of an overarching conspiracy even when the allegations against that defendant are relatively limited. For example, in *In re New Jersey Tax Sales Certificates Antitrust Litigation*, No. CIV. A. 12-1893 MAS, 2014 WL 5512661 (D.N.J. Oct. 31, 2014), plaintiffs alleged that several defendants were part of "an overarching and statewide conspiracy" to rig auctions of tax liens. *Id.* at *5 (internal quotation marks omitted). The conspiracy ran from 1998 to 2009, and the plaintiffs described forty-nine auctions for which certain defendants allocated the to-be-auctioned liens. *Id.* at *2, 9. The plaintiffs alleged that one of the defendant groups—the Crestar Defendants—"participated in two auctions at which they participated in collusion prior to the auctions." *Id.* at *7. In contrast, the plaintiffs alleged that other defendants participated in *many more* bid-rigged auctions—with other defendant groups and individuals having been part of 24, 4, 28, and 11 rigged auctions respectively. *Id.* at *6–7. The Crestar Defendants argued that "their alleged limited participation in the conspiracy" and the "lack of particularized allegations as to each of the Crestar Defendants require[d] the dismissal of the claims asserted against them." *Id.* at *9. They also asserted that they "did not even begin operations until . . . approximately only four months prior to the end of the conspiracy . . ., and as a result, [they] could not plausibly have been involved in the alleged conspiracy." *Id.* (internal quotation marks omitted). Nevertheless, the district court held that the

---

alleged Mayne's involvement in another drug-specific conspiracy. In this regard, Mayne has acknowledged that it *did* sell another MDL drug—Fluocinonide—during the relevant time period. *See* Declaration of Brian J. Smith (16-MD-02724, ECF 739-6), Ex. E (16-MD-02724, ECF 739-5) at 3 n.1. Plaintiffs' investigation of Mayne's conduct in connection with its sales of Fluocinonide is ongoing.

"allegations plausibly connect[ed] *all* of the Crestar Defendants to the [statewide] conspiracy," notwithstanding "the relatively small number of auctions at which the Crestar Defendants colluded (two)." *Id.* (emphasis in original).

Further, a defendant may be part of an overarching conspiracy even when that defendant's connection to the larger conspiracy is just through one other co-conspirator, particularly where the connection is to a central figure in the conspiracy—like Mayne's connection to Heritage. *See United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992) (affirming the jury's finding that a drug distributor was part of a single conspiracy with other members of a cocaine distribution operation even though that distributor's "only connection to the conspiracy shown by the government was through . . . the central figure . . . in the scheme").

Therefore, the "limited" allegations against Mayne and its Heritage-Doxy DR conspiracy are sufficient to plausibly infer that Mayne was also part of the overarching conspiracy.

**D.      Plaintiffs Are Not Required to Allege That Mayne Used Specific Language in Its Competitor Communications to Further the Conspiracy.**

Apparently because Plaintiffs do not allege that Mayne said "fair share" in a competitor communication, Mayne asserts that there is "no legal basis to conclude that [it] had knowledge of or was party to" the overarching conspiracy. Mayne's Memo. at 13. Of course, this argument overlooks that the standard here is whether Plaintiffs' allegations—*taken as a whole and true* and drawing *all* permissible inferences *in Plaintiffs' favor*—make it *plausible* that Mayne was part of the overarching conspiracy. For example, the States allege that "Defendants allocate the market for an individual drug . . . so that each competitor obtains *an acceptable share* of the market." State CAC ¶ 98 (emphasis added). While not alleging that Mayne said "fair share" or "acceptable share," the States allege that Mayne and Heritage communicated back and forth until they worked out a Doxy DR customer allocation that was *acceptable to Mayne*. *Id.* ¶¶ 218–38.

13

As a further matter, it is not necessary to allege that Mayne used a key phrase of the overarching conspiracy to properly link Mayne to the scheme. This principle is illustrated in *Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119 (D. Mass. 2013), where the court denied the defendants' summary judgment motion because the evidence suggested that the observed lack of competition among the defendants "was not the result of mere independent conduct." *Id.* at 138. The court reached this conclusion because *one* (out of eleven) defendants had stated, regarding *one* transaction (out of twenty-seven transactions that were part of the conspiracy), that "'club etiquette prevail[ed]'" and because "the term 'club etiquette' denote[d] an accepted code of conduct between the Defendants." *Id.* at 137–38. Hence, even at the summary judgment stage, *one* statement about the prevailing "club etiquette" by *one* defendant was sufficient to keep *all* of the defendants in the case on the overarching conspiracy claim.

Accordingly, to survive a motion to dismiss, it is not necessary that Plaintiffs allege that Mayne uttered the words "fair share." It is enough to allege that Defendants, generally, spoke of and had a "fair share" or "acceptable share" code of conduct, and that Mayne and Heritage worked out an acceptable Doxy DR share for Mayne.

### E. Plaintiffs Are Not Required to Allege that Every Form of the Overarching Conspiracy Was Part of the Mayne-Heritage Doxy DR Conspiracy.

Mayne asserts that the overarching conspiracy cannot apply to Mayne because (1) "[t]here are no allegations . . . that Mayne received any competitive concession in the Doxy DR market in exchange for a concession to a non-competitor in another generic market in which Mayne did not participate," Mayne Memo. at 14–15, and (2) Heritage, in April 2014, decided to raise the price on eighteen drugs—but not on Doxy DR. *Id*. at 15. There is no merit to these arguments.

Plaintiffs did *not* allege, and are not required to allege, that *every* defendant implemented the overarching conspiracy in the same way. The States allege that "[d]ecisions on 'fair share'

14

can, *at times*, be based on conduct that occurs between competitors across more than one generic drug market."   State CAC ¶ 101 (emphasis added).   The States also allege that sometimes Defendants "discuss[ed] fair share and the desire to *maintain or raise prices* with respect to specific drugs."   *Id.* ¶ 93 (emphasis added).   *See also id.* ¶ 99 ("Once the market is 'stable,' the competitors agree not to compete on price and, *at times*, significantly raise prices in the absence of competition." (emphasis added)).   These allegations are simply *examples* of how *some* Defendants, in *some* situations, implemented the overarching scheme.   Therefore, the fact that Plaintiffs did not allege that these "sometimes" examples were part of the Mayne-Heritage agreement is irrelevant to whether it is plausible that Mayne participated in the overarching conspiracy.

## IV.    Conclusion.

This Court has previously decided and there can be no dispute that Plaintiffs' allegations plausibly show that Mayne was part of a Doxycycline conspiracy.   These allegations also are sufficient to plausibly implicate Mayne in the overarching conspiracy.   Accordingly, this Court must deny Mayne's Motion to Dismiss.

Dated:  May 2, 2019

Respectfully submitted,

PLAINTIFF STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

BY:     */s/  W. Joseph Nielsen*
         W. Joseph Nielsen
         Federal Bar No. ct20415
         Assistant Attorney General
         55 Elm Street
         P.O. Box 120
         Hartford, CT 06141-0120
         Tel: (860) 808-5040
         Fax: (860) 808-5391
         Joseph.Nielsen@ct.gov

**Liaison Counsel for the Plaintiff States**

PLAINTIFF STATE OF IDAHO
LAWRENCE G. WASDEN
ATTORNEY GENERAL

BY:     */s/  John K. Olson*
         John K. Olson
         Deputy Attorney General
         Consumer Protection Division
         954 W. Jefferson, 2nd Floor
         Boise, ID 83720
         Tel: (208) 332-3549
         Fax: (208) 334-4151
         john.olson@ag.idaho.gov

/s/  *Roberta D. Liebenberg*
Roberta D. Liebenberg
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
215-567-6565
rliebenberg@finekaplan.com

**Liaison and Lead Counsel for the End-Payer Plaintiffs**

*/s/  Jonathan W. Cuneo*
Jonathan W. Cuneo
CUNEO, GILBERT & LADUCA LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
202-789-3960
jonc@cuneolaw.com

**Lead Counsel for the Indirect Reseller Plaintiffs**

*/s/  William J. Blechman*
William J. Blechman
KENNY NACHWALTER, P.C.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
305-373-1000
wblechman@knpa.com

**Counsel for Kroger Direct Action Plaintiffs**

/s/  *Peter D. St. Phillip, Jr.*
Peter D. St. Phillip, Jr.
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
914-997-0500
pstphillip@lowey.com

**Counsel for Humana, Inc.**

16