**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | MDL 2724 <br> 16-md-2724 <br><br> HON. CYNTHIA M. RUFE <br><br> Civil Action Nos. <br> 18-2401 <br> 18-2533 <br> 18-284 <br> 18-3299 |
| **THIS DOCUMENT RELATES TO:** <br><br> *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc., et al.* <br><br> *West Val Pharm., et al. v. Actavis Holdco U.S., Inc., at al.* <br><br> *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* <br><br> *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | |

**PLAINTIFFS' OPPOSITION**
**TO DEFENDANT WEST-WARD PHARMACEUTICALS CORP.'S**
**MOTION TO DISMISS PLAINTIFFS' OVERARCHING CONSPIRACY CLAIMS**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................... 1

II.    PLAINTIFFS PLEAD FACTS ESTABLISHING WEST-WARD'S
PARTICIPATION IN THE OVERARCHING CONSPIRACY ...................................... 3

    A.    Legal Standard ........................................................................................ 3

    B.    The Conspiratorial Conduct of West-Ward and Other Defendants Was
Interdependent in Nature................................................................................ 3

    C.    Plaintiffs' Allegations Satisfy the Three Factors in *Kelly* for Determining
Whether West-Ward Participated in a "Single Conspiracy." ................................ 8

        1.    West-Ward and Other Defendants Shared a "Common Goal." .................. 9

        2.    West-Ward Continuously Cooperated With its Co-Conspirators to
Achieve Their Common Anticompetitive Goal. ......................................... 9

        3.    West-Ward Sufficiently Overlaps with Other Defendants. ...................... 10

    D.    West-Ward's Other Arguments Also Fail.............................................................. 11

III.    CONCLUSION.......................................................................................................... 15

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................ 3

*BanxCorp v. LendingTree LLC*, No. 10–2467,
  2011 WL 541807 (D.N.J. Feb. 7, 2011) ..................................................................... 14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 3, 6, 14

*Blumenthal v. U.S.*, 332 U.S. 539 (1947)........................................................................ 12

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962).......................... 14

*In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538 (M.D. Pa. 2009) ................. 12

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015) ......................... 4, 12

*In re K-Dur Antitrust Litig.*, No. 01–cv–1652,
  2016 WL 755623 (D.N.J. Feb. 25, 2016) .......................................................... 4, 8, 9

*In re Lithium Ion Batteries Antitrust Litigation*, No. 13-MD-2420,
  2014 WL 309192 (N.D. Cal. Jan. 21, 2014).............................................................. 11

*In re N.J. Tax Sales Certificates Antitrust Litig.*, Civ. A. No. 12-1893,
  2014 WL 5512661 (D.N.J. Oct. 31, 2014) ............................................................... 12

*In re OSB Antitrust Litig.*, No. 06–826,
  2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ............................................................ 14

*In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363 (M.D. Pa. 2008)........ 14

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) ............... 14, 15

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)............................................... 3

*United States v. Adams*, 759 F.2d 1099 (3d Cir. 1985................................................... 13

*United States v. DeVarona*, 872 F.2d 114 (5th Cir. 1989)............................................. 13

*United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989)............................................. passim

*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007) ................................................... 4

*United States v. Padilla*, 982 F.2d 110 (3d Cir. 1992)................................................... 8

*United States v. Rigas*, 605 F.3d 194 (3d Cir. 2010) ........................................................................ 9

*United States v. Theodoropoulos*, 866 F.2d 587 (3d Cir. 1989) ............................................. 10, 13

*United States v. Whitfield*, 215 Fed. Appx. 190 (3d Cir. 2007) ...................................................... 11

**Rules**

Fed. R. Civ. P. 8(a)(2) ........................................................................................................................ 3

Fed. R. Civ. P. 12(b)(6) ...................................................................................................................... 8

## I.   INTRODUCTION

This Court aptly noted that "judging the sufficiency of a pleading is a context-dependent exercise." October 16, 2018 Opinion, Doc. 721 ("Op.") at 36 (citation omitted). Claims that West-Ward conspired to fix prices, allocate markets and/or rig bids for Doxy RR and Digoxin have already been upheld as sufficient in the context of the "Group 1" actions. Op. at 51-53.

EPPs, IRPs, Kroger, and Humana (collectively, "Plaintiffs")[1] have learned more about Defendants' conspiratorial conduct since the "Group 1" actions were filed. Accordingly, Plaintiffs now allege that West-Ward's conduct should be viewed in a broader context—that of an "overarching" conspiracy, "the purpose of which was to raise prices and minimize competition in the generic drug industry for numerous generic drugs" *including* Doxy RR and Digoxin.[2] West-Ward has moved to dismiss those claims. But the Complaints adequately allege West-Ward's participation in a "conspiracy [that] encompassed an agreement among all Defendants that covered all Drugs at Issue, and included subsidiary agreements among certain Defendants relating to individual Drugs at Issue." EPP CAC ¶ 2.

At core, "Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs," and any agreement among Defendants to fix prices on one drug "would not likely hold" if other manufacturers "not party to that agreement entered

---

[1] This Response is filed on behalf of the End-Payer Plaintiffs ("EPPs"), the Indirect Reseller Plaintiffs ("IRPs"), the Kroger Direct Action Plaintiffs ("Kroger"), and Humana, Inc. ("Humana") in support of their Complaints: EPP Class Action Complaint ("EPP CAC"), No. 18-cv-2401, Dkt. No. 2 (June 7, 2018); Humana Amended Complaint ("Humana Compl."), No. 18-cv-3299, Dkt. No. 30 (Dec. 21, 2018); Kroger Amended Complaint ("Kroger Compl."), No. 18-cv-284, Dkt. No. 36 (Dec. 21, 2018); IRP Amended Overarching Complaint ("IRP CAC"), No. 18-cv-2533, Dkt. No. 4 (Dec. 21, 2018).

[2] EPP CAC ¶ 2. EPPs and IRPs refer to their earlier Group 1 Doxy RR and Digoxin pleadings, and specifically allege Doxy RR to be a "Drug at Issue" in the overarching conspiracy; Kroger and Humana allege both Doxy RR and Digoxin to be "Drugs at Issue." *See id.* ¶¶ 286-296, IRP Compl. ¶¶ 71, 126-131, Kroger Compl. ¶¶ 9-10, 387-398, 437-447, Humana Compl. ¶¶ 262-263, 392-406, 423-435 (collectively, the "Complaints").

the market with an intent to compete on price." EPP CAC ¶ 102. In other words, the conspiracy was interdependent in nature. Participants selling certain generic pharmaceuticals agreed to not compete with each other in connection with their sales, but they also refrained from entering and competing in markets where *other* participants selling *other* generic pharmaceuticals had reached similar agreements to not compete in connection with *their* sales. For example, when West-Ward agreed to artificially raise prices for Doxy RR along with co-conspirators Actavis and Sun, it benefited when other Defendants with active or discontinued Doxy RR ANDAs opted not to enter the Doxy RR market (or entered as co-conspirators with inflated prices, as Mylan and Par later did). Likewise, when Heritage and Dr. Reddy's raised the price of Meprobamate, they benefited from cooperative inaction by West-Ward, Actavis, Mylan, Sun, and others with active or discontinued ANDAs for Meprobamate.[3]

West-Ward also misreads, and almost entirely ignores, *United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989). Per the inquiry required by *Kelly* "to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies" (*id.* at 259), West-Ward participated in a *single* conspiracy: Defendants' common goal was to increase profits on drugs they sold with the assurance that hostile acts of legitimate competition from other quarters would not materialize; the scheme required Defendants' continuous cooperation with each other; and the scheme's participants significantly overlapped.

West-Ward's remaining arguments are similarly flawed. The allegations, viewed as a whole, plausibly suggest an "overarching conspiracy" in which West-Ward was a participant. West-Ward's motion to dismiss should be denied.

---

[3] EPP CAC ¶¶ 2, 115. *See* IRP Compl. ¶ 71, Kroger Compl. ¶ 139, Humana Compl. ¶¶ 117-120, 262-263.

II.   **PLAINTIFFS PLEAD FACTS ESTABLISHING WEST-WARD'S PARTICIPATION IN THE OVERARCHING CONSPIRACY**

   A.   **Legal Standard**

In evaluating the sufficiency of a complaint under Rule 12(b)(6), courts "accept all

factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotes and citation

omitted).

   Rule 8 requires "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2). Pleading an antitrust conspiracy only "requires a

complaint with enough factual matter (taken as true) to suggest that an agreement was made,"

and "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In sum, claims asserted and accepted as

true must be "plausible." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

   B.   **The Conspiratorial Conduct of West-Ward and Other Defendants Was Interdependent in Nature.**

Incorporated in Plaintiffs' "overarching conspiracy" Complaints are allegations, already

found plausible by this Court, that in late 2012/early 2013, West-Ward, Actavis, and Sun (and

later, Mylan and Par) conspired to dramatically raise prices for Doxy RR.[4] Even assuming that

West-Ward had been previously unaware of *any* misconduct on the part of *any* generic

manufacturer, it was obviously aware that co-conspirators Actavis and Sun were, as of that time,

---

   [4] *See* Op. at 52-53; EPP CAC ¶¶ 288-296, IRP Compl. ¶¶ 126-131, Kroger Compl. ¶¶ 437-447, Humana Compl. ¶¶ 419-435.

participating in *that* conspiracy. But the Complaints also make clear that the Doxy RR

conspiracy cannot and should not be viewed in isolation:

> All of these Defendants market and sell multiple products. The effectiveness of an
> agreement on any one drug would be limited and unstable without a broader
> agreement that encompassed other drugs as well. For example, an agreement
> between two Defendants to raise prices or to allocate market share on one drug
> would not likely hold where those same two Defendants engaged in vigorous
> price competition on another drug, or where a third manufacturer not party to that
> agreement entered the market with an intent to compete on price. *Therefore,
> Defendants understood that in order to be effective, their agreement needed to
> extend to multiple manufacturers and drugs.*

EPP CAC ¶ 102 (emphasis added). The Complaints thus describe a conspiracy that is

*interdependent*. In this context, "interdependence" refers to "how helpful one individual's

contribution is to another's goals." *United States v. Kemp*, 500 F.3d 257, 289 (3d Cir. 2007). "To

evaluate interdependence, the court engages in an inquiry focused on the extent to which the

success or failure of one conspiracy is independent of a corresponding success or failure by the

other." *In re K-Dur Antitrust Litig.*, No. 01–cv–1652, 2016 WL 755623, at *21 (D.N.J. Feb. 25,

2016) (quotes and citation omitted). Interdependence "serves as evidence of an agreement; that

is, it helps establish whether the alleged coconspirators are 'all committed to the same set of

objectives in a single conspiracy.'" *Kemp*, 500 F.3d at 289 (quotes and citation omitted).[5]

At the time West-Ward joined with Actavis and Sun in artificially increasing the price of

Doxy RR, Mylan, Par and Citron had active ANDAs, and Teva had a discontinued ANDA, for

Doxy RR.[6] This meant that these potential competitors had already cleared a significant barrier

---

[5] This is distinct from "the economic theory of interdependence, which recognizes the
differences between competitive markets (markets with many smaller firms) and oligopolistic
markets (concentrated markets with only a few firms)." *In re Chocolate Confectionary Antitrust
Litig.*, 801 F.3d 383, 397 (3d Cir. 2015). *See also* Op. at 57-58 (referring to economic concept of
oligopolistic interdependence).

[6] Discontinued ANDAs "can be re-activated with relative ease." EPP CAC ¶ 115 n.52.
Companies also can purchase or license existing ANDAs. *See* EPP CAC ¶ 114.

to entry—the years-long "intense application process" required to obtain an ANDA. EPP CAC ¶ 646. Mylan and Par are alleged to have actively participated in the Doxy RR conspiracy by later entering the market at artificially high prices. But those same high prices represented an opportunity for Citron and Teva to enter the market and undercut a rival's price, steal market share, and profit from newfound sales. Yet Plaintiffs' pricing charts demonstrate that did not happen; would-be competitors did not enter market.[7] In a similar fashion, Heritage and Dr. Reddy's are alleged to have conspired to raise the price of Meprobamate. West-Ward and Doxy RR co-conspirators Actavis, Mylan, and Sun had active or discontinued Meprobamate ANDAs, as did Defendants Lannett, Perrigo, Sandoz, Taro, and Teva. These would-be competitors did not enter the market. *See* EPP CAC ¶¶ 115, 396. Heritage, Dr. Reddy's, and Par are also alleged to have conspired to raise the price of Zoledronic Acid.[8] Doxy RR co-conspirators West-Ward, Actavis, Mylan, and Sun, and Defendant Teva, had active or discontinued Zoledronic Acid ANDAs. These would-be competitors did not enter the market. *See* EPP CAC ¶ 115. More recently, Zydus has obtained a Doxy RR ANDA and Apotex and Aurobindo have obtained Zoledronic Acid ANDAs, thus demonstrating that Defendants can and do enter new markets when they want to do so. *Id*.

Again and again the Complaints both document Defendants' efforts to fix, maintain, or stabilize prices for the drugs they sold, and reveal repeated instances of strategic *in*action— Defendants not availing themselves of opportunities to enter or re-enter markets and "price their products below the prevailing market price in order to gain market share." EPP CAC ¶ 118 (quote and citation omitted). Rather, the common "responsibility shared by all defendants" was

---

[7] *See* Kroger Compl. ¶¶ 442-443; Humana Compl. ¶¶ 425-428; *see* DX EPP CAC ¶¶ 81, 85-92, DX IRP Compl. ¶¶ 77-93.

[8] *See* EPP CAC ¶¶ 371-393, IRP Compl. ¶¶ 148-157, Kroger Compl. ¶¶ 778-785.

to stay out of each other's markets. Kroger Compl. ¶ 185. *See also id.* ("responsible companies

… don't go into the market place"); Humana Compl. ¶ 265 (Defendants agreed to "trade large

customers" to achieve an "artificial equilibrium" and create a "stable market"). Cooperation thus

avoided a "chase to the bottom" on price. Humana Compl. ¶ 231.

The pervasive lack of competitive responses to the conspiratorial pricing conduct of

others demonstrates the interdependent nature of the conspiracy. West-Ward "played fair" by

conspiring to sell Doxy RR at an inflated price, but it also "played fair" by *not* entering the

Meprobamate or Zoledronic Acid markets at competitive prices. Here, "viewed in light of

common economic experience"—which in generic drug markets is low and stable pricing—the

sudden and extreme price increases in multiple markets, coupled with the lack of competitive

responses in those markets, give rise to a plausible inference of collusion. *Twombly*, 550 U.S. at

565.[9] West-Ward thus clearly understood that Actavis and Sun were not its *only* co-conspirators,

that Doxy RR and Digoxin were not the *only* drugs over which manufacturers were conspiring,

and that the interdependent nature of the overarching conspiracy was critical to its success.

Indeed, the conspirators were so intertwined that even drugs a particular Defendant did

not sell *or* hold an ANDA for could nevertheless influence the success of the conspiracy as it

related to a product that Defendant *did* sell. For example, as noted above, Citron did not utilize

its Doxy RR ANDA (obtained through Chartwell Lifesciences, LLC) to enter the market and

undercut inflated prices charged by West-Ward and its co-conspirators. Had Citron instead

engaged in the hostile act of legitimately competing in the Doxy RR market, West-Ward could

not immediately retaliate; West-Ward did not hold an ANDA for any Drug at Issue sold by

Citron. But Actavis, a Doxy RR co-conspirator, did. Actavis conspired with Citron in the market

---

[9] *See* Kroger Compl. ¶ 231 ("Each of the conspiratorial price increases would have been
against each Defendant's self-interest if taken unilaterally and without advance agreement.").

for Glyburide Metformin; Actavis held an ANDA for Glyburide; Actavis held a discontinued ANDA for Fosinopril-HCTZ. *See* EPP CAC ¶ 115. Even if West-Ward itself could not keep Citron in check, West-Ward would benefit from Actavis's interdependent connections with Citron.

To illustrate Defendants' interdependence, and West-Ward's "competitive overlap" in particular, reproduced below is a modified version of the graphic from paragraph 116 of the EPP Complaint showing Defendants' common ANDAs, highlighting West-Ward's connections:



West-Ward has ANDAs in common with at least fourteen of its co-Defendants, including Actavis, Heritage, and Mylan, each of which have ANDAs in common with *every other Defendant*. This Court has already found that plausibly alleged contacts among the Group 1 Defendants (including West-Ward) created a "web of connections" among them such that various government investigations and guilty pleas by Heritage executives described in the

Group 1 complaints "are probative of *broadly anticompetitive conduct in the generic pharmaceutical industry*." Op. at 63 (emphasis added).[10] Plaintiffs' "overarching conspiracy" Complaints describe a web of connections among Defendants (including West-Ward) that is exponentially more intertwined and complex. The overlapping connections demonstrate that Defendants' anticompetitive conduct is not simply broad in scope, but inextricably interconnected and interdependent.

**C.      Plaintiffs' Allegations Satisfy the Three Factors in *Kelly* for Determining Whether West-Ward Participated in a "Single Conspiracy."**

*United States v. Kelly* sets forth three factors that courts analyze to determine whether conspiratorial conduct constitutes separate, unrelated conspiracies or a single overarching conspiracy. *Kelly*, 892 F.2d at 259. The factors are: (1) whether defendants shared a "common goal"; (2) whether defendants' conduct was "necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture"; and (3) whether defendants "overlap in [their] various dealings." *Id.*[11] Notably, the term "interdependence" does not appear in *Kelly*. However, *In re K-Dur*, 2016 WL 755623, at *18, notes (in the summary judgment context) that plaintiffs' evidence must "tend[] to show" interdependence with respect to *Kelly*'s first two factors. 2016 WL 755623 at *21. Plaintiffs' allegations satisfy all three factors.

---

[10] Although the Group 1 Complaints contained "no allegations…that West-Ward received subpoenas," Op. at 22, West-Ward's parent company, Hikma Pharmaceuticals, recently disclosed that it **has** received DOJ and State subpoenas. *See* Hikma 2018 Annual Report at 157 ("In 2017, the Group had received a subpoena from a US state attorney general and a subpoena from the US Department of Justice.") (emphasis added) (*available at* https://www.hikma.com/media/2187/hikma_ar2018_full-ar.pdf).

[11] That said, the Third Circuit does not require plaintiffs to mechanically plead all three factors to survive Rule 12(b)(6). *See In re K-Dur*, 2016 WL 755623, at *18 ("'The absence of one [*Kelly*] factor does not necessarily defeat an inference of the existence of a single conspiracy.'") (quoting *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992)).

### 1.   West-Ward and Other Defendants Shared a "Common Goal."

"[I]n considering whether the defendants had a common goal, we look to the underlying

purpose of the alleged criminal activity." *United States v. Rigas*, 605 F.3d 194, 214 (3d Cir.

2010).[12] Defendants' common goal was to increase profits on drugs they sold with the assurance

that hostile acts of legitimate competition from other quarters would not materialize.[13] This

common goal was governed by "rules" dictating the mutual understanding that Defendants "play

fair" and "play nice in the sandbox." EPP CAC ¶¶ 124, 254. *See* IRP CAC ¶ 71, Kroger Compl.

¶ 139, Humana Compl. ¶ 264.

With respect to interdependence, as discussed in Section II.B. above, Plaintiffs'

allegations demonstrate West-Ward's and other Defendants' extensive interdependence in

effectuating the overarching conspiracy to their mutual benefit. The interconnectedness among

Defendants, the products they sold, and the ANDAs for products they did not sell, was a driving

feature of the success of the conspiracy as a whole. Different Defendants sold different products,

but their common purpose was to charge supracompetitive prices without the constraints

imposed by other competitors "enter[ing] the market with an intent to compete on price." EPP

CAC ¶ 102.

### 2.   West-Ward Continuously Cooperated With its Co-Conspirators to Achieve Their Common Anticompetitive Goal.

Plaintiffs have also pleaded facts to meet *Kelly*'s second factor, *i.e.*, whether "the

agreement contemplated bringing to pass a continuous result that will not continue without the

continuous cooperation of the conspirators." *Kelly*, 892 F.2d at 259 (citation omitted). Activities

---

[12] "[C]ourts treat civil and criminal conspiracies alike—apart of course from standard of proof and other respects in which civil and criminal procedure differ". *In re K-Dur*, 2016 WL 755623, at *18 (quotes and citation omitted).

[13] *See generally* EPP CAC ¶¶ 2, 5, 6, 12, 122, IRP CAC ¶¶ 2, 67, 68, 71, Kroger Compl. ¶¶ 9, 10, 12, Humana Compl. ¶¶ 12, 262, 263, 265-268.

"necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture" satisfy this factor. *Id*. (citation omitted).

"In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share." EPP CAC ¶ 118. Defendants created, and through "continuous cooperation" maintained, via the "rule" of "play[ing] nice in the sandbox," a generic drug landscape that was *not* competitive. The Complaints allege facts demonstrating that is precisely what West-Ward and its co-conspirators did. *See* EPP CAC ¶¶ 12-14, 120-126, 128-181, IRP CAC ¶¶ 68, 70-73, 75-324, Kroger Compl. ¶¶ 9-10, 21, 147-226, Humana Compl. ¶¶ 12, 262-263, 269-714.

Here too, the interdependent nature of Defendants' overarching scheme is manifest. Defendants' agreement "extend[ed] to multiple manufacturers and drugs." EPP CAC ¶ 102, Humana Compl. ¶ 262; *see* IRP CAC ¶ 71, Kroger Compl. ¶ 137. West-Ward conspired with others to illegally maintain high prices for Doxy RR, Op. at 51-53, and the strategic inaction of other Defendants with Doxy RR ANDAs was advantageous to West-Ward's success, just as West-Ward's strategic inaction with respect to Meprobamate and Zoledronic Acid, for example, was advantageous to other Defendants' successful manipulation of those markets. *See* EPP CAC ¶¶ 385, 387, 391-393; IRP CAC ¶ 153.

### 3.     West-Ward Sufficiently Overlaps with Other Defendants.

The third *Kelly* factor looks to "the extent to which the participants overlap in the various dealings." *Kelly*, 892 F.2d at 259. Plaintiffs satisfy this factor.

Plaintiffs will not repeat here the significant overlap between West-Ward and other Defendants described in Section II.B. It is worth noting, however, that Plaintiffs "'need not prove that each defendant knew all the details, goals, or other participants' in order to find a single conspiracy." *Id*. at 260 (quoting *United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir.

1989)). *See also In re Lithium Ion Batteries Antitrust Litig.,* No. 13-MD-2420, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) (recognizing single conspiracy to inflate the prices of various types of batteries that not all defendant manufacturers made).

It is also worth noting that West-Ward and other Defendants also overlapped with each other through their extensive opportunities to conspire:

- West-Ward attended the 2012 ECRM Retail Pharmaceutical Conference and the HDMA Business Leadership Conference with Actavis, Sun, and Heritage; months later, it joined Actavis and Sun in increasing Doxy RR prices. EPP CAC ¶ 152.

- West-Ward executives attended HDMA's June 2013 Business and Leadership Conference, along with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mylan, Par, Sandoz, Sun, Teva, and Zydus. EPP CAC ¶ 350.

- West-Ward representatives attended the NACDS Total Store Expo on August 10-13, 2013 along with executives from Heritage, Lannett, Sun, Aurobindo, Apotex, Zydus, and representatives from Actavis, Dr. Reddy's, Glenmark, Par, Perrigo, Sandoz, Taro, and Teva. EPP CAC ¶¶ 161, 355.

- West-Ward representatives attended 2014 ECRM Retail Pharmacy Conference, along with executives from Heritage, Sun, Apotex, and representatives from Actavis, Citron, Dr. Reddy's, Lannett, Mayne, Par, Perrigo, Sandoz, Taro, Teva, and Zydus. EPP CAC ¶ 168.

Plaintiffs have sufficiently shown significant overlap between West-Ward and other Defendants. In light of the foregoing, Plaintiffs have plausibly alleged West-Ward's participation in a single overarching conspiracy.

### D.      West-Ward's Other Arguments Also Fail

Given its participation in a single, interdependent conspiracy, West-Ward's lament that no Complaint "pleads allegations connecting West-Ward to a larger, overarching agreement that goes beyond the alleged individual Doxy RR and Digoxin conspiracies" (Def. Br. at 2) is flatly wrong. *See United States v. Whitfield*, 215 Fed. Appx. 190, 191-92 (3d Cir. 2007) (information "support[ing] an inference" that the "lookout" for a "single burglary" knew of other defendants'

involvement in a "larger" conspiracy was sufficient to find that the "lookout" conspired in a two-year long crime spree that "involved … over fifty burglaries, armed robberies, and related crimes." *See also Blumenthal v. U.S.*, 332 U.S. 539, 558 (1947) (defendants alleged to have aided a conspiracy through separate individual acts "knew or must have known that others unknown to them were sharing in so large a project"); *In re N.J. Tax Sales Certificates Antitrust Litig.*, Civ. A. No. 12-1893, 2014 WL 5512661, at *8 (D.N.J. Oct. 31, 2014) (allegations of collusion at individual auctions considered in establishing a larger overarching conspiracy).

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015) (Def. Br. at 13) does not help West-Ward. The case deals with summary judgment, not a pleadings motion, and the issue—the use of a separate *foreign* conspiracy with *non*-U.S. actors to prove the existence of a domestic U.S. antitrust conspiracy—is factually distinct from this case. Worth noting, however, is that at the pleading stage, even the foreign conspiracy worked in *plaintiffs'* favor. *See In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 548-49 (M.D. Pa. 2009) (plaintiffs adequately pleaded a price-fixing conspiracy in part because of allegations regarding the contemporaneous foreign conspiracy).

In *Chocolate*, the Third Circuit also commented on a scenario (ignored by West-Ward), factually closer to this case, that supports Plaintiffs: "if two markets are sufficiently similar or adjacent and the relevant activities therein are sufficiently linked or tied in some way, *e.g.*, the people involved in the conspiracies are the same or overlapping, it may be reasonable to use evidence of a foreign conspiracy to support an inference of a domestic conspiracy." *In re Chocolate*, 801 F.3d at 403. Here, West-Ward joined Actavis and Sun in raising prices on Doxy RR not long after Actavis (i) successfully hiked prices on Nystatin Cream, with Perrigo, Par, and Taro, and (ii) successfully hiked prices on Nystatin Ointment, with Perrigo and Sandoz. *See* EPP

12

CAC ¶¶ 189-195, 204-209. West-Ward later joined an ongoing Digoxin conspiracy (with an

overlapping group of co-conspirators) by entering the market at an inflated price, and witnessed

others join the Doxy RR and Digoxin conspiracies by entering at inflated prices. EPP CAC ¶¶

166, 170, 294-295; DG EPP CAC ¶¶ 78-83; Humana Compl. ¶¶ 395, 397-402; Kroger Compl. ¶¶

392-394. West-Ward also observed, but did nothing about, price hikes by Heritage and Dr.

Reddy's on Meprobamate, and by Heritage, Dr. Reddy's, and Par on Zoledronic Acid, despite

having ANDAs (one active and one discontinued) for both drugs, and West-Ward's own

conspiratorial conduct was buoyed by ANDA holders who likewise stayed on the sidelines. *See*

EPP CAC ¶ 406, IRP CAC ¶ 168, Kroger Compl. ¶ 654; *see* EPP CAC ¶¶ 385, 391, IRP CAC ¶¶

153, 156-157, Kroger Compl. ¶ 782. Throughout this entire time period, West-Ward had and

took advantage of numerous opportunities to meet with all of its co-Defendants at trade meetings

and other industry events. *See, e.g.*, Kroger Compl. Exh. 3.  It is therefore plausible to infer

West-Ward's participation in the alleged overarching conspiracy. Indeed, the notion that a

benighted West-Ward could participate in or witness these and other events and not be "aware"

of an overarching conspiracy strains credulity.

West-Ward's litany of things that "no complaint alleges" concerning its communications

or its actions (Def. Br. at 3) cannot mask its interdependent involvement in the overarching

conspiracy. Critically, a plaintiff "'need not prove that each defendant knew all the details, goals,

or other participants' in order to find a single conspiracy." *Kelly*, 892 F.2d at 260 (quoting

*Theodoropoulos*, 866 F.2d at 593)). "A single conspiracy finding does not require every member

to participate in every transaction." *United States v. DeVarona,* 872 F.2d 114, 119 (5th Cir.

1989); *United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir. 1985) (argument of defendant, who

dealt only with one conspirator, that he had no connection with larger conspiracy rejected on

13

ground that "[k]nowledge of all the particular aspects, goals, and participants of a conspiracy ...

is not necessary to sustain a conviction").

Moreover, West-Ward's parsing of the Complaints to focus solely on its own conduct is

improper. "[I]n the context of a multi-defendant, multi-faceted conspiracy, the conspiracy must

not be 'compartmentalized.'" *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709,

718 (E.D. Pa. 2011). Rather, Plaintiffs' Complaints must be viewed "as a whole." *Id.* (quoting

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). *See also In

re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008)

("Nothing in *Twombly*, however, contemplates this 'dismemberment' approach to assessing the

sufficiency of a complaint. Rather, a district court must consider a complaint in its entirety

without isolating each allegation for individualized review.").

West-Ward's "group pleading" argument (Def. Br. at 5-6) is also misplaced. First, the

Complaints contain (or incorporate by reference) specific allegations concerning West-Ward's

(and other Defendants') coordinated pricing activities, ANDAs, and opportunities to conspire

(*see generally* Sections II.B. and II.C.3., above), and thus they plausibly "allege that each

individual defendant joined the conspiracy and played some role in it." *BanxCorp v.

LendingTree LLC*, No. 10–2467, 2011 WL 541807, at *7 (D.N.J. Feb. 7, 2011) (quotes and

citation omitted). But it is also the case that "antitrust conspiracy allegations need not be detailed

on a defendant-by-defendant basis." *In re Processed Eggs*, 821 F. Supp. 2d at 719. *See In re OSB

Antitrust Litig.*, No. 06–826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) (same).

"Individual defendants must have reasonable, not exhaustive, notice of the allegations, and such

notice is achieved when the plaintiff states a plausible claim for relief against those defendants."

*In re Processed Eggs*, 821 F. Supp. 2d at 719. Reasonable notice is satisfied when a complaint

14

"plausibly suggest[s] that the individual defendant actually joined and participated in the conspiracy." *Id.*

Finally, with respect to the Kroger and Humana complaints, West-Ward mistakenly argues that there are insufficient allegations that West-Ward joined a "general" doxycycline conspiracy, as opposed to its established involvement in the Doxy RR conspiracy. If, as set forth above, the complaints adequately allege West-Ward's involvement in the overarching drug conspiracy, the precise scope of the sub-conspiracies within that overarching conspiracy is largely moot. In any event, Kroger and Humana have alleged interdependence among the markets for the three Doxycycline products. *See, e.g.,* Humana Compl. ¶ 488 ("In February 2013, Heritage learned from a customer that demand for some Doxycycline products was increasing and wanted to use this as a pretext to raise the prices of Doxy Mono."). The three products also have overlapping participants, with Heritage and Mylan selling Doxy DR and Doxy Mono, while Par sells Doxy Hyclate and Doxy Mono. *See, e.g,* Humana Compl. ¶ 422.

West-Ward also is mistaken in its assertion that Kroger and Humana do not also allege a Doxy RR conspiracy. While the charging allegations combine the three doxycycline products for the avoidance of repetition, Humana Compl. ¶¶ 1157-1200, the factual allegations state sufficient facts to establish separate conspiracies for all three doxycycline products, *id.* ¶¶ 423-435 (Doxy RR), ¶¶ 436-487 (Doxy DR), & 488-521 (Doxy Mono). Thus, West-Ward's attempt to obtain dismissal even as to Doxy RR lacks merit.

## III.    CONCLUSION

For the foregoing reasons, EPPs, IRPs, Kroger, and Humana respectfully request that West-Ward's motion to dismiss Plaintiffs' overarching conspiracy claims be denied.

Dated:  May 2, 2019                                Respectfully submitted,


/s/  *Roberta D. Liebenberg*                       /s/  *Jonathan W. Cuneo*
Roberta D. Liebenberg                              Jonathan W. Cuneo
FINE, KAPLAN AND BLACK, R.P.C.                     CUNEO, GILBERT & LADUCA LLP
One South Broad Street, 23rd Floor                 4725 Wisconsin Ave. NW, Suite 200
Philadelphia, PA 19107                             Washington, DC 20016
215-567-6565                                       202-789-3960
rliebenberg@finekaplan.com                         jonc@cuneolaw.com

**Liaison and Lead Counsel for the End-Payer**     **Lead Counsel for the Indirect Reseller**
**Plaintiffs**                                     **Plaintiffs**


/s/  *William J. Blechman*                         /s/  *Peter D. St. Phillip, Jr.*
Richard Alan Arnold                                Peter D. St. Phillip, Jr.
William J. Blechman                                LOWEY DANNENBERG, P.C.
KENNY NACHWALTER, P.C.                             44 South Broadway, Suite 1100
1441 Brickell Avenue, Suite 1100                   White Plains, NY 10601
Miami, FL 33131                                    914-997-0500
305-373-1000                                       pstphillip@lowey.com
rarnold@knpa.com
wblechman@knpa.com

                                                    /s/ *Todd M. Schneider*

**Counsel for Kroger Direct Action Plaintiffs**   Todd M. Schneider
                                                   SCHNEIDER WALLACE COTTRELL
                                                   KONECKY WOTKYNS LLP
                                                   2000 Powell Street, Suite 1400
                                                   Emeryville, California 94608
                                                   Tel.: 415-421-7100
                                                   tschneider@schneiderwallace.com

                                                   **Counsel for Humana, Inc.**