# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | MDL 2724<br>16-md-2724<br>HON. CYNTHIA M. RUFE |
| **THIS DOCUMENT RELATES TO:** | Civil Action Nos. |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc. et al.* (DPPs) | 18-cv-2641 |
| *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc. et al.* (EPPs) | 18-cv-2401 |
| *West Val Pharm., et al. v. Actavis Holdco U.S., Inc. et al.* (IRPs) | 18-cv-2533 |
| *State of Connecticut, et al. v. Actavis Holdco U.S. Inc.* | 17-cv-3768 |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc.* | 18-cv-284 |
| *Humana Inc. v. Actavis Elizabeth, LLC et al.* | 18-cv-3299 |

## PLAINTIFFS' JOINT OPPOSITION

## TO DEFENDANT ZYDUS PHARMACEUTICALS (USA) INC.'S

## INDIVIDUAL MOTION TO DISMISS OVERARCHING CONSPIRACY CLAIMS

Plaintiffs[1] respectfully submit this memorandum of law in opposition to Defendant Zydus Pharmaceuticals (USA), Inc.'s ("Zydus") Individual Motion to Dismiss Plaintiffs' "Overarching Conspiracy" Claims.[2]

## I. INTRODUCTION

This Court has already deemed plausible Plaintiffs' allegations that Zydus conspired with Dr. Reddy's, Par, and Mylan to increase divalproex prices and that Zydus conspired with Apotex, Glenmark, Lupin, Sandoz/Fougera and Teva to increase pravastatin prices. *In re Generic Pharmaceuticals Pricing Antitrust Litig.* ("*Generics*"), 338 F. Supp. 3d 404, 452 (E.D. Pa. Oct. 16, 2018). In the overarching conspiracy complaints at issue here, Zydus is also accused of having conspired with Heritage and Teva to maintain and increase the prices of the epilepsy drug acetazolamide, and it does not seek dismissal of claims related specifically to that allegation.[3] By its motion, Zydus seeks only to be excused from any joint and several liability because, while there might have been an overarching conspiracy operating at the same time that Zydus was conspiring, and that overarching conspiracy would have involved all of Zydus's immediate co-conspirators, it is simply not plausible, Zydus argues, that its anticompetitive conduct regarding

---

[1] This brief in opposition is filed by the Direct Purchaser Plaintiffs ("DPPs"), the End Payer Plaintiffs ("EPPs"), the Indirect Reseller Plaintiffs ("IRPs"), the State Attorneys General ("States"), the Kroger Plaintiffs ("Kroger"), and Humana Inc. ("Humana") and addresses the following complaints: DPP Consolidated Amended Compl. ("DPP CAC"), 18-cv-2641, Dkt. 1; EPP Class Action Compl. ("EPP CAC"), 18-cv-2401, Dkt. 1; IRP Amended Overarching Compl. ("IRP AOC"), 18-cv-2533, Dkt. 4; Plaintiff States' Consolidated Amended Compl. ("States' CAC"), 17-cv-3768, Dkt. 15; Kroger Amended Compl. ("Kroger AC"), 18-cv-284, Dkt. 37; and Humana Amended Complaint ("Humana AC"), 18-cv-3299, Dkt. 30.

[2] The Zydus Brief is on each of these dockets, and can be found at, for example, 18-cv-2533, Dkt 40-1.

[3] Zydus Brief at 2 ("Zydus asks that the Court dismiss the overarching complaints as to Zydus to the extent Plaintiffs seek to impose joint and several liability for the alleged overarching conspiracy.").

1

multiple drugs was part of this conspiracy. Zydus would prefer that it be dismissed from the overarching conspiracy without testing Plaintiffs' allegations. However, this is a case where Plaintiffs have stated enough facts to raise a reasonable expectation that discovery will reveal evidence of Zydus's participation in an overarching illegal agreement.

Zydus essentially argues that, for years, it remained oblivious to broader misconduct even as it made deals to fix the prices of, and allocate markets for, acetazolamide, pravastatin and divalproex. Because the standard here is plausibility of inferences, and Zydus's interpretation of the allegations is beyond implausible, Zydus's motion should be denied, and Plaintiffs should have a chance to prove what they allege: Zydus was imbricated with the other MDL Defendants in an overarching conspiracy.

## II. LEGAL STANDARD

The only claim Zydus seeks to dismiss is the claim that Zydus was a participant in an overarching code of conduct to manipulate the prices of generic drugs in the United States. Since the foundational plausibility of Plaintiffs' allegations about Zydus's drug-specific conduct is not in question, the only issue is whether Plaintiffs have adequately alleged that these events were episodes in a unified conspiracy.

The Third Circuit has identified three factors to assess whether conspiratorial conduct constitutes separate, unrelated conspiracies or a single overarching conspiracy: whether defendants (1) shared a "common goal;" (2) achieved a "continuous result" through "continuous cooperation," i.e., acted interdependently; and (3) "overlap in [their] various dealings." *U.S. v. Kelly*, 892 F.2d 255, 259 (3d. Cir 1989). *See also* Plaintiffs' Joint Opposition to Defendants' Joint Motion to Dismiss, to be filed concurrently with this brief, on each docket.

Plaintiffs have alleged facts from which one could reasonably infer that, after discovery, each of these factors will be entirely satisfied. And even if, in this Court's judgment, the Plaintiffs' complaints fall short of offering reasonable hope for the satisfaction of each factor, "[t]he absence of one [*Kelly*] factor does not necessarily defeat an inference of the existence of a single conspiracy." *U.S. v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

### III. ARGUMENT: PLAINTIFFS PLAUSIBLY ALLEGE THAT ZYDUS JOINED AN OVERARCHING CONSPIRACY

Plaintiffs allege that Defendants reached an agreement, in which "each generic drug manufacturer was entitled to its fair share of the market … so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of many dozens (if not hundreds) of generic drugs." DPP CAC ¶ 9; *see, e.g.,* EPP CAC ¶102-104; IRP AOC ¶; Kroger Opposition to Defendants' Joint MTD (discussing DPPs' overarching conspiracy allegations as to Zydus and why they are sufficient).  This Court has already concluded, with respect to the non-futility of amending the States' Complaint, that "it is plausible to infer that there was a broader conspiracy." *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, ("*In re Generics*"), 315 F. Supp. 3d at 853 (E.D. Pa. June 5, 2018).  The same conclusion should apply to Zydus's motion to dismiss the overarching conspiracy claims in the complaints at issue here.

#### A. ZYDUS SHARED A COMMON GOAL WITH ALL OF ITS CO-CONSPIRATORS

 "To determine whether the conspirators shared a common goal, 'we look to the underlying purpose of the alleged criminal activity' in a fairly broad sense." *U.S. v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019) (quoting *U.S. v. Rigas*, 605 F.3d 194, 214 (3d Cir. 2010) (en banc)).

Zydus and its co-Defendants know that when generic drug competition is working properly, the price of a given drug should decrease further and further with each additional manufacturer. States' ¶5.  The common goal of their "fair share" conspiracy was to break this

competitive trend and ensure that prices remained elevated despite, for example, the arrival of new market entrants. *See* EPP CAC ¶¶2- 6, 12, 122; IRP AOC ¶¶2, 66-70; Kroger AC ¶¶9- 12, 118; Humana AC ¶¶12, 262-268. The complaints contain ample illustrative evidence of a widespread agreement premised on the concept of fair share, which is an understanding that newcomers should seek only a proportional share of the market, and incumbents should cede some market share by, for example, walking away from customers so long as the newcomer does not "trash the market" by offering lower prices. IRP AOC ¶66; EPP CAC ¶124, 254; Kroger AC ¶139.

The complaints also allege that, in some instances, this same overall understanding led to extraordinary parallel price increases on numerous generic drugs. In a "fairly broad sense," respecting the boundaries of fair share was the gist of the conspiracy, but once a set of defendants had collectively cornered a drug market—leaving prices unmoored from competition—they did not resist the temptation of helping themselves to higher and higher profits. *See, e.g.* IRP AOC ¶6; Kroger AC ¶139; States' CAC ¶99-101. This required communication of assurances that price increases would not be undercut, which is a purpose of the fair share understanding.

Zydus argues that there are "no allegations sufficient to support a finding that Zydus was aware of a larger conspiracy." Zydus Brief at 5. The proper standard is instead whether the totality of the allegations, with all inferences drawn in favor of Plaintiffs, make it at least plausible that Zydus was aware of the common goal of a larger conspiracy when it engaged in anticompetitive conduct as to at least divalproex, pravastatin, and acetazolamide. *In re Generics*, 338 F. Supp. 3d at 438 (citing *In re Processed Egg Prod. Antitrust Litig.*, 821 F.Supp.2d 709, 720 (E.D. Pa. 2011) ("the conspiracy must not be 'compartmentalized.'")).

4

Plaintiffs' complaints offer several satisfactory allegations. For example, Zydus was separately contacted by two other MDL Defendants, Heritage and Teva, in the weeks leading up to price increases in 2014. On April 15, 2014, Teva's Nisha Patel agreed with confessed conspirator Jason Malek that Teva would follow Heritage's price increases for acetazolamide (among other drugs). States' CAC ¶ 297-299; IRP AOC ¶297; EPP CAC ¶435; DPP CAC ¶154; Kroger AC ¶245. Zydus, the other acetazolamide capsule competitor at the time, got a call from Ms. Patel the very next day. Speaking for Zydus was Kevin Green, a senior director of National Accounts, and although they spoke for nearly twenty minutes, Mr. Green called Ms. Patel to speak with her again a day later. DPP CAC ¶155; IRP CAC ¶180; EPP CAC ¶437. In the following weeks, Mr. Malek closed the loop by contacting Zydus via Kristy Ronco, its Vice President of Sales, who invited Malek to call her "anytime." States' CAC ¶299; DPP CAC ¶158; IRP AOC ¶182. From Zydus's multiple contacts with these two conspirators, who are each alleged to have been in the thick of the conspiracy, it is plausible to infer that the Zydus employees were aware that their conspiratorial agreements were part of a larger pattern, and that their participation strengthened the trust and efficiency of this larger anticompetitive enterprise and made them complicit in it.

Zydus employees are also alleged to have attended social events where women in the generic drug industry gathered for the explicit purpose of networking and exchanging 'intel,' including one 'Girls' Night Out' in Baltimore in May 2015, which was attended by executives from Citron, Heritage, Dr. Reddy's and Teva, among others. States' CAC ¶88; Kroger AC ¶168. And on top of all these conversations during which, one could infer, Zydus became aware of the scope of the overarching conspiracy, Zydus held a seat on the board of Defendants' lobbying

5

group, the Generic Pharmaceuticals Association ("GPhA")[4] during the span of the events alleged in the complaints (2012-2016). *See* Kroger AC ¶157. The GPhA board included, among others, executives from Zydus's alleged co-conspirators Apotex, Dr.Reddy's, Lupin, Mylan, Par, Sandoz, Teva, as well as admitted conspirator Jeff Glazer, CEO of Heritage. *Id.*

Moreover, this Court has already sustained complaints that allege that, by the time of these communications with Teva and Heritage in 2014, Zydus had already joined sub-agreements regarding divalproex and pravastatin, *In re Generics*, 338 F. Supp. 3d at 452, and in the overarching complaints, Plaintiffs allege that all these sub-agreements shared a common goal. *See*, *e.g.*, IRP AOC ¶2 ("anticompetitive conduct alleged in previously-filed actions and the actions described herein were all acts in furtherance of an overarching conspiracy"); DPP ¶9 ("an industry-wide, overarching "fair share" conspiracy … involving at least the Named Generic Drugs [in the DPP OC] and the numerous generic drugs previously-filed on."). In summer 2013 Zydus matched its competitors' price increases for divalproex and pravastatin. These prices were 300% and 200% above the pre-conspiracy prices, but Zydus had no need to offer low prices because the fair share system allowed Zydus to gain some market share even at a higher price. *See*, *e.g.*, Kroger AC ¶416, 720.  It is plausible to infer that when the phone rang in 2014, Zydus was already committed to the fair share conspiracy's common goal of preventing price erosion and promoting baseless price increases.

Finally, there is another reason to infer that Zydus must have been aware of the broader conspiracy, and therefore aware that, by arranging the sub-agreements, it was abetting the common goal of a broader anticompetitive scheme: the massive, glaring price increases across the industry.  In late 2013, Zydus publicly admitted its awareness that the competitive climate

---

[4] The GPhA, is today known as the Association for Accessible Medicines ("AAM").

6

had changed, that "pricing pressure" had abated so much so that "on selective products we are able to actually up the price," and that this "trend" was "likely to continue" given the "revised wisdom" of the generic drug industry. Kroger AC ¶226.

Zydus concedes that the complaints "specifically allege that employees from Heritage and Teva contacted employees at Zydus for the purpose of entering into a price fixing agreement" but argues in a footnote that "there are no direct allegations that anyone at Zydus ever agreed." Zydus Br. at 6. This is a slender reed that cannot resist the heft of Plaintiffs' allegations. After having spoken with both Teva and Zydus, Jason Malek, who is specifically alleged to have been "responsible for communicating with Zydus," confirmed in writing that his company Heritage had obtained "buy in from all to go up" on acetazolamide pricing. States' ¶298-300. This is dispositive evidence of agreement, and so Zydus only meekly criticizes—but does not seek dismissal of—these acetazolamide-specific allegations.

Zydus also argues that Plaintiffs' allegations pointing to a common goal are insufficient, as they were in *Auto Parts*, 12-CV-203, 2016 WL 8200512, at *4 (E.D. Mich. Apr. 13, 2016), but this Court has already rejected that comparison in its earlier opinion granting permission to amend the States' complaint to add a theory of overarching conspiracy. *In re Generics*, 315 F. Supp. 3d at 854.

Next, Zydus claims that there was no common goal because "the Overarching Complaints are devoid of any factual allegations that Zydus … engaged in any unlawful actions with any of the defendants who do not manufacture or market acetazolamide." Zydus Br. at 6. This, too, is false, because the Kroger and Humana complaints contain factual allegations that Zydus was engaged in the pravastatin and divalproex sub-schemes, and the IRP, DPP and EPP complaints all incorporate these allegations by reference, as mentioned above. And even if that

7

were not the case, Plaintiffs "need not prove that each [conspirator] knew all of the conspiracy's details, goals, or other participants" in order to demonstrate the existence of a single overall conspiracy. *U.S. v Rodriguez*, 726 F. App'x 136, 142 (3d Cir. 2018).

The Defendants may have huddled in various different side-chapels, whispering about different drugs, but they were all parishioners of the same "fair share" church, a single congregation united by their common belief in fair share. In the context of the allegations already sustained in this MDL, Zydus has been plausibly alleged to have conspired, during the key years of the conspiracy, with many other MDL Defendants regarding multiple drugs, including with Defendants who left dozens of emails and texts evincing the conspiracy. This is a sufficient basis from which to infer that Zydus supported the overarching understanding's common goal.

**B.      THE COLLUSIVE SUB-AGREEMENTS ALLEGED IN MDL 2724 ARE STRUCTURALLY INTERDEPENDENT**

What might at first appear as multiple schemes should be considered a single, interdependent conspiracy if there is "evidence that the activities of one group were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *U.S. v. Rigas*, 605 F.3d 194, 214–15 (3d Cir. 2010) (citing *U.S. v. Greenidge,* 495 F.3d 85, 93 (3d. Cir. 2007)).

Zydus argues that the "simple fact that … Zydus was allegedly involved in a price-fixing conspiracy similar to a series of other alleged conspiracies is not sufficient to demonstrate interdependence." Zydus Br. at 8. However, Plaintiffs have done more than allege similarity, even though similarity in the sense of a common goal and a nontrivial overlap in membership is probably sufficient to allege an overarching conspiracy on a motion to dismiss. See *Padilla*, 982 F.2d at 115.

Plaintiffs plausibly allege that sub-agreements regarding specific drugs are interdependent, because behavior as to one drug serves as a carrot or a stick to induce conspiracy-compliant behavior as to another drug. Plaintiffs specifically explain why the overarching conspiracy was interdependent, and Zydus entirely ignores these parts of the complaints.  *See, e.g.,* EPP CAC ¶102.  ("Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.")  DPP CAC ¶15; IRP AOC ¶70; Kroger AC ¶820-825.  In a conspiracy covering a single product, one cannot punish a 'cheating,' undercutting competitor without slashing one's own prices, and one cannot reward price-raisers except by announcing a price increase, which creates a temporary vulnerability that others might exploit.  But in a conspiracy where many manufacturers overlap in their catalog of similar products, but each does not make every product, it is possible to retaliate or reward a co-conspirator and thereby police and reinforce the overarching agreement without severely upsetting all the other conspirators or one's own business. *See, e.g.*, Kroger AC ¶821-823; DPP CAC ¶23. Interdependence is inherent in the structure of Defendants' multi-drug conspiracy.

Zydus's schemes were interdependent with the continued success of the overarching conspiracy because Zydus had interest in other MDL drugs apart from acetazolamide, pravastatin and divalproex.  For example, based on examination of data and other information, Zydus appears to have obtained the requisite National Drug Codes in order to sell the antidepressant amitriptyline, the antibiotic doxycycline monohydrate, the diabetes drugs glyburide, glyburide-metformin, and glipizide-metformin, and the antifungal nystatin.

Zydus insists that the interdependence factor requires that the other conspiracies be "contingent upon" Zydus's agreements regarding acetazolamide, pravastatin and divalproex. Zydus Br. at 7.  First, this is too narrow a view of the interdependence factor, which counts any

incremental advantage supplied by each conspirator's membership (not just unique contributions sine qua non). *See Rigas*, 605 F.3d at 214 ("necessary or advantageous to the success"). Second, it can be difficult to guess whether the overarching conspiracy would have failed without a certain conspirator's membership precisely because it did not fail. Plaintiffs allege that it was spectacularly successful for Defendants, netting them hundreds of millions of dollars, if not more, in illegal profits. Had Zydus affirmatively withdrawn from its three drug-specific arrangements, it could have exposed the conduct of its proximate co-conspirators, which could have revealed every scheme so far alleged in MDL 2724 save for econazole and ursodiol.[5] This inference should be drawn in Plaintiffs' favor, and establishes the plausibility of interdependence and a single conspiracy.

Zydus cites *Precision Associates* for the proposition that "Plaintiffs are required to plead the 'how, when, or where' the conspiracies became connected to each other into one global conspiracy." Zydus Br. at 7 (citing *Precision Assocs.. v. Panalpina World Transp.*, No. 08-CV-42, 2011 WL 7053807, at *27 (E.D.N.Y. Jan. 4, 2011)). But this ruling arises under the specific facts of that inapposite case, where the plaintiffs' unsuccessfully alleged a "global conspiracy" from a combination of European, Japanese and Chinese/Asian "local conspiracies," which the court found were "logically, temporally, and geographically distinct," and where "thirteen of the defendants [were] not named as defendants in any of the local conspiracies and yet [were] still alleged to be part of the global conspiracy." *Id.* In contrast, this MDL focuses on conduct in the United States market.

---

[5] Collectively, Zydus's sub-agreement co-conspirators (Apotex, Lupin, Dr. Reddy's, Heritage Par, Sandoz, and Teva) are plausibly alleged to have conspired as to every drug in the MDL other than econazole and ursodiol.

Here, there is no reason to assume that there were individual fair share conspiracies that developed in isolation and had to become "connected to each other." From the allegations in the complaints, it is plausible to infer that fair share was a single norm of conduct that gained more and more adherents as it became clear that participation was profitable. The fact that Plaintiffs have already established dozens of episodes of anticompetitive conduct, each of which might be considered a separate conspiracy, counts in favor of, not against, the inference that there was a single overarching conspiracy. And *Precision Associates* makes clear that Zydus "need not know the identity" of all the other co-conspirators; Plaintiffs need only plausibly allege that Zydus was "aware of and agree[d] to the essential purpose of the overarching conspiracy." 2011 WL 7053807, at *30.

In sum, Zydus's brief provides no reason to disassociate its three drug-specific agreements from one another or from the broader conspiracy. Plaintiffs allege a conspiracy in which each MDL Defendant's participation reinforced the mechanism of the conspiracy and allowed the continued concealment of the conspiracy, which was "advantageous … to the overall success of the venture." *Rigas*, 605 F.3d at 214–15.

### C. MEMBERS OF ZYDUS'S SUB-AGREEMENTS OVERLAP WITH NEARLY ALL THE ALLEGED SUB-AGREEMENTS

Unlike common goal and interdependence, which require factual development, overlap in participants is a factor that reveals itself on the face of the complaints, according to the clusters of defendants alleged to have conspired as to specific drugs under the overarching understanding of fair share. Zydus omits any mention of its alleged co-conspirators other than Heritage and Teva.

The precise question is not whether Zydus itself participated in many or most of the sub-agreements alleged as part of the overarching conspiracy, but whether the membership of

11

Zydus's sub-agreements overlaps with the membership of the other alleged sub-agreements. The following chart shows the extensive overlap, and Zydus has no argument for why this degree of overlap is not sufficient to satisfy the standard for alleging a single conspiracy.

| Zydus alleged to have conspired directly with … | … who overlaps with (*in a scheme regarding*) | |
|---|---|---|
| Apotex | Glenmark, Lupin, Sandoz, Teva, Zydus (*pravastatin*) | Heritage, Teva (*leflunomide*) |
| Lupin | Apotex, Glenmark, Sandoz, Teva, Zydus (*pravastatin*) | |
| Dr. Reddy's | Mylan, Par, Zydus (*divalproex*)<br>Heritage (*meprobamate*) | Heritage, Par (*zoledronic acid*) |
| Heritage | Teva, Zydus (*acetazolamide capsules*)<br>Mayne, Mylan (*doxy hyclate DR*)<br>Lannett, Mylan, Par (*doxy mono*)<br>Aurobindo, Citron, Glenmark, Sandoz (*fosi-HCTZ*)<br>Mylan, Teva (*glipizide-metformin*)<br>Aurobindo, Citron, Teva (*glyburide*)<br>Aurobindo, Citron, Actavis, Teva (*glyburide-metformin*)<br>Apotex, Teva (*leflunomide*) | Dr. Reddy's (*meprobamate*)<br>Sun (*nimodipine*)<br>Sun, Teva (*nystatin tablets*)<br>Sun (*paromomycin*)<br>Breckenridge, Mylan, Par, Actavis Teva, Upsher-Smith (*propranolol*)<br>Teva (*theophylline ER*)<br>Mylan, Actavis (*verapamil*)<br>Dr. Reddy's, Par (*zoledronic acid*) |
| Mylan | Sun (*albuterol*)<br>Par, Sandoz (*amitriptyline*)<br>Sandoz (*benazepril-HCTZ*)<br>Sandoz, Taro (*clomipramine*)<br>Impax, Lannett, Par, West-Ward (*digoxin*)<br>Dr. Reddy's, Par, Zydus (*divalproex*)<br>Heritage, Mayne (*doxy hyclate DR*)<br>Actavis, Par, Sun, West-Ward (*doxy hyclate "RR"*) | Heritage, Lannett, Par (*doxy mono*)<br>Heritage, Teva (*glipizide-metformin*)<br>Lannett, Sandoz (*levothyroxine*)<br>Breckenridge, Heritage, Par, Actavis, Teva, Upsher-Smith (*propranolol*)<br>Heritage, Actavis (*verapamil*) |
| Par | Mylan, Sandoz (*amitriptyline*)<br>Lannett, Teva, Upsher-Smith (*baclofen*)<br>Impax, Lannett, Mylan, West-Ward (*digoxin*)<br>Dr. Reddy's, Mylan, Zydus (*divalproex*)<br>Actavis, Mylan, Sun, West-Ward (*doxy hyclate "RR"*) | Heritage, Lannett, Mylan (*doxy mono*)<br>Actavis, Perrigo, Sandoz, Taro (*nystatin cream*)<br>Breckenridge, Heritage, Mylan, Actavis, Teva, Upsher-Smith (*propranolol*)<br>Dr. Reddy's, Heritage (*zoledronic acid*) |
| Sandoz | Mylan, Par (*amitriptyline*)<br>Mylan (*benazepril HCTZ*)<br>Akorn, Perrigo, Actavis, Taro, Wockhardt (*clobetasol*)<br>Mylan, Taro (*clomipramine*)<br>Perrigo, Taro, Actavis (*desonide*)<br>Apotex, Glenmark, Lupin, Teva, Zydus (*pravastatin*) | Aurobindo, Breckenridge, Glenmark, Heritage (*fosinopril-HCTZ*)<br>Lannett, Mylan (*levothyroxine*)<br>Akorn, Hi-Tech, Impax (*lidocaine-prilocaine*)<br>Actavis, Par, Perrigo, Taro (*nystatin cream*) |
| Teva | Heritage, Zydus (*acetazolamide capsules*)<br>Lannett, Par, Upsher-Smith (*baclofen*)<br>Taro, Actavis (*fluocinonide*)<br>Heritage, Mylan (*glipizide-metformin*)<br>Aurobindo, Citron, Heritage (*glyburide*)<br>Aurobindo, Citron, Heritage, Actavis (*glyburide-metformin*)<br>Apotex, Heritage (*leflunomide*) | Heritage, Sun (*nystatin tablets*)<br>Apotex, Glenmark, Lupin, Sandoz, Zydus (*pravastatin*)<br>Breckenridge, Heritage, Mylan, Par, Actavis, Upsher-Smith (*propranolol*)<br>Heritage (*theophylline ER*) |

13

Plaintiffs also allege another type of overlap that bolsters the inference that Zydus was part of an overarching conspiracy: overlap of individuals. During the relevant time period, Zydus alumni could be found working for several other conspirators. "Daniel Lukasiewicz began his career at Defendant Aurobindo, moved to Defendant Zydus, and currently works at Defendant Heritage." IRP AOC ¶71. The complaints allege that Mr. Lukasiewicz began colluding with other manufacturers within his first six months at Heritage, so one could infer that, having encountered similar practices at Zydus, it was not his first rodeo. *See* States' CAC ¶270, 277 (allegations of contacts in April 2014; Lukasiewicz started in November 2013). Zydus employees Laura Short and Karen Strelau went to Defendant Citron in October 2013, where they then conspired with Heritage. States' CAC ¶320. Kevin Green, currently VP of Sales at Zydus, and former senior director for National Accounts, worked in an identical role at Teva for nearly eight years in the runup to the conspiracy, and then participated in the confirmation of the acetazolamide agreement between Teva, Zydus, and Heritage. DPP CAC ¶155; EPP CAC ¶437; States' CAC ¶298.

Zydus has no answer to these allegations, which are more than sufficient to establish overlap. Zydus instead argues that Plaintiffs "plead no facts to establish that there were any agreements amongst the other defendants," a sentence that is at odds with the plain allegations of the complaints.

Zydus also makes references to opinions dismissing "hub-and-spoke" conspiracies, Zydus Br. at 9, implying that is what Plaintiffs have alleged. But because Zydus is connected to more than one "hub," any hub-and-spoke concept is a poor fit. In antitrust law, a hub-and-spoke conspiracy involves vertical ties from one level to another (e.g. manufacturer to distributor, or distributor to dealerships), and here no such vertical component is alleged. In traditional

14

conspiracy law, it refers to a classic *Kotteakos* conspiracy where "different persons who did not know or have anything to do with one another" were running parallel, independent schemes under the tutelage of a single hubman, and therefore cannot be said to have participated in a single conspiracy with the others. *Kotteakos v. U.S.*, 328 U.S. 750, 758 (1946). The overarching conspiracy here alleges an intertwined web, where every Defendant has multiple ties to some, if not all, of the others, and the overarching scheme requires the continued complicity of all.

## IV.     CONCLUSION

Plaintiffs have plausibly alleged the existence of an overarching agreement, and the "entire context of the allegations" in Plaintiffs' complaints provides more than enough to plausibly infer Zydus's conscious commitment to the fair share conspiracy, its interdependence, and its membership. *Generics,* 338 F. Supp. 3d at 444. Accordingly, Zydus's motion to dismiss should be denied.[6]

Dated:  May 2, 2019                                         Respectfully submitted,

| /s/ Roberta D. Liebenberg | /s/ Dianne M. Nast |
|---|---|
| Roberta D. Liebenberg | Dianne M. Nast |
| FINE, KAPLAN AND BLACK, R.P.C. | NASTLAW LLC |
| One South Broad Street, 23rd Floor | 1101 Market Street, Suite 2801 |
| Philadelphia, PA 19107 | Philadelphia, PA 19107 |
| 215-567-6565 | 215-923-9300 |
| rliebenberg@finekaplan.com | dnast@nastlaw.com |
| **Liaison and Lead Counsel for the End-Payer Plaintiffs** | **Liaison and Lead Counsel for the Direct Purchaser Plaintiffs** |

---

[6] If the Court concludes that Plaintiffs' allegations are insufficient to sustain their claims against Zydus, Plaintiffs request leave to amend their respective complaints under the liberal pleading standard of Rule 15(a)(2).

*/s/  Jonathan W. Cuneo*
Jonathan W. Cuneo
CUNEO, GILBERT & LADUCA LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
202-789-3960
jonc@cuneolaw.com

**Lead Counsel for the Indirect Reseller Plaintiffs**

*/s/  William J. Blechman*
Richard Alan Arnold
William J. Blechman
KENNY NACHWALTER, P.C.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
305-373-1000
rarnold@knpa.com
wblechman@knpa.com

**Counsel for Kroger Direct Action Plaintiffs**

*/s/  W. Joseph Nielsen*
W. Joseph Nielsen
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
860-808-5040
joseph.nielsen@ct.gov

**Liaison Counsel for the States**

/s/  *Peter D. St. Phillip, Jr.*
Peter D. St. Phillip, Jr.
Jennifer Risener
Lee Yun Kim
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
914-997-0500
pstphillip@lowey.com
jrisener@lowey.com
lkim@lowey.com

**Counsel for Humana, Inc.**