# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | ORAL ARGUMENT REQUESTED |
| *The State of Connecticut, et al. v. Actavis Holdco U.S., Inc., et al.* | 17-CV-03768 |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-00284 |
| *1199SEIU National Benefit Fund, et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-02401 |
| *West Val Pharmacy, et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-02533 |
| *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | 18-CV-03299 |
| *Marion Diagnostic Center, LLC, et al. v. McKesson Corporation, et al.* | 18-CV-04137 |

**DEFENDANT MAYNE PHARMA INC.'S REPLY IN SUPPORT OF ITS MOTION UNDER FRCP 12(b)(6) TO DISMISS VARIOUS PLAINTIFFS' SO-CALLED "OVERARCHING CONSPIRACY" COMPLAINTS**

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................................................... iii

Introduction ....................................................................................................................................1

Argument .......................................................................................................................................1

    A. **Plaintiffs Fail To Allege Facts To Support The Conclusion That Mayne Conspired With Heritage On Doxy DR** ............................................................1

        1.    The Glazer & Malek Guilty Pleas Are Not "Direct Evidence" And Do Not Support Plaintiffs' Allegations ...................................................2

        2.    Plaintiffs' Specific Factual Allegations Of Communications Between One Mayne Employee And One Heritage Employee Do Not Support The Conclusion That An Anticompetitive Agreement Was Reached ....................................................................................................5

    B. **There Are No Factual Allegations Supporting Mayne's Knowledge Of Or Participation In An Overarching "Fair Share" Conspiracy** ...................................6

        1.    Plaintiffs Fail To Allege That Mayne Knew Of Or Participated In Any Industry-Wide "Fair Share" Conspiracy ...........................................7

        2.    Plaintiffs Seek To Paper Over The Deficiency Of Their Factual Allegations With A Series Of Weak And Ineffective Assertions ............................8

        3.    Plaintiffs' Theory Of An Alleged "Fair Share" Agreement Is Too Amorphous To Be Interpreted Or Enforced ..........................................................10

Conclusion ...................................................................................................................................10

# TABLE OF CITATIONS & AUTHORITIES

**Cases**                                                                                                                                    **Page(s)**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................... 7

*Emich Motors Corp. v. Gen. Motors Corp.*,
    340 U.S. 558 (1951) ............................................................................................... 3

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016) .................................................................................. 7

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) .................................................................................. 9

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015) .................................................................................. 9

*In re Optical Disk Drive Antitrust Litig.*,
    2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ...................................................... 3

*Partmar Corp. v. Paramount Pictures Theatres Corp.*,
    347 U.S. 89 (1954) ................................................................................................. 3

*United States v. Cont'l Group, Inc.*,
    456 F. Supp. 704 (E.D. Pa. 1978), aff'd, 603 F.2d 444 (3d Cir. 1979) ................. 7

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) .................................................................................. 10

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*,
    513 F. Supp. 1100 (E.D. Pa. 1981) ........................................................................ 9

**Other Citations & Authorities**                                                                                                    **Page(s)**

"Dealings with Competitors," FEDERAL TRADE COMMISSION, *available at*
    https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-
    laws/dealings-competitors ..................................................................................... 9

Deferred Prosecution Agreement, *United States v. Heritage Pharmaceuticals Inc.*,
    Case No. 19-cr-00316 (E.D. Pa. June 11, 2019) ................................................... 2

Information, *United States v. Heritage Pharmaceuticals Inc.*,
    Case No. 19-cr-00316 (E.D. Pa. May 30, 2019) ................................................... 2

Plea Agreement, *United States v. Glazer*,
    Case No. 16-cr-00506 (E.D. Pa. Jan. 9, 2017) .................................................. 2, 4

Plea Agreement, *United States v. Malek*,
   Case No. 16-cr-00509 (E.D. Pa. Jan. 10, 2017) ................................................................. 2, 4

Settlement Agreement Among Attorneys General and Jeffrey Glazer,
   *The State of Connecticut, et al. v. Actavis Holdco U.S., Inc., et al.*,
   Case No. 17-cv-03768 (E.D. Pa. Mar. 16, 2017) ............................................................ 4, Ex. A

Settlement Agreement Among Attorneys General and Jason Malek,
   *The State of Connecticut, et al. v. Actavis Holdco U.S., Inc., et al.*,
   Case No. 17-cv-03768 (E.D. Pa. Mar. 16, 2017) ............................................................ 4, Ex. A

**INTRODUCTION**

In its Memorandum of Law in support of its motion to dismiss (ECF 65-1, 17-cv-03768) ("Memorandum" or "Memo"), Mayne Pharma Inc. ("Mayne") demonstrated that the extraordinarily limited factual allegations against Mayne in Plaintiffs' complaints reflect communications with <u>only one</u> other generic drug company (Heritage) about the sale of <u>only one</u> generic drug (Doxy DR) to <u>only four</u> customers.[1] There are no factual allegations that logically or reasonably support the inference that Mayne participated in any industry-wide agreement to fix prices or allocate markets of generic drugs. And, as demonstrated in the initial Memorandum, even Plaintiffs' allegations of Mayne's participation in a *single-drug conspiracy* with only one other defendant fail to plausibly allege an anticompetitive agreement.  Accordingly, this Court must dismiss all of the federal Sherman Act claims against Mayne.

**ARGUMENT**

**A.     Plaintiffs Fail To Allege Facts To Support The Conclusion That Mayne Conspired With Heritage On Doxy DR**

In its Memorandum, Mayne carefully reviewed in detail Plaintiffs' factual allegations and the words they use to depict purported communications between Heritage and Mayne about Doxy DR. *See* Memo at 5-12. The plain meaning of those alleged words demonstrates that Heritage and Mayne ***never agreed*** to allocate any of the four customers specifically identified in the complaints. In their Response, Plaintiffs <u>do not respond</u> to this argument. *See* ECF 120, 17-cv-03768 ("Response" or "Opposition").  Instead, Plaintiffs place principal reliance on the guilty pleas entered by two former Heritage executives, Jeffrey Glazer and Jason Malek, arguing that

---

[1] For the same reasons, Mayne moved to dismiss the same claims in the following "overarching conspiracy" complaints, filing the same Memorandum in support. *See* ECF 65-1, *State of Connecticut, et al. v. Actavis Holdco U.S., Inc., et al.* (17-cv-03768), ECF 75-1, *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* (18-CV-00284); ECF 111-1, *1199SEIU National Benefit Fund, et al. v. Actavis Holdco U.S., Inc., et al.* (18-CV-02401); ECF 32-1, *West Val Pharmacy, et al. v. Actavis Holdco U.S., Inc., et al.* (18-CV-02533); ECF 66-1, *Humana Inc. v. Actavis Elizabeth, LLC, et al.* (18-CV-03299); ECF 40-1, *Marion Diagnostic Center, LLC, et al. v. McKesson Corporation, et al.* (18-CV-04137).

1

these pleas "put the existence of a conspiracy with Mayne involving [Doxy DR] ***beyond dispute***." Opp. at 1 (emphasis added). Despite this insistence, Plaintiffs fail to demonstrate *any connection* between these guilty pleas and the allegations of an agreement between Heritage and Mayne. Rather than address the actual words used in the alleged communications, Plaintiffs inaccurately summarize and mischaracterize those words to avoid confronting their plain meaning. Accordingly, Plaintiffs have failed to plead factual allegations to support a claim that Mayne participated in a Doxy DR conspiracy with Heritage.[2]

1. The Glazer & Malek Guilty Pleas Are Not "Direct Evidence" And Do Not Support Plaintiffs' Allegations

Plaintiffs contend that the guilty pleas entered by Glazer and Malek constitute "direct evidence" of a conspiracy between Heritage and Mayne. Opp. *passim*. But the factual bases for these guilty pleas do not mention Mayne or any conspiratorial conduct related to Mayne. Instead, these guilty pleas admit only the following:

> In furtherance of the conspiracy, the defendant and his co-conspirators, including individuals the defendant supervised at [Heritage] and reported to at Company B, engaged in discussions, and attended meetings with co-conspirators involved in the production and sale of doxycycline hyclate. During such discussions and meetings, agreements were reached to allocate customers, rig bids, and fix and maintain the prices of doxycycline hyclate sold in the United States.[3]

Simply put, there is no "direct evidence" in this language to conclude that Mayne is "Company B" or a "co-conspirator."[4]

Plaintiffs bear the burden to specifically demonstrate the scope of the guilty pleas on

---

[2] In their Response, Plaintiffs make no effort to support their allegations that Mayne participated in either (1) a Doxy RR or Doxy Mono conspiracy with any other defendant or (2) a Doxy DR conspiracy ***with Mylan***. *See* Opp. 2-6. Accordingly, for the reason set forth in Mayne's Memo at 5-8, this Court must dismiss any and all claims related to these alleged separate conspiracies.

[3] *See* Plea Agreement, *United States v. Glazer*, Case No. 16-cr-00506 (E.D. Pa. Jan. 9, 2017), ECF 18 at ¶ 4; *see also* Plea Agreement, *United States v. Malek*, Case No. 16-cr-00508 (E.D. Pa. Jan. 10, 2017), ECF 17 at ¶ 4 (collectively, "guilty pleas").

[4] The Court should also take judicial notice of the fact that the criminal charges recently filed against Heritage relate only to glyburide and do not charge Heritage with any competitive conduct related to Doxy DR, ***and make no reference to Doxy DR or to Mayne***. *See United States v. Heritage Pharmaceuticals Inc.*, Case No. 19-cr-00316 (E.D. Pa. May 30, 2019), ECF 1 (Information) and ECF 4 (Deferred Prosecution Agreement).

2

which their allegations rely. *See In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *2 (N.D. Cal. Apr. 19, 2012) (the Court may take judicial notice of a criminal guilty plea but such a plea falls "well short of dispositive"—*i.e.*, they are not "direct evidence"—"on the breadth of the claimed conspiracy.") Here, Plaintiffs have failed to carry this burden by failing to show that Mayne or its employees were part of the factual bases of the Glazer and Malek guilty pleas. *See Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951) ("a [criminal] verdict does not establish that defendants used all of the means charged or any particular one . . . in effectuating the conspiracy . . . [and thus] what was decided by the criminal judgment must be determined by the trial judge hearing the treble-damage suit, upon an examination of the [criminal] record"); *see also Partmar Corp. v. Paramount Pictures Theatres Corp.*, 347 U.S. 89, 102 (1954) ("final judgments or decrees in Government antitrust actions are admissible . . . as *prima facie* evidence **only of issues actually determined in the prior adjudication**") (emphasis added). Instead, Plaintiffs attempt to take advantage of the ***ambiguity*** of these guilty pleas, arguing simply that because Mayne competed against Heritage in the Doxy DR market, Mayne must have been involved in the Doxy DR conspiracy to which Glazer and Malek plead guilty. The facts, as alleged, however, do not support this conclusion:

Despite the States' extensive and ongoing investigation, neither the States nor any other Plaintiffs plead any factual allegations that Glazer or Malek communicated with any Mayne employee. Instead and importantly, the States specifically allege two *separate* Doxy DR conspiracies—one between <u>Heritage and Mylan</u>, and one between Heritage and Mayne. *Compare* State CAC ¶¶ 180-217 *with id.* ¶¶ 218-242. In their allegations of a separate "Heritage/**Mylan** Agreement," the States specifically allege that both Glazer and Malek directly communicated with Mylan employees about Doxy DR. *See* State CAC ¶¶ 185-188, 199-200. But

in their allegations of a separate "Heritage/**Mayne** Agreement," Plaintiffs plead no communications whatsoever between either Glazer or Malek and Mayne. *Id.* at ¶¶ 218-241.

Thus, because Plaintiffs allege that (1) Heritage was involved in *separate* conspiracies with Mayne and Mylan and (2) Glazer and Malek only communicated with employees *at Mylan*, there is no basis to conclude that the factual bases of Glazer's and Malek's respective guilty pleas involve Mayne or its employees. Instead, the logical conclusion—when reading the plea agreements through the lens of *Plaintiffs' own allegations*—is that Mylan and its employees were the "Company B" and "co-conspirators" identified in the guilty pleas as having "engaged in discussions, and attended meetings" with both Glazer and Malek. *See* Guilty Pleas at ¶ 4.

Plaintiffs' reliance on the ambiguity of these plea agreements is even more egregious considering that the States have access to the factual bases of these guilty pleas because both Glazer and Malek *are cooperating with* the States. *See* Ex. A.[5] Accordingly, Mayne attempted to resolve this issue with the States so the Court could reliably assess this critical issue based on accurate factual information, and not merely conjecture. Mayne thus contacted the States seeking disclosure of any information that would support Plaintiffs' contention that the factual bases for the Guilty Pleas involved conduct by or relating to Mayne. *See* Ex. B. The States refused to provide this information, rehashing instead the same arguments from their Response that seek to avoid confronting this very issue. *See* Ex. C. The reason for the States' refusal to respond is clear: The States know but are unwilling to admit that the factual bases for the Glazer and Malek guilty pleas do not include any conduct by or related to Mayne.

Plaintiffs should not be allowed to propound their principal argument as to the sufficiency of their Doxy DR allegations against Mayne on a conclusion that is at best

---

[5] The March 16, 2017 settlement agreements between both Glazer and Malek and the States both provide that Glazer and Malek each "agrees to continue to provide full, complete and prompt cooperation with the ongoing Attorneys General's Investigation, and related proceedings and actions against any other person, corporation or entity."

4

ambiguous, and which the States have refused to clarify or specifically support, despite having access to the factual bases that would dispel any ambiguity. Thus, because of the factual deficiency in the Plaintiffs' attempt to link the guilty pleas to conspiratorial conduct by Mayne, the Court's prior determination on this issue is not the law of the case.

2. Plaintiffs' Specific Factual Allegations Of Communications Between One Mayne Employee And One Heritage Employee Do Not Support The Conclusion That An Anticompetitive Agreement Was Reached.

In their Opposition, Plaintiffs continue to ignore the specific words they allege formed anticompetitive communications between Heritage and Mayne. Instead, Plaintiffs inaccurately summarize and thus mischaracterize these communications in a manner favorable to their argument that they have plead plausible factual allegations of a conspiracy. *See* Opp. at 4-5.

First, Plaintiffs focus on their allegations that Heritage "walked away" from an account when "Mayne underbid Heritage's price." State CAC ¶ 227; Opp. at 8. This is an insufficient allegation to support an inference of a conspiracy between Mayne and Heritage. Plaintiffs make no allegation that Mayne communicated with Heritage about not bidding on a customer at this time, or even that Heritage agreed not to bid on a customer. Rather, the complaints support the position that these communications between Mayne and Heritage resulted in Heritage ***refusing to agree*** to refrain from competing for a customer. Refusing to agree not to compete is the opposite of anticompetitive conduct. Thus, there is no basis here to conclude that what Plaintiffs' characterize as "walk[ing] away from [a customer]" was anything more than an independent business decision of Heritage because Mayne successfully beat them on price. *See* Opp. at 8.

Second, Plaintiffs focus on their allegations of Heritage's *proposed* trade-off of McKesson and Econdisc as customer accounts for Doxy DR. State CAC ¶¶ 228-238; Opp. at 5. Again, Plaintiffs misrepresent their allegations, failing to mention that this "trade-off" was presented by Heritage as a *quid pro quo*, wherein **Heritage** proposed it ***would*** agree to not bid

5

competitively for Econdisc *if* Mayne would withdraw its bid to McKesson. State CAC ¶ 234. But Plaintiffs do not allege that Mayne did, in fact, withdraw its bid, as required by Heritage's alleged unsolicited proposal, presumably because the States' investigation revealed that Mayne did not withdraw its bid to McKesson. Accordingly, on the face of the complaints themselves, there is no basis to support an inference of anticompetitive conduct by Mayne.

Third, Plaintiffs focus on their allegations of the decision by Heritage not to bid an account in September 2015. State CAC ¶¶ 239-241; Opp. at 5. Yet again, Plaintiffs fail to acknowledge that their own complaints include no factual allegations that Mayne requested that Heritage refrain from submitting a bid in response to the alleged customer request. There is no allegation that Heritage offered and Mayne agreed to a *quid pro quo* arrangement—*i.e.*, wherein it would refrain from submitting a bid in exchange for Mayne agreeing to do *something*. Instead, Plaintiffs only allege that Heritage informed Mayne that it was not submitting a bid. This allegation that Mayne merely *received* unsolicited information from Heritage is not sufficient to plausibly infer that Mayne engaged in anticompetitive conduct. Instead, the only logical inference supported by Plaintiffs' allegations is that Heritage made an independent business judgment and informed Mayne of that decision. Thus, Plaintiffs cannot plausibly allege anticompetitive conduct based on Heritage's independent decision not to submit a bid.

Accordingly, for the reasons set forth above and in Mayne's initial Memorandum, Plaintiffs fail to plead a Doxy DR conspiracy between Mayne and Heritage.

### B.     There Are No Factual Allegations Supporting Mayne's Participation In An Overarching "Fair Share" Conspiracy.

In its Memorandum, Mayne argued that Plaintiffs' allegations of an "overarching conspiracy" fail because (1) Plaintiffs plead insufficient allegations as to Mayne's participation in a Doxy DR-specific conspiracy, (2) Plaintiffs plead no factual allegations that Mayne knew of

6

or participated in any anticompetitive agreement beyond the (insufficiently) alleged agreement with Heritage about Doxy DR, and (3) Plaintiffs' allegations of Mayne's conduct are directly inconsistent with Plaintiffs' theory of a "fair share" conspiracy. *See* Memo at 12-15.  In their Response, Plaintiffs again <u>do not respond</u> to these arguments, but instead argue either that their allegations are "consistent with" their "overarching" theory or that they "aren't required" to make a direct connection between their allegations against Mayne and their overarching allegations. *See* Opp. at 8-15. But that argument fails. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) (explaining plaintiffs in *Twombly* "looked around and saw conduct ***consistent with*** conspiracy, but [alleged] no facts that indicated more plausibly that a conspiracy actually existed.") (emphasis in original).

       1.     <u>Plaintiffs Fail To Allege That Mayne Knew Of Or Participated In Any Industry-Wide "Fair Share" Conspiracy.</u>

There are <u>no factual allegations</u> in any of the Plaintiffs' complaints that Mayne knew of or participated in any industry-wide "fair share" conspiracy.  Despites the States' five-year, "ongoing" investigation into the generic drug industry, Plaintiffs have failed to allege *a single communication* between Mayne and any other company besides Heritage concerning any customer, price, or decision to bid for any generic drug product. There are <u>no factual allegations</u> in any complaint that Mayne discussed with anyone the so-called "industrywide arrangement" alleged by Plaintiffs. There are <u>no factual allegations</u> in any complaint that Mayne even *knew of* this alleged "industry-wide arrangement." As such, there are <u>no factual allegations</u> that Mayne implemented and thus knowingly participated in any industry-wide conspiracy. Accordingly, Plaintiffs' complaints all fail to plausibly allege that Mayne participated in any "overarching" conspiracy. *See U.S. v. Cont'l Group, Inc.*, 456 F. Supp. 704, 715 (E.D. Pa. 1978) (a violation of § 1 of the Sherman Act requires that "the conspiracy was ***knowingly formed*** and that the

7

***defendants knowingly participated*** in the conspiracy") (emphases added).

    2.    <u>Plaintiffs Seek To Paper Over The Deficiency Of Their Factual Allegations With A Series Of Weak And Ineffective Assertions.</u>

Trying to salvage their lack of factual allegations that Mayne participated in an industry-wide conspiracy, Plaintiffs first point to alleged communications between Mayne and Heritage as evidence of such an "overarching" agreement. Opp. at 7-8. But these are the *same communications*—as noted above—that cannot support even allegations of a *drug-specific* agreement between Mayne and Heritage. None of these alleged communications make reference to an industry-wide "fair share" agreement, nor to any conduct by any other generic drug company, nor to any conduct regarding the implementation of a "fair share" agreement. Instead, these recycled allegations are nothing more than Plaintiffs' failed attempt to "repurpose" their insufficiently plead allegations of communications between Mayne and Heritage.

Next, Plaintiffs point to alleged "awareness" by competitors of the business plans of each other as evidence that Mayne participated in an industry-wide conspiracy. Opp. at 7. Here, again, Plaintiffs make <u>no factual allegations</u> specific to Mayne. There are <u>no factual allegations</u> in any complaint that Mayne participated in any discussion with or even about another generic drug manufacturer's business plans. It would be unconscionable to order that Mayne remain in this expansive "industry-wide" conspiracy case based on such a broad and conclusory statement.

Third, Plaintiffs argue that there were communications between Mayne and Teva as evidence that Mayne participated in an industry-wide conspiracy. Opp. at 2, 7. But there are <u>no factual allegations</u> in any of Plaintiffs' complaints concerning the ***subject*** of any such purported communications. Plaintiffs do not allege that Mayne and Teva sold any of the same generic drugs and competed against each other for customers in any generic drug market. Moreover, it is not illegal or anticompetitive to communicate with a person who may be employed by another

8

company in the same industry. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) (mere "communications between competitors do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement, tacit or otherwise.") Accordingly, there is no basis whatsoever on which the Court could conclude that any alleged communication between Mayne and Teva occurred for an illegal purpose, and thus there is no plausible basis to conclude that any such alleged communication was for any reason other than a legitimate business purposes or a non-business personal reason.[6]

Fourth, Plaintiffs point to a "web of communications" among the Defendants—allegedly reflected by Mayne's attendance at trade association meetings—as evidence that Mayne participated in an industry-wide conspiracy. Opp. 1-2. There are <u>no factual allegations</u> that Mayne communicated with any other attendees of these alleged trade association meetings, much less that Mayne communicated with other Defendants about anticompetitive conduct. Plaintiffs' argument that there *might have* been anticompetitive communications at these meetings is not a permissible inference to be drawn from the allegations, but rather an unfounded guess. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 513 F. Supp. 1100, 1149 (E.D. Pa. 1981) (all federal courts "reject[] the notion that mere membership in a trade association gives rise to an inference of conspiratorial conduct by a particular member, even when the association itself has been found to have engaged in illegal conduct, [and instead] emphasize that there must be proof

---

[6] The Court must correct Plaintiffs' fundamental mistake that "people of the same trade [should never communicate] or meet together." This antiquated belief has been wholly rejected by the Supreme Court, the Third Circuit, the Antitrust Division of the Department of Justice, and the Federal Trade Commission. *See*, *e.g.*, "Dealings with Competitors," FEDERAL TRADE COMMISSION, *available at* https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors ("In today's marketplace, competitors interact in many ways, through trade associations, professional groups, joint ventures, standard-setting organizations, and other industry groups. **Such dealings often are not only competitively benign but procompetitive.**") (emphasis added); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015) ("Plaintiffs' evidence [that competitors] . . . were in the same place at the same time . . . is insufficient to support a reasonable inference of concerted activity.") The number of reasons why an employee at Mayne might have personal or legitimate business communications with an employee of Teva are far too great to even list here.

of knowing, intentional participation in the illegal scheme.") This Court must thus disregard Plaintiffs' allegations that Mayne merely attended trade association meetings, as such allegations are insufficient to support allegations of anticompetitive conduct.

### 3. Plaintiffs' Theory of an Alleged "Fair Share" Agreement Is Too Amorphous to Be Interpreted or Enforced.

Finally, Plaintiffs fail to define the terms and/or scope of their alleged industry-wide "fair share" agreement among all Defendants. For example, Plaintiffs assert there were numerous "variations" to this alleged agreement. Opp. at 9. If so—*i.e.*, if the alleged "agreement" was so varied, ambiguous, and vague—then this Court cannot conclude that there could have been a "meeting of the minds" among the alleged co-conspirators about either (1) the nature of the agreement or (2) how to implement such an agreement. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) ("An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme.") Plaintiffs have alleged—at most—*an agreement to discuss* potential anticompetitive conduct, which is not an antitrust violation. Plaintiffs must allege that the purported "fair share" agreement resulted in an anticompetitive effect on the market, which—under Plaintiffs' theory—can only stem from *implemented* drug-specific agreements between competitors in the same single-drug market; it cannot stem from an industry-wide "fair share" agreement about *potential* sales for *any* generic drugs. Thus, this Court must reject Plaintiffs' argument that the existence of an undefined and vague "fair share" arrangement could plausibly constitute an antitrust violation. Any other ruling would force Mayne to defend against claims of harm from purchases of drugs that Mayne itself did not manufacture or sell.

## CONCLUSION

For the reasons set forth above and in Mayne's Memorandum in support of its motion to

10

dismiss, the Court should dismiss the Multi-Drug Complaints against Mayne.

                                                  Respectfully Submitted,

Dated: June 13, 2019                        */s/ Michael E. Martinez*

                                                  Michael Martinez
Steven Kowal
Lauren Norris Donahue
Brian J. Smith
**K&L GATES LLP**
70 W. Madison St., Suite 3300
Chicago, IL 60602
Tel. 312-372-1121
Fax 312-827-8000
michael.martinez@klgates.com
steven.kowal@klgates.com
lauren.donahue@klgates.com
brian.j.smith@klgates.com

*Counsel for Defendant Mayne Pharma Inc.*