# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-md-2724 |
| | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | Civil Action Nos. |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc. et al.* | 18-2641<br>18-2401 |
| *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc.* | 18-3299<br>18-2533<br>18-284 |
| *Humana Inc. v. Actavis Elizabeth, LLC et al.* | 18-4137<br>17-3768 |
| *West Val Pharm., et al. v. Actavis Holdco U.S., Inc.* | |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc.* | **ORAL ARGUMENT REQUESTED** |
| *Marion Diagnostic Center, LLC, et al. v. McKesson Corp., et al.* | |
| *The State Attorneys General Litigation* | |

**DEFENDANT LANNETT COMPANY, INC.'S
REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS INDIVIDUAL
MOTION TO DISMISS PLAINTIFFS' OVERARCHING CONSPIRACY CLAIMS**

Defendant Lannett[1] submits this memorandum of law in further support of its individual motion to dismiss Plaintiffs' Overarching Complaints.  Lannett joins, and incorporates by reference, Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims ("Def. Joint Br."), also filed today.

## I.      PRELIMINARY STATEMENT

To survive Lannett's motion to dismiss, Plaintiffs must plead facts—not conclusions or unsupported conjecture—plausibly suggesting that Lannett had knowledge of and participated in the broad industry-wide, overarching scheme encompassing dozens of drugs Lannett never sold that they purport to allege.  Plaintiffs' Overarching Complaints, however, contain no factual allegations suggesting that Lannett consciously committed to some industry-wide, "overarching" conspiracy.

Rather, Plaintiffs rely on allegations directed solely to Lannett's conduct with respect to products it actually sold.  But strikingly absent from these allegations is any reference to Lannett's agreement to join a far-reaching, overarching agreement.  And while Plaintiffs go to great lengths to blur the lines between allegations of individual, drug-specific conspiracies and their claimed overarching conspiracy, allegations of Lannett's conduct as to the individual drugs are insufficient to tie it to the overarching conspiracy, and Plaintiffs have failed to push their theory over the line of plausibility established by the Supreme Court.

## II.     NONE OF PLAINTIFFS' FACTUAL ALLEGATIONS CONNECT LANNETT TO AN OVERARCHING CONSPIRACY.

Plaintiffs cannot state an overarching conspiracy against Lannett without pleading facts suggesting that Lannett was not only *aware of*, but *consciously committed to*, the overarching

---

[1] Unless otherwise noted herein, all defined terms in Lannett's opening brief shall have the same meaning in this reply brief.

conspiracy.  *See* Def. Joint Br. at 7-8.  Plaintiffs' Opposition[2] merely serves to highlight their pleading failures regarding Lannett.

In their Opposition, Plaintiffs offer three categories of allegations against Lannett that they claim "show Lannett was involved in an overarching agreement not to compete": (1) allegations regarding conduct by Lannett on drugs Lannett sold; (2) alleged communications with competitors; and (3) alleged "opportunities" to conspire at trade association and industry events.  *See* Pl. Opp. at 3.  None of these allegations, however, is enough to tie Lannett to a broader conspiracy regarding products Lannett never sold.

***Allegations regarding drugs Lannett sold***.  Plaintiffs cannot rely on allegations that Lannett participated in conspiracies regarding products Lannett sold as a short-cut to suggesting Lannett participated in an industry-wide, overarching conspiracy.  *See* Def. Joint Br. at 18; *see also In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-2670, 2017 WL 35571, at *6 (S.D. Cal. Jan. 3, 2017) (finding that allegations of conspiracy as to one product are not sufficient to create the inference of participation in a broader, multi-product conspiracy).  Yet Plaintiffs acknowledge that is exactly what they seek to do to Lannett here.

Plaintiffs' "short-cut" approach of using specific allegations about one drug to make a leap to broader conduct about all drugs is exemplified by their treatment of Doxycycline Monohydrate. As an initial matter, the bulk of Plaintiffs' Opposition is really a description of Heritage's conduct, not Lannett's.  *See* Pl. Opp. at 6-8.  While the law requires allegations demonstrating Lannett's specific agreement to enter into the overarching conspiracy, Plaintiffs ignore that reality.  For example, Plaintiffs try to tie alleged conversations between Heritage and Dr. Reddy's about other drugs, Zoledronic Acid and Meprobamate, to Lannett's sale of Doxycycline Monohydrate merely

---

[2] All references to Plaintiffs' Opposition to Defendant Lannett's Individual Motion to Dismiss shall be to "Pl. Opp."

because these same conversations supposedly took place at the same general time.  *See id.* at 7.
Any actual connection between these two unrelated conversations, however, is entirely a figment
of Plaintiffs' imagination.

As yet another example of their "creative license" with the actual allegations in the
Overarching Complaints, Plaintiffs focus on a particular text message communication between a
Heritage employee and a Lannett employee.  There, a Lannett employee allegedly sent a text
message to a Heritage employee about being late to a social meeting because of a "market wide
increase," to which the Heritage employee responded, "Is it doxy mono?"  Plaintiffs insist that this
exchange "strongly suggests that the conspiracy extended beyond Doxy Mono and included other
generic drugs."  Pl. Opp. at 7 n.7 (citing States' Complaint at ¶ 255).  While on a motion to dismiss
Plaintiffs are entitled to all *reasonable* inferences from their allegations, *see Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 556 (2007), this leap is undoubtedly unreasonable.  First, Plaintiffs fail to
acknowledge that the exchange ends there.  There are no further allegations that the Lannett
employee ever responded to the Heritage employee's question, so this is another instance of
Plaintiffs trying to inappropriately take Heritage conduct and attribute it to Lannett.  Second, since
the alleged market increase involved a drug Lannett *did sell*, there is absolutely nothing in this
allegation to suggest that Lannett was involved in an overarching conspiracy for drugs it *did not
sell*.

Plaintiffs also attempt to make much of their allegations that Lannett and Taro captured
"remarkably stable" market share on their sales of Acetazolamide, claiming there was a "nearly
perfect market share split" across two different dosages of the drug.  Pl. Opp. at 9.  Plaintiffs
contend that this supposed market split "powerfully illustrate[s] Lannett's commitment to the 'fair
share' scheme."  *Id.*  This "market split" is yet another invention of Plaintiffs' own making.  First,

Plaintiffs' path to get to this supposedly "equal split" can charitably be described as tortuous. Plaintiffs allege that in a two-competitor market for Acetazolamide 250mg tablets, Lannett and Taro split the market with shares of 56% and 44%, respectively.  *See* EPP Compl. at ¶ 425.  Of course, there is nothing anticompetitive in that type of market share split.  So Plaintiffs take it one step further (and less plausibly), adding in Taro's 100% share of the market for the sale of 125mg tablets of Acetazolamide.  *See id.*  Only by combining Taro's share of a strength of Acetazolamide that Lannett *does not sell or compete in* can Plaintiffs concoct the "remarkably stable market share split" Plaintiffs seek to further their narrative.  But even that illogical path does not get Plaintiffs what they need, as their allegations about one drug Lannett did sell do nothing to advance the notion that Lannett agreed to some broader overarching conspiracy to allocate markets for dozens of other drugs it does not sell.  Plaintiffs' effort is the definition of implausible and cannot satisfy *Twombly*.

Similarly, Plaintiffs contend that "Lannett's role in other drugs [*sic*] conspiracies further shows that its alleged unlawful conduct was widespread and not tied to a particular drug." Pl. Opp. at 8.  Yet Plaintiffs' allegations relate solely to Lannett's involvement in five drugs that it actually sold, which only reinforces Lannett's main argument:  Plaintiffs' cannot cite anything tying Lannett to an agreement to join a broad overarching conspiracy for drugs it never sold.  But since the alleged conspiracy at issue here is an overarching one, not an individual drug-specific one, without allegations that Lannett agreed to join the overarching conspiracy, Lannett's motion must be granted.  *See* Def. Joint Br. at 4-7.

Contrary to Plaintiffs' suggestion, Lannett is not "dismembering" the overarching conspiracy or "viewing it as separate parts" as opposed to a "whole." Pl. Opp. at 6.  Rather, the "whole" of the Lannett allegations in the various Overarching Complaints is nothing more than a

series of unconnected allegations related to drugs Lannett sold, which does nothing to support or suggest the plausibility of Lannett's involvement in an overarching conspiracy for dozens of other drugs with which it had no involvement.

  ***Allegations regarding communications***.  In their Opposition, Plaintiffs also boast that their pleaded "allegations detail the meetings and conversations Lannett personnel had with their counterparts at other Defendants, including verbatim accounts of what was said, when, and by whom, and the extent of the resulting coordinated price increases."  Pl. Opp. at 1.  Notably, Plaintiffs do not cite to any actual allegations in their Overarching Complaints to support this assertion, a telling omission. In fact, the only details in the Overarching Complaints about Lannett-specific discussions with competitors concern a single drug: Doxycycline Monohydrate.  *See, e.g.*, States' Complaint at ¶¶ 249-55.  That allegation is not enough to satisfy Plaintiffs' pleading burden on the overarching conspiracy claims.

  Plaintiffs do not cite a single allegation in any of the Overarching Complaints that even remotely suggests that Lannett had any communications whatsoever with any competitors related to drugs it did not make or sell, let alone any communications to fix prices or allocate markets for those drugs.  There are no allegations that Lannett was planning to enter any other generic drug markets at issue in this MDL.  Nor are there any allegations that Lannett allocated markets on the expectation that it would receive some unidentified benefit in an unidentified future drug market.  Once again, Plaintiffs' Opposition is long on generalized, speculative rhetoric while its Overarching Complaints are short on Lannett-specific facts.

  Finally, Plaintiffs contend that "Lannett fails to explain away the unusually high volume of communications and meetings it had with Heritage [and] Teva."  Pl. Opp. at 14.  Again, those communications do not demonstrate any alleged overarching conspiracy as opposed to a drug-

specific conspiracy, particularly since the Overarching Complaints allege that Lannett directly competed with Heritage on Doxycycline Monohydrate and with Teva on Baclofen.  *See, e.g.*, EPP Compl. at ¶ 340; Humana Compl. at ¶ 329.  Therefore, while Lannett denies that it participated in any type of conspiracy, these communications do not add any plausibility to Plaintiffs' overarching claims.

>    *Allegations regarding trade associations and industry events*.  Finally, Plaintiffs tout "highly specific allegations about Lannett's trade association attendance, communications with competitors, and other conspiratorial conduct spanning a number of generic drugs."  Pl. Opp. at 3. Plaintiffs also argue that "Lannett was extensively involved in direct communications by email, telephone, and text messages, as well as in person, with other Defendants, and that these personal connections facilitated the formation and maintenance of the overarching conspiracy."  *Id.* However, the actual allegations cited in the Overarching Complaints do not support Plaintiffs' conclusion that they furthered the overarching conspiracy.  In fact, the citations are only to the same general, non-specific allegations concerning "Defendants" that do not mention any Lannett-specific conduct.  *See id.*  This is not nearly enough to justify holding Lannett responsible for an overarching conspiracy it never joined, and exposing it to super joint and several liability with nothing to tie Lannett to Plaintiffs' overbroad theory of their cases.  *See* Def. Joint Br. at 3.

>    Similarly, Plaintiffs in their Opposition claim that Lannett had "plentiful opportunities to speak" or meet at various trade association or industry meetings attended by various Lannett personnel.  Yet an opportunity to conspire is not evidence of conspiracy, and Plaintiffs cannot substitute their own conjecture or speculation for required allegations of fact.  *See* Def. Joint Br. at 15 n.7.  Against the backdrop of their own allegations, Plaintiffs' statement that "Defendants used these meetings as opportunities to engage in anticompetitive conduct related to the Drugs At

Issue" is unsupportable, certainly with respect to Lannett, as Plaintiffs do not—indeed, cannot—point to any allegations where Lannett engaged in any conduct at these meetings to support an overarching conspiracy.

Plaintiffs also rely on certain statements that Lannett's former CEO, Arthur Bedrosian, made during various earnings calls in an effort to bolster the plausibility of their overarching conspiracy claims. *See* Pl. Opp. 1-2, 10-11. This Court already rejected the notion that those statements could support a conspiracy claim, holding that "many [of the statements] appear to be equally consistent with passive or reflective observations and opinions. Ultimately, the Court declines to rely on these allegations in reaching its conclusion with respect to whether Group 1 Plaintiffs have sufficiently alleged a Sherman Act claim based on circumstantial evidence." *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 338 F.Supp.3d 404, 453 n.295 (E.D. Pa. 2018). Plaintiffs' use of the same statements to try to support their overarching conspiracy claims is equally unpersuasive.

Stripping out improper conclusory allegations, unsupported innuendo untethered to their actual factual allegations, and pleading strategies the Court has already rejected, Plaintiffs Overarching Complaints have not properly pleaded facts tying Lannett to any overarching conspiracy.

III.     **PLAINTIFFS CANNOT RELY ON SPECULATION AND MISREPRESENTATION TO SURVIVE A MOTION TO DISMISS.**

With no well-pleaded facts supporting their claims that Lannett joined the alleged overarching conspiracy, Plaintiffs instead resort to a combination of (1) conclusory statements and speculation and (2) misrepresentation of the allegations against Lannett that are actually included

in the Overarching Complaints.  But even this tactic is sufficient to tie Lannett to a broad, industry-wide conspiracy.

First, Plaintiffs attempt to ascribe conduct regarding individual drugs to an overarching conspiracy using purely conclusory language, unsupported by any factual allegations.  For example, Plaintiffs argue that "Lannett's unlawful agreement with its competitors with respect to Doxy Mono furthered Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, or stabilize the prices of numerous generic drugs."  Pl. Opp. at 8.  But Plaintiffs plead no facts in support of that theory.  In that same vein, the "in-depth timeline of events" that Plaintiffs claim "make[s] it more than plausible that Lannett was a willing party to the overarching conspiracy" is nothing of the sort.  *See* Pl. Opp. at 4-5.  Plaintiffs' allegations either involve conduct related to drugs Lannett actually sold or are generalities about Lannett and others attending trade association or industry events.  *See id.*  Plaintiffs again point to no factual allegations that actually connect Lannett to the alleged overarching conspiracy.

Additionally, in their zeal to create an inference of an overarching conspiracy where none exists, Plaintiffs' Opposition highlights a pleading failure this Court already stated should doom any attempt to connect a Defendant to an antitrust conspiracy.  In deciding the motion to dismiss the Group 1 DPP Complaints, this Court held, "The Court properly looks for more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy."  *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d at 438 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010)).  Yet this is precisely what Plaintiffs do in their Opposition, where they claim that, "Throughout the conspiracy, Defendants communicated with each other to agree on the amount of market share each competitor would be allocated under their unlawful 'fair share

agreement.'"  Pl. Opp. at 13.  Plaintiffs cite only two paragraphs of the EPP Overarching Complaint to support that assertion, which do nothing more than recite that same inadequate conclusory allegation followed by yet another:  "Defendants implemented the 'fair share' agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful."  EPP Compl. at ¶ 7.  The improper attempt to bolster their overarching claims through generic repetition of "Defendants" followed by a conclusory verb form is the rule, and not the exception, in the Overarching Complaints.  *See, e.g.*, EPP Compl. at ¶ 5 ("Defendants engaged in pervasive conspiratorial conduct designed to maintain inflated prices and avoid competition with one another"); States' Compl. at ¶ 113 ("When entering a generic market, Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price"); DPP Compl. at ¶ 113 ("Defendants and their co-conspirators repeatedly engaged in decision-making that was against their financial self-interest, turning down or walking away from potentially profitable business opportunities in order to uphold their Fair Share Agreement and allow other Defendants or co-conspirators to gain or maintain predetermined market share"); IRP Compl. at ¶ 65 ("Defendants have each participated in a mutually-established code of conduct in the generic drugs industry that was developed to allow Defendants to raise and maintain prices far above what the drugs should cost"); Kroger Compl. at ¶ 170 ("Defendants also routinely communicated and shared information with each other about bids and pricing strategy").

Further, when they do try to cite specifics, Plaintiffs engage in blatant misrepresentations. For instance, Plaintiffs write in their opposition, "A number of Defendants, including Lannett and Taro, *met in person in 2013*, including at an August 2013 NACDS Total Store Expo and the October 2013 GPhA Fall Tech Conference."  Pl. Opp. at 8-9 (emphasis added).  In their own

Overarching Conspiracy Complaints, however, the cited supporting allegations state merely that Lannett and Taro *attended* certain of the same large industry events, not that Lannett and Taro representatives *actually met* together while at any conference.  There is a large, legally significant difference between claiming that two competitors attended, with an untold number of other individuals, a large trade association event, and claiming that two competitors actually met at that same conference to plan a price increase.  The latter allegations are absent from the Overarching Complaints, while the former allegations are legally insufficient to demonstrate the supposed overarching conspiracy.

Another example of Plaintiffs' disregard of their own allegations relates to Digoxin. Plaintiffs contend that that their overarching conspiracy claims against Lannett are buttressed by looking at the Digoxin market because the "fair share system allocated markets in order to avoid depressing prices."  *See* Pl. Opp. at 9-10.  Yet in their prior Digoxin Complaint, Plaintiffs already pleaded that when additional competitors entered the Digoxin market, prices decreased in a non-uniform fashion.  In other words, the market operated just as it supposed to operate.  *See, e.g.*, Consolidated Direct Purchaser Class Action Complaint, Case No. 16-DG-27241, at ¶¶ 68-69.  Far from supporting their overarching claims, the functioning of the Digoxin market actually undercuts them.

Finally, Plaintiffs finish their opposition brief with the outrageous claim that Lannett "concedes that its conduct was anticompetitive (as least with respect to six drugs)."  Pl. Opp. at 15.  This mischaracterization of Lannett's position wholly disregards the fact that Lannett has filed Answers denying any misconduct as to each of the drugs for which it was specifically named as a Defendant.  Moreover, Plaintiffs demonstrate a fundamental lack of knowledge of the pleadings stage of a litigation that any first-year law student would possess.  Like all Defendants, Lannett

understands that (1) this motion involves only whether Plaintiffs adequately pleaded an overarching conspiracy (as opposed to a series of independent, drug-specific ones), and (2) Lannett is required by law to accept Plaintiffs' allegations as true at this stage of the process, no matter how far-fetched, implausible, and flat-out wrong they are.  Lannett categorically denies involvement in any alleged misconduct, overarching or otherwise.  Not filing a motion to dismiss as to each drug-specific conspiracy is not tantamount to an admission, and Plaintiffs' suggestion that it does is unequivocally false.

**IV.**      **CONCLUSION**

Without actual factual allegations connecting Lannett to the purported overarching, industry-wide conspiracy—as opposed to individual drug-specific conspiracies tied to the drugs Lannett actually made or sold—the Overarching Complaints do not pass *Twombly's* plausibility test.  Lannett respectfully requests that the Court dismiss the Overarching Conspiracy Complaints against it to the extent they assert claims for an overarching conspiracy.

Dated:  June 13, 2019

Respectfully submitted,

*/s/ Gerald E. Arth*
Gerald E. Arth
Ryan T. Becker
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Tel: (215) 299-2000
Fax: (215) 299-2150
garth@foxrothschild.com
rbecker@foxrothschild.com

George G. Gordon
Stephen D. Brown
Julia Chapman
DECHERT LLP
2929 Arch Street

Philadelphia, PA 19104-2808
Tel: (215) 994-2382
Fax: (215) 655-2240
george.gordon@dechert.com
stephen.brown@dechert.com
julia.chapman@dechert.com

*Counsel for Defendant*
*Lannett Company, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify on this 13th day of June 2019, I caused a true and correct copy of the foregoing to be filed electronically and is available for viewing and downloading from the Court's ECF System.  Notice of this filing will be sent to all counsel of record by operation of  the ECF System.

<u>/s/ <i>Ryan T. Becker</i></u><br>Ryan T. Becker

Dated:        June 13, 2019