IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO:<br><br>*Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc. et al.*<br><br>*The Kroger Co., et al. v. Actavis Holdco U.S., Inc.* | ORAL ARGUMENT REQUESTED |

# DEFENDANT G&W LABORATORIES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE DIRECT PURCHASER AND KROGER PLAINTIFFS' COMPLAINTS

**FILED WITH REDACTIONS - PUBLIC VERSION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

ARGUMENT ................................................................................................................................1

I.  THE COURT CANNOT INFER FROM PLAINTIFFS' CONCLUSORY ALLEGATIONS REGARDING "DEFENDANTS" THAT G&W JOINED THE ALLEGED OVERARCHING CONSPIRACY ..............................................................2

II. PLAINTIFFS' OPPOSITION DOES NOTHING TO CURE THEIR FAILURE TO ALLEGE PLUS FACTORS THAT PLAUSIBLY SUGGEST THAT G&W PARTICIPATED IN THE ALLEGED METRONIDAZOLE CONSPIRACY ..................6

III. PLAINTIFFS CONCEDE THAT THEIR OWN ALLEGATIONS REQUIRE DISMISSAL UNDER THE STATUTE OF LIMITATIONS ............................................8

CONCLUSION ...........................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*In re Aspartame Antitrust Litig.*,
   416 Fed. App'x 208 (3d Cir. 2011) .......................................................................................... 10

*In re Auto. Parts Antitrust Litig.*,
   No. 12-md-02311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016) ..................................... 2, 3

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ...................................................................................................... 6

*In re Blood Reagents Antitrust Litig.*,
   266 F. Supp. 3d 750 (E.D. Pa. 2017) ......................................................................................... 9

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) ...................................................................................................... 5

*In re Buspirone Patent Litig.*,
   185 F. Supp. 2d 363 (S.D.N.Y. 2002) ....................................................................................... 8

*Cetel v. Kirwan Fin. Grp., Inc.*,
   460 F.3d 494 (3d Cir. 2006) ...................................................................................................... 9

*In re Generic Pharms. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) .............................................................................1, 5, 6, 7

*Jung v. Ass'n of Am. Med. Colls.*,
   300 F. Supp. 2d 119 (2004) ....................................................................................................... 2

*In re K-Dur Antitrust Litig.*,
   No. 01-cv-1652 (SRC)(CLW) (D.N.J. Feb. 25, 2016) .............................................................. 4

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ................................................................................................................... 8

*Lifewatch Servs. Inc. v. Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018) ...................................................................................................... 6

*In re Processed Egg Prods. Antitrust Litig.*,
   2011 WL 5980001 (E.D. Pa. Nov. 30, 2011) .......................................................................... 10

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ......................................................................................... 2

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,
    181 F.3d 410 (3d Cir. 1999) ....................................................................................................5

*United States v. Kelly*,
    892 F.2d 255 (3d Cir. 1989)..................................................................................................3, 4

*United States v. Heritage Pharms. Inc.*,
    No. 19-cr-316 (RBS) (E.D.Pa., May 30, 2019) ........................................................................5

**INTRODUCTION**

Plaintiffs do not seriously dispute that, collectively, they allege only three facts about G&W: (1) that G&W manufactured and sold metronidazole cream and jelly; (2) that G&W increased prices on those two products once in 2011; and (3) that G&W attended a handful of trade association events. Under *Twombly*, the Court cannot infer that G&W participated in either of the alleged conspiracies – drug-specific or overarching – from those three facts. Nor should the Court allow plaintiffs to impose the burden of this massive sprawling litigation on G&W based solely on vague, conclusory allegations directed at all "defendants." Well-settled law requires a plaintiff to allege facts as to each individual defendant and plaintiffs have not done so here with respect to G&W.

Moreover, even if plaintiffs could base their conspiracy claims on the sparse facts alleged against G&W, their damages claims before June 22, 2014 and December 21, 2014 are barred because plaintiffs have not alleged facts sufficient to toll the statute of limitations. Plaintiffs were aware of G&W's alleged collusive price increases on metronidazole jelly and cream in 2011, and do not dispute that they were on notice of their claims by at least 2014 when they urged Congress to investigate generic drug pricing. Having sat on their claims for years, plaintiffs cannot now recover damages against G&W that accrued more than four years before they filed their complaints.

**ARGUMENT**

Plaintiffs concede that they have no direct evidence that G&W participated in any conspiracy and that their claims against G&W "rest on allegations of 'circumstantial evidence'." Opp'n at 4. Relying heavily on this Court's decision denying the Group 1 Defendants' motions to dismiss, plaintiffs argue that the complaints sufficiently allege "parallel conduct" and "plus factors" from which the Court can infer that G&W joined the alleged conspiracies. *In re Generic*

1

*Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018). Plaintiffs are wrong. The complaints do not contain facts that plausibly suggest that G&W participated in an overarching conspiracy with 28 other defendants relating to 40 disparate products, nor that G&W's price increases on metronidazole cream and metronidazole jelly in 2011 were the result of a conspiracy among all metronidazole manufacturers.

**I.    THE COURT CANNOT INFER FROM PLAINTIFFS' CONCLUSORY ALLEGATIONS REGARDING "DEFENDANTS" THAT G&W JOINED THE ALLEGED OVERARCHING CONSPIRACY**

Plaintiffs identify no alleged facts from which this Court may infer that *G&W* joined an overarching conspiracy to fix the prices of 40 different generic pharmaceuticals. Plaintiffs allege only that G&W manufactured metronidazole cream and jelly, that it raised prices on those products once in 2011, and that G&W employees attended trade association meetings. *See* DPP CAC ¶¶ 270–79; Kroger Compl. ¶¶ 656–62.

Plaintiffs' opposition makes clear that they are asking the Court to infer G&W's participation in the alleged overarching conspiracy *not* from those three facts – clearly they are not enough. Rather, plaintiffs want the Court to infer that G&W joined the alleged conspiracy based on conclusory allegations against "defendants" generally. Opp'n 8-10. But to maintain a conspiracy claim against a defendant, a plaintiff must plead facts *specific to that defendant* showing that it was aware of, and committed to, the alleged common scheme. *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2016 WL 8200512, at *4 (E.D. Mich. Apr. 13, 2016) ("Only after a defendant agrees to the common purpose [of the overarching conspiracy] may it be held responsible for the conduct of co-conspirators."); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (same). That is because "at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *Jung v. Ass'n*

*of Am. Med. Colls.*, 300 F. Supp. 2d 119, 158 (2004); *see also id.* at 163–64.  Thus, the facts alleged as to "defendants" generally do not establish a claim against G&W specifically.

Plaintiffs also argue that G&W's allegedly collusive price increases on metronidazole jelly and cream in 2011 suffice to show its involvement in the alleged overarching conspiracy under *United States v. Kelly*, 892 F.2d 255, 260 (3d Cir. 1989).  But that too is incorrect.  With respect to the first *Kelly* factor – whether G&W shared a common goal with the non-metronidazole manufacturer defendants – plaintiffs rely on a single conclusory allegation that the alleged product-specific conspiracies were part of an overarching conspiracy because "[t]he common understanding and goal of the Fair Share Agreement [was] for generic drug manufacturers to achieve artificially inflated prices because no generic manufacturer is incentivized to compete for additional market share by eroding price."  Opp'n at 8-9 (citing DPP CAC ¶ 10).  That type of conclusory assertion (without any supporting facts) says nothing about G&W's goals vis-a-vis any other defendant's.  *Auto Parts*, 2016 WL 8200512, at *4 (general allegation that "each Defendant willingly agreed to and did conspire[] with DENSO and by doing so, conspired with each other" did not create an inference of a conscious commitment to an overarching conspiracy).

Nor can the Court infer from plaintiffs' conclusory allegations against "defendants" that *G&W* engaged in "continuous cooperation" with other defendants to "achieve a continuous result" – the second *Kelly* factor.  Plaintiffs must allege facts from which the Court can infer that G&W *itself* continuously cooperated in the alleged scheme.  Their circular argument that G&W must have cooperated with *other* defendants, and must have benefitted from the overarching conspiracy because *some* defendants allegedly fixed prices for other generic drugs, Opp'n at 9, merely proves that the complaints allege no such facts.  In *Kelly*, the Third Circuit found that although the identities of co-conspirators changed throughout the duration of a conspiracy to import P2P (a

3

chemical used to manufacture methamphetamine) into the U. S., their cooperation with Kelly to insure a continuous supply of the chemical did not change, and thus Kelly remained the "one constant member during the course of the conspiracy." *Kelly*, 892 F.2d at 260.  Here, in contrast, plaintiffs do not allege that G&W cooperated with any other defendant after the alleged metronidazole jelly and cream price increases in 2011 or that G&W's allegedly higher prices allowed other defendants to raise their prices for completely unrelated drugs. Opp'n at 9.

Plaintiffs attempt to distinguish *In re K-Dur Antitrust Litigation*, No. 01-cv-1652 (SRC)(CLW) (D.N.J. Feb. 25, 2016), ECF No. 863, in which the court determined that two separate, allegedly anticompetitive agreements did not constitute a single conspiracy, by arguing that *K-Dur* involved reverse-payment settlement agreements rather than price fixing agreements. *Id*.  But the types of agreements at issue does not alter the analysis.  In *K-Dur*, the plaintiffs alleged a hub-and-spoke conspiracy, the goal of which was to eliminate generic competition for K-Dur and share in the economic benefits of its delayed entry. *Id*. at 19.  The plaintiffs argued that the two agreements were interdependent because without them, the defendants could not maintain high prices for K-Dur. *Id*.  The Court found that while the plaintiffs may have articulated a possible motivation for the defendants' conduct, that alone did not suggest that the agreements were interdependent because it did not show that the success of the second settlement agreement was dependent on the first. *Id.* at 23.  Plaintiffs' claims in this case fail for the same reason–they do not allege any facts that suggest that maintaining high prices for metronidazole jelly and cream pursuant to the alleged metronidazole conspiracy was in any way dependent on maintaining high prices for 38 other products as part of an overarching conspiracy, or vice versa.

Plaintiffs argue that their allegations meet the third *Kelly* factor – the extent to which the alleged participants in the individual conspiracies overlap – because they have alleged that G&W

4

is part of the "web of connections" that this Court described in its earlier decision regarding the Group 1 Complaints. Opp'n at 10. In that decision, the Court relied on factual allegations that suggested a "web of connections between Heritage and other Group 1 Defendants" to find that the drug-specific Group 1 conspiracies were plausible. *Generic Pharms. Pricing,* 338 F. Supp. 3d at 453. Here, by contrast, plaintiffs do not allege any facts that connect G&W to any non-metronidazole manufacturers. The only even arguable overlap relates to a single former G&W employee, who left the company well before G&W's 2011 price increases, and later worked for a different defendant that did not manufacture metronidazole. *See* Opp'n at 4. That hardly suggests that G&W was part of a "web of connections."

Finally, plaintiffs' attempt to invoke the existence of government investigations into the generics industry in support of their overarching conspiracy claim is equally unavailing. The criminal charge recently filed against Heritage describes a conspiracy involving only glyburide, and Heritage's Deferred Prosecution Agreement makes clear that the DOJ is investigating "conspiracies" in the generics industry, *not a single conspiracy*.[1] Neither document suggests that even Heritage – let alone G&W – was involved in an overarching conspiracy involving 29 companies and 40 different drugs.[2] Plaintiffs' overarching conspiracy claims should be dismissed.

---

[1] *See* Information, *United States v. Heritage Pharms. Inc.*, No. 19-cr-316 (RBS) (E.D.Pa., May 30, 2019), ECF No. 1, attached hereto as Exhibit A; Deferred Prosecution Agreement, *United States v. Heritage Pharms. Inc.*, No. 19-cr-316-RBS (E.D.Pa. June 11, 2019), ECF No. 4, attached hereto as Exhibit B.

[2] *See id.* In evaluating a motion to dismiss, a Court may consider documents that are attached to or submitted with the complaint, and any "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed.2004)). Federal courts have long deemed it appropriate to take judicial notice of public records, including judicial proceedings. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (collecting cases).

## II. PLAINTIFFS' OPPOSITION DOES NOTHING TO CURE THEIR FAILURE TO ALLEGE PLUS FACTORS THAT PLAUSIBLY SUGGEST THAT G&W PARTICIPATED IN THE ALLEGED METRONIDAZOLE CONSPIRACY

Plaintiffs argue that the Court should allow them to maintain their metronidazole conspiracy claim[3] against G&W because they have adequately alleged the existence of "plus factors" that, together with parallel pricing, permits the Court to infer that G&W participated in a conspiracy to fix the prices of metronidazole products. *See* Opp'n at 5. But plaintiffs' opposition merely confirms that their allegations as to G&W are fatally deficient.

Motive to Conspire. Plaintiffs acknowledge that their allegations regarding G&W's alleged motive "to set drug prices" are based on nothing more than G&W's interest in higher profits. *Id*. As the Third Circuit has recognized, profit motive "is not a plus factor establishing an agreement without further evidence of concerted, collusive conduct." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 335 n.7 (3d Cir. 2018) (internal quotation marks omitted). *See also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999) ("In a free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits.").

Actions Against Interest. Plaintiffs argue that G&W acted against its interests in raising prices for metronidazole cream and jelly. But the only allegation they identify in their complaints to support that argument is the conclusory assertion that G&W's "increase[ed] prices" would be "irrational in a competitive market." Opp'n at 6. The Court previously has held that these types of allegations are entitled to little weight because they "simply restate the (legally insufficient fact) that market behavior is interdependent and characterized by conscious parallelism." *Generic*

---

[3] Plaintiffs' opposition confirms that DPPs do not allege a separate metronidazole-specific claim against G&W. To the extent that DPPs' overarching conspiracy claims rely on allegations that G&W conspired to fix prices of metronidazole jelly and cream, those allegations are insufficient to state a claim against G&W for the reasons described in Section II.

*Pharms. Pricing*, 338 F. Supp. 3d at 449. Further, plaintiffs' own allegations undercut their argument – the pricing charts plaintiffs rely on to show rising prices actually indicate that G&W's prices were well below its competitors' prices for metronidazole jelly and fluctuated significantly for metronidazole cream during the relevant period. *See* Opp'n at 2-3.

<u>Facts Implying A Traditional Conspiracy</u>.  Plaintiffs argue that they have sufficiently alleged "facts implying a traditional conspiracy" based on the allegation that G&W attended trade shows, and the fact that "at least one manufacturer" of metronidazole has received a subpoena. Opp'n at 6-7.  But this Court's prior decision makes clear that neither constitutes a "plus factor" that supports plaintiffs' claims against G&W.

First, plaintiffs' allegations regarding G&W's attendance at trade shows do not suggest that G&W joined the alleged metronidazole conspiracy because the timing does not match up with the alleged price increases. *See Generic Pharms. Pricing*, 338 F. Supp. 3d at 451 (allegations regarding Teligent's trade show attendance were insufficient to state a claim when viewed in context with the timing of price increases on econazole). According to the Kroger Plaintiffs, representatives from G&W attended only one trade association meeting in 2011, months *after* the allegedly collusive price increase. *Compare* Kroger Compl. Ex. 3 (alleging that G&W attended 2011 NACDS meeting on August 27-30) *with* Opp'n at 2 (alleging that price increases on metronidazole cream and jelly occurred in or around ▮▮▮▮▮.  Similarly, DPPs cite the attendance at trade shows of former G&W employee Jan Bell, as an example of G&W's "opportunity to conspire." Opp'n at 7.  But Ms. Bell's LinkedIn Profile, cited in the complaint, makes clear that Ms. Bell left G&W in August 2010 – well before the allegedly collusive price increase occurred.  DPP CAC ¶ 447 n.55 (citing https://www.linkedin.com/in/jan-bell-51a3135/).

7

Second, plaintiffs do not make any connection between G&W and their allegations regarding government investigations. In its previous opinion, the Court noted that plaintiffs alleged sufficient facts showing connections between Heritage and the Group 1 Defendants to support the conclusion that the Heritage executives' guilty pleas were not "entirely separate" from the subpoenas received by the Group 1 Defendants. *Generic Pharms. Pricing*, 338 F. Supp. 3d at 453. Here, as described above, plaintiffs do not allege any facts that connect G&W with Heritage, Malek, Glazer, or the drugs they sold, such that the Court could reach the same conclusion as to G&W. Neither metronidazole nor G&W are mentioned at all in the States' multi-drug complaints, despite years of investigation. Plaintiffs have failed to allege any facts implying a traditional conspiracy against G&W.

### III. PLAINTIFFS CONCEDE THAT THEIR OWN ALLEGATIONS REQUIRE DISMISSAL UNDER THE STATUTE OF LIMITATIONS

Plaintiffs argue that their claims are timely under the continuing-violation doctrine, which provides that a separate cause of action accrues each time a purchaser pays an unlawfully high price for a product subject to a price-fixing conspiracy. Opp'n at 11, *citing Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). That assertion is beside the point.

Even if plaintiffs were able to allege a continuing violation as to G&W (which they have not), it only gets plaintiffs so far. Because plaintiffs were on notice of their claims in 2011 (and, at the latest, in 2014), their claims *for damages* prior to four years before the date of the complaints are barred. The law on this issue is not in dispute. Opp'n at 11-12 (citing *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("[P]urchasers maintain a right of action for any overcharges paid within the four years prior to their filings.")). Plaintiffs argue, however, that the limitations period should be extended beyond that four year period because G&W "concealed [the] nature of its conspiracy." Opp'n at 12. But plaintiffs have not met the standard to plead fraudulent

8

concealment against G&W.  The Third Circuit requires a plaintiff to plead particularized facts sufficient to suggest that the defendant actively misled the plaintiff.  Plaintiffs do not identify a single fact here that suggests that G&W concealed anything from anyone.  *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2006).  This deficiency is fatal to their fraudulent concealment claim.

Instead, plaintiffs assure the Court that even though G&W's metronidazole price increases were "stunningly large" and "unprecedented," the complexity of the pharmaceutical market prevented them from seeing "warnings of collusive behavior that would merit greater investigation" before 2018.  Opp'n at 13.  But the complexities to which plaintiffs refer relate only to *consumer* pricing, not pricing to sophisticated corporate direct purchasers such as plaintiffs.  *Id.* at 13 n.56, *see also* DPP CAC ¶ 98.  The complaints make clear that pharmaceutical manufacturers provide WAC, or list prices, to direct purchasers, such that those purchasers know precisely how much they are being charged at the time of purchase.  *Id.* ¶ 99. The complaints further explain that direct purchasers are so attuned to price increases for pharmaceutical drugs that they can appeal those increases.  *Id.* ¶ 106.  Thus, plaintiffs were, or should have been, on notice of their claims at the time of the alleged price increases in 2011.

*In re Blood Reagents Antitrust Litigation* does not suggest otherwise, as plaintiffs claim. In that case, the plaintiffs admitted that they had knowledge of allegedly anticompetitive price increases, but could not assert their claims because they did not possess information regarding communications between the defendants.  266 F. Supp. 3d 750, 785 (E.D. Pa. 2017).  The court concluded that the plaintiffs did not have access to "crucial information" that would have allowed them to identify facts supporting their claims.  *Id*.  Here, by contrast, all of the facts that plaintiffs allege against G&W were publicly available in 2011, including G&W's attendance at trade show

9

association meetings. Plaintiffs have not identified any "crucial information" relating to G&W that was not available until 2018. *In re Aspartame Antitrust Litig.*, 416 Fed. App'x 208, 212 (3d Cir. 2011).

To the contrary, even if the Court were to assume that plaintiffs did not have enough information in 2011 to assert their claims, plaintiffs admit that there were "storm warnings" at least as early as 2014 when they requested a congressional inquiry into "significant spikes" in generic pharmaceutical prices. DPP CAC, Ex. B. Plaintiffs ignore that fact entirely in their opposition, despite that it is critical to the statute of limitations analysis. *See* Opp'n at 12-13.

Because plaintiffs' suspicions in 2014 are clear from the face of the complaints, plaintiffs' claims are ineligible for equitable tolling. *In re Processed Egg Prods. Antitrust Litig.,* 2011 WL 5980001, at *2 (E.D. Pa. Nov. 30, 2011) (a statute of limitations defense may be resolved on a Rule 12(b)(6) motion where "the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."). As the court in *Processed Eggs* explained, "a plaintiff cannot sit on its rights and incubate its claim for damages for an undue period without exercising due diligence and pursuing judicial remedies." *Id*. at *13. Here, direct purchasers do not allege that they exercised any due diligence to assess their claims, despite their concerns about generic drug pricing in 2014. Thus, even if this Court finds that plaintiffs have plausibly alleged a continuing violation as to G&W, DPPs may not recover damages before June 22, 2014 and Kroger Plaintiffs may not recover damages before December 21, 2014. *Id.*

## CONCLUSION

For the above reasons, G&W respectfully requests that the Court dismiss DPPs' and Kroger Plaintiffs' claims against G&W, with prejudice.

Dated: June 13, 2019					Respectfully Submitted,

**LATHAM & WATKINS LLP**

*/s/ Marguerite M. Sullivan*
Marguerite M. Sullivan (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C., 20004
(202)-637-2200
marguerite.sullivan@lw.com

Anna M. Rathbun (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C., 20004
(202)-637-2200
anna.rathbun@lw.com

*Attorneys for Defendant*
*G&W Laboratories, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2019, a sealed unredacted copy of the foregoing Defendant G&W Laboratories, Inc.'s Reply in Support of its Motion to Dismiss the Direct Purchaser and Kroger Plaintiffs' Complaints was served via electronic mail on Liaison Counsel pursuant to the Court's Pretrial Order No. 40. A redacted version was filed via the Court's CM/ECF system, which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading via the ECF system.

Dated: June 13, 2019

*/s/ Marguerite M. Sullivan*
Marguerite M. Sullivan