# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | MDL NO. 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| **THIS DOCUMENT RELATES TO:** | Civil Action Nos. |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-02641 |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-00284 |
| *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | 18-CV-3299 |
| | **ORAL ARGUMENT REQUESTED** |

**DEFENDANT IMPAX LABORATORIES, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO DISMISS DIRECT PURCHASERS' FIRST AMENDED CLASS ACTION COMPLAINT AND COUNT TWENTY-THREE OF KROGER PLAINTIFFS' AMENDED COMPLAINT**

**FILED WITH REDACTIONS – PUBLIC VERSION**

**TABLE OF CONTENTS**

**Page**

I. Plaintiffs Do Not Identify Any Allegations That Impax Joined and Participated in the Purported "Fair Share" Conspiracy. ...................................................... 2

II. Certain Plaintiffs' Metronidazole Allegations Fail Because Impax's Entry into the Metronidazole Market Does Not Show Parallel Pricing or Action Against Self-Interest. ................................................................................ 5

III. Plaintiffs' Complaints Fail To Allege the Elements of Fraudulent Concealment. ........................................................................................................ 9

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ......................................................................................... 6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 6, 8

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ....................................................................................... 4

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015) ......................................................................................... 6

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ......................................................................................... 6

*Frederico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007) ......................................................................................... 5

*In re Generic Pharm. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ............................................................... 3, 5, 7, 8

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ............................................................................. 4, 6, 7, 8

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993) ................................................................................. 9, 10

*In re Magnesium Oxide Antitrust Litig.*,
    2011 WL 5008090 (D.N.J. Oct. 20, 2011) ............................................................. 9, 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..................................................................................................... 8

*In re Packaged Seafood Prod. Antitrust Litig.*,
    2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ..................................................................... 5

*Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*,
    836 F.2d 173 (3d Cir. 1988) ......................................................................................... 5

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013), *adopted by*
    2014 WL 298594 (E.D.N.Y. Jan. 28, 2014) ................................................................. 5

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) ........................................................................... 4

**FILED WITH REDACTIONS – PUBLIC VERSION**

*Prosterman v. Am. Airlines, Inc.*,
   747 F. App'x 458 (9th Cir. 2018) ...................................................................................4

*In re Publ'n Paper Antitrust Litig.*,
   2005 WL 2175139 (D. Conn. Sept. 7, 2005) ..............................................................9, 10

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ..........................................................................................6

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ..........................................................................................4

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017).................................................................................6, 8, 9

**Other Authorities**

Decision and Order, *In re Novartis AG*,
   FED. TRADE COMM'N (Sept. 5, 2012)..............................................................................7

*Frequently Asked Questions About Merger Consent Order Provisions*, FED.
   TRADE COMM'N, https://www.ftc.gov/tips-advice/competition-
   guidance/guide-antitrust-laws/mergers/merger-faq ......................................................8

Impax Laboratories, Inc. FQ3 2012 Earnings Call Transcript (Oct. 30, 2012),
   https://seekingalpha.com/articl e/962321-impax-laboratories-ceo-discusses-
   q3-2012-results-earnings-call-transcript .......................................................................7

Press Release, *In re Novartis AG*, FED. TRADE COMM'N (Sept. 5, 2012) ........................................7

Impax's opening brief posed several questions that revealed the implausibility of Plaintiffs' theory that it participated in an industry-wide conspiracy to allocate markets for dozens of generic drugs it did not make and legally could not sell. Impax Mem. 1. In their response, Plaintiffs do not answer any of those questions. Indeed, Plaintiffs do not cite a single case that has upheld a conspiracy with a kaleidoscope of parties and products this vast. This alone requires dismissal of their multi-drug complaints.

Even if Plaintiffs' industry-wide market allocation conspiracy were theoretically possible, Plaintiffs do not allege any facts that tie Impax to it. At best, Plaintiffs allege that Impax participated in separate single-drug price-fixing conspiracies. According to Direct Purchaser Plaintiffs, for instance, the only conduct that Impax took in furtherance of the alleged multi-drug conspiracy was entering the market for a single drug, metronidazole, at prevailing market prices. However, DPPs do not plead facts from which the Court can infer that Impax's entry into the metronidazole market was indicative of participation in a broader industry-wide conspiracy. No overarching complaint filed against Impax contains a single allegation that Impax communicated with other Defendants regarding any drug, that Impax agreed to refrain from entering the market for one drug in exchange for increased sales in another, or that Impax conceded market share or customers on one drug in exchange for increased market share or customers on another.

Without any factual allegations to support the alleged conspiracy or Impax's involvement in it, Plaintiffs argue that the factors that led the Court to deny Impax's motion to dismiss the digoxin complaints require denial of the motion currently before the Court. However, along every dimension relevant to a Section 1 claim based on circumstantial evidence – economic plausibility, parallel pricing, motive to conspire, self-interest, and opportunities to conspire – the multi-drug complaints' allegations against Impax are weaker and merit a different result.

**FILED WITH REDACTIONS – PUBLIC VERSION**

**I.  Plaintiffs Do Not Identify Any Allegations That Impax Joined and Participated in the Purported "Fair Share" Conspiracy.**

In its opening brief, Impax challenged Plaintiffs to identify specific factual allegations in their complaints concerning Impax's involvement in the purported "fair share" agreement. *Id*. 6, 8-9. Plaintiffs respond by asserting that their complaints "provide many detailed examples of drug-specific conduct and of the broader 'fair share' conspiracy in action," including "inter-Defendant communications and agreements that spanned multiple drugs." Opp'n 2. But *only one* of the paragraphs that they cite even mentions Impax, and that paragraph merely alleges that Impax received a grand jury subpoena. *See* DPP Compl. ¶¶ 103-126 (describing MAC pricing and how "Defendants acted to render particular generic drug markets . . . 'stable'" but not mentioning Impax, the "market share ratios" for any of Impax's drugs, any "profitable business opportunities" that Impax turned down, or any communications involving Impax that achieved and maintained "proportional market share"), *cited in* Opp'n 2 n.8; Kroger Compl. ¶¶ 9 (purporting to describe purpose of alleged "fair share" agreement; not mentioning Impax), 17 (alleging that Impax and other Defendants publicly acknowledged receiving subpoenas), 463 (purporting to describe communications between Heritage and Mylan; not mentioning Impax), *cited in* Opp'n 2 n.8; Humana Compl. ¶¶ 262-88 (describing alleged communications between Heritage and other Defendants, none of which involved Impax), *cited in* Opp'n 2 n.8; DPP Compl. ¶¶ 118-21 (alleging that "Defendants" effectuated a "Heritage-Related" conspiracy through "communications, contacts, and meetings at trade associations"; not mentioning Impax), *cited in* Opp'n 2 n.9; Humana Compl. ¶ 136(h) (alleging that industry groups provided "Defendants" with opportunities to communicate; not mentioning Impax), *cited in* Opp'n 2 n.9.

Plaintiffs attempt to tie Impax to the alleged industry-wide conspiracy by claiming that "the Metronidazole price increases and Impax's entry at supracompetitive prices were part of a

larger understanding among generic drug manufacturers each of whom has overlapping generic drug portfolios spanning many drugs." Opp'n 5. Not a single allegation they cite, however, alleges that Impax had knowledge of or involvement in any such understanding. Opp'n 5 n.27 (citing DPP Compl. ¶¶ 14-19 (not mentioning Impax or metronidazole at all) and Kroger Compl. Ex. 2 (merely listing the drugs each Defendant sold)).

Rather than identify any allegations in *the multi-drug complaints* that implicate Impax in alleged industry-wide market allocation, Plaintiffs suggest that the complaints should stand because the Court found that the allegations against Impax in the digoxin actions were sufficient to survive a motion to dismiss. Opp'n 1, 2, 6. The conspiracy alleged here – industry-wide market allocation involving up to 30 suppliers and 43 drugs (nearly all of which Impax did not sell) – is a far cry from a single-drug price-fixing conspiracy involving five defendants. First, the alleged industry-wide market allocation conspiracy is not plausible on its face given the number of diverse competitors, non-overlapping products, and complex pricing mechanisms. Impax Mem. 5. Second, Impax would not have a motive to join a "Heritage-Related" conspiracy when it was not alleged to have sold any of the same drugs as Heritage. *Id.* 5-6, 9. Third, Plaintiffs do not identify any action that Impax took that was against its self-interest.

Plaintiffs are, therefore, left to argue that opportunities to collude and government investigations are sufficient to withstand a motion to dismiss. Opp'n 2, 4, 5, 6. The Court has recognized that, without more, neither opportunities to conspire nor government investigations are sufficient to create an inference of a conspiracy. *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 449-50, 452 (E.D. Pa. 2018). Here, Plaintiffs' allegations regarding trade associations and government investigations do not provide "the required added factual enhancement that is necessary for their claims to withstand dismissal," particularly where they also fail to alleged motive or actions against self-interest. *Id*. at 448.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Courts "have long been skeptical that participation in a trade organization is suggestive of collusion, and that skepticism has only hardened since *Twombly* and its progeny." *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018) (citations omitted); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (noting that *Twombly* "reject[ed] the contention that the defendants' common membership in a trade union, combined with parallel conduct, plausibly suggests conspiracy"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009) ("The fact that American and Continental gathered at industry trade association meetings during the seven-year period when defendants reduced commission rates should not weigh heavily in favor of suspecting collusion. The Supreme Court rejected a similar argument in *Twombly* . . . ."). Plaintiffs' assertion that trade association participation is suggestive of collusion invites even more skepticism here, where Plaintiffs do not allege that an actual Impax employee attended a single trade association meeting before Impax was legally permitted to sell metronidazole. Plaintiffs do not dispute that "of the six trade association meetings DPPs list, five took place before Impax was legally permitted to sell metronidazole jelly or even knew it would be acquiring the rights to the product," and "[a]s to the sixth, . . . the only individual from Impax that DPPs allege attended this meeting . . . did not start working for Impax until August 1, 2016." Impax Mem. 3-4. Nor do Plaintiffs dispute that "[o]f the meetings that Kroger Plaintiffs claim facilitated the price increases on metronidazole, Impax is only alleged to have attended one such meeting prior to entering the market," which "took place before Impax acquired the right to sell the product," and "the representative that allegedly attended on Impax's behalf did not work at Impax until four years later." *Id*. 4. Plaintiffs instead point to materials "extraneous to the pleadings," which the Court cannot consider on a motion to dismiss. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 740 (E.D. Pa. 2011) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)); *see also*

**FILED WITH REDACTIONS – PUBLIC VERSION**

*Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988))).

Likewise, the government investigations *cut against* Plaintiffs in Impax's case. In its Group 1 opinion, the Court held that the existence of a parallel criminal investigation could bolster the plausibility of a Section 1 claim because it meant that "at least several individuals within the governmental chain of command thought certain facts warranted further inquiry into a potential criminal conspiracy." *Generic Pharm.*, 338 F. Supp. 3d at 452 (quoting *In re Packaged Seafood Prod. Antitrust Litig.*, 2017 WL 35571, at *8 (S.D. Cal. Jan. 3, 2017)). However, no government agency has issued a subpoena to Impax regarding metronidazole. Impax Mem. 13. The State of Connecticut issued Impax a subpoena in July 2014. Though five years have passed since its investigation began, Connecticut has not sued Impax regarding *any* drug. Indeed, State Plaintiffs' new complaint, filed May 10, 2019, neither names Impax as a defendant nor alleges metronidazole was part of the alleged industry-wide agreement. Given the length of time that the government has been investigating Impax, the Court should infer that individuals within the government thought the facts were not worthy of filing even a civil complaint against Impax. *Cf. Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2013 WL 6481195, at *2, *22-23 (E.D.N.Y. Sept. 20, 2013) (dismissing global conspiracy claim against four defendants despite 22 guilty pleas by other parties), *adopted by* 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014), *cited in Generic Pharm.*, 338 F. Supp. 3d at 443 n.216.

**II.    Certain Plaintiffs' Metronidazole Allegations Fail Because Impax's Entry into the Metronidazole Market Does Not Show Parallel Pricing or Action Against Self-Interest.**

In its brief, Impax argued that DPPs' and Kroger Plaintiffs' metronidazole claims fail as a matter of law because Impax did what any entrant in a concentrated market would do. Impax

Mem. 10-11. Plaintiffs do not contest that Impax entered the market at prevailing prices more than a year after three other Defendants increased prices or that such conduct is typical of entrants in a concentrated market. Rather, Plaintiffs argue it would be "inappropriate" for the Court to consider "pricing-specific arguments . . . at this stage of the proceedings." Opp'n 7. To the contrary, "*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct *should be dismissed* if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *Ins. Brokerage*, 618 F.3d at 326 (emphasis added).

Plaintiffs' metronidazole claims suffer from a fundamental problem: entry at existing market prices is "just as much in line with a wide swath of rational and competitive business strategy prompted by common perceptions of the market." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Courts make clear that it is not only legal for a new entrant to charge the prevailing market price, it is pro-competitive:

> And might not entry into concentrated markets be deterred because an entrant who, having successfully entered such a market, charged the prevailing market price would be a tacit colluder and could be prosecuted as such, if tacit collusion were deemed to violate the Sherman Act? What could be more perverse than an antitrust doctrine that discouraged new entry into highly concentrated markets?

*In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874 (7th Cir. 2015). Plaintiffs ignore *Text Messaging* in their response. Judge Posner's observation is consistent with an unbroken string of Third Circuit cases holding that firms may set their prices at similar levels without engaging in concerted action. *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359 (3d Cir. 2004); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 121-22 (3d Cir. 1999). Plaintiffs admit that "prices fell" as soon as Impax entered the market, Opp'n 8, providing further evidence that Impax's entry was pro-competitive and not

the result of a conspiracy.

Plaintiffs' pricing allegations, even taken as true, fail to satisfy two elements of a Sherman Act claim – parallel conduct and actions against self-interest. *Ins. Brokerage*, 618 F.3d at 321-22. The Court addressed parallel pricing in its opinion on the Group 1 motions to dismiss, holding that a "time lapse between [a Defendant's] price increases and those of the other Defendants" may be too great to aver parallel conduct. *Generic Pharm.*, 338 F. Supp. 3d at 444. The Court found that it was a "close[] question" whether Plaintiffs alleged that Actavis and Perrigo had engaged in coordinated conduct for clobetasol, *id*. at 443, though it ultimately rejected their argument. *Id*. at 444. Impax does not "recycle[]" an argument the Court has already "rejected," Opp'n 7; it articulates several reasons why the allegations against Impax are distinguishable and fall on the other side of this question. Impax Mem. 11-12. Plaintiffs do not dispute the factual bases of Impax's argument, including that (1) "unlike Perrigo, Impax was a new entrant," (2) "the time interval between the alleged price increase and entry" was greater in Impax's case in comparison to Actavis,[1] (3) "Impax entered the market at a price that was ▉▉▉▉▉▉▉▉▉▉ what it considered to be the established market price," (4) Impax's entry "occurred pursuant to an FTC divestiture order,"[2] and (5) the trade association allegations

---

[1] Plaintiffs attempt to create a "dispute of fact" concerning the date Impax entered the metronidazole market, Opp'n 7, but Plaintiffs' own data shows that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ DPP Compl. ¶¶ 139 n.46, 281.

[2] Plaintiffs' claim that "Impax was not a party to the divestiture order," Opp'n 9, is inaccurate. The order required Novartis "to end a marketing agreement that allows it to sell three of the products," including metronidazole, Press Release, *In re Novartis AG*, Fed. Trade Comm'n (Sept. 5, 2012), and to transition the products to a "New Commercialization Partner," "a Third Party(ies) designated by Tolmar to market, distribute or sell the Divestiture Products," Decision and Order at I.BB, OO, *In re Novartis AG*, Fed. Trade Comm'n (Sept. 5, 2012). Impax was the New Commercialization Partner referred to in the FTC's order. DPP Compl. ¶ 281 n.49; *see also* Impax Laboratories, Inc. FQ3 2012 Earnings Call Transcript (Oct. 30, 2012), https://seekingalpha.com/articl e/962321-impax-laboratories-ceo-discusses-q3-2012-results-earnings-call-transcript. Plaintiffs also contend that

against Impax are thinner than the allegations against Actavis and Perrigo. Impax Mem. 11-12.

Plaintiffs' brief also ignores the actions against self-interest element of a Sherman Act claim. Impax's decision to enter the market was consistent with its self-interest – it allowed the company to expand its offerings to customers and boost sales with the addition of a new drug. Matching the incumbent suppliers' prices was in Impax's self-interest and consistent with what economic theory and Third Circuit case law would predict. *Valspar*, 873 F.3d at 191 (in an oligopoly, "[a] firm is unlikely to lower its price in an effort to win market share because its competitors will quickly learn of that reduction and match it, causing the first mover's profits to decline and a subsequent decline in the overall profits of the industry"). Subjecting a company to burdensome discovery and the threat of treble damages when it sees elevated prices, enters the market with the imprimatur of a government regulator, and competes with the incumbents, thereby driving prices down, would "chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986), *cited in Ins. Brokerage*, 618 F.3d at 321.[3]

---

Impax's acquisition of metronidazole as the result of an FTC divestiture "does not make its participation in the [alleged] conspiracy any less plausible." Opp'n 9. The divestiture is relevant in two respects. First, the FTC orders divestiture to restore competition that would be lost as a result of a problematic merger. *See Frequently Asked Questions About Merger Consent Order Provisions*, FED. TRADE COMM'N, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/merger-faq. Impax's entry, which restored competition that otherwise would have been lost as a result of a merger, is presumptively pro-competitive and inconsistent with Plaintiffs' market allocation theory. Second, with respect to the metronidazole price-fixing allegations, the "context" in which Impax entered the market, where government enforcers and an interim monitor had a heightened interest in ensuring that vigorous competition remained after Novartis' acquisition of Fougera, undermines "a suggestion of a preceding agreement" between Impax and the three incumbent metronidazole suppliers. *Twombly*, 550 U.S. at 557. The Court can take judicial notice of FTC regulatory proceedings. Impax Mem. 15 n.8.

[3] The Court's discussion of actions against self-interest focused on Plaintiffs' allegation that "MAC pricing . . . limits the ability of a generic pharmaceutical manufacturer *to unilaterally lead* the market in a price increase absent collusion." *Generic Pharm.*, 338 F. Supp. 3d at 448-49 (emphasis added). It did not address the situation here, where an entrant allegedly *matched* the prices as they existed at the time it entered the market. In this situation, it would be *against* the entrant's self-interest to charge a

**FILED WITH REDACTIONS – PUBLIC VERSION**

**III.     Plaintiffs' Complaints Fail To Allege the Elements of Fraudulent Concealment.**

DPPs and Kroger Plaintiffs do not dispute that they filed their metronidazole claims after the statute of limitations expired. They instead claim that the limitations period was tolled under the doctrine of fraudulent concealment. Opp'n 9-12. Plaintiffs' argument fails because they do not plead the elements of fraudulent concealment.

*First,* Plaintiffs fail to identify "an affirmative act of concealment" by Impax. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178 (3d Cir. 1993). They instead argue that the alleged conspiracy is "self-concealing." Opp'n 10. "Carried to its logical conclusion, [Plaintiffs' argument] would mean that the antitrust statute of limitations never applies to a price-fixing conspiracy." *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *4 n.5 (D. Conn. Sept. 7, 2005). As a result, "merely alleging a price-fixing conspiracy, and nothing more, does not establish the existence of a 'self-concealing' violation." *Id.* at *4.

Plaintiffs must "allege particular circumstances surrounding the [metronidazole] market indicating that the alleged conspiracy was self-concealing." *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *22 (D.N.J. Oct. 20, 2011). Plaintiffs plead the opposite here. Impax's entry was public, and the initial price increases by three other manufacturers in 2011 and the prices charged by Impax upon its entry in 2012 were public and well-known to Plaintiffs. Plaintiffs' own complaints allege that the 2011 metronidazole price increases were abnormal and could not be ascribed to market forces. *See* DPP Compl. ¶¶ 275-78; Kroger Compl. ¶¶ 660-62.

Plaintiffs argue in the alternative that they "plausibly allege that Defendants engaged in affirmative acts of concealment, including making consistent efforts to avoid communicating in writing, *e.g.*, providing instructions not to communicate in writing, and deleting electronic

---

lower price because the incumbent suppliers would simply match it. *Valspar*, 873 F.3d at 191. Plaintiffs do not address *Valspar* or the proposition for which Impax cited it in their brief.

-9-
**FILED WITH REDACTIONS – PUBLIC VERSION**

communications." Opp'n 10-11. None of the allegations they cite mentions Impax, however. Opp'n 11 n.59 (citing DPP Compl. ¶ 502 and Humana Compl. ¶ 757). Even if they did, courts have rejected similar allegations as affirmative acts of concealment. *Publ'n Paper*, 2005 WL 2175139, at *3 (allegations about "secret meetings, misrepresentations to customers concerning the reason for price increases and surreptitious communications . . . at trade association meetings (and elsewhere) in order to prevent the existence of written records" were "wholly insufficient under Rule 9(b)"); *Magnesium Oxide*, 2011 WL 5008090, at *22 n.20 (allegations that "defendants met secretly . . . for the express purpose of fixing prices and allocating markets" and justified their price increases by reference to "tight supply, thinning margins, and increased energy and freight costs" did not establish an affirmative act of concealment under Rule 9(b)).

*Second,* Plaintiffs fail to allege that they "exercised due diligence in investigating [their] cause of action." *Lower Lake Erie*, 998 F.2d at 1179. In fact, Plaintiffs' brief does not identify *any* steps they took to investigate their claims. Opp'n 11. Plaintiffs claim they could not have learned of the alleged metronidazole conspiracy "through a diligent investigation until the filing of the redacted Plaintiff States' Heritage-Related Multi-Drug Complaint ("States' complaint") on October 31, 2017." Opp'n 11. Plaintiffs' claim is baffling – the States' complaint *does not name Impax* as a defendant and *does not allege a conspiracy involving metronidazole*!

Plaintiffs allegedly experienced "drastic, market-wide increases" in metronidazole prices starting in June 2011. Opp'n 3. This is sufficient to put them on inquiry notice. *See, e.g.*, *Lower Lake Erie Iron Ore*, 998 F.2d at 1179 (plaintiffs' knowledge of publicized pricing decisions "should reasonably have made them aware of a basis for asserting the very claims now being raised"); *Publ'n Paper*, 2005 WL 2175139, at *5-6 (plaintiffs failed to satisfy their burden of pleading reasonable diligence where they alleged "dramatic, lockstep price increases").

Dated: June 13, 2019                              Respectfully submitted,

<div style="margin-left: 3em;">

/s/ *Raymond A. Jacobsen, Jr.*
Raymond A. Jacobsen, Jr.
Paul M. Thompson (Pa. No. 82017)
Lisa A. Peterson
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
Telephone: (202) 756-8000
rayjacobsen@mwe.com
pthompson@mwe.com
lpeterson@mwe.com

David L. Hanselman Jr.
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Suite 4000
Chicago, IL 60605
Telephone: (312) 372-2000
dhanselman@mwe.com

Nicole L. Castle
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173
Telephone: (212) 547-5400
ncastle@mwe.com

*Counsel for Impax Laboratories, Inc.*

</div>

**FILED WITH REDACTIONS – PUBLIC VERSION**

**CERTIFICATE OF SERVICE**

      I hereby certify on this 13th day of June 2019, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's ECF System. Notice of this filing will be sent to all counsel of record by operation of the ECF System.

                                                  /s/ *Raymond A. Jacobsen, Jr.*
                                                  Raymond A. Jacobsen, Jr.

**FILED WITH REDACTIONS – PUBLIC VERSION**