# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-md-2724<br><br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | Civil Action Nos. |
| *Ahold USA, Inc., et al. v. Actavis Holdco U.S., Inc. et al.* | 18-2641<br>18-2401 |
| *1199SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco US, Inc.* | 18-3299<br>18-2533<br>18-284 |
| *Humana Inc. v. Actavis Elizabeth, LLC et al.* | 18-4137<br>17-3768 |
| *West Val Pharm., et al. v. Actavis Holdco U.S., Inc.* | |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc.* | **ORAL ARGUMENT REQUESTED** |
| *Marion Diagnostic Center, LLC, et al. v. McKesson Corp., et al.* | |
| *The State Attorneys General Litigation* | |

# DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' OVERARCHING CONSPIRACY CLAIMS

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ........................................................................................ 2

II. ARGUMENT ............................................................................................................... 4

    A.    Plaintiffs have failed to plead facts showing each Defendant's awareness
        of, and conscious commitment to, an industry-wide, overarching
        conspiracy. ............................................................................................................. 8

        1.    Conclusory allegations regarding unspecified Defendants'
            "agreement" or "understanding" are insufficient to state a claim for
            overarching conspiracy. ............................................................................. 9

        2.    Plaintiffs similarly cannot state a claim based on speculative
            theories regarding Defendants' participation in an overarching
            conspiracy. ................................................................................................ 14

        3.    Plaintiffs' only factual allegations relate to conduct in individual
            drug markets or bilateral conduct between certain Defendants that
            cannot support an overarching conspiracy claim. .................................... 17

        4.    Plaintiffs' use of the label "fair share" does not change this
            analysis. .................................................................................................... 23

        5.    The absence of factual allegations goes to the nature of the alleged
            conspiracy, not its "scope." ...................................................................... 25

    B.    Plaintiffs' arguments regarding interdependence of the alleged individual-
        drug agreements are speculative and not grounded in any factual
        allegations. ........................................................................................................... 27

III. CONCLUSION ........................................................................................................... 31

# TABLE OF AUTHORITIES

**CASES**

*Advanced Tech. Corp., Inc. v. Instron, Inc.*,
  925 F. Supp. 2d 170 (D. Mass. 2013) ........................................................................5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................15, 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................5, 11, 15, 16

*Dahl v. Bain Capital Partners LLC*,
  937 F. Supp. 2d 119 (D. Mass. 2013) ..............................................................22, 23

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)...........................................................................4

*Hinds v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)..............................................................9, 11

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)..........................................................................11

*In re Elevator Antitrust Litig.*,
  No. 04-1178, 2006 WL 1470994 (S.D.N.Y. May 30, 2006) *aff'd*, 502 F.3d 47
  (2d Cir. 2007)........................................................................................16

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  No. 13-7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) .................................26

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404, 438 (E.D. Pa. 2018) .......................................................9

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...........................................................26

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010).................................................................... passim

*In re Ins. Brokerage Antitrust Litig.*,
  No. 04-5184, 2006 WL 2850607 (D.N.J. Oct. 3, 2006) .......................................16

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
  768 F. Supp. 2d 961 (N.D. Iowa 2011)..........................................................26, 27

*In re K-Dur Antitrust Litig.*,
   No. 01-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ...................................................4, 7, 27

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) ..................11, 16

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-2420, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014).............................................15, 26

*In re LTL Shipping Servs. Antitrust Litig.*,
   No. 08-01895, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009).....................................................12

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...............................................................................................5

*In re New Jersey Tax Sales Certificates Antitrust Litig.*,
   No. 12-1983, 2014 WL 5512661 (D.N.J. Oct. 31, 2014) .................................................22, 23

*In re Optical Disk Drive Antitrust Litig.*,
   No. 10-2143, 2014 WL 3378336 (N.D. Cal. July 10, 2014) ...............................................9, 14

*In re Packaged Seafood Prods. Antitrust Litig.*,
   No. 15-2670, 2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ........................................................27

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   566 F.Supp.2d 363 (M.D. Pa. 2008) .......................................................................................9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................................................9

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ...................................................................................................5

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ...............................................................................4, 11, 13, 14

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)....................................................................................................9

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
   998 F.2d 1224 (3d Cir. 1993)..................................................................................................6

*Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*,
   No. 08-42, 2011 WL 7053807 (E.D.N.Y Jan. 4, 2011) .................................................. passim

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) .......................................................................................13, 14

*R.E. Davis Chem. Corp. v. Nalco Chem. Corp.*,
   757 F. Supp. 1499 (N.D. Ill. 1990) ...............................................................................14

*Resco Prods. v. Bonsai Mineral Grp. Co., Ltd.*,
   158 F. Supp. 3d 406, 425-26 (W.D. Pa. 2016) .......................................................16

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ..............................................................................4, 11

*United States v. Gatling*,
   96 F.3d 1511 (D.C. Cir. 1996) .................................................................................29

*United States v. Kelly*,
   892 F.2d 255 (3d Cir. 1989) ...................................................................................4, 7

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990) .......................................................................................6

*United States v. Perez*,
   489 F.2d 51 (5th Cir. 1973) ........................................................................................6

Defendants submit this consolidated Reply in Support of their Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims.[1]

## I.    PRELIMINARY STATEMENT

To survive a motion to dismiss, Plaintiffs must plead facts supporting their claims—not conclusory assertions or wholly speculative "narratives" unsupported by factual allegations in any Complaint.  Plaintiffs' Oppositions, however, confirm that they have failed to do so.  None of Plaintiffs' allegations of *fact* support their efforts to impose sweeping joint and several liability on each (or any) Defendant for allegedly fixing prices and allocating markets for dozens of drugs that it did not sell.

Plaintiffs accuse Defendants of "ignoring" a "multitude of substantive allegations" in Plaintiffs' Overarching Complaints that they claim provide the "connective tissue" linking random dots into an overarching conspiracy.  But Plaintiffs cite no *facts* connecting each Defendant to alleged conspiracies involving drugs (in many cases, dozens of drugs) that it did not sell, and no *facts* showing that the series of individual-drug conspiracies alleged (which differ among the various Overarching Complaints) were connected into a single, overarching agreement.

---

[1]    Although not every Defendant is implicated in every Complaint addressed herein, to maximize efficiency for the Court, Defendants respond in this single Reply to: Plaintiffs' Joint Response in Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims, Dkt. 118; States' Response in Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims, Dkt. 119; Marion Diagnostic Center, LLC's and Marion Healthcare LLC's Opposition to Manufacturer Defendants' Motions to Dismiss, Dkt. 82; Kroger Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claim, Dkt. 130; Plaintiff Humana Inc.'s Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claim, Dkt. 130; Indirect Reseller Plaintiffs (IRP) Brief in Opposition to Defendants' Joint Motion to Dismiss the IRP Overarching Complain, Dkt. 83; End Payor Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims, Dkt. 176; and Direct Purchaser Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims, Dkt. 82 (collectively "Plaintiffs' Oppositions").

Instead, Plaintiffs' "allegations" consist of conclusory assertions, which they attempt to weave into a "narrative" explaining how an overarching conspiracy of the type they claim might be "possible." That narrative, however, is based entirely on Plaintiffs' own speculation regarding why and how each Defendant "might have" participated in an overarching conspiracy involving drugs it did not make, and how such a conspiracy "might have" operated. Such storytelling regarding "possible" scenarios that "might" have occurred, devoid of well-pled factual allegations that would support a plausible inference of conspiracy, is insufficient to survive a motion to dismiss under *Twombly*.

In the few instances where Plaintiffs point to allegations that arguably qualify as factual, those allegations, including use of the term "fair share" by certain Defendants, relate only to bilateral communications between two specific Defendants involving individual drugs those that Defendants sold. None of these allegations plausibly supports the existence of a broad, industry-wide overarching conspiracy involving dozens of different Defendants and drugs. Pleading participation in individual conspiracies—and suggesting that the totality of these individual conspiracies somehow demonstrates that there was an overarching conspiracy in the air—cannot be used as a "short cut" to avoid pleading facts showing that each Defendant was aware of, and committed to, such an overarching conspiracy. For the reasons explained in Defendants' Opening Brief, the Plaintiffs' reliance on these allegations illustrate that they have failed to allege a conspiracy.

In sum, Plaintiffs seek to tie together alleged individual conspiracies in entirely separate alleged drug markets in an effort to impose liability on each Defendant not only for any individual drug conspiracy that it is alleged to have joined, but also for dozens of other purported individual conspiracies involving numerous drugs that Defendant did not sell. *Twombly* demands that before

Plaintiffs are permitted to proceed down this path—and to subject Defendants and this Court to the enormous costs and burdens inherent in litigation that is growing in both size and complexity (and promises to continue to do so)—they must plead *facts* supporting such a massive overarching scheme.  Their Oppositions confirm that the Overarching Complaints fail this test.

## II.     ARGUMENT

At the motion to dismiss stage, the Court must *first* identify "with precision" the nature of the conspiracy—*i.e.*, the common scheme—plaintiffs claim and *then* determine whether the *facts* alleged in the complaint are sufficient to plausibly support each defendant's alleged knowledge of, and participation in, that scheme.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 339 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Where, as here, plaintiffs claim an "overarching conspiracy" encompassing numerous alleged individual conspiracies involving distinct products and different defendants, the facts alleged must also demonstrate that the individual conspiracies operated in a manner that was somehow connected across the various products, or otherwise interdependent, such that the success of each was related to the success of the others.  *See United States v. Kelly*, 892 F.2d 255, 258-59 (3d Cir. 1989); *see also In re K-Dur Antitrust Litig.*, No. 01-1652, 2016 WL 755623, at *21 (D.N.J. Feb. 25, 2016) (explaining that, to examine whether individual conspiracies were connected, the court examines "the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other").

In evaluating the Complaints' sufficiency, the Court must separate the well-pled factual allegations from legal conclusions and theoretical speculation.  *Fowler*, 578 F.3d at 210-11. Well-pled factual allegations should supply the "who, what, where, when, how or why" of a claimed conspiracy.  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n. 10

(2007)); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (explaining that factual allegations "answer the basic questions who, did what, to whom (or with whom), where, and when?").  By contrast, allegations that defendants "entered into a contract, combination or conspiracy to prevent competitive entry," "agreed not to compete with one another," or engaged in a "parallel course of conduct…to prevent competition" are legal conclusions not entitled to an assumption of truth.  *Twombly*, 550 U.S. at 564-66; *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) ("Conspiracy is a legal conclusion.") (citing *Kendall*, 518 F.3d at 1047); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 904-05 (6th Cir. 2009) (explaining asserting that an "agreement" exists among defendants "is nothing more than a legal conclusion masquerading as a factual allegation" and is insufficient to state a claim for violation of Section 1); *Advanced Tech. Corp., Inc. v. Instron, Inc*., 925 F. Supp. 2d 170, 179 (D. Mass. 2013) ("[The] complaint contains a number of legal conclusions, including allegations that Defendants 'conspired,' 'agreed,' and 'colluded.'"  While these allegations can provide a framework for the complaint, they are not entitled to an assumption of truth.  As a result, these allegations do not bring [the] conspiracy claim any closer to plausibility.").

Plaintiffs claim that each Defendant joined an expansively defined overarching, industry-wide "fair share" agreement "to achieve artificially-inflated generic drug prices through the allocation of markets, which prevented price erosion through competition, and through price-fixing agreements."  Pls. Joint Opp. at 2.  By doing so, Plaintiffs seek to hold each Defendant jointly and severally liable not just for allegedly fixing the prices of, or allocating markets for, the drugs that

it sold, but also for conduct in the markets for as many as "all" generic drugs—including dozens of drugs that the vast majority of the Defendants never sold.[2]

To survive a motion to dismiss such claims, Plaintiffs must, at a minimum, plead facts demonstrating that each Defendant was aware of, and consciously committed to, this ill-defined overarching conspiracy, including with respect to the drugs it did not sell.[3]  *Auto. Parts*, 2016 WL 8200512, at *4 ("[o]nly after a defendant agrees to the common purpose [of the overarching conspiracy] may it be held responsible for the conduct of the co-conspirators"); *Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 08-42, 2011 WL 7053807, at *30 (E.D.N.Y Jan. 4, 2011), *rep. and rec. adopted*, No. 08-42, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) (to survive motion to dismiss, factual allegations in a complaint must show that "each of the

---

[2]     Of the Complaints at issue here, the Plaintiff States' Complaint names 20 Defendants and identifies 15 different drugs; the Kroger Complaint names 29 Defendants and identifies 40 different drugs; the Humana Complaint names 36 Defendants and identifies 27 different drugs; the Class Complaints collectively name 21 Defendants and identify 24 different drugs; and the Marion Complaint names 16 Defendants and purports to claim a conspiracy covering "all generic drugs."

As discussed in detail below, the fact that Plaintiffs' claims can be molded to fit any set of facts makes it clear they are based solely on conclusory narrative, and not on any well-pled factual allegations.

[3]     The State Plaintiffs argue that they need not plead facts showing that each Defendant benefitted from "every agreement concerning each individual drug" in their claimed overarching conspiracy.  State Plaintiffs Opp. at 12; *see also* IRP Opp. at 11.  This argument is a red herring. Even if the argument were accurate, it does not relieve Plaintiffs of pleading facts demonstrating each Defendant's awareness of, and commitment to, the overarching conspiracy.  Moreover, the cases cited for this proposition neither support it nor contradict Defendants' position.  *See, e.g.*, *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973) (holding that while each defendant need not participate in each transaction of an alleged conspiracy, each defendant must commit to one common objective for a single conspiracy to exist); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc*., 998 F.2d 1224, 1243 (3d Cir. 1993) (holding only that defendants need not have the **same** motive to enter a claimed conspiracy);*United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) (noting that while all participants in an alleged conspiracy need not have "congruent" goals with their participation, each must "agree[] to participate in what he knew to be a *collective venture*") (emphasis added).

defendants was aware of and committed to the essential purpose of the ***overarching*** conspiracy"). Plaintiffs' Complaints do not even come close to meeting this standard.  As confirmed by their Oppositions, Plaintiffs' allegations fall into one of three categories:

1.  Conclusory assertions regarding the existence of an overarching agreement among Defendants, of precisely the type that *Twombly* deemed insufficient to survive a motion to dismiss;

2.  Speculative theorizing—based on conclusory assertions, not facts—regarding the possibility of how an overarching conspiracy "might" have worked, which fundamentally misunderstands *Twombly*'s distinction between claims that are merely "conceivable" or "possible" and those that are "plausible"; and

3.  Allegations regarding communications related to individual drugs or between two particular Defendants, ***none*** of which references the existence of the claimed overarching agreement.

None of these allegations, individually or collectively, suggests that any Defendant was aware of, and consciously committed to, a broad industry-wide conspiracy to fix the price of generic drugs that it did not sell.  Plaintiffs' overarching conspiracy claims fail for this reason alone.

Plaintiffs also fail to allege facts demonstrating that the dozens of alleged individual-drug conspiracies were interdependent, such that the success of one was related to the success of another.  *See Kelly*, 892 F.2d at 258-59; *see also K-Dur*, 2016 WL 755623, at *21.[4]  Plaintiffs' allegations regarding the purported interdependence of the various alleged individual conspiracies suffer from the same essential defects as their allegations regarding conscious commitment.  In sum, Plaintiffs fail to allege facts, and rely on nothing more than conclusory assertions and/or speculative theorizing.[5]

---

[4]    Further, as Defendants explained in their Opening Brief, Plaintiffs have failed to plausibly allege sufficient overlap to demonstrate a connection among the individual drug conspiracies.  *See* Mot. at 25-27.

[5]    Plaintiffs, to varying degrees, seek to inappropriately ascribe quasi-*res judicata* effect to the Court's decision regarding the Plaintiff States' Motion to Amend.  *See, e.g.*, Kroger Opp. at 5;

**A.      Plaintiffs have failed to plead facts showing each Defendant's awareness of, and conscious commitment to, an industry-wide, overarching conspiracy.**

In their Oppositions, Plaintiffs ignore their obligation to plead facts suggesting that each Defendant consciously committed to the industry-wide agreement they allege, *see* Mot. at 10-11, and instead rely on conclusory assertions and speculative theories.  None of the thousands of paragraphs in the seven Overarching Complaints mentions, refers to, or discusses *facts* suggesting the existence of an industry-wide, overarching conspiracy.  To the contrary, once the Court peels away the legal conclusions and unsupported speculation, it will find only alleged instances of bilateral communication between certain specific Defendants related to particular drugs—none of which includes any reference to, or supports the existence of, the massive overarching conspiracy claimed by Plaintiffs.  The Court will search in vain for facts suggesting that any Defendant agreed to fix the price of, or allocate markets for, a single drug—let alone dozens of drugs—that it did not sell.  The only references to such an industry-wide, overarching conspiracy are found in Plaintiffs' rhetoric, unsupported by any well-pled facts.

---

Humana Opp. at 2 ("As a practical matter, [the Motion to Amend] ruling instructs that Defendants' motions to dismiss Humana's Amended Complaint should be denied.").  In doing so, Plaintiffs ignore the text of the Court's Order, which specifically provided that the Court was evaluating the proposed complaint under the liberal standard of Federal Rule of Civil Procedure 15.  *See* Dkt. 603 at 6.  Further, Defendants in the Motion to Dismiss raise different and distinct arguments from their Opposition to Plaintiff States' Motion to Amend, and the Court is evaluating Complaints beyond (and significantly more expansive than) the Plaintiff States' Complaint.  Additionally, not all of the Defendants joining in the present Joint Motion to Dismiss are named in the Plaintiff States' Complaint, and accordingly, did not participate in the prior briefing on the States' Motion to Amend.  Finally, the Court itself contemplated that it would be addressing "[t]he arguments of all Defendants as to potential liability, including joint and several liability," at a later stage in the case.  *Id.* at 8.

1.      <u>Conclusory allegations regarding unspecified Defendants' "agreement" or "understanding" are insufficient to state a claim for overarching conspiracy.</u>

"[A]t the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).  A defendant cannot be subject to the risk of joint and several liability for allegedly participating in a conspiracy absent factual allegations demonstrating that it was aware of, and committed to, the common purpose of ***that conspiracy***.  *See Hinds v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009).  "Only after a defendant agrees to the common purpose may it be held responsible for the conduct of co-conspirators."  *Auto. Parts*, 2016 WL 8200512, at *4.  Plaintiffs must allege facts showing "***each Defendant's*** understanding of the common purpose of the overarching conspiracy."  *Id.* (emphasis added) (citing *United States v. Hodges*, 935 F.2d 766, 772-73 (6th Cir. 1991)).  Plaintiffs must also allege facts showing that "***each of the defendants*** was aware of and agreed to the essential purpose of the overarching conspiracy."  *Precision Assocs.*, 2011 WL 7053807, at *30; *see also In re Optical Disk Drive Antitrust Litig.*, No. 10-2143, 2014 WL 3378336, at *4 (N.D. Cal. July 10, 2014) (explaining that plaintiffs must plead "allegations specific to [each defendant] alleging [each defendant's] role in the alleged conspiracy").

At the Rule 12(b)(6) stage, therefore, the "Court properly looks for more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy."  *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 438 (E.D. Pa. 2018) (quotations and citations omitted).  Conclusory allegations that "Defendants" entered into an "overarching" agreement, without supporting factual allegations, are insufficient to state a claim for relief.  *See Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013); *see also In re*

*Pressure Sensitive Labelstock Antitrust Litig.*, 566 F.Supp.2d 363, 376 (M.D. Pa. 2008) ("[S]prinkling a complaint with conclusory assertions that a party was a 'participant in coordinated conduct' or a 'conspirator' or acted in 'concert' with others does not make the requisite showing of entitlement to relief mandated by Rule 8(a)(2).").

Here, with respect to the supposed overarching conspiracy, Plaintiffs' Oppositions confirm that the Overarching Complaints offer nothing but conclusory assertions regarding the alleged conduct of "Defendants" as a group.  The only "allegations" that Plaintiffs cite that refer to an "overarching" conspiracy merely tack the term "Defendants" on to a conclusory assertion that "Defendants" engaged in such a conspiracy.  The Direct Purchaser Plaintiffs, for example, cite Paragraphs 10 and 111 of their Complaint, which allege that "Defendants and their co-conspirators sought to avoid competition within the generic drug industry, instead maintaining the stability of the relative market shares assigned to each competitor," and "[t]he common understanding and goal of the Fair Share Agreement is for generic drug manufacturers to achieve artificially inflated prices because no generic manufacturer is incentivized to compete for additional market share by eroding price."  *See* DPP Opp. at 8 (citing DPP Compl. ¶¶ 10, 111).  Plaintiffs' assertion that Defendants are "repeat players who have overlapping generic drug portfolios," Pls. Joint Opp. at 2, adds nothing to the plausibility of, or factual basis for, an overarching conspiracy.

The other "allegations" cited by Plaintiffs fit exactly the same mold, simply adding the term "Defendants" to a conclusory legal assertion of participation in an overarching and/or "fair share" conspiracy.  *See, e.g.*, EPP Opp. at 8 (citing EPP Compl. ¶ 103) ("Defendants developed the concept of 'fair share,' in which each market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to free and fair price competition."); EPP Opp. at 6 (citing EPP Compl. ¶¶ 107, 125 ("[E]ach defendant…was a party

to the broader, overarching conspiracy…")); Humana Opp. at 7 (citing Humana Compl. ¶¶ 261, 263-64, 266); IRP Opp. at 6 (citing IRP Compl. ¶¶ 2, 4); Kroger Opp. at 9 (citing Kroger Compl. ¶¶ 814-15); State Opp. at 4-5 (citing State Compl. ¶¶ 90, 97, 99).

In addition to constituting impermissible group pleading, such "allegations" are precisely the type of conclusory assertions *rejected* by *Twombly*.  *See Twombly*, 550 U.S. at 564-66 (explaining that assertions that defendants "ha[d] entered into a contract, combination, or conspiracy to prevent competitive entry…and ha[d] agreed not to compete with one another" were conclusory allegations, not factual allegations, and were therefore not entitled to an assumption of truth); *see also Kendall*, 518 F.3d at 1048 (explaining that allegation that defendants "'knowingly, intentionally and actively participated in an individual capacity in the alleged scheme' to fix the interchange fee or merchant discount fee…is nothing more than a conclusory statement").  Courts following *Twombly*'s direction have held consistently that these types of conclusory allegations are insufficient to survive a motion to dismiss.  *See In re Late Fee & Over-Limit Fee Litig*., 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (dismissing antitrust claims where "[t]he complaint does include several conclusory allegations that the defendants agreed to increase late fees, but it *provides no details as to when, where, or by whom* this alleged agreement was reached"), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *see also Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (finding allegation that "all of the defendants…conspired and knew about the alleged plan" insufficient because "to survive dismissal it does not suffice to simply say that the defendants had knowledge; there must be factual allegations to plausibly suggest as much"); *Total Benefits Planning Agency*, 552 F.3d at 436 ("Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*."); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d

499, 513-15 (S.D.N.Y. 2009) ("[T]he CAC's general references to a conspiracy involving all of the Defendants and its reliance on industry-wide trade associations and conferences and various government investigations cannot help Named Plaintiffs satisfy the standard for stating a § 1 claim."); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-01895, 2009 WL 323219, at *10-11 (N.D. Ga. Jan. 28, 2009) (explaining that "for allegations of conspiracy to reach the plausibility threshold required by *Twombly,* they often must include factual allegations such as the specific time, place, and persons involved in the conspiracy alleged" and dismissing as conclusory the allegation that "Defendants agreed with each other to charge LTL fuel surcharges to customers and to set and assess them in a common manner").

The decision in *Auto Parts* is particularly instructive.  There, plaintiffs alleged a single "megaconspiracy" to "fix, raise, and maintain the prices" of 18 different automotive parts.  *Auto. Parts*, 2016 WL 8200512, at *1.  Like the "overarching" conspiracy allegations here, plaintiffs in *Auto Parts* alleged, in conclusory fashion, that defendants agreed to "respect[] co-conspirators' 'incumbency' or 'commercial rights,' refrain[] from competing for customers, allocat[e] customers…coordinat[e] response to requests for quotation, and coordinat[e] responses to requests for price reduction."  *Id*.  In denying the plaintiffs leave to amend, the court in *Auto Parts* emphasized that there were no factual allegations (1) that the defendants competed for the sale of all products in the alleged conspiracy; (2) suggesting a defendant committed to agreements with respect to products it did not make; and (3) of defendants having knowledge of agreements "outside [their own] specific deals."  *Id*.  Given those fundamental deficiencies in pleading, the *Auto Parts* court found that the plaintiffs failed to allege facts "creating at least an inference as to

each Defendant's knowing participation in a conspiracy to raise, fix, maintain, or stabilize the price

of auto parts, not just the parts it makes or sells." *Id*. at *4.  The same deficiencies exist here.[6]

Plaintiffs attempt to justify their reliance on conclusory group pleading tactics in two ways.

First, Plaintiffs argue that they are not required to "allege the same quantity or caliber of evidence

with respect to each Defendant."  EPP Opp. at 5.  But this misses the point.  With respect to

Plaintiffs' allegations regarding an overarching conspiracy, the issue is not the "quantity" or

"caliber" of factual allegations regarding each Defendant—it is the ***absence*** of factual allegations

showing that each (or any) Defendant joined an overarching conspiracy including drugs that it did

not sell.  The Complaints here simply assert the existence of a vast conspiracy without alleging the

predicate facts of who, what, when, where, and why a particular manufacturer agreed to conspire

on drugs it never sold.  Second, Plaintiffs argue that "there is nothing wrong with alleging 'each

Defendant' committed any act, provided that the complaint otherwise puts those defendants on fair

notice of the conduct attributable to each individual company."  Kroger Opp. at 9.  But again, what

is missing from each Overarching Complaint is ***any factual allegation*** sufficient to put any

Defendant on notice of how it was supposedly aware of, and consciously committed to, the

overarching conspiracy alleged.  *See Kendall*, 518 F.3d at 1047 ("A bare allegation of conspiracy

is almost impossible to defend against, particularly where the defendants are large institutions…").

The decision in *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indem. Co*.,

917 F.3d 1249 (11th Cir. 2019), cited by the Kroger Plaintiffs, highlights the problem with the

Overarching Complaints.  In *Quality Auto*, the court found only that using the phrase "the

---

[6]    The fact that the decision in *Auto Parts* came late in the case does not change this
conclusion.  Regardless of when a complaint is filed, plaintiffs must plead facts at least raising an
inference that each defendant knew about, and agreed to participate in, the purported overarching
conspiracy.

defendants" in connection with allegations of defendants' alleged tortious interference was adequate where plaintiffs specifically explained that the phrase "defendants" was coupled with specific factual allegations as to "defendant's" conduct.  *Id.* at 1275.  No Plaintiff here, however, couples assertions regarding "Defendants" with specific factual allegations showing each Defendant's awareness of, and participation in, the alleged overarching conspiracies.  Indeed, most instructive for purposes of this case is *Quality Auto*'s affirmance of the dismissal of plaintiffs' antitrust conspiracy claims because, after separating conclusory statements of "agreement" and "conspiracy" from the factual allegations necessary to sustain an antitrust claim, it was clear that plaintiffs had pleaded no facts supporting their claim for conspiracy.  *See id.* at 1261-68.

There is a reason that plaintiffs must plead "allegations specific to [each Defendant] alleging [each Defendant's] role in the alleged conspiracy" and "that plausibly suggest that [each Defendant] participated in th[at] conspiracy." *Optical Disk Drive*, 2014 WL 3378336, at *4.  "A bare allegation of a conspiracy is almost impossible to defend against." *Kendall*, 518 F.3d at 1047.  And bare allegations of conspiracy are not "facts which evince each defendant's agreement to participate in what he or it knew to be a collective venture toward a common goal." *R.E. Davis Chem. Corp. v. Nalco Chem. Corp.*, 757 F. Supp. 1499, 1515 (N.D. Ill. 1990) (internal quotations omitted).  Yet, with respect to the purported overarching conspiracy, bare allegations of conspiracy are all that the Plaintiffs offer here.

2. <u>Plaintiffs similarly cannot state a claim based on speculative theories regarding Defendants' participation in an overarching conspiracy.</u>

Plaintiffs attempt to weave their conclusory allegations into a "narrative" purporting to explain why and how Defendants "might" have, in theory, participated in a vast, industry-wide overarching conspiracy involving dozens of drugs that each individual Defendant did not even sell. Based on these speculative narratives, Plaintiffs argue that their overarching conspiracy claims

should survive because such a conspiracy might have been "possible." *See, e.g.*, EPP Opp. at 9-10.  But creative narratives based on conclusory assertions, unsupported by well-pled factual allegations, are not sufficient to survive a motion to dismiss under *Twombly*.

For example, the End Payor Plaintiffs argue that "[a]lthough Citron and Zydus do not share a drug in common…***it is not hard to see*** that they share a common interest in a broader, multi-drug agreement."  EPP Opp. at 9 (emphasis added).  Musing as to "[w]hat would have happened" if Heritage "decided to abandon" an alleged individual drug agreement, the End Payor Plaintiffs imagine the following hypothetical scenario:

> It is ***possible*** that Actavis, Aurobindo, Citron, and Teva would have lowered their own prices on Glyburide-Metformin to compete for share.  It also is plausible that having seen Heritage abandon their agreement on one drug, these Defendants ***might*** expect Heritage to do the same on others as well.  They ***might*** then have decided to lower prices on other drugs to pre-empt another attack by Heritage, or to retaliate by stealing Heritage's share.  Aurobindo, for example, ***might*** have opted to cut prices on Fosi-HCTZ to attack Heritage's share of that drug—but that ***might*** have prompted a price decline across the market for Fosi-HCTZ.  Teva, for its part, ***might*** have responded by attacking Heritage's share of Acetazolamide capsules, which ***could*** have triggered price declines not only for Heritage, but also for Zydus.  And so on, and so forth.

*Id*. at 9-10 (emphases added).  Nowhere do the End Payor Plaintiffs tether their narrative to a single factual allegation of conduct by a particular Defendant.  Indeed, the End Payor Plaintiffs recognize that they "do not allege specific instances of conduct like that described above." *Id*. at 10.

"To withstand a motion to dismiss, a plaintiff must not merely allege conduct that is ***conceivable*** but must instead allege 'enough facts to state a claim to relief that is ***plausible*** on its face.'"  *In re Lithium Ion Batteries Antitrust Litig*., No. 13-2420, 2014 WL 309192, at *7 (N.D. Cal. Jan. 21, 2014) (citing *Twombly*, 550 U.S. at 570) (emphasis added).  "A claim has facial plausibility when the plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662,

679-79 (2009) (emphasis added).   "The plausibility standard…*asks for more than a sheer possibility* that a defendant has acted unlawfully." *Id.* (emphasis added).  In short, to show that a Defendant was aware of, and consciously committed to, the claimed overarching conspiracies, Plaintiffs must do more than speculate regarding what "might" have happened, or how a Defendant "might" have participated.[7]  Here, however, Plaintiffs' proffered "narratives" are nothing but speculation, supported only by conclusory assertions, not facts.

---

[7]     Plaintiffs' Oppositions rely heavily on Defendants' attendance at trade association meetings and industry events, arguing that "all of these Defendants were in the same rooms, with the same competitors, with the same *opportunities* to conspire."  EPP Opp. at 18.  It is well settled, however, that alleged facts showing a mere opportunity to conspire—absent additional facts demonstrating that defendants actually discussed the subject matter of the alleged conspiracy—are insufficient to survive a motion to dismiss.  *See Twombly*, 550 U.S. at 567, n.12 (rejecting argument that a defendant should be forced to "devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy…just because he belonged to the same trade guild as one of his competitors); *see also Resco Prods. v. Bonsai Mineral Grp. Co., Ltd.*, 158 F. Supp. 3d 406, 425-26 (W.D. Pa. 2016); *Late Fee & Over-Limit Fee*, 528 F. Supp. 2d at 963-64; *In re Ins. Brokerage Antitrust Litig.,* No. 04-5184, 2006 WL 2850607, at *12 (D.N.J. Oct. 3, 2006); *In re Elevator Antitrust Litig.,* No. 04-1178, 2006 WL 1470994, at *11 (S.D.N.Y. May 30, 2006) *aff'd*, 502 F.3d 47 (2d Cir. 2007).

Moreover, to the extent Plaintiffs purport to plead facts suggesting that a particular Defendant "took advantage" of an opportunity at a trade show or industry event, each such factual allegation relates only to communications regarding specific products, and does not speak in any way to the existence of the overarching "fair share" agreement that Plaintiffs claim here.  *See, e.g.*, EPP Opp. at 18-20.  As explained below, allegations related solely to conduct with respect to individual drugs are not enough for the alleged broader overarching conspiracy claims to survive a motion to dismiss.

Finally, the allegation that Defendants communicated with each other, *see, e.g.*, EPP Opp. at 7, similarly says nothing about the existence of the industry-wide agreement that Plaintiffs claim.

3.     <u>Plaintiffs' only factual allegations relate to conduct in individual drug markets or bilateral conduct between certain Defendants that cannot support an overarching conspiracy claim</u>.[8]

Stripped of Plaintiffs' conclusory assertions and speculative theorizing, the only allegations in the Overarching Complaints that even potentially qualify as ***factual*** relate to alleged individual drug conspiracies or bilateral conduct between certain Defendants.  None of these allegations demonstrates that, by purportedly agreeing to fix the price of one drug that it sold, any Defendant agreed to participate in an industry-wide conspiracy encompassing at least dozens, and potentially hundreds or thousands, of other drugs that it did not sell and from which it would derive no profit or benefit.  To the contrary, the factual allegations cited by the Plaintiffs actually illustrate this point, and are the very type of allegations Defendants pointed to as inadequate in their Opening Brief.  *See* Mot. at 6-8; 12-13.

For example Direct Purchaser Plaintiffs argue in their Opposition that Zydus should be subject to joint and several liability for an alleged industry-wide agreement (including for products Zydus did not make or sell) based on the following alleged facts: (1) Zydus participated in an agreement with respect to Acetazolamide; (2) Zydus received a government subpoena and Congressional letter regarding its pricing; (3) Zydus's involvement in trade associations; (4) former Zydus employees now work for other Defendants; and (5) Zydus's communications with employees other Defendants.  DPP Opp. at 12-13.  Strikingly absent is any factual allegation suggesting Zydus's awareness of, and conscious commitment to, any alleged agreement ***beyond*** a

---

[8]     The instant Joint Motion to Dismiss Plaintiffs' Overarching Complaints is not about the sufficiency of Plaintiffs' pleadings regarding any of the alleged conspiracies in the markets for individual drugs (although many of those are deficient as well and certain of them are subject to separate motions to dismiss).  Whether Plaintiffs have alleged sufficient facts with respect to alleged conduct regarding individual drugs is irrelevant in deciding this Motion, which relates solely to Plaintiffs' alleged industry-wide overarching conspiracy.

single drug, Acetazolamide.[9]   Indeed, the Direct Purchaser Plaintiffs can point to no factual allegations that, if true, would suggest that Zydus committed to the industry-wide, overarching conspiracy Plaintiffs purport to allege.

Similarly, the Indirect Reseller Plaintiffs offer the following allegation to support Mayne's alleged conscious commitment to an overarching, industry-wide conspiracy: That in January 2014, about a month before Mayne began selling Doxy DR, an employee from Heritage and an employee from Mayne had a telephone call, during which the Indirect Reseller Plaintiffs claim the employees agreed to "avoid price erosion" for Doxy DR.  IRP Opp. at 13 (citing IRP Compl. ¶ 119).  The Indirect Reseller Plaintiffs' Opposition then references the Plaintiff States' Complaint, which offers additional allegations regarding Heritage and Mayne relating exclusively to Doxy DR.  *See* State Compl. ¶¶ 219-237.  Plaintiffs offer no factual allegation that says anything about Mayne's knowledge of—or conscious commitment to—a "broader fair share system" involving drugs it did not sell.  *See* IRP Opp. at 13.  At most, the factual allegations speak to conduct relating to Doxy DR.

To cite another example, Plaintiffs rely on an allegation that Heritage and Mylan agreed that Mylan would purportedly "give up" two accounts to Heritage as Heritage began selling Doxy DR because of a supposed "prior agreement to allow Mylan to enter the market for another drug without competition."  State Compl. ¶¶ 187-88; IRP Compl. ¶ 108.  These threadbare allegations are wholly undefined and do not suffice to show a two-company conspiracy involving a specific drug, let alone to somehow implicate Mylan, Heritage, and all of the other Defendants in a far-

---

[9]      The Direct Purchaser Plaintiffs note that Zydus is also "implicated" as to Divalproex and $54 Pravastatin, neither of which is at issue in the Direct Purchaser Plaintiffs' Overarching Complaint, as well as the fact that Zydus manufactured "other drugs," the import of which is unclear.  *See* DPP Opp. at 12

reaching, industry-wide agreement covering scores of drugs they never sold.  Indeed, the dozens of other Defendants are not even alleged to have been party to this alleged communication.[10]

Recognizing that such allegations fail to show that Defendants were aware of, and consciously committed to, the claimed overarching conspiracy, Plaintiffs resort to the extraordinary argument that alleged participation in certain drug-specific agreements is itself enough to suggest that Defendants joined an overarching, multi-drug conspiracy.  *See, e.g.*, Kroger Opp. at 9 ("[G]iven that Plaintiffs have plausibly implicated every Defendant in their Complaint into at least one individual conspiracy, it ***stands to reason*** that those same Defendants are also plausibly linked to the overarching conspiracy.") (emphasis added); *see also* DPP Opp. at 3, 9. Plaintiffs are wrong as a matter of law.

Pleading participation in individual conspiracies is ***not*** a "short cut" to pleading awareness of, and commitment to, an overarching conspiracy.  *See Ins. Brokerage*, 618 F.3d at 348-51 (explaining that similar "pernicious industry practice[s]" among different groups of defendants did not "plausibly imply an industry-wide conspiracy"); *Auto. Parts*, 2016 WL 8200512, at *4 ("To meet their burden, [Plaintiffs] must allege facts creating at least an inference as to each Defendant's

---

[10]     Defendants could offer additional examples, each of which suffers from the same flaw: A complete absence of any reference to or suggestion of an overarching agreement such that any Defendant could be found to have consciously committed to such an agreement.  As just one final example, the End Payor Plaintiffs allege that an employee of Heritage and an employee of Sun not only communicated frequently and "reached multiple drug specific agreements," *see* EPP Opp. at 21, but on one occasion the employee from Heritage told the employee from Sun about the existence of a drug-specific communication between Heritage and Actavis regarding products that Sun did not sell, *see id.*  This alleged communication—which, again, may at most relate to alleged agreements regarding specific products or agreements between specific Defendants—certainly does not support the massive inferential leap that "with respect to ***every other Defendant***, not only were Defendants aware of agreements about drugs they did not sell, they actively sought out and shared such information."  *Id.* at 22 (emphasis added).  Notably, ***no other Defendant*** is alleged to have been "aware of" the existence of drug specific agreements regarding those products, let alone committed to an industry-wide "fair share" agreement with respect to those products.

knowing participation in a conspiracy to raise, fix, maintain or stabilize the price of auto parts, not just the parts it makes or sells."); *see also Precision Assocs.*, 2011 WL 7053807, at *27-30.  Like the plaintiffs in *Auto Parts*, Plaintiffs here allege, at best, conspiracies that are "multiple, separate, and product specific."   2016 WL 8200512, at *4 (finding no plausibly alleged overarching conspiracy despite the fact that "the proposed [complaints] contain many examples of conspiratorial conduct that occurred between subsets of Defendants," including meetings "to discuss Requests for Quotations of particular component parts and involved Defendants making and/or selling those component parts").

Plaintiffs' efforts to distinguish the Third Circuit's decision in *Insurance Brokerage* are unsuccessful.  *See* Mot. at 22-23.  Plaintiffs argue that their "open ended" overarching conspiracy claims are nothing like the "overarching 'global conspiracy'" dismissed in *Insurance Brokerage*, but rather are similar to the single broker-centered conspiracy that survived dismissal.  This argument misses the point.  The Third Circuit's holdings in *Insurance Brokerage* demonstrate that the ***factual allegations*** in a complaint—not plaintiffs' ***theories***—must determine the breadth of an adequately pled conspiracy.  Similarly, the Third Circuit also held that the alleged existence of similar individual conspiracies was not a short-cut to plead a broader, global conspiracy.  *See Ins. Brokerage*, 618 F.3d at 327.

The plaintiffs in *Insurance Brokerage* alleged two types of conspiracies.  First, plaintiffs alleged multiple "broker-centered antitrust conspiracies" where the broker steered its clients to a particular insurer among a predetermined subset of insurers, all of whom agreed to pay the broker a commission and then "communicated the details" of its agreement with one insurer partner to the other insurer partners.  *Id*. at 327-29.  Second, plaintiffs theorized that a broader, overarching conspiracy existed, suggesting the alleged communications ensured that no insurer-partner was

"taking more than the allegedly agreed-upon share." *Id*. at 329.  The court, however, found that plaintiffs' ***theory*** did not render the broader overarching conspiracy plausible.  *Id*. at 330.  The court therefore affirmed dismissal of all but one of the "broker centered" conspiracies.  *Id*.

The single "broker centered" conspiracy that survived dismissal was a "narrower agreement" among a single broker and its partners to rig bids in order to avoid competing for each other's incumbent business.  *Id*. at 312-13.  Notably, the conspiracy was defined by specific factual allegations of bid rigging, including only those defendant insurers that entered contingent commission agreements with the specific broker and who "acceded to broker requests to provide 'false' bids…" *Id*. at 312.  The Third Circuit emphasized that the allegations of the broker-centered conspiracy did not inform its analysis of the broader overarching conspiracy.  *Id*. at 341 (concluding that complaint satisfied *Twombly* standard with respect to only "those participants in the asserted Marsh-centered commercial conspiracy who allegedly engaged in bid rigging").  The court further emphasized that factual allegations related to the narrower conspiracy "cannot support claims of [another] horizontal agreement" or an overarching agreement of which it was alleged to be a part.  *Id*. at 342.  Ultimately, the Third Circuit concluded that alleged participation in an individual—or "narrow"—conspiracy cannot be used to plausibly allege an overarching conspiracy, of which that narrow conspiracy is claimed to be a part.  *Id*. at 341-42.

*Insurance Brokerage* is also pertinent due to the court's analysis of the plaintiffs' attempt to use allegations related to the narrow broker-centered hub-and-spoke conspiracies to support their claims of a broader "global conspiracy" among all brokers and all insurers to conceal and continue the arrangements between brokers and insurers.  *Id.* at 348.  Similar to Plaintiffs here, the *Insurance Brokerage* plaintiffs pointed to the similar nature of the narrower conspiracies and similar confidentiality agreements among the brokers and insurers, and argued that in a

competitive market, brokers would have competed for each other's business by exposing each other's arrangements. *Id.* at 349–51. The Third Circuit held that these allegations were insufficient to survive a motion to dismiss the global conspiracy claim. *Id.* The fact that all industry participants engaged in a "pernicious practice" involving commissions and all covered it up did not mean they coordinated to do so. *Id.* In the same way here, Plaintiffs allege that certain Defendants coordinated with certain other Defendants in individual drug markets, but do not adequately connect those practices in different drug markets such that an overarching conspiracy among all Defendants for all drugs is plausible.

Plaintiffs also mistakenly rely on *Dahl v. Bain Capital Partners LLC*, 937 F. Supp. 2d 119 (D. Mass. 2013) and *In re New Jersey Tax Sales Certificates Antitrust Litig.*, No. 12-1983, 2014 WL 5512661 (D.N.J. Oct. 31, 2014) to argue that alleged participation in a single-drug agreement is sufficient in and of itself to tie a Defendant to an industry-wide agreement. *See, e.g.*, Joint Opp. at 12-14. Notably, in both *Dahl* and *New Jersey Tax Sales*, plaintiffs had pleaded specific facts suggesting that defendants—all of whom were competitors in the markets at issue in those cases— had contemplated an agreement that extended beyond the specific transactions in which they were alleged to have participated. *See Dahl*, 937 F. Supp. 2d at 125 (alleging that every defendant agreed with every other defendant not to compete for each other's deals)[11]; *N.J. Tax Sales*, 2014

---

[11]     The *Dahl* court's denial of summary judgment was not, as Plaintiffs suggest, based only on the statement by a defendant executive that "KKR has agreed not to jump our deal since ***no one in private equity*** ever jumps an announced deal" and a Goldman Sachs executive's statement after learning that KKR withdrew from a specific transaction that "***club etiquette*** prevails." *Id.* at 137-38 (emphasis added). The court also considered the following statements from defendant executives: (1) a Blackstone executive statement that a KKR employee "just called to say congratulations and that they were standing down because ***he had told me before they would not jump a signed deal of ours***"; (2) a Blackstone statement regarding a different transaction that "[t]he reason we didn't go forward was basically ***a decision on not jumping someone else[']s deal*** . . . ." To which the recipient responded, "I think deal represents good value and is a ***shame we let kkr get away with highway robbery*** but understand decision"; and (3) a Carlyle executive

WL 5512661, at *2 (alleging not only the "individual instances" of collusion, but also when and how the overarching conspiracy formed, methods for accomplishing the objects of the overarching conspiracy, methods for policing the conspiracy, and indictments reflecting the overarching conspiracy alleged).[12]  In other words, the factual allegations themselves suggested that defendants were aware of and committed to an agreement that extended beyond individual transactions.  *Dahl* is also instructive because while the court acknowledged that the allegations suggested an agreement beyond individual transactions, the allegations were insufficient to support plaintiff's claims of general agreement beyond the agreement not to "jump deals" that was explicitly referenced by multiple executives.  937 F. Supp.at 137-38.

> 4.   Plaintiffs' use of the label "fair share" does not change this analysis.

Plaintiffs cannot salvage their overarching conspiracy claims by relying on the alleged use of the term "fair share" by certain Defendants.  According to Plaintiffs, "fair share" is the operative

---

statement after learning that KKR may have decided to compete on one of their deals, "[a]nd just think, **KKR asked <u>the industry to step down</u>** on HCA." *Id.* at 132-33.  In short, the statements at issue in *Dahl* themselves referred to an industry-wide agreement.  No such allegations have been made here.

[12]    Further, in *New Jersey Tax Sales*, the Court addressed the fact that not all defendants had participated in each allegedly "rigged" auction as follows: Because "Plaintiffs allege[d] a conspiracy involving bid rotation or bid allocation…[i]t is equally plausible, under the terms of the alleged conspiracy, that a Defendant's absence from a particular auction was a direct result of the understanding reached among the Defendants that certain liens were to be allocated and not bid upon by co-conspirators." *N.J. Tax Sales Certificates*, 2014 WL 5512661, at *8.

Plaintiffs here, however, have explicitly disavowed any claim that Defendants reached agreements with respect to market entry.  *See, e.g.,* Kroger Opp. at 5 ("The Kroger Plaintiffs do not allege that the generic drug manufacturers conspired *not to enter* certain drug markets.") (emphasis in original); Pls. Joint Opp. at 12 n.8 ("The main premise of the overarching conspiracy is not that any given Defendant would have begun manufacturing a given drug absent the overarching agreement…").

Finally, both *Dahl* and *New Jersey Tax Sales* involved single product markets—not markets in which defendants were not market participants.

language of the overarching agreement they allege.  *See* Pls. Joint Opp. at 18 ("[F]air share is the actual language of the overarching agreement.").  But there is nothing improper about the term "fair share."  On the contrary, the term fair share and similar phrases are commonly used in business and academia, sometimes to describe the expectations of a seller in an oligopolistic market, and the use of this language is logical in the generic drug industry.

Moreover, none of the instances in which a Defendant allegedly used that term (or anything like it) refers in any way to an industry-wide, overarching agreement.  Rather, each use relates to alleged conduct involving a specific individual-drug conspiracy.

Plaintiffs first direct the Court to an alleged communication between two Defendants, Heritage and Dr. Reddy's, in which a Heritage employee reported to his superior that Dr. Reddy's was "willing" to divide the market for Zoledronic Acid and "view[ed] it this way.  If they are first and others come out after, he deserves 60%.  If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25% etc."  State Compl. ¶ 153.  Contrary to the Plaintiffs' argument, this is not a "factual allegation" suggesting what the "common understanding" of fair share was.  State Opp. at 4.  Rather, at most the allegation speaks to a supposed communication involving two specific Defendants with respect to a ***single drug***.  And, notably, the communication includes no reference to or suggestion of the overarching, ***industry-wide*** agreement Plaintiffs claim here.

Second, Plaintiffs highlight an alleged communication between Defendants Heritage and Sun, in which a Heritage employee allegedly reported to her superior that Sun was "concern[ed] that [Sun] get their 'fair share'" of the market for Nimodipine, and her superior responded that Sun was getting its "fair share" of the Nimodipine market.  State Compl. ¶¶ 119-20.  Again, this alleged reference to "fair share" references only a single drug and involved only two Defendants.

But this is not merely an issue of Plaintiffs' failure to allege that each Defendant **used** "the operative language of the agreement," as Plaintiffs claim.  *See* State Opp. at 8 ("Plaintiffs do not need to allege that every Defendant explicitly used the terms 'fair share' to be connected to the overarching conspiracy."); IRP Opp. at 11 (recognizing that "not all conversations explicitly discuss the common goal").  The issue is that Plaintiffs plead no facts suggesting any Defendant was aware of, let alone committed to, a "fair share" agreement involving the dozens of drugs identified in the Overarching Complaints.[13]

Plaintiffs attempt to save their "fair share" theory by claiming that Defendants' alleged conduct in individual drug markets was "consistent with" an overarching "fair share" agreement. *See, e.g.*, EPP Opp. at 10.  That argument is merely a repackaging of the argument that the alleged existence of the individual conspiracies should be a short-cut to showing each Defendant's awareness of, and commitment to, a broader overarching conspiracy.  That argument fails for the reasons explained above.  *See supra* Section A.3.

     5.    <u>The absence of factual allegations goes to the nature of the alleged conspiracy, not its "scope."</u>

Plaintiffs also attempt to cast the absence of factual allegations demonstrating that each Defendant was aware of, and committed to, the claimed overarching conspiracies as an issue of the "scope" of the conspiracy that cannot be resolved at the motion to dismiss stage.  *See, e.g.*, EPP Opp. at 3; Humana Opp. at 9.  They are wrong.  The issue is not whether Plaintiffs have

---

[13]    With respect to Defendants who are alleged to have used the term "fair share" (or some term that Plaintiffs claim is similar), the use of a common term by industry participants is insufficient to suggest conscious commitment to a goal to fix prices or allocate markets for all generic drugs. *See Ins. Brokerage*, 618 F.3d at 349-51 (concluding that "similar nature" of alleged individual conspiracies "may allege a 'pernicious industry practice,' but they do not plausibly imply an industry-wide conspiracy"); *Precision Assocs.*, 2011 WL 7053807, at *27 (explaining that there was "nothing unique" about plaintiffs' allegations that the conspiracies "involved the same designs and methods") (internal quotations omitted).

pleaded sufficient facts regarding the scope of the alleged conspiracy, but rather whether they have satisfied a fundamental pleading requirement—rooted in basic principles of due process and adequate notice—of alleging *facts* showing that each Defendant was aware of, and committed to, an industry-wide overarching conspiracy of the type Plaintiffs purport to claim.  As explained above, courts evaluating claims of "overarching" versus individual conspiracies require factual allegations suggesting that each defendant consciously committed to the overarching scheme, not just individual conspiracies.  *Auto. Parts*, 2016 WL 8200512, at *4; *Precision Assocs.*, 2011 WL 7053897, at *30.

The cases Plaintiffs rely on to support their "scope" argument involved complaints that *included factual* allegations actually speaking to the defendants' awareness of, and commitment to, the overarching (as opposed to individual) conspiracies alleged.  *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) (denying motion to dismiss where factual allegations offered "direct evidence" that each defendant participated in chat rooms in which multiple currencies that each defendant sold were discussed); *Lithium Ion Batteries*, 2014 WL 309192, at *11-12 (finding that plaintiffs had pleaded facts suggesting conspiracy that "cover[ed] all three battery cell formats" at issue in the complaint, but eliminating from the conspiracy years in which plaintiffs failed to "plead the critical act of agreeing"); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1119–20 (N.D. Cal. 2012) (denying motion to dismiss overarching conspiracy claims where all six of the bilateral agreements between defendants that were otherwise highly confidential were identical).

By contrast, courts have dismissed overarching conspiracy claims where the factual allegations fail to support the "larger picture" of such an overarching conspiracy.  *See, e.g.*, *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975-76 (N.D. Iowa 2011); *see*

*also*, *Auto. Parts.*, 2016 WL 8200512, at *4; *Precision Assocs.*, 2011 WL 7053807, at *30. Plaintiffs' attempts to distinguish *Iowa Ready-Mix* are unpersuasive.  Like the plaintiffs in *Iowa Ready-Mix*, Plaintiffs here have failed to allege any ***facts*** supporting the existence of an overall plan to fix prices or showing that each defendant had knowledge that others were involved in the conspiracy.  *Iowa Ready-Mix*, 768 F. Supp. 2d at 975 ("What is missing in this case . . . is the 'larger picture' from which inferences of a wider conspiracy can be drawn from guilty pleas to separate bilateral conspiracies."); *see also In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-2670, 2017 WL 35571, at *6 (S.D. Cal. Jan. 3, 2017) (finding that "sufficient allegations of a tuna-specific conspiracy do not…therefore create a correspondingly viable conspiracy encompassing the entire packaged seafood product category" given variance in "price, availability, taste, and potential for consumer allergies").

### B. Plaintiffs' arguments regarding interdependence of the alleged individual-drug agreements are speculative and not grounded in any factual allegations.

For the reasons explained above, Plaintiffs' failure to allege actual facts showing that each (or any) Defendant was aware of, and committed to, the claimed overarching conspiracies is itself sufficient to require dismissal of Plaintiffs' overarching conspiracy claims.  *See infra* Section II.A, *see also* Mot. at 20.  But Plaintiffs' overarching conspiracy claims should be dismissed for an additional reason: They fail to plausibly plead facts showing that the alleged individual conspiracies were somehow interdependent.  *See Ins. Brokerage*, 618 F.3d at 348-51; *K-Dur*, 2016 WL 755623, at *21.

Interdependence is the touchstone of the overarching conspiracy analysis.  *K-Dur*, 2016 WL 755623, at *21.  Interdependence involves evaluating "the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other."  *Id*. In their Opening Brief, Defendants explained that merely asserting a "series" of multiple

conspiracies in the same industry does not demonstrate interdependence.  *See* Mot. at 21.  While

such conspiracies, if they existed, "may evidence a widespread problem in the industry," *Precision*

*Assocs.*, 2011 WL 7053807, at *30, or similar "pernicious practices" among different groups of

defendants, *Ins. Brokerage*, 618 F.3d at 348-51, industry-wide **problems** or **practices** do not, on

their own, show interdependence.  Moreover, alleged similarity among the individual conspiracies

does not demonstrate the "how, when, or where" that is necessary to show that a series of alleged

conspiracies were somehow connected into a single, interdependent overarching whole.  *See*

*Precision Assocs.*, 2011 WL 7053807, at *27.

> In response, Plaintiffs point to no alleged facts demonstrating interdependence, and again

rely on conclusory assertions and speculative theorizing.  For example, in their Joint Opposition,

Plaintiffs argue that:

> > Defendants knew that they would need to enter into future
> > agreements with other combinations of would-be competitors (in
> > their existing markets or new markets), and therefore had a vested
> > interest in everyone "playing fair" according to their shared code of
> > conduct.  They often discussed or agreed to conspiratorial conduct
> > across multiple drugs at the same time; Defendants constantly
> > contacted each other concerning their various agreements.  A refusal
> > to "play fair" with a competitor in one drug market would risk
> > retribution not just on that one drug, but potential other drugs that
> > the companies shared.  The more specific-drug conspiracies a
> > Defendant was involved in, the stronger the incentive was to
> > maintain the stability of every other specific-drug conspiracy, and
> > therefore the overarching conspiracy, to protect their
> > supracompetitive profits over multiple products.

Pls. Joint Opp. at 22.  Strikingly absent from Plaintiffs' collective articulation of their theory of

interdependence, however, is **any citation** to **any factual allegation** in **any Complaint** that supports

Plaintiffs' wholly theoretical narrative.  And there are none.  Plaintiffs' suspicion that there might

be nefarious conduct across an industry is just that—suspicion—without the requisite factual

allegations to withstand dismissal.

Plaintiffs' individual Oppositions fare no better, relying exclusively on their own imaginings of how the alleged individual conspiracies ***might*** have been interdependent. For example, as described above, the End Payor Plaintiffs resort to rank speculation regarding how Actavis, Aurobindo, Citron and Teva "might have" acted if Heritage "decided to abandon" an individual drug agreement. EPP Opp. at 9-10. The End Payor Plaintiffs admit that they have alleged no facts demonstrating their imagined scenario. *Id.* at 10.

Similarly, the Plaintiff States base their claims of interdependence on two theories: (1) that certain pairs of Defendants are alleged to have communicated and reached agreement with respect to multiple products actually sold by those Defendants,[14] State Opp. at 15-17, and (2) that Defendants "were in frequent, crisscrossing communication during 2014." State Opp. at 16. They resort to speculation, imagining (without supporting factual allegations) that "[r]efusing to 'play fair' with a competitor when it reached out to allocate the market or raise prices would risk retribution on not just that drug, but ***potentially*** other drugs that the companies shared." *Id.* (emphasis added). Each of the other Plaintiff groups similarly offers speculative theories, without any facts, on the theoretical "interdependence" of the "overarching" conspiracy they claim. *See* DPP Opp. at 9; Humana Opp. at 7-8; IRP Opp. 17-19; Kroger Opp. 10-15.

---

[14]     As explained in detail in Section II.A.3, *supra*, these allegations at most represent alleged agreements between two Defendants with respect to drugs they sold, and say nothing about the existence of an overarching conspiracy of the type claimed by Plaintiffs. But allegations involving two specific Defendants and two particular drugs, *see, e.g.*, State Compl. ¶¶ 187-88, cannot be used to support the massive inferential leap that each of the dozens of separate individual conspiracies involving different drugs and different Defendants were somehow interdependent. The Plaintiff States cite to *United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996), which at best supports interdependence limited to alleged agreements between two specific Defendants, and involving two particular drugs, and nothing broader. *See* State Opp. at 16 n.14.

Even where Plaintiffs purport to direct the Court to facts, as opposed to speculation, suggesting "interdependence," a review of the Complaints themselves demonstrates there are none. Take, for example, the End Payor Plaintiffs' Opposition, which argues as follows:

> Defendants accuse EPPs of "hid[ing] behind conclusory allegations with no factual predicate" for the allegation that "customers in one generic drug market were sometimes traded for customers in a different generic drug market so that fair share could be allocated across the larger market." Def. Brief at 25 (EPP Compl. ¶ ¶ 125). Defendants again ignore EPPs' allegations. *See id*. ¶¶ 425-26 (***Taro and Lannett allocating shares across Acetazolamide dosages, including a dosage Lannett did not sell***). *See also id*. ¶¶ 637-39 (***Actavis and Mylan coordinating Verapamil prices, including for a dosage that Mylan did not sell***).

EPP Opp. at 4-5 n.5 (emphasis added).  The End Payor Plaintiff Complaint, however, includes no such allegation.  Instead, it merely observes that "Taro and Lannett captured remarkably stable shares of the 250mg [Acetazolamide] tablet market, with Lannett claiming approximately 56% and Taro claiming 44%" and that Taro manufactured the 125mg tablets but Lannett did not.  EPP Compl. ¶¶ 425-26.  The unsurprising fact that the only two generic companies that sold a particular drug had relatively equal shares of the market does not, absent additional factual allegation, support the conclusory and wholly speculative assertion that those shares were "allocated" as the result of some broad "fair share" agreement.

Similarly, the facts alleged in paragraphs 637-39 of the End Payor Plaintiffs' Complaint do not, as the End Payor Plaintiffs claim, support the conclusion that "Actavis and Mylan coordinat[ed] Verapamil prices, including for a dosage that Mylan did not sell."  EPP Opp. at 5 n.5.  There is no factual allegation that Mylan conspired on a dosage it did not sell, let alone one that explains why it would do so.  Instead, the Complaint merely alleges, without factual support,

that the "higher prices for 120mg, 180mg and 240mg capsules enabled Actavis also to raise its prices for 360mg capsules, for which it was the lone seller in the market."  EPP Compl. ¶ 639.[15]

In short, Plaintiffs plead only theories regarding interdependence, not facts.  And where Plaintiffs purport to offer facts, those drug-specific factual allegations cannot support the weight of Plaintiffs' expansive, industry-wide theory of interdependence.

### III.   CONCLUSION

For the reasons stated herein and in their Memorandum in Support of their Motion to Dismiss Plaintiffs' Overarching Complaints, Defendants respectfully request that the Court dismiss the conspiracy claims in each Overarching Complaint as specified in the Motion to Dismiss and Proposed Order.

---

[15]      Even if Plaintiffs had accurately represented the allegations in their Complaints, again, the factual allegations speak at best to conduct within the markets for specific drugs.

Dated:  June 13, 2019


Respectfully submitted,

_/s/ Sheron Korpus_                                               _/s/ Anthony C. Porcelli_
Sheron Korpus                                                     Anthony C. Porcelli
Seth A. Moskowitz                                                 POLSINELLI PC
KASOWITZ BENSON TORRES LLP                                        150 N. Riverside Plaza, Suite 3000
1633 Broadway                                                     Chicago, IL  60606
New York, New York 10019                                         Tel : (312) 819-1900
Tel: (212) 506-1700                                               Fax : (312) 819-1910
Fax: (212) 506-1800                                              aporcelli@polsinelli.com
skorpus@kasowitz.com
smoskowitz@kasowitz.com                                          Amy D. Fitts
                                                                 POLSINELLI PC
_Counsel for Actavis Pharma, Inc.,_                               900 W. 48th Place, Suite 900
  _Actavis Holdco U.S., Inc._                                     Kansas City, MO 64112
                                                                 Tel: (816) 753-1000
                                                                 Fax: (816) 222-0425
                                                                 afitts@polsinelli.com

                                                                   _Counsel for Defendants Akorn, Inc. and_
                                                                     _Hi-Tech Pharmacal Co. Inc._

*/s/ James W. Matthews*
James W. Matthews
Katy E. Koski
John F. Nagle
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
jmatthews@foley.com
kkoski@foley.com
jnagle@foley.com

James T. McKeown
Elizabeth A. N. Haas
Kate E. Gehl
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Tel: (414) 271-2400
Fax: (414) 297-4900
jmckeown@foley.com
ehaas@foley.com
kgehl@foley.com

Terry M. Henry
Melanie S. Carter
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Tel: (215) 569-5644
Fax: (215) 832-5644
THenry@blankrome.com
MCarter@blankrome.com

*Counsel for Defendant Apotex Corp.*

*/s/ W. Gordon Dobie*
W. Gordon Dobie
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
wdobie@winston.com

*/s/ Irving Wiesen*
Irving Wiesen
LAW OFFICES OF IRVING L. WIESEN,
   P.C.
420 Lexington Avenue - Suite 2400
New York, NY 10170
Tel: (212) 381-8774
Fax: (646) 536-3185
iwiesen@wiesenlaw.com

*Counsel for Defendant Ascend Laboratories,
LLC*

/s/  Wayne A. Mack
Wayne A. Mack
Sean P. McConnell
Sarah O'Laughlin Kulik
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
Tel: (215) 979-1152
wamack@duanemorris.com
spmcconnell@duanemorris.com
sckulik@duanemorris.com

*Counsel for Defendant*
   *Aurobindo Pharma USA, Inc.*

/s/ Stacey Anne Mahoney
Stacey Anne Mahoney
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6930
Fax: (212) 309-6001
stacey.mahoney@morganlewis.com

Charles Reitmeyer
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Tel: (215) 963-5000
Fax: (215) 963-5001
charles.reitmeyer@morganlewis.com

*Counsel for Defendant Breckenridge*
   *Pharmaceutical, Inc.*

/s/ Steven E. Bizar
Steven E. Bizar
John P. McClam
Tiffany E. Engsell
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
steven.bizar@dechert.com
john.mcclaim@dechert.com
tiffany.engsell@dechert.com

*Counsel for Defendant Citron Pharma LLC*

/s/ Roger Kaplan
Roger Kaplan
Aaron Van Nostrand
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Tel:  (973) 360-7900
Fax: (973) 295-1257
kaplanr@gtlaw.com
vannostranda@gtlaw.com

*Counsel for Defendant*
   *Dr. Reddy's Laboratories, Inc.*

/s/ Jeffrey D. Smith
Jeffrey D. Smith
Thomas A. Abbate
DeCOTIIS, FITZPATRICK, COLE &
GIBLIN, LLP
Glenpointe Centre West
500 Frank W. Burr Blvd.
Teaneck, NJ 07666
Tel: (201) 907-5228
Fax: (201) 928-0588
jsmith@decotiislaw.com
tabbate@decotiislaw.com

*Counsel for Defendant Epic Pharma, LLC*

/s/  Steven A. Reed
Steven A. Reed
R. Brendan Fee
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Tel: (215) 963-5603
Fax: (215) 963-5001
steven.reed@morganlewis.com
brendan.fee@morganlewis.com

Andrew S. Wellin
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel:   (212) 309-6154
Fax:   (212) 309-6001
andrew.wellin@morganlewis.com

*Counsel for Defendant*
  *Glenmark Pharmaceuticals Inc., USA*

/s/ Marguerite M. Sullivan
Marguerite M. Sullivan
Anna M. Rathbun
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com

*Counsel for Defendant G&W Laboratories,*
  *Inc..*

/s/ *Raymond A. Jacobsen, Jr.*

Raymond A. Jacobsen, Jr.
Paul M. Thompson (Pa. Bar No. 82017)
Lisa A. Peterson
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, D.C. 20001
Tel. (202) 756-8000
rayjacobsen@mwe.com
pthompson@mwe.com
lpeterson@mwe.com

David L. Hanselman Jr.
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60605
Tel. (312) 984-3610
dhanselman@mwe.com

Nicole L. Castle
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173
Tel. (212) 547-5400
ncastle@mwe.com

*Counsel for Defendant*
  *Impax Laboratories, Inc.*

/s/ *Leiv Blad*

Leiv H. Blad
Zarema A. Jaramillo
Katie R. Glynn
LOWENSTEIN SANDLER LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 753-3800
Fax: (202) 753-3838
lblad@lowenstein.com
zjaramillo@lowenstein.com
kglynn@lowenstein.com

*Counsel for Defendant*
  *Lupin Pharmaceuticals, Inc.*

/s/ *Gerald E. Arth*

Gerald E. Arth
Ryan T. Becker
Evan R. Luce
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Tel: (215) 299-2000
Fax: (215) 299-2150
garth@foxrothschild.com
rbecker@foxrothschild.com
eluce@foxrothschild.com

George G. Gordon
Stephen D. Brown
Julia Chapman
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
Fax: (215) 994-2222
george.gordon@dechert.com
stephen.brown@dechert.com
julia.chapman@dechert.com

*Counsel for Defendant*
*Lannett Company, Inc.*

/s/ *Robert J. Cleary*

Robert J. Cleary
Dietrich L. Snell
David A. Munkittrick
Edward Canter
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
Tel: (212) 969-3000
rjcleary@proskauer.com
dsnell@proskauer.com
dmunkittrick@proskauer.com
ecanter@proskauer.com

*Counsel for Defendant Rajiv Malik*

/s/ Michael Martinez
Michael Martinez
Steven Kowal
Lauren Norris Donahue
Brian J. Smith
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Tel: (312) 372-1121
Fax: (312) 827-8000
michael.martinez@klgates.com
steven.kowal@klgates.com
lauren.donahue@klgates.com
brian.j.smith@klgates.com

*Counsel for Defendant Mayne Pharma Inc.*

/s/ Chul Pak
Chul Pak
Jeffrey C. Bank
WILSON SONSINI GOODRICH & ROSATI, PC
1301 Avenue of the Americas
40th Floor
New York, New York  10019
Tel: (212) 497-7726
Fax: (212) 999-5899
cpak@wsgr.com
jbank@wsgr.com

Seth C. Silber
WILSON SONSINI GOODRICH & ROSATI, PC
1700 K Street, NW
Fifth Floor
Washington, DC  20006
Tel: (202) 973-8824
Fax: (202) 973-8899
ssilber@wsgr.com

Adam K. Levin
Benjamin F. Holt
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
adam.levin@hoganlovells.com
benjamin.holt@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendants Mylan Inc,.*
*Mylan Pharmaceuticals, Inc., UDL*
*Laboratories, Inc., and Mylan N.V*

*/s/ John E. Schmidtlein*
John E. Schmidtlein
Sarah F. Teich
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
jschmidtlein@wc.com
steich@wc.com

*Counsel for Defendant*
  *Par Pharmaceutical, Inc.*

*/s/ Scott A. Stempel*
Scott A. Stempel
J. Clayton Everett, Jr.
Tracey F. Milich
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: (202) 739-3000
Fax: (202) 739-3001
scott.stempel@morganlewis.com
clay.everett@morganlewis.com
tracey.milich@morganlewis.com

Harvey Bartle IV
Francis A. DeSimone
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
harvey.bartle@morganlewis.com
frank.desimone@morganlewis.com

*Counsel for Defendant Perrigo New York, Inc.*

*/s/ Saul P. Morgenstern*
Saul P. Morgenstern
Margaret A. Rogers
Amanda Croushore
Ada Añon
Kathryn L. Rosenberg
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
saul.morgenstern@apks.com
margaret.rogers@apks.com
amanda.croushore@arnoldporter.com
ada.anon@arnoldporter.com
kathryn.rosenberg@arnoldporter.com

Laura S. Shores
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 942-5000
Fax: (202) 942-5999
laura.shores@apks.com

*Counsel for Defendant Sandoz Inc.*

*/s/  John M. Taladay*
John M. Taladay
Erik T. Koons
Stacy L. Turner
Christopher P. Wilson
BAKER BOTTS LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004-2400
Tel: (202) 639-7700
Fax: (202) 639-7890
john.taladay@bakerbotts.com
erik.koons@bakerbotts.com
stacy.turner@bakerbotts.com
christopher.wilson@bakerbotts.com

Lauri A. Kavulich
Ann E. Lemmo
CLARK HILL PLC
2005 Market St, Suite 1000
Philadelphia, PA 19103
Tel: (215) 640-8500
Fax: (215) 640-8501
lkavulich@clarkhill.com
alemmo@clarkhill.com

Lindsay S. Fouse
CLARK HILL PLC
301 Grant St, 14th Floor
Pittsburgh, PA 15219
Tel: (412) 394-7711
Fax: (412) 394-2555
lfouse@clarkhill.com

*Counsel for Defendants Sun Pharmaceutical*
    *Industries, Inc., Taro Pharmaceuticals USA,*
    *Inc., Taro Pharmaceutical Industries Ltd.,*
    *and Mutual Pharmaceutical Company*

/s/  *Heather K. McDevitt*

Heather K. McDevitt
Bryan D. Gant
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 819-8200
Fax: (212) 354-8113
hmcdevitt@whitecase.com
bgant@whitecase.com

*Counsel for Defendant Teligent, Inc.*

*s/ J. Gordon Cooney, Jr.*

J. Gordon Cooney, Jr.
John J. Pease, III
Alison Tanchyk
William T. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
jgcooney@morganlewis.com
john.pease@morganlewis.com
alison.tanchyk@morganlewis.com
william.mcenroe@morganlewis.com

Amanda B. Robinson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 739-3000
Fax: (202) 739-3001
amanda.robinson@morganlewis.com

*s/ Jan P. Levine*

Jan P. Levine
Robin P. Sumner
Michael J. Hartman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:  (215) 981-4000
Fax:  (215) 981-4750
levinej@pepperlaw.com
sumnerr@pepperlaw.com
hartmanm@pepperlaw.com

*Counsel for Defendant*
    *Teva Pharmaceuticals USA, Inc*

/s/ Devora W. Allon
Jay P. Lefkowitz, P.C.
Devora W. Allon
Alexia R. Brancato
Erin H. Ogburn
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Tel:  (212) 446-4800
Fax:  (212) 446-6460
jay.lefkowitz@kirkland.com
devora.allon@kirkland.com
alexia.brancato@kirkland.com
erin.ogburn@kirkland.com

*Counsel for Defendant Upsher-Smith
    Laboratories, LLC*


/s/ Jan P. Levine
Jan P. Levine
Robin P. Sumner
Michael J. Hartman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:  (215) 981-4000
Fax:  (215) 981-4750
levinej@pepperlaw.com
sumnerr@pepperlaw.com
hartmanm@pepperlaw.com

Keith J. Harrison
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
Tel. (202) 624-2500
Fax. (202) 624-5116
kharrison@crowell.com

*Counsel for Defendant West-Ward
    Pharmaceuticals Corp.*

s/  Robin D. Adelstein
Robin D. Adelstein
Mark A. Robertson
Gerald A. Stein
Matthew C. Lamb
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Tel:  (212) 318-3000
Fax:  (212) 318-3400
robin.adelstein@nortonrosefulbright.com
mark.robertson@nortonrosefulbright.com
gerald.stein@nortonrosefulbright.com
matthew.lamb@nortonrosefulbright.com

*Counsel for Defendants Valeant
    Pharmaceuticals North America LLC,
    Valeant Pharmaceuticals International, and
    Oceanside Pharmaceuticals, Inc.*


/s/ William A. Escobar
William A. Escobar
Damon W. Suden
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897
wescobar@kelleydrye.com
dsuden@kelleydrye.com

*Counsel for Defendants Wockhardt USA LLC
    and Morton Grove Pharmaceuticals Inc.*

*/s/ Jason R. Parish*

Jason R. Parish
Bradley J. Kitlowski
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW
Washington, D.C. 20006
Tel:  (202) 452-7900
Fax:  (202) 452-7989

*Counsel for Defendant Zydus Pharmaceuticals
(USA) Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 13th day of June 2019, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's ECF System.  Notice of this filing will be sent to all counsel of record by operation of the ECF System.

/s/  *Julia Chapman*
Julia Chapman

Dated:    June 13, 2019