**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

THE KROGER CO., ALBERTSONS
COMPANIES, LLC, AND H.E. BUTT GROCERY
COMPANY L.P.,

          Plaintiffs,

vs.

ACTAVIS HOLDCO U.S., INC., ACTAVIS
PHARMA, INC., AKORN, INC., APOTEX CORP.,
AUROBINDO PHARMA USA, INC.,
BRECKENRIDGE PHARMACEUTICAL, INC.,
CITRON PHARMA, LLC, DR. REDDY'S
LABORATORIES, INC., EPIC PHARMA, LLC,
FOUGERA PHARMACEUTICALS, INC., G&W
LABORATORIES, INC., GLENMARK
PHARMACEUTICALS INC., USA, HERITAGE
PHARMACEUTICALS, INC., HI-TECH
PHARMACAL CO., INC., IMPAX
LABORATORIES, INC., LANNETT COMPANY,
INC., LUPIN PHARMACEUTICALS, INC.,
MAYNE PHARMA USA INC., MORTON GROVE
PHARMACEUTICALS, INC., MYLAN INC.,
MYLAN PHARMACEUTICALS, INC., MYLAN
N.V., OCEANSIDE PHARMACEUTICALS,
INC., PAR PHARMACEUTICAL, INC., PERRIGO NEW
YORK, INC., PLIVA, INC., SANDOZ, INC., SUN
PHARMACEUTICAL INDUSTRIES, INC., TARO
PHARMACEUTICALS USA, INC. TELIGENT,
INC., TEVA PHARMACEUTICALS USA, INC.,
UDL LABORATORIES, INC., UPSHER-SMITH
LABORATORIES, LLC, WEST-WARD
PHARMACEUTICALS CORP., WOCKHARDT
USA LLC, VALEANT PHARMACEUTICALS
NORTH AMERICA LLC, VALEANT
PHARMACEUTICALS INTERNATIONAL, AND
ZYDUS PHARMACEUTICALS (USA) INC.,

          Defendants.

---

Civil Action No: 18-cv-284

JURY TRIAL DEMANDED

**REDACTED PUBLIC VERSION**

[PROPOSED] SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs The Kroger Co., Albertsons Companies, LLC, and H.E. Butt Grocery Company L.P. ("Plaintiffs"), file this Complaint under the antitrust laws of the United States against Defendants Actavis Holdco U.S., Inc., Actavis Pharma, Inc., Akorn, Inc., Apotex Corp.,, Aurobindo Pharma USA, Inc., Breckenridge Pharmaceutical, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories, Inc., Epic Pharma, LLC, Fougera Pharmaceuticals, Inc., G&W Laboratories, Inc., Glenmark Pharmaceuticals Inc., USA, Heritage Pharmaceuticals, Inc., Hi-Tech Pharmacal Co., Inc., Impax Laboratories, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma USA Inc., Morton Grove Pharmaceuticals, Inc., Mylan Pharmaceuticals, Inc., Mylan, Inc., Mylan N.V., Par Pharmaceutical, Inc., Perrigo New York, Inc., Pliva, Inc., Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Teva Pharmaceuticals USA, Inc., UDL Laboratories, Inc., Upsher-Smith Laboratories, LLC, West-Ward Pharmaceuticals Corp., Wockhardt USA LLC, Valeant Pharmaceuticals North America, LLC, Valeant Pharmaceuticals International and Zydus Pharmaceuticals (USA) Inc., (collectively "Defendants"), and allege as follows:

## I.   INTRODUCTION

1.     This is a civil antitrust action against Defendants and their co-conspirators for violating Section One of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix, increase, stabilize, or maintain prices of the specified generic pharmaceutical drugs. As a result of this unlawful conspiracy, Plaintiffs seek damages against Defendants, jointly and severally, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, and such other relief as provided by law.

2.     The existence of the conspiracy is supported by a number of facts alleged below, which should be read collectively.  Plaintiffs' allegations are based upon personal knowledge as well as upon information and belief as to all other matters.  Some of the information on which Plaintiffs rely is based upon information made public during ongoing government investigations of Defendants' cartel.

3.     The existence of the conspiracy alleged in this Complaint is supported by, among other facts, the fact that Heritage executives Jeffrey Glazer and Jason Malek have pled guilty to participating in a conspiracy to fix prices of Glyburide and Doxycycline between at least 2013 and 2015.  By operation of law, these guilty pleas merely define the minimum parameters of the generic drug price fixing conspiracy.  *See, e.g., In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ([T]he Court rejects the notion that the guilty pleas … foreclose a broader conspiracy.  Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention.").  Thus, the scope of the conspiracy actionable in this civil antitrust action may be (and as alleged in this Complaint is) broader than the criminal convictions to date.  While the guilty pleas establish that a conspiracy did exist, discovery is necessary to determine the full scope of the conspiracy in terms of products, time period, and participants.

4.     An indication that the generic drug price fixing conspiracy is broader than revealed by the Malek and Glazer guilty pleas is provided by, among other facts, the allegations in the Consolidated Amended Complaint in a civil enforcement action brought by the Attorneys General of 45 States.  *See* State Attorneys' General Consolidated Amended Complaint, Dkt. 15, Case No. 17-cv-3768-CMR (E.D. Pa.) ("State AG Complaint").  The State AG Complaint is a result of information gathered in response to Civil Investigative Demands ("CIDs").  The reported

investigation already done by the State AGs reveals a conspiracy substantially broader than the guilty pleas.  The State AG Complaint reveals that the companies with whom Heritage's executives conspired regarding Glyburide and Doxycycline included at least Aurobindo, Citron, Mayne, Mylan, and Teva.  All seven of these companies manufactured a number of generic drugs other than Glyburide and Doxycycline, and also conspired with each other (and with other Defendants) to fix the prices of these drugs as well.  Glazer and Malek, as the CEO and the President of Heritage, respectively, had pricing authority for generic drugs other than Doxycycline and Glyburide, including, for example, Propranolol.  Thus, as alleged in this Complaint, Heritage, through Messrs. Glazer and Malek, conspired to fix prices of not just Glyburide and Doxycycline, but also Propranolol – which Teva and Mylan also manufactured.

5.      According to the State AG Complaint, the conspiracy included specific agreements to fix prices of at least 13 additional drugs in addition to Glyburide and Doxycycline, including Acetazolamide, Fosinopril-hydrochlorothiazide, Glipizide-Metformin, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline (extended release), Verapamil, and Zoledronic Acid.  In addition to the seven Defendants that colluded to fix prices of Doxycycline and Glyburide, the State AGs establish that Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, Sun, and Zydus all reached agreements not to compete on the pricing and sale of at least one of these 13 additional generic drugs.  The State AG Complaint also explains that Mylan's CEO participated in the conspiracy in both his individual and official capacity.

6.      The State AGs explain clearly that the conspiracy was not limited to just the 15 drugs or 17 corporate Defendants identified in their Complaint.  To the contrary, the State AG Complaint also reveals substantial evidence of a broader overarching conspiracy to cartelize the

entire generic drug market.  Specifically, the State AGs allege that there was a longstanding agreement or understanding in the generic drug industry that each competitor was entitled to a certain percentage of the market for each generic drug that it manufactured, depending on the timing of its entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

7.     In a competitive marketplace, each generic drug manufacturer should price its drug competitively relative to other manufacturers.  Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices.  But, as uncovered by the States, the market for generic drugs has not been characterized by such competition for many years.

8.     The States have exposed a marketplace in which generic drug manufacturers communicated with each other to determine and agree on the amount of market share each "competitor" would be allocated.  These shares were determined by the timing of each manufacturer's entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

9.     The purpose of the unlawful "fair share" allocation was to fix, maintain and stabilize prices—either for a particular generic drug or any number of generic drugs. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug.  Manufacturers implemented the "fair share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful.  This prevented prices from declining even when a new "competitor" joined the market.

10.     Additionally, in conjunction with their market allocation agreement, manufacturers also agreed to raise prices above competitive levels for certain drugs, and were able to maintain or slow the decline of prices for other drugs that would have been lower absent their conspiratorial agreements.

11.     Currently, the Connecticut AG and the Attorneys' General of 48 additional jurisdictions ("States") are pursing claims against 20 Defendants alleging collusion that distorted the prices of at least 15 generic drugs.  The States' investigation is ongoing, and they have indicated that many other manufacturers and up to three hundred additional drugs are implicated in widespread anticompetitive conduct.

12.     Through this industry-wide market allocation agreement, Defendants were also able to implement substantial price increases on a number of additional generic drugs.  For example, as detailed below, during the conspiracy, Defendants' price increases included increases on: (1) Acetazolamide of approximately 75%; (2) Albuterol of more than 3,400%; (3) Amitriptyline of more than 900%; (4) Baclofen of more than 400%; (5) Benazepril HCTZ of more than 300%; (6) Clobetasol of more than 800%; (7) Clomipramine of more than 2,700%; (8) Desonide of more than 140%; (9) Digoxin of more than 630%; (10) Divalproex ER by as much as 361%; (11) Econazole of more than 600%; (12) Fluocinonide of more than 200%; (13) Fosinopril HCTZ of approximately 200%; (14) Levothyroxine of as much as 120%; (15) Nystatin of approximately 100%; (16) Paromomycin of approximately 100%; (17) Pravastatin of more than 100%; (18) Propranolol of more than 1700%; (19) Theophylline ER of approximately 150%; and (20) Ursodiol of more than 560%.  All of these price increases were collusive, and nearly all of these abrupt and substantial price increases were carried out by two or more Defendants that are the subject of the pending state and federal enforcement actions.

13.     Indeed, the United States Department of Justice ("DOJ") has publicly acknowledged that its criminal investigation has uncovered evidence that a "significant number" of the drugs that are not yet the subject of government enforcement actions were nonetheless subject to collusion.[1]   Specifically, the DOJ informed the Court that "[e]vidence uncovered during the criminal investigation implicates other companies (including a significant number of the Defendants here) and individual employees in collusion with respect to ... a significant number of the [additional drugs]."   The DOJ further noted that the lack of complete overlap between its criminal investigation and the drugs that are not yet subject to enforcement actions should not be read as an indication that any of these drugs was not the subject of collusion by Defendants, explaining that: "[s]till more companies and individuals, and additional drugs, may be implicated as the investigation continues to develop."   Based on the substantial overlap between the allegations in this Complaint and the DOJ's pending investigation, the DOJ has sought to stay all discovery by private litigants in MDL 2724.  ECF No. 561.

14.     Moreover, for the drugs that are not yet the subject of pending enforcement actions, the collusive nature of Defendants' price increases on these drugs is supported by the facts from those enforcement actions that have been made publicly available.   Take Digoxin, for example. Digoxin is an essential heart medication that was widely used in the U.S. prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act.  Between 2010 and 2013, the price for Digoxin was remarkably stable, with one tablet costing as little as 12 cents.   Beginning in October 2013, however, Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward successfully raised prices from 12 cents per tablet to more than a dollar per tablet, an increase of 750%.  We know for certain

_____

[1]     United States' Cross Motion to Stay Discovery, at 2, *In re: Generic Pharm. Pricing Antitrust Litig*., MDL No. 2724, ECF 561-1 (E.D. Pa. Oct. 27, 2017).

(from Glazer's and Malek's guilty pleas) that Heritage conspired to fix prices of Doxycycline, and the State AG Complaint reflects that Mylan and Mayne were the unidentified co-conspirators with which Malek and Glazer pled guilty to conspiring. Additionally, the State AG Complaint further reflects that Mylan, Lannett, Par and Sun adhered to the generic drug industry's overarching market allocation agreement. Accordingly, under the circumstances alleged here, the unprecedented 750% price increase on Digoxin is also shown to be the result of collusion. (Or put differently, this enormous price increase was <u>not</u> the result of competitive and independent decision-making by documented conspirators participating in an industry rife with collusion).

15.     Further, each of the price increases that are the subject of this Complaint was against each Defendant's self-interest at the time in the absence of collusion. This is because, among other reasons, based on fundamental economic theory and the nature of price competition in the generic drug industry, in the absence of collusion, each Defendant that raised prices would lose substantial market share to rivals that continued to price competitively. This is particularly so where, as here, the price increases were so stunningly large. Thousands of generic drugs have been sold in the United States since the passage of the Hatch-Waxman Act in 1984. Prior to approximately 2007, nearly all of the pricing behavior of generic drugs was consistent with economic theory, *i.e.*, when generic entry occurred, generic drug prices declined. Not so for the 31 generic drugs that are the subject of this Complaint; their pricing pattern – considered alone or in comparison with Glyburide and Doxycycline – is so unusual and extraordinary as to demonstrate the existence of a conspiracy. (Plaintiffs reserve the right to amend this Complaint to add allegations about other generic drugs subject to discovery or further proceedings in this case.)

16.     Still other economic evidence confirms the broader scope of the conspiracy alleged in this Complaint. As alleged below, each of the generic drug price increases covered by this

Complaint is not explained by changes in supply, the costs of production, or demand.  Indeed, there are no market forces that explain the pricing of the drugs identified in this Complaint other than collusion.  Moreover, as alleged below, each Price-Fixed Generic Drug has commodity-like characteristics, there are barriers to entry of a new competitor, the demand is highly inelastic, and the market for the sale of each generic drug is relatively concentrated.  These economic conditions make the market for the manufacture and sale of the Price-Fixed Generic Drugs conducive to cartelization.

17.  The existence of a broader generic drug price fixing conspiracy is further revealed or supported by other activities of U.S. law enforcement.  The DOJ convened a grand jury to investigate a number of the Defendants identified in this Complaint.  As explained in detail in Section VII, to empanel a grand jury, DOJ's Guidelines require senior executives in the Antitrust Division to conclude that sufficient credible evidence of collusion exists.  Upon information and belief, nearly all of the Defendants identified in this Complaint were served with grand jury subpoenas.  (The following companies (some of whom are not yet Defendants in this MDL) have publicly acknowledged receiving the grand jury subpoenas: Aceto (which purchased Citron), Actavis, Aurobindo, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus.  Privately-held companies are under no obligation to make this disclosure.)  The DOJ also executed search warrants at the corporate offices of Perrigo, Mylan, and Aceto (which purchased Citron in 2016).  *See infra* ¶ 126. For this to occur, DOJ had to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan, Perrigo, and ACETO.  *See* U.S. CONST. amend. IV.  Finally, upon information and belief, the DOJ has granted conditional amnesty to one of the Defendants in

this case.  (This company has not yet publicly acknowledged its amnesty status.)  Under the DOJ

Guidelines, for DOJ to grant a company conditional amnesty, the amnesty applicant had to confess

to criminal violations of the U.S. antitrust laws and inform on its co-conspirators based on

information known to the amnesty applicant.  *See infra* ¶ 129.

18.     As noted above, the State AGs' and DOJ's investigations are ongoing and likely

involve additional conspirators and additional drugs beyond those named in this Complaint.  Just

months ago, Pfizer Inc. reported in an SEC filing dated August 10, 2017 that:

> As of July 2017, the U. S. Department of Justice's Antitrust Division is
> investigating our Greenstone generics business.  We believe this is related
> to an ongoing antitrust investigation of the generic pharmaceutical industry.
> The government has been obtaining information from Greenstone.

19.     In addition to the information made public from these government investigations,

the allegations in this Complaint are further supported by the fact that Defendants engaged in an

extremely high level of interfirm communications.  These communications included a large

number of in-person meetings facilitated by an almost constant stream of industry trade events,

such as the trade association meetings sponsored by the Generic Pharmaceutical Association.  In

addition to these in-person meetings, Defendants frequently communicated by telephone, e-mail,

and text message.  *See infra* ¶¶ 173–176.  As demonstrated in this Complaint, these interfirm

communications involved high-level executives with pricing authority and directly affected

Defendants' pricing decisions on the generic drugs identified in this Complaint.

20.     Considered collectively – (1) the guilty pleas; (2) the State AGs' civil enforcement

action and allegations; (3) the unprecedented price increases with respect to the generic drugs

covered in this Complaint (particularly given the economic and market conditions in the generic

drug industry); (4) the absence of any reasonable economic or market explanation for these price

increases other than collusion; (5) the correlation between the unprecedented and indisputably

collusive pricing on Glyburide and Doxycycline and the other generic drugs covered in this Complaint; (6) the economic and structural factors rendering the market for the manufacture and sale of generic drugs conducive to cartelization; (7) the extremely high level of interfirm communications by senior executives with pricing authority that occurred in-person through trade association meetings as well as by telephone, e-mail, and text message; and (8) the other U.S. law enforcement activities, including the search warrants and criminal subpoenas – all support the existence of the conspiracy alleged in this Complaint.

21.     Defendants and their co-conspirators carried out their continuing conspiracy regarding generic drugs through in-person meetings and communications, including e-mails, text messages, and telephone calls. During these meetings and communications, they conspired on the terms alleged in this Complaint, and coordinated price increase announcements or pricing terms, allocated markets and customers, rigged bids, secretly and collusively exchanged pricing information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of generic drugs sold to Plaintiffs and others in the United States.

22.     Upon information and belief, a single group of core conspirators consisting of Actavis, Heritage, Mylan, Par, Sun/Taro, Teva, and the Sandoz Defendants (collectively the "Core Conspirators") engaged in the conduct alleged in this Complaint and directed the implementation of an overarching conspiracy. As set forth in Exhibits 1 & 2 attached to this Complaint, each of the Price-Fixed Generics alleged in this Complaint were manufactured by at least one of the Core Conspirators. A second group of conspirators, consisting of Akorn/Hi-Tech, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Epic, Fougera, G&W, Glenmark, Impax, Lannett, Lupin, Mayne, Morton Grove/Wockhardt, Perrigo, Teligent, Upsher-Smith, West-Ward, Valeant and Zydus (collectively the "Additional Conspirators") joined the Core Conspirators and were active

participants in the overarching conspiracy.  In some cases, these Additional Conspirators only manufactured one or two of the Price-Fixed Generics, but their participation in the overarching conspiracy was necessary to raise the price of the Price Fixed Generic Drugs that they manufactured because it would have been in their independent interests not to follow the price increases of the other conspirators and thereby increase their market share.  The existence of the overarching conspiracy permitted the Core Conspirators to induce the Additional Conspirators to participate as necessary to increase prices on each of the Price Fixed Generic Drugs to fully implement and maintain the overarching conspiracy.  The nomenclature "Core" and "Additional" is intended to assist in explaining structural characteristics of the overarching conspiracy, and is not intended, and does not, indicate relative liability among all Defendant co-conspirators.

23.     The allegations in this Complaint are pled in the alternative if necessary to avoid inconsistency.  Count I alleges an overarching conspiracy among all Defendants regarding all of the Price-Fixed Generic Drugs in violation of Section 1 of the Sherman Act.  Counts II–XXXII each allege individual conspiracies among the specified Defendants regarding each individual Price-Fixed Generic Drug in violation of Section 1 of the Sherman Act.

## II.     <u>DRUGS INVOLVED IN THE CONSPIRACY</u>

24.     "Acetazolamide" is a carbonic anhydrase inhibitor used to treat a wide range of conditions including epilepsy, glaucoma, temporary paralysis, hypertension, heart failure, and altitude sickness.  Acetazolamide is sold in two formulations—tablets and sustained release capsules.

25.     "Albuterol" is a bronchodilator that specifically targets the β-2 receptor of the lungs to relax muscles in the airways and increase airflow to the lungs.  It was first discovered in the

1960s and is commonly prescribed to treat wheezing and shortness of breath caused by, among other things, asthma and chronic obstructive pulmonary disease.

26.     "Amitriptyline" is an antidepressant also used to treat other conditions such as migraines and nerve pain.

27.     "Baclofen" is a commonly prescribed muscle relaxant and anti-spastic medication used primarily to alleviate the signs and symptoms of spasticity resulting from multiple sclerosis ("MS"), particularly for the relief of flexor spasm and concomitant pain, clonus, and muscular rigidity.

28.     Benazepril Hydrochlorothiazide ("Benazepril HCTZ")" is a commonly prescribed drug for the treatment of high blood pressure and kidney disease.  Benazepril HCTZ combines an angiotensin converting enzyme ("ACE") inhibition, Benazepril, and hydrochlorothiazide, a diuretic.

29.     "Clobetasol" means Clobetasol proprionate topical ointment 0.05%, topical solution 0.05%, topical gel 0.05%, topical cream 0.05%, and emollient 0.05%.  Clobetasol is a highly potent topical corticosteroid used to treat skin disorders such as eczema, psoriasis, and dermatitis.  Clobetasol is available in topical ointment, solution, emollient-cream, or gel form.

30.     "Clomipramine" is a prescription oral tricyclic antidepressant used to treat obsessive compulsive disorder, panic disorder, major depressive disorder, and chronic pain.

31.     "Desonide" – which includes topical ointment 0.05% and topical cream 0.05% – is a topical corticosteroid used to treat skin disorders such as eczema, psoriasis, and dermatitis. Because it is less potent than Clobetasol, it is more commonly prescribed for children or for adults to use in sensitive areas like the eyelids.  Desonide is available in cream or ointment form.

32.     "Digoxin" is a purified cardiac glycoside used to treat atrial fibrillation and mild to moderate heart failure.

33.     "Divalproex ER" refers to Divalproex sodium extended release.  It derives from valproate, a compound that has been in use for more than 100 years and is a commonly prescribed anticonvulsant indicated for the treatment of migraines and seizures.

34.     "Doxycycline" is a tetracycline antibiotic that is used to treat bacterial infections ranging from malaria to Lyme disease to various STDs.  Doxycycline hyclate ("Doxy Hyclate") is a water soluble form of Doxycycline that absorbs quickly into the bloodstream.  A delayed release version of Doxy Hyclate ("Doxy DR") is used to treat acne.  Doxy hyclate is available in regular release capsules and tablets, and delayed release tablets.  Doxycycline monohydrate ("Doxy Mono") is a significantly less water soluble form of Doxycycline that absorbs more slowly than Doxy Hyclate.

35.     "Econazole" refers to Econazole nitrate cream 1%.  Econazole is a topical antifungal agent used to treat skin infections such as ringworm, tinea versicolor, and yeast infections.  Econazole is available in topical cream, ointment, emollient-cream, or gel form.

36.     "Fluocinonide" – which includes topical cream 0.05%, topical ointment 0.05%, and topical gel 0.05% – is a topical corticosteroid used to treat conditions such as psoriasis and eczema. Among other things, Fluocinonide reduces the swelling, itching, and redness that can occur in these types of conditions.

37.     Fosinopril Hydrochlorothiazide ("Fosinopril HCTZ") refers to the combination of Fosinopril (an angiotensin converting enzyme) and Hydrochlorothiazide (a diuretic) used to treat hypertension and heart failure.

38.     Glipizide-Metformin combines Glipizide (a sulfonylurea that stimulates the body's natural insulin production) with Metformin (a biguanide that reduces the body's absorption of sugar) in order to reduce blood sugar in patients with type-2 diabetes.  Hereafter, "Glipizide" refers to Glipizide-Metformin.

39.     "Glyburide" is an oral diabetes medication that is used to control blood sugar levels caused by Type 2 diabetes.

40.     "Glyburide-Metformin" is also taken orally to control blood sugar for patients with type-2 diabetes that combines Glyburide with Metformin.

41.     "Leflunomide" is a pyrimidine synthesis inhibitor used to treat arthritis.

42.     "Levothyroxine" refers to Levothyroxine sodium.  It is a synthetic thyroid hormone replacement used to treat hypothyroidism and other thyroid ailments such as goiters.

43.     "Lidocaine-prilocaine" is a combination anesthetic indicated for dermal anesthesia, meaning it is a combination of two topical anesthetics that is applied to the skin or genital area to cause numbness or loss of feeling before a medical procedure.

44.     "Metronidazole" is a generic antibiotic.  It comes in cream, jelly, and lotion form and is used to treat various types of infections including certain types of vaginal infections.

45.     "Meprobamate" is an oral tranquilizer used to treat various anxiety disorders.

46.     "Nimodipine" is a dihydropyridine calcium channel blocker used to manage and reduce the risk of certain brain hemorrhages.

47.     "Nystatin" is an antifungal medication sold in cream, ointment, and tablet form, used to treat Candida infections and yeast infections.

48.     "Paromomycin" is an antibiotic used to treat a wide range of infections, including amebiasis, giardiasis, leishmaniasis, and tapeworm infection.

49.     "Pravastatin" is a HMG CoA reductase inhibitor used to lower triglycerides and LDL cholesterol, lowering the risk of stroke, heart attack, and other heart complications.

50.     "Propranolol" is a beta-blocker used to prevent heart attack and to treat heart or circulatory conditions such as hypertension and angina.  Propranolol is available in capsule and tablet form.

51.     "Theophylline ER" is an extended release form of Theophylline used to treat asthma and other lung conditions such as emphysema and chronic bronchitis.

52.     "Ursodiol" is a widely-prescribed drug used to treat gallstones.  A bile acid, it works by decreasing the production of cholesterol and by dissolving the cholesterol in bile so that it cannot form stones.

53.     "Verapamil" is a calcium channel blocker used to treat hypertension (high blood pressure), angina, and certain heart rhythm disorders.

54.     "Zoledronic acid" is a bisphosphonate used primarily by cancer patients to prevent skeletal fractures and treat bone disease.  It is also used to treat osteoporosis.

55.     As it is used in this Complaint, the term "Price-Fixed Generic Drugs" (individually or collectively, as context requires) refers to all dosages, strengths, and formulations of generic Acetazolamide, Albuterol, Amitriptyline, Baclofen, Benazepril HCTZ, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex ER, Doxycycline (including Doxy Hyclate, Doxy DR, and Doxy Mono), Econazole, Fosinopril HCTZ, Fluocinonide, Glipizide, Glyburide, Glyburide-Metformin, Leflunomide, Levothyroxine, Lidocaine-prilocaine, Meprobamate, Metronidazole, Nimodipine, Nystatin, Paromomycin, Pravastatin, Propranolol, Theophylline ER, Ursodiol, Verapamil, and Zoledronic Acid.

### III.   **VENUE AND JURISDICTION**

56.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26.

57.     This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§ 1331 & 1337.

58.     Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below:

(a)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District, including the sale of generic drugs to one or more Plaintiffs and others at supracompetitive prices;

(b)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District;

(c)     Defendants transact business or are found in this District, and, therefore, venue is proper under 15 U.S.C. § 22; and/or

(d)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

59.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated below:

(a)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, or is found in this District.  Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling generic drugs throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because, as alleged in this Complaint, each Defendant belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling one or more generic drugs to one or more Plaintiffs and others in this District at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the Commonwealth in which this Federal Court sits because, as alleged in this Complaint, each Defendant has transacted business in the Commonwealth, each Defendant has contracted to supply services or things in this Commonwealth, each Defendant has caused harm by acts taken within this Commonwealth, each Defendant has caused harm in this Commonwealth by acts or omissions outside this Commonwealth, each Defendant has committed violations of 15 U.S.C. § 1 within this Commonwealth, and because the Commonwealth's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the Commonwealth to satisfy due process; and/or

(e)     This Court has personal jurisdiction over Defendants because, as alleged in this Complaint, they and one or more of their co-conspirators contracted to supply services or goods, including generic drugs, in the Commonwealth where this Federal Court sits; money flowed from Plaintiffs or other purchasers in the Commonwealth to pay Defendants and their co-conspirators for generic drugs; Defendants and one or more of their co-conspirators transact business in the Commonwealth in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts alleged in this Complaint to be done, or consequences to occur, in the Commonwealth; Defendants and their co-conspirators engaged in unlawful conduct described in this Complaint outside of the Commonwealth causing injury to one or more Plaintiffs in the Commonwealth, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this Commonwealth or the Constitution of the United States.

(f)     Based on the allegations in this Complaint, Defendants are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum Commonwealth) and have purposefully availed themselves of the laws of the United States.  As alleged in this Complaint, each Defendant, either directly, or indirectly through their subsidiaries, engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce of the forum Commonwealth and the United States.

IV.    **PARTIES**

A.    **Plaintiffs**

60.    Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger brings this action on its own behalf and as the assignee of

Cardinal Health, Inc. ("Cardinal"), a pharmaceutical wholesaler that, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants for resale to Kroger and has assigned or agreed to assign its claims arising out of those purchases to Kroger.  Kroger owns and operates retail stores and pharmacies that sell generic drugs.  During the time period relevant to Plaintiffs' claims, Kroger and/or its assignor directly purchased each of the Price-Fixed Generic Drugs in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

61.     Plaintiff Albertsons Companies, LLC, is a Delaware limited liability company with its principal place of business in Boise, Idaho.  Albertsons Companies, LLC is wholly owned by AB Acquisition LLC (a Delaware limited liability company) and is the parent corporation of Albertsons LLC, New Albertsons Inc., and Safeway Inc. (collectively "Albertsons").  Albertsons Companies, LLC, brings this action on its own behalf and as the assignee of Cardinal Health, Inc. ("Cardinal"), a pharmaceutical wholesaler that, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants for resale to Albertsons and has assigned or agreed to assign its claims arising out of those purchases to Albertsons.  Albertsons also brings this action based on an internal assignment from Safeway Inc.  Albertsons owns and operates retail stores and pharmacies that sell generic drugs.

62.     During the relevant period, Albertsons and/or its assignor directly purchased each of the Price-Fixed Generic Drugs in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Plaintiff H.E. Butt Grocery Company ("HEB") is a Texas limited partnership with its principal place of business in San Antonio, Texas.  HEB brings this action on its own behalf and, during the relevant period, purchased Price-Fixed Generic Drugs directly from

Defendants and/or their co-conspirators and sustained injury and damage to its business or property as a proximate result of the antitrust violations alleged in this Complaint.  HEB owns and operates retail stores and pharmacies that sell generic drugs.

### B.   Defendants

63.   Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In March 2015, Actavis, plc, the parent company of Defendant Actavis, merged with Allergan, plc ("Allergan") and adopted Allergan's name.  In August 2016, Defendant Teva USA purchased Actavis' generics business, which included Actavis Inc., Actavis Elizabeth Inc. and Defendant Actavis Pharma Inc., from Allergan, plc.  All the assets of the entities were then transferred to the newly formed Actavis Holdco.  The acquisition cost Teva USA $33.43 billion in cash and approximately 100 million shares of Teva securities.  During the time period relevant to Plaintiffs' claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds from Defendant Actavis Pharma, Inc., and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

64.   Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco and is now a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  During the time period relevant to Plaintiffs' claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Actavis Holdco (and its

predecessors) and Actavis Pharma are collectively defined as "Actavis." During the time period relevant to Plaintiffs' claims, Actavis manufactured the following generic drugs Clobetasol Propionate, Desonide, Doxy Hyclate, Fluocinonide, Glyburide-Metformin, Nystatin, Pravastatin, Propranolol, Verapamil, and Ursodiol. Actavis is defined to include its managers, officers, employees, and agents acting on its behalf.

65.     Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business located in Lake Forest, Illinois. Akorn is the parent company of Defendant Hi-Tech (defined below). During the time period relevant to Plaintiffs' claims, Akorn manufactured generic Clobetasol and Lidocaine-Prilocaine. Akorn is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Akorn directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

66.     Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida. During the time period relevant to Plaintiffs' claims, Apotex manufactured generic Leflunomide and Pravastatin. Apotex is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Apotex directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

67.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business located in Dayton, New Jersey. During the time period relevant

to Plaintiffs' claims, Aurobindo manufactured the following generic drugs: Fosinopril HCTZ, Glyburide, and Glyburide-Metformin.  Aurobindo is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Aurobindo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

68.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business located in Fairfield, New Jersey.  Breckenridge is wholly-owned by Pensa Pharma S.A.  During the time period relevant to Plaintiffs' claims, Breckenridge manufactured generic Propranolol.  Breckenridge is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Breckenridge directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

69.     Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business located in East Brunswick, New Jersey.  During the time period relevant to Plaintiffs' claims, Citron manufactured generic Fosinopril HCTZ, Glyburide, and Glyburide-Metformin.  Citron is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Citron directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

70.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business located in Princeton, New Jersey.  Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company. During the time period relevant to Plaintiffs' claims, Dr. Reddy's manufactured the following generic drugs: Divalproex ER, Meprobamate, Pravastatin, and Zoledronic Acid.  Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

71.     Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York.  During the time period relevant to Plaintiffs' claims, Epic manufactured generic Ursodiol.  Epic is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Epic directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

72.     Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  In 2012, Novartis International AG acquired Fougera.  During the time period relevant to Plaintiffs' claims, Fougera manufactured the following generic drugs: Clobetasol Propionate, Desonide, Econazole, and Lidocaine-Prilocaine. Fougera is defined to include its managers, officers, employees, and agents acting on its behalf.

During the time period relevant to Plaintiffs' claims, Fougera directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  The term "Sandoz Defendants" refers to Fougera and Sandoz, collectively.

73.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey.  During the time period relevant to Plaintiffs' claims, Glenmark manufactured generic Fosinopril HCTZ and Pravastatin.  Glenmark is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Glenmark directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

74.     Defendant G&W Laboratories, Inc. is a New Jersey Corporation with its principal place of business in South Plainfield, New Jersey.  During the time period relevant to Plaintiffs' claims, G&W manufactured generic Metronidazole.  G&W is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, G&W directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

75.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey.  In April 2011, Emcure (a

pharmaceutical company based in India) acquired Heritage.  During the time period relevant to Plaintiffs' claims, Heritage manufactured the following generic drugs: Acetazolamide, Doxy DR, Fosinopril HCTZ, Glipizide, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Propranolol, Theophylline ER, Verapamil, and Zoledronic Acid.  Heritage is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Heritage directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

76.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business located in Amityville, New York.  Hi-Tech is a wholly-owned subsidiary of Defendant Akorn, which purchased Hi-Tech in April 2014, for $640 million.  During the time period relevant to Plaintiffs' claims, Hi-Tech manufactured generic Clobetasol and Lidocaine-Prilocaine.  Hi-Tech is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Hi-Tech directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

77.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  During the time period relevant to Plaintiffs' claims, Impax manufactured generic Digoxin, Lidocaine-Prilocaine, and Metronidazole.  Defendant Impax is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Impax directly

participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

78.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  During the time period relevant to Plaintiffs' claims, Lannett manufactured the following generic drugs: Acetazolamide, Baclofen, Digoxin, Doxycycline, Levothyroxine, and Ursodiol.  Defendant Lannett is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Lannett directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

79.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business located in Baltimore, Maryland.  During the time period relevant to Plaintiffs' claims, Lupin manufactured generic Pravastatin.  Lupin is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Lupin directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

80.     Defendant Mayne Pharma USA, Inc. ("Mayne") is a Delaware corporation with its principal place of business located in Paramus, New Jersey.  During the time period relevant to Plaintiffs' claims, Mayne manufactured generic Doxy Hyclate DR.  Mayne is defined to include

its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Mayne directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

81.     Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business located in Morton Grove, Illinois.  Wockhardt, Ltd., an Indian company, is the parent company of Morton Grove.  During the time period relevant to Plaintiffs' claims, Morton Grove manufactured generic Clobetasol.  Defendant Morton Grove is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Morton Grove directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

82.     Defendant Mylan N.V. is Dutch corporation with its principal place of business and global headquarters in Canonsburg, Pennsylvania.  Mylan N.V. is the direct parent corporation of Defendant Mylan Inc. and the ultimate parent and owner of Defendants Mylan Pharma and UDL (both defined below).  During the time period relevant to Plaintiffs' claims, Mylan N.V. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

83.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Mylan Inc. is the parent company of Defendant UDL (defined below) and Defendant Mylan Pharma (defined below).  Mylan Inc. is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Mylan Inc. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

84.     Defendant Mylan Pharmaceuticals, Inc., ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  Mylan Pharma is a subsidiary of Defendant Mylan Inc.  During the time period relevant to Plaintiffs' claims, Mylan Pharma manufactured the following generic drugs: Albuterol, Amitriptyline, Benazepril HCTZ, Clomipramine, Digoxin, Divalproex ER, Doxy Hyclate, Doxy DR, Glipizide, Levothyroxine, Pravastatin, Propranolol, and Verapamil.  Mylan Pharma is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Mylan Pharma directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Mylan N.V., Mylan Inc., Mylan Pharma, and UDL (defined below) are collectively defined as "Mylan."

85.     Defendant Par Pharmaceutical, Inc. ("Par") is a New York corporation with its principal place of business located in Chestnut Ridge, New York.  Endo International plc, an Irish company, is the parent company of Defendant Par.  As alleged above, in September 2015, Endo

purchased Par from a private investment firm.  During the time period relevant to Plaintiffs' claims, Par manufactured the following generic drugs: Amitriptyline, Baclofen, Digoxin, Divalproex ER, Doxy Hyclate, Nystatin, and Propranolol.  Defendant Par is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Par directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

86.    Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its principal place of business in Allegan, Michigan.  Perrigo is a subsidiary of Perrigo Company, plc, an Irish company.  During the time period relevant to Plaintiffs' claims, Perrigo manufactured and sold the following generic drugs: Clobetasol Propionate, Desonide, Nystatin, and Econazole Nitrate.  Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Perrigo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

87.    Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey.  Pliva is a wholly-owned subsidiary of Defendant Teva (defined below).  During the time period relevant to Plaintiffs' claims, Pliva manufactured generic Propranolol.  Pliva is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Pliva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs

throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

88.     Defendant Sun Pharmaceutical Industries, Inc. (f/k/a Caraco Pharmaceutical Laboratories, Ltd.) ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  Co-conspirator Sun Pharmaceutical Industries Ltd., ("Sun Ltd."), based in Mumbai, India, along with certain of its wholly-owned subsidiaries, owns 100% of Sun.  Sun Ltd. also owns approximately 70% of Defendant Taro (defined below) and Taro's parent, Taro Pharmaceutical Industries, Ltd.  In late 2012, Sun acquired URL Pharma, Inc., which is a wholly-owned subsidiary of co-conspirator Mutual Pharmaceutical Company, Inc. ("Mutual").  Mutual is a wholly-owned subsidiary of Sun.  Additionally, Defendant Taro During the time period relevant to Plaintiffs' claims, Sun (individually and through Mutual) manufactured the following the generic drugs: Albuterol, Digoxin, Doxy Hyclate, Nimodipine, Nystatin, and Paromomycin.  Sun is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Sun directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

89.     Defendant Sandoz, Inc. ("Sandoz USA") is a Colorado corporation with its principal place of business located in Princeton, New Jersey.  Sandoz USA distributes the drugs that its parent, Sandoz Germany, develops and manufacturers.  Sandoz USA and Sandoz Germany are both owned by Novartis International AG.  During the time period relevant to Plaintiffs' claims, Sandoz Germany manufactured, and Defendant Sandoz USA distributed, the following generic drugs:  Amitriptyline, Benazepril HCTZ, Clobetasol Propionate, Clomipramine, Desonide,

Fosinopril-Hydrochlorothiazide, Lidocaine-Prilocaine, Levothyroxine, Metronidazole, Nystatin and Pravastatin.  Defendant Sandoz USA is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Sandoz USA directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Sandoz USA is hereinafter referred to as "Sandoz."

90.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli corporation.   During the time period relevant to Plaintiffs' claims, Taro manufactured the following generic drugs: Acetazolamide, Clobetasol Propionate, Clomipramine, Desonide, Econazole Nitrate, and Fluocinonide.  Taro is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Taro directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

91.     Defendant Teligent, Inc. (f/k/a IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business located in Buena, New Jersey.  During the time period relevant to Plaintiffs' claims, Teligent manufactured generic Econazole.  Teligent is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Teligent directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United

States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

92.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation.  During the time period relevant to Plaintiffs' claims, Teva manufactured the following generic drugs: Acetazolamide, Baclofen, Fluocinonide, Glipizide, Glyburide, Glyburide-Metformin, Leflunomide, Metronidazole, Nystatin, Pravastatin, Propranolol, and Theophylline ER.  Teva is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims: Teva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

93.     Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois.  UDL, n/k/a Mylan Institutional Inc., is a subsidiary of Defendant Mylan Inc.  During the time period relevant to Plaintiffs' claims, UDL manufactured generic Propranolol.  UDL is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, UDL directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

94.     Defendant Upsher-Smith Laboratories, LLC (f/k/a Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a Minnesota limited liability company with its principal place of

business located in Maple Grove, Minnesota.  During the time period relevant to Plaintiffs' claims, Upsher-Smith manufactured generic Baclofen and Propranolol.  Upsher-Smith is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Upsher-Smith directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

95.     Defendant Valeant Pharmacueuticals International ("Valeant International") is a Canadian company with its principal place of business in Bridgewater, New Jersey.  Valeant International was a California company until September 2010, when it merged with Biovail Corporation, a Canadian company.  Defendant Valeant Pharmaceuticals North America, LLC ("Valeant North America") is a Delaware corportation with its principal place of business in Bridgewater, New Jersey.  It is a wholly-owned subsidiary of Valeant International.  Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California.  Oceanside is a wholly-owned subsidiary of Valeant.  In this Complaint, Valeant International, Valeant North America, and Oceanside are referred together as Valeant.  Valeant is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Valeant manufactured generic Metronidazole.  During the time period relevant to Plaintiffs' claims, Valeant directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

96.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey.  During the time period relevant to Plaintiffs' claims, West-Ward manufactured generic Digoxin and Doxy Hyclate. West-Ward is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, West-Ward directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

97.     Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Wockhardt is a wholly-owned subsidiary of Defendant Morton Grove Pharmaceuticals, Inc.  During the time period relevant to Plaintiffs' claims, Wockhardt manufactured generic Clobetasol.  Wockhardt is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Wockhardt directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

98.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business located in Pennington, New Jersey.  During the time period relevant to Plaintiffs' claims, Zydus manufactured the following generic drugs: Acetazolamide, Divalproex ER, and Pravastatin.  Zydus is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Zydus directly participated in the conspiracy alleged in this Complaint, produced and sold

one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

### C.     Co-Conspirators and Agents

99.     Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

100.     The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs reserve the right to amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

101.     At all relevant times, other persons, firms, and corporations, referred to in this Complaint as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

102.     The acts alleged in this Complaint that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

103.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.      TRADE AND COMMERCE

104.    During the time period relevant to Plaintiffs' claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial.  In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)      Defendants and their co-conspirators sold and shipped substantial quantities of generic drugs in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the generic drugs;

(b)      Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)      Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d)      Defendants and their co-conspirators imported substantial quantities of raw materials for generic drugs from outside the United States.

105.    The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## VI.     GENERIC DRUGS, THE FDCA & THE HATCH-WAXMAN AMENDMENTS

106.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can (and do) exploit in order to obtain or maintain market power in the sale of a particular pharmaceutical composition.

Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase. When the same person both pays for and chooses the product, the price of the product plays an appropriate role in the person's choice and, consequently, manufacturers have an appropriate incentive to lower the prices of their products.

107.    The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products, including each of the Price-Fixed Generics Drugs, to patients without a prescription written by a doctor. The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection. The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

108.    Brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products. The result is a marketplace in which the price plays a comparatively unimportant role in product selection.

109.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up. This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable.

110.    Due to this disconnect, retailers like Plaintiffs play an important role in driving down prescription drug costs in the United States.  The most important tool that retailers like Plaintiffs have at their disposal is the availability of generic drug manufacturers operating in a competitive marketplace.  As explained below, when drug manufacturers begin selling generic bio-equivalent alternatives to branded prescription drugs that have previously been subject to a patent, retailers are able to drive the prices paid for those drugs down substantially.

111.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain Food and Drug Administration ("FDA") approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).  The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).  A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA").  An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA by showing that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug – that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

112.    The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

113.    Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate generic competitors, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

114.    The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had soared to $300 billion.

115.    Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts.  The only material difference between generic and brand name drugs is their price: generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers.  The Federal Trade Commission ("FTC")

estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product. Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiator and the basis for competition among manufacturers. Over time, generics' pricing nears the generic manufacturers' marginal costs.

116.    Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug (*i.e.*, a drug that generates annual sales of $1 billion or more) can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found that the use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[2]

117.    Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name counterpart. Since passage of the Hatch-Waxman Amendments, every State has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

118.    There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain. Pharmaceutical wholesalers and retailers pay lower prices to

---

[2]    GPhA, Generic Drug Savings in the U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

acquire generic drugs than to acquire the corresponding brand-name drug.  Health insurers and patients also benefit from the lower prices that result from generic competition.

119.    Further, the more generic manufacturers that enter a market, the more the price for the drug decreases.  As an FDA study reflects, "generic competition is associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction," as average prices fall to roughly half the price of the branded drug.  Further, with the entry of each additional generic manufacturer up to the ninth manufacturer, the price continues to fall.  In mature markets with 19 or more generic manufacturers, the price of the generic drug is as low as 6% of the branded version.  This phenomenon is demonstrated in the following chart prepared by the FDA:



**Generic Competition and Drug Prices**

Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

120.    Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume

sales.  Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.[3]

## VII.   THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS

121.    As noted above, Defendants' conduct regarding generic drugs is under investigation by the DOJ, State Attorneys General, the United States Congress and others.

### A.   The DOJ is Leading a Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers

122.    No later than November 3, 2014, as noted above, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas to several generic drug manufacturers, including nearly all Defendants and/or their affiliates.

123.    A source at the Policy and Regulatory Report says "prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever.  Like in that case, prosecutors expect to move from one drug to another in a similar cascading fashion."[4]

124.    According to BLOOMBERG NEWS, the investigation encompasses more than a dozen companies and at least two dozen generic drugs.  The source quoted by the BLOOMBERG article

---

[3]     At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.

[4]     *See* Eric Palmer, *DOJ criminal probe takes a look at trade associations*, FIERCE PHARMA (July 10, 2015), http://www.fiercepharma.com/regulatory/doj-criminal-probe-takes-a-look-at-trade-associations.

correctly predicted in November 2016 that the DOJ would file criminal charges against at least one member of the generic drug price-fixing conspiracy by the end of 2016.[5]

125.    Sure enough, on December 12, 2016, DOJ filed criminal charges against Jeffrey Glazer (the former CEO of Heritage) and Jason Malek (the former president of Heritage).  Both Glazer and Malek have since pled guilty to violations of Section 1 of the Sherman Act for their participation in conspiracies to fix prices, rig bids, and allocate customers for Glyburide and Doxycycline.  The Hon. Barclay Surrick of this Court determined that there was a factual basis for both Glazer's and Malek's pleas, and convicted each individual of a felony violation of the Sherman Act.  Sentencing for both Glazer and Malek was originally set for April 2017, but has been rescheduled to March 2019 as they continue to cooperate with the DOJ.  As alleged above, by operation of law, these guilty pleas merely define the minimum parameters of the conspiracy alleged in this Complaint.

126.    Following the plea agreements of Malek and Glazer, the DOJ has obtained and executed search warrants against at least Aceto Corporation (which purchased Citron's generic drugs business in December 2016), Perrigo, and Mylan in connection with the generic drug price fixing probe.  Accordingly, at least one federal judge has necessarily found probable cause that such a conspiracy existed, and that it was probable that evidence of the conspiracy would be found in the offices of Perrigo, Mylan, and Citron.

127.    In addition to the raid of Perrigo's, Mylan's, and Aceto's corporate offices, the grand jury empaneled by DOJ as part of its investigation has issued subpoenas to numerous

---

[5]        *See* D. McLaughlin & C. Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG NEWS (Nov. 3, 2016,), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

Defendants and/or their employees. The following companies (some of whom are not yet Defendants in this MDL) have publicly acknowledged receiving grand jury subpoenas: Aceto, Actavis, Aurobindo, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus. Upon information and belief, additional companies have also received subpoenas but have not publicly acknowledged this fact.

128.    The fact that most Defendants and/or their employees received criminal subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, *available at* https://www.justice.gov/atr/division-manual. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which Price-Fixed sales were made or where conspiratorial communications occurred." *Id*. Thus, the fact that one or more of the Defendants and certain of their employees received federal grand jury subpoenas is an indication that antitrust offenses have occurred involving these companies.

129.    Additionally, public sources have reported that at least one Defendant or co-conspirator has applied for conditional amnesty under ACPERA.  That a target has applied for leniency is significant.  As the DOJ notes on its web site (https://www.justice.gov/atr/page/file/926521/download):

> 5.    Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?
>
> Yes.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.
>
> The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.[6]

*Id.*

130.    The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical Propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed.''  The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation

---

[6]    https://www.justice.gov/atr/page/file/926521/download.

noting that: "The complaints in those civil cases - which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug - overlap significantly with aspects of the ongoing criminal investigation.'' As noted above, the DOJ also filed a motion to stay discovery in MDL 2724, stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to Doxy Hyclate, Glyburide, and other drugs (including a significant number of the drugs at issue here)."[7]

131.    The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines. The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[8]

**B.    At Least 45 State Attorneys General Are Also Investigating the Anticompetitive Conduct in The Generic Drug Industry**

132.    In addition to the DOJ's criminal enforcement action, at least 45 States' Attorneys General, led by the State of Connecticut, also filed a civil enforcement action on December 15, 2016, based on their investigation to date into generic drug pricing. To date, the State Attorneys

---

[7]    *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.,* MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

[8]    DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

General ("State AGs") have identified as co-conspirators 17 generic drug manufacturers[9] that conspired to fix prices of at least 15 different generic drugs.[10]  Additionally, the State AGs allege that Rajiv Malik (President and Executive Director of Mylan N.V.) participated in the conspiracy in his individual capacity.

133.    The State AGs allege – and document with detail based on records obtained from Defendants through Civil Investigative Demands – that the identified Defendants and their co-conspirators participated in an overarching conspiracy to unlawfully increase prices, allocate markets, and rig bids of numerous generic drugs.  Although the State AGs identify 15 drugs as part of the conspiracy, the State AGs make clear that the "overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in [the State AG Complaint]."

134.    In essence, the State AGs allege that these generic drugs (along with many others) were cartelized based on an agreement or understanding between or among Defendants and their co-conspirators to refrain from competing with each other on the pricing and sale of the generic drugs in the United States.  This agreement or understanding that the Defendants and their co-conspirators adhered to provides that each generic manufacturer "is entitled to its [predetermined share] of the market, whether the market is a particular drug, or a number of generic drugs.  [The predetermined share] is an approximation of how much market share each competitor is entitled

---

[9]    The Defendants identified by the State AGs include: Actavis (multiple entities), Ascend, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva, and Zydus.

[10]    The State AGs have identified specific unlawful agreements to fix prices of: Acetazolamide, Doxycycline, Fosinopril HCTZ, Glipizide, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline ER, Verapamil, and Zoledronic Acid.

to, based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry....   The objective is to attain a state of equilibrium, where none are incentivized to compete for additional market share by eroding price."  State AG Complaint, ¶¶ 90, 97.  In other words, generic drug manufacturers followed an express agreement to apply a negotiated formula that allocated the market share for the manufacturers of numerous generic drugs.

135.    The State AGs establish that this formula was developed and agreed to as the result of "an almost constant ability for Defendants to meet in person and discuss their business plans." State AG Complaint, ¶ 91.  For example, anticompetitive agreements are reached at:

> [o]rganized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.   Of particular importance here, generic drug manufacturer representatives who attend these functions ... use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively sensitive information.
>
> These trade shows and customer conferences provide generic drug manufacturers, including but not limited to [the identified Defendants], with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

State AG Complaint, ¶¶ 79-80.

136.    In furtherance of the conspiracy, the State AGs' Complaint establishes that Defendants would frequently rig bids by increasing pricing to existing customers in order to allow another conspirator to win the business of that customer and obtain the market share to which it was entitled by the conspiracy's formula.   This process of purposefully abandoning existing customers would occur most frequently when a new conspirator enters the market for a generic drug.  Whereas fundamental economic principles dictate that the price of the drug should decrease

as the number of suppliers of that drug increases, the opposite typically occurred as a direct result of the conspiracy, because the existing competitors would walk away from their customers in order to allow the new entrant a portion of the market.  State AG Complaint, ¶ 100.

137.    These market allocation and price-fixing agreements were often negotiated across more than one generic drug.  In order to maintain supracompetitive prices, "customers in one drug market might be traded for customers in another drug market....  Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs."  State AG Complaint, ¶ 101.

138.    For example, Rajiv Malik of Mylan, N.V., spoke with Jeffrey Glazer of Heritage, and Malik agreed that Mylan would walk away from two large accounts for Doxycycline DR so that Heritage could win this business.  Malik noted that Mylan's consideration for abandoning this business had been provided previously, when Heritage intentionally forfeited accounts to Mylan on a different drug.  State AG Complaint, ¶ 103.  During this exchange, as with all collusive communications involving Mylan alleged in this Complaint, the senior executive from Mylan (in this case Mr. Malik) acted on behalf of and reached an agreement that bound all of the Mylan entities identified in this Complaint.

139.    By adhering to the common understanding regarding the market share that each conspirator was entitled to, the Defendants also facilitated substantial price increases.  "As long as everyone in the 'sandbox' is playing fair, and the manufacturers believe that they have their [predetermined market share], the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business.  Doing so is viewed as 'punishing' a competitor for raising prices – which is against the rules."  State AG Complaint, ¶ 106.

## VIII.   CONGRESSIONAL RESPONSES TO GENERIC DRUG PRICE INCREASES

140.    In addition to the investigations by the DOJ and the State AGs, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.

141.    In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs that had experienced extraordinary price increases.[11] In November 2014, Senator Sanders conducted a hearing entitled "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").  Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[12]

142.    Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far outpaced inflation.[13]

143.    In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic

---

[11]    Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[12]    Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

[13]    HHS OIG, Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs (Dec. 2015), available at https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[14] The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[15] And this was the case for most generics. But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[16] Eighteen of those drugs, namely Acetazolamide, Albuterol, Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex, Doxycycline, Econazole, Fluocinonide, Lidocaine, Nystatin, Pravastatin, Theophylline, and Ursodiol are among the drugs identified by the GAO as having experienced extraordinary price increases.[17]

## IX.   THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH FACILITATED COLLUSION BETWEEN DEFENDANTS

144.   The collusion alleged in this Complaint infected the generic drug industry, and at a minimum it contaminated the pricing and sale of the Price-Fixed Generic Drugs in this case.

145.   As Connecticut's Attorney General George C. Jepsen commented, there is "a culture of cronyism [in the generic drugs industry] where, whether it's over a game of golf or a dinner or drinks, there's just systematic cooperation."[18]

---

[14]     GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/products/GAO-16-706.

[15]     GAO Report, at 23-25.

[16]     *Id.* at 1 & Appendix III.

[17]     *Id.* at 1 & Appendix III.

[18]     K. Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, NY TIMES (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html?mcubz=3.

146.    As alleged in this Complaint, these numerous competitor contacts resulted in express agreements between Defendants and their co-conspirators to fix prices, allocate markets, and rig bids on the pricing and sale of generic drugs sold in the United States to Plaintiffs and others, including the Price-Fixed Generics.  In other words, the Defendants got together and exchanged assurances of common action and also adopted a common plan to cartelize the pricing and sale of the Price-Fixed Generic Drugs.

### A.    Defendants Used Trade Association Meetings to Facilitate Their Collusion

147.    As the civil and criminal enforcement actions indicate, Defendants were members of numerous trade associations and used the meetings of those associations to facilitate their collusion.  The frequent trade association meetings provided an ideal mechanism through which Defendants could and did meet in person and reach agreements with their competitors to increase prices on the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States.

148.    Upon information and belief, Defendants' anticompetitive conduct was a result of an agreement (or series of agreements) to fix, maintain, and stabilize prices, rig bids, and allocate customers for the sale of the Price-Fixed Generic Drugs.  The agreement (or series of agreements) was furthered by discussions held at industry meetings and events hosted by various trade associations, including GPhA, HDMA, ECRM, and MMCAP (all defined below) as well as other meetings and communications.

149.    In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other acts:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with coconspirators to discuss the sale and pricing of Price-Fixed Generic Drugs in the United States;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(c)     Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Price-Fixed Generic Drugs sold in the United States;

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)     Selling Price-Fixed Generic Drugs in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Price-Fixed Generic Drugs sold in the United States at collusive and noncompetitive prices.

150.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through: (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

151.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market and customer allocation scheme.

152.    The industry intelligence-gathering reporting firm Policy and Regulatory Report has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.  The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct e-mail, phone, and text message communications."[19]

153.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning Price-Fixed Generic Drugs, including but not limited to GPhA and HDMA.   In addition, Defendants regularly attended industry events hosted by the MMCAP.[20]

154.    The GPhA bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The trade association

---

[19]        http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.
[20]        Exhibit 3 to the Complaint contains a chart which details all known trade association meetings, conferences, and/or events attended by Defendants from 2010-2016.  The latter half of Exhibit 3 lists the names of individual attendees at each meeting.

was the result of a 2000 merger between the GPhA and two rival trade associations (the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance). According to GPhA's website, its "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."  The GPhA's website touts the "business networking opportunities" and the "peer-to-peer connections" as the primary reasons to join the trade association.  *See* http://www.gphaonline.org/about/ membership.  GPhA members during the relevant time period have included Defendants Actavis, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus.

155.    Throughout the period relevant to Plaintiffs' claims, the GPhA held three conferences each year.  The GPhA's Fall Technical Conference was held each year in late October in Bethesda, Maryland.  The GPhA's Annual Meeting was held each year in mid-February in Orlando, Florida.  The GPhA's CMC Workshop was held each year in early June in Bethesda, Maryland.  Exhibit 1 lists GPhA meetings attended by Defendants.

156.    Upon information and belief, each of the conspiratorial price increases alleged in this Complaint was discussed, at least in part, at the GPhA's three annual meetings (including the numerous social events that were attendant to these meetings, such as golf outings, cocktail parties, and even informal dinners).  In many of the instances alleged above, attendees for each conspirator included individuals with pricing authority over generic pharmaceutical drugs, including the Price-Fixed Generic Drugs.  Indeed, the State AGs allege that the GPhA meetings and other events "provide generic drug manufacturers, including but not limited to [the 17 corporate Defendants named in the State AG Complaint], with ample opportunity to meet, discuss, devise and implement

a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."

157.   Moreover, several of Defendants' high-ranking corporate officers served on GPhA's Board of Directors, which gave Defendants an opportunity to communicate with each other.  Listed below are the individuals and their companies.

| Defendants' Membership in GPhA Board of Directors 2012-2016 | |
| --- | --- |
| Actavis | 2012-2013 (Charles Mayr) |
| | 2015 (Bob Stewart) |
| Apotex | 2012-2016 (Jeff Watson) |
| Aurobindo | 2016 (Robert Cunard) |
| Dr. Reddy's | 2016 (Alok Sonig) |
| Heritage | 2012-2015 (Jeffrey Glazer) |
| Impax | 2012-2014 (Carole Ben-Maimon) |
| | 2015-2016 (Marcy Macdonald) |
| Lupin | 2014-2016 (Paul McGarty) |
| Mylan | 2012-2014 (Tony Mauro) |
| | 2015 (Marcie McClintic Coates) |
| | 2016 (Heather Bresch) |
| Par | 2015-2016 (Tony Pera) |
| Perrigo | 2013-2015 (Doug Boothe) |
| | 2016 (Richard Stec) |
| Sandoz | 2012-2013 (Don DeGolyer) |
| | 2014-2016 (Peter Goldschmidt) |
| Sun | 2015-2016 (Jim Kedrowski) |
| Teva | 2012-2013 (Debra Barrett) |
| | 2014 (Allan Oberman) |
| | 2015-2016 (Debra Barrett) |
| West-Ward | 2016 (Michael Raya) |
| Zydus | 2012-2016 (Joseph Renner) |

158.   In addition to the GPhA meetings, other industry events provided Defendants with opportunities to collude, and Defendants did in fact use these opportunities to discuss their unlawful agreements.

159.    The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.   HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.   HDMA members, during the relevant time period, have included Defendants Apotex, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, Mayne, Mylan, Par, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, Zydus.   Exhibit 1 lists HDMA meetings attended by Defendants.

160.    Other events at which Defendants may have conspired included meetings held by the Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP) and the Efficient Collaborative Retail Marketing (ECRM).

161.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.   MMCAP has been delivering pharmacy and healthcare value to members since 1985.   MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.   Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

162.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program....   In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy ... and currently provide

healthcare-related contracting to state and local government members located across the United States of America.  Total purchases by MMCAP member facilities for all MMCAP programs exceed $1 billion annually.

163.    MMCAP held its National Member Conference in Bloomington, Minnesota on May 12-15, 2014.  At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."  At the MMCAP conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm agreement to raise prices of one or more Price-Fixed Generic Drugs.  Exhibit 1 lists MMCAP meetings attended by Defendants.

164.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up one on-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.  Exhibit 1 lists ECRM meetings attended by Defendants.

165.    At these various conferences and trade shows, representatives from at least some Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

166.    In conjunction with meetings at these conferences and trade shows, representatives of generic drug manufacturers got together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level

executives of many generic drug manufacturers got together periodically for what at least some of them referred to as industry dinners.

167.    A large number of generic drug manufacturers, including many Defendants here, are headquartered in close proximity to one another in New York, New Jersey, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.   For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

168.    Generic drug manufacturer employees also got together regularly for what they referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discussed competitively sensitive information.   For example, several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving sales executives from Citron, Dr. Reddy's, Heritage, Lannett, and Teva, among others); (2) in Baltimore, Maryland in May (involving sales executives from Citron, Dr. Reddy's, Heritage, Teva, and Zydus, among others); and (3) upon information and belief, in August in Denver, Colorado (involving sales executives from Citron, Dr. Reddy's, and Heritage, among others).

169.    Through these various interactions, Defendants' employees were often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often led to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

170.     Defendants also routinely communicated and shared information with each other about bids and pricing strategy.  This included forwarding bid packages received from a customer (*e.g.,* a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.  Upon information and belief, these information exchanges were made by individuals with pricing and bidding authority and impacted the prices charges by Defendants for the Price-Fixed Generic Drugs.

171.     Additionally, Defendants shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.  Defendants used this information from their competitors to negotiate higher prices or superior terms with their customers, which was to the ultimate detriment of consumers.  Again, this information sharing was undertaken for the purpose of impacting (and increasing) Defendants and their conspirators' prices for the Priced Fixed Generic Drugs.

172.     In sum, during meetings of the GPhA, HDMA, ECRM, and MMCAP, and the other meetings described in Exhibit 1, Defendants and co-conspirators exchanged confidential, commercially sensitive information in furtherance of the conspiracy, or agreed to fix prices, or both of Price-Fixed Generic Drugs.

### B.     Defendants Communicated in Secret Through E-Mail, Telephone, and Text Messages

173.     In addition to the in-person meetings, Defendants also communicated regularly in furtherance of the conspiracy via e-mail, telephone, and text.

174.     Telephone records produced to the State AGs establish that senior sales executives and other individuals with responsibility for pricing at Heritage had at least 513 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne,

Par, Sandoz, Sun, Teva, and Zydus.  State AG Complaint, ¶ 94 (as the State AG Complaint further notes, the 513 figure likely underrepresents the actual number of phone contacts during this period, "because it is based on phone and text message records from only some of the executives and salespeople at issue.").

175.    Similarly, senior sales executives and other individuals responsible for pricing at Teva had at least 1,501 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.

176.    Collusion is the only plausible inference to draw from the extremely high number of competitors' contacts revealed by Defendants' phone records.  Upon information and belief, Defendants used these contacts to discuss the unlawful agreements alleged in this Complaint.

## C.    Defendants Communicated Their Conspiratorial Plans Through Their Statements to The Investment Community

177.    Defendants also used public statements to investors (that would then be disseminated throughout the generic drug industry) to communicate their commitment to the conspiratorial scheme alleged in this Complaint.  Numerous Defendants have made statements to the investment community during the relevant time period demonstrating their intention to depart from prior industry pricing norms and maintain supracompetitive prices and communicating that intention to all other members of the conspiracy.

178.    For example, representatives of Defendants in various earnings calls noted that the pricing conduct in the U.S. generic pharmaceutical industry, during the relevant time period, had changed from past pricing behavior.

179.    During an October 29, 2013 Actavis earnings call, Actavis Pharma Director and President Sigurdur Olafsson stated: "But there's opportunities to take pricing increases, and that is what has changed since maybe five years ago when there wasn't an opportunity."

180.    During Hi-Tech's March 8, 2013 earnings call, Hi-Tech Chairman and CEO David

Seltzer stated:

> So we happen to have -- a number one, we happen to be doing a significant
> amount of topicals than -- compared to several years back.  So we have the
> Clobetasol items that we pretty much brought all in-house on the
> manufacturing side.  We have our generic EMLA.  We have licensed in a
> couple of Lidocaine products that are doing very well for us.  So we have
> capacity.  And it just happens to be that we were also able to purchase very
> recently a very high-speed filling and packaging line for creams and
> ointments that we needed.  But that's also going to give us a tremendous
> amount of capacity going forward.  So we are looking very hard to find
> additional products.  We definitely see opportunity.  I think everybody
> knows and understands that there's been some significant price changes in
> that market over the last couple of years.

181.    During Akorn's August 5, 2014 earnings call, Akorn CEO Raj Rai had the

following exchange with an analyst:

> Q (analyst): Raj, can you just go into a little bit more detail on the pricing increases
> on Clobetasol.  Are you seeing other opportunities across the portfolio, how much
> of an impact in terms of flow through from that increase are you going to see in the
> P&L and any pushback that you have heard around that, that would be helpful?
> Thank you.
>
> A (Raj Rai, CEO): [T]his is sort of a new development and with the price increase
> came some additional contracts and we are in the process of implementing those
> contracts.  So, I think the situation is still little bit fluid and we will have more to
> discuss in our next conference call when we have fully implemented these new
> contracts.  But the opportunity as it stands is real and it's going to increase our sales
> substantially in the next quarter.  I mean the process has already begun and as Tim
> mentioned that there are some costs associated with the price increases, so the third
> quarter would sort of be flat but I think we will start to see the benefit of the price
> increase and volumes coming through in the fourth quarter.
>
> And the question on other products, yes I think there is a general, we are seeing lot
> of price increases that are happening in the generic space and it affects some of our
> products as well.  So, I would say overall, there is a healthier pricing environment
> than it was there, I would say six to eight months ago.

182.    In multiple earnings calls in 2013, Lannett's CEO Arthur P. Bedrosian confirmed

Lannett's confidence in being able to take initial price increases given the changing landscape.  On

February 7, 2013, for example, Mr. Bedrosian stated: "I could just say that we're very capable of raising prices and we tend to sometimes lead the market.  We see opportunities to raise a price, we take it.  We don't sit back and wait for someone else to do it.  So you might say we're a little more aggressive in the pricing arena."  Similarly, on September 10, 2013, Mr. Bedrosian stated in an earnings call:

> We're not a price follower.  We tend to be a price leader on price increasing and the credit goes to my sales vice president.  He takes an aggressive stance towards raising prices.  He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company.  And he's the first step in that process.  I can reduce costs and manufacturing efficiencies, but it has to be combined with sales increase, a profit increase, as I should say, by the salespeople.  And he's done a good job there.  With 1 or 2 exceptions, we've tended to lead in the way of price increases.  We believe that these prices are important.  We need to try raising them. Sometimes, it doesn't stick and we have to go back and reduce our price, and other times it does.  I am finding a climate out there has changed dramatically and I see more price increases coming from our competing – competitors than I've seen in the past.  And we're going to continue to lead. We have more price increases planned for this year within our budget.  And hopefully, our competitors will follow suit.  If they don't, that's their issue. But our plan is to raise prices on any product that we think we can or we haven't raised a price.

183.    During the same call, Mr. Bedrosian stated:

> We're seeing more responsibility on the part of all of our competitors, I believe, because all of us are facing the same costs....  So I would expect that all the companies are not going to behave like they have in the past. And I suspect you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace because of that.

184.    An analyst asked Mr. Bedrosian on the same call for a reaction to a competitor's recent and significant price increase on Levothyroxine.  Bedrosian responded: "You mean after I sent them the thank you note?"  He then went on to say:

> I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well....  So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of

generic drug prices, I'm grateful.  Because Lannett tends to be active in raising prices.

185.    On the same call, an investor asked Mr. Bedrosian whether he has any "any expectations for any new competitors" in connection with Levothyroxine.  Mr. Bedrosian noted that "two possible competitors were in the wings... [b]ut hopefully, both companies turn out to be responsible companies and don't go into the marketplace."  Mr. Bedrosian added that "[w]e're seeing more responsibility on the part of all of our competitors," adding that because of costs in the industry, he "suspect[s] you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace."

186.    On November 7, 2013, Mr. Bedrosian and others at Lannett noted their ongoing confidence that the price increases would stick.  Mr. Bedrosian noted:

> I don't really see anything significant on the horizon that could cause us any pain, quite frankly.  We're still conservatively run.  We're still careful how we spend money.  We still realize we're in a commodity business.  While we're enjoying the success of the company, it's not getting to our heads in anyway.

187.    On the same call, Lannett's CFO Martin P. Galvan signaled that these were just the "earlier days of the increase," and Bedrosian explained "these price increases that are going on in the industry, I think they're going to stick for all the companies."

188.    On February 6, 2014, both Bedrosian and Galvan confirmed that the price increases were driving growth at Lannett.  Galvan further stated: "We do believe strongly that there's sustainability in some of the price increases."

189.    On November 3, 2014, Mr. Bedrosian described one of Lannett's "rational" competitors as one that would not do "anything crazy" such as "just going out and trying to grab market share."

190.     During the same November 3 call, Mr. Bedrosian also stated that he was "more positive now, more confident" that the "multiple-fold" increase on Ursodiol would continue. Galvan then confirmed that there were still more price increases on Ursodiol planned for the next quarter.

191.     On February 4, 2015, Mr. Bedrosian stated during an earnings call:

> So from my perspective, what we're seeing here is an opportunity to raise prices because everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share.  We're all interested in making a profit, not how many units we sell.

> So it's really a combination to those things.  So I don't think Levo and Digoxin are the only products that would sit here and tell you I could raise prices on, because I believe any of the products in our product line, including products that we may have just gotten approved, have those same opportunities underlying them.  We look at the market and sometimes we're the first ones to raise a price, sometimes we're not.  But we look at everything in line as a potential product to have a price increased on.

> If you're saying that the price increases that we've had in place, are they sustainable, and are they maintaining?  My answer would be yes, they continue to hold up.  As far as whether we talked about any increases for this year, we don't usually give a guidance for that.  We predict what our revenues will be for the year.  We're not seeing any declines, generally speaking on the price increase products.  So they continue to, let's say, level off at their new pricing.

192.     Mr. Bedrosian further stated during the same call:

> So I'm expecting these pricings to really sustain themselves to continue.  I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced the product by 90%.  It's because the generic marketplace has so much competition sometimes, people get desperate just to unload their inventory that they cut the prices.

> We don't see that kind of behavior sustainable, and we don't see it going further into the future.  I think you're going to find more capital pricing, more - I'll say less competition, in a sense.  You won't have price wars.  You are still going to have competition, because there's a lot of generic companies in the market.  I just don't see the prices eroding like they did in the past.

193.    On August 25, 2015, Mr. Bedrosian again signaled continuing price increases because they have been "sustainable" and because "it's a more rational market we're in."

194.    On August 23, 2016, Mr. Bedrosian summarized that price competition "usually doesn't get you to results you want.  So, I think a lot of people have learned that lesson by now." He described a problem of some of the dumber newer companies [that] continue to go down that path" of competing on price.  Echoing the attitude of many price-fixers who seek to rationalize their misconduct, he equated "expertise" with raising prices, and contrasted it with "crazy behaviors" of companies who seek to gain market share by cutting prices.  Mr. Bedrosian also said that these "occasional" competitors who attempted to compete on price were fortunately "maturing in the market in realizing they need to make it profit as well."

195.    On October 27, 2015, Lupin's Group President and CEO Vinita Gupta stated during an earnings call:

> My sense that most of our competitors have similar challenges that they have had a lot of competitive pressures, they have had a lot of margin pressures coming out of consolidation and because of the fact that companies have been lacking meaningful product approvals, I think the majority of the industry is looking forward to more approvals when I look at some of our peers in the industry, all of them talk about similar challenges.  So one would think that our competitors or peers would be rationale [sic] and be strategic in the way they price products.

196.    On November 14, 2013, during an earnings call, Sun's Managing Director Dilip Shanghvi stated in response to an analyst question concerning generic drug manufacturers' "opportunities [to take] price hikes across portfolio that seems to becoming a little more widespread sort of a thing" that "price increases [are] becoming kind of more widespread than what it used to be historically, so clearly there would be some impact going forward."

197.    On October 29, 2015, Teva's President and CEO of the Global Generic Medicines Group Sigurdur Olafsson stated during an earnings call that the "pricing environment has been quite favorable for generics versus six years ago."

198.    On February 27, 2013, Mylan's CFO, John Sheehan, stated in an earnings call:

> 2013 will yet be another strong year for Mylan.  In the U.S., we are anticipating a high volume of new product launches, and we expect to once again be agile enough to quickly seize new supply opportunities when they become available.  In addition, favorable changes to the regulatory environment, including increased resources to expedite product reviews and greater oversight with respect to manufacturing, as well as an anticipated more stable pricing environment resulting in part from continued consolidation within the industry, are just two of the favorable macroeconomic factors that we see in 2013.

199.    On May 2, 2013, Mylan's CEO Heather Bresch stated in an earnings call: "From my perspective, we see the generic industry alive and well.  We still see a lot of runway room here in the United States."  A year later, on May 1, 2014, Ms. Bresch noted: "We continue to see stability really across our entire generic line on pricing."

200.    On October 30, 2015, Ms. Bresch stated: "Look, I would say as far as price increases, we've had a very consistent approach.  We have absolutely had opportunities around generic pricing."

201.    On a February 20, 2014 earnings call with analysts, Impax's President of its Global Pharmaceuticals Division Carole Ben-Maimon stated regarding Digoxin, "the market has been pretty stable ... [w]e're pretty comfortable that what we have done is rational and will result in ongoing profitability for that product."  Ms. Ben-Maimon also stated:

> Obviously, we can't really talk about, for competitive reasons, about specific products with specific prices.  But as you've seen across the industry, pricing has improved and the ability to take some price increases has clearly been available.  Obviously, we're really careful and we want to make sure that we do that in a very rational way so that we make sure that the price -- that what we're doing sticks and that we actually do make more

money in the long run.  But we're pretty confident that what we did through towards the end -- throughout the end of last year and the beginning of this year will result in more profitability from many other products that we have been able to take some price on.

202.    In addition, several Defendants noted publicly the tremendous gains in profits during the relevant time period resulting from their successful supracompetitive price increases.

203.    In its 2015 annual report, Akorn, for example, reported: "Our gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014.  Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014."  The company attributed its $109.7 million increase in revenue on existing products as the direct result of the "price changes due to the competitive nature of our business and industry."  During Akorn's August 4, 2016 earnings call, Akorn CFO Duane Portwood stated: "net revenue for the quarter ended June 30, 2016, was $281 million, an increase of $60 million or 27% over the prior-year quarter.  The increase in revenue was driven by organic growth, with approximately two-thirds attributable to price."

204.    On a May 2, 2014 Impax earnings call, Reasons noted that a "strong quarter in the generic division" was driven in part by "some pricing initiatives."

205.    On August 7, 2014, Mylan's Ms. Bresch stated in an earnings call:

As far as pricing, look, I think that, that stability in our North American - that core business is certainly why we're able to deliver the results we have today, which, like I said, despite those product delays, we see growth year-over-year.  We've seen North America continue to maximize opportunities.

206.    On October 30, 2015, Mylan's CEO Mr. Sheehan stated in an earnings call:

With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained.  They have steadily increased over the last five, six years.... It also has been driven by the positive pricing

environment that we've seen, especially over the last couple of years in North America.

207.    On February 28, 2014, Endo's CFO Suketu Upadhyay stated in an earnings call that:

> [O]ur US generic pharmaceuticals business remained a source of strong organic growth in 2014.  We believe the base of Qualitest products will continue to experience low-double digit revenue growth.  That growth is primarily driven by an increase in demand for products but it also a result of selected pricing opportunities within the higher barrier to entry categories.

208.    During Endo's May 1, 2014 earnings call, Endo CEO Rajiv De Silva stated that Endo's generics business (Par) was performing strongly in part because "we have been able to take advantage of some pricing opportunities."

209.    On March 2, 2015, Mr. Silva stated in an Endo earnings call that "pricing actions give us some gross margin benefit."  During the same call, Upadhyay stated that:

> The other thing I'd say [] is we exited fourth quarter on Qualitest in the high-40s from a gross margin perspective.  We'd expect that business to be in the low-50s going into 2015 and believe we can hold that on a sustained basis.

210.    In a May 18, 2015 presentation by Endo concerning its acquisition of Par, Endo noted that "consolidation and maturation of competitors have stabilized the pricing environment" for generic pharmaceuticals in the U.S.

211.    On August 8, 2016, Par's President Paul Campanelli stated in response to a question about the generics environment: "And typically you want to just be very careful about trying to go after too much share.  You just have got to take a balanced approach."

212.    On February 7, 2015, Perrigo's Chairman and CEO Joseph C. Papa stated during an earnings call that: "On the question of pricing….  I will say the Rx side does have, as I sit here today, the greatest upside." Papa also noted that Perrigo "achieved record results, growing sales

12% with an adjusted operating margin of 46%." On February 7, 2015 Perrigo Earnings call, industry analyst Gregg Gilbert from Deutsche Bank commented that: "Obviously, the generic side of your business and many other companies has benefited from an enhanced pricing environment, if we could call it that, in the last several years." In response, Perrigo's Chairman and CEO Joseph C. Papa affirmed the continued enhanced pricing trend: "The next year we're going to look at Rx and raise those prices."

213.    On January 29, 2014, the Sandoz Division Head Jeffrey George stated:

> So I think overall what I would say is that we've been quite pleased with the acquisition of Fougera. It is a business that has performed very well for us, with strong double-digit growth and very good margins given the limited competition nature of a lot of these markets.

214.    On April 23, 2015, Novartis CEO Joe Jiminez stated that Sandoz "delivered strong financial results" and "the U.S. was up 13% ... driven by ... our Fougera dermatology business." A few months later, on July 21, 2015, Mr. Jimenez stated: "Sandoz delivered very strong financial results with sales and profit up double-digits; as you can see this is driven by the division's increased focus on core markets particularly the U.S., which is up 23%."

215.    On February 13, 2014, Sanghvi stated in an earnings call that Sun continued "to enjoy the benefits of favourable [sic] pricing for certain generic products in the US." On the same call, an analyst also noted that Sun "had some good price increases in select products after [Sun's] purchase of [the URL/Mutual] portfolio."

216.    In 2013, Sun's subsidiary URL "had undertaken price hikes in March" and, as a result of these price increases, Sun estimated "$60-80 million (of $128 million in total revenue for URL estimated…, for FY[20] 14) to come from [Doxycycline], with operating margins in the range of 50-55 percent."

217.     In 2013 and 2014, Sun reported that its costs were stable.  In its quarterly reports during that period, Sun's directors reported that the company's material cost and other expenditures as a percentage of net sales, as well as staff costs, were substantially the same or lower than the same periods in the prior year.  For example, Sun reported that net sales increased 40% in fiscal year 2013 compared to 2012 even while "[m]aterial cost, as a percentage of the net sales is 18.5% which is lower as compared to the previous year."  Staff costs and other expenditures were also reported to be lower in 2013.  Similarly, Sun reported that second quarter 2013-14 costs were also "in-line with Q2 last year."

218.     Sun reported in September 2015 and February 2016 investor presentations that one of the "key drivers" of its sales through the period 2012 through 2014 was Doxycycline, which it described as a "low competition product" in the U.S. – a notable description in light of the large number of competitor products.

219.     During a November 10, 2014 earnings call, Taro CEO Kal Sundaram attributed the company's significant growth to price increases:

> Our sales and earnings growth is attributable to upward price adjustments and prudent life cycle management of our portfolio, while our overall volumes remain relatively constant.
>
> . . .
>
> In 2010, as per IMS data, Taro was ranked third among the genetic [sic] dermatology companies in USA.  In terms of sales, now it is ranked number one for the past three years.  U.S. remains the dominant market for Tam Taro's earnings per share also has grown 50% CAGR, compounded annual growth, since 2010.  Taro's sales and earnings growth is attributable to upward price adjustments and the prudent life cycle management of our product portfolio while our overall volumes remain relatively constant and we remain cautious about the long-term sustainability of these prices.  Our sales and earnings growth is attributable to upward price adjustments and prudent life cycle management of our portfolio, while our overall volumes remain relatively constant.

. . .

Again market to volume fluctuations can happen for very different reasons as and when a new generation product comes, it will have impact on the older generation product.  And once again I am saying generics remain to be sort of, what do you say cost value for money and competitive.  I don't think there will be any significant--we have seen any significant impact of volume shifting because of price adjustments

220.    On the same call, Taro Group Vice President and CFO Michael Kalb noted:

Net sales for Q2 were $251 million, up 22% over Q2 last year.  As we anticipated in last quarter's earnings release we are realizing the benefits of the previous quarter's price adjustments in the current quarter.  Gross profit increased 24% to $198 million year-on-year resulting in a 130 basis points expansion in our gross margins to 79%.

221.    Sundaram has also emphasized Taro's strategy of relying upon high-priced generics in a May 27, 2016 earnings call, stating that: We operate in niche market[s], smaller volumes, but better priced."

222.    On October 29, 2013, during an earnings call, President and CEO of Teligent Jason Grenfell-Gardner noted that "there are certainly some markets there which had seen price appreciation.  And that's a trend that's been happening throughout the topical market in various ways....  We hope at this point that trend will continue."

223.    On October 24, 2014, during an earnings call President and CEO of Teligent Jason Grenfell-Gardner stated that maximizing value through price increases helped to significantly increase the company's revenues: "Year-to-date in 2014, we recognized $9.3 million in sales of IGI label products, that's an increase of 123% over the same period last year.  This growth has been driven partially ... from significant price increases for core products in the portfolio."

224.    Grenfell-Gardner and Jenniffer Collins, Teligent's CFO, continued to recognize the "positive market conditions" for Econazole in the April 28, 2015 earnings call for the first quarter of 2015.  The company's 56% increase in revenue over the same period in 2014 was attributed by

Collins to Econazole, noting that the product represented 53% of the company's total revenue for the first quarter of 2015.

225.    On February 6, 2014, Teva's President and CEO Eyal Desheh stated in an earnings call that "our U.S. generic business is definitely the most profitable part with gross margin of about 50%." Desheh went on to comment that the "U.S. generic business is highly profitable" and Oberman added that "at the gross profit levels that Eyal was talking about, [the U.S. generics business] is a very valuable business to Teva and we see it continuing to be on a go-forward basis."

226.    On an October 31, 2013 earnings call, Executive Director of Cadila, Zydus' parent company, Ganesh Nayak stated: "This quarter, the major growth has come from price improvement and not actually from new product." During the same call, Cadila's Chairman and Managing Director Pankaj Patel noted:

> Up to last quarter, we were [seeing] pricing pressure, but now we see that, on selective products we are able to actually up the price. So it is the kind of a mixed scenario at this moment. We are seeing some visibility where pricing are firming up given the kind of challenges companies are facing, many players are going out of the market, and as a result there are opportunities to basically products with low margins to increase prices. So at least in 3 or 4 products, we have seen price being better and increases are ranging between 10-15% and we also see that the trend is likely to continue given the revised wisdom the industry is getting.

## X.    INDUSTRY COMMENTARY FURTHER SUGGESTS THAT DEFENDANTS' COLLUSIVE CONDUCT IS A PLAUSIBLE EXPLANATION FOR THE INCREASED PRICES OF THE PRICE-FIXED GENERIC DRUGS

227.    Comments from industry analysts suggest manufacturers alternative explanations for the price hikes (*e.g.*, supply disruptions) are mere pretext, intended to shroud the Defendants' and co-conspirators' conspiratorial conduct and ends. For instance, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are

cooperating to raise the prices of products whose characteristics - low sales due to either very low prices or very low volumes - accommodate price inflation.[21]

228.    One study of the generic drug industry concluded that in 2014: "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[22]   The GAO Report also noted similar "extraordinary price increases" across many generic drugs, including Doxycycline, in recent years that could not be linked to any particular cause.

## XI.    THE CONSPIRATORIAL PRICE-FIXING AGREEMENTS

229.    As a result of their frequent in-person meetings and the collusive communications that ensued as a result of these meetings via e-mail, telephone, and text messages, Defendants and their co-conspirators were able to implement, and did implement, radical, extraordinary, and abrupt price increases on Price-Fixed Generic Drugs identified in this Complaint.

230.    There were no market-based justifications for any of the abrupt price increases described below.  The increases in price were not necessitated by increased manufacturing costs, or research and development costs.  Federal law requires drug manufacturers to report potential drug shortages to the FDA, and no supply disruption was reported during the duration of the alleged conspiracy as to any of the Price-Fixed Generic Drugs (except where expressly alleged below).  Similarly, during the time frame relevant to these allegations, there were no known raw material shortages affecting the manufacture of any of the Price-Fixed Generic Drugs in the United States, nor did demand for any of these drugs suddenly increase.

---

[21]    *See* Ed Silverman, Generic Drug Prices Keep Rising, but is a Slowdown Coming?, WALL ST. J. (Apr. 22, 2015), *available at*  http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.
[22]    David   Belk,   MD,   Generic   Medication   Prices,   *available   at* http://truecostofhealthcare.net/generic_medication_prices/.

231.    Each of the conspiratorial price increases would have been against each Defendant's self-interest if taken unilaterally and without advance agreement.  As the last 30 years of generic drug pricing has demonstrated, in a competitive industry, a firm would cut its price with the expectation of increasing its market share if its competitors were setting prices above marginal costs.

232.    This economic reality is further compelled by the existence of MAC prices.  As noted above, a MAC price represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.  Payors set the MAC price of a drug based on a variety of factors including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions.  MAC pricing effectively requires pharmacies to purchase the least costly version of a generic drug available in the market, without regard to the manufacturer's list price.

233.    MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices.  Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug while competing manufacturers do not will swiftly lose sales to a competing generic manufacturer whose price remains constant.

234.    Given the existence of MAC pricing and the fact that AB-rated generic drugs are bioequivalent to both the branded version and also to other AB-rated generic versions of the same drug, Plaintiffs base their purchasing decisions almost exclusively on price.  Due to this homogeneity, there is a very high cross-elasticity of demand for generic drugs from different manufacturers.

235.    Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales, and the price increases of the Price-Fixed Generic Drugs described in this Complaint were against each Defendant's individual self-interest.

### A.    __Acetazolamide__

236.    Acetazolamide is sold in at least two formulations – tablets (manufactured by Taro and Lannett) and sustained release capsules (manufactured by Heritage, Zydus, and Teva).

1.    Acetazolamide Tablets

237.    The market for Acetazolamide tablets is dominated by Taro and Lannett.  Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share on Acetazolamide tablets.

238.    These tablets come in two dosages: 125 mg and 250 mg.  Both Taro and Lannett make the 250 mg dosage, which is the predominant form.  While only Taro makes the 125 mg dosage, this formulation appears to be included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

239.    In mid-2012, Taro and Lannett imposed list price increases of 40% to 50%, and brought list prices for Acetazolamide 250 mg tablets to identical levels.

240.    By mid-2013, Taro and Lannett appeared to have worked out a remarkably stable split of the market, taking into account both 125 mg tablets and 250 mg tablets.

241.    In late 2013, within weeks of each other, Taro and Lannett imposed identical list prices for Acetazolamide 250 mg tablets.  The increases were well over 200%.  Taro imposed a similarly large list price increase on 125 mg tablets around this time.  Average wholesale prices for both products increased dramatically.

242.    Throughout these coordinated increases, Lannett and Taro captured stable shares of the 250 mg table market.  Lannett claimed approximately 56% and Taro claimed 44%.  Taro was the lone manufacturer of 125 mg tablets and had 100% of sales of that dosage.  Interestingly, the total dollar sales across both products was virtually identical.  Lannett's larger share of the 250 mg tablet market was offset by Taro's sales of 125 mg tablets.

243.    Taro and Lannett's ability to reach market share and price increase agreements was aided by the prevalence of trade association events and conferences where the parties were able to meet in person.  For example, in August 2013, not long before the large price increases imposed by Taro and Lannett, both Defendants attended the NACDS Total Store Expo in Las Vegas.

2.    Acetazolamide Capsules

244.    During the relevant time period, Heritage, Teva, and Zydus sold generic Acetazolamide capsules to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

245.    In April 2014, Malek of Heritage discussed the possibility of a collusive price increase on Acetazolamide with a senior sales executive at Teva, Nisha Patel ("Patel").  (Heritage and Teva controlled almost 80% of the market for Acetazolamide.)  During an April 15, 2014 phone call, Malek and the Teva sales executive, Patel, agreed that Heritage would lead the price increase (which would be approximately 75%) and Patel would communicate the details of the price increase to the sales executive at Zydus, Kristy Ronco ("Ronco"), who was responsible for Acetazolamide.

246.    On April 16, 2014, the sales executives responsible for Acetazolamide at Teva and Zydus (Patel and Ronco) discussed the collusive price increase by phone for approximately 20 minutes (on April 16) and for 12 minutes (on April 17).

247.    On April 24, 2014, Malek reached out to Ronco, the Zydus sales executive, via LinkedIn, and the two communicated the next day about the Acetazolamide price increase as well.

248.    In order to ensure that the price increase was successful, Heritage, Zydus, and Teva agreed that they would not underbid each other's Acetazolamide business while they implemented the price increase.  Malek and Ronco confirmed this agreement with each other by telephone on May 7, 2014.

249.    On June 26, 2014, as agreed with Zydus and Teva, Heritage began notifying its customers that it was increasing prices of Acetazolamide by approximately 75%.  Heritage fully implemented this price increase on all its major accounts (at least 17 customers) by July 9, 2014.

250.    Following Heritage's lead, Zydus and Teva increased prices of Acetazolamide by approximately 75% as well.

**B.    Albuterol**

251.    The market for Albuterol is mature, as Albuterol has been available in the United States for over twenty-five years.  The World Health Organization ("WHO") includes Albuterol on its list of essential medicines.  During the relevant time period, Mylan sold Albuterol pursuant to an ANDA approved by the FDA in or around January 1991.  Sun (either directly or through its subsidiary Mutual) sold Albuterol to purchasers pursuant to ANDAs that were approved by the FDA in or around December 1989.  Both Mylan and Sun sold Albuterol to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint

252.    At all times relevant to this lawsuit there has been more than one manufacturer of Albuterol on the market.  Defendants Mylan and Sun dominate the market for Albuterol.

253.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Albuterol was remarkably stable.  Beginning in March 2013, the prices rose abruptly and, for the most part, in unison.

254.    By way of example, available WAC data demonstrates that beginning in March 2013, Defendants selling generic Albuterol took substantial price increases on the 2 mg strength that exceeded 3400%:[23]

| Product 2 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378025501 | $0.13 | $5.88 | 6-Mar-13 | 4317% |
| 500 ct | Mylan | 00378025505 | $0.13 | $5.88 | 6-Mar-13 | 4549% |
| 100 ct | Sun | 53489017601 | $0.13 | $4.70 | 15-Apr-13 | 3485% |
| 500 ct | Sun | 53489017605 | $0.12 | $4.70 | 15-Apr-13 | 3674% |

255.    There are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Albuterol.  Demand for Albuterol has not materially changed between 2010 and the present, nor does any change in input costs explain these price increases. Furthermore, at the time Albuterol prices were increased in March 2013, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

256.    Upon information and belief, the price increases on Albuterol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Albuterol in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

---

[23]     WAC prices referenced throughout this Complaint are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

257.    For example, on on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan and Sun.  *See* Ex. 1.

258.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Mylan and Sun. *See* Ex. 1.

259.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  This meeting was attended by representatives from Mylan and Sun.  *See* Ex. 1.

260.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  This conference was attended by representatives from both Mylan and Sun.  *See* Ex. 1.

261.    In 2014, 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida; (ii) the April 26-29, 2014 NACDS Annual Meeting in Scottsdale, Arizona; (iii) the June 1-4, 2014 HDMA BLC in Phoenix, Arizona; (iv) the June 3-4, 2014 GPhA meeting in Bethesda, Maryland; (v) the August 23-26, 2014 NACDS Total Store Expo in Boston Massachusetts; (vi) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (vii) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (viii) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (ix) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (x) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (xi) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (xii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (xiii) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xiv) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (xv) the June 12-16, 2016 HDMA BLC in Colorado

Springs, Colorado; and (xvi) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

### C.   Amitriptyline

262.    The market for Amitriptyline is mature, as Amitriptyline has been available in the United States for over sixty years.  Amitriptyline is on the WHO's List of Essential Medicines. During the relevant time period, Defendants Mylan, Par, and Sandoz sold Amitriptyline to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

263.    At all times relevant to this lawsuit there has been more than one manufacturer of Amitriptyline on the market.  Defendants Mylan, Par, and Sandoz dominate the market for Amitriptyline.

264.    In the years prior to the conspiracy period, Defendants' average price in the U.S. for Amitriptyline were remarkably stable.  Beginning in May 2014, Defendants increased their prices abruptly and, for the most part, in unison.  Average prices for Amitriptyline increased 300% to nearly 2,000% across dosage strengths.  The Financial Times reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[24]  The Boston Globe similarly reported: "The cost of the antidepressant drug Amitriptyline jumped 2,475 percent, from 4 cents for a 10-milligram pill in 2014 to $1.03 in 2015."[25]

---

[24]    David Crow, Teva bids for Mylan amid pressure on copycat drugmakers, The Financial Times (May 12, 2015), *available at* https://wvv\:v.ft.com/content/8ff2fc5a-f5 1 3-l l e4-8a42-00l44feab7de.

[25]    Priyanka Dayal McCluskey, As competition wanes, prices.for generics skyrocket, The Boston Globe (Nov. 6, 2015), *available at* https://www.bostonglobe.com/business

265.     Defendants' WAC prices further illustrate these substantial price increases.  By way of example, beginning in May 2014, Defendants Sandoz, Mylan, and Par set their WACs for their 50 mg product in lockstep, increasing from previous WACs that exceeded 900%:

| Product 50 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Sandoz | 00781148801 | $0.05 | $0.57 | 23-May-14 | 1032% |
| 1000 ct | Sandoz | 00781148810 | $0.05 | $0.48 | 23-May-14 | 945% |
| 100 ct | Mylan | 00378265001 | $0.05 | $0.57 | 16-Jul-14 | 1032% |
| 1000 ct | Mylan | 00378265010 | $0.05 | $0.57 | 16-Jul-14 | 1157% |
| 100 ct | Par | 00603221421 | * | $0.57 | 26-Sep-14 | * |
| 1000 ct | Par | 00603221432 | * | $0.48 | 26-Sep-14 | * |

266.     There are no legitimate reasons or explanations for the unprecendented and dramatic price increases of Amitriptyline.  Changes in demand for Amitriptyline do not justify the price increases.  If anything, the price should have gone down because demand was likely lower after 2012.  In 2012, Amittriptyline was added to the American Geriatrics Society's Beers list of drugs that pose a high risk of adverse effects in seniors.  When drugs are classified as high risk, doctors tend to prescribe them to seniors less causing total demand to decline.  Lower total demand generally causes prices to drop.  Here, the drop in demand does not explain the price increase.

267.     Furthermore, at the time Amitryptiline prices were increased in May 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.  The huge increases on Amitryptiline were not due to supply disruptions.

268.     Upon information and belief, the price increases on Amitryptiline were the result of collusive agreements between and among Defendants to increase pricing and restrain

_____

/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-andconsumers/l-13 iA9CSxA UylnCdGjLNKVN/story.html.

competition for the sale of Amitryptiline in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

269.    For example, on February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida.  GPhA's 2013 Annual Meeting was attended by representatives of Sandoz, Mylan, and Par, including key executives such as Mylan's President, Tony Mauro and Sandoz's President, Don DeGolyer.  *See* Ex. 1.

270.    On June 2-5, 2013, the HDMA held a Business Leadership Conference ("BLC") in Orlando, Florida that was attended by representatives from Sandoz, Mylan, and Par, including key executives for generics prices and sales.  For example, all three Defendants sent their National Account Directors.  *See* Ex. 1.

271.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan, Par, and Sandoz.  *See* Ex. 1.

272.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

273.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

274.    On December 3, 2013, NACDS held its 2013 Foundation Reception & Dinner that was attended by representatives from Defendants Mylan and Sandoz.  *See* Ex. 1.

275.    On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Defendants Mylan, Sandoz, and Par.  *See* Ex. 1.

276.     On April 1, 2014, the HDMA held its Sixth Annual CEO Roundtable Fundraiser in New York City that was attended by representatives of Mylan and Sandoz.  *See* Ex. 1.

277.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Mylan, Sandoz, and Par. *See* Ex. 1.

278.     On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The June 1-4, 2014 BLC was attended by representatives from Mylan, Sandoz, and Par.  *See* Ex. 1.

279.     On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

280.     On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Mylan, Sandoz, and Par.  *See* Ex. 1.

281.     On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

282.     On December 3, 2014, NACDS held its 2014 Foundation Reception & Dinner that was attended by Mylan and Sandoz employees.  *See* Ex. 1.

283.     The price increases on Amitriptyline closely followed Mylan, Sandoz, and Par's, participation in the February 2014 GPhA Annual Meeting and their participation in the April 2014 Annual Meeting of the NACDS in Scottsdale, Arizona.

284.     In 2015 and 2016, representatives of Mylan, Sandoz, and Par continued to regularly attend trade association meetings and events.

D.    **Baclofen**

285.    The market for Baclofen is mature, as Baclofen has been available in the United States for nearly 50 years.  During the relevant time period and continuing today, Defendant Lannett sells Baclofen pursuant to an ANDA that was approved by the FDA in or around July 2007 and Defendant Par sells Baclofen pursuant to ANDAs approved by the FDA in or around August 2005.  Teva sells Baclofen pursuant to ANDAs approved in February 1992, and Upsher-Smith sells Baclofen pursuant to ANDAs approved in May 1988 and August 1996.  Lannett, Par, Teva, and Upsher-Smith each sold Baclofen to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint

286.    At all times relevant to this lawsuit, there has been more than one manufacturer of Baclofen on the market.  Defendants Lannett, Par, Teva, and Upsher-Smith dominate the market for Baclofen.  In the years prior to the conspiracy period, Defendants' average price in the U.S. for Baclofen was remarkably stable.  Beginning in February 2014, Defendants increased their prices abruptly and in unison.

287.    By way of example, beginning in February 2014, Upsher-Smith, Teva, Par, and Lannett matched their WAC prices on their 20 mg product within less than two months of each other and by more than 400%:

| Product 20 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 1000 ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 100 ct | Teva | 00172409760 | $0.10 | $0.49 | 15-Apr-14 | 420% |
| 1000 ct | Teva | 00172409780 | $0.09 | $0.49 | 15-Apr-14 | 447% |

288.     Although WAC data is not available, upon information and belief, Par and Lannett implemented the same price increases as Upsher-Smith and Teva, such that all price increases were in unison.

289.     Baclofen is among the drugs identified by the GAO, which concluded that Baclofen, in both the 10 mg and 20 mg tablet form "[e]xperienced and extraordinary price increase" in 2014-2015.  Similarly, American Pharmacies, a group of independent pharmacists that monitors the pricing of generic drugs and issues notices to customers, warned in February 2014 of the recently announced "[m]arketwide price increases of more than 500% … occurring on Baclofen tablets."

290.     These dramatic price increases were not the result of supply shortages or demand spikes.  There were no relevant labeling changes or reported drug shortages that might have led to price increases.  Nor was there a spike in demand that could explain these large price increases.

291.     Upon information and belief, the price increases on Baclofen were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Baclofen in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings described below.

292.     For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Lannett, Par, Teva, and Upsher-Smith.  *See* Ex. 1.

293.     On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives of Defendants Par and Teva.  *See* Ex. 1.

294.     On June 4-5, 2013, GPhA held a meeting in Bethesda, Marlyand that was attended by representatives from Lannett, Par, Teva, and Upsher-Smith.  *See* Ex. 1.

295.     On August 10-13, 2013, NACDS held its 2013 Total Shores Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Lannett, Par, Teva, and Upsher-Smith.  *See* Ex. 1.

296.     On September 29-Ocotber 2, 2013, HDMA held its Annual Board and Membership Meeting in White Sulphur Springs, West Virginia, which was attended by representatives from Teva and Upsher-Smith.  *See* Ex. 1.

297.     On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Lannett, Par, Teva, and Upsher-Smith.

298.     On December 3, 2013, NACDS held its 2013 NYC Week and annual foundation dinner in New York City, which was attended by representatives from Teva and Upsher-Smith. *See* Ex. 1.

299.     On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Teva, Par, and Upsher-Smith.  *See* Ex. 1.

300.     On April 1, 2014, HDMA held its Sixth Annual Roundtable Fundraiser in New York City, which was attended by representatives from Teva and Upsher-Smith.  *See* Ex. 1.

301.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Par, Teva, and Upsher-Smith.  *See* Ex. 1.

302.     On May 12-15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota.  At this conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm an agreement to raise prices of at least one drug (Glyburide).  This conference was attended by representatives from Lannett, Teva, and Upsher-Smith.  *See* Ex. 1.

303.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriot Desert Ridge in Phoenix, Arizona.  Representatives from Lannett, Upsher-Smith, Par, and Teva attended.

304.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Lannett, Par, Teva, and Upsher-Smith.  *See* Ex. 1.

305.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center.  NACDS's August 2014 Total Store Expo was attended by representatives from Lannett, Par, Teva, and Upsher-Smith.  *See* Ex. 1.

306.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Lannett, Par, Teva, and Upsher-Smith.  *See* Ex. 1.

307.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner which was attended by representatives from Teva and Upsher-Smith.  *See* Ex. 1.

308.    In 2015 and 2016, Lannett, Par, Teva, and Upsher-Smith continued to regularly attend trade association meetings, conferences, and events.

### E.    **Benazepril HCTZ**

309.    The market for Benazepril HCTZ is mature, as Benazepril HCTZ has been available in the United States for over 25 years.  During the relevant time period, Defendants Mylan and Sandoz sold Benazepril HCTZ to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

310.    At all times relevant to this lawsuit there has been more than one manufacturer of Benazepril HCTZ on the market.  Defendants Mylan and Sandoz dominate the market for Benazepril HCTZ.

311.    At issue here are three dosage strengths of Benazerpil HCTZ: 10 mg/12.5 mg, 20 mg/12.5 mg, and 20 mg/25 mg.

312.     In the years prior to the conspiracy period, Defendants' average price in the U.S. for Benazepril HCTZ was remarkably stable.  Beginning in August 2013, Defendants increased their prices abruptly and in unison.

313.     By way of example, in August 2013, Mylan and Sandoz set nearly identical WAC prices on their 25 mg product for Benazepril HCTZ, reflecting increases of more than 300%:

| Product 25 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 20 ct | Mylan | 00378477501 | $0.38 | $1.65 | 9-Aug-13 | 334% |
| 20 ct | Sandoz | 00185027701 | $0.32 | $1.62 | 20-Aug-13 | 407% |

314.     In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs that had experienced extraordinary prices increases, including Benazepril HCTZ.  Senator Sanders and Representative Cummings, in their letter to Heather Bresch, Chief Executive Officer of Mylan, specifically noted that the prices for Benazepril HCTZ had increased by approximately 452 %.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the United States Government Accountability Office ("GAO") issued a report in which Amitriptyline was identified as experiencing an "extraordinary price increase."

315.     There were no potential shortages or supply disruptions, or any other lawful market phenomena, to explain the price increases on this drug.

316.     Upon information and belief, the price increases on Benazepril HCTZ were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Benazepril HCTZ in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry

events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

317.    For example, just a few months prior to Mylan and Sandoz's announced price increases on Benazepril HCTZ, representatives from both Mylan and Sandoz attended numerous trade association meetings.

318.    On February 20-22, 2013, representatives from Mylan and Sandoz attended the GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

319.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from both Mylan and Sandoz.  *See* Ex. 1.

320.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  HDMA's June 2013 BLC was attended by representatives from both Mylan and Sandoz.  *See* Ex. 1.

321.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from both Sandoz and Mylan.  *See* Ex. 1.

322.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo Convention at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by both Sandoz and Mylan.  *See* Ex. 1.

323.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from both Sandoz and Mylan.  *See* Ex. 1.

324.    On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner that was attended by representatives from both Sandoz and Mylan.  *See* Ex. 1.

325.    In 2014, 2015, and 2016, Sandoz and Mylan continued to regularly attend trade association meetings, conferences and events, including: (i) the February 19-21, 2014 GPhA

Annual Meeting in Orlando, Florida; (ii) the April 26-29, 2014 NACDS Annual Meeting in Scottsdale, Arizona; (iii) the June 1-4, 2014 HDMA BLC in Phoenix, Arizona; (iv) the June 3-4, 2014 GPhA meeting in Bethesda, Maryland; (v) the August 23-26, 2014 NACDS Total Store Expo in Boston Massachusetts; (vi) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (vii) the December 3, 2014, NACDS 2014 Foundation Reception and Dinner; (viii) the February 9-11, 2015 GPhA meeting in Miami, Florida; (ix) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (x) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (xi) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (xii) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (xiii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (xiv) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (xv) the December 3, 2015, NACDS 2015 Foundation Reception and Dinner; (xvi) the April 10-14, 2016 MMCAP meeting in Minneapolis, Minnesota; (xvii) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xviii) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (xix) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; (xx) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts; and (xxi) the December 1, 2016 NACDS 2016 Foundation Reception and Dinner.  *See* Ex. 1.

### F.   **Clobetasol**

326.   The market for Clobetasol is mature, as Clobetasol has been available in the United States for decades.  During the relevant time period, Defendants Actavis, Akorn, Hi-Tech, Sandoz, Fougera, Perrigo, Taro, Wockhardt, and Morton Grove sold Clobetasol to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

327.    For more than two years prior to June 2014, Defendants' average price in the U.S. for Clobetasol was remarkably stable.

328.    Beginning in approximately June 2014, Defendants abruptly increased their prices for Clobetasol on multiple formulations and sizes.  By way of example, Taro, Sandoz, Hi-Tech, Actavis, and Wockhardt all took price increases on their 0.05% cream product in near lockstep reflecting increases of more than 800%:

| Product crm .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672125801 | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | 00168016315 | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | 50383026715 | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | 00472040015 | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | 51672125802 | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | 00168016330 | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | 50383026730 | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | 00472040030 | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | 51672125806 | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | 00168016346 | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | 50383026745 | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | 00472040045 | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | 51672125803 | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | 00168016360 | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | 50383026760 | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | 00472040060 | * | $6.12 | 10-Mar-15 | * |

329.    Upon information and belief, between June and August 2014, Akorn, Morton Grove, Fougera, and Perrigo all increased their list prices for Clobetasol by similar amounts, even though these prices were not publicly reported.

330.    Clobetasol was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase" in 2014-15.

331.    Defendants' dramatic price increases were not due to supply disruptions because there is no indication that there was a drug shortage.  These dramatic increases cannot be explained by any other market feature or shock.

332.    Upon information and belief, the price increases on Clobetasol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clobetasol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

333.    For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

334.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland, which was attended by representatives from Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

335.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended the Expo.  *See* Ex. 1.

336.    On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Actavis, Sandoz, Hi-Tech, Perrigo, Taro, and Wockhardt.  *See* Ex. 1.

337.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

338.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Arizona.  The June 1-4, 2014 BLC was attended by represnetatives from Actavis, Hi-Tech, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

339.    On June 3-4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Perrigo, Sandoz, Hi-Tech, and Taro.  *See* Ex. 1.

340.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Actavis, Hi-Tech, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

341.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Sandoz, Fougera, Perrigo, Taro, and Wockhardt.  *See* Ex. 1.

342.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo.  *See* Ex. 1.

343.    On February 9-11, 2015, GPhA held its Annual Meeting in Miami Beach, Florida. Representatives from Actavis, Sandoz, Akorn, Perrigo, Taro, and Wockhardt attended.  *See* Ex. 1.

344.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, palm Beach, Florida.  NACDS's 2015 annual meeting was attended by representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

345.     The June 7-10, 2015 HDMA BLC was held in San Antonio, Texas.  The June 2015 BLC was attended by representatives from Actavis, Sandoz, and Wockhardt.  *See* Ex. 1.

346.     On June 9-10, 2015, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Sandoz, Perrigo, Taro and Wockhardt.  *See* Ex. 1.

347.     On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center.  Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended.  *See* Ex. 1.

348.     In 2016, Actavis, Akorn, Fougera, Perrigo, Sandoz, Taro, and Wockhardt continued to attend trade association meetings and events.  *See* Ex. 1.

### G.     **Clomipramine**

349.     The market for Clomipramine is mature, as Clomipramine has been available in the United States for over 20 years.  The World Health Organization ("WHO") includes Clomipramine on its list of essential medicines.  During the relevant time period, Mylan sold Clomipramine pursuant to ANDAs approved by the FDA in or around January 1998.  Sandoz sells Clomipramine to purchasers pursuant to ANDAs that were approved by the FDA in or around June 1997 and March 1998.  Taro sells Clomipramine to purchasers pursuant to ANDAs approved by the FDA in December 1996.

350.     At all times relevant to this lawsuit there has been more than one manufacturer of Clomipramine on the market.  Defendants Mylan, Sandoz, and Taro sold Clomipramine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

351.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Clomipramine was remarkably stable.  Beginning in approximately May 2013, Mylan, Sandoz, and Taro increased their prices abruptly and, for the most part, in unison.

352.    By way of example, beginning in May 2013, Mylan, Sandoz, and Taro set their WACs in lockstep on their 25 mg product, reflecting increases from previous WACs of, more than 2,700%:

| Product 25 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 30 ct | Taro | 51672401106 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 90 ct | Taro | 51672401105 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 100 ct | Mylan | 378302501 | $0.30 | $8.99 | 16-May-13 | 2853% |
| 100 ct | Sandoz | 781202701 | $0.31 | $8.99 | 22-Jul-13 | 2778% |

353.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Clomipramine, which had experienced extraordinary price increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, in August 2016, the GAO issued a report in which Clomipramine was identified as experienced an "extraordinary price increase."

354.    There are no legitimate justifications for these price hikes.  There were no supply shortages or disruptions, no new patents or formulations, and no changes in drug labeling that explain these abrupt increases.

355.    Upon information and belief, the price increases on Clomipramine were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clomipramine in the United States.

356.    Senior executives at Taro, Mylan, and Sandoz reached agreement to raise the prices of Clomipramine and monitored compliance with the agreement.  These executives included

Mylan's Chief Executive Officer, Heather Bresch.  Upon information and belief, these executives also included Peter Goldschmidt of Sandoz; James Kedrowski, Taro's interim CEO from September 2010 to August 2013 and President from 2012 to 2015; and Kal Sundaram, Taro's CEO from August 2013 to December 2016.

357.    These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

358.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

359.    On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida.  GPhA's 2013 Annual Meeting was attended by representatives of Taro, Sandoz, and Mylan. *See* Ex. 1.

360.    On April 20–23, 2013 NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's Annual Meeting was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

361.    On June 2–5, 2013, HDMA held its 2013 BLC in Orlando, Florida.   HDMA's June 2013 BLC was attended by representatives from Sandoz and Mylan. *See* Ex. 1.

362.    On June 4–5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1

363.    On August 10–13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

364.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

365.    On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Defendants Mylan and Sandoz.  *See* Ex. 1.

366.    In 2014, 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida; (ii) the April 1, 2014 HDMA Sixth Annual CEO Roundtable Fundraiser in New York City; (iii) the April 26-29, 2014 NACDS Annual Meeting in Scottsdale, Arizona; (iv) the June 1-4, 2014 HDMA BLC in Phoenix, Arizona; (v) the June 3-4, 2014 GPhA meeting in Bethesda, Maryland; (vi) the August 23-26, 2014 NACDS Total Store Expo in Boston Massachusetts; (vii) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (viii) the December 3, 2014 NACDS Foundation Reception and Dinner; (ix) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (x) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (xi) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (xii) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (xiii) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (xiv) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (xv) the December 3, 2015 NACDS Week in NYC Foundation Reception and Dinner; (xvi) the April 10-14, 2016 MMCAP meeting in Minneapolis, Minnesota;;(xvii) the  April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xviii) the April 16-19, 2016, NACDS 2016 Annual Meeting in Palm Beach, Florida; (xix) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; (xx) the August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts; and (xv) the December 1, 2016 NACDS Reception and Dinner.

**H.** **Desonide**

367.   The market for Desonide is mature, as both the ointment and cream form of the drug have been available in the United States since the 1970s, and generic Desonide has been available in the United States since 1994.

368.   During the relevant time period, Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro sold Desonide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

369.   At all times relevant to this lawsuit there has been more than one manufacturer of Desonide on the market.  Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro dominate the market for Desonide.

370.   For at least five years prior to May 2013, Defendants' prices for Desonide in the United States remained stable.  In May 2013, however, Defendants abruptly began implementing substantial price increases.

371.   By way of example, Defendants all set the same WACs for their ointment products beginning in May 2013, reflecting increases from previous WACs of more than 140%:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 15 GM | Taro | 51672128101 | $0.84 | $3.21 | 1-May-13 | 282% |
| 60 GM | Taro | 51672128103 | $0.53 | $3.21 | 1-May-13 | 501% |
| 15 GM | Perrigo | 45802042335 | $1.30 | $3.21 | 21-May-13 | 146% |
| 60 GM | Perrigo | 45802042337 | $0.31 | $3.21 | 21-May-13 | 932% |
| 15 GM | Sandoz | 00168030915 | * | $3.21 | 17-Jan-14 | * |
| 60 GM | Sandoz | 00168030960 | * | $3.21 | 17-Jan-14 | * |

372.    In August 2013, Actavis entered the market for Desonide and implemented the supracompetitive prices as well.  Upon information and belief, just as the Defendants did with Glyburide and Doxy DR, Actavis communicated its intention to enter the market to Perrigo, Sandoz, Fougera, and Taro well in advance of its actual entry, and the Defendants reached an agreement on the supracompetitive pricing that each would charge its customers.  This agreement on Desonide was facilitated by the overarching market allocation (or "fair share") agreement that was followed by all Defendants and conspirators and it prevented Actavis' entry into the market from eroding the conspiratorial pricing on Desonide.

373.    Desonide was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

374.    No competitive justifications explain the abrupt increase in price.  Changes in ingredient costs do not explain Defendants' price increases.  The gel and lotion formulations of desonide did not experience the same coordinated and extraordinary price increases in May 2013 that the cream and ointment formulations experienced, even though all formulations have the same active ingredient.

375.    The abrupt price increases were not due to supply disruptions.

376.    Upon information and belief, the price increases on Desonide were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Desonide in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

377.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

378.     On February 20-22, 2013, GPhA held its Annual Meeting at the JW Marriott Orlando Grand Lake in Orlando, Florida that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

379.     On April 20-23, 2013, shortly before the drastic May 2013 price increases, NACDS held its annual meeting at The Breakers, Palm Beach, Florida.  This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

380.     On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  HDMA's June 2013 BLC was attended by representatives from Actavis and Sandoz.  *See* Ex. 1.

381.     On June 4-5, 2013, GPhA held a CMC Workshop meeting at Bethesda North Marriott Hotel, Bethesda, Maryland, that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

382.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center.  NACDS's August 2013 event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

383.     On October 28-30, 2013, GPhA held its 2013 Fall Technical Conference in Bethesda, Maryland that was attended by representatives from all Defendants.  *See* Ex. 1.

384.     On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo.  *See* Ex. 1.

385.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

386.     These Defendants continued to attend trade associaition meetings and events between 2014 and 2016.  *See* Ex. 1.

### I.   **Digoxin**

387.    The market for Digoxin is mature, as Digoxin has been available in the United States for more than a decade.  Generic Digoxin is prescribed to approximately 6.5 million patients in the United States and it is considered an essential medicine by the World Health Organization. Variants of the drug have been in existence since the 18th century.  Because Digoxin was in existence prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act, the drug was manufactured and sold by a large number of companies outside the NDA/ANDA process.

388.    In 1997, GlaxoSmithKline obtained an NDA authorizing it to market Lanoxin, a branded version of Digoxin.  Because Digoxin was not a new chemical compound, its NDA allowed for just a three-year period of exclusivity, and by 2003 there were at least eight manufacturers of generic Digoxin in the United States, including Defendants Impax, Lannett, Mylan, Par, and West-Ward.

389.    During the relevant time period, Defendants Impax, Lannett, Mylan, Par, and West-Ward sold Digoxin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

390.    At all times relevant to this lawsuit there has been more than one manufacturer of Digoxin on the market.  Defendants Impax, Lannett, Mylan, Par, and West-Ward dominate the market for Digoxin.

391.    Due to industry consolidation and manufacturing difficulties experienced by Mylan, Par, and West-Ward, by the end of 2012, just Lannett and Impax remained active in the market for generic Digoxin.  Despite the existence of a duopoly, until October 2013, the price of Digoxin charged by Lannett and Impax remained stable.

392.     Beginning in October 2013, however, Defendants issued abrupt and substantial price increases.

393.     Defendants continued to increase the prices they charged to Plaintiffs and others for Digoxin during the first six months of 2014, despite Par's entry into the Digoxin market in early 2014 and West-Ward's re-entry soon after.  Mylan also re-entered in early 2015 and followed the pricing agreed to by the conspirators.  Upon information and belief, Par, West-Ward, and Mylan each communicated their entry into the generic Digoxin market to their co-conspirators well in advance of the date each entrant began marketing the drug, so that agreements could be reached on price without any disruption to the prevailing supracompetitive prices.

394.     By way of example, with respect to WAC pricing, in October 2013, Lannett and Impax implemented lockstep WAC prices on their 0.125 mg products, reflecting increases of more than 630%.  Instead of competing on price, Par, West-Ward, and Mylan reported the same WAC benchmarks as Lannett and Impax as they entered the market:

| Product 0.125 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Lannett | 00527132401 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 1000 ct | Lannett | 00527132410 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 100 ct | Impax | 00115981101 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 1000 ct | Impax | 00115981103 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 100 ct | Par | 49884051401 | * | $1.19 | 17-Jan-14 | * |
| 1000 ct | Par | 49884051410 | * | $0.99 | 17-Jan-14 | * |
| 100 ct | West-Ward | 00143124001 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 1000 ct | West-Ward | 00143124010 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 100 ct | Mylan | 00378615501 | * | $1.19 | 17-Nov-14 | * |
| 1000 ct | Mylan | 00378615510 | * | $0.99 | 17-Nov-14 | * |

395.     In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Digoxin, which had experienced

extraordinary price increases.  In  response  to a  Congressional request  from  Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in  August 2016,  the GAO issued a report in  which  Digoxin was identified as experiencing an "extraordinary price increase."

396.  There were no legitimate justifications for these abrupt shifts in pricing conduct. There were no drug shortages or supply disruptons which would cause large price spikes.

397.  Defendants' pricing of Digoxin is the exact opposite of what one would expect to see in a competitive market, where the entry of new manufacturers brings the price down.  Instead, as a result of their collusion, Defendants' pricing for Digoxin in the United States increased as the number of "competitors" in the market grew.  Thus, the pricing of Digoxin mirrors Defendants' collusion on Glyburide, where Mylan, Heritage, and Mayne agreed to increase prices on the diabetes drug in advance of the entry into the market by Heritage and Mayne.

398.  In early 2015, Mylan re-entered the market and Defendants continued to adhere to their anticompetitive agreements on pricing, which continue to persist in the market even as of the filing of this Complaint.

399.  Upon information and belief, the price increases on Digoxin were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Digoxin in the United States.

400.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

401.  For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida.  This meeting was attended by representatives from  Defendants Mylan and Par.  *See* Ex. 1.

402.     On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  This meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

403.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

404.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.  This meeting was attended by representatives from Defendants Mylan and Par.  *See* Ex. 1.

405.     On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

406.     On August 23-26, 2014, NACDS held its 2014 TSE at the Boston Convention Center in Boston, Massachusetts.  This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

407.     On February 16-18, 2015 the National Pharmacy Forum ("NPF") took place at the Marriott Waterside Hotel & Marina in Tampa, Florida.  The speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends."  The NPF was attended by representatives of Defendants Mylan and Westward.  *See* Ex. 1.

408.     On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida.  This meeting was attended by representatives from Defendants Mylan, Par, and West-Ward.  *See* Ex. 1.

409.   Defendants continued to regularly attend trade association meetings, conferences and events in 2015-16, including: (a) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (b) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (c) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (d) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (v) the February 8-10, 2016 NPF meeting in Scottsdale, Arizona; (e) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (f) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (g) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (h) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

### J.      Divalproex ER

410.   The market for Divalproex ER is mature, as generic versions of the drug have been available in the United States for almost a decade.  Valproate, the base compound in Divalproex ER, has been in use for more than a century and is recognized as an essential medicine by the World Health Organization.

411.   In 1999, Abbot Laboratories received FDA approval to market Depakote ER, a branded version of the drug.  Depakote ER was a blockbuster drug that achieved nearly $1,000,000,000 in sales for Abbot.

412.   Between January and May of 2009, Mylan, Zydus, and Par (through Anchen Pharmaceuticals, its predecessor-in-interest) all received ANDAs authorizing them to market Divalproex ER as generic versions of Depakote ER.  Defendant Dr. Reddy's sells Divalproex ER pursuant to ANDAs approved by the FDA in March 2012.

413.    During the relevant time period, Defendants Mylan, Zydus, Dr. Reddy's and Par sold Divalproex ER to Plaintiffs and others in the United States  at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

414.    At all times relevant to this lawsuit there has been more than one manufacturer of Divalproex ER on the market.  Defendants Mylan, Zydus, Dr. Reddy's and Par dominate the market for Divalproex ER.

415.    Between 2009 and June 2013, Defendants' prices for Divalproex ER remained relatively stable.  However, in early July 2013, Defendants implemented in unison abrupt and substantial price increases on Divalproex ER.  For example, Defendants increased the price for a bottle of 500 pills at 250 mg strength from approximately $30 to more than $200 per bottle.  Bottles of 500 mg strength pills increased at even greater rates, increasing from approximately $130 per bottle to more than $1600 per bottle, an increase of more than 1100%.

416.    By way of example, with respect to WAC pricing, Mylan and Par set identical WAC prices within a couple weeks of each other in June 2013; and Dr. Reddy's and Zydus matched those WACs in August 2013, around the time they each entered the market.  As noted below, the new WACs for 100 and 500 count bottles of 500 mg pills reflected increases of more than 300%:

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378047301 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 ct | Mylan | 00378047305 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 100 ct | Par | 10370051110 | $0.74 | $3.26 | 26-Jun-13 | 338% |
| 500 ct | Par | 10370051150 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 100 ct | Zydus | 68382031501 | * | $3.26 | 14-Aug-13 | * |
| 500 ct | Zydus | 68382031505 | * | $3.26 | 14-Aug-13 | * |
| 100 ct | Dr. Reddy's | 55111053401 | * | $3.26 | 19-Aug-13 | * |
| 500 ct | Dr. Reddy's | 55111053405 | * | $3.26 | 19-Aug-13 | * |

417.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Divalproex ER, which had experienced extraordinary price increases. In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Divalproex ER was identified as experiencing an "extraordinary price increase."

418.    There are no legitimate justifications for the abrupt increases in 2013. Divalproex ER was not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to the FDA. Furthermore, the large price spike cannot be attributed to an increase in demand. If anything, in defiance of rational economic behavior, demand for Divalproex ER was actually decreasing when prices were increasing.

419.    Upon information and belief, the price increases on Divalproex ER were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Divalproex ER in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

420.   For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland which was attended by representatives from Dr. Reddy's and Mylan.  *See* Ex. 1.

421.   On February 20-22, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

422.   On April 20-23, 2013, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Annual Meeting in Palm Beach, Florida.  *See* Ex. 1.

423.   Shortly before Mylan's and Par's Divalproex ER prices increased, Dr. Reddy's, Mylan, Par, and Zydus, attended the HDMA 2013 BLC in Orlando, Florida on June 2-5, 2013. *See* Ex. 1.

424.   On June 4-5, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.  *See* Ex. 1.

425.   On August 10-13, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Total Store Expo in Las Vegas, Nevada.  *See* Ex. 1.

426.   On October 28-30, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Fall Technical Conference in Bethesda, Maryland.  *See* Ex. 1.

427.   On February 19-21, 2014 representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2014 GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

428.   On April 26-29, 2014, NACDS held its 2014 Annual Meeting in Scottsdale, Arizona.  NACDS's 2014 Annual Meeting was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

429.   On June 1-4, 2014, the HDMA held a BLC in Arizona.  This event was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

430.     On June 3-4, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.  *See* Ex. 1.

431.     On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center.  This Expo was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

432.     On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.  *See* Ex. 1.

433.     On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.  *See* Ex. 1.

434.     On February 9-11, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Annual Meeting in Miami, Beach, Florida.  *See* Ex. 1.

435.     On June 9-10, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the GPhA CMC Workshop.  *See* Ex. 1.

436.     On November 2-4, 2015, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the 2015 GPhA Fall Technical Conference in North Bethesda, Maryland.  *See* Ex. 1.

## K.     **Doxycycline**

437.     The Doxycycline market is mature, as generic Doxycycline – which includes generic versions of branded Doxycycline such as Vibramycin, Vibra-Tabs, and Monodox – has been available in the United States since the mid-1980s in tablet and capsule form.  Doxycycline has been designated by the WHO as an essential medicine.  Doxy DR is the generic version of the branded acne medication, Doryx, for which Warner Chilcott received an NDA in May 2005. Although Doxy Hyclate and Doxy Mono are not bioequivalent drugs, doctors will often simply

write a prescription for Doxycycline, which allows pharmacists to supply consumers with either Doxy Hyclate or Doxy Mono.

438.   Although there were, at one point, approximately 20 manufacturers of Doxycycline, by early 2012, the primary manufacturers were Actavis, Par, Sun (including its subsidiaries Mutual and Caraco), and West-Ward (for Doxy Hyclate) and Heritage, Lannett, Mylan, and Par (for Doxy Mono).  In 2012, Mylan received authorization to market both Doxy Hyclate and Doxy DR.  Because Mylan was the first generic manufacturer to receive an ANDA for Doxy DR, it received 180 days of exclusivity as the sole authorized generic manufacturer, which expired in early 2013.  Mylan remained the only generic manufacturer of Doxy DR until Heritage and Mayne entered the market in 2013.  Historically, Doxy Mono cost more than Doxy Hyclate, and for that reason, Doxy Hyclate was the most commonly used version of Doxycycline.

439.   Defendants Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun (including Mutual and Caraco), and West-Ward each sold at least one variation of Doxycycline to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1.   *The Doxy Hyclate Collusive Price Increase*

440.   Although prices of Doxycycline had remained stable for several years, beginning in approximately November 2012, Defendants implemented an abrupt and substantial price increase across all doses of Doxy Hyclate.  By May 2013, Defendants' prices for Doxy Hyclate increased on certain strengths by as much as 8,000%.  For example, in mid-January 2013, West-Ward and Sun raised prices for a bottle of 500 tablets of 100 mg strength Doxy Hyclate pills from an average of less than $25 per bottle to approximately $2,000 per bottle.

441.    Upon information and belief, the agreement to increase prices on Doxy Hyclate was discussed at the GPhA meetings in October 2012 in Bethesda and February 2013 in Orlando.  The October 2012 meeting was attended by Actavis, Teva, Sun, and Mylan, in addition to the other conspiring Defendants identified in Exhibit 1.  The February 2013 meeting was attended by Actavis, Mylan, and Teva, in addition to the other conspiring Defendants identified in Exhibit 1.

442.    By way of example, Defendants raised Doxycycline WACs on the 100 mg capsules to identical benchmark prices over a two-week period reflecting increases of more than 2,500%:

| Product 100 mg cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | West-Ward | 00143314250 | $0.10 | $4.43 | 21-Jan-13 | 4326% |
| 500 ct | West-Ward | 00143314205 | $0.10 | $4.43 | 21-Jan-13 | 4370% |
| 50 ct | Actavis | 00591544050 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591544005 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489011902 | $0.10 | $4.92 | 5-Feb-13 | 4847% |
| 500 ct | Sun | 53489011905 | $0.06 | $4.92 | 5-Feb-13 | 7844% |

443.    In addition, Defendants increased WACs on the 100 mg tablets within a few days of each other, reflecting increases of more than 2,500%:

| Product 100 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | Actavis | 00591555350 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591555305 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489012002 | $0.09 | $4.92 | 5-Feb-13 | 5631% |
| 500 ct | Sun | 53489012005 | $0.08 | $4.92 | 5-Feb-13 | 6268% |

444.    In May 2013, after the price increases had been implemented, Teva discontinued production of Doxy Hyclate – a product that it had manufactured for three decades.  This act was against Teva's individual self-interest (given that pricing for Doxy Hyclate had been raised by

orders of magnitude above Defendants' marginal costs) and in furtherance of Defendants' conspiracy.

445.    By April 2014, DAVA launched Doxy Hyclate pursuant to an exclusive supply and distribution agreement with Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals, LLC ("Chartwell").  Around this time, Endo was in discussions with DAVA to acquire it, which it did in August 2014.

446.    Following DAVA's acquisition by Endo, Chartwell and Endo sued each other in New York state court for alleged failures to comply with the terms of the supply and distribution agreement for Doxycycline.[26]  Chartwell alleged that DAVA, DAVA's former President Aram Moezinia, and Endo (through its generics subsidiaries) were refusing to take delivery of Doxycycline shipments from Chartwell despite the fact that there was demand for Doxycycline in the market.  Because Endo (through its generics subsidiaries including DAVA) refused to accept the available Doxycycline supply, Chartwell attempted to rescind its agreement with DAVA in order to find other generic drug marketers, which Chartwell claims it was able to accomplish.

447.    Chartwell recognized that its supply of Doxycycline provided an opportunity to "reduc[e] prices for consumers, all while earning significant profits."  But Endo (and, subsequently, Par) withheld Doxycycline supply from the U.S. market and priced its Doxycycline at the supracompetitive price of its co-conspirators.  Chartwell suggested a reason for Endo's economically irrational decision to withhold additional Doxycycline supply when there was ample demand in the market.  It accused Endo and its generic subsidiaries of engaging in an illegal price-fixing and market allocation scheme: "Having bought DAVA, Endo implemented its withhold-

---

[26]    *See Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC,* Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

and-price-gouge scheme, did virtually nothing to sell the Chartwell Entities' Doxycycline, and, in collusion with its alleged 'competitors,' set Doxycycline's price at the *exact same* level its competitors were charging for the drug." (Emphasis in original). Chartwell further alleged that "DAVA and Moezinia dedicated efforts to *withhold* [Doxycycline] from the marketplace..., to keep the overall price of Doxy high." (Emphasis in original). For example, Chartwell cites to an e-mail dated on or about July 11, 2014 where Moezinia emailed Chartwell and stated that DAVA's plan was to sell Doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market.

448.   Chartwell sought discovery of the materials that Par and Endo have produced to the DOJ and the State AGs. Notably, the regulators' inquiries to Endo have focused on at least three drugs that Endo acquired rights to via DAVA: Doxy Hyclate, doxazosin mesylate, and methotrexate sodium. Chartwell and Endo settled their claims in November 2016.

2.   *The Doxy Mono Collusive Price Increase*

449.   In February 2013, because the abrupt and substantial price increase on Doxy Hyclate led it to cost more than Doxy Mono, large purchasers of Doxycycline (such as Plaintiffs) began to increase their purchases of Doxy Mono, so that they could supply their customers with the cheaper drug. In February and March of 2013, Heritage and Lannett recognized this opportunity to implement a substantial collusive price increase on Doxy Mono as well.

450.   In February 2013, Heritage believed that demand for some Doxycycline products was increasing, and wanted to use this as a pretext to raise the prices of Doxy Mono. Accordingly, Heirtage began reaching out to Lannett, Mylan, and Par to institute a price increase for Doxy

Mono.  These pricing discussions occurred at the same time as Heritage and Dr. Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, as discussed below.

451.    Starting in March 2013, Heritage's Anne Sather ("Sather"), began communicating with Lannett about pricing for Doxy Mono.

452.    On March 7, 2013, Sather spoke with a senior sales executive from Lannett, Tracy Sullivan ("Sullivan") by telephone for approximately 14 minutes, and executives from both companies followed up on March 13, 2013, through e-mail and a five-minute phone call.

453.    Throughout the next several months, Sather and Sullivan communicated about Doxy Mono by phone, text message an in person.

454.    On April 25, 2013, Sather and Sullivan spoke on the phone for more than eight minutes.

455.    Heritage's Sather and Lannett's Sullivan attended a conference together on May 14, 2013.  At the conference, they discussed a possible increase on Doxy Mono.

456.    On June 4, 2013, Sather called and texted with another Lannett employee, Grace Wilks ("Wilks"), a Director of National Accounts at Lannett.

457.    Upon information and belief, these communications resulted in an agreement between Heritage and Lannett to increase prices on Doxy Mono by approximately 400%.

458.    However, before they could implement the price increase, Lannett and Heritage had to confirm that Mylan and Par were on board as well.  During a series of industry events in May and June, executives from all four companies met in person to discuss the Doxy Mono price increase.  Lannett agreed to lead the price increase on June 12, 2013, and communicated this intention to Mylan, Par, and Heritage.  For example, a Lannett executive, Wilks, met with a Heritage executive, Sather, to discuss the price increase during a trade association event on June

4.    Sales executives from Mylan, Michael Aigner ("Aigner"), and Par, Karen O'Connor ("O'Connor"), spoke several times about the price increase by telephone on June 7, and on June 11, a Heritage executive, Sather, and a Mylan executive, Aigner, spoke by phone, while Lannett's Sullivan and a Par's O'Connor communicated through at least nine text messages.  The following day, when Lannett announced the price increase, Lannett's Sullivan and Par's O'Connor texted at least another nine times.

459.    Upon information and belief, these communications by Mylan, Par, Lannett, and Heritage resulted in an agreement that each would follow Lannett's price increase of approximately 400% on Doxy Mono, which each Defendant did.  For example, Par provided instructions to its sales employees to begin implementing the price increase of August 13, 2013.  And upon information and belief, Mylan began announcing price increases on Doxy Mono to customers during Summer 2013 as well.

460.    Although Heritage had supply chain issues for Doxy Mono for a brief period in 2013 (and had to delay the implementation of the price increase), these issues arose after Defendants had reached the agreement to increase prices.  By October 2013, Heritage began announcing the price increase on Doxy Mono and fully implemented the price increase by March 2014.

461.    Additionally, during the period that it delayed announcing the price increase, Heritage continued to speak with Lannett, Mylan, and Par to ensure that it remained committed to the price increase, notwithstanding its delay in implementation.  For example, Hertiage's Sather met with Par's Sullivan and O'Connor at a conference in August 2013, and Par, Mylan, Lannett, and Heritage continued to communicate about the pricing of Doxy Mono throughout the Summer of 2013.  Additionally, consistent with the overarching agreement that governed each Defendant's

market share of each drug in the industry, Mylan, Heritage, and Par agreed to refrain from competing for any of Lannett's Doxy Mono business after Lannett led the price increase.

3.    *Collusion on Doxy DR*

462.    With respect to Doxy DR, as the sole generic manufacturer of the drug for a period of time in 2012, Mylan was able to charge a supracompetitive price during the period of generic exclusivity.  (As explained in ¶ 119, the FDA estimates that, in a market with one generic manufacturer, the generic drug will typically sell at 94% of the branded drug).

463.    Beginning in May 2013, Heritage reached out to Mylan for the purpose of colluding to allocate the Doxy DR market without disturbing the supracompetitive price.  On May 2, 2013, Malek of Heritage contacted a senior executive at Mylan through the social networking website LinkedIn, and on May 7 and 8, 2013, Glazer of Heritage spoke with another senior executive by e-mail and by telephone.

464.    In addition to the discussions involving Glazer, a representative of Heritage engaged in discussions with the President of Mylan N.V.  (Rajiv Malik) to negotiate the terms of the agreement.  Upon information and belief, these discussions resulted in an agreement that Mylan would concede significant business in the Doxy DR market that accounted for approximately 30% of that market.  Malik noted that Mylan was agreeing to concede this business to Heritage because Heritage had previously agreed to concede market share to Mylan for another generic drug.

465.    In July 2013, Heritage began to sell Doxy DR to Plaintiffs and others in the United States subject to the terms of its unlawful agreement with Mylan.

466.    In January 2014, Mayne informed Heritage and Mylan that it planned to enter the Doxy DR market as well.  For example, a senior executive with Mayne spoke with a senior

executive with Heritage on January 7, 2014, about making room for Mayne in the market allocation agreement between Heritage and Mylan.

467.    Senior executives from Heritage, Mylan, and Mayne communicated frequently via e-mail, text, and phone about their collusive market allocation agreement throughout 2014. Executives from Heritage and Mayne also met in person at the American Society of Health System Pharmacist's conference in Anaheim, California in December 2014.

468.    Mayne, Heritage, and Mylan continued to adhere to their collusive agreements.  For example, in May 2014, Heritage walked away from a large account so that Mayne could win the bid.  Similarly, in January 2015, Heritage submitted a bid to Econdisc, a group purchasing organization, that it knew would be above Mayne's bid, so that Mayne could win the Econdisc business.

469.    As a result of their collusion, the price in the United States for Doxy DR has remained at elevated and supracompetitive levels since 2013, despite the entry of two additional generic manufacturers.  Indeed, whereas the FDA study mentioned in ¶ 119 would predict a market price of 44% of the branded price, Mylan, Heritage, and Mayne, charged – and continue to charge – Plaintiffs the same or similar price that Mylan charged during its period of generic exclusivity. Accordingly, Plaintiffs have paid, and continue to pay, substantial overcharges to Defendants on Doxy DR.

470.    The State Attorneys General have uncovered the following specific evidence of anticompetitive activity among Defendants Heritage, Mayne, and Mylan, including but not limited to:

- An instance in which Mylan agreed to "walk away" from large orders and allow Heritage to obtain the business and increase its market share;

- An instance in November 2013 in which Heritage and Mylan discussed the fact that the purpose of their agreement was to maintain high prices and ensured that both companies were committed to that goal;

- An instance in February 2014 in which Mayne approached Heritage to discuss engaging in market and customer allocation concerning Doxycycline.

- Instances in early to mid-2014 in which Heritage and Mayne engaged in bid rigging related to Doxy DR.

- An instance in August 2014 in which Heritage communicated with Mylan concerning their agreement to fix prices.

- An instance in November 2014 in which Heritage and Mayne engaged in bid rigging related to Doxy DR.

- An instance in December 2014 in which Heritage and Mayne employees met at a trade association conference to discuss their illegal agreement.

- An instance in December 2014 in which Mayne followed through on its agreement with Heritage to rig bids on Doxy DR.

- An instance in December 2015 in which Heritage and Mayne engaged in bid rigging related to Doxycycline DR.

471.    The market allocation agreement on Doxy DR and the price-fixing agreements on Doxy Hyclate and Doxy Mono remain in force or effect (or both) as of the date of the filing of this Complaint, and Plaintiffs have been and continue to be injured by this unlawful conduct.

**L.    Econazole**

472.    The market for Econazole is mature, as Econazole has been available in the United States for almost 20 years.  Defendants Taro and Fougera sell generic Econazole pursuant to ANDAs approved by the FDA in November 2002.  Defendant Perrigo sells Econazole pursuant to an ANDA approved in 2004.  Teligent sells Econazole pursuant to an ANDA it acquired in February 2013.

473.    During the relevant time period, Defendants Fougera, Perrigo, Taro, and Teligent sold Econazole to purchasers throughout the United States.

474.     At all times relevant to this lawsuit there has been more than one manufacturer of Econazole on the market.  Defendants Fougera, Perrigo, Taro, and Teligent sold Econazole to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

475.     Between 2009 and September 2013, Defendants' prices for Econazole remained relatively stable.  However, beginning in September 2013 and continuing thereafter, Defendants began implementing abrupt and substantial price increases on Econazole.

476.     Between September 2013 and the Summer of 2014, Econazole, which had cost roughly ███████████████████████████████████.

477.     This skyrocketing price cannot be explained by supply shortages or other market events.  The only material change in the months preceding the price increases was Teligent's entry into the market.

478.     On Feburary 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC. During that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three Defendants had an opportunity to discuss Teligent's entry into the market.

479.     During this same time period, Teligent also became interested in entering the market for other generic pharmaceuticals.  Teligent launched its first topical generic drug in late 2012, followed by its acquisition of the Econazole ANDA in February 2013.  By September 2013, Teligent had 12 ANDAs pending for FDA approval.  By June 20, 2014, that number had jumped to 17, with four additional ANDAs submitted under joint-development plans with other manufacturers and another five ANDAs planned for submission by the end of 2014.

480.     When Teligent acquired the right to sell Econazole from Prasco LLC, it was the beginning of a publicly announced plan that would place Teligent in direct competition with Taro

and Perrigo across numerous drugs.  Teligent now makes 20 topical drugs.  Seventeen of these drugs are also made by Taro; fifteen are made by Perrigo.

481.    Teligent's entry into the Econazole market demonstrates a "fair share" agreement. Where a drug manufacturer, like Teligent, plans to enter a market with established manufacturers, and where the established manufacturers are competitors across multiple drugs, such a situation sets the groundwork for a "fair share" agreement.  Rather than allow the new entrant to drive the price of drugs lower, the incumbent manufacturers and the new entrant can "play nice in the sandbox" and keep prices high.  The conduct of Teligent, Perrigo, Fougera and Taro after Teligent entered the Econazole market is the result of a market allocation or "fair share" agreement among these Defendants.

482.    Teligent launched Econazole under its own label in September 2013.  In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.  Teligent, however, announced a list price (WAC) increase in July 2013, even before its first sale of Econazole under its own label.  Rather than competing for market share by lowering prices, Teligent made the economically irrational decision to raise prices.  Upon information and belief, Teligent's conduct reflected an agreement with Perrigo, Fougera, and Taro that Teligent would enter with higher – rather than lower – prices in exchange for the incumbents' promise to cede market share to Teligent.

483.    On October 28-30, 2013, right before Teligent's higher prices took effect in the marketplace, representatives from Perrigo, Taro, Fougera and Teligent, met at a GPhA conference where they had an opportunity to discuss Econazole market shares and pricing.  *See* Ex. 1.

484. 

Pursuant to their agreement, the incumbents also matched Teligent's high prices.

485.

.   Taro's prices remained relatively stable, but that changed after representatives from Perrigo, Teligent, and Taro, met at the June 3-4, 2014 GPhA meeting in Bethesda, Maryland.

486.   Consistent with their price-fixing agreement, in mid to late 2014, Teligent, Perrigo, Taro, and Fougera each implemented abrupt and substantial price increases on the Econazole products they sold to Plaintiffs and others in the United States in lockstep.

487.   With respect to WAC pricing, Taro, Teligent, and Perrigo raised their WACs to identical prices, reflecting increases of more than 600%:

| Product CRM | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Perrigo | 45802046635 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 30 gm | Perrigo | 45802046611 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 85 gm | Perrigo | 45802046653 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 15 gm | Teligent | 52565002215 | $0.82 | $5.80 | 1-Sep-14 | 610% |
| 30 gm | Teligent | 52565002230 | $0.72 | $5.80 | 1-Sep-14 | 704% |
| 85 gm | Teligent | 52565002285 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 15 gm | Taro | 51672130301 | $0.66 | $5.80 | 18-Nov-14 | 779% |
| 30 gm | Taro | 51672130302 | $0.59 | $5.80 | 18-Nov-14 | 890% |
| 85 gm | Taro | 51672130308 | $0.42 | $4.09 | 18-Nov-14 | 871% |

488.   Upon information and belief, by November 2014, Fougera increased its WAC prices to the same levels as Perrigo, Teligent, and Taro.

489.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Econazole, which had experienced extraordinary prices increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, in August 2016, the GAO issued a report in which Econazole was identified as experiencing an "extraordinary price increase."

490.    Although the conspirators have not been able to maintain their full conspiracy price increase, Defendants continue to charge an average of more than $2.00 per dose for Econazole, which is roughly four times the prevailing market price before the conspiratorial price increases in late 2014.

491.    Upon information and belief, the price increases on Econazole were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Econazole in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those identified below.

492.    For example, on October 1–3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Perrigo, Fougera, and Taro.  *See* Ex. 1.

493.    On February 20–22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida that was attended by representatives from Perrigo, Taro, and Teligent.  *See* Ex. 1.

494.    On February 24-27, 2013, representatives from Perrigo, Fougera, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficent Program Planning Session.  *See* Ex. 1.

495.    On April 20–23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives of Perrigo and Taro.  *See* Ex. 1.

496.     On June 4–5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, and Taro. *See* Ex. 1.

497.     On August 10–13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Defendants Perrigo, Fougera, and Taro. *See* Ex. 1.

498.     On October 28–30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from  Perrigo, Fougera, Taro, and Teligent. *See* Ex. 1.

499.     On February 19–21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Defendants Perrigo, Taro, and Teligent. *See* Ex. 1.

500.     On February 23-26, 2014, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session. *See* Ex. 1.

501.     On April 26–29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives  from Defendants Perrigo and Taro. *See* Ex. 1.

502.     On June 3–4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Perrigo, Fougera, and Taro. *See* Ex. 1.

503.     On August 23–26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Defendants Perrigo and Taro. *See* Ex. 1.

504.     On October 27–29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, Taro, and Teligent. *See* Ex. 1.

505.    The GPhA Annual Meeting in Miami Beach, Florida on February 9–11, 2015 was attended by representatives of Perrigo, Taro, and Teligent.  *See* Ex. 1.

506.    On February 22-25, 2015, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session.  *See* Ex. 1.

507.    On April 25–28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida.  NACDS's 2015 annual meeting was attended by representatives from Defendants Perrigo and Taro, who were key executives for generic drug sales and pricing.  *See* Ex. 1.

508.    On June 9–10, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro.  *See* Ex. 1.

509.    On August 22–25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado.  NACDS's August 2015 Total Store Expo was attended by representatives from Perrigo and Taro.  *See* Ex. 1.

510.    On November 2–4, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro.  *See* Ex. 1.

511.    Defendants continued to attend trade association meetings and conference throughout 2016, including: (i) NACDS's 2016 annual meeting at The Breakers, Palm Beach, Florida on April 16–19, 2016; and (ii) NACDS's 2016 Total Store Expo at the San Diego Convention Center in San Diego, California on August 19–22, 2016.  *See* Ex. 1.

512.    A number of individuals with leadership roles at Teligent have ties to other Defendants that are implicated in the conspiracy.

513.    For example, Jason Grenfell-Gardner ("Grenfell-Gardner") joined Teligent as CEO in July 2012.  Prior to that time, he had served in a number of roles at West-Ward.

514.     Damian Finio, who worked with Grenfell-Gardner at West-Ward, served briefly on Teligent's Board in 2014 before leaving that job to become the CFO of Heritage.  In 2018, he returned to Teligent and is now Teligent's CEO.

515.     Carole Ben-Maimon joined the Teligent Board in 2016.  She has held leadership positions at Impax, Par, and Teva.

516.     Narendra Borkar served on the Board of Teligent and is the former CEO of Aurobindo and Caraco (now part of Sun).

517.     Bhaskar Chaudhuri served on the Teligent Board and previously worked for Valeant and Mylan.

**M.     Fluocinonide**

518.     The market for Fluocinonide is mature.  Fluocinonide is the generic version of Lidex, a topical corticosteroid that has been available in the United States for more than 40 years. Generic Fluocinonide has been available for more than 20 years.  Fluocinonide is sold in cream, gel, and ointment versions.

519.     During the relevant time period, Defendants Taro, Teva, and Actavis sold Fluocinonide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

520.     At all times relevant to this lawsuit there has been more than one manufacturer of Fluocinonide on the market.  Defendants Taro, Teva, and Actavis dominate the market for Fluocinonide.

521.     As an established generic drug that had been on the market for a long period of time, in early 2014, the price of generic Fluocinonide was fairly stable.

522.     Beginning in June 2014, however, Actavis planned to enter the market for Fluocinonide, and sell the drug in cream form.  Upon information and belief, Actavis discussed its planned entry with at least Defendants Taro and Teva in advance of its entry into the market and coordinated a collusive price increase between all three Defendants for Fluocinonide cream.

523.     Spurred by the collusive agreement on Fluocinonide cream, Taro and Teva also agreed to increase prices on Fluocinonide gel and ointment.  During the last week of July 2014, Taro, Actavis, and Teva were able to roughly triple the prices that each charged for Fluocinonide cream, gel, and ointment in the United States, with the collusive price increase implemented before Actavis entered the market (Actavis followed the collusive price increase that it had agreed to upon its entry).  These abrupt prices were in lockstep, or virtual lockstep, across Fluocinonide cream, gel, and ointment.

524.     By way of example, with respect to WAC pricing, Taro and Teva set identical WAC prices within a month of each other in the Summer of 2014, reflecting increases of more than 200%:

| Product CRM .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Taro | 51672125301 | $0.79 | $2.43 | 3-Jun-14 | 206% |
| 30 gm | Taro | 51672125302 | $0.56 | $2.43 | 3-Jun-14 | 337% |
| 60 gm | Taro | 51672125303 | $0.39 | $2.43 | 3-Jun-14 | 524% |
| 15 gm | Teva | 00093026215 | $0.79 | $2.43 | 1-Jul-14 | 206% |
| 30 gm | Teva | 00093026230 | $0.56 | $2.43 | 1-Jul-14 | 337% |
| 60 gm | Teva | 00093026292 | $0.39 | $2.43 | 1-Jul-14 | 524% |

525.     Fluocinonide was identified by the GAO Report as one of the drugs that experienced "extraordinary price increases."

526.     There are no legitimate justifications for the large price hikes.   Changes in ingredient costs do not explain Defendants prices increases.   The prices for certain formulations of fluocinonide remained relatively stable even though they have the same active ingredients as the formulations that experienced dramatic price increases.   Furthermore, Defendants enormous price increases were not due to supply disruptions.

527.     Upon information and belief, the price increases on Fluocinonide were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Fluocinonide in the United States.   As with other drugs identified in the Complaint, this collusion was spurred in part by Actavis' planned entry into the market, and with Taro, Teva, and Actavis reaching agreements on pricing in advance of Actavis' entry.   These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

528.     For example, on February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Actavis and Teva.   *See* Ex. 1.

529.     On April 20-23, 2013, NACDS held it Annual Meeting at The Breakers in Palm Beach.   Representatives from Actavis, Taro and Teva attended.   *See* Ex. 1.

530.     On June 2-5, 2013, HDMA held its BLC in Orlando, Florida.   Representatives from Actavis and Teva attended.   *See* Ex. 1.

531.     On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Taro, and Teva.   *See* Ex. 1.

532.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas.   Representatives from Actavis, Taro, and Teva attended.

533.     On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Taro, and Teva.  *See* Ex. 1.

534.     On December 3, 2013, NACDS held its 2013 NYC Week and Annual Foundation Dinner, and representatives from Actavis and Teva attended.  *See* Ex. 1.

535.     On February 19-21, 2014, GPhA held its Annual Meeting in Florida. Representatives from Actavis, Taro, and Teva attended this event.  *See* Ex. 1.

536.     On April 1, 2014, HDMA held its Sixth Annual CEO Roundtable in New York. Representatives from Actavs and Teva attended.  *See* Ex. 1.

537.     On April 26-29, 2014, NACDS held its annual meeting in Arizona.  Representatives from Actavis, Taro, and Teva attended.  *See* Ex. 1.

538.     On May 12-15, 2014, MMCAP held its National Member Conference in Minnesota.  Representatives from Actavis and Teva attended.  *See* Ex. 1.

539.     On June 1-4, 2014, HDMA held its BLC in Arizona.  Representatives from Actavis, Taro, and Teva attended.  *See* Ex. 1.

540.     On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Actavis, Taro, and Teva.  *See* Ex. 1.

541.     On August 23-26, 2014, NACDS held its 2014 Total Store Expo in Boston. Representatives from Actavis, Taro, and Teva attended.  *See* Ex. 1.

542.     On September 27-October 1, 2014, HDMA held its 2014 Annual Board Meeting in Laguna Beach, California which was attended by Actavis and Teva.  *See* Ex. 1.

543.     On October 27-29, 2014, GPhA held its Fall Technical Conference in Maryland. This event was attended by representatives from Actavis and Teva.  *See* Ex. 1.

544.    On December 3, 2014, NACDS held its 2014 NYC Week Dinner which was attended by representatives from Actavis and Teva.

545.    Representatives from Actavis, Teva, and Taro continued to attend trade association events in 2015 and 2016.

**N.    Fosinopril HCTZ**

546.    Fosinopril HCTZ is the generic version of Monopril HCT, a drug developed by Bristol Meyers Squibb in 1994 to treat hypertension.  The market for Fosinopril HCTZ is mature. The primary marketers of Fosinopril HCTZ are Aurobindo, Citron, Glenmark, Heritage, and Sandoz, and each sold Fosinopril HCTZ to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

547.    During an April 22, 2014 internal call at Heritage, Malek informed the sales team that he wanted Heritage to take a price increase on Fosinopril HCTZ.  Both Malek and Glazer pushed the Heritage sales team members to communicate with their competitors to obtain agreements to raise prices.

548.    In early May 2014, sales executives with pricing authority for Fosinopril HCTZ from Heritage, Glenmark, and Aurobindo began to discuss a collusive price increase for the drug. For example, on May 2, 2014, the Heritage executive, Dan Lukasiewicz ("Lukasiewicz"), reached out to his counterpart at Glenmark, the Executive Vice President of Generics.  On May 8, 2014, the Fosinopril HCTZ sales executives from each of the three companies spoke several times by telephone in order to discuss and coordinate the price increase.

549.    On May 14, 2014, at the MMCAP conference, executives from Sandoz, Aurobindo, and Heritage met in person to discuss raising prices on Fosinopril HCTZ.  Heritage's Sather spoke

with the Director of National Sales at Aurobindo, Tim Gustafson ("Gustafson").  Sather also spoke with Christopher Bihari ("Bihari"), a National Accounts Executive at Sandoz.  The next day, Aurobindo's Gustafson and Sandoz's Bihari communicated by text messages about the price increase.

550.    Also on May 15, 2014, Heritage agreed to walk away from a large pharmacy account, so that it could concede this business to Aurobindo.  This act against Heritage's self-interest was done to ensure that Aurobindo participated in the price increase.

551.    On May 21, 2014, Heritage's Sather exchanged texts with Sandoz's Bihari to confirm that each had the other's mobile phone numbers.

552.    On June 3, 2014, following an HDMA conference held that day, Heritage's Sather met for drinks with her counterpart at either Sandoz or Aurobindo (or both).  During the week that followed this conference, the sales executives from Aurobindo, Sandoz, and Glenmark spoke by phone at least nine times and also exchanged numerous text messages about the Fosinopril HCTZ price increase.

553.    On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for twenty-two minutes.  Again, these discussions were presumably about the pricing of various Drugs at Issue, including Fosinopril HCTZ.

554.    On June 25, 2014, Heritage's Sather and Aurobindo's Paul McMahon ("McMahon") spoke by phone for approximately 18 minutes.  Upon information and belief, during that call, Heritage informed the Aurobindo executive that Heritage would increase Fosinopril HCTZ prices by approximately 200% beginning the next day, and the Aurobindo executive ensured Heritage that each of Aurobindo, Glenmark, and Sandoz would follow Heritage's price increase.

555.    That same day, Glenmark's sales executive spoke with the sales executive at Citron with responsibility for both Glyburide and Fosinopril HCTZ, Karen Strelau ("Strelau").   Upon information and belief, during the discussion, Citron informed Glenmark that Citron would be entering the Fosinopril HCTZ market, and Glenmark informed Citron about the agreement between Glenmark, Heritage, Aurobindo, and Sandoz to follow Heritage's forthcoming price increase.

556.    Beginning on June 26, 2014, Heritage began to implement the 200% price increase on Fosinopril HCTZ with its customers.

557.    On June 27, 2014, executives from Aurobindo and Glenmark discussed the price increase on Fosinopril HCTZ.   Upon information and belief, each confirmed to the other that the two companies would follow Heritage's price increase.

558.    On July 1, 2014, Citron's Strelau, the Citron employee that had discussed the price increase with Glenmark reached out to Heritage's Lukasewicz to discuss the price increases of both Glyburide and Fosinopril HCTZ.   Strelau told Lukasewicz that communications should not be done through e-mail (this would leave evidence of the conspiracy), and instead, Heritage should communicate only by phone with a specific Citron executive, Laura Short ("Short").

559.    On July 2, 2014, Heritage's Sather spoke with the specified Citron representative, Short, for approximately 22 minutes.   Upon information and belief, during that call, Citron agreed to follow Heritage's price increases on both Fosinopril HCTZ and Glyburide.   The two executives continued to speak frequently about both drugs for the rest of July 2014.

560.    By July 9, 2014, Heritage had fully implemented the price increase of 200% on Fosinopril HCTZ.   That same day, Citron executives spoke internally about their intention to

follow through on their agreement to increase prices of Fosinopril HCTZ, as well as other drugs (including Glyburide).

561.    A few days later, on July 14, 2014, Citron's Strelau spoke with a Glenmark employee on the phone for about 20 minutes.

562.    The next day, July 15, 2014, Citron began announcing to customers its pricing of Fosinopril HCTZ (which was in line with the increased prices announced by Heritage).

563.    The Defendants continued to communicate in mid- and late-July 2014 regarding the Fosinopril HCTZ price increase.  For example, Heritage's Sather spoke with her Glenmark counterpart for about 23 minutes on July 18 and for approximately 5 minutes on July 30, and Aurobindo's McMahon and Citron's Short spoke for about 24 minutes on July 28.  Upon information and belief, Defendants communicated to each other during these calls their commitment to the agreement to follow Heritage's increased prices.

564.    By January 2015, each of the Defendants fully implemented the increased pricing on Fosinopril HCTZ.

565.    As alleged above, the price increases regarding Fosinopril-HTCZ were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Fosinopril HCTZ to Plaintiffs and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### O.    Glipizide-Metformin

566.    The market for Glipizide is mature, as the drug has been available in generic form since 2005.  During the relevant time period, Heritage, Teva, and Mylan sold Glipizide to Plaintiffs

and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

567.   During the same April 15, 2014 phone call between Malek and the Teva's Patel alleged above that resulted in an agreement between the two companies to increase prices on Doxy Mono, Malek informed Teva's Patel that Heritage wanted to raise prices on Glipizide.  Teva agreed that it would either match Heritage's price increase or commit to not bidding against Heritage's business.

568.   Around the same time, a second Heritage employee, Neal O'Mara ("O'Mara"), who was tasked with coordinating price increases with Mylan discussed the Glipizide price increase with his Mylan contact, Aigner.  On April 23, 2014, Heritage's O'Mara e-mailed Malek to confirm to him that Mylan agreed to the Glipizide price increase as well.  (They also agreed to raise prices on Doxy Mono and Verapamil in the same communication).

569.   Pursuant to the agreement with Teva and Mylan, Heritage began informing customers of the price increase in late June, and had fully implemented the price increase by July 9, 2014.

570.   In furtherance of the agreement, Teva and Mylan did not bid for any of Heritage's Glipizide business.  Additionally, in those instances where Heritage's customers sought out bids from Teva, Teva responded with pricing that it knew was higher than Heritage's pricing.

571.   As alleged above, the price increases regarding Glipizide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glipizide to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

P.     **Glyburide**

572.    The market for Glyburide is mature, as Glyburide has been available in the United States for decades and has been available in generic form in the United States for more than 20 years.  Prior to September 2015, the primary manufacturers were Heritage, Teva, Citron, and Aurobindo (Citron entered the market in 2014 through a manufacturing partnership with Aurobindo), and each sold Glyburide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

573.    Glazer's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that "[i]n furtherance of the conspiracy, [Glazer] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide.  During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

574.    Similarly, Malek's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that "[i]n furtherance of the conspiracy, [Malek] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide.  During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

575.    On or about April 22, 2014, Heritage held an internal teleconference during which Malek identified drugs that could be targeted for price increases.  Glyburide was one of the drugs on Malek's list.  During the call or shortly thereafter, Malek instructed Heritage sales executives

to contact their counterparts at Teva and Aurobindo and to reach an agreement to raise prices on Glyburide.

576.    Malek himself spoke to a senior executive at Teva, Patel, about Glyburide and several other drugs on his list, including an 18 minute call on April 15, 2014 (one week before and after the April 22 conference call).  During Malek's communications with the Teva's Patel, an agreement was reached that both companies would raise their prices on Glyburide sold to Plaintiffs and others in the United States.

577.    After successfully reaching an agreement with Teva in late April, Malek and Glazer pressured their sales executives to reach agreement with Aurobindo as well in order to allow the collusive Glyburide price increase to succeed.

578.    While Malek was responsible for communicating with Teva (among other Defendants), Heritage's Lukasiewicz was assigned to communicate with Aurobindo.  Malek and Glazer asked Lukasiewicz for updates about his communications with Aurobindo on April 28, 29, and 30.  Lukasiewicz eventually connected with his contact at Aurobindo on May 8, 2014, when the two spoke for sixteen minutes.  During this call, they agreed to rise the price of a number of drugs, including Glyburide.

579.    On May 9, 2014, Heritage's sales team had another internal call to share the results of their conversations with competitors and further discuss the contemplated prices increases for other generic drugs, including Glyburide.

580.    At the MMCAP conference in Bloomington, Minnesota, between May 12-15, 2014, Heritage's Sather met with a number of competitors and held collusive discussions on a number of generic drugs.  Among her conspiratorial meetings, Sather met with an executive from Aurobindo, Gustafson, who also attended the conference and confirmed that each of the three

generic manufacturers of Glyburide (Aurobindo, Heritage and Teva) would increase prices on Glyburide sold in the United States. Sather confirmed that Aurobindo was committed to the agreement in an e-mail to Malek on May 15, 2014.

581.    But the Defendants were not done. On June 23, 2014, Heritage held another teleconference during which the company determined that the price of Glyburide could be raised by 200%, notwithstanding the fact that Citron was planning to enter the market through its partnership with Aurobindo. (As noted earlier, the FDA has documented that, with each new competitor that enters a market for a generic drug, the price of the drug typically declines substantially).

582.    In June and July 2014, executives from Heritage communicated with executives from Citron via text message, phone, and e-mail in order to ensure that Citron would abide by the collusive agreement already in place between the three existing manufacturers of generic Glyburide. Citron agreed to increase prices on Glyburide, but Citron's Strelau requested that there be no communication to Citron via e-mail in order to prevent the unlawful agreement from being exposed. Citron requested that the collusive communications be conveyed by telephone and directed to a specific individual within the company, Short.

583.    By early July 2014, with Citron, Heritage, Aurobindo, and Teva all committed to the collusive price increase, these four Defendants had successfully implemented the collusive price increase and were able to raise their prices for Glyburide to Plaintiffs and others in the United States to supracompetitive levels.

584.    Thereafter, Citron, Heritage, Aurobindo, and Teva adhered to the collusive agreement. In July 2014, a purchaser of Glyburide sought a request for proposal from Teva on Glyburide, in response to Heritage's price increase. Teva sales executives declined to bid based

on their agreement with Defendants, and referenced the agreements on both Glyburide and another drug as the basis for refusing to issue a competitive bid to the potential customer. Defendants also engaged in discussions about how Citron could acquire market share without disrupting the collusive conspiracy agreement.

585. Through their continued collusion, Citron, Heritage, Aurobindo, and Teva were able to maintain their collusive pricing on Glyburide until at least December 2015. This conspiratorial agreement continues to impact prices that Plaintiffs and others in the United States pay for Glyburide.

586. As alleged above, the price increases regarding Glyburide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide to Plaintiffs and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above, and at trade association events and conferences.

## Q. **Glyburide-Metformin**

587. The market for Glyburide-Metformin is mature, as the drug has been available in generic form since 2004. During the relevant time period, Heritage, Teva, Aurobindo, Actavis, and Citron sold Glyburide-Metformin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

588. During the same April 15, 2014 phone call alleged above when they discussed a number of other collusive price increases, Malek and the senior Teva sales executive, Patel, agreed to increase prices on Glyburide-Metformin.

589.    On April 22, 2014, Heritage held an internal call during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. After the call, Malek assigned Lukasiewicz to contact Aurobindo about Glyburide-Metformin, and Sather was assigned to Actavis to discuss Glyburide-Metformin.

590.    After the internal conference call, Heritage's Sather spoke with a senior executive at Actavis, Michael Dorsey ("Dorsey"), on April 22, 2014 about the Glyburide-Metformin price increase.  Upon information and belief, during this call, the executives from Heritage and Actavis agreed to increase prices on both Glyburide-Metformin and another drug (Verapamil).  As with all collusive communications identified in this Complaint involving Actavis, the Actavis representative acted on behalf of and reached an agreement that was followed by all Actavis entities identified in this Complaint.

591.    On May 8, 2014, Heritage's Lukasiewicz spoke with Aurobindo's McMahon about the Glyburide-Metformin price increase.  Heritage and Aurobindo executives followed up this phone call with an in-person meeting, during which – upon information and belief – the Glyburide-Metformin price increase was discussed (along with price increases on other drugs).

592.    Executives from the four companies continued to communicate regarding the price increase for the next month.  For example, the Actavis executive spoke with Teva by phone on May 1 and May 6, and the two exchanged at least 30 text messages about pricing agreements on Glyburide-Metformin and other drugs.  The same Actavis executive also spoke with Aurobindo's CEO regarding the pricing agreement.

593.    Heritage also communicated the terms of the agreement to Citron and Sun.  Because Citron had agreed to increase prices of Glyburide, Heritage sought to ensure that Citron (which had authority to market Glyburide-Metformin, but did not actively manufacture the drug at that

time) did not take any steps that would undermine or reveal the collusion on Glyburide-Metformin. Accordingly, a Heritage sales executive discussed the Glyburide-Metformin price agreement by text. Additionally, to facilitate collusion on other drugs, Heritage informed Sun through a chain of text messages sent in August 2014 about the successful price increases on Glyburide-Metformin and Verapamil.

594. In Summer 2014, Aurobindo, Actavis, Heritage, and Teva increased their WAC pricing on Glyburide-Metformin.

595. In August 2014, Heritage's Sather texted a Sun employee regarding agreements Heritage had reached with Actavis to increase the prices of both Glyburide-Metformin and Verpamil. Such a communication highlights the overarching nature of the conspiracy; Sun was kept apprised of agreements (in this case between Actavis and Heritage) relating to drugs that it did not market or sell.

596. By September 2014, Citron had mobilizied to enter the Glyburide-Metformin market. Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list prices higher than all of them.

597. As alleged above, the price increases regarding Glyburide-Metformin were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide-Metformin to Plaintiffs and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

**R.     Leflunomide**

598. The market for Leflunomide is mature, as the drug has been available in generic form since 2005. During the relevant time period, Defendants Apotex, Heritage, and Teva sold

Leflunomide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

599.    During their April 15, 2014 phone call alleged above, Malek and the Teva's Patel also discussed Leflunomide and targeted it for a price increase.

600.    During the first week of May 2014, executives from Teva, Heritage and Apotex spoke several times by telephone.  During these phone calls, all three companies agreed to increase prices on Leflunomide and to refrain from submitting competitive bids to each other's customers.  These conversations also resulted in an agreement that Apotex would lead the price increase, which it did on May 9, 2014.

601.    Pursuant to the agreement between the three companies, Heritage began to announce the price increase in June, and had fully implemented the price increase on all its major Leflunomide accounts by early July.

602.    In early July, after the price increase on Leflunomide was implemented, Teva exited the market for the drug.  Because the price increase was successful, this action was against Teva's self interest.  Upon information and belief, Heritage induced Teva's exit by agreeing to concede market share to Teva on other drugs.

603.    As alleged above, the price increases regarding Leflunomide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Leflunomide to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

S.      **Levothyroxine**

604.    The market for Levothyroxine is mature, as Levothyroxine has been available in the United States for over 50 years.  Levothyroxine is on the WHO's list of essential medicines. Levothyroxine is often featured on lists of the top ten most prescribed generic drugs and, as of June 2015, it was the most prescribed generic drug in the United States and constituted 2.7% of the entire generic drug market by number of prescriptions.

605.    During the relevant time period, Defendants Lannett, Mylan, and Sandoz all sold Levothyroxine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

606.    At all times relevant to this lawsuit there has been more than one manufacturer of Levothyroxine on the market.  Defendants Lannett, Mylan, and Sandoz dominate the market for Fluocinonide.

607.    For more than two years prior to the conspiracy period, the prices for Levothyroxine remained remarkably stable, with the typical pill costing an average of just a few cents.  However, beginning in or around August 2013, Lannett, Mylan, and Sandoz began to implement a series of price increases across all dosage strengths of Levothyroxine, with their average price roughly doubling.  The abrupt price increases were done in lockstep.

608.    The conspirators were able to maintain their collusive price increase into the Summer of 2014, but Defendants determined that they could collusively increase prices even further.  Between May and August 2014, Defendants Mylan, Sandoz, and Lannett colluded to increase prices again

609.    By way of example, with respect to WAC pricing, Defendants set matching WAC prices on their 0.05 mg tablet in quick succession in August and September 2013 and again in April and May 2014, reflecting cumulative increases of more than 125%:

| Product .05 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1000 ct | Mylan | 00378180310 | $0.18 | $0.27 | 9-Aug-13 | 45% |
| 100 ct | Lannett | 00527134201 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 1000 ct | Lannett | 00527134210 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 90 ct | Sandoz | 00781518192 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 1000 ct | Sandoz | 00781518110 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 1000 ct | Mylan | 00378180310 | $0.27 | $0.41 | 25-Apr-14 | 54% |
| 100 ct | Lannett | 00527134201 | $0.27 | $0.41 | 28-Apr-14 | 55% |
| 1000 ct | Lannett | 00527134210 | $0.27 | $0.41 | 28-Apr-14 | 54% |
| 90 ct | Sandoz | 00781518192 | $0.27 | $0.41 | 23-May-14 | 54% |
| 1000 ct | Sandoz | 00781518110 | $0.27 | $0.41 | 23-May-14 | 54% |

610.    Mylan, Sandoz, and Lannett have maintained their prices at these supracompetitive levels and, as of the filing of this Complaint, Plaintiffs continue to pay supracompetitive prices for generic Levothyroxine.

611.    There are no legitimate reasons or competitive explanations for these price hikes. There were no supply shortages or disruptions, no new patents or formulations, and no changes in drug labeling that could explain these dramatic increases.

612.    Upon information and belief, the price increases on Levothyroxine were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Levothyroxine in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events

hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

613.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Marlyand that was attended by representatives from Lannett, Mylan, and Sandoz.  *See* Ex. 1.

614.    On February 20-22, 2013, GPhA held a meeting in Florida that was attended by representatives from Mylan and Sandoz.  *See* Ex. 1.

615.    On April 20-23, 2013, NACDS held its Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Mylan and Sandoz.  *See* Ex. 1.

616.    On June 2-5, 2013, HDMA held its 2013 BLC in Florida.  Representatives from Lannett, Mylan, and Sandoz attended.  *See* Ex. 1.

617.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Lannett, Mylan, and Sandoz.  *See* Ex. 1.

618.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas. Lanett, Mylan, and Sandoz attended.  *See* Ex. 1.

619.    On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by representatives from Lannett, Mylan, and Sandoz.  *See* Ex. 1.

620.    On December 3, 2013, NACDS held its 2013 Dinner that was attended by Mylan and Sandoz.  *See* Ex. 1.

621.    On February 19-21, 2014, GPhA held its Annual Meeting in Florida. Representatives from Mylan and Sandoz attended.  *See* Ex. 1.

622.    On April 1, 2014, HDMA held its Sixth Annual CEO Roundtable in New York. Representatives from Mylan and Sandoz attended.  *See* Ex. 1.

623.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott in Arizona.  The BLC was attended by representatives from Lannett, Mylan, and Sandoz.  *See* Ex. 1.

624.    On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Lannett, Mylan, and Sandoz.  *See* Ex. 1.

625.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo, and representatives from Lannett, Mylan, and Sandoz attended.  *See* Ex. 1.

626.    On December 3, 2014, NACDS held its 2014 Foundation Reception Dinner attended by representatives from Mylan and Sandoz.  *See* Ex. 1.

627.    On June 9-10, 2015, GPhA held a meeting in Maryland attended by representatives from Lannett, Mylan, and Sandoz.  *See* Ex. 1.

628.    Mylan, Sandoz, and Lannett attended trade association events throughout 2015 and 2016.

**T.    Lidocaine-Prilocaine**

629.    The market for Lidocaine-Prilocaine is mature, as Lidocaine-prilocaine has been available in the United States for decades.  It is marketed in the United States under the brand name EMLA.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera have all sold Lidocaine-prilocaine throughout the United States.

630.    At all times relevant to this lawsuit there has been more than one manufacturer of Lidocaine-prilocaine on the market.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera sold Lidocaine-prilocaine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

631.     For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Lidocaine-prilocaine was remarkably stable.  Beginning in mid-2014, Defendants increased their prices abruptly and, for the most part, in unison.

632.     Upon information and belief, Akorn, Hi-Tech, Impax, Sandoz, and Fougera reached an agreement to increase prices for Lidocaine-Prilocaine in the United States from an average of 47 cents per dose in April 2014 to an average price of $1.20 by January 2015.

633.     These extraordinary price increases were not the result of supply shortages, demand spikes, or other competitive market conditions.  There were no relevant labelling changes or reported drug shortages that might have led to price increases.  Nor was there a spike in demand that could explain the price hikes.

634.     Upon information and belief, this agreement to increase prices on Lidocaine-Prilocaine was the result of collusive communications between and among Defendants that were initiated by Sandoz and Fougera to increase pricing and restrain competition for the sale of Lidocaine-Prilocaine in the United States, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry.  The collusive agreement to increase prices on Lidocaine-Prilocaine was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

635.     For example, on October 1-3, 2012, representatvies from Fougera, Impax, and Sandoz attended the GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

636.     On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by Akorn, Impax, and Sandoz.  *See* Ex. 1.

637.     On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida, which was attended by Akorn, Impax, and Sandoz.  *See* Ex. 1.

638.     On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by Fougera, Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

639.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas.  This event was attended by representatives from Akorn, Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

640.     On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by Akorn, Fougera, Hi-Tech, Impax, and Sandoz representatives.  *See* Ex. 1.

641.     On February 28-30, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

642.     On June 1-4, 2014, HDMA held a BLC in the Marriott in Phoenix, Arizona. Representatives from Akorn, Sandoz, and Impax attended.  *See* Ex. 1.

643.     On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Hi-Tech, Fougera, Impax, and Sandoz.  *See* Ex. 1.

644.     On August 23-26, 2014, NACDS held its 2014 Total Store Expo in Boston. Representatives from Akorn, Impax, and Sandoz attended.  *See* Ex. 1.

645.     On October 27-29, 2014, GPhA held its Fall Conference in Bethesda, Maryland. Representatives from Impax, Fougera, and Sandoz attended.  *See* Ex. 1.

646.     Akorn, Hi-Tech, Impax, Sandoz, and Fougera continued to attend trade association events in 2015 and 2016.

**U.     Meprobamate**

647.     The market for Meprobamate is mature, as the drug has been available in the United States since 1955.  Heritage and Dr. Reddy's sold Meprobamate to Plaintiffs and others in the

United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

648.    On March 21, 2013, Heritage's Malek e-mailed O'Mara and instructed him to contact Dr. Reddy's about a possible increase in Meprobamate prices.

649.    On March 22, 2013, Heritage's O'Mara e-mailed a senior sales executive at Dr. Reddy's, Jake Adams ("Adams") to propose that both companies increase their prices for Meprobamate in the United States.

650.    On March 22, 2013, Heritage's O'Mara spoke with the Dr. Reddy's Adams by phone for about nine minutes.  Upon information and belief, during the phone call, the two companies agreed to increase prices on Meprobamate in the United States.  The terms of the agreement were further confirmed in e-mails exchanged between O'Mara and Dr. Reddy's Adams between March 22 and March 25, 2013.

651.    On March 27, 2013, Malek forwarded an RFP to O'Mara that Heritage had received from a prospective purchaser of Meprobamate.  Through e-mails that followed and through about a four minute phone call on March 29, 2013 between O'Mara and Adams, Heritage and Dr. Reddy's took steps to ensure that neither submitted bids that undercut the other's pricing for Meprobamate.

652.    In April 2013, Dr. Reddy's requested that Heritage allow Dr. Reddy's to increase its market share for Meprobamate.  Dr. Reddy's wanted to achieve this by reaching an agreement that Heritage would walk away from its existing Meprobamate business with a national pharmacy chain.  Heritage quickly agreed to give this business to Dr. Reddy's, and by April 2013, Heritage took steps to give up this business so that Dr. Reddy's could take it.

653.    Malek and other employees continued to e-mail and speak by phone throughout May 2013 to ensure that the market for Meprobamate in the United States was allocated to the liking of both Dr. Reddy's and Heritage.

654.    As a result of this anticompetitive conduct, Heritage and Dr. Reddy's increased the prices for Meprobamate sold to Plaintiffs and others in the United States to supracompetitive levels.  This market allocation and price-fixing agreement and the ensuing supracompetitive pricing continued in either force or effect (or both) until at least the end of 2016.

### V.    Metronidazole

655.    The market for Metronidazole is mature, as the drug has been available in the United States since the 1970s.  Defendants G&W, Impax, Sandoz, Teva, and Valeant sold Metronidazole to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.  There are several formulations of Metronidazole including cream, jelly, lotion, and vaginal formulations.

#### 1.    *Metronidazole Cream*

656.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

657.    The GAO Report listed Metronidazole Cream as having experienced an "extraordinary price increase."

658.    These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

### 2. _Metronidazole Jelly_

659.  

660.

661.  The GAO Report listed Metronidazole Jelly as having experienced an "extraordinary price increase."

662.  These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

### 3. _Metronidazole Lotion_

663.

664.

665.  The GAO Report listed Metronidazole Lotion as having experienced an "extraordinary price increase."

666.  These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

4.    *Metronidazole Vaginal*

667.    

668.    ████████████████████████████████████████████.

669.    ███████████████████████████████████████████

670.    Notably, ██████████████████████████ occurred around the same

time that news sources reported that Valeant was dramatically increasing prices on other drugs.

671.    These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.   There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

672.    Upon information and belief, the agreement to increase prices on all formulations of Metronidazole was the result of collusive communications between and among Defendants, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry.  The collusive agreement to increase prices on Metronidazole was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

673.    For example, on August 30-31, 2010, representatives from G&W, Sandoz, and Teva attended the NACDS Pharmacy and Technology Conference in San Diego, California.  *See* Ex. 1.

674.    On August 27-30, 2011, NACDS held a Pharmacy and Technology Conference in Boston.  Representatives from G&W, Sandoz, and Teva attended.  *See* Ex. 1.

675.     On April 24-27, 2012, NACDS held its Annual Meeting.   Representatives from G&W, Impax, Sandoz, and Teva attended.   *See* Ex. 1.

676.     On February 20-22, 2013, GPhA held its annual meeting in Orlando, Florida. Representatives from G&W, Impax, Sandoz, and Teva attended.   *See* Ex. 1.

677.     On December 3, 2014, NACDS held its Foundation and Reception Dinner in New York City.   Representatives from Sandoz, Valeant, and Teva attended.   *See* Ex. 1.

678.     On April 25-28, 2015, NACDS held its annual meeting in Florida.   Representatives from G&W, Impax, Sandoz, Teva, and Valeant attended.   *See* Ex. 1.

**W.     Nimodipine**

679.     The market for Nimodipine is mature, as the drug has been available in the United States in generic form for more than 10 years.   Heritage, Sun (through Caraco), and Teva sold Nimodipine in the United States to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

680.     In June 2012, Malek instructed a Heritage employee, Sather, to reach out to a sales executive at Caraco to discuss an agreement to raise prices and confirm the market allocation that the two companies would abide by in the U.S. market for Nimodipine.   The ensuing communications between Heritage's Sather and Caraco's Susan Knoblauch ("Knoblauch") resulted in an agreement to increase prices on Nimodipine.

681.     In furtherance of this agreement to increase prices, Heritage agreed to submit a sham bid to an RFP from Cardinal, with Heritage intentionally quoting a price to Cardinal that Heritage knew was higher than the price that Caraco was quoting.

682.     In late 2012, the FDA issued a recall on the Nimodipine that Caraco was selling in the United States, which required Caraco to briefly exit the market.

683.    In late April or early May 2013, Malek learned that Caraco would seek to re-enter the Nimodipine market by July 2013.  Malek initiated discussions with Caraco that resulted in an agreement that both companies would continue charging elevated prices on Nimodipine, and Heritage would allow Caraco to retake a certain percentage of the market.

684.    Caraco ultimately reentered the Nimodipine market in November 2013 and implemented the agreement with Heritage by charging the agreed-upon prices.  Upon information and belief, Heritage reciprocated by allowing Sun and Caraco to retake the agreed-upon percentage of the Nimodipine market.

685.    These anticompetitive agreements by Heritage and Sun (through Caraco) resulted in supracompetitive prices for Nimodipine in the United States that persisted as of the filing of this Complaint.

686.    As alleged above, the price increases regarding Nimodipine were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Nimodipine to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### X.    Nystatin

687.    The market for Nystatin is mature, as the drug has been available in the United States since 1950.  The drug is considered an essential medicine by the World Health Organization.  Actavis, Par, Perrigo, Sandoz, Taro, Teva, Heritage, and Sun (through Mutual) sold Nystatin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

688.     During the relevant period, Defendants Actavis, Par, Perrigo, Sandoz, and Taro were the primary manufacturers of Nystatin external cream.

689.     During the relevant period, Defendants Actavis, Perrigo, and Sandoz were the primary manufacturers of Nystatin ointment.

690.     During the relevant period, Defendants Teva, Heritage, and Sun (through Mutual) were the primary manufacturers of Nystatin tablets.

1.     *Nystatin Cream*

691.     In late 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin cream.  Taro and Perrigo increased their prices in very close succession in late 2011.  Par followed the price increase in August and Actavis joined in November 2011.  Sandoz joined the price increase when it re-entered the market in 2013.

692.     In June 2011, Taro announced a dramatic price increase of more than 600%.  Rather than compete on price in order to gain market share, Perrigo followed Taro's increase and raised its own prices to almost identical levels.  Perrigo increased production and managed to gain some market share from 2011-2013, but, consistent with the overarching market allocation (or "fair share") agreement, market prices remained relatively stable.

693.     In August 2011, Par, which only had about 1% of the market, followed the Taro and Perrigo price increase.  Rather than competing on price in order to gain market share, Par followed this price increase.  Over the next few years Par grew its market share, but it did so without competing on price, just as the fair share agreement intended.

694.     In November, Actavis ramped up production of Nystatin cream and re-joined the market.  It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forgo price competition and the prospect of winning a larger share of the market.

Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working.

695.    Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price in order to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

696.    Upon information and belief, the price increases on Nystatin cream were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Nystatin in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

### 2.    *Nystatin Ointment*

697.    In June 2011, after Sandoz and Actavis had ceded the Nystatin ointment market, Perrigo implemented a more than 300% increase.

698.    In early 2012, Actavis increased production of Nystatin ointment. Rather than compete on price and try to steal market share from Perrigo, Actavis increased its list prices to high levels to match Perrigo.

699.    This pattern repeated in the Summer of 2012. Sandoz increased its production. Rather than compete on price to gain market share, Sandoz raised its list price to identical levels as Perrigo and Actavis.

700.    These actions by Actavis and Sandoz reflected the "fair share" agreement understanding.

701.   Upon information and belief, the price increases on Nystatin ointment were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Nystatin in the United States.   These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

3.     *Nystatin Tablets*

702.   Beginning in approximately April 2013, Sun (along with its subsidiary, Mutual) sought to increase the prices of Nystatin.   A senior executive from Sun, Knoblauch, discussed the price increase with Sather of Heritage on April 16, 2013, during a phone call that lasted approximately 40 minutes.   However, the newly hired senior executive at Teva responsible for pricing of Nystatin was initially leery about joining Sun's price increase.

703.   Malek sought to get Teva on board with the price increase.   Malek spoke with Teva's Patel by telephone regarding a possible price increase on Nystatin several times in July 2013, including for about 21 minutes on July 9, 10 minutes on July 23 and for more than approximately 20 minutes on July 30.   Heritage's Sather also discussed with Sun's Knoblauch the conversations Heritage was having with Teva.

704.   The discussions between the three companies were put on hold for a period of time in late 2013, while Teva's Patel went on maternity leave.   Shortly after her return to work, she spoke with Malek about finally implementing the Nystatin price increase during a February 4, 2014 telephone conversation.   Malek and Teva's Patel spoke several additional times about the Nystatin price increase in February and March in order to confirm the agreement.

705.   On April 4, 2014, Teva announced an increase of approximately 100% on its Nystatin pricing.   Around the same time, Malek renewed discussions with Sun to confirm the

timing of Sun's and Heritage's price increases.  As it was Sun that began the collusive discussions on Nystatin roughly one year prior, Sun quickly agreed to implement the price increase.

706.    Beginning in late June 2014, Heritage began announcing to its customers an increase on its Nystatin prices of almost 100%.  Heritage confirmed to Sun the details of its pricing announcements in a detailed text message sent on June 25, 2014.  By July 9, 2014, Heritage had fully implemented the Nystatin price increase.

707.    After Heritage implemented its price increase on Nystatin, a large pharmacy sent an RFP to Teva seeking a competitive bid on Nystatin pricing.  Teva forwarded the RFP to Heritage, confirming that Teva was following the conspiracy pricing.

708.    In August 2014, as it had discussed with Teva and Heritage, Sun (and Mutual) announced and implemented the increased pricing on Nystatin.

709.    As a result of this collusive agreement on Nystatin pricing, Teva, Heritage, and Sun (including Mutual) were able to roughly double the prices for generic Nystatin tablets that they sold to Plaintiffs and others in the United States.  This collusive agreement remained in force or effect (or both) from April 2014 until the present.

### Y.    Paromomycin

710.    The market for Paromomycin is mature, as the drug has been available in the United States since 1960.  The drug is considered an essential medicine by the World Health Organization. Heritage and Sun sold Paromomycin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

711.    Until April 2014, pursuant to the conspiracy's overarching agreement on market allocation, Heritage maintained approximately a 65% market share for Paromomycin and Sun maintained approximately a 35% market share.

712.    During a lengthy phone call on April 22, 2014, Sun's Knoblauch and Heritage's Sather discussed an agreement to raise prices on Paromomycin. Ultimately, it was agreed between the two companies that Sun would exit the market for Paromomycin. Upon information and belief, Heritage agreed to concede market share to Sun on another generic drug in exchange for Sun's agreement to stop manufacturing Paromomycin.

713.    In May 2014, Sun stopped its production of Paromomycin (although it continued to sell its surplus inventory of the drug until approximately January 2015).

714.    Knowing that it would have a complete monopoly for the manufacture of generic Paromomycin in the United States, Heritage decided to raise prices, and on June 26, 2014, Heritage notified its customers that its prices for Paromomycin would double going forward. Upon information and belief, Heritage raised its prices by approximately 100%.

715.    As a result of this unlawful agreement between Heritage and Sun, supracompetitive pricing on generic Paromomycin sold to Plaintiffs and others in the United States persists as of the date of the filing of this Complaint.

**Z.    Pravastatin**

716.    The market for Pravastatin is mature, as generic Pravastatin has been available in the United States for over 10 years. In October 1991, Bristol Meyers Squibb received FDA approval to market Pravachol, which is prescribed to control high cholesterol and triglycerides. Pravastatin is the generic version of Pravachol.

717.    Upon the expiration of Bristol Meyers Squibb's patent in 2006, a number of generic manufacturers applied for ANDAs to market Pravastatin in the United States.  By 2010, Actavis, Apotex, Glenmark, Teva, Dr. Reddy's, Lupin, Zydus, Sandoz and Mylan had all received ANDAs to manufacture and sell generic Pravastatin and each sold Pravastatin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.  As a result, the average cost of a dose of generic Pravastatin sold at a competitive price of less than 10 cents between January 2010 and June 2013.

718.    Beginning in May 2013, Defendants conspired to implement a series of collusive price increases on Pravastatin.  Although the price increases were taken in stair-step fashion, they could not have been implemented without collusion between and among each of the eight generic manufacturers of Pravastatin.

719.    Between July 2013 and October 2013, Actavis, Apotex, Glenmark, Teva, Lupin, Zydus, Sandoz and Mylan each increased their prices for generic Pravastatin sold to Plaintiffs and others in the United States.  The Defendants continued to further raise prices throughout the remainder of 2013.

720.    By way of example, with respect to WAC pricing, Defendants reported nearly identical WACs for their 10 mg products, reflecting increases of more than 100%:

| Product 10 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct | Apotex | 60505016809 | $0.26 | $0.56 | 28-May-13 | 119% |
| 500 ct | Apotex | 60505016805 | $0.26 | $0.56 | 28-May-13 | 119% |
| 90 ct | Zydus | 68382007016 | $0.17 | $0.48 | 14-Jun-13 | 189% |
| 500 ct | Zydus | 68382007005 | $0.15 | $0.48 | 14-Jun-13 | 222% |
| 90 ct | Teva | 00093077198 | $0.17 | $0.48 | 9-Aug-13 | 189% |
| 1000 ct | Teva | 00093077110 | $0.15 | $0.48 | 9-Aug-13 | 221% |
| 90 ct | Lupin | 68180048509 | $0.17 | $0.48 | 28-Aug-13 | 190% |
| 500 ct | Lupin | 68180048502 | $0.15 | $0.48 | 28-Aug-13 | 222% |

721.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Pravastatin, which had experienced extraordinary price increases.  The GAO eventually issued a report in which Pravastatin was identified as experiencing an "extraordinary price increase."

722.    These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

723.    Upon information and belief, the price increases on Pravastatin were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Pravastatin to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

724.    For example, on February 20-22, 2013, GPhA held its annual meeting in Orlando, Florida, which was attended by representatives from Actavis, Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus.  *See* Ex. 1.

725.     On April 20-23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Actavis, Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus.  *See* Ex. 1.

726.     On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  HDMA's June 2013 BLC was attended by representatives from Actavis, Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus.  *See* Ex. 1.

727.     On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Actavis, Apotex, Glenmark, Sandoz, Teva, and Zydus.  *See* Ex. 1.

728.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Actavis, Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus.  *See* Ex. 1.

729.     On September 29-October 2, 2013, HDMA held its 2013 Annual Board and Membership Meeting in White Sulphur Springs, West Virginia.  This conference was attended by representatives from Apotex and Teva.  *See* Ex. 1.

730.     On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Apotex, Glenmark, Lupin, Teva, and Zydus.  *See* Ex. 1.

731.     On December 3, 2013, NACDS held its 2013 NYC Week and annual foundation dinner in New York City, which was attended by representatives from Actavis, Apotex, Sandoz, and Teva.  *See* Ex. 1.

732.     On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by Actavis, Apotex, Lupin, Sandoz, Teva, and Zydus.  *See* Ex. 1.

733.    On April 1, 2014, HDMA held its Sixth Annual CEO Roundtable Fundraiser in New York, which was attended by representatives of Actavis, Apotex, Sandoz, and Teva. *See* Ex. 1.

734.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives of Defendants Actavis, Apotex, Glenmark, Lupin, Sandoz, Teva and Zydus, who were key executives for generic drug sales and pricing. *See* Ex. 1.

735.    On May 12-15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota.  At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."

736.    MMCAP's May 12-15, 2014 National Member Conference was attended by representatives from Actavis, Apotex, and Teva. *See* Ex. 1.

737.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The June 1-4, 2014 BLC was attended by representatives from Actavis, Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus. *See* Ex. 1.

738.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center.  NACDS's August 2014 Total Store Expo was attended by representatives from Actavis, Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus. *See* Ex. 1.

739.    On September 27-October 1, 2014, HDMA held its 2014 Annual Board and Membership Meeting at the Montage in Laguna Beach, California.  HDMA's 2014 meeting was attended by representatives from Actavis, Apotex, and Teva. S*ee* Ex. 1.

740.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner in New York City, which was attended by representatives from Apotex, Sandoz, and Teva. *See* Ex. 1.

741.    Although prices for Pravastatin have receded somewhat from the peak in early 2014, Defendants continue to charge supracompetitive prices for Pravastatin to Plaintiffs and others in the United States.  The conspiracy overcharge remains embedded in the price of Pravastatin that Defendants charge Plaintiffs and others.

**AA.    Propranolol**

742.    The market for Propranolol is mature, as Propranolol has been available in the United States for decades.  The drug is considered an essential medicine by the World Health Organization, and is used by millions of patients in the United States.  The price for Propranolol had fallen steadily since its introduction in the 1960s, and as recently as early 2013, a monthly prescription for Propranolol cost as little as $8.00.

743.    Actavis, Breckenridge, and Upsher-Smith each manufacture Propranolol in capsule form, while Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage manufacture Propranolol in tablet form.  Each sold either Propranolol capsules or tablets (or both) to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint

1.    *Propranolol Capsules*

744.    Actavis, Breckenridge, and Upsher-Smith implemented a collusive price increase beginning in November 2013 on Propranolol capsules.  Breckenridge, which had previously had lower prices for Propranolol capsules, increased its prices for all dosages by 88% to 140%.  Upsher-Smith followed in December with a corresponding price increase on all dosages of

Propranolol capsules that ranged from 49% to 79%, depending on the dosage strength.  In February 2014, Actavis increased prices for all dosages of Propranolol capsules by 64% to 81%, depending on the dosage strength.   Although prices fell slightly from their peak in 2014, Actavis, Breckenridge, and Upsher-Smith continue to price Propranolol capsules at supracompetitive levels as of the filing of this Complaint.  The conspiracy continued in either force or effect until the filing of this Complaint.[27]

745.    Upon information and belief, the price increases on Propranolol capsules were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Propranolol capsules to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications as described in Ex. 1.

2.    *Propranolol Tablets*

746.    Although the conspiring Defendants increased prices on Propranolol capsules by early 2014, Defendants' prices for Propranolol tablets remained stable throughout 2014.

747.    Beginning in January 2015, however, Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage colluded to increase prices on Propranolol tablets as well.  Heritage increased effective prices by 102%-151% in January 2015, and, a few weeks later, Teva, Pliva, and Actavis increased their own prices in March 2015 by 566%-898% and 395%-638%, respectively.  Mylan and Par began increasing their prices soon after, in April and June 2015, by amounts ranging from 55%-607% and 52%-216%, respectively.  Actavis, Mylan, Teva, Pliva, Par, and Heritage continued to

---

[27]      *See generally In re Propranolol Antitrust Litig.*, No. 16-cv-09901 (JSR), 2017 WL 1287515, at *2 & n.1 (Apr. 6, 2017).

increase prices throughout 2015, and by January 2016, Defendants had increased their prices for some strengths of Propranolol tablets by more than 1700%. For example, Actavis raised its prices of 80 mg Propranolol tablets from an average of $0.30 to $0.46 per tablet between December 2014 and November 2015.[28]

748.    Upon information and belief, the price increases on Propranolol tablets were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Propranolol capsules in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications as described in Ex. 1.

749.    With respect to both the capsule and the tablet price increases, even in those instances in which the Defendants did not increase prices in perfect unison, they still managed to align their pricing on a bi-monthly or quarterly basis, which is consistent with an illegal agreement.

750.    Defendants continue to charge supracompetitive prices for Propranolol tablets as of the filing of this Complaint.

**BB.    Theophylline ER**

751.    The market for Theophylline ER is mature, as Theophylline has been used to treat various conditions since approximately 1900. Heritage and Teva sold Theophylline ER to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

---

[28]    *See generally In re Propranolol Antitrust Litig.*, No. 16-cv-09901 (JSR), 2017 WL 1287515, at *2 & n.1 (Apr. 6, 2017).

752.    In February 2014, Teva's Patel spoke with Heritage's Malek for more than an hour regarding a number of potential drugs on which prices could be increased.  Upon information and belief, during that conversation, Heritage and Teva agreed that they would increase prices for Theophylline ER.

753.    Teva agreed that it would lead the price increase for Theophylline ER.  By late April 2014, Teva fully implemented a price increase on the drug of approximately 150%.

754.    During an internal company meeting on April 22, 2014, Malek informed sales employees at Heritage that Heritage would follow Teva's price increase and raise prices for Theophylline ER by approximately 150%.

755.    Heritage began announcing the price increase to customers in late June 2014, and by July 9, 2014, it had fully implemented the collusive 150% price increase of Theophylline ER.

756.    As a result of the unlawful agreement on Theophylline ER between Teva and Heritage, prices for the drug remain at supracompetitive levels as of the filing of this Complaint.

**CC.    Ursodiol**

757.    The market for Ursodiol is mature, as generic versions of Ursodiol have been available in the United States since 2000.  Defendants Actavis, Lannett, and Epic sold Ursodiol to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

758.    At all times relevant to this lawsuit there has been more than one manufacturer of Ursodiol on the market.  Defendants Actavis, Lannett, and Epic dominate the market for Ursodiol.

759.    In the years prior to the conspiracy period, Defendants' average price in the U.S. for Ursodiol were remarkably stable.  Beginning in or around May 2014, Defendants increased their prices for Ursodiol abruptly and, for the most part, in unison.

760.    By way of example, beginning in May 2014, Defendants selling generic Ursodiol set their WACs in near lockstep, reflecting increases from previous WACs on the 300 mg capsule of more than 560%:

| Product cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300 mg | Lannett | 00527132601 | * | $5.11 | 1-May-14 | * |
| 300 mg | Epic | 42806050301 | $0.45 | $5.10 | 6-May-14 | 1034% |
| 300 mg | Actavis | 00591315901 | $0.77 | $5.11 | 24-Jun-14 | 562% |

761.    Ursodiol was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

762.    Furthermore, there are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Ursodiol.  Demand for Ursodiol has not materially changed in the last few years, nor does any change in input costs explain these price increases.  Furthermore, at the time Ursodiol prices were increased in Summer 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

763.    Upon information and belief, the price increases on Ursodiol were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Ursodiol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are highlighted below.

764.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

765.    On June 4-5, 2013, the GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

766.    On June 2-5, 2013, HDMA held its 2013 BLC in Florida.  Representatives from Actavis and Lannett attended the event.  *See* Ex. 1.

767.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas. Representatives from Actavis and Lannett attended.  *See* Ex. 1.

768.    On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

769.    On May 12-15, 2014, MMCAP held its National Member Conference which was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

770.    On June 1-4, 2014, HDMA held its BLC at the JW Marriott in Arizona.  This event was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

771.    On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

772.    On August 23-26, 2014, NACDS held its 2014 TSE in Boston.  Representatives from Actavis, Epic, and Lannett attended.  *See* Ex. 1.

773.    On October 27-29, 2014, GPhA held a meeting in Maryland that attended by Actavis and Lannett.  *See* Ex. 1.

### DD.   <u>Verapamil</u>

774.    The market for Verapamil is mature, as the drug has been available in the United States since 1981.  The drug is considered an essential medicine by the World Health Organization. Actavis, Heritage, and Mylan sold Verapamil to Plaintiffs and others in the United States at

supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

775.    During phone calls with senior sales executives from Mylan and Actavis on April 22 and April 23, 2014, Heritage, Mylan, and Actavis agreed to raise prices on Verapamil in the United States.

776.    Heritage began announcing the price increase to its customers in late June 2014, and had fully implemented the Verapamil price increase by July 9, 2014.

777.    During the Summer of 2014, Mylan and Actavis also implemented the collusive price increase on Verapamil, as agreed by the three Defendants.  As a result of this agreement, prices for Verapamil sold to Plaintiffs and others in the United States remain at supracompetitive levels as of the filing of this Complaint.

### EE.    Zoledronic Acid

778.    The market for Zoledronic Acid is mature, as the drug has been available in generic form since 2013.  The drug is considered an essential medicine by the World Health Organization. Heritage and Dr. Reddy's sold Zoledronic Acid to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

779.    In early 2013, Heritage received approval to market Zoledronic Acid in the United States.  On January 21, 2013, Malek instructed members of his sales team to reach out to Dr. Reddy's – which at the time was the exclusive manufacturer of generic Zoledronic Acid in the United States – to reach an agreement on the price that the two companies would charge and a "fair share" market allocation that each would follow once Heritage entered the market.

780.    Through a number of phone calls in late January 2013 between Heritage's O'Mara and Dr. Reddy's Adams, an agreement was reached that Heritage would be entitled to a 40% market share and Dr. Reddy's could keep the remaining 60% of the market.  The two Defendants also agreed not to compete on pricing for Zoledronic Acid.

781.    Conversations between the two companies in furtherance of the agreement continued in early March 2013, in preparation for Heritage's entry into the market on March 13, 2013.  For example, Heritage employees, at Malek's direction, e-mailed and spoke by telephone with Dr. Reddy's employees on March 1, March 4, March 6, and March 12, 2013.  Heritage employees also exchanged a number of texts with their contacts at Dr. Reddy's on March 12, 2013.

782.    When Heritage began shipping Zoledronic Acid on March 13, 2013, Malek confirmed this to Dr. Reddy's, and he also confirmed the exact prices that Heritage was charging.

783.    On April 19, 2013, in order to conceal the conspiracy, Malek instructed his sales team not to reduce to writing any collusive discussions or agreements relating to Zoledronic Acid or other drugs.

784.    In order to ensure that the market allocation agreement (and the resulting supracompetitive pricing) remained in place, Malek and his counterparts at Dr. Reddy's discussed their bids to potential customers.  For example, in November 2013, Malek e-mailed Dr. Reddy's to discuss an instance in which Dr. Reddy's responded to an RFP with quoted prices below what Heritage was charging.

785.    As a result of these anticompetitive agreements and collusive communications, prices for Zoledronic Acid sold to Plaintiffs and others in the United States remain at supracompetitive levels as of the filing of this Complaint.

XII.   **THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION**

786.   Defendants' anticompetitive conduct alleged in the Complaint constitutes a conspiracy to fix prices and engage in market customer allocation, which is a per se violation of Section 1 of the Sherman Act.  Therefore, Plaintiffs need not define a relevant market.  There are, however, features of the industry relevant to this case that show both (i) that the industry is susceptible to collusion, and (ii) that the price increases were in fact the result of collusion and not the result of conscious parallelism.

787.   Indeed, the U.S. market for each of the Price-Fixed Generic Drugs has been characterized by numerous factors that facilitated Defendants' conspiracy, including: (i) industry concentration; (ii) sufficient numbers to drive competition; (iii) substantial barriers to entry; (iv) demand inelasticity; (v) lack of substitutes; (vi) interchangeability; (vii) absence of non-conspiring competitors; (viii) opportunities for contact and an extremely high level of inter-firm communications; (ix) the magnitude of the price increases; and (x) the reimbursement of generic drugs purchases by third parties.

788.   Since 2005, consolidation has reduced the number of competitors in the generic drug industry, which has rendered the market ripe for collusion.  For example: Teva acquired Ivax Corporation in 2006, Barr Laboratories in 2008 (including Defendant Pliva), Ratiopharm (Germany's second largest generic drug producer) in 2010, and Allergan's generics business (including Actavis) in 2016; Watson Pharmaceuticals acquired Andrx Corporation in 2006; Endo acquired Qualitest in 2010; Perrigo acquired Paddock Laboratories, Inc. in 2011; and Sandoz acquired Fougera in 2012.  As a result of the industry-wide consolidation, for each of the Price-Fixed Generic Drugs, there were between three and ten manufacturers of the generic drugs for sale in the United States during the time period relevant to Plaintiffs' claims, thus rendering the market

for each drug concentrated. Each of the drugs at issue in this Complaint also had at least two sellers. While the numbers were small enough to foster collusion, the number of competitors was enough to suggest that, absent collusion, prices would have approached manufacturers' marginal costs.

789. Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supracompetitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supracompetitive prices. Costs of manufacture, intellectual property, and expenses related to regulatory oversight create substantial barriers to entry in the generic pharmaceutical industry.

790. Each of the Price-Fixed Generic Drugs is medically necessary to the health and well-being of the patient for whom it is prescribed. For that reason, each demonstrates substantial demand inelasticity. Indeed, notwithstanding the substantial price increases alleged in this Complaint, demand for each of the Price-Fixed Generic Drugs dropped very little following the increase in price.

791. There are a lack of available substitute products for each of the Price-Fixed Generic Drugs, because patients face substantial barriers to switching to other drugs, and because patients often face little incentive to switch as a result of the disconnect described in ¶ 107.

792. Because a generic drug must be the therapeutic equivalent of its branded counterpart, each generic drug that is approved for sale in the United States is interchangeable with each other generic drug of the same dosage strength. For example, a 40 mg tablet of Pravastatin manufactured by Mylan is interchangeable with a 40 mg tablet of Pravastatin manufactured by Teva. Accordingly, each of the Price-Fixed Generic Drugs is highly interchangeable from

Defendant to Defendant, and the only way that a Defendant can gain market share is by competing on price.

793.    The Defendants control the markets for each of the Price-Fixed Generic Drugs, which enables them to increase prices without losing market share to non-conspirators.

794.    As alleged above in Section IX, there was a high level of interfirm communications within the generic pharmaceutical industry, and numerous opportunities for such communications through various trade association and similar meetings.

795.    The magnitude of the price increases involved in this case further differentiates them from parallel price increases.

796.    As noted above, there are unique features of the generic drug industry, including the fact that reimbursement for generic drugs to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of the a pharmaceutical's generic equivalent versions.  There is therefore, in the absence of collusion, an enhanced incentive to compete on price within this reimbursement system.

## XIII.  DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ONGOING

797.    As a proximate result of this conspiracy, and during the time period relevant to Plaintiffs' claims, Defendants and co-conspirators charged Plaintiffs and others in the United States supracompetitive prices (*i.e.*, prices above a competitive level) for each of the Price-Fixed Generic Drugs.

798.    Defendants and co-conspirators' conspiracy alleged in this Complaint overcharged Plaintiffs on the Price-Fixed Generic Drugs that Plaintiffs directly purchased from one or more Defendants and co-conspirators.  Even in those instances in which Plaintiffs were able to negotiate

Defendants down from the full overcharge agreed to by conspirators, Defendants' agreements still impacted and artificially elevated the prices paid by Plaintiffs, because each Defendant knew that Plaintiffs would not be able to obtain a competitive price from the Defendant's competitors for each Price-Fixed Generic Drug. Defendants also knew that any new entrants to the market would also follow the conspiracy pricing (or even seek to increase it further) based on the conspiracy's overarching market allocation agreement.

799.    As alleged in this Complaint, during the conspiracy, Defendants and co-conspirators agreed on the timing and amount of price increases for each of the Price-Fixed Generic Drugs. They were successful in achieving these price increases, which enabled them to impose supracompetitive prices on Plaintiffs and others. This was because Defendants knew during the conspiracy that all of them were increasing prices (or offering the same or similar prices) of each Price-Fixed Generic Drug; and the resulting prices were higher than would have occurred if, in the absence of the conspiracy, each Defendant had competed and independently and unilaterally set its own prices for each Price-Fixed Generic Drug. Defendants' coordinated price increases provided them with a higher, unified starting point negotiating prices with Plaintiffs and others for each Price-Fixed Generic Drug than would have resulted if each Defendant had independently and unilaterally set its own price increases for each Price-Fixed Generic Drug.

800.    The conspiracy alleged in this Complaint remains in either force of effect (or both) as of the date Plaintiffs filed this Complaint and Defendants continue to charge Plaintiffs supracompetitive prices for each Price-Fixed Generic Drug as a result of the conspiracy alleged in this Complaint.

801.    Beyond the fact that Defendants continue to sell the Price-Fixed Generic Drugs to Plaintiffs and others in the United States at levels inflated by the conspiracy, Defendants continue

to seek to impose additional collusive price increases on other generic drugs. At an investor conference held on March 14, 2017, in Laguna Niguel, California, Arthur Bedrosian (the CEO of Lannett) boasted behind closed doors that Lannett had just been able to triple the price of a generic drug that day (he did not identify which one) and that Lannett still has the ability to impose additional substantial price increases. Bedrosian's claim can only be true if Defendants continue to conspire.

## XIV.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

802.   Discovery is necessary to determine the full scope of the conspiracy, including the time frame, products, and participants. Plaintiffs reserve the right to amend or supplement this Complaint to add other Defendants, claims, time period, products, or other allegations based upon discovery and further investigation.

## XV.   TOLLING OF THE STATUTE OF LIMITATIONS

803.   The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Complaint were tolled because of one or more of the following events:

(a)   The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of each of the Price-Fixed Generic Drugs tolled the running of the statute of limitations on Plaintiffs' claims;

(b)   On December 12, 2016, the DOJ filed an Information charging Glazer with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of generic Doxycycline and Glyburide sold in the United States. The Glazer criminal proceedings, and the Malek criminal proceedings that were filed one day later, toll

the running of the statutes of limitation on Plaintiffs' claims during the criminal proceedings and

for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i); and/or

(c)     Defendants' affirmative and fraudulent concealment of the conspiracy

prevented Plaintiffs from having notice of their claims more than four years before filing this

Complaint, and tolled the statute of limitations on Plaintiffs' claims.

804.     Each of the overt acts in furtherance of the conspiracy alleged in this Complaint

was done for the purpose of concealing the conspiracy and preventing Plaintiffs and other

purchasers of generic drugs from learning about the conspiracy's existence.   Accordingly,

Plaintiffs did not know or reasonably suspect the existence of their claims more than four years

before filing this Complaint, nor were they aware of any facts more than four years before filing

this Complaint that would have put them on reasonable notice of their claims.   More than four

years before Plaintiffs filed this Complaint, Defendants and their co-conspirators fraudulently

concealed the existence of each Plaintiff's antitrust claim so that each Plaintiff, acting as a

reasonable person, did not know of the existence of its claim at the time.

805.     During the time period relevant to Plaintiffs' claims, including the time period more

than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators

concealed the existence of Plaintiffs' antitrust claims from Plaintiffs as a result of the self-

concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged

in affirmative and deceptive acts of concealment as described below.   As a result, Plaintiffs did

not know, and through the exercise of due diligence (which they exercised) could not have known,

about the existence of their antitrust claims more than four years before filing this Complaint.

806.     During the time period relevant to Plaintiffs' claims, Plaintiffs exercised diligence

in an effort to ensure that the prices that they were paying Defendants for each generic drug that

is the subject of claims in this Complaint were competitive.  For example, Plaintiffs frequently submitted requests for competitive bids on each of the Price-Fixed Generic Drugs to Defendants. Unbeknownst to Plaintiffs, Defendants shared these requests for quotations and took steps to coordinate with their conspirators to ensure that the bids they provided in response to these requests were rigged and were not competitive.

807.    Notwithstanding the self-concealing nature of their conspiracy, during the time period relevant to Plaintiffs' claims, including more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators affirmatively misled Plaintiffs by wrongfully and affirmatively concealing the existence of Plaintiffs' antitrust claims from Plaintiffs.  In addition to the many overt acts alleged above that were undertaken for the purpose of concealing the conspiracy, Defendants took additional steps to conceal their illegal conduct from Plaintiffs and others.  For example:

(a)     During the conspiracy alleged in this Complaint, and as alleged above, Defendants and co-conspirators spoke and met in secret to affirmatively conceal the existence of the conspiracy from Plaintiffs and others.  For each of the numerous meetings between Defendants alleged in this Complaint, Defendants took steps to either conceal the existence of the meeting from Plaintiffs or others, or to create a pretextual explanation for why the meeting occurred.

(b)     During the conspiracy alleged in this Complaint, Defendants made false and pretextual statements about the bids they provided to Plaintiffs and others in response to requests from Plaintiffs and others for competitive bids.  For example, upon information and belief, when Cardinal requested that Heritage provide a competitive bid for Nimodipine in June 2012, Heritage made representations to Cardinal that the sham bid that Heritage submitted in response (and that Heritage had coordinated with Sun and Caraco in advance) was the lowest price that Heritage

could provide.  In reality, Heritage could have manufactured and sold the drug for substantially less than it quoted to Cardinal, but Heritage had agreed in advance with Sun and Caraco that Heritage would not submit a competitive price in response to Cardinal's request.  Accordingly, Heritage's false statements to Cardinal were intended to conceal from all purchasers of Nimodipine (and all other generic drugs) the existence of the conspiracy.

(c)     During the conspiracy alleged in this Complaint, Defendants took steps to ensure that their communications in furtherance of the conspiracy were not recorded in writing. For example, on April 19, 2013, Malek instructed his employees at Heritage not to keep in writing any evidence of the agreements that Heritage was negotiating (and that it would soon reach) with other Defendants relating to the Zoledronic Acid (and other drugs).  Similarly, during the July 1, 2014 telephone conversation in which a senior sales executive at Heritage discussed the collusive price increases of Glyburide and Fosinopril HCTZ with a senior sales executive at Citron, the Citron representative told the Heritage representative not to communicate with Citron through e-mail.

(d)     During the conspiracy alleged in this Complaint, Defendants took steps to confine knowledge of the conspiracy to a small group of senior executives for the purpose (and with the effect) of concealing the conspiracy's existence.  For example, during the same July 1, 2014 telephone conversation between Heritage and Citron, the Citron representative told the Heritage representative to communicate with a specifically designated employee of Citron that was fully briefed on the conspiracy.

(e)     During the conspiracy alleged in this Complaint, Defendants discussed and coordinated the timing of their price increase announcements for the purpose of making each price increase seem like it was each Defendant's independent decision to raise prices even though, in

reality, it was not.   For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine.  For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz issued its matching price increase on May 23, 2014.  Also on May 23, 2014, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering the announcement of these price increases, Sandoz and Mylan intended to convince generic drug purchasers such as Plaintiffs and others that the latter price increase was the independent response to the initial price increase.  As the allegations in this Complaint make clear though, Defendants actively discussed, coordinated, and agreed to these price increases in secret, in order to conceal the existence of the conspiracy.

808.   During the conspiracy, including more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiffs; and Plaintiffs were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

809.   As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, each Plaintiff did not have actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led any Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this Complaint, more than four years before Plaintiffs filed this Complaint.  Before then, no Plaintiff was aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in this Complaint.

810. Accordingly, Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for each of Plaintiffs' claims.

811. Plaintiffs' claims have been brought within the applicable statute of limitations period.

## XVI. ANTITRUST VIOLATIONS

### A. Count One – Overarching Conspiracy on All Price-Fixed Generic Drugs Against All Defendants

812. Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

813. By 2011, as alleged above, the market for manufacture, pricing and sale of Price-Fixed Generic Drugs had become conducive to cartelization.  The Defendants' efforts to manipulate the pricing and sale of some Price-Fixed Generic Drugs as alleged above infected and over time spread to the pricing and sale of all Price-Fixed Generic Drugs as alleged above. Beginning at a time yet to be determined, but no later than June 2011, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Price-Fixed Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

814. Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits.  This objective was a common goal among all the Defendants.  In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Price-Fixed Generic Drugs.

815.   Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Price-Fixed Generic Drugs in order to achieve supracompetitive profits.   Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1.   Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

816.   Every Defendant intended to join the all-Price-Fixed Generic Drugs conspiracy.

817.   The Core Conspirators, consisting of Actavis, Heritage, Mylan/UDL, Par, Sun, Taro, Teva/Pliva, and the Sandoz Defendants, engaged in the conduct alleged in this Complaint and directed the implementation of the all Price-Fixed Generic Drugs conspiracy.   Each of these Core Conspirators played a prominent role in the overarching all-Price-Fixed Generic Drugs conspiracy.   Each of them sold more than five of the Price-Fixed Generic Drugs, and most sold 10 or more.   For example, Heritage sold 15 Price-Fixed Generic Drugs, and Taro and Sun (which are commonly owned) together sold 11 Price-Fixed Generic Drugs.   Collectively, they sold all of the Price-Fixed Generic Drugs.   The Additional Conspirators, consisting of Akorn/Hi-Tech, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Epic, G&W, Fougera, Glenmark, Impax, Lannett, Lupin, Mayne, Morton Grove/Wockhardt, Perrigo, Teligent, Upsher-Smith, West-Ward, Valeant, and Zydus also engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy.   But each of the Additional Conspirators sold fewer Price-Fixed Generic Drugs than any of the Core Conspirators.   Some only sold one Price-Fixed Generic Drug.

However, the participation of the Additional Conspirators in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured. Absent the participation of the Additional Conspirators, the Core Conspirators' efforts to increase the prices of the all-Price-Fixed Generic Drugs would have been thwarted because it would have been in the independent interests of the Additional Conspirators to increase their market share by refusing to follow the price increases of the Core Conspirators. A single overarching market allocation agreement facilitated all of the collusive agreements alleged in this Complaint. And, this overarching agreement was negotiated and policed through the industry meetings attended by all Defendants. In this way, and for the reasons explained below in ¶¶ 819 to 826, there was substantial overlap between all Defendants in the overarching conspiracy.

818.   By joining the all-Price-Fixed Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the success of the all-Price-Fixed Generic Drugs Conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in Section X, *supra*, were interdependent for at least six reasons.

819.   First, every agreement on each of the Price-Fixed Generics was interdependent because every agreement was the byproduct of the same overlapping overarching market allocation agreement. Indeed, the interdependent nature of these agreements was what allowed the Defendants to enforce and police every agreement reached in furtherance of the all-Price-Fixed Generics Conspiracy. For example, Defendants with a proportionately smaller market shares of certain drugs agreed not to compete for additional market share in return for an agreement that their competitors would not compete for additional market share of other drugs for which they enjoyed a proportionately larger market share. Further, because each Defendant knew that its market share was safe from competition, market share itself became a fungible commodity that

could be traded.  For example, as alleged in ¶ 464, Mylan agreed to concede market share for Doxycycline to Heritage in consideration for Heritage conceding market share to Mylan for a second generic drug.

820.    The overarching all-Price-Fixed Generics conspiracy also benefitted Additional Conspirators that manufactured just one of the Price-Fixed Generics.  For example, when Additional Conspirator Mayne entered the Doxy DR market that had been cartelized by Core Conspirators Heritage and Mylan, the overarching conspiracy allowed Defendants to reach an agreement that allocated to Mayne a percentage of the market and prevented price competition that would have disturbed the prevailing supracompetitive prices on Doxy DR.  The portion of Doxy DR sales allocated to Mayne by agreement with Heritage and Mylan yielded profits sufficient to compensate Mayne for not competing on price to gain sales of Doxy DR at the supracompetitive price level.

821.    In this manner, the existence of the overarching conspiracy permitted the Core Conspirators to induce the collusive agreements of the Additional Conspirators as needed to raise prices on each of the Price Fixed Generic Drugs.  In other words, the Core Conspirators allocated sufficient sales to Additional Conspirators to incentivize and compensate them for adhering to the collusive scheme.  Absent such compensation, the Additional Conspirators would have acted in their unilateral self interests by lowering their prices to gain profitable sales.  For example, the existence of the overarching conspiracy allowed Core Conspirator Actavis to persuade Additional Conspirator Breckenridge to lead a series collusive price increase on Propranolol capsules and to persuade Additional Conspirator Epic to raise its prices by more than 1000% on Ursodiol, notwithstanding the fact that the actions taken by Breckenridge and Epic were against their respective self-interests and would not have been taken absent collusion.  Similarly, the existence

of the overarching conspiracy facilitated the ability of Defendants, including Core Conspirators Actavis, Mylan, and Teva, to reach an agreement with Additional Conspirator Lupin that would triple its prices on Pravastatin. And, the overarching conspiracy facilitated the collusive agreement of Additional Conspirators Morton Grove and Wockhardt to raise prices on Clobetasol, and Additional Conspirator Teligent's collusive agreement to raise prices on Econazole. And although the Core Conspirators were the primary facilitators of the collusive conduct alleged in this Complaint, the success of the overarching conspiracy was also dependent on the agreement (or understanding) that the Additional Conspirators would participate in the overarching conspiracy as well. For example, Breckenridge's participation in the conspiracy was dependent on its knowledge – gained in part from attending the many industry events alleged in Section VIII, *supra* – that each of the Additional Conspirators would follow the conspiracy's supracompetitive pricing and market allocation agreements in the event that any entered the market for Propranolol.

822. Second, the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented. For example, as alleged in ¶ 584, Teva declined to offer a competitive bid to a customer that sought Glyburide based not only on its agreement with Heritage on Glyburide, but also based on its collusion with Heritage on a second drug. In other words, Teva knew that undercutting the conspiratorial price increase on Glyburide would impact not only Glyburide, but also the conspiratorial price increases on other drugs. Because a number of another Defendants manufactured multiple Price-Fixed Generic Drugs, a manufacturer who cheated on the conspiracy as to one Price-Fixed Generic Drug would be subject or susceptible to punishment by the cartel with respect to accounts for that drug, along with each of the other Price-Fixed Generic Drugs that

the cheater manufactured.  Thus, the overarching conspiracy enhanced Defendants' ability to enforce the conspiracy, both for conspirators that manufactured many Price-Fixed Generic Drugs, and for those that manufactured just one.  For example, Mayne (which manufactured only Doxycycline) knew that Mylan and Heritage had an added incentive to follow through on the unlawful agreements on Doxycycline, which helped to ensure that Mayne also committed to the conspiracy.  Indeed, Mylan and Heritage shared a strong incentive to reward Mayne for its adherence to the overarching conspiracy.

823.   Third, and along the same lines, the coordination of price increases and market allocation agreements across multiple Price-Fixed Generic Drugs allowed Defendants to police individual conspiratorial agreements and better conceal the conspiracy from Plaintiffs and others. For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine.  For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz increased its matching price increase on May 23, 2014.  That same day, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering these price increases in a "my turn, your turn" fashion, Sandoz and Mylan were able to ensure that each would follow through with its promise to increase prices (as they had unlawfully agreed), while avoiding announcing price increases on the same day or extremely close in time.  And for the same reasons explained in ¶¶ 819–822, the ability of Core Conspirators such as Sandoz and Mylan to compel each other's compliance with the unlawful agreement helped to ensure that the Additional Conspirators, some of whom manufactured just one of the drugs subject to staggered price increases – such as Lannett (Levothyroxine) or Par (Amitriptyline) – would also commit to the unlawful agreement, because they were promised a sufficient volume of profitable sales to compensate for their forbearance.

824.   Fourth, each successful conspiratorial price fixing agreement helped the Defendants by reducing the quantity produced of the drug, which in turn reduced demand for the raw materials required to manufacture that drug.   Because all of the drugs involved in the conspiracy shared common inputs such as binding agents, the reduction in supply of Propranolol (for example) helped to reduce the demand for these inputs, which reduced the cost to produce not only Propranolol, but also each of the other Price-Fixed Generic Drugs, which also used the same binding agents.

825.   Fifth, with each successful price increase, Defendants were able to commit a portion of their production capacity to a drug priced substantially above marginal cost.   However, successful price increases also incentivized other manufacturers to substitute capacity towards the high margin drugs.   Accordingly, it was necessary for Defendants to implement the numerous conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supracompetitive profits.   Further, in the instances, if any, that the Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug.   For example, Fougera stopped production of Fluocinonide in January 2015, after the collusive price increase had been implemented on the drug.   Similarly, Teva discontinued production of Doxy Hyclate in May 2013, after the collusive price increase had been implemented on the drug.

826.   Sixth, certain of the Price-Fixed Generic Drugs are subject to a degree of long-run demand-side substitution.   For example, the topical corticosteroids – Fluocinonide, Desonide, and Clobetasol – are all used for similar purposes.   The same is true of the oral diabetes drugs (Glipizide, Glyburide, and Glyburide-Metformin).   Accordingly, the success of certain of the

conspiratorial price increases for the Price-Fixed Generic Drugs were relevant to the long-term success of other of the conspiratorial price increases.

827.   The contract, combination and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

828.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(c)   To control the production and/or sale of the Price-Fixed Generic Drugs to Plaintiffs and others in the United States; and/or

(d)   To earn supracompetitive profits on the price of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States that resulted from the collusion alleged in this Complaint.

829.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)   They agreed to exchange, and did exchange, current and future price information about the Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of the Price-Fixed Generic Drugs;

(b)     They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Price-Fixed Generic Drugs sold in the United States;

(c)     They agreed on prices, price levels, and/or production levels of the Price-Fixed Generic Drugs in the United States; and/or

(d)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

830.    Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Price-Fixed Generic Drugs to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Price-Fixed Generic Drugs to Plaintiffs and/or others in the United States.

831.    As a result of this conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of the Price-Fixed Generic Drugs among Defendants to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)     Prices for the Price-Fixed Generic Drugs sold by Defendants to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of the Price-Fixed Generic Drugs produced and sold by Defendants have been deprived of the benefit of free and open competition.

832.    Each Plaintiff and/or its assignor has been injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of the Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

**B.     Counts Two through Thirty-Two (Individual Conspiracies)**

1.     *Table of Individual Counts*

833.    For ease of reference, the individual product conspiracies alleged in Counts Two through Thirty-Two, which are pled in full below, involve the following drugs and the following Defendants, as indicated on the table below.  The Defendants named in each of these individual product conspiracies are also identified in the chart below.  For the purposes of Counts Two through Thirty-Two, the term "Defendants" refers to only those companies identified in each individual Count.

| Count | Generic Drug | Defendants | Alleged Time Period |
|---|---|---|---|
| 2 | Acetazolamide | Heritage, Lannett, Taro, Teva, Zydus,  Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Mayne, Mylan, Par, Sandoz, Sun | Spring 2012 to the present |
| 3 | Albuterol | Mylan, Sun | March 2013 to the present |
| 4 | Amitriptyline | Mylan, Par, Sandoz | May 2014 to present |
| 5 | Baclofen | Lannett, Par, Teva, Upsher-Smith | February 2014 to present |
| 6 | Benazepril HCTZ | Mylan, Sandoz | August 2013 to present |
| 7 | Clobetasol | Actavis, Akorn, Fougera, Hi-Tech, Morton Grove,  Perrigo, Sandoz, Taro, Wockhardt | June 2014 to the present |
| 8 | Clomipramine | Mylan, Sandoz, Taro | May 2013 to the present |
| 9 | Desonide | Actavis, Fougera, Perrigo, Sandoz, Taro | May 2013 to the present |
| 10 | Digoxin | Impax, Lannett, Mylan, Par, West-Ward | October 2013 to the present |
| 11 | Divalproex ER | Dr. Reddy's, Mylan, Par, Zydus | June 2013 to the present |
| 12 | Doxycycline | Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun, West-Ward, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Sandoz, Teva, Zydus | October 2012 to the present |
| 13 | Econazole | Fougera, Perrigo, Taro, Teligent | June 2014 to the present |
| 14 | Fluocinonide | Actavis, Taro, Teva | June 2014 to the present |
| 15 | Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, Sandoz,  Actavis, Apotex, Dr. Reddy's, Lannett, Mayne, Mylan, Par, Sun, Teva, Zydus | April 2014 to the present |
| 16 | Glipizide | Heritage, Mylan, Teva,  Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Zydus | April 2014 to the present |
| 17 | Glyburide | Aurobindo, Citron, Heritage, Teva, Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Zydus | April 2014 to the present |
| 18 | Glyburide-Metformin | Actavis, Aurobindo, Citron, Heritage, Teva,  Apotex, Dr. | April 2014 to the present |

| | | Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Zydus | |
|---|---|---|---|
| 19 | Leflunomide | Apotex, Heritage, Teva, Actavis, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva, Zydus | April 2014 to the present |
| 20 | Levothyroxine | Lannett, Mylan, Sandoz | August 2013 to the present |
| 21 | Lidocaine-Prilocaine | Akorn, Fougera, Hi-Tech, Impax, Sandoz | March 2014 to present |
| 22 | Meprobamate | Dr. Reddy's, Heritage, Actavis, Apotex, Aurobindo, Citron, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva, Zydus | March 2013 to the present |
| 23 | Metronidazole | G&W, Impax, Sandoz, Teva, and Valeant | Summer 2011 to the present |
| 24 | Nimodipine | Heritage, Sun, Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Teva, Zydus | June 2012 to the present |
| 25 | Nystatin | Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teva, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Zydus | Summer 2011 to the present |
| 26 | Paromomycin | Heritage, Sun, Actavis, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, Zydus | April 2014 to the present |
| 27 | Pravastatin | Actavis, Apotex, Glenmark, Lupin, Mylan, Sandoz, Teva, Zydus | May 2013 to the present |
| 28 | Propranolol | Actavis, Breckenridge, Heritage, Mylan, Par, Teva, Upsher-Smith | November 2013 to the present |
| 29 | Theophylline ER | Heritage, Teva, Actavis, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Zydus | February 2014 to the present |
| 30 | Ursodiol | Actavis, Epic, Lannett | May 2014 to the present |
| 31 | Verapamil | Actavis, Heritage, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, Zydus | April 2014 to the present |

| 32 | Zoledronic Acid | Dr. Reddy's, Heritage, Actavis, Apotex, Aurobindo, Citron, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva, Zydus | January 2013 to the present |

2.   *Count Two – Acetazolamide Overarching Conspiracy (Against Heritage, Lannett, Taro, Teva, Zydus, Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Mayne, Mylan, Par, Sandoz, Sun)*

834.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

835.   Beginning at a time yet to be determined, but no later than Spring 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Acetazolamide to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

836.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Acetazolamide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

837.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Acetazolamide sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Acetazolamide sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Acetazolamide to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Acetazolamide sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

838.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Acetazolamide sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Acetazolamide;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Acetazolamide sold in the United States;

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

839.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Acetazolamide to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Acetazolamide to Plaintiffs and/or others in the United States.

840.     As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Acetazolamide among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Acetazolamide sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Acetazolamide produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

841.     Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Acetazolamide is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

3.     *Count Three – Albuterol Conspiracy (Against Mylan and Sun)*

842.     Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

843.     Beginning at a time yet to be determined, but no later than March 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to

compete on the sale of Albuterol to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

844.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Albuterol in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

845.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Albuterol sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Albuterol sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Albuterol to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Albuterol sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

846.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Albuterol sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Albuterol;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Albuterol sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

847.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Albuterol to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Albuterol to Plaintiffs and/or others in the United States.

848.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Albuterol among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Albuterol sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Albuterol produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

849.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Albuterol is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

4.      *Count Four – Amitriptyline Conspiracy (Against Mylan, Par, and Sandoz)*

850.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

851.    Beginning at a time yet to be determined, but no later than May 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Amitriptyline to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

852.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Amitriptyline in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

853.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Amitriptyline sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Amitriptyline sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Amitriptyline to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Amitriptyline sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

854.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Amitriptyline sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Amitriptyline;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Amitriptyline sold in the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

855.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Amitriptyline to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their

conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Amitriptyline to Plaintiffs and/or others in the United States.

856.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Amitriptyline among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Amitriptyline sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Amitriptyline produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

857.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Amitriptyline is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

5.    _Count Five – Baclofen Conspiracy (Against Lannett, Par, Teva, and Upsher-Smith)_

858.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

859.    Beginning at a time yet to be determined, but no later than February 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Baclofen to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

860.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Baclofen in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

861.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)      To fix, stabilize, maintain, and/or raise prices of Baclofen sold to Plaintiffs and others in the United States;

(b)      To allocate customers, the volume of sales, and/or market shares of Baclofen sold to Plaintiffs and others in the United States;

(c)      To control the production and/or sale of Baclofen to Plaintiffs and others in the United States; and/or

(d)      To earn supracompetitive profits on the price of Baclofen sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

862.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Baclofen sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Baclofen;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Baclofen sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

863.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Baclofen to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Baclofen to Plaintiffs and/or others in the United States.

864.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Baclofen among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Baclofen sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Baclofen produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

865.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Baclofen is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

6.      *Count Six – Benazepril HCTZ (Against Mylan and Sandoz)*

866.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

867.    Beginning at a time yet to be determined, but no later than August 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Benazepril HCTZ to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

868.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Benazepril HCTZ in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

869. The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a) To fix, stabilize, maintain, and/or raise prices of Benazepril HCTZ sold to Plaintiffs and others in the United States;

(b) To allocate customers, the volume of sales, and/or market shares of Benazepril HCTZ sold to Plaintiffs and others in the United States;

(c) To control the production and/or sale of Benazepril HCTZ to Plaintiffs and others in the United States; and/or

(d) To earn supracompetitive profits on the price of Benazepril HCTZ sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

870. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a) They agreed to exchange, and did exchange, current and future price information about Benazepril HCTZ sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Benazepril HCTZ;

(b) They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Benazepril HCTZ sold in the United States; and/or

(c) They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

871. Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above,

including, without limitation, participating in conversations and meetings to discuss the prices of Benazepril HCTZ to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Benazepril HCTZ to Plaintiffs and/or others in the United States.

872.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Benazepril HCTZ among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Benazepril HCTZ sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Benazepril HCTZ produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

873.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Benazepril HCTZ is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

7.   *Count Seven – Clobetasol Conspiracy (Against Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt)*

874.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

875.   Beginning at a time yet to be determined, but no later than June 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Clobetasol to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

876.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Clobetasol in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

877.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Clobetasol sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Clobetasol sold to Plaintiffs and others in the United States;

(c)   To control the production and/or sale of Clobetasol to Plaintiffs and others in the United States; and/or

(d)   To earn supracompetitive profits on the price of Clobetasol sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

878.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Clobetasol sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Clobetasol;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Clobetasol sold in the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

879.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Clobetasol to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Clobetasol to Plaintiffs and/or others in the United States.

880.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Clobetasol among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Clobetasol sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Clobetasol produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

881.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Clobetasol is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

8.      _Count Eight – Clomipramine Conspiracy (Against Mylan, Sandoz, and Taro)_

882.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

883.    Beginning at a time yet to be determined, but no later than May 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Clomipramine to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

884.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the

production, pricing, marketing, and/or sale of Clomipramine in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

885. The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a) To fix, stabilize, maintain, and/or raise prices of Clomipramine sold to Plaintiffs and others in the United States;

(b) To allocate customers, the volume of sales, and/or market shares of Clomipramine sold to Plaintiffs and others in the United States;

(c) To control the production and/or sale of Clomipramine to Plaintiffs and others in the United States; and/or

(d) To earn supracompetitive profits on the price of Clomipramine sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

886. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a) They agreed to exchange, and did exchange, current and future price information about Clomipramine sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Clomipramine;

(b) They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Clomipramine sold in the United States; and/or

(c) They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

887.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Clomipramine to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Clomipramine to Plaintiffs and/or others in the United States.

888.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Clomipramine among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Clomipramine sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Clomipramine produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

889.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Clomipramine is an injury of the type the antitrust laws were

designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

9.   *Count Nine – Desonide Conspiracy (Against Actavis, Fougera, Perrigo, Sandoz, and Taro)*

890.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

891.   Beginning at a time yet to be determined, but no later than May 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Desonide in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

892.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Desonide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

893.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Desonide sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Desonide sold to Plaintiffs and others in the United States;

(c)   To control the production and/or sale of Desonide to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Desonide sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

894.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Desonide sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Desonide;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Desonide sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

895.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Desonide to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Desonide to Plaintiffs and/or others in the United States.

896.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Desonide among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Desonide sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Desonide produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

897.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Desonide is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

10.    *Count Ten – Digoxin Conspiracy (Against Impax, Lannett, Mylan, Par, and West-Ward)*

898.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

899.    Beginning at a time yet to be determined, but no later than October 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Digoxin to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

900.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the

production, pricing, marketing, and/or sale of Digoxin in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

901.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Digoxin sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Digoxin sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Digoxin to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Digoxin sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

902.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Digoxin sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Digoxin;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Digoxin sold in the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

903.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Digoxin to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Digoxin to Plaintiffs and/or others in the United States.

904.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Digoxin among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Digoxin sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Digoxin produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

905.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's

injury as a direct purchaser of Digoxin is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

           11.    *Count Eleven – Divalproex ER Conspiracy (Against Dr. Reddy's, Mylan, Par, and Zydus)*

906.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

907.    Beginning at a time yet to be determined, but no later than June 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Divalproex ER to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

908.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Divalproex ER in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

909.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

        (a)    To fix, stabilize, maintain, and/or raise prices of Divalproex ER sold to Plaintiffs and others in the United States;

        (b)    To allocate customers, the volume of sales, and/or market shares of Divalproex ER sold to Plaintiffs and others in the United States;

        (c)    To control the production and/or sale of Divalproex ER to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Divalproex ER sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

910.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Divalproex ER sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Divalproex ER;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Divalproex ER sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

911.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Divalproex ER to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Divalproex ER to Plaintiffs and/or others in the United States.

912.     As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Divalproex ER among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Divalproex ER sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Divalproex ER produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

913.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Divalproex ER is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

12.     *Count Twelve – Doxycycline Overarching Conspiracy (Against Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun, West-Ward, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Sandoz, Teva, Zydus)*

914.    Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

915.    Beginning at a time yet to be determined, but no later than October 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Doxycycline to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

916.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Doxycycline in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

917.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Doxycycline sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Doxycycline sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Doxycycline to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Doxycycline sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

918.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Doxycycline sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Doxycycline;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Doxycycline sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

919.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Doxycycline to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Doxycycline to Plaintiffs and/or others in the United States.

920.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Doxycycline among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Doxycycline sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Doxycycline produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

921.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Doxycycline is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

13.   *Count Thirteen – Econazole Conspiracy (Against Fougera, Perrigo, Taro, and Teligent)*

922.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

923.   Beginning at a time yet to be determined, but no later than June 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Econazole to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

924.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Econazole in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

925.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Econazole sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Econazole sold to Plaintiffs and others in the United States;

(c)      To control the production and/or sale of Econazole to Plaintiffs and others in the United States; and/or

(d)      To earn supracompetitive profits on the price of Econazole sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

926.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)      They agreed to exchange, and did exchange, current and future price information about Econazole sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Econazole;

(b)      They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Econazole sold in the United States; and/or

(c)      They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

927.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Econazole to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Econazole to Plaintiffs and/or others in the United States.

928.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Econazole among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Econazole sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Econazole produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

929.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Econazole is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

14.    _Count Fourteen – Fluocinonide Conspiracy (Against Actavis, Taro, and Teva)_

930.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

931.    Beginning at a time yet to be determined, but no later than June 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to

compete on the sale of Fluocinonide to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

932. The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Fluocinonide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

933. The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a) To fix, stabilize, maintain, and/or raise prices of Fluocinonide sold to Plaintiffs and others in the United States;

(b) To allocate customers, the volume of sales, and/or market shares of Fluocinonide sold to Plaintiffs and others in the United States;

(c) To control the production and/or sale of Fluocinonide to Plaintiffs and others in the United States; and/or

(d) To earn supracompetitive profits on the price of Fluocinonide sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

934. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a) They agreed to exchange, and did exchange, current and future price information about Fluocinonide sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Fluocinonide;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Fluocinonide sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

935.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Fluocinonide to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Fluocinonide to Plaintiffs and/or others in the United States.

936.     As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Fluocinonide among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Fluocinonide sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Fluocinonide produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

937.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Fluocinonide is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

15.     *Count Fifteen – Fosinopril HCTZ Overarching Conspiracy (Against Aurobindo, Citron, Glenmark, Heritage, Sandoz, Actavis, Apotex, Dr. Reddy's, Lannett, Mayne, Mylan, Par, Sun, Teva, Zydus)*

938.    Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

939.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Fosinopril HCTZ in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

940.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Fosinopril HCTZ in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

941.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a) To fix, stabilize, maintain, and/or raise prices of Fosinopril HCTZ sold to Plaintiffs and others in the United States;

(b) To allocate customers, the volume of sales, and/or market shares of Fosinopril HCTZ sold to Plaintiffs and others in the United States;

(c) To control the production and/or sale of Fosinopril HCTZ to Plaintiffs and others in the United States; and/or

(d) To earn supracompetitive profits on the price of Fosinopril HCTZ sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

942. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a) They agreed to exchange, and did exchange, current and future price information about Fosinopril HCTZ sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Fosinopril HCTZ;

(b) They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Fosinopril HCTZ sold in the United States; and/or

(c) They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

943. Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Fosinopril HCTZ to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their

conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Fosinopril HCTZ to Plaintiffs and/or others in the United States.

944.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Fosinopril HCTZ among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Fosinopril HCTZ sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Fosinopril HCTZ produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

945.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Fosinopril HCTZ is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

16.    *Count Sixteen – Glipizide Overarching Conspiracy (Against Heritage, Mylan, Teva, Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Zydus)*

946.    Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

228

947.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Glipizide to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

948.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Glipizide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

949.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Glipizide sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Glipizide sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Glipizide to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Glipizide sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

950.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Glipizide sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Glipizide;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Glipizide sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

951.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Glipizide to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Glipizide to Plaintiffs and/or others in the United States.

952.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Glipizide among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Glipizide sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Glipizide produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

953.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Glipizide is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

17.    *Count Seventeen – Glyburide Overarching Conspiracy (Against Aurobindo, Citron, Heritage, Teva, Actavis, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Zydus)*

954.    Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

955.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Glyburide to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

956.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Glyburide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

957.     The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Glyburide sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Glyburide sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Glyburide to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Glyburide sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

958.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Glyburide sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Glyburide;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Glyburide sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

959.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above,

including, without limitation, participating in conversations and meetings to discuss the prices of Glyburide to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Glyburide to Plaintiffs and/or others in the United States.

960.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)   Price competition in the sale of Glyburide among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)   Prices for Glyburide sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)   Plaintiffs and other direct purchasers of Glyburide produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

961.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Glyburide is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

18.   _Count Eighteen - Glyburide-Metformin Overarching Conspiracy (Against Actavis, Aurobindo, Heritage, Citron, Teva, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Zydus)_

962.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

963.   Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Glyburide-Metformin to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

964.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Glyburide-Metformin in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

965.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Glyburide-Metformin sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Glyburide-Metformin sold to Plaintiffs and others in the United States;

(c)   To control the production and/or sale of Glyburide-Metformin to Plaintiffs and others in the United States; and/or

(d)   To earn supracompetitive profits on the price of Glyburide-Metformin sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

966.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)   They agreed to exchange, and did exchange, current and future price information about Glyburide-Metformin sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Glyburide-Metformin;

(b)   They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Glyburide-Metformin sold in the United States; and/or

(c)   They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

967.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Glyburide-Metformin to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Glyburide-Metformin to Plaintiffs and/or others in the United States.

968.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Glyburide-Metformin among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Glyburide-Metformin sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Glyburide-Metformin produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

969.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Glyburide-Metformin is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

19.    *Count Nineteen – Leflunomide Overarching Conspiracy (Against Apotex, Heritage, Teva, Actavis, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva, Zydus)*

970.    Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

971.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Leflunomide to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

972.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Leflunomide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

973.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Leflunomide sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Leflunomide sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Leflunomide to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Leflunomide sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

974.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Leflunomide sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Leflunomide;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Leflunomide sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

975.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Leflunomide to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Leflunomide to Plaintiffs and/or others in the United States.

976.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Leflunomide among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Leflunomide sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Leflunomide produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

977.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Leflunomide is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

20.   *Count Twenty – Levothyroxine Conspiracy (Against Lannett, Mylan, and Sandoz)*

978.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

979.   Beginning at a time yet to be determined, but no later than August 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Levothyroxine to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

980.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Levothyroxine in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

981.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Levothyroxine sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Levothyroxine sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Levothyroxine to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Levothyroxine sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

982.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Levothyroxine sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Levothyroxine;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Levothyroxine sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

983.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Levothyroxine to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Levothyroxine to Plaintiffs and/or others in the United States.

984.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Levothyroxine among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Levothyroxine sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Levothyroxine produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

985.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Levothyroxine is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

21.    *Count Twenty-One – Lidocaine-Prilocaine Conspiracy (Against Akorn, Fougera, Hi-Tech, Impax, and Sandoz)*

986.    Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

987.    Beginning at a time yet to be determined, but no later than March 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Lidocaine-prilocaine to Plaintiffs and others in the United States in

unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

988.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Lidocaine-prilocaine in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

989.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Lidocaine-prilocaine sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Lidocaine-prilocaine sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Lidocaine-prilocaine to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Lidocaine-prilocaine sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

990.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Lidocaine-prilocaine sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Lidocaine-prilocaine;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Lidocaine-prilocaine sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

991.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Lidocaine-prilocaine to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Lidocaine-prilocaine to Plaintiffs and/or others in the United States.

992.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Lidocaine-prilocaine among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Lidocaine-prilocaine sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)      Plaintiffs and other direct purchasers of Lidocaine-prilocaine produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

993.    Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Lidocaine-prilocaine is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

22.      *Count Twenty-Two – Meprobamate Overarching Conspiracy (Against Dr. Reddy's, Heritage, Actavis, Apotex, Aurobindo, Citron, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva, Zydus)*

994.    Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

995.    Beginning at a time yet to be determined, but no later than March 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Meprobamate to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

996.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Meprobamate in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

997.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Meprobamate sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Meprobamate sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Meprobamate to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Meprobamate sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

998.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Meprobamate sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Meprobamate;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Meprobamate sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

999.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Meprobamate to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their

conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Meprobamate to Plaintiffs and/or others in the United States.

1000.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Meprobamate among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Meprobamate sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Meprobamate produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1001.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Meprobamate is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

23.     *Count Twenty-Three – Metronidazole Conspiracy (Against G&W, Impax, Sandoz, Teva, and Valeant)*

1002.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

1003.  Beginning at a time yet to be determined, but no later than Summer 2011, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Metronidazole to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1004.  The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Metronidazole in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1005.  The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Metronidazole sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Metronidazole sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Metronidazole to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Metronidazole sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1006.  In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Metronidazole sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Metronidazole;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Metronidazole sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1007.  Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Metronidazole to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Metronidazole to Plaintiffs and/or others in the United States.

1008.  As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Metronidazole among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)      Prices for Metronidazole sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)      Plaintiffs and other direct purchasers of Metronidazole produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1009.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.   Each Plaintiff's injury as a direct purchaser of Metronidazole is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

24.      *Count Twenty-Four – Nimodipine Overarching Conspiracy (Against Heritage, Sun, Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Teva, Zydus)*

1010.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

1011.   Beginning at a time yet to be determined, but no later than June 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Nimodipine to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1012.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Nimodipine in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1013. The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Nimodipine sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Nimodipine sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Nimodipine to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Nimodipine sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1014. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Nimodipine sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Nimodipine;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Nimodipine sold in the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1015. Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above,

including, without limitation, participating in conversations and meetings to discuss the prices of Nimodipine to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Nimodipine to Plaintiffs and/or others in the United States.

1016.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)   Price competition in the sale of Nimodipine among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)   Prices for Nimodipine sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)   Plaintiffs and other direct purchasers of Nimodipine produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1017.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Nimodipine is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

25. _Count Twenty-Five – Nystatin Overarching Conspiracy (Against Actavis, Par, Perrigo, Sandoz, Taro, Teva, Heritage, Sun, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Zydus)_

1018.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

1019.   Beginning at a time yet to be determined, but no later than 2011, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Nystatin to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1020.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Nystatin in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1021.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Nystatin sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Nystatin sold to Plaintiffs and others in the United States;

(c)   To control the production and/or sale of Nystatin to Plaintiffs and others in the United States; and/or

(d)   To earn supracompetitive profits on the price of Nystatin sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1022.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)   They agreed to exchange, and did exchange, current and future price information about Nystatin sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Nystatin;

(b)   They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Nystatin sold in the United States; and/or

(c)   They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1023.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Nystatin to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Nystatin to Plaintiffs and/or others in the United States.

1024.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Nystatin among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Nystatin sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Nystatin produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1025.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Nystatin is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

26.     *Count Twenty-Six – Paromomycin Overarching Conspiracy (Against Heritage, Sun, Actavis, Heritage, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, Zydus)*

1026.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

1027.   Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Paromomycin to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1028.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the

production, pricing, marketing, and/or sale of Paromomycin in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1029.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of Paromomycin sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of Paromomycin sold to Plaintiffs and others in the United States;

(c)   To control the production and/or sale of Paromomycin to Plaintiffs and others in the United States; and/or

(d)   To earn supracompetitive profits on the price of Paromomycin sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1030.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)   They agreed to exchange, and did exchange, current and future price information about Nystatin sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Paromomycin;

(b)   They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Paromomycin sold in the United States; and/or

(c)   They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1031.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Nystatin to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Nystatin to Plaintiffs and/or others in the United States.

1032.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Paromomycin among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Paromomycin sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Paromomycin produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1033.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Paromomycin is an injury of the type the antitrust laws were

designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

> 27. *Count Twenty-Seven – Pravastatin Conspiracy (Against Actavis, Apotex, Glenmark, Lupin, Mylan, Sandoz, Teva, and Zydus)*

1034.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

1035.   Beginning at a time yet to be determined, but no later than May 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Pravastatin to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1036.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Pravastatin in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1037.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

> (a)   To fix, stabilize, maintain, and/or raise prices of Pravastatin sold to Plaintiffs and others in the United States;

> (b)   To allocate customers, the volume of sales, and/or market shares of Pravastatin sold to Plaintiffs and others in the United States;

> (c)   To control the production and/or sale of Pravastatin to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Pravastatin sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1038.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Pravastatin sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Pravastatin;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Pravastatin sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1039.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Pravastatin to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Pravastatin to Plaintiffs and/or others in the United States.

1040.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Pravastatin among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Pravastatin sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Pravastatin produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1041.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Pravastatin is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

28.   _Count Twenty-Eight – Propranolol Conspiracy (Against Actavis,_
_Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith)_

1042.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

1043.   Beginning at a time yet to be determined, but no later than November 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Propranolol to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1044.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the

production, pricing, marketing, and/or sale of Propranolol in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1045.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of Propranolol sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of Propranolol sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of Propranolol to Plaintiffs and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of Propranolol sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1046.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about Propranolol sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Propranolol;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Propranolol sold in the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1047.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Propranolol to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Propranolol to Plaintiffs and/or others in the United States.

1048.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)    Price competition in the sale of Propranolol among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for Propranolol sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)    Plaintiffs and other direct purchasers of Propranolol produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1049.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Propranolol is an injury of the type the antitrust laws were designed

to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

> 29.     *Count Twenty-Nine – Theophylline ER Overarching Conspiracy (Against Heritage, Teva, Actavis, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Zydus)*

1050.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

1051.   Beginning at a time yet to be determined, but no later than February 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Theophylline ER to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1052.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Theophylline ER in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1053.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Theophylline ER sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Theophylline ER sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Theophylline ER to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Theophylline ER sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1054.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Theophylline ER sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Theophylline ER;

(b)     T They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Theophylline ER sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1055.  Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Theophylline ER to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Theophylline ER to Plaintiffs and/or others in the United States.

1056.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)      Price competition in the sale of Theophylline ER among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)      Prices for Theophylline ER sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)      Plaintiffs and other direct purchasers of Theophylline ER produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1057.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.   Each Plaintiff's injury as a direct purchaser of Theophylline ER is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

30.      *Count Thirty - Ursodiol Conspiracy (Against Actavis, Epic, and Lanett)*

1058.   Plaintiffs incorporate by reference ¶¶ 1 through 811 above.

1059.   Beginning at a time yet to be determined, but no later than May 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to

compete on the sale of Ursodiol to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1060.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Ursodiol in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1061.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Ursodiol sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Ursodiol sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Ursodiol to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Ursodiol sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1062.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Ursodiol sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Ursodiol;

(b)      They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Ursodiol sold in the United States; and/or

(c)      They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1063.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Ursodiol to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Ursodiol to Plaintiffs and/or others in the United States.

1064.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)      Price competition in the sale of Ursodiol among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)      Prices for Ursodiol sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)      Plaintiffs and other direct purchasers of Ursodiol produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1065.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Ursodiol is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

31.      *Count Thirty-One – Verapamil Overarching Conspiracy (Against Actavis, Heritage, Mylan, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, Zydus)*

1066.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

1067.   Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Verapamil to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1068.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Verapamil in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1069.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Verapamil sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Verapamil sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Verapamil to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Verapamil sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1070.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Verapamil sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Verapamil;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Verapamil sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1071. Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Verapamil to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing

price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Verapamil to Plaintiffs and/or others in the United States.

1072.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)   Price competition in the sale of Verapamil among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)   Prices for Verapamil sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)   Plaintiffs and other direct purchasers of Verapamil produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1073.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Verapamil is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

32.   *Count Thrity-Two – Zoledronic Acid Conspiracy (Against Dr. Reddy's, Heritage, Actavis, Apotex, Aurobindo, Citron, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva, Zydus)*

1074.   Plaintiffs incorporate by reference ¶¶ 1 through 826 above.

1075.   Beginning at a time yet to be determined, but no later than January 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of Zoledronic Acid to Plaintiffs and others in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1076.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of Zoledronic Acid in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1077.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of Zoledronic Acid sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of Zoledronic Acid sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of Zoledronic Acid to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of Zoledronic Acid sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1078.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about Zoledronic Acid sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of Zoledronic Acid;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of Zoledronic Acid sold in the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1079.  Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of Zoledronic Acid to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of Zoledronic Acid to Plaintiffs and/or others in the United States.

1080.  As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of Zoledronic Acid among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for Zoledronic Acid sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of Zoledronic Acid produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1081.  Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of Zoledronic Acid is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## XVII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A.     A jury verdict in the amount of the compensatory damages sustained by each Plaintiff.

B.     A judgment against Defendants, jointly and severally, by the Court, in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs, and interest as allowable by law.

C.     A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices which facilitate those violations.

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  August 30, 2019                           Respectfully submitted,

By: _____
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Scott E. Perwin, Esquire
Anna T. Neill, Esquire
Samuel J. Randall, Esquire
Brandon S. Floch, Esquire
Joshua B. Gray, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:   (305) 373-1000
Fax:   (305) 372-1861
E-mail:  rarnold@knpa.com
            wblechman@knpa.com
            sperwin@knpa.com
            aneill@knpa.com
            srandall@knpa.com
            bfloch@knpa.com
            jgray@knpa.com
*Counsel for Plaintiffs*

606752.1