## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE KROGER CO., ALBERTSONS COMPANIES, LLC, AND H.E. BUTT GROCERY COMPANY L.P., <br><br> Plaintiffs, <br><br> vs. <br><br> ACTAVIS HOLDCO U.S., INC., ACTAVIS PHARMA, INC., ALVOGEN INC., AMNEAL PHARMACEUTICALS, INC.,  AMNEAL PHARMACEUTICALS, LLC, APOTEX CORP., AUROBINDO PHARMA USA, INC., CAMBER PHARMACEUTICALS, INC., CITRON PHARMA, LLC, DR. REDDY'S LABORATORIES, INC., EMCURE PHARMACEUTICALS, LTD., ENDO INTERNATIONAL PLC, EPIC PHARMA, LLC, FOUGERA PHARMACEUTICALS, INC., G&W LABORATORIES, INC.,  GLENMARK PHARMACEUTICALS INC., USA, GREENSTONE LLC, HERITAGE PHARMACEUTICALS, INC.,  HIKMA LABS, INC., HIKMA PHARMACEUTICALS, USA, INC., IMPAX LABORATORIES, INC.,  JUBILANT CADISTA PHARMACEUTICALS, INC., LANNETT COMPANY, INC., LUPIN PHARMACEUTICALS, INC., MAYNE PHARMA USA INC., MORTON GROVE PHARMACEUTICALS, INC., MYLAN PHARMACEUTICALS, INC., MYLAN, INC., MYLAN N.V., NOVARTIS AG,  OCEANSIDE PHARMACEUTICALS, INC., PERRIGO NEW YORK, INC., PFIZER INC., PLIVA, INC., SANDOZ AG, SANDOZ, INC., STRIDES PHARMA, INC., SUN PHARMACEUTICAL INDUSTRIES, INC., TARO PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICALS USA, INC.,  TORRENT PHARMA INC., UDL LABORATORIES, INC., UPSHER-SMITH LABORATORIES, LLC, | Civil Action No: 18-cv-284-CMR <br><br> JURY TRIAL DEMANDED <br><br><br><br> **<u>REDACTED PUBLIC VERSION</u>** |

VALEANT PHARMACEUTICALS NORTH
AMERICA, LLC, VALEANT
PHARMACEUTICALS INTERNATIONAL, INC.,
VERSAPHARM, INC.,WEST-WARD
COLUMBUS, INC. WEST-WARD
PHARMACEUTICALS CORP., WOCKHARDT
USA LLC, AND ZYDUS PHARMACEUTICALS
(USA) INC.

       Defendants.

**[PROPOSED] THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   DRUGS INVOLVED IN THE CONSPIRACY .................................................. 6

III.  VENUE AND JURISDICTION ......................................................................... 9

IV.   PARTIES ........................................................................................................... 12

      A.    Plaintiffs ................................................................................................ 12

      B.    Defendants ............................................................................................. 13

      C.    Co-Conspirators and Agents ................................................................ 35

V.    SANDOZ SPIN-OFF & NOVARTIS' PARTICIPATION IN THE CONPSIRACY ........ 36

VI.   TRADE AND COMMERCE ............................................................................ 46

VII.  GENERIC DRUGS, THE FDCA AND THE HATCH-WAXMAN AMENDMENTS ...... 47

VIII. THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS ...................... 52

      A.    The DOJ is Leading a Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers ........................... 52

      B.    At Least 49 State Attorneys General are Also Investigating the Anticompetitive Conduct in the Generic Drug Industry ................................ 66

IX.   CONGRESSIONAL RESPONSES TO GENERIC DRUG PRICE INCREASES ............ 70

X.    THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH FACILITATED COLLUSION BETWEEN DEFENDANTS ............................................ 71

      A.    Defendants Used Trade Association Meetings to Facilitate Their Collusion ............................................................................................................ 72

      B.    Defendants Communicated in Secret through E-Mail, Telephone, and Text Messages ................................................................................................. 80

      C.    The Overarching Conspiracy between Generic Drug Manufacturers – Playing Nice in the Sandbox ......................................................................... 81

XI.   INDUSTRY COMMENTARY FURTHER SUGGESTS THAT DEFENDANTS' COLLUSIVE CONDUCT IS A PLAUSIBLE EXPLANATION FOR THE INCREASED PRICES OF THE PRICE-FIXED GENERIC DRUGS .............................. 96

XII.     CORPORATE AND INDIVIDUAL RELATIONSHIPS THAT ALLOWED THE
         CONSPIRACY TO EVOLVE ................................................................. 97

         A.     Ranking "Quality of Competition" to Identify Price Increase Candidates ..... 99

                1.     The "High Quality" Competitor Relationships ................................. 101

         B.     Individual Relationships ................................................................. 106

                1.     Ara Aprahamian ................................................................... 106

                2.     David Berthold .................................................................... 107

                3.     Jim Brown .......................................................................... 107

                4.     Maureen Cavanaugh .............................................................. 107

                5.     Marc Falkin ........................................................................ 108

                6.     Jim Grauso ......................................................................... 108

                7.     Kevin Green ........................................................................ 109

                8.     Armando Kellum .................................................................. 109

                9.     Jill Nailor .......................................................................... 110

                10.    James Nesta ........................................................................ 110

                11.    Konstantin Ostaficiuk ............................................................ 110

                12.    Nisha Patel ......................................................................... 111

                13.    David Rekenthaler ................................................................ 111

                14.    Rick Rogerson ..................................................................... 112

                15.    Tracy Sullivan ..................................................................... 112

XIII.    THE CONSPIRATORIAL PRICE-FIXING, BID-RIGGING, & MARKET
         ALLOCATION AGREEMENTS ............................................................... 112

         A.     Acetazolamide ............................................................................ 116

                1.     Acetazolamide Tablets ........................................................... 116

                2.     Acetazolamide Capsules ......................................................... 118

ii

B.      Adapalene ................................................................................. 119

C.      Albuterol .................................................................................. 124

D.      Alclometasone Dipropionate ................................................... 127

E.      Allopurinol ............................................................................... 130

F.      Amantadine HCL ..................................................................... 132

G.      Amiloride HCL/HCTZ ............................................................ 133

H.      Amitriptyline ........................................................................... 134

I.      Amphetamine/Dextroamphetamine ......................................... 138

J.      Atenolol Chlorthalidone........................................................... 141

K.      Baclofen ................................................................................... 141

L.      Balsalazide Disodium .............................................................. 147

M.      Benazepril HCTZ..................................................................... 148

N.      Betamethasone Dipropionate ................................................... 151

        1.      Lotion, Cream, and Ointment ........................................ 151

        2.      CBD ............................................................................... 154

O.      Betamethasone Valerate........................................................... 160

        1.      Lotion ............................................................................ 160

        2.      Ointment ........................................................................ 163

P.      Bromocriptine Mesylate Tablets.............................................. 166

Q.      Budesonide DR Capsules ........................................................ 172

R.      Budesonide Inhalation ............................................................. 174

S.      Buspirone Hydrochloride Tablets ............................................ 176

T.      Butorphanol Tartrate................................................................ 177

U.      Cabergoline .............................................................................. 178

V.      Calcipotriene ............................................................................ 179

W.      Calcipotriene Betamethasone.........................................................180

X.      Capecitabine.................................................................................187

Y.      Captopril......................................................................................191

Z.      Carbamazepine.............................................................................192

AA.      Cefpodoxime Proxetil...................................................................195

CC.      Celecoxib.....................................................................................200

DD.      Chlorpromazine............................................................................202

EE.      Cholestyramine............................................................................203

FF.      Ciclopirox....................................................................................204

GG.      Clindamycin Phosphate................................................................210

      1.      The First Coordinated Price Increase (60ml Solution – Fougera and Greenstone)..................................................211

      2.      The Second Coordinated Increase (October 2012 – All Formulations – Sandoz and Greenstone).........................214

      3.      New Entrants on Clindamycin Solution – Actavis, Perrigo and Taro – Do Not Significantly Erode Pricing.....................218

      4.      The Third Coordinated Price Increase (2014 – All Formulations Except Solution – Sandoz and Greenstone)....................227

HH.      Clobetasol....................................................................................228

II.      Clomipramine...............................................................................232

JJ.      Clonidine-TTS Patch....................................................................238

KK.      Clotrimazole................................................................................245

LL.      Desogestrel/Ethinyl Estradiol Tablets (Kariva).............................247

MM.      Desonide.....................................................................................248

NN.      Desoximetasone Ointment............................................................251

OO.      Dexmethylphenidate HCL Extended Release..............................256

PP.     Dextroamphetamine Sulfate Extended Release ............................................. 259

QQ.     Digoxin .......................................................................................................... 260

RR.     Diphenoxylate Atropine ................................................................................ 265

SS.     Divalproex ER ............................................................................................... 265

TT.     Doxycycline ................................................................................................... 269

     1.     The Doxy Hyclate Collusive Price Increase ..................................... 270

     2.     The Doxy Mono Collusive Price Increase ........................................ 273

     3.     Collusion on Doxy DR ...................................................................... 276

UU.     Drospirenone and ethinyl estradiol (Ocella) ................................................. 278

VV.     Econazole ....................................................................................................... 281

WW.     Enalapril Maleate .......................................................................................... 287

XX.     Entecavir ....................................................................................................... 292

YY.     Eplerenone Tablets ........................................................................................ 294

ZZ.     Erythromycin Solution .................................................................................. 295

AAA.     Estradiol Tablets ........................................................................................... 303

BBB.     Estradiol/Norethindrone Acetate Tablets (Mimvey) .................................... 304

CCC.     Ethambutol HCL Tablets .............................................................................. 305

DDD.     Ethinyl Estradiol and Levonorgestrel .......................................................... 310

EEE.     Etodolac ........................................................................................................ 311

FFF.     Fenofibrate .................................................................................................... 317

GGG.     Fluocinolone Acetonide ................................................................................ 325

HHH.     Fluocinonide ................................................................................................. 329

III.     Fluticasone Propionate .................................................................................. 343

JJJ.     Fosinopril HCTZ .......................................................................................... 350

KKK.     Gabapentin Tablets ....................................................................................... 354

LLL.        Glipizide-Metformin ................................................................ 355

MMM.       Glyburide .................................................................................. 356

NNN.       Glyburide-Metformin ............................................................... 360

OOO.       Halobetasol Propionate ............................................................ 362

       1.      The First Coordinated Price Increase – September 2012 ................. 363

       2.      The Second Coordinated Price Increase – March/April 2013 ......... 365

       3.      Sandoz Launches Halobetasol Cream ................................ 366

       4.      Taro Launches Halobetasol Cream and Ointment ........................... 371

PPP.        Hydralazine ............................................................................... 374

QQQ.       Hydrocortisone Acetate Suppositories (Anucort HC) .................. 375

RRR.        Hydrocortisone Valerate Cream ................................................ 381

SSS.        Imiquimod Cream ..................................................................... 383

       1.      Perrigo Entry (April 2010) ................................................ 383

       2.      Sandoz Entry (February 2011) .......................................... 387

       3.      Taro Entry (July 2011) ...................................................... 389

TTT.        Irbesartan .................................................................................. 394

UUU.       Isosorbide Dinitrate .................................................................. 396

VVV.       Labetalol ................................................................................... 397

WWW.      Lamivudine/Zidovudine (Generic Combivir) ............................. 398

XXX.       Latanoprost Drops ..................................................................... 402

YYY.       Leflunomide .............................................................................. 410

ZZZ.        Levothyroxine ........................................................................... 411

AAAA.     Lidocaine Ointment .................................................................. 415

BBBB.      Lidocaine-Prilocaine ................................................................ 421

CCCC.      Loperamide HCL Capsules ....................................................... 423

DDDD.        Meprobamate ................................................................. 424

EEEE.        Metformin ER ................................................................ 425

FFFF.        Methadone HCL............................................................... 426

GGGG.        Methazolamide Tablets.................................................... 427

HHHH.        Methylphenidate ............................................................. 430

IIII.          Methylprednisolone ......................................................... 433

JJJJ.         Metronidazole ................................................................. 435

            1.      Metronidazole Gel ............................................ 435

            2.      Metronidazole Cream and Lotion .................... 446

            3.      Metronidazole Vaginal...................................... 450

KKKK.        Moexipril Hydrochloride Tablets .................................... 451

LLLL.        Nadolol............................................................................ 453

MMMM.       Naproxen Sodium ............................................................ 456

NNNN.        Niacin ER ........................................................................ 457

OOOO.        Nimodipine ...................................................................... 460

PPPP.        Nitrofurantoin Macrocrystal Capsules............................ 461

QQQQ.        Norethindrone Acetate .................................................... 463

RRRR.        Norethindrone/ethinyl estradiol (Balziva®) .................... 463

SSSS.        Nortriptyline Hydrochloride ........................................... 464

TTTT.        Nystatin ........................................................................... 468

            1.      Nystatin Cream ................................................ 469

            2.      Nystatin Ointment ............................................ 470

            3.      Nystatin Tablets ............................................... 471

UUUU.        Nystatin Triamcinolone ................................................... 472

VVVV.        Omega-3-Acid Ethyl Esters ............................................ 481

WWWW.      Oxaprozin Tablets ................................................................ 484

XXXX.      Oxycodone/Acetaminophen .............................................. 490

YYYY.      Paricalcitol ......................................................................... 492

ZZZZ.      Paromomycin ...................................................................... 499

AAAAA.    Permethrin ........................................................................... 500

BBBBB.    Perphenazine ...................................................................... 502

CCCCC.    Phenytoin Sodium Capsules .............................................. 503

DDDDD.    Pilocarpine HCL ................................................................. 507

EEEEE.     Pioglitazone HCL Metformin HCL Tablets ....................... 508

FFFFF.      Piroxicam ............................................................................ 515

GGGGG.    Potassium Chloride ............................................................ 518

HHHHH.    Pravastatin .......................................................................... 519

IIIII.          Prednisolone Acetate .......................................................... 528

JJJJJ.        Prednisone ........................................................................... 529

KKKKK.    Prochlorperazine ................................................................ 530

                    1.      Suppositories .......................................................... 531

                    2.      Tablets ..................................................................... 533

LLLLL.      Promethazine HCL .............................................................. 533

MMMMM.  Propranolol .......................................................................... 541

                    1.      Propranolol Capsules ............................................. 542

                    2.      Propranolol Tablets ................................................ 543

NNNNN.    Spironolactone HCTZ ......................................................... 545

OOOOO.    Tacrolimus Ointment .......................................................... 546

PPPPP.      Temozolomide ..................................................................... 549

QQQQQ.    Theophylline ER .................................................................. 552

RRRRR.	Timolol Maleate ....................................................................... 553

SSSSS.	Tobramycin ............................................................................... 554

TTTTT.	Tolterodine ............................................................................... 556

    1.	Tolterodine ER ............................................................... 556

    2.	Tolterodine Tartrate ....................................................... 559

UUUUU.	Triamcinolone Acetonide .......................................................... 562

VVVVV.	Triamterene HCTZ ................................................................... 563

WWWWW. Ursodiol .................................................................................... 565

XXXXX.	Valsartan HCTZ ....................................................................... 567

YYYYY.	Verapamil .................................................................................. 570

ZZZZZ.	Zoledronic Acid ........................................................................ 571

XIV.	THE CONSPIRATORS INCREASE PRICES IN BUNCHES ....................... 572

    A.	Aprahamian and Perfetto of Taro Lead Price Increases on Alclometasone Dipropionate, Ammonium Lactate, Betamethasone Dipropionate, Betamethasone Valerate, Carbamazepine, Clomipramine HCL, Desonide, and Terconazole .............................................................. 573

    B.	Sandoz Coordinates with Aurobindo to Allocate Markets for Oxacillin Sodium and Nafcillin Sodium Injectable Vials ............................. 583

    C.	Glenmark Leads Price Increases on Ciclopirox Cream and Mometasone Furoate ....................................................................... 586

    D.	Nisha Patel's First List of Increase Candidates: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron .......................................... 591

        1.	Glenmark ....................................................................... 594

        2.	Sandoz ........................................................................... 598

        3.	Taro ................................................................................ 602

E.      Nisha Patel's July 3, 2013 Price Increases: Adapalene Gel, Cefaclor ER Tablets, Cefadroxil Tablets, Cefdinir Capsules and Oral Suspension, Cefprozil Tablets, Cimedine Tablets, Doxazosin Mesylate Tablets, Fluconazole Tablets, Fluocinonide Cream, Gel, and Ointment, Methotrexate Tablets, Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Nadolol Tablets, Oxybutynin Chloride Tablets, Prazosin HCL Capsules, and Ranitidine HCL Tablets ................... 603

        1.      Upsher-Smith ............................................................................. 605

        2.      Mylan ......................................................................................... 607

        3.      Sandoz........................................................................................ 611

F.      Summer 2013: Sandoz and Mylan Coordinate to Orchestrate Price Increases on Diltiazem HCL, Haloperidol, Clomipramine, Tizanidine, Levothyroxine, and Nadolol ...................................................................... 613

        1.      Haloperidol and Trifluoperazine HCL............................................. 615

        2.      Tizanidine ................................................................................... 617

G.      Enalapril Maleate ............................................................................. 620

H.      August 9, 2013 Price Increases ("Patel's Round 2"): Amiloride HCL/HCTZ Tablets, Clemastine Fumarate Oral Liquid and Tablets, Diclofenac Tablets, Diltiazem HCL Tablets, Etodolac ER Tablets, Ketoprofen Capsules, Ketorolac Tablets, Pravastatin Tablets, Tometin Sodium Capsules ........................................................................................ 625

        1.      Mylan ......................................................................................... 629

        2.      Etodolac ..................................................................................... 632

        3.      Impact of Price Increases ............................................................. 637

        4.      Price Increase Hiatus.................................................................... 638

I.      March 7, 2014: (Niacin ER)............................................................... 639

J.  April 4, 2014 Price Increases: Azithromycin Suspension and Oral Suspension, Bumetanide Tablets, Cephalexin Suspension, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Dicloxacillin Sodium Capsules, Diflunisal Tablets, Estazolam Tablets, Ethosuximide Capsules and Oral Suspension, Hydroxyzine Pamoate Capsules, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tablets, Estradiol/Norethindrone Acetate Tablets, Nystatin Oral Tablets, Pentoxifylline Tablets, Tamoxifen Citrate Tablets, Theophylline ER Tablets ................................................................ 642

1.  Lupin (Cephalexin Oral Suspension)................................................ 648

2.  Greenstone (Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets) .............................. 650

3.  Actavis (Clarithromycin ER Tablets, Tamoxifen Citrate and Estazolam)....................................................................................... 653

4.  Multiple Manufacturers (Ketoconazole Cream and Tablets)............ 656

5.  New Relationships Emerge................................................................ 659

6.  Valeant ............................................................................................. 664

7.  Impact .............................................................................................. 665

K.  August 28, 2014 Price Increases: Amiloride HCL/HCTZ Tablets, Amoxicillin/Clavulanate Chewable Tablets, Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clemastine Fumarate Tablets, Clotrimazole Solution, Desmopressin Acetate Tablets, Diclofenac Potassium Tablets, Disopyramide Phosphate Capsules, Enalapril Maleate Tablets, Epitol Tablets, Flurbiprofen Tablets, Flutamide Capsules, Fluvastatin Sodium Capsules, Hydroxyurea Capsules, Loperamide HCL Capsules, Penicillin VK Tablets, Prazosin HCL Capsules, Prochlorperazine Tablets, Topiramate Sprinkle Capsules, Warfarin Sodium Tablets ........................................................................................... 665

1.  Mylan ............................................................................................... 669

2.  Taro .................................................................................................. 673

3.  Zydus................................................................................................ 677

4.  Competitors Follow Teva ................................................................. 678

L.   January 28, 2015 Price Increases: Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, Propranolol ..................................................... 679

1.   Ciprofloxacin HCL and Glimepiride ................................................ 681

2.   Griseofulvin ..................................................................... 684

XV.   AFTER SUCCESSFULLY COLLUDING, DEFENDANTS' QUALITY RANKINGS IMPROVE ........................................................................................ 685

A.   Apotex ............................................................................ 686

B.   Zydus ............................................................................. 687

C.   Heritage .......................................................................... 689

D.   Lupin ............................................................................. 690

E.   Par ............................................................................... 691

F.   Greenstone ........................................................................ 693

G.   Amneal ............................................................................ 694

H.   Rising – Hydroxyzine Pamoate & Diflunisal Tablets................................... 696

I.   Breckenridge ...................................................................... 697

J.   Glenmark .......................................................................... 698

K.   A Commitment to the Overarching Conspiracy Was Instrumental to the Success of the Price-Fixing Agreements ................................................ 699

L.   "Quality Competitor" Rankings Relate to Price Increases, But Even "Low Quality" Competitors Comply With the Overarching Conspiracy..... 701

1.   Camber and Teva Fix Prices on Ranitidine HCL ............................ 701

XVI.   CONSCIOUSNESS OF GUILT ......................................................... 707

XVII.   THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION ............. 711

XVIII.   DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ONGOING........ 714

XIX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY......... 716

XX.     TOLLING OF THE STATUTE OF LIMITATIONS ......................................... 717

        A.      Spoliation of Evidence ................................................................... 721

        B.      Obstruction of Justice ................................................................... 722

XXI.    ANTITRUST VIOLATIONS ...................................................................... 723

        A.      Count One – Overarching Conspiracy on all Price-Fixed Generic Drugs
                Against all Defendants.................................................................. 723

        B.      Count Two (Pled in the Alternative to Count One) Against Teva,
                Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's,
                Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz,
                Taro, Upsher-Smith, Wockhardt, and Zydus................................... 732

        C.      Counts Three through One Hundred Ninety (Individual Conspiracies) ....... 738

XXII.   PRAYER FOR RELIEF ........................................................................... 752

Plaintiffs The Kroger Co., Albertsons Companies, Inc., and H.E. Butt Grocery Company L.P., ("Plaintiffs"), file this Third Amended Complaint ("Complaint") under the antitrust laws of the United States against Defendants Actavis Holdco U.S., Inc., Actavis Pharma, Inc., Alvogen Inc., Amneal Pharmaceuticals, Inc., Amneal Pharmaceuticals, LLC, Apotex Corp., Aurobindo Pharma USA, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories, Inc., Emcure Pharmaceuticals, Ltd., Endo International plc, Epic Pharma, LLC, Fougera Pharmaceuticals, Inc., G&W Laboratories, Inc., Glenmark Pharmaceuticals Inc., USA, Greenstone LLC, Heritage Pharmaceuticals, Inc., Hikma Labs, Inc., Hikma Pharmaceuticals, USA, Inc., Impax Laboratories, Inc., Jubilant Cadista Pharmaceuticals, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma USA Inc., Morton Grove Pharmaceuticals, Inc., Mylan Pharmaceuticals, Inc., Mylan, Inc., Mylan N.V., Novartis AG, Oceanside Pharmaceuticals, Inc., Perrigo New York, Inc., Pfizer Inc., Pliva, Inc., Sandoz AG, Sandoz, Inc., Strides Pharma, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals USA, Inc., Teva Pharmaceuticals USA, Inc., Torrent Pharma Inc., UDL Laboratories, Inc., Upsher-Smith Laboratories, LLC, Valeant Pharmaceuticals North America, LLC, Valeant Pharmaceuticals International, Inc., Versapharm, Inc., West-Ward Columbus, Inc., West-Ward Pharmaceuticals Corp., Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc., (collectively "Defendants"), and allege as follows:

## I.    <u>INTRODUCTION</u>

1.      This is a civil antitrust action against Defendants and their co-conspirators for violating Section One of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix, increase, stabilize, or maintain prices of the specified generic pharmaceutical drugs.  As a result of this unlawful conspiracy, Plaintiffs seek damages against Defendants, jointly and severally, as provided in

Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, and such other relief as provided by law.

2.      The existence of the conspiracy is supported by a number of facts alleged below, which should be read collectively.  Some of the information on which Plaintiffs rely is based upon information made public during ongoing government investigations of Defendants' cartel.

3.      The existence of the conspiracy alleged in this Complaint is supported by, among other facts, the fact that a number of Defendants have already admitted to its existence.  For example, Jeffrey Glazer (Heritage's former CEO) and Jason Malek (Heritage's former President), have pled guilty to participating in a conspiracy to fix prices of "generic pharmaceutical products," including Glyburide and Doxycycline.  Similarly, Armando Kellum, a Vice President of Sandoz responsible for pricing of generic drugs, pled guilty to participating in a conspiracy to fix prices of generic drugs including, but not limited to, Clobetasol and Nystatin.  Additionally, Heritage, Sandoz, Apotex, Taro, Glenmark, Teva and Co-conspirator Rising Pharma have each entered into deferred prosecution agreements that involved admissions that they collectively conspired to fix the prices of Glyburide, Benazepril HCTZ, Pravastatin, Clobetasol, Desonide, Nystatin Triamcinolone, Clotrimazole, Etodolac, Tobramycin, Carbamazepine and numerous additional generic drugs not specified in their agreements with DOJ.  Heritage also resolved False Claims Act claims brought by the United States related to its price fixing of Hydralazine and Theophylline ER.  By operation of law, these guilty pleas and judicial admissions merely define the minimum parameters of the generic drug price fixing conspiracy.

4.      Indeed, other criminal actions brought by DOJ, along with the criminal enforcement actions described above and other conduct alleged in this Complaint, demonstrate that the conspiracy is broader than these companies and these specified drugs.  The plea agreements and

deferred prosecution agreements mentioned above expressly implicate as co-conspirators Emcure, and Perrigo.  Further, a Grand Jury found probable cause that Aprahamian conspired to fix the prices of generic drugs, including (but not limited to) Carbamazepine, Clobetasol, Clotrimazole, Desonide, Etodolac, Fluocinonide, Lidocaine, Nystatin Triamcinolone, and Warfarin.  Similarly, the same Grand Jury found probable cause that Glenmark and Teva conspired to fix prices of Pravastatin, and that Teva also conspired to fix the prices of Carbamazepine, Clotrimazole, Etodolac, Fluocinonide, Warfarin, Tobramycin, Nadolol, Temozolomide, and also other unnamed generic drugs.  Thus, the scope of the conspiracy actionable in this civil antitrust action may be (and as alleged in this Complaint is) broader than the judicial admissions to date.  While these admissions establish that a conspiracy did exist, discovery is necessary to determine the full scope and effect of the conspiracy in terms of products, time period, and participants.  Indeed, Plaintiffs have learned substantial additional facts about the scope and operation of Defendants' conspiracy since filing its Second Amended Complaint.  This amended pleading is not intended to include all facts learned as a result of that continuing investigation.

5.      In addition to the criminal enforcement actions, the Attorney General of Connecticut and the Attorneys' General of 48 additional jurisdictions (the "States") have further exposed collusion in the generic drug industry and the market-allocation and price-fixing scheme as a result of evidence they received from Civil Investigative Demands.  As detailed by the States, the purpose of the conspiracy was to fix, maintain, increase, and stabilize prices – either for a particular generic drug or any number of generic drugs.  In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug.  Manufacturers implemented the "fair share" agreement by refusing to bid for a

particular customer or by providing a pretextual bid that they knew would not be successful. This prevented prices from declining even when a new "competitor" joined the market.

6.     Currently, the States are pursing claims against 30 generic drug manufacturers alleging collusion that distorted the prices of approximately two hundred generic drugs. The States' investigation is ongoing.

7.     All of these criminal and civil enforcement actions arise from the same agreement or understanding to restrain trade that is detailed in this Complaint and in which all Defendants and their co-conspirators knowingly participated. Through this agreement or understanding, Defendants implemented a series of rules to allocate the market for every generic drug identified in this Complaint. Pursuant to this agreement or understanding, every Defendant and co-conspirator was entitled to its "fair share" of market share for each drug identified in this Complaint that it manufactured. When new competitors entered the market for a given generic drug, Defendants would purposefully concede market share to the new entrant so that it could obtain its fair share as well. Further, when other Defendants in the market for a generic drug raised prices on that drug, the rules of the overarching conspiracy provided that other Defendants would follow the price increase and also not seek to add market share, which allowed the price increases to stick. Indeed, through this industry-wide market allocation agreement, Defendants were also able to implement substantial price increases that, in some instances, approached 5000% or more.

8.     In a competitive marketplace, each generic drug manufacturer should price its drug competitively relative to other manufacturers. Accordingly, if any one company decided to raise prices, then it would do so at the risk of losing customers and sales to its rivals with more competitive prices. But the market for generic drugs has not been characterized by such

competition for many years.  Because of the overarching conspiracy, Defendants have been able to sell every drug identified in this Complaint at supracompetive levels.

9.     Other economic evidence confirms the broader scope of the conspiracy alleged in this Complaint.  Indeed, there are no market forces that explain the pricing of the drugs identified in this Complaint other than collusion.  Moreover, as alleged below, each Price-Fixed Generic Drug has commodity-like characteristics, there are barriers to entry of a new competitor, the demand is highly inelastic, and the market for the sale of each generic drug is relatively concentrated.  These economic conditions make the market for the manufacture and sale of the Price-Fixed Generic Drugs conducive to cartelization.

10.     In addition to the information made public from these government investigations, the allegations in this Complaint are further supported by the fact that Defendants engaged in an extremely high level of interfirm communications.  These communications included a large number of in-person meetings facilitated by an almost constant stream of industry trade events, such as the trade association meetings sponsored by the Generic Pharmaceutical Association.  In addition to these in-person meetings, Defendants frequently communicated by telephone, e-mail, and text message.  As demonstrated in this Complaint, these interfirm communications involved high-level executives with pricing authority and directly affected Defendants' pricing decisions on the generic drugs identified in this Complaint.

11.     Defendants and their co-conspirators carried out their continuing conspiracy regarding generic drugs through in-person meetings and communications, including e-mails, text messages, and telephone calls.  During these meetings and communications, they conspired on the terms alleged in this Complaint, and coordinated price increase announcements or pricing terms, allocated markets and customers, rigged bids, secretly and collusively exchanged pricing

information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of generic drugs sold to Plaintiffs and others in the United States.

12.     The allegations in this Complaint are pled in the alternative if necessary to avoid inconsistency.  Count I alleges an overarching conspiracy among all Defendants regarding all of the Price-Fixed Generic Drugs in violation of Section 1 of the Sherman Act and Count II, which is pled in the alternative to Count I, alleges an overarching conspiracy that generally aligns with the States' Complaint in Case No. 19-cv-2407-CMR (E.D. Pa.).  Counts III through CXC allege, in the alternative, individual-drug conspiracies among the specified Defendants regarding each individual Price-Fixed Generic Drug in violation of Section 1 of the Sherman Act.

## II.   DRUGS INVOLVED IN THE CONSPIRACY

13.     As it is used in this Complaint, the term "Price-Fixed Generic Drugs" (individually or collectively, as context requires) refers to all dosages, strengths, and formulations (if none are specified) of the following generic drugs.

| | | |
|---|---|---|
| Acetazolamide | Disopyramide Phosphate Capsules | Moexipril HCL Tablets |
| Adapalene | Drospirenone and ethinyl estradiol (Ocella) | Moexipril HCL/HCTZ Tablets |
| Albuterol | Econazole | Mometasone Furoate |
| Alclometasone Dipropionate | Enalapril Maleate Tablets | Nabumetone Tablets |
| Allopurinol | Entecavir | Nadolol Tablets |
| Amantadine HCL | Epitol Tablets | Nafcillin |
| Amiloride HCL/HCTZ Tablets | Eplerenone | Naproxen Sodium |
| Amitriptyline | Erythromycin Solution | Niacin ER Tablets |
| Ammonium Lactate | Estazolam Tablets | Nimodipine |
| Amoxicillin/Clavulanate Chewable Tablets | Estradiol Tablets | Nitrofurantoin MAC Capsules |

| | | |
|---|---|---|
| Amphetamine/Dextroamphetamine (aka Mixed Amphetamine Salts) | Estradiol/Norethindrone Acetate Tablets (Mimvey) | Norethindrone Acetate |
| Atenolol Chlorthalidone | Ethambutol HCL Tablets | Norethindrone/ethinyl estradiol (Balziva) |
| Azithromycin | Ethinyl estradiol and levonorgestrel (Portia and Jolessa) | Nortriptyline HCL Capsules |
| Baclofen | Ethosuximide | Nystatin |
| Balsalazide Disodium | Etodolac | Nystatin Triamcinolone |
| Benazepril HCTZ | Fenofibrate | Omega-3-Acid Ethyl Esters |
| Betamethasone Dipropionate (including Augmented and CBD formulations) | Fluconazole Tablets | Ondansetron |
| Betamethasone Valerate | Fluocinolone Acetonide | Oxacillin Sodium |
| Bethanechol Chloride Tablets | Fluocinonide | Oxaprozin Tablets |
| Bromocriptine Mesylate | Fluoxetine HCL Tablets | Oxybutynin Chloride Tablets |
| Budesonide DR Capsules | Flurbiprofen Tablets | Oxycodone/Acetaminophen |
| Budesonide Inhalation | Flutamide Capsules | Paricalcitol |
| Bumetanide Tablets | Fluticasone Propionate | Paromomycin |
| Buspirone Hydrochloride Tablets | Fluvastatin Sodium Capsules | Penicillin VK Tablets |
| Butorphanol Tartrate | Fosinopril HCTZ | Pentoxifylline Tablets |
| Cabergoline | Gabapentin Tablets | Permethrin |
| Calcipotriene | Glimepiride Tablets | Perphenazine |
| Calcipotriene Betamethasone Dipropionate Ointment | Glipizide | Phenytoin Sodium |
| Capecitabine | Glyburide | Pilocarpine HCL |
| Captopril | Glyburide-Metformin | Pioglitazone HCL Metformin |
| Carbamazepine | Griseofulvin | Piroxicam |
| Cefdinir | Halobetasol | Potassium Chloride |
| Cefpodoxime Proxetil | Haloperidol | Pravastatin |
| Cefprozil Tablets | Hydralazine | Prazosin HCL Capsules |

| | | |
|---|---|---|
| Cefuroxime Axetil | Hydrocortisone Acetate | Prednisolone Acetate |
| Celecoxib | Hydrocortisone Valerate | Prednisone |
| Cephalexin Suspension | Hydroxyurea Capsules | Prochlorperazine |
| Chlorpromazine HCL | Hydroxyzine Pamoate Capsules | Promethazine HCL |
| Cholestyramine | Imiquimod | Propranolol |
| Ciclopirox | Irbesartan | Raloxifene HCL Tablets |
| Cimetidine Tablets | Isoniazid | Ranitidine HCL |
| Ciprofloxacin HCL Tablets | Isosorbide Dinitrate | Spironolactone HCTZ |
| Clarithromycin ER Tablets | Ketoconazole | Tacrolimus Ointment |
| Clemastine Fumarate Tablets | Ketoprofen Capsules | Tamoxifen Citrate Tablets |
| Clindamycin Phosphate | Ketorolac Tromethamine Tablets | Temozolomide |
| Clobetasol | Labetalol HCL Tablets | Terconazole Cream |
| Clomipramine | Lamivudine/Zidovudine (generic Combivir) | Theophylline ER |
| Clonidine TTS Patch | Latanoprost | Timolol Maleate |
| Clotrimazole | Leflunomide | Tizanidine |
| Cyproheptadine HCL Tablets | Levothyroxine | Tobramycin |
| Desmopressin Acetate Tablets | Lidocaine HCL Ointment | Tolmetin Sodium Capsules |
| Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Lidocaine-Prilocaine | Tolterodine |
| Desonide | Loperamide HCL Capsules | Topiramate Sprinkle Capsules |
| Desoximetasone | Medroxyprogesterone Tablets | Triamcinolone Acetonide |
| Dexmethylphenidate HCL ER Capsules | Meprobamate | Triamterene HCTZ |
| Dextroamphetamine Sulfate ER | Metformin ER | Trifluoperazine HCL |
| Diclofenac Potassium Tablets | Methadone HCL | Ursodiol |
| Dicloxacillin Sodium Capsules | Methazolamide | Valsartan HCTZ |
| Diflunisal Tablets | Methotrexate Tablets | Verapamil |
| Digoxin | Methylphenidate | Warfarin Sodium Tablets |

| Diltiazem HCL Tablets | Methylprednisolone | Zoledronic Acid |
|---|---|---|
| Diphenoxylate Atropine | Metronidazole | |

## III.   VENUE AND JURISDICTION

14.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26.

15.     This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§ 1331 & 1337.

16.     Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below:

(a)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District, including the sale of generic drugs to one or more Plaintiffs and others at supracompetitive prices;

(b)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District;

(c)     Defendants transact business or are found in this District, and, therefore, venue is proper under 15 U.S.C. § 22; and/or

(d)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

17.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated below:

(a)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, or is found in this District.   Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling generic drugs throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because, as alleged in this Complaint, each Defendant belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling one or more generic drugs to one or more Plaintiffs and others in this District at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the Commonwealth in which this Federal Court sits because, as alleged in this Complaint, each Defendant has transacted business in the Commonwealth, each Defendant has contracted to supply services or things in this Commonwealth, each Defendant has caused harm by acts taken within this Commonwealth, each Defendant has caused harm in this Commonwealth by acts or omissions outside this Commonwealth, each Defendant has committed violations of 15 U.S.C. § 1 within this Commonwealth, and because the Commonwealth's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the Commonwealth to satisfy due process;

(e)     This Court has personal jurisdiction over Defendants because, as alleged in this Complaint, they and one or more of their co-conspirators contracted to supply services or goods, including generic drugs, in the Commonwealth where this Federal Court sits; money flowed from Plaintiffs or other purchasers in the Commonwealth to pay Defendants and their co-conspirators for generic drugs; Defendants and one or more of their co-conspirators transact business in the Commonwealth in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts alleged in this Complaint to be done, or consequences to occur, in the Commonwealth; Defendants and their co-conspirators engaged in unlawful conduct described in this Complaint outside of the Commonwealth causing injury to one or more Plaintiffs in the Commonwealth, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this Commonwealth or the Constitution of the United States; and/or

(f)     Based on the allegations in this Complaint, Defendants are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum Commonwealth) and have purposefully availed themselves of the laws of the United States.  As alleged in this Complaint, each Defendant, either directly, or indirectly through their subsidiaries, engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce of the forum Commonwealth and the United States.

## IV.   PARTIES

### A.   Plaintiffs

18.     Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger brings this action on its own behalf and as the assignee of Cardinal Health, Inc. ("Cardinal"), a pharmaceutical wholesaler that, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants for resale to Kroger and has assigned its claims arising out of those purchases to Kroger.  Kroger owns and operates retail stores with pharmacies that sell generic drugs.  During the time period relevant to Plaintiffs' claims, Kroger and/or its assignor directly purchased each of the Price-Fixed Generic Drugs in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

19.     Plaintiff Albertsons Companies, Inc. (f/k/a Albertsons Companies, LLC), is a Delaware limited company with its principal place of business in Boise, Idaho.  Albertsons Companies, Inc., is the parent corporation of Albertsons LLC, New Albertsons L.P., and Safeway Inc. (collectively "Albertsons").  Albertsons brings this action on its own behalf and as the assignee of Cardinal Health, Inc. ("Cardinal"), a pharmaceutical wholesaler that, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants for resale to Albertsons and has assigned its claims arising out of those purchases to Albertsons.  Albertsons also brings this action based on an internal assignment from Safeway Inc.  Albertsons owns and operates retail stores with pharmacies that sell generic drugs.  During the relevant period, Albertsons and/or its assignor directly purchased each of the Price-Fixed Generic Drugs in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

20.     Plaintiff H.E. Butt Grocery Company ("HEB") is a Texas limited partnership with its principal place of business in San Antonio, Texas.  HEB brings this action on its own behalf and, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants and/or their co-conspirators and sustained injury and damage to its business or property as a proximate result of the antitrust violations alleged in this Complaint.  HEB owns and operates retail stores with pharmacies that sell generic drugs.

**B.     Defendants**

21.     Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Watson Pharmaceuticals, Inc., ("Watson") acquired Actavis in or about October 2012.  The two companies operated as a single entity, albeit under separate names, until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name.  March 2015, Actavis, plc, the parent company of Defendant Actavis, merged with Allergan, plc ("Allergan") and adopted Allergan's name.  In August 2016, Defendant Teva USA purchased Actavis' generics business, which included Actavis Inc., Actavis Elizabeth Inc. and Defendant Actavis Pharma Inc., from Allergan, plc.  All the assets of the entities were then transferred to the newly formed Actavis Holdco.  The acquisition cost Teva USA $33.43 billion in cash and approximately 100 million shares of Teva securities.  During the time period relevant to Plaintiffs' claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds from Defendant Actavis Pharma, Inc., and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

22.     Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco and is now a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  During the time period relevant to Plaintiffs' claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Actavis Holdco (and its predecessors, including Watson) and Actavis Pharma are collectively defined as "Actavis."  Actavis is defined to include its managers, officers, employees, and agents acting on its behalf.

23.     Defendant Alvogen Inc. ("Alvogen") is a Delaware corporation with its principal place of business in Pine Brook, New Jersey.  Robert Wessman, the former CEO of Actavis, stepped down from that position in order to found Alvogen in 2009.  Alvogen is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Alvogen directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

24.     Defendant Amneal Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business located in Bridgewater, New Jersey.  The company was formed for the purpose of facilitating the merger between Amneal Pharmaceuticals LLC (also a Delaware limited liability company) and Defendant Impax (defined below).  Accordingly, Amneal Pharmaceuticals Inc., is the predecessor in interest to Amneal Pharmaceuticals LLC, and both companies will be

collectively referenced in this Complaint as "Amneal."  Amneal is defined to include its managers, officers, employees, and agents acting on its behalf.  At all times relevant to the Complaint, Amneal produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

25.     Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida.  Apotex is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Apotex directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

26.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business located in Dayton, New Jersey.  Aurobindo is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Aurobindo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

27.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey.  Camber is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Camber directly participated in the conspiracy alleged in this Complaint,

produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

28.     Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business located in East Brunswick, New Jersey.  Citron is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Citron directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

29.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business located in Princeton, New Jersey.  Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company. Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

30.     Defendant Emcure Pharmaceuticals, Ltd. ("Emcure") is an Indian company with its principal place of business located in Pune, India.  In April 2011, Emcure acquired Defendant Heritage (defined below).   Heritage, as a subsidiary of Emcure, conducts Emcure's U.S. commercial operations.  Emcure is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Emcure directly

participated in the conspiracy alleged in this Complaint; produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories both directly and through its wholly owned subsidiaries, directly and/or through its subsidiaries sold Price-Fixed generic drugs to Plaintiffs and others in the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  In addition, during the time period relevant to this Complaint, Defendant Emcure purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

31.     Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York.  Epic is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Epic directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

32.     Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  In 2012, Novartis International AG acquired Fougera and merged it with its existing generic pharmaceutical subsidiary Sandoz (defined below).  Fougera is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Fougera directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged

in this Complaint in violation of Section 1 of the Sherman Act.  As used in this Complaint, "Sandoz" refers to Fougera and Sandoz, collectively, for the period beginning July 23, 2012.

33.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey Corporation with its principal place of business in South Plainfield, New Jersey.  G&W is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, G&W directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

34.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey.  Glenmark is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Glenmark directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

35.     Defendant Greenstone LLC ("Greenstone") is a Delaware limited liability company with its principal place of business in North Peapack, New Jersey.  Greenstone is a wholly-owned subsidiary of Defendant Pfizer Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer. Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President.  Greenstone employees also use Pfizer for financial analysis, human resources and

employee benefit purposes, making the two companies essentially indistinguishable.  At all times relevant to the Complaint, Greenstone has – under the direction and control of Pfizer – marketed and sold generic pharmaceuticals in this District and throughout the United States.  Greenstone and Pfizer are defined to include their managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Greenstone and Pfizer directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, received the proceeds of their unlawful in the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

(a)     In the Sections below, and throughout this Complaint, all references to Defendant Greenstone apply equally to Defendant Pfizer.  Indeed, the two companies operate in many important respects as a single functioning entity, without regard to corporate formalities.

(b)     As such, Greenstone is the alter ego of Pfizer, because Pfizer exercised domination and control over Greenstone; and injustice will result if the separate identity is maintained despite unity of interests between Pfizer and Greenstone.  Indeed, Greenstone sold price-fixed drugs to Plaintiffs and others at the direction of Pfizer and for the benefit of Pfizer.  During the period relevant to this Complaint, Pfizer received billions of dollars in proceeds of the conspiracy because of actions taken on its behalf by Greenstone, and Pfizer was therefore unjustly enriched.

(c)     Pfizer is the sole owner and shareholder of Greenstone, but treats Greenstone as its generics division or an internal business unit rather than as a separate and independent entity, controlling and directing Greenstone's business activities including Greenstone's marketing and sale of generic drugs.  Both companies share the same office space at

Pfizer's Peapack, New Jersey campus.   They also share common officers, managerial and supervisory personnel, and other employees.

(d)     Pfizer performs many of the important business functions of Greenstone that an independent corporate entity would typically perform on its own, including but not limited to: financial and sales analysis, business technology, customer service, legal, intellectual property, supply chain, human resources and employee benefits. Importantly, Greenstone – which as of 2017 was the 15th largest generic manufacturer in the country with annual gross sales of over one billion dollars – does not have its own Finance Department, Accounting Department, Legal Department, Customer Services Department, Human Resources Department, Operations Department or Information Technology Department – all critical functions for a legitimate business operation. All of those functions are performed by Pfizer.

(e)     Most – if not all – of Greenstone's "employees" are actually employed by Pfizer. The two primary individuals identified throughout this Complaint as having conspired with competitors on behalf of Greenstone – Jill Nailor and █████████ – are Pfizer employees.  They are paid directly by Pfizer, and Pfizer is listed as their employer in W-2 Wage and Tax Statements submitted to the United States government.  In their communications internally and with customers and competitors, both Nailor and ██████ regularly used e-mail addresses that ended with Pfizer's e-mail domain: "@pfizer.com."  This is the case for most if not all of Greenstone's "employees." Nailor and ██████ also both received shares of Pfizer stock as compensation for their work, in addition to their Pfizer-paid salaries.  They were reimbursed and/or compensated by Pfizer through its accounts payable system for membership in industry trade associations; they used Pfizer cell phones and/or iPads; and they used Pfizer teleconference and WebEx services to conduct their work.

(f)     Jill Nailor received regular performance evaluations directly from Pfizer, called "Pfizer Senior Leader Excellence Profile[s]," and participated in a program called "Pfizer Cornerstones of Management."  Accordingly, Nailor and ███ were agents of Pfizer during the period relevant to this Complaint because there was a manifestation by Pfizer that Nailor and ███ would act on Pfizer's behalf; Nailor and ███ accepted the undertaking; and there was an understanding between Pfizer on the one hand and both Nailor and ███ on the other that Pfizer would be in control of the undertaking.

(g)     During all times relevant to this Complaint, Greenstone has not had its own President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Commercial Officer or any Vice Presidents.  The highest-ranking position at Greenstone has been the General Manager, a position held by a Pfizer employee that reports directly to higher-level executives at Pfizer.

(h)     During all times relevant to this Complaint, Pfizer has operated with multiple business units, one of which was always responsible for overseeing the marketing and sale of "established" products, including the generic drugs sold by Greenstone.  The name of this business unit has changed over time.   As of 2014, it was called the Global Established Pharmaceuticals Division ("GEP").  Today, it is referred to as "Pfizer Essential Health" ("PEH"). Within Pfizer, Greenstone has operated as part of GEP and/or PEH, and Greenstone "employees" (often referred to as the "Greenstone team") were all included in Pfizer's organizational charts – demonstrating that Greenstone was acting as an internal division within Pfizer rather than as a separate company.  For example, as of 2017, Jill Nailor and other Greenstone executives were prominently identified as PEH employees in certain Pfizer organizational charts.

(i)     Similarly, as of 2014 these same individuals were considered part of GEP. In an April 2014 presentation to Greenstone customers at the NACDS Annual Conference in Scottsdale, Arizona, Jill Nailor gave what she referred to as a "Greenstone/Pfizer overview" where she discussed the new streamlined organization of Pfizer and Greenstone.  Specifically, Nailor told customers that the General Manager of Greenstone – Jim Cannon – was now only three levels away from the CEO of Pfizer within the overall Pfizer corporate structure.  She showed customers the organizational structure of Pfizer, which included both Jim Cannon (General Manager of Greenstone) and herself as reports within the Pfizer corporate hierarchy.

(j)     Even Greenstone's own separate organizational charts, to the extent they exist, include all Pfizer employees, the Pfizer trademarked logo and brand name, and refer to the "Extended Pfizer Team" of individuals who perform many important business functions for the company. Greenstone also promotes itself publicly as a marketing or distribution wing of Pfizer, specifically adopting the Pfizer logo in its marketing materials.   Greenstone touts that the authorized generic drugs it sells "███████████████████████████████████████████████ ████████████████████████" and that they "████████████████████████████████████ ████████████████████████████████████████████."  Greenstone has consistently advertised its connection with Pfizer in order to strategically capitalize on Pfizer's brand recognition and respect, for purposes of increasing its own sales.

(k)     In carrying out its business, Greenstone's internal training and marketing documents regularly carry Pfizer's trademarked logo and brand name.  This includes internal "Greenstone" presentations relating solely to generic drugs and issues specific to the generic pharmaceutical industry.

(l)     Because Greenstone operates as part of Pfizer, Pfizer is directly involved in the generics business and extensively evaluates generic competitors, price erosion in the generic industry, and other strategic issues on behalf of Greenstone.  Greenstone and Pfizer management regularly coordinate on strategy and communicate about concepts such as "fair share," "responsible pricing" and following other competitors' price increases in particular generic drug markets.  For example, in a PEH presentation in January 2017 relating to Greenstone, a dual Pfizer/Greenstone employee explained the strategy behind the "fair share" concept, and indicated that Greenstone should "PUSH" those drugs where Greenstone had less than fair share, and simply maintain market share in those markets that were "STABLE."

(m)     Pfizer employees also work directly with the FDA on Greenstone's behalf to obtain approval for the drugs that Greenstone sells.

(n)     Greenstone also relies on Pfizer for cost and pricing strategy. For new products in particular, Pfizer's Global Supply unit ("PGS") makes the budget, defines the costs of goods sold, and then conveys that information to Greenstone without significant feedback. PGS is also heavily involved in deciding which new molecules will be produced and/or sold by Greenstone.

(o)     Pfizer performs all financial analyses, sales reports, revenue projections, and other finance functions for Greenstone.  Since at least January 2013, these tasks have been performed by Pfizer's Director of Business Finance, Gerardo Cabriada. In his LinkedIn profile, Cabriada lists his employer as Pfizer, and includes within his responsibilities that he is the "Finance Lead" for Greenstone – a "business unit" of Pfizer that sells generic pharmaceuticals in the U.S. and Puerto Rico.

(p)     Greenstone does not have its own separate IT infrastructure, and Pfizer provides access to its bid-tracking software and other business tools so that Greenstone can keep track of its operations, including but not limited to: budget, supply, pricing, molecules sold, competition, market share, and financial performance generally.

(q)     In every important respect, including financially, Pfizer directly controls the decision-making of Greenstone. Greenstone does not even have the authority to implement its own price increases without first obtaining the approval of Pfizer. This includes the price increases discussed below. Not only does Pfizer have to approve Greenstone's price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer. For example, in a "Business Review" presentation to the President of PEH in May 2017, Greenstone indicated that, for price increases specifically, it must "████████████████."

(r)     For these reasons, although technically Greenstone is a separately incorporated entity, it is separate in name only. Any actions attributed to Defendant Greenstone throughout this Complaint, including specifically those of Jill Nailor or ████████, are actions taken, directed and/or controlled by Pfizer.

36.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey. In April 2011, Emcure acquired Heritage. Heritage is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Heritage directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

37.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  Defendant Impax is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Impax directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  As noted above, Defendant Amneal acquired Impax in October 2017.

38.     Defendant Jubilant Cadista Pharmaceuticals, Inc. ("Cadista") is a Delaware corporation with its principal place of business in Salisbury, Maryland.  Defendant Cadista is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Cadista directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

39.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  Defendant Lannett is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Lannett directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

40.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business located in Baltimore, Maryland.  Lupin is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Lupin directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

41.     Defendant Mayne Pharma USA, Inc. ("Mayne") is a Delaware corporation with its principal place of business located in Paramus, New Jersey.  Mayne is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Mayne directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

42.     Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business located in Morton Grove, Illinois.  Wockhardt, Ltd., an Indian company, is the parent company of Morton Grove.  Defendant Morton Grove is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Morton Grove directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

43.     Defendant Mylan N.V. is a Dutch corporation with its principal place of business and global headquarters in Canonsburg, Pennsylvania.  Mylan N.V. is the direct parent corporation of Defendant Mylan Inc. and the ultimate parent and owner of Defendants Mylan Pharma and UDL (both defined below).  During the time period relevant to Plaintiffs' claims, Mylan N.V. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

44.     Defendant Mylan Inc. ("Mylan") is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Mylan Inc. is the parent company of Defendant UDL (defined below) and Defendant Mylan Pharma (defined below).  Mylan Inc. is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Mylan Inc. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

45.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  Mylan Pharma is a subsidiary of Defendant Mylan Inc.  Mylan Pharma is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Mylan Pharma directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman

Act.  Mylan N.V., Mylan Inc., Mylan Pharma, and UDL (defined below) are collectively defined as "Mylan."

46.    ParParDefendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its principal place of business in Allegan, Michigan.  Perrigo is a subsidiary of Perrigo Company, plc, an Irish company.  Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Perrigo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

47.    Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey.  Pliva is a wholly-owned subsidiary of Defendant Teva (defined below).  Pliva is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Pliva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

48.    Defendant Sun Pharmaceutical Industries, Inc. (f/k/a Caraco Pharmaceutical Laboratories, Ltd.) ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  Co-conspirator Sun Pharmaceutical Industries Ltd., ("Sun Ltd."), based in Mumbai, India, along with certain of its wholly-owned subsidiaries, owns 100% of Sun.  Sun Ltd. also owns approximately 70% of Defendant Taro (defined below) and Taro's parent, Taro Pharmaceutical Industries, Ltd.  In late 2012, Sun acquired URL Pharma, Inc., which is a wholly-owned subsidiary of co-conspirator Mutual Pharmaceutical Company, Inc. ("Mutual").  Mutual is

a wholly-owned subsidiary of Sun.  Sun is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Sun directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

49.     Defendant Novartis AG ("Novartis") is a global pharmaceutical company organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.  During the time period relevant to Plaintiff's claims, Novartis directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Acvatis purposefully directed all conduct alleged in this Complaint at the United States, incluing the Eastern District of Pennsylvania.

50.     Defendant Sandoz, Inc. ("Sandoz USA") is a Colorado corporation with its principal place of business located in Princeton, New Jersey.  Defendant Sandoz AG is a company organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.  Sandoz USA distributes the drugs that its parent, Sandoz AG, develops and manufacturers.  Defendant Sandoz USA and Sandoz AG are defined to include their managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Sandoz USA directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Prior to October 4, 2023, Sandoz USA was an indirect, wholly owned subsidiary

of Novartis through which Novartis operated its generic pharmaceutical business in the United States, and Sandoz AG was an indirect, wholly owned subsidiary of Novartis through which Novartis operated its global generic pharmaceutical business.

51.     In August 2022, Novartis announced its intention to "separate Sandoz, its generics and biosimilars division into a new publicly traded standalone company, by way of a 100% spin-off."  On September 15, 2023, at an extraordinary general meeting, Novartis's shareholders voted to approve the spin-off ("2023 Spin-Off").

52.     According to the August 18, 2023 Prospectus, the 2023 Spin-Off would result in "the complete legal and structural separation of the Sandoz division into an independent company," and "the separation would be effected through a pro-rata distribution of the shares of an existing entity, Sandoz Group AG, which was formed in January 2022 to hold the assets and liabilities of the Sandoz Business."

53.     On October 4, 2023, Novartis announced that it had "completed the Spin-off of Sandoz, its Generics and Biosimilars business, through a dividend-in-kind distribution to holders of Novartis shares and American Depositary Receipts (ADRs), with each holder receiving one Sandoz share for every five Novartis shares or one Sandoz ADR for every five Novartis ADRs, held at the close of business on October 3, 2023."

54.     Following the 2023 Spin-Off, Sandoz Group AG became an independent, standalone entity.  Defendants Sandoz Inc. and Sandoz AG survived as indirect, wholly owned subsidiaries of Sandoz Group AG.

55.     Unless addressed individually, Fougera, Novartis AG, Sandoz AG, and Sandoz Inc. are collectively referred to herein as "Sandoz."

56.     Defendant Strides Pharma, Inc. ("Strides") is a New Jersey corporation with its principle place of business in East Brunswick, New Jersey.  Strides is the U.S. subsidiary and sales agent of Strides Pharma Science Limited, an Indian pharmaceutical conglomerate.  Strides is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Strides directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

57.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli corporation.  Taro is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Taro directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

58.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation.  Teva is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Teva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its

territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

59.     Defendant Torrent Pharma Inc. ("Torrent") is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey.  Torrent is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims: Teva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

60.     Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois.  UDL, n/k/a Mylan Institutional Inc., is a subsidiary of Defendant Mylan Inc.  UDL is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, UDL directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

61.     Defendant Upsher-Smith Laboratories, LLC (f/k/a Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business located in Maple Grove, Minnesota.  During the time period relevant to Plaintiffs' claims, Upsher-Smith manufactured generic Baclofen and Propranolol.  Upsher-Smith is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Upsher-Smith directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United

States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

62.     Defendant Valeant Pharmaceuticals International ("Valeant International") is a Canadian company with its principal place of business in Bridgewater, New Jersey. Valeant International was a California company until September 2010, when it merged with Biovail Corporation, a Canadian company. Defendant Valeant Pharmaceuticals North America, LLC ("Valeant North America") is a Delaware limited liability corporation with its principal place of business in Bridgewater, New Jersey. It is a wholly-owned subsidiary of Valeant International. Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California. Oceanside is a wholly-owned subsidiary of Valeant. In 2018, in an attempt to distance itself from wide-ranging corporate malfeasance (including, but not limited to, conduct alleged in this Complaint), Valeant Pharmaceuticals International changed its name to Bausch Health Companies Inc., and Valeant North America changed its name to Bausch Health US, LLC. In this Complaint, Valeant International, Valeant North America, and Oceanside are referred to collectively as "Valeant." Valeant is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Valeant directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

63.     Defendant Versapharm, Inc. ("Versapharm") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Marietta, Georgia. Versapharm is defined to include its managers, officers, employees, and agents acting

on its behalf.   During the time period relevant to Plaintiffs' claims, Versapharm directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

64.    Defendant West-Ward Pharmaceuticals Corp., (now known as Hikma Pharmaceuticals USA, Inc.) and West-Ward Columbus Inc. are Delaware corporations with their principal place of business located in the same office in Eatontown, New Jersey.  West-Ward is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, West-Ward directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

65.    Defendant Hikma Labs Inc. (formerly known as Roxane Laboratories, Inc.) ("Roxane") is a Nevada corporation with its principal place of business in the same Eatontown, New Jersey office as West-Ward Pharmaceuticals Corp., and West-Ward Columbus Inc.  Each of the three companies is a wholly-owned subsidiary of Hikma Pharmaceuticals plc, a multinational pharmaceutical company founded in Amman, Jordan and headquartered in London.  Hikma Labs Inc., West-Ward Pharmaceuticals Corp., and West-Ward Columbus Inc. are collectively referred to in this Complaint as "West-Ward" for the period beginning March 2, 2016.  During the time period relevant to Plaintiffs' claims, West-Ward directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

66.     Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Wockhardt is a wholly-owned subsidiary of Defendant Morton Grove Pharmaceuticals, Inc.  Wockhardt is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Wockhardt directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

67.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business located in Pennington, New Jersey.  Zydus is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Zydus directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

### C.     <u>Co-Conspirators and Agents</u>

68.     Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

69.     The names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs reserve the right to amend this Complaint to allege the names and capacities of additional co-conspirators as they are discovered.

70.     At all relevant times, other persons, firms, and corporations, referred to in this Complaint as "co-conspirators," the identities of which are presently unknown, have knowingly and willingly conspired with Defendants in their unlawful scheme as described herein.

71.     The acts alleged in this Complaint that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

72.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.     SANDOZ SPIN-OFF & NOVARTIS' PARTICIPATION IN THE CONPSIRACY

73.     Prior to the Sandoz Spin-Off, Sandoz and Novartis Operated as a single entity and Novartis exercised control over Sandoz's actions.

74.     Novartis was created as a result of the merger of Sandoz AG and CIBA-Geigy AG ("Merging Parties") on December 20, 1996 when all assets and liabilities of the Merging Parties were transferred by universal succession to Novartis (the "1996 Merger").  The 1996 Transaction was structured as a "merger of equals" and "based on an exchange of shares," with former Sandoz AG shareholders receiving 55% of Novartis shares.  Under U.S. GAAP, Sandoz AG would be deemed to have acquired the assets and liabilities of CIBA-Geigy AG.

75.     Novartis and Sandoz Group AG share the same headquarters, the venerable St. Johann facility located in Basel, Switzerland.  Even following the 2023 Spin-Off, Novartis and Sandoz Group AG continue to share the same headquarters.

76.     After the 1996 Merger, the Sandoz name became dormant, with Novartis operating its generic business as Novartis generics.  Novartis relaunched and operated its global generics businesses under the Sandoz brand in 2003 through various subsidiary companies, including Sandoz, Inc., Sandoz AG, and Sandoz International GmbH.  But Novartis and these subsidiary companies acted as a single functioning entity without regard to corporate formalities.  For all practical purposes, Novartis treated Sandoz as part of a larger integrated company and exercised control over its actions, including its decisions related to the manufacture and sale of the generic drugs at issue in this litigation.

77.     The Sandoz, Inc. board of directors operated as a mere formality. Globally, the Novartis generics operation was supervised by Sandoz International GmbH based out of Germany, and a subsidiary of Sandoz AG.  Meaningful corporate oversight was also exercised by, and strategic direction was dictated by, the Novartis Board of Directors and the Executive Committee of Novartis.

78.     When Peter Goldschmidt was appointed CEO of Sandoz, Inc. in 2013, he was, and remained, an employee of Sandoz International GmbH who was seconded or loaned to Sandoz, Inc.  As part of the organizational reporting structure of Sandoz Inc., he initially reported to the president of another Novartis subsidiary, Novartis Pharmaceutical Company, who defined his operational objectives.  The CEO of Sandoz regularly reported to and received direction from Novartis and the head of Sandoz's global operations.

79.     Prior to the 2023 Spin-Off, Novartis treated Sandoz not as a separate corporate entity, but as a line of Novartis's business.  To that end, Sandoz's revenues and financial success were rolled up into the financial results of Sandoz's global operations, and then further consolidated into Novartis's financial statements with the ultimate objective of transferring value

and profits to the Novartis organization as a whole, including the illegal profits that arose from the conspiracy alleged herein. As a result, Novartis dictated Sandoz's financial targets and how Sandoz needed to achieve those targets in order for Novartis to reap the profits.  For example, in 2012, the Executive Committee of Novartis dictated to the global head of Sandoz that to improve the profitability of Novartis as a whole, the Sandoz business needed to generate substantial additional revenue through pricing actions.  The global head of Sandoz then communicated this directive throughout the Sandoz organization, explaining the work they needed to perform "███████████████ ███████████████████████████."

80.     Pursuant to Sandoz's internal guidelines, "certain management matters," such as capital expenditures in excess of certain values, were "assigned and require[d] coordination or escalation of approvals to certain Novartis governance bodies."

81.     Consistent with the commercial realities, Novartis continually identified Sandoz in its Annual Reports and investor communications as its generics "division" or "segment" or part of the "Novartis Group."  Additionally, pursuant to formal marketing guidelines directed by Novartis and intended to present the image of an integrated company, the Sandoz name in presentations and other documents was typically accompanied by the squib "A Novartis Company" or "A Novartis Division."  When dealing with customers and the public, Novartis presented the image of a single unified Novartis and blurred the distinctions between the various subsidiaries.  For example, when one of its largest customers, McKesson, requested information on the relationship between Sandoz entities, Sandoz would say nothing other than "Sandoz Inc., Sandoz AG and Sandoz International GmbH are all affiliates ultimately owned by Novartis AG."  When McKesson sought further clarification, Sandoz continued its obfuscation by refusing to provide any more information and

stating, "███████████████████████████████████████████████████████████

████████████████████████."

82.     Furthermore, Novartis's Code of Conduct was applicable to all Novartis entities, including Sandoz, and provided: "███████████████████████████████████████

████████████████████████."

83.     Novartis also claimed Sandoz's revenues and financial success as its own and rolled up Sandoz's financial results into its consolidated Novartis financial statements.  For example, in Novartis' filings made with the U.S. Securities and Exchange Commission ("SEC") during the Relevant Period, Sandoz revenues (and profits) were consolidated on the Novartis balance sheet. Those annual reports further calculated earnings per Novartis share and cash dividends per Novartis share based on those consolidated revenues, which included the profits earned by Novartis as a result of the illegal conduct detailed herein.  In fact, Novartis' 2021 Integrated Report states that Novartis is undertaking a strategic review of "███████████████████████

████████████████████████████████████████████████████████████████."

In other words, Novartis was strategizing how to improve Sandoz's profitability so that it could use those profits to compensate Novartis shareholders.  Responsibility for this "strategic review to maximize shareholder value" was undertaken by Novartis' Board of Directors.

84.     As a result, Novartis dictated Sandoz's financial targets, as well as the steps Sandoz needed to take in order to meet those targets and thereby "█████████████████████" for Novartis. For example, in 2012, the Novartis Executive Committee issued a "████████████

█████████" by hundreds of millions of dollars, and that plan included a directive to Sandoz to generate $██████ in additional revenue through pricing.  Sandoz understood the directive; the then-global head of Sandoz sent the email to other Sandoz employees, noting that the message

"█████████████████████████████████████████████████████

███████████████."  In other words, Sandoz understood that its responsibility was to generate

revenue for, and increase the profitability of, Novartis.

85.     In addition to treating Sandoz revenues and profits as its own, Novartis satisfied

Sandoz's outstanding debts by issuing Novartis stock to debtholders.  For example, in a Form 20-

F filed by Novartis with the SEC on March 18, 2002, Novartis reported that it would satisfy various

debt obligations owed by Sandoz AG and its subsidiaries by issuing Novartis shares to the

debtholders or otherwise paying such debtholders cash out of cash controlled by Novartis.

86.     In addition, Novartis's communications with external parties represented that the

creditworthiness of Sandoz entities was entirely dependent on the creditworthiness of Novartis.

For example, in a 2015 email exchange, a prospective business partner asked Sandoz about the

Novartis-Sandoz corporate structure and other questions designed to "███████████████████

██████████████████████████."  The Sandoz response, "████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████," and that Novartis AG was the only publicly traded

entity.

87.     Moreover, personnel employed by Novartis made decisions regarding the direction

of Sandoz's generics business, such as whether to integrate certain functions across its "divisions,"

and whether to keep supply and other relationships in-house or out.

88.     Prior to the 2023 Spin-Off, Novartis also controlled several of Sandoz's business

functions, including: accounting, finance, quality and pharmacovigilance, human resources

operations, pension administration, legal, real estate and facility services, including site security

and executive protection, procurement, information technology, information security, commercial

and medical support services, financial reporting and accounting operations.  While controlling Sandoz's financial functions, Novartis handled billing issues for Sandoz products and communicated directly with Sandoz customers.  Still more, during the period relevant to this case, the manufacturing and supply chain operations for both Novartis and Sandoz were consolidated into a single division, referred to as "███████████████."  Novartis' technical operations unit managed the production, supply chain and quality of the Sandoz division.  At least two of the drugs at issue in this case – timolol maleate and prednisolone acetate – were manufactured at Novartis facilities.  Because of this consolidation, Sandoz's supply chain operations reported not to the Sandoz CEO, but to Novartis.

89.    The intermingling of Sandoz and Novartis operations was so extensive that even employees were not sure which of Sandoz or Novartis was technically their employer.  For example, Sandoz corporate designee, █████████████████████████████ ████████████████████."  Indeed, Sandoz employees received their annual reviews on Novartis letterhead.  Sandoz employees also received their bonuses based on whether Novartis and Sandoz reached their sales targets.

90.    It is not surprising that employees were confused about the identity of their employer because Novartis mandated a "Customers First" culture throughout its divisions that required the divisions, including Sandoz, to work together for the overall benefit of Novartis.  Novartis's Customer First culture sought to promote all of the Novartis divisions (including Sandoz) together.  The goal was to market all Novartis divisions as "One Novartis" to customers so Novartis could develop a reputation with customers that all of its business units were a single entity.  The "One Novartis" concept stuck at Sandoz, and Sandoz employees frequently made business decisions that were focused on delivering value to Novartis, not Sandoz.  Additionally,

to promote a "."

91.     Moreover, Novartis was heavily involved in, exercised control over, and dominated the exact Sandoz conduct at issue in this case. Pursuant to Sandoz's internal guidelines, "███████ ████████████████████████████████████████████████████████████████ ███████████████████████████."  For example, Novartis approval was required for increases to the Wholesale Acquisition Cost (WAC) on Sandoz products.  The WAC price is the list price at which wholesalers purchase a product from Sandoz.  Any increases to the WAC price for a particular product would first go through the Sandoz pricing committee, then to Novartis for final approval.  Then, and only then, could a WAC price increase be implemented.

92.     In addition to having final approval over certain Sandoz pricing committee decisions, Novartis employees also participated in the Sandoz pricing committee. For example, Novartis's ███████████ regularly participated in Sandoz pricing committee meetings and decisions from early 2013 to early 2016.  During this time, ██████████ often performed financial analyses related to pricing decisions put before the committee.  She served in a variety of roles on the committee, from Deputy General Approver all the way up to committee chair.  For this entire period, ██████████ was a Novartis employee.  She used a "@novartis.com" email address; and her public LinkedIn page describes her position from December 2012 to January 2016 as "Associate Director, Revenue Finance" at Novartis.

93.     After Sandoz took price increases, Novartis personnel were also involved in formulating Sandoz's media strategy and drafting Sandoz's responses to press inquiries regarding the dramatic price increases for generic drugs.  For example, in 2015, in response to reporter

inquiries about price increases on certain generic drugs – including clobetasol – Novartis employees directly participated in drafting "█████████" for discussions with reporters. Among these Novartis employees was ████████, the Vice President of Communications at Novartis Pharmaceuticals Corporation. Further to this same response effort, Sandoz Inc.'s Vice President of Communications had a phone discussion with a press member – a discussion she made clear to her superiors was "██████████████████████████████████" – to relay the Novartis/Sandoz talking points. These Novartis/Sandoz press communications concealed the fact that the price increases were caused by Defendants' unlawful and anticompetitive activities.

94.    Novartis also participated in, exercised control over, and dominated bidding decisions at Sandoz. For example, when Sandoz considered bidding for certain generic drugs with McKesson (a significant Sandoz customer), ███████████, who held himself out as a Novartis employee, commented that he would "████████████████████████████████████████████████████████████." IGI Laboratories, Inc. (now known as Teligent, Inc.) is another generic drug manufacturer and a large competitor of Sandoz. Reflecting his knowledge of the conspiracy's "fair share" rules, ██████████ instructed Sandoz to avoid "████████████████████████████████████████████████████████," meaning prepare an offer for Rite Aid. In other words, ██████████ steered Sandoz away from one bidding decision in favor of another to ensure that Sandoz followed the rules of the conspiracy.

95.    At the time that he was participating in these Sandoz bidding decisions, ███ held himself out as a Novartis employee. In the course of his work, he exclusively used an email address with the domain "@novartis.com." And on his public LinkedIn page, ███ ██████ identified himself as a Novartis employee.

96.     Novartis also exercised control over the launch and pricing of several Sandoz generic drugs at issue in this litigation including Carbamazepine and Valsartan HCTZ.  Novartis placed an immense amount of pressure on Sandoz to be successful with these drugs, and directed Sandoz to provide Novartis with competitive intelligence on these drugs so that Novartis could use the information in its business plans.  CW-4 noted that the pressure Novartis placed on Sandoz concerning carbamazepine was so extreme that she reached out to a Taro employee, Doug Statler, to gain competitive intelligence concerning Taro's target market share goal and target customers.  Sandoz wanted this information so they could allocate the market with Taro and avoid price erosion.  This was the first time that CW-4 reached out to a competitor to gain conspiratorial information.  CW-4 continuously reached out to Mr. Statler to obtain competitive intelligence concerning carbamazepine.

97.     Moreover, Novartis also exercised control and dominated over the investigation into, and litigation over, the conduct at issue in this case.  For example, upon receiving a criminal subpoena from DOJ in spring 2016, Novartis retained outside counsel to conduct an internal investigation.  Also, the general counsel for Novartis gave advice to the Novartis executive committee and board of directors on how to proceed with the resolution.  Sandoz did not conduct any additional investigation beyond that which was conducted by Novartis's chosen outside counsel.

98.     Sandoz also closely coordinated with Novartis's media relations personnel to formulate responses to media inquiries in response to the dramatic price increases on generic drugs in 2014 and 2015 at issue in this case, which had the effect of concealing the fact that these increases were caused by Defendants' unlawful and anticompetitive activities.

99.     To that end, Novartis has also accepted financial responsibility for, at least, some of the illegal conduct detailed herein when Novartis also authorized Sandoz general counsel, Karen McDonnell, to sign a DPA with the DOJ.  Despite the fact that Sandoz signed the DPA, Novartis "fully provisioned for this settlement."  Indeed, Note 20 to Item 18 in Novartis' Consolidated Financial Statement, as filed with the SEC as part of Novartis' Form 20-F for 2022, shows that its provision for non-current liabilities, specifically for "governmental investigations and other legal matters" increased from $181 million in 2020 to $341 million in 2021 despite having agreed to settle the DOJ investigation with, among other things, a payment of $185 million.

100.     Novartis specifically identifies this Multi-District Litigation as one of several matters for which Novartis has provisioned for further costs under Note 20.  Novartis freely admits that its provisions may prove to be insufficient: "Given the inherent difficulties in estimating liabilities in this area, Novartis may incur additional costs beyond the amounts provided."

101.     The spun-off Sandoz entity does not have enough capital reserved to meet its litigation liabilities.  According to the August 18, 2023 Prospectus, the spun-off Sandoz entity would maintain reserves for "significant legal proceedings," including this case.  As of December 31, 2022, those reserves were set at $87 million.  The Prospectus reports that an additional USD 185 million was added to these reserves, including $51 million for an unrelated case.  Therefore, even assuming none of the remaining 2022 reserves were released in 2023, Sandoz's reserves, at most, $221 million, are woefully inadequate for its liabilities in this case, let alone the multitude of other "significant legal proceedings" disclosed in the Prospectus.  And all of this potential liability stems from the same set of facts under which Sandoz has already paid in excess of USD 380 million to settle claims brought by the United States.  Still more, Sandoz's reserves also need to cover all other "significant legal proceedings" listed in the Prospectus – including the opioid

litigation, in which "Sandoz is named in more than 600 complaints filed in the multidistrict litigation in US federal court in the Eastern District of Ohio, as well as approximately 45 lawsuits filed outside the MDL in state and federal courts."  In short, Sandoz's reserves are woefully inadequate for its liabilities in this case alone, let alone the multitude of other "significant legal proceedings" disclosed in the Prospectus. For that reason, there is a significant risk that Sandoz Group AG, as a spun-off entity, will be unable to satisfy a judgment in this litigation.

## VI.    **TRADE AND COMMERCE**

102.    During the time period relevant to Plaintiffs' claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial.  In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)    Defendants and their co-conspirators sold and shipped substantial quantities of generic drugs in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the generic drugs;

(b)    Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)    Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d)    Defendants and their co-conspirators imported substantial quantities of raw materials for generic drugs from outside the United States.

103.    The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## VII.   <u>GENERIC DRUGS, THE FDCA AND THE HATCH-WAXMAN AMENDMENTS</u>

104.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can (and do) exploit in order to obtain or maintain market power in the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase.  When the same person both pays for and chooses the product, the price of the product plays an appropriate role in the person's choice and, consequently, manufacturers have an appropriate incentive to lower the prices of their products.

105.    The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including each of the Price-Fixed Generics Drugs, to patients without a prescription written by a doctor.  The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection.  The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

106.    Brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturers' products.  These sales representatives do not advise doctors of the cost of the branded products.  Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive

to price differences because they do not have to pay for the products. The result is a marketplace in which the price plays a comparatively unimportant role in product selection.

107. The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up. This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable.

108. Due to this disconnect, retailers like Plaintiffs play an important role in driving down prescription drug costs in the United States. The most important tool that retailers like Plaintiffs have at their disposal is the availability of generic drug manufacturers operating in a competitive marketplace. As explained below, when drug manufacturers begin selling generic bio-equivalent alternatives to branded prescription drugs that have previously been subject to a patent, retailers are able to drive the prices paid for those drugs down substantially.

109. Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain Food and Drug Administration ("FDA") approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b). The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the

brand manufacturer's original NDA by showing that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug – that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

110.   The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

111.   Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate generic competitors, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

112.   The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had soared to $300 billion.

113.     Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts.  The only material difference between generic and brand name drugs is their price: generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers.  The Federal Trade Commission ("FTC") estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiator and the basis for competition among manufacturers.  Over time, generics' pricing nears the generic manufacturers' marginal costs.

114.     Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug.  Generic competition to a single blockbuster brand drug (*i.e.*, a drug that generates annual sales of $1 billion or more) can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others.  Indeed, one study found that the use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[1]

115.     Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name

_____

[1]     GPhA, Generic Drug Savings in the U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

counterpart.   Since passage of the Hatch-Waxman Amendments, every State has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

116.    There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain.   Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug.   Health insurers and patients also benefit from the lower prices that result from generic competition.

117.    Further, the more generic manufacturers that enter a market, the more the price for the drug decreases.   As an FDA study reflects, "generic competition is associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction," as average prices fall to roughly half the price of the branded drug.   Further, with the entry of each additional generic manufacturer up to the ninth manufacturer, the price continues to fall.   In mature markets with 19 or more generic manufacturers, the price of the generic drug is as low as 6% of the branded version.   This phenomenon is demonstrated in the following chart prepared by the FDA:



**Generic Competition and Drug Prices**

Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

118.    Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales.  Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.[2]

## VIII.   THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS

119.    As noted above, Defendants' conduct regarding generic drugs is under investigation by the DOJ, State Attorneys General, the United States Congress and others.

### A.    The DOJ is Leading a Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers

120.    No later than November 3, 2014, as noted above, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas to several generic drug manufacturers, including nearly all Defendants and/or their affiliates.

121.    A source at the Policy and Regulatory Report says "prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever.  Like in that case, prosecutors expect to move from one drug to another in a similar cascading fashion."[3]

---

[2]    At one time, payers relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.

[3]    *See* Eric Palmer, *DOJ criminal probe takes a look at trade associations*, FIERCE PHARMA (July 10, 2015), http://www.fiercepharma.com/regulatory/doj-criminal-probe-takes-a-look-at-trade-associations.

122.    According to BLOOMBERG NEWS, the investigation encompasses more than a dozen companies and at least two dozen generic drugs.  The source quoted by the BLOOMBERG article correctly predicted in November 2016 that the DOJ would file criminal charges against at least one member of the generic drug price-fixing conspiracy by the end of 2016.[4]

123.    Sure enough, on December 12, 2016, DOJ filed criminal charges against Jeffrey Glazer (the former CEO of Heritage) and Jason Malek (the former president of Heritage).  Both Glazer and Malek have since pled guilty to violations of Section 1 of the Sherman Act for their participation in conspiracies to fix prices, rig bids, and allocate customers for generic drugs, including Glyburide and Doxycycline.

124.    The Hon. Barclay Surrick of this Court determined that there was a factual basis for both Glazer's and Malek's pleas, and convicted each individual of a felony violation of the Sherman Act.  Sentencing for both Glazer and Malek was originally set for April 2017, but both sentencings have been repeatedly rescheduled as Glazer and Malek continue to cooperate with the DOJ.

125.    As alleged above, by operation of law, these guilty pleas merely define the minimum parameters of the conspiracy alleged in this Complaint.   The conspiracy (or, alternatively, conspiracies) detailed in this Complaint encompasses and is based in part on the criminal conduct of Glazer and Malek, as detailed in the Informations filed against each of them.  However, the conspiracy alleged in this Complaint is an eventual outgrowth of the conspiracy described in the Glazer and Malek charging documents.  In other words, the conspiracy (or,

---

[4]      *See* D. McLaughlin & C. Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG NEWS (Nov. 3, 2016,), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

alternatively, conspiracies) alleged in this Complaint are based at least in part on, and bear a real relation to, the matters complained of in the Malek and Glazer Informations.

126.    This is evidenced by the fact that in filing the charges against Glazer and Malek, the DOJ issued a press release saying that "[t]oday's charges are the result of an ongoing federal antitrust investigation into price-fixing, bid rigging, and other anticompetitive conduct in the generic pharmaceutical industry…"  To that end, following the plea agreements of Malek and Glazer, the DOJ obtained and executed search warrants against at least Aceto Corporation (which purchased Citron's generic drugs business in December 2016), Perrigo, and Mylan in connection with the generic drug price fixing probe.  Accordingly, at least one federal judge has necessarily found probable cause that such a conspiracy existed, and that it was likely that evidence of the conspiracy would be found in the offices of Perrigo, Mylan, and Citron.

127.    In addition to the raid of Perrigo's, Mylan's, and Aceto's corporate offices, the grand jury empaneled by DOJ as part of its investigation has issued subpoenas to numerous Defendants and/or their employees.  The following companies have publicly acknowledged receiving grand jury subpoenas: Aceto, Actavis, Aurobindo, Citron, Dr. Reddy's, Greenstone/Pfizer, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, co-conspirator Rising, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus.  Upon information and belief, additional companies have also received subpoenas but have not publicly acknowledged this fact.

128.    The fact that most Defendants and/or their employees received criminal subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, *available at* https://www.justice.gov/atr/division-manual.  Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury

investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82.  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.  *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."  *Id*. at III-83.  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which Price-Fixed sales were made or where conspiratorial communications occurred." *Id*.  Thus, the fact that one or more of the Defendants and certain of their employees received federal grand jury subpoenas is an indication that antitrust offenses have occurred involving these companies.

129.    Additionally, public sources have reported that at least one Defendant or co-conspirator has applied for conditional amnesty under ACPERA.  That a target has applied for leniency is significant.  As the DOJ notes on its web site (https://www.justice.gov/atr/page/file/926521/download):

> 5.    Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?
>
> Yes.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

> The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.[5]

*Id.*

130.    The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical Propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] Informations that were unsealed.''  The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that: "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug - overlap significantly with aspects of the ongoing criminal investigation.''  As noted above, the DOJ also filed a motion to stay discovery in MDL 2724, stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to Doxy Hyclate, Glyburide, and other drugs (including a significant number of the drugs at issue here)."[6]  DOJ has continued to maintain that a Stay of certain discovery is necessary to protect its

---

[5]      https://www.justice.gov/atr/page/file/926521/download.

[6]      *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.,* MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

investigation even after the judicial admissions by Heritage, Rising, Sandoz, Taro, and Apotex (detailed further below).

131.    Some of the companies that have received subpoenas have confirmed that the inquiry extends to other drugs.  For example, Mayne disclosed that the criminal investigation into its conduct "is focused on [Doxy DR] and potassium chloride powders," and Impax disclosed that the DOJ subpoena sought focused on specific drugs including digoxin and lidocaine/prilocaine.

132.    Since the charges against Glazer and Malek, DOJ's ongoing criminal investigation into the generic pharmaceutical drug industry has resulted in additional charges against seven generic drug manufacturers: Heritage, Rising, Sandoz, Apotex, Glenmark, Taro, and Teva. Additionally, Armando Kellum and Sandoz and Ara Aprahamian of Taro were also charged criminally in their individual capacities.

133.    On May 30, 2019, DOJ charged Heritage with participating in a conspiracy to fix prices of Glyburide and reached a deferred prosecution agreement with Heritage to resolve that charge.  In that agreement, Heritage admitted, accepted, and acknowledged that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information.

134.    Jason Malek is one of the "officers, directors, employees, and agents" whose acts for which Heritage admitted, acknowledged, and accepted responsibility.

135.    Jeffrey Glazer is one of the officers, directors, employees, and agents" whose acts for which Heritage admitted, acknowledged, and accepted responsibility.

136.    Heritage further admitted that, from in or around April 2014 and continuing until at least December 2015, Heritage, through certain of its officers and employees, including certain of its high-level personnel, participated in a conspiracy with other persons and entities engaged in

57

the production and sale of generic pharmaceutical products, including Glyburide, a purpose of which was to suppress and eliminate competition by allocating customers and fixing and maintaining prices for Glyburide sold in the United States.  To further the conspiracy, Heritage, through certain of its officers and employees, including certain of its high-level personnel, engaged in discussions with co-conspirators involved in the production and sale of Glyburide.  During these discussions, agreements were reached to allocate customers, rig bids, and fix and maintain the prices of Glyburide sold in the United States.  During the relevant period, Glyburide sold by one or more of the conspirators, and equipment and supplies necessary to the production and distribution of Glyburide, as well as payments for Glyburide, traveled in interstate commerce.  The business activities of Heritage and its co-conspirators in connection with the production and sale of Glyburide affected by this conspiracy were within the flow oi and substantially affected, interstate trade and commerce.  Glyburide was sold by one or more of the conspirators to customers in the Eastern District of Pennsylvania and acts in furtherance of this conspiracy were carried out within the Eastern District of Pennsylvania.

137.    In December 2019, co-conspirator Rising Pharmaceuticals LLC reached a deferred prosecution agreement with DOJ in which Rising agreed that, between April 2014 and September 2015, it knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers for and to stabilize, maintain, and fix prices of Benazepril HCTZ sold in the United States.  Rising further admitted that it (a) discussed the allocation of and agreed to allocate customers located in the United States; (b) provided or received specific non-public prices paid by the allocated customers to the existing supplier; (c) submitted offers to and declined requests to submit offers from customers in accordance with the agreement reached; and (d) sold

and accepted payment for Benazepril HCTZ in the United States at collusive and noncompetitive prices.

138.    On February 4, 2020, Ara Aprahamian, the former Vice President of Sales and Marketing of Defendant Taro, was indicted by a Grand Jury for criminal violations of the Sherman Act.  Aprahamian participated in a conspiracy between Sandoz, Taro, and other conspiring companies, the purpose of which was to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States.

139.    On February 14, 2020, Armando Kellum – formerly the Senior Director of Pricing and Contracts and, beginning in approximately November 2013, the Vice President of Contracting and Business Analytics of Sandoz – pled guilty to DOJ charges that he participated in a conspiracy with Sandoz, Taro, and other co-conspirators, the purpose of which was to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain and fix prices of, generic drugs sold in the United States between at least as early as March 2013 and continuing until at least June 2015.

140.    On March 2, 2020, DOJ charged Sandoz with a four-count Information alleging four separate violations of the Sherman Act.  Count 1 of the Information charged that Sandoz conspired with Taro to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as March 2013 and continuing until at least December 2015.  Count 2 of the Information charged that Sandoz conspired to suppress and eliminate competition with Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.), a generic drug company with its principal place of business in New Jersey, by agreeing to allocate

customers for, and stabilize, maintain, and fix prices of, Benazepril HCTZ sold in the United States, from at least as early as April 2014 and continuing until at least September 2015.  Count 3 of the Information charged that Sandoz conspired with Perrigo to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015.  Count 4 of the Information charged that Sandoz conspired with Teva to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015.

141.   Sandoz reached a deferred prosecution agreement with DOJ to resolve these charges in which Sandoz Inc. admitted that it is responsible for the acts of certain of its current and/or former employees that give rise to the charges in the Information.  Under that agreement, Sandoz Inc. further admitted that, from in or about March 2013 and continuing until in or about December 2015, Sandoz, through certain of its officers and employees, including an individual within high-level personnel, conspired with other persons and entities engaged in the production and sale of generic drugs to suppress and eliminate competition by allocating customers, rigging bids, and increasing and/or maintaining prices for certain generic drugs sold in the United States. Sandoz, through certain of its officers and employees, including an individual within high-level personnel, engaged in discussions with co-conspirators involved in the production and sale of certain generic drugs that competed with Sandoz products.  During these discussions, agreements were reached with co-conspirators to allocate customers, rig bids, and/or stabilize, maintain, and fix the prices of certain generic drugs sold in the United States.  Sandoz's sales of generic drugs affected by these conspiracies totaled more than $500,000,000.

142.     Sandoz further admitted that, from in or about March 2013 and continuing until in or about December 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, and nystatin triamcinolone cream, with Defendant Taro.  Generic drugs sold by Sandoz and its co-conspirators, as well as payments for affected generic drugs, traveled in interstate commerce.  The business activities of Sandoz and its co-conspirators in connection with the production and sale of generic drugs affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.  Generic drugs affected by the activities of Sandoz and its co-conspirators were sold to customers in the Eastern District of Pennsylvania.

143.     Sandoz further admitted that, from in or about April 2014 and continuing until in or about September 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers for, and/or stabilize, maintain, and fix prices of, Benazepril HCTZ with Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.). Benazepril HCTZ sold by Sandoz and its co-conspirators, as well as payments for Benazepril HCTZ, traveled in interstate commerce.  The business activities of Sandoz and its co-conspirators in connection with the production and sale of Benazepril HCTZ affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.  Benazepril HCTZ affected by the activities of Sandoz and its co-conspirators was sold to customers in the Eastern District of Pennsylvania.

144.     Sandoz further admitted that, from in or about July 2013 and continuing until in or about December 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic

drugs, including Desonide ointment, with Defendant Perrigo.  Generic drugs sold by Sandoz and its co-conspirators, as well as payments for affected generic drugs, traveled in interstate commerce. The business activities of Sandoz and its co-conspirators in connection with the production and sale of generic drugs affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.  Generic drugs affected by the activities of Sandoz and its co-conspirators were sold to customers in the Eastern District of Pennsylvania.

146.    Sandoz further admitted that, from in or about July 2013 and continuing until in or about December 2015, Sandoz Inc. conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including tobramycin inhalation solution, with Defendant Teva Pharmaceuticals USA, Inc. Generic drugs sold by Sandoz and its co-conspirators, as well as payments for affected generic drugs, traveled in interstate commerce.  The business activities of Sandoz and its co-conspirators in connection with the production and sale of generic drugs affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.  Generic drugs affected by the activities of Sandoz and its co-conspirators were sold to customers in the Eastern District of Pennsylvania.

146.    On May 6, 2020, DOJ charged Defendant Apotex with participating in a conspiracy, the purpose of which was to suppress and eliminate competition by agreeing to increase and maintain prices of Pravastatin in the United States between May 2013 and December 2015.

147.    On May 7, 2020, Apotex entered into a deferred prosecution with DOJ to resolve that charge.  Apotex admitted that, under United States law, it is responsible for the acts of certain of its current and/or former employees that give rise to the DOJ charges.  Apotex further admitted

that, from May 2013 and continuing until at least December 2015, Apotex, through certain of its current and/or former employees, conspired with other persons and entities engaged in the sale of generic drugs to suppress and eliminate competition by agreeing to increase and maintain prices of Pravastatin sold in the United States.  Apotex's relevant sales of Pravastatin totaled at least $105,000,000.

148.    Apotex further admitted that, from May 2013 and continuing until at least December 2015, Pravastatin sold by one or more conspirators, as well as payments for Pravastatin, traveled in interstate commerce.  The business activities of Apotex and its co-conspirators in connection with the production and/or sale of Pravastatin affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.  Pravastatin affected by the activities of Apotex and its co-conspirators was sold to customers in the Eastern District of Pennsylvania.

149.    On July 14, 2020, a Grand Jury charged Defendant Glenmark with criminal violations of the Sherman Act.  Defendant Glenmark, Defendant Apotex, Defendant Teva, and other co-conspirators knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to increase and maintain prices of Pravastatin and other generic drugs sold in the United States.

150.    On July 23, 2020, DOJ charged Defendant Taro with conspiring with Sandoz Inc. to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as March 2013 and continuing until at least December 2015; and with conspiring with Defendant Teva to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and

stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as May 2013 and continuing until at least December 2015.

151.    On July 23, 2020, Taro reached a deferred prosecution agreement with DOJ to resolve these charges.  In that agreement, Taro acknowledged that under United States law, it is responsible for the acts of its officers, directors, employees, and agents that give rise to the DOJ charges. Ara Aprahamian was one of the "officers, directors, employees, and agents" for which Taro acknowledged and accepted legal responsibility.  Taro further admitted that, from in or about March 2013 and continuing until in or about December 2015, through certain of its officers and employees, including Ara Aprahamian, Taro U.S.A.'s Vice President of Rx Marketing, and beginning in April 2014, Taro U.S.A.'s Vice President of Sales and Marketing, conspired with other individuals and entities engaged in the manufacture and sale of generic drugs to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of certain generic drugs sold in the United States in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  Taro U.S.A.'s sales of generic drugs affected by these conspiracies totaled at least $524,625,555.

152.    Taro further admitted that from in or about March 2013 and continuing until in or about December 2015, Defendant Taro conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, certain generic drugs in the United States, including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, and Nystatin Triamcinolone cream, with Sandoz; Armando Kellum, Sandoz's Senior Director of Pricing and Contracts, and beginning in November 2013, Sandoz's Vice President of Contracting and Business Analytics; and other individuals.  Between in or about March 2013 and December 2015, the generic drugs sold by Defendant Taro and Sandoz

that were affected by this conspiracy, as well as payments for the affected generic drugs, traveled in interstate trade and commerce. The business activities of Defendant Taro and its co-conspirators in connection with the manufacture and sale of generic drugs affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce. Generic drugs affected by the activities of Defendant Taro and its co-conspirators were sold to customers located in various states in the United States, including within the Eastern District of Pennsylvania.

153.    Defendant Taro further admitted that, from in or about May 2013 and continuing until in or about December 2015, Defendant Taro conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, certain generic drugs in the United States, including Etodolac immediate release and extended release and Carbamazepine tablets and chews, with Defendant Teva. Between in or about May 2013 and December 2015, the generic drugs affected by this conspiracy sold by Defendant Taro and Defendant Teva, as well as payments for the affected generic drugs, traveled in interstate trade and commerce. The business activities of Defendant Taro and its co-conspirators in connection with the manufacture and sale of the generic drugs affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce. The generic drugs affected by the activities of Defendant Taro and its co-conspirators were sold to customers in various states in the United States, including within the Eastern District of Pennsylvania.

154.    On August 25, 2020, a Grand Jury superseded the Indictment issued against Glenmark. In this Second Superseding Indictment, the Grand Jury identified as co-conspirators Apotex, Taro, Sandoz, and also various entities and individuals both known and unknown to the grand jury.

155.    The Grand Jury established that, between May 2013 and December 2015, Teva, Glenmark, and their co-conspirators knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to increase and maintain prices of Pravastatin, Carbamazepine, Clotrimazole, Etodolac, Fluocinonide, Warfarin, Tobramycin, Nadolol, Temozolomide, and other generic drugs sold in the United States.  Additionally, Teva, Glenmark, and their co-conspirators (including Apotex) sold substantial quantities of generic drugs affected by the conspiracy.  The indictment also established that Teva and its co-conspirators derived at least $350,000,000 in gains from the conspiracy.

156.    On July 31, 2023, Glenmark entered into a deferred prosecution agreement with DOJ. In that agreement, Glenmark admitted that through certain of its officers and employees, including high-level personnel of Glenmark, conspired with Teva Pharmaceuticals USA, Inc., Apotex Corp., and other individuals and entities engaged in the sale of generic drugs to suppress and eliminate competition by agreeing to increase and maintain the price of Pravastatin.

157.    On August 21, 2023, Teva admitted that it was responsible for the conduct of "Employee 1" (Nisha Patel).  Teva further admitted that, through Ms. Patel, the company conspired to fix prices of Pravastatin, Clotrimazole, and Tobramycin with Glenmark, Apotex, Taro, and Sandoz between May 2013 and December 2015.

## B.    At Least 49 State Attorneys General are Also Investigating the Anticompetitive Conduct in the Generic Drug Industry

158.    In addition to the DOJ's criminal enforcement action, at least 49 States' Attorneys General, led by the State of Connecticut, have also filed several civil enforcement actions based on their investigation to date into generic drug pricing.  To date, the States have identified as co-conspirators 30 corporate generic drug manufacturers that conspired to fix prices of approximately 200 different generic drugs.  Those companies are Actavis, Ascend, Apotex, Amneal, Aurobindo,

Breckenridge, Citron, Dr. Reddy's, Emcure, Fougera, G&W, Glenmark, Greenstone, Heritage, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teligent, Teva, Upsher-Smith, Valeant, Wockhardt, and Zydus.

159.    In essence, the States allege that the market for more than 200 generic drugs (along with many other drugs not included in their Complaints) was cartelized based on an agreement or understanding between or among Defendants and their co-conspirators to refrain from competing with each other on the pricing and sale of the generic drugs in the United States.  This agreement or understanding that the Defendants and their co-conspirators adhered to provides that each generic manufacturer "is entitled to its [predetermined share] of the market, whether the market is a particular drug, or a number of generic drugs.  [The predetermined share] is an approximation of how much market share each competitor is entitled to, based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry....  The objective is to attain a state of equilibrium, where none are incentivized to compete for additional market share by eroding price."  In other words, generic drug manufacturers followed an agreement or understanding to apply market allocation rules – referred to as fair share – that governed the market share that generic drug manufacturers should receive for every generic drug that they sold.

160.    The States establish that this rule was developed and agreed to as the result of "an almost constant ability for Defendants to meet in person and discuss their business plans."  For example, anticompetitive agreements are reached at:

> [o]rganized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions ... use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing

strategies and pricing terms in their contracts with customers, among other competitively sensitive information.

These trade shows and customer conferences provide generic drug manufacturers, including but not limited to [the identified Defendants], with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

161.    In furtherance of the conspiracy, the States allege that Defendants would frequently rig bids by increasing pricing to existing customers in order to allow another conspirator to win the business of that customer and obtain the market share to which it was entitled by the conspiracy's rules.  This process of purposefully abandoning existing customers would occur most frequently when a new conspirator entered the market for a generic drug.  Whereas fundamental economic principles dictate that the price of the drug should have decreased as the number of suppliers of that drug increased, the opposite typically occurred as a direct result of the conspiracy, because the existing competitors would walk away from their customers in order to allow the new entrant a portion of the market.

162.    These market allocation and price-fixing agreements were often negotiated across more than one generic drug.  In order to maintain supracompetitive prices, "customers in one drug market might be traded for customers in another drug market....  Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs."

163.    For example, Rajiv Malik of Mylan, N.V., spoke with Jeffrey Glazer of Heritage, and Malik agreed that Mylan would walk away from two large accounts for Doxycycline DR so that Heritage could win this business.  Malik noted that Mylan's consideration for abandoning this business had been provided previously, when Heritage intentionally forfeited accounts to Mylan on a different drug.  During this exchange, as with all collusive communications involving Mylan

alleged in this Complaint, the senior executive from Mylan (in this case Mr. Malik) acted on behalf of and reached an agreement that bound all of the Mylan entities identified in this Complaint.

164.    By adhering to the common understanding regarding the market share that each conspirator was entitled to, the Defendants also facilitated substantial price increases. "As long as everyone in the 'sandbox' is playing fair, and the manufacturers believe that they have their [predetermined market share], the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as 'punishing' a competitor for raising prices – which is against the rules."

165.    These allegations – and numerous others – from the States' investigation are supported by direct evidence from at least six cooperating witnesses. The expected testimony from these cooperating witnesses will directly support and corroborate the allegations throughout this Complaint. Some of those cooperating witnesses include:

(a)    A former pricing executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

(b)    A former sales and marketing executive at Rising Pharmaceuticals, Inc. ("Rising") and Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

(c)    A former senior sales executive at Defendant Sandoz and Defendant Fougera during the time period relevant to this Complaint [referred to herein as CW-3];

(d)    A former senior sales executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

(e)    A former senior executive at Defendant Glenmark during the time period relevant to this Complaint [referred to herein as CW-5];

(f)    A former senior executive at Defendant Fougera and Defendant Aurobindo during the time period relevant to this Complaint [referred to herein as CW-6]; and

(g)    Jason Malek ("Malek"), the former Vice President of Commercial Operations at Defendant Heritage who pled guilty to his role in the price-fixing Glyburide and Doxycycline.

## IX.    CONGRESSIONAL RESPONSES TO GENERIC DRUG PRICE INCREASES

166.    In addition to the investigations by the DOJ and the States, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.

167.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs that had experienced extraordinary price increases.[7]  In November 2014, Senator Sanders conducted a hearing entitled "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").  Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[8]

168.    Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and

---

[7]    Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[8]    Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far outpaced inflation.[9]

169.    In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[10]  The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[11]  And this was the case for most generics. But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[12]

## X.    THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH FACILITATED COLLUSION BETWEEN DEFENDANTS

170.    The collusion alleged in this Complaint infected the generic drug industry, and at a minimum it contaminated the pricing and sale of the Price-Fixed Generic Drugs in this case.

---

[9]        HHS OIG, Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[10]       GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/products/GAO-16-706.

[11]       GAO Report, at 23-25.

[12]       *Id.* at 1 & Appendix III.

171.     As Connecticut's Attorney General George C. Jepsen commented, there is "a culture of cronyism [in the generic drugs industry] where, whether it's over a game of golf or a dinner or drinks, there's just systematic cooperation."[13]

172.     As alleged in this Complaint, these numerous competitor contacts resulted in express agreements between Defendants and their co-conspirators to fix prices, allocate markets, and rig bids on the pricing and sale of generic drugs sold in the United States to Plaintiffs and others, including the Price-Fixed Generics.  In other words, the Defendants got together and exchanged assurances of common action and also adopted a common plan to cartelize the pricing and sale of the Price-Fixed Generic Drugs.

### A.     Defendants Used Trade Association Meetings to Facilitate Their Collusion

173.     As the civil and criminal enforcement actions indicate, Defendants were members of numerous trade associations and used the meetings of those associations to facilitate their collusion.  The frequent trade association meetings provided an ideal mechanism through which Defendants could and did meet in person and reach agreements with their competitors to increase prices on the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States.

174.     Upon information and belief, Defendants' anticompetitive conduct was a result of an agreement (or series of agreements) to fix, maintain, and stabilize prices, rig bids, and allocate customers for the sale of the Price-Fixed Generic Drugs.  The agreement (or series of agreements) was furthered by discussions held at industry meetings and events hosted by various trade

---

[13]     K. Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, NY TIMES (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html?mcubz=3.

associations, including GPhA, HDMA, ECRM, and MMCAP (all defined below) as well as other meetings and communications.

175.    In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other acts:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with coconspirators to discuss the sale and pricing of Price-Fixed Generic Drugs in the United States;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(c)    Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Price-Fixed Generic Drugs sold in the United States;

(e)    Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)    Selling Price-Fixed Generic Drugs in the United States at collusive and noncompetitive prices; and

(g)    Accepting payment for Price-Fixed Generic Drugs sold in the United States at collusive and noncompetitive prices.

176.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through: trade association meetings and conferences, private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

177.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market and customer allocation scheme.

178.    The industry intelligence-gathering reporting firm Policy and Regulatory Report has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.  The States have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct e-mail, phone, and text message communications."[14]

179.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation

---

[14]        http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

concerning Price-Fixed Generic Drugs, including but not limited to GPhA and HDMA.   In addition, Defendants regularly attended industry events hosted by the MMCAP.[15]

180.    The GPhA bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The trade association was the result of a 2000 merger between the GPhA and two rival trade associations (the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance). According to GPhA's website, its "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."   The GPhA's website touts the "business networking opportunities" and the "peer-to-peer connections" as the primary reasons to join the trade association.  *See* http://www.gphaonline.org/about/ membership.  GPhA members during the relevant time period have included Defendants Actavis, Amneal, Apotex, Aurobindo, Cadista, Dr. Reddy's, Glenmark, Greenstone, Heritage, Impax, Lupin, Mallinckrodt, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus.

181.    Throughout the period relevant to Plaintiffs' claims, the GPhA held three conferences each year.  The GPhA's Fall Technical Conference was held each year in late October in Bethesda, Maryland.  The GPhA's Annual Meeting was held each year in mid-February in Orlando, Florida.  The GPhA's CMC Workshop was held each year in early June in Bethesda, Maryland.  Exhibit 1 lists GPhA meetings attended by Defendants.

---

[15]    Exhibit 1 to the Complaint contains a chart which details all known trade association meetings, conferences, and/or events attended by Defendants from 2010-2016.  The latter half of Exhibit 1 lists the names of individual attendees at each meeting.

182.    Upon information and belief, each of the conspiratorial price increases alleged in this Complaint was discussed, at least in part, at the GPhA's three annual meetings (including the numerous social events that were attendant to these meetings, such as golf outings, cocktail parties, and even informal dinners).  In many of the instances alleged above, attendees for each conspirator included individuals with pricing authority over generic pharmaceutical drugs, including the Price-Fixed Generic Drugs.  Indeed, the States allege that the GPhA meetings and other events "provide generic drug manufacturers ... with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."

183.    Moreover, several of Defendants' high-ranking corporate officers served on GPhA's Board of Directors, which gave Defendants an opportunity to communicate with each other.  Listed below are the individuals and their companies.

| Defendants' Membership in GPhA Board of Directors 2012-2016 | |
|---|---|
| Actavis | 2012-2013 (Charles Mayr) |
| | 2015 (Bob Stewart) |
| Apotex | 2012-2016 (Jeff Watson) |
| Amneal | 2012-2013 (Chriag Patel) |
| Aurobindo | 2016 (Robert Cunard) |
| Dr. Reddy's | 2016 (Alok Sonig) |
| Heritage | 2012-2015 (Jeffrey Glazer) |
| Impax | 2012-2014 (Carole Ben-Maimon) |
| | 2015-2016 (Marcy Macdonald) |
| Lupin | 2014-2016 (Paul McGarty) |
| Mylan | 2012-2014 (Tony Mauro) |
| | 2015 (Marcie McClintic Coates) |
| | 2016 (Heather Bresch) |
| Par | 2015-2016 (Tony Pera) |
| Perrigo | 2013-2015 (Doug Boothe) |
| | 2016 (Richard Stec) |
| Sandoz | 2012-2013 (Don DeGolyer) |
| | 2014-2016 (Peter Goldschmidt) |
| Sun | 2015-2016 (Jim Kedrowski) |

| Defendants' Membership in GPhA Board of Directors 2012-2016 | |
| --- | --- |
| Teva | 2012-2013 (Debra Barrett) 2014 (Allan Oberman) 2015-2016 (Debra Barrett) |
| West-Ward | 2016 (Michael Raya) |

184.    In addition to the GPhA meetings, other industry events provided Defendants with opportunities to collude, and Defendants did in fact use these opportunities to discuss their unlawful agreements.

185.    The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics. HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. HDMA members, during the relevant time period, have included Defendants Apotex, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, Mayne, Mylan, Par, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus. Exhibit 1 lists HDMA meetings attended by Defendants.

186.    Other events at which Defendants may have conspired included meetings held by the Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP) and the Efficient Collaborative Retail Marketing (ECRM).

187.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume-buying power. Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as,

medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

188.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program....  In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy ... and currently provide[s] healthcare-related contracting to state and local government members located across the United States of America.  Total purchases by MMCAP member facilities for all MMCAP programs exceed $1 billion annually."

189.    MMCAP held its National Member Conference in Bloomington, Minnesota on May 12-15, 2014.  At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."  At the MMCAP conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm agreement to raise prices of one or more Price-Fixed Generic Drugs.  Exhibit 1 lists MMCAP meetings attended by Defendants.

190.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made of one on-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.  Exhibit 1 lists ECRM meetings attended by Defendants.

191.    At these various conferences and trade shows, representatives from at least some Defendants, as well as other generic drug manufacturers, discussed their respective businesses and

customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows. Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

192.    In conjunction with meetings at these conferences and trade shows, representatives of generic drug manufacturers got together separately, in smaller groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers got together periodically for what at least some of them referred to as industry dinners.

193.    A large number of generic drug manufacturers, including many Defendants here, are headquartered in close proximity to one another in New York, New Jersey, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

194.    Through these various interactions, Defendants' employees were often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often led to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

195.    Defendants also routinely communicated and shared information with each other about bids and pricing strategy.  This included forwarding bid packages received from a customer (*e.g.,* a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request

of a competitor, or by contacting a competitor to request that the competitor share that type of information. Upon information and belief, these information exchanges were made by individuals with pricing and bidding authority and impacted the prices charges by Defendants for the Price-Fixed Generic Drugs.

196. Additionally, Defendants shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate higher prices or superior terms with their customers, which was to the ultimate detriment of consumers. Again, this information sharing was undertaken for the purpose of impacting (and increasing) Defendants and their conspirators' prices for the Priced Fixed Generic Drugs.

197. In sum, during meetings of the GPhA, HDMA, ECRM, and MMCAP, and the other meetings described in Exhibit 1, Defendants and co-conspirators exchanged confidential, commercially sensitive information in furtherance of the conspiracy, or agreed to fix prices, or both of Price-Fixed Generic Drugs.

**B.      Defendants Communicated in Secret through E-Mail, Telephone, and Text Messages**

198. In addition to the in-person meetings, Defendants also communicated regularly in furtherance of the conspiracy via e-mail, telephone, and text.

199. Telephone records produced to the States establish that senior sales executives and other individuals with responsibility for pricing at Heritage had at least 513 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus.

200.   Similarly, senior sales executives and other individuals responsible for pricing at Teva had at least 1,501 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.

201.   Collusion is the only plausible inference to draw from the extremely high number of competitors' contacts revealed by Defendants' phone records.  Upon information and belief, Defendants used these contacts to discuss the unlawful agreements alleged in this Complaint.

C.   **The Overarching Conspiracy between Generic Drug Manufacturers – Playing Nice in the Sandbox**

202.   As a result of these communications, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans. This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

203.   The overarching conspiracy among generic manufacturers, however – which ties together all of the agreements on individual drugs identified in this Complaint – is an agreed- upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs.  Coined "fair share," the term is generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry.  Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business.  The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion and serve as the basis for further supra-competitive price increases.

204.   This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint.  This Complaint focuses on

the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy.  This Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy.

205.    The exact contours of this "fair share" understanding, which has been in place for many years, has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans.  For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four different tradeshows or customer conferences when the Defendants had the opportunity to meet in person.  These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

206.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs.  These types of communications occur with great frequency across the industry, including among Defendants.

207.    For example, from the period of January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions.  Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below.  The following Table (Table 1), which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text

messages between the Defendants during that period, sheds some light on the frequency with which Defendants communicated with each other throughout 2013.

**Teva Phone/Text Communications with Other Defendants (By Month)**
**January 1, 2013 – December 31, 2013**

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

208.    Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Green, Patel and Rekenthaler of Teva speaking with competitors.  Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

209.    Similarly, from the period of January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions.

210.    It was not just Teva personnel speaking to their competitors, however.  All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy.  Because it would be too voluminous to list the total number of calls among all of the Defendants, the following graphic shows the interlocking web of communications and relationships between just some of the individuals employed by Teva and its key competitors.  Each line in the graphic below demonstrates that at least one phone call or text message was sent between those individuals (identified by their initials) while they were

competitors.  For many of these individuals, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



211.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections below are centered on the relationship between Defendant Teva and another conspirator.  However, this convenience should not imply that the Complaint is solely concerned with bilateral relationships involving Teva, because it is not.

212.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct.  For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants: Teva, Taro and Wockhardt discussed among themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for

Ketoconazole Cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR Capsules.  These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

213.    Referred to sometimes as the "████████████████" for the generic drug industry, the fair share understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market.  When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

214.    When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market.  For example, when Defendant Dr. Reddy's was about to enter the market for a drug in January 2013, the Vice President of Sales and Marketing explained during negotiations with his competitor that "████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████."

215.    Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share. One of the many examples of this occurred in March 2014, when – as discussed more fully below – Defendant Lupin entered the Niacin ER market after Defendant Teva had previously been exclusive.  Patel of Teva and Berthold of Lupin spoke directly by phone a number of times during this period, including three calls on March 24, 2014.  That same day, Rekenthaler of Teva sent an internal e-mail to Patel stating: "████████████████

██████████████████████████████████████████████████████████████

█████████████.″  Here, Teva's expectation to maintain 60% share in a two-player market,

after being the first in that market, was consistent with the overarching conspiracy.

216.    Defendant Taro went so far as to create a graphic representation of that

understanding, taking into account both the number of competitors and order of entry to estimate

what its "fair share" should be in any given market:



217.    Although these general parameters are well-known by generic manufacturers, there

is no precise method for apportioning "fair share" because market share is ultimately determined

by either winning or maintaining the business of various customers, which is inherently variable

in a given year.  The shared objective, however, is to attain a state of equilibrium, where no

competitors are incentivized to compete for additional market share by eroding price.

218.    This common goal was stated succinctly by Aprahamian, who advised the Taro

Pricing Department in training documents from September and November 2013 that "████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████.″   As  demonstrated  throughout  the

Complaint, Aprahamian's idea of "███████" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

219.    This scheme to minimize competition and allocate "fair share" was typically implemented as follows.  First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market.  Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price.  This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

220.    This "fair share" understanding was particularly effective when a new competitor entered the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down.  During the conspiracy, a new competitor would either approach or be approached by the existing competitors.  Existing competitors would agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. The new competitor's transition into the market was seamless; the new entrant was ceded market share and immediately charged a supra-competitive price.  The competitors then continued this process of dividing up customers until the market reached a new artificial equilibrium.

221.    "Fair share" principles also dictated how generic drug manufacturers responded when a competitor experienced supply issues.  If the disruption was temporary, the existing competitors would refrain from taking any action that might upset the market balance.  By contrast, if the disruption was longer term, the competitors would divide up customers until each player achieved a revised "fair share" based on the number of players remaining in the market.  For example, in July 2013, a retail pharmacy customer e-mailed Defendant Taro stating that one of

Defendant Mylan's products was on back order and asked Taro to bid for the business. Aprahamian sent an internal e-mail stating: "█████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████."

222.    These rules about "fair share" applied equally to price increases.  As long as everyone was playing fair, and the competitors believed that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business.  Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules."  Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

223.    For example, in May 2013 after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs.  Kevin Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

> On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
> Do you think the Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase.

224.    Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

225.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox."  Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor.  For

instance, in May 2013, , a senior sales and marketing executive at Defendant Sandoz, sent an internal e-mail to ▮▮▮▮▮, another Sandoz senior executive, stating: "▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

226.    Defendant Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles.  For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and Defendant Taro as a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

227.    Defendant Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors.  As explored more fully below, Teva had long-standing relationships with these competitors, including several of the corporate Defendants, which affected nearly every overlapping drug they sold.  As just one example, Patel of Teva exchanged seven text messages and had two long phone calls with Aprahamian of Taro on June 3 and 4, 2014.  After a lengthy twenty-five minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to ▮▮▮▮▮▮▮▮, a Teva senior marketing executive, stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

228.    Adherence to the rules regarding "fair share" is critical in order to maintain high prices. Indeed, that is the primary purpose of the agreement.  If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices.  In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is

viewed as "irresponsible," and is spoken to by other competitors.  For example, in March 2015, Defendant Upsher-Smith learned that Defendant Sandoz had submitted a bid for Chlorpromazine at one of Upsher-Smith's GPO customers.  ███████████, a senior account manager at Upsher-Smith, forwarded that information internally stating: "███████████████████████████

███████████████████████████████████████████████████████████████████████"

229.    "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants.  Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below.  For example, in July 2013, ███████████, a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market.  After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| From: | Kellum, Armando |
|---|---|
| Sent: | Tuesday, July 02, 2013 12:31 AM |
| To: | █████████████████████████ |
| Subject: | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

230.    Similarly, in September 2014, a large wholesale customer reached out to several large generic manufacturers, including Defendant Teva, asking them to submit a "███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████."

231.    Further, in January 2015, Defendant Teva was in discussions with a large retail customer about the possibility of becoming its supplier for Moexipril HCL/HCTZ Tablets.  The customer stated: "███████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████."

232.    The "fair share" agreement is not limited to any one drug; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across individual-drug markets.  For example, in November 2013, Defendant Dr. Reddy's won the "B" slot[16] business at a large wholesale customer on Divalproex ER.  Dr. Reddy's had previously won the "A" slot business at that customer because Defendant Mylan had "███████████" from the business.  █████████, a senior account executive at Dr. Reddy's, sent an internal e-mail stating: "███████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████."

233.    Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail, including to Kellum, stating that Sandoz had decided not to bid on Haloperidol and Trifluoperazine at a large retail customer.  CW-1 explained his reasoning as follows: "█

---

[16]    Sometimes purchasers contract with multiple suppliers – referring to them as primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████.”   These decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Defendants Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including Nadolol and Benazepril HCTZ.

234.    A similar scenario occurred in August 2015, when Defendant Taro declined to bid on Etodolac extended release tablets at a large supermarket chain where Defendant Zydus was the incumbent.  Taro voiced concerns internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium Tablets.  ███████████████████████████

███████████████████████████████████████████

████████████████.”  As discussed more fully below, both Etodolac ER and Warfarin were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014.  Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

235.    As these examples make clear, the interdependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, and any future markets where they might eventually compete.

236.    In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped.  For instance, shortly after Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases.  Patel explained that she had been hired by Teva to identify products where Teva could increase prices.  CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price.  CW-1 reiterated his conversation to Kellum, who understood and approved.

237.    Indeed, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time.  As just one example, in July 2013, Defendant Teva increased pricing on a list of 21 different products.  There was a great deal of internal pressure from management at Sandoz – including from Kellum and CW-1 – to obtain a copy of the Teva price increase list.  As a result, CW-2 (then a Sandoz employee) reached out to his former colleague, Rekenthaler, the Vice President of Sales at Teva, to obtain a copy of the full Teva price increase list. Rekenthaler forwarded the list to his own personal e-mail address before then forwarding it to CW-2's personal e-mail address.  Upon receiving the list, CW-2 read it to his supervisor – CW-1 – over the phone.  Notably, the Teva list included a number of products that Defendant Sandoz did not even sell.

238.    It was not uncommon for generic manufacturers to communicate with each other about products that they did not sell.  In another example, Defendants Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril in July 2013 (discussed more fully below).  After a lengthy conversation with Patel in the midst of the price increases, Aprahamian of Taro (not in the market for Enalapril at that time) sent an internal e-mail, including to ███████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████. Taro then re-entered the Enalapril market and matched competitor pricing.

239.    In another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items – Green of Teva spoke five times with Nesta of Mylan. The next day, Green spoke with Kellum of Sandoz. Kellum then sent an internal e-mail to the Sandoz team stating: "████████████████████████████████████

███████████████████████████████████

████████████████████." Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

240.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, based on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Defendant Sandoz was looking to implement a "████████████" that involved temporarily delisting ten products that they overlapped on with Defendant Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

241.    This interdependence between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course. The States have gathered evidence going back more than a decade of generic companies routinely communicating and sharing information with each other about bids and pricing strategy.

This includes forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

242.   Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of purchasers and payers. For instance, in December 2013, Defendant Teva was negotiating new price increase language in its customer contracts, and wanted some comfort that its competitors had similar language. On December 23, 2013, Rekenthaler spoke with Nesta of Mylan three times, including a thirteen minute call. Immediately after hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:

> From:    Dave Rekenthaler
> Sent:    Mon 12/23/2013 10:41 AM (GMT-05:00)
> To:      ████████; Maureen Cavanaugh
> Cc:      Nisha Patel02
> Bcc:
> Subject: RE: Proposed Price Increase Language
>
> Mylans language is vague. "Pricing subject to change at Mylan's sole discretion."

243.   Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of Taro's received a bid on augmented Betamethasone Dipropionate and gave Taro an opportunity to bid to retain the business. ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████:

No emails please. Phone call. ███let's discuss.

244.     Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read: "Avoid fair share terminology on slides – underdeveloped or overdeveloped is better."

245.     To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

246.     It bears noting that the examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.  Indeed, to date, many of the Defendants have made no document productions in connection with the States' investigation or MDL 2724, including Defendants Amneal, Apotex, Breckenridge, Glenmark, Lupin, and Zydus, and several other Defendants have made only limited productions focused on particular drugs or custodians, including Actavis, Mylan, Par, and Wockhardt.  Even Teva, the central figure in this Complaint, has to date only produced documents from two custodians to the States.

## XI.     INDUSTRY COMMENTARY FURTHER SUGGESTS THAT DEFENDANTS' COLLUSIVE CONDUCT IS A PLAUSIBLE EXPLANATION FOR THE INCREASED PRICES OF THE PRICE-FIXED GENERIC DRUGS

247.     Comments from industry analysts suggest manufacturers alternative explanations for the price hikes (*e.g.*, supply disruptions) are mere pretext, intended to shroud the Defendants' and co-conspirators' conspiratorial conduct and ends.  For instance, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are

cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes - accommodate price inflation.[17]

248.    One study of the generic drug industry concluded that in 2014: "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[18]   The GAO Report also noted similar "extraordinary price increases" across many generic drugs, including Doxycycline, in recent years that could not be linked to any particular cause.

## XII.   CORPORATE AND INDIVIDUAL RELATIONSHIPS THAT ALLOWED THE CONSPIRACY TO EVOLVE

249.    An important event in the evolution of the conspiracy occurred in April 2013, when Teva took a major step toward implementing more significant price increases by hiring Nisha Patel as its Director of Strategic Customer Marketing.  In hiring Patel, Teva threw gasoline on an already smoldering conspiracy.

250.    In this position, Patel's job responsibilities included, among other things: serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; establishing pricing strategies for new product launches and in-line product opportunities; and overseeing the customer bid process and product pricing administration at Teva.

251.    Most importantly, she was responsible for – in her own words – "████████████ ███████████████████████████████████████████████████████████ ████████████."  In that role, Patel had 9-10 direct reports in the pricing department at Teva.

---

[17]      *See* Ed Silverman, Generic Drug Prices Keep Rising, but is a Slowdown Coming?, WALL ST. J. (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[18]      David Belk, MD, Generic Medication Prices, *available at* http://truecostofhealthcare.net/generic_medication_prices/.

One of Patel's primary job goals was to effectuate price increases.  This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

252.     Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing.  During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer, and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

253.     Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.  Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role.  For example, on April 2, 2013 – nearly three weeks before Patel started at Teva – Ara Aprahamian, the Vice President of Sales and Marketing at Defendant Taro, sent an e-mail to the Chief Operating Officer ("COO") at Taro stating: "■■■■■■■■■■■■■■■■■■■■ ■■■■■■."  The COO responded by saying "[m]aybe the industry will be better for it.  Teva can only improve."  Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva.  Patel had also worked with Aprahamian several years earlier at ABC.

254.     Patel's last day at ABC was April 11, 2013, and she started at Teva on April 22, 2013.  Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva.

255.    Once Patel  b e g a n  her employment at Teva, her communications with certain competitors became much more systematic and frequent – and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

## A.    Ranking "Quality of Competition" to Identify Price Increase Candidates

256.    When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition.  As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors.  In a separate tab of the same

"███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████." 

257.    Patel understood – and stressed internally at Teva – that "█████████████████

███████████████████████████████████████████." Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly.  Conversely, it was important for Patel to be able to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly.  Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

258.    As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale.  For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices.  She asked CW-

1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

259. It is important to note that Patel had several different ways of communicating with competitors. Throughout this Complaint, you will see references to various phone calls and text messages that she was exchanging with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications. Although the States have been able to obtain some of these communications, many of them have been destroyed by Patel.

260. By May 6, 2013, Patel had completed her initial ranking of fifty-six different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included the following companies:

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

261.    The lowest ranked competitors were:

| Strong Leader/Follower | Point Scale |
|---|---|
| Apotex | -3 |
| Zydus | -3 |

262.    Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase.  According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality."  Conversely, a Teva price increase in drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

263.    Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

        1.    The "High Quality" Competitor Relationships

264.    The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's price increases.   The agreements and understandings regarding price increases were what made each of those competitors a high quality competitor.  As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

       (a)     *Mylan (+3)*

265.    Mylan was Teva's highest-ranked competitor by "quality."  The relationship between these two competitors was longstanding, and deeply engrained.  It survived changes in personnel over time, and pre-dated Patel's creation of the quality competitor rankings.

266.    Kevin Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Jim Nesta of Mylan by telephone on February 21, 2012.  From that time until the time that Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least twelve text messages – including at or around every significant price increase taken by either company.  This amounts to an average of nearly one call or text message every business day during this period.

267.    Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five minutes.  Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often.  Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel.  Several examples of these communications are outlined more fully in various sections below.

268.    When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong.  Rekenthaler promptly took over the role of communicating with Nesta.  Starting in December 2013, through the time that Rekenthaler left Teva in April, 2015, Rekenthaler spoke to Nesta 100 times.  Prior to Green leaving Teva in late October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

269.     The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta.  For example, between January 1, 2010 and October 26, 2011, ████████, a senior executive at Teva, communicated with ██████, a senior executive counterpart at Mylan, by phone or text at least 135 times.  The pace of communications between the two companies slowed dramatically in November 2011 after ██████ left Teva and before Green began communicating with Nesta – but continued nevertheless as needed during that time through communications between Rekenthaler and ████ at Mylan.

(b)     *Watson/Actavis (+3)*

270.     Actavis was Teva's next highest quality competitor by ranking. Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and ████████, a senior sales executive at Actavis.  Rekenthaler also communicated frequently with ████████, a senior sales executive at Actavis – a relationship that pre-dated Patel joining Teva.

271.     Patel contacted ██████ shortly after she started her employment at Teva, as she was creating the quality competitor rankings.  She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013.  But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis.  From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

272.     In August 2013, Marc Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler.  From August 7, 2013 through the date that Rekenthaler left Teva in April, 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

103

273.   Maureen Cavanaugh also had a very strong relationship with Falkin.  The two communicated with great frequency.  From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other 410 times.

(c)   *Sandoz (+3)*

274.   Sandoz was also considered a top-quality competitor by Teva.  Patel had a very strong relationship with CW-1 at Sandoz.

275.   Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016, Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company.  As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel asked CW-1 how Sandoz handled price increases.  Patel explained that she had been hired at Teva to identify products where Teva could increase prices.  CW-1 reassured Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

276.   Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was – at that time – a senior Sandoz executive.  These relationships pre-dated Patel joining Teva.

(d)   *Glenmark (+3)*

277.   Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown and ▮▮▮▮▮▮▮▮, a sales and marketing executive at Glenmark.

278.   As stated above, Patel began communicating with CW-5 even before she began her employment at Teva.  Patel was also communicating frequently with both CW-5 and ▮▮▮▮

during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

279.    Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six months.  After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark. Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

(e)    *Taro (+3)*

280.    Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Ara Aprahamian.  Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

281.    Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva.  From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

(f)    *Lupin (+2)*

282.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with David Berthold, the Vice President of Sales at Lupin.  The relationship between Teva and Lupin, however, pre-dated Patel.  Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold.  Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone 125 times.

105

283.     From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

284.     Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Defendants Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave.  For example, in October 2013, Lupin was preparing to increase its pricing on the drug Cephalexin Oral Suspension.  Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and ██████████ of Teva in order to coordinate the price increase.

### B.     Individual Relationships

285.     In addition to the corporate relationships discussed above, individual relationships were also important to the conspiracy's evolution.   The following sections discuss certain individuals who held senior positions at certain Defendants and who played key roles in the conspiracy's operation.

#### 1.     Ara Aprahamian

286.     Aprahamian is the Vice President of Sales at Defendant Taro and has held that position since he moved to Taro from Actavis in March 2013.   Aprahamian regularly communicated with competitors, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the corporate Defendants.  For example, between March 2013 and October 2018, Aprahamian exchanged at least 706 phone calls and text messages with his contacts at Defendants Sandoz, Glenmark, Teva, Dr. Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, Aurobindo, and Greenstone.

2.      David Berthold

287.    Berthold is the Vice President of Sales at Defendant Lupin and has held that position since June 2006.  During his tenure at Lupin, Berthold has been the primary person at the company communicating with competitors.  Indeed, Berthold has relationships with individuals at many of the corporate Defendants and is one of the most prolific communicators of all the individual participants.  For example, between March 2011 and October 2018, Berthold exchanged at least 4,185 phone calls and text messages with his contacts at Defendants Aurobindo, Glenmark, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, Lannett, and Greenstone.

3.      Jim Brown

288.    Brown is the Vice President of Sales at Defendant Glenmark and has held that position since November 2012.  Brown was one of several Glenmark executives that conspired with competitors.  Although not as prolific in his communications with competitors as some of the other individuals, he did communicate when necessary to further the agreements.  For example, between June 2012 and August 2018, Brown exchanged at least 395 calls and text messages with his contacts at Defendants Actavis, Teva, Lupin, Amneal, Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Zydus, Par, Apotex, and Taro.

4.      Maureen Cavanaugh

289.    Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Defendant Teva until April 2018.  She is currently the Senior Vice President and Chief Commercial Officer at Defendant Lannett.  During her employment at Teva, Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation.  In addition, Cavanaugh maintained her own relationships with certain competitors and coordinated

with them directly when necessary to further the agreements.  For example, between January 2011 and August 2017, Cavanaugh exchanged at least 612 phone calls and text messages with her contacts at Defendants Actavis, Amneal, Zydus, Sandoz, Glenmark, and Greenstone.

### 5.  Marc Falkin

290.    Falkin was the Vice President of Marketing, Pricing and Contracts at Defendant Actavis until Actavis was acquired by Teva in August 2016.  For a period of time, Falkin was also the Senior Vice President, US Generic Sales, at Teva.  During his employment at Actavis, which is the focus of this Complaint, Falkin was a prolific communicator and had established relationships with executives at many of the corporate Defendants.  For example, between August 2013 and July 2016, Falkin exchanged at least 2,562 phone calls and text messages with his contacts at Defendants Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Apotex, Taro, Amneal, Sandoz, Wockhardt, and Greenstone.

### 6.  Jim Grauso

291.    Grauso was employed as a Senior Vice President of Commercial Operations at Defendant Aurobindo until January 2014.  In February 2014, Grauso moved to Defendant Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations.  Grauso regularly communicated with competitors while he was at Aurobindo and continued those relationships when he transferred to Glenmark.  For example, between December 2011 and January 2014, Grauso exchanged at least 1,763 phone calls and text messages with his contacts at Defendants Lupin, Teva, Actavis, Taro, Zydus, Amneal, Glenmark, Wockhardt, Breckenridge, and Greenstone.

292.    Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo.  For

example, between February 2014 and October 2018, he exchanged at least 2,018 phone calls and text messages with his contacts at Defendants Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Dr. Reddy's, Amneal, Rising, Par, Breckenridge, Upsher-Smith, Mylan, and Greenstone.

### 7.    Kevin Green

293.    Green worked at Defendant Teva as a Director of National Accounts until November 2013 when he took a position with Defendant Zydus.  Green is currently the Vice President of Sales at Zydus.  Green developed a number of relationships with individuals at many of the corporate Defendants.  He regularly communicated with competitors while at Teva and then carried those relationships over to his time at Zydus.  For example, between January 2010 and October 2013, Green exchanged at least 1,410 phone calls and text messages with his contacts at Defendants Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Breckenridge, Wockhardt, Lannett, and Greenstone.

294.    Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors, including with his former colleagues at Teva.  For example, between November 2013 and August 2018, Green exchanged at least 969 phone calls and text messages with his contacts at Defendants Teva, Glenmark, Mylan, Lupin, Aurobindo, Rising, Amneal, Sandoz, Lannett, Dr. Reddy's, and Greenstone.

### 8.    Armando Kellum

295.    Kellum was the Director of Pricing and Contracts at Defendant Sandoz until July 2015. While at Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with competitors.  In addition, Kellum had his own relationships with certain competitors and communicated with those contacts directly when necessary to further the agreements.  For example, between May 2011 and April

2015, Kellum exchanged at least 182 phone calls and text messages with his contacts at Defendants Lupin, Teva, Upsher-Smith, Zydus, Actavis, Amneal, Dr. Reddy's, and Greenstone.

9.      Jill Nailor

296.    Nailor has worked at Defendant Greenstone since August 2010 and is currently the Senior Director of Sales and National Accounts.  Nailor directed her subordinate ███████████, a national account executive, and others at Greenstone to fix prices and allocate customers with competitors on overlap drugs, including with several of the Defendants.  She also instructed them to avoid putting any evidence of such communications into writing.

297.    In addition, Nailor regularly communicated directly with competitors herself.  For example, between August 2010 and May 2017, Nailor exchanged at least 4,439 phone calls and text messages with her contacts at Defendants Amneal, Dr. Reddy's, Actavis, Aurobindo, Mylan, Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Apotex, Upsher-Smith, Par, and Taro.

10.     James Nesta

298.    Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Defendant Mylan.  Nesta communicates regularly with his counterparts at many of the corporate Defendants.  For example, between January 2011 and February 2016, Nesta exchanged at least 5,293 phone calls and text messages with his contacts at Defendants Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis, Lupin, Sandoz, Lannett, Taro, Par, and Greenstone.

11.     Konstantin Ostaficiuk

299.    Ostaficiuk is the President of Defendant Camber and has held that position since 2009.  During his tenure at Camber, Ostaficiuk has been the primary person responsible for

110

furthering price fixing and market allocation agreements with his competitors.  Indeed, Ostaficiuk regularly communicated with competitors and maintained relationships with executives at many of the corporate Defendants.  For example, between March 2011 and August 2017, Ostaficiuk exchanged at least 464 phone calls with his contacts at Defendants Amneal, Lannett, Breckenridge, Aurobindo, Lupin, Teva, Breckenridge, Taro, Glenmark, Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis.

12.    <u>Nisha Patel</u>

300.    Patel worked at Defendant Teva from April 2013 to December 2016, first as a Director of Strategic Customer Marketing and then as a Director of National Accounts.  As discussed in great detail above, Patel was in frequent communication with her counterparts at the corporate Defendants to fix prices and allocate markets.  For example, during her time at Teva, Patel exchanged at least 1,240 phone calls and text messages with her contacts at Defendants Zydus, Sandoz, Actavis, Glenmark, Taro, Lupin, Dr. Reddy's, Lannett, Par, Apotex, Aurobindo, Mylan, Amneal, Upsher-Smith, Breckenridge, and Greenstone.  As discussed in various sections of this Complaint, Patel also frequently communicated with competitors using Facebook Messenger, LinkedIn messaging, and the encrypted messaging application WhatsApp.

13.    <u>David Rekenthaler</u>

301.    Rekenthaler was the Vice President of Sales, US Generics at Defendant Teva until April 2015. Rekenthaler is now the Vice President of Sales at Defendant Apotex.  During his time at Teva, Rekenthaler knew that his colleagues, including Green and Patel, were colluding with competitors. Indeed, Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the corporate Defendants.  For example, between January 2011 and March 2015, Rekenthaler exchanged at least 1,044 phone calls and text messages

111

with his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Taro, Lannett, Wockhardt, and Greenstone.

### 14. Rick Rogerson

302. Rogerson was the Executive Director of Pricing and Business Analytics at Defendant Actavis until Actavis was acquired by Teva in August 2016. Rogerson now works at Defendant Amneal as a Senior Director of Marketing and Business Analytics. During his time at Actavis, Rogerson communicated with his contacts at several corporate Defendants. For example, between February 2010 and July 2016, Rogerson exchanged at least 635 phone calls and text messages with his contacts at Defendants Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus.

### 15. Tracy Sullivan

303. Tracy Sullivan has been employed at Defendant Lannett since 2007 and is currently the Director of National Accounts. Sullivan regularly communicated with competitors and maintained relationships with executives at many of the corporate Defendants. For example, between March 2011 and August 2016, Sullivan exchanged at least 495 phone calls and text messages with her contacts at Defendants Zydus, Wockhardt, Teva, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, Breckenridge, and Greenstone.

## XIII. THE CONSPIRATORIAL PRICE-FIXING, BID-RIGGING, & MARKET ALLOCATION AGREEMENTS

304. As a result of their frequent in-person meetings and the collusive communications that ensued as a result of these meetings via e-mail, telephone, and text messages, Defendants and their co-conspirators were able to implement, and did implement, radical, extraordinary, and abrupt price increases on many of the Price-Fixed Generic Drugs identified in this Complaint.

305.    There were no market-based justifications for any of the abrupt price increases described below.  The increases in price were not necessitated by increased manufacturing costs, or research and development costs.  Federal law requires drug manufacturers to report potential drug shortages to the FDA, and no supply disruption was reported during the duration of the alleged conspiracy as to any of the Price-Fixed Generic Drugs (except where expressly alleged below).  Similarly, during the time frame relevant to these allegations, there were no known raw material shortages affecting the manufacture of any of the Price-Fixed Generic Drugs in the United States, nor did demand for any of these drugs suddenly increase.

306.    Each of the conspiratorial price increases would have been against each Defendant's self-interest if taken unilaterally and without advance agreement.  As the last 30 years of generic drug pricing has demonstrated, in a competitive industry, a firm would cut its price with the expectation of increasing its market share if its competitors were setting prices above marginal costs.

307.    This economic reality is further compelled by the existence of MAC prices.  As noted above, a MAC price represents the upper limit that a prescription drug payer will pay a pharmacy for a generic drug.  Payers set the MAC price of a drug based on a variety of factors including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions.  MAC pricing effectively requires pharmacies to purchase the least costly version of a generic drug available in the market, without regard to the manufacturer's list price.

308.    MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices.  Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug while

competing manufacturers do not will swiftly lose sales to a competing generic manufacturer whose price remains constant.

309. Given the existence of MAC pricing and the fact that AB-rated generic drugs are bioequivalent to both the branded version and also to other AB-rated generic versions of the same drug, Plaintiffs base their purchasing decisions almost exclusively on price. Due to this homogeneity, there is a very high cross-elasticity of demand for generic drugs from different manufacturers.

310. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales, and the price increases of the Price-Fixed Generic Drugs described in this Complaint were against each Defendant's individual self-interest.

311. While drug-specific agreements involve those Defendants that marketed and sold the particular drug, each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was also a party to the broader, overarching conspiracy to abide by the "fair share" agreement covering all of the drugs that are the subject of this Complaint. From this broad agreement among all Defendants sprang additional agreements among the manufacturers relating to each of the individual drugs. The purpose and effect of all of these agreements was to lessen competition in the markets for each drug and throughout the industry.

312. When entering a generic drug market, Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where

in fact little to none existed. Some illustrative examples of these agreements are set forth below, describing specific examples relating to specific drugs over time.

313. As evident from the many examples below, the overarching "fair share" conspiracy was well established in the industry by 2012, including among each of the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

314. As further detailed below, manufacturers eventually began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain prices at already supracompetitive levels – there was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

315. A troubling pattern began to emerge. Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – *i.e.*, that they would not punish a competitor for leading a price increase, or steal a competitor's market share on an increase. There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a

competitor's price increase by increasing their own market share (unless they had less than "fair share").

316.    It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly.  Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays.  In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

317.    The following examples of drug-specific collusion, set forth alphabetically by drug, demonstrate how the conspiracy pervaded the entire industry.

**A.    Acetazolamide**

318.    Acetazolamide is sold in at least two formulations – tablets (manufactured by Taro and Lannett) and sustained release capsules (manufactured by Heritage, Zydus, and Teva).

1.    Acetazolamide Tablets

319.    The market for Acetazolamide tablets is dominated by Taro and Lannett.  Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share on Acetazolamide tablets.

320.    These tablets come in two dosages: 125 mg and 250 mg.  Both Taro and Lannett make the 250 mg dosage, which is the predominant form.  While only Taro makes the 125 mg dosage, this formulation appears to be included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

321.    In mid-2012, Taro and Lannett imposed list price increases of 40% to 50%, and brought list prices for Acetazolamide 250 mg tablets to identical levels.

322.    By mid-2013, Taro and Lannett appeared to have worked out a remarkably stable split of the market, taking into account both 125 mg tablets and 250 mg tablets.  On April 3, 2012 at 7:37 in the morning, Blashinsky, then a senior Taro marketing executive, called ███████ at Lannett.  The call lasted one minute.  That same day, Taro increased its WAC price for the 250mg dosage by 44.5% to $61.43.  Lannett followed and matched Taro's increase two days later on April 5, 2012.  Blashinsky and ████ would not speak again until May 9, 2012.

323.    In late 2013, within weeks of each other, Taro and Lannett imposed identical list prices for Acetazolamide 250 mg tablets.  The increases were well over 200%.  Taro imposed a similarly large list price increase on 125 mg tablets around this time.  Average wholesale prices for both products increased dramatically.  This price increase was coordinated by Aprahamian (who had just recently joined Taro) and ██████████, the CEO of Lannett, as well as other executives from both companies (including executives from Sun) at the NACDS event in Las Vegas, Nevada from August 10-13, 2013.

324.    After the conference, on August 16, 2013, ████████ of Lannett had dinner with ██████ and ██████████ of Sun.  ████ followed up by e-mail a few days later thanking ████ for dinner and also "███████████████████████████████████████."  ████ further noted that "███████████████████████████████████████ ███████████████████████████████."

325.    On November 15, 2013, ██████ of Lannett called Aprahamian twice.  Both calls lasted two minutes.  ██████ called Aprahamian again the next day, on November 16, 2013.  The call lasted one minute.  According to available phone records, the calls on November 15, 2013

were the first calls between the two competitors since August 22, 2012, as well as the first time that they had spoken by phone since Aprahamian joined Taro.

326.    Shortly after these calls, on November 26, 2013, Lannett raised its WAC price on Acetazolamide by 275.5% to $230.65.

327.    Throughout these coordinated increases, Lannett and Taro captured stable shares of the 250 mg tablet market.  Lannett claimed approximately 56% and Taro claimed 44%.  Taro was the lone manufacturer of 125 mg tablets and had 100% of sales of that dosage.  Interestingly, the total dollar sales across both products was virtually identical.  Lannett's larger share of the 250 mg tablet market was offset by Taro's sales of 125 mg tablets.  Upon information and belief, this was a result of an agreement between the companies that Lannett would not manufacture 125 mg tablets, and in exchange, Taro would cede a slightly larger share of the 250 mg market to Lannett.

2.    Acetazolamide Capsules

328.    During the relevant time period, Heritage, Teva, and Zydus sold generic Acetazolamide capsules to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

329.    In April 2014, Malek of Heritage discussed the possibility of a collusive price increase on Acetazolamide with a senior sales executive at Teva, Nisha Patel.  (Heritage and Teva controlled almost 80% of the market for Acetazolamide.)  During an April 15, 2014 phone call, Malek and the Teva sales executive, Patel, agreed that Heritage would lead the price increase (which would be approximately 75%) and Patel would communicate the details of the price increase to the sales executive at Zydus, ███████, who was responsible for Acetazolamide.

330.     On April 16, 2014, the sales executives responsible for Acetazolamide at Teva and Zydus (Patel and ▮▮▮▮) discussed the collusive price increase by phone for approximately 20 minutes (on April 16) and for 12 minutes (on April 17).

331.     On April 24, 2014, Malek reached out to ▮▮▮▮, the Zydus sales executive, via LinkedIn, and the two communicated the next day about the Acetazolamide price increase as well.

332.     In order to ensure that the price increase was successful, Heritage, Zydus, and Teva agreed that they would not underbid each other's Acetazolamide business while they implemented the price increase.  Malek and ▮▮▮▮ confirmed this agreement with each other by telephone on May 7, 2014.

333.     On June 26, 2014, as agreed with Zydus and Teva, Heritage began notifying its customers that it was increasing prices of Acetazolamide by approximately 75%.  Heritage fully implemented this price increase on all its major accounts (at least 17 customers) by July 9, 2014.

334.     Following Heritage's lead, Zydus and Teva increased prices of Acetazolamide by approximately 75% as well.

**B.     Adapalene**

335.     Adapalene, also known by the brand name Differin, is a retinoid used to treat severe acne. It is sold several formulations, including both gel and cream.

336.     In October 2010, when Perrigo entered the market for Adapalene Cream, Fougera and Perrigo colluded to allocate market share to Perrigo.  Two years later, in November 2012, Sandoz (which had acquired Fougera) left the Adapalene Cream market temporarily due to supply issues. This left Perrigo as the sole manufacturer of the product for a brief window.

337.     By early January 2013, Sandoz was making plans for its re-entry into the market. On January 14, 2013, CW-3 provided ▮▮▮▮▮▮▮, a Sandoz marketing executive, a list of

potential targets for Adapalene Cream stating that "████████████████████████████

████████████████████████████████████."  CW-3 further explained that "███████

████████████████████████████████████████████████████████████████████████████

████████████████████████."  The list of potential targets was organized by

historical volume of units purchased and Walgreens was the first name on that list.  Wal-Mart was

not listed as a target.

338.    On June 24, 2013, approximately one month before Sandoz's re-launch, CW-3 and

████████████ of Perrigo had a ten minute phone call during which ████████ shared Perrigo's non-

public dead net pricing for Adapalene Cream for two customers – Walgreens and Optisource.

During that conversation, CW-3 recorded those prices in his Notebook as follows:



339.    On July 15, 2013, Sandoz held a Commercial Operations call during which they

discussed, among other things, the Adapalene Cream re-launch scheduled for July 26, 2013.  That

same day, ████████ and CW-3 exchanged two more calls, both lasting one minute.  After

exchanging a third call that lasted one minute on July 16, 2013, the two competitors connected on

July 17, 2013 and spoke for nineteen minutes.  During this call, ████████ provided CW-3 with

Perrigo's non-public pricing for Adapalene Cream for a list of customers.  ████████ also told CW-

3 that Perrigo was not willing to give up Walgreens to Sandoz.  The purpose of conveying this

information was so that Sandoz, when it re-entered the market, could target and obtain specific agreed-upon customers with the highest prices possible, to minimize price erosion.

340.  Also, between July 16, 2013 and July 18, 2013, CW-3 and █████████, a sales executive at Perrigo, exchanged at least nineteen text messages.

341.  On July 26, 2013, the day of Sandoz's re-launch of Adapalene Cream, CW-3 called CW-1 and they spoke for eight minutes.  On this call, CW-3 provided CW-1 with the customer pricing for Adapalene Cream that █████ had provided to him.  Within minutes of hanging up with CW-3, CW-1 sent an internal e-mail, including to Kellum, regarding Adapalene Cream.  In that e-mail, CW-1 recommended that Sandoz approach "████████████████████████████ ███████████████████████████████████████████."  CW-1 also provided the following pricing information for those customers:

> Here are is some current pricing deadnets
>
> ABC = $150
> Mckesson = $150
> Wal-Mart = $137
>
> █████

342.  Notably, the price points matched exactly with the price points █████ had provided to CW-3.  In his e-mail, CW-1 also stated that Sandoz would need to bid 30% lower than ABC's current price in order to win the business upon re-launch.

343.  That same day, on July 26, 2013, Sandoz prepared and sent offers for Adapalene Cream to the three customers CW-1 identified – ABC, McKesson, and Wal-Mart – as well as Rite Aid and Morris & Dickson.  Consistent with the prior conversations between CW-3 and █████ of Perrigo, Sandoz did not submit a bid to Walgreens.

344.   Later that day, on July 26, 2013, Morris & Dickson accepted Sandoz's bid for Adapalene Cream.  The following Monday (the next business day), on July 29, 2013, ███ of Perrigo called CW-3 twice.  Both calls lasted one minute.  The next day, on July 30, 2013, CW-3 called ███ back and they spoke for thirteen minutes.  CW-3 hung up and immediately called CW-1 to report about his conversation with the competitor.  The call lasted four minutes.  That same day, Rite Aid accepted Sandoz's bid for Adapalene Cream.

345.   The next day, on July 31, 2013, Sandoz sent an offer for Adapalene Cream to Econdisc.  The next morning, on August 1, 2013, Econdisc notified Perrigo of the offer and gave the incumbent an opportunity to bid to retain the business.  Within the hour, ███ called CW-3.  The call lasted one minute.  Ten minutes later, ███ called CW-3 again and they spoke for five minutes.  Later that day, in an effort to avoid putting evidence of his collusive conversations in writing, CW-3 e-mailed CW-1 to "████████████."  The two then spoke for five minutes.

346.   On August 2, 2013, ABC accepted Sandoz's bid for Adapalene Cream.

347.   On August 6, 2013, ███ and CW-3 exchanged two calls lasting four minutes and twelve minutes, respectively.  Later that day, ███ and his colleagues at Perrigo, including his supervisor, Wesolowski, had a conference call to discuss Adapalene Cream.  That same afternoon, Perrigo notified Econdisc that it was declining to bid to retain the customer's business.  Later that day, Econdisc accepted Sandoz's bid for Adapalene Cream.

348.   The next day, on August 7, 2013, McKesson accepted Sandoz's offer for Adapalene Cream.

349.   ███ of Perrigo and CW-3 continued to talk throughout August 2013 to coordinate Sandoz's smooth entry into the market.  For example, between August 12 and August

15, 2013, the two competitors exchanged at least eight calls, including two calls on August 15, 2013 lasting eight minutes and fourteen minutes, respectively.  Later that day, ████████, a Sandoz marketing executive, e-mailed CW-1 regarding Adapalene Cream stating that Sandoz's market share was now 25.5% and asking whether Walgreens could be "████."  As detailed above, Sandoz had stayed away from Walgreens because Perrigo said they would not give up the business.

350.    Respecting the agreement that the two competitors had arranged, Sandoz stayed away from Walgreens.  However, as of December 2013, Sandoz had only obtained approximately 30% share of the Adapalene Cream market.  This was well below its expected share in a two-player market and less than the 47% market share that Sandoz had maintained prior to leaving the market in November 2012 due to supply issues, which caught the attention of high-level executives at Sandoz.

351.    On January 8, 2014, a Sandoz finance executive, convened a meeting to discuss the Adapalene Cream re-launch and the issue of securing more market share on the product.  By that time, it had been decided internally by the sales team that Sandoz would pursue Walgreens – representing approximately 19% share – to meet its fair share targets on Adapalene Cream.

352.    That same day, on January 8, 2014, CW-3 called █████ of Perrigo.  The call lasted one minute.  First thing the next morning, CW-3 called █████ again and they spoke for sixteen minutes.  █████ and CW-3 would exchange two more calls the following week, on January 13 and January 16, 2013, lasting one minute and ten minutes, respectively.  Immediately upon hanging up from the ten minute call, CW-3 called CW-1 and they spoke for eight minutes.

353.    On January 28, 2014, Sandoz held a follow-up meeting to discuss the Adapalene Cream re-launch and Walgreens as Sandoz's next target.  Two days later, on January 30, 2014,

Sandoz met with Walgreens to discuss new product opportunities, including Adapalene Cream. The next day, on January 31, 2014, CW-3 called ███ and they spoke for eight minutes.  Upon hanging up with ███, CW-3 called CW-1.  The call lasted one minute.

354.    After this series of communications between CW-3 of Sandoz and ███ of Perrigo, Sandoz submitted a bid to Walgreens for Adapalene on February 14, 2014.  Perrigo promptly conceded the customer and Walgreens awarded the business to Sandoz on March 5, 2014.  This award brought Sandoz's share back to 47% – the same percentage it had before exiting the market in 2010.

355.    As further detailed below, this collusion between Sandoz and Perrigo on Adapalene Cream was facilitated by collusion between Teva, Glenmark, and Taro on Adapalene Gel during the same time period.  Indeed, it was in the interest of all Defendants to keep prices on both formulations at supracompetitive levels so that customers would not substitute between cream and gel based on price.

C.    **Albuterol**

356.    The market for Albuterol is mature, as Albuterol has been available in the United States for over twenty-five years.  The World Health Organization ("WHO") includes Albuterol on its list of essential medicines.  During the relevant time period, Mylan sold Albuterol pursuant to an ANDA approved by the FDA in or around January 1991.  Sun (either directly or through its subsidiary Mutual) sold Albuterol to purchasers pursuant to ANDAs that were approved by the FDA in or around December 1989.  Both Mylan and Sun sold Albuterol to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

357.    At all times relevant to this lawsuit there has been more than one manufacturer of Albuterol on the market.  Defendants Mylan and Sun dominate the market for Albuterol.

358.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Albuterol was remarkably stable.  Beginning in March 2013, the prices rose abruptly and, for the most part, in unison.

359.    By way of example, available WAC data demonstrates that beginning in March 2013, Defendants selling generic Albuterol took substantial price increases on the 2 mg strength that exceeded 3400%:

| Product MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378025501 | $0.13 | $5.88 | 6-Mar-13 | 4317% |
| 500 ct | Mylan | 00378025505 | $0.13 | $5.88 | 6-Mar-13 | 4549% |
| 100 ct | Sun | 53489017601 | $0.13 | $4.70 | 15-Apr-13 | 3485% |
| 500 ct | Sun | 53489017605 | $0.12 | $4.70 | 15-Apr-13 | 3674% |

360.    There are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Albuterol.  Demand for Albuterol has not materially changed between 2010 and the present, nor does any change in input costs explain these price increases.  Furthermore, at the time Albuterol prices were increased in March 2013, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

361.    Upon information and belief, the price increases on Albuterol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Albuterol in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

362.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan and Sun.  *See* Ex. 1.

363.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Mylan and Sun. *See* Ex. 1.

364.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  This meeting was attended by representatives from Mylan and Sun.  *See* Ex. 1.

365.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  This conference was attended by representatives from both Mylan and Sun.  *See* Ex. 1.

366.    In 2014, 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida; (ii) the April 26-29, 2014 NACDS Annual Meeting in Scottsdale, Arizona; (iii) the June 1-4, 2014 HDMA BLC in Phoenix, Arizona; (iv) the June 3-4, 2014 GPhA meeting in Bethesda, Maryland; (v) the August 23-26, 2014 NACDS Total Store Expo in Boston Massachusetts; (vi) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (vii) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (viii) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (ix) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (x) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (xi) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (xii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (xiii) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xiv) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (xv) the June 12-16, 2016 HDMA BLC in Colorado

Springs, Colorado; and (xvi) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

**D.    Alclometasone Dipropionate**

367.    Alclometasone Dipropionate ("Alclometasone"), also known by the brand name Aclovate, is a lower-potency topical corticosteroid used to treat inflammation and itching caused by skin conditions such as allergic reactions, eczema, and psoriasis.  During the time period relevant to this Complaint, Taro, Sandoz, and Glenmark dominated the market for Alclometasone cream and ointment.

368.    In May 2013, Sandoz was the exclusive generic manufacturer of Alclometasone Ointment. The other competitors – Taro and Glenmark – had exited the market due to supply issues.  However, around this time, Sandoz began experiencing supply issues of its own on Alclometasone Ointment. As a result, Taro and Glenmark – in consultation with Sandoz – used this as an opportunity to raise the price of the product and re-enter at that higher price.

369.    The competitors were discussing their plans for Alclometasone Cream and Ointment as early as April 2013.  For example, on April 15 and April 16, 2013, CW- 3 of Sandoz exchanged several calls with Aprahamian of Taro and Blashinsky of Glenmark.  On these calls, Blashinsky relayed that Glenmark expected to re-enter the Alclometasone ointment market in the "████████████████████████" percent share.  CW-3 took contemporaneous notes during these conversations, and his complete notes from those calls are pictured below:

370. Three days later, on April 19, 2013, CW-3 of Sandoz e-mailed ███████████, a Sandoz marketing executive, stating "████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████." However, the true source of CW-3's information was Glenmark, not a customer.  CW-3 wanted a breakdown of sales by customer so that he could understand how best to divide up customers as Glenmark entered the market.

371. On May 23, 2013, Sandoz sent an internal e-mail advising that it could no longer supply the 45gm formulation of Alclometasone Ointment.  At that time, both the 15gm and 60gm formulations were also on temporary back order.  That same day, on May 23, 2013, CW-3 called Blashinsky and they spoke for four minutes.

372. On May 29, 2013, ███████████, a Taro sales executive, forwarded Aprahamian an e-mail he received from Cardinal regarding Sandoz's supply issues on Alclometasone Ointment. The next day, Aprahamian responded, "███████████████████████████████████████ █████████████████████████████████████████████████████████████████████

128

██████████████████████████████████████████████████████

██████████████████████████████████████."

373.     Over the next several days, Taro had several calls with Glenmark during which the

two competitors coordinated their plans to increase pricing in advance of their re-entry into the

Alclometasone Ointment market.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2013 | Voice | Blashinsky, Mitchell | Incoming | D.S. (Taro) | 9:47:00 | 0:03:00 |
| 5/31/2013 | Voice | Blashinsky, Mitchell | Outgoing | D.S. (Taro) | 11:00:00 | 0:19:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:03:00 | 0:06:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:09:00 | 0:14:00 |

374.     On June 6, 2013, after exchanging e-mails with Taro's supply chain regarding

Alclometasone Ointment, Aprahamian sent an internal e-mail stating, "███████████████████

████████████████████████████████████████."  The next day, on June 7, 2013,

Aprahamian called CW-3 of Sandoz and they spoke for eleven minutes.

375.     On June 10, 2013, Glenmark re-entered the Alclometasone Ointment market with

WAC pricing that was significantly higher than Sandoz's WAC pricing.  The next day, on June 11,

2013, Taro issued notices to the three big wholesalers – ABC, Cardinal, and McKesson –

announcing it was re-entering the Alclometasone Ointment market at new WAC pricing that

matched Glenmark.  Taro increased its WAC pricing between 201% and 239%, depending on the

formulation.

376.     That same day, on June 11, 2013, ███████████████ of Sandoz sent an internal e-mail

indicating that Taro had increased pricing on Alclometasone Ointment.  ████████████████████

████████████████████████████████████████████████████████

████████."

377.    The next day, on June 12, 2013, Aprahamian e-mailed Perfetto and  ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████." 

378.    That same day, ██████████, a Taro sales executive, e-mailed Aprahamian stating,

"████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████."

**E.    Allopurinol**

379.    Allopurinol, also known by the brand name Zyloprim, is a xanthine oxidase inhibitor used to treat gout and kidney stones.  During the period relevant to this Complaint, Actavis, Dr. Reddy's, Mylan and Qualitest/Endo were the primary manufacturers of Allopurinol during the conspiracy.

380.    Prior to 2014, Qualitest, Actavis, Dr. Reddy's and Mylan all offered prices for Allopurinol for pennies per pill – indeed, even when  Dr. Reddy's exited the market in 2012, prices from the other manufacturers remained low and stable.  In the spring of 2014, Qualitest and Actavis used brief supply disruptions for Allopurinol as a pretext for enormous price increases.  Actavis announced a WAC price increase of approximately 400%, and Qualitest announced a price increase slightly higher than that of Actavis.  Approximately six months after Actavis and Qualitest announced their price increases, Mylan joined them, announcing list prices identical to those of Actavis.

381.     In August 2014, Dr. Reddy's evaluated a possible re-entry into the Allopurinol market, which – combined with the pending price increases – prompted significant communication between senior sales executives from each of the manufacturers.  For example, Falkin of Actavis spoke with Nesta of Mylan twice on September 23, 2014 (four days after Actavis announced its WAC price increases on Allopurinol on September 19, 2014).  Falkin also communicated with ███████ of Dr. Reddy's (the Senior Director of National Accounts) on September 4th, 12th, 15th, 22nd and 23rd.

382.     On September 26, 2014, a week after Actavis's price increase, ███████ of Actavis (the VP of Sales) spoke to ███████ of Qualitest (the VP of National Accounts), for fourteen minutes and thirty-five seconds.  Qualitest announced list (WAC) prices for Allopurinol that were even higher than those of Actavis several days later.

383.     When Dr. Reddy's did re-enter the market in January 2015, it did so while adhering to the fair share agreement among manufactures rather than lowering prices to compete for market share. Dr. Reddy's ultimately announced identical list (WAC) prices to Actavis.  As ███████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████."

384.     Internal documents reveal that Dr. Reddy's was careful not to disrupt its competitors' pricing as it sought a fair share of the market.  For example, on January 19, 2015, when Dr. Reddy's internally discussed an Allopurinol opportunity, its Vice President and Head of Prescription Drugs emphasized: "████████████████████████████████."

385.     Falkin of Actavis again spoke to ███████ of Dr. Reddy's on January 5th, 8th, 15th and 21st as well as on February 12th.  Falkin also spoke with ███████ of Dr. Reddy's

on January 8th and on February 9th.  Dr. Reddy's announced its list (WAC) price increases on

January 26, 2015.  Falkin also spoke to Nesta of Mylan on March 9, 2015 and again on March

10th.  These calls were just after Mylan announced its list (WAC) price increases on Allopurinol.

386.    As a result of this coordination, Defendants were able to charge Plaintiffs and others

supracompetitive prices for Allopurinol in the United States.

### F.    Amantadine HCL

387.    Amantadine HCL, also known by the brand name Symmetrel, is a medication used

to treat flu and Parkinson's disease.

388.    Sandoz, Upsher-Smith, Lannett, and co-conspirator Banner Pharmacaps were the

primary manufacturers of Amantadine HCL capsules during the conspiracy. Additionally, Mylan

held an ANDA for Amantadine, but never sought to obtain its fair share of the market, and always

maintained a market share of approximately 1-2%.

389.    Prior to 2012, Amantadine HCL capsules cost pennies per dose. However,

Beginning in late 2011, Sandoz and Upsher-Smith began coordinating to drive up the price of

Amantadine HCL by approximately 500%, with the average price per capsule increasing from

approximately ███████████.  Sandoz and Upsher-Smith matched also simultaneously

increased their WAC prices for Amantadine HCL.  Lannett, which had the lowest market share of

the three companies, also announced an identical list price and complied with its fair share

agreement by declining to take customers from Sandoz or Upsher-Smith. Lannett ultimately

matched the price increase in December 2012.

390.    Sandoz, Upsher-Smith, Mylan, and Lannett communicated directly with each other

in furtherance of the conspiracy, including at the trade association events identified in Exhibit 1.

391.    In the summer of 2013, co-conspirator Banner Pharmacaps entered the market for Amantadine.  Although the market price was significantly more profitable at this time than it had been two years prior, Mylan, Sandoz, Upsher-Smith and Lannett arranged for Lannett to exit the market.  Indeed, in August 2013, Lannett forfeited virtually all of its market share to Banner.

392.    Upon information and belief, this coordination reflected the overarching conspiracy at work.  At the same time that Banner had entered the market for Amantadine, Lannett, Mylan, and Sandoz were coordinating to increase prices on Levothyroxine (one of the highest volume generic drugs in the country).  Upon information and belief, Lannett agreed to forfeit its share to Banner (for the benefit of Upsher-Smith and Sandoz), and in return, Sandoz agreed not to seek increased share in the Levothyroxine market (where Sandoz had less than its fair share).

**G.**    **Amiloride HCL/HCTZ**

393.    The market for Amiloride HCL/HCTZ is mature, as the drug has been available in generic form for more than thirty years to treat edema and hypertension.  Moduretic 5-50, the branded version of Amiloride HCL/HCTZ was patented by Merck prior to 1982.

394.    At all times relevant to this lawsuit there has been more than one manufacturer of Amitriptyline on the market.  Defendants Mylan and Teva dominate the market for Amiloride HCL/HCTZ.

395.    Prior to June 2011, Amiloride HCL/HCTZ were stable at just a few cents per dose. However, in Summer 2011, Mylan and Teva – applying their common understanding of the fair share overarching agreement – conspired to implement an abrupt and substantial price increase of more than 300%.

396.    Mylan and Teva continued to conspire to stabilize and maintain this supracompetitive price increase.  Indeed, after Nisha Patel arrived at Teva, the Defendants targeted

Amiloride HCL/HCTZ for additional price increases in 2013 and 2014. As a result of this collusion, by 2014, Teva and Mylan were able to charge prices for Amiloride that were up to 700% higher than they were prior to June 2011.

397. These price increases were coordinated by telephone and in-person communications by high-level sales executives at Teva and Mylan, including Patel, Rekenthaler, and Green of Teva, and James Nesta and ▮▮▮▮▮▮▮▮ of Mylan.

398. As a result of these collusive communications, Defendants continue to charge supracompetitive prices for Amiloride HCL/HCTZ as of the filing of this Complaint.

**H.  Amitriptyline**

399. The market for Amitriptyline is mature, as Amitriptyline has been available in the United States for over sixty years. Amitriptyline is on the WHO's List of Essential Medicines. During the relevant time period, Defendants Mylan, Qualitest/Endo, and Sandoz sold Amitriptyline to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

400. At all times relevant to this lawsuit there has been more than one manufacturer of Amitriptyline on the market. Defendants Mylan, Qualitest/Endo, and Sandoz dominate the market for Amitriptyline.

401. In the years prior to the conspiracy period, Defendants' average price in the U.S. for Amitriptyline were remarkably stable. Beginning in May 2014, Defendants increased their prices abruptly and, for the most part, in unison. Average prices for Amitriptyline increased 300% to nearly 2,000% across dosage strengths. The Financial Times reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years"

noting that "in July 2013, the same pill cost just 4 cents."[19]  The Boston Globe similarly reported: "The cost of the antidepressant drug Amitriptyline jumped 2,475 percent, from 4 cents for a 10-milligram pill in 2014 to $1.03 in 2015."[20]

402.     Defendants' WAC prices further illustrate these substantial price increases.  By way of example, beginning in May 2014, Defendants Sandoz, Mylan, and Qualitest set their WACs for their 50 mg product in lockstep, increasing from previous WACs that exceeded 900%:

| Product 50 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Sandoz | 00781148801 | $0.05 | $0.57 | 23-May-14 | 1032% |
| 1000 ct | Sandoz | 00781148810 | $0.05 | $0.48 | 23-May-14 | 945% |
| 100 ct | Mylan | 00378265001 | $0.05 | $0.57 | 16-Jul-14 | 1032% |
| 1000 ct | Mylan | 00378265010 | $0.05 | $0.57 | 16-Jul-14 | 1157% |
| 100 ct | Qualitest | 00603221421 | * | $0.57 | 26-Sep-14 | * |
| 1000 ct | Qualitest | 00603221432 | * | $0.48 | 26-Sep-14 | * |

403.     There are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Amitriptyline.  Changes in demand for Amitriptyline do not justify the price increases.  If anything, the price should have gone down because demand was likely lower after 2012.  In 2012, Amitriptyline was added to the American Geriatrics Society's Beers list of drugs that pose a high risk of adverse effects in seniors.  When drugs are classified as high risk, doctors

---

[19]     David Crow, Teva bids for Mylan amid pressure on copycat drug makers, The Financial Times (May 12, 2015), *available at* https://vvv\:v.ft.com/content/8ff2fc5a-f5 l 3-l l e4-8a42-00l44feab7de.

[20]     Priyanka Dayal McCluskey, As competition wanes, prices.for generics skyrocket, The Boston Globe (Nov. 6, 2015), *available at* https://www.bostonglobe.com/business /2015/11/06/generic-drug-price-increases-alarm-insurers-providers-andconsumers/l-13 iA9CSxA UylnCdGjLNKVN/story.html.

tend to prescribe them to seniors less causing total demand to decline.  Lower total demand generally causes prices to drop.  Here, the drop in demand does not explain the price increase.

404.    Furthermore, at the time Amitriptyline prices were increased in May 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.  The huge increases on Amitriptyline were not due to supply disruptions.

405.    Upon information and belief, the price increases on Amitriptyline were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Amitriptyline in the United States.  These collusive agreements were furthered at least in part through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

406.    For example, on February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida.  GPhA's 2013 Annual Meeting was attended by representatives of Sandoz and Mylan, including key executives such as Mylan's President, Tony Mauro and Sandoz's President, Don DeGolyer.  *See* Ex. 1.

407.    On June 2-5, 2013, the HDMA held a Business Leadership Conference ("BLC") in Orlando, Florida that was attended by representatives from Sandoz andMylan, including key executives for generics prices and sales.  For example, these Defendants sent their National Account Directors.  *See* Ex. 1.

408.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan, and Sandoz.  *See* Ex. 1.

409.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Mylan, and Sandoz.  *See* Ex. 1.

410.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, and Sandoz.  *See* Ex. 1.

411.    On December 3, 2013, NACDS held its 2013 Foundation Reception & Dinner that was attended by representatives from Defendants Mylan and Sandoz.  *See* Ex. 1.

412.    On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Defendants Mylan, and Sandoz.  *See* Ex. 1.

413.    On April 1, 2014, the HDMA held its Sixth Annual CEO Roundtable Fundraiser in New York City that was attended by representatives of Mylan and Sandoz.  *See* Ex. 1.

414.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Mylan and Sandoz.  *See* Ex. 1.

415.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The June 1-4, 2014 BLC was attended by representatives from Mylan and Sandoz.  *See* Ex. 1.

416.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, and Sandoz.  *See* Ex. 1.

417.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Mylan and Sandoz.  *See* Ex. 1.

418.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan and Sandoz.  *See* Ex. 1.

419.    On December 3, 2014, NACDS held its 2014 Foundation Reception & Dinner that was attended by Mylan and Sandoz employees.  *See* Ex. 1.

420.     The price increases on Amitriptyline closely followed Mylan and Sandoz's participation in the February 2014 GPhA Annual Meeting and their participation in the April 2014 Annual Meeting of the NACDS in Scottsdale, Arizona.

421.     In 2015 and 2016, representatives of Mylan, Sandoz, and Par continued to regularly attend trade association meetings and events, with Par's employees participating in the conspiracy on behalf of Qualitest and Endo.

**I.     Amphetamine/Dextroamphetamine**

422.     Amphetamine/Dextroamphetamine Immediate and Extended Release, also known by the brand name Adderall, is a medication used in the treatment of attention deficit hyperactivity disorder (ADHD).   The drug is comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS."

423.     During the time period relevant to this Complaint, Actavis, Impax, and Teva dominated the marker for MAS Extended Release ("MAS-XR"), and Actavis, Aurobindo, Mallinckrodt, Sandoz, and Teva dominated the market for MAS Immediate Release ("MAS-IR").

424.     On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "███████" of its MAS-XR business.   A senior Teva sales director, ██████, insisted on knowing the identity of the competitor before deciding what Teva's response would be.   The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

425.     Teva deferred its decision on pricing until Actavis was in a position to ship the product.

426.     Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012.   At 9:58 p.m. that same evening, Rekenthaler instructed Teva employees to find

out Actavis's plans regarding its newly-approved generic, including shipping details and inventory levels.  At 8:32 a.m. the next morning, Teva employee ███████████ responded that she had spoken to ███████████, a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:

**From:** ███████████
**Sent:** Saturday, June 23, 2012 8:32 AM
**To:** Dave Rekenthaler; ███████████ Kevin Green
**Subject:** Re: Actavis Adderall XR

Spoke to ███████. Going after approx 15 share.
1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS.

427.  The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

428.  Upon learning which customers Actavis wanted, ███████ warned colleagues that this allocation of market share could be tricky.  She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "███████" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

429.  One year later, Teva's customer renewed its request for a price reduction on MAS-XR, citing Actavis's desire to gain a share of the customer's business for the drug.  On May 7, 2013, ███████ informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business.  She made it clear that Teva had already conceded an appropriate amount of business to its competitor.  She stated: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

430.     Also in 2012, Mallinckrodt entered the market for MAS-IR and sought to add share. In internal documents, Teva acknowledged that it had willingly conceded a number of accounts to Mallinckrodt, the new competitor, which was wholly consistent with the fair share agreement.

431.     In March 2014, Aurobindo was making plans to enter the market with its MAS-IR product.  On March 18, 2014, Teva's ███████ shared with her colleagues that Aurobindo's market share target for the impending launch was 10%.  Teva's senior marketing operations executive, ████████, indicated that Teva was aware that both Aurobindo and Actavis were launching.

432.     A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing e-mail.  The day before, on March 17, 2014, Patel had spoken to Actavis's Director of Pricing, Rick Rogerson, three times. Rekenthaler and Falkin of Actavis also spoke once on that day.  On March 18, 2014, the day of the e-mail, Rekenthaler and ██████, a senior-most executive at Aurobindo, had a thirty minute telephone conversation. Rekenthaler and Falkin spoke again seven times on March 20, 2014.

433.     On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for MAS-IR.  Patel informed ████████ that the challenge was coming from Actavis and recommended that Teva concede that customer's account.  At 1:43 p.m., she communicated to another colleague that the decision had been made to concede.  Apparently closing the loop, she called Rogerson at Actavis at 1:55 p.m. They spoke for just over four minutes.

434.     As a result of these collusive communications, Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, and Teva were able to charge supracompetitive prices for both MAS-XR and MAS-IR, and those supracompetitive prices persist as of the filing of this Complaint.

**J.**     **Atenolol Chlorthalidone**

435.     Atenolol Chlorthalidone, also known by the brand name Tenoretic, is a medication used to treat high blood pressure.

436.     During the period relevant to this Complaint, Actavis and Mylan were the primary manufacturers of Atenolol Chlorthalidone tablets.

437.     Mylan and Actavis sought to allocate the market for Atenolol Chlorthalidone pursuant to fair share principles, with each company entitled to 50% market share.  Although monthly fluctuations in the orders of customers allocated between the two companies occasionally resulted in small fluctuations in total market share, the two companies communicated with each other to ensure that they were following the fair share rules.

438.     Actavis and Mylan communicated directly with each other in furtherance of the conspiracy. For example, Nesta of Mylan and Falkin of Actavis spoke extensively through this period, including: nine times in March 2014, four times in May, twenty times in June, nine times in July and twice in September.

439.     As a result of this coordination, beginning in March of 2014, Defendants were able to impose a collusive price increase of more than 200%, and to maintain prices at supracompetitive levels into 2020. Indeed, Defendants continue to charge Plaintiffs and others supracompetitive pricing for Atenolol Chlorthalidone sold in the United States.

**K.**     **Baclofen**

440.     The market for Baclofen is mature, as Baclofen has been available in the United States for nearly 50 years.  During the relevant time period and continuing today, Defendants Lannett, Qualitest/Endo, Teva, and Upsher-Smith each sold Baclofen to Plaintiffs and others in

the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

441.    At all times relevant to this lawsuit, there has been more than one manufacturer of Baclofen on the market.  Defendants Lannett, Qualitest/Endo, Teva, and Upsher-Smith dominate the market for Baclofen.  In the years prior to the conspiracy period, Defendants' average price in the U.S. for Baclofen was remarkably stable.  Beginning in February 2014, Defendants increased their prices abruptly and in unison.

442.    Baclofen is among the drugs identified by the GAO, which concluded that Baclofen, in both the 10 mg and 20 mg tablet form "[e]xperienced and extraordinary price increase" in 2014-2015.  Similarly, American Pharmacies, a group of independent pharmacists that monitors the pricing of generic drugs and issues notices to customers, warned in February 2014 of the recently announced "[m]arketwide price increases of more than 500% … occurring on Baclofen tablets."

443.    Effective February 21, 2014, Defendant Upsher-Smith took a significant price increase on Baclofen, ranging from 350-420% to the WAC price, depending on the formulation.  Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith was considering whether to exit the market or significantly raise price.  It chose the latter.

444.    The primary competitors in the market for Baclofen at this time were Teva (62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

445.    Teva initially considered following the Upsher-Smith price increase quickly, as part of its April 4, 2014 price increases – but decided against it.  The primary reason was that Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor.  In other words, Qualitest would likely compete for market share if Teva increased its price.

446.    Starting on April 10, 2014, however, Teva learned that Qualitest was having supply problems, and could exit the market for at least 3-4 months, if not permanently.

447.    Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the price increase.  Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

448.    Upsher-Smith was a highly-ranked competitor by Patel (+2) in large part because of Patel's relationship and understanding with ███████, a national account executive at Upsher-Smith.  In the week before she started her employment at Teva (after leaving her previous employment), Patel and █████ exchanged several text messages.  During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to █████ on April 29, 2013 for nearly twenty minutes.   During these initial communications, Patel and █████ reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase.  Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

449.    There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher-Smith price increase based on Patel's prior conversations with █████, and based on the history of collusion between the two competitors.

450.    Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher-Smith's pricing exactly.  Teva increased its WAC pricing from 350-447%, depending on the

dosage strength.   Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

451.    The chart below shows the increases by Teva and Upsher-Smith on 20 mg strength doses of baclofen:

| Product 20 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 1000 ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 100 ct | Teva | 00172409760 | $0.10 | $0.49 | 15-Apr-14 | 420% |
| 1000 ct | Teva | 00172409780 | $0.09 | $0.49 | 15-Apr-14 | 447% |

452.    Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow.  Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith.  As Patel told ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████ ."

453.    Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit. In short order, Baclofen became a very profitable product for Upsher-Smith.  On April 18, 2014 – only three days after the Teva price increase – ████████, a Senior Director of Sales and Marketing at Upsher-Smith, made the following pronouncement:

> On Apr 18, 2014, at 3:07 PM, ████████████████@upsher-smith.com> wrote:
>
> Qualitest is out. Teva matched our pricing. Bac is our newest ~$20M product.
>
> ██
> Sent from my iPhone
>

454.     Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith.   Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

455.     These dramatic price increases were not the result of supply shortages or demand spikes.   There were no relevant labeling changes or reported drug shortages that might have led to price increases.   Nor was there a spike in demand that could explain these large price increases. Instead, the increase was the product of the overarching fair-share agreement and also collusive communications between Defendants.

456.     In June 2014, Defendant Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply. In an internal e-mail sent to his sales staff, ▮▮▮▮▮▮▮, a senior sales executive at Lannett, stated: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮."   At that time, Teva had a large market share in relation to the existing competitors in the market.

457.     Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail, promptly communicated with Patel (Teva was a competitor for Baclofen) using Facebook Messenger.  On June 12, 2014, Sullivan messaged Patel, stating:



458.    The message was sent at 11:16 a.m.  At 11:30 a.m., Patel called Sullivan and they spoke for seven minutes.  This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013.  During the conversation, Sullivan informed Patel that Lannett would be entering the market for Baclofen shortly.  In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



459.    True to her word, Sullivan called Patel on July 1, 2014 and left a voicemail.  Patel promptly returned the call, and the two spoke for almost seven minutes.

460.    On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague: "████████████████████████████████████████████████████ ████████████████████████████████████████████."  That same day, Patel sent a text message to Sullivan asking "███████?"  Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back promptly, and they spoke for more than three minutes.  After speaking, Patel sent another text message to Sullivan, stating: "████████████████████████████ ████"

461.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating: "██████████████████████████████████████████████████████████." The customer asked whether Teva wanted to exercise its right of first refusal (*i.e.*, offer a lower price to maintain the account).  Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid.  Patel specifically agreed with the decision to concede, stating:

"███████████████████████████████████████████

██████████████████████████████."

### L.   **Balsalazide Disodium**

462.    Balsalazide Disodium ("Balsalazide"), also known by the brand name Giazo, is an anti-inflammatory drug used in the treatment of inflammatory bowel disease.  During the period relevant to this Complaint, Mylan, West-Ward and Apotex were the primary manufacturers of Balsalazide Disodium.

463.    As with other drugs identified in this Complaint, Defendants arranged for manufacturers to exit the market so that they could increase prices.  With respect to Balsalazide, West-Ward, Apotex, and Mylan arranged for Mylan to exit the market, which it did in June 2013. As detailed further below, Apotex, Mylan and West-Ward also controlled the market on Butorphanol Tartrate and Mylan and West-Ward controlled the market for Captopril.  Whereas Mylan exited the Balsalazide, Apotex exited the market for Butorphanol, and West-Ward exited the market for Captopril.

464.    Additionally, in January 2014, Apotex briefly exited the market for Balsalazide based on what it claimed to be a supply issue.  West-Ward used this opportunity to increase prices by approximately 400%.  And, upon its re-entry in February 2014, rather than compete for market share, Apotex matched West-Ward's price increase.

465.    Upon information and belief, Apotex's one month hiatus from the market was a pretext that it coordinated with West-Ward to impose a substantial price increase.  Upon its re-entry into the market, Apotex arranged with West-Ward to concede to West-Ward its fair share of the market.

466.    Senior sales executives from Mylan, West-Ward, and Apotex communicated directly with each other in furtherance of the conspiracy in order to coordinate the price increases and market allocation for Balsalazide Disodium, as well as Butorphanol Tartrate and Captopril. For example, ███████████ of West-Ward was in frequent contact with ███████████ (Mylan's Director of National Accounts), with the two communicating by phone at least 20 times between March and June of 2013.  Executives from West-Ward, Apotex, and Mylan also met regularly at trade association events frequently throughout this time period, as detailed in Exhibit 1.

## M.    **Benazepril HCTZ**

467.    Benazepril HCTZ, also known by the brand name Lotensin, is an angiotensin converting enzyme (ACE) inhibitor that is used to treat high blood pressure.

468.    The market for Benazepril HCTZ is mature, as Benazepril HCTZ has been available in the United States for over 25 years.  At all times relevant to this lawsuit there has been more than one manufacturer of Benazepril HCTZ on the market.  Defendants Mylan and Sandoz dominate the market for Benazepril HCTZ, and co-conspirator Rising entered the Benazepril HCTZ market following collusive discussions with Mylan and Sandoz during which Rising agreed to follow the conspiracy pricing.

469.    At issue here are three dosage strengths of Benazepril HCTZ: 10 mg/12.5 mg, 20 mg/12.5 mg, and 20 mg/25 mg.

470.    In the years prior to the conspiracy period, Defendants' average price in the U.S. for Benazepril HCTZ was remarkably stable.  Beginning in August 2013, Defendants increased their prices abruptly and in unison.  This price increase was the result of an agreement reached during discussions between Mylan and Sandoz.

471.    In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ.  However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

472.    On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding "█████████████████████████████████████████████████████████████ █████████."   Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

473.    The next day, on July 16, 2013, CW-4 spoke with Nesta and sent the July 2013 E-mail outlining the Mylan price increase drugs that Nesta had provided to her (discussed more fully above).  That list did not include Benazepril HCTZ.  CW-1 forwarded the July 2013 E-mail to Kellum stating: "███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████."

474.    Over the next few days, CW-4 and Nesta communicated several times, during which they discussed Benazepril HCTZ.  These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

475.    On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled, "█████████

████████████████████████████████████████████████████████████████████

██████████████."

476.    One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ.  The increase was large – nearly 334% on all dosage strengths.

477.    On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

478.    By way of example, in August 2013, Mylan and Sandoz set nearly identical WAC prices on their 25 mg product for Benazepril HCTZ, reflecting increases of more than 300%:

| Product 25 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 20 ct | Mylan | 00378477501 | $0.38 | $1.65 | 9-Aug-13 | 334% |
| 20 ct | Sandoz | 00185027701 | $0.32 | $1.62 | 20-Aug-13 | 407% |

479.    A third competitor – Rising – entered the Benazepril HCTZ market on April 2, 2014 as the authorized generic.  When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan.  Both before and after entering the market, CW-2 – then at Rising – communicated with his former colleagues at Sandoz (CW-1, CW-3, and █████) about obtaining market share on Benazepril HCTZ.  Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

480.    In December 2019, Co-conspirator Rising reached a deferred prosecution agreement in which it admitted to price-fixing Benazepril HCTZ between at least April 2014 and September 2015.

481.   As a result of the overarching "fair share" understanding and these collusive communications, Mylan, Sandoz, and Rising sold Benazepril HCTZ to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

### N.   Betamethasone Dipropionate

482.   Betamethasone Dipropionate is a topical steroid used to treat inflammation caused by allergic reactions, eczema, psoriasis, fungal infections and a wide range of other skin conditions.  It is sold in a variety of formulations, including cream, lotion, and ointment.  It is also sold in an Augmented formulation, and a formulation that included Clotrimazole ("CBD").  During the time period relevant to this Complaint, Sandoz/Fougera and Taro manufactured each formulation.  Additionally, Actavis manufactured cream, ointment, and CBD formulations, while Perrigo manufactured Betamethasone Dipropionate lotion.

### 1.   Lotion, Cream, and Ointment

483.   In 2010, Fougera, Perrigo, and Teva were the only three competitors in the market for Betamethasone Dipropionate lotion.

484.   On December 16, 2010, CW-6 of Fougera e-mailed Kaczmarek to inform him that Teva was exiting the market, leaving Fougera and Perrigo as the only competitors.  With a strong collusive understanding firmly in place between Fougera and Perrigo at that point, Kaczmarek was thrilled with the news and immediately suggested that Fougera take advantage of Teva's departure by increasing pricing on the product:

From: Walt Kaczmarek
Sent: Thursday, December 16, 2010 9:51 AM
To: ▮
Cc: ▮
Subject: FW: Beta Dip Lotion (not augmented)

Let's add this one to the beta party! Current WAC is $6.50, that will need to go up significantly. Thinking $40 or so.

Walt Kaczmarek
Vice President, National Accounts

485.    Also on December 16, 2010, Perrigo held an internal meeting to discuss increasing pricing on Betamethasone Dipropionate.  Notes from that meeting stated: "▮ ▮" That same day, ▮ of Perrigo and CW-6 of Fougera exchanged several calls.  After hanging up with ▮, CW-6 called Kaczmarek to update him on their discussions.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/16/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 8:58:29 | 0:00:25 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:12:49 | 0:05:32 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:18:34 | 0:01:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:20:00 | 0:03:51 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:24:02 | 0:05:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 10:00:24 | 0:01:08 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:34:32 | 0:01:04 |

486.    After this series of phone calls, Perrigo also decided to raise prices – and did so even before Fougera.  On January 4, 2011, Perrigo increased its WAC pricing for Betamethasone Dipropionate by 504% to $▮.  That same day, ▮ called CW-6 and they spoke for seven minutes. Just minutes after hanging up, CW-6 again called Kaczmarek.  The call lasted one minute.

487.    Three days later, on January 7, 2011, the Fougera sales team held a conference call during which they discussed the upcoming increase on Betamethasone Dipropionate, among other products.  That same day, ▮ called CW-6 and they spoke for four minutes.  Over the course of the day, the two competitors would exchange several more calls and CW-6 would continue to keep Kaczmarek apprised of his discussions.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:02:00 | 0:04:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:48:35 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:21:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:22:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 11:17:00 | 0:02:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:45:31 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 14:56:11 | 0:00:14 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:00:53 | 0:20:39 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 16:00:36 | 0:04:27 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:05:31 | 0:01:57 |
| 1/7/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:17:40 | 0:01:15 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 17:09:52 | 0:00:00 |

488.    On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99 – slightly higher than Perrigo's WAC pricing. The next day, on January 13, 2011, CW-6 called ███ again and they spoke for twelve minutes.

489.    At the same time that Fougera was coordinating to raise prices on Betamethasone Dipropionate lotion, it also coordinated with Actavis and Taro to increase prices on the ointment and cream formulations. For example, Actavis increased prices on Betamethasone Dipropionate cream in December 2010, and Fougera and Taro agreed to follow this increase in January 2011, which they ultimately did within days of each other. At the same time that Actavis increased its prices on cream, it also increased its prices on Betamethasone Dipropionate ointment. And although Fougera did not follow this increase until late in 2011, it complied with the fair share agreement to support Actavis' price increase by refraining from taking any of Actavis' customers during this time period.

490.    As further detailed below in Section XIII, in May 2013, Aprahamian and Perfetto of Taro coordinated another round of price increases on Betamethasone Dipropionate cream and lotion, and also augmented Betamethasone Dipropionate, shortly after leaving Actavis for Taro.

2.   CBD

491.    In early 2011, the competitors in the generic market for CBD Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

492.    On March 9, 2011, ▮▮▮▮▮, a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011.  Actavis planned to raise WAC prices for CBD Cream by 227% and to increase contract prices to customers by as much as 1100%.  Notably, Actavis had not yet conveyed the proposed increases to its customers.  In fact, in that March 9, 2011 e-mail, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

493.    Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware.  For example, on March 9, 2011 – the same day that ▮▮▮ circulated the price increase proposal internally at Actavis – ▮▮▮ ▮▮▮, a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek.  In that recap, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" is a reference to all of Taro's betamethasone products.  Importantly, Taro had not yet raised its prices on those products.

494.    Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with one another to ensure that each competitor would follow the other's price increases.

495.    For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing

executive, eight times for a total of approximately fifty-two minutes. During that same time, ▌▌▌▌▌▌, a Taro sales executive, spoke with CW-6 of Fougera three times for a total of approximately fifteen minutes.

496.    On March 25, 2011, Actavis informed its customers of the price increases for CBD Cream. By happenstance, just days before the announcement, Actavis learned that its API costs for CBD Cream would increase. Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

497.    Before the announcements went out, Perfetto e-mailed the Actavis sales executives, telling them to "▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌."

498.    In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis's formal price increase announcement on March 25, 2011, including calls between the following individuals:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

499.    On March 30, 2011 – just three business days after Actavis sent out its price increase notices for CBD Cream – Fougera sent out notices to its customers stating that it was

raising prices for CBD Cream.  Those increases, which took effect April 1, 2011, increased Fougera's WAC prices for CBD Cream by 54% and increased contract prices across the board, in some cases by over 1200%.  The day after Fougera announced those price increases, CW-6 of Fougera and ███████████ of Taro spoke three separate times for a total of eighteen minutes.

500.   Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD Cream and CBD Lotion.  For some customers, Taro raised prices for CBD Cream by approximately 1350% and raised prices for CBD Lotion by approximately 960%.  The next day, █████ called CW-6 and they spoke for eighteen minutes.

501.   On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion – raising its WAC by 71% and increasing its contract prices across the board, in some cases by over 900%.  At the time, Fougera's gross profit margin on CBD Lotion was already ███, yet, with this price increase, their gross profit percentage would soar to ███ .  Fougera estimated that these increases accounted for an extra $███████ in profit for the rest of 2011 alone.

502.   In furtherance of the conspiracy, Fougera refrained multiple times from taking customers that approached it for bids.  For example, after Taro's increase, Wal-Mart, a Taro customer for CBD Cream and Lotion, asked Fougera to bid for that business.  Kaczmarek cautioned "████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████" Kaczmarek determined that Fougera should opt for the latter.

503.     Shortly after pulling off one massive coordinated price increase, Taro wasted no time planning the next.  In an e-mail to Kaczmarek on May 6, 2011, ▉▉▉▉▉, a senior Fougera executive, detailed how Taro had already approached Fougera about raising CBD prices again:



504.     By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream.  Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera.  During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

505.    The day after the final calls detailed above, on March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7% and its contract prices by 15% for most of its existing customers.

506.    In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors.  Both times Taro declined, comfortable that its competitors would not poach its business. Taro's confidence was well placed.

507.    On May 23, 2012, McKesson contacted an Actavis sales executive, asking if Actavis's recent RFP bid still stood because "



."  The following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call lasting fourteen minutes.  Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him. Aprahamian called Perfetto the next morning on May 25, 2012.  After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was "                                         ."

508.    In the Fall of 2012, a fourth competitor (Prasco) was entering the CBD Cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD Lotion market.  Facing new competition on CBD Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

509.    Starting in late August 2012, Sandoz began planning a 100% price increase on CBD Lotion to take place in October, which – assuming "

158

███████████████████████████████████████

█████████████████████████████████████,

including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

510.    On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling its WAC price (from $61.90 to $123.80) as well as its contract prices.  As expected, Taro did not attempt to poach Sandoz's customers.  For example, when MMCAP e-mailed Taro on October 26, 2012 to request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

511.    Taro also made plans to follow the Sandoz price increase. On January 4, 2013, ███ ███████, a senior Taro sales executive, instructed Taro sales executives, including ███████s and ██████████, to gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase.  That same day, ████████ spoke with CW-3 of Sandoz for five minutes.  The pair

spoke again on January 7, 2013 for thirteen more minutes.  Three days later, on January 10, 2013,

███████ spoke with CW-4 of Sandoz for twenty-three minutes.

512.    On February 12, 2013, Taro instituted its price increase on CBD Lotion, raising WAC by approximately 80% and contract prices by approximately 60%.

513.    After Taro's increase was issued, news of it spread throughout Sandoz. One Sandoz employee remarked "████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████."

**O.    Betamethasone Valerate**

514.    Betamethasone Valerate ("Beta Val"), also known by brand names such as Betamethacot, Beta-Val and Betacort, among others, is a medium strength topical corticosteroid prescribed for the treatment of skin conditions such as eczema and dermatitis, as well as allergies and rashes.  It is manufactured in various formulations, including cream, lotion, and ointment. During the time period relevant to this Complaint, Sandoz manufactured each of the three formulations.  Additionally, Taro manufactured cream; G&W and Teva manufactured lotion; and Actavis manufactured both cream and ointment.

**1.    Lotion**

515.    In mid-2011, two companies shared the market for Beta Val Lotion – Fougera with 79% of the market, and Teva with 21% market share.

516.    In early November 2011, however, Grauso at G&W contacted CW-6 with some important news about G&W's plans to enter the Beta Val Lotion market.  Grauso called CW-6 late

in the afternoon of November 9, 2011.  They also spoke three times the next morning. Later that day, CW-6 informed his Fougera colleagues that G&W would be launching "███████████" and that he believed Teva had discontinued the product.   He opined that, under those circumstances, Beta Val Lotion "████████████████████████████████ ████████████."

517.    Fougera promptly began preparing for an even larger price increase than CW-6 had recommended.  On December 13, 2011, CW-3, a Fougera sales executive, created a spreadsheet detailing Fougera's upcoming price increases, including a 200% increase in WAC pricing for Beta Val Lotion from $20.00 to $60.00 per 60ml bottle.  The average net sales price for the product would go from $10.11 to $30.33.

518.    With the Fougera price increase details now firm, CW-6 began coordinating the price increase directly with G&W.  Between December 14 through December 21, 2011, CW-6 and Grauso spoke by phone 12 times.  Fougera's price increase to $60.00 for Beta Val Lotion, went into effect on December 22, 2011.

519.    CW-6 and Grauso remained in close contact in the days that followed the Fougera price increase, as G&W also finalized plans for its Beta Val Lotion launch, including a twenty minute call on December 28, 2011, Grauso's last day as a G&W employee.  During these calls, the competitors discussed G&W's market share goals and identified customers for G&W to target as it launched.

520.    On January 9, 2012, Vogel-Baylor of G&W (who had just taken over for Grauso) distributed to her colleagues a "████████████████████████████████ ████████████."  That same day, she sent an e-mail to Wal-Mart announcing the

G&W launch.  On January 11, 2012, she followed up with a quote, offering to supply the product for $10.40, far below Fougera's newly increased average net sales price.

521.    Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer – Rite Aid – on January 10, 2012, offering a price of $10.20.

522.    Something had clearly been lost in translation after Grauso's departure, and CW-6 of Fougera set out to figure out what had happened.  Late in the afternoon on January 11, 2012, CW-6 placed an urgent call to Grauso, who had recently started at Aurobindo.

523.    Grauso called him back quickly and the two spoke for five minutes. Immediately upon ending that call, Grauso called his former colleague at G&W, Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underpriced offers.  As soon as that call ended, Grauso called CW-6 of Fougera to confirm that he had addressed the problem.

524.    At 10:02 p.m. that same day, Vogel-Baylor e-mailed Orlofski with the news she had just received about Fougera:

> Fougera raised their WAC & AWP on December 21st as follows:
>
> - WAC - from $20.00 to $60.00
> - AWP - from $24.00 to $72.00
>
> I am trying to find out if the prices went up to.  I will let you know but for now I would recommend increasing the WAC & AWP to:
>
> - WAC from $30.00 to $60.15
> - AWP from $36.00 to $72.25

525.    At 7:55 a.m. the following morning, Vogel-Baylor asked that the G&W team re-submit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price.  That same day, G&W also issued a revised price proposal to Wal-Mart, quoting the new price of $20.00.

526.     Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised the G&W launch pricing for this product "██████████████." The modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

527.     One week later, on January 19, 2012, Vogel-Baylor announced to Orlofski that G&W had already reached its target market share for Beta Val Lotion: "██████████████ ████████████████." By following Fougera's price increase, that 45% share equated to $1.6 million in total annual gross sales for G&W.

528.     In a February 17, 2012 e-mail exchange with a distributor, Orlofski explained G&W's rationale for not seeking additional market share on this product: "████████████ ██████████████████████████ ██████████████████████████ ████████████████." 

> 2.     Ointment

529.     As noted above with respect to Betamethasone Dipropionate, Sandoz/Fougera coordinated large price increases across all formulations of Betamethasone beginning in late 2010. For Betamethasone Valerate ointment, prices remained at the supracompetitive levels established through this collusion, including during a brief period in 2012, when Sandoz stopped production.

530.     In early January 2013, Sandoz began making plans to re-enter the market for Betamethasone Valerate and targeted February 15, 2013 as its re-launch date. At that time, Actavis was the only other generic competitor in the market.

531.     On January 21, 2013, Sandoz held a Commercial Operations call during which the Betamethasone Valerate re-launch was discussed. During that call, CW-3 noted that Sandoz was

seeking 40% of the market – which was typical (and consistent with fair share principles) for a second entrant in a two-player market – and was looking for price points and customer information.

532.    On February 4, 2013, CW-3 called Aprahamian, who at that time was still at Actavis.  The call lasted one minute.  The next day, February 5, 2013, CW-3 spoke with Aprahamian two more times – with one call lasting twenty-three minutes.  Immediately after each call with Aprahamian, CW-3 called Kellum or CW-1 to report back what he had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 10:14:00 | 0:23:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 10:38:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:39:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 11:24:00 | 0:03:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:27:00 | 0:01:00 |

533.    During these calls, Aprahamian provided CW-3 with Actavis's non-public pricing for Betamethasone Valerate at its largest customers, as well as the percentage of the market that each customer represented.  The purpose of providing this specific information was so that Sandoz would be able to price as high as possible while still obtaining business from specific, agreed-upon customers that represented an agreed-upon market share.    CW-3 took the following contemporaneous notes in his Notebook, placing check marks next to Rite Aid and Walgreens, two of the customers that he and Aprahamian agreed that Sandoz would target.  These notes are pictured below:

534.    Later in the evening on February 5, 2013, ███████████, a senior Sandoz marketing executive, sent an internal e-mail, including to CW-3, stating: "███████████ ████████████████████████████████████████████████████████████ ███████████████████████."

535.    Two days later, on February 7, 2013, ████████, a pricing analyst at Sandoz, sent an internal e-mail, including to CW-3, stating that Sandoz planned to send an offer to Walgreens shortly and would send offers to additional targets once they received feedback from Walgreens. CW-3 responded: "██████████████████████████."

536.    On February 13, 2013, CW-3 called Aprahamian and they spoke for nearly sixteen minutes.  That same day, on February 13, 2013, Rick Rogerson, a senior pricing executive at Actavis, discussed ceding the Walgreens account to Sandoz, stating in an internal e-mail: "█ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████."

537.     Two days later, on February 15, 2013, Sandoz re-entered the market and published WAC pricing that matched Actavis's WAC pricing.  That same day, on February 15, 2013, Sandoz was awarded the Betamethasone Valerate business at Walgreens.

538.     On February 19, 2013, Sandoz bid on the Betamethasone Valerate business at Rite Aid.  That same day, CW-3 called Aprahamian to let him know.  The call lasted less than one minute.  On February 28, 2013, Rite Aid awarded the business to Sandoz.

539.     On March 15, 2013, Sandoz bid on the Betamethasone Valerate business at Cardinal.  A few weeks later, on March 27, 2013, Cardinal awarded the business to Sandoz.  These three accounts – Walgreens, Rite Aid, and Cardinal – accounted for approximately 32% of the Betamethasone Valerate market.

540.     On April 1, 2013, Sandoz held a Commercial Operations call during which they discussed, among other items, the status of the Betamethasone Valerate re-launch.  CW-3's notes from that call reflect that Sandoz had been able to secure three customers, but was "███████" one additional customer, OptiSource, to reach its original 40% market share goal.  The next day, April 2, 2013, CW-3 called and spoke with Aprahamian twice, with one call lasting six minutes.

541.     On April 4, 2013, Sandoz submitted an offer to Optisource for its Betamethasone Valerate business.  Four days later, on April 8, 2013, Optisource awarded Sandoz the business.

542.     As detailed further below in Section XIII, Sandoz and Taro then proceeded to coordinate a second price increase on Betamethasone Valerate cream beginning in April 2013, and culminating with a July 2013 collusive price increase.

### P.     Bromocriptine Mesylate Tablets

543.     Bromocriptine Mesylate Tablets ("Bromocriptine"), also known by the brand name Parlodel, is used in the treatment of Parkinson's disease, hyperprolactinemia (abnormally high

levels of prolactin in the blood), and acromegaly (a syndrome where the pituitary gland produces excess growth hormones).

544.    As of December 2012, the three competitors in the market for Bromocriptine were Sandoz (with 65% share), Perrigo (with 30%), and Mylan (with 5%).

545.    On March 1, 2013, Walgreens reached out to Sandoz asking for a one-time buy for Bromocriptine because Mylan was having supply issues and would be out of the market for two months.  On March 4, 2013, ████████████ responded to Walgreens stating that Sandoz could not fill the customer's request.

546.    Viewing Mylan's supply issues as an opportunity, ████████ forwarded his exchange with Walgreens to Kellum asking, "████████████████████?" Kellum responded within the hour stating, "███." That same day, March 4, 2013, CW-4, a Sandoz senior sales executive, spoke with Jim Nesta, a senior sales executive at Mylan, for nearly four minutes.  The two competitors spoke again on March 11, 2013 for nearly ten minutes.

547.    On March 22, 2013, Kellum e-mailed the Pricing Committee recommending that Sandoz increase prices on Bromocriptine, among other products.  In particular, Kellum sought a 206% increase to Sandoz's WAC pricing for Bromocriptine and noted the reason for the increase was due to "████████████████████."

548.    By March 31, 2013, all members of the Sandoz Pricing Committee (which included Kellum and CW-1, among others) had approved the increase.  The very next day, on April 1, 2013, CW-3, a Sandoz senior sales executive, called ████████ of Perrigo – the other competitor on Bromocriptine – and they spoke for seventeen minutes.  The next morning, on April 2, 2013, CW-3 called ████████ again and they spoke for five minutes.  On this call, CW-3 conveyed to his

competitor a list of products that Sandoz planned to increase pricing on in April 2013, including Bromocriptine, as well as the amount of those increases.

549.     After hanging up with ██████, CW-3 called Kellum.  The call lasted one minute. A few hours later, CW-3 called CW-1, a senior pricing executive at Sandoz, and they spoke for eleven minutes.

550.     The next day, on April 3, 2013, Sandoz held an internal meeting attended by sales and pricing personnel, including CW-3, CW-4, CW-1, and Kellum, to discuss the upcoming Sandoz price increases, including Bromocriptine.

551.     Two days later, on April 5, 2013, Sandoz implemented the Bromocriptine increase and raised WAC pricing on the product by 205%.

552.     Throughout the first three weeks of May 2013, CW-4 spoke with Nesta of Mylan regularly, including on May 8, 13, and 20.

553.     By late May 2013, Mylan had resolved its supply issues on Bromocriptine and was readying to increase its own price.  To that end, on May 22, 2013, Mylan held an internal meeting to discuss Bromocriptine.

554.     That same day, on May 22, 2013, ABC e-mailed Sandoz to request a bid on Bromocriptine, citing supply issues with its incumbent manufacturer. ██████████████, a Sandoz sales executive, who had a better idea of Mylan's plans, forwarded the request to Kellum stating "████████████████████████████████."

555.     Sandoz quickly set out to confirm the reason for ABC's request.  First thing the next morning, on May 23, 2013, Kellum called ██████████, a sales executive at Mylan.  The call lasted two minutes.  Notably, this was the only call ever between the two competitors according

to the available phone records.  That same morning, CW-3 spoke twice with ███████ of Perrigo and CW-4 exchanged two calls with Nesta of Mylan.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | L.W. (Mylan) | Incoming | Kellum, Armando (Sandoz) | 8:33:00 | 0:01:55 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 10:49:23 | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 12:40:43 | 0:01:25 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |

556.  After speaking with their competitors, CW-3 and ███████ reported back to their superiors, CW-1 and Kellum of Sandoz and Wesolowski of Perrigo.  During these calls, Sandoz learned that ABC was in fact Perrigo's customer, and that Perrigo might be leaving the market for Bromocriptine due to supply problems.  This call pattern is illustrated in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 9:13:00 | 0:07:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:20:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 10:26:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:51:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:14:00 | 0:16:00 |

557.  After this series of calls, Kellum called ███████ of Sandoz and they spoke for twenty- one minutes.  While on the phone with Kellum, sent the following internal e-mail, with a copy to Kellum, regarding the reason for ABC's bid request on Bromocriptine:



From:       ███████████████
Sent:       Thursday, May 23, 2013 1:58 PM
To:         ████████████
Cc:         Kellum, Armando
Subject:    BID REQUEST: BROMOCRIPTINE MESYLATE

███████████

Perrigo is out.  This is ABC's primary.  Can we please evaluate.

Best Regards,

SG

558.    Not wanting to upset the market balance between the competitors, Sandoz ultimately decided to submit an offer to ABC for a one-time buy.  However, the customer declined the offer because Sandoz's pricing was too high.

559.    Just one week later, on May 31, 2013, Mylan re-entered the market and published WAC pricing for Bromocriptine that matched Sandoz's increased pricing.  In the days leading up to, and on the day of, Mylan's price increase, the competitors again exchanged several calls.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 7:58:00 | 0:07:00 |
| 5/29/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 9:46:30 | 0:12:51 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 11:46:43 | 0:08:32 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:45:59 | 0:00:06 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:54:01 | 0:00:04 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 13:54:45 | 0:03:01 |
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 14:23:00 | 0:03:00 |
| 5/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:29:00 | 0:04:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:21:00 | 0:02:00 |

560.    As of June 2013, Sandoz decided not to pursue additional market share on Bromocriptine because it had reached its "█████████████████████████."

561.    Perrigo did not quickly follow the price increases taken by Sandoz and Mylan, in part due to their intermittent supply issues.  As a result, Sandoz received several complaints from its customers that Perrigo was selling the product at a cheaper price.

562.    For example, on July 22, 2013, McKesson e-mailed Sandoz requesting a price reduction for Bromocriptine because a competitor was selling the product at "████████████

████████████████████████████████████████████████████████

of Mylan and they spoke for eight minutes.  Within minutes of hanging up, CW-3 called CW-1.

The call lasted two minutes. Two days later, Sandoz responded to McKesson and declined to lower its pricing stating, "████████████████████████████████████."

563. On July 29, 2013, McKesson asked that Sandoz reconsider its decision because otherwise it would need to request a bid from Perrigo. That same day, ██████ of Perrigo called CW-3 twice. Both calls lasted one minute. The next morning, CW-3 called ██████ and they spoke for thirteen minutes. During these calls, the competitors discussed the fact that Perrigo had not followed the Sandoz and Mylan price increases on Bromocriptine. However, ██████ assured CW-3 that Perrigo would not take Sandoz's business at McKesson. CW-3's contemporaneous notes from his conversation with ██████ are pictured below:



564. After hanging up with ██████, CW-3 called CW-1 and they spoke for four minutes. On this call, CW-3 conveyed to CW-1 what ██████ had told him about Bromocriptine. According to CW-3, it was not a question of whether Perrigo would follow, but when they would follow. Armed with this assurance from Perrigo, Sandoz responded to McKesson's request by declining to lower its pricing and reiterating "████████████████████████████████████."

565. Similarly, on August 23, 2013, Omnicare, a Sandoz customer, e-mailed Perrigo stating that they noticed Perrigo's price for Bromocriptine was significantly lower than the other competitors and asked "████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



."

566.    Sandoz and Mylan generated a substantial amount of money from Bromocriptine sales in 2013.  For example, on February 4, 2014, Sandoz released a business review report that detailed how the 2013 price increases for certain drugs delivered upwards of $197 million of revenue for Sandoz after price protection.  Among the drugs mentioned, Bromocriptine realized incremental net sales of $3.2 million after price protection.

567.    Perrigo ultimately followed its competitors and implemented a price increase on Bromocriptine in October 2014.

568.    On October 2, 2014, ▮▮▮▮ of Perrigo called CW-3 and they spoke for seven minutes.  Immediately upon hanging up with CW-3, ▮▮▮▮ called his supervisor, Wesolowski.  Less than one week later, on October 7, 2014, Perrigo sent letters to its customers notifying them of the Bromocriptine increase.  The next day, on October 8, 2014, CW-3 sent an internal e-mail to Kellum and CW-1, among others, noting that Perrigo "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**Q.    Budesonide DR Capsules**

569.    Budesonide DR Capsules, also known by the brand name Entocort EC, is a steroid used to treat Crohn's disease and ulcerative colitis when taken orally.

570.     Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70% market share and Mylan had the remaining 30%.

571.     Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug.  On April 1, 2014, ███████████, a senior national account executive at Par, called Rekenthaler at Teva.  The two executives spoke for twenty-six minutes.  The next day, April 2, 2014 – which happened to be the same day that Teva received FDA approval to market Budesonide DR – Par increased its price for Budesonide DR by over 15%.

572.     That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: "████████████████████████████████████ ███████████████████████████████████████████████████████."

573.     Par and Mylan were also communicating at this time.  On April 3, 2014 – the day after the Par price increase – ███████████████████████████████████████ ████████ a senior account manager at Mylan, for fifteen minutes.

574.     On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so.  Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and ████, a similarly high-level executive at Par, that same day.

575.     Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

**R.**     **Budesonide Inhalation**

576.     Budesonide Inhalation, also known by the brand name Pulmicort Respules, is an anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent asthma attacks.  It belongs to a class of drugs called corticosteroids, and works directly in the lungs to make breathing easier by reducing the irritation and swelling of the airways.  During the period relevant to this Complaint, Actavis, Sandoz, and Teva were the primary manufacturers of Budesonide Inhalation.

577.     Teva obtained approval to market Budesonide Inhalation in November 2008.  As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation Suspension.  Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly.  So before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide Inhalation Suspension by 9%.  Although a very modest increase in percentage terms, the 9% price increase added $█████████ to Teva's annual revenues.

578.     On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid.  Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent.  That same day, David Rekenthaler of Teva called his counterpart at Actavis, █████████ – a senior sales and marketing executive – and they spoke for two minutes.  This was the first-ever phone call between them based on the phone records produced.

579.     The next day, April 2, 2013, Rekenthaler spoke to ███ two more times, including one call lasting eight minutes.  Actavis then immediately began shipping the product.  Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva.  Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was "███ ████████████████████████"

580.     At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market, but in the interim Teva was able to continue to charge the agreed-upon prices.  In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

581.     On February 13, 2015, Rekenthaler informed other Teva employees of Actavis's plans to enter the market, saying: "████████████████████████" Budesonide Inhalation.  Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

582.     On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three minutes.  The following morning, Teva's ███ confirmed to her colleagues that Teva had conceded the Budesonide Inhalation accounts of two major customers to Actavis.  She explained that Actavis's sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer.  Thus, she explained, she was working with the customers on an "███████" to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

583.    In late July 2015, Sandoz entered the market at the elevated prices established by Teva and Actavis.  Teva – which still had more than its fair share of the market – quickly conceded several large accounts to Sandoz so that it could get its fair share. And because Actavis and Teva communicated to Sandoz which accounts to target, Sandoz was able to add market share without decreasing the market price, in accordance with the fair share rules.

### S.    Buspirone Hydrochloride Tablets

584.    Buspirone HCL is an antianxiety drug that was first approved for medical use in the United States in 1986.

585.    During the time period relevant to this Complaint, Actavis, Mylan, and Teva dominated the market for Buspirone HCL.

586.    Buspirone HCL was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekenthaler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ████ ██ of Alvogen.  On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called ███.  Also, Rekenthaler spoke with ██████████████ ███ of Breckenridge.  These communications solidified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

587.    As a result of these collusive communications, Defendants have been able to maintain Buspirone HCL at anticompetitive prices since July 2012.

**T.**     **Butorphanol Tartrate**

588.    Butorphanol Tartrate, also known by the brand name Stadol NS, is used to treat moderate to severe pain. During the period relevant to this Complaint, Mylan, West-Ward and Apotex were the primary manufacturers of Butorphanol Tartrate.

589.    In December 2013, Apotex temporarily left the market in 2013. Rather than compete on price to win Apotex's customers, West-Ward and Mylan increased prices by more than 200%, and divided Apotex's share between them evenly.

590.    In a familiar pattern, when Apotex re-joined the market in January 2015, it did not attempt to compete on pricing to regain market share. On the contrary, it matched the existing manufacturers' increased prices, and in return, West-Ward and Mylan conceded to Apotex more market share than it had in 2013.

591.    Senior sales executives from Mylan, West-Ward, and Apotex communicated directly with each other in furtherance of the conspiracy in order to coordinate the price increases and market allocation for Balsalazide Disodium, as well as Butorphanol Tartrate and Captopril. For example, ▮▮▮▮▮▮▮▮ of West-Ward was in frequent contact with ▮▮▮▮▮▮▮▮ (Mylan's Director of National Accounts), with the two communicating by phone at least 20 times between March and June of 2013. Executives from West-Ward, Apotex, and Mylan also met regularly at trade association events frequently throughout this time period, as detailed in Exhibit 1.

592.    As a result of this coordination, Defendants were able to charge supracompetitive pricing on Butorphanol Tartrate sold in the United States to Plaintiffs and others.

U.     **Cabergoline**

593.     Cabergoline, also known by the brand name Dostinex, is used to treat medical problems that occur when too much of the hormone prolactin is produced.  It can be used to treat certain menstrual problems, fertility problems in men and women, and tumors of the pituitary gland.

594.     During the time period relevant to this Complaint, the market for Cabergoline was dominated by Greenstone, Par, and Teva.

595.     In December 2014, as Greenstone was preparing to enter the market for Cabergoline, a senior Greenstone sales executive approached ▌▌▌▌ of Teva on Greenstone's behalf to discuss obtaining market share for Greenstone.  The Greenstone executive made clear to Teva that, in exchange for market share, Greenstone would adhere to the overarching fair share agreement.

596.     The same day that ▌▌▌▌ e-mailed Greenstone, she also spoke with a senior sales executive at Par.  Upon information and belief, the purpose of this call was so that ▌▌▌▌ could inform Par that Teva was prepared to concede a large customer to Greenstone, consistent with the overarching fair share agreement.

597.     The next day, after some internal conversation at Teva, ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌."

598.     Pursuant to this agreement, Greenstone was able to acquire ABC as a customer for Cabergoline without any fear that Teva (or Par) would compete to retain the business.  In exchange, Greenstone agreed to "▌▌▌▌▌▌▌▌▌▌▌▌" – *i.e.*, not compete with Teva for other customers and drive prices down in the market.

599.     As a result of these collusive communications, Teva, Par, and Greenstone have been able to charge supracompetitive prices to Plaintiffs and others for Cabergoline since December 2014.

### V.     Calcipotriene

600.     Calcipotriene Solution ("Calcipotriene"), also known by the brand name Dovonex Scalp, is a form of vitamin D that impacts the growth of skin cells.  This topical medication is prescribed for the treatment of chronic plaque psoriasis of the scalp.

601.     In early 2010, the market for generic Calcipotriene was shared by Defendants Fougera, Hi-Tech, and Impax.  Even with three competitors in the market, pricing remained high and the product was "████████████" for the sellers.

602.     On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection.  Even though G&W was not in the Calcipotriene market at the time, Grauso knew his contact at Fougera would be interested in the information.  On July 28, 2010, he forwarded a copy of the FDA letter to CW-6 at Fougera.  Pleased with the news, CW-6 replied: "████████████."

603.     By the end of July 2010, Hi-Tech had discontinued the product, leaving its approximate 35% market share open for competitors to claim.

604.     One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several phone calls, with one call lasting eight minutes.  During those calls, Grauso informed CW-6 that G&W would soon be launching its own generic Calcipotriene.  Shortly after speaking with Grauso, CW-6 e-mailed Kaczmarek and other colleagues at Fougera sharing the news that he had just learned from his competitor – G&W was launching that week.

605. G&W did, indeed, launch Calcipotriene that week – on June 10, 2011. As G&W was entering the market, CW-6 and Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen minutes.

606. A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls. The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

607. At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54% price increase on Calcipotriene, effective November 18, 2011. Grauso sent an internal e-mail advising the team to "███████████████████████████████████ ███████████████████████████████████████████████████."

608. Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Kaczmarek. Immediately upon hanging up, CW-6 called Grauso and they spoke for five minutes. Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor. Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Orlofski and Vogel-Baylor.

609. Fougera acted quickly. Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

### W. Calcipotriene Betamethasone

610. Calcipotriene Betamethasone Dipropionate ("Cal Beta"), also known by the brand name Taclonex Ointment, is a vitamin D analogue and corticosteroid combination product indicated for the topical treatment of psoriasis vulgaris in adults 18 years of age and older. Cal Beta Ointment is available in 60gm and 100gm dosages.

611.    In early 2014, both Sandoz and Perrigo were preparing to launch CBD Ointment. Sandoz was preparing to launch as the first-to-file generic and Perrigo was preparing to launch as the authorized generic (the "AG").   Under the agreement that Perrigo had reached with the brand manufacturer, Perrigo could not launch until Sandoz, the first filer, entered the market.   Typically, a first filer interested in gaining a competitive advantage would want to keep its launch date a secret from the company launching the AG so that the first filer could catch the AG by surprise and maintain market exclusivity for a longer period of time.   But that was not the case with regard to Cal Beta Ointment.

612.    ███████, a sales executive at Perrigo, and CW-3, a senior sales executive at Sandoz, exchanged two calls in late February 2014. On those calls, ████ told CW-3 that Perrigo would be launching the AG of Cal Beta Ointment and asked CW-3 when Sandoz planned to launch its generic version.

613.    When first approached by ████ about Cal Beta Ointment, CW-3 was not aware that Sandoz was planning to launch it.   After being approached by ████, CW-3 reached out to others at Sandoz to find out what Sandoz's plans were.   On March 4, 2014, ████████, a senior Sandoz launch executive, confirmed to CW-3 that Sandoz would be launching Cal Beta Ointment.   Within minutes of receiving ████ confirmation the night of March 4, 2014, CW-3 e-mailed Kellum, stating: "███████████████████████."

614.    The next day, on March 5, 2014, Sandoz held an internal "████████ ██████" teleconference to discuss its plans.   Kellum, ██████, CW-1, a Sandoz senior pricing executive, and other members of the sales and launch teams attended the call.   Additional meetings were held on March 10 and March 13, 2014 to coordinate the Cal Beta Ointment launch.

615.     Also on March 13, 2014, CW-3 called ███████ two times, with one of the calls lasting twelve minutes.  That same day, Perrigo scheduled its own teleconference for the following day to discuss its Cal Beta Ointment launch.   ███████, his supervisor Wesolowski, a senior executive at Perrigo, and over twenty other Perrigo sales and launch team members attended the call.  On the call, the Perrigo sales executives were directed to go after only six select customer accounts, and no others.  These accounts were referred to as "██████████████████ ██."

616.     Promptly following the call, ████████████, a Perrigo marketing executive, circulated a document that was discussed on the call.  The document was internally prepared at Perrigo and indicated that Sandoz may launch on March 31, 2014 and that Perrigo's "████████" was 50% of the market.  Perrigo's information was accurate.  Sandoz ultimately launched the 100gm size on March 31, 2014 and the 60gm size on April 1, 2014.  In harmony with Perrigo's target share goal of 50%, internal Sandoz e-mail correspondence circulated prior to launch stated that Sandoz also had a target market share of 50% for Cal Beta Ointment.

617.     While Perrigo planned to approach a small, select group of potential customers, Sandoz was deciding which large customers to go after.  Sandoz initially planned to target Walgreens and ABC for Cal Beta Ointment.  However, Sandoz remained involved in ongoing business disputes with Walgreens and ABC in the middle of March 2014.  Sandoz was concerned that Walgreens and ABC would not award Sandoz their Cal Beta Ointment business if the disputes were not resolved prior to launch.

618.     On the night of Friday, March 14, 2014, ██████████████████████, the President of Sandoz US, stating that resolving the ABC and Walgreens disputes would be a "███████████████" for the Cal Beta Ointment launch.  ████████████ responded by directing

███████ to look for Cal Beta Ointment business "███████████████████████

███████████████████."

619.   ███████████ forwarded his e-mail correspondence with ███████ to Kellum and others at Sandoz on the afternoon of March 16, 2014.  Consistent with ███████ direction, ███████, Kellum, CW-3 and CW-1 immediately began to strategize how Sandoz could reach its market share target of 50% without Walgreens and ABC.  ███████ determined that in order to reach that goal, Sandoz would need to have CVS as a customer.  At an in-person meeting in Sandoz's Princeton offices, Kellum told CW-3 and CW-1 that he also wanted McKesson and Rite Aid as customers.

620.   On the next day, March 17, 2014, CW-3 called ███████ at Perrigo to resume their discussions about customer allocation and to exchange pricing information.  Between March 17 and March 20, 2014, CW-3 and ███████ exchanged more than ten phone calls, with one call lasting eleven minutes and another call lasting seventeen minutes.  Further, ███████ reported the substance of these calls to his supervisor, Wesolowski, seeking direction from him on how to respond to CW-3.  ███████ often spoke with Wesolowski between calls with CW-3, sometimes even calling him immediately after hanging up with CW-3.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:38:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 8:56:00 | 0:11:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 9:08:00 | 0:12:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:49:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:13:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 13:48:00 | 0:08:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:56:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:00:00 | 0:03:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 15:30:00 | 0:04:00 |
| 3/19/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:20:00 | 0:17:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:37:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 8:40:00 | 0:03:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 12:37:00 | 0:08:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:07:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:24:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:08:00 | 0:03:00 |

621.    Although most of ████ and CW-3's calls were just between the two of them, occasionally other colleagues would join them.  For example, CW-3 made a call early in the week of March 17, 2014 to ████████████ office in Princeton, and Kellum and CW- 1 also joined the call.

622.    As noted above, over the course of these calls, ████ and CW-3 discussed market pricing and customer allocation.  In a call early in the week of March 17, 2014, ████ shared Perrigo's proposed WAC pricing and AWP pricing for different types of customers.  During that call, CW-3 took the following contemporaneous notes in his Notebook:



623.    When Perrigo launched Cal Beta Ointment about two weeks later, its WAC and AWP matched those price points.  The two rows of WAC prices in the Notebook represent the different pricing for the 60gm and 100gm sizes.  Sandoz's WAC prices at launch were close but slightly higher than Perrigo's, at $657.45 for the 60gm size and $968.40 for the 100gm size.

624.    ████ also shared with CW-3 what Perrigo's non-public, "dead net" pricing would be for its customers.  Perrigo ranked its customers into five "████."  Customers in the same tier were typically sold a drug at the same "dead net" price.  ████ communicated the Cal Beta Ointment pricing tiers to CW-3 by giving examples of the types of customers in a tier, such as large wholesalers like ABC and Cardinal or regional wholesalers like HD Smith or Optisource,

and what the corresponding "dead net" pricing would be for that type of customer. CW-3's contemporaneous notes regarding Perrigo's dead net pricing for Cal Beta Ointment are below:



625.    The pricing tiers ▮▮▮ gave to CW-3 matched the pricing tiers Perrigo planned to use. The following rows are from an internally prepared spreadsheet that shows Perrigo's main pricing tiers for the two different sizes of Cal Beta Ointment:

626.    Moreover, Perrigo's offers to customers were in step with the "dead net" pricing noted above. For example, Perrigo made offers to Wal-Mart and Meijer, both so-called "▮▮▮" customers, that resulted in Wal-Mart and Meijer having "dead net" pricing of $426.31 and $627.94 for the 60g and 100g sizes respectively and offers to Optisource and Morris Dickson, both so-called "▮▮▮" customers, that resulted in Morris Dickson and Optisource having "dead net" pricing of $448.75 and $660.99 for the 60g and 100g sizes respectively

627.    As noted earlier, ▮▮▮ and CW-3 did not just use these calls to share pricing information in anticipation of their launches. They also used them to allocate the customers that would be in the market. When CW-3 and ▮▮▮ spoke on calls early in the week of March 17, 2014, each shared his respective company's position on how customers should be divided between

them to achieve "fair share."   CW-3 told ▮▮▮▮ that Sandoz wanted McKesson, Rite Aid, Econdisc, CVS, Cardinal, Omnicare and Kaiser.

628.   ▮▮▮▮ responded that Perrigo wanted Anda, Walgreens, ABC, Wal-Mart, Rite Aid and McKesson.   The purpose of reaching agreement on the list of customers was to avoid competing with one another as both companies entered the market simultaneously.

629.   As the lists above show, with the exception of Rite Aid and McKesson, Sandoz and Perrigo were aligned on how significant customers should be allocated.  In March 2014, Rite Aid was purchasing generic drugs through McKesson's "OneStop Generics" program, so Perrigo and Sandoz viewed these customers as a package or, put another way, whoever got McKesson also got Rite Aid as a customer.  Both of the competitors wanted that business.

630.   As the negotiations continued, Sandoz recognized that the list of customers it wanted for Cal Beta Ointment was more than its fair share of the market.  However, in keeping with its general strategic preference for selling to a smaller number of large customers, Sandoz did not want to give up McKesson, Rite Aid, CVS, or Cardinal.  To resolve the issue, Kellum, CW-3 and CW-1 brainstormed a list of other customers that, when combined, would have about the same market share as Rite Aid and McKesson and that Sandoz was willing to give up to Perrigo. Ultimately, the list of customers that Sandoz created included Optisource, Publix, Morris & Dickson (MD), PBA Health (PBA), Meijer, and Kaiser.

631.   Thereafter, CW-3 called ▮▮▮▮ and proposed that Sandoz give up these customers to Perrigo in exchange for McKesson and Rite Aid.  Perrigo agreed.

632.   Following the plan, Perrigo submitted offers to the customers listed above and was awarded the business at Optisource, Publix, Morris & Dickson, Meijer, and Kaiser.  In addition,

and as planned, Perrigo bid on and won Anda, Walgreens, ABC and Wal-Mart, while Sandoz bid on and won McKesson, Rite Aid, CVS, Cardinal, and Omnicare.

633.     While Wesolowski encouraged the Perrigo sales team to go after their assigned customers, he was also careful to make sure they adhered to the agreement reached with Sandoz. For example, on March 21, 2014, Omnicare reached out to Perrigo asking for a bid on Cal Beta Ointment.   Omnicare was a customer allocated to Sandoz.   Pete Haakenstad, a Perrigo sales executive, forwarded the request to Wesolowski who responded, "███████████████████e ███████."   Consistent with Wesolowski's direction, Haakenstad told Omnicare that Perrigo was "███████████████," even though Perrigo was actively sending offers to other potential customers at that time.

634.     On March 31, 2014, CW-3 called █████.   The call lasted two minutes.   That same day, Sandoz officially launched the 100gm package size of Cal Beta Ointment and Perrigo launched both the 100gm and 60gm package sizes.   The next day, on April 1, 2014, Sandoz launched the 60gm size.   Early in the morning of April 1, 2014, ████████, a Sandoz marketing executive, e-mailed Kellum and █████ to advise that she received an alert that Perrigo had increased prices on Cal Beta Ointment.   She noted that she was "███████████ ██████████████."

635.     On April 7, 2014, Douglas Azzalina, a Sandoz launch executive, noted in an internal e-mail that Sandoz "████████████████."   At the end of April 2014, Sandoz and Perrigo had a virtually even split of the market for that product.

## X.     **Capecitabine**

636.     Capecitabine, also known by the brand name Xeloda, is an anti-cancer chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

637.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers – including Teva and Mylan – that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

638.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them. For example, in a January 31, 2014 e-mail, █████, a national accounts executive at Teva, informed █████, Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "███████████ ██████████████████████████████." Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

639.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva.

640.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

641.    On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

642.    For example, at 12:46 p.m. that day, Nesta called Rekenthaler and they spoke for a little more than five minutes. Immediately after hanging up the phone, Rekenthaler sent the following e-mail:

From:      Dave Rekenthaler
Sent:      Mon 8/04/2014 12:51 PM (GMT-05:00)
To:        ████████████████████████  Nisha Patel02
Cc:        Maureen Cavanaugh
Bcc:
Subject:   Capcetibine

Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy.

643.     Cavanaugh responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

644.     Less than an hour later, Rekenthaler sent another e-mail, just to Patel, asking her to run a customer report and indicating that Mylan will "████████████████████████████████ ████████████████████████████████."  Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

645.     On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business.  Patel then sent an e-mail to ███████, Rekenthaler, and ████████der, a senior operations executive at Teva, to ask if they had ████████████████████████████████ replied that Teva did "████ ████████████████████████████████████████████████████████████████████" to discuss it.  ███████ separately questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information.  Rekenthaler also did not want to put that "████████████████" in writing, so he responded: "████████████████ ████."

646.     The "████" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva.  The same day that Mylan put a bid in to McKesson –

August 7, 2014 – Nesta and Rekenthaler spoke by phone for nearly thirteen minutes.  On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

647.    This market allocation "███" was highlighted in other e-mails as well.  On August 10, 2014, ███ e-mailed Rekenthaler, Patel, and ██████ about the plan.  █████ stated that her "████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

648.    The next morning, at 8:30 a.m. on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "████████

████████████." Five minutes later, Rekenthaler received a call from Nesta.  After exchanging voicemails, the two spoke at 8:52 a.m.  The call lasted nearly six minutes.  Shortly after hanging up the phone, at approximately 9:02 a.m., Rekenthaler e-mailed █████, Patel and others at Teva to confirm that Mylan's "██████████████████████████████████." He added that Teva "████████████████████████████████████████████████████████████

██████████."

649.    In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

650.    Teva also conceded some of the "██████████" as well, pursuant to the agreement.  On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine.  On August 18, 2014, Rekenthaler called Nesta to discuss the market

allocation scheme and Mylan's bid to Cigna.  The pair talked for thirteen minutes.  The next day, ███████ circulated an internal e-mail confirming that Teva "████████████████████" at Cigna.

**Y.    Captopril**

651.    Captopril, also known by the brand name Capoten, is an angiotensin-converting enzyme (ACE) inhibitor used for the treatment of hypertension and congestive heart failure. During the period relevant to this Complaint, Mylan, West-Ward and Wockhardt were the primary manufacturers of Captopril.

652.    Prior to 2013, Captopril was priced competitively, and cost roughly one cent per dose.  However, as with Balsalazide and Butorphanol, Mylan and West-Ward agreed for West-Ward to temporarily halt production in April 2013.  Mylan and Wockhardt followed fair share rules, and divided West-Ward's market share roughly evenly between them.  Further, Mylan and Wockhardt increased prices by approximately 2000% by the end of 2013.

653.    In March 2014, West-Ward re-entered the market (less than a year after it halted production).  Rather than compete for market share through competitive pricing, Mylan, West-Ward, and Wockhardt increased prices substantially.  For the 12.5 mg dosage, this resulted in an increase of approximately one hundred times what it had been before West-Ward halted its production in furtherance of the conspiracy.

654.    Additionally, Wockhardt and Mylan conceded share to West-Ward in accordance with the fair share rules.  Mylan's internal documents indicated that "███████████████████ ████████████████████████████████████████████."

655.    Mylan, Wockhardt and West-Ward communicated directly with each other in furtherance of the conspiracy.  For example, ███████████ of Mylan (the Director of National

Accounts) communicated by phone with ████████████ of West-Ward (the National Account Manager) more than 20 times during the spring, including at least six times in June 2013 and for nearly twelve minutes on July 1st, in order to coordinate West-Ward's exit and reentry.  Mylan's price increase was announced on July 2, the day after this last call with ████████.

656.    Additionally, Wockhardt and West-Ward sent representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida.  In April, both companies announced large WAC price increases on the heels of Mylan's second list price increase.

657.    In mid-2015, Wockhardt exited the Captopril market, even though prices were significantly more profitable than they had been just a few years earlier.  Upon information and belief, Wockhardt's decision to exit was discussed with Mylan, which agreed to concede market share to Wockhardt on Enalapril in late 2015.

658.    As a result of this collusion, Defendants were able to charge supracompetitive prices on Captopril to Plaintiffs and others in the United States.

**Z.    Carbamazepine**

659.    Carbamazepine tablets, including regular tablets, chewable tablets, and extended release tablets, are anticonvulsants used to prevent seizures and treat bipolar disorder.

660.    During the period relevant to this Complaint, Apotex, Taro, Teva, and Torrent dominated the market for Carbamazepine tablets ("Tablets"); Taro, Teva, and Torrent dominated the market for Carbamazepine chewable tablets ("Chewable Tablets"); and Sandoz and Taro dominated the market for Carbamazepine Extended Release tablets ("Carbamazepine ER").

661.    Taro was the first generic manufacturer to enter the market for Carbamazepine ER. However, because Novartis – Sandoz' parent – held the patent for branded Carbamazepine

(Tergetol), Novartis directed Sandoz to enter the market as an authorized generic during Taro's 180-day exclusivity period.

662.    Beginning in March 2009, Taro and Sandoz made plans to allocate the Carbamazepine ER market between them in accordance with fair share principles. ████████ of Taro and CW-4 of Sandoz spoke frequently by phone in 2009 to coordinate this allocation. ████ informed CW-4 that Taro intended to secure 50%-60% of the market, and was targeting Wal-Mart, Walgreens, and Supervalu.  CW-4 reported this information to ██████████ at Sandoz. ████ and CW-4 continued to communicate competitively sensitive information about the Carbamazepine ER market into 2010, such as Taro's plans to delay the launch of the 100 mg formulation.

663.    Taro and Sandoz also refused to challenge each other's accounts. For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER.  CW-2, then a senior sales executive at Sandoz, was hesitant, and asked his colleagues if there was any appetite to compete for the business.  The purpose for pursuing CVS, he opined, would be "████████████████████████████████ ████████████████████████."  He added: "████████████████████████."  Sandoz ultimately declined to bid on the CVS account because it did not want to "█████" the successful collusion with Taro.

664.    As a result of this collusion, Carbamazepine ER prices remained at supracompetitive levels from the point of generic entry and did not drop significantly from the branded price.

665.    The companied continued to collude on other formulations of Carbamazepine. ████████ and CW-4 spoke by phone on May 16, 2013, and again on May 17, 2013.

666.    Upon information and belief, the purpose of these calls was to coordinate a price increase on Carbamazepine ER.

667.    Following these calls between ███ and CW-4, both Taro and Sandoz implemented substantial and abrupt price increases on Carbamazepine ER of more than 50%.

668.    One year later, in May 2014, Ara Aprahamian of Taro led price increases on all three formulations of Carbamazepine.

669.    Between May and July of 2014, Aprahamian texted or spoke with Nisha Patel of Teva a number of times.  Following their first series of communications in May 2014, Patel added Carbamazepine to the list of drugs she was then targeting for price increases.

670.    In early June 2014, Taro increased prices on all formulations of Carbamazepine tablets, including price increases on the Carbamazepine Tablets and Chewable Tablets of between 200% and 1000%.

671.    As a result of the overarching fair share agreement, Aprahamian knew that his competitors would follow these massive price increases – which each did for their respective formulations in July 2014.

672.    Aprahamian continued to speak with Patel by phone in June and July 2014. Additionally, David Rekenthaler of Teva and ███████ (a senior vice president at Apotex) texted and spoke by phone a number of times between June and September 2014.  Further, Kelly ██████ of Torrent spoke by phone with ██████ of Teva on September 11, 2014.

673.    Additionally, the competitors complied with the fair share rules during this time period. As an internal Taro spreadsheet indicated in March 2014, "████████████████ ████" on chewable tablets.  Following this adjustment, the three competitors' market shares for chewable tablets were stable for the remainder of 2014, consistent with fair share principles.

674.    Due to these collusive communications and each Defendant's commitment to the overarching fair share agreement, prices on Carbamazepine have remained elevated since May 2013.  For example, Defendants continue to sell Carbamazepine Tablets at prices more than 700% higher than in early 2014.  Additionally, Defendants' prices for Carbamazepine ER are more than 100% higher today than in early 2013, and their prices for Carbamazepine Chewable Tablets are more than 300% higher than before the collusive price increase.

**AA.    Cefpodoxime Proxetil**

675.    Cefpodoxime Proxetil ("Cefpodoxime"), also known by the brand name Vantin, is an antibiotic used to treat a wide variety of bacterial infections.  It is sold in both oral suspension and tablet form.  During the period relevant to this Complaint, Sandoz and Aurobindo dominated the market for Cefpodoxime.

676.    On January 3, 2013, CW-3 of Sandoz called CW-6 of Aurobindo. The call lasted two minutes.  The next day, on January 4, 2013, CW-6 called CW-3 twice, with one call lasting three minutes.  A few minutes after hanging up, CW-3 called Kellum and they spoke for nine minutes.  After that call, Kellum e-mailed ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████."

677.    The following business day, on January 7, 2013, CW-6 of Aurobindo and CW-3 of Sandoz exchanged three calls, including one lasting six minutes.  On these calls, CW-6 confirmed that Aurobindo planned to launch both formulations of Cefpodoxime that week.  CW-3 told CW-6 that Sandoz planned to increase pricing on both formulations by 20%.  CW-6 advised that Aurobindo was looking for 40% share and would start by targeting Cardinal and CVS.  In turn,

CW-3 gave his competitor specific non-public contract price points that Sandoz was charging to those customers.   CW-6 then stated: "███████████████████████████."   CW-3's contemporaneous notes from this call are pictured below:



678.   Shortly after speaking with each other, CW-6 called Grauso and CW-3 called Kellum to report back what they had discussed.   This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 4:53:00 | 0:07:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |

679.   On January 9, 2013 and January 11, 2013, the day that Sandoz increased WAC pricing on Cefpodoxime, CW-3 and CW-6 exchanged three more calls.   After speaking with each

other, CW-3 called Kellum and CW-6 called Grauso to report back what they had discussed. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:47:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:38:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |

680.    Due to an issue at its manufacturing facility, Aurobindo's launch of Cefpodoxime was delayed and the company was unable to launch in January 2013 as planned.

681.    Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo and Sandoz were in attendance, including CW-6 and Grauso of Aurobindo and Kellum, CW-3, and CW-2 of Sandoz.

682.    On February 26, 2013, CW-2, a Sandoz senior sales executive – while still at the ECRM conference – sent the following e-mail to his Sandoz colleagues:



683.    On April 17, 2013, CW-6 of Aurobindo called CW-3 of Sandoz. The call lasted two minutes. Less than an hour later, CW-3 called CW-6 back and they spoke for six minutes.

The next day, on April 18, 2013, CW-6 called CW-3 and they spoke for ten minutes. That same day, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing.

684.     On April 30, 2013, CW-3 and CW-6 exchanged three phone calls, including one call lasting three minutes. On these calls, the competitors again discussed Aurobindo's launch of Cefpodoxime Tablets, including that Aurobindo was looking for 40-50% market share. The competitors also discussed specific customers that Aurobindo was targeting. CW-3's contemporaneous notes from these calls are pictured below:



685.     In accordance with the plan, on May 22, 2013, Aurobindo made an offer to CVS for Cefpodoxime Tablets and the customer accepted that offer the very next day on May 23, 2013.

686.     Similarly, on August 29, 2013, Aurobindo made an offer to ABC for Cefpodoxime Tablets. The next day, on August 30, 2013, ABC e-mailed Sandoz to advise that it had received a competitive offer and asked whether Sandoz wanted to bid to retain the business. On September 4, 2013, ████████, a Sandoz sales executive, responded to ABC and declined the

opportunity stating, "███████████████████████████████████." Later that same day, ABC awarded the business to Aurobindo.

687.   Aurobindo would also win awards for Cefpodoxime Tablets at McKesson and several other smaller customers, without substantially eroding the high pricing in the market.

688.   On September 9, 2013, ████████████, an Aurobindo sales and marketing executive, pushed Grauso to submit a bid for Wal-Mart's Cefpodoxime business. Grauso balked at the request stating, "████████████████████████████." ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████." Given the market share breakdown, Grauso gave his approval to submit a bid to Wal-Mart.  Thereafter, on September 30, 2013, the customer accepted the bid and awarded Aurobindo its indirect business.

689.   Later, in December 2013, when Sandoz was looking to identify additional products to supply to Wal-Mart, Kellum noted with respect to Cefpodoxime: "█████████████████ ████████████████████████████████████████████████████████████."

**BB.   Cefuroxime Axetil**

690.   Cefuroxime Axetil, also known by the brand name Ceftin, is an antibiotic used to treat a variety of bacterial infections.   Aurobindo, Citron, and Lupin were the primary manufacturers of Cefuroxime Axetil during the conspiracy.

691.   In February 2014, Lupin and Aurobindo were the primary manufacturers of the drug and they began to coordinate to increased prices by 500%.  Citron entered the market in April 2014, and it matched the WAC pricing of its competitors rather than compete for market share.  In exchange, Lupin and Aurobindo conceded to Citron its fair share of the market.

692.    For example, when a customer came to Aurobindo in 2014 asking them to reduce prices, their Director of National Accounts refused, stating: "███████████████████ ███████████████████████████████████████████."  There are likewise indications that manufacturers who had a much smaller share of the market were aware of the coordination.

693.    Lupin, Aurobindo and Citron communicated directly with each other in furtherance of the conspiracy.  For example, David Berthold of Lupin (the VP of sales) spoke with ████ █████ of Citron (the EVP of Sales) for nearly ten minutes on January 10, 2014, for over thirty minutes on April 10, 2014, three times in June, on July 16, 2014 for fifteen minutes and on July 17, 2014 for fourteen minutes.

694.    Lupin's Berthold also communicated by phone multiple times in January and February 2014 with ██████████ of Aurobindo (the Senior Director of Commercial Operations).  Notably, they spoke on the days close to their coordinated WAC price increases.  This included conversations on January 23, 2014 for seven minutes; twice on February 4, 2014; three times on February 5th; once on February 14th for over eight minutes; once on February 15th; three times on February 18th; twice on February 20th; and once on February 25th.

695.    As a result of this coordination, Defendants were able to charge supracompetitive pricing on Cefuroxime Axetil to Plaintiffs and others in the United States.

**CC.    Celecoxib**

696.    Celecoxib, also known by the brand name Celebrex, is a nonsteroidal anti-inflammatory medication used in the treatment of pain and inflammation associated with arthritis, juvenile rheumatoid arthritis, and other disorders.

697.    Teva received approval to market generic Celecoxib in May 2014.

698.    On November 20, 2014, as Teva was preparing to launch its generic Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business.  The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "█████████" in light of the fact that Teva had already secured over 30% of the market.

699.    Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: "████████████████████████████."

700.    By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided.  Rekenthaler's strategy was consistent with the "███████ ███████████████████████████████████████████ ████████."

701.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis.  Rekenthaler had a six minute call with Falkin at Actavis on November 25.  The two spoke twice more on December 3 – once for two minutes and another time for one minute.  Patel spoke to ███████, a senior sales and marketing executive at Actavis, for over eight minutes on December 5, and for over sixteen minutes on December 8.  Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one minute phone call.  On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one minute, nine minutes, and three minutes in duration.

702.    As a result of these collusive communications, Defendants have been able to sell Celecoxib at supracompetitive prices since December 2014.

DD.   **Chlorpromazine**

703.   Chlorpromazine HCL is prescribed to treat psychotic disorders such as schizophrenia, manic depression, and bipolar disorder.  It is also used to treat nausea, vomiting, anxiety, and other symptoms.

704.   During the period relevant to this Complaint, Sandoz, Mylan, and Upsher-Smith dominated the market for Chlorpromazine.

705.   Beginning in approximately August of 2011, Sandoz, Mylan, and Upsher-Smith colluded to implement a series of abrupt and substantial price increases.

706.   The companies also coordinated price increases through their common purchase of the APIs for Chlorpromazine.  For example, on July 1, 2013, ████████ of Upsher-Smith emailed ██████, Armando Kellum, ██████, and others at Sandoz to discuss an increase in the APIs for Chlorpromazine and other drugs.  Although the price increase on the API for Chlorpromazine represented a cost increase to the manufacturers of a fraction of a cent per tablet, Sandoz's procurement director asked internally on July 16, 2013, whether there was "██ ██████████████████████████████████████████?"  And indeed there was, as that very same day, Kellum circulated a list of drugs for which Sandoz would increase prices that included Chlorpromazine (along with other drugs such as Betamethasone, Cholestyramine, Clomipramine, Etodolac, and Methazolamide for which Kellum and others at Sandoz also communicated with competitors to implement price increases).

707.   Kellum was able to add Chlorpromazine to the list of pending price increase because senior executives from Mylan, Sandoz, and Upsher-Smith had been in frequent contact by phone during the two months prior to his email.  For example, ████████ of Upsher-Smith spoke with ████████ of Mylan and CW-3 of Sandoz a number of times between May and

August July 2013.  During this same period, James Nesta of Mylan had dozens of calls with CW-4 of Sandoz.

708.    ████ continued to speak with CW-3 of Sandoz and ████ of Mylan in 2014 and 2015, and the companies continued to coordinate additional price increases on Chlorpromazine. Although Upsher-Smith led another price increase in August 2014, Sandoz and Mylan did not follow it until early in 2015.  However, upon information and belief, ████ confirmed with CW-3 and ████ that the companies would comply with the fair share rules, and refrain from taking Upsher-Smith's customers.

709.    As a result of these communications, Sandoz, Mylan, and Upsher-Smith were able to increase prices on Chlorpromazine by approximately 1000% between August 2011 and May 2015.  Additionally, the companies have been able to maintain prices at supracompetitive levels they established during the conspiracy as of the filing of this Complaint.

**EE.    Cholestyramine**

710.    Cholestyramine is prescribed to lower cholesterol levels and also to alleviate itching associated with liver disease.  During the period relevant to this Complaint, Sandoz, Upsher-Smith, and Par dominated the market for Cholestyramine powder.

711.    As noted above, ████ of Upsher-Smith was in frequent communication with CW-3 of Sandoz between May and August of 2013, discussing Chlorpromazine.   Upon information and belief, these discussions also included collusion on Cholestyramine, which the Defendants increased prices on at the same time as Chlorpromazine.  Indeed, Cholestyramine was included by Kellum on his list of drugs slated for increases in late July 2013.

712.    In addition to the calls between ████ and CW-3, ████ of Upsher-Smith spoke with CW-3 on July 16 (the same day that Kellum created his list of price increase targets

that included Cholestyramine), and again on July 26.  Three days later, █████████ of Upsher-Smith spoke with █████████ of Par.  The two spoke again on September 5, 2013.

713.    Upon information and belief, through these calls, Par, Upsher-Smith and Sandoz agreed to implement a price increase that Upsher-Smith led in June 2013.  Sandoz followed this increase in July 2013, and Par followed the increase in August 2013.  Additionally, the competitors agreed to comply with the fair share market allocation rules in order to effectuate the price increase.

714.    As a result, Defendants were able to increase prices by between 100-200%, depending on the method of packaging.  For example, between August and September 2013, Par increased its prices of Cholestyramine cans from $22 to more than $63, and on Cholestyramine packets from $43 to more than $107.

**FF.    Ciclopirox**

715.    Ciclopirox, also known by the brand names Loprox and Penlac, is an antifungal medicine that is sold in a variety of formulations including cream, gel, shampoo, solution, and suspension.  During the period relevant to this Complaint, Actavis, Fougera/Sandoz, Glenmark, G&W, Perrigo, and Taro.

716.    In the summer of 2011, the market for Ciclopirox cream was evenly split between four competitors – Perrigo with 26%; Paddock Laboratories, LLC – which was acquired by Perrigo in July 2011 – with 30%; Fougera with 21%; and Glenmark with 21%.  Defendant G&W was not in the market at this time.

717.    On September 21, 2011, however, Vogel-Baylor learned from a customer that Fougera had temporarily discontinued Ciclopirox Cream.  Vogel-Baylor forwarded that information to her supervisor, Grauso, who then called CW-6 at Fougera twice to confirm the information.  The two competitors also spoke again the next morning.

718.    G&W saw Fougera's exit as an opportunity to enter the market for Ciclopirox Cream.  After confirming Fougera's plans to exit, G&W began making plans to enter the market.

719.    On October 28, 2011, Vogel-Baylor e-mailed Grauso regarding a meeting she had with Rite Aid concerning G&W's upcoming launches. Regarding Ciclopirox Cream, Vogel-Baylor noted that Rite Aid's current incumbent was Glenmark and stated that "███████████████ ████████████."

720.    Throughout January 2012, G&W began formalizing its strategy for the Ciclopirox Cream launch and reached out to various customers to obtain incumbent information, usage, and pricing intelligence.

721.    On February 3, 2012, Vogel-Baylor e-mailed Orlofski, a senior G&W executive, notifying him that Ciclopirox Cream was now available in small quantities and that several additional batches would be ready for shipment in the next few weeks.  She further stated that she needed to sit down with him to discuss which customers G&W wanted to approach.

722.    On February 20, 2012, Orlofksi e-mailed Vogel-Baylor with a list of the tasks that she was accountable for.  One of those responsibilities was to secure approximately 20% market share of Ciclopirox Cream per the company's launch plan.

723.    The next day, on February 21, 2012, Orlofski exchanged eight text messages with ████████████, a high-level executive at Perrigo.  Two days later, on February 23, 2012, the two competitors exchanged an additional ten text messages.

724.    As of March 2012, Glenmark had 60% share of the Ciclopirox Cream market, Perrigo had 25%, and Fougera had the remaining share even as it was phasing out of the market.

725.    By March 19, 2012, G&W had secured the Ciclopirox Cream business at Walgreens.  Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20% of the market for Ciclopirox Cream.

726.    On March 23, 2012, Vogel-Baylor asked ███████████, a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox Cream.  ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████"

727.    On March 27, 2012, ████████ advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the upcoming RFP.  That same day, while they were both at a Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met CW-5, a senior executive at Glenmark, for the first time.

728.    Two days later, on March 29, 2012, Vogel-Baylor e-mailed CW-5 stating, "████████
██████████████████████████████████████████████" and asked the Glenmark executive to send his full contact information.  The next day, CW-5 responded to Vogel-Baylor's e-mail, providing his contact information and adding, "██████████████████████████."  After exchanging a few more e-mails, the two then also exchanged several text messages.

729.    On April 2, 2012, CW-5 e-mailed Vogel-Baylor stating that he had forgotten his cell phone at home and was "███████████████████████████████████████████
████████████."

730.    Throughout the month of April 2012, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls.  During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise their contract pricing on Ciclopirox Cream almost simultaneously.

731.    For example, on April 11 and April 12, 2012, Vogel-Baylor and CW-5 exchanged more than fifty text messages and phone calls.  In the early morning of April 12, 2012, Vogel-Baylor e-mailed her supervisor, Orlofski, recommending that G&W increase contract pricing for Walgreens and Publix.  She suggested a direct price increase for Publix between 57% and 82% and between 233% and 408% for Walgreens, depending on the dosage size.

732.    On April 18, 2012, Vogel-Baylor e-mailed ███████ at G&W with specific pricing to submit for the upcoming Publix RFP.  Regarding Ciclopirox Cream, Vogel-Baylor advised that because G&W was doing a price increase on the product, she was including increased pricing on the bid.  Vogel-Baylor further stated that ███████ should discuss this with her before submitting the bid.  That same day, Vogel-Baylor exchanged at least twenty text messages and phone calls with CW-5 of Glenmark.

733.    That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox Cream.

734.    From April 24 to April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Glenmark, G&W, and Perrigo all attended, including ███████ of Perrigo, Orlofksi and Vogel-Baylor of G&W, and CW-5 of Glenmark.

735.    ███████ of Perrigo and Orlofski of G&W communicated several times by phone in advance of the conference, as well as on the day the conference began.  Between April 19 and 24, 2012, Orlofski and ███████ exchanged at least fifteen text messages.  Orlofski also called ███████

once on April 24, 2012.   The call lasted less than one minute.   Vogel-Baylor and CW-5 of Glenmark continued to communicate constantly throughout this time period.   On April 24, 2012 alone, Vogel-Baylor exchanged eighty-eight text messages with CW-5.

736.    That same day, April 24, 2012, Cardinal e-mailed G&W requesting a bid on Ciclopirox Cream. ██████, a sales executive at G&W, forwarded the request to Vogel-Baylor stating: "███████████████████████████████████████████████." G&W declined to bid on the opportunity.

737.    The next day, on April 25, 2012, Vogel-Baylor e-mailed ████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████."

738.    Two days later, on April 27, 2012, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens raising the prices for Ciclopirox Cream between 233% and 408% depending on the formulation.

739.    On May 21, 2012, Plaintiff Kroger, a Glenmark customer, e-mailed Vogel-Baylor asking if G&W would like to bid on Ciclopirox Cream. Vogel-Baylor declined to bid on the opportunity claiming that G&W could not handle the volume.

740.    On May 24, 2012, Vogel-Baylor e-mailed ██████████ asking if he had heard whether Publix would accept the price increase on Ciclopirox Cream. ██████████ responded that Perrigo had submitted low pricing on the RFP.

741.    By this time, Vogel-Baylor had been introduced to CW-6 at Fougera and was communicating with him directly (instead of through Grauso, as she had done previously).   Vogel-Baylor knew that CW-6 had a relationship with ██████ at Perrigo, so she reached out to him that

same day to have CW-6 act as a conduit between her and ████ n at Perrigo.  Immediately upon

hanging up with Vogel-Baylor, CW-6 called ████ of Perrigo.  After speaking with ████,

CW-6 hung up and immediately called Vogel-Baylor back.  This call pattern is detailed in the chart

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Fougera) | 17:35:03 | 0:01:01 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:39:00 | 0:05:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 17:43:00 | 0:02:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:45:00 | 0:01:00 |
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Fougera) | 17:46:02 | 0:00:44 |

742.    Later that day, Vogel-Baylor replied to her colleague ███████████████████

████████████████████████████████.”  Vogel-Baylor forwarded

Perrigo's pricing to her supervisor, Orlofski.

743.    On June 4, 2012, G&W sent its price increase notice to Walgreens.  In an internal

pricing spreadsheet, Perrigo listed its direct pricing at one of its customers on the 15gm, 30gm,

and 90gm package sizes as $7.14, $11.22, and $19.39, respectively.  Notably, this pricing was even

higher than the increased pricing G&W sent to Walgreens on June 4, 2012.

744.    On June 6, 2012, Vogel-Baylor and CW-5 of Glenmark exchanged eight phone

calls.  All of the calls lasted less than one minute.

745.    On June 11, 2012, ████████ of G&W e-mailed Vogel-Baylor stating that he had

spoken with Walgreens and the customer had told him "████████████████████████████

████████████████████████████████.”  ███████████████████████

████████████████████████████████.”  Vogel-Baylor

responded: "████████████████████████████████████." That same day, Vogel-Baylor and CW-5 of Glenmark exchanged more than eighty text messages.

746.    Vogel-Baylor forwarded her exchange with ████ to Orlofski.  The next day, on June 13, 2012, Vogel-Baylor exchanged eighteen text messages with CW-5 of Glenmark. G&W ultimately retained the Walgreens business.

747.    Between June 15, 2012 and June 26, 2012, Vogel-Baylor and CW-5 continued to exchange multiple text messages each day.  During that time period, the two competitors exchanged 545 text messages.

748.    On June 29, 2012, ████ e-mailed Vogel-Baylor to advise her that MMCAP was requesting a bid on Ciclopirox Cream.  Vogel-Baylor asked: "████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████." 

749.    As noted below in Section XIII, Defendants also conspired to fix prices of other formulations of Ciclopirox.

**GG.    Clindamycin Phosphate**

750.    Clindamycin Phosphate ("Clindamycin"), also known by the brand names Cleocin T, Clinda Max, and Clinda-Derm, among others, is a topical antibiotic used on the skin to stop the growth of certain bacteria that cause acne.  Clindamycin comes in several different formulations, including a cream, gel, lotion, and solution.

751.    At all times relevant to the Complaint, Fougera (and later Sandoz, after its acquisition of Fougera) and Greenstone were the primary players in the markets for the four different formulations of Clindamycin Phosphate.  In each of those markets, the two competitors adhered to the "fair share" understanding across all four product markets and coordinated several significant price increases.  In only one of those markets – Clindamycin Solution – did any competitor ever enter.  As discussed more fully below, Taro and Perrigo entered the market for Clindamycin Solution in late 2013, coordinating to avoid competition and minimize price erosion consistent with the "fair share" understanding.

1.    The First Coordinated Price Increase (60ml Solution – Fougera and Greenstone)

752.    In 2010, Defendants Fougera and Greenstone were the only suppliers in the market for Clindamycin 60ml solution. Fougera – a separate entity that was subsequently acquired by Sandoz in 2012 – temporarily discontinued the product in September 2010, leaving Greenstone as the sole supplier in the market.

753.    By late 2010, however, Greenstone also began to experience production problems, although it did continue to supply certain select customers.  Fougera immediately started preparing to re-enter the market and significantly raise price – in direct coordination with Greenstone.

754.    On November 1, 2010, Fougera learned that it had Clindamycin 60ml solution in stock and that the product was available for shipping.  That day, Kaczmarek stated internally that

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████."  That same executive initially suggested that Fougera double its WAC price, from $7.50 to $15.

755. Fougera did get the price point "████████," with the help of Greenstone. The next day – November 2, 2010 – Fougera scheduled an internal "████████████████████████ ████████████████████████" for the call included Kaczmarek, CW-3 and CW-6, among others. Before that conference call, CW-6 of Fougera called Jill Nailor of Greenstone – someone he generally did not speak with on the phone for social reasons – and the two spoke for nearly six minutes.

756. At some point that day, Fougera changed plans and decided to re-enter the market with a much more dramatic WAC price increase than originally suggested the day before, going from $7.50 to $31.50 – or a 320% increase. Customer contract prices increased even higher. Within two days after the price increase, for example, during a conversation with a Fougera national account representative, a customer complained that it had only just recently taken Clindamycin off contract with Fougera but "████████████████████████████ ████████" That same day, November 4, 2010, CW-6 and Nailor of Greenstone exchanged twenty-one text messages.

757. Based on their communications, Fougera knew that Greenstone would follow its price increase – but it could not tell its customers that. For example, in January 2011, a large wholesaler customer, ABC, approached Fougera asking if it knew whether Greenstone would be following Fougera's price increase on Clindamycin Solution. In an internal Fougera e-mail exchange, CW-3 asked CW-6 (who, as stated above, had spoken with Nailor at Greenstone on the day of the Fougera price increase) if there was "████████████████████████████ ████████████████████████." CW-6 responded that he did not have any new information, other than that a Greenstone price increase "████████." When CW-3 pressed for more detail about how quickly it would be coming, CW-6 responded: "████████████████████

███████.”  Indeed, CW-6 had called Nailor at Greenstone and left a 43-second voicemail immediately before sending that e-mail to CW-3.

758.    Over the ensuing months, Fougera was contacted by several customers requesting price reductions due to the fact that Greenstone had not yet followed.  Fougera continued to coordinate regularly with Greenstone and did not reduce its price, but grew frustrated when its competitor did not promptly follow as expected – internally stating that Greenstone was "████████ ██████████████,” and that they "███████████,” and that they were "████████.”

759.    Greenstone did ultimately follow Fougera's price increase with an increase of its own on Clindamycin Solution in July 2011, but it did not fully match Fougera's public WAC pricing.  Nonetheless, Fougera refused to bid on any of Greenstone's accounts as it did not want to punish Greenstone for actually raising its prices.

760.    During this time period, the anticompetitive understanding and coordination between Fougera and Greenstone applied to the other formulations of Clindamycin as well.  For example, in May 2012 Greenstone notified customers that it would be raising the price of Clindamycin Gel.  Shortly after that, Fougera was approached by a customer asking for a bid on Clindamycin Gel.  In conveying the request to Kaczmarek, a Fougera senior executive explained that "████████████████████████████████████████████████ ████████████████████.”  Kaczmarek agreed.

761.    The next day, CW-6 exchanged five text messages with Nailor of Greenstone, likely to convey Fougera's decision not to challenge Greenstone's market share at that customer.

762.    Similarly, on June 27, 2012, CW-3 at Fougera learned that ABC had put Clindamycin Gel, Lotion and Cream out to bid "████████████████████.”  According

to CW-3, "████████████████████████████." That same day, CW-6 of Fougera placed a call to Nailor at Greenstone and left a 31-second voicemail.

       2.     The Second Coordinated Increase (October 2012 – All Formulations – Sandoz and Greenstone)

    763.    In late July 2012, Sandoz formally acquired Fougera. As discussed more fully below, even before the acquisition Sandoz had been conspiring separately with Greenstone to fix prices on Latanoprost Drops, and thus had its own separate relationships with Greenstone.

    764.    After the merger, Sandoz began to scrutinize the Fougera business line and search for ways to maximize revenue for Fougera products in order to meet its pre-merger expectations. Starting in or about August 2012, Kellum (of Sandoz) and Kaczmarek (of Fougera, still with the company during the transition) – now co-workers – were tasked with discussing and identifying a list of price increase candidates from the Fougera drug portfolio.

    765.    By August 1, 2012, Greenstone had identified Clindamycin Solution as a "████ ████████████." On August 7, 2012, Kellum called ████ and the competitors exchanged six text messages. The next day, August 8, 2012, Kellum and ████ spoke for ten minutes.

    766.    Later that month, on August 22, 2012, Kellum identified Clindamycin, in all of its various formulations, as a price increase candidate. In describing his reasoning, Kellum indicated that the only competitor for all four formulations was Greenstone, "████████████████████ ████████████████████████████." Kellum was referring to his recent successful collusion with Greenstone on Latanoprost drops (discussed below) which had resulted in a significant price increase. In response, Kaczmarek recalled his own experience of Greenstone's failure to follow Fougera's Clindamycin Solution price increase as quickly as he wanted, stating "████████████████████████████████."

767.   Kellum's confidence in Greenstone was based on his own relationship with ███ of Greenstone, and his prior conversations with her.  Kellum pushed forward with the planned price increases for Clindamycin, noting in a late-August 2012 presentation that "█████████ ███████████████████████████████████████████████████ ████████████████."

768.   As Sandoz was planning for the Clindamycin price increase in August 2012, Kellum was coordinating with ████.  For example, on August 29, 2012, a colleague at Sandoz sent Kellum a draft "████████████████████," which included detailed information about the proposed Clindamycin price increase.  After speaking with ████ of Greenstone that same day for more than three minutes, Kellum responded to his colleague saying, "██████ ███████████████████████████████████."

769.   Similarly, in September 2012 when Kellum was asked for his "██████" for the price increases on Clindamycin, he told colleagues that he expected Greenstone would "████ ████████████████████████" and follow the Sandoz price increase.  Although others at Sandoz expressed some concern that Greenstone might not follow, Kellum remained confident in his agreement with ████ and Greenstone.

770.   On October 19, 2012, Sandoz implemented price increases on all four formulations of Clindamycin ranging from 77% for vaginal cream to 188% for gel.

771.   In the days leading up to the price increases, Kellum continued his coordination – by phone and text message – with ████ of Greenstone.  As detailed in the table below, Kellum reached out repeatedly by phone and text message to ████ at Greenstone in the days leading up to Sandoz's announcement of the price increases.  This culminated in a nearly four minute call

between the two competitors on October 19, 2012 – the day the Sandoz price increases became effective:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/17/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:10:55 | 0:00:00 |
| 10/17/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 19:03:16 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:38:07 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:37:57 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:14:42 | 0:00:33 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 16:46:17 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 17:58:49 | 0:00:00 |
| 10/18/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 17:59:38 | 0:00:00 |
| 10/18/2012 | Text | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 18:24:33 | 0:00:00 |
| 10/19/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 8:23:59 | 0:03:56 |

772.    During these communications, the competitors confirmed their understanding that Greenstone would follow the Sandoz price increases.  With the agreement in hand and understood between the two competitors, Kellum and ▉▉▉▉ would not need to speak again by phone or text message for nearly a year-and-a-half, until March 18, 2014 – as Sandoz was preparing for another large increase on Clindamycin (discussed below).

773.    Greenstone followed the price increases quickly this time, notifying its customers of a price increase on all of Clindamycin formulations on November 27, 2012 – although the WAC price increases did not become effective and publicly visible until December 27, 2012.  In the interim period before Greenstone publicly followed the Sandoz price increases, Sandoz made sure to avoid disrupting the market.

774.    When Greenstone's customers approached Sandoz looking for a lower price, Sandoz refused to bid.  Kellum, in particular, "▉▉▉▉▉▉▉▉▉▉▉▉▉" that Sandoz avoid bidding as a result of the Greenstone price increases.

775.    During that same time period, Sandoz's own customers also approached the company, seeing lower public prices from Greenstone and requesting that Sandoz reduce its pricing because they were not yet aware that Greenstone had followed.  Knowing that Greenstone

216

would follow, however, Sandoz refused.   For example, in early December 2012 Sandoz was approached by its customer McKesson asking Sandoz to reduce its pricing for Clindamycin because Greenstone was offering significantly lower pricing in the market.   A Sandoz pricing employee initially responded to the customer by refusing to lower the price, saying "█████

████████████████████████████████████████████████████

███████████████████████████████" your e-mail.   When the customer challenged those responses and asked for additional details about what intelligence Sandoz was referring to, the pricing employee forwarded the e-mail string to Kellum and CW-1, asking for advice on how to avoid referring to the illegal understanding between the two companies by "█████████████████████████████████████."   Kellum responded by instructing the employee to call McKesson and "██████████████████████████."   Knowing that a Greenstone increase would be coming, Kellum concluded: "███████████████

██████████████████████████████."

776.   The Greenstone Clindamycin WAC price increases became effective and publicly visible on December 27, 2012.   Greenstone followed Sandoz's WAC price increases to the penny on every formulation, with Greenstone's prices on Clindamycin Solution increasing by 416%.

777.   The coordinated price increases were a success.   In a May 2013 Sandoz Planning Meeting, Sandoz noted with respect to Clindamycin: "███████████████████████████

████████."   By May 2014, those price increases had resulted in an additional $61,000,000 in net sales to Sandoz.

3.    <u>New Entrants on Clindamycin Solution – Actavis, Perrigo and Taro – Do Not Significantly Erode Pricing</u>

778.    The late-2012 Sandoz and Greenstone price increases got the attention of two competitors – Taro and Perrigo – that had previously obtained approval to market Clindamycin Solution but had not recently been active in the market.

779.    For example, in a January 2013 internal e-mail Perrigo employees noted that they had "█████████████████████████████" on Clindamycin Solution.  They noted that Perrigo already possessed approved ANDAs for the product that were "███████████████████ ██████████████████████████████████████████████████████ ██████"  Perrigo did indeed begin making plans to return to the market; and was in frequent communication with its competitors at every important step throughout the process.

780.    Taro similarly had approval to sell Clindamycin Solution; but had not been marketing the product.  As early as April 2013, however, Taro began taking steps to bring the product back to market, which included reaching out to competitors.  For example, on April 17, 2013, Taro circulated an internal e-mail about a "█████████████" for Clindamycin Solution, requesting specific information about material availability in order to estimate an available launch date.  That same day, Aprahamian called his contact at Sandoz, CW-3, and the two spoke for four minutes.

781.    Similarly, Aprahamian scheduled a meeting with colleagues at Taro on June 6, 2013 to discuss Taro's entry into the market for Clindamycin Solution.  The day before that meeting, he sent an e-mail internally saying, "██████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

▮▮▮▮▮." The day after his internal meeting – June 7, 2013 – Aprahamian called CW-3 at Sandoz and the two competitors spoke for nearly eleven minutes.

782. Starting in July 2013, Sandoz started having temporary supply problems for Clindamycin Solution, due to a change in the adhesive label which required additional testing. The disruption was temporary, and Sandoz expected to be back in the market by the end of the year. However, this left Greenstone as the only viable competitor while Taro and Perrigo were planning to enter the market.

783. Because it was well understood under "fair share" principles that Greenstone would have to concede market share and "play nice in the sandbox" as these new competitors entered the market (and as Sandoz subsequently re-entered the market), it was important for Taro, Perrigo and Sandoz to coordinate with each other in order to avoid competition and minimize price erosion as they re-entered the market.

784. Perrigo started preparing in earnest to enter the market for Clindamycin Solution in August 2013. Over the next several weeks, executives at Perrigo, Taro and Sandoz were in almost constant communication, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:54:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:07:00 | 0:01:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:27:00 | 0:12:00 |
| 8/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:45:00 | 0:03:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:19:00 | 0:02:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:47:00 | 0:01:00 |
| 8/8/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 10:32:00 | 0:06:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 16:42:00 | 0:04:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:37:00 | 0:08:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 6:42:00 | 0:03:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:39:00 | 0:02:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:22:00 | 0:01:00 |
| 8/14/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:01:00 | 0:01:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:53:00 | 0:08:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:09:00 | 0:14:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:51:00 | 0:08:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 19:41:00 | 0:05:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |

785.    On August 28, 2013, at 1:30 p.m. ET, the Perrigo sales team held an internal launch meeting regarding Clindamycin Solution.   In advance of that meeting, a Perrigo executive circulated pricing and market share information to the team, including a pricing grid with proposed Perrigo pricing for different "███" of customers.  One of the attached documents listed Perrigo's "███████████████."  This led to several more phone calls between Taro, Perrigo, and Sandoz that same day.  Aprahamian of Taro and ██████ of Perrigo both spoke to CW-3 of Sandoz in the morning before the 1:30 p.m. ET Perrigo launch meeting.  Shortly after the meeting, at 2:36 p.m., Boothe of Perrigo called the Taro main line and spoke to someone at Taro – likely Perfetto – for approximately thirteen minutes.

786.    Perrigo formally launched and entered the market for Clindamycin Solution on Monday, September 9, 2013 – a week earlier than expected.  The week before the launch, as Perrigo was deciding which customers to approach, executives at the company were again in frequent contact with competitors Taro and Sandoz. On Wednesday, September 4, 2013, a Perrigo executive sent an e-mail to the Perrigo sales team about Clindamycin Solution, stating: "███████ ██████████████████████████████████████████ of Perrigo called his contact at Sandoz, CW-3, and the two spoke for approximately ten minutes.  The day after that – Friday September 6, 2013 –Boothe of Perrigo spoke to Perfetto of Taro for nearly two minutes.

787.    Perrigo was quickly able to obtain ABC and Walmart as customers, allowing the company to even exceed its initial market share targets.

788.    Shortly after Perrigo entered the market, on September 12, 2013, Aprahamian of Taro sent an internal e-mail announcing that "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

789.    Over the next several weeks, executives at Taro communicated frequently with their counterparts at Perrigo and Sandoz to determine which customers to target, and how to avoid competing with each other.  At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/17/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:10:07 | 0:16:39 |
| 9/17/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 19:08:00 | 0:02:00 |
| 9/18/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 11:52:11 | 0:11:14 |
| 9/19/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:41:00 | 0:17:00 |
| 9/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 15:23:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:42:00 | 0:15:00 |
| 9/26/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:37:17 | 0:06:44 |
| 9/26/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:22:00 | 0:15:00 |
| 9/27/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 16:00:00 | 0:05:00 |
| 10/1/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 17:56:00 | 0:01:00 |
| 10/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:41:00 | 0:10:00 |
| 10/3/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 16:13:00 | 0:05:00 |
| 10/3/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:16:00 | 0:01:00 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:20 | 0:00:12 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:52 | 0:04:51 |
| 10/4/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:37:00 | 0:02:00 |

790.    As can be seen in the table above, Aprahamian called CW-3 at Sandoz on October 1, 2013, most likely leaving a voicemail.  CW-3 called Aprahamian back the next day, and the two spoke for ten minutes.  During that call, Aprahamian and CW-3 talked about specific pricing in the market and which customers Taro should approach as it entered the market.  That same day – October 2, 2013 – Aprahamian created a spreadsheet titled "██████████████████████

██████████," which documented some of the information he had received during that call.  In that document, Aprahamian created an initial pricing model for Taro's upcoming launch of Clindamycin Solution, based on his conversations with CW-3.  The spreadsheet included not only public WAC pricing for Sandoz, Greenstone and Perrigo, but also in a separate tab of the spreadsheet titled "████████" – non-public price points for three potential customers: Rite Aid, Publix, and ABC:

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Company | Size | Price | Manufacturer | Comments | | |
| 2 | Publix | 30ml | 18.5 | Greenstone | | | |
| 3 | Publix | 60ml | 37.25 | Greenstone | | | |
| 4 | ABC | 30 ml | $15 invoice | Perigo | just switched from Greenstone | | |
| 5 | ABC | 60ml | $30 invoice | Perigo | just switched from Greenstone | | |
| 6 | Rite Aid | 30ml | $19 | Greenstone | 11, 195 units year | | |
| 7 | Rite Aid | 60ml | $38 | Greenstone | 54,907 year | | |
| 8 | | | | | | | |

791.   On October 8, 2013, Taro was busy preparing for the launch. Aprahamian sent an e-mail to the Taro sales team indicating that Taro was planning to launch Clindamycin Solution "████████" and asking those sales executives to reach out to customers and "████████ ████████."  Aprahamian said he was "████████████████████ ████████████████████."  Consistent with the "fair share" understanding, Aprahamian indicated that "████████████████████;" meaning that Taro would only target Greenstone customers – not Perrigo – due to Greenstone's very high market share.  Another Taro employee was concurrently creating a "████████████████████" with information about the product, recent price trends in the market, competitors, and Taro's "████████████" of 20%.  That same day, Aprahamian called CW-3 at Sandoz and left a message.  CW-3 returned the call immediately and the two spoke for approximately three minutes.

792.    Taro also scheduled an internal meeting regarding the Clindamycin launch for October 11, 2013.  The day before and the day of that meeting, Aprahamian was again busy communicating with CW-3 of Sandoz.  On October 10, 2013, Aprahamian called CW-3 twice – first on CW-3's office line, leaving a message, and then immediately after on his cell phone, leaving another message.  The next day – the day of the Taro internal launch meeting – the two competitors spoke three times, with calls lasting three, one, and five minutes, respectively.

793.    As Aprahamian kept speaking to CW-3 at Sandoz, who was in turn speaking with ███████ at Perrigo, he continued compiling competitively sensitive, non-public price points for various customers.  For example, by October 25, 2013, the "███████████" tab of Aprahamian's Clindamycin Solution pricing spreadsheet had grown:

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Company | Size | Price | Manufacturer | Comments | | |
| 2 | Publix | 30ml | $       18.50 | Greenstone | | | |
| 3 | Publix | 60ml | $       37.25 | Greenstone | | | |
| 4 | ABC | 30 ml | $15 invoice | Perigo | just switched from Greenstone | | |
| 5 | ABC | 60ml | $30 invoice | Perigo | just switched from Greenstone | | |
| 6 | Rite Aid | 30ml | $       19.00 | Greenstone | 11, 195 units year | | |
| 7 | Rite Aid | 60ml | $       38.00 | Greenstone | 54,907 year | | |
| 8 | Henry Sc | 30ml | $       19.50 | Greenstone | | | |
| 9 | Henry Sc | 60ml | $       39.75 | Greenstone | | | |
| 10 | HD Smith | 30 ml | $       21.00 | Greenstone | 2160 year | | |
| 11 | HD Smith | 60ml | $       54.00 | Sandoz | 2800 year | | |
| 12 | Kroger | 30ml | | Greenstone | 3600 yr | | |
| 13 | Kroger | 60ml | mid $30's | Greenstone | 58000 YR | | |
| 14 | Cardinal | 30ml | $       22.00 | Greenstone | 1500 / month | | |
| 15 | Cardinal | 60ml | $       44.00 | Greenstone | 6500 / month | | |
| 16 | Humana | 60ml | $       14.75 | ? | low volumen | | |
| 17 | | | | | | | |

794.    Having this competitively sensitive, non-public information allowed Taro to price as high as possible while still obtaining new business – accomplishing one of the fundamental goals of the "fair share" understanding by minimizing price erosion as it entered the market.

795.     Taro entered the market for Clindamycin Solution on October 28, 2013, matching Sandoz, Greenstone and Perrigo's WAC pricing exactly.  When launching, Taro quickly targeted and obtained Rite Aid – not ABC or Walmart – to avoid competing with Perrigo for market share. This gave Taro approximately 13% market share immediately, almost reaching its target goal with just one customer.

796.     When Sandoz subsequently re-entered the market for Clindamycin Solution in early 2014, it also did so in coordination with its competitors.  For example, on Monday, February 10, 2014, members of the Sandoz sales team had a conversation about the company's upcoming re-launch of Clindamycin Solution.  As a result of that discussion, it was decided that " ████████████ ████████████████████████████████ ."

797.     That same day, Kellum sent an internal e-mail to the Sandoz sales team reminding them of the important understanding already in place with Greenstone across all of the Clindamycin formulations, not just the Solution:

| From: | Kellum, Armando |
|---|---|
| Sent: | Monday, February 10, 2014 6:35 PM |
| To: | ████████████████████████████ |
| Subject: | RE: ABC Clindamycin Solution - Monthly Usage/Aligment? |

Team,

Because of the other Clinda's I think we should avoid Greenstone as much as possible despite their large share.

We enjoy a very good and stable situation on the other Clinda products.

Thanks!

Armando Kellum
Vice President, Contracting and Business Analytics.
Sandoz Inc.

798.     Two days later, on February 12, 2014, CW-3 of Sandoz called Aprahamian of Taro and the two spoke for seventeen minutes.  They spoke again on February 13 for one minute.  That same day – February 13, 2014 – CW-1 of Sandoz sent an internal e-mail again stressing the broader

relationship with Greenstone and the desire not to disrupt that relationship: "████████

████████████████████████████████████████████████████

████████████ ."

799.     Over the next several weeks until Sandoz re-launched, the four competitors for Clindamycin Solution – Sandoz, Taro, Perrigo and Greenstone – coordinated through numerous phone calls, in order to minimize any disruption that might be caused by Sandoz's re-entry:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/14/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 13:04:00 | 0:17:00 |
| 2/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 15:42:00 | 0:02:00 |
| 2/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 4:56:11 | 0:00:34 |
| 2/20/2014 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 9:21:00 | 0:03:00 |
| 2/20/2014 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 9:24:00 | 0:11:00 |
| 2/24/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:01:00 |
| 2/26/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 3/1/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 18:06:00 | 0:01:00 |
| 3/5/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 6:48:00 | 0:12:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:18:40 | 0:00:16 |
| 3/11/2014 | Text | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:23:15 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 9:02:21 | 0:00:09 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Wesolowski, John (Perrigo) | 11:51:57 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 11:53:16 | 0:02:38 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 4:05:00 | 0:01:00 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 9:42:00 | 0:12:00 |
| 3/18/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 11:43:38 | 0:00:31 |
| 3/18/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 12:22:44 | 0:07:39 |

800.     Sandoz set its target market share at 25%, choosing to target 20% from Greenstone and 5% from Perrigo.  In a May 2014 internal Sandoz presentation, Sandoz laid out its plan for re-entry, specifically referring to one of its competitors as "████" rather than "████████:"



## Tactics to hit target in May 2014
_Group Three – Three or more competitors & Sandoz is below Fair Share_

| Code | Product Description | Δ Price[1] | Δ Volume[2] | Δ Value May[3] | Comments |
|------|---------------------|-----------|-------------|----------------|----------|
| 0201-60 | Clindamycin solution 1% 60ml bottle | No changes | 25,000 | $1.47M | Pfizer 55.4%, Perrigo 26.4%, SDZ 2.5% Target: Take 20% from Pfizer and 5% from Perrigo |

Ultimately, these coordinated efforts to minimize price erosion were very successful. Even after both Taro and Perrigo's entry, and Sandoz's re-entry, prices for Clindamycin Solution remained significantly higher than they had been prior to the first coordinated price increase. In a "███████ ████" presentation to Pfizer in 2017, Greenstone summarized the lock-step price increases in the market for Clindamycin Solution, while also showing relatively minimal price erosion even after two additional competitors had entered the market:



801.    Indeed, even when Actavis entered the market in early 2015, the competitors' commitment to the fair share scheme allowed a fifth entrant without materially affecting market prices. This was because Aprahamian coordinated Actavis' entry with ██████████ of Actavis during several lengthy calls in January 2015. During, Actavis identified which customers to target

to gain its fair share, which allowed Actavis to gain share at the same supracompetitive pricing as the existing competitors.

4. The Third Coordinated Price Increase (2014 – All Formulations Except Solution – Sandoz and Greenstone)

802. Starting in April 2014, Sandoz decided to raise prices on the three formulations of Clindamycin where Greenstone was still its only competitor. This led to a quick flurry of phone calls between Greenstone and Sandoz in early April 2014 to confirm the understanding, as shown below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 13:49:38 | 0:06:59 |
| 4/2/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:52:52 | 0:03:05 |
| 4/4/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 10:50:27 | 0:00:25 |
| 4/4/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 11:36:07 | 0:03:04 |

803. The phone call between Nailor and Kellum listed above was the first phone call ever between the two, according to phone records. As a result of these calls, Sandoz understood that Greenstone would follow its price increases. During these calls, the competitors also discussed a separate price increase on Eplerenone Tablets, discussed more fully below.

804. Sandoz moved quickly, raising its WAC prices on Clindamycin Gel, Clindamycin Lotion, and Clindamycin Cream by approximately 20%, effective April 18, 2014. Shortly after the Sandoz increase, on April 23, 2014, Nailor of Greenstone and Kellum spoke again for nearly fifteen minutes.

805. By now, Greenstone understood the need to follow the Sandoz price increases quickly – and did so. It followed the Sandoz WAC increases to the penny less than a month-and-a-half later, with an effective date of June 2, 2014. Shortly before Greenstone followed the Sandoz Clindamycin increases – on May 22, 2014 – ▇▇▇ of Greenstone called Kellum of Sandoz twice, leaving him a forty-seven second voicemail. They did not speak again for nearly three months.

Similarly, three days before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six second voicemail.  As part of that same price increase, Greenstone also raised its pricing on Eplerenone Tablets.

806.    Sandoz honored the "fair share" understanding with Greenstone and the agreement to raise prices on Clindamycin.  For example, when approached by a customer, Omnicare, on May 28, 2014 to provide a bid for Clindamycin Gel, the first reaction from a Sandoz marketing manager was that Kellum "████████████████████████████████."  Omnicare approached Sandoz again in August, asking if Sandoz had enough supply to meet the customer's needs.  The e-mail from Omnicare followed a flurry of phone calls between Kellum and ████ of Greenstone only a few days prior, on August 14, 2014 (their first calls since May 2014).  After receiving the e-mail from Omnicare, CW-3 of Sandoz informed the customer that Sandoz would not do anything that would disrupt the market.

### HH.    Clobetasol

807.    The market for Clobetasol is mature, as Clobetasol has been available in the United States for decades.  During the relevant time period, Defendants Actavis, Akorn, Hi-Tech, Sandoz, Fougera, Perrigo, Taro, Wockhardt, and Morton Grove sold Clobetasol to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

808.    For more than two years prior to June 2014, Defendants' average price in the U.S. for Clobetasol was remarkably stable.

809.    Beginning in approximately June 2014, Defendants abruptly increased their prices for Clobetasol on multiple formulations and sizes.  By way of example, Taro, Sandoz, Hi-Tech,

Actavis, and Wockhardt all took price increases on their 0.05% cream product in near lockstep reflecting increases of more than 800%:

| Product crm .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672125801 | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | 00168016315 | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | 50383026715 | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | 00472040015 | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | 51672125802 | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | 00168016330 | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | 50383026730 | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | 00472040030 | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | 51672125806 | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | 00168016346 | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | 50383026745 | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | 00472040045 | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | 51672125803 | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | 00168016360 | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | 50383026760 | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | 00472040060 | * | $6.12 | 10-Mar-15 | * |

810.   Upon information and belief, between June and August 2014, Akorn, Morton Grove, Fougera, and Perrigo all increased their list prices for Clobetasol by similar amounts, even though these prices were not publicly reported.

811.   Clobetasol was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase" in 2014-15.

812.   Defendants' dramatic price increases were not due to supply disruptions because there is no indication that there was a drug shortage.  These dramatic increases cannot be explained by any other market feature or shock.

813.    Upon information and belief, the price increases on Clobetasol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clobetasol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

814.    For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

815.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland, which was attended by representatives from Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

816.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended the Expo.  *See* Ex. 1.

817.    On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Actavis, Sandoz, Hi-Tech, Perrigo, Taro, and Wockhardt.  *See* Ex. 1.

818.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

819.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Arizona.  The June 1-4, 2014 BLC was attended by representatives from Actavis, Hi-Tech, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

820.    On June 3-4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Perrigo, Sandoz, Hi-Tech, and Taro.  *See* Ex. 1.

821.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Actavis, Hi-Tech, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

822.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Sandoz, Fougera, Perrigo, Taro, and Wockhardt.  *See* Ex. 1.

823.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo.  *See* Ex. 1.

824.    On February 9-11, 2015, GPhA held its Annual Meeting in Miami Beach, Florida. Representatives from Actavis, Sandoz, Akorn, Perrigo, Taro, and Wockhardt attended.  *See* Ex. 1.

825.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers in Palm Beach, Florida.  NACDS's 2015 annual meeting was attended by representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

826.    The June 7-10, 2015 HDMA BLC was held in San Antonio, Texas.  The June 2015 BLC was attended by representatives from Actavis, Sandoz, and Wockhardt.  *See* Ex. 1.

827.    On June 9-10, 2015, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Sandoz, Perrigo, Taro and Wockhardt.  *See* Ex. 1.

828. On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center. Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended. *See* Ex. 1.

829. In 2016, Actavis, Akorn, Fougera, Perrigo, Sandoz, Taro, and Wockhardt continued to attend trade association meetings and events. *See* Ex. 1.

## II. Clomipramine

830. Clomipramine HCL, also known by the brand name Anafranil, is used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain. The market for Clomipramine is mature, as Clomipramine has been available in the United States for over 20 years. The World Health Organization ("WHO") includes Clomipramine on its list of essential medicines. During the relevant time period, Mylan sold Clomipramine pursuant to ANDAs approved by the FDA in or around January 1998. Sandoz sells Clomipramine to purchasers pursuant to ANDAs that were approved by the FDA in or around June 1997 and March 1998. Taro sells Clomipramine to purchasers pursuant to ANDAs approved by the FDA in December 1996.

831. At all times relevant to this lawsuit there has been more than one manufacturer of Clomipramine on the market. Defendants Mylan, Sandoz, and Taro sold Clomipramine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

832. For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Clomipramine was remarkably stable. Beginning in approximately May 2013, Mylan, Sandoz, and Taro increased their prices abruptly and, for the most part, in unison.

833.   In addition to Defendants Sandoz and Mylan, Taro also manufactured Clomipramine HCL. Indeed, it was Taro that led a price increase on this product on May 1, 2013. The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.

834.   In the weeks leading up to the Taro price increase on Clomipramine, Aprahamian of Taro spoke several times with both CW-3 at Sandoz and ███████████, a national account manager at Mylan. In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next. At the same time, CW-4 of Sandoz was also speaking with ███████████, a senior sales and national account executive at Taro. During these conversations, Defendants Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine HCL.

835.   CW-3 of Sandoz also took contemporaneous notes of some of his conversations with competitors. For example, after speaking with Aprahamian of Taro twice on April 30, 2013, CW-3 made the notes identifying Clomipramine HCL as one of the products that Taro planned to increase on May 1.

836.   Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

837.   As part of the agreement to raise prices and not poach each other's customers on Clomipramine, Sandoz consistently refused to bid for Taro's customers after Taro raised its price. For example, on April 30, 2013, Publix e-mailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine, and asked whether Sandoz wanted to bid for the business. Kellum e-mailed CW-4 stating: "███████████

███████████████████████████████████████████████████

██████████████████████████████████████████████"

838.   Taro did agree to concede one customer to Sandoz so that the competitor could achieve its fair share of the market.  On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid on Clomipramine. Kellum responded: "███████████████████████████████████

█████████████████████████████████████████████████████

██████████."

839.   The next day, on May 2, 2013, Aprahamian of Taro called CW-3 at Sandoz and they spoke for five minutes.  CW-3 hung up the phone and then immediately called Kellum.  The two spoke for eight minutes. First thing the next morning – on May 3, 2013 – CW-3 called Aprahamian back and they spoke for another five minutes.  Within a half hour, CW-3 again contacted Kellum and spoke for two minutes.  Later that day, CW-4 of Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid stating: "████████████████████████

█████████████████████████████████████████████████████

███████████████."

840.   Ultimately, Sandoz was awarded the Clomipramine business at Rite Aid.  When Rite Aid notified Taro, Aprahamian forwarded the e-mail to Michael Perfetto, stating: "███

████████████████████████████."

841.   Mylan was the next to increase price on Clomipramine HCL.  On May 16, 2013, Mylan increased to the same WAC per unit cost as Taro.  In the days leading up to the Mylan price increase, all three competitors were in contact with each other by telephone to coordinate efforts.

842.   On July 3, 2013, Plaintiff HEB informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business.  Aprahamian responded that he was

"███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████."

843.    On July 16, 2013, CW-4 of Sandoz sent the July 2013 e-mail identifying Clomipramine HCL as a Mylan price increase product.  By this time, Sandoz knew that Mylan had increased its price on this product.

844.    On July 20, 2013, Taro received a "███████" notification that Sandoz was increasing price on Clomipramine HCL.  Aprahamian forwarded the notice to Perfetto stating:

"████████████████████████████████████████████

████████████████████████████████████████████

████████████████████."

845.    Two days later – on July 22, 2013 – Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

846.    On August 5, 2013, Walgreens – a Mylan customer – e-mailed Sandoz and requested a bid on Clomipramine HCL.  ███████████, a national account executive at Sandoz, sent an internal e-mail asking "██████████████████████████████████?" Kellum responded negatively, based on the agreement in place with Mylan, stating: "███████ ███████████████████████." On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls lasted less than a minute (likely voicemails).  The next day, on August 7, 2013, ██████████ replied to Kellum's e-mail, stating: "████████████████████████████████ ██████████████████."

847.    In October 2013, CW-4 and Nesta spoke by phone several times, including multiple calls on October 3rd and 4th.

848.    After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Kellum.  The call lasted one minute.  Approximately one half hour later, Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

849.    On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro. CW-1 was surprised and forwarded the request to CW-4, copying Kellum, stating: "███████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████."

850.    In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL.  Kellum prepared a response claiming that Sandoz had simply followed the market price increase after learning of it through public sources.

851.    As is clear from the above allegations, Kellum's statement was a lie.  In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance, and stayed true to its commitments to keep those prices high.

852.    By way of example, beginning in May 2013, Mylan, Sandoz, and Taro set their WACs in lockstep on their 25 mg product, reflecting increases from previous WACs of, more than 2,700%:

| Product 25 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 30 ct | Taro | 51672401106 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 90 ct | Taro | 51672401105 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 100 ct | Mylan | 378302501 | $0.30 | $8.99 | 16-May-13 | 2853% |
| 100 ct | Sandoz | 781202701 | $0.31 | $8.99 | 22-Jul-13 | 2778% |

853.     In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Clomipramine, which had experienced extraordinary price increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, in August 2016, the GAO issued a report in which Clomipramine was identified as experiencing an "extraordinary price increase."

854.     There are no legitimate justifications for these price hikes.  There were no supply shortages or disruptions, no new patents or formulations, and no changes in drug labeling that explain these abrupt increases.

855.     The price increases on Clomipramine were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clomipramine in the United States.

856.     These collusive agreements were also furthered at least in part, through in-person meetings at industry events hosted by GPhA and HDMA.

857.     For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

858.     On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida.  GPhA's 2013 Annual Meeting was attended by representatives of Taro, Sandoz, and Mylan.  *See* Ex. 1.

859.     On April 20-23, 2013 NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's Annual Meeting was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

860.     On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  HDMA's June 2013 BLC was attended by representatives from Sandoz and Mylan.  *See* Ex. 1.

861.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1

862.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

863.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

864.    On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Defendants Mylan and Sandoz.  *See* Ex. 1.

### JJ.    **Clonidine-TTS Patch**

865.    Clonidine-TTS Patch – also known by the brand name Catapres-TTS – is a medication in the form of a transdermal patch used to treat high blood pressure.

866.    As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately 48.4% market share and Teva having approximately 44.4% market share.  At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

867.    In November 2011, Teva took over Mylan's business for Clonidine-TTS at Walgreens after Walgreens solicited Teva to provide a bid.  Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "███████ ████████" that Mylan was experiencing.  A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine-TTS.  Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.

868.   On February 10, 2012, the move of Cardinal's business to Teva prompted ██████ of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler called ████████, a senior national accounts executive at Mylan, to obtain the information and they spoke for six minutes.  Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, "████████████████████" and cautioned that Teva should "████████."  Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan.  With the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market share for Clonidine-TTS.

869.   To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson.  To de-escalate the situation, Teva "████████████████████████."  Then, in April 2012, Mylan aggressively challenged Teva's Clonidine-TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business.  Internally, Teva lamented that Mylan was "████████████████████ ████████████████████."

870.   Teva heard Mylan's retaliatory message loud and clear.  On May 4, 2012, just a few days after losing the CVS Clonidine-TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin.  At the time, Mylan was the primary supplier for Doxazosin at Cardinal.  Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva.  Rather than take this business, ██████ cautioned his colleagues that Teva "████████████████████████

██████████████████████████████████████████████████████████

██████████████████████."

871.    On July 18, 2012, Eugene Cioschi, a senior Teva product manager, circulated an internal e- mail to Teva's national account managers that the "████████████████████████ ██████████████████████."  Teva learned of this "██████" directly from Mylan over the course of at least two calls between Green and Nesta on July 17 and the morning of July 18, 2012.  Those calls lasted three minutes and five minutes, respectively.

872.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least twice, once for four minutes and once for fourteen minutes.  On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.  As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

873.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market.  For example, in April 2012, before Mylan had challenged Teva's Clonidine-TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine-TTS was $22.13, $37.81, and $54.41, respectively.  Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively.  Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

874.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS.  For example, Teva submitted bids

to CVS and Wal-Mart – which were ultimately accepted by those companies – on October 4, 2012 and October 5, 2012, respectively.   In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

875.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine-TTS market, Mylan could regain market share without eroding price through competitive bidding.  For example, on October 10, 2012, Green and Nesta spoke for ten minutes.  That same day, ████████████ of Teva sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should "████████████ ████████████████████████████████."

876.    In or about February 2013, Mylan relaunched Clonidine-TTS and began seeking market share.   In early March 2013 Mylan sought to secure the Clonidine-TTS business at Econdisc.  Rather than competitively bid for the business, Teva's internal documents state that they chose to "████████" Econdisc back to Mylan.  By April 2013 Teva also "████████████ ████████████████████████████████.

877.    In a stark admission of Teva's willingness to help Mylan regain market share without competition, Rekenthaler acknowledged in an internal e-mail dated February 28, 2013, that Teva was "██████████████████████████████████████" to Mylan.  Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was

higher than Mylan's "█████████████████████."  For its part, Teva was "██ █████████████████████████████████████████████" if CVS brought Mylan's price challenge to Teva's attention.  CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so.  Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing.  Nonetheless, because Mylan's bid to CVS was not competitive – but rather an effort to allocate the market without eroding price – Teva was able to maintain artificially higher prices at CVS.

878.    To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact.  In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times and spoke for nearly 2 hours and 45 minutes.

879.    By April 2013, Teva had "██████████████████████████."  Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine-TTS.  On April 8, 2013, ███████████, a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:



From: ███████████
Sent: Tuesday, April 09, 2013 2:24 PM
To: ███████████; Dave Rekenthaler
Cc: ███████████
Subject: Clonidine - Mylan Challenges
Importance: High

Kevin / Dave,

Do we have a target share percentage we want to maintain/concede now that Mylan is back in supply?

We just gave up Rite Aid which was worth ~5% of our business and we also have a challenge from Omnicare which is also worth ~5%.  We received the Omnicare challenge yesterday.

Based on a discussion with Kevin Green, Mylan would follow a price increase.

880.    Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Nesta (Mylan), with one lasting one minute and the other lasting eight minutes.  In a follow up call the following day between Green and Nesta lasting eleven minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

881.    On May 6, 2014, Actavis was granted approval to market Clonidine-TTS.  Teva and Actavis immediately commenced an extensive negotiation over price and market share. Rekenthaler and Falkin spoke by phone three times that day for fifteen minutes, one minute, and three minutes, respectively.

882.    The next day, Rekenthaler announced to his colleagues that Actavis was entering the market. ██████ of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis.  At the same time, Teva employees bemoaned Actavis's "████████████████████████████████████ ██."

883.    On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with another flurry of phone calls.  On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls).  Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54 a.m.  At 10:02 a.m., she informed her colleagues of the results of the negotiations, instructing them: "████ ████████████████████."

884.    The following day, May 9, 2014, Patel learned from yet another customer of a "████████████████████" on this drug.  Suspecting the source of the challenge was Actavis, Patel called Rogerson three times.  Following those conversations, Patel informed her colleagues

that Actavis wanted 25% of the market. She also stated that Actavis would likely want 10%-15% of that share from Teva. During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis's pricing was, because not long after those phone calls, she conveyed to her supervisor, ████████████████████████████████████████."

Shortly after that, Patel also learned that Actavis had "████████████████████████████ ████████████████████."

885.   Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████."

886.   The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine-TTS. On May 14, 2014, for example, Patel told colleagues that Teva must be "████████" and concede a particular wholesaler's account to Actavis. On May 17, 2014, Teva conceded a large retailer account to Actavis. On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating: "██ re ████████████████████."

887.   When ████████, Teva's analytics manager, recommended giving up yet another Clonidine-TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, ████████ of Teva reluctantly approved, saying: "████████████████ ████████████████████████████."

KK. **Clotrimazole**

888.    Clotrimazole, also known by the brand name Lotrimin, is an antifungal medication used to treat yeast infections, oral thrush, diaper rash, pityriasis versicolor, and various types of ringworm including athlete's foot and jock itch.  It is available in a variety of formulations including cream and solution.

889.    As detailed further below in Section XIII, Taro and Teva led price increases on Clotrimazole solution in June 2014.

890.    In early January 2015, Sandoz was readying to re-launch into the Clotrimazole cream market.  At that time, there were three other competitors in the market – Taro, Glenmark, and Major Pharmaceuticals. Sandoz had some supply constraints and was only targeting between 15% and 20% market share as the fourth entrant.

891.    On the evening of January 7, 2015, ██████, a senior Sandoz launch executive, sent an internal e-mail to the Sandoz launch team, stating that the Pricing Department was preparing pre-launch offers for Clotrimazole Cream to be sent the following week.

892.    First thing the next morning, on January 8, 2015, CW-3 of Sandoz called Aprahamian of Taro. Aprahamian called him back shortly thereafter.  Both calls lasted one minute. That same day, ██████, a Sandoz launch executive, told his colleague CW-1, a Sandoz senior pricing executive, that CW-3 was getting an additional price point for the Clotrimazole cream launch.  The next day, on January 9, 2015, Aprahamian called CW-3.  CW-3 called him back and they spoke for four minutes.

893.    First thing the next business day, Monday January 12, 2015, ████████████ ████████████████████████████████████████████████████████

████████████████████████████████

███████████ ."

894.     That same day, CW-3 called Aprahamian. Aprahamian returned the call and they spoke for seven minutes.  On that call, Aprahamian provided CW-3 with Taro's non-public pricing for two different categories of customer – wholesalers and retailers.  CW-3 told Aprahamian that Sandoz had limited supply of Clotrimazole cream and that it planned to target Wal-Mart and Walgreens only.  CW-3's contemporaneous notes from the call are detailed below:



895.     Immediately after his call with Aprahamian, CW-3 called CW-1. The call lasted one minute.  Also, later that day CW-3 sent the following e-mail to ███████ at Sandoz, with a copy to CW-1, conveying the competitively sensitive information he had learned from Aprahamian:



896.    The prices matched exactly the prices that CW-3 had written down in his Notebook.

897.    The next day, on January 13, 2015, CW-3 spoke with CW-1 for sixteen minutes. Later that afternoon, Aprahamian called CW-3. CW-3 returned the call and they spoke for eight minutes.

898.    On January 29, 2015, Sandoz bid on Clotrimazole cream at Wal-Mart, a Taro customer. Wal-Mart e-mailed Aprahamian to inform him of the bid and asked if Taro wanted to bid to retain the business. Aprahamian responded, "████████████████████████████ ███████████." That same day, Aprahamian called CW-3 and they spoke for nine minutes.

899.    The following Monday, February 2, 2015, Aprahamian e-mailed Wal-Mart and declined the opportunity, explaining that "███████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████." Aprahamian then forwarded his response along internally stating: "█████████████████████████████ ██████."

900.    On February 9, 2015, Wal-Mart e-mailed Sandoz to notify the company that it had won the Clotrimazole cream business.

901.    In March 2015, and consistent with its plans, Sandoz also bid on Clotrimazole cream at Walgreens, a Glenmark customer. On March 27, 2015, Walgreens awarded the business to Sandoz.

**LL.    Desogestrel/Ethinyl Estradiol Tablets (Kariva)**

902.    Desogestrel/Ethinyl Estradiol ("Kariva") is a combination pill containing two hormones: progestin and estrogen. This medication is an oral contraceptive. These drugs are also

known by various brand names such as Viorele and Mircette. During the period relevant to this Complaint, Actavis, Glenmark, and Teva were the primary manufacturers of Kariva.

903. During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for its own version of Kariva – Viorele – at Publix, a retail pharmacy purchaser. Stephanie Brady, an analyst at Teva, e-mailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including Kariva. The chart included a suggested re-bid price for Kariva of $76.14 – which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

904. This sparked a flurry of communications that same day between Patel and three different Glenmark representatives – Brown and Grauso, and ███████████, a sales and marketing executive – and also with Rick Rogerson of Actavis. Indeed, Patel had previously been communicating with Rogerson on May 8, 9, and 12.

905. After this flurry of communications between the three competitors, Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally proposed re-bid price of $76.14 – virtually guaranteeing that the business would be awarded to Glenmark.

**MM.  Desonide**

906. The market for Desonide is mature, as both the ointment and cream form of the drug have been available in the United States since the 1970s, and generic Desonide has been available in the United States since 1994.

907. During the relevant time period, Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro sold Desonide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

908.    At all times relevant to this lawsuit there has been more than one manufacturer of Desonide on the market.  Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro dominate the market for Desonide.

909.    For at least five years prior to May 2013, Defendants' prices for Desonide in the United States remained stable.  In May 2013, however, Defendants abruptly began implementing substantial price increases.

910.    By way of example, Defendants all set the same WACs for their ointment products beginning in May 2013, reflecting increases from previous WACs of more than 140%:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 15 GM | Taro | 51672128101 | $0.84 | $3.21 | 1-May-13 | 282% |
| 60 GM | Taro | 51672128103 | $0.53 | $3.21 | 1-May-13 | 501% |
| 15 GM | Perrigo | 45802042335 | $1.30 | $3.21 | 21-May-13 | 146% |
| 60 GM | Perrigo | 45802042337 | $0.31 | $3.21 | 21-May-13 | 932% |
| 15 GM | Sandoz | 00168030915 | * | $3.21 | 17-Jan-14 | * |
| 60 GM | Sandoz | 00168030960 | * | $3.21 | 17-Jan-14 | * |

911.    In August 2013, Actavis entered the market for Desonide and implemented the supracompetitive prices as well.  Upon information and belief, just as the Defendants did with Glyburide and Doxy DR, Actavis communicated its intention to enter the market to Perrigo, Sandoz, Fougera, and Taro well in advance of its actual entry, and the Defendants reached an agreement on the supracompetitive pricing that each would charge its customers.  This agreement on Desonide was facilitated by the overarching market allocation (or "fair share") agreement that was followed by all Defendants and conspirators and it prevented Actavis' entry into the market from eroding the conspiratorial pricing on Desonide.

912.   Desonide was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

913.   No competitive justifications explain the abrupt increase in price.  Changes in ingredient costs do not explain Defendants' price increases.  The gel and lotion formulations of Desonide did not experience the same coordinated and extraordinary price increases in May 2013 that the cream and ointment formulations experienced, even though all formulations have the same active ingredient.

914.   The abrupt price increases were not due to supply disruptions.

915.   Upon information and belief, the price increases on Desonide were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Desonide in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

916.   For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

917.   On February 20-22, 2013, GPhA held its Annual Meeting at the JW Marriott Orlando Grand Lake in Orlando, Florida that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

918.   On April 20-23, 2013, shortly before the drastic May 2013 price increases, NACDS held its annual meeting at The Breakers, Palm Beach, Florida.  This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

919.   On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  HDMA's June 2013 BLC was attended by representatives from Actavis and Sandoz.  *See* Ex. 1.

920.    On June 4-5, 2013, GPhA held a CMC Workshop meeting at Bethesda North Marriott Hotel, Bethesda, Maryland, that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

921.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center.  NACDS's August 2013 event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

922.    On October 28-30, 2013, GPhA held its 2013 Fall Technical Conference in Bethesda, Maryland that was attended by representatives from all Defendants.  *See* Ex. 1.

923.    On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo.  *See* Ex. 1.

924.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

925.    These Defendants continued to attend trade association meetings and events between 2014 and 2016.  *See* Ex. 1.

### NN.    **Desoximetasone Ointment**

926.    Desoximetasone Ointment ("Desoximetasone"), also known by the brand name "Topicort," is a corticosteroid used to treat a variety of skin conditions, including eczema and dermatitis.  Desoximetasone reduces the swelling, redness and itching associated with those conditions.

927.    As of the summer of 2012, Taro was the only manufacturer of Desoximetasone Ointment.  However, starting in August 2012, Sandoz began making plans to enter the Desoximetasone market.  Because it would be a 2-player market upon Sandoz's entry, and because

Sandoz was the second manufacturer to enter the market, Sandoz initially decided – consistent with the "fair share" understanding outlined above – to target 40% market share.

928.    On the evening of August 21, 2012, Sandoz held an internal meeting to discuss its "████████████████████████████████" regarding Desoximetasone.  Shortly after the meeting, a Sandoz executive sent an initial list of eight customers that Sandoz should consider approaching. The executive indicated that Sandoz's success would depend "████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████."

929.    First thing the next morning, Sandoz began to coordinate with Taro.  ██████████, a national account executive at Sandoz, called ██████████, a senior sales executive at Taro, and the two spoke for nine minutes.

930.    On August 30, 2012, Sandoz held another internal meeting to discuss its Desoximetasone launch.  That same day, ████████ of Sandoz spoke again to ████████ of Taro, this time for two minutes.  The day after this internal Sandoz meeting and the phone conversation with Taro, on August 31, 2012, CW-1 of Sandoz sent Kellum a "████████████" for Desoximetasone, which included specific pricing "██████" and a more refined list of customers that would provide Sandoz with its target market share.

931.    As the Sandoz launch date approached, CW-3 of Sandoz also began speaking to ████████████████, an account executive at Taro, to coordinate Sandoz's entry into the market.  The two competitors were not friends, and nearly all their conversations were collusive in nature. According to phone records, the first ever call between the two competitors was on September 6, 2012.  They spoke again on September 21, 2012, as Sandoz was finalizing its launch plan.  During these calls, ████████ provided CW-3 with Taro price points for various customers so that Sandoz

could bid as high as possible and avoid price erosion, while still obtaining new customers as it entered the market.  CW-3 passed that pricing information and list of customer targets on to CW-1 and Kellum at Sandoz.  That same day, ███ also sent an internal e-mail relaying a "███" that Sandoz would be entering the Desoximetasone market "████████," and suggesting six accounts as possible targets.

932.    Sandoz received FDA approval and formally launched Desoximetasone on September 28, 2012, matching Taro's WAC pricing exactly.  That same day, CW-3 of Sandoz also called ███ at Taro and left a message; ███ returned the call almost immediately, leaving CW-3 a voicemail.

933.    Based on the conversations with Taro, Sandoz decided to take a "███ ████████████████████████ ████████████████████████ ██████████████████."

934.    Shortly after receiving approval, on October 1, 2012, Sandoz began approaching a limited set of customers, per its agreement with Taro.  That same day, CW-4 of Sandoz reached out to ███ at Taro – someone CW-4 had colluded with in the past – and spoke two times, including one call lasting twenty-one minutes.

935.    Consistent with the understanding in place between the two competitors, Taro immediately started conceding customers to Sandoz.  For example, on October 11, 2012, a high-ranking Taro executive sent an internal e-mail discussing Sandoz's launch of Desoximetasone.  In the e-mail, the executive indicated that Taro had been aware of Sandoz's launch "████████" and that Taro had just conceded two large customers to Sandoz, with the expectation of relinquishing "████████████████████ of Taro called

CW-3 of Sandoz, likely to let him know that the customers had been conceded and confirm the plan moving forward. They spoke twice that day, including one call lasting more than six minutes.

936. Sandoz was able to obtain most of its targeted market share quickly, without any market disruption. By October 12, 2012, for example, ██████████████, a senior sales and marketing executive at Sandoz, provided a summary of the Desoximetasone launch, stating: "██████████████████████████████████████████████████████████████████████████████████████████████."

937. At that point, Sandoz decided it needed to obtain at least one more customer to meet its fair share goals. Internally, Sandoz discussed sending a message to Taro that "███████████████████████████████." On October 23, 2012, CW-1, CW-3 and Kellum scheduled a conference call to discuss which customers to approach to "████████████████████████████████████████ at Taro and the two competitors spoke several times, including two separate fifteen minute calls.

938. As a result of these conversations, Taro agreed to relinquish additional customers to Sandoz. By February 2013, Sandoz had captured its original goal of 40% of the Desoximetasone market, without any significant disruption.

939. Glenmark received FDA approval to sell Desoximetasone on September 20, 2013. In the days and weeks leading up to the Glenmark launch, Perfetto of Taro was also communicating with ████████████████, a senior-most executive at Glenmark, through e-mail. Additionally, senior sales executives from each company were speaking frequently to coordinate Glenmark's entry, including at least the following calls and text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 13:33:00 | 0:08:00 |
| 8/20/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 9:40:00 | 0:02:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:45:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:56:00 | 0:02:00 |
| 8/21/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 11:37:00 | 0:07:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |
| 8/27/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 17:48:00 | 0:03:00 |
| 8/28/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:29:00 | 0:01:00 |
| 8/28/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:36:00 | 0:15:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:08:00 | 0:01:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:26:00 | 0:01:00 |
| 9/5/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 15:29:00 | 0:03:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 11:05:00 | 0:01:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 11:07:00 | 0:10:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 11:24:00 | 0:01:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 12:35:00 | 0:01:00 |

940.    Glenmark's approval came on Friday, September 20, 2013.   The following Monday, there was a flurry of additional communications between the three competitors to coordinate Glenmark's entry.

941.    The day after that, September 24, CW-3 of Sandoz spoke to Aprahamian at Taro again for fifteen minutes.  CW-3 then sent an e-mail to his superiors, including CW-1 and Kellum, alerting them to the situation: "███████████████████████████████████████

███████."

942.    On September 26th, there was another torrent of phone calls between Glenmark, Taro and Sandoz:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:45:00 | 0:04:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:35:00 | 0:06:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:22:00 | 0:15:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:32:00 | 0:02:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:44:00 | 0:01:00 |

943.    During these calls, the competitors reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion. That same day, September 26, 2013, CW-5, a senior-most executive at Glenmark, described Glenmark's launch strategy as a "████████████████████████████████████."

944.    Because Taro still had a majority of the market share, it understood pursuant to the "fair share" understanding that it would be the primary target of Glenmark and would have to relinquish market share to Glenmark as it entered.  Internally, Taro executives commented that it "███████████████████████████████████████████████████████████████."

945.    Taro began to concede customers to Glenmark immediately.  By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30% market share for Desoximetasone.

946.    Because of the discussions between the competitors in advance, and because prices remained high, Taro was not upset about conceding this business to Glenmark.  Taro executives continued to stress that "██████████████████████████████████████████ ███████████████████████████████."

947.    In early November 2013, Taro was approached by a customer to bid on Desoximetasone as part of an RFP.  In deciding whether to provide a bid, Taro executives noted that the company had already "███████████████████" so that Glenmark could obtain market share.  Nonetheless, Taro still decided not to bid, stating "█████████████████ ██████████████████████████████."

## OO.    **Dexmethylphenidate HCL Extended Release**

948.    Dexmethylphenidate HCL Extended Release ("Dexmeth ER") is a generic version of the drug Focalin, and it is used to treat attention deficit hyperactivity disorder (ADHD).

949.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmeth ER in February 2014, Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price.  On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account

for Dexmeth ER 40mg.  Later that night, CW-1 called Patel and the two spoke for more than thirteen minutes. On February 18, Patel left a voicemail for CW-1.  That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

950.    Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmeth ER.  After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business.  In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:

```
From:     Nisha Patel02
Sent:     Wed 2/12/2014 6:34 PM (GMT-05:00)
To:       ███████████
Cc:
Bcc:
Subject: Re: ABC Dexmethylphenidate 40mg - Challenge


We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this
class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the
WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.

Sent from my iPhone
```

951.    One of the Teva national account managers on the e-mail responded by confirming that the approach "█████████████." 

952.    On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

953.    Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (*i.e.*, a lower purchase price for the drug).  Patel spoke to CW-1 the same day for almost twenty-one minutes.  The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating:

"███████████████████████████████████████████████████

███████████████████████████████████████████████."

954.    Also on February 21, 2014, Patel sent a calendar invite to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "████

███████████████████████████████████████████████."    Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmeth ER.

955.    Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva.  In February 2014, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.  Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER.  The agreement was also carried out by other manufacturers allowing Sandoz to take share from them.  In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "████

██████████████████████████████."  As Sandoz was entering the market, Rekenthaler of Teva was speaking to ██████████, a senior national account executive at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on February 10 (18 and 3 minutes), two calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

956.    The market allocation scheme between Teva and Sandoz on Dexmeth ER continued through at least mid-2015.  On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmeth ER 5mg on the basis that "██████████████████████████████████

██████████."  Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had 57%

market share – greater than its sole competitor on this dosage strength, Teva.  When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

**PP.  Dextroamphetamine Sulfate Extended Release**

957.    Dextroamphetamine Sulfate Extended Release, also known by the brand name Dexedrine® and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.

958.    During the relevant time period, Actavis, Teva, Impax, and Mallinckrodt dominated the market for Dex Sulfate XR capsules, with Teva having by far the largest share as the first generic entrant. Additionally, during the period relevant to this Complaint, Aurobindo, Teva, and Mallinckrodt were the primary manufacturers of Dex Sulfate XR tablets.

959.    Impax prepared to enter the capsules market in August 2011 and communicated these plans to Teva, which allowed Teva to increase prices substantially even prior to Impax's entry. Consistent with the fair share rules, Impax then entered the market at the supracompetitive prices established by Teva.

960.    In 2012, as Mallinckrodt entered the market for both capsules and tablets, internal Teva documents acknowledged that Teva had "████████" (*i.e.*, willingly) conceded a large number of accounts for the drug to Mallinckrodt solely because it was entering the market and sought to add share.  Moreover, with respect to tablets, Teva increased prices substantially in advance of Mallinckrodt's entry, based on the assurances it received from Mallinckrodt that it comply with the fair share rules.  Indeed, internal Teva documents indicate that it repeatedly conceded share to Mallinckrodt between 2012 and 2014, in order to ensure that Mallinckrodt supported the conspiracy pricing.

961.    On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR capsules, Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of the market Actavis was targeting.  Rekenthaler responded: "████."  Rekenthaler knew Actavis's market share goals because he and Falkin of Actavis had spoken twice by phone that morning – once for more than eleven minutes and again for more than nine minutes.

962.    Five days later on June 24, 2014, Teva employee ████████ confirmed to her colleagues in an e-mail that Actavis had entered the market for Dex Sulfate XR.  She remarked that Teva had a 72.2% share of this "████████████" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to ████ – in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis.  Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "████████ ████████████████████████."

963.    Once again, when Aurobindo entered the market for tablets in mid-2014, Teva again conceded share to the new entrant, and communicated to Aurobindo which customers it would concede.  Moreover, these communications with Aurobindo overlapped with collusion between the two companies (and others) with respect to Glyburide and other drugs during this same timeframe.

**QQ.    Digoxin**

964.    The market for Digoxin is mature, as Digoxin has been available in the United States for more than a decade.  Generic Digoxin is prescribed to approximately 6.5 million patients in the United States and it is considered an essential medicine by the World Health Organization. Variants of the drug have been in existence since the 18th century.  Because Digoxin was in

existence prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act, the drug was manufactured and sold by a large number of companies outside the NDA/ANDA process.

965.    In 1997, GlaxoSmithKline obtained an NDA authorizing it to market Lanoxin, a branded version of Digoxin.  Because Digoxin was not a new chemical compound, its NDA allowed for just a three-year period of exclusivity, and by 2003 there were at least eight manufacturers of generic Digoxin in the United States, including Defendants Impax, Lannett, Mylan, Par, and West-Ward.

966.    During the relevant time period, Defendants Impax, Lannett, Mylan, Par, and West-Ward sold Digoxin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

967.    At all times relevant to this lawsuit there has been more than one manufacturer of Digoxin on the market.  Defendants Impax, Lannett, Mylan, Par, and West-Ward dominate the market for Digoxin.

968.    Due to industry consolidation and manufacturing difficulties experienced by Mylan, Par, and West-Ward, by the end of 2012, just Lannett and Impax remained active in the market for generic Digoxin.  Despite the existence of a duopoly, until October 2013, the price of Digoxin charged by Lannett and Impax remained stable.

969.    Beginning in October 2013, however, Defendants issued abrupt and substantial price increases.

970.    Defendants continued to increase the prices they charged to Plaintiffs and others for Digoxin during the first six months of 2014, despite Par's entry into the Digoxin market in early 2014 and West-Ward's re-entry soon after.  Mylan also re-entered in early 2015 and followed the pricing agreed to by the conspirators.  Upon information and belief, Par, West-Ward, and

Mylan each communicated their entry into the generic Digoxin market to their co-conspirators well in advance of the date each entrant began marketing the drug, so that agreements could be reached on price without any disruption to the prevailing supracompetitive prices.

971.    By way of example, with respect to WAC pricing, in October 2013, Lannett and Impax implemented lockstep WAC prices on their 0.125 mg products, reflecting increases of more than 630%.  Instead of competing on price, Par, West-Ward, and Mylan reported the same WAC benchmarks as Lannett and Impax as they entered the market:

| Product 0.125 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Lannett | 00527132401 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 1000 ct | Lannett | 00527132410 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 100 ct | Impax | 00115981101 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 1000 ct | Impax | 00115981103 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 100 ct | Par | 49884051401 | * | $1.19 | 17-Jan-14 | * |
| 1000 ct | Par | 49884051410 | * | $0.99 | 17-Jan-14 | * |
| 100 ct | West-Ward | 00143124001 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 1000 ct | West-Ward | 00143124010 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 100 ct | Mylan | 00378615501 | * | $1.19 | 17-Nov-14 | * |
| 1000 ct | Mylan | 00378615510 | * | $0.99 | 17-Nov-14 | * |

972.    In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Digoxin, which had experienced extraordinary price increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Digoxin was identified as experiencing an "extraordinary price increase."

973.    There were no legitimate justifications for these abrupt shifts in pricing conduct. There were no drug shortages or supply disruptions which would cause large price spikes.

974.    Defendants' pricing of Digoxin is the exact opposite of what one would expect to see in a competitive market, where the entry of new manufacturers brings the price down.  Instead, as a result of their collusion, Defendants' pricing for Digoxin in the United States increased as the number of "competitors" in the market grew.  Thus, the pricing of Digoxin mirrors Defendants' collusion on Glyburide, where Mylan, Heritage, and Mayne agreed to increase prices on the diabetes drug in advance of the entry into the market by Heritage and Mayne.

975.    In early 2015, Mylan re-entered the market and Defendants continued to adhere to their anticompetitive agreements on pricing.

976.    Upon information and belief, the price increases on Digoxin were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Digoxin in the United States.  As a result, Defendants have sold Digoxin at supracompetitive levels since October 2013.

977.    These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

978.    For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida.  This meeting was attended by representatives from  Defendants Mylan and Par.  *See* Ex. 1.

979.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  This meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

980.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

981.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.  Representatives from Mylan and Par attended this meeting.  *See* Ex. 1.

982.     On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

983.     On August 23-26, 2014, NACDS held its 2014 TSE at the Boston Convention Center in Boston, Massachusetts.  This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

984.     On February 16-18, 2015 the National Pharmacy Forum ("NPF") took place at the Marriott Waterside Hotel & Marina in Tampa, Florida.  The speaker topics included: "current pricing and spending trends;" "a critique of the rationale for high prices offered by manufacturers;" and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends."   The NPF was attended by representatives of Defendants Mylan and West-Ward.  *See* Ex. 1.

985.     On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida.  This meeting was attended by representatives from Defendants Mylan, Par, and West-Ward.  *See* Ex. 1.

986.   Defendants continued to regularly attend trade association meetings, conferences and events in 2015-16, including: (a) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (b) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (c) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (d) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (e) the February 8-10, 2016 NPF meeting in Scottsdale, Arizona; (f) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (g) the

April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (h) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (i) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

### RR.   Diphenoxylate Atropine

987.    Diphenoxylate Atropine, also known by the brand name Lomotil, is used to treat and prevent diarrhea.  During the period relevant to this Complaint, Mylan and Greenstone were the primary manufacturers of Diphenoxylate Atropine tablets.

988.    In April 2014, Mylan and Greenstone coordinated to impose substantial price increases on Diphenoxylate Atropine tablets of more than 100%.

989.    Senior sales executives from Mylan and Greenstone communicated directly with each other in furtherance of the conspiracy.  For example, ██████████ of Mylan (the National Account Director) communicated by phone with ██████████ of Greenstone (the Director of National Accounts), on April 3rd, 4th, 22nd, 28th and 29th.  Mylan announced its WAC price increases on April 17th.

990.    When Greenstone followed the increase on June 2, 2014, with pricing that exactly matched Mylan's, ██████████ of Greenstone again spoke to ██████████ of Mylan on June 24th.

991.    As a result of this collusion, Defendants charged supracompetitive pricing on Diphenoxylate Atropine tablets to Plaintiffs and others in the United States.

### SS.   Divalproex ER

992.    The market for Divalproex ER is mature, as generic versions of the drug have been available in the United States for almost a decade.  Valproate, the base compound in Divalproex

ER, has been in use for more than a century and is recognized as an essential medicine by the World Health Organization.

993.   In 1999, Abbot Laboratories received FDA approval to market Depakote ER, a branded version of the drug.   Depakote ER was a blockbuster drug that achieved nearly $1,000,000,000 in sales for Abbot.

994.   Between January and May of 2009, Mylan, Zydus, and Par (through Anchen Pharmaceuticals, its predecessor-in-interest) all received ANDAs authorizing them to market Divalproex ER as generic versions of Depakote ER.  Dr. Reddy's sells Divalproex ER pursuant to ANDAs approved by the FDA in March 2012.

995.   During the relevant time period, Defendants Mylan, Zydus, Dr. Reddy's and Par sold Divalproex ER to Plaintiffs and others in the United States  at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

996.   At all times relevant to this lawsuit there has been more than one manufacturer of Divalproex ER on the market.  Defendants Mylan, Zydus, Dr. Reddy's and Par dominate the market for Divalproex ER.

997.   Between 2009 and June 2013, Defendants' prices for Divalproex ER remained relatively stable.  However, in early July 2013, Defendants implemented in unison abrupt and substantial price increases on Divalproex ER.  For example, Defendants increased the price for a bottle of 500 pills at 250 mg strength from approximately $30 to more than $200 per bottle.  Bottles of 500 mg strength pills increased at even greater rates, increasing from approximately $130 per bottle to more than $1600 per bottle, an increase of more than 1100%.

998.   By way of example, with respect to WAC pricing, Mylan and Par set identical WAC prices within a couple weeks of each other in June 2013; and Dr. Reddy's and Zydus

matched those WACs in August 2013, around the time they each entered the market.  As noted below, the new WACs for 100 and 500 count bottles of 500 mg pills reflected increases of more than 300%:

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378047301 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 ct | Mylan | 00378047305 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 100 ct | Par | 10370051110 | $0.74 | $3.26 | 26-Jun-13 | 338% |
| 500 ct | Par | 10370051150 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 100 ct | Zydus | 68382031501 | * | $3.26 | 14-Aug-13 | * |
| 500 ct | Zydus | 68382031505 | * | $3.26 | 14-Aug-13 | * |
| 100 ct | Dr. Reddy's | 55111053401 | * | $3.26 | 19-Aug-13 | * |
| 500 ct | Dr. Reddy's | 55111053405 | * | $3.26 | 19-Aug-13 | * |

999.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Divalproex ER, which had experienced extraordinary price increases.  In response to a Congressional request from Senators Susan  Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Divalproex ER was identified as experiencing an "extraordinary price increase."

1000.    There are no legitimate justifications for the abrupt increases in 2013.  Divalproex ER was not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to the FDA.  Furthermore, the large price spike cannot be attributed to an increase in demand.  If anything, in defiance of rational economic behavior, demand for Divalproex ER was actually decreasing when prices were increasing.

1001.   Upon information and belief, the price increases on Divalproex ER were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Divalproex ER in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

1002.   For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland which was attended by representatives from Dr. Reddy's and Mylan.  *See* Ex. 1.

1003.   On February 20-22, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

1004.   On April 20-23, 2013, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Annual Meeting in Palm Beach, Florida.  *See* Ex. 1.

1005.   Shortly before Mylan's and Par's Divalproex ER prices increased, Dr. Reddy's, Mylan, Par, and Zydus, attended the HDMA 2013 BLC in Orlando, Florida on June 2-5, 2013. *See* Ex. 1.

1006.   On June 4-5, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.  *See* Ex. 1.

1007.   On August 10-13, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Total Store Expo in Las Vegas, Nevada.  *See* Ex. 1.

1008.   On October 28-30, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Fall Technical Conference in Bethesda, Maryland.  *See* Ex. 1.

1009.   On February 19-21, 2014 representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2014 GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

1010.   On April 26-29, 2014, NACDS held its 2014 Annual Meeting in Scottsdale, Arizona.  NACDS's 2014 Annual Meeting was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

1011.   On June 1-4, 2014, the HDMA held a BLC in Arizona.  This event was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

1012.   On June 3-4, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.  *See* Ex. 1.

1013.   On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center.  This Expo was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

1014.   On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.  *See* Ex. 1.

1015.   On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.  *See* Ex. 1.

1016.   On February 9-11, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Annual Meeting in Miami Beach, Florida.  *See* Ex. 1.

1017.   On June 9-10, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the GPhA CMC Workshop.  *See* Ex. 1.

1018.   On November 2-4, 2015, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the 2015 GPhA Fall Technical Conference in North Bethesda, Maryland.  *See* Ex. 1.

### TT.   **Doxycycline**

1019.   The Doxycycline market is mature, as generic Doxycycline – which includes generic versions of branded Doxycycline such as Vibramycin, Vibra-Tabs, and Monodox – has

been available in the United States since the mid-1980s in tablet and capsule form.  Doxycycline has been designated by the WHO as an essential medicine.  Doxy DR is the generic version of the branded acne medication, Doryx, for which Warner Chilcott received an NDA in May 2005. Although Doxy Hyclate and Doxy Mono are not bioequivalent drugs, doctors will often simply write a prescription for Doxycycline, which allows pharmacists to supply consumers with either Doxy Hyclate or Doxy Mono.

1020.  Although there were, at one point, approximately 20 manufacturers of Doxycycline, by early 2012, the primary manufacturers were Actavis, Par, Sun (including its subsidiaries Mutual and Caraco), and West-Ward (for Doxy Hyclate), and Heritage, Lannett, Mylan, and Par (for Doxy Mono).  In 2012, Mylan received authorization to market both Doxy Hyclate and Doxy DR.  Because Mylan was the first generic manufacturer to receive an ANDA for Doxy DR, it received 180 days of exclusivity as the sole authorized generic manufacturer, a benefit that expired in early 2013.  Mylan remained the only generic manufacturer of Doxy DR until Heritage and Mayne entered the market in 2013.  Historically, Doxy Mono cost more than Doxy Hyclate, and for that reason, Doxy Hyclate was the most commonly used version of Doxycycline.

1021.  Defendants Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun (including Mutual and Caraco), and West-Ward each sold at least one variation of Doxycycline to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1.  The Doxy Hyclate Collusive Price Increase

1022.  Although prices of Doxycycline had remained stable for several years, beginning in approximately November 2012, Defendants implemented an abrupt and substantial price

increase across all doses of Doxy Hyclate.  By May 2013, Defendants' prices for Doxy Hyclate increased on certain strengths by as much as 8,000%.  For example, in mid-January 2013, West-Ward and Sun raised prices for a bottle of 500 tablets of 100 mg strength Doxy Hyclate pills from an average of less than $25 per bottle to approximately $2,000 per bottle.

1023.    Upon information and belief, the agreement to increase prices on Doxy Hyclate was discussed at the GPhA meetings in October 2012 in Bethesda and February 2013 in Orlando.  The October 2012 meeting was attended by Actavis, Teva, Sun, and Mylan, in addition to the other conspiring Defendants identified in Exhibit 1.  The February 2013 meeting was attended by Actavis, Mylan, and Teva, in addition to the other conspiring Defendants identified in Exhibit 1.

1024.    By way of example, Defendants raised Doxycycline WACs on the 100 mg capsules to identical benchmark prices over a two-week period reflecting increases of more than 2,500%:

| Product 100 mg cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | West-Ward | 00143314250 | $0.10 | $4.43 | 21-Jan-13 | 4326% |
| 500 ct | West-Ward | 00143314205 | $0.10 | $4.43 | 21-Jan-13 | 4370% |
| 50 ct | Actavis | 00591544050 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591544005 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489011902 | $0.10 | $4.92 | 5-Feb-13 | 4847% |
| 500 ct | Sun | 53489011905 | $0.06 | $4.92 | 5-Feb-13 | 7844% |

1025.    In addition, Defendants increased WACs on the 100 mg tablets within a few days of each other, reflecting increases of more than 2,500%:

| Product 100 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | Actavis | 00591555350 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591555305 | $0.10 | $2.74 | 1-Feb-13 | 2663% |

| Product 100 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | Sun | 53489012002 | $0.09 | $4.92 | 5-Feb-13 | 5631% |
| 500 ct | Sun | 53489012005 | $0.08 | $4.92 | 5-Feb-13 | 6268% |

1026.   In May 2013, after the price increases had been implemented, Teva discontinued production of Doxy Hyclate – a product that it had manufactured for three decades.  This act was against Teva's individual self-interest (given that pricing for Doxy Hyclate had been raised by orders of magnitude above Defendants' marginal costs) and in furtherance of Defendants' conspiracy.

1027.   By April 2014, DAVA launched Doxy Hyclate pursuant to an exclusive supply and distribution agreement with Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals, LLC ("Chartwell").  Around this time, Endo was in discussions with DAVA to acquire it, which it did in August 2014.

1028.   Following DAVA's acquisition by Endo, Chartwell and Endo sued each other in New York state court for alleged failures to comply with the terms of the supply and distribution agreement for Doxycycline.[21]  Chartwell alleged that DAVA, DAVA's former President Aram Moezinia, and Endo (through its generics subsidiaries) were refusing to take delivery of Doxycycline shipments from Chartwell despite the fact that there was demand for Doxycycline in the market.  Because Endo (through its generics subsidiaries including DAVA) refused to accept the available Doxycycline supply, Chartwell attempted to rescind its agreement with DAVA in order to find other generic drug marketers, which Chartwell claims it was able to accomplish.

---

[21]   *See Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC,* Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

1029.   Chartwell recognized that its supply of Doxycycline provided an opportunity to "reduc[e] prices for consumers, all while earning significant profits."   But Endo (and, subsequently, Par) withheld Doxycycline supply from the U.S. market and priced its Doxycycline at the supracompetitive price of its co-conspirators.   Chartwell suggested a reason for Endo's economically irrational decision to withhold additional Doxycycline supply when there was ample demand in the market.   It accused Endo and its generic subsidiaries of engaging in an illegal price-fixing and market allocation scheme: "Having bought DAVA, Endo implemented its withhold-and-price-gouge scheme, did virtually nothing to sell the Chartwell Entities' Doxycycline, and, in collusion with its alleged 'competitors,' set Doxycycline's price at the *exact same* level its competitors were charging for the drug."   (Emphasis in original).   Chartwell further alleged that "DAVA and Moezinia dedicated efforts to *withhold* [Doxycycline] from the marketplace..., to keep the overall price of Doxy high."   (Emphasis in original).   For example, Chartwell cited an e-mail dated on or about July 11, 2014 where Moezinia e-mailed Chartwell and stated that DAVA's plan was to sell Doxycycline "slowly not to disturb pricing."   Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market.

1030.   Chartwell sought discovery of the materials that Par and Endo have produced to the DOJ and the States.   Notably, the regulators' inquiries to Endo have focused on at least three drugs that Endo acquired rights to via DAVA: Doxy Hyclate, doxazosin mesylate, and methotrexate sodium.   Chartwell and Endo settled their claims in November 2016.

### 2.   The Doxy Mono Collusive Price Increase

1031.   In February 2013, because the abrupt and substantial price increase on Doxy Hyclate led it to cost more than Doxy Mono, large purchasers of Doxycycline (such as Plaintiffs)

began to increase their purchases of Doxy Mono, so that they could supply their customers with the cheaper drug. In February and March of 2013, Heritage and Lannett recognized this opportunity to implement a substantial collusive price increase on Doxy Mono as well.

1032.   In February 2013, Heritage believed that demand for some Doxycycline products was increasing, and wanted to use this as a pretext to raise the prices of Doxy Mono. Accordingly, Heritage began reaching out to Lannett, Mylan, and Par to institute a price increase for Doxy Mono. These pricing discussions occurred at the same time as Heritage and Dr. Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, as discussed below.

1033.   Starting in March 2013, Heritage's ███████ began communicating with Lannett about pricing for Doxy Mono.

1034.   On March 7, 2013, ███████ spoke with a senior sales executive from Lannett, Tracy Sullivan by telephone for approximately fourteen minutes, and executives from both companies followed up on March 13, 2013, through e-mail and a five-minute phone call.

1035.   Throughout the next several months, ███████ and Sullivan communicated about Doxy Mono by phone, text message, and in person.

1036.   On April 25, 2013, ███████ and Sullivan spoke on the phone for more than eight minutes.

1037.   Heritage's ███████ and Lannett's Sullivan attended a conference together on May 14, 2013. At the conference, they discussed a possible price increase on Doxy Mono.

1038.   On June 4, 2013, ███████ called and texted with another Lannett employee, ███████ ███████, a Director of National Accounts at Lannett.

1039.   Upon information and belief, these communications resulted in an agreement between Heritage and Lannett to increase prices on Doxy Mono by approximately 400%.

1040.   However, before they could implement the price increase, Lannett and Heritage had to confirm that Mylan and Par were on board as well.  During a series of industry events in May and June, executives from all four companies met in person to discuss the Doxy Mono price increase.  Lannett agreed to lead the price increase on June 12, 2013, and communicated this intention to Mylan, Par, and Heritage.  For example, a Lannett executive, ████, met with a Heritage executive, ████, to discuss the price increase during a trade association event on June 4.  Sales executives from Mylan, ███████████, and Par, ████████████, spoke several times about the price increase by telephone on June 7, and on June 11, a Heritage executive, ████, and a Mylan executive, ████, spoke by phone, while Lannett's Sullivan and a Par's ████ communicated through at least nine text messages.  The following day, when Lannett announced the price increase, Lannett's Sullivan and Par's ████████ texted at least another nine times.

1041.   Upon information and belief, these communications by Mylan, Par, Lannett, and Heritage resulted in an agreement that each would follow Lannett's price increase of approximately 400% on Doxy Mono, which each Defendant did.  For example, Par provided instructions to its sales employees to begin implementing the price increase on August 13, 2013.  And upon information and belief, Mylan began announcing price increases on Doxy Mono to customers during Summer 2013 as well.

1042.   Although Heritage had supply chain issues for Doxy Mono for a brief period in 2013 (and had to delay the implementation of the price increase), these issues arose after Defendants had reached the agreement to increase prices.  By October 2013, Heritage began announcing the price increase on Doxy Mono and fully implemented the price increase by March 2014.

1043.   Additionally, during the period that it delayed announcing the price increase, Heritage continued to speak with Lannett, Mylan, and Par to ensure that it remained committed to the price increase, notwithstanding its delay in implementation.  For example, Heritage's █████ met with Par's ████████ and Lannett's Sullivan at a conference in August 2013, and Par, Mylan, Lannett, and Heritage continued to communicate about the pricing of Doxy Mono throughout the Summer of 2013.  Additionally, consistent with the overarching agreement that governed each Defendant's market share of each drug in the industry, Mylan, Heritage, and Par agreed to refrain from competing for any of Lannett's Doxy Mono business after Lannett led the price increase.

3.   Collusion on Doxy DR

1044.   With respect to Doxy DR, as the sole generic manufacturer of the drug for a period of time in 2012, Mylan was able to charge a supracompetitive price during the period of generic exclusivity.  (As explained in ¶ 119, the FDA estimates that, in a market with one generic manufacturer, the generic drug will typically sell at 94% of the branded drug.)

1045.   In April 2013, Malek and then-Heritage CEO Jeffrey Glazer traveled to India and met with two executives of Heritage's parent company, Defendant Emcure, to discuss, among other things, their plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition between them.  It was decided that Satish Mehta, the CEO of Emcure, would reach out first to a high-level counterpart at Mylan, Rajiv Malik, in order to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

1046.   Beginning in May 2013, Heritage reached out to Mylan for the purpose of colluding to allocate the Doxy DR market without disturbing the supracompetitive price.  On May 2, 2013, Malek of Heritage contacted a senior executive at Mylan through the social networking website LinkedIn, and on May 7 and 8, 2013, Glazer of Heritage spoke with Rajiv Malik senior executive

by e-mail and then by telephone, first writing: "Rajiv: Would like to schedule a time for a call to catch up and discuss some recent Heritage news.  Please let me know when you are available and we'll pencil it in."  Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

1047.   Upon information and belief, these discussions between Glazer and Malik – which were facilitated by Satish Mehta of Emcure – resulted in an agreement that Mylan would concede significant business in the Doxy DR market that accounted for approximately 30% of that market. Malik noted that Mylan was agreeing to concede this business to Heritage because Heritage had previously agreed to concede market share to Mylan for another generic drug.

1048.   In July 2013, Heritage began to sell Doxy DR to Plaintiffs and others in the United States subject to the terms of its unlawful agreement with Mylan.  Again, Satish Mehta of Emcure spoke with Rajiv Malik of Mylan on July 18, 2013, to coordinate Heritage's entry into the market. Following Mehta's entreaty, Glazer spoke with Malik again to finalize the details.  Following these calls between Mehta, Glazer, and Malik, Mylan arranged to put in a bid at Walgreens that it knew would be above Heritage's bid, so that Heritage could take this business and get its "fair share" of the market.

1049.   In January 2014, Mayne informed Heritage and Mylan that it planned to enter the Doxy DR market as well.  For example, a senior executive from Mayne spoke with a senior executive from Heritage on January 7, 2014, about making room for Mayne in the market allocation agreement between Heritage and Mylan.

1050.   Senior executives from Heritage, Mylan, and Mayne communicated frequently via e-mail, text, and phone about their collusive market allocation agreement throughout 2014.

Executives from Heritage and Mayne also met in person at the American Society of Health System Pharmacist's conference in Anaheim, California in December 2014.

1051.   Mayne, Emcure, Heritage, and Mylan continued to adhere to their collusive agreements.  For example, in May 2014, Heritage walked away from a large account so that Mayne could win the bid.  Similarly, in January 2015, Heritage submitted a bid to Econdisc, a group purchasing organization, which it knew would be above Mayne's bid, so that Mayne could win the Econdisc business.

1052.   As a result of their collusion, the price in the United States for Doxy DR has remained at elevated and supracompetitive levels since 2013, despite the entry of two additional generic manufacturers.  Indeed, whereas the FDA study mentioned in ¶ 117 would predict a market price of 44% of the branded price, Mylan, Emcure, Heritage, and Mayne, charged – and continue to charge – Plaintiffs the same or similar price that Mylan charged during its period of generic exclusivity.  Accordingly, Plaintiffs have paid, and continue to pay, substantial overcharges to Defendants on Doxy DR.

1053.   The market allocation agreement on Doxy DR and the price-fixing agreements on Doxy Hyclate and Doxy Mono still remain in force or effect (or both).

### UU.   Drospirenone and ethinyl estradiol (Ocella)

1054.   Drospirenone and ethinyl estradiol, commonly known by the brand name Ocella®, is a pair of drugs used in combination as an oral contraceptive.  This drug is also marketed under the brand names Yaz, Yasmin and Gianvi.

1055.   Barr Pharmaceuticals received approval to market generic Ocella in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi.

1056.   In late 2012, Lupin received approval to market a generic Ocella product.

1057.   By April 2013, Lupin was making plans for a summer 2013 entry into the market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between themselves.  On April 24, 2013, Berthold of Lupin called Green at Teva.  The two spoke for over three minutes. Berthold called Green two more times the following day.

1058.   The negotiations intensified the following week among Teva, Lupin, and a third competitor – Actavis.  In preparation, on April 29, 2013, ▮▮▮▮▮ of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers.  The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

1059.   The next day, April 30, ▮▮▮▮▮▮, a senior sales and marketing executive at Actavis, and ▮▮▮▮▮ of Teva spoke twice by phone.  That same day, Patel of Teva also called ▮▮▮.  On May 1, Patel sent ▮▮▮ four text messages.

1060.   The competitors' communications continued into early May.  On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two minutes.  Green and Berthold also spoke that same day.  On May 7, Patel and Berthold had yet another call, this one lasting over ten minutes.  Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

1061.   Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share.  Patel called Rogerson on May 8, and they spoke for nineteen minutes.  On May 9, Green spoke with Berthold twice, for one and twelve minutes, respectively.

1062.   The following day, Teva's ▮▮▮▮▮ complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin.  Armed with that analysis, Patel spoke to Berthold three times that afternoon

– with one call lasting over seventeen minutes.  Patel also called Rogerson at Actavis and the two spoke for more than five minutes.

1063.   On May 14, 2013, ██████ of Teva recommended to Rekenthaler that Teva concede the business to Actavis.  Rekenthaler replied simply: "██████."

1064.   On July 10, 2013, Green spoke to Berthold twice (for more than eight minutes and more than two minutes).  After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin:

> **From:** Kevin Green
> **Sent:** Wednesday, July 10, 2013 9:46 AM
> **To:**
> **Cc:** ██████; Nisha Patel02
> **Subject:** Ocella
>
> Tom,
>
> Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market.

1065.   Later that day, Green called and spoke to Patel for more than seven minutes, conveying what he had learned from Berthold.  During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin.  Patel called Berthold shortly after and the two spoke for more than four minutes.  They spoke again first thing the next morning, for nearly one minute.

1066.   The next day, Patel e-mailed Green, saying: "████████████████████ ████████████████████████████" Patel confirmed that she had indeed called her counterpart at Lupin: "████████████████."

1067.   Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty minutes.

1068.   On July 29, 2013, Green announced to his colleagues: "████████████████ ████████."

1069.   The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Ocella accounts.  On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share.  Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

1070.   On September 9, 2013, █████ of Teva sent an internal e-mail to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business.  He informed them that because Teva had secured two other significant customers, "█ █████████████████████████████████████████████."

1071.   In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, █████ sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement.  He told her to be careful before conceding large customers on a "████ ███" rather than drug-by-drug in order to "████████████████████████████████ ████████████████."

### VV.   **Econazole**

1072.   The market for Econazole is mature, as Econazole has been available in the United States for almost 20 years.  Defendants Taro and Fougera sell generic Econazole pursuant to ANDAs approved by the FDA in November 2002.  Perrigo sells Econazole pursuant to an ANDA approved in 2004.  Teligent sells Econazole pursuant to an ANDA it acquired in February 2013.

1073.   During the relevant time period, Defendants Sandoz/Fougera, Perrigo, Taro, and Teligent sold Econazole to purchasers throughout the United States.

1074.   At all times relevant to this lawsuit there has been more than one manufacturer of Econazole on the market.  Defendants sold Econazole to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1075.   Between 2009 and September 2013, Defendants' prices for Econazole remained relatively stable.  However, beginning in September 2013 and continuing thereafter, Defendants began implementing abrupt and substantial price increases on Econazole.

1076.   Between September 2013 and the Summer of 2014, Econazole, which had cost roughly 12 cents/unit shot up to more than four dollars/unit.

1077.   This skyrocketing price cannot be explained by supply shortages or other market events.  The only material change in the months preceding the price increases was Teligent's entry into the market.

1078.   On February 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC. During that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three Defendants had an opportunity to discuss Teligent's entry into the market.

1079.   During this same time period, Teligent also became interested in entering the market for other generic pharmaceuticals.  Teligent launched its first topical generic drug in late 2012, followed by its acquisition of the Econazole ANDA in February 2013.  By September 2013, Teligent had 12 ANDAs pending for FDA approval.  By June 20, 2014, that number had jumped to 17, with four additional ANDAs submitted under joint-development plans with other manufacturers and another five ANDAs planned for submission by the end of 2014.

1080.   When Teligent acquired the right to sell Econazole from Prasco LLC, it was the beginning of a publicly announced plan that would place Teligent in direct competition with Taro and Perrigo across numerous drugs.   Teligent now makes 20 topical drugs.   Seventeen of these drugs are also made by Taro; fifteen are made by Perrigo.

1081.   Teligent's entry into the Econazole market demonstrates a "fair share" agreement. Where a drug manufacturer, like Teligent, plans to enter a market with established manufacturers, and where the established manufacturers are competitors across multiple drugs, such a situation sets the groundwork for a "fair share" agreement.   Rather than allow the new entrant to drive the price of drugs lower, the incumbent manufacturers and the new entrant can "play nice in the sandbox" and keep prices high.   The conduct of Teligent, Perrigo, Fougera and Taro after Teligent entered the Econazole market is the result of a market allocation or "fair share" agreement among these Defendants.

1082.   Teligent launched Econazole under its own label in September 2013.   In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.   Teligent, however, announced a list price (WAC) increase in July 2013, even before its first sale of Econazole under its own label.   Rather than competing for market share by lowering prices, Teligent made the economically irrational decision to raise prices.   Upon information and belief, Teligent's conduct reflected an agreement with Perrigo, Fougera, and Taro that Teligent would enter with higher – rather than lower – prices in exchange for the incumbents' promise to cede market share to Teligent.

1083.   On October 28-30, 2013, right before Teligent's higher prices took effect in the marketplace, representatives from Perrigo, Taro, Fougera and Teligent, met at a GPhA conference where they had an opportunity to discuss Econazole market shares and pricing.   *See* Ex. 1.

1084.  By January 2014, Teligent's effective pricing for Econazole was more than double that of Perrigo and Taro.  Pursuant to their agreement, the incumbents also matched Teligent's high prices.

1085.  In February 2014, Perrigo began to increase its effective prices, and by March, Perrigo's effective prices had risen to the level of Teligent's prices.  Taro's prices remained relatively stable, but that changed after representatives from Perrigo, Teligent, and Taro, met at the June 3-4, 2014 GPhA meeting in Bethesda, Maryland.

1086.  Consistent with their price-fixing agreement, in mid to late 2014, Teligent, Perrigo, and Taro each implemented abrupt and substantial price increases on the Econazole products they sold to Plaintiffs and others in the United States in lockstep.

1087.  In June 2014, Perrigo began planning a price increase. On June 17, 2014, Boothe of Perrigo called a Taro employee – likely Perfetto – and they spoke for forty-five minutes.

1088.  One week later, on June 25, 2014, ███████, a sales executive at Taro, sent an internal e-mail stating that "████████████████████████████████████████ ████," and suggested bidding at Associated Pharmacies.  On July 8, 2014, Taro put together an offer for that customer.  With regard to Taro's pricing for the bid, Aprahamian stated: "████ █████████████████████████████████████████████."  Notably, the price of Econazole had not yet gone up – and would not do so for another several weeks.

1089.  On July 18 and July 19, 2014, Boothe of Perrigo and Perfetto of Taro exchanged three short calls.  The next business day, on July 21, 2014, the two competitors spoke for twenty-six minutes.  On July 22, 2014, ████ of Perrigo spoke with S.M., a sales executive at Teligent, for more than five minutes.  Three days later, on July 24, 2014, Boothe called Perfetto again.  The call lasted two minutes.  Perfetto returned the call and the two competitors spoke for seven minutes.

1090.   That same day, on July 24, 2014, Perrigo instituted a dramatic price increase for Econazole. Customers saw increases ranging from 637% to 735%.

1091.   That morning, Aprahamian notified his colleagues at Taro of the development.  He instructed them not to capitalize on any opportunities that might come Taro's way as a result of Perrigo's price increase, saying: "██████████████████████████████████████████ ██████████████████████████████."  Aprahamian further instructed his team to increase Taro's Econazole price to GPOs to $0.02 under its WAC price with just five days' notice for all such customers. "████████████████████████████████████████████ ██████████████████."

1092.   The next day, on July 25, 2014, ██████████████, a Taro sales executive, placed two calls to ██████████████ at Teligent. ████████ called ████████ again on August 12, 2014 and they spoke for nearly five minutes.  The next day, on August 13, 2014, Perfetto spoke with Boothe for eleven minutes.

1093.   The coordination among the competitors bore fruit quickly.  Just two weeks later, on September 1, 2014, Teligent increased its WAC prices for Econazole to match Perrigo.

1094.   Taro's price increases followed two months later, on November 18, 2014.

1095.   With respect to WAC pricing, Taro, Teligent, and Perrigo raised their WACs to identical prices, reflecting increases of more than 600%:

| Product CRM | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Perrigo | 45802046635 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 30 gm | Perrigo | 45802046611 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 85 gm | Perrigo | 45802046653 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 15 gm | Teligent | 52565002215 | $0.82 | $5.80 | 1-Sep-14 | 610% |
| 30 gm | Teligent | 52565002230 | $0.72 | $5.80 | 1-Sep-14 | 704% |

| Product CRM | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 85 gm | Teligent | 52565002285 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 15 gm | Taro | 51672130301 | $0.66 | $5.80 | 18-Nov-14 | 779% |
| 30 gm | Taro | 51672130302 | $0.59 | $5.80 | 18-Nov-14 | 890% |
| 85 gm | Taro | 51672130308 | $0.42 | $4.09 | 18-Nov-14 | 871% |

1096.   By May 2015, Sandoz was making plans to re-enter the Econazole market, attracted by the fact that the other players had instituted price increases.  CW-3 advocated a re-launch strategy that considered fair share principles as well as Sandoz's ongoing understanding with Perrigo.  He advised his colleagues: "███████████████████████████████████

███████████████████████████."

1097.   On October 1, 2015, a Sandoz launch executive e-mailed CW-3 seeking intel on current prices for various customer accounts in anticipation of the upcoming Econazole re-launch. Less than an hour later, CW-3 called ██████ at Perrigo and they spoke for twenty-seven minutes.

1098.   Later that day, CW-3 responded to his colleague's e-mail with details of Perrigo's pricing at Morris & Dickson.  Not wanting to put additional details about his conversation with Polman in writing, CW-3 copied CW-1, and wrote "██████████████████████████████

███████████████████████."

1099.   On November 30, 2015, Sandoz bid on the Econazole business at Morris & Dickson.  Perrigo, however, refused to cede the business to Sandoz because it had already given up one customer to the new entrant and was not inclined to hand over another.

1100.   Intent on working out a deal with the market share leader, CW-3 and ████████ of Perrigo exchanged four calls on December 16, 2015.  The next day, on December 17, 2015, Sandoz contacted Morris & Dickson and convinced the customer to consider a revised offer from Sandoz. This time, Perrigo ceded the customer to Sandoz.  Despite the fact that Perrigo initially fought

Sandoz on its attempt to take Perrigo's market share, Sandoz did not target accounts held by Teligent because this would not have been consistent with the fair share rules.

1101.   When Sandoz's re-launch of Econazole finally came to fruition in late 2015, it matched its competitors' increased WAC prices.

1102.   Upon information and belief, the Defendants further coordinated this collusion at numerous trade association meetings that each attended between 2013 and 2016.  *See* Ex. 1.

1103.   Additionally, a number of individuals with leadership roles at Teligent have ties to other Defendants that are implicated in the conspiracy.  For example, Jason Grenfell-Gardner joined Teligent as CEO in July 2012.  Prior to that time, he had served in a number of roles at West-Ward.  Damian Finio, who worked with Grenfell-Gardner at West-Ward, served briefly on Teligent's Board in 2014 before leaving that job to become the CFO of Heritage.  In 2018, he returned to Teligent and is now Teligent's CEO. Carole Ben-Maimon joined the Teligent Board in 2016.  She has held leadership positions at Impax, Par, and Teva. Narendra Borkar served on the Board of Teligent and is the former CEO of Aurobindo and Caraco (now part of Sun). Bhaskar Chaudhuri served on the Teligent Board and previously worked for Valeant and Mylan.

### WW.  **Enalapril Maleate**

1104.   Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec, is a drug used in the treatment of high blood pressure and congestive heart failure.

1105.   In 2009, Taro discontinued its sales of Enalapril under its own label and effectively exited the market.   It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

1106.   By mid-2013, the Enalapril market was shared by three players: Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%.  Those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

1107.   Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

1108.   In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel of Teva as well as ███████, a senior sales and marketing executive at Wockhardt, about Enalapril.  As a result of those conversations, Taro's plans changed.

1109.   On July 17, 2013 – the same day that Teva was taking steps to implement the price increase – Patel called Aprahamian and left a message.  He returned the call and the two spoke for almost fourteen minutes.  Then, on July 19, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril became effective – Aprahamian called ████ at Wockhardt on his office phone and left a message.  He then immediately called ████ cell phone, which ████ answered.  They spoke for nearly eleven minutes.

1110.   On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans:



From: Ara Aprahamian/US/TARO
To: ████████████████████
Cc: ██████████
Date: 07/19/2013 07:19 AM
Subject: Taro Enalapril

Currently if I'm not mistaken we only supply the government with Enalapril in TPLI label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

1 of 768

1111.  Aprahamian followed up with another e-mail shortly after, adding that Taro

"████████████████████████████████████████████████████████

████████████████████████."

1112.  In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

1113.  On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets.  Enalapril was one of the drugs for which, according to Patel, Teva was "███████," so she authorized the submission of a bid.  Prior to sending that e-mail, Patel had spoken to Aprahamian on July 30 (11 minute call) and July 31, 2013 (4 minute call).  Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

1114.  Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "█████

████████████████████████."

1115.  In early December 2013, Taro was fully ready to re-enter the Enalapril market.  On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, █████████, during conversations of two and eleven minutes.

1116.  On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and

20mg strengths.  At 4:30 p.m. that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

1117.   Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva.  On December 5, 2013, he and Patel spoke by phone for nearly five minutes.

1118.   Taro's fact sheet for the Enalapril re-launch generated on the day of Aprahamian's call with Teva showed a " █████████████ " of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

1119.   Taro began submitting offers on Enalapril the following day, December 6, 2013.  But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's █████ during a brief phone conversation that afternoon.  This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

1120.   Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market.  Aprahamian and █████ talked for ten minutes on December 11, and for seven minutes on December 12.

1121.   Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

1122.   Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both.  For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer.  This caused █████████ of Wockhardt to call Aprahamian on December 31, 2013, to discuss the situation.  During the call, █████ agreed that so long as

Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro. In an e-mail on January 2, 2014, ███████████ of Wockhardt conveyed the details to his colleagues:



From: ████████████
Sent: Thursday, January 2, 2014 10:20 AM
To: ████████████
Subject: RE: Competitive Offer for Enalapril

████

I spoke to ███ on NYE. Once we confirm we are keeping McKesson, let's yield MoDick. Call to discuss.

1123. By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril: "████████████████████████████████████." The same day she sent that e-mail – May 14, 2014 – Patel spoke to Aprahamian for more than four minutes, and exchanged eight text messages with him.

1124. By June 2014, Taro had obtained 25% market share for Enalapril in a 4-player market. Mylan and Teva each had approximately 28% market share.

1125. In January 2015, Aprahamian conducted a market analysis of Enalapril and noted that Teva might be leaving the market, but that Oceanside/Valeant would be "██████." In reality, Valeant had always sold a small amount of Enalapril, with a market share of less than 1%. But Valeant was able to get word to Aprahamian in January 2015 of its future plans, even though it did not ramp up production of the drug until December 2015. Leveraging Teva's exit from the market, the competitors allowed Valeant to take the share forfeited by Teva, and in December 2015, Valeant sold more Enalapril tablets than either Mylan or Taro, despite the fact that its market share

was less than 1% just a few months prior.  Additionally, Valeant was able to ramp up production substantially without disturbing price because it knew from its competitors which accounts to target.  Moreover, upon ramping up production, Valeant began charging prices that were higher than the other competitors.

1126.  Moreover, as discussed earlier with respect to Captopril, Mylan agreed to concede market share to Wockhardt for Enalapril after it exited the Captopril market, and as a result, Wockhardt received the largest market share on Enalapril.  Accordingly, as a result of the fair share conspiracy, Defendants were able to charge supracompetitive pricing on Enalapril tablets (and also other drugs).

## XX.  **Entecavir**

1127.  Entecavir, also known by the brand name Baraclude, is a medication used to treat chronic Hepatitis B.

1128.  As Teva was preparing to enter the market for Entecavir in August 2014, ████d, a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir "████," depending on when the FDA approved the drug.

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████ ."

1129.  On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: "████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████.”

1130.   The same day, August 28, 2014, Rekenthaler had three phone calls with ████

████, a senior national account executive at Par.  The two spoke two more times the next day, August 29, 2014.

1131.   On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva.  The employee inquired whether Teva might consider reducing its price as well.  Rekenthaler, after speaking with ████ at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "████████████████████████."  Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

1132.   Also on August 29, Rekenthaler e-mailed ████████ asking if she had received any feedback from CVS on Entecavir.  ████████ replied that she had not, and followed up later saying that ABC had indicated that it would sign Teva's offer letter.  Rekenthaler replied: "████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████.”

1133.   Teva and Par both launched their respective Entecavir products on September 4, 2014.  Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

1134.   Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

1135.   On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "█████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████.

1136.   The two-player market for Entecavir remained stable over time.  By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

### YY.   **Eplerenone Tablets**

1137.   Eplerenone, also known by the brand name Inspra, is an oral medication used alone or in combination with other medicines to treat high blood pressure by blocking a chemical (aldosterone) in the body that in turn lowers the amount of sodium and water the body retains.

1138.   As of spring 2014, Sandoz and Greenstone were the only generic manufacturers of Eplerenone Tablets.

1139.   As discussed above, while Greenstone was coordinating with Sandoz in April 2014 to follow Sandoz's price increases on various formulations of Clindamycin, it was also coordinating to lead a price increase on Eplerenone Tablets.

1140.   Originally, Greenstone planned its Eplerenone price increase to become effective on May 1, 2014, but sometime in mid-April that increase was delayed.  Shortly after the decision was made to delay the Eplerenone price increase, on April 22, 2014, Nailor of Greenstone called

Kellum and left a message.  They traded voicemails until they were able to speak the next day for nearly fifteen minutes.

1141.   Greenstone planned its increases of Clindamycin and Eplerenone together, as it was coordinating with Sandoz – and both increases ultimately became effective on June 2, 2014. Shortly before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six second voicemail.

1142.   Sandoz's intent was always to follow Greenstone's Eplerenone price increase, rather than compete for market share.  Sandoz began preparing to follow Greenstone's Eplerenone price increase in early July 2014.  However, because of price protection terms with several of Sandoz's customers, the company decided to delay the roll-out of its Eplerenone price increase (and several others) until it made more financial sense and Sandoz would be able to limit any contractual penalties that would arise as a result of the increase.

1143.   Ultimately, Sandoz followed Greenstone's price increase on Eplerenone on October 10, 2014. Sandoz increased its pricing by as much as 270% to certain customers.  During the time period after Greenstone's price increase and before Sandoz could follow, the two competitors continued to coordinate by phone, including a number of calls between Kellum and ███████ of Greenstone in August 2014.  Shortly after the Sandoz price increase became effective, on October 15, 2014, Kellum and Nailor of Greenstone also communicated briefly.

**ZZ.   Erythromycin Solution**

1144.   Erythromycin Base/Ethyl Alcohol Solution ("Erythromycin Solution") is a topical medication used to treat acne.

1145.   In the summer of 2011, Defendants Fougera and Wockhardt were the only two competitors in the market for Erythromycin Solution.  However, both manufacturers would

experience intermittent supply issues that would require their exit from the market for periods of time. Because of these supply problems, extensive coordination was necessary between competitors in order to maintain a stable market.

1146. Between May 17 and May 19, 2011, Perrigo discussed internally whether to re-enter the Erythromycin Solution market. The next day, May 20, 2011, ███████ of Perrigo called CW-6 of Fougera and they spoke for seven minutes. Immediately after that call, ████ called his supervisor, Wesolowski, and they spoke for three minutes. The following Monday, on May 23, 2011, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

1147. On August 5, 2011, CW-3 of Fougera e-mailed his supervisor, Kaczmarek, stating,



1148. Thereafter, on August 9, 2011, CW-6 of Fougera called ████████████, a Wockhardt sales executive, three times, including one call lasting ten minutes. Notably, these were the first phone calls ever between the two competitors according to available phone records. Indeed, CW-6 and ████ were not friends and did not socialize together. If they did speak, it was to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

1149. Over the next week, CW-6 exchanged several calls with ████ of Wockhardt and ████ of Perrigo, the prospective new entrant. Because ████████████ did not have an independent relationship, CW-6 acted as the go-between – relaying information between the two. After speaking with his competitors, CW-6 called his supervisor, Kaczmarek, to report back what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

1150.  On August 19, 2011, after the final call listed above, Fougera held an internal meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone calls with competitors.

1151.  On November 15, 2011, Wesolowski of Perrigo sent an internal e-mail to the Perrigo sales team, including to ████, stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011.  Wesolowski stated, "███████████████████ ████████████████████████████████████████."  Beginning that day, and over the next few days, ████ exchanged several calls with CW-6 of Fougera.  At the same time, CW-6 was speaking with ████ of Wockhardt.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:57:00 | 0:07:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 11:23:00 | 0:06:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:29:00 | 0:02:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:37:00 | 0:01:00 |
| 11/17/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 11:38:00 | 0:01:00 |

1152.  The next day, on November 18, 2011, ████████████, another Wockhardt sales executive, called CW-3 of Fougera.  The call lasted two minutes.  Later, CW-3 sent the following e-mail to his supervisor, Kaczmarek:

**From:** ▮▮▮▮▮▮▮
**Sent:** Friday, November 18, 2011 10:59 AM
**To:** Walt Kaczmarek
**Subject:** Erythromycin Topical Solution

Walt,

FYI. I heard from a customer that Perrigo is planning to launch Erythromycin Topical Solution in the next few weeks.

Thanks,
▮▮▮▮▮

1153.  It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing.  In response to CW-3's e-mail, Kaczmarek stated simply: "▮▮▮▮▮▮▮▮."

1154.  On November 30, 2011, ▮▮▮▮ of Wockhardt called CW-6 and they spoke for four minutes.  Later that same day, CW-6 sent the following e-mail to Kaczmarek regarding Erythromycin Solution:

-----Original Message-----
**From:** ▮▮▮▮▮▮▮
**Sent:** Wednesday, November 30, 2011 12:37 PM
**To:** Walt Kaczmarek
**Subject:** Erythromycin TS Intel

FYI....Wockhardt will be out of erythro TS 60 ml for 18 - 24 months starting in January.  That leaves only us and Perrigo.  Perrigo has not launched yet but is shooting for end of year.

1155.  Kaczmarek forwarded the e-mail along internally to ▮▮▮▮▮▮▮, a Fougera operations manager.  ▮▮▮▮ reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

1156.  A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher – indeed, approximately 200% higher – than the market WAC pricing at that time.

1157.  CW-6 of Fougera exchanged several calls with ▮▮▮▮ of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself.  On

these calls, the competitors discussed pricing and the allocation of market share to the new entrant, Perrigo.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

1158.   Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Fougera, Perrigo, and Wockhardt attended, including CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and ▓▓▓▓ of Wockhardt.

1159.   At that time, Fougera was readying to re-enter the Erythromycin Solution market. Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek e-mailed his sales team stating, "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓"  CW-3 responded with the following e-mail:

| | |
|---|---|
| **From:** | ▓▓▓▓▓▓▓▓ |
| **Sent:** | Monday, April 30, 2012 12:26 PM |
| **To:** | Walt Kaczmarek; ▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| **Subject:** | RE: erythromycin sol |

Heard that Wockhart will be discontinuing sometime soon due to API issues (re-qualify new API supplier with the FDA) and will be out of the market for quite a while.

1160.   Fougera's re-launch caused a flurry of communications among the three competitors on May 1 and May 2, 2013.  Following his consistent practice, CW-6 reported these conversations back to his boss, Kaczmarek.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

1161.   The next day, on May 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing.  That morning, Kaczmarek sent the following e-mail to his sales team:



1162.   That same day, CW-3 of Sandoz spoke with ▆▆ of Wockhardt for five minutes and called ▆▆▆▆, a sales executive at Perrigo.  Further, CW-6 called his contact at Perrigo, ▆▆, and the two competitors spoke for fifteen minutes.  Immediately after hanging up with ▆▆, CW-6 again called his supervisor, Kaczmarek, and they spoke for five minutes.

1163.   The following Monday, on May 7, 2012, Wesolowski of Perrigo sent the following e-mail regarding Erythromycin Solution to other Perrigo executives:



300

1164.   On that same day, Kaczmarek circulated a proposed customer pricing grid for Erythromycin Solution to the Fougera sales team.  Kaczmarek advised: "█████████████████████████████████████████████████████████████████████████████████████████████████████.""

1165.   Over the next several days, CW-3 and CW-6 exchanged calls with their respective contacts at Perrigo, Felix and ████.  As was his practice, after hanging up with ████, CW-6 immediately reported back to Kaczmarek what he had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

1166.   On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent the following internal e-mail to his sales team, lying about the source of his information to avoid putting evidence of illegal conduct into writing:



| | |
|--|--|
| From: | Walt Kaczmarek |
| Sent: | Monday, May 14, 2012 11:11 AM |
| To: | National_Accounts; ████████████ |
| Subject: | updated erythro sol strategy |
| Attachments: | erythro sol pricing grid_5.14.12.xlsx |

All:

As you may be aware, we have been receiving customer intel to suggest that Perrigo took the entire market upon the exit of Wockhardt.  As such, new price points attached as well as phase 1 accounts (highlighted in green).

1167.   Less than two months later, on June 7, 2012, Fougera recalled Erythromycin Solution and again placed the product on back order.  By that time, Fougera had approached and secured approximately 12% market share on the product, including several customers on its target list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

1168.   By August 2012, Fougera had resolved those supply issues. Around this same time, Sandoz had completed its acquisition of Fougera.  As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

1169.   After the Fougera acquisition was completed, CW-6 left the company for another position.  At some point before he left Fougera, CW-6 introduced CW-3 – who would be remaining at Sandoz after the acquisition – to ▮▮▮▮ at Perrigo.  This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent Sections of this Complaint.

1170.   The first ever phone calls between CW-3 and ▮▮▮▮, according to the available phone records, were on August 8, 2012.  They spoke two times that day.  The competitors spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

1171.   On September 5, 2012, ▮▮▮▮▮▮, a Sandoz sales executive, e-mailed CW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens.  Kellum responded, "▮▮▮▮▮▮▮."  On September 6, 2012, CW-3 called ▮▮▮ of Perrigo and they spoke for eleven minutes.

1172.   The next day, on September 7, 2012, CW-3 sent an internal e-mail including to CW-1, a Sandoz senior pricing executive, recommending that Sandoz target the same customers

that Fougera had targeted when it re-launched Erythromycin Solution in May 2012.  Not wanting to have a discussion in writing, CW-1 responded to CW-3 directly, stating, "█████████████

██."

1173.   On September 13, 2012, CW-3 called ██████ of Perrigo and they spoke for three minutes.  CW-3 hung up and called █████████, a senior sales and marketing executive at Sandoz.  The call lasted one minute.  Later that day, CW-3 called ████ of Wockhardt.  The call lasted one minute.

1174.   The following Monday, on September 17, 2012, CW-1 instructed CW-3 to put together offers for Cardinal and Wal-Mart and advised that they would be the only customers Sandoz would be bidding on at this time.  That same day, █████ of Wockhardt called CW-3 and they spoke for four minutes.

1175.   Between September 20 and September 21, 2012, CW-3 and █████ of Perrigo exchanged six calls, including two calls lasting eight minutes and seven minutes, respectively.  By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Wal-Mart to Sandoz.

**AAA.  Estradiol Tablets**

1176.   Estradiol is a form of estrogen that used to treat symptoms of menopause.  During the time period relevant to this Complaint, Actavis, Mylan, and Teva dominate the market for Estradiol tablets.

1177.   Estradiol was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekenthaler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July

2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ███████ of Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called Hill. Also, Rekenthaler spoke with ███████ of Actavis and ███████ of Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

**BBB.  Estradiol/Norethindrone Acetate Tablets (Mimvey)**

1178.  Estradiol/Norethindrone Acetate Tablets ("Mimvey") contains estrogen and progestin and is used to reduce the symptoms of menopause. During the time period relevant to this Complaint, Breckenridge and Teva dominate the market for Estradiol/Norethindrone Acetate tablets.

1179.  Estradiol/Norethindrone Acetate was one of eight drugs that Teva targeted for a price increase effective July 31, 2012. Prior to implementing the price increase for these drugs, Green and Rekenthaler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen. For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ███████ of Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called Hill. Also, Rekenthaler spoke with ███████ of Actavis and ███████ of Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

1180.  On November 14, 2013, Breckenridge increased its pricing on both Mimvey and Cyproheptadine HCL Tablets. For Cyproheptadine, Breckenridge increased its WAC pricing by

as high as 150%, and raised its customer contract pricing even higher – 400%.  The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1181.   In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with ███ at Breckenridge to coordinate the price increases.  The two spoke twice on October 14, 2013 and had a twenty-six minute call on October 24, 2013.  After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

1182.   Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter and refused to increase market share while it had a lower price than its competitors.

1183.   On April 4, 2014, Teva followed the Breckenridge price increases with a price increase on Mimvey across all its customer contracts.  In addition, Teva increased the WAC price on Mimvey by 26% to exactly match Breckenridge's WAC price.

**CCC.**  **Ethambutol HCL Tablets**

1184.   Ethambutol HCL Tablets ("Ethambutol"), also known by the brand name Myambutol, is a drug used to treat tuberculosis.  In 2012, G&W marketed the authorized generic of Ethambutol for the manufacturer, STI Pharma ("STI"), and Lupin, VersaPharm, and Teva sold the generic version.

1185.   By late 2012 and early 2013, however, both VersaPharm and Teva were experiencing supply issues on Ethambutol.  Viewing this as an opportunity, Lupin and G&W colluded to significantly raise price on the product while their competitors were out of the market.

1186.   In November and December 2012, Orlofski and Vogel-Baylor of G&W exchanged several calls with David Berthold of Lupin to discuss Ethambutol.  At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his discussions with G&W.

1187.   For example, on November 15, 2012, Orlofski exchanged at least eight text messages with Berthold.  The next day, on November 16, 2012, Orlofski and Berthold spoke for nearly twelve minutes.  Shortly thereafter, Berthold spoke three separate times with Green, with the calls lasting five minutes, ten minutes, and five minutes, respectively.

1188.   That same day, G&W reached out to several VersaPharm customers, including Econdisc, HealthTrust, and FW Kerr, to inquire whether they were interested in a new supplier for Ethambutol due to VersaPharm's supply issues.

1189.   Over the next month, Berthold would continue to exchange numerous calls and text messages with Vogel-Baylor and Orlofski during which they discussed a coordinated price increase on Ethambutol.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:29 | 0:00:00 |
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:33 | 0:00:00 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 12:55:26 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:24:13 | 0:07:55 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:31:57 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:57:55 | 0:03:11 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:34 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:36 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:04 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:08 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:15 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:19 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:46 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:48 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:28 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:33 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:44 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:45 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:03 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:08 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:21:48 | 0:00:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:22:36 | 0:00:03 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:57:26 | 0:00:00 |

1190.   On December 9, 2012, the day after the final call listed above, ███████████, a finance executive at Lupin, e-mailed Berthold at 3:41 p.m. stating: "███████████████ ██████████████████████████████████████████████████████████ ███████████." Three minutes later, at 3:44 p.m., Berthold called Orlofski.  The call lasted less than one minute.  The next day, on December 11, 2012, Berthold called Vogel-Baylor and they spoke for nearly six minutes.  A short time later, Orlofski sent a text message to Berthold and the two competitors exchanged two more calls that day, including one lasting nearly six minutes.

1191.   On December 17, 2012, ███████████, a Lupin sales executive, sent an internal e-mail including to Berthold, attaching the price increase letters for Ethambutol that Lupin planned to send on December 18, 2012.  Between December 17, 2012 and December 19, 2012, Berthold again exchanged several calls and text messages with Orlofski and Vogel-Baylor.  These are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/17/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:32:53 | 0:00:14 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:48:43 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:51:13 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:44 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:48 | 0:00:00 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 8:19:40 | 0:00:02 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:54:06 | 0:00:25 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 11:56:05 | 0:00:58 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:12:46 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 15:13:09 | 0:00:07 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:56:16 | 0:13:10 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 16:56:44 | 0:04:12 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:06:52 | 0:04:52 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:25:24 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:30:08 | 0:04:19 |

1192.   On January 2, 2013, Orlofski e-mailed Vogel-Baylor suggesting that they discuss the Ethambutol price increase during their meeting scheduled for the next day.  That same day,

Vogel-Baylor called Berthold and they spoke for eleven minutes.  Later that evening, Vogel-Baylor e-mailed Orlofski a price increase analysis for Ethambutol.

1193.   On January 14, 2013, another customer, Morris & Dickson, e-mailed Lupin asking for a bid on Ethambutol.  The customer explained that both VersaPharm and Teva were having supply issues.  That same day, Orlofski sent a text message to Berthold. Berthold also called Green of Teva and they spoke for nine minutes.

1194.   On January 28, 2013, the manufacturer of G&W's authorized generic, STI, e-mailed Vogel-Baylor to inform her that it would be shipping Ethambutol to G&W the following day stating: "███████████████████████████."  Vogel-Baylor then forwarded the e-mail to Orlofski as an "██████."  Later that day, Vogel-Baylor sent her Ethambutol price increase analysis to the sales team and asked them to draft letters to their customers advising them of the increases.  The next day, on January 29, 2014, Orlofski sent a text message to Berthold and Berthold spoke two times with Green of Teva by phone, with calls lasting three minutes and more than five minutes, respectively.

1195.   On January 31, 2013, Vogel-Baylor called Berthold and they spoke for three minutes.  The next day, on February 1, 2013, Vogel-Baylor called Berthold again. Berthold returned the call and they spoke for five minutes.  The following Monday, on February 4, 2013, Vogel-Baylor e-mailed Orlofski to inform him that G&W planned to send the Ethambutol price increase letters on February 7, 2013 and would call customers in advance to advise that they would be coming.

1196.   Consistent with the plan, on February 6, 2013, G&W reached out to its customers to advise them of the Ethambutol increases.  As Vogel-Baylor explained in her e-mail to Wal-

Mart: "███████████████████████████████████████████

████████████████████████████████████████."

1197.   Berthold continued to communicate with Orlofski and Vogel-Baylor over the next several weeks.  For example, on February 19, 2013, Vogel-Baylor and Berthold had a joint dinner with representatives from two customers – ABC and Plaintiff Kroger.

1198.   On April 1, 2013, STI began notifying customers that it was terminating its relationship with G&W regarding Ethambutol.  STI advised that it would be taking over the marketing and distribution of the product effective April 15, 2013.  Between April 2, 2013 and April 15, 2013, Berthold exchanged several calls with Orlofski and Vogel-Baylor.  The calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 10:38:29 | 0:00:03 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 10:38:57 | 0:03:49 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:48:27 | 0:00:07 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:19 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:18 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 20:47:56 | 0:00:04 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:04:58 | 0:03:24 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:24:05 | 0:00:08 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:24:29 | 0:02:27 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:33:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:35:51 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:48:32 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:49:08 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:49:40 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:50:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:50:42 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:51:24 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:37:55 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:38:21 | 0:00:00 |

1199.   Notably, after April 15, 2013, the date of the last two text messages listed above, Berthold and Vogel-Baylor would never communicate by phone again, according to the phone records available to the Plaintiffs.

### DDD.  **Ethinyl Estradiol and Levonorgestrel**

1200.  Ethinyl estradiol and levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy.  During the relevant time period, both Teva and Sandoz marketed ethinyl estradiol and levonorgestrel under multiple names – including both Portia and Jolessa.

1201.  In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

1202.  On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████"  The customer responded that it was Sandoz. █████ had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that: "██████████████████████████████████████████████████ ██████████████████████████████."

1203.  After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer.  The night before this change in plans, on May 22, Green of Teva spoke on the phone with CW-2, then at Sandoz, for five minutes, and agreed to withdraw the offer for Portia and Jolessa.  The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa.  Teva discussed the decision internally and explained that the reason for the "████████████████████████████████████████████████."

1204.   Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa.  On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its "███████."  On July 9, 2013, CW-1 of Sandoz called Patel and left a voicemail. Shortly thereafter, they connected for a sixteen minute call.  On July 10, Teva learned that the challenger was Sandoz.  At 12:16 p.m., Rekenthaler forwarded an e-mail to Patel and posed the question: "████████████████?"  Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with CW-1 directly to Rekenthaler.

1205.   Rekenthaler then called CW-2 at Sandoz at 1:26 p.m. that same day and they spoke for two minutes.  CW-2 called Rekenthaler back a few minutes later and they spoke for nine minutes.  CW-2 and Rekenthaler would speak once more later that day, at 4:48 p.m., for seven minutes.  Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as "████████████" for their primary supply.  Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

**EEE.  Etodolac**

1206.   Etodolac, also known by the brand name Lodine, is a medication known as a non-steroidal anti-inflammatory drug (NSAID).  It is used to reduce pain, swelling and joint stiffness from arthritis.  It works by blocking the body's production of certain natural substances that cause inflammation. An extended release version of Etodolac – Etodolac ER –also known by the brand name Lodine XL, is also available.

1207.   Apotex, Taro, Teva and Sandoz dominated the market for Etodolac tablets; Teva, Taro, and Zydus dominated the market for Etodolac ER tablets; and Apotex, Teva, and Taro dominated the market for Etodolac capsules.

1208.   In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in 2000) was planning to re-enter the market for the drug while Teva was planning to exit the market.  Although the number of competitors in the market would remain the same, Apotex and Taro were able to coordinate a large price increase due to the overarching fair share Agreement.

1209.   As a result of this coordination, Taro was able to lead a price increase that more than tripled its previous price for Etodolac capsules from early 2012, while Apotex was able to enter the market at the higher price and gain its "fair share."  As a result, between May and August of 2012, Taro and Apotex were able to coordinate to increase prices by more 200%.

1210.   This coordination paved the way for a subsequent price increase on the tablet formulations of the drug.  One year later, when Patel first began planning for "███████" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases.  For example, when she circulated a long list of potential "██████" increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

1211.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

1212.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for sixteen minutes.  Aprahamian called CW-3 back the next day and the two spoke again for eight minutes.  After hanging up the phone with CW-3,

Aprahamian immediately called Patel.  They exchanged voicemails until they were able to connect later in the day for nearly fourteen minutes.  On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten minutes.

1213.   During this flurry of phone calls, Defendants Sandoz, Taro and Teva agreed to raise prices for both Etodolac tablets and Etodolac ER.

1214.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac tablets and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
|---|---|
| Etodolac ER | Could follow IR (Shared with Taro) |

1215.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac tablets, and that Taro would follow suit and raise its price for Etodolac ER.  During those conversations, Teva agreed to follow both price increases.

1216.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac tablets.  Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen minutes that day.  During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac tablets. Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three minutes.

1217.   The Sandoz price increase for Etodolac tablets became effective on July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg

Tablets.  After learning of the request, Aprahamian responded swiftly internally: "███████
███████████████████████████████████████████████████."

1218.   When Taro received another request on July 30 from a large wholesale customer
for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | ████████████████████████████████████ |
| **CC:** | |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

1219.   Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor
████████, Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR
(immediate release).  She instructed them to "███████████████████████████████████████
██████████████████████████████████████████████."

1220.   Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac
tablet and Etodolac ER price increases (among other things).  Between July 29 and August 2, 2013,
for example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian
at Taro:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

1221. Aprahamian was also speaking to his contact at Sandoz – CW-3 – during this time, including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

1222. On August 1, 2013 - shortly after speaking with Patel – Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac tablets and Etodolac ER. Aprahamian stated: "█████████████████████████████████████████████████ █████████████████████████████████████████████."

1223. By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac tablets and Etodolac ER. The minutes from a Teva "████████ ███" meeting on August 5, 2013 – which Patel attended – reflect the following:

4. Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week. CIM still monitoring to 100% forecast for all customers.

1224. When Patel sent the "███████████████████" spreadsheet to her supervisor ████████ on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac tablets and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "█ ███." ███████ quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1225. Teva and Taro raised prices for Etodolac tablets and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were

315

increased to the exact same price points.  The increases were substantial.  For Etodolac tablets, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

1226.  This substantial price increase resulted in Zydus entering the market for Etodolac ER, which should have led to price competition.  Instead, Teva and Taro willingly gave up customers to Zydus so that it could get its "fair share" of the market.  For example, Nisha Patel, Ara Aprahamian, and Kevin Green discussed a plan to cede a large wholesale client to Zydus in May 2014, and Teva then ceded a second customer to Zydus a few months later.  Some of these conversations are reflected in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

1227.  Defendants continued to allocate the market.  On May 14, 2014, Anda, a wholesaler customer of Teva, notified Teva that Zydus had submitted a bid for its Etodolac ER business.  That same day, Patel exchanged eight text messages and had a four minute call with Aprahamian.  The next day, on May 15, 2014, Green called Patel and they spoke for twenty minutes.

1228.  On May 20, 2014, Green called Patel and they spoke for four minutes.  That same day, ▓▓▓▓▓▓, a senior sales executive at Zydus, also exchanged two text messages and had a

39-second call with Maureen Cavanaugh of Teva. The next day – May 21, 2014 – Green called Patel again and they spoke for twenty-eight minutes. That same day, ████ of Zydus and Cavanaugh of Teva exchanged four text messages.

1229. The next day, on May 22, 2014, ████████, Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Patel, stating: "██████



██████████████████████████████████████████████." Patel responded: "████

███████."

1230. Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Aprahamian at Taro for fourteen minutes.

1231. On July 2, 2014, Patel called Green and left a four-second voicemail. The next day, on July 3, 2014, Patel sent an internal e-mail advising that: "████████████." Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

1232. When Patel's supervisor, ████████, learned that Teva had lost the Econdisc business, he sent an internal e-mail asking "████████████████?" Patel responded: "████████████████████████████████████."

### FFF.   Fenofibrate

1233. Fenofibrate – also known by brand names such as Tricor – is a medication used to treat cholesterol conditions by lowering "bad" cholesterol and fats (such as LDL and triglycerides) and raising "good" cholesterol (HDL) in the blood.

1234.   By the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

1235.   Based on the fair share agreement, between late 2012 and March 2014, three new competitors entered the Fenofibrate market – Mylan, Perrigo, and Zydus.  Consistent with the conspiracy, when each competitor entered, the existing manufacturers coordinated to cede market share to the new entrant.

1236.   On February 27, 2013, ███████████, a senior marketing executive at Teva, e-mailed multiple Teva colleagues asking them to provide "█████████████████████████████ ███████████████████████████████████████████."  Specifically, ████████ was seeking "█████████████████████" on Mylan's potential entry to the market.  In order to get this information, Green called Mylan's Vice President of National Accounts, Jim Nesta.  Over the course of that day, Green and Nesta spoke at least four different times.  That same day, Green reported back to ████████ and other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

1237.   A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate.  In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate.  On May 8, 2013, Green e-mailed his colleagues at Teva that "████████ ███████████████████████████████████."  To assist in Teva's efforts to allocate the Fenofibrate market, Green asked a colleague for the "████████████████████."  This request for information was reiterated – and its purpose made clear – the following day when ████████████ sent an internal e-mail stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets

"█████████████" and that he needed Teva's Fenofibrate sales and profitability information

"█████████████████████████" to Mylan.

1238.   Up to this point, executives for Teva, Mylan, and Lupin had all been in regular

contact by phone.  These calls include at least those listed below.  On these calls, Teva, Mylan,

and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate

market share to Mylan.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

1239.   In one striking example of the coordination between the three companies, Nesta

called Green at 2:42 p.m. on May 7 and they spoke for more than eleven minutes.  Immediately

after hanging up the phone – at 2:54 p.m. – Nesta called Berthold and spoke for nearly three

minutes.

1240.   On May 10, 2013, ████████ received the Teva sales and profitability information

he requested.  After having the information for barely a half hour, and before there was even a

formal price challenge by Mylan at any of Teva's customers, ████████ concluded that "████████

█████████████████████████████████████████████."  By conceding

Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross

profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Patel, who had been at Teva for only two weeks at that point, said she "███████ ████████████████████████████████████████████████████." The logic, of course, was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

1241.  Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

1242.  Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "████████████████████████████████████████████████ ████████████████████."

1243.  Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

1244.   In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, Berthold, and Perrigo's ▮▮▮ ▮▮▮ to share pricing information and allocate market share to his new employer, Zydus.

1245.   On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, ▮▮▮, Senior Director, Marketing Operations, for a meeting to discuss "▮▮▮ ▮▮▮▮▮▮▮▮▮▮" on February 24, 2014.  One discussion item was Zydus's anticipated entry into the Fenofibrate market.  Notably, Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

1246.   In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven minutes and nearly nine minutes, respectively; one call on February 21 lasting twenty-five minutes; and a call on February 24 lasting nearly eight minutes.

1247.   On or about March 7, 2014, Defendant Zydus entered the Fenofibrate market at WAC pricing that matched Defendants Teva, Mylan, and Lupin.   In the days leading up to the launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.   Indeed, between March 3 and March 7, these competitors exchanged at least 26 calls with each other.   These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

1248.   During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six minutes and just over five minutes.   During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.   A half an hour after the second call, Patel e-mailed her supervisor, ██████████████████████ for several products on which Teva overlapped with Zydus – including Fenofibrate.   With respect

to Fenofibrate, Patel recommended "███████████████." Later that same day, Patel called Green again and they spoke for more than eleven minutes.

1249.   In the months that followed, Teva "███████████████" several customers to Zydus in accordance with the agreement they had reached.

1250.   For example, on Friday March 21, 2014, ███████████, a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "███████████████."

1251.   That morning, Patel sent a calendar invite to Rekenthaler and to ████████ scheduling a meeting to discuss "███████████████." One item on the agenda was "███████████████████."

1252.   The following Monday – March 24, 2014 – Patel sent internal e-mails directing that Teva "██████" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "███████████" to a third customer, NC Mutual, but stated that Teva should "███████ ███████████████." That same day, Patel called Green and they spoke for more than fourteen minutes. She also spoke with Berthold of Lupin for nearly twelve minutes.

1253.   In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, 2014, Patel e-mailed Rekenthaler stating: "████████████████████████ ███████████." Patel then sent an internal e-mail directing that Teva "██████" the Ahold business. Later that day, Patel called Green. He returned the call and they spoke for nearly eight minutes. Patel also called Berthold of Lupin and they spoke for five minutes.

1254.   On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, ████████,

and explained "███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████."

     1255.   ███████ agreed with the approach and on May 15, 2014, Patel sent an internal e-mail directing that Teva reduce its price to Walgreens, but explained that "██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████." Later that day, Green called Patel and they spoke for twenty minutes.

     1256.   On June 2, 2014, Green called Patel and they spoke for nearly six minutes.  He also called Rekenthaler, and they spoke for two minutes.  Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

     1257.   On June 10, 2014, ██████████████, Senior Analyst, Strategic Support at Teva e-mailed ███████████, Director of National Accounts, stating: "████████████

███████████████████████████████████ forwarded the e-mail to

███████, copying Patel and Rekenthaler, asking to "██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ responded that Anda would maintain Teva on secondary and award the primary

position to Zydus.  Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

1258.   The next day, on June 11, 2014, Green called Rekenthaler and they spoke for eight minutes. Later that day, Patel called Green.  He returned the call and they spoke for nearly fifteen minutes.

**GGG.  Fluocinolone Acetonide**

1259.   Fluocinolone Acetonide ("Fluocinolone") is a steroid that reduces inflammation. In its topical formulations (cream – 0.025%, 0.01% and ointment – 0.025%), it is prescribed for the treatment of skin conditions such as eczema and psoriasis.

1260.   In early 2011, Fougera had 100% share of the market for these products and was making plans to implement a price increase.

1261.   At an October 3, 2011 meeting of the Fougera Pricing Committee, members discussed their confidence that they were nearly ready to execute the planned increase.  Moreover, they discussed the possibility that Fougera could use the impending entry of a competitor into the Fluocinolone market to ensure the success of the price hike, saying: "████████████████████ ████████████████████████████████████████████████."

1262.   The market intelligence that the Fougera Pricing Committee had when it convened was the result of at least a week's worth of preparatory conversations that CW-6 had in late September 2011 with the entering competitor – G&W.  Between September 20, 2011 and September 27, 2011, CW-6 and Grauso at G&W exchanged five phone calls, speaking for a total of forty-six minutes.

1263.   The conversations between CW-6 and Grauso continued at a vigorous pace over the coming weeks as Fougera moved towards its price increase, and G&W planned for its launch. The two exchanged sixteen calls during October and November 2011:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 11:10:00 | 0:06:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 12:10:00 | 0:01:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 13:08:00 | 0:14:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:22:00 | 0:01:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:53:00 | 0:01:00 |
| 10/11/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:39:00 | 0:02:00 |
| 10/31/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:01:00 | 0:06:00 |
| 11/2/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:49:00 | 0:10:00 |
| 11/9/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:01:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:29:00 | 0:02:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 5:56:00 | 0:07:00 |
| 11/11/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:55:00 | 0:04:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:37:00 | 0:02:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:54:00 | 0:11:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 15:04:00 | 0:04:00 |
| 11/21/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 8:37:00 | 0:05:00 |



1264.   On the morning of December 14, 2011, Fougera learned that G&W had launched Fluocinolone the preceding day and, importantly, that it had done so at nearly the same pricing as Fougera's current (pre-increase) price.

1265.   ███████████, a senior executive at Fougera, was quite displeased with the development considering Fougera's impending price increase, saying: "███████████ ███████████████████████████████████████████ ███████████."

1266.   Less than a half hour later, Kaczmarek called CW-6. The call lasted two minutes. Immediately after hanging up, CW-6 placed a call to Grauso. They spoke for six minutes. Later that day, the competitors exchanged two more calls lasting nine minutes and eighteen minutes, respectively.

1267.   Having received some peace of mind from the conversations between CW-6 and Grauso, ▮▮▮ of Fougera sent an internal e-mail recommending that Fougera move forward with the planned price increase on Fluocinolone, adding "▮▮▮▮▮▮▮."

1268.   To solidify the plan, CW-6 and Grauso placed three more calls to each other that afternoon.  Less than an hour after his final call with CW-6, Grauso initiated the first of three calls to his superior, Orlofski, to update him on the Fluocinolone discussions with Fougera.  CW-6 also called to update his supervisor, Kaczmarek.

1269.   Six more calls followed between CW-6 and Grauso in the days that followed between December 15, 2011 and December 21, 2011.

1270.   At the conclusion of that series of calls, on December 22, 2011, Fougera increased WAC pricing on Fluocinolone Cream and Ointment by 200%.

1271.   Fougera knew from its discussions with G&W that G&W would follow the price increase.  On the morning of December 28, 2011, ▮▮▮ of Fougera instructed a co-worker to find out whether G&W had followed Fougera's price increase yet.  The co-worker reported that the competitor had not.

1272.   Shortly before noon that day, CW-6 and Grauso had a twenty minute phone conversation.  Immediately after that call ended, Grauso called his colleague at G&W, Vogel-Baylor.

1273.   Less than a week later, on January 3, 2012, G&W followed through with its assurances to Fougera, increasing WAC prices on Fluocinolone Cream and Ointment to within pennies of Fougera's prices.  ▮▮▮ was delighted by the news and agreed with a colleague's suggestion that Fougera would "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

1274.   Fougera was satisfied with G&W's compliance and promptly gave up its Wal-Mart business to G&W, quoting intentionally high prices on this drug to allow the rival to "████████ ███." Specifically, Kaczmarek recommended giving G&W 30-35% share of the market, adding "██████████████████████████████████."

1275.   In early February 2012, the two companies continued to collaborate on allocating the market between themselves to give the new entrant its fair share.  CW-6 called Orlofski on the morning of February 1, 2012, because his regular contact at G&W – Grauso – had left the company for employment at Aurobindo a few weeks earlier.  Less than one hour later, Orlofski called CW-6 back.  On February 8, 2012, Orlofski called Kaczmarek. Kaczmarek called Orlofski back on February 9, 2012, and the competitors exchanged two more calls the following day, including one call lasting over twenty-five minutes.

1276.   At the conclusion of these communications, on February 14, 2012, Fougera ceded another large customer to G&W, telling Cardinal that it would "██████████████████ ████."

1277.   In late 2012, Sandoz (having recently acquired Fougera) learned that Teligent was planning to enter the market. In advance of Teligent's entry, Sandoz raised its WAC prices again, and also made plans to concede to Teligent its fair share of the market.  For example, when Ahold sought to negotiate lower pricing from Sandoz based on Teligent's entry on March 6, 2013, CW-1 of Sandoz notified others internally that Sandoz "██████████████████████ ██████████████████████████████." In exchange for Sandoz and G&W conceding market share, Teligent agreed to match the WAC price increases announced by Sandoz and G&W on each formulation.

1278.   Upon information and belief, the Defendants coordinated these price increases with Teligent by phone and also at the trade association events identified in Ex. 1.  For example, Erika Vogel-Baylor of G&W spoke with ████████████ (Teligent's CEO) and ██████ ████████ (Teligent's Director of National Accounts) several times each between November 2013 and May 2014, in order to coordinate Teligent's fair share allocation and also Teligent's entry into the market for Fluocinolone cream (which it did in early 2014).

1279.   Additionally, when Taro entered the market for Fluocinolone in 2015, it did so at the prices set by Sandoz, G&W, and Teligent, and in return, Taro received its fair share of the market from the existing competitors.

**HHH. <u>Fluocinonide</u>**

1280.   Fluocinonide, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatological drugs in the United States.

1281.   There are several different formulations of Fluocinonide including, among others: Fluocinonide cream, Fluocinonide gel and Fluocinonide ointment.

1282.   On January 14, 2014, Perrigo launched Fluocinonide .1% as the first-to-file generic, giving it 180 days of exclusivity against all other generic competitors, except for the authorized generic.  Two weeks later, on January 31, 2014, Valeant launched the AG of Fluocinonide .1% and published WAC pricing that matched Perrigo.

1283.   When Valeant entered the market, the company submitted a bid to Publix for Fluocinonide .1%.  After consultation with ██████, a sales executive at Perrigo, and Wesolowski, a senior Perrigo executive, the company decided to "play fair" and gave up the business to Valeant.

1284.   On June 25, 2014, Taro submitted an offer to Publix, a Valeant customer, for Fluocinonide .1%.   On June 30, 2014, Publix e-mailed Valeant asking whether the company wanted to bid to retain the business. ████████████ a sales executive at Valeant, forwarded the request along internally stating that he had spoken with his contact at Publix who told him that Taro "████████████████████████████████████████

████████████████████████████████████████

████████████████████████████." After discussing the issue internally, ████████████, a marketing executive at Valeant, responded with his agreement to act in accordance with the larger fair share understanding among the Defendants: "████████████████████████████

████████████." Thereafter, on July 7, 2014, Publix awarded the business to Taro.

1285.   Around this same time, Glenmark entered the market for 0.1% Fluocinonide.   In the days leading up to Taro's and Glenmark's Fluocinonide .1% launch, Aprahamian of Taro and Grauso of Glenmark exchanged several calls, including two calls on July 14, 2014 – the day that both competitors launched the product.   These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/1/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:33:00 | 0:18:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 6:11:00 | 0:07:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 6:21:00 | 0:01:00 |
| 7/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 11:55:00 | 0:06:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:26:00 | 0:01:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 13:31:00 | 0:02:00 |

1286.   On July 14, 2014, Taro and Glenmark published WAC pricing that essentially matched each other.   Prior to their entry, the generic market was evenly split between Perrigo (with 56%) and Valeant (with 44%).   Through the end of July 2014, the competitors continued to talk with each other.   Aprahamian and Perfetto of Taro exchanged several calls with Grauso of Glenmark and Perfetto exchanged several calls with Boothe of Perrigo.   During this time, and in

accordance with fair share principles, Perrigo and Valeant both ceded several accounts to the new entrants, Taro and Glenmark.

1287.  For example, on July 14, 2014, Meijer, a Perrigo customer, e-mailed Glenmark to advise that it was interested in receiving an offer for Fluocinonide .1%. Jeffrey Johnson, a sales executive at Glenmark, forwarded the e-mail to his colleague Jim Brown, a senior sales executive at Glenmark, who responded: "███████████████████████████████████████████████████ ██████████████████████████████."

1288.  Over the next several days, Glenmark secured awards for Fluocinonide .1% at Econdisc, a Valeant customer, and Rite Aid and ABC, both Perrigo customers. With respect to ABC, when ███████████, a Glenmark sales executive, received the customer's acceptance she forwarded it along internally, stating, "██████████████████████████████████████████████████ ██████████████████."

1289.  After securing these accounts, ██████ of Glenmark followed up with his colleague ██████ regarding Meijer, asking "████████████████████████████████████████████████ █████████████████████████?"  Brown replied to Johnson's e-mail stating "████████ █████████████████████████████████████████."

1290.  With respect of 0.05% formulations of the drug, Teva and Taro had divided the market evenly under fair share principles prior to Sandoz's entry in early 2013. On March 2, 2013, CW-3 and ██████ exchanged three text messages. That same day, ██████████████████, a Taro sales executive, forwarded the customer request along internally and attached a spreadsheet indicating that McKesson was Taro's largest customer and including the notation: "██████████████ ████████████████████."

1291.  On March 5, 2013, ████████████ confirmed that Taro supplied ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████." After confirming that Taro was primary on all three,

████████████████████████████████████████████████████████████

████████████████████████████████████."

1292.  Looking for a creative way to communicate with Sandoz that Taro would rather it approach ABC or Cardinal instead of McKesson, Perfetto reached out to his former colleague at Actavis, Aprahamian (who would not leave for Taro for a few more weeks), who he knew had a relationship with CW-3 at Sandoz. Perfetto asked Aprahamian to speak with CW-3 about Fluocinonide Ointment. The two exchanged calls, and Aprahamian reported back to Perfetto what they discussed. In accordance with the agreement between the two competitors brokered by Aprahamian (still with Actavis), Sandoz bid on Fluocinonide Ointment at ABC and Taro promptly conceded the business.

1293.  On June 11, 2014, Teva identified the market-share breakdown the formulations of the drug that it manufactured as follows:



| Product Description | Teva Market Share | Market Data |
|---|---|---|
| FLUOCINONIDE CREAM 0.05% 15GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 30GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 60GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM-E 0.05% 15GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 30GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 60GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE GEL 0.05% 60GM | 26.0% | Taro 61.7% |
| FLUOCINONIDE OINTMENT 0.05% 15GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 30GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 60GM | 53.8% | Taro 37.7%; Sandoz 8.5% |

1294.  As discussed above, Teva coordinated with Taro and Sandoz to increase the price of all four of those formulations of Fluocinonide in July 2013, based in part on discussions that

started between Patel and Aprahamian even before Patel started her employment at Teva. The increases to the WAC prices in 2013 were a modest 10-17%, depending on the formulation.

1295. The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014. For each, the increases to Taro's WAC prices are set forth below:

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

Taro notified its customers of the increases the day before they became effective – June 2, 2014.

1296. Patel knew of these (and other) Taro increases well in advance, and was prepared so that Teva would be able to quickly follow the price increases. Patel was already preparing for the next round of Teva price increases in June 2014, many of which would ultimately be implemented by Teva in August.

1297. On May 14, 2014, Patel and Aprahamian exchanged eight text messages, and had one phone conversation lasting more than four minutes.

1298. Subsequent to the May 14 communications, Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him. On May 28, 2014, that colleague sent her a list titled "███████████████████████

████." The list included several drugs sold by Taro –including the four formulations of Fluocinonide (plus Carbamazepine and Clotrimazole) – with the notation "████████" listed as the reason for the increase, *even though Taro had not yet increased its price on those drugs or*

*notified its customers that it would be doing so.* The relevant portions of that spreadsheet are set forth below:

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

1299.   On June 3, 2014 – the day the Taro increases on Fluocinonide became effective – CVS reached out to ███████████████████████████████████████

███████████████████ " on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for providing that opportunity to Teva. The CVS representative offered to move a significant amount of business from Taro to Teva, stating: "███████████

████." The e-mail was forwarded to Patel, who responded:

> **From:** Nisha Patel02
> **Sent:** Tuesday, June 03, 2014 12:46 PM
> **To:** ████████
> **Subject:** Re: Fluocinonide Cream
>
>
> I suspect a price increase...and we would likely follow.
>
> Sent from my iPhone

1300.   Of course Patel already knew the bid request was due to a price increase, because she had spoken to Aprahamian in May and included Fluocinonide on her list of price increases with a notation to " ██████████ ."  But she still needed to determine the specific price points so that Teva could follow quickly.

1301.   ██████ stated that she had not heard about a price increase from anyone else, but indicated that she would " ████████████████████████████████ ."

1302.   Patel immediately began snooping around by exchanging five text messages with Aprahamian at Taro.  Later that afternoon, she reported that she had " ████████████ ████████," but that she was " ████████████ ."  ████████████ at Teva suggested that it might be a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations.  He asked Patel to provide " ██████ " by the next day.  Patel responded at 4:23 p.m., making it clear that she had been talking to Aprahamian not only about Fluocinonide, but other drugs as well:



1303.   Shortly after sending that e-mail Patel called Aprahamian and they spoke for nearly seven minutes.  As discussed more fully below, Taro had also increased its prices for Warfarin and Carbamazepine on June 3.  Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

1304.   First thing the next morning – June 4, 2014 – Patel exchanged two more text messages with Aprahamian, and then the two spoke on the phone for more than twenty-five minutes.  Within minutes after hanging up the phone with Aprahamian, Patel sent the following e-

mail to ██████, making it clear that she had obtained additional "████" that she did not want to put in writing:



From:        Nisha Patel02
Sent:        Wed 6/04/2014 10:44 AM (GMT-05:00)
To:          ██████████████
Cc:
Bcc:
Subject:     Fluo Crm and E Crm Info
Attachments: Analysource_Report_20140604113534(1).xlsx


████,


Per your request, I have added in the plain cream. I know you're working on a lot, so just let me know if you'd like to discuss further. I have additional intel (I can discuss with you) that will be useful.


We should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor--I think we need to be responsible where we have adequate market share.


Thanks,

Nisha

1305.   That same day, Teva received a bid request from another large customer, Walmart. Shortly after that e-mail was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro:

From:    Nisha Patel02
Sent:    Wed 6/04/2014 2:09 PM (GMT-05:00)
To:      ████████████████
Cc:      ████████████████
Bcc:
Subject: RE: Item Questions


████████

(Please consider the Taro items alert items.) Based on quality of competitor, the intention of being responsible in the market, and market share, below is my commentary:


1.  Gel: WAC issue. I estimate that WM nets are right around our WAC. Recommend bidding right below WAC, assuming we can supply.
2.  Ointment: Should not pursue. We have reasonable share.
3.  Cream: Since we are pursuing CVS, and assuming it works out, we should probably not pursue.

After further deliberation, Teva decided not to bid on any of the Walmart business at all.

1306.   On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with "█████" she had obtained directly from Aprahamian.   That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (*i.e.*, wholesalers, chain drug stores, mail order and GPO).   Prior to sending that "████," Patel had spoken to Aprahamian on June 17 for fifteen minutes, and June 19 for nearly fourteen minutes.   The contract price points obtained by Patel were not otherwise publicly available.

1307.   Sandoz was also a competitor on two formulations of Fluocinonide – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel.   Not coincidentally, Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period.   At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

1308.   During one of the calls on June 20 referenced above, Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz.   CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available.   Based on a history and pattern of practice between CW-3 and Aprahamian, it was understood that Sandoz would follow the Taro price increase.

1309.   On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees- including Patel and Rekenthaler – for a 3:00 p.m. conference call that day.  The notice stated: "██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████."  The next morning, at 9:57 am, Patel and Aprahamian spoke again for nearly thirteen minutes.

1310.   Taro and Teva set identical WAC prices within a month of each other in the Summer of 2014, reflecting increases of more than 200%:

| Product CRM .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Taro | 51672125301 | $0.79 | $2.43 | 3-Jun-14 | 206% |
| 30 gm | Taro | 51672125302 | $0.56 | $2.43 | 3-Jun-14 | 337% |
| 60 gm | Taro | 51672125303 | $0.39 | $2.43 | 3-Jun-14 | 524% |
| 15 gm | Teva | 00093026215 | $0.79 | $2.43 | 1-Jul-14 | 206% |
| 30 gm | Teva | 00093026230 | $0.56 | $2.43 | 1-Jul-14 | 337% |
| 60 gm | Teva | 00093026292 | $0.39 | $2.43 | 1-Jul-14 | 524% |

1311.   The Teva price increases on Fluocinonide became effective on July 1, 2014.  Teva increased its WAC pricing to match Taro's pricing almost exactly.  That same day, Patel spoke to her contact at Sandoz – CW-1 – several times, including at least those calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

1312.   During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

1313.   Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014, but followed the increase on the gel three months later, on October 10, 2014).  Sandoz increased its WAC pricing on the gel by 491%.  That same day, Patel spoke to CW-1 at Sandoz by phone for more than three minutes.

1314.   During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream, but had not yet gained any significant market share due to supply problems.  Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro.  The Actavis price increase on Fluocinonide cream was effective December 19, 2014.  Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently.  At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

1315.   Although the price increases on Fluocinonide were successful across all formulations, Sandoz and Teva exited the market for Fluocinonide gel in late 2014, and Teva sold its ANDA for the product to G&W.  In the Fall of 2015, however, G&W was making plans to join Taro in the market by launching the product that November, after purchasing the product from Teva. G&W built into its plans an assumption that Taro would cede approximately twenty-five (25%) percent market share to G&W upon its launch.

1316.   By mid-November, G&W had bumped its product launch date back to December because of a product testing problem at an outside lab.  No longer content with assuming that Taro would give it a quarter of the market when the launch came to fruition, G&W executives reached out to the competitor to confirm.  On November 17, 2015, Orlofski of G&W called Aprahamian at Taro, and the two competitors spoke for seventeen minutes.  Later that same day, Perfetto of Taro placed a brief call to Orlofski.

1317.   On November 20, 2015, Vogel-Baylor of G&W worked on confirming that Taro was, indeed, the only competitor with whom G&W had to confer, asking a colleague to pull information for Fluocinonide Gel: "███████████████████████████████████

███████████.”  Orlofski placed another quick call to Perfetto on November 21, 2015.  Two days later, on November 23, 2015 at 11:25 a.m., Orlofski called Perfetto yet again.  They spoke for seven minutes.  Less than two hours later, Vogel-Baylor sent Plaintiff Kroger an e-mail with news of the G&W launch of Fluocinonide Gel and a request for information about the purchaser's usage numbers for the product.  On November 24, 2015, Kroger responded that G&W would need to offer all three sizes of the product – 15gm, 30gm, and 60gm – before it would consider moving the business.  G&W, however, would not be prepared to launch the two smaller sizes until May 2016.

1318.   The Kroger response sent the competitors back to square one in figuring out how to allocate the Fluocinonide Gel market between them.  G&W set to work quickly exploring other options. On November 25, 2015, Orlofski called Perfetto and the two competitors spoke for seven minutes.   On December 3, 2015, Vogel-Baylor reached out to Walgreens asking whether the customer would entertain a bid for Fluocinonide Gel.  Vogel-Baylor explained to Walgreens that it was "████████████████████████."

1319.   A few days later on December 8, 2015, Aprahamian and Orlofski had a twenty-three minute phone conversation.  Later that day, Vogel-Baylor moved forward, e-mailing her Walgreens contact to ask where G&W should send its Fluocinonide Gel proposal soliciting Walgreens' business.

1320.   While Vogel-Baylor awaited Walgreens' response, other G&W executives continued their conversations with their counterparts at Taro.  On December 13, 2015, Perfetto called ████████ of G&W and they spoke for twenty-nine minutes.  The following day, December 14, 2015, Aprahamian called Orlofski and they spoke for nine minutes.

1321.   Having gotten the requested information from Walgreens late in the evening on December 14, 2015, and having vetted the plan with its competitor, G&W sent its pricing proposal on Fluocinonide Gel to Walgreens the following day.

1322.   Walgreens contacted Taro two days later, on December 17, 2015, to inform the incumbent of G&W's proposal and to find out whether Taro intended to defend.  Taro sales executive ████████ asked Aprahamian: "████████████████" Aprahamian responded simply "████████████████████████████████████████████████████████████████████████"

1323.   To keep the lines of communication open, Orlofski called Perfetto first thing the following morning.

1324.   On January 4, 2016 the Walgreens representative again pressed for an answer on what Taro's approach would be on Fluocinonide Gel, asking: "█████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████."

1325.   The following day, January 5, 2016, a Taro pricing executive, ███████████, confirmed that Taro had voluntarily ceded its Walgreens business to the competitor, telling his colleague: "██████████████████████████████████████████████████████████ ████████████████."

1326.   That same day, a Taro pricing executive, ███████████████████████████ that he should have someone on the pricing team send e-mails to customers when Taro declines to bid – like the one he sent to Walgreens for Fluocinonide Gel. █████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████.'"

1327.   On January 6, 2016, the day after Taro declined to bid at Walgreens, Vogel-Baylor called █████████ at Taro and they spoke for twenty-five minutes.  Notably, this was the only phone call ever between these two competitors according to the available phone records.

1328.   Several months later, on April 26, 2016, ████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████."

### III.   **Fluticasone Propionate**

1329.   Fluticasone Propionate Lotion ("Fluticasone"), also known by the brand name "Cutivate," is a topical corticosteroid used to treat swelling and itching that result from various chronic skin disorders, including atopic dermatitis.

1330.   Glenmark was the first generic manufacturer to enter the market for Fluticasone on March 26, 2012.  As the first generic manufacturer to file an approved ANDA, Glenmark enjoyed a 180-day period of exclusivity during which time no other competitors could sell the product. Even before Glenmark launched, Sandoz (then Fougera) was planning to enter the market for Fluticasone after Glenmark's exclusivity period ended in September 2012 and understood that Perrigo was also planning to enter at the same time.  Over the course of several months, Fougera – in particular CW-6, at the direction of Kaczmarek – coordinated with Glenmark frequently about Fluticasone, including market share targets and pricing, to prepare for its eventual Fluticasone launch.

1331.   After the Sandoz acquisition of Fougera in July 2012, as the end of Glenmark's 180-day exclusivity period approached, Sandoz continued to stay in communication with Glenmark and Perrigo about Fluticasone.  As part of its launch strategy, Sandoz planned to obtain 33% of the market.  Perrigo, however, only anticipated taking about one-quarter of the market.

1332.   By mid-August 2012, Sandoz learned that its launch of Fluticasone would be delayed until the end of November 2012 because of certain production problems.  As a result of this delay, Kellum was concerned that Perrigo would be able to launch earlier than Sandoz and wanted to learn more about Perrigo's launch strategy.  On August 21, 2012, Kellum sent an e-mail to his sales team asking about "███████████."  Within minutes of receiving the e-mail, CW-3 reached out to ██████, his contact at Perrigo, by phone.

1333.   That same day, a customer sent an e-mail to a Perrigo sales executive, stating: "█████████████████████████████████████████████████████" The Perrigo sales executive informed the customer that Perrigo's Fluticasone launch had now been "████████" to the first quarter of 2013.

1334.   Around this same time, Sandoz also began preparing to have conversations with "████████" about its Fluticasone launch while at the NACDS Conference in Denver in late August 2012.  It was at that same conference where CW-3 first spoke to Blashinsky at Glenmark about working "██████████████████████." In an internal e-mail to the Sandoz sales team on August 25, 2012, in advance of the NACDS Conference, ."

1335.   As its launch date for Fluticasone approached, Sandoz began to think more critically about which customers to target and began to communicate directly with Glenmark on the subject.  On November 26, 2012, Sandoz scheduled an internal meeting to discuss which customers it should approach as part of its Fluticasone launch.  That same day, CW-3 of Sandoz spoke to Blashinsky of Glenmark twice, with one call lasting five minutes.  After the second call with Blashinsky, CW-3 e-mailed his Sandoz colleagues a list of six customers he thought Sandoz should target.  That list would later grow to eight customers.  CW-3 also made it known to his Sandoz colleagues that Glenmark was planning a potential price increase on Fluticasone at some point in the future.

1336.   The next day, November 27, 2012, a senior Sandoz marketing executive asked CW-3 to get Fluticasone "███████" for the customers Sandoz had agreed to target.  CW-3 responded that he was "█████████████████████████."  As promised, the next morning (November 28) CW-3 called Blashinsky of Glenmark.  The two spoke four times that day, including one call lasting eight minutes.  Later that same day, CW-3 was again asked if he had been able to "████ ██████████████████████████████████ ██████████████████████████."

1337.   The next morning, CW-3 sent an updated list of nine customers that Sandoz should target for Fluticasone – based on his conversations with Blashinsky – but he did not include the pricing information that had been requested.  The senior Sandoz marketing executive responded immediately: "███████" CW-3 countered by referring to one of the biggest pop songs of 2012, suggesting that his boss should call him instead of asking for the information in writing:



| From: | ████████ |
|---|---|
| Sent: | Thursday, November 29, 2012 1:37 PM |
| To: | ████████ |
| Cc: | ████████ |
| Subject: | RE: Fougera Launches - Fluticasone Propionate and Ciclopirox Shampoo |

Call me....maybe?

1338.   As Sandoz continued to prepare for its imminent launch, it also began to evaluate the usage expected from the nine customers that it had agreed with Glenmark to target.  Sandoz found that those nine customers would not allow the company to reach its desired market share goals.  As a result, on November 30, 2012 a senior Sandoz marketing executive suggested that Sandoz approach two large wholesaler customers, instead of one as originally agreed.  CW-3 responded immediately, saying "███████████████████████████."  CW-3 then stated that "████████████████████████████████████████████████

███████████████████████████████████.”  A few hours later, CW-3 called Blashinsky and left a message.  Blashinsky promptly returned the call and the competitors spoke for three minutes.  Later that day, CW-3 also called and spoke to his contact at Perrigo, ████, twice.

1339.  Sandoz officially entered the market for Fluticasone on December 3, 2012, matching Glenmark's WAC pricing exactly.  That same day, CW-3 of Sandoz called Blashinsky of Glenmark and they had a two minute call.  Also that day, Blashinsky directed the sales team to relinquish the Publix and Optisource accounts to Sandoz, two of the nine customers that Glenmark had agreed to give up to the new entrant.

1340.  Sandoz continued to coordinate with Glenmark to make sure that it was targeting the appropriate customers and minimizing price erosion as it entered the Fluticasone market.  For example, on December 13, 2012, a large wholesaler that Sandoz had agreed not to target approached Sandoz looking for an offer.  That same day, CW-3 spoke to Blashinsky twice.  When Sandoz refused to respond to the customer, the customer followed up again on December 21, 2012.  Again, following the same pattern, CW-3 spoke to Blashinsky twice that day, including one call lasting four minutes.

1341.  Although Sandoz made sure to coordinate extensively with Glenmark, it had initial difficulty meeting its market share goal, in part because some of the customers already had a significant amount of inventory on hand.  On January 9, 2013, CW-3 had a conversation with Blashinsky where the two competitors walked through a list of customers, identifying those that Sandoz should target and those which it should not.  CW-3 took detailed contemporaneous notes of the conversation.  Later in the day, after reviewing the list, CW-3 of Sandoz began to suspect

that Glenmark may have oversold to certain customers in advance of Sandoz's entry, stating in an e-mail that he had "█████████████████████████████."

1342.   By January 11, 2013, CW-1 of Sandoz sent around a summary of "████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████"

and that Sandoz should continue to press for its original market share goal.

1343.   During an internal Commercial Operations meeting on January 21, 2013, Sandoz decided to approach another customer, CVS, in order to obtain additional market share.  But before doing so Sandoz wanted to confirm that it was acceptable with Glenmark.  In his contemporaneous notes of the meeting, CW-3 recorded in his Notebook that he was supposed to "████████████

██████████████████████████████████████████."

1344.   Sandoz subsequently learned why Glenmark was reluctant to give up more market share to Sandoz.  There was a discrepancy between the two competitors about how much market share Sandoz had already obtained.  On January 29, 2013, a senior Sandoz marketing executive reported that "████████████████████████████████████████████████

██████████████████████████████████████████."  Two days later, on January 31, 2013, CW-3 and Blashinsky spoke two more times, for five minutes each.

1345.   Over the next several months Sandoz and Glenmark continued to coordinate about Fluticasone, including about a Glenmark price increase on that drug.  For example, on April 16, 2013, as Glenmark was preparing for a large-scale price increase on several different drugs (in

coordination with several different competitors), CW-3 of Sandoz had two separate calls with Blashinsky of Glenmark, including one call lasting thirteen minutes. They talked about several things, including Glenmark's potential entry and market share targets on a different drug, Alclometasone, as well as a price increase on Fluticasone, as recorded by CW-3 in his contemporaneous notes of the call:



1346.   Blashinsky called CW-3 again on May 6, 2013, in advance of the Glenmark price increase. He also called CW-3 on May 17, 2013 – the day after the Glenmark price increase on Fluticasone became effective. In all, the two competitors spoke three times on May 17, 2013, including two separate five minute calls.

1347.   Throughout this time period, Sandoz also kept in close communication with Perrigo about the details of Perrigo's anticipated entry into the Fluticasone market. For example, in early April 2013 CW-3 of Sandoz spoke to █████████ of Perrigo multiple times, including calls lasting seventeen and five minutes, respectively. CW-3 subsequently reported to his colleagues at Sandoz that Perrigo would be delayed in entering the Fluticasone market "████████████████████ ████████████████." On April 9, 2013, a colleague at Sandoz followed up asking CW-3 for additional information about whether Perrigo planned to enter "████████████████████ ███████" The next day, CW-3 communicated directly with Perrigo to obtain the answer, calling and speaking with █████ two times.

1348.   On May 21, 2013, as Perrigo was beginning to plan its entry into the market, a Perrigo executive asked █████ to obtain "██████████" for Fluticasone Lotion. Two days later, on May 23, 2013, █████ called CW-3 at Sandoz. They ended up speaking twice that day, for

five and three minutes, respectively.  Immediately after their second call, CW-3 called Blashinsky at Glenmark – the other competitor on Fluticasone – and the two spoke for four minutes.

1349.  Similarly, on May 28, 2013 a senior Sandoz executive requested additional "█████" about Perrigo's entry timing on Fluticasone.  That same day, CW-3 called ███████ at Perrigo and they spoke for four minutes.  The next day, ██████ called CW-3 back and they spoke again for two minutes.

1350.  By July 2013, Perrigo finally began preparing in earnest to enter the Fluticasone market.  As of that time Sandoz had been able to obtain 30% market share, reaching its initial target goal for a 3-player market with Glenmark and Perrigo.  Sandoz understood that, because Glenmark still had a significant majority of the market share, Perrigo would target Glenmark customers as it entered.

1351.  In the days and weeks leading up to Perrigo's launch, Perrigo was in frequent communication with Sandoz, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 11:13:00 | 0:01:00 |
| 7/10/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:14:00 | 0:01:00 |
| 7/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:06:00 | 0:01:00 |
| 7/16/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 9:22:00 | 0:01:00 |
| 7/17/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:22:00 | 0:19:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:11:00 | 0:01:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:09:00 | 0:13:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |

1352.  Perrigo held an internal meeting to discuss its Fluticasone launch on July 16, 2013.  As can be seen in the table above, on the day of the meeting ██████ of Perrigo called CW-3 at Sandoz and left a message.  He called CW-3 again the next day, and they were able to speak for nineteen minutes.  During these conversations, ██████ informed CW-3 that, consistent with the

"fair share" understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25% market share.  CW-3 took contemporaneous notes of his conversation with ▇▇▇, as set forth below:



1353.   On July 30, 2013, Perrigo received FDA approval to begin selling Fluticasone. That same day, ▇▇▇ of Perrigo spoke to CW-3 of Sandoz for thirteen minutes.  Perrigo then formally launched the product on August 1, 2013, with the same exact WAC pricing as Glenmark and Sandoz.  ▇▇▇ and CW-3 also spoke twice that day.

1354.   As Perrigo entered the market it planned only a "▇▇▇▇," targeting only $1 million per year in sales.  In accordance with the fair share understanding and the previous communications between the competitors, Perrigo targeted – and Glenmark conceded – multiple customers immediately.

**JJJ.   Fosinopril HCTZ**

1355.   Fosinopril HCTZ is the generic version of Monopril HCT, a drug developed by Bristol Meyers Squibb in 1994 to treat hypertension.  The market for Fosinopril HCTZ is mature. The primary marketers of Fosinopril HCTZ are Aurobindo, Citron, Glenmark, Heritage, and Sandoz, and each sold Fosinopril HCTZ to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1356.   During an April 22, 2014 internal call at Heritage, Malek informed the sales team that he wanted Heritage to take a price increase on Fosinopril HCTZ.  Both Malek and Glazer pushed the Heritage sales team members to communicate with their competitors to obtain agreements to raise prices.

1357.   In early May 2014, sales executives with pricing authority for Fosinopril HCTZ from Heritage, Glenmark, and Aurobindo began to discuss a collusive price increase for the drug. For example, on May 2, 2014, the Heritage executive, Dan Lukasiewicz, reached out to his counterpart at Glenmark, the Executive Vice President of Generics.  On May 8, 2014, the Fosinopril HCTZ sales executives from each of the three companies spoke several times by telephone in order to discuss and coordinate the price increase.

1358.   On May 14, 2014, at the MMCAP conference, executives from Sandoz, Aurobindo, and Heritage met in person to discuss raising prices on Fosinopril HCTZ.  Heritage's ███ spoke with the Director of National Sales at Aurobindo, ███████.  ███ also spoke with CW-3, a National Accounts Executive at Sandoz.  The next day, Aurobindo's Gustafson and Sandoz's CW-3 communicated by text messages about the price increase.

1359.   Also on May 15, 2014, Heritage agreed to walk away from a large pharmacy account, so that it could concede this business to Aurobindo.  This act against Heritage's self-interest was done to ensure that Aurobindo participated in the price increase.

1360.   On May 21, 2014, Heritage's ████ exchanged texts with Sandoz's CW-3 to confirm that each had the other's mobile phone numbers.

1361.   On June 3, 2014, following an HDMA conference held that day, Heritage's ███ met for drinks with her counterpart at either Sandoz or Aurobindo (or both).  During the week that followed this conference, the sales executives from Aurobindo, Sandoz, and Glenmark spoke by

phone at least nine times and also exchanged numerous text messages about the Fosinopril HCTZ price increase.

1362.   On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for twenty-two minutes.   Again, these discussions were presumably about the pricing of various drugs, including Fosinopril HCTZ.

1363.   On June 25, 2014, Heritage's ████ and Aurobindo's ████████ spoke by phone for approximately 18 minutes.   Upon information and belief, during that call, Heritage informed the Aurobindo executive that Heritage would increase Fosinopril HCTZ prices by approximately 200% beginning the next day, and the Aurobindo executive ensured Heritage that each of Aurobindo, Glenmark, and Sandoz would follow Heritage's price increase.

1364.   That same day, Glenmark's sales executive spoke with the sales executive at Citron with responsibility for both Glyburide and Fosinopril HCTZ, ███████.   Upon information and belief, during the discussion, Citron informed Glenmark that Citron would be entering the Fosinopril HCTZ market, and Glenmark informed Citron about the agreement between Glenmark, Heritage, Aurobindo, and Sandoz to follow Heritage's forthcoming price increase.

1365.   Beginning on June 26, 2014, Heritage began to implement the 200% price increase on Fosinopril HCTZ with its customers.

1366.   On June 27, 2014, executives from Aurobindo and Glenmark discussed the price increase on Fosinopril HCTZ.   Upon information and belief, each confirmed to the other that the two companies would follow Heritage's price increase.

1367.   On July 1, 2014, Citron's ████, the Citron employee that had discussed the price increase with Glenmark, reached out to Heritage's ██████ to discuss the price increases of both Glyburide and Fosinopril HCTZ.   ██████████████ that communications should not

be done through e-mail (this would leave evidence of the conspiracy), and instead, Heritage should communicate only by phone with a specific Citron executive, █████████.

1368.   On July 2, 2014, Heritage's █████ spoke with the specified Citron representative, █████, for approximately 22 minutes.  Upon information and belief, during that call, Citron agreed to follow Heritage's price increases on both Fosinopril HCTZ and Glyburide.  The two executives continued to speak frequently about both drugs for the rest of July 2014.

1369.   By July 9, 2014, Heritage had fully implemented the price increase of 200% on Fosinopril HCTZ.  That same day, Citron executives spoke internally about their intention to follow through on their agreement to increase prices of Fosinopril HCTZ, as well as other drugs (including Glyburide).

1370.   A few days later, on July 14, 2014, Citron's █████ spoke with a Glenmark employee on the phone for about 20 minutes.

1371.   The next day, July 15, 2014, Citron began announcing to customers its pricing of Fosinopril HCTZ (which was in line with the increased prices announced by Heritage).

1372.   The Defendants continued to communicate in mid- and late-July 2014 regarding the Fosinopril HCTZ price increase.  For example, Heritage's █████ spoke with her Glenmark counterpart for about 23 minutes on July 18 and for approximately 5 minutes on July 30, and Aurobindo's ████████ and Citron's █████ spoke for about 24 minutes on July 28.  Upon information and belief, Defendants communicated to each other during these calls their commitment to the agreement to follow Heritage's increased prices.

1373.   By January 2015, each of the Defendants fully implemented the increased pricing on Fosinopril HCTZ.

1374.   As alleged above, the price increases regarding Fosinopril-HTCZ were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Fosinopril HCTZ to Plaintiffs and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### KKK.   Gabapentin Tablets

1375.   Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants.  The medication is used to treat epilepsy and neuropathic pain.

1376.   During the time period relevant to this Complaint, Aurobindo, Glenmark, and Teva dominate the market for Gabapentin 600mg and 800mg tablets.

1377.   On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors, including executives at Glenmark and Aurobindo. The PCMA described its Annual Meeting as "the ... ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

1378.   Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin, and suggested that this would be a great opportunity to pick up some market share.  The Glenmark increase had not yet been made public, and would not be effective until November 13, 2014. Nonetheless, Patel informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain

contract price points that Glenmark would be charging to distributors.  At around the time she sent

the e-mail, Patel exchanged two text messages with Brown of Glenmark.

1379.   Also in October 2014, Jim Grauso of Glenmark was speaking frequently with

████████████, the CEO of Aurobindo, and ███████ was speaking frequently with Teva's

Rekenthaler.

1380.   Having relatively little market share for Gabapentin, Teva discussed whether it

should use the Glenmark price increase as an opportunity to pick up some market share.  Over the

next several weeks, Teva did pick up "████████████" to be more in line with fair share principles,

but cautioned internally that it did not "████████████████████████████████████████."

1381.   These communications reflect that, even in instances when competitors took share

from each other, it was fully in line with the conspiracy's fair share principles.  Indeed, the fact

that these high-level conspirators were actively communicating about confidential pricing

information while also taking market share from each other demonstrates that Teva's act of taking

market share from Glenmark was the conspiracy functioning on a business as usual basis.

**LLL.   <u>Glipizide-Metformin</u>**

1382.   The market for Glipizide is mature, as the drug has been available in generic form

since 2005.  During the relevant time period, Heritage, Teva, and Mylan sold Glipizide to Plaintiffs

and others in the United States at supracompetitive prices inflated by the unlawful and

anticompetitive agreements alleged in this Complaint.

1383.   During the same April 15, 2014 phone call between Malek and the Teva's Patel

alleged above that resulted in an agreement between the two companies to increase prices on Doxy

Mono, Malek informed Teva's Patel that Heritage wanted to raise prices on Glipizide.  Teva agreed

that it would either match Heritage's price increase or commit to not bidding against Heritage's business.

1384.   Around the same time, a second Heritage employee, ███████, who was tasked with coordinating price increases with Mylan discussed the Glipizide price increase with his Mylan contact, ████.  On April 23, 2014, Heritage's ████ e-mailed Malek to confirm to him that Mylan agreed to the Glipizide price increase as well.  (They also agreed to raise prices on Doxy Mono and Verapamil in the same communication.)

1385.   Pursuant to the agreement with Teva and Mylan, Heritage began informing customers of the price increase in late June, and had fully implemented the price increase by July 9, 2014.

1386.   In furtherance of the agreement, Teva and Mylan did not bid for any of Heritage's Glipizide business.  Additionally, in those instances where Heritage's customers sought out bids from Teva, Teva responded with pricing that it knew was higher than Heritage's pricing.

1387.   As alleged above, the price increases regarding Glipizide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glipizide to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

**MMM. <u>Glyburide</u>**

1388.   The market for Glyburide is mature, as Glyburide has been available in the United States for decades and has been available in generic form in the United States for more than 20 years.  Prior to September 2015, the primary manufacturers were Heritage, Teva, Citron, and Aurobindo (Citron entered the market in 2014 through a manufacturing partnership with

Aurobindo), and each sold Glyburide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1389.   Glazer's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that: "[i]n furtherance of the conspiracy, [Glazer] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide.  During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

1390.   Similarly, Malek's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that: "[i]n furtherance of the conspiracy, [Malek] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide.  During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

1391.   On or about April 22, 2014, Heritage held an internal teleconference during which Malek identified drugs that could be targeted for price increases.  Glyburide was one of the drugs on Malek's list.  During the call or shortly thereafter, Malek instructed Heritage sales executives to contact their counterparts at Teva and Aurobindo and to reach an agreement to raise prices on Glyburide.

1392.   Malek himself spoke to a senior executive at Teva, Patel, about Glyburide and several other drugs on his list, including an 18 minute call on April 15, 2014 (one week before and after the April 22 conference call).  During Malek's communications with Teva's Patel, an

agreement was reached that both companies would raise their prices on Glyburide sold to Plaintiffs and others in the United States.

1393.   After successfully reaching an agreement with Teva in late April, Malek and Glazer pressured their sales executives to reach agreement with Aurobindo as well in order to allow the collusive Glyburide price increase to succeed.

1394.   While Malek was responsible for communicating with Teva (among other Defendants), Heritage's ███████ was assigned to communicate with Aurobindo.  Malek and Glazer asked ███████ for updates about his communications with Aurobindo on April 28, 29, and 30.  ███████ eventually connected with his contact at Aurobindo on May 8, 2014, when the two spoke for sixteen minutes.  During this call, they agreed to raise the price of a number of drugs, including Glyburide.

1395.   On May 9, 2014, Heritage's sales team had another internal call to share the results of their conversations with competitors and further discuss the contemplated prices increases for other generic drugs, including Glyburide.

1396.   At the MMCAP conference in Bloomington, Minnesota, from May 12-15, 2014, Heritage's ████ met with a number of competitors and held collusive discussions on a number of generic drugs.  Among her conspiratorial meetings, ████ met with an executive from Aurobindo, Gustafson, who also attended the conference and confirmed that each of the three generic manufacturers of Glyburide (Aurobindo, Heritage and Teva) would increase prices on Glyburide sold in the United States.  ████ confirmed that Aurobindo was committed to the agreement in an e-mail to Malek on May 15, 2014.

1397.  But the Defendants were not done.  On June 23, 2014, Heritage held another teleconference during which the company determined that the price of Glyburide could be raised

by 200%, notwithstanding the fact that Citron was planning to enter the market through its partnership with Aurobindo. (As noted earlier, the FDA has documented that, with each new competitor that enters a market for a generic drug, the price of the drug typically declines substantially.)

1398. In June and July 2014, executives from Heritage communicated with executives from Citron via text message, phone, and e-mail in order to ensure that Citron would abide by the collusive agreement already in place between the three existing manufacturers of generic Glyburide. Citron agreed to increase prices on Glyburide, but Citron's ███ requested that there be no communication to Citron via e-mail in order to prevent the unlawful agreement from being exposed. Citron requested that the collusive communications be conveyed by telephone and directed to a specific individual within the company, ███.

1399. By early July 2014, with Citron, Heritage, Aurobindo, and Teva all committed to the collusive price increase, these four Defendants had successfully implemented the collusive price increase and were able to raise their prices for Glyburide to Plaintiffs and others in the United States to supracompetitive levels.

1400. Thereafter, Citron, Heritage, Aurobindo, and Teva adhered to the collusive agreement. In July 2014, a purchaser of Glyburide sought a request for proposal from Teva on Glyburide, in response to Heritage's price increase. Teva sales executives declined to bid based on their agreement with Defendants, and referenced the agreements on both Glyburide and another drug as the basis for refusing to issue a competitive bid to the potential customer. Defendants also engaged in discussions about how Citron could acquire market share without disrupting the collusive conspiracy agreement.

1401.   Through their continued collusion, Citron, Heritage, Aurobindo, and Teva were able to maintain their collusive pricing on Glyburide until at least December 2015.   This conspiratorial agreement continues to impact prices that Plaintiffs and others in the United States pay for Glyburide.

1402.   As alleged above, the price increases regarding Glyburide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide to Plaintiffs and others in the United States.   These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above, and at trade association events and conferences.

### NNN.  **Glyburide-Metformin**

1403.   The market for Glyburide-Metformin is mature, as the drug has been available in generic form since 2004.   During the relevant time period, Heritage, Teva, Aurobindo, Actavis, and Citron sold Glyburide-Metformin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1404.   During the same April 15, 2014 phone call alleged above when they discussed a number of other collusive price increases, Malek and the senior Teva sales executive, Patel, agreed to increase prices on Glyburide-Metformin.

1405.   On April 22, 2014, Heritage held an internal call during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. After the call, Malek assigned ███████ to contact Aurobindo about Glyburide-Metformin, and ███ was assigned to Actavis to discuss Glyburide-Metformin.

1406.   After the internal conference call, Heritage's ███ spoke with a senior executive at Actavis, ████████, on April 22, 2014 about the Glyburide-Metformin price increase. Upon information and belief, during this call, the executives from Heritage and Actavis agreed to increase prices on both Glyburide-Metformin and another drug (Verapamil).  As with all collusive communications identified in this Complaint involving Actavis, the Actavis representative acted on behalf of and reached an agreement that was followed by all Actavis entities identified in this Complaint.

1407.   On May 8, 2014, Heritage's ██████ spoke with Aurobindo's █████ about the Glyburide-Metformin price increase.  Heritage and Aurobindo executives followed up this phone call with an in-person meeting, during which – upon information and belief – the Glyburide-Metformin price increase was discussed (along with price increases on other drugs).

1408.   Executives from the four companies continued to communicate regarding the price increase for the next month.  For example, the Actavis executive spoke with Teva by phone on May 1 and May 6, and the two exchanged at least 30 text messages about pricing agreements on Glyburide-Metformin and other drugs.  The same Actavis executive also spoke with Aurobindo's CEO regarding the pricing agreement.

1409.   Heritage also communicated the terms of the agreement to Citron and Sun.  Because Citron had agreed to increase prices of Glyburide, Heritage sought to ensure that Citron (which had authority to market Glyburide-Metformin, but did not actively manufacture the drug at that time) did not take any steps that would undermine or reveal the collusion on Glyburide-Metformin. Accordingly, a Heritage sales executive discussed the Glyburide-Metformin price agreement by text.  Additionally, to facilitate collusion on other drugs, Heritage informed Sun through a chain

of text messages sent in August 2014 about the successful price increases on Glyburide-Metformin and Verapamil.

1410.   In Summer 2014, Aurobindo, Actavis, Heritage, and Teva increased their WAC pricing on Glyburide-Metformin.

1411.   In August 2014, Heritage's ████ texted a Sun employee regarding agreements Heritage had reached with Actavis to increase the prices of both Glyburide-Metformin and Verapamil.  Such a communication highlights the overarching nature of the conspiracy; Sun was kept apprised of agreements (in this case between Actavis and Heritage) relating to drugs that it did not market or sell.

1412.   By September 2014, Citron had mobilized to enter the Glyburide-Metformin market.  Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list prices higher than all of them.

1413.   As alleged above, the price increases regarding Glyburide-Metformin were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide-Metformin to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### OOO. <u>Halobetasol Propionate</u>

1414.   Halobetasol Propionate, also known by the brand name Ultravate, is a strong corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, psoriasis, and rash.  Halobetasol comes in both cream and ointment form.

1415.   As of June 2012, the market was split between Perrigo with 60% share and G&W with 40%.

1. <u>The First Coordinated Price Increase – September 2012</u>

1416.  On September 25, 2012, both G&W and Perrigo announced price increases for Halobetasol Cream and Ointment.  G&W's price increases took effect on September 28, 2012 and Perrigo's price increases took effect one month later on October 28, 2012.

1417.  In the days leading up to the price increases, both Vogel-Baylor of G&W and ███████ of Perrigo had numerous discussions with CW-6 of Aurobindo concerning Halobetasol. Although Aurobindo did not manufacture either form of Halobetasol, Vogel-Baylor and ███████ used CW-6 as a conduit to convey information between them about the price increases.  As discussed in detail above, CW-6 had formerly worked at Fougera and had developed relationships with Vogel-Baylor and ███████ of Perrigo during his tenure there.

1418.  For instance, on September 19, 2012, less than one week before the price increases, Vogel-Baylor exchanged three text messages with CW-6.  Then, CW-6 called Vogel-Baylor, hung up, and immediately called ███████.  After speaking with ███████, CW-6 hung up and immediately called Vogel-Baylor back, relaying the information he had learned from ███████.  Indeed, within a twenty-minute period, CW-6 had exchanged at least eight calls with Vogel-Baylor and ███████ These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

1419.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski and spoke to him for thirteen minutes.  Similarly, ███ also reported back to his boss, Wesolowski, a senior executive at Perrigo, exchanging two calls with him totaling roughly six minutes.

1420.   Further, two days later, on September 21, 2012, and then again on September 27, 2012, the day before the G&W price increase went into effect, the same call pattern occurred. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |

1421.   In early November 2012, a customer reached out to G&W asking it to submit a bid for Halobetasol Cream and Ointment because the customer believed its prices were inconsistent with the market.

1422.   After receiving the request, Vogel-Baylor had several calls with CW-6 who, again, served as a conduit between Vogel-Baylor and ███ to discuss Halobetasol.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:03:00 | 0:03:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:05:00 | 0:05:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:09:00 | 0:04:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:13:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:38:00 | 0:02:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 6:41:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:42:00 | 0:03:00 |

1423.  After this call exchange, Vogel-Baylor sent the following directive to █████ ███████, a sales executive at G&W, instructing him to submit a cover bid to the customer in order to create a false appearance of competition between G&W and Perrigo:



2.      The Second Coordinated Price Increase – March/April 2013

1424.  The competitors colluded to raise the price of Halobetasol again in 2013.  This time, there were multiple channels of communication between the competitors.  For example, on March 26, 2013, Boothe of Perrigo called Orlofski of G&W directly and they spoke for seven minutes.  That same day, ████████ of Perrigo once again called CW-6.  The call lasted two minutes.  Right after that call, CW-6 called Vogel-Baylor.  That call lasted one minute.

1425.  The next day, on March 27, 2013, Perrigo increased its WAC pricing for Halobetasol Cream and Ointment by over 250%.

1426.  Roughly two weeks later, on April 11, 2013, G&W also increased its contract and WAC pricing for the two formulations.  G&W's contract price was now double what it had been just the year before.

1427.  G&W told one of its customers, Morris & Dickson, that G&W increased prices in "███████████████████████████████████████."  Indeed, in the days leading up to the G&W price increase, Vogel-Baylor and ███████ had again engaged in a game of telephone with CW-6 to coordinate their pricing actions.  After speaking with ████████ for four minutes on April 8, 2013,

CW-6 immediately called Vogel-Baylor.  The call lasted one minute. CW-6 then called Vogel-Baylor a short while later and they spoke for four minutes.  Immediately after that call, Vogel-Baylor called her boss, Orlofski.  The call lasted a little over one minute.

### 3.   Sandoz Launches Halobetasol Cream

1428.  In December 2013, Sandoz began preparing to re-launch Halobetasol Cream. At that time, G&W had 63% of the market and Perrigo had 36%.  Sandoz was targeting 20% market share.  Because G&W was the market share leader, Sandoz wanted to " ███████████████ ███████████████████████████████ ."

1429.  On December 11, 2013, ████████████, a senior Sandoz launch executive, instructed Sandoz employees to reach out to Rite-Aid and Walgreens to learn who their suppliers were for Halobetasol Cream and what their pricing was.  Upon learning that both customers were with G&W – the market share leader – Sandoz decided to target those customers.

1430.  On December 12, 2013, Walgreens reached out to G&W to advise that Sandoz had expressed interest in its Halobetasol Cream business.  When Vogel-Baylor shared this information with Orlofski, he remarked that G&W " ██████████████████████████████████ ." Although Sandoz submitted a bid for Halobetasol on December 16, 2013, Walgreens declined to move the business because the price was slightly higher than G&W's price.

1431.  On December 17, 2013, another one of G&W's customers, Ahold, informed G&W that it had received a bid from Sandoz and was now seeking a lower price from G&W.  Vogel-Baylor e-mailed Orlofski stating, " ███████████████████████████████████ █████████████████████████████ " Orlofski responded by asking Vogel-Baylor to call him, noting " ████████████████████████ ." Later that day,

Rite Aid also e-mailed Vogel-Baylor stating that Sandoz had submitted a bid for Halobetasol Cream and requested that G&W lower its price to retain the business.

1432.   Vogel-Baylor tried calling Orlofski three times on December 17, 2013.  After the third call, Vogel-Baylor called ███████ of Perrigo and they spoke for more than seven minutes. Vogel-Baylor hung up with ██████ and called Orlofski again.  Orlofski returned her call later that day and they spoke for five minutes.

1433.   After speaking with Orlofski, Vogel-Baylor e-mailed Rite-Aid stating, "████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████."  Rite-Aid accepted Sandoz's offer the next day.

1434.   At the same time that Sandoz was going after G&W's Halobetasol customers, it was also approaching some Perrigo customers as well, albeit in coordination with Perrigo.  On December 17, 2013, CW-1, a senior Sandoz pricing executive, e-mailed CW-3, a senior Sandoz sales executive, asking him to inquire whether Wal-Mart, a Perrigo customer, was interested in receiving a bid from Sandoz for Halobetasol Cream.  CW-3 happened to be meeting with Wal-Mart at that time at its offices in Bentonville, Arkansas.

1435.   Wal-Mart told CW-3 that it was interested in receiving an offer.  Thereafter, CW-3 called ██████ of Perrigo.  During that call, ██████ provided CW-3 with Perrigo's price points for Halobetasol Cream at Wal-Mart and Omnicare and agreed to give up Wal-Mart to Sandoz. CW-3 took the following contemporaneous notes in his Notebook during that call:



1436.   Also on December 17, 2013, CW-3 responded to an e-mail exchange with CW-1 and Kellum regarding Halobetasol Cream, stating: "████████████████████████ ████████████████████████████████████████."

1437.   Two days later, on December 19, 2013, CW-3 called ██████ again.  The call lasted one minute.  After hanging up, CW-3 called CW-1, and they spoke for four minutes.  That same day, Sandoz sent offers to Wal-Mart and Omnicare.  The next day, on December 20, 2014, ████ ██████, a senior Sandoz launch executive, followed up with CW-3 regarding the Wal-Mart offer. CW-3 responded, "█████████████████████████████████████████████████ █████████████████████████████."

1438.   That same day, Boothe of Perrigo called Orlofski of G&W.  The call lasted two minutes.  Orlofski returned the call a half hour later and they spoke for eleven minutes.  Later that day, Orlofski called Vogel-Baylor and they spoke for more than seventeen minutes.

1439.   On January 8, 2014, CW-3 called ████████ of Perrigo.  The call lasted one minute. Later that day, Wal-Mart accepted Sandoz's bid for Halobetasol Cream.  CW-3 forwarded the acceptance to his supervisor, CW-1, who asked, "████████████████████████?"  CW-3 replied in two separate e-mails sent simultaneously: "██████████████████████████."

1440.   The next day, on January 9, 2014, CW-1 and CW-3 agreed that "███████████ ██████████████."  That same day, CW-3 called ████████ and they spoke for more than fifteen minutes.

1441.  In early February 2014, ████████████ joined G&W as a Director of Sales & Marketing.  Once at G&W, ██████ wasted no time using his competitor contacts at Sandoz – CW-3 and CW-4 to coordinate regarding Halobetasol.

1442.   On February 18, 2014, ▮▮▮▮ of G&W e-mailed Vogel-Baylor stating that Sandoz had bid on Halobetasol at Walgreens again and the customer was providing G&W with an opportunity to bid to retain the business.  Less, than an hour later, Vogel-Baylor called ▮▮▮▮ at Perrigo and ▮▮▮▮ called CW-3 at Sandoz to coordinate a response.  The calls lasted one minute and two minutes, respectively.  Immediately after hanging up, ▮▮▮▮ sent Vogel-Baylor the following e-mail:



1443.   After receiving the e-mail, Vogel-Baylor called ▮▮▮▮.  He returned the call and they spoke for sixteen minutes.  Immediately after hanging up with ▮▮▮▮, Vogel-Baylor sent a text message to ▮▮▮▮ of Perrigo.  Later that day, ▮▮▮▮ sent the following e-mail to Vogel-Baylor:

1444.   Two days later, on February 20, 2014, ██████ had still not heard back from CW-3 and so he reached out to his other contact at Sandoz, CW-4, and the competitors spoke for four minutes.   Immediately after hanging up, ██████ called Vogel-Baylor and they spoke for four minutes.  Later that morning, Vogel-Baylor and ██████ exchanged two more calls lasting thirteen minutes and three minutes, respectively.   Upon hanging up with Vogel-Baylor, ██████ sent an internal e-mail, including to Vogel-Baylor, stating "████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████."  Vogel-Baylor later responded: "██████████████████████████."

1445.   A few minutes after receiving ██████ e-mail, Vogel-Baylor sent a text message to ██████ of Perrigo.   A half hour later, she called ██████ and they spoke for more than seven minutes.   At around the same time, CW-3 of Sandoz called ██████ and they spoke for minutes. Immediately after hanging up with CW-3, ██████ called Vogel-Baylor to report back what he had learned.  That call lasted nineteen minutes.

1446.   Later that afternoon, Vogel-Baylor called her supervisor, Orlofski, to apprise him of the situation and they spoke for twenty-one minutes.   Upon hanging up, Vogel-Baylor called ██████ and they spoke for nearly twelve minutes.  Immediately after talking to ██████, Vogel-Baylor called ██████ of Perrigo one more time that day.  The call lasted less than one minute.

1447.   That evening, after his conversation with G&W, CW-3 emailed CW-1 and asked that he call him "████████████████."  Within a half hour of receiving the e-mail, CW-1 called CW-3 and they spoke for twenty minutes.

1448.   The next morning, on February 21, 2014, CW-3 and CW-1 spoke again for fourteen minutes. CW-3 hung up and immediately called ██████ of G&W.  The call lasted one minute.

Immediately after that call, ███ called Vogel-Baylor.  The call lasted one minute. That same day, ███ sent the following response to Walgreens (which accounted for more than 33% of G&W's business for Halobetasol Cream:



4.   Taro Launches Halobetasol Cream and Ointment

1449.   In mid-March 2014, Taro was making plans to re-launch Halobetasol Cream and Ointment.  Although its launch was ultimately delayed until May 2014 due to issues relating to the FDA, Aprahamian called Vogel-Baylor on March 27, 2014 and they spoke for fourteen minutes. Notably, this was the first phone call ever between these two competitors, according to the available phone records.  Four days later, on March 31, 2014, Vogel-Baylor called Aprahamian and they spoke for over five minutes.

1450.   On May 13, 2014, Taro re-entered the Halobetasol Cream and Ointment markets and published WAC pricing that matched its competitors.  In the days leading up to the re- launch, all four competitors were speaking frequently by phone.  At least some of those calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:28:00 | 0:04:00 |
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Vogel-Baylor, Erika (G&W) | 7:57:00 | 0:14:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:23:00 | 0:05:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 8:28:00 | 0:02:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:30:00 | 0:01:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:31:00 | 0:01:00 |
| 5/8/2014 | Voice | K.K. (G&W) | Outgoing | CW-3 (Sandoz) | 8:39:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:18:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:24:00 | 0:02:00 |

1451.   After the phone calls detailed above, Aprahamian would not speak to Vogel-Baylor again until September 2015.  Similarly, the two calls between Aprahamian and Wesolowski of Perrigo are the only calls ever exchanged between the two competitors, according to the available phone records.

1452.   On May 11, 2014, Aprahamian circulated a Fact Sheet including details regarding the Halobetasol re-launch.  Taro stated that "

.”  The Fact Sheet detailed the following market share breakdown and set Taro's target market shall goal at 15%:



1453.   On June 10, 2014, Aprahamian instructed a colleague to put together offers for Halobetasol at Publix (a G&W and Perrigo customer) and HD Smith (a Perrigo customer). Aprahamian cautioned "                                                                                    .” That same day, Perfetto of Taro exchanged three text messages with Orlofski of G&W.

1454.   On June 11, 2014, Vogel-Baylor called ████ of Perrigo.  The call lasted one minute.  The next day, on June 12, 2014, HD Smith informed Taro that Perrigo had proactively revised its pricing shortly after Taro submitted the bid and asked Taro to lower its bid to win the business.

1455.   On June 17, 2014, Boothe of Perrigo called a Taro employee on his office line.  The call lasted forty-five minutes.  Later that day, ████████, a Taro pricing executive, sent an internal e-mail stating, "████████████████████████████████████████████ ████████."  The next day, June 18, 2014, Perfetto called Boothe.  That call lasted two minutes.

1456.   Around that same time, G&W employees were having a similar exchange over e-mail. On June 17, 2014, ████ sent an internal e-mail to Orlofski stating: "████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████."

1457.   On June 18, 2014, Orlofski sent a text message to Perfetto and also called him.  The call lasted two minutes.  The next morning, on June 19, 2014, Orlofski replied to ████ 's e-mail stating: "████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████."  ████ then sent an internal e-mail directing that G&W should cede the Publix and Morris & Dickson accounts to Taro.  As ████ explained to his colleagues, it was "████████████████████████████████████████████."

1458.   On June 20, 2014, Orlofski exchanged two text messages and two calls with Perfetto, including one call lasting nearly thirty-eight minutes.

1459.   At the same time, G&W was also careful not to take any steps that would throw off its market share balance with Perrigo.  For example, on June 18, 2014, Plaintiff HEB, a Perrigo customer, asked G&W to bid on their Halobetasol business.  ████ responded, "█████████████

███████████████████████████████████████████████████████

████████████████████."

### PPP.   Hydralazine

1460.   Hydralazine HCL is a drug used to treat high blood pressure.  It is also known by the brand names Apresoline and Dralzine.

1461.   During the relevant time period, Teva, Par, Heritage, Strides, Camber, and Glenmark dominated the market for Hydralazine tablets.

1462.   In approximately August 2014, Defendants applied the "fair share" understanding to the market for Hydralazine in order to prevent any price erosion for the drug.

1463.   As of August 2014, Defendant Strides was in the process of ramping back up its domestic operations, following its 2013 sale of its specialty injectable business to Defendant Mylan.  As a result of this ramp up, Strides sought to obtain its "fair share" of the Hydralazine market, consistent with the principles of Defendants' fair share agreement.  As a company with more share for Hydralazine than the market allocation scheme allowed, it was up to Heritage to concede business to Strides.

1464.   ████████ joined Defendant Heritage as VP of Marketing on August 1, 2014.  One of his first acts of business for Heritage was to facilitate an agreement to allow Defendant Strides to obtain market share for Hydralazine.

1465.   In early August 2014, ████ spoke to ████████, an executive working with co-conspirator TruPharma, who relayed the message that Strides would submit an unsolicited bid

to Morris & Dickson, a wholesaler, for its Hydralazine business.  Through Randazzo, Strides requested that Heritage concede the business.

1466.  On August 20, 2014, ███ informed Malek that Strides wanted Morris & Dickson's Hydralazine business.  ███ advised Malek that Heritage should concede this business to Strides.  Malek also looped in █████, who was responsible for the Morris & Dickson account.

1467.  On September 5, Morris & Dickson informed ███ that it had received a competing bid for its Hydralazine business and asked for Heritage to provide a better price for Hydralazine.

1468.  Consistent with the fair share understanding, Heritage declined to match Strides' bid and instead conceded the Morris & Dickson business to Strides.

1469.  Upon information and belief, Heritage's decision to concede this business to Strides was communicated to Teva, Par, Camber, and Glenmark, so that each of these Defendants would know that Heritage was complying with the fair share agreement for the benefit of each Defendant.

1470.  As a result of the overarching fair share agreement, Defendants have been able to maintain the market allocation agreement for Hydralazine tablets since at least August 2014, which has allowed them to sell Hydralazine at supracompetitive prices to Plaintiffs and other.

**QQQ.  Hydrocortisone Acetate Suppositories (Anucort HC)**

1471.  Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate"), also known by the G&W brand name Anucort-HC, are used to treat itching or swelling caused by hemorrhoids as well as ulcerative colitis, proctitis, and other inflammatory conditions of the intestines, rectum, or anus.  Hydrocortisone Acetate is a corticosteroid.

375

1472.   During the time period relevant to this Complaint, Hydrocortisone Acetate was G&W's top-selling product.  As of January 2016, the 25mg formulation of Hydrocortisone Acetate accounted for nearly half of all of G&W's moving annual sales, totaling more than $119.7 million.  Similarly, Hydrocortisone Acetate was Perrigo's second-best selling product.  During that same time period, Perrigo's moving annual sales for the 25mg and 30mg formulations accounted for approximately $78.3 million of Perrigo's total sales.

1473.   In 2013, the Hydrocortisone Acetate market was split between G&W with 41% market share, Perrigo with 32%, and County Line Pharmaceuticals with 25%.  However, by late June 2013, County Line made the decision to exit the market for Hydrocortisone Acetate.

1474.   County Line's exit created an opportunity for Perrigo and G&W to collude to significantly raise the price of Hydrocortisone Acetate in July 2013, and then again one year later in July 2014.

1475.   On June 25, 2013, Vogel-Baylor of G&W e-mailed Wal-Mart, a County Line customer, stating that she had heard that County Line was discontinuing Hydrocortisone Acetate and asked whether Wal-Mart was interested in a new supplier.

1476.   Similarly, on June 26, 2013, ABC, also a County Line customer, e-mailed G&W requesting a bid on Hydrocortisone Acetate due to a "████████████████."  Vogel-Baylor forwarded the request to her supervisor, Orlofski, explaining: "████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████"

1477.   Between June 27 and June 30, 2013, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Venetian hotel in Las Vegas, Nevada.

1478.   While at the trade show, on June 27, 2013, Vogel-Baylor received a call from ████████, a sales executive at Perrigo.  The call lasted approximately one minute.  A few hours later, Vogel-Baylor called Orlofski and they spoke for nearly fifteen minutes.  Shortly thereafter, Vogel-Baylor sent an internal e-mail to her team notifying them that G&W would be implementing a price increase for Hydrocortisone Acetate and requesting that they draft customer notifications to that effect.  The price increase included a 200% increase to WAC and would result in an estimated $27.9 million in increased sales for G&W.

1479.   ████████████████, an operations manager at G&W, responded to Vogel-Baylor's e-mail stating, "████████████████████████████████████████ ████████████████████████████████"

1480.   The next day, on June 28, 2013, Vogel-Baylor contacted Orlofski three more times from the trade show, including exchanging two text messages and one call lasting more than nineteen minutes.

1481.   On July 8, 2013, ██████ of Perrigo and Vogel-Baylor exchanged two calls and then connected for a call lasting more than seven minutes, during which they coordinated their price increases on Hydrocortisone Acetate.  After that call, both ██████ of Perrigo and Vogel-Baylor reported the substance of their conversations back to their supervisors.  Immediately upon hanging up with ██████, Vogel-Baylor called Orlofski and they spoke for more than six minutes.  Similarly, ██████ called Wesolowski three times after speaking with Vogel-Baylor, including two calls lasting one minute and a third lasting six minutes.

1482.   The G&W price increases on Hydrocortisone Acetate went into effect on July 9, 2013.  That same day, Perrigo issued a product announcement notifying its customers that it was also increasing its pricing on Hydrocortisone Acetate effective July 11, 2013.  Perrigo increased its WAC by 473% on the 25mg formulation to essentially match G&W's WAC.  That same day, July 11, 2013, ███████ of Perrigo called Vogel-Baylor.  The call lasted one minute.

1483.   Also on July 11, 2013, ABC e-mailed Vogel-Baylor asking G&W to lower its dead net pricing for Hydrocortisone Acetate to match Perrigo's slightly lower dead net pricing.  Vogel-Baylor forwarded the request to Orlofski who responded: "███████!"  Vogel-Baylor replied, "███████"  Later that day, Vogel-Baylor responded to ABC and declined to lower its pricing.

1484.   On July 19, 2013, Harvard Drug Group e-mailed Vogel-Baylor asking why G&W was increasing its price on Hydrocortisone Acetate.  Vogel-Baylor replied: "████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████."

1485.   Several months later, on April 9, 2014, ███████, a G&W sales executive, e-mailed Vogel-Baylor regarding bidding on several products at Kaiser, including Hydrocortisone Acetate.  Vogel-Baylor responded that G&W could not disrupt the market and pursue the customer, reasoning that Kaiser "█████████████████████████████ █████████████████████."

1486.   On June 11, 2014, Vogel-Baylor e-mailed Orlofski recommending that G&W increase McKesson's contract pricing for Hydrocortisone Acetate.  That same day, Vogel-Baylor

called ██████ of Perrigo.  The call lasted less than one minute.  Two days later, on June 13, 2014, Vogel-Baylor tried to reach ██████ again by phone.  The call lasted less than one minute.

1487.   Less than a week later, on June 26, 2014, Perrigo generated its own internal price increase analysis for Hydrocortisone Acetate.  The analysis assumed zero percent unit loss as a result of the planned increase.

1488.   On July 22, 2014, Perrigo notified its customers that it was increasing pricing on a list of products, including Hydrocortisone Acetate.  This included a 235% increase to WAC for its 25mg formulation, effective on July 24, 2014.

1489.   At the time the increase was announced, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Gaylord Palms Hotel in Orlando, Florida.

1490.   Over the next several days, G&W heard from multiple customers that Perrigo had increased pricing on Hydrocortisone Acetate.

1491.   In accordance with their ongoing understanding to follow each other's price increases, and consistent with past practice on this product and others, G&W went to work implementing a comparable price increase of its own.

1492.   On July 29 and July 30, 2014, Vogel-Baylor and Orlofski exchanged e-mails finalizing the details of the price increase for Hydrocortisone Acetate.  The increase included an increase to WAC for the 25mg, 12 count bottle that essentially matched Perrigo pricing.

1493.   Also on July 30, 2014, Vogel-Baylor learned of pricing that Perrigo had offered to Schnucks and sent a text message to her superiors: "████████████████████████████ ███████████████████████████████████████████████."

1494.   The next day, on July 31, 2014, ███████████, a senior G&W executive, e-mailed Vogel-Baylor stating: "███████████████████████████████████

████████████████████████████████████████████████████████

███████████████." Vogel-Baylor responded, "████████████████████

████████████████████████████████████████████████████████

████████████."

1495.   The next day, on August 1, 2014, G&W began notifying its customers of the price increase on Hydrocortisone Acetate. Vogel-Baylor sent an internal e-mail advising the team that,

"████████████████████████████████████████████████████████

████████████████████████████████████████████" G&W sent out a second wave of letters to additional customers on August 5, 2014.

1496.   The increase included a 200% increase to WAC for all three package sizes. According to an internal analysis, G&W projected an increase in Hydrocortisone Acetate sales from $41.3 million to $111.3 million as a result of the increase, or a total of $70 million in sales.

1497.   The two competitors continued to coordinate after the price increases.  On August 11, 2014, ████ of Perrigo called Vogel-Baylor and they spoke for more than sixteen minutes. One week later, on August 18, 2014, Vogel-Baylor called ████ and they spoke for more than ten minutes.

1498.   Several customers did not react kindly to the increase.  For example, when Vogel-Baylor e-mailed Econdisc to notify the customer of the price increase, Econdisc responded by stating that G&W's conduct was "████████████████████████"

**RRR.  Hydrocortisone Valerate Cream**

1499.  Hydrocortisone Valerate Cream is a topical corticosteroid used to treat a variety of skin conditions including eczema, dermatitis, allergies, and rash.

1500.  The two competitors on Hydrocortisone Valerate Cream were Taro and Perrigo. Boothe of Perrigo colluded with Perfetto of Taro to raise the price of Hydrocortisone Valerate Cream in August 2013, including raising WAC pricing by 351% on certain formulations.  Building on this success, the competitors colluded to raise the price again in June 2014.

1501.  As detailed above, on June 3, 2014, Taro published increased WAC pricing for the June 2014 Increase products, including Hydrocortisone Valerate.  That same day, ████████, a sales executive at Perrigo, sent an internal e-mail advising of the Taro price increases. Wesolowski, a senior executive at Perrigo, responded stating: "████████████████████████ ██."  That same day, Boothe and Perfetto exchanged four phone calls, including one call lasting five minutes.  Two days later, on June 5, 2014, Boothe followed up with Perfetto again.  The call lasted two minutes.

1502.  On July 14, 2014, ████████, a sales executive at Perrigo, sent an internal e-mail asking for a list of products that were due for a price increase.  The next day, on July 15, 2014, ████████, a Perrigo pricing executive responded "████████████████████████ ██████████████████████████████."  Hydrocortisone Valerate was on the list.

1503.  Over the next several days, Boothe and Perfetto exchanged several calls during which they discussed the price increase on Hydrocortisone Valerate, as well as other products. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 14:20:00 | 0:26:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:02:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 15:03:00 | 0:07:00 |

1504.   After the lengthy twenty-six minute call between Boothe and Perfetto on July 21, 2014, Perrigo notified its customers on July 22, 2014 that it would be increasing its WAC pricing on a list of products, including Hydrocortisone Valerate, effective July 24, 2014.  Notably, Perrigo was also colluding with competitors regarding other products on its list – Econazole Nitrate Cream (Taro and Teligent) and Hydrocortisone Acetate Suppositories (G&W).  These products are discussed in detail below in other subsections of this Complaint.

1505.   Indeed, Teligent's role in agreeing to the price increase on Econazole is reflective of its knowledge of and support for the overarching conspiracy.  Without Teligent's support for the Econazole price increase – which Shawn McMorrow promised during his conversations with ███████ of Perrigo and ████████ of Taro in July 2014 – the Econazole price increase would have failed, but so would the market allocation agreements and collusive price increases on those products for which Taro, Perrigo, and Sandoz overlapped, such as Clobetasol, Hydrocortisone Valerate, Halobetasol Propionate, and Imiquimod. This allowed the competitors to implement the "████████████" in which Sandoz would exit the market for certain drugs and Taro would lead price increases with the remaining competitors in those markets.  And in return for its express support of the overarching conspiracy, Teligent was rewarded upon Sandoz's reentry into the Econazole market, as Sandoz knew to take share from Perrigo and not Teligent.

### SSS.   Imiquimod Cream

1506.   Imiquimod Cream, also known by the brand names Aldara and Zyclara, is a topical medication used to treat actinic keratosis, or precancerous growths on the skin. Imiquimod Cream was a high-priced, large volume drug that provided a significant source of revenue for its manufacturers.  In 2012, the annual market for Imiquimod Cream in the United States exceeded $200 million.

1507.   On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream.  At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

### 1.   Perrigo Entry (April 2010)

1508.   Less than two months later, on April 13, 2010, Perrigo announced that it would be the AG for Imiquimod Cream.  That same day, ▬▬▬▬, a senior Fougera executive, sent the following e-mail to Kaczmarek, also a senior Fougera executive:



Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera, and they spoke for nearly four minutes.  CW-6 hung up and immediately called ▬▬▬▬, a sales executive at

Perrigo, and they spoke for nearly nine minutes.  When CW-6 hung up with ███████, he promptly called Kaczmarek back.  That call lasted less than one minute.

1509.  It is rare that the entry of a generic competitor would cause prices to actually increase – but it did so in this case.  Three days later, on Friday April 16, 2010, in advance of Perrigo's entry into the market, Fougera increased its WAC pricing for Imiquimod Cream.  That same day, CW-6 called ███████. The call lasted more than two minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they ultimately spoke for more than six minutes. Immediately after hanging up with Kaczmarek, CW-6 called ███████ back.  The call lasted one minute.

1510.  The next business day, Monday April 19, 2010, Perrigo sent an internal e-mail stating that "███████████████████████████████████████████████████ ███████."  As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.  That same day, John Wesolowski, a senior executive at Perrigo, called ███████ and they spoke for nearly six minutes.  This set off another rush of communications between ███████ of Perrigo and CW-6 of Fougera, with each of them concurrently reporting the results of those communications to their superiors, Wesolowski and Kaczmarek.  These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

1511.  The following week, between April 24 and April 27, 2010, the NACDS held its annual meeting in Palm Beach, Florida.  Several executives from Fougera and Perrigo were in

attendance, including Kaczmarek, ████████████, and CW-6 from Fougera and Wesolowski and ████████████, senior executives from Perrigo.

1512.   Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference.   On April 26, 2010, ████████ and CW-6 spoke by phone for seven minutes. Immediately after that call, CW-6 hung up and called Kaczmarek, speaking for four minutes.

1513.   Similarly, on April 27, 2010, ████████ e-mailed Kaczmarek while they were still at the NACDS meeting, stating that he needed "████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████."

1514.   On April 28, 2010, Perrigo officially entered the Imiquimod Cream market and published WAC pricing that was slightly higher than Fougera's.   That same day, ████████ e-mailed Fougera executives with an update regarding his conversations at the NACDS meeting.   With respect to Imiquimod Cream, ████████ stated, "████████████████████████████████ ████████████████████████."   ████ explained that Fougera gave up McKesson and ABC to Perrigo because "████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████."   CW-3, a sales executive at Fougera, expressed confusion that Fougera had lost ABC's business.   Kaczmarek explained that "████████████████████."   CW-3 replied: "████████████████████████."

1515.   On April 30, 2010, a senior Fougera executive, ████████████, demanded an urgent explanation from ████████ as to why Fougera was willing to give up both McKesson and ABC. ████████ reminded ████████ that it was inevitable that Perrigo would take some of the market.   ████████ also explained: "████████████████████████████████████████████████



.” ████████ stated that Perrigo's share would likely settle in the range of 30-40% "████████████████████████

██████████████████████████.”

1516.   Consistent with fair share principles and the prior discussions between the competitors, by April 30, 2010 Fougera had given up more than ten of its Imiquimod customers to Perrigo.

1517.   On May 16, 2010, Fougera was preparing an internal presentation regarding Imiquimod Cream, which included a statement that "████████████████████████

████.”   While reviewing the presentation, Boesch challenged ████ about the statement, asking

"████████████████████████████████████

████”   ████   assured Boesch that "████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████.”

1518.   The next day, on May 17, 2010, CW-6 and ████ exchanged at least six calls, including one lasting more than six minutes, likely to confirm (again) the agreement in place between the two competitors.

1519.   Several months later, on September 8, 2010, CW-6 circulated a press release to the Fougera sales team announcing that Perrigo had received its own ANDA approval to market generic Imiquimod Cream.   Previously, Perrigo had been selling the AG through a license with a branded manufacturer.   That same day, CW-6 called ████.   That call lasted less than a minute. ████ called CW-6 back almost immediately, and they spoke for more than two minutes.

1520.   On September 27, 2010, CW-6 gave a presentation to Fougera's parent company titled "████████████████████" during which he noted that Fougera had given up Imiquimod share to Perrigo and that, with regard to the larger fair share understanding, Fougera is "██████████████████████████████."  Later that year, in November 2010, CW-6 also noted in his monthly recap that "████████████████████" in the Imiquimod market.

1521.   Fougera also continued to monitor the status of other competitors' plans to enter the Imiquimod market.  For example, on February 7, 2011, a Glenmark employee called CW-6, and they spoke for four minutes.  Later that day, CW-6 e-mailed Kaczmarek and ████ regarding Imiquimod Cream that "██████████████████████████████."  ████ responded, "██████████████."

2.   <u>Sandoz Entry (February 2011)</u>

1522.   Although Fougera was fortunate that Glenmark had no near-term plans to enter the Imiquimod Cream market, another competitor – Sandoz – did receive FDA approval on February 28, 2011 to launch the product.   That same day, CW-6 of Fougera and ████ of Perrigo exchanged at least five calls, including two calls lasting two minutes each.

1523.   On March 1, 2011, one of Fougera's customers, NC Mutual, also e-mailed CW-3, a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod.  CW-3 promptly forwarded the e-mail to Kaczmarek.  That same day, CW-6 called ████ and they spoke for more than three minutes.

1524.   When Sandoz entered the market, it did so seamlessly – initially taking comparable share from the existing competitors Fougera and Perrigo.

1525.   For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer.   In total, the customers accounted for approximately 13% of the Imiquimod Cream market (ABC at 8% and Rite Aid at 5%).

1526.   On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and gave up its primary position to Sandoz.  The next day, on March 4, 2011, Kellum of Sandoz followed up with ████████████, a sales executive at Sandoz, stating, "████████████████████ ████████████████████████████████████████████████████████." Later that day, Perrigo followed suit and declined to bid to retain the ABC business.  That same day, CW-6 called ██████ and they spoke for four minutes.  A few minutes later, Kaczmarek called CW-6 and they spoke for nearly five minutes.

1527.   Around this same time, Taro was also starting to make plans to enter the market. Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida.  These representatives included CW-6 from Fougera, ████████ from Perrigo, CW-4 and Kellum from Sandoz, and ████████████ and ██████████, sales executives from Taro.

1528.   On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and ████ of Taro spoke on the phone for four minutes.  Later that day, Kellum – CW-4's boss sent an internal e-mail from ECRM stating that he had "████" Taro may be entering the Imiquimod Cream market. Also, while at the ECRM conference, CW-6 of Fougera and ████ of Perrigo spoke once by phone on March 9, 2011.  The call lasted one minute.  By March 9, 2011, Sandoz had acquired approximately 13% of the Imiquimod Cream market and Kellum recommended that they "███ ████████████████████████████████████████." "██████" referred to a group

of direct purchasers including Plaintiff HEB, Ahold, Schnucks, and Giant Eagle.  These were all

Perrigo customers, and Sandoz intended to obtain their Imiquimod business "███████████

█████████████████████████████████████████████████████████████████████████████

███." Those customers were the only additional customers whose business Sandoz was seeking.

To that end, Kellum conveyed to ████████████, a sales executive at Sandoz, that "████████

█████████████████████████████████████████████████████████████████████████████

██████████████████████████████████."  Ultimately, on March 17, 2011, Perrigo

conceded the consortium business to Sandoz.

1529.  On March 10, 2011, Kellum provided additional color for his recommendation that

Sandoz only go after smaller Fougera customers moving forward, explaining that "███████████

█████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████."

  3. Taro Entry (July 2011)

1530.  A month or so later, on April 15, 2011, Taro received FDA approval to market

Imiquimod Cream.  Taro immediately began coordinating its entry with competitors.  On April 17,

2011, ████ of Taro and CW-4 of Sandoz exchanged two calls, with one call lasting twelve

minutes.  Within an hour of ending the second call, CW-4 called her supervisor, Kellum, and they

spoke for five minutes.  The next day, on April 19, 2011, ████ called CW-4 again.  The call

lasted one minute.

1531.  On these calls, ████ conveyed to CW-4 that Taro had gotten FDA approval for

Imiquimod Cream but advised that Taro would not formally launch until June.  ████ also told

CW-4 that Taro had already received a pre-commitment from Econdisc, a large GPO customer,

and now would only go after smaller customers.  CW-4 understood that ████ shared this

information with her so that she knew Taro would not attack Sandoz at large customers and, if it did compete for smaller customers, it was only to obtain its fair share of the market.  CW-4 also understood that Sandoz should not compete for the Econdisc business, and in return, Taro "███

█████████████████████████████████████████████████████."

1532.   Perrigo and Fougera were also simultaneously coordinating how they would react to Taro's entry.   For example, on April 18, 2011, Kaczmarek informed the Fougera sales executives that Taro had received FDA approval to market Imiquimod Cream and asked, "████████

████████████?"  This set off a flurry of communications that same day between CW-6 of Fougera and ███████ of Perrigo, who were both concurrently reporting to, and taking direction from, their supervisors, Kaczmarek and Wesolowski.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

1533.   Three days later, on April 21, 2011, CW-6 decided to reach out to Taro directly and called ████████████, a sales executive at Taro.  The two men spoke for eight minutes.  Upon hanging up, CW-6 called Kaczmarek.  The call lasted one minute.  First thing the next morning, CW-6 sent a text message to ████████ of Perrigo.

1534.   By early July 2011, Taro was finally starting to enter the Imiquimod Cream market.  On July 5, 2011, ███████ reached out to CW-6 of Fougera.  The call lasted only two minutes, but it set off another rush of communications among the three competitors – Perrigo, Fougera, and Taro – to make sure they were on the same page regarding Taro's entry.  These calls, which all occurred within the span of approximately fifteen minutes, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

1535.   At the same time, ███ of Taro was coordinating with CW-4 of Sandoz. On July 7, 2011, ███ of Taro called CW-4 of Sandoz.  The call lasted two minutes.  CW-4 returned the call and they spoke for sixteen minutes.  A few hours later, CW-4 called ███ and they spoke for another four minutes.

1536.   On July 14, 2011, CW-6 of Fougera called ███ at Taro again and they spoke for nine minutes.  As soon as CW-6 hung up he called his boss, Kaczmarek, and the two spoke for five minutes.  Later that day, Kaczmarek e-mailed the Fougera sales team stating, "███ ████████████████████████████████████████████████████████."

1537.   On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price.  MedCo declined to disclose who made the offer.  This sparked another flurry of phone communications starting first thing the next morning between Perrigo, Taro and Fougera, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

1538.   The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business.  That same day, CW-6 of Fougera called ▮▮▮ of Perrigo.  The call lasted one minute. ▮▮▮ returned the call and they spoke for six minutes.

1539.   On August 8, 2011, ▮▮▮ of Taro called CW-4 of Sandoz again. They ultimately spoke for seventeen minutes.  On that call, ▮▮▮ informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not support any more customers.  CW-4 understood this to mean that the market would remain strong with no price erosion and Sandoz would not have to relinquish any additional customers to Taro. Later that evening, on August 8, 2011, CW-4 passed along competitive intelligence to the effect that Taro "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

1540.   On August 19, 2011, Hannaford – a retail pharmacy customer – advised CW-6 that it had received a competitive offer for Imiquimod Cream, but similarly would not identify which competitor made the offer.  Thereafter, CW-6 spoke several times with ▮▮▮ (Perrigo) and ▮▮▮ (Taro), in an effort to discover which competitor made the offer.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:07:00 | 0:02:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:09:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:10:00 | 0:06:00 |

1541.   During those calls, CW-6 was able to confirm that Taro had in fact made the offer. Later that day, CW-6 sent the e-mailed Kaczmarek that Hannaford received a competitive offer on Imiquimod, but would not tell him "▮▮▮▮▮▮▮▮▮▮."  Despite not getting this info from the customer, CW-6 reported "▮▮▮▮▮▮▮▮▮▮."  CW-5 responded again that

he thought they should "███████████████████." Kaczmarek ultimately agreed with this assessment, and Fougera conceded the account to Taro.

    1542.   The goal of these communications between the various competitors on Imiquimod Cream – Fougera, Perrigo, Sandoz, and Taro – was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors.  The results were highly successful.

    1543.   The next day, on August 20, 2011, ██████, a senior executive at Fougera, sent an e-mail to other senior Fougera executives regarding Imiquimod Cream stating, "



."

    1544.   Throughout September 2011, ████████████ of Taro, CW-6 of Fougera, and ████ of Perrigo spoke several times by phone during which they discussed, among other things, Taro's new capacity to take on additional market share for Imiquimod Cream and how that should be accommodated in the market.  As always, CW-6 and ████ kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations. Some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:46:00 | 0:03:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:31:14 | 0:12:10 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:46:35 | 0:05:01 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:24:00 | 0:01:00 |

1545.  After this series of calls, on September 30, 2011, Kaczmarek e-mailed other Fougera sales executives, including ▮▮▮▮, to advise them that Taro had made an offer for Imiquimod Cream at Wal-Mart, a Fougera customer.  Kaczmarek explained that "▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

Kaczmarek reluctantly recommended that Fougera give up Wal-Mart's business and "▮▮▮▮

▮▮▮▮▮▮▮."  Kaczmarek noted that, if Fougera defended Wal-Mart's business, Taro would likely just go after other customers at lower and lower prices "▮▮▮▮▮▮

▮▮▮▮"  On the other hand, if Fougera gave up Wal-Mart, Taro would hopefully "▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." ▮▮▮

agreed with Kaczmarek's recommendation and Fougera ultimately ceded the business to Taro in order to keep the market stable.

**TTT.  <u>Irbesartan</u>**

1546.  Irbesartan is a drug used in the treatment of hypertension.  It prevents the narrowing of blood vessels, thus lowering the patient's blood pressure.  Irbesartan is also known by the brand name Avapro.

1547.  Teva received approval to manufacture generic Irbesartan in March 2012.

1548. On March 6, 2012, Teva's ███████ polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

1549. At 11:27 a.m., ███████, an account manager at Teva responded: "████████ ████████." Less than twenty minutes later, Green placed a call to Berthold at Lupin. They talked for seventeen minutes. Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:

From:     Kevin Green
Sent:     Tue 3/06/2012 12:26 PM (GMT-05:00)
To:       ████████; Dave Rekenthaler; ████████
Cc:       ████████; Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out. I assume Winthrop id the AG

1550. That same day, Rekenthaler informed the group that he still had not received "████ ████████." He received an immediate response from a senior commercial operations executive at Teva, expressing his displeasure:

From:     ████████
Sent:     Tue 3/06/2012 3:08 PM (GMT-05:00)
To:       Dave Rekenthaler; ████████; Kevin Green; T████████
Cc:       ████████, Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Then work harder….

1551. At 10:54 a.m. the next day, Green called Berthold again. They spoke for nearly seven minutes. At 12:20 p.m., ███████ of Teva shared with the sales team the competitively sensitive information Green had obtained. Included were the details Berthold had shared with Green about which competitors were launching/not launching the drug, and the identity of the

customers that received offers.  ████████  stated that Teva was in a position to take up to a 40% market share when it launched Irbesartan on March 30, 2012.

**UUU.  Isosorbide Dinitrate**

1552.   Isosorbide Dinitrate, also known by the brand name Sorbitrate, is used to prevent chest pain by relaxing and widening blood vessels so blood can flow more easily to the heart. During the period relevant to this Complaint, Sandoz, Par and West-Ward were the primary manufacturers of Isosorbide Dinitrate tablets.

1553.   In July 2012, due to claimed supply disruptions, both Sandoz and West-Ward dramatically increased their prices by approximately 1000%.  Following these price increases, internal Sandoz documents kept by Armando Kellum and CW-3 concluded that Sandoz had its fair share of the market for Isosorbide Dinitrate and did not seek more share for this reason.

1554.   Following this price increase, Par sought to increase its presence in the market for Isosorbide Dinitrate.  Rather than compete for price, Par knew that Sandoz and West-Ward would concede share.  Accordingly, Par matched the 1000% price increase announced by Sandoz and West-Ward.

1555.   These price increases were coordinated by senior sales executives from each of Sandoz, Par, and West-Ward. For example, ████████████████  of West-Ward spoke to ████  ████████  of Sandoz for nearly twenty minutes on September 5, 2012.  Likewise, on June 6, 2012, Sandoz's CW-3 spoke for approximately twenty-five minutes to ████████, West-Ward's Director of National Accounts.  The next week, on June 15th, Sandoz announced its price increases on Isosorbide.  The two executives next spoke for approximately twenty-one minutes on October 11th, and West-Ward announced its Isosorbide Dinitrate list price increases the next day.

1556.   Par announced its WAC price increases on March 11, 2013. Not long after, on March 26th, ███████████ of Par (the VP of National Accounts) spoke to CW-1 of Sandoz for approximately twenty-five minutes.

1557.   As a result of this coordination, Defendants increased prices on Isosorbide Dinitrate by more than 1000% and charged supracompetitive prices to Plaintiffs and other in the United States.

**VVV.   Labetalol**

1558.   Labetalol, also known by brand names such as Normodyne and Trandate, is a medication used to treat high blood pressure.  Labetalol, like Nadolol, is in a class of drugs called beta blockers, and it works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure.

1559.   Labetalol was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekenthaler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ███████ of Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called ██.  Also, Rekenthaler spoke with ██████████ of Actavis and ██████████ of Breckenridge.  These communications solidified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

1560.   After Teva increased its pricing on Labetalol on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug.  For example, in October 2012, Teva learned that Sandoz was "███████████████████" but that

"████████████████" (*i.e.*, did not have enough supply to meet all of its demand).  In an internal e-mail sent on October 16, 2012, ████████, a senior analyst at Teva, questioned whether Teva should consider lowering "████████████████" in order to retain its market share.

1561.   That same day, Green spoke to CW-2 of Sandoz two times.  After those calls with CW-2, Green responded to the analyst's question:

Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.

Stay the course and maintain our higher price

1562.   ████ of Teva agreed: "████████████████████████."

1563.   Rekenthaler was not satisfied, however.  In order to confirm that Actavis was also still committed to maintain high pricing on Labetalol, Rekenthaler called and spoke to ████, ████, a senior sales executive at Actavis, four times on October 18, 2012.

**WWW.  Lamivudine/Zidovudine (Generic Combivir)**

1564.   Lamivudine/Zidovudine, also known by the brand name Combivir, is a combination of medications used in the treatment of human immunodeficiency virus infection.  This combination of drugs is often prescribed to decrease the chances that an HIV-positive patient will develop acquired immunodeficiency syndrome or other related illnesses.

1565.   Teva launched its generic Combivir product in December 2011.

1566.   In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

1567.   Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants.  Rekenthaler was

speaking to ███████, a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

1568.   For example, on April 24, 2012, ██████ of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir.   Rekenthaler responded immediately that Aurobindo was entering.   When ████████ questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:

> **From:** Dave Rekenthaler
> **Sent:** Tuesday, April 24, 2012 11:17 AM
> **To:** ████████
> **Subject:** RE: what r you guys hearing on generic combivir?
>
> It was brought up to me last week by our good friend so I'm assuming it's accurate.

1569.   That "████████" was Aurobindo's Cunard, who had previously worked with both ████████ and Rekenthaler while at Teva.   Rekenthaler was reluctant to identify Cunard in writing as it would evidence conspiratorial communications between the two competitors.   To confirm this information, Green also called and spoke to Grauso of Aurobindo that same day for twelve minutes and Berthold of Lupin for four minutes.

1570.   After speaking with Berthold, Green responded separately to ████████, providing specific information regarding Lupin's entry plans, including commercially sensitive intelligence about Lupin's anticipated bid at a large wholesaler.   Green and Berthold then spoke again the next day, April 25, 2012, for seven minutes.

1571.   In early May, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated noticeably.   Over the four-day period

from May 7 to May 10, for example, the three companies spoke at least 32 times, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|------|----------|-------------|-----------|--------------|--------|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

1572.   During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible.   The phone records demonstrate several instances during this 4-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

400

1573.  On  May  10,  2012,  at  the  conclusion  of  this  four-day  period  of  intensive communications, ██████████ of Teva informed his colleagues of the results.  He confirmed that "████████████████████████████████████."  Importantly, he went on to list the specific accounts that Teva had negotiated to retain in order to hold on to a 40% market share in generic Combivir. ██████████ also identified the specific accounts that Teva would concede to its competitors Aurobindo and Lupin.

1574.  Even before the negotiations with Aurobindo and Lupin were finalized, ██████████ made it clear to the sales team that Teva would be cooperating with its competitors to provide them with their fair share of the generic Combivir market.  On May 9, 2012, when a major customer was pressing Teva for a bid, ██████████ instructed ██████████ that Teva did not plan to keep that customer.  When ██████████ asked if she should provide any bid at all, ██████████ directed her to provide a sham bid, saying:

> From: ██████████
> Sent: Wed 5/09/2012 2:54 PM (GMT-05:00)
> To: ██████████
> Cc:
> Bcc:
> Subject: RE: Combivir - Multisource Strategy
>
> We can send them a proposal that will not work.

1575.  Three days later, when preparing the bid for that customer, ██████████ pushed back on ██████████'s directive on price, asking: "████████████████████████████████████ ████?"  But ██████████ refused, responding that they could not go any lower or else Teva might risk actually winning the business.  He concluded: "████████████████████████████████ ██████████████████████."

1576. In a separate e-mail exchange with ▮▮▮▮ on that same day, May 11, 2012, ▮▮▮▮ told ▮▮▮ that another of her major customers was not on the list for Teva to retain with respect to generic Combivir. He reminded her of the goal of the overarching conspiracy, stating that Teva should concede that customer "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮." ▮▮▮▮ pointed out that such a move would give Teva its fair share as the first entrant: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." ▮▮▮ then informed that customer that Teva would not compete for its business because "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

1577. Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

### XXX. <u>Latanoprost Drops</u>

1578. Latanoprost, also known by the brand name Xalatan (manufactured by Pfizer), is an ophthalmic solution, in the form of eye drops, used to treat high blood pressure inside the eye due to glaucoma (open angle type) or other eye diseases including but not limited to ocular hypertension. In 2013, the annual market for Latanoprost Drops in the United States exceeded $100 million.

1579. As of March 2012, there were three generic manufacturers in the market for Latanoprost Drops: Sandoz, Greenstone, and Valeant (sometimes referred to as Bausch & Lomb ("B&L")). Greenstone had the largest market share with 42%, followed by Valeant with 30% and Sandoz with 19%. In April 2012, all three manufacturers raised their prices in direct coordination with one another.

1580. In early April 2012, Greenstone informed its customers that it would be taking a price increase on Latanoprost Drops. In the days and weeks leading up to the Greenstone price

increase notice, Robin Hatosy of Greenstone acted as the conduit, sharing information between Sandoz and Valeant in order to secure an agreement from both to raise prices, through phone and text message exchanges with Kellum of Sandoz and ▮▮▮▮▮▮▮▮ of Valeant:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 12:35:30 | 0:00:00 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:38:54 | 0:00:29 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:39:39 | 0:00:46 |
| 3/5/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:30:16 | 0:05:18 |
| 3/16/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:26:02 | 0:00:00 |
| 3/16/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:27:11 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 16:21:54 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 20:13:55 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:08:36 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 11:07:59 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:03:57 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:07:02 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:11:17 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:15:28 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:49:42 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:51:14 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:52:14 | 0:00:00 |

1581.   On the day that Greenstone sent out the price increase notices, April 3, 2012, both CVS and Walgreens approached Sandoz looking for a lower price on Latanoprost Drops.  That same day, ▮▮▮ and Kellum exchanged five text messages while Kellum replied internally to his colleagues at Sandoz, stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  Later that evening, Kellum instructed his sales team not to make any "▮▮▮▮▮▮" for Latanoprost and to put the product on "▮▮▮▮▮▮▮▮."  Kellum also instructed ▮▮▮▮▮▮▮▮, one of his sales executives, to lie to Walgreens about why Sandoz was unable to bid, instructing him to "▮▮▮▮▮▮▮▮" even though Sandoz had plenty of supply.

1582.   Sandoz immediately began preparing an increase of its own.  On April 4, 2012, Kellum called ▮▮▮ but was unable to connect.  He called her again on April 5, 2012, and the two competitors spoke for nearly two minutes.

1583.   On April 6, 2012, Kellum requested a customer list from a colleague so that he could begin calculating the financial impact of a Sandoz price increase.  He also added the item "███████████████████████████████████████████████████████████ ██████."   After some quick calculations, Kellum determined that a Sandoz increase on Latanoprost Drops could increase the company's revenues by up to $14,900,000 per year.

1584.   In a presentation he created that same day to support the Latanoprost price increase, Kellum was intentionally opaque about why Sandoz should take the increase, stating that "███████ ████████████████████████████████████████████████████████████ ██████████████████████████."  But that was a lie.  Kellum had first learned of the Greenstone price increase directly from ██████, not a customer.  In addition, the Valeant price increase had not even happened yet.  In fact, it would not be effective until April 24, 2012, three weeks in the future; Kellum's inside information instead came directly from his prior conversations with his competitor, Greenstone.

1585.   While he was in the midst of planning the Sandoz price increase on April 6, 2012, Kellum also exchanged two more text messages and had a nearly seven minute call with ██████ of Greenstone.  ██████, in turn, then called ██████ at Valeant and the two spoke for nearly five minutes.  Later that evening, Kellum told colleagues: "████████████████████████████████ ████████████████████████████."

1586.   Things moved quickly from there. On April 9, 2012, Kellum sent around an agenda for the Pricing Committee meeting the next day.  The agenda included "████████████████████ ████████████████████████."   He also called ██████ of Greenstone but was unable to reach her.  Kellum quickly obtained approval for the Latanoprost price increase; customers were notified of

the increase on April 11, 2012, and it became effective on April 13, 2012.  As a result of this quick action, Sandoz's price increase became effective even before Greenstone's.

1587.   On April 12, 2012, a large retail pharmacy customer, Rite-Aid, sent Greenstone a request for a bid on Latanoprost.  Knowing that this was likely an indication that Sandoz had followed Greenstone's price increase, ████ (then using a different surname) forwarded the e-mail directly to Kellum with an approving message:

| | |
|---|---|
| **From:** | Strzeminski, Robin <Robin.Strzeminski@pfizer.com> |
| **Sent:** | Thursday, April 12, 2012 7:55 PM |
| **To:** | Kellum, Armando |
| **Subject:** | Fwd: Open Bid - Latanoprost |

Nice!

Robin Strzeminski | National Account Director|Greenstone LLC Mobile ████ | Fax ████ Email |
robin.strzeminski@pfizer.com<mailto:robin.strzeminski@pfizer.com>

1588.   That same day, a different customer, Optisource, approached Sandoz – angry that it was not notified in advance of Sandoz's Latanoprost price increase.  A Sandoz sales executive told the customer that Sandoz was simply "████████," but Optisource challenged that idea, saying that Valeant – which was also on a secondary contract with that customer – had not raised its price.  Questioning Kellum's intel about the price increases, a senior sales and pricing executive at Sandoz forwarded the e-mail string directly to Kellum on Friday, April 13, 2012, asking: "████████████ ████."  Kellum's understanding, of course – based on his conversations with ████ – was that Valeant would be raising, or already had raised, its price.

1589.   The following Monday, April 16, 2012, Kellum called ████.  She called him back the next day, but they were unable to connect.  On April 18 and 19, 2012, ████ and ████ of

405

Valeant then communicated several times by phone and text message, including one call lasting nearly fourteen minutes.

1590. On April 24, 2012, Valeant raised its WAC pricing on Latanoprost to a point even higher than Sandoz's. That same day, ███████ of Valeant called ███████ of Greenstone, likely to report the news.

1591. Three price increases in the span of roughly three weeks caused a lot of customer activity and confusion – which in turn required additional coordination among the three manufacturers to make sure prices stayed high and the market remained stable. For the most part, Sandoz tried to avoid taking any of its competitors' customers after the price increases, but it did want to pick up one customer to get closer to its "fair share" of the market.

1592. For example, on Friday May 4, 2012 – shortly after the Greenstone and Valeant price increases became effective – Cardinal approached Sandoz with an opportunity to bid and take the business with a lower price. Kellum called ███████ that day, but they were unable to connect. He called her again on Monday, and they spoke for more than six minutes. They spoke about Sandoz's desire to obtain another customer, and which customer it should target. Monday morning, before speaking to ███████, Kellum responded to the internal Sandoz e-mail saying, "███ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████." The next day, after speaking to ███████, Kellum followed up the e-mail, confirming that Sandoz should pass on Cardinal, stating "███████████████████████████████ ███████████████████████████████████." Consistent with the agreement reached with Greenstone, Sandoz retained its secondary position with Cardinal, instead of bidding for the

primary position, and decided to wait until ABC put its Latanoprost business out to bid and let Greenstone concede that customer instead.

1593.   Around this same time, CW-1 started at Sandoz. He had previously worked with ███ at a prior employer and thus had a pre-existing relationship with the Greenstone sales executive.  When some confusion arose later in May 2012 around the Cardinal business, ███ communicated with both CW-1 and Kellum from Sandoz, as well as ███ of Valeant, in order to enforce the agreement already in place among the three manufacturers.

1594.   For example, on the morning of May 31, 2012, ███ of Valeant and ███ of Greenstone exchanged one text message and had several phone calls of varying lengths.  In the midst of those communications with ███, ███ was simultaneously communicating with CW-1 of Sandoz using iPhone chat, resulting in the following message exchange:

| From | | Body | Status | Timestamp: Time |
|---|---|---|---|---|
| +███ | Robin | Did u guys pick up cardinal on latanaprost? | Read | 5/31/2012 8:18:08 AM |
| +███ | | No , did you lose it? | Sent | 5/31/2012 8:23:11 AM |
| +███ | Robin | You guys bid?? I'm confused... Its b&l. And supposedly you ranked the price unless cardinal is lying. | Read | 5/31/2012 8:28:48 AM |
| +███ | Robin | Tanked the price? I need to call Armando. | Read | 5/31/2012 8:28:48 AM |

1595.   As ███ explained to CW-1, Valeant (B&L) had the Cardinal business, not Greenstone, but Cardinal was telling Valeant that Sandoz had a lower price in the market. ███ expressed the need to call "Armando" [Kellum] because CW-1 had only recently started at Sandoz and thus did not completely understand the scope of the prior collusive communications between ███ and Kellum about the Latanoprost price increases.

1596.   Immediately following this exchange, ███ did call Kellum, setting off a flurry of calls between the three competitors that day, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:29 | 0:00:02 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:50 | 0:01:57 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:34:24 | 0:03:15 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:39:30 | 0:00:59 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:43:46 | 0:00:00 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:44:31 | 0:00:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:45:15 | 0:02:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 9:17:22 | 0:02:29 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 10:38:48 | 0:01:01 |

1597.   Over the next several weeks, ████ went to great lengths to make sure Sandoz and Valeant lived up to their agreement to keep prices high across the board for Latanoprost.   For example, between June 26 and 28, 2012, ████ and ████ of Valeant exchanged twelve text messages.

1598.   After that series of communications, on June 29, 2012, ████ reached out again to CW-1 via iPhone chat (At the exact same time that ████ was exchanging these iPhone chat messages with CW-1 at Sandoz, she was also exchanging separate text messages with ████ of Valeant):

| From | Body | Status | Timestamp: Time |
|------|------|--------|-----------------|
| ████ Robin | Remind Armando to remove lantanoprost from cardinals secondary contract or raise the price. PLEASE!! it's visible everywhere. | Read | 6/29/2012 4:24:32 PM |
| ████ | We are working on it | Sent | 6/30/2012 8:46:10 PM |
| ████ Robin | Lol!! Speedy Gonzales please!!! If I get another message someone is getting shot. | Read | 6/30/2012 8:46:56 PM |
| ████ | Sorry vacation going on this week. Ak out and I am in Miami | Sent | 6/30/2012 8:48:21 PM |
| ████ Robin | Lol!! Enjoy!!! Tell him to get his shit together!! | Read | 6/30/2012 8:51:12 PM |

1599.   Those efforts were successful.   On July 3, 2012, CW-1 followed up with ████ via iPhone chat message confirming that Sandoz's pricing for Latanoprost was not low at Cardinal – or any other customer for that matter:

| From | Body | Status | Timestamp: Time |
|------|------|--------|-----------------|
| ▮▮▮▮ | FYI we do not have old low pricing out there | Sent | 7/3/2012 4:24:54 PM |
| ▮▮▮▮ | We have a secondary but it's not old or low | Sent | 7/3/2012 4:26:20 PM |
| ▮▮▮▮ Robin | Secondary cardinal pricing? Are u sure?? | Read | 7/3/2012 4:26:40 PM |
| ▮▮▮▮ Robin | I hope it's higher than primary would be??? | Read | 7/3/2012 4:26:40 PM |
| ▮▮▮▮ Robin | Like over $11 | Read | 7/3/2012 4:26:40 PM |
| ▮▮▮▮ | Correct | Sent | 7/3/2012 4:28:21 PM |
| ▮▮▮▮ Robin | Ok!! What about Kinray Parmed? In line?? | Read | 7/3/2012 4:30:56 PM |
| ▮▮▮▮ | Yes | Sent | 7/3/2012 4:37:50 PM |
| ▮▮▮▮ Robin | Otherwise I get my voodoo doll out! | Read | 7/3/2012 5:17:52 PM |
| ▮▮▮▮ | And I don't want that | Sent | 7/3/2012 5:19:48 PM |
| ▮▮▮▮ Robin | Right!!! You don't! :)) | Read | 7/3/2012 5:20:00 PM |

1600.   Again, shortly after receiving this information from CW-1 about Sandoz's pricing, ▮▮▮▮ sent a text message to ▮▮▮▮ at Valeant.  They exchanged several other text messages that same day.

1601.   Greenstone similarly lived up to its agreement to concede the ABC business to Sandoz, allowing Sandoz to get closer to its "fair share" of the Latanoprost market.  On June 22, 2012, ABC requested a bid from Sandoz on Latanoprost, as expected, due to the Greenstone price increase.  Consistent with the agreement, Greenstone quickly conceded the customer to Sandoz, allowing Sandoz to obtain the business "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

1602.   Remarkably, the Defendants were able to implement this price increase despite the fact that Akorn launched Latanoprost in July 2012 as well.  Each of the competitors conceded market share to Akorn, and in return, Akorn entered the market at the price set by Sandoz, Greenstone/Pfizer, and Valeant.

1603.   As discussed above, this successful effort at price fixing convinced Kellum to recommend further efforts at price fixing with Greenstone on various formulations of Clindamycin beginning in August 2012, continuing through 2014.  That history also paved the way for another successful price fixing agreement between Sandoz and Greenstone on Eplerenone Tablets, discussed above.

**YYY.  Leflunomide**

1604.   The market for Leflunomide is mature, as the drug has been available in generic form since 2005.  During the relevant time period, Defendants Apotex, Heritage, and Teva sold Leflunomide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1605.   During their April 15, 2014 phone call alleged above, Malek and the Teva's Patel also discussed Leflunomide and targeted it for a price increase.

1606.   During the first week of May 2014, executives from Teva, Heritage and Apotex spoke several times by telephone.  During these phone calls, all three companies agreed to increase prices on Leflunomide and to refrain from submitting competitive bids to each other's customers.  These conversations also resulted in an agreement that Apotex would lead the price increase, which it did on May 9, 2014.

1607.   Pursuant to the agreement between the three companies, Heritage began to announce the price increase in June, and had fully implemented the price increase on all its major Leflunomide accounts by early July.

1608.   In early July, after the price increase on Leflunomide was implemented, Teva exited the market for the drug.  Because the price increase was successful, this action was against Teva's self-interest.  Upon information and belief, Heritage induced Teva's exit by agreeing to concede market share to Teva on other drugs.

1609.   As alleged above, the price increases regarding Leflunomide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Leflunomide to Plaintiffs and others in the United States.  These

collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

**ZZZ.   Levothyroxine**

1610.   Levothyroxine is a synthetic form of the thyroid hormone thyroxine used to treat hypothyroidism, goiter, thyroid cancer, and cretinism.  The market for Levothyroxine is mature, as Levothyroxine has been available in the United States for over 50 years.  Levothyroxine is on the WHO's list of essential medicines.  Levothyroxine is often featured on lists of the top ten most prescribed generic drugs and, as of June 2015, it was the most prescribed generic drug in the United States and constituted 2.7% of the entire generic drug market by number of prescriptions.  Over 120 million prescriptions are written annually for Levothyroxine in the United States, treating 15% of the population over the age of 55.

1611.   Since approximately December 2010, Defendants Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1612.   In 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine.  Nesta of Mylan spearheaded the discussions by speaking with Kevin Smith, a senior sales executive at Lannett, and with CW-4 of Sandoz.  In addition to communicating directly with CW-4 on this drug, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Green of Teva.  Notably, Levothyroxine was not a drug that Teva sold.

1613.   As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine.  The day before the Mylan increase, on January 3, 2013, Nesta of Mylan and Green of Teva spoke at least four times by phone.  The next morning – the day of the Mylan price increases – Green spoke twice with Kellum, including a six minute call at 9:34 a.m.

411



1614.   Shortly after hanging up the phone with Green, Kellum sent an internal e-mail stating, among other things, that he "███████████████████████████████████████ ████████████████████████" and Kellum advised his team to "██████████████" on this product.   As the phone records demonstrate, Kellum's source for the information was not "█ ████████," but rather Green of Teva.

1615.   That same morning, ████ of Lannett called Nesta of Mylan.   The phone call lasted 44 seconds.   Then, on January 10, 2013, Nesta called ████ back and they spoke for more than six minutes.   That same day, McKesson e-mailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally: "██████████████████████████████████████ ████████████████."

1616.   The following Monday – January 14, 2013 – Lannett raised its WAC pricing for Levothyroxine to match Mylan.   Notably, after these phone calls, Nesta would not speak again with ████ of Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.

1617.   On July 16, 2013 – as detailed above – CW-4 spoke with Nesta and sent the July 2013 E-mail identifying the Mylan price increases.   The price list included Levothyroxine and noted that Lannett had followed.

1618.   On August 6, 2013, Nesta called CW-4 two times. Both calls lasted less than a minute.   A few minutes after the second call, Nesta called ████ at Lannett.   The call lasted 24 seconds (likely a voicemail).   Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

1619.   On August 10, 2013, ██████████████, a national account executive at Sandoz, sent an internal e-mail that stated: "████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████.” CW-4 replied to ████████'s

e-mail stating: "████████████████████████."

1620.  Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1621.  On August 14, 2013, ████████ sent an e-mail to Kellum, copying CW-1, regarding "████████████████" and asked "████████████████████?"  CW-1 responded: "████████████."  In response, ████████ replied: "█████████████████████████████

████████████."  CW-1 answered: "████████████████████."

1622.  On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine.  ████████████, a national account manager at Lannett, forwarded the request to ████ stating: "████████████████████████████████████

████████████████████████████████████████████████."  ████████ explained that "███████████████████████████████████████████████████████

████████████████."  Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating: "████████████████████████████████████████

████████████████."

1623.  During a September 10, 2013 earnings call, Lannett's CEO, ████████████, was asked for his reaction to Mylan's Levothyroxine price increase.  ████████ responded: "████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████."

413

1624.   On September 13, 2013, Sandoz did indeed act "███████████" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1625.   By way of example, Defendants set matching WAC prices on their 0.05 mg tablet in quick succession in August and September 2013:

| Product .05 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1000 ct | Mylan | 00378180310 | $0.18 | $0.27 | 9-Aug-13 | 45% |
| 100 ct | Lannett | 00527134201 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 1000 ct | Lannett | 00527134210 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 90 ct | Sandoz | 00781518192 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 1000 ct | Sandoz | 00781518110 | $0.12 | $0.27 | 13-Sep-13 | 120% |

1626.   The three competitors – Defendants Mylan, Lannett, and Sandoz – did not stop there.  They coordinated again to raise price on Levothyroxine in April/May 2014.

1627.   Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014.  In the two days leading up to the increase, Nesta and ███████ ██████ of Lannett spoke by phone several times.  These calls are listed below.  Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

1628.   On April 25, 2014 – the day that Mylan increased its pricing for Levothyroxine –a sourcing manager at Cardinal Health, sent a text message to Sullivan of Lannett stating: "████████ ████████████████████████████████████████████."  Sullivan responded: "████████████

█████████████████████████████" Sullivan had "████" about the Mylan increase from her supervisor, ██████████, who had communicated with Nesta only days prior.

1629.   Lannett quickly followed with a price increase of its own - raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors. The following chart reflects Defendants' price increases on .05 mg tablets:

| Product .05 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1000 ct | Mylan | 00378180310 | $0.27 | $0.41 | 25-Apr-14 | 54% |
| 100 ct | Lannett | 00527134201 | $0.27 | $0.41 | 28-Apr-14 | 55% |
| 1000 ct | Lannett | 00527134210 | $0.27 | $0.41 | 28-Apr-14 | 54% |
| 90 ct | Sandoz | 00781518192 | $0.27 | $0.41 | 23-May-14 | 54% |
| 1000 ct | Sandoz | 00781518110 | $0.27 | $0.41 | 23-May-14 | 54% |

1630.   As a result of the overarching "fair share" understanding and these collusive communications, Defendants Lannett, Mylan, and Sandoz all sold Levothyroxine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1631.   Mylan, Sandoz, and Lannett have maintained their prices at these supracompetitive levels and, as a result, Plaintiffs have been forced to pay supracompetitive prices for generic Levothyroxine since January 2013.

### AAAA.  Lidocaine Ointment

1632.   Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as Xylocaine Topical Solution, among others, is an anesthetic used to temporarily numb and relieve

pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

1633.   In late 2011, Hi-Tech began making plans to launch Lidocaine Ointment.  At that time, Fougera was the sole generic manufacturer in the market.

1634.   On November 21, 2011, ███████████, a Fougera sales executive, forwarded an invitation to CW-6, among others, for a conference call on November 28, 2011 to discuss "███████ ███████████."  "████████████████████████ – a product on which Fougera and G&W overlapped and where CW-6 was colluding with Grauso of G&W at the same time.  That anticompetitive conduct is discussed above in an earlier Section of this Complaint.

1635.   The next day, on November 22, 2011, █████████ of Hi-Tech called CW-6 and they spoke for seven minutes.  Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they spoke for four minutes.  The November 2011 call between CW-6 and ████ was the first time that the two competitors had ever spoken by phone (according to the available phone records).  During these calls, the two competitors discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

1636.   Fougera held its internal strategy meeting on November 28, 2011.  A few days later, on December 2, and then again on December 5, 2011, CW-6 called ████.  The calls lasted one minute each.

1637.   Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200%.

1638.   Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, ██████ and CW-6 began speaking more frequently.  On February 23, 2012, ██████ of Hi-Tech called CW-6 and they spoke for seven minutes.  Immediately upon hanging up, CW-6 called

his supervisor, Kaczmarek, to report the conversation.  That call lasted one minute.  An hour later, Kaczmarek called CW-6 back and they spoke for six minutes.  Further, on March 7, 2013, ███ called CW-6 and they spoke for five minutes.  CW-6 called ███ back a few minutes later.  The call lasted one minute.  During these calls, the competitors discussed which customers Hi-Tech should target as it entered the Lidocaine market, as well as pricing.

1639.  One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment market and matched Fougera's increased WAC pricing.

1640.  After Hi-Tech entered, and consistent with fair share principles, Fougera gave up several of its Lidocaine Ointment customers to the new entrant.  For example, on March 22, 2012, ABC e-mailed Fougera ███████████████████████████ ███████████████████████.  CW-3, then a sales executive at Fougera, ███ Kaczmarek ███████████████████████.

1641.  Similarly, on March 27, 2012, CW-6 advised Kaczmarek that Hi-Tech had ███ ███████████████████.  CW-6 suggested that Fougera "███ ████████████," to which Kaczmarek replied: "█████."

1642.  On May 17, 2012, Wal-Mart e-mailed ████████, another Fougera sales executive, ████████████████████████████ ██████████████.  ███ forwarded Wal-Mart's request to Kaczmarek, ████████████.

1643.  First thing the next morning, Kaczmarek called CW-6 and they spoke for ten minutes.  A few hours later, Kaczmarek called CW-6 again and they spoke for three minutes.  Immediately upon hanging up, CW-6 called ████ of Hi-Tech.  The call lasted one minute.  A half hour later, CW-6 called ████ again.  The call lasted one minute.  That same morning,

Kaczmarek responded to ████ 's e-mail stating, "████████████████
████████████ ."

1644.  Later that day, Kaczmarek e-mailed the sales team ████████████

████████████████████████████████████████

████████ , and advised that Fougera was "████████████████ ."  A Fougera sales

executive, ████████████████████████████████████

████ .  Therefore, Kaczmarek recommended that Fougera "████████████████

████████ ."  The next day, on May 19, 2012, CW-6 called ████ , speaking for four minutes

– likely letting him know that Fougera was now done conceding customers to the new entrant.

1645.  One year later, in March 2013, Taro began preparing to re-launch into the Lidocaine

Ointment market. At that time, Sandoz (which by that point had acquired Fougera) had

approximately 56% market share and Hi-Tech had 42%.

1646.  On March 18, 2013, the same day that Aprahamian started at Taro, Perfetto sent an

internal e-mail, ████████████████████████████████

████████████████████████████████ ."

1647.  Over the next several days, Aprahamian and CW-3 of Sandoz exchanged several

calls, including a call on March 19, 2013 lasting sixteen minutes and a call on March 21, 2013

lasting twelve minutes.

1648.  Later in the day on March 21, 2013, after Aprahamian's conversations with CW-

3, ████████ , a senior Taro sales executive, sent an internal e-mail ████████████

████████████████████████ and stating: "████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████.'"  The next day, on March 22, 2013, Aprahamian called CW-

3 again.  CW-3 returned the call and the two competitors spoke for seventeen minutes.

1649.   During these calls in March 2013, Aprahamian informed CW-3 that Taro would be

re-entering the Lidocaine Ointment market.  CW-3, in turn, provided Aprahamian with non-public

price points that Sandoz was charging to its customers for the product.

1650.   Armed with this competitively sensitive information, on or about March 23, 2013,

Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC pricing.  Over the

next two weeks, Aprahamian and CW-3 exchanged numerous calls during which they discussed,

among other things, the allocation of customers to the new entrant, Taro.  These calls are listed in

the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/25/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:56:00 | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:15:00 | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:16:00 | 0:06:00 |

1651.   Although Aprahamian wanted CW-3 to tell him which customers to target, CW-3

had a difficult time obtaining that guidance from Kellum.  Aprahamian told CW-3 that Taro would

be taking two customers from Sandoz – CW-3 understood that to mean that Taro planned to take

one wholesaler and one retailer.

1652.   On April 5, 2013, ██████████, a senior Sandoz marketing executive, sent an

internal e-mail asking, "████████████████████████████████████████

█████?"  CW-3 responded: "████████████████████████████████████████

█████████████████████████████████████.” █████████ replied ███████ Kellum, ████

█████████████████” Kellum ██████████████████████████████████████████

████████████ : “███████████████████████████████████████████████████████

██████████████████████████.”  Later that day, ███████████ sent another e-mail to others at

Sandoz stating: “███████████████████████████████████████.”

1653.   On April 8, 2013, Taro held a Sales and Marketing conference call. According to

the meeting minutes, Perfetto reported the following: “████████████████████████████████

████████████████████████████████████████████████████████.”  The

next day, on April 9, 2013, CW-3 called Aprahamian and they spoke for seven minutes.

1654.   On April 15, 2013, Aprahamian and CW-3 exchanged three calls, including one

lasting eighteen minutes and another lasting nine minutes.  Later that day, Aprahamian sent an

internal e-mail attaching a “█████████████████████████.”  The █████████████████████

█████████████████████████, Taro's “████████████” was “████████████” and they had

achieved “███████” share.  For pricing, ███████████████████████████████████████

█████████████████████████████████.”

1655.   The next day, on April 16, 2013, CW-3 called Aprahamian. Aprahamian returned

the call and the two competitors spoke for eleven minutes.  At the same time, ████████████ of Taro

called ██████████, a senior Hi-Tech sales and marketing executive, and they spoke for eight

minutes.  Throughout the rest of April, CW-3 and Aprahamian would exchange at least ten more

phone calls.

1656.   In June 2013, Taro circulated a spreadsheet detailing its gains and losses for May

2013 for various products.  With respect to Lidocaine Ointment, ████████████████████████████

█████████████████ “██████████████.”

1657.  By January 2014, Sandoz held a "  " which included a presentation on "                                            ."  The presentation contained a slide titled, "                                ," which                  , and

.  Sandoz described Taro's "

" as a "                                ."

1658.  Throughout 2014, Sandoz was careful not to disrupt the market balance it had achieved with Taro and Hi-Tech with regard to Lidocaine Ointment.  For example, in March 2014 Sandoz created a list of products to target at Wal-Mart in 2014.  With regard to Lidocaine Ointment, CW-3 responded that Sandoz had "

."

**BBBB.   Lidocaine-Prilocaine**

1659.  The market for Lidocaine-Prilocaine is mature, as Lidocaine-prilocaine has been available in the United States for decades.  It is marketed in the United States under the brand name EMLA.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera have all sold Lidocaine-prilocaine throughout the United States.

1660.  At all times relevant to this lawsuit there has been more than one manufacturer of Lidocaine-prilocaine on the market.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera sold Lidocaine-prilocaine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1661.  For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Lidocaine-prilocaine was remarkably stable.  Beginning in mid-2014, Defendants increased their prices abruptly and, for the most part, in unison.

1662.   Upon information and belief, Akorn, Hi-Tech, Impax, Sandoz, and Fougera reached an agreement to increase prices for Lidocaine-Prilocaine in the United States from an average of 47 cents per dose in April 2014 to an average price of $1.20 by January 2015.

1663.   These extraordinary price increases were not the result of supply shortages, demand spikes, or other competitive market conditions.   There were no relevant labelling changes or reported drug shortages that might have led to price increases.   Nor was there a spike in demand that could explain the price hikes.

1664.   Upon information and belief, this agreement to increase prices on Lidocaine-Prilocaine was the result of collusive communications between and among Defendants that were initiated by Sandoz and Fougera to increase pricing and restrain competition for the sale of Lidocaine-Prilocaine in the United States, and this agreement to increase prices was facilitated because each adhered to the overarching market allocation agreement in the generic drug industry. The collusive agreement to increase prices on Lidocaine-Prilocaine was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

1665.   For example, on October 1-3, 2012, representatives from Fougera, Impax, and Sandoz attended the GPhA Annual Meeting in Orlando, Florida.   *See* Ex. 1.

1666.   On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by Akorn, Impax, and Sandoz.   *See* Ex. 1.

1667.   On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida, which was attended by Akorn, Impax, and Sandoz.   *See* Ex. 1.

1668.   On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by Fougera, Hi-Tech, Impax, and Sandoz.   *See* Ex. 1.

1669.  On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas.  This event was attended by representatives from Akorn, Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

1670.  On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by Akorn, Fougera, Hi-Tech, Impax, and Sandoz representatives.  *See* Ex. 1.

1671.  On February 28-30, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

1672.  On June 1-4, 2014, HDMA held a BLC in the Marriott in Phoenix, Arizona.  Representatives from Akorn, Sandoz, and Impax attended.  *See* Ex. 1.

1673.  On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Hi-Tech, Fougera, Impax, and Sandoz.  *See* Ex. 1.

1674.  On August 23-26, 2014, NACDS held its 2014 Total Store Expo in Boston.  Representatives from Akorn, Impax, and Sandoz attended.  *See* Ex. 1.

1675.  On October 27-29, 2014, GPhA held its Fall Conference in Bethesda, Maryland.  Representatives from Impax, Fougera, and Sandoz attended.  *See* Ex. 1.

1676.  Akorn, Hi-Tech, Impax, Sandoz, and Fougera continued to attend trade association events in 2015 and 2016.

### CCCC.  **Loperamide HCL Capsules**

1677.  Mylan and Teva dominate the market for Loperamide HCL capsules.

1678.  Loperamide HCL was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekenthaler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ▮▮▮▮

██ of Alvogen.  On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called Hill.  Also, Rekenthaler spoke with ██████ of Actavis and ████ ████ of Breckenridge.  These communications solidified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

1679.  As a result of these collusive communications, Mylan and Teva were able to increase prices on Loperamide HCL.  By adhering to the fair share agreement and through the numerous other examples of collusion between Teva and Mylan, Defendants have been able to maintain prices for Loperamide HCL at supracompetitive levels since July 2012.

**DDDD.  Meprobamate**

1680.  The market for Meprobamate is mature, as the drug has been available in the United States since 1955.  Heritage and Dr. Reddy's sold Meprobamate to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1681.  On March 21, 2013, Heritage's Malek e-mailed ██████ and ████████████ ████████████████████████████████████████.

1682.  On March 22, 2013, Heritage's ██████ e-mailed a senior sales executive at Dr. Reddy's, ████████ to propose that both companies increase their prices for Meprobamate in the United States.

1683.  On March 22, 2013, Heritage's ██████ spoke with the Dr. Reddy's ██████ by phone for about nine minutes.  Upon information and belief, during the phone call, the two companies agreed to increase prices on Meprobamate in the United States.  The terms of the agreement were further confirmed in e-mails exchanged between ██████ and Dr. Reddy's ██████ between March 22 and March 25, 2013.

1684.   On March 27, 2013, Malek forwarded an RFP to ███ that Heritage had received from a prospective purchaser of Meprobamate.  Through e-mails that followed and through about a four minute phone call on March 29, 2013 between ███ and ███, Heritage and Dr. Reddy's took steps to ensure that neither submitted bids that undercut the other's pricing for Meprobamate.

1685.   In April 2013, Dr. Reddy's requested that Heritage allow Dr. Reddy's to increase its market share for Meprobamate.  Dr. Reddy's wanted to achieve this by reaching an agreement that Heritage would walk away from its existing Meprobamate business with a national pharmacy chain.  Heritage quickly agreed to give this business to Dr. Reddy's, and by April 2013, Heritage took steps to give up this business so that Dr. Reddy's could take it.

1686.   Malek and other employees continued to e-mail and speak by phone throughout May 2013 to ensure that the market for Meprobamate in the United States was allocated to the liking of both Dr. Reddy's and Heritage.

1687.   As a result of this anticompetitive conduct, Heritage and Dr. Reddy's increased the prices for Meprobamate sold to Plaintiffs and others in the United States to supracompetitive levels.  This market allocation and price-fixing agreement and the ensuing supracompetitive pricing continued in either force or effect (or both) until at least the end of 2016.

### EEEE.  Metformin ER

1688.   Metformin ER, the generic version of Fortamet, is prescribed to treat adult-onset diabetes.

1689.   During the time period relevant to this Complaint, Actavis, Amneal, Lupin, Sun, and Teva dominated the market for Metformin ER tablets.

1690.  Lupin led the price increase in August 2015, by raising prices by approximately 200%.  Between August 2015 and January 2016, Actavis, Amneal, Sun, and Teva all supported Lupin's price increase by following it themselves and by refraining from adding market share beyond each Defendant's "fair share" of the market.

1691.  Senior sales executives from each Defendant were in active contact with each other during the period in which they implemented the price increase, both by telephone and at trade shows and industry events.

1692.  For example, and as detailed in the phone records tables depicted throughout this Complaint, between July 2015 and February 2016, David Berthold of Lupin was in frequent contact with ████████████ and ██████████████ (both of Amneal); and with Mark Falkin and ████████████ of Actavis.  Similarly, during this same time period, Ara Aprahamian (on behalf of Taro's corporate parent, Sun) was in frequent contact with was in frequent contact with ████████ (Amneal); Rick Rogerson, Mark Falkin, and ██████████████ of Actavis; and Nisha Patel of Teva.

1693.  As a result of these collusive communications, Defendants have been able to maintain prices at supracompetitive levels on Metformin ER tablets since July 2015.

**FFFF. <u>Methadone HCL</u>**

1694.  Methadone HCL is an opioid used by cancer patients and others to manage moderate to severe pain.  It is also used to treat addiction to opioids by stopping withdrawal symptoms. During the period relevant to this Complaint, West-Ward and Mallinckrodt were the primary manufacturers of Methadone HCL tablets.

1695.   Prior to 2014, West-Ward and Mallinckrodt both sold Methadone HCL tablets for pennies per pill.  However, in June 2014 both manufacturers significantly increased their WAC prices by approximately 200%.

1696.   West-Ward and Mallinckrodt communicated directly with each other in furtherance of the conspiracy.  For example, ██████████, West-Ward's Senior Director and Head of Sales, and ██████████, Mallinckrodt's National Account Director, both attended a February 2014 ECRM event at the Omni Amelia Island Plantation Resort in Amelia Island, Florida.  They spoke by phone on May 15, 2014, and attended the August 2014 NACDS Total Store Expo in Boston.  Upon information and belief, ██████ and ██████ agreed that West-Ward would lead the price increase and Mallinckrodt would follow it.  After the meeting in Boston, this is exactly what happened; in September 2014, West-Ward announced its WAC price increases for Methadone, and Mallinckrodt followed this price increase in October 2014.

1697. As a result of this collusion, Defendants charged Plaintiffs and others supracompetitive prices for Methadone HCL tablets sold in the United States.

### GGGG.  **Methazolamide Tablets**

1698.   Methazolamide, also known by the brand name Neptazane, is used to treat ocular conditions where lowering intraocular pressure would be beneficial, including several types of glaucoma.  Methazolamide Tablets are available in 25mg and 50mg dosages.

1699.   By the fall of 2013, there were two manufacturers marketing Methazolamide – Defendant Sandoz and Fera Pharmaceuticals, Inc. ("Fera").  Both competitors had posted nearly identical WAC pricing for the 25mg and 50mg dosage sizes, respectively.

1700.   In early 2014, Sandoz began experiencing issues with its API supplier and was forced to temporarily withdraw from the market.  At that time, Sandoz expected that its supply problems would be resolved in June 2014 and it would re-enter then.

1701.   At the same time that Sandoz was experiencing supply problems, Perrigo acquired Fera's right to distribute Methazolamide.  As a result of Perrigo's acquisition, Fera left the Methazolamide market.

1702.   On March 6, 2014, Perrigo formally launched Methazolamide.  Perrigo knew prior to its launch that Sandoz, its only competitor, was out of the market and was not expected to re-enter until the summer of 2014.  Perrigo leveraged its temporary position as the only manufacturer with the ability to supply by implementing a large price increase.  Perrigo's WAC pricing when it entered was 136% higher than Sandoz's.  An internal Perrigo document circulated approximately one month prior to the launch ███████████████████████████████████ ████████████████████████████████████████████."  On June 17, 2014, Perrigo learned from a customer that Sandoz was back in the Methazolamide market.  That same day, ██████ of Perrigo called CW-3, a Sandoz senior sales executive.  The call lasted one minute.  After that call, █████ called his supervisor, Wesolowski, and they spoke for three minutes.  The next day, on June 18, 2014, ██████ and CW-3 exchanged two more calls, with one call lasting three minutes.  On Monday, June 23, 2014, ██████ e-mailed Wesolowski the following:

1703.   Indeed, Sandoz had re-entered the market for the 25mg with a WAC price of $129.84 – which was significantly lower than Perrigo's WAC price of $306.47.  Wesolowski was upset that Sandoz did not reach out to Perrigo before re-entering the market.  Had it done so, Sandoz would have known to raise its price, and to what level.  Wesolowski forwarded ██████'s

e-mail above to Boothe, a senior Perrigo executive, and others at Perrigo with the following cover note:

> Guys,
>
> Confirmed at three accounts that Sandoz is back at the old price on the 25mg. No timetable set on the 50mg yet but "soon". Bummer that they didn't do their homework.
>
> JW

1704.   In the meantime, Perrigo would make sure that Sandoz did its "████████" before re-entering on the 50mg, and that it would correct its prior mistake on the 25mg.

1705.   On October 21, 2014, CW-3 and ████ spoke for fifteen minutes.  During that call, ████ provided CW-3 with Perrigo's increased WAC pricing for the 25mg and 50mg package sizes of Methazolamide to ensure that Sandoz would match those prices when it re-entered the market.  CW-3's contemporaneous notes from that call are pictured below:



1706.   Shortly after the call, in early November 2014, Sandoz began ramping up for its re-entry into the Methazolamide market.  On November 3, 2014, Sandoz held a Commercial Operations meeting during which Sandoz discussed its plans for the Methazolamide re-launch, including implementing significant price increases to align with Perrigo's pricing.

1707.   The next day, on November 4, 2014, CW-1, a senior Sandoz pricing executive, sent an internal e-mail ████████████████ the "████████████████████" if ████████████ ████████████████████. The next day, CW-3 called ████████ at Perrigo and the

two competitors spoke for twelve minutes. Also on that day, CW-1 directed the Sandoz pricing team to remove Methazolamide from any existing contracts. CW-1 explained that "██████ ████████████████████████████████████████████████████████████ ██████."

1708. The two competitors continued to coordinate over the next several weeks as Sandoz made final preparations to re-enter the market and raise prices. On November 10, 2014, CW-3 called ██████ twice with one call lasting two minutes and the other call lasting three minutes.

1709. On December 4, 2014, CW-3 e-mailed Kellum, CW-1, and others at Sandoz ████████████████████████████████████████████████████████████ ████████████████████████:



GPO price points in the market are as follows (dead nets) - $250 & $500.

1710. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████. This pricing information was not publicly available.

1711. 1124. On December 5, 2014, Sandoz re-launched its 50mg dosage with a WAC price of $612.97, which matched Perrigo's WAC price. At the same time, Sandoz increased the WAC price on its 25mg dosage by 136% to match Perrigo's pricing.

### HHHH. **Methylphenidate**

1712. Methylphenidate – the generic version of the branded drug Ritalin – is a central nervous system stimulant prescribed to treat attention deficit disorder.

1713. During the time period relevant to this Complaint, Actavis, Impax, Mallinckrodt, Par, Sandoz, and Sun dominated the market for Methylphenidate.

1714.   In early March 2013, Mallinckrodt announced that it would have a temporary supply disruption.  Whether Mallinckrodt truly had a supply disruption or not remains unclear; what is clear though, is that immediately after this announcement, Sandoz and Mallinckrodt began coordinating to exploit this purported supply disruption to raise prices.

1715.   Between March 1, 2013, and March 8, 2013, CW-3 (a senior sales executive at Sandoz) and Walt Kaczmarek (a Vice President of Mallinckrodt) spoke by phone four times and exchanged.  Following their fourth call of the week on March 8, 2013, Sandoz announced that it was raising its prices on Methylphenidate by 400%.

1716.   Following Sandoz's announcement, ███████████, a Director of National Accounts at Watson (later Actavis) spoke with ██████████, the VP of Generic Sales of Sandoz for more than 20 minutes on April 21, 2013.  Upon information and belief, ██████████ confirmed to █████ that Actavis would follow Sandoz's price increase.

1717.   Two days after the call between ████████ and ███████, █████████████ of Sun reported to her superior that Actavis/Watson would raise price effective May 25 (even though Actavis had not yet announced a price increase) and that Mallinckrodt would follow this price increase when it resolved its supply issue.

1718.   Sure enough, on April 25, 2013, Actavis/Watson announced that it was matching Sandoz's 400% price increase.

1719.   Less than a week later, Mallinckrodt sought to re-enter the market and regain the share that it had forfeited during the period of its claimed supply disruption – which lasted just two months.  Despite selling the product at competitive levels in February 2013, Mallinckrodt reentered the market at the elevated price set by Sandoz and Actavis.

1720.  The day after Mallinckrodt announced that its supply disruption had been resolved, ███████ – a national accounts director at Mallinckrodt – spoke by phone with CW-3, his former colleague from Sandoz.  Upon information and belief, the purpose of this call was to determine which customers that Sandoz would concede to Mallinckrodt so that it could regain its market share.

1721.  And that is just what happened.  In August 2013, CW-2 and Armando Kellum – both of Sandoz – ████████████████████████ "████████████████████ ███████████████████" ██████████████████.

1722.  In late 2014, Sun's market share was well below what it determined would be its fair share of 17% in what was then a five-manufacturer market.  ██████████ and ████████ of Sun then coordinated with the other Defendants to arrange for Sun to increase its market share on Methylphenidate.

1723.  In 2014 and 2015, Impax and Par entered the Methylphenidate market at the elevated prices set by Sandoz, Actavis, and Mallinckrodt.  Consistent with the overarching fair share agreement, Impax and Par communicated with the existing manufacturers to arrange for the seamless transfer of a "fair share" of the market without disrupting the price.  For example, ██████ ██████████, Sun's Manager of National Accounts, spoke with ██████████ and ██████████████ – both senior sales executives at Par – to coordinate Par's entry into the market and arrange for Par to receive fair share in mid-2015.

1724.  As a result of these collusive communications, Defendants have been able to maintain prices for Methylphenidate at supracompetitive levels since March 2013.

### IIII.   Methylprednisolone

1725.   Methylprednisolone, the generic version of the branded drug Medrol manufactured by Defendant Pfizer, is a corticosteroid that is prescribed to reduce inflammation and treat a wide range of conditions including arthritis, ulcerative colitis, psoriasis, and endocrine disorders. Methylprednisolone is most typically sold in 4 mg tablets, but is also occasionally sold in higher-dose tablets ranging from 8 mg to 32 mg.

1726.   The market for Methylprednisolone is mature, as the drug has been available in the United States for more than 60 years.

1727.   During the time period relevant to this Complaint, Breckenridge, Cadista, Greenstone, Qualitest/Endo, and Sandoz dominated the market for Methylprednisolone.

1728.   In early 2011, Methylprednisolone cost just a few cents per tablet.  For example, Cadista sold packages of 21 4 mg tablets for 85 cents each.  Between March and June 2011, however, Defendants colluded to implement a massive price increase.

1729.   Cadista and Sandoz both raised their prices by more than 2000%.  For example, the same 21 tablet package that Cadista sold for 85 cents in March cost more than $19.00 by June. Sandoz concurrently imposed the same price increase as Cadista.

1730.   Qualitest – which was obligated by contractual price protections to maintain its current prices for large customers – complied with the fair share agreement by declining to supply Cadista's and Sandoz's customers.   As Qualitest's contractual price obligations for Methylprednisolone phased out, Qualitest also raised its prices in accordance with Sandoz and Cadista.

1731.   Between October 2011 and October 2012, Greenstone and Breckenridge entered the market for Methylprednisolone.  Consistent with the fair share agreement, Greenstone and

Breckenridge communicated with the other Defendants and confirmed their intentions to enter the market at the elevated price.  In return, and Cadista, Qualitest, and Sandoz conceded market share to the new entrants so that they could receive their "fair share."

1732.   In response to this price increase, customers pushed back on the Defendants to lower their pricing on Methylprednisolone.  For example, Walgreens – who was supplied by Cadista – solicited Sandoz to submit a bid in December 2012. Upon learning that Walgreens was soliciting bids, Richard Tremonte, the Vice President of Sales & Marketing at Sandoz, ███████ ████████████ that "████████████████████████████████████████████ ██████████████████████████████████████." Of course, the "████" was the collusion between the competitors that led to the price increase in the first place, which Tremonte was unwilling to put in writing. ████████████████████████████████████.

1733.   Walgreens continued to seek a lower price on Methylprednisolone in 2013.  In September 2013, Kellum of Sandoz ███████████████████████████████████ ████████████████████████████████. Upon learning that a sales executive was working on a bid for Walgreens for Methylprednisolone, Kellum ██████████████: "█ ████████████████████████████████████████████ ████████████████" ████████████ Kellum's ████████████████████████ Kellum █████████ "████████████████████████████," ████████ Kellum ████████████████████████: "████████████████████."

1734.   Qualitest and Endo also ████████████████████████████ █████ prepared in July 2013, that they had "████████████████████████ ████████," ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████.

1735.   As a result of these collusive communications and each Defendants' adherence to the fair share agreement, the price increase on Methylprednisolone stuck, and Defendants have been able to sell the drug at supracompetitive levels ever since.  Indeed, in August 2012, roughly a year after the initial Methylprednisolone price increase, Kellum of Sandoz ████████████████████

█████████████████████████████████████." ███████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████.

## JJJJ.  Metronidazole

1736.   The market for Metronidazole is mature, as the drug has been available in the United States since the 1970s.  Defendants Actavis, G&W, Impax, Sandoz, Teva, and Valeant sold Metronidazole to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.  There are several formulations of Metronidazole including cream, gel, lotion, and vaginal formulations.

### 1.   Metronidazole Gel

1737.   Metronidazole Gel ("Metro Gel" also known by the brand name Metrogel) is a topical antibiotic prescribed for the treatment of skin lesions in patients suffering from rosacea. Defendants G&W, Sandoz, Taro, and Teva were the primary manufacturers of the gel formulation in 2011.  Impax entered the market in 2012.

1738.   Beginning around July 2011, G&W, Sandoz/Fougera, and Taro engaged in price increases of Metronidazole Gel of more than 400%.  When Impax entered the market in 2012, it did not disturb the artificially inflated pricing because it adhered to the fair share understanding.

1739.   In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products.  In pursuit of that goal, on July 6, 2011, James Park, a product manager at Sandoz, sent an internal e-mail . The ████████████████ "████████████████ ████████████████."

1740.   That same day, July 6, 2011, CW-4, a senior sales executive at Sandoz, exchanged three calls with ███████ at Taro, including one call lasting sixteen minutes.  During these calls, █████ informed CW-4, among other things, that Taro would be raising prices on Metro Gel .75%.  Based on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the price increase.

1741.   Later that day, CW-4 ██████ Park's e-mail █████ "██████████████ ████████████." ████████████████████  ████. ██████████████████ "██████████."

1742.   Over the coming months, Sandoz kept watch on the market, waiting to follow Taro's expected price increase on Metro Gel .75%.  In the interim, on July 20, 2011, a fourth competitor, G&W, entered the Metro Gel .75% market.  Despite only recently entering the market, G&W quickly got to work coordinating a price increase on Metro Gel .75%.  For the increase to succeed, G&W would need to ensure that the other competitors in the market would follow – and follow they did.

1743.   From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy Generic Pharmaceuticals Conference in Atlanta, Georgia.  Representatives from all four competitors in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance.  These

representatives included CW-6 and Kaczmarek of Fougera, CW-4 of Sandoz, ███ of Taro, and Vogel-Baylor and Orlofski of G&W. Grauso, then at Aurobindo, was also in attendance.

1744.   On February 2, 2012, the day after the conference concluded, G&W generated a price increase analysis for Metro Gel .75%, which included a 245% increase to the WAC price from $39.99 to $137.99.  That same day, Vogel-Baylor used her former colleague Grauso (then at Aurobindo) to convey information to CW-6 at Fougera regarding the Metro Gel .75% price increase.

1745.   For example, on February 2, 2012, Vogel-Baylor called Grauso and they spoke for eight minutes. Grauso hung up and immediately called CW-6 of Fougera.  The two men spoke for four minutes.  Immediately upon hanging up, Grauso called Vogel-Baylor back and they spoke for eleven minutes.  Grauso then called CW-6 again and spoke to him for five minutes.  Grauso hung up, received a call from Orlofski at G&W, and the two men spoke for thirteen minutes.  These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:08:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 9:36:00 | 0:04:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:40:00 | 0:11:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 10:14:00 | 0:05:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Orlofski, Kurt (G&W) | 10:19:00 | 0:13:00 |

1746.   Later that evening, CW-6 e-mailed his boss at Fougera, Kaczmarek, ███████████ ███████.  CW-6 and Kaczmarek spoke by phone three times the following day.

1747.   On February 7, 2012, Vogel-Baylor e-mailed Orlofski her latest price increase analysis for Metro Gel .75%.  The next day, on February 8, 2012, Orlofski called Kaczmarek at Fougera.  The two competitors exchanged two more calls over the next few days and finally connected on February 10, 2012 for a twenty-five minute call.

1748.  The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement.  As they had done previously, Vogel-Baylor and CW-6 used Grauso as the conduit to coordinate their plans on Metro Gel .75%.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

1749.  Similarly, the next day, on February 15, 2012, Vogel-Baylor called Grauso and they spoke for eleven minutes.  Less than ten minutes later, Grauso called Vogel-Baylor back and they spoke for forty-one minutes. Grauso hung up the phone and immediately called CW-6 at Fougera. That call lasted one minute.  The next day, Vogel-Baylor instructed her team to generate price increase letters for Metro Gel .75%, and to issue them by 1:00 p.m. on February 17, 2012.

1750.  Even before G&W notified its customers of the increase, other competitors in the market knew that G&W would be increasing price and planned to do the same.  For example, on February 15, 2012, two days before G&W sent its notice letters to its customers, Blashinsky, then a senior marketing executive at Taro, ███████████████████████████ "██████ ██████" ████████████████████████████████. "███████████████," he added.

███████████, a senior executive at Taro, ███████: "████████████████████████████

████████████████████████████████."

1751.   On February 17, 2012, Orlofski e-mailed Blashinsky of Taro ██████████████████

████████████████████████████████████. Orlofski stated, "███████████████████

████████████████████" Blashinsky ██████, "████████████████████████████

█████████." The next day, Orlofski e-mailed █████, a senior Taro executive, asking "████████

███████████████████████ ███████████████████████████████████████

██████████?" ████████████, "█████████████████████████████████████████."

1752.   On February 17, 2012, G&W sent out letters notifying its customers of the Metro Gel .75% price increase.  That same day, Grauso called Vogel-Baylor and they spoke for sixteen minutes.  Following the now normal pattern, Grauso hung up and called CW-6 at Fougera.  The two men spoke for five minutes.  Immediately upon hanging up, Grauso called Vogel-Baylor again.  That call lasted two minutes.

1753.   On February 18, 2012, a ██████████████████████████████████████████

███████████████████ asking, "█████████████████████████████████████████

██████████████████████████████████████████████████████." Vogel-Baylor responded, "█████████████████████████████████████████████

████████████████████████████████." Of course, Vogel-Baylor already knew that her competitors would follow G&W's price increase, but she could not tell the customer that.  Ultimately, the customer ████████████████████████████, "████████████████████████

████████████████████" On February 20, 2012, Blashinsky ████████████████████████████

████████" ████████████████████████████████████, and that Taro "████████████

████████."

439

1754.   From February 22 to February 24, 2012, the GPhA held its annual meeting in Orlando, Florida. Senior executives from all four competitors in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance.   These representatives included Kaczmarek and ██████, a senior executive at Fougera, Tremonte of Sandoz, ██████ of Taro, and Orlofski of G&W.  During the conference, the competitors were actively discussing and agreeing on the details of the Metro Gel .75% price increase.

1755.   On February 22, 2012, the first day of the GPhA meeting, Orlofski e- mailed ██████ again, stating "███████████████████████████████████████████████ ████████████████████████████." ██████ replied, "███████████████████████████."

1756.   Immediately after meeting with Orlofski on February 22, ██████ e-mailed Blashinsky ████████████████ stating: "███████████████████████████████ █." Blashinsky responded, "█████████." ██████ replied, "█████████████████████" to which Blashinsky answered, "████████████████████." ██████ further inquired, "████████ █████████████?" and Blashinsky replied, "████████████████████████████." Of course, Fougera and Sandoz had not increased their Metro Gel .75% pricing yet – but ██████ of Taro understood that they would from his conversation with Orlofski.

1757.   Similarly, that same evening, on February 22, 2012, Kaczmarek of Fougera (who was also at the GPhA conference) sent an e-mail to the Fougera Pricing Committee stating: "████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████



."

1758.   On March 9, 2012, Rite Aid e-mailed Sandoz asking for a bid on Metro Gel .75%. CW-4 of Sandoz forwarded the invitation to Kellum with the simple comment " ." Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity, saying: " ."

1759.   One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum



."

1760.   Withing the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing.  Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.  On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee lasting twelve minutes and two minutes, respectively.  Customers began to react immediately to the dramatic price hikes by seeking price quotes from the competitors.  The competitors, however, refused to break ranks.  On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metro Gel .75% in light of the Taro

increase.  CW-6 ██████████████████ Kaczmarek, saying: "█████████████████." Kaczmarek ████████████████████████."

1761.  The following day, on April 4, 2012, CW-6 sent Kaczmarek an ████████████ ████████████████████████. CW-6 ████████████████████████ ████████████████████████████████████████: "█ ████████████████████████████████████████ ██████."

1762.  Two years later, in June 2014, Taro began making plans to enter the market for Metro Gel 1% and, on July 1, 2014, Taro launched the product and matched Sandoz's WAC pricing.

1763.  In the days leading up to the launch, CW-3 of Sandoz and Aprahamian of Taro exchanged several calls during which they discussed the launch and Sandoz's allocation of customers to the new entrant, Taro.  Further, during these calls, Aprahamian told CW-3 that Taro was targeting 35% market share and identified the customers that it planned to target.  Immediately upon hanging up with Aprahamian, CW-3 reported this information back to his superiors, CW-1 and Kellum.  This call pattern is detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:44:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:03:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:18:00 | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 9:55:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |
| 6/25/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:02:00 | 0:13:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 13:15:00 | 0:01:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 13:18:00 | 0:01:00 |

1764.   On June 18, 2014, Aprahamian sent an internal e-mail to ███████████, a pricing executive at Taro, stating "████████████████████████████████████████████ ████████████████." ████████████████████████████████████████████████ ████████████████████. On June 25, 2014, Taro submitted an offer to Walgreens.  A few days later, on June 30, 2014, Taro submitted a separate offer to ABC.

1765.   On the same day that ABC received the offer from Taro, the customer notified Sandoz that it had received a competitive bid from Taro and asked whether Sandoz would lower its price to retain the business. ████████████, a sales executive at Sandoz, forwarded the request along internally, including to CW-1 and Kellum.  CW-1 responded to ████████ stating:



████████████████████████████████." Kellum ███████ "████████████████."

1766.   The next day, July 1, 2014, Anuj Hasija, a sales executive at Sandoz, sent an internal e-mail stating that Taro was "████████████████████████████████." Kellum responded, "████████████████████████████████████████████████ ████████████████████████." CW-1 replied: ████████████████████████ ████████████████."

1767.   Walgreens accepted Taro's bid on July 2, 2014 and ABC accepted Taro's bid on July 7, 2014.   WBAD (including ABC and Walgreens) represented approximately 20% of Sandoz's volume and sales for Metro Gel 1%.

1768.   On July 8, 2014, Taro also submitted a bid to Wal-Mart for Metro Gel 1%.  That same day, Aprahamian called CW-3 of Sandoz twice. Both calls lasted one minute.  Two days later, on July 10, 2014, Aprahamian e-mailed ████████████, a Taro sales executive, asking her to follow up with Wal-Mart regarding the offer.  The next day, on July 11, 2014, CW-3 and Aprahamian exchanged four calls.  After the last call, CW-3 hung up and immediately called Kellum.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:31:00 | 0:01:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:49:00 | 0:01:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:05:00 | 0:03:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:52:00 | 0:05:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:57:00 | 0:01:00 |

1769.   The following Monday, on July 14, 2014, Wal-Mart notified Sandoz that it had received a competitive bid on Metro Gel 1% that was 10% lower than Sandoz's pricing and asked whether it would bid to retain the business.

1770.   On July 18, 2014, ████████, a pricing executive at Sandoz, ████████ ████████, including to CW-1 and Kellum, stating "████████████████████ ████████████████████████████████████████████████████ ████████████████."  CW-1 responded by ████████████ ████████████, "████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████."  Kellum then replied, "█ ███."

1771.   Notably, after sending this e-mail, ████████████████████ ██████████████ "████████████████" to "████████████

███████." ████████████████████████████████████████

████████████████████████████████████.

 1772. Although Sandoz gave up the business, Wal-Mart was unexpectedly reluctant to stop ordering Metro Gel 1% from Sandoz.  On August 7, 2014, ████████, a sales executive at Sandoz, sent an internal e-mail ████████████████████████████, "████

████████████████████████████████████████████

██████████████████████████████████." ████████████ of Sandoz replied, "█████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████."

 1773. On August 4, 2014, McKesson also notified Sandoz that it had received an unsolicited bid for the Rite Aid portion of its Metro Gel 1% business and gave Sandoz the opportunity to bid to retain the business.  Kellum responded that "████████████████████

████████████████████████████████████████████

███████████████████████████████████.

 1774. As ████████, a pricing executive at Sandoz, explained in an internal e-mail on August 8, 2014: "████████████████████████████████████████

████████████."

 1775. On August 11, 2014, McKesson awarded the Rite Aid portion of its Metro Gel 1% business to Taro.  Two days later, on August 13, 2014, Aprahamian called CW-3 and they spoke again for seven minutes.

2.     Metronidazole Cream and Lotion

1776.   During the period relevant to this Complaint, Defendants Sandoz and Actavis were the primary generic manufacturers of Metronidazole Lotion in 2011, and Sandoz, G&W, and Actavis dominated the market for Metronidazole Cream.

1777.   Beginning in early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its rival G&W.  On July 6, 2011, Mike Perfetto, then a senior sales and marketing executive at Actavis, called Grauso at G&W twice.  The calls lasted four minutes and twenty-one minutes.  The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six minute call to Grauso.

1778.   Confident that at least G&W was on board with the planned increase, Actavis raised the price of Metro Cream and Lotion effective July 22, 2011.  The new WAC price for Metro Cream was $153.33 for a 45gm tube, an increase of 278%.  The WAC price for Metro Lotion increased by 189% to $208.03 for a 59ml bottle.

1779.   That same day, ████████, a Fougera marketing executive, e-mailed several colleagues, including Kaczmarek, █████████████████████.  Kaczmarek ███████████████████████████████████████████████████████ █████████████████████.  He inquired ████████████████████████ █████████████████████████████”

1780.   The next morning, on Saturday July 23, 2011, Fougera utilized one of its most reliable sources of information – the relationship between Fougera's CW-6 and Grauso at G&W.  CW-6 called Grauso and the two competitors spoke for four minutes.  A few minutes later, CW-6 called Grauso again and they spoke for fourteen minutes.

Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metro Cream or Metro Lotion, saying: "█████████████████████████████████████████████████████ █████████████████."

1781.   By 10:31 a.m. that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis.  He told his colleagues: "████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████."   By early afternoon, a ████████████████████████ ████████████████████████████████████████ Kaczmarek's "████████████ ████████.

1782.   Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m. Less than twenty minutes after the second call with Grauso ended, CW-6 called his boss, Kaczmarek, to report the information he had obtained.   A total of eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

1783.   During those calls – only 3 days after the Actavis increase and before G&W had even been able to follow – Kaczmarek informed the Fougera team that "…███████████████ ██████████████████████████."

1784.   In the early afternoon of Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metro Lotion and another product.  CW-6 asked ███████████████████████████████████ or "████████████████." The

███████████████████████████████████████████.  CW-6, ███████

Kaczmarek's ████████████████ "████████████████████████████."

    1785.   That same day, Fougera informed its customers that it was increasing its pricing for both Metro Cream and Metro Lotion effective July 26, 2011, closely tracking Actavis's new prices. The new WAC price for Metro Cream was $151.80 for a 45gm tube.  The new WAC price for Metro Lotion was $205.95 for a 59ml bottle.

    1786.   Customers quickly began to complain to Fougera about the sharp price increase, ███████████████████████████ Kaczmarek ███████████████ ████████████████████████████████████████████ "██████."

    1787.   Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases. ████████████ ████████████████████████, Kaczmarek ████████████████████ ███████████████████: "████████████████████████████."

    1788.   Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metro Cream were already in full swing.  On July 26, 2011 – the day of the Fougera increase – Grauso of G&W called CW-6 of Fougera.  The call lasted one minute.  CW-6 hung up and immediately called Kaczmarek.

    1789.   Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brought Actavis into the conversation, initiating a two minute call to Perfetto.  Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that.  Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven minutes.  Within five

minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting five minutes.

1790.   By that evening, Grauso had spoken to Perfetto by phone for thirty-five more minutes, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek.  Over the next two days, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six more times.

1791.   With its competitors fully apprised, G&W raised the price of Metro Cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.

1792.   As the news of yet another Metro Cream price increase hit the market, customers again scrambled to find more reasonably priced sources of supply.  One large customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes.  Fougera sales executive ████ contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

1793.    CW-6, Kaczmarek ████████████: "████████ ." ████████████ "████ ████████ ."

1794.   Finally, just four days later on August 1, 2011, the remaining competitor, Harris (a co-conspirator), fell in line with an increase of its own on Metro Cream.  The new Harris WAC price was $135.00, an increase of 437%.

1795.   On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metro Cream, but only by a small margin considering the market-

wide increases.  Vogel-Baylor promised the customer a slight price adjustment in order to maintain the primary position.

### 3.  Metronidazole Vaginal

1796.  Defendants Sandoz and Valeant were the primary generic manufacturers of generic Metronidazole Vaginal in 2015.

1797.  Prior to January 2015, prices for Metronidazole Vaginal remained stable for years.

1798.  Beginning in around February 2015, Defendants Sandoz and Valeant engaged in price increases of more than 300%.

1799.  Notably, the price increase on Metronidazole Vaginal occurred around the same time that news sources reported that Valeant was dramatically increasing prices on other drugs.

1800.  These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

1801.  Upon information and belief, the agreement to increase prices on all formulations of Metronidazole was the result of collusive communications between and among Defendants, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry.  The collusive agreement to increase prices on Metronidazole was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

1802.  For example, on August 30-31, 2010, representatives from G&W, Sandoz, and Teva attended the NACDS Pharmacy and Technology Conference in San Diego, California.  *See* Ex. 1.

1803.   On August 27-30, 2011, NACDS held a Pharmacy and Technology Conference in Boston.  Representatives from G&W, Sandoz, and Teva attended.  *See* Ex. 1.

1804.   On April 24-27, 2012, NACDS held its Annual Meeting.  Representatives from G&W, Impax, Sandoz, and Teva attended.  *See* Ex. 1.

1805.   On February 20-22, 2013, GPhA held its annual meeting in Orlando, Florida.  Representatives from G&W, Impax, Sandoz, and Teva attended.  *See* Ex. 1.

1806.   On December 3, 2014, NACDS held its Foundation and Reception Dinner in New York City.  Representatives from Sandoz, Valeant, and Teva attended.  *See* Ex. 1.

1807.   On April 25-28, 2015, NACDS held its annual meeting in Florida.  Representatives from G&W, Impax, Sandoz, Teva, and Valeant attended.  *See* Ex. 1.

### KKKK.   Moexipril Hydrochloride Tablets

1808.   Moexipril Hydrochloride ("Moexipril"), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors.  It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently. Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril on December 31, 2010.

1809.   As discussed more fully below, Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril between May and July, 2013.  When Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

1810.   On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC.  Upon hearing this news, Rekenthaler, the Vice President

of Sales at Teva, ███████████████████████████████████

███████████████████████████████████:

> **From:** Dave Rekenthaler
> **Sent:** Monday, August 05, 2013 7:05 PM
> **To:** Nisha Patel02
> **Subject:** Fwd: ABC - Loss business on Moexipril
>
>
> ???
>
> Sent from my iPhone

1811.   Rekenthaler ████████████████████████████████

████████████████████████████.

1812.   Five minutes after receiving the e-mail from Rekenthaler, Patel responded:

> From:      Nisha Patel02
> Sent:      Mon 8/05/2013 7:10 PM (GMT-05:00)
> To:        Dave Rekenthaler
> Cc:
> Bcc:
> Subject: RE: ABC - Loss business on Moexipril
>
>
> I know...made the call already

1813.   The call that Patel had made earlier that day was to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

1814.   Patel spoke to CW-5 three times that day. The following day – August 6, 2013 – Jim Brown, the Vice President of Sales at Glenmark, called Patel at 9:45 a.m. but did not reach her. Patel returned Brown's call at 10:08 a.m. and the two spoke for approximately thirteen minutes. Later that day, at 1:11 p.m., the two spoke again for approximately fifteen minutes.

During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

1815.   As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril.  Later that same day – August 6, 2013 – a Teva executive informed colleagues that "███████████████████ ████████████████████████████████████████████████████ ████████."

### LLLL.  Nadolol

1816.   As early as 2012, Teva was speaking to competitors about the drug Nadolol. Nadolol, also known by the brand name Corgard, is a "beta blocker" which is used to treat high blood pressure, reducing the risk of stroke and heart attack.  It is also used to treat chest pain (angina).

1817.   In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability.  Nadolol was a high volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

1818.   Teva's relationships with Mylan and Sandoz are discussed more fully below, but by 2012 an anticompetitive understanding among those companies was firmly entrenched.

1819.   Teva raised its price on Nadolol on July 31, 2012.  In the days leading up to that increase – following a pattern that would become routine and systematic over the following years Kevin Green, at the time in the sales department at Teva, was in frequent communication with

executives at both Sandoz and Mylan. Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012. Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five calls on the day of the price increase.

1820. Sandoz followed with its own increase on August 27, 2012. The increases were staggering – varying from 746% to 2,762% depending on the formulation. The day before the Sandoz increase, Armando Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green. They had also spoken once earlier in the month, shortly after the Teva increase. CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price. The day after the Sandoz increase, Green – acting as the conduit of information between Sandoz and Mylan – called Nesta of Mylan twice, with one call lasting fourteen minutes.

1821. Mylan, which returned to the market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013. In what had become a routine component of the scheme, the day before the Mylan increase Nesta spoke to Green four times. The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz. On January 4, 2013 – the day of the Mylan increase Green called Kellum twice in the morning, including a six minute call at 9:43 a.m. Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:

**From:** Kellum, Armando
**Sent:** Friday, January 04, 2013 11:28 AM
**To:** ███████████████████████████████████████
**Subject:** Levothyroxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

1822.   ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

1823.   Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013.  At 11:50 a.m. the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen minutes.

1824.   Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

1825.   In 2014, Greenstone entered the market for Nadolol and abided by the overarching fair share rules in the process.  Jill Nailor of Greenstone was in frequent contact with Kellum of Sandoz, Nesta of Mylan, and Patel of Teva around the time that Greenstone entered the market. Through these conversations, the competitors arranged for Greenstone to obtain its "fair share" of the Nadolol market, and Greenstone agreed to enter the market at the existing supracompetitive price.

1826.   To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years.  In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol.  Today, that same 90-day supply of Nadolol would cost the complainant more than $500.

1827.   As discussed more fully below, Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

**MMMM.  Naproxen Sodium**

1828.   Naproxen Sodium is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, menstrual cramps, inflammatory diseases such as rheumatoid arthritis and fever.  During the period relevant to this Complaint, Amneal and Glenmark were primary manufacturers of Naproxen Sodium tablets.

1829.   Prior to 2015, Naproxen Sodium cost pennies per tablet.  However, in March 2015, Amneal and Glenmark imposed abrupt and substantial price increases of more than 1000%.

1830.   Amneal and Glenmark communicated directly with each other in furtherance of the conspiracy.  For example, Jim Brown of Glenmark (the VP of Sales) and ████████████ of Amneal (the Senior Director of Sales) frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium.  The two executives communicated by phone multiple times per month in every month of 2015 – including before and after their respective price increases – which allowed the companies to increase prices and maintain the fair share rules.

1831.   As a result of this collusion, Defendants charged supracompetitive pricing on Naproxen Sodium to Plaintiffs and others in the United States.

**NNNN.   Niacin ER**

1832.   Niacin Extended Release, also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

1833.   Defendant Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.  Teva's exclusivity was set to expire on March 20, 2014.

1834.   Teva had advance knowledge that Defendant Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter.  Teva also knew that Defendant Zydus planned to enter on June 28, 2014.

1835.   Armed with that knowledge, Teva increased price on Niacin ER on March 7, 2014 in advance of the competitors' entry.  In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin.  The communications between Green and Patel and Rekenthaler of Teva, and Berthold of Lupin are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

1836.   Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER.  The communications between Green and Rekenthaler and Patel of Teva, and Berthold of Lupin, are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

1837.   In May 2014, Zydus began readying to enter the Niacin ER market.  On May 5, 2014, Zydus bid on the Niacin ER business at ABC – a Teva customer.  The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three minutes.  Less than an hour later, Green called Patel and they spoke for eight minutes.  A few minutes later, Green called Patel again and left a twelve-second voicemail.  Later that evening, Patel e-mailed ██████████████████ ████████████████████.



1838.  ████████████████████████████████████████████████
███████████████████████████████.

1839.  Over the next several days, Patel and Rekenthaler exchanged several calls with Green.  Green also exchanged several calls with Berthold of Lupin.

1840.  Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

1841.  On May 29, 2014, Cassie Dunrud, an Associate Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, stating: "███████████████████████████████████████████████████████████████ ████████."  After receiving the e-mail, Rekenthaler called Green.  The call lasted two minutes. Green returned the call a few minutes later and they spoke for twenty-eight minutes.  Later that day, Patel called Green and they spoke for nearly twenty-one minutes.

1842.  On June 2, 2014, ████████, a Director of National Accounts at Teva, sent an internal e-mail stating: "████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ███████████████."  Patel replied, "███████████████████████████████ ██████."  Later that morning, Green called Rekenthaler.  The call lasted two minutes.  Green then called Patel and they spoke for nearly six minutes.

1843.  On June 5, 2014, ██████ sent an internal e-mail regarding "████████████████" stating: "████████████████████████████████████████████████."  ██████ ███████████████████████████████████████████████████████ ██████████████ "█████████████████████."

1844.   On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

**OOOO.  <u>Nimodipine</u>**

1845.   The market for Nimodipine is mature, as the drug has been available in the United States in generic form for more than 10 years.  Heritage, Sun (through Caraco), and Teva sold Nimodipine in the United States to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1846.   In June 2012, Malek instructed a Heritage employee, ███, to reach out to a sales executive at Caraco to discuss an agreement to raise prices and confirm the market allocation that the two companies would abide by in the U.S. market for Nimodipine.  The ensuing communications between Heritage's ███ and Caraco's █████ resulted in an agreement to increase prices on Nimodipine.

1847.   In furtherance of this agreement to increase prices, Heritage agreed to submit a sham bid to an RFP from Cardinal, with Heritage intentionally quoting a price to Cardinal that Heritage knew was higher than the price that Caraco was quoting.

1848.   In late 2012, the FDA issued a recall on the Nimodipine that Caraco was selling in the United States, which required Caraco to briefly exit the market.

1849.   In late April or early May 2013, Malek learned that Caraco would seek to re-enter the Nimodipine market by July 2013.  Malek initiated discussions with Caraco that resulted in an agreement that both companies would continue charging elevated prices on Nimodipine, and Heritage would allow Caraco to retake a certain percentage of the market.

1850.   Caraco ultimately reentered the Nimodipine market in November 2013 and implemented the agreement with Heritage by charging the agreed-upon prices.  Upon information

and belief, Heritage reciprocated by allowing Sun and Caraco to retake the agreed-upon percentage of the Nimodipine market.

1851.   These anticompetitive agreements by Heritage and Sun (through Caraco) resulted in supracompetitive prices for Nimodipine in the United States that have persisted since June 2012.

1852.   As alleged above, the price increases regarding Nimodipine were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Nimodipine to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

**PPPP.**  **Nitrofurantoin Macrocrystal Capsules**

1853.   Nitrofurantoin Macrocrystal, also known by the brand name Macrodantin, is a medication used to treat certain urinary tract infections.

1854.   In 2012, Mylan and Teva dominated the market for Nitrofurantoin Macrocrystal capsules, and Alvogen also maintained approximately 10% market share.

1855.   Nitrofurantoin Macrocrystal was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekenthaler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ██████████ of Alvogen.  On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called Hill.  Also, Rekenthaler spoke with ████ ██████ of Actavis and ██████████ of Breckenridge.  These communications solidified the

agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

1856.   Teva's July 31, 2012 price increase on Nitrofurantoin Macrocrystal was between 90-95% depending on the dosage and formulation.   After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

1857.   For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (*i.e.*, other distributors).   At 9:49 a.m. on October 10, 2012, ▮▮▮▮▮ of Teva sent an internal e-mail to the Teva sales team, including Green and Rekenthaler, among others, saying:

> Sales Team,
>
> We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past.  Please confirm current market pricing.

1858.   Immediately after receiving that e-mail, Green reached out to both Nesta at Mylan and ▮▮▮▮▮, his counterpart at Alvogen.   At 10:01 a.m., Green called Nesta and the two spoke for ten minutes.   After hanging up – at 10:11 a.m. – Green called ▮ at Alvogen for the first of three calls that day, including one call lasting fourteen minutes.   To close the loop, Nesta also separately spoke to Hill two times that same day, including a call lasting almost ten minutes.   Teva did not lower its price.

**QQQQ.**  **Norethindrone Acetate**

1859.   Norethindrone Acetate, also known by the brand name Primolut-Nor among others, is a female hormone used to treat endometriosis, uterine bleeding caused by abnormal hormone levels, and secondary amenorrhea.

1860.   On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate.   One of Teva's competitors for Norethindrone Acetate was Defendant Amneal.  The same day, Patel received phone calls from two different Amneal employees – ████████████, a senior sales executive (call lasting more than three minutes), and ████████████, a senior sales and finance executive (almost twenty-five minutes).  These were the first calls Patel had with either ████████ or ██████ since she joined Teva in April 2013.  That same day, ██████ also spoke several times with Jim Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

1861.   After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market.  At that time, market share was almost evenly split between the three competitors. When discussing it later, Patel ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████.″ ████████████████████████████████████████████ ████████████████████████████████████████████████.

**RRRR.**  **Norethindrone/ethinyl estradiol (Balziva®)**

1862.   Norethindrone/ethinyl estradiol, also known by the brand name Ovcon®35, is a combination of medications used as an oral contraceptive.  Teva markets its generic version of this combination medication under the name Balziva.

1863.   On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business.   Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing its generic of Ovcon-35.

1864.   ████████████████████████████████████████████
████, with one expressing ████████████████████████████████
████████████████.''

1865.   ████████████████████████████████████████████
████████████████████████, however.   On January 24, 2014, Patel spoke to Berthold at Lupin twice by phone.

1866.   Five days later, on January 29, Patel informed Rekenthaler ████████████████████
████████████████████████████████████████████████████████,
saying: ''████████████████████████████████████████████
████████████

1867.   On February 4, Patel received the ████████████████████████████
████████████████████████████████████.   That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

**SSSS.  <u>Nortriptyline Hydrochloride</u>**

1868.   Nortriptyline Hydrochloride (''Nortriptyline''), also known by the brand name Pamelor, is a drug used to treat depression.

1869.   While Taro was approved in May 2000 to market generic Nortriptyline, it subsequently withdrew from the market.   As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

1870.  By February 2013, Taro personnel ███████████████████████
███████████████, one opining that "…██████████████████████████
████████████████████."

1871.  In early November, ████████████████████████████ a "████
█████████████" ████████████████████████████████████████████████
██████.

1872.  On November 6, 2013, Aprahamian ███████ his team to "…███████████
████████████████." He emphasized ██████████████████████████████
████████████████████ "██████████████████████████."

1873.  Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

1874.  Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market.  For example, Rekenthaler of Teva and Falkin of Actavis spoke twice by phone on November 10, 2013.

1875.  Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva.  Their conversation lasted almost eleven minutes.  That same day, Aprahamian announced to his colleagues that ██████████████████████████████████████: "██████
█████████████████." Accordingly, ████████████████████████████████
████████████.

1876.  The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however.  Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18.  Falkin also exchanged two text messages with Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

1877.  Immediately following this series of discussions, Aprahamian began delivering a new message to his team:  .  On November 19, 2013 ."

1878.  The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue.  Armed with this new information, Aprahamian wasted no time in seeking Actavis's permission, placing a call to ███████, a senior national account executive at Actavis, less than four hours later.  They ultimately spoke on November 22, 2013 for more than eleven minutes.

1879.  Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro.  On November 21, 2013, ."

1880.  The competitors continued consulting with each other over the coming months on Nortriptyline.  On December 6, 2013, for example, Aprahamian called ███ at Actavis and the two spoke for over thirteen minutes.  On December 10, 2013, a Taro colleague informed Aprahamian that Plaintiff HEB, a large customer, was with Actavis for all but one of the Nortriptyline SKUs, and that HEB was interested in moving the business to Taro.

1881.  Having already cleared the move with Actavis during his December 6 call with ███y, Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

1882.  Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up.  The dialogue continued on February 4, 2014 when Patel called Aprahamian back.  The two talked for nearly twenty-four minutes.

1883.   Two days later, on February 6, a potential customer solicited Taro to bid on its business.  When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued.

1884.   Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

1885.   At the end of this flurry of communications, Teva ███████████████████████ ███████████████. Prior to this time, particularly in early 2014, ███████████████████ ██████████████████████████████. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five minutes), ████████████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████.″  As discussed

more fully below, Teva subsequently raised the price of Nortriptyline on January 28, 2015 – in coordination with both Taro and Actavis.

1886.   Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts.  Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

1887.   In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva.  During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus.  Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

**TTTT.  Nystatin**

1888.   The market for Nystatin is mature, as the drug has been available in the United States since 1950.  The drug is considered an essential medicine by the World Health Organization. Actavis, Qualitest/Endo, Perrigo, Sandoz, Taro, Teva, Heritage, and Sun (through Mutual) sold Nystatin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1889.   During the relevant period, Defendants Actavis, Qualitest/Endo, Perrigo, Sandoz, and Taro were the primary manufacturers of Nystatin external cream.

1890.   During the relevant period, Defendants Actavis, Perrigo, and Sandoz were the primary manufacturers of Nystatin ointment.

1891.   During the relevant period, Defendants Teva, Heritage, and Sun (through Mutual) were the primary manufacturers of Nystatin tablets.

1.     <u>Nystatin Cream</u>

1892.   In late 2011, Taro, Perrigo, Qualitest/Endo, and Actavis all raised the list prices of Nystatin cream.  Taro and Perrigo increased their prices in very close succession in late 2011. Qualitest followed the price increase in August and Actavis joined in November 2011.  Sandoz joined the price increase when it re-entered the market in 2013.

1893.   In June 2011, Taro announced a dramatic price increase of more than 600%.  Rather than compete on price in order to gain market share, Perrigo followed Taro's increase and raised its own prices to almost identical levels.  Perrigo increased production and managed to gain some market share from 2011-2013, but, consistent with the overarching market allocation agreement, market prices remained relatively stable.

1894.   In August 2011, Qualitest, which only had about 1% of the market, followed the Taro and Perrigo price increase.  Rather than competing on price in order to gain market share, Qualitest followed this price increase.  Over the next few years Qualitest grew its market share, but it did so without competing on price, just as the fair share agreement intended.

1895.   In November, Actavis ramped up production of Nystatin cream and re-joined the market.  It, too, immediately elevated its prices to match that of Taro, Perrigo and Qualitest, also choosing to forgo price competition and the prospect of winning a larger share of the market.  Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working.

1896.   Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market.  Like Perrigo, Qualitest and Actavis before it, rather than compete on price in order to regain lost market share,

Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

1897.  Upon information and belief, the price increases on Nystatin cream were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Nystatin in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

2.    Nystatin Ointment

1898.  In June 2011, after Sandoz and Actavis had ceded the Nystatin ointment market, Perrigo implemented a more than 300% increase.

1899.  In early 2012, Actavis increased production of Nystatin ointment. Rather than compete on price and try to steal market share from Perrigo, Actavis increased its list prices to high levels to match Perrigo.

1900.  This pattern repeated in the Summer of 2012. Sandoz increased its production. Rather than compete on price to gain market share, Sandoz raised its list price to identical levels as Perrigo and Actavis.

1901.  These actions by Actavis and Sandoz reflected the "fair share" agreement understanding.

1902.  Upon information and belief, the price increases on Nystatin ointment were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Nystatin in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

3.      Nystatin Tablets

1903.   Beginning in approximately April 2013, Sun (along with its subsidiary, Mutual) sought to increase the prices of Nystatin.  A senior executive from Sun, ███████, discussed the price increase with █████ of Heritage on April 16, 2013, during a phone call that lasted approximately 40 minutes.  However, the newly hired senior executive at Teva responsible for pricing of Nystatin (Nisha Patel) was initially leery about joining Sun's price increase.

1904.   Malek sought to get Teva on board with the price increase.  Malek spoke with Teva's Patel by telephone regarding a possible price increase on Nystatin several times in July 2013, including for about 21 minutes on July 9, 10 minutes on July 23 and for more than approximately 20 minutes on July 30.  Heritage's █████ also discussed with Sun's ████████ the conversations Heritage was having with Teva.

1905.   The discussions between the three companies were put on hold for a period of time in late 2013, while Teva's Patel went on maternity leave.  Shortly after her return to work, she spoke with Malek about finally implementing the Nystatin price increase during a February 4, 2014 telephone conversation.  Malek and Teva's Patel spoke several additional times about the Nystatin price increase in February and March in order to confirm the agreement.

1906.   On April 4, 2014, Teva announced an increase of approximately 100% on its Nystatin pricing.  Around the same time, Malek renewed discussions with Sun to confirm the timing of Sun's and Heritage's price increases.  As it was Sun that began the collusive discussions on Nystatin roughly one year prior, Sun quickly agreed to implement the price increase.

1907.   Beginning in late June 2014, Heritage began announcing to its customers an increase on its Nystatin prices of almost 100%.  Heritage confirmed to Sun the details of its pricing

announcements in a detailed text message sent on June 25, 2014. By July 9, 2014, Heritage had fully implemented the Nystatin price increase.

1908. After Heritage implemented its price increase on Nystatin, a large pharmacy sent an RFP to Teva seeking a competitive bid on Nystatin pricing. Teva forwarded the RFP to Heritage, confirming that Teva was following the conspiracy pricing.

1909. In August 2014, as it had discussed with Teva and Heritage, Sun (and Mutual) announced and implemented the increased pricing on Nystatin.

1910. As a result of this collusive agreement on Nystatin pricing, Teva, Heritage, and Sun (including Mutual) were able to roughly double the prices for generic Nystatin tablets that they sold to Plaintiffs and others in the United States. This collusive agreement remained in force or effect (or both) from April 2014 until the present.

**UUUU.  Nystatin Triamcinolone**

1911. Nystatin Triamcinolone ("NT") Cream and Ointment is used for the treatment of cutaneous candidiasis, such as yeast infections and thrush.

1912. By early 2011, Sandoz had discontinued NT Cream and Ointment leaving Taro as the exclusive generic manufacturer of the products.

1913. Capitalizing on this exclusivity, Taro took several significant price increases on NT Cream and Ointment in 2011 and 2012, which resulted in a total WAC increase of more than 700% on certain formulations.

1914. Not surprisingly, during this time period, NT Cream and Ointment were Taro's highest grossing products and represented approximately 14.1% of the company's consolidated net sales for the year ending March 31, 2013.

1915.  Enticed by the high pricing, Sandoz began making plans to re-enter the NT Cream and Ointment markets in late 2012 and began coordinating regularly with Taro.  On November 12, 2012 – before Aprahamian had joined Taro – CW-3 of Sandoz called Marcus, a Taro sales executive, three times with one call lasting four minutes, to alert him to the fact that Sandoz might be entering the market.  That same day, CW-3 e-mailed ███████████, a Sandoz marketing executive, ███████████████ asking, "███████████████████████████████████ ██████████████████." ████████████████████████████████████████████████████ ███.

1916.  Two days later, on November 14, 2012, ██████████, a senior Taro executive, sent an internal e-mail to other senior executives at Taro and Sun ███████████████████████ ████████████████████████████████████. ████ explained that "███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████."

1917.  Sandoz's launch dates for NT Cream and Ointment would get pushed back, but CW-3 continued to keep ██████ informed.  On January 4 and 7, 2013, CW-3 called ██████ of Taro.  The calls lasted five minutes and thirteen minutes, respectively.  One week later, on January 14, 2013, Taro held a Sales and Marketing conference call.  During that call, Perfetto, then a Taro senior executive, ████████████████████ a "██████████████████████," that Taro was "█████████████████████" on ████████████████████████ "████ ██████████████████████."

1918.  Two days later, on January 16, 2013, Perfetto e-mailed ██████████, a senior Taro sales executive, ███████████████ "███████████████████████████████████

███

473

█████████████████████████," and asked █████████████████████████

███████. ██████ then forwarded ███████████████████, "████████████

███████████████████████████████████."

1919.   On February 12, 2013, Taro increased WAC pricing on NT Cream by 25%.  On

February 28, 2013, CW-3 ████████████████████████████████████████████████

█████████████████.  She responded: "███████."  That same day, CW-3 called ████████ of Taro to

keep him updated on Sandoz's plans, and they spoke for eleven minutes.  Two days later, on March

2, 2013, the two competitors exchanged three text messages.

1920.   The following Monday, March 4, 2013, Taro held a Sales and Marketing

conference call.  During that call, Perfetto informed the team that Sandoz was "███████████████

████████████████████."

1921.   On March 13, 2013, █████████████, a senior sales executive at Sandoz, sent an

internal e-mail to the sales team, including to CW-3, requesting "█████████████" █████████

████████████████████████████████████████████████████████████████████████

█████████.

1922.   One week later, on March 18, 2013, Aprahamian started at Taro.  Over the next

several days, Aprahamian and CW-3 exchanged several calls.  These calls are detailed in the chart

below:



| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:16:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/21/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:18:00 |

1923.   On March 19, 2013, ███ sent CW-3 a "████████" stating: "███ ████████████████████." CW-3 ████████████████████████ ████████████████. CW-3 responded: "███████████████ ████████████████████████████████ ██████████."

1924.   True to his word, on March 22, 2013, after the series of phone calls referenced above, CW-3 stated: "██████████████████████████████ ██████." Although CW-3 ███████████████ "████████," ████████ █████████████. CW-3 ████████████ Kellum and CW-1, a Sandoz senior pricing executive.  Kellum and CW-1 understood at the time that CW-3 obtained this information directly from Taro.

1925.   The file attached to CW-3's e-mail, which is pictured below, ███████████ ████████████████████████████████████████████ █████████████████████. Notably, CW-3 ████████████ ██████████████████████████████ CW-3 ████████ ████████████████████████.  The pricing information had been provided directly by Aprahamian for the express purpose of allowing Sandoz to price as high as possible when entering the market.



| Product | Size | NDC | Comments | CAH | Rite Aid | Walgreen | Winn Dixie | Comments |
|---|---|---|---|---|---|---|---|---|
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 15 gram tube | 00168-0268-15 | Prasco entered 8/6/2012 | | | | $ 30.00 | Actavis pricing |
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 50 gram tube | 00168-0268-50 | Prasco entered 8/6/2012 | | | | $ 45.00 | Actavis pricing |
| Desoximetasone Cream 0.25% | 15 gram tube | 00168-0180-15 | Taro Price Increase 2-12-13 | $ 17.00 | | $  6.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 60 gram tube | 00168-0180-60 | Taro Price Increase 2-12-13 | $ 36.00 | | $ 24.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 100 gram tube | 00168-0180-99 | Taro Price Increase 2-12-13 | $ 96.50 | | $ 43.00 | | Taro pricing |
| Nystatin Cream 100,000 U/g | 15 gram | 00168-0054-15 | | $  8.00 | $  5.25 | | | Taro pricing |
| Nystatin Cream 100,000 U/g | 30 gram | 00168-0054-30 | | $ 12.00 | $  7.75 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 15 gram | 00168-0081-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 30 gram | 00168-0081-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 60 gram | 00168-0081-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 15 gram | 00168-0089-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 30 gram | 00168-0089-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 60 gram | 00168-0089-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |

1926.   On the morning of April 15, 2013, Aprahamian called CW-3 and they spoke for eighteen minutes.  A few minutes after hanging up, CW-3 called Aprahamian back.  The call lasted one minute.  During these calls, CW-3 told Aprahamian that Sandoz would be entering the market for NT Cream shortly.  Later that day, Taro held a Sales and Marketing conference call.  The minutes from the conference call stated: "███████████████████████████████████ ███████████████."

1927.   On that same day, April 15, 2013, Sandoz held its own Commercial Operations call during which they discussed NT Cream.  During that call, Sandoz identified ABC, Walgreens, Rite Aid, Wal-Mart, and Omnicare as potential targets for the re-launch.  CW-3's contemporaneous notes from that call are pictured below:



1928.   Later that same day, on April 15, 2013, CW-3 called Aprahamian to further discuss the NT Cream launch.  The two competitors spoke for nine minutes.  CW-3's contemporaneous notes from that call are pictured below:



1929.   On the call, Aprahamian provided CW-3 with Taro's non-public pricing at ABC, Walgreens, Rite Aid, and Omnicare.   Aprahamian also told CW-3 that Taro would not defend these customers.   CW-3 noted that by drawing arrows pointing at those customer names in his Notebook.

1930.   After hanging up with Aprahamian, CW-3 immediately called Kellum to report his conversation with the competitor.   The call lasted one minute.   First thing the next morning, on April 16, 2013, CW-3 called Kellum again and they spoke for five minutes.

1931.   From April 20 to April 23, 2013, NACDS held its annual meeting in Palm Beach, Florida.   Representatives from Taro, including Aprahamian and Perfetto, and Sandoz, including ███████████ and Richard Tremonte, attended.

1932.   The following day, on April 24, 2013, Aprahamian called CW-3 twice. The calls lasted one minute and five minutes, respectively.   On April 25, 2013, CW-3 called Aprahamian. The call lasted one minute.   That same day, Sandoz re-entered the NT Cream market and matched Taro's increased WAC pricing.

1933.   On the day of Sandoz's re-entry, Rite Aid e-mailed Taro ███████████



███████ of Taro ███████████████████████, Perfetto, and Aprahamian stating: "████████████████████████████████." Aprahamian responded: "████████████████████."

1934.   The next day, on April 26, 2013, Aprahamian called CW-3 and they spoke for eight minutes. Consistent with Taro's agreement to cede that customer to Sandoz, Aprahamian e-mailed ███████ on April 27, 2013 ███████████████████████, "███████████████████████████."

1935.   Also on April 26, 2013, Omnicare e-mailed Taro ███████████████████ ████████████████████████████████████████████. ██████ forwarded the ██████ to Aprahamian who responded, "████████████████████████████████████ ██████████████████████████."

1936.   That same day, Perfetto sent an internal e-mail to █████████████ and Michael Kalb, two senior Taro executives, and others including Aprahamian, █████████████████████ ████████████████████████████████████████████████████████. Perfetto concluded: "███████████████████████████████."

1937.   On May 8, 2013, Perfetto sent an internal e-mail to Taro executives █████████ ████████████████████████████████████ stating that "████████████████████ ████████████████." That same day, Aprahamian called CW-3 and they spoke for eight minutes.  CW-3 called Aprahamian back later that day and they spoke for another nine minutes.

1938.   On May 28, 2013, NC Mutual e-mailed Taro █████████████████████ ███████████████████████████████████████████████████. ██████████ ████████, a Taro sales executive, ██████████████████████████, but Aprahamian ██████████, stating: "████████████████████████████████████████ ████████████████████████." Two days later, on May 30, 2013, Aprahamian called CW-3.  The call lasted one minute.

1939.   On June 4, 2013, Taro ████████████████████████████████████████████ ██████████████████████████████. ████████████████████████████████████, Taro noted ██████████████████████████████████████████████████" and ████ ██████████████████ "████████████████████."

1940.   Despite Sandoz's entry, prices for NT Cream remained extremely high. Around this same time, ███████████, a policy executive at Taro, actually sent an internal e-mail to ███ ██████, Perfetto, and Aprahamian █████████████████████ "████████████████████ ███████████████████████████████████████████" because "████████████████████ ███████████████████████████████████████." ████████ replied that Kaiser ██████ "█████████████████████████████████" in ███████████████████████ ███████████.

1941.   Following Sandoz's re-launch into the NT Cream market, Sandoz executives began discussing a larger "█████████████" which involved "█████████████████████████████████ ███████████████████████████." The rationale was simple – allow Taro to grow these markets by increasing prices and then Sandoz could re-enter later at the higher prices, in coordination with Taro.  Sandoz ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████.

1942.   Indeed, the following chart from a Credit Suisse Investor report graphically illustrates the success of such an approach – depicting the price increases taken by Taro on NT Cream while Sandoz was out of the market and Sandoz's re-entry at the higher price:



Figure 2: Competition followed Taro in past price increases

Nystatin triam - Price increase

Sandoz re-entered at same price as Taro

Source: Price Rx, Company data, Credit Suisse research

1943.  In November 2013, Sandoz began readying to re-enter the NT Ointment market. Sandoz executives, including Kellum, wanted to mirror the NT Ointment launch after the NT Cream launch by targeting the same customers as it had for NT Cream.  Kellum specifically discussed this approach with CW-1.

1944.  On November 13 and 15, 2013, Aprahamian and CW-3 exchanged several calls during which they discussed NT Ointment.  CW-3 then reported what he discussed on those calls to CW-1.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 8:00:00 | 0:01:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:15:00 | 0:02:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:32:00 | 0:08:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:33:00 | 0:08:00 |
| 11/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:41:00 | 0:11:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:55:00 | 0:01:00 |

1945.  During his calls with Aprahamian, CW-3 took the following contemporaneous notes in his Notebook regarding NT Cream and Ointment:



1946.  On these calls, CW-3 and Aprahamian discussed Sandoz's plan to target the same customers that it had targeted on NT Cream – ABC, Walgreens, Rite Aid, and Omnicare.  CW-3 drew an arrow from the customers listed under NT Cream to the NT Ointment pricing to

demonstrate this.  As he had done before, Aprahamian agreed that Taro would not defend those customers and provided CW-3 with Taro's pricing at those accounts.

1947.  On November 22, 2013, Aprahamian called CW-3 and they spoke for seven minutes.  That same day, Sandoz re-entered the NT Ointment market and matched Taro's increased WAC pricing.  Per the competitors' agreement, Sandoz submitted offers to " ███████████████ ████████████████████████████."

1948.  The next day, on November 23, 2013, ██████████████, Sandoz's President, e-mailed Kellum and ████████████████████████. ███████████████████ ████████████████████████████████████████████. ████ responded: "████████████████████████████████████████████ ███████████████████████████████."

1949.  By December 2013, Sandoz had – as agreed – targeted and secured the NT Ointment business at ABC, Walgreens, Rite Aid, and Omnicare.

1950.  In July 2015, Actavis entered the market for both NT Cream and Ointment, and Sandoz and Taro promptly arranged to concede to Actavis approximately 10% of the market for both formulations, and Actavis accepted this concession without disrupting pricing.  Accordingly, by following the fair share rules, Sandoz, Taro, and Actavis were able to maintain supracompetitive pricing on NT Cream and Ointment, even as a third competitor entered the market for the drug.

### VVVV.  Omega-3-Acid Ethyl Esters

1951.  Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid-regulating agent used to lower levels of triglycerides.

1952.   Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014.  On the morning of June 26, 2014, Patel e-mailed ███, a senior operations executive at Teva, ████████████ ████████████████████████████████.  ███ responded ████████ ████████████████████.  Patel replied at 10:24 a.m. ████████████ ████████████ "████████."

1953.   Patel had indeed already started "████████████."  At 9:46 a.m., she had sent a message to ████, a senior-most executive at Par, through the website LinkedIn, stating:



1954.   ███ did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten text messages between them in the late afternoon and early evening. Patel then followed up with ████████████████████████████ ████████████████ "████████████."

1955.   The next morning, ███ called Patel and they spoke for nearly thirty minutes.  That was the first and only voice call ever between the two according to the phone records.  That same

morning, Patel informed ▮▮▮ that she now had ▮▮▮▮▮▮" ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮.  At 11:27 a.m. that same morning, Rekenthaler sent an e-mail to

▮▮▮, a Teva sales executive, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮:



1956.  Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

1957.  After the discussions between Patel and ▮▮▮ at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.  As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

1958.  As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high.  For example, in an internal e-mail on October 2, 2014, Teva's

▮▮▮ stated that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮."  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮.

1959.  Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014.  On November 10, 2014, Patel and ▮▮▮ exchanged five text messages.  On December 1, 2014, Teva was notified by a customer that it had received a price challenge on

Omega-3-Acid Ethyl Esters. ███████████████████████████████

████████████████████████: "██████████████." Rekenthaler informed ████████████

████████████████████████████████████████████████████.

1960.  By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing.  During this time, Rekenthaler was speaking frequently with ████████, a senior national account executive at Par, to coordinate.

1961.  By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop.  By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%.  Rekenthaler was speaking frequently with ████████ at Apotex to coordinate during the time period of Apotex's entry in the market.

**WWWW. <u>Oxaprozin Tablets</u>**

1962.  Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID).  It is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

1963.  Prior to July 2012, Teva and Dr. Reddy's dominated the Oxaprozin market.  However, between July 2012 and March 2013, two additional competitors entered the market, yet the price of the drug went up more than 500% in the process.

1964.  First, Sandoz entered the market in July 2012.  Prior to Sandoz's entry into the market, Teva raised its prices by approximately 500%.

1965.  This price increase was made possible by the fair share agreement, as Teva knew that it would not lose market share by raising prices, even with Sandoz's pending entry into the

market.  Indeed, when Sandoz did enter the market in July 2012, it matched Teva's higher prices and was still able to gain its "fair share" of the market.

1966.   Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva.  In the days and weeks leading up to Greenstone's entry into the market, Green of Teva and ▇▇▇▇▇, an account executive at Greenstone, were in frequent communication by phone and text to coordinate the entry, as set forth in more detail below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

1967.   During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

1968.   Part of the understanding between the companies was that Teva would concede at least two large customers – CVS and Cardinal – to Greenstone, and that Teva would retain Walmart as a customer.  On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

1969.   On March 27, 2013, ▇▇▇ of Teva forwarded an e-mail that ▇▇▇ had received from Walmart to Green and Rekenthaler.  The e-mail from Walmart, sent the same day, ▇▇▇▇

██████████████████████████████████████████████████████████

██████████████████████████.

1970.  Rekenthaler's ████████████████████'s e-mail was "████████████

████████."  In subsequent e-mails between █████ and Rekenthaler, ████████████

Rekenthaler that, ██████████████████████████: "██████████████████

██████████" Rekenthaler corrected her, ███████████████████████████

██████████.  Rekenthaler remarked that: "████████████████████████████

██████████████." In her reply, █████████████████████████████████

████████████:



From: ███████████
Sent:   Wed 3/27/2013 4:36 PM (GMT-05:00)
To:      Dave Rekenthaler; Kevin Green
Cc:
Bcc:
Subject: RE: Oxaprozin 600mg Tab

I thought they said they were done after cardainl.. I am pissed.

1971.  Teva took immediate steps to address the situation.  That same day – March 27,

2013 – Green called █████ at Greenstone at 5:25 p.m. but she did not answer.  The next morning,

at 8:06 a.m., █████ sent an e-mail to Walmart stating: "████████████████" Less than a

half hour later, she sent an e-mail to Green, stating: "████████████████████████

██████."

1972.  After Green spoke to █████, he immediately called █████ at Greenstone.  She

relayed the information from Green to her boss, Nailor, in a series of conversations and text

messages over the course of that morning, and later in the day, as set forth below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

1973.   During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

1974.   At 1:22 p.m. that day, after several of the communications outlined above, Walmart sent an e-mail to ███████ at Teva ███████████████████████████████████████████████: "█
████████████████████████████████████████████████████████████████████████████
███████████████████████████████████." ███████ forwarded the e-mail to Green, with
██████████████████████████████████████████████████████████████████████████
"████████."

1975.   Pursuant to the overarching agreement, there was very little price erosion as a result of Greenstone's entry.   A couple of months later, as Defendant Dr. Reddy's was preparing to reenter the market for Oxaprozin (Dr. Reddy's briefly exited the market after Sandoz's entry in 2012), a Dr. Reddy's ██████████████████████████████: "█████████████████" on Oxaprozin. ██████████████████████████████████████████████████
██████████ "██████████████████████████████████!"

1976.   In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year.  In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large chain and one large wholesaler in order to obtain at least 30% market share.  Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

1977.   On June 13, 2013, members of the Dr. Reddy's sales force met for an "███████ ████████████████████████" to "██████████████████████████████████████ ██████████."



1978.   Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva.  At the time, Teva had 60% market share.  Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier.  Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

1979.   Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens.  At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████."

1980.   ████████████████████████████████.  On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price.  Per Green, Walgreens ███████████████████████████████."

1981.   While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – ███████ of Dr. Reddy's called Green.  That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five minutes.

1982.   Two days later, Green noted that: "████████████████████████ ████████████████████████████."  Green also ████████████████████ ████████████████████████, Dr. Reddy's will "███████████" – ████ ████████████████████████████████████.

1983.   While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy.  On July 29, 2013, ████████ at Teva ████████████████████████████ ████████████████████████████████████ ████████████████████████, Rekenthaler ████████ asked Patel to "████████████████████████████."  Rekenthaler's ████████████████████████████████ ████████████████.

1984.   At 12:33 p.m. that day, Patel asked a colleague to "████████████ ████████████████████."  ████████████████████████ ████████████████.  At 2:20 p.m., that colleague ████████████ ██  Patel, copying Rekenthaler and ████████.  ████████████████████ ██, Rekenthaler placed a call to ████████, a Senior Director of National Accounts at Dr. Reddy's.  The call lasted two minutes, and was their only telephone conversation in 2013.

1985.   After having this conversation with ████████, Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's.  Teva conceded the

Econdisc business on August 7, 2013.  Green ███████████████████████████████
█████████████████████████████████████████████.

1986.   By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market.  At that time, its customers included Econdisc, Keysource, and Premier.

1987.   As a result of this collusion, Defendants have been able to maintain pricing for Oxaprozin at supracompetitive levels since July 2012.

**XXXX.   Oxycodone/Acetaminophen**

1988.   Oxycodone/Acetaminophen, which is the generic version of Percocet and is sometimes abbreviated as "Oxy/Apap," is prescribed to treat chronic or severe pain.

1989.   During the time period relevant to this Complaint, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, Par, and Qualitest/Endo dominated the market for Oxy/Apap. Given the large number of competitors that entered the market for the drug between 2011 and 2015, pricing for Oxy/Apap should have fallen substantially over time.  Instead, the opposite occurred.  For example, by December 2013, Mallinckrodt, Actavis, Alvogen, Amneal and Qualitest/Endo all sold 100-tablet bottles of 10/325 mg pills that had cost roughly $18 per bottle throughout 2011 and 2012 for more than $80.

1990.   Although the Defendants did not increase prices on the drug until late 2013, Defendants ensured that the fair share agreement applied as new competitors entered the market. For example, Alvogen received approval to launch Oxy/Apap in July 2012.  Upon learning that Alvogen was entering the market for Oxy/Apap, Dr. Reddy's – which did not manufacture the drug – reached out to ████████, Alvogen's EVP of US Commercial Sales, to ███████████
████████████.  Hill responded ██████████████████████████████████████
██████████████████████████████████████." ██████████████████████████████



1991.   Between July and December 2013, Defendants coordinated to more than quadruple their prices on Oxy/Apap.  Mallinckrodt led the price increase, and Actavis, Alvogen, Amneal, and Qualitest quickly followed.  Upon information and belief, the campaign to increase prices on the drug was spearheaded by Actavis and Mallinckrodt.  Between July 2013 and December 2013, Marc Falkin of Actavis spoke with ████████, Alvogen's EVP of US Commercial Sales; ████████, VP of Sales at Amneal; ████████, the CEO of Aurobindo; and Walt Kaczmarek, Vice President and General Manager at Mallinckrodt.  ████████ (Alvogen) and ████████ (Amneal) also coordinated with Aurobindo and Actavis, respectively, during this timeframe.  Additionally, Falkin spoke with ████████ of Qualitest at least 10 times between May 2 and May 19, 2014.

1992.   On November 19, 2013, Qualitest received an inquiry from Econdisc to bid for Oxy/Apap.  Upon learning that the RFP was requested due to a price increase from the incumbent supplier. Qualitest and Endo declined to bid for this business based on its commitment to the fair share rules.  Further, although sales executives from Qualitest participated in the collusion, this was done on Endo's behalf, as it was Endo that held the ANDA for the drug.  And following the acquisition of Par by Endo in May 2015, sales executives from Par began to sell Oxycodone/APAP on behalf of Endo as well, adhering to the collusive pricing set before the acquisition, and continuing to abide by the fair share rules.

1993.   As a Teva sales executive reported internally in a November 26, 2013 e-mail to ████████, ████████, David Rekenthaler, Nisha Patel, and others, "████████ ████████████████████████████████████████████████

████████.” ████████████████████████████████████████████

████████████. Notably, ████████████ of Teva had spoken with ████████ of Qualitest a number of times in the weeks prior to this exchange. Although Teva did not manufacture Oxycodone/Apap, it did manufacturer Codeine/Acetaminophen, which is prescribed for similar uses. Reflecting the overarching nature of the conspiracy, Teva therefore communicated with competitors about drugs that it did not manufacture, because it did make drugs that could be substituted those drugs.

1994.  Mayne entered the market for Oxy/Apap in late 2014.  In planning for the launch, Stefan Cross, Mayne's President, encouraged his sales team to engage in "████████████████

████████████" with competitors to determine which customers Mayne should target to receive its "fair share."  Indeed, upon entry, Mayne received its "fair share" as the eighth entrant into the market without any disruption to price, in accordance with the overarching conspiracy.

1995.  As a result of these collusive communications, Defendants have been able to maintain Oxy/Apap at supracompetitive levels since July 2012.

**YYYY.  Paricalcitol**

1996.  Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent high levels of parathyroid hormone in patients with long-term kidney disease.

1997.  Defendant Teva entered the market on Paricalcitol on September 30, 2013.  As the first generic to enter the market, it was entitled to 180 days of exclusivity.

1998.  In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede.  Teva had advance knowledge that Defendant Zydus and another generic manufacturer not named as a Defendant in this case planned to enter the market on day 181, which was March 29, 2014.

1999.  Following its period of exclusivity, Teva's ████████████████████
████ " but "████████████████████████████████████████████████████
████████████ ."

2000.  In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

2001.  On February 28, 2014, ████████████████, a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, █████████ ████████████████████████████████████████████████████ .  After receiving that e-mail, Rekenthaler called Green.  The call lasted less than one minute (likely a voicemail).  The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty minutes.  Later that afternoon, Patel also called Green.  The two exchanged four calls that day, including one that lasted nearly twenty minutes.  On March 4, Patel called Green again and left a voicemail.

2002.  On March 12, 2014, ████████████ e-mailed Patel and Rekenthaler █████████ ████████████████████████ .  That same day, Patel sent an internal e-mail █████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ .

2003.  On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing.  The next day, on March 14, 2014, Patel called Green.  A few minutes later, Green returned the call and they spoke for nineteen minutes.  Rekenthaler then called Patel and they spoke for eleven minutes.

2004.   During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six minutes and just over five minutes.  During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.  A half an hour after the second call, Patel e-mailed her supervisor, ███████, ████████████████████████"

████████████████████████████████████████████████████████

████████████████, Patel recommended that Teva "████████████████████████

████████████████████."  Later that same day, Patel called Green again and they spoke for more than eleven minutes.

2005.   Over the next several weeks, Defendant Teva would "strategically" concede several customers to the new entrant Zydus.

2006.   For example, on March 27, 2014, Green called Patel. Patel returned the call and they spoke for nearly nine minutes.  The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified ████████████, a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business.  ████████ forwarded the OptiSource e-mail to Patel. Within minutes, Patel responded "████████████████."

2007.   That same day, Defendant Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business.  On April 1, 2014, Defendant Teva ████████████████████████████████████████████████████████

████████████████████."

2008.   Also on April 1, 2014, Defendant Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer.  That same day, Patel called Green and left a 22-second voicemail. The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten minutes.  Later that evening ████████████, an Associate Manager,

Customer Marketing at Teva, sent an internal e-mail to ████████, the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "████████ ████████████████████?" Patel responded: ████████████████ ████."

2009.   On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain.  Two days later, on April 17, 2014, ████ ████████████████.  Patel replied: "████████████ ████████████████████ ████████████████." Later that day, Green called Patel.  She returned his call and they spoke for nearly twelve minutes.  Later that day, after her discussion with Green, Patel sent an internal e-mail stating: "████████████████ ████." On April 22, 2014, Patel sent an internal e-mail ████████████ ████████████."

2010.   By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market.  On May 1, 2014, ████████ of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven minutes.

2011.   At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices.  Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

2012.   On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – Patel spoke with ████████, the Vice President of Sales for North American Generics at Dr.

Reddy's, several times.  At 8:50 a.m., Patel called ███████ and left a voicemail. ███████ returned

the call at 9:18 a.m., and the two spoke for more than ten minutes.

2013.   By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and

Walgreens.  The internal plan was that if Walgreens declined, then Dr. Reddy's would make an

offer to CVS.  That same day, Teva agreed to concede its Paricalcitol business at Omnicare,

dropping its market share by 3%.

2014.   Teva also strategically conceded what remained of its Cardinal business (it had

previously conceded some of that business to Zydus).  After receiving Dr. Reddy's bid, Cardinal

approached Teva and asked whether Teva would bid to retain the four mcg portion of the business.



2015.   Dr. Reddy's also submitted a bid to ABC, which was one of the customers that

Teva had targeted to keep after losing exclusivity.  ABC notified Teva of Dr. Reddy's competitive

bid for Paricalcitol on June 26, 2014.  In internal e-mails discussing this price challenge, ███

From:     Dave Rekenthaler
Sent:     Tue 7/01/2014 9:42 AM (GMT-05:00)
To:       Nisha Patel02
Cc:
Bcc:
Subject: RE: ABC Paricalcitol CPC #12233 (DRL LAUNCH) -->DUE TODAY <--

My thoughts are that Dr. Reddy is really a pain in my ass.  Have they picked anyone up to date?

2016.   Despite the pricing challenge, Teva retained the ABC Paricalcitol business.  As ABC explained to Dr. Reddy's: "██████████████████████████████████████████ ████."

2017.   Dr. Reddy's formally launched Paricalcitol on June 24, 2014.  On or around that date, it sent offers to, *inter alia*, Winn-Dixie, Giant Eagle, and Schnucks.  On June 26, 2014, Teva's ██████ told Patel that he was "█████████████████████████████████" to Dr. Reddy's.

2018.   Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's.  Patel recommended that Teva concede the business.  Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

2019.   Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014.  That same day, ██████ of Dr. Reddy's called Patel and the two spoke for more than twelve minutes.  Shortly after getting off the phone with ██████, Patel responded to a question from a colleague regarding an RFP to another supermarket chain.  One of the potential bid items was Paricalcitol.  Patel ███████████████████████████████████████████████ █████████████████████████████████████████████████████████████." Her colleague responded: "████████████████████████████.

2020.   The next day, Teva conceded the Giant Eagle business to Dr. Reddy's.  Stephanie

Brady, a Teva Strategic Customer Analyst, wrote in an internal e-mail: "████████████████

████████████████████████████."  Giant Eagle accepted Dr. Reddy's

proposal the next day.

2021.   After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced

pricing in order to retain the business.  Teva ████████████████████████████████

████████████████████████████."  ████████████████████

████████████████████ "███████," ████████████

████████████████████████████████

████████.  Indeed, Schnucks was "█████████" ████████████████

████████████████████.  When Patel learned of this, she remarked to a Teva

salesperson ████████████████████████:



From:    Nisha Patel02
Sent:    Thu 7/17/2014 11:36 AM (GMT-05:00)
To:      ████████████
Cc:
Bcc:
Subject: RE: Schnucks Paricalcitol CPC (#12201)

Sorry! Had to laugh.  In regards to our recent conversation….this is what we see when we provide fluff pricing.
Can't win!

2022.   Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

2023.   On July 16, 2014, McKesson informed Teva that it had received a competing bid

for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business.

Teva initially decided to concede the One Stop portion of McKesson's business only, while

retaining the Rite Aid portion.  Patel wrote internally to her team that "████████████████

████████████████████████████████

███████████████████████████████████████████" Patel further added that

Teva had been "████████████████████████████████████" and that "███

████████████████████████████████."

2024.  On July 18, 2014 – a Friday – Patel called ██████ at Dr. Reddy's at 4:20 p.m. and left a message.  ██████ returned the call on Monday morning, and the two spoke for more than four minutes.  They spoke again the next morning, July 22, 2014, for more than six minutes. During these calls, Patel and ██████ agreed that Dr. Reddy's would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's.  ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████.

2025.  The next day, July 23, 2014, Teva decided to concede its entire McKesson business – both Rite Aid and One Stop – to Dr. Reddy's.  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████." 

2026.  By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "██████████████."

### ZZZZ.  Paromomycin

2027.  The market for Paromomycin is mature, as the drug has been available in the United States since 1960.  The drug is considered an essential medicine by the World Health Organization. Heritage and Sun sold Paromomycin to Plaintiffs and others in the United States at

supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2028.   Until April 2014, pursuant to the conspiracy's overarching agreement on market allocation, Heritage maintained approximately a 65% market share for Paromomycin and Sun maintained approximately a 35% market share.

2029.   During a lengthy phone call on April 22, 2014, Sun's ████████ and Heritage's ████████ discussed an agreement to raise prices on Paromomycin.  Ultimately, it was agreed between the two companies that Sun would exit the market for Paromomycin.  Upon information and belief, Heritage agreed to concede market share to Sun on another generic drug in exchange for Sun's agreement to stop manufacturing Paromomycin.

2030.   In May 2014, Sun stopped its production of Paromomycin (although it continued to sell its surplus inventory of the drug until approximately January 2015).

2031.   Knowing that it would have a complete monopoly for the manufacture of generic Paromomycin in the United States, Heritage decided to raise prices, and on June 26, 2014, Heritage notified its customers that its prices for Paromomycin would double going forward.  Upon information and belief, Heritage raised its prices by approximately 100%.

2032.   As a result of this unlawful agreement between Heritage and Sun, Defendants have charged supracompetitive prices on generic Paromomycin sold to Plaintiffs and others in the United States since at least April 2014.

### AAAAA. Permethrin

2033.   Permethrin cream is used to treat scabies.  During the period relevant to this Complaint, Actavis, Perrigo and Mylan were the primary manufacturers of Permethrin cream.

2034.   Prior to 2010, Perrigo and Actavis sold Permethrin cream for pennies per dose. However, beginning in May 2010, senior executives from Actavis and Perrigo began coordinating to increase prices substantially.  On May 27, 2010, ▮▮▮▮▮▮▮ of Actavis (the Director of National Accounts) spoke by phone with ▮▮▮▮▮▮▮▮ of Perrigo (the Director of National Accounts).  Upon information and belief, the two executives reached an agreement to double their WAC prices for Permethrin by July 2010.

2035.   After successfully doubling their prices, ▮▮▮▮ and ▮▮▮▮ began speaking again in August 2011 to discuss another price increase.  The two spoke twice on August 5, and at least four times on August 8, 2011.  Upon information and belief, these conversations resulted in an agreement that each company would increase their prices on Permethrin by at least an additional 200% (on top of the 2010 price increase).

2036.   In early 2013, Perrigo and Actavis learned that Mylan would be entering the market. As a result, ▮▮▮▮ and ▮▮▮▮ spoke again on March 12, 14, and 18 to coordinate yet another price increase of approximately 100%.  ▮▮▮▮ and ▮▮▮▮ then spoke again on April 11, in order to confirm their third successful price increase on Permethrin.

2037.   In June 2013, Mylan entered the market for Permethrin.  Even though prices were more than 1000% higher than they had been in 2010, Mylan entered the market at higher prices than either Actavis or Perrigo.  Pursuant to the fair share rules, Perrigo and Actavis conceded market share to Mylan.

2038.   To coordinate Mylan's entry and determine which customers Actavis and Perrigo would concede, Jim Nesta of Mylan and ▮▮▮▮▮ of Perrigo called each other nine times between August 27 and August 28, 2013.  Nesta and ▮▮▮▮ then spoke again on November 15, 2013.  ▮▮▮▮ also acted as the intermediary between Nesta and ▮▮▮▮, as he continued to speak

501

with ███ regularly about the Permethrin market, including multiple calls on August 21, August 23rd, September 6th, September 9th, and September 10th and once on September 11th, 2013.

2039.   As a result of this coordination between the three companies, Mylan, Actavis, and Perrigo were able to implement the fair share rules and maintain supracompetitive pricing on Permethrin cream that they sold to Plaintiffs and others in the United States.

**BBBBB.  Perphenazine**

2040.   Perphenazine is used to treat certain mental health issues and mood disorders. During the period relevant to this Complaint, Qualitest/Endo and Sandoz were the primary manufacturers of Perphenazine.

2041.   Prior to 2009, the price of Perphenazine cost pennies per dose.  However, Qualitest left the market in 2009 due to a disruption in supply, and Sandoz dramatically increased prices. When Qualitest re-entered in the summer of 2009, it matched Sandoz's increased price.

2042.   The market shares of Qualitest and Sandoz are wholly reflective of each company's adherence to the fair share rules.  As of May 2010, Qualitest had less than 14% market share, compared to Sandoz's 86.1% share of the market.   Over the next year, Sandoz conceded approximately 20% market share to Qualitest, and by May 2011, Qualitest's share was more than 33% compared to 66% for Sandoz. But during this time, despite the fact that Qualitest increased its market share from 13% to 33%, prices charged by both companies remained virtually unchanged.

2043.   Indeed, between May 2011 and May 2014, the respective market shares of Qualitest and Sandoz remained essentially fixed, with Par supply roughly one third of the market, and Sandoz supplying the remaining two thirds.  As a result of their adherence to the fair share rules, the companies were able to increase prices twice (once in 2011 and again in 2013), and as a result,

their average prices roughly doubles from the supracompetitive pricing establishing by Sandoz in 2009.  And although executives from Qualitest and Sandoz did communicate regarding their pricing during this time, their adherence to the fair share rules rendered the price increases virtually self-executing.  Because each company knew that the other was committed to the conspiracy, the communications about pricing were essentially a formality.

2044.   In mid-2014, the companies reallocated share to be more consistent with fair share rules, and Sandoz conceded additional share to Qualitest so that the two companies had market share close to 50%.  Following this reallocation, Sandoz and Qualitest maintained market share within a few percentage points of 50% until at least the end of 2016.

2045.   As a result of this collusion, Sandoz and Qualitest were able to charge supracompetitive prices for Perphenazine to Plaintiffs and others in the United States.

### CCCCC. **Phenytoin Sodium Capsules**

2046.   Phenytoin Sodium Extended Release Capsules ("Phenytoin Sodium"), also known by the brand name Dilantin, is an antiepileptic drug that is used to prevent and treat seizures.

2047.   Throughout the spring and summer of 2014, there were four competitors in the Phenytoin Sodium market: Taro, Mylan, Amneal, and Taro's parent company, Sun.

2048.   In early April 2014, Taro began formulating its list of products for the June 2014 Increases.  On April 3, 2014, Aprahamian exchanged an e-mail with █████████, a pricing executive at Taro, ████████████████████ and, by April 7, 2014, Taro had added the product to its price increase list.

2049.   Three days later, on April 10, 2014, Aprahamian and ██████████, a Mylan sales executive, exchanged two calls lasting two minutes and ten minutes, respectively.  Notably, the

competitors would not speak again by phone until June 4, 2014, one day after Taro increased its pricing on Phenytoin Sodium.

2050. ████████████████████████████████████████████████████████

██████████████████.  After an internal discussion regarding market shares, Aprahamian responded on April 20, 2014 stating: "███████████████████████████████████████████

██████."  Similarly, on April 24, 2014, Walgreens also e-mailed Mylan, another competitor in the market, asking for a bid on the product.

2051.  Between April 26 and 29, 2014, NACDS held its annual meeting in Scottsdale, Arizona.  Key representatives from Taro, Mylan, Amneal, and Sun all attended the conference. The attendees included Aprahamian and Perfetto of Taro, Jim Nesta of Mylan, ████████, a pricing executive at Amneal, and ████████, a senior executive at Sun.

2052.  While attending the NACDS annual meeting, the competitors had numerous opportunities at various programming and social events to discuss Phenytoin Sodium, along with other products on which they competed.  Indeed, between April 27 and April 29, Nesta of Mylan and ████████ of Amneal exchanged at least twenty-two phone calls and text messages.  Further, on April 29, 2014, while still at the NACDS meeting, Aprahamian sent an e-mail to an administrative clerk at Taro, asking, "████████████████████████████████████████████████

████████."

2053.  One month later, on May 29, 2014, the Pricing and Contracts ("P&C") team at Mylan generated a Daily Report listing the Mylan opportunity at Walgreens on Phenytoin Sodium. In the report, Mylan noted that it could supply in July 2014 and identified the product as "████████

████████████████████."  Notably, no generic manufacturer of Phenytoin Sodium had increased pricing yet, including Amneal.

2054.   In the days leading up to the generation of the P&C Report, Nesta and ███, a sales executive at Mylan, both communicated multiple times with ███ of Amneal.   These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/27/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 18:44:13 | 0:02:56 |
| 5/28/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 12:14:56 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 15:55:15 | 0:00:14 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:08:45 | 0:00:06 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:09:19 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:20:50 | 0:00:15 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:36:27 | 0:01:23 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:53:02 | 0:05:37 |
| 5/29/2014 | Text | S.R. (Amneal) | Incoming | M.A. (Mylan) | 17:05:22 | 0:00:00 |

2055.   Ultimately, Mylan declined to bid on the Walgreens business, refusing to take the business away from its competitor, Amneal.

2056.   As detailed above, on June 2, 2014 Taro notified its customers that it would be increasing its prices on the June 2014 Increase products, including Phenytoin Sodium.   That same day, ███ of Amneal called both ███ and Nesta several times.   Over the next several days, all three competitors would exchange a number of calls.   These are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:46:53 | 0:00:02 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 16:47:32 | 0:00:04 |
| 6/2/2014 | Voice | S.R. (Amneal) | Incoming | Nesta, Jim (Mylan) | 17:02:54 | 0:00:06 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:03:18 | 0:00:03 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:04:14 | 0:00:19 |
| 6/2/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:51:53 | 0:00:46 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 13:17:00 | 0:01:00 |
| 6/4/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:21:17 | 0:07:38 |
| 6/4/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 13:51:18 | 0:00:26 |
| 6/5/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:47:00 | 0:00:02 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Incoming | S.R. (Amneal) | 13:47:37 | 0:00:17 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:49:34 | 0:00:05 |
| 6/5/2014 | Text | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:50:12 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:15 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:41 | 0:03:34 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 6:56:00 | 0:02:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | S.R. (Amneal) | 6:57:00 | 0:07:00 |

| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 12:41:00 | 0:09:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 9:02:00 | 0:04:00 |

2057.   On July 2, 2014, ████████, a sales executive at Sun, sent an internal e-mail advising ████, a senior executive at Sun, and others, ████████████████████████ ████████. ████████████████████████████████████ ████████████████.

2058.   In the days leading up to July 2, Taro, Mylan, and Amneal continued to communicate.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 12:11:00 | 0:01:00 |
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 13:04:00 | 0:09:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:29:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:35:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 12:19:00 | 0:11:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 10:52:00 | 0:02:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Incoming | S.R. (Amneal) | 11:17:00 | 0:06:00 |
| 7/1/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 6:15:00 | 0:09:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 11:11:00 | 0:04:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:15:00 | 0:06:00 |
| 7/2/2014 | Voice | M.A. (Mylan) | Outgoing | Aprahamian, Ara (Taro) | 11:18:00 | 0:02:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 11:20:00 | 0:04:00 |

2059.   On July 10, 2014, ████████████████████████████ ████████████████████████████████.  That same day, ████ of Mylan called Aprahamian.  The call lasted seven minutes.  First thing the next morning, on July 11, 2014, Aprahamian called ████████ of Amneal.  ████ returned the call a few minutes later and they spoke for three minutes.  Later that day, Courtney Wilson, a pricing executive at Mylan, sent an internal e-mail regarding the Wal-Mart opportunity stating: "████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████.″  (emphasis in original).

2060.   On July 14, 2014, Sun followed its competitors and increased pricing on Phenytoin Sodium.  Similarly, Mylan followed suit on July 16, 2014, increasing its WAC pricing by 210% to match market pricing.

2061.   

2062.   One month later, on September 1, 2014, Amneal followed and matched its competitors' WAC pricing.

**DDDDD. <u>Pilocarpine HCL</u>**

2063.   Pilocarpine HCL tablets, also known by the brand name Salagen, is used to treat dryness of the mouth associated with Sjogren's syndrome (an immune disease), and also to treat saliva gland damage after radiation treatment for cancer.  During the period relevant to this Complaint, Actavis, Impax, and Lannett were the primary manufacturers of Pilocarpine HCL tablets.

2064.   Prior to 2014, Pilocarpine tablets cost pennies per dose. However, when Impax claimed to suffer a brief disruption in supply in late 2013, Lannett and Actavis conspired to increase prices by approximately 200% in March 2014.  When Impax re-entered the market in the fall of 2015, it matched or exceeded the prices offered by Actavis and Lannett, but was still able

to recover its fair share of the market (because Actavis and Lannett conceded this share back to Impax pursuant to the fair share rules).

2065.   Senior sales executives from Actavis, Lannett and Impax communicated directly with each other in furtherance of the conspiracy.  For example, Falkin of Actavis spoke with ███ ███ of Lannett on November 10th, 22nd and 25th, and December 12th and 13th of 2013, while the two companies were determining what to do in response to Impax's claimed supply disruption. They spoke again on January 17, 2014, twice on February 20th and once on February 27th, just weeks before the two companies imposed their price increases.  Likewise, Falkin and Michael Grigsby of Impax spoke on November 11, 2013. ███ of Lannett and ███ of Impax also spoke once January 15, 2014.  Upon information and belief, during these calls, Defendants promised to follow Lannett's price increase and to abide by the fair share rules upon Impax's reentry into the market.

2066.   As a result of this coordination, Defendants were able to charge supracompetitive prices on Pilocarpine HCL to Plaintiffs and others in the United States.

**EEEEE.  Pioglitazone HCL Metformin HCL Tablets**

2067.   Pioglitazone HCL Metformin HCL ("Pioglitazone Metformin"), also known by the brand name Actoplus Met, is used to control high blood sugar in patients with type 2 diabetes mellitus.

2068.   Prior to February 2013, Mylan and Teva were the only competitors in the market for Pioglitazone Metformin.  As a result of settling patent litigation with the brand manufacturer, Mylan was entitled to 180 days exclusivity as the first-to-file generic and Teva earned the right to market the authorized generic.  During that period, Mylan and Teva split the market equally with Teva controlling 48% share and Mylan controlling 52%.

2069.   Mylan and Teva's 180-day exclusivity period expired on February 13, 2013 and Aurobindo and Torrent Pharmaceuticals entered the market on that date.   Although Sandoz also planned to enter at that time, the company ran into regulatory obstacles that delayed its launch until April 16, 2013.

2070.   In advance of Aurobindo's entry, CW-6 and Grauso were in frequent communication with their contacts at Mylan and Teva to discuss, among other things, Aurobindo's entry into the Pioglitazone Metformin market.   On these calls, the competitors spoke about pricing and the allocation of market share to the new entrant.

2071.   For example, in the week leading up to Aurobindo's entry on February 13, 2013, CW-6 exchanged at least nine calls with Jim Nesta, a senior sales executive at Mylan.   At the same time, Grauso was communicating with his contacts at Teva, exchanging at least twenty-one calls with sales executives Kevin Green and ███████████████.   These calls are detailed in the chart below:

2072.   Illustrating the substance of these calls, on February 12, 2013, ███████████ spoke to Grauso at Aurobindo for forty-five minutes.   ████████████████████

████████████████████████████████████████████████████████

████████████████.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 9:23:00 | 0:06:00 |
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 14:25:00 | 0:02:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:33:00 | 0:22:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 12:12:00 | 0:07:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 15:20:00 | 0:03:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:04:00 | 0:05:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:41:00 | 0:21:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:56:00 | 0:08:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:34:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:40:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 10:41:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 11:21:00 | 0:11:00 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 13:55:05 | 0:00:19 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 14:04:28 | 0:02:17 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:38:09 | 0:00:04 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 15:41:26 | 0:00:03 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:58:28 | 0:00:27 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 16:09:54 | 0:03:40 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 16:19:22 | 0:00:04 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 13:01:14 | 0:00:29 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 14:06:26 | 0:00:52 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:52:00 | 0:12:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 6:26:00 | 0:39:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:35:00 | 0:45:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:53:00 | 0:09:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 11:11:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 12:19:00 | 0:02:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 12:42:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:58:00 | 0:01:00 |

2073.  At the same time, Mylan and Teva were communicating with each other.  In the week leading up to Aurobindo's entry on February 13, 2013, Green of Teva exchanged at least seventeen calls with Nesta of Mylan.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:19:51 | 0:00:13 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:29:54 | 0:00:05 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:01:05 | 0:00:07 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:17:07 | 0:00:06 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:53:33 | 0:08:47 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:16:25 | 0:00:10 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 17:19:23 | 0:00:10 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 8:26:12 | 0:00:05 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:08:59 | 0:29:51 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:44:04 | 0:11:18 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:14:42 | 0:06:03 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:31:39 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:45:09 | 0:12:58 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:09:47 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:18:15 | 0:08:38 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:44:01 | 0:03:25 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 19:17:42 | 0:04:15 |

2074.  Similarly, Green of Teva exchanged several calls with his contacts at Sandoz,
Kellum and CW-2.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | CW-2 (Sandoz) | 4:24:00 | 0:05:00 |
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | Kellum, Armando (Sandoz) | 11:04:00 | 0:01:00 |
| 2/7/2013 | Voice | CW-2 (Sandoz) | Outgoing | Green, Kevin (Teva) | 12:29:00 | 0:02:00 |
| 2/10/2013 | Voice | Green, Kevin (Teva) | Incoming | Kellum, Armando (Sandoz) | 9:09:00 | 0:06:00 |
| 2/12/2013 | Voice | Kellum, Armando (Sandoz) | Outgoing | Green, Kevin (Teva) | 7:15:00 | 0:08:00 |

2075.  On February 7, 2013, the same day that Green talked to both Kellum and CW-2,
both of those Sandoz employees participated in a conference call in which they discussed "█████
███████████" on Pioglitazone Metformin.

2076.  Finally, the new entrants, Sandoz and Aurobindo, were also communicating
directly with each other regarding Pioglitazone Metformin.  For example, CW-3 of Sandoz and
CW-6 of Aurobindo exchanged at least six calls between February 13 and February 19, 2013.
These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/13/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:51:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:36:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:16:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:03:00 | 0:01:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:06:00 | 0:04:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:52:00 | 0:01:00 |

2077.  During their calls on February 19, 2013, CW-6 and CW-3 discussed specific
customers and price points for Pioglitazone Metformin, and the fact that Aurobindo had already
picked up Cardinal as a customer.  ██████████████████████████████:

2078.  By mid-April, Aurobindo had secured approximately 20% of the Pioglitazone Metformin market, including Cardinal, a portion of the CVS business, Costco, and several other smaller customers.

2079.  Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas.  Representatives from Aurobindo and Sandoz attended, including CW-6 and Grauso from Aurobindo and CW-3 and Kellum from Sandoz.

2080.  On February 28, 2013, Kellum sent an internal e-mail to other Sandoz executives regarding the "████████████████████████." ████████████████████████ ████████████████ :

> Pioglitazone/Metformin is much better than we probably forecast - Torrent and Aurobindo entered but were more responsible than we would assume.  Pricing still ok – we'll do homework before launching.

2081.  A month and a half later, on April 16, 2013, Sandoz finally received FDA approval to market Pioglitazone Metformin.  The next day, CW-1, a Sandoz senior pricing executive, e-mailed the sales team stating: "████████████████████████████████ ████████████████████████████████ ████████." Six minutes later, CW-1 e-mailed CW-3 individually, asking him to "████████ ████████."

2082.   That same day, CW-3 exchanged two calls with CW-6 of Aurobindo lasting two minutes and six minutes.  The next day, on April 18, 2013, the two competitors spoke again for ten minutes.  During that call, CW-6 provided CW-3 with Aurobindo's dead net prices at several customers, including Cardinal and CVS.  CW-3's contemporaneous notes from that call are pictured below:



2083.   At the same time, Sandoz was speaking with Teva.  On April 18 and April 19, 2013, CW-2, a Sandoz senior sales executive, spoke three times with Green of Teva, including two calls lasting four minutes and one call lasting eight minutes.

2084.   Later in the evening on April 19, 2013, CW-1 e-mailed Kellum and others at Sandoz ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ stating, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



2085.   The next day, on April 23, 2013, ABC e-mailed Teva to inform it that ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ▓▓▓. ABC further stated that "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Green, the Teva sales executive who had spoken to CW-2 the day before, forwarded ABC's e-mail to several other Teva executives, writing: "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓," ▓▓▓▓▓▓, a senior Teva marketing executive, responded, "▓▓▓▓▓▓▓▓▓▓▓▓▓."

2086.   Three days later, on April 26, 2013, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, that "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" ▓▓▓▓▓▓▓▓." That same day, ABC awarded the business to Sandoz.

2087.   Also, that same day, on April 26, 2013, Sandoz officially entered the market and published WAC pricing that matched its competitors. Sandoz's entry prompted even more communication between the competitors.  Between May 8 and May 20, James Nesta of Mylan spoke with CW-4 of Sandoz three times and with Kevin Green of Teva more than 20 times. Additionally, Jim Grauso of Aurobindo spoke with Kelly Gegenheimer of Torrent on May 16, 2013.

2088.   Through this coordination, Teva and Mylan conceded significant market share of Pioglitazone Metformin to Sandoz, Taro, Aurobindo, and Torrent, and in return, the new entrants agreed to support the supracompetitive pricing and not compete for market share in excess of their fair share.

FFFFF. **Piroxicam**

2089.   Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID).  Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis. During the period relevant to this Complaint, Greenstone, Teva, and Mylan were the primary manufacturers of Piroxicam.

2090.   Prior to 2010, prices for Piroxicam cost pennies per dose. However, in April 2010, Rekenthaler of Teva and ███████ of Mylan coordinated to increase prices by approximately 3000%.  The two spoke by phone on April 27, 2010, and again on May 14, 2014.

2091.   On March 3, 2014, Greenstone received FDA approval to market Piroxicam Capsules.  It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

2092.   Greenstone immediately began seeking potential customers.  At 10:07 a.m. on March 5, 2014, Levinson of Teva sent an e-mail to Patel ███████████████████████ ████████████████████████████████████████████████ ██████████████████████████████"

2093.   Before responding to that e-mail, Patel sought to negotiate strategy with Greenstone.  Patel called ██████ at Greenstone at 10:55 a.m. and they spoke briefly.  Shortly after that call, Patel also called ██████'s boss, Nailor.  At 2:14 p.m. that afternoon, Patel and Nailor spoke briefly.  Immediately after hanging up with Nailor, Patel responded to Levinson's e-mail:



From: Nisha Patel02
Sent: Wed 3/05/2014 2:17 PM (GMT-05:00)
To: ███████████████████████████
Cc: ███████████████████████████
Bcc:
Subject: RE: Piroxicam CPCs in house

████████

We will need to concede, but either way, will need to understand the value involved. This will help us to determine the share we want to retain v. concede and in order of customers. Please create the concede analysis and customer profitability analysis (the type that ████ did yesterday for Amphetamine IR).

2094.   Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market.  On March 6, 2014, Patel requested a customer profitability and share analysis.  During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a "███████████████████████████████████" (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

2095.   That same day, Patel had multiple calls with Nailor and ████████ at Greenstone to discuss their plans for dividing the Piroxicam market.  At least some of those calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

2096.   The next day – March 7, 2014 – after the flurry of phone calls detailed above, Patel sent an e-mail to ███████, a customer marketing manager at Teva, ████████████



.”

2097.   Additional challenges did come.  On March 12, 2014, Patel learned that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam.  Teva refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market share for that drug. Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account.  The same day, after hearing that Teva was not going to back down on the CVS challenge, ████ of Greenstone called Patel at 1:41 p.m. and they spoke briefly.

2098.   Mylan, Teva, and Greenstone continued to coordinate their allocation over the coming days and weeks.  On March 11, 2014, ███████ of Mylan spoke with ████ twice by phone.  On March 17, 2014, Patel called ████ and they spoke briefly.  ████ called Patel back at 11:35 p.m. that same day and they spoke for fifteen minutes.  Immediately after speaking to Patel, ████ called Nailor and they spoke for ten minutes.  The following day, March 18, ████ spoke with ████ of Mylan twice.  Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

2099.   For example, on March 25, 2014 Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor.  Following an analysis of its market share, Teva determined that it still had more than its fair share of the market.  Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it was obligated under the unwritten rules of

the fair share agreement to concede the Anda business to Greenstone on Piroxicam. ████████ of Teva spoke with ██████ by phone briefly the next day.  Patel agreed with the decision to concede on April 1, 2014. ██████ then had a number of calls with ██████, Nesta, and Patel between April 2, and April 4.

2100.   As a result of this coordination, Teva, Mylan, and Greenstone charged supracompetive prices on Piroxicam to Plaintiffs and others in the United States.

**GGGGG. <u>Potassium Chloride</u>**

2101.   Potassium Chloride is prescribed to treat hypokalemia, a condition occurring when a patient's blood levels have insufficient potassium.

2102.   During the time period relevant to this Complaint, Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus dominated the market for Potassium Chloride tablets and capsules.

2103.   In August 2010, Actavis, Sandoz, and Upsher-Smith each implemented abrupt and substantial parallel price increases on Potassium Chloride.  For example, bottles of 100 tablets of 8 MEQ dosage strength that sold for less than $7.00 at the end of July 2010 increased to more than $42.00 by mid-August.

2104.   Upon information and belief, this price increase was agreed upon during telephone calls between ██████████, the Director of Contracts and Pricing at Sandoz, and Doug Zitnack, the Senior National Accounts Manager at Upsher-Smith, who spoke several times in August 2010, including before and after price increase.   Additionally, representatives of each of the three companies met at trade shows and other industry events throughout Summer 2010.

2105.   In mid-2011, Zydus entered the market at the elevated prices established by Actavis, Sandoz, and Upsher-Smith.   Prior to Zydus' entry, ██████████ – the company's Associate Vice President of National Accounts – communicated frequently with CW-4 of Sandoz.

The purpose of these communications was to determine which accounts Zydus would add in order for the company to receive its "fair share" of the market.  In exchange for Zydus' support of the supracompetitive conspiracy pricing for Potassium Chloride, Actavis, Sandoz, and Upsher-Smith each conceded market share to Zydus.

2106.   In late 2014, Mylan also entered the market for Potassium Chloride.  Consistent with the fair share agreement, Jim Nesta of Mylan reached out to Marc Falkin of Actavis in September 2014 to coordinate Mylan's receipt of its "fair share" of the market.  Like Zydus, Mylan agreed to support the pricing as already fixed by Actavis, Sandoz, and Upsher-Smith, and in return, the existing manufacturers of Potassium Chloride conceded market share to Mylan.

2107.   

2108.   As a result of these collusive communications, Defendants have been able to maintain supracompetitive pricing for Potassium Chloride tablets and capsules since August 2010.

**HHHHH. <u>Pravastatin</u>**

2109.   Pravastatin, also known by the brand name Pravachol, is a medication belonging to a class of drugs called "statins," and is used to treat high cholesterol and triglyceride levels.  The market for Pravastatin is mature, as generic Pravastatin has been available in the United States for

over 10 years.  In October 1991, Bristol Meyers Squibb received FDA approval to market Pravachol, which is prescribed to control high cholesterol and triglycerides.  Pravastatin is the generic version of Pravachol.

2110.  Upon the expiration of Bristol Meyers Squibb's patent in 2006, a number of generic manufacturers applied for ANDAs to market Pravastatin in the United States.  By 2010, Apotex, Glenmark, Teva, Dr. Reddy's, Lupin, Zydus, and Mylan had all received ANDAs to manufacture and sell generic Pravastatin and each sold Pravastatin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.  As a result, the average cost of a dose of generic Pravastatin sold at a competitive price of less than 10 cents between January 2010 and June 2013.

2111.  Beginning in May 2013, Defendants conspired to implement a series of collusive price increases on Pravastatin.  Although the price increases were taken in stair-step fashion, they could not have been implemented without collusion between and among each of the eight generic manufacturers of Pravastatin.

2112.  As early as May 2, 2013, Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark.  Early in the morning of May 2, █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████."  Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin.  Shortly after that call, Patel

████████████████████████████████████████████████████████████

████████████████████████.  In all, Patel spoke to CW-5 four times throughout the day on May 2, 2013, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

2113.   As of May 2013, the market for Pravastatin included five competitors: Glenmark, Teva, Lupin, Zydus and Apotex.  The number of competitors made it more difficult to coordinate a price increase.  This difficulty stemmed in part because two of those competitors – Zydus and Apotex – were also the two lowest quality competitors in Patel's quality of competition rankings, and any price increase for that drug would require significant coordination and communication before Teva could feel comfortable raising its own price.

2114.   Teva was able to achieve a sufficient level of comfort and substantially raise prices for Pravastatin by systematically communicating and reaching agreement with each and every competitor on that drug over the next several months.

2115.   On May 3, 2013, Green called ████████████, a senior executive at Zydus, twice with one call lasting four minutes.  Over the next several weeks, Green communicated numerous times with both ██████ and ████████████, a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.

2116.   On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Berthold) and Glenmark (████████████, a national account executive) multiple times.  Those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

2117.   During one or more of her calls with ████ and/or CW-5 of Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet.

2118.   By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase,  ."

2119.   As the Glenmark increase for Pravastatin was approaching, Patel began preparing. On May 15, 2013 – the day before Glenmark's increase would become effective – a Teva executive sent an e-mail out to the pricing team stating that: " .   The Teva executive concluded: "████████████████████████████████████████████████████████ ."

2120.   That same day, Glenmark notified its customers that it would substantially raise the price of Pravastatin, effective May 16, 2013.

2121.   As was now the practice among co-conspirators, the day before and the day of the Glenmark increase brought a flurry of phone calls among several of the competitors, including Teva executives.  At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

2122.   As of May 16, 2013, Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and follow a price increase. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████.”  Patel later indicated that "████████████████████████████

████████████████████████.”

2123.   Green was responsible for coordinating with Zydus.  As seen in the table above, on May 15, 2013, Green spoke with three Zydus employees, including a call with ████ of Zydus lasting sixteen minutes.  The next day, on May 16, Green spoke with ████ for 4 minutes.  Later that day, ████ called ████ and the two Zydus executives spoke for more than seventeen minutes.  Green also spoke to Rekenthaler and Patel the same day, conveying what he had learned from his communications with the Zydus executives.

2124.   Also on May 16, Patel's supervisor, ███████, sent an internal e-mail to several colleagues, including Patel and Rekenthaler, stating: "



██████." In response, Rekenthaler indicated that he was now comfortable with the price increase, but he did not want to put his reasoning in writing:



2125.   The next day – May 17, 2013 – Patel continued to coordinate the price increase with executives at both Glenmark and Lupin. For example, at 12:08 p.m., Patel called Berthold at Lupin for eleven minutes. While she was on the phone with Berthold, CW-5 of Glenmark called Patel (at 12:09 p.m.) and left a twenty-three second voice mail. Immediately after she hung up the phone with Berthold, Patel returned the call to CW-5; they ultimately connected for nearly eight minutes.

2126.   As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex. From May 20-24, Patel had the following series of phone calls with ██████████, a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

2127.  These were the first documented phone calls between Patel and ███████ since Patel had joined Teva.

2128.  But even with this agreement in hand, Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price.  For example, when she sent the "██████████" spreadsheet to her supervisor ████████ on May 24, 2013, Pravastatin was still not on the list.

2129.  That would change shortly.  On May 28, 2013, Apotex raised its price for Pravastatin.  That same day, Green also exchanged six text messages with ██████ at Zydus.  The next day, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.

2130.  The day after the Apotex increase, Green spoke to ███████ at Zydus two more times, and exchanged four more text messages.  Zydus then quickly followed with a price increase of its own on June 14, 2013.

2131.  Following the normal pattern, Green spoke to ██████ and others at Zydus several times in the days leading up to the Zydus increase, including at least the following calls and text messages:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 |

2132.   Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on August 9, 2013. As described in more detail above, in the days and weeks leading up to August 9, Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

2133.   When Patel sent the " ███████████ " to her supervisor, ██████████, on August 7, 2013, two days in advance of Teva's price increase, she included ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ .

2134.   A couple of days after Teva implemented its increase, a ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ :

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel...he might know off the top if his head.

2135.   Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

2136.   The extra work required to implement the Pravastatin price increase was well worth it to Teva.  On August 8, 2013 – the day before the Teva increase – ████████████████████ ████████████████████████████████████████████████████████.  She estimated that, ████████████████████████████████████████████████████████████████ ████████.

2137.   Between July 2013 and October 2013, Apotex, Glenmark, Teva, Lupin, Zydus, and Mylan each increased their prices for generic Pravastatin sold to Plaintiffs and others in the United States.  The Defendants continued to further raise prices throughout the remainder of 2013.

2138.   By way of example, with respect to WAC pricing, Defendants reported nearly identical WACs for their 10 mg products, reflecting increases of more than 100%:

| Product 10 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct | Apotex | 60505016809 | $0.26 | $0.56 | 28-May-13 | 119% |
| 500 ct | Apotex | 60505016805 | $0.26 | $0.56 | 28-May-13 | 119% |
| 90 ct | Zydus | 68382007016 | $0.17 | $0.48 | 14-Jun-13 | 189% |
| 500 ct | Zydus | 68382007005 | $0.15 | $0.48 | 14-Jun-13 | 222% |
| 90 ct | Teva | 00093077198 | $0.17 | $0.48 | 9-Aug-13 | 189% |
| 1000 ct | Teva | 00093077110 | $0.15 | $0.48 | 9-Aug-13 | 221% |
| 90 ct | Lupin | 68180048509 | $0.17 | $0.48 | 28-Aug-13 | 190% |
| 500 ct | Lupin | 68180048502 | $0.15 | $0.48 | 28-Aug-13 | 222% |

2139.   These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

2140.   Although prices for Pravastatin have receded somewhat from the peak in early 2014, Defendants continue to charge supracompetitive prices for Pravastatin to Plaintiffs and others in the United States.   The conspiracy overcharge remains embedded in the price of Pravastatin that Defendants charge Plaintiffs and others.

### IIIII.   **Prednisolone Acetate**

2141.   Prednisolone Acetate suspension, also known by the brand names Omnipred and Pred Forte (among others), is a medication used to treat eye conditions and relieve swelling, redness, and itching in the eye.   During the period relevant to this Complaint, Defendants Sandoz and Greenstone were the primary manufacturers of Prednisolone Acetate suspension.

2142.   Prior to late 2013, prices for Prednisolone Acetate suspension cost approximately $1 per package.   However, in July 2013, Sandoz increased its WAC pricing by approximately 500%, and Greenstone followed this price increase in September 2013.

2143.   Senior sales executives from Sandoz and Greenstone communicated directly with each other in furtherance of the conspiracy.   As noted with respect to Clindamycin, Latanoprost, and Eplerenone, Kellum of Sandoz was in frequent contact with ███████ and Jill Nailor of Greenstone during this time period, and other executives from both companies also communicated in furtherance of the conspiracy.   Indeed, between 2011 and 2014, there were at least 360 communications between senior sales executives of the two companies in furtherance of the conspiracy.

2144.   Throughout this time period, Sandoz consistently had more than its fair share of the market.   As the first generic entrant in what was essentially a two-player market, Sandoz was arguably entitled to 60% share under the conspiracy's rules.   However, Sandoz consistently maintained market share above this threshold, and as such, it was cautious not to bid for any new

business on the drug.  For example, on January 22, 2014, OptiSource approached Sandoz to see if it was interested in supplying OptiSource members with Prednisolone Acetate.  Kellum ███████



███████ ," ████████████████████████████████████████████ , Sandoz ████████████████████████████ ." ███████ at Sandoz ████████████████ , and Chris Bihari ████████████████████████████ that " ████████████████████ ." Sandoz's Kellum ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ .

2145.   Through this collusion, Defendants were able to charge supracompetitive pricing on Prednisolone Acetate to Plaintiffs and others in the United States.

**JJJJJ. <u>Prednisone</u>**

2146.   Prednisone is a corticosteroid that is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders.  During the period relevant to this Complaint, Actavis, Cadista, Qualitest/Endo and West-Ward were the primary manufacturers of Prednisone tablets.

2147.   Prior to 2013, Prednisone tablets cost pennies per pill. However, beginning in February of 2013, Actavis, Cadista, Qualitest, Roxane, and West-Ward colluded to raise their prices by approximately 200%.  In January 2013, a marketing manager at Actavis inquired about the possibility of increasing prices on Prednisone.  At the time, Cadista had exited the market temporarily, and Actavis knew from its regular communications with West-Ward that its supply was limited.

2148.   In early March 2013, Qualitest submitted revised pricing to Rite Aid for Prednisone knowing that it would be rejected, which allowed Qualitest to concede the account to Roxane in accordance with the fair share rules, and in return, Roxane agreed to support the upcoming price increase (which it did).

2149.   Between April and June, Actavis, Roxane, and Qualitest each increased their prices on Prednisone by approximately 200%.   Additionally, West-Ward was able to cure its supply issues and followed the price increase as well during this same timeframe.   And when Cadista reentered the market in August, it followed the higher pricing as well.   In accordance with the fair share rules, Actavis, Qualitest, and Roxane allowed West-Ward and Cadista to receive their fair share of the market.

2150.   Senior sales executives continued to communicate to implement this agreement. For example, shortly after joining Actavis in July 2013, Mark Falkin began communicating with _____ of Cadista (the VP of Sales) to coordinate Cadista's reentry into the market.   Falkin also spoke regularly with _____ of Qualitest beginning in September 2013.   Additionally, Mark Falkin of Actavis spoke with _____ of Qualitest twice on May 2, 2014.

2151.   As a result of this coordination, Defendants were able to charge supracompetitive prices for Prednisone to Plaintiffs and others in the United States.

**KKKKK. Prochlorperazine**

2152.   Prochlorperazine Maleate ("Prochlorperazine"), also known by the brand names Compro and Compazine, are used to treat nausea and vomiting.

2153.   Since at least 2011, G&W and Perrigo have been the only generic suppliers of Prochlorperazine suppositories, while Teva, Cadista, Mylan, and Sandoz dominated the market for Prochlorperazine tablets.

1.    Suppositories

2154.    Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine similarly and maintained a virtually even split of the market.  In mid-January 2013, Perrigo hired Boothe as an executive.  On January 25, 2013, Orlofski called Boothe for the first time ever, according to the available phone records.

2155.    A little over one month later, on Friday, March 1, 2013, Boothe and Orlofski met for lunch at an Italian restaurant, Al Dente Ristorante, in Piscataway, New Jersey.

2156.    The next business day, on Monday, March 4, 2013, Orlofski met with Vogel-Baylor in his office at 1:00 p.m.  Later that same day, Vogel-Baylor sent an internal e-mail to Michelle Sisco, a sales analyst at G&W, asking her to run sales reports on Prochlorperazine in anticipation of a price increase.  Sisco provided the requested information to Vogel-Baylor on March 5, 2013.

2157.    On March 7, 2013, Vogel-Baylor e-mailed Orlofski a price increase analysis for Prochlorperazine.  Vogel-Baylor recommended increasing WAC pricing by 200% from $35.66 to $106.98.

2158.    On March 19, 2013, G&W implemented the 200% increase.  That same day, Orlofski called Boothe.  The two competitors would exchange two more phone calls later that day, including one call lasting six minutes.  These were the first calls exchanged between Orlofksi and Boothe since their lunch on March 1, 2013, according to the available phone records.  Orlofski and Boothe would exchange one text message and one more phone call in March 2013 and would not communicate by phone again until August 30, 2013, according to the available phone records.

2159.    On April 11, 2013, Perrigo announced it would also be increasing its WAC price for Prochlorperazine by 200% from $34.85 to $104.55.  However, Perrigo waited to notify its

customers of the specific changes to its contract pricing until after attending the NACDS 2013 annual meeting.

2160.   The NACDS 2013 annual meeting was held at the Sands Expo Convention Center in Palm Beach, Florida between April 20 and April 23, 2013.  Boothe, Orlofksi, and Vogel-Baylor attended the conference and had many opportunities to meet in person to discuss the Prochlorperazine increases at various programming and social events.

2161.   For example, on Sunday, April 21, 2013, Boothe and Orlofski had dinner together with a representative of Pfizer.  That same evening, Boothe and Orlofski also attended a wine tasting hosted by Upsher-Smith.  Also on Sunday, Vogel-Baylor told a potential GPO customer that G&W would need to understand who its incumbent supplier was for Prochlorperazine, among other drugs, before participating in a bid for new business.

2162.   Over the next several days, Perrigo sent out price increase notices to its customers for Prochlorperazine specifying its new contract pricing.

2163.   On May 7, 2013, Associated Pharmacies, a Perrigo customer, e-mailed ▮▮▮, a sales executive at G&W, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ :

> Hi ▮▮▮,
> It's just us and Perrigo on this.  We actually led the price increase on it and Perrigo followed.  Their pricing is slightly below ours and I don't think Erika is wanting to go after any new share.
>
> I appreciate the opportunity to bid on this but we are not going to be able to do it right now.
>
> Thanks,
>
> ▮▮▮▮▮▮▮
> Director, National Accounts|G&W Laboratories, Inc.
> ▮▮▮▮▮ (C)|225-622-0386 (O)
> ▮▮▮@gwlabs.com

2164.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████.   After trading these accounts, the competitors fell back in line with the agreement.  By the Fall of 2013, the Prochlorperazine Suppositories market was again virtually evenly split between Perrigo and G&W.

2. <u>Tablets</u>

2165.   As detailed further below in Section XIII, in August 2014, Patel and Rekenthaler of Teva led price increases on a number of drugs, including Prochlorperazine tablets.

2166.   In order to coordinate the price increase with Mylan, Cadista, and Sandoz, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11.  Nesta, in turn, communicated with ███████, a senior sales executive at Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

2167.   ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████.

**LLLLL.  Promethazine HCL**

2168.   Promethazine HCL, also known by the brand name Promethegan, is an antihistamine that is used to treat some allergies, nausea, and vomiting.  In late 2012 and early 2013, the competitors in the market for Promethazine HCL were Actavis, Perrigo, and G&W.

2169.   Starting in late August 2012 – around the same time that Vogel-Baylor first met Rogerson at Actavis – G&W began planning a price increase for Promethazine HCL.  Prior to implementing that increase, and as it had done on other products, G&W reached out to its competitors to coordinate plans.

2170.   On September 18, 2012, Vogel-Baylor sent an internal e-mail to Michelle Sisco, a sales analyst at G&W, ███████████████████████████████████████████████████. That same day, Vogel-Baylor also responded to a request from her boss, Orlofski, ███████████████████████████████████████████████. Vogel-Baylor stated ███████████████████████████████████████████████████. The next day, on September 19, 2012, Orlofski replied: "███████████████████████████████ ███████████████████."

2171.   Meanwhile, Vogel-Baylor was actively communicating with Rogerson of Actavis regarding the increases.  Indeed, on September 18, 2012 alone, Vogel-Baylor exchanged thirty-four text messages with Rogerson.

2172.   Similarly, on September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with ███████ of Perrigo, the other competitor on Promethazine HCL.  This call pattern is detailed in the chart below.  Notably, these are the same calls that Vogel-Baylor used to convey information regarding the price increase on Halobetasol, another product on which Perrigo and G&W overlapped, which was happening at the same time.  The collusion on Halobetasol is discussed in detail in an earlier Section.



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

2173.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski, and spoke to him for thirteen minutes.

2174.   While Vogel-Baylor was communicating with ▮▮▮ of Perrigo through her contact CW-6, ▮▮▮ was also communicating directly with ▮▮▮▮, a sales executive at Actavis, and reporting that information back to his superior, Wesolowski.   This call pattern, including the calls between ▮▮▮ and CW-6, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:38:00 | 0:11:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:58:00 | 0:02:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:59:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Aurobindo) | 13:02:00 | 0:02:00 |

2175.   Over the next week, G&W worked to finalize its price increase for Promethazine HCL.   On September 21, 2012, Vogel-Baylor forwarded her initial price increase analysis to Orlofski and scheduled a one-on-one meeting to discuss it on September 24, 2012.   Two days later, on September 26, 2012, Vogel-Baylor e-mailed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.   In her e-mail, Vogel-Baylor ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.

2176.   Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis.   For example, between September 25, 2012 and October 5, 2012 – the day the price increase notices were sent – Vogel-Baylor exchanged thirty-eight text messages with Rogerson.   Similarly, Vogel-Baylor continued to keep ▮▮▮ of Perrigo informed of G&W's plans through her conduit CW-6.   This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |
| 10/5/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 5:30:01 | 0:01:41 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 5:38:00 | 0:02:00 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 5:39:00 | 0:06:00 |

2177.   Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis.  For example, between September 25, 2012 and October 5, 2012 – the day the price increase notices were sent – Vogel-Baylor exchanged thirty-eight text messages with Rogerson.  Similarly, Vogel-Baylor continued to keep ███████ of Perrigo informed of G&W's plans through her conduit CW-6.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |
| 10/5/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 5:30:01 | 0:01:41 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 5:38:00 | 0:02:00 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 5:39:00 | 0:06:00 |

2178.   On October 8, 2012, G&W published increased WAC pricing for Promethazine HCL, which included an 18% increase on the 25mg dosage and a 35% increase on the 12.5mg dosage.

2179.   Perrigo followed suit on December 4, 2012, when it notified customers that it would be increasing contract pricing on Promethazine HCL effective January 5, 2013.  Similarly, on February 12, 2013 and April 3, 2013, Actavis also followed and increased its WAC pricing to

match G&W on the 12.5mg and 25mg dosages, respectively.  On February 12, 2013, Rogerson called Vogel-Baylor and they spoke for nearly twenty-two minutes.

2180.   The competitors were not satisfied to stop there, however.  Knowing now that all three competitors were on board to increase prices, they began contemplating a second increase on Promethazine HCL – and this time, it would be much larger.

2181.   On March 25, 2013, Michelle Sisco, a sales analyst at G&W, forwarded Vogel-Baylor updated sales data for Promethazine HCL.  That same day, Orlofski of G&W sent a text message to Boothe, an executive at Perrigo.  The next day, on March 26, 2013, Boothe called Orlofski back and they spoke for six minutes.  Similarly, Vogel-Baylor continued to communicate with ██████ of Perrigo through her conduit, CW-6, about Promethazine HCL.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:59:51 | 0:00:15 |
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:21:57 | 0:06:46 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:28:00 | 0:01:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 17:33:00 | 0:02:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:36:00 | 0:01:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 20:04:10 | 0:00:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 20:05:10 | 0:01:37 |
| 3/28/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 18:19:55 | 0:00:03 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 18:41:00 | 0:05:00 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 18:46:00 | 0:01:00 |

2182.   On March 28, 2013, the same day as the last calls listed above, Vogel-Baylor finalized a price increase analysis for Promethazine HCL and, on April 1, 2013, she forwarded that information to Orlofski.  Vogel-Baylor and Orlofski discussed some revisions to the analysis and, on April 10, 2013, Vogel-Baylor sent the revised analysis to Orlofski.  G&W planned to implement the price increase on April 15, 2013, but ultimately sent the notices on April 16, 2013.

2183.   Meanwhile, all three competitors continued to coordinate their plans on Promethazine HCL.  Vogel-Baylor of G&W was speaking with Rogerson at Actavis, while ███ at Perrigo was speaking to ███████ at Actavis.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | | Time | Duration |
|------|-----------|-------------|-----------|--------------|--|------|----------|
| 4/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | | 15:11:49 | 0:00:26 |
| 4/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | | 13:51:41 | 0:00:00 |
| 4/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | | 13:55:41 | 0:01:30 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | | 17:33:07 | 0:00:00 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | | 19:32:16 | 0:00:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | | 7:35:00 | 0:01:00 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | | 13:12:00 | 0:25:00 |

2184.   At the same time, Vogel-Baylor continued to use CW-6 as a conduit to communicate with ███ of Perrigo regarding Promethazine HCL.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/4/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:37:55 | 0:07:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:25:00 | 0:01:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:30:28 | 0:00:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:36:07 | 0:00:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:44:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 11:59:40 | 0:00:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:00:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:03:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:18:02 | 0:00:03 |
| 4/8/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:23:18 | 0:00:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:36:24 | 0:00:03 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:53:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:26:00 | 0:02:00 |
| 4/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 11:08:00 | 0:04:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:50:56 | 0:00:29 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:00:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 14:09:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:52:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 16:59:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 17:05:00 | 0:02:00 |

2185.   According to the plan, on April 17, 2013 G&W published new WAC pricing for Promethazine HCL, increasing WAC from $38.99 to $116.97 – an approximately 200% increase.

2186.  . Sisco forwarded the request to Vogel-Baylor who responded, "

2187.  A few weeks later, Actavis followed G&W's price increase on Promethazine HCL and, on June 5, 2013, published WAC pricing that matched G&W.  Prior to increasing its price, and as it had now done several times before, Actavis spoke with both G&W and Perrigo.  These calls are detailed in the chart below:

2188.  On June 26, 2013, Vogel-Baylor e-mailed Orlofski . Vogel-Baylor explained, "

."  The next day, Vogel-Baylor received a short phone call from Shelley Snyder, a sales executive at Perrigo.  Several hours later, Vogel-Baylor placed a phone call to Orlofski.

2189.  G&W had no reason to fear because a few weeks later, on July 30, 2013, Perrigo notified its customers that it was increasing price on a list of products, including Promethazine HCL, with an effective date of August 1, 2013.  This included an increase to its WAC pricing that matched G&W and Actavis.  In the days leading up to Perrigo's price increase, the three competitors again spoke several times by phone.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 0:01:11 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 0:03:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 0:01:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:02:33 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | T.P. (Perrigo) | 0:00:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:09:06 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 0:21:00 |

2190.    Several months later, the collusion continued on Promethazine HCL.  On March 5, 2014, ▮▮▮▮▮▮, a G&W sales executive, informed Vogel-Baylor that Walgreens had received an offer from Actavis for a one time buy on the 25mg dosage at a significantly discounted price of $42.08.  G&W would later learn that Actavis had made the offer because it had an excess of short-dated inventory on the 25mg dosage.  This information stunned Vogel-Baylor, who asked "▮▮▮▮

▮▮▮▮▮▮▮▮▮▮?"

2191.    Despite her initial surprise, Vogel-Baylor ▮▮▮▮▮▮▮▮ to Orlofski: "▮▮▮



▮▮," ▮▮▮▮▮▮▮▮▮▮▮, Vogel-Baylor placed a call to Rogerson fifteen minutes later.  The two competitors continued to trade phone calls over the next several days, including a call on March 6, 2014 that lasted eleven minutes.

2192.    Apparently, Vogel-Baylor's communications with Rogerson did yield a solution to her problem.  On March 18, 2014, she e-mailed Walgreens ▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮."

540

2193.   Over the next several months, G&W would continue to decline to bid on new opportunities for Promethazine HCL so as not to upset the market share balance it had achieved with its competitors.

2194.   For example, on May 5, 2014, ██████████, a sales executive at G&W, summed up G&W's commitment to playing nice in the sandbox when she told a customer, PBA Health, that she ██████████████████████████████████████████████ ████████████████████████████████." Similarly, on May 30, 2014, Vogel-Baylor ████████████████████████████████████████████████ █████████████████████████████████████████." Further, on August 8, 2014, Vogel-Baylor told █████████████████████ ████████████████████████████████████████████████ ████████████████████████████████."

2195.   Lastly, on August 25, 2014, McKesson – an Actavis customer – e-mailed ████ █████████████████████████████████.  ██████████████████████ ████████████████████████, asked Vogel-Baylor if ████████████████ ████████████████████████.  Vogel-Baylor ██████████████████ August 28, 2014 stating: "████████████████████████████████████ ████████████████████."

**MMMMM. <u>Propranolol</u>**

2196.   The market for Propranolol is mature, as Propranolol has been available in the United States for decades.  Propranolol, also known by various brand names including Inderal LA, Inderal XL, Hemangeol and InnoPran XL, is a beta-blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions.  The drug is considered an essential

medicine by the World Health Organization, and is used by millions of patients in the United States.  The price for Propranolol had fallen steadily since its introduction in the 1960s, and as recently as early 2013, a monthly prescription for Propranolol cost as little as $8.00.

2197.  Actavis, Breckenridge, and Upsher-Smith each manufacture Propranolol in capsule form, while Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage manufacture Propranolol in tablet form.  Each sold either Propranolol capsules or tablets (or both) to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

        1.    <u>Propranolol Capsules</u>

2198.  Actavis, Breckenridge, and Upsher-Smith implemented a collusive price increase beginning in November 2013 on Propranolol capsules.  Breckenridge, which had previously had lower prices for Propranolol capsules, increased its prices for all dosages by 88% to 140%. Upsher-Smith followed in December with a corresponding price increase on all dosages of Propranolol capsules that ranged from 49% to 79%, depending on the dosage strength.  In February 2014, Actavis increased prices for all dosages of Propranolol capsules by 64% to 81%, depending on the dosage strength.  Although prices fell slightly from their peak in 2014, Actavis, Breckenridge, and Upsher-Smith still continue to price Propranolol capsules at supracompetitive levels.

2199.  Upon information and belief, the price increases on Propranolol capsules were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Propranolol capsules to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, through

in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications as described in Ex. 1.

2.    <u>Propranolol Tablets</u>

2200.    Although the conspiring Defendants increased prices on Propranolol capsules by early 2014, Defendants' prices for Propranolol tablets remained stable throughout 2014.

2201.    Beginning in January 2015, however, Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage colluded to increase prices on Propranolol tablets as well.

2202.    On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol.  The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

2203.    In the days before Actavis sent this notice to its customers, Falkin of Actavis and Rekenthaler of Teva spoke frequently.  For example:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

2204.    Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase with Falkin and Nesta of Mylan – the other quality competitor in the market for Propranolol.  The timing and duration of those phone calls are set forth in the table below:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

2205.  On January 16, 2015 – more than a month before the Activis price increase for Propranoolol was disclosed to the public – ██████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████ :

| Product Description | Price Increase Strategy | Reason for Increase |
|---|---|---|
| PROPRANOLOL HCL TABLETS 10MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 10MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 60MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 500 | Market Intelligence | Follow Competitor - Actavis |

2206.  Teva raised its pricing for Propranolol on January 28, 2015 – before the Actavis price increase even became effective.  As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up to Teva's price increase.

2207.  When the Actavis price increase on Propranolol did become effective – on February 17, 2015 – Rekenthaler and Falkin continued to discuss pricing.  For example, the day before those price increases became visible to the public – February 16, 2015 – Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty- three minutes.  Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

2208.  Heritage increased effective prices by 102%-151% in January 2015, and, a few weeks later, Teva, Pliva, and Actavis increased their own prices in March 2015 by 566%-898% and 395%-638%, respectively.  Mylan and Par began increasing their prices soon after, by amounts ranging from 55%-607% and 52%-216%, respectively.  Actavis, Mylan, Teva, Pliva, Par, and

Heritage continued to increase prices throughout 2015, and by January 2016, Defendants had increased their prices for some strengths of Propranolol tablets by more than 1700%. For example, Actavis raised its prices of 80 mg Propranolol tablets from an average of $0.30 to $0.46 per tablet between December 2014 and November 2015.

2209. With respect to both the capsule and the tablet price increases, even in those instances in which the Defendants did not increase prices in perfect unison, they still managed to align their pricing on a bi-monthly or quarterly basis, which is consistent with an illegal agreement.

2210. Defendants continue to charge supracompetitive prices for Propranolol tablets as of the filing of this Complaint.

**NNNNN. Spironolactone HCTZ**

2211. Spironolactone HCTZ is used to treat high blood pressure, heart failure, and edema. During the period relevant to this Complaint, Greenstone, Mylan, and Sun were the primary manufacturers of Spironolactone HCTZ tablets.

2212. Prior to 2013, Spironolactone HCTZ tablets cost pennies per pill. However, beginning in February 2013, Defendants conspired to increase prices twice in the span of 18 months, and by the end of 2014, Spironolactone HCTZ tablets cost approximately 500% more than they did in early 2013.

2213. Greenstone, Mylan, and Sun and communicated directly with each other in furtherance of the conspiracy. As noted elsewhere in this Complaint, Jim Nesta of Mylan was in constant contact with Jill Nailor and ▮▮▮▮▮▮ of Greenstone throughout the conspiracy, including during the periods that Defendants were implementing their price increases on Spironolactone HCTZ. For example, ▮▮▮▮ and Nesta spoke at least 12 times between February 2013 and April 2013. Nailor and ▮▮▮▮ were likewise in frequent contact with Aprahamian,

Perfetto, and CW-1 of Sun's subsidiary, Taro.  Additionally, Gary Tighe of Mylan spoke with Chris Urbanski of Sun/Taro for twenty-five minutes on March 17, 2014 and for five minutes on March 18th.  ██████████ of Mylan and Aprahamian of Taro (and on behalf of Sun) spoke several times during this period: on March 18, 2014, on June 4th, twice on June 6th, once on June 9th, at least three times on July 2nd and for seven minutes on July 10th.

2214.  Due to this coordination, Defendants charged supracompetitive pricing on Spironolactone HCTZ tablets to Plaintiffs and others in the United States.

**OOOOO. Tacrolimus Ointment**

2215.  Tacrolimus Ointment ("Tacrolimus"), also known by the brand name Protopic, is a secondary treatment option for moderate to severe eczema.  Tacrolimus is available in 30gm, 60gm and 100gm dosages.  Recent annual sales of Tacrolimus Ointment in the United States exceeded $100 million.

2216.  In August 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz was the first-to-file generic and Perrigo was the authorized generic.

2217.  On August 13, 2014 at 3:57 p.m., ██████████, a Sandoz launch executive, sent an internal e-mail ████████████████████████████████████ ████████████████████████████.  At 5:11 p.m. that same day, CW-3, a Sandoz senior sales executive, called ██████████, a Perrigo sales executive, and they spoke for fifteen minutes. Notably, prior to this call, CW-3 and ████ had not spoken since June 18, 2014.  Within a half hour of hanging up with ████, CW-3 sent the following e-mail ████████████████ ████ :



2218.  On September 8, 2014, Sandoz held a Commercial Operations meeting during which they discussed the Tacrolimus launch.  That same day, CW-3 called ▇▇▇ four times, with one call lasting eleven minutes and another six minutes. On those calls, CW-3 and ▇▇▇ discussed the Tacrolimus launch and decided to model it after the Cal Beta Ointment launch.  As discussed above in the previous Section, in the spring of 2014 CW-3 and ▇▇▇ had colluded on Cal Beta Ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG.  By using Cal Beta Ointment as a model, the competitors would not have to spend significant time negotiating the allocation of customers for Tacrolimus.

2219.  That same day, on September 8, 2014, CW-3 sent the following e-mail to Sandoz launch executives, ▇▇▇ and ▇▇▇, with a copy to CW-1, a Sandoz senior pricing executive:

> **To:**
> **Cc:**
> **Subject:** RE: Tacrolimus 0.03% & 0.1%(Protopic)
>
> ▇▇▇
>
> Since Perrigo will be the AG we should model it similar to the Cal Beta launch (i.e. same customers). Omnicare should be included as well.
>
> Are you available to discuss on the phone now?
>
> Thanks, ▇▇▇

2220.  Two days later, on September 10, 2014, CW-3 called ▮▮▮▮ and they spoke for fifteen minutes. During that call, the competitors again talked about the Tacrolimus launch. Specifically, they discussed the allocation of certain customers to Sandoz and Perrigo so that each competitor could reach 50% market share.  Further, ▮▮▮▮ provided CW-3 with ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. CW-3's contemporaneous notes from that call are pictured below:



2221.  In his notes, CW-3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Sandoz planned to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

2222.  On November 10, 2014, ▮▮▮▮▮▮▮, a Perrigo sales executive, e-mailed Wesolowski, a senior Perrigo executive, to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.  In turn, Wesolowski e-mailed ▮▮▮▮ and others at Perrigo ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.  That same day, ▮▮▮▮ and CW-3 spoke two times, with one call lasting two minutes and the second lasting three minutes.  During those calls, CW-3 told ▮▮▮▮

548

that Sandoz had not yet formally launched the product or started shipping to customers.  Later that afternoon, ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ .

2223.   On November 19, 2014, Sandoz launched Tacrolimus and Perrigo launched on the following day, November 20, 2014.  Consistent with the competitors' plans, Sandoz was awarded CVS, Cardinal, Omnicare, and Econdisc, among other customers.  As planned, Perrigo won Walgreens, Walmart, ABC (secondary), Anda, Optisource, and Publix.

2224.   On November 20, 2014, Boothe, a senior Perrigo executive, sent around a ███████████████ e-mail to the Perrigo team ██████████████████████████ .  He specifically ████████████████████████████████ , a Perrigo business development executive, and ████████████ ████████████████████ "  A few days later, in ██████████████████████████████ , Van Stedum replied, "████████████████████ ████████████████████████████ ."

PPPPP.  **Temozolomide**

2225.   Temozolomide, also known by the brand name Temodar, is used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain.

2226.   The patent on Temodar was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent expiration.  Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

2227.   On July 18, 2013, a large retail pharmacy customer submitted an RFP to Sandoz for Temozolomide.  Playing by the rules of the road, Sandoz waited to see what Teva was going

to do before submitting their own bid.  That same day, CW-1 received a telephone call from Patel.

Patel sought information on Sandoz's current customers and discussed options to allocate

customers for Temozolomide.  Nothing was agreed to on that call.

2228.   On July 22, 2013, Patrick Genestin, a senior Sandoz executive, 

."

2229.   At the same time, CW-1 was reaching out to Teva directly to get more information.

CW-1 called Patel at approximately 1:45 p.m. on July 23, 2013.  After exchanging voicemails,

they spoke for over fourteen minutes that same afternoon.

2230.   On July 30, 2013, another customer, CVS Caremark, contacted Teva ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.  ▮▮▮▮▮▮▮, a senior sales executive at Teva, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮, Rekenthaler, "▮▮▮▮▮▮▮▮▮▮▮▮" Rekenthaler

responded by alluding to the ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮."  Rekenthaler most likely got his information from Patel.  Just one day earlier,

on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine minutes, where the two

discussed how to carve up the market for the drug.

2231.   Teva and Sandoz were also coordinating through other channels. After receiving

the RFP from Walgreens, ▮▮▮▮▮ of Sandoz coordinated with ▮▮▮▮▮▮, a senior

account executive at Teva, on a seven minute call on July 29, 2013 followed by an eleven minute

call on July 31, 2013.  After those calls, ▮▮▮▮▮▮▮▮ in an internal e-mail on July 31 that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮: "▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████

████████████████████████████████████████."

2232.  Similarly, on July 29, 2013, Green spoke to CW-2 of Sandoz two times.  The two

spoke again on July 31, 2013 for six minutes.  During those calls, Green told CW-2 about Teva's

launch plans and that Teva wanted Walgreens' business.  The next day, August 1, 2013, ████

████, another Sandoz executive, e-mailed Kellum, ████████████████████████:



2233.  ███████████████████████████████████████████████████

██████████████████████████████.  On July 31, 2013, ████████ of Sandoz e-mailed an

████████████████████████ to his coworker, stating: "██████████████████████████

█████████████████████████████"

2234.  Going  forward,  Sandoz  and  Teva  continued  to  coordinate  with  respect  to

Temozolomide.  On August 12, 2013, the same day as Teva's launch, CW-2 met in person with

Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference.

There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva

had officially launched and shipped all formulations of the drug.

2235.   Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength.  In an internal e-mail dated August 16, 2013, a Teva employee ███████████ : "███████████ ████████████████████████████████████████████████ ."

2236.   CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

### QQQQQ. Theophylline ER

2237.   The market for Theophylline ER is mature, as Theophylline has been used to treat various conditions since approximately 1900.  Heritage and Teva sold Theophylline ER to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2238.   In February 2014, Teva's Patel spoke with Heritage's Malek for more than an hour regarding a number of potential drugs on which prices could be increased.  Upon information and belief, during that conversation, Heritage and Teva agreed that they would increase prices for Theophylline ER.

2239.   Teva agreed that it would lead the price increase for Theophylline ER.  By late April 2014, Teva fully implemented a price increase on the drug of approximately 150%.

2240.   During an internal company meeting on April 22, 2014, Malek informed sales employees at Heritage that Heritage would follow Teva's price increase and raise prices for Theophylline ER by approximately 150%.

2241.   Heritage began announcing the price increase to customers in late June 2014, and by July 9, 2014, it had fully implemented the collusive 150% price increase of Theophylline ER.

2242.   As a result of the unlawful agreement on Theophylline ER between Teva and Heritage, prices for the drug still remain at supracompetitive levels.

### RRRRR. Timolol Maleate

2243.   Timolol Maleate is used to treat high pressure inside the eye due to glaucoma or other eye diseases. During the period relevant to this Complaint, Sandoz and Valeant were the only manufacturers of Timolol Maleate gel, and they divided the market in accordance with the fair share rules.

2244.    . For example, in May 2013 Sandoz decided not to bid for one of Valeant's accounts because "                             ."  Similarly, following the successful price increase, a Sandoz executive advised CW-1 and CW-3 that Sandoz                             "                             ."

2245.   Beginning in November 2013, Sandoz and Valeant coordinated to increase their prices on Timolol Maleate. Valeant first initiated a modest WAC price increase of approximately 25% in November 2013.  In January 2014, Sandoz responded with a WAC increase of more than 200%.  One month later, Valeant raised its prices again, matching Sandoz's price increase.

2246.   Valeant and Sandoz communicated directly with each other in furtherance of the conspiracy. For example, both companies sent representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida.  Sandoz had raised its

list (WAC) prices before the conference, and Bausch announced the second portion of its price increases in March.

2247.   As a result of this coordination and their commitment to the fair share rules, Sandoz and Valeant were able to charge supracompetitive pricing for Timolol Maleate to Plaintiffs and others in the United States.

SSSSS.   **Tobramycin**

2248.   Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

2249.   Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period. ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████.''

2250.   As expected, Teva was ''███████████████████████████████████████.

Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Patel exchanged seven calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Patel ████████████████████████████ in an internal Teva e-mail the same day, writing: ''██████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████.”  The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

2251.   On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven minutes.   On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other. Patel then memorialized the agreement in an e-mail two days later.   The result: Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare.  Teva also planned to concede the Cardinal business to Sandoz.

2252.   Patel told CW-1 specifically that Teva would not even submit a bid to CVS.  This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

2253.   According to plan, ████████████████████████████ ██████████████████████████████.  Rekenthaler wrote in an internal e-mail: "████████████████████████████████ ██████████████████████.” ██████████████████████████ ████████.

2254.   CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens.   CW-1 spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan.  Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

2255.   CW-1 and Patel ███████████████████████.  CW-1 informed Patel that Sandoz ██████████████, but Patel ████████████████████████ ██████████.”  ████████████████████████████, Patel went back to CW-



1 ██████████████████████████.” Sandoz ███████████████████, as

Patel ████████ Sandoz "████████████████████.”

2256.   On July 9, 2014, one of the above allocated customers, ████████████████. A Teva analyst stated in an internal e-mail, "███████████████████████████████████████████████.” A Teva national accounts director ██████████████████████: "███████████████████████████████.” The analyst responded and said, "██████████████████████████████████████████████████████████████████████████.” Patel's ████████ had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left him a voicemail.  CW-1 then returned her call the same day and the two spoke for four minutes.

**TTTTT.  Tolterodine**

2257.   Tolterodine Tartrate, also known by the brand name Detrol, is in the antispasmodics class of medications and is prescribed to treat an overactive bladder.  Tolterodine Extended Release ("Tolterodine ER") – also known by the brand name Detrol LA – is an extended release version of the drug used for the same purpose.

1.   Tolterodine ER

2258.   Teva planned to launch the first generic version on January 2, 2014.  During the first half of December 2013, Teva was under the impression that Mylan was not in a position to launch until 30 to 60 days after Teva launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.  On December 3, 2013, ████████, a marketing executive at Teva, sent an e-mail to Rekenthaler, ████████, and several other Teva colleagues stating: "████████████████████████████████████████

.”

███████████.

2259.   Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date.  Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER.  Specifically, Teva expected that on January 1, 2014, the price of branded Detrol LA was going to increase.  This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

2260.   At the end of the day on Friday December 20, 2013, ███████████ of Teva ███ from Dale Hill at Cardinal ███████████████████████████████. ███████████████████████████, and ███████████████ "███████████████," and that Teva "███████████."

2261.   ███████████.  ███ informed her Teva colleagues ███████████. ███████ of Teva then ███████████████████████████████ 

2262.   On Monday, December 23, 2013, Rekenthaler, Patel, ██████, ██████, and several others at Teva had a telephone conference scheduled from 8:00 a.m. to 9:00 a.m. to discuss the Tolterodine ER launch strategy.  Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan.  Nesta returned Rekenthaler's call at 8:15 a.m., which was during Teva's scheduled Tolterodine ER phone conference.  Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds.  Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times.  At 10:22 a.m., Nesta returned Rekenthaler's calls and the pair spoke for an additional 12 minutes, 2 seconds.  During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

2263.   For example, at 10:33 a.m. – while Rekenthaler was still on the phone with Nesta, ██████ sent an e-mail to Rekenthaler and others asking ████████████████████ ████████████████████████. Minutes after Rekenthaler finished his call with Nesta, ████████████████████████:

```
From:     Dave Rekenthaler
Sent:     Mon 12/23/2013 10:41 AM (GMT-05:00)
To:       ██████████; Maureen Cavanaugh
Cc:       Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language

Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."
```

2264.   Most importantly though, during these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

2265.   At 12:12 p.m. on December 23, 2013, ████████████████████ ████████████████████. ████████████████████



2266.   In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted.  This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers located to Mylan; Walgreens, Cigna, Humana, Prime Therapeutics, Optum, and Kaiser.

2267.   In addition to submitting inflated bids for the accounts listed above, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

2268.   The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement.  Those calls lasted for nine minutes and eight minutes, respectively.

2.   Tolterodine Tartrate

2269.   Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets ("Tolterodine") on January 23, 2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, ▮▮▮ and Nailor of Greenstone were speaking frequently to Patel and Rekenthaler of Teva to coordinate Greenstone's entry into the market. Those calls and text messages include at least those set forth below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

2270.    During these calls and text messages, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

2271.    The day after Greenstone's entry – January 24, 2014 – in a message to Teva national account managers ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Patel stated: "████████████████████████ ████████████████████████████████████████████." 

2272.    On January 28, 2014, Teva ████████████████████████████████ ████████████████████████. ████████ of Teva immediately asked: "████████████████ ████████?" Rekenthaler ████████████████████████████████████████ ████████:

From: Dave Rekenthaler
Sent: Tue 1/28/2014 4:02 PM (GMT-05:00)
To: ████████████
Cc: Maureen Cavanaugh; Nisha Patel02
Bcc:
Subject: RE: price challenge delphi 10707 cvs tolterdine

It's Greenstone, new to market. We can discuss.

2273.   The next day, Patel and ██████ of Greenstone tried to reach each other several times, and were ultimately able to speak once, for more than two minutes.

2274.   On Monday, February 3, 2014, ████████████████████████████ ████████████████████████████████████████ ████████████████. ██████ of Teva, ██████████████████████████ ████████████████████████████████████████ ██████:

On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:

████ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

2275.   The next day, Patel called ██████ at Greenstone and the two spoke for nearly sixteen minutes.

2276.   ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████.

**UUUUU. Triamcinolone Acetonide**

2277.   Triamcinolone Acetonide, also known by the brand names Aristocort, Aristocort HP, Kenalog, and Triderm, is a corticosteroid that is used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rashes.  Triamcinolone Acetonide is available as both a cream and an ointment.  During the period relevant to this Complaint, Par, Perrigo, Sandoz/Fougera, and Taro were the primary manufacturers of Triamcinolone Acetonide.

2278.   As of July 2010, Fougera and Perrigo were the only generic manufacturers in the market for both Triamcinolone Acetonide Cream and Ointment.  They took advantage of their already ongoing collusive relationship to raise prices on both products.  On July 1, 2010 and again on July 20, 2010, Fougera raised WAC prices for various sizes and formulations of both the cream and the ointment.  CW-3, a sales executive at Fougera, ███████████████████████ "███████████████."  On July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to comparable levels.

2279.   In the days leading up to, and surrounding these increases, CW-6 and ███████ (Perrigo) exchanged at least eight calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

2280.   After the price increases, both companies adhered to their understanding not to poach the other's customers or improperly take advantage of the price increase by seeking additional market share.  ████████████████████████

██████████████████████████████████████████████

████. CW-3 of Fougera e-mailed Kaczmarek, his supervisor, stating, "████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████."

2281.   That same day, Kaczmarek called CW-6.  The call lasted two minutes.  CW-6 then called ██████ and they spoke for three minutes.  CW-6 hung up with ██████, called Kaczmarek back, and they spoke for five minutes.  Immediately upon hanging up, Kaczmarek responded to CW-3's e-mail, with a copy to CW-6.  Confident that the agreement with Perrigo was strong, Kaczmarek stated, "██████████████████████████████."  At the same time, ██████ called his supervisor, Wesolowski, and they spoke for five minutes.

2282.   The following week, on August 3 and 6, ██████████ of Par spoke twice with a sales executive from Taro calling from the company's main line. Between October 2010 and March 2011, ██████ spoke at least 10 times with ██████ of Taro, and also exchanged calls with Taro's main company line during this period as well (which makes it impossible to determine from phone records whether she was speaking with ██████ or someone else from Taro). Upon information and belief, ██████ communicated to ██████ that Par was following the price increase on Triamcinolone Acetate as well, and that Par would also follow the fair share rules and not poach market share from the other manufacturers.

### VVVVV. Triamterene HCTZ

2283.   Triamterene HCTZ is a medication used to treat high blood pressure as well as other ailments. During the period relevant to this Complaint, Actavis, Apotex, Lannett, Mylan, and Sandoz were the primary manufacturers of Triamterene HCTZ.  Sandoz and Mylan manufactured

the drug in both tablet and capsule formulations, while Actavis and Apotex made just tablets, and Lannett made just capsules.

2284.   In late 2011, Mylan led price increases on both capsules and tablets, and Sandoz and Actavis followed shortly thereafter.  Mylan's price increases were between 100% and 300%, depending on the strength and formulation.  Throughout this time period, CW-1 of Sandoz was in constant contact with Edgar Escoto, Mylan's Director of National Accounts.  Indeed, the two spoke hundreds of times in 2011 and 2012.  Additionally, Armando Kellum of Sandoz spoke with Rick Rogerson of Actavis on May 5, 2011, July 28, 2011, and September 28, 2011, and ████ ████ of Mylan spoke with ████████ (Sandoz's Executive Director of Marketing) in November 2011.  As a result of this coordination, each of the three companies announced their price increases on the formulations of Triamterene HCTZ that each manufactured by November 2011.

2285.   Prior to 2012, neither Apotex nor Lannett manufactured Triamterene HCTZ.  However, in a familiar pattern, both entered the market in early 2012 after the existing manufacturers imposed large price increases.  However each company received its fair share of the market after the incumbent suppliers followed the fair share rules, and both Apotex (on tablets) and Lannett (on capsules) were able to enter the market at prices that were higher than the existing market prices.

2286.   Additionally, to determine which tablet customers it should bid on, ████████ of Actavis spoke with ██████ (a National Account Manager at Apotex) on March 8 and March 16, 2012.

2287.   Similarly, ▮▮▮▮ (Mylan's VP of Sales) coordinated with ▮▮▮▮ (Lannett's VP of Sales) on April 19, 20, and 23, to determine which customers Lannett should bid on to get its fair share of the capsules market.

2288.   As a result of this coordination, Defendants were able to charge supracompetitive prices on Triamterene HCTZ to Plaintiffs and others in the United States.

### WWWWWW. Ursodiol

2289.   Generic versions of Ursodiol have been available in the United States since 2000. At all times relevant to this lawsuit there has been more than one manufacturer of Ursodiol on the market.  Defendants Actavis, Lannett, and Epic dominated the market for Ursodiol and sold it to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2290.   In the years prior to the conspiracy period, Defendants' average price in the U.S. for Ursodiol were remarkably stable.  Beginning in or around May 2014, Defendants increased their prices for Ursodiol abruptly and, for the most part, in unison.

2291.   By way of example, beginning in May 2014, Defendants selling generic Ursodiol set their WACs in near lockstep, reflecting increases from previous WACs on the 300 mg capsule of more than 560%:

| Product Cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300 mg | Lannett | 00527132601 | * | $5.11 | 1-May-14 | * |
| 300 mg | Epic | 42806050301 | $0.45 | $5.10 | 6-May-14 | 1034% |
| 300 mg | Actavis | 00591315901 | $0.77 | $5.11 | 24-Jun-14 | 562% |

2292.   Ursodiol was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

2293.   Furthermore, there are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Ursodiol.  Demand for Ursodiol has not materially changed in the last few years, nor does any change in input costs explain these price increases.  Furthermore, at the time Ursodiol prices were increased in Summer 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

2294.   Upon information and belief, the price increases on Ursodiol were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Ursodiol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are highlighted below.

2295.   For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

2296.   On June 4-5, 2013, the GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

2297.   On June 2-5, 2013, HDMA held its 2013 BLC in Florida.  Representatives from Actavis and Lannett attended the event.  *See* Ex. 1.

2298.   On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas. Representatives from Actavis and Lannett attended.  *See* Ex. 1.

2299.   On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

2300.   On May 12-15, 2014, MMCAP held its National Member Conference which was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

2301.   On June 1-4, 2014, HDMA held its BLC at the JW Marriott in Arizona.  This event was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

2302.   On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

2303.   On August 23-26, 2014, NACDS held its 2014 TSE in Boston.  Representatives from Actavis, Epic, and Lannett attended.  *See* Ex. 1.

2304.   On October 27-29, 2014, GPhA held a meeting in Maryland that attended by Actavis and Lannett.  *See* Ex. 1.

**XXXXX. Valsartan HCTZ**

2305.   Valsartan HCTZ works to lower blood pressure and relax blood vessels so that blood can flow more easily, in order to prevent strokes, heart attacks, and kidney problems.  Mylan and Sandoz dominate the market for Valsartan HCTZ.

2306.   In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment.  CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta immediately started talking about competitively-sensitive information.  Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

2307.   In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases.  Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone.  Examples of their coordination with respect to specific drugs are discussed in more detail below.

2308.   The first drug that CW-4 and Nesta coordinated about was Valsartan HCTZ. Valsartan HCTZ, also known by the brand name Diovan HCT, is used to treat high blood pressure.

2309.   Diovan was a large volume drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

2310.   Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

2311.   Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012.  In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one times by phone during which they discussed, among other things, allocating market share for this product. These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

2312.   During these phone calls, Sandoz and Mylan- through CW-4 and Nesta – agreed to divvy up the market so that each competitor obtained roughly a 50% market share.

2313.   Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

2314.   On September 21, 2012 – the date of the Valsartan HCTZ launch – Richard Tremonte, a senior sales and marketing executive at Sandoz, sent an internal e-mail stating: "███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████"

2315.   That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ.  In an internal series of e-mails reacting to this news, a Sandoz employee remarked: "███████████████████████████████."  Don DeGolyer, a senior-most executive of Sandoz North America, ███:

> I guess this is what they call "co-opetition".

2316.   Kellum ███████████████████████████████ to the Sandoz pricing and sales teams.  ███████, a national account executive at Sandoz, replied "███████████."

2317.   On September 25, 2012 – only four days after the launch – ABC contacted Sandoz ███████████████████████████.  ███████ forwarded the request to CW-1 and Kellum stating: "███████████████████████████████

███████████████████████████████████

███████████████████████████.  Kellum replied: "███████

███."

2318.   On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ.  Tremonte sent an internal e-mail ████████████████████ : "████████ ████████████████████████████████████ " After a colleague responded ████████████████████████████████ , Kellum responded: "████████████████████ ████████████████████████████████████████████ " Tremonte then informed the Sandoz team: "████████████████████████████████████ ████████████████████ ."

### YYYYY. <u>Verapamil</u>

2319.   The market for Verapamil is mature, as the drug has been available in the United States since 1981.  The drug is considered an essential medicine by the World Health Organization. Actavis, Heritage, and Mylan sold Verapamil to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2320.   During phone calls with senior sales executives from Mylan and Actavis on April 22 and April 23, 2014, Heritage, Mylan, and Actavis agreed to raise prices on Verapamil in the United States.

2321.   Heritage began announcing the price increase to its customers in late June 2014, and had fully implemented the Verapamil price increase by July 9, 2014.

2322.   During the Summer of 2014, Mylan and Actavis also implemented the collusive price increase on Verapamil, as agreed by the three Defendants.  As a result of this agreement, prices for Verapamil sold to Plaintiffs and others in the United States still remain at supracompetitive levels.

### ZZZZZ.  Zoledronic Acid

2323.   The market for Zoledronic Acid is mature, as the drug has been available in generic form since 2013.  The drug is considered an essential medicine by the World Health Organization. Heritage and Dr. Reddy's sold Zoledronic Acid to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2324.   In early 2013, Heritage received approval to market Zoledronic Acid in the United States.  On January 21, 2013, Malek instructed members of his sales team to reach out to Dr. Reddy's – which at the time was the exclusive manufacturer of generic Zoledronic Acid in the United States – to reach an agreement on the price that the two companies would charge and a "fair share" market allocation that each would follow once Heritage entered the market.

2325.   Through a number of phone calls in late January 2013 between Heritage's ███████ and Dr. Reddy's ██████, an agreement was reached that Heritage would be entitled to a 40% market share and Dr. Reddy's could keep the remaining 60% of the market.  The two Defendants also agreed not to compete on pricing for Zoledronic Acid.

2326.   Conversations between the two companies in furtherance of the agreement continued in early March 2013, in preparation for Heritage's entry into the market on March 13, 2013.  For example, Heritage employees, at Malek's direction, e-mailed and spoke by telephone with Dr. Reddy's employees on March 1, March 4, March 6, and March 12, 2013.  Heritage employees also exchanged a number of texts with their contacts at Dr. Reddy's on March 12, 2013.

2327.  When Heritage began shipping Zoledronic Acid on March 13, 2013, Malek confirmed this to Dr. Reddy's, and he also confirmed the exact prices that Heritage was charging.

2328.   On April 19, 2013, in order to conceal the conspiracy, Malek instructed his sales team not to reduce to writing any collusive discussions or agreements relating to Zoledronic Acid or other drugs.

2329.   ████████████████████████████████████████████ ██████████████████████████████████, Malek and his counterparts at Dr. Reddy's discussed their bids to potential customers.  For example, in November 2013, Malek e-mailed Dr. Reddy's ████████████████████████████████████████████████ ████████████████████.

2330.   As a result of these anticompetitive agreements and collusive communications, prices for Zoledronic Acid sold to Plaintiffs and others in the United States remain at supracompetitive levels as of the filing of this Complaint.

## XIV.   THE CONSPIRATORS INCREASE PRICES IN BUNCHES

2331.   As discussed in detail in Section XIII, the overarching "fair share" agreement allowed the conspirators to maintain supracompetitive prices on numerous drugs, and implement massive price increases on many others.  Defendants were able to reach this common goal by adopting a set of "rules" that all Defendants followed.  These rules – the "fair share" principles – involved an agreement or understanding as to the market allocation for each Defendant for each generic drug identified in this Complaint.  Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1.  Each Defendants' knowledge of the overarching conspiracy is further established by the fact that each Defendant identified in this Complaint followed the "fair share" rules of the Conspiracy, both by applying the fair share market allocation

principles, and also by agreeing not to undercut each other's price increases by adding customers when a competitors' price increase was pending. Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

2332. In this Section, Plaintiffs explain how the overarching "fair share" agreement allowed competitors to begin increasing prices on drugs in bunches. As detailed below – including by tying in examples of price-fixing agreement discussed above in Section XIII – as the rules of the conspiracy became more established and the relationships within the industry developed, Defendants ramped up their price increase activity substantially.

### A. Aprahamian and Perfetto of Taro Lead Price Increases on Alclometasone Dipropionate, Ammonium Lactate, Betamethasone Dipropionate, Betamethasone Valerate, Carbamazepine, Clomipramine HCL, Desonide, and Terconazole

2333. In addition to the numerous examples of collusion involved Aprahamian and Perfetto identified above, the pair also began planning significant price increases on a number of products starting in early 2013. Although some of these price increases have been discussed individually above, each price increase was the result of collusion across generic drugs, which was made possible by the overarching conspiracy and its rules on fair share.

2334. Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at the competitor companies. The two men capitalized on these relationships to coordinate price increases and avoid competing with each other in the markets for those overlap drugs.

2335. One early example occurred in May 2013, when Taro increased its pricing on twelve different products. As result of these price increases, Taro anticipated approximately $110

million in additional revenue. These products, their corresponding WAC increases, and Taro's competitors for each product are detailed in the chart below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

2336.   In advance of the May 2013 Increases, Aprahamian and Perfetto spoke with their competitors on those products – Sandoz, Perrigo, Actavis, Mylan, and Glenmark – to discuss the increases and limit competition between them.   Indeed, Taro began communicating with competitors, and formulating its list of products for the increases, as early as April 2, 2013.

2337.   For example, on April 2, 2013, Aprahamian spoke with CW-3 of Sandoz for six minutes.  During that call, the two competitors discussed the price increases that Taro was planning for May 2013 and CW-3 took the following contemporaneous notes in his Notebook:



2338.   Immediately upon hanging up with Aprahamian, CW-3 called another competitor, ▮▮▮▮ of Perrigo, and they spoke for five minutes.  During that call, CW-3 discussed the May 2013 Increases with ▮▮▮, who told CW-3 that he already knew about them.  When CW-

3 hung up with ████, he immediately called Aprahamian back.  The call lasted one minute.  A few minutes after hanging up with Aprahamian, CW-3 called his superior Kellum.  Later that morning, Aprahamian called CW-3 and they spoke for another six minutes.

2339.  Two days later, on April 4, 2013, Aprahamian called ████ of Mylan and the two competitors spoke for fifteen minutes.  Immediately upon hanging up, Aprahamian called CW-3 of Sandoz and they spoke for six minutes.  Mylan and Sandoz were competitors with Taro on Clomipramine, one of the May 2013 Increase products.

2340.  The following Monday, April 8, 2013, Mylan circulated a list of products that it wanted to focus on to increase its market share.  For Clomipramine, Mylan noted that the product should be removed, because Mylan "████████████████████████."

2341.  The fact that Clomipramine was a "████████████████" had come directly from ████'s conversation with Aprahamian, because Taro had not yet publicly announced its price increase on this product and would not do so for several more weeks.

2342.  At the same time, Taro was communicating with Blashinsky of Glenmark.  On both April 2, 2013 and April 9, 2013, a Taro employee – likely Perfetto – called Blashinsky from his office phone. The calls lasted twenty-eight minutes and twenty-three minutes, respectively.  Also on April 9, 2013, Aprahamian exchanged two calls with CW-3 of Sandoz, including one call lasting seven minutes.  Sandoz and Glenmark were competitors with Taro on Alclometasone Dipropionate cream, one of Taro's May 2013 Increase products.

2343.  Further, on April 15, 2013 and April 16, 2013, CW-3 exchanged several calls with Aprahamian and Blashinsky.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:26:00 | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:49:00 | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:58:00 | 0:09:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/16/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 6:29:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:38:00 | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:11:00 |

2344.   During these calls, the three competitors discussed, among other things, Taro's planned price increase on Alclometasone Cream. During at least one of those calls, CW-3 recorded the following contemporaneous notes in his Notebook:



2345.   At the same time, Perfetto and Aprahamian were communicating frequently with their contacts at Perrigo and Actavis. Further, Perrigo and Actavis were also speaking directly with each other during this time period. Perrigo and Actavis had at least two May 2013 Increase products in common that overlapped with Taro, Ammonium Lactate Cream and Lotion.

2346.   While the competitors were communicating with each other, they kept their colleagues apprised of their communications with competitors. For example, after several of CW-3's calls with competitors, he immediately called Kellum or CW-1 to inform them of what he had learned. A few of these examples are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:50:00 | 0:01:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:51:00 | 0:07:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 5:58:00 | 0:02:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:58:00 | 0:09:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:07:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:46:00 | 0:05:00 |

2347.   By April 17, 2013, Aprahamian and Perfetto had finalized their list of products for the May 2013 Increases.  That same day, ████████████, a sales executive at Sandoz, sent an internal e-mail, including to CW-3 and CW-4, regarding potential supply issues on Carbamazepine ER Tablets – a drug on Taro's list.  He stated, "███████████████████████████

████████████████████████████████████████████████████."

2348.   After receiving the e-mail, CW-4 and ██████████ of Taro spoke twice, with the calls lasting twelve minutes and two minutes, respectively.  On those calls, ██████ explained that Taro did not have any long-term supply issues.  After hanging up with ██████ for the second time, CW-4 responded to ██████████'s e-mail stating: "████████████████████████████

██████."

2349.   At the same time, CW-3 forwarded ██████████'s request regarding Carbamazepine ER directly to Kellum in a separate e-mail stating, "████████████████████████████

██████" – likely referring to the impending Taro price increase.  To that, Kellum responded simply, "██."

2350.   In the days leading up to the May 2013 Increases, the competitors continued to communicate with each other in order to coordinate the price increases.   Some of these communications are detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:28:00 | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 10:41:00 | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:13:00 | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:30:00 | 0:09:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 5:12:00 | 0:01:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 7:24:00 | 0:01:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 10:44:00 | 0:02:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:48:00 | 0:02:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 11:49:00 | 0:02:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 5:43:00 | 0:04:00 |
| 4/22/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 7:00:00 | 0:01:00 |
| 4/22/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:42:00 | 0:08:00 |
| 4/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 11:51:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:42:00 | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 7:52:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:34:00 | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:43:00 | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:30:00 | 0:08:00 |

2351.   Also, between April 20 and April 23, 2013, the NACDS held its annual meeting at the Sands Convention Center in Palm Beach, Florida.  Representatives from Taro, Sandoz, Perrigo, Actavis, Mylan, and Glenmark were all in attendance.

2352.   One week later, on April 29 and April 30, 2013, Taro sent notices to its customers informing them of the May 2013 Increases.  The next day, on May 1, 2013, Taro published increased WAC pricing for the affected products.

2353.   During this time, Aprahamian and Perfetto continued to communicate with their competitors.  For example, on April 30, 2013, Aprahamian and CW-3 exchanged two calls lasting fourteen minutes and two minutes, respectively.   During those calls, Aprahamian and CW-3 discussed the May 2013 Increases and the seven Sandoz products that Taro had increased prices on. CW-3's notes from those phone calls are detailed below.  The notes also include references to the other competitors on these products.  For example, CW-3 listed "███████████," which stood for Taro and Glenmark:

2354.   After each call with Aprahamian, CW-3 hung up and immediately called Kellum to inform him of what he had learned from Aprahamian.   At the same time, Aprahamian and Perfetto were also communicating with other competitors about the May 2013 Increases.   In the days leading up to the May 2013 Increases, the competitors continued to communicate with each other in order to coordinate the price increases.   Some of these communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 6:30:00 | 0:01:00 |
| 4/30/2013 | Voice | Perfetto, Mike (Taro) | Incoming | A.B. (Actavis) | 7:14:00 | 0:10:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:24:23 | 0:00:06 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 12:44:00 | 0:15:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:37:00 | 0:02:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 9:32:00 | 0:01:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Incoming | Blashinsky, Mitchell (Glenmark) | 9:43:00 | 0:21:00 |
| 5/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:35:00 | 0:11:00 |

2355.   Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases.   Taro's competitors understood that to do so would violate the "████████████" and would disrupt the market-share balance that they had worked so hard to achieve.   Indeed, rather than compete, these competitors began working on implementing price increases of their own.

2356.   For example, on April 30, 2013, Publix e-mailed Sandoz stating that Taro had increased pricing on a number of Sandoz overlap products and asked whether Sandoz wanted to bid on them.   The products included Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER.   Kellum e-mailed CW-4 stating, "█████████████████████████ ████████████████████████████████████████████ ████████████████████████████" By "███████," Kellum and CW-4 both meant that this was a chance for Sandoz to raise its prices on these products as well.

579

2357.   That same day, April 30, 2013, Publix e-mailed Actavis to notify it that Taro had raised pricing on Terconazole Cream and asked whether Actavis wanted to bid for the business. Two days later, and after several calls between Aprahamian and Perfetto and their former Actavis colleagues, ███████████, a sales executive at Actavis, also refused to bid, stating: "███████ ██████████████████████████████████████████████████████████████ ████████████."

2358.   Similarly, on May 7, 2013, CVS asked Sandoz if they would be interested in bidding on several of the May 2013 Increase products. ██████████, a pricing analyst at Sandoz, responded internally stating, "████████████████████████████████████████████ ██████████████████████████████████████████████."  To that, Kellum responded: "███████████████████████████████████████████ █████████████████████████."

2359.   At the same time, Taro was confident based on its conversations with competitors that its increases would stick.  For example, when Kaiser gave Taro push back on the May 2013 Increases, including asking for "████████████████████████████████████████████ ██████," Aprahamian saw no need for explanation and in an internal e-mail responded simply, "████████████████████████████████." Ultimately, Aprahamian's approach yielded results and Taro retained the business at the higher pricing.

2360.   Similarly, on May 8, 2013, Cardinal e-mailed ██████ of Taro stating that regarding Desonide, "████████████████████████████████████████████████ ████████████████?" ██████ forwarded the e-mail internally and Aprahamian responded, "███ ██████████████████████████████████████████████████████████████ ████████████████████████████."

2361.   Further, by the time the May 2013 Increases were publicly announced, Taro's competitors were already well on their way to implementing comparable price increases of their own.  For example, by May 1, 2013, the day that Taro published its increased WAC pricing, Actavis had already conducted its own price increase analysis for Terconazole Cream and had revised its contract pricing to follow the Taro increase.

2362.   Similarly, one day later on May 2, 2013, Kellum e-mailed the Sandoz Pricing Committee recommending that Sandoz increase prices on six of the seven Sandoz products on Taro's May 2013 Increase list.  The power point presentation that Kellum submitted to the Committee contained no detailed price increase analysis and noted simply that Sandoz should increase because Taro had raised prices on those products.

2363.   Over the next several months, and consistent with their ongoing understandings, Taro's competitors – Sandoz, Perrigo, Actavis, Mylan, and Glenmark – followed Taro's May 2013 Increases with increases of their own.

2364.   Consistent with past practice, the competitors also often spoke before they followed with a price increase.  By way of example, and as detailed in the chart above, Sandoz followed Taro's price increases on Alclometasone Cream and Carbamazepine ER with its own price increases on May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013.

2365. Similarly, Sandoz followed the Taro price increases on Betamethasone Dipropionate Cream and Lotion and Betamethasone Valerate Cream on July 28, 2013.  In the days leading up to the Sandoz price increase, Aprahamian exchanged several calls with CW-3, including a call on July 23, 2013 that lasted three minutes.  During that call, CW-3 conveyed to Aprahamian

that Sandoz would be increasing prices on several Taro products, including the Betamethasone products.

2366.   Lastly, Perrigo followed the Taro price increases on Desonide Cream and Ointment on May 21, 2013 and Actavis re-entered the Desonide Cream market and matched the competitors' pricing on August 15, 2013.

2367.   Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own.  For example, on May 23, 2013, Econdisc reached out to Taro asking for a bid on Alclometasone Cream.  Aprahamian asked ██████, a Taro sales executive, why Econdisc was looking for a bid and ██████ replied: "█████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████."  Consistent with Aprahamian's directive, Taro subsequently declined to bid on the business.

2368.   The competitors continued to communicate about the May 2013 Increase products even after the competitors had followed the increases.  These open lines of communication were important to ensure that the competitors did not run afoul of the delicate market share balance they had achieved with each other.

2369.   For example, in September 2013, █████ of Taro called CW-4 of Sandoz to tell her that Taro's Carbamazepine ER product was being held up at the border.  As a result, Sandoz would likely be receiving requests from Taro customers for the product.  By conveying this to CW-4, █████ was sending the message that Taro would lose customers if Sandoz sold too much and Taro

would have no choice but to compete to get its market share back.  This would disrupt the market and cause prices to deteriorate across the board.

2370.   After speaking with ████, CW-4 sent an internal e-mail, including to Kellum, stating: "████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████."

**B.**   **Sandoz Coordinates with Aurobindo to Allocate Markets for Oxacillin Sodium and Nafcillin Sodium Injectable Vials**

2371.   Oxacillin Sodium ("Oxacillin") and Nafcillin Sodium ("Nafcillin") are separately marketed antibiotics used to treat infections caused by penicillin-resistant staphylococci, among other bacteria.

2372.   In 2012, Sagent Pharmaceuticals and Sandoz were the primary generic suppliers of Oxacillin and Nafcillin.  However, in December 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant.

2373.   In advance of Aurobindo's entry into those markets, on December 26, 2012 for Nafcillin and January 22, 2013 for Oxacillin, CW-6 and CW-3 spoke several times to discuss pricing and the allocation of market share to the new entrant, Aurobindo.  All the while, CW-6 kept his supervisor, Grauso, informed of his conversations with CW-3.

2374.   For example, on December 12, 2012, CW-6 called Grauso and they spoke for five minutes.  That set off a flurry of phone calls between CW-6 and CW-3, with nearly constant reporting back by CW-6 to his supervisor, Grauso, as the two competitors orchestrated how to avoid competition upon Aurobindo's entry.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:21:00 | 0:05:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:25:00 | 0:01:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:26:00 | 0:03:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:28:00 | 0:02:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 11:41:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:05:00 |

2375.   Two weeks later, on December 26, 2012, Aurobindo received FDA approval to market Nafcillin and published WAC pricing that essentially matched Sandoz's WAC pricing.  On the date that Aurobindo received approval, and in the days surrounding the launch, CW-6 spoke several more times with CW-3 during which they discussed the launch.  As he had done before, CW-6 reported back to Grauso what they had discussed.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:37:00 | 0:06:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:32:00 | 0:08:00 |

2376.   The calls between the competitors continued into January 2013.  On January 3, 2013, CW-6 spoke with Grauso three times for a total of twenty-five minutes.  Twenty minutes later, CW-3 called CW-6.  The call lasted two minutes.  The next morning, CW-6 spoke with Grauso for four minutes.  That same morning, CW-6 called CW-3 of Sandoz twice, with one call lasting three minutes.

2377.   Two days later, on January 6, 2013, Sandoz put together a Monthly Business review regarding its key products, including Nafcillin and Oxacillin.  Regarding Oxacillin, Sandoz noted that Aurobindo was "███████" to be entering the market.  Sandoz stated that its "██████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████."

2378.   Over the next several days, between January 7, 2013 and January 11, 2013, CW-6 and CW-3 spoke several more times by phone.  After those calls, CW-6 promptly called Grauso to keep him apprised of his discussions.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 9:29:00 | 0:03:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:46:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 12:26:00 | 0:08:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:49:00 | 0:02:00 |
| 12/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 16:49:00 | 0:02:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Aurobindo Pharma | 3:19:00 | 0:13:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:39:00 | 0:11:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:24:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:51:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:32:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 8:01:00 | 0:04:00 |

2379.   Two weeks later, on January 22, 2013, Aurobindo entered the Oxacillin market and again published WAC pricing that essentially matched Sandoz's WAC pricing.  That same day, CW-6 spoke with Grauso for ten minutes.  Ten minutes after hanging up, CW-6 called CW-3 of Sandoz.  The call lasted one minute.  Over the next two days, CW-6 and CW-3 shared five more phone calls.

2380.   In an e-mail dated January 30, 2013, Sandoz noted that it had "███████████" its Oxacillin contract at Walgreens to the new entrant, Aurobindo.  That same day, CW-3 and CW-6 spoke by phone for four minutes.

**C.**    **Glenmark Leads Price Increases on Ciclopirox Cream and Mometasone Furoate**

2381.   As noted above, after Fougera exited the Ciclopirox market in 2012, G&W colluded with Perrigo, Glenmark, and Fougera to coordinate its own entry into the market and also to allocate that market and increase prices.  As of May 2013, the primary competitors for Ciclopirox Cream were Glenmark with 44% market share, Perrigo with 38%, and G&W with 16%.

2382.   Mometasone Furoate ("Mometasone"), also known by the brand name Elocon, is a medium-strength corticosteroid used to treat skin conditions such as eczema, psoriasis, allergies, and rashes.  Mometasone is available in several forms, including cream, ointment, and solution.

2383.   As of May 2013, the same three competitors – Glenmark, Perrigo, and G&W – controlled a majority of the market share on the various formulations of Mometasone.

2384.  Beginning as early as May 2, 2013, Glenmark began communicating with its competitors, including G&W, to coordinate its May 2013 price increases.  Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor of G&W during which they discussed and agreed to increase prices on Ciclopirox Cream and the various formulations of Mometasone.  Notably, prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 18:10:31 | 0:00:33 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 9:00:46 | 0:00:00 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 9:00:48 | 0:00:51 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 13:57:00 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 15:27:37 | 0:02:50 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:01:30 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:05:56 | 0:03:42 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:27:03 | 0:00:55 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:13 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:14 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 18:26:47 | 0:00:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/14/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 11:18:55 | 0:00:40 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:04:27 | 0:00:14 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:05:28 | 0:05:07 |
| 5/16/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:12:12 | 0:06:33 |

2385.   Similarly, Vogel-Baylor, as she had done in the past, used her contact, CW-6 – then at Aurobindo – to communicate with ██████ of Perrigo regarding the increases.  As discussed above, CW-6 had formerly worked at Fougera and developed relationships with Vogel-Baylor and ██████ of Perrigo during his tenure there.  At this time, G&W and Aurobindo had no products that overlapped and CW-6 and Vogel-Baylor were not social friends.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:43:12 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:45:35 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:47:58 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:50:22 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:52:45 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:55:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:05:32 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:18:21 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:20:44 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:23:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:25:31 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:27:54 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:30:19 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:40:42 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:50:48 | 0:00:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:47:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:48:00 | 0:02:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:50:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 13:02:00 | 0:07:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:09:00 | 0:06:00 |

2386.   As a result of these conversations, Glenmark increased prices on Ciclopirox Cream and Mometasone Cream, Ointment, and Solution on May 16, 2013.  Soon thereafter, G&W would follow with comparable increases of its own on Ciclopirox Cream and the various formulations of Mometasone and Perrigo would follow with an increase on Ciclopirox Cream.

2387.   Over the next several weeks, G&W consistently declined opportunities to reduce pricing on the various formulations of Mometasone so as not to take advantage of the Glenmark price increases.

2388.   For example, on May 15, 2013 – the day before the Glenmark price increases would become effective and publicly visible – ███████████, a G&W sales executive, e-mailed Vogel-Baylor to inform her that ANDA was requesting decreased pricing on several products because the prices were higher than their competitors.  The list included Mometasone Solution and listed Glenmark's pre-increase pricing for Cardinal as the comparison price point.  Knowing that Glenmark was increasing pricing on this product, Vogel-Baylor advised ██████ that G&W would not lower its pricing.

2389.   Similarly, on May 17, 2013, the day after the Glenmark increases became effective, McKesson sent G&W a request for a bid on Mometasone Ointment because it "███████████ ██████████████████████"  Vogel-Baylor asked the customer who its incumbent was, and McKesson responded that it was Glenmark.  Immediately upon receiving this response, Vogel-Baylor called CW-5 of Glenmark.  The call lasted less than one minute.  She then hung up and called Brown of Glenmark.  That call lasted less than one minute.  Fifteen minutes later, Brown called Vogel-Baylor back and they spoke for twelve minutes.  Later that day, Vogel-Baylor responded to McKesson and declined the opportunity, stating "████████████████████ ██████████████████████████."

2390.   The next business day, on May 20, 2013, ██████ e-mailed Vogel-Baylor asking, "████████████████████████████████████████ ██████████████████████."  Vogel-Baylor responded by sending the following e-mail to ██████ and others on the sales team:

**RE: Mometasone**

**From:**
ERIKA VOGEL </o=pharma/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=erika vogelf6c">

**To:**
████████████████@gwlabs.com>

**Cc:**
████████████@gwlabs.com>, ████████████████@gwlabs.com>

**Date:**
Tue, 21 May 2013 00:20:12 +0000

Hi ████ /All,

Glenmark has done a price increase on Ciclopirox Cream, Mometasone Cream, Mometasone Ointment, and Mometasone Solution.  We are going to follow this increase, probably within a week or two, once we have an idea of how the rest of the market is responding.

Also, this may be a good time to find an opportunity with Ciclopirox Cream so please let me know if you get requests for pricing.

Thanks,
Erika

2391.   Later that day, ANDA e-mailed ████████ asking if G&W was interested in bidding on Ciclopirox Cream.  Because G&W had slightly less than its fair share of the Ciclopirox Cream market, ████████ responded: "████████████████████████████████████████" ANDA provided the usage information and, the next day, on May 22, 2013, ████████ forwarded the request to Vogel-Baylor, along with some additional bid requests it had received from other customers on other products.  With regard to Ciclopirox Cream, ████████ stated: "████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████."

Vogel-Baylor responded: "████████████████████████████████ ████████████████████████████████████████████████ ████████████."

2392.   On May 23, 2013, Vogel-Baylor e-mailed price increase analyses for Ciclopirox Cream and the Mometasone line to her supervisor, Orlofski.  The next day, May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice.  The calls lasted less than one minute each.

2393.   On May 29, 2013, Vogel-Baylor exchanged five calls with CW-5 and Brown of Glenmark.  That same day, G&W finalized its price increase notifications for Ciclopirox Cream to send to its customers, including Publix and Wal-Mart.  Vogel-Baylor sent an internal e-mail to the team stating: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

2394.   Also on May 29, 2013, Target e-mailed █████████ of G&W stating that the customer had received a 250% price increase on another drug, Halobetasol, and asking whether ████████ could provide any insight into why.  ████████ responded, "█████████████████████████████████████████████████████████████████████████████████████."

2395.   On May 30 and May 31, 2013, Brown called Vogel-Baylor twice.  The calls lasted four minutes and less than one minute, respectively.

2396.   On June 4, 2013, G&W sent price increase notifications to its customers regarding the various Mometasone formulations.  That same day, Vogel-Baylor called Brown.  The call lasted less than one minute.

2397.   On June 5, 2013, Pharmacy Select e-mailed █████████ regarding the notification and asked him to provide new WAC pricing for the Mometasone line of products.  ████████ forwarded the request to Vogel-Baylor asking, "██████████████████████████████████████████████████████████████████████████."

2398.   G&W and Glenmark continued to coordinate even after their price increases.  For example, on June 5, 2013, Rite Aid, a G&W customer for Mometasone, asked Glenmark whether it wanted to bid for the business because G&W had increased price.  The next day, on June 6, 2013, Brown of Glenmark called Vogel-Baylor and they spoke for six minutes.  On June 7, 2013, Vogel-Baylor called Brown back.  The call lasted less than one minute.  That same day, CW-5 e-mailed his colleagues Brown and Blashinsky regarding the Rite Aid opportunity stating "███

███████████████████████████████████████████████████."

2399.   After preparing the bid for Rite Aid, Brown e-mailed CW-5 and Blashinsky on Saturday, June 8, 2013 stating: "█████████████████████████████████."  The following Monday, on June 10, 2013, Brown called Vogel-Baylor.  Vogel-Baylor returned the call and they spoke for more than six minutes.  Within ten minutes of hanging up, and having confirmed the pricing with his competitor, Brown e-mailed his colleagues with specific price points that Glenmark should use to bid high and not take the Rite Aid business from G&W.

### D.   Nisha Patel's First List of Increase Candidates: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron

2400.   As noted above, Patel's first task at Teva was to identify drugs for which Teva could increase prices by colluding with its competitors.  Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them.  For example, a number of the drugs identified in Patel's internal document containing the list of drugs for which she was planning price increases were targeted because of the Glenmark price increases on Ciclopirox Cream and Mometasone Ointment on May 16, 2013 (which Teva did not manufacture).  On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

2401.   After one of her calls with CW-5 of Glenmark, Patel sent an internal e-mail to one of her subordinates directing him to add six different Glenmark drugs to Teva's "███████" price increase list: Adapalene Gel; Nabumetone; Pravastatin; Ranitidine; Moexipril; and Moexipril HCTZ.  As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

2402.   Patel completed and sent her first formal list of recommended price increases to her supervisor, ███████, on May 24, 2013.  She sent the list via e-mail, with an attached spreadsheet entitled "███████████." The attached list included twelve different drugs where Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors.  The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase. 5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase. 5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

2403.   For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013.  (The increases on Fluocinonide and Pravastatin have been discussed in more detail above.)  During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs.  For some of these drugs including the multiple formulations of Fluocinonide – Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

2404.  The following graphic summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013:



2405.  The "▆▆▆▆▆▆▆▆," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor ▆▆▆▆ to Maureen Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013. Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013.

2406.  The Teva price increases for the drugs identified in Patel's May 24, 2013 "▆▆▆▆▆▆▆" went into effect on July 3, 2013.  Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to ▆▆▆▆ on May 24, 2013. Some illustrative examples of that coordination are set forth below.

       1.    <u>Glenmark</u>

2407.  As noted above, a number of the drugs identified in the "▆▆▆▆▆▆▆" were targeted because of the Glenmark price increases on Ciclopirox Cream and Mometasone Ointment

on May 16, 2013 (described above).  As soon as Patel started at Teva, she began to identify price

increase candidates through her conversations with various sales and marketing executives at

Glenmark, including:

- **CW-5:** 4 calls on 5/2/13 (5:02; 0:06; 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and 0:06); 1 text message on 5/3/13;

- ███████████: 3 calls on 5/6/13 (6:45; 20:44; 8:39); 2 calls on 5/7/13 (7:59 and 1:03).  For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:

> From:  Nisha Patel02
> Sent:   Thu 5/02/2013 6:49 AM (GMT-05:00)
> To:     ████████
> Cc:
> Bcc:
> Subject: RE: Price Increases — will you be scheduling time next week to discuss?
>
> When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly.

2408.  Less than fifteen minutes later, Patel received a call from CW-5 of Glenmark and

the two spoke for just over five minutes.  Shortly after that call, at 7:44 a.m., Patel sent a follow-

up e-mail where she identified six different "██████████" Glenmark drugs to add to the price

increase list, including: Adapalene Gel; Nabumetone; Pravastatin; Ranitidine; Moexipril; and

Moexipril HCTZ.  Glenmark had not yet increased price on any of those drugs, nor had it sent any

notices to customers indicating that it would be doing so (and would not send such notices until

May 15, 2013).

2409.  As the Glenmark price increases were approaching, Patel took steps to make sure

that Teva did not undermine its competitor's action.  During the morning on May 15, 2013, in

anticipation of the Glenmark price increases that had not yet been implemented or made public,

Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different Glenmark drugs:



2410.   In accordance with the fair share understanding outlined above, Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

2411.   Following the normal pattern, Patel also spoke to CW-5 of Glenmark for nearly six minutes the next day, May 16, 2013 – the day of the Glenmark price increases.  Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron.  Patel also spoke to CW-5 and ▮▮▮▮▮ at Glenmark multiple times on May 17, 2013.

2412.   After the implementation of the Glenmark price increases on May 16, 2013, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price.  Teva refused to bid on most of these solicitations in order to

maintain market stability.  When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.  As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs: "████████████████████ ██████████████████."

2413.  Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved competitors that were not of the highest "██████."  For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

2414.  For example, the market for Fluconazole Tablets included Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark.  As of Friday May 17, 2013, Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor.  In an internal e-mail that day, Patel indicated to colleagues – including her supervisor, ██████ – that she was "████████████████████" about Fluconazole in order to determine next steps.  The following Monday, May 20, Patel called ████████, a national account manager at Greenstone but was unable to connect.  Patel was ultimately not able to communicate with ████ by phone until May 28, 2013 when the two had a twenty-one minute call.  The next day after speaking to ████ – May 29, 2013 – Patel promptly added Fluconazole to the Teva price increase list.

2415.  As discussed more fully below, Teva followed the Glenmark price increase for Fluconazole Tablets on July 3, 2013.  That same day, Patel spoke to ██████ for nearly sixteen minutes; she also spoke to CW-5 at Glenmark for almost five minutes.  The Teva price increases were a staggering 875% – 1,570%, depending on the dosage strength.  Greenstone then followed

with an increase of its own on August 16, 2013.  Patel coordinated those increases with both Glenmark and Greenstone.

2416.   The price increase on Fluconazole Tablets is also reflective of how the overarching conspiracy operating.  The massive price increase on Fluconazole Tablets led to two additional market entrants:  Citron and Dr. Reddy's.  When both of these competitors entered the market for Fluconazole Tablets, they spoke with the existing entrants to arrange for their "fair share" and to prevent competition for the drug.  For example, ████████ and ████████ (both senior sales executives at Citron) spoke with ████████ of Teva and Jim Grauso of Glenmark to coordinate Citron's entry into the market.  Similarly, Nisha Patel spoke with ████████ (a senior sales executive at Dr. Reddy's) to coordinate Dr. Reddy's entry.  As a result of these communications and the overarching fair share agreement, the market for Fluconazole Tablets went from three competitors to five, but the supracompetitive pricing remained in effect.

      2.   <u>Sandoz</u>

2417.   In her May 24 "████████," Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was "████████" on that drug.  In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase.  Patel had spoken to CW-1 for nearly twenty-five minutes on May 15, 2013, and again for more than eighteen minutes on May 20, 2013, during which time she learned this information.

2418.   Patel also likely gained comfort from the fact that Sandoz had, one year earlier, colluded with Dr. Reddy's to increase prices on Ranitidine HCL capsules, when ████████ of Sandoz and ████████ of Dr. Reddy's twice in March 2012, just after the companies had

announced 50% price increases on that drug. Thus, Sandoz's collusion with another competitor helped facilitate collusion between Sandoz and Teva on Nabumetone and Ranitidine HCL.

2419. In May 2013, Sandoz was also internally discussing its "████████" strategy for Nabumetone. Two days before Patel sent the "████████████" to her supervisor, a Sandoz pricing analyst sent the following e-mail to Kellum and CW-1 confirming the strategy:

| From: | ████████ |
|---|---|
| Sent: | Wednesday, May 22, 2013 4:14 PM |
| To: | Kellum, Armando; ████████ |
| Subject: | Target RFP Question |

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price. Are you okay with us bidding on this one? McKesson does not purchase this product from us.

2420. Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to ████████ on May 24, 2013. For example, at 8:15 a.m. on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine). She left CW-1 a voicemail, and he called her back promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

2421. After these conversations with Patel, at 10:02 a.m., CW-1 sent an e-mail to Kellum indicating that he believed there would be price increases in the pipeline with respect to Ranitidine, and suggesting a potentially substantial increase in Sandoz's price:

From: ███████████
Sent: Thursday, May 30, 2013 10:02 AM
To: Kellum, Armando
Cc: ███████████
Subject: Ranitidine tabs

I think there might be some price increases in the pipeline.

Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16.  I wonder if Teva and Amneal will follow?  They are the two dominant players on this molecule

We just bid and I think we are getting the award at a contract price of $1.77.  This contract is negative gross margins but 15% above variable costs.  RAD was at $0.95.  Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.

RAD is also buying up a lot of our short dated product.

Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well.  I'm thinking we can go from $1.77 to $5 maybe

2422.   Concurrent to Patel's outreach to Sandoz and Glenmark, Rekenthaler reached out to his friend ████████████, the VP of sales at Amneal to confirm that it would also follow Glenmark's price increase on Ranitidine HCL capsules. Rekenthaler received confirmation from Amneal that it was also on board in late May 2013.

2423.   The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period.  For example, in June 2013 Teva was "████████████████████████████████████████████████████████████████."  On June 11, 2013, ████████████, a Teva marketing representative, asked Patel whether she was "████ ████████████████████████████████████████"  According to the marketing representative, Sandoz was also in the market for Isoniazid and had "████████████████████████████████" in January 2013.  Patel responded: "████████████████████████████████████████████████████████ ████████████"

2424.   The next day – June 12, 2013 – Patel exchanged at least five calls with CW-1 at Sandoz, including those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

2425.  At 8:27 a.m., after the first two of the phone calls listed above, Patel sent the following e-mail clarifying some of the information that ▇▇▇▇ had provided, reflecting some of the conversations about market share she was having with CW-1:



**From:** Nisha Patel02
**Sent:** Wednesday, June 12, 2013 8:27 AM
**To:** ▇
**Cc:** ▇▇▇▇
**Subject:** RE: Isoniazid market pricing

▇

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply...which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

2426.  Later that day, at 3:21 p.m., Patel passed along additional information with specific price points she had received from CW-1 at Sandoz:

From:     Nisha Patel02
Sent:     Wed 6/12/2013 3:21 PM (GMT-05:00)
To:
Cc:       ▇▇▇▇
Bcc:
Subject:  RE: Isoniazid market pricing

▇

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me know if you need anything else.

2427.  As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015 – in coordination with Sandoz.  Patel spoke to CW-1 for more than sixteen minutes shortly before the increase, on January 22, 2015.

       3.    <u>Taro</u>

2428.  Patel noted in her May 24, 2013 "███████████" that for the drug Adapalene Gel, she was confident in following the Glenmark price increase because there were also "██████ ██████████" on that drug.  In addition to Teva and Glenmark, Taro was the only other competitor in the market for Adapalene Gel at that time.  Patel had heard the "██████" about a Taro increase directly from Ara Aprahamian, the Vice President of Sales and Marketing at Taro.  During a nearly eleven minute phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark increase.  This was the first call between Patel and Aprahamian since Patel joined Teva.

2429.  Shortly after the phone call with Patel, Aprahamian made an internal request for a report with specific information about Adapalene Gel in order to evaluate a potential Taro increase on the drug, including volume and pricing.  Aprahamian indicated that the reason for his request was that the "████████████████████████████████."

2430.  The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a price increase on Adapalene Gel:



From: Ara Aprahamian/US/TARO
To: ▓
Cc: Customer Accounting/US/TARO@TARO, Ara Aprahamian/US/TARO@TARO.▓
Date: 05/23/2013 11:28 PM
Subject: Fw: Adapalene - price changes

▓ please coordinate price adjustment for Adapalene for all the highlighted accounts (distributor price only - most specifically keep Target net price the same but Anda distributor price needs to be raised) to a new net of $97.25...

If you can do today fine, otherwise early next week...

602

2431.   Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene Gel.  As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

> **E.**   **Nisha Patel's July 3, 2013 Price Increases: Adapalene Gel, Cefaclor ER Tablets, Cefadroxil Tablets, Cefdinir Capsules and Oral Suspension, Cefprozil Tablets, Cimedine Tablets, Doxazosin Mesylate Tablets, Fluconazole Tablets, Fluocinonide Cream, Gel, and Ointment, Methotrexate Tablets, Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Nadolol Tablets, Oxybutynin Chloride Tablets, Prazosin HCL Capsules, and Ranitidine HCL Tablets**

2432.   Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one different generic drugs.  Many of the drugs slated for price increases were from the May 24, 2013 "███████████," but several others had been added in the interim.  Patel scheduled a conference call for the day before the price increases to discuss those increases with members of Teva's sales and pricing departments:

| Price Increase -- Agenda | |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ████████████████████████████ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.  Dial In: 866-225-0660  Access Code: 4075453 |

1)  Price increase effective Wednesday, 7/3/2013

2)  List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS Total | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

2433.   Following the now-established pattern, Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

2434.   The following graphic details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase; color coded to show the calls with specific competitors relating to each drug:



2435.   The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the graphic above) were drugs where Teva was exclusive – *i.e.*, had no competitors.

2436.   Patel – and other executives at Teva –went to great efforts to coordinate these price increases with competitors prior to July 3, 2013.  Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

      1.    <u>Upsher-Smith</u>

2437.   On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Defendant Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride Tablets.

2438.   Oxybutynin Chloride, also known by the brand name Ditropan XL, is a medication used to treat certain bladder and urinary conditions.   Belonging to a class of drugs called antispasmodics, Oxybutynin Chloride relaxes the muscles in the bladder to help decrease problems of urgency and frequent urination.

2439.   Apotex, Par, Teva, and Upsher-Smith dominated the market for Oxybutynin Chloride during the time period relevant to this Complaint.

2440.   On June 13, 2013, ▮▮▮▮▮ of Teva sent an e-mail to several Teva employees, including Patel, asking them to "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" regarding Oxybutynin Chloride.  At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability.   One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase.  On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

2441.   On June 15, 2013, Patel exchanged six text messages with ▮▮▮▮▮▮, the Senior Director of National Accounts at Upsher-Smith.  Around this same time, ▮▮▮▮▮▮ – a Vice

President of Sales at Par – was in contact with ██████████, the Senior National Accounts Manager at Upsher-Smith.

2442.   Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with ██████████.   In the week before she began her employment at Teva (after leaving her previous employment), Patel and ████████ exchanged several text messages.   During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to ████████ on April 29, 2013 for nearly twenty minutes.   During these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases.   This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

2443.   On June 19, 2013, Teva learned that Apotex also increased its price for that drug. As a result, a national account executive at Teva sent an e-mail to Patel stating: "████████████ ██████████████████████████████████████████████████████████"  Patel responded: "████ ████████████████████████████████████████████████████"  That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

2444.   On July 3, 2013, Teva implemented a price increase ranging between 1,100%-1,500% increase on Oxybutynin Chloride, depending on the dosage strength.   Like the other drugs on the list, Teva would not have increased its price without the existence of the fair share agreement, which provided the rules for the industry and generally prevented competitors from stealing market share from each other.

2.    <u>Mylan</u>

2445.   Immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases.  For example, on May 6, 2013, as she was creating the list of "████████" candidates, Patel sent Green an e-mail with an attached spreadsheet titled "████████████████████████████████."  Patel asked Green to "████████████ ████████████████" for certain, specific items that she had highlighted in blue, including nine Mylan drugs: Tolmetin Sodium Capsules; Doxazosin Mesylate Tablets; Methotrexate Tablets; Diltiazem HCL Tablets; Flurbiprofen Tablets; Nadolol Tablets; Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; and Estradiol Tablets.

2446.   The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven minutes.  Green also called Patel twice that day to report on what he had learned.  Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013.

2447.   On May 14, 2013, Patel asked several Teva national account managers, including Green, to obtain "████████" on certain Mylan drugs including Cimetidine and Nadolol in preparation for a potential price increase.  She indicated internally to another Teva colleague that she was expecting "████████████████" and that she was expecting Mylan "████████ ████████████" on those items.  On May 17, 2013, Green spoke to Nesta six times, including calls lasting 11:50, 2:23, 4:25 and 16:02.

2448.   On May 29, 2013, after a discussion with Cavanaugh, Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin and Methotrexate.

2449.   For Methotrexate, Par had already increased its prices in February 2013 and West-Ward followed this price increase on May 15, 2013.  Consistent with the "fair share" agreement,

Par knew it could lead this price increase without losing market share, and West-Ward knew that it could follow Par's increase without losing share to Mylan or Teva as well.

2450.   Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs.  From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

2451.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

2452.  In response, Patel's supervisor, ████████ of Teva, commented that "█████████ █████████████████████████." Patel also responded favorably with regard to some of the drugs, alluding to the fact that she had inside information about at least Ketoprofen:



2453.  At that time, Nystatin was not considered a strong candidate for a price increase because of the quality of the competitors in the market.  As discussed more fully below, those dynamics would later change after Patel struck up a collusive relationship with a high-level executive at Heritage.

2454.  Not surprisingly given the "██████," Mylan raised its price for both Ketorolac and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013.  Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013.  As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

2455.  At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 – Green and Nesta had a four minute call starting at 10:59 a.m.  Within minutes after that call, Patel sent the following e-mail internally at Teva:



From:    Nisha Patel02
Sent:    Fri 6/28/2013 11:22 AM (GMT-05:00)
To:      ███████████████████████
Cc:      ████████████
Bcc:
Subject: Competitor Increase Items

All,

It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply, etc).

██████,

Hearing that Ketoprofen is on the list.

2456.  Patel obtained this information directly from Green, but got one significant point wrong (which confirms that she had advance notice of the Mylan increase).  In actuality, Mylan did not announce the price increases until the following Monday, July 1, 2013 – with an effective date of July 2, 2013.

2457.  "████████" was a term consistently used by Patel in e-mails to camouflage the fact that she and her co-conspirators within Teva were communicating with competitors about future price increases.  She used the term when discussing Taro in the May 24, 2013 "████████" spreadsheet, after speaking with Aprahamian and before Taro raised its price on Adapalene Gel. She used it again on June 26, 2013 – after Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

2458.  Similarly, on July 2, 2013 – the day before Teva's price increases (including for the drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate.  Patel responded that Mylan's pricing was a little low on that drug, "██████████████████████████████████," so Teva felt comfortable increasing the price of that drug on July 3, 2013.  These "██████" – which were based on the direct

communications between Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

2459.  Moreover, this collusion between Teva and Mylan – two of the largest generic manufacturers in the country – facilitated collusion with smaller companies as well.  At the same time that senior executives from Teva and Mylan were speaking, both companies were also coordinating with other competitors (and potential competitors) for the drugs being allocated between Teva and Mylan.  For example, Rekenthaler of Teva spoke a number of times with ███ ███ of Par at the same time that Patel and Green were discussing the Doxazosin Mesylate price increase with Nesta of Mylan.  When Par – which already had an ANDA for the drug – reentered the market in early 2014, it matched the supracompetitive pricing set by Teva, Mylan, and Apotex. Similarly, ██████████ of Mylan coordinated Greenstone's entry into the market through discussions with ██████████ of Greenstone.  The two spoke a number of times between April and July 2014, in advance of Greenstone's August 2014 entry into the Doxazosin Mesylate market. And in both instances, this coordination between Mylan and Teva allowed the new competitors to enter the market and gain market share without disturbing the supracompetitive pricing.

3.    Sandoz

2460.  After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "████████████████████" increased so that it would ████████████ ████████████" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

2461.  On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would ▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇ ."

2462.  Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called CW-2 back immediately and the two had a three minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to CW-2's personal e-mail account:



**From:**      David Rekenthaler [daverek@verizon.net]
**Sent:**      Monday, July 15, 2013 5:02 PM
**To:**        ▇▇▇▇▇▇▇ @icloud.com
**Subject:**   Fwd:

Sent from my iPhone

Begin forwarded message:

**From:** Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
**Date:** July 15, 2013, 4:59:27 PM EDT
**To:** "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (net actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-300% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1300% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econodisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

2463.   CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

2464.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol.  Sandoz was the only other competitor in that market.  Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

F.   **Summer 2013: Sandoz and Mylan Coordinate to Orchestrate Price Increases on Diltiazem HCL, Haloperidol, Clomipramine, Tizanidine, Levothyroxine, and Nadolol**

2465.   Patel's efforts to coordinate the July 2013 Price increases also helped facilitate additional collusion between Mylan and Sandoz.  After Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "████████████" of those Teva and Mylan price increases.  Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

2466.   To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "█ ██████████████████████████████████████."

2467.   That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each.  Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta.  The call lasted more than two minutes.  Thirty minutes later, Nesta returned the call and they spoke for nearly nineteen minutes.

2468.   During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase.  Nesta provided CW-

4 with a list of drugs, highlighting that the Nadolol price increase would be large.  Nesta also

emphasized that Mylan did not appreciate having its prices challenged and that prices should be

kept high.  After the phone call ended, CW-4 sent the following e-mail to her superiors:



2469.   For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the

time of the July 2013 e-mail.  Indeed, Mylan would not raise price on this product until August 9,

2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also

increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list

– Trifluoperazine HCL and Benazepril HCTZ.

2470.   Over the next several months, and consistent with their understanding, Sandoz

declined to bid and take business from Mylan customers (except in one instance where Mylan had

more than its fair share) and raised prices to match Mylan on a number of products.  Some

examples of this conduct are detailed below.

2471.   Additionally, consistent with the overarching conspiracy's fair share principles, the

price increases attracted new market entrants without any resulting price competition.  For

example, Zydus entered the market for Haloperidol in late 2014, and Kevin Green communicated frequently with Nesta to ensure that Zydus obtained market share without eroding market pricing.

       1.      <u>Haloperidol and Trifluoperazine HCL</u>

2472.  Haloperidol, also known by the brand name Haldol, and Trifluoperazine HCL, also known by the brand name Stelazine, are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette syndrome.

2473.  On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice.  Both calls were less than a minute long.  Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL.  For Haloperidol, Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

2474.  On August 19, 2013, ███████████, a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine and that Sandoz needed to "████████████."

2475.  On August 22, 2013, CW-2 e-mailed Kellum stating that CVS "███████████ ████████████████████████████████████████████."  Kellum forwarded the request to CW-1 and ████████████, a pricing manager at Sandoz. ██████ responded: "███████████████████████████████████ ███████████████████" CW-1 replied that he would obtain the pricing data, "████████████████."

2476.  On September 18, 2013, CW-1 e-mailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL.  For Haloperidol, CW-1 indicated that Mylan had 72%

market share, Sandoz had 15%, and Zydus had 10%.  For Trifluoperazine HCL, CW-1 stated that

"█████████████████████████████████████████."

2477.   On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz asking

for bids on Haloperidol and Trifluoperazine HCL.  CW-1 sent an internal e-mail explaining that

"████████████████████████████████████████████████████████████████

████████████████████."

2478.   On October 2, 2013, CW-1 e-mailed ███████████████, the Sandoz national

account executive assigned to Walgreens, directing ███████████ to not only decline to bid at

Walgreens, but also lie about the reason for doing so:

| | |
|---|---|
| **From:** | ███████████ |
| **Sent:** | Wednesday, October 02, 2013 6:45 PM |
| **To:** | ███████████ |
| **Cc:** | Kellum, Armando |
| **Subject:** | Haloperidol and Trifluoperazine - WAGS |

Steve,

We discussed internally and decided not to pursue WAGS on these at this point.  We have been running up against Mylan a lot lately(Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment.

Trying to be responsible in the sandbox.

I recommend you blame supply.

███

2479.   Over the next several days, CW-4 and Nesta spoke by phone several times.  These

communications are detailed in the table below.  Prior to these calls, CW-4 and Nesta had not

communicated by phone since August 6, 2013.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

2480. On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL. After reviewing the e-mail, ▮▮▮▮▮▮, a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013. As ▮▮▮ explained: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

2481. Ultimately, Sandoz followed ▮▮▮▮ recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, but waited to follow on Trifluoperazine HCL until January 31, 2014.

## 2. Tizanidine

2482. Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

2483. Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug. As of May 2013, Defendants Apotex, Dr. Reddy's, Mylan, Sandoz, and Sun were in the

market for Tizanidine.  Dr. Reddy's led the increase on this product in early May 2013, increasing its WAC price and raising contract pricing tenfold, and by July 2013, Apotex, Mylan, Sandoz, and Sun each followed the price increase.

2484.  Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine.  For example, on May 10, 2013, ███████████, a national account executive at Sandoz, sent an internal e-mail stating that: "



"

2485.  On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes.  Two days later, CW-1 of Sandoz sent an internal e-mail to Kellum regarding "████████" stating: "████

████"

2486.  On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation. Sandoz's WAC increases were significant – ranging from 248% to 344%, depending on the formulation.  In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and ████████, a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine.  At least some of those calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

2487.   Notably, after this, Nesta would not speak with ▮▮▮▮ again until three months later in August 2013.

2488.   On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine.  CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  A few minutes later, Nesta called CW-4 at Sandoz and they spoke for nearly thirteen minutes.  Later that day, CW-1 replied to CW-3's e-mail stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  CW-3 then responded to Omnicare, stating that: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

2489.   On June 11, 2013, ▮▮▮▮▮▮▮▮, the VP of National Accounts at Dr. Reddy's, spoke to ▮▮▮▮ a National Accounts Manager at Apotex.  Upon information and belief, the purpose of this call was to confirm that Apotex would support the "fair share" agreement and follow Dr. Reddy's price increase (which Apotex subsequently did).

2490.   On June 14, 2013, Anda, a wholesale customer, e-mailed ▮▮▮▮ of Dr. Reddy's asking "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?"  ▮▮▮ responded: "▮▮▮▮▮▮▮▮▮▮."  ▮▮▮ had learned of Mylan's intent to follow the price increase through his prior communications

with Nesta.  However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry, and would not do so until July 2, 2013.

2491.   On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine.  ███ forwarded the request to ████████, a marketing executive at Dr. Reddy's, stating: "████████████████████."  ██████ responded:



"█████████████████████████████████████████████████████████

█████████████████████████████████████████."   ████   replied:

"█████████████████████████████████."  Dr. Reddy's informed Sun's Marketing Director that it would not bid for Meijer's business two days later.  A few weeks later, Meijer forwarded the same request to Sandoz. Sandoz's response was similar: "████████████████

█████████."

## G.   Enalapril Maleate

2492.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "███████" – another large set of Teva price increases.  In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate Tablets.

2493.   Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec, is a drug belonging to the class called ACE inhibitors, and is used to treat high blood pressure.

2494.   Mylan previously increased its price for Enalapril effective July 2, 2013.  At that time, there were only three manufacturers in the market: Mylan, Teva and Wockhardt. Enalapril was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect.

2495.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril.  Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase. ███████ of Teva confirmed that Enalapril "████████████████████████████████████ ████████████████████████████."

2496.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify.  That same day, Green and Nesta had two phone calls, including one lasting almost sixteen minutes.  The next day, July 11, 2013, Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril.  This information sparked the following e-mail exchange between Green and Patel (starting from the bottom):

> **From:** Kevin Green
> **Sent:** Friday, July 12, 2013 1:12 AM
> **To:** Nisha Patel02
> **Subject:** Re: Enalapril / Wockhardt Supply Constraint
>
> Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API
>
> Sent from my iPhone
>
> On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:
>
>> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
>>
>> Nisha Patel
>>
>> Teva Pharmaceuticals USA
>>
>> Director, Strategic Customer Marketing
>>
>> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>>> This is all a result of a wockhardt price increase following a Mylan increase
>>>
>>> Sent from my iPhone

2497.   As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact *plan* to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

2498.   On Friday, July 12, 2013, ███████████, a national account executive at Teva, asked Patel whether Teva was "██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████."

2499.   That same day, Patel and Green each started "███████████████████" and "███████████████" by reaching out to Teva's two competitors for Enalapril.  Patel called Nesta of Mylan directly and they spoke three times, including calls lasting six and five minutes.  Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing.  Upon information and belief, ███████████ – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40 a.m. that evening (now the morning of July 13, 2013) ██████ created a contact on his cell phone with Green's cell phone number in it.

2500.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one minutes.  During these calls, Green conveyed to Patel what he had learned from ██████: that Wockhardt planned to follow the Mylan price increase.

2501.   First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating: "████████████████████████████████████████████████████ ████████████."  At the same time, Wockhardt began planning to raise the price of Enalapril and

sought to confirm specific price points for the increase.   Internally, Wockhardt employees understood that ███ would try to obtain price points from a competitor.   That morning, ███ of Wockhardt called Green for a one minute call; shortly thereafter, Green returned the call and they spoke for two more minutes.   At 9:57 a.m. that morning, ███ reported internally the specific price ranges that he had obtained from Green.

2502.   Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase.   On Tuesday, July 16, 2013, Patel sent the following internal e-mail to her supervisor ███, again using the term "███" to obfuscate the true source of her information:



From:     Nisha Patel02
Sent:     Tue 7/16/2013 11:08 AM (GMT-05:00)
To:       ████████████
Cc:
Bcc:
Subject: Enalapril Increase Overview

████

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:

1. Mylan: 44%
2. Wockhardt: 43%
3. Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

That same day, Nesta called Patel and left a voice mail.

2503.   Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who promptly approved the price increase.   That same day, July 16, 2013, Patel then scheduled a "███

█████████████████" with members of Teva's sales and pricing teams, and sent the following agenda:



2504.   Teva and Wockhardt simultaneously implemented price increases on July 19, 2013. Although the timing of the price increase was coordinated among the competitors, Patel nevertheless described the simultaneous increase as a coincidence in an internal e-mail that same day:

From:   Nisha Patel02
Sent:   Fri 7/19/2013 8:10 AM (GMT-05:00)
To:     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dave Rekenthaler; ▮▮▮▮▮
Cc:
Bcc:
Subject: RE: Enalapril Competitive Customer Volume

FYI, I heard that Wockhardt announced a price increase yesterday morning (probably effective today). Coincidentally, Teva's increase was announced yesterday afternoon with an effective date of today.

I will pass on any supply information I receive.

2505.  Within a few days after the increases, a customer complained to ▮▮▮ at Wockhardt, asking: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?" ▮▮▮'s response to the customer was direct: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Similarly, in early August a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point.  Knowing this to be untrue, ▮▮▮ replied again "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

2506.  In mid-2015, Valeant/Oceanside entered the market for Enalapril at *higher* prices than the existing competitors were charging.  Valeant did so because it knew that the existing competitors would concede to Valeant its fair share of the market, and this is precisely what happened.

### H.   August 9, 2013 Price Increases ("Patel's Round 2"): Amiloride HCL/HCTZ Tablets, Clemastine Fumarate Oral Liquid and Tablets, Diclofenac Tablets, Diltiazem HCL Tablets, Etodolac ER Tablets, Ketoprofen Capsules, Ketorolac Tablets, Pravastatin Tablets, Tometin Sodium Capsules

2507.  On August 9, 2013, Teva raised prices on twelve different drugs.  These increases were again coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

2508.   Patel began planning for the increase shortly after the July 3 increases were
implemented.  On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to
a colleague for what she referred to as "███████."  For the drugs on the preliminary list, Patel
stated that "█████████████████████████████████████████████████████████
█████████████████████████████████."

2509.   The list included a number of drugs involving the following competitors, primarily:
Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz.  In the days leading up to
July 11, 2013, Patel was communicating directly with executives at nearly all of those competitors,
including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

2510.   Patel was also communicating indirectly with Mylan through Kevin Green. For
example, on July 10, 2013 – the day before Patel sent the preliminary "█████" increase list –
Green and Nesta spoke twice.  Shortly after the second call, Green called Patel and the two spoke
for just over seven minutes.  The next day, on July 11, Nesta and Green exchanged several more
calls. The timing of those calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

2511.   Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva increase.

2512.   By August 7, 2013, Patel had finalized the list.  That day she sent an e- mail to her supervisor, ███████, with a "███████████████████" spreadsheet which she had prepared for Maureen Cavanaugh, summarizing the increases.   As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors.

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|------------------|--------------------|--------------------|-------------|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 95.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 10.8% |
| DICLOFENAC TABLETS | 302% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.1% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 158% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 414% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 30.8% - Watson/Actavis, 0.5% - Apotex, 0.2% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 268% | Follow Mylan | Mylan, 31.7% |
| PRAVASTATIN TABLETS | 833% | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. | Glenmark, 33.2% - Apotex, 7.1% - Zydus, 3.8% - Lupin, 1.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.5% |

2513.   ▮▮▮▮▮▮   immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva.  In response to the e-mail, he politely asked Patel to remove some of the incriminating information.



In accordance with the executive's request, Patel deleted the information.

2514.   Following the now common and systematic pattern, Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase. The following graphic details some of the calls with competitors in the days and weeks leading up to the increases:



2515.   The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate Oral Liquids) was a drug where Teva was exclusive and thus had no competitors.  Interestingly, that drug was slated for the lowest increase of all drugs on the list (7%).

2516.   The day before the price increase went into effect – August 8, 2013 – Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

2517.   As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

1.   Mylan

2518.   Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases.  During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions.   The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "██████" on many different drugs.  But at times, Patel communicated directly with Nesta.

2519.   For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of "⬛⬛⬛" increase items.  She indicated that she was "⬛⬛⬛⬛" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "⬛⬛⬛⬛⬛."

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

A large majority were Mylan drugs.

2520.   The next day – July 23, 2013 – at 4:30 p.m., Green and Nesta spoke for more than six minutes.  Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan.  The call lasted more than three minutes.

2521.   On July 29, 2013, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July.  Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:

**From:** Kevin Green
**Sent:** Monday, July 29, 2013 9:49 AM
**To:** ▮
**Cc:** ▮
**Subject:** Walgreens: Items for discussion

▮

From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I want to see what the current market looks like.

2522.   The next day, July 30, 2013, Patel sent Green the "▮" price increase file as an attachment, saying that she "▮." Patel asked Green to obtain additional "▮" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

2523.   Following the same consistent pattern, Green and Nesta spoke six times over the next two days.  After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations.  This series of phone calls is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

2524.   In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel sent the following e-mail with "▮" about the customer request, with a particular focus

on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that may affect its market share for certain products sold by Mylan:



From:      Nisha Patel02
Sent:      Wed 7/31/2013 3:23 PM (GMT-05:00)
To:        Kevin Green;                    Dave Rekenthaler
Cc:
Bcc:
Subject: RE: DELPHI 9429 Walgreens: Items for discussion

My initial commentary...

If we can take on the supply, we can bid on items we have already taken our increase on (bold).

**Enalapril: seeking share**

**Cimetidine: shared with Mylan, but do not have our fair share**

**Prazosin: shared with Mylan, but do not have our fair share**

**Nadolol: can pursue additional share (Mylan) for 3-player market**

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list

There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't implemented an increase by the time we respond. From what I understand, we have some time.

2525.   Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different Mylan drugs on August 9, 2013, as set forth above.

2.   Etodolac

2526.   Etodolac, also known by the brand name Lodine, is a medication known as a non-steroidal anti-inflammatory drug (NSAID).  It is used to reduce pain, swelling and joint stiffness from arthritis.  It works by blocking the body's production of certain natural substances that cause inflammation.  An extended release version of Etodolac – Etodolac ER –also known by the brand name Lodine XL, is also available.

2527.   Apotex, Taro, Teva and Sandoz dominated the market for Etodolac tablets; Teva, Taro, and Zydus dominated the market for Etodolac ER tablets; and Apotex, Teva, and Taro dominated the market for Etodolac capsules.

2528.   In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in 2000) was planning to re-enter the market for the drug while Teva was planning to exit the market.  Although the number of competitors in the market would remain the same, Apotex and Taro were able to coordinate a large price increase due to the overarching fair share Agreement.

2529.   As a result of this coordination, Taro was able to lead a price increase that more than tripled its previous price for Etodolac capsules from early 2012, while Apotex was able to enter the market at the higher price and gain its "fair share."  As a result, between May and August of 2012, Taro and Apotex were able to coordinate to increase prices by more 200%.

2530.   This coordination paved the way for a subsequent price increase on the tablet formulations of the drug.  One year later, when Patel first began planning for " █████ " of Teva's price increases, Etodolac and Etodolac ER were not slated for increases.  For example, when she circulated a long list of potential " █████ " increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

2531.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

2532.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for sixteen minutes.  Aprahamian called CW-3 back the next day and the two spoke again for eight minutes.  After hanging up the phone with CW-3,

Aprahamian immediately called Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen minutes. On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten minutes.

2533.   During this flurry of phone calls, Defendants Sandoz, Taro and Teva agreed to raise prices for both Etodolac tablets and Etodolac ER.

2534.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac tablets and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
|---|---|
| Etodolac ER | Could follow IR (Shared with Taro) |

2535.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac tablets, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

2536.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac tablets. Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac tablets. Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three minutes.

2537.   The Sandoz price increase for Etodolac tablets became effective on July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg

Tablets.  After learning of the request, Aprahamian responded swiftly internally: "███████████

████████████████████████████████████."

2538.  When Taro received another request on July 30 from a large wholesale customer

for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | ████████████████████████ |
| **CC:** | |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

2539.  Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor

███████, Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR

(immediate release).  She instructed them to "█████████████████████████████████

████████████████████████████████████."

2540.  Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac

tablet and Etodolac ER price increases (among other things).  Between July 29 and August 2, 2013,

for example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian

at Taro:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

2541.  Aprahamian was also speaking to his contact at Sandoz- CW-3 - during this time, including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

2542.  On August 1, 2013 – shortly after speaking with Patel – Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac tablets and Etodolac ER. Aprahamian stated: "█████████████████████████████████████████████████████████ █████████████████████████████████████████████████."

2543.  By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac tablets and Etodolac ER.  The minutes from a Teva "████████ ██" meeting on August 5, 2013 – which Patel attended – reflect the following:

> 4. Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

2544.  When Patel sent the "██████████████████" spreadsheet to her supervisor ████████ on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac tablets and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "██ ███."  ████████ quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

2545.  Teva and Taro raised prices for Etodolac tablets and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were

increased to the exact same price points.  The increases were substantial.  For Etodolac tablets, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

2546.   Once again, this substantial price increase resulted in Zydus entering the market for Etodolac ER in early, which should have led to price competition.  Instead, Teva and Taro willingly gave up customers to Zydus so that it could get its "fair share" of the market.  For example, Nisha Patel, Ara Aprahamian, and Kevin Green discussed a plan to cede a large wholesale client to Zydus in May 2014, and Teva then ceded a second customer to Zydus a few months later.

3.   Impact of Price Increases

2547.   As she was preparing to implement Teva's August 9, 2013 price increases, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013.  The analysis also included the financial impact of the recent Pravastatin increase.  The results were staggering.

2548.   According to her analysis, the "███████████████████" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079 (nearly $1 billion) *per quarter* to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

2549.   Patel was rewarded handsomely by Teva for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

4.    Price Increase Hiatus

2550.   Shortly after the August 9, 2013 price increase went into effect, Patel left the office for several months while on maternity leave.

2551.   This slowed down Teva's plans for its next round of price increases.  During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work.  Patel began to return to the office on a part-time basis beginning in November 2013.

2552.   During this time period, Kevin Green left Teva to join Defendant Zydus as the Associate Vice President of National Accounts.  His last day of employment at Teva was October 23, 2013.   This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan.  Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

2553.   As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases. In Patel's absence, they simply communicated through different channels.  These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

2554.   As discussed more fully below, by early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

## I.   **March 7, 2014: (Niacin ER)**

2555.   Niacin Extended Release (ER), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

2556.   On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer.  As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

2557.   Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014.  As that date approached, Teva began to plan for loss of its exclusivity.  By at least as early as February, Teva learned that Defendant Lupin would be the only competitor entering the market on March 20.

2558.   The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price.  On February 28, 2014, Maureen Cavanaugh instructed ██████████ and others at Teva that "████████████████████████████████████ ███████████████████████████."  ████████ immediately forwarded the e-mail to Patel with the instruction: "████████████████████████████████████████████ ███████████."  Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven minutes.

2559.   Within a week, Teva was ready to implement the price increase.  On March 5, 2014, Patel sent an e-mail to the Teva pricing group stating: "████████████████████████████ ████████████████████████████████████████████████████████████."  The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014.  The increase was for 10% across the board, on all formulations.

2560.   Once Teva coordinated the price increase, it next began taking the necessary steps to divvy up the Niacin ER market with new entrant Lupin so as to avoid competition that would erode Teva's high pricing. Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "███████" for Niacin ER. "███████," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "███████ ███████" in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

2561.   This situation was no different. During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven minutes. During this and several subsequent calls, discussed in more detail below, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin upon entry.

2562.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation. In the days leading up to Lupin's entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

2563.   In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing – so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels. In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

2564.   Over the next several days, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers.  For example, on March 24, 2014, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received "███████████ ████████████."  Cardinal was one of the customers that Teva had already agreed to concede to Lupin.  The Teva executive forwarded the e-mail to several people internally at Teva, including Patel, Rekenthaler and Cavanaugh, confirming the plan:



From: ███████
Sent: Monday, March 24, 2014 2:10 PM
To: ███████        Dave Rekenthaler
Cc: Maureen Cavanaugh; Nisha Patel02; ███████
Subject: FW: Niacin ER

I want to make sure our strategy has not changed>  we are conceding correct ?

2565.   That same day, Patel spoke to Berthold at Lupin three times, as shown below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

Patel responded:



From: Nisha Patel02
Sent: Mon 3/24/2014 1:13 PM (GMT-05:00)
To: ███████
Cc: Maureen Cavanaugh; ███████████        Dave Rekenthaler
Bcc:
Subject: RE: Niacin ER

Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed.

2566.  The next day – March 25, 2014 – ████████ of Teva summarized the status of Teva's LOE Plan and the company's agreement with Lupin on Niacin ER: "█████████

████████████████████████████████████████████████████

█████████████████████████████████████."



**J.      April 4, 2014 Price Increases: Azithromycin Suspension and Oral Suspension, Bumetanide Tablets, Cephalexin Suspension, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Dicloxacillin Sodium Capsules, Diflunisal Tablets, Estazolam Tablets, Ethosuximide Capsules and Oral Suspension, Hydroxyzine Pamoate Capsules, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tablets, Estradiol/Norethindrone Acetate Tablets, Nystatin Oral Tablets, Pentoxifylline Tablets, Tamoxifen Citrate Tablets, Theophylline ER Tablets**

2567.  On April 4, 2014, Teva raised prices on twenty-two different generic drugs.  Again, nearly all of these increases were coordinated with a number of Teva's high-quality competitors who by now were familiar co-conspirators, including Defendants Sandoz, Taro, Actavis, Mylan, Lupin, and Greenstone.  But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Defendants Breckenridge and Versapharm, as well as Heritage and Rising – as new sources for anticompetitive agreements.  For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

2568.  Leading more price increases was part of a strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors.  This strategy was well known, understood and authorized by individuals at much higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor ████████.  For example, on January 16, 2014, Patel sent a document to ████████ titled "█████████

█████████████████," where she outlined her plan for implementing price increases:

---

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
  - Exclusive items
  - Number of competitors; Target 2-4 total players, where quality of competitor is high
  - Teva has majority share and quality of competitors is high - lead
  - Competitors with long term supply issues
  - Competitors exiting market
  - Low or limited financial exposure
  - Adjust pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
  - Delayed reactions erode pricing
  - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

---

2569.   Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave.  On January 14, 2014, Patel sent ██████ a preliminary draft list of price "████████████████████████████████ ████████████████████████████████████████████████████████████████."

2570.   The initial list contained drugs sold by Actavis, Lupin and Greenstone, among others.  Not surprisingly, Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

2571.   On February 7, 2014, Patel created a formal list of "████████████" in a spreadsheet. In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

2572.   Those efforts were successful.  By February 26, 2014, Patel had a more refined list

of "███████████," which she forwarded to another colleague for his review.  That list included

the following drugs and notes about each drug:

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuximide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract $5.10 |
| Minnvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMEBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMEBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandor and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

Patel continued to refine the list over the next several weeks.

2573.   On March 17, 2014, Patel sent a near final version of the "PI Candidates"

spreadsheet to ████████ with the statement: "████████████████████████████████████████

████████████."  In a practice that had now become routine at Teva, Patel and Rekenthaler both

were communicating frequently with competitors- in this case Taro, Lupin, Actavis, Greenstone,

Zydus, Heritage, and Rising – to coordinate the price increases in the week before Patel sent the

price increase list to ████████.  At least some of those communications are reflected in the table

below:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

2574.  Rekenthaler had also previously spoken with his contact at Versapharm – ███

███ , a senior national accounts executive – on January 22, 2014 (a five minute call) and March

7, 2014 (a three minute call) to secure Versapharm's agreement to follow the Teva increase on two

drugs.  Those were the only two identified telephone calls between Rekenthaler and ███ since

2012.  As discussed more fully below, Versapharm followed with its own price increase shortly after the Teva increase.

2575.  In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone.  On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – *i.e.*, the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

2576.  Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
| --- | --- | --- |
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

2577.   These price increases were all coordinated and agreed to between Teva and its competitors.   As was now their standard procedure, Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase.   Many of those communications are set forth in the graphic below:



2578.   Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave.   Some illustrative examples of those efforts are set forth below.

1.    Lupin (Cephalexin Oral Suspension)

2579.   Throughout 2013, David Berthold of Lupin colluded with two different individuals at Teva: Patel and Green.  As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

2580.   As of late October, 2013, however, neither of those options was available to Berthold.  Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

2581.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with.  The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals.  So in October 2013, when Lupin decided to raise price on Cephalexin Oral Suspension – a drug where Teva was the only other competitor in the market – Berthold already knew that Teva would follow the increase.

2582.   On October 14, 2013, Berthold called Rekenthaler at Teva.  They ultimately spoke for sixteen minutes that day. Communication was rare between those two executives.  Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

2583.   On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin Oral Suspension – Berthold also called ████████████, a national account executive at Teva, to notify Teva of the price increase.  He called ████████████ at 9:18 a.m. that morning and left a message.  ████████████ returned the call at 9:57 a.m., and the two spoke for nearly five minutes.

2584.   Within minutes after hanging up the phone with Berthold, ████████ notified others internally at Teva about the substantial increase Lupin was about to take:



2585.   The Lupin increase on Cephalexin Oral Suspension actually became effective the next day, November 1, 2013 – demonstrating that ████████ had advance knowledge of the increase.   Shortly thereafter, ████████ followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

2586.   ████████ of Teva responded later that day, asking: "████████



."

2587.   On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase.   ████████ forwarded the e-mail from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business.   ████████ agreed, and simultaneously forwarded the e-mail to Patel stating: "████████."   Patel called Berthold the same day and left a message.

2588.   And discuss they did.  When Patel drafted her initial list of possible price increase candidates and forwarded it to ███████ in January 2014, Cephalexin Oral Suspension was on the list. Patel coordinated the increase consistently with Berthold throughout the period.

2589.   On April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly.   The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

2.   <u>Greenstone (Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets)</u>

2590.   In November 2013, Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets.   Patel and ███████████, a national account executive at Greenstone, were communicating frequently during that time, including exchanging six text messages on November 16, 2013 and a phone call on November 23, 2013.   Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

2591.   On December 2, 2013 - the same day that Greenstone was slated to send out notices of the price increases to its customers – Patel spoke to ██████ at Greenstone three times within a span of twenty minutes, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:18:50 | 0:01:37 |

2592.   After the last of those three calls, Patel sent an e-mail to several colleagues at Teva notifying them of an impending Greenstone price increase – one that would not be effective for another month:



2593.   On December 5, 2013, Patel continued to communicate with ████████ about the Greenstone increases, and how Teva would react to unsolicited customer requests for bids – trading two voicemails.   The next day, Patel sent another e-mail to ████████ about Azithromycin Suspension:



2594.  ▮▮▮▮▮▮  agreed with Patel's recommendation.  Later that day, Levinson of Teva sent the following notice to several Teva colleagues:



> **From:** ▮▮▮▮▮▮
> **Sent:** Friday, December 06, 2013 2:27 PM
> **To:**
> **Cc:** ▮▮▮▮▮▮  Nisha Patel02
> **Subject:** RE: Giant Eagle Cephalexin Offer
>
> We've been informed that we will not be pursuing any business at this time on the Azithromycin OS.
>
> As Greenstone recently took a price increase that will not be visible to the market until January, it's been decided to hold off until that time.  Once the information is available, we will consider a price increase and then attempt to revisit the opportunities.
>
> The request was left open to see if we could supply for internal purposes only.
>
> Please inform the customer that we are unable to provide an offer at this time.

That same day, Teva declined to bid on Azithromycin at multiple customers.

2595.  Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone Tablets.  For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxyprogesterone due to a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  After speaking with ▮▮▮▮▮ of Greenstone for more than five minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

2596.  Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly final price increase list to ▮▮▮▮▮ – Teva was approached by another wholesaler requesting a lower price for Azithromycin Oral Suspension. A national account executive at Teva asked Patel: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮."  Patel had spoken with ▮▮▮▮ of Greenstone twice earlier that day, including one call

lasting more than fifteen minutes.  Patel's response to the national account executive was: "███████ █████████."

2597.   Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets on April 4, 2014.  Patel spoke twice with ██████ from Greenstone that same day.

### 3.   Actavis (Clarithromycin ER Tablets, Tamoxifen Citrate and Estazolam)

2598.   Teva and Actavis were coordinating about several drugs increased by Teva on April 4, 2014.  One of them was Clarithromycin ER Tablets.  As of December 2013, Teva, Actavis and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

2599.   On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market.  Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

2600.   The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014.  At 9:37 a.m. that morning, ████████, a customer marketing manager at Teva, suggested providing an offer to Cardinal at "██████████████████████████████ ████." ██████ also stated: "████████████████████████████████████ ██████████████████████████."

2601.   Immediately after receiving that e-mail, at 9:40 a.m., Patel called Rogerson at Actavis and the two spoke for more than seventeen minutes.  Shortly after hanging up the phone with Rogerson, at 10:12 a.m., Patel responded to the e-mail, saying: "████████████ ████████████████████████████████████████."

2602.   On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price.  At 9:19 a.m. that morning, Patel called Rogerson at Actavis and they spoke for more than six minutes.  Shortly after that call, at 9:45 a.m., Patel sent an e- mail internally at Teva stating: "████████████████████████████████████████████

████████████."

2603.   When Patel sent her supervisor the initial list of "████████████████████" on January 14, 2014, Clarithromycin ER was on the list.

2604.   Similarly, in March, 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva.  Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

2605.   Following a now very familiar pattern, at 9:54 a.m. on March 14, 2014, Rogerson called Patel and left a message.  Patel called Rogerson back at 10:31 a.m., and the two spoke for more than twelve minutes.  Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

**From:** Nisha Patel02
**Sent:** Friday, March 14, 2014 10:47 AM
**To:** █████████████████████
**Cc:** Dave Rekenthaler; ██████████████
**Subject:** Market Increases

NAMs,

I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):

Tamoxifen

Mirtazipine

Estazolam

2606.   In actuality, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

2607.   Within half an hour of sending that e-mail, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list.  She added: "████████████████████."

2608.   Less than two hours later, at 12:37 p.m., Patel called Rogerson again.  They spoke for more than five minutes.  Shortly after hanging up the phone, at 12:51 p.m., Patel wrote another e-mail to certain colleagues at Teva, stating: "████████████████████████ ████████████████████████████."

2609.   First thing the next business day – which was the following Monday, March 17, 2014 – Patel forwarded the "███████" list to ██████ at Teva.  The list included both Tamoxifen Citrate and Estazolam.  Later that morning, Patel called Rogerson.  After quickly exchanging voicemails, they spoke for more than nineteen minutes.  Rekenthaler of Teva and Falkin of Actavis also exchanged four text messages that day, and had one call lasting more than six minutes.

2610.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014.  Patel and Rogerson spoke twice by phone that day. Rekenthaler and Falkin also spoke by phone that day.  Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

2611.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis.  For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "████████████████████████

██████████.”  When Patel and her other conspirators at Teva used the term "██████" in this context, it was code for the fact that there was an understanding in place with a competitor.

2612.  Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate.  As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "████████████████████████████ ████████████████████████████████.”

### 4.   Multiple Manufacturers (Ketoconazole Cream and Tablets)

2613.  Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in February 2014.  They were not listed on her original "████████████" list that she sent to ██████ on January 14, 2014, but they were on the list of "████████████" that she sent to a colleague on February 26, 2014, with the following notes about each:

| Ketoconazole Cream | Shared with Taro and Sandoz |
| Ketoconazole Tab | Shared with Taro, Myl[an] and Apo[tex] |

2614.  Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation.  For Ketoconazole Cream, Teva's competitors were Taro and Sandoz.  For Ketoconazole Tablets, Teva's competitors were Taro, Mylan and Apotex.

2615.  Teva led the price increases for both drugs, but made sure to coordinate with all of its competitors before (and as it was) doing so.  On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian of Taro and CW-1 of Sandoz.  During each call, she let them know that Teva was increasing the price of Ketoconazole.  The same day, Rekenthaler spoke to Nesta of Mylan; he had previously communicated with ████████, a senior sales executive at Apotex, on March 20 and 25, 2014.

2616.  On Ketoconazole Cream, co-conspirators at Taro and Sandoz were also communicating directly with each other.  On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen minutes.  They discussed the Teva increase and the fact that Taro would follow.  CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:

**From:** ███████████
**Sent:** Friday, April 04, 2014 3:01 PM
**To:** █████████; Kellum, Armando; ████████████████████
████
**Subject:** Ketoconazole Cream Price Increase

As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled).  Taro will more than likely follow shortly.  We should determine if Teva had additional increases yesterday as well.

2617.  CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "██████████" until Sandoz determined how to proceed.

2618.  That same day, Aprahamian sent a similar e-mail internally to his colleagues at Taro.

2619.  The following Monday, April 7, 2014, Taro received a request from a customer – the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), seeking a competitive bid on Ketoconazole Tablets due to the Teva price increase.  After reviewing the request, a Taro sales executive sent an internal e-mail stating: "████████████████████████ ██████████████████████."  In a follow-up e-mail, █████████████, a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "████████████████████████████████ ████."

2620.   Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen minutes.  Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole Cream and the Tablets.  Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

2621.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October.  The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014.  At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase.  In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

2622.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers.  For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase.  The e-mail from Cardinal was forwarded to Patel, who responded immediately:

From:     Nisha Patel02
Sent:     Wed 5/14/2014 10:05 AM (GMT-05:00)
To:       ████████████
Cc:       ████████████████████████
Bcc:
Subject: RE: Cardinal Ketoconazole CR NBO # 11796

Unable to bid at this time. For internal purposes, it is for strategic reasons.

2623.   Shortly before sending the e-mail, Patel exchanged several text messages with Aprahamian at Taro.  She would ultimately exchange eight text messages and had one phone call lasting more than four minutes with Aprahamian on that day.

2624.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: "████████████████████████████."

2625.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole Cream on October 10, 2014.  That same day, Patel and CW-1 at Sandoz spoke for more than three minutes.

2626.   The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%.  For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

2627.   Following this first successful price increase, Defendants were able to increase prices again on Ketoconazole Cream when G&W entered the market. Consistent with the overarching fair share agreement, G&W entered the market at prices that were substantially higher than those charged by the existing manufacturers.  Notwithstanding the fact that it was a new market entrant with a higher price, G&W was able to gain market share as Taro, Sandoz, and Teva ceded market share to G&W.  Further, Taro quickly matched G&W's price increase.  Upon information and belief, this collusion was facilitated by communications between Aprahamian of Taro and high level executives at G&W.

5.   New Relationships Emerge

2628.   By early 2014, the generic drug industry was in the midst of a price increase explosion.  In an internal Teva presentation given shortly after the April 2014 price increases – titled "████████████████" – Teva reflected on the current state of the industry, noting that

the "████████████████████████████."  In commenting on the future implications for Teva's pricing strategy, the company stated: "████████████████████ ████████████████████████."  Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases.  Some illustrative examples are set forth below.

(a)      *Breckenridge*

2629.  One of those new co-conspirators was Breckenridge.  Patel already had a relationship with █████████, a senior sales executive at Breckenridge, and Rekenthaler had a relationship with █████████, another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

2630.  On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyroheptadine HCL Tablets.[22]  For Cyroheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%.  The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

2631.  In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with █████ at Breckenridge to coordinate the price increases.  The two spoke twice on October 14, 2013 and had a twenty-six minute call on October

---

[22]      Breckenridge had acquired the ANDA for Cyroheptadine HCL Tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label.

24, 2013.  After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

2632.   Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

2633.   With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market.  For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase.  For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine.  When she learned the news, Patel called ███████ at Breckenridge.  They ended up speaking twice that day – the first and only phone calls ever between them.  After speaking to ██████, Patel sent the following e-mail regarding the customer's request:



2634.   With regard to Mimvey, however, Teva only had 19% market share in a two-player market.  For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

2635.   On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Mimvey (contract increases of as much as 393%) and Cyproheptadine HCL Tablets (contract increases of as much as 526%).  In addition, Teva increased the WAC price on Mimvey

(Estradiol/Norethindrone Acetate Tablets) by 26% and the WAC price on Cyproheptadine HCL Tablets by as much as 95% – to exactly match Breckenridge's WAC price on both products.

2636.   Further demonstrating both Teva and Breckenridge's adherence to the fair share rules, when Impax entered the market in mid-2015, Teva and Breckenridge both coordinated to concede market share to the new entrant, and Impax was able to enter the market at the same supracompetitive WAC prices and net prices as those charged by Teva and Breckenridge.  Once again, ███ of Breckenridge brokered Impax's entrance through a series of texts with Michael Grigsby (a senior sales executive from Impax) on July 20, 2015.

(b)   *Rising*

2637.   Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013.  Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

2638.   Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal.  For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

2639.   Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen minutes. When Patel sent her initial list of "████████" to ████ on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

2640.   Teva and Rising continued to coordinate the increase over the next several months. For example, when Patel sent a nearly final list of "████████" to her supervisor ████ on March 17, 2014, she included the following notation about Diflunisal:

| Diflunisal | Shared only with Rising |
|------------|-------------------------|

2641.   That same day, Rekenthaler spoke with CW-2 twice.  During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future.  CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

2642.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal.  On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

2643.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014.  When Rising decided to exit the market, CW-2 called Rekenthaler to let him know.  Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal.  Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal Tablets.  Its new pricing exactly matched Teva's WAC price increase from April 2014.

(c)   *Versapharm*

2644.   On the April 4, 2014 Teva price increase list, Defendant Versapharm was a competitor on Ethosuximide Capsules and Oral Solution.

2645.   When Patel began creating the price increase list, Ethosuximide was not considered a candidate for an increase.  For example, when Patel sent her initial "█████████████" list to █████████ in mid-January 2014, neither drug was on the list.

2646. Versapharm was not considered a high-quality competitor. When Patel created the quality competitor rankings in May 2013, Versapharm was given a -2 score in the rankings. That did not stop Rekenthaler, however, from calling ███████, a senior national account executive at Versapharm, and speaking for five minutes on January 22, 2014. When Patel sent the next "███████" list to a colleague on February 26, 2014 – Ethosuximide Capsules and Oral Solution were both on the list, with the following notation:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

2647. Rekenthaler called again and spoke with ██████ at Versapharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014. For Ethosuximide Capsules, Teva raised is WAC price by 87%, and its contract prices by up to 322%. For Ethosuximide Oral Solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

2648. If Versapharm was being tested by Patel and Teva, it passed with flying colors. On April 9, 2014 – only five days after the Teva increase – Versapharm increased its pricing on both Ethosuximide Capsules and Oral Solution to a nearly identical price to Teva.

2649. Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and ██████ of Versapharm never spoke by phone again.

6. Valeant

2650. As noted above in Section XII, senior sales executives from Valeant coordinated with Teva and other companies to raise prices and allocate markets on a number of drugs, including Enalapril Maleate, Fluocinonide, Metronidazole and Timolol Maleate. For example, ██████ ██████ and ██████████ of Valeant spoke with executives at Greenstone, Mylan, Sandoz, Teva, and other Defendant manufacturers with respect to these drugs. Similarly, Valeant sent

representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida, which led to successful collusion with Greenstone, Mylan, Sandoz and Teva on other drugs.

2651.   Thus, when Valeant entered the market for drugs in which Teva was already present, relationships already existed to allow for the implementation of the fair share rules.  For example, when Valeant entered the market for Pentoxifylline in October 2014 – shortly after Teva, Mylan, and Apotex led a price increase on this drugs – Valeant was able to coordinate with these companies – through ███, ████, and others – to obtain its fair share.  As a result, Valeant entered the market for Pentoxifylline at higher prices than the incumbent suppliers, but was still able to obtain its fair share, because the relationships existed between Valeant and the other conspirators to implement the fair share rules.

7.   Impact

2652.   A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase.  Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

**K.   August 28, 2014 Price Increases: Amiloride HCL/HCTZ Tablets, Amoxicillin/Clavulanate Chewable Tablets, Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clemastine Fumarate Tablets, Clotrimazole Solution, Desmopressin Acetate Tablets, Diclofenac Potassium Tablets, Disopyramide Phosphate Capsules, Enalapril Maleate Tablets, Epitol Tablets, Flurbiprofen Tablets, Flutamide Capsules, Fluvastatin Sodium Capsules, Hydroxyurea Capsules, Loperamide HCL Capsules, Penicillin VK Tablets, Prazosin HCL Capsules, Prochlorperazine Tablets, Topiramate Sprinkle Capsules, Warfarin Sodium Tablets**

2653.   On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (5.2%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (5.2%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (57%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

2654.   Following the normal pattern of the conspiracy, in the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in advance.   At least some of those communications are set forth in the graphic below:



2655.   The day before the increase became effective – August 27, 2014 – Patel spent most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro, Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

2656.   In addition to those phone communications noted above, representatives from Teva and every other defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year.  Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

2657.   For those few drugs where the phone records do not identify direct communications between Teva executives and their competitors, these executives, at a minimum, communicated through other competitors.

2658.   For example, with regard to Enalapril, Patel was speaking to Aprahamian at Taro as shown above.  Aprahamian, in turn, spoke to ███████, the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen minutes, and again twice on August 14, 2014, including one call lasting eight minutes.

2659.   Similarly, with regard to the drug Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11, as shown above.  Nesta, in turn, communicated

with ███████, a senior sales executive at Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

2660.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor.  The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

1.   <u>Mylan</u>

2661.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva.  Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

2662.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases.  On April 21, 2014, ███████ ███, a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan.  The spreadsheets were created by Mylan personnel.

2663.   Patel, in turn, forwarded the e-mail to the Teva sales team and stated: "█████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████"  The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; Enalapril Maleate Tablets; Fluvastatin Sodium Capsules; Loperamide HCL Capsules; Prazosin HCL Capsules; and Sotalol Hydrochloride Tablets.

2664.   Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases.  On April 24, 2014, Patel began to formulate a "███████████████"

in order to respond to those requests, but noted that Teva was "████████████████" about the Mylan customer contract price points, which were not publicly available. Previously, Patel had relied on Kevin Green to obtain specific Mylan customer price points (referred to as "████") through his communications with Nesta of Mylan, which she used to follow Mylan's pricing. The next day, in a follow-up e-mail about the Mylan strategy, Patel noted that one of her Mylan increase strategies would not have been appropriate for this situation, and concluded that: "████████████████ ████████████████" about the Mylan contract price points.

2665.   Patel continued to push for specific contract price points from Mylan. On April 28, 2014, Patel sent an e-mail to the Teva sales team, stating: "████████████████████████ ████████████████████████████████████████ ██████████████████."

2666.   On May 9, 2014, Patel sent another e-mail:

From: Nisha Patel02
Sent: Fri 5/09/2014 9:55 AM (GMT-05:00)
To: ████████████████████████████████████
Cc: Dave Rekenthaler; ████████████████████████
Bcc:
Subject: Mylan Increase Intel

NAMs,

Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet. Whatever you can gather and provide would be greatly appreciated. Our intention is to become better, quicker followers, but without intel, we are unable to do so.

In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market.

Please send any intel to me and Tom.

2667.  Shortly after receiving that e-mail – at 11:15 a.m. that morning – Rekenthaler called

Nesta at Mylan and left a message.  Nesta returned the call at 11:23 a.m., and the two spoke for

nearly eight minutes.

2668.  Separately, and before Rekenthaler was able to convey any information he had

obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items)

directly to ▆▆▆▆▆▆▆ at Teva, lamenting the absence of Green to obtain the Mylan intel:

> I am in a really tough spot on these.  Please help!  There are several requests
> open for offers, but I have ZERO intel.  A little frustrating/discouraging, as
> we are bound to hear complaints on how long it took to close the Delphi
> request.  Is there anything you are able to get to help when you are back? ...
> At some point, I know I'll have to find another source of magic :))

2669.  The next day, ▆▆▆▆▆▆▆ sent Patel an e-mail with an attached spreadsheet

listing the Mylan contract price points for all of the recent increases:

| | |
|---|---|
| From: | ▆▆▆▆▆▆▆ |
| Sent: | Tue 5/13/2014 1:34 PM (GMT-05:00) |
| To: | Nisha Patel02 |
| Cc: | |
| Bcc: | |
| Subject: | FW: Dirt |
| Attachments: | Mylan-Price List A.xlsx |

FYI

2670.  The e-mail was unclear on where ▆▆▆▆▆▆▆ had obtained this "▆," but the

spreadsheet attached to her e-mail was created by a Mylan employee.

2671.  Rekenthaler and Nesta spoke again on May 20, 2014.  Armed with this new source

of "▆," Patel was more confident that Teva could follow the Mylan price increases exactly,

without disrupting the market.  That same day, as Patel began to create a new list of Teva price

increase candidates, she instructed a colleague to include the Mylan increase drugs – with specific

price points – as its own separate tab in the spreadsheet, called "▮▮▮▮." Her colleague provided the list, as requested, on May 21.

2672. On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four minutes. By May 28, Teva had a much more comprehensive list of price increase items. On that list, seven of the Mylan items were prominently listed with a "▮▮▮▮▮▮▮▮▮" notation listed next to each:

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 5000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

2673.   Also on the list were three additional Mylan drugs for which Teva would be leading the price increase: Diclofenac Potassium Tablets; Flurbiprofen Tablets; and Prochlorperazine Tablets.

2674.   With the list firmly squared away at the end of May, Rekenthaler and Nesta had no need to speak again until August, when Teva was preparing to implement the price increases.  In the weeks leading up to the August 28, 2014 Teva price increases, Rekenthaler and Nesta spoke several times to coordinate, including at least the calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/7/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:02:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:13:00 |
| 8/21/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:06:00 |

2.    Taro

2675.   As discussed above, Taro implemented a substantial price increase on various formulations of Fluocinonide on June 3, 2014.  In addition to Fluocinonide, Taro also significantly raised its prices on the following additional drugs, which overlapped with Teva: Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Solution and Warfarin Sodium Tablets.

2676.   Patel learned of the prices increases for certain of these drugs in advance, based on her conversations with Aprahamian.  It was understood that Teva would follow the Taro price increases based on these and prior conversations.  In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

2677.   Specifically, on May 28, 2014, ██████████ of Teva sent Patel the then-current version of her "██████████████████" spreadsheet.   That list included the following Taro drugs, which had not yet been increased by Taro:

| Item Description | BUCKET |
|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

2678.   Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight text messages and spoke for more than four minutes by phone.

2679.   On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin and other drugs – Patel and Aprahamian exchanged five text messages.   After exchanging those text messages, Patel confirmed to her supervisor ██████ and another Teva representative that Taro had in fact raised its pricing on Fluocinonide.   Patel then added: "████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████"   At 5:08 p.m. that evening, Patel called Aprahamian and the two spoke for nearly seven minutes.

2680.   First thing the next morning, Patel and Aprahamian exchanged two text messages. Then, at 9:56 am, the two spoke again for almost twenty-six minutes.   Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to ██████ making it clear that she had obtained additional "████" regarding the Taro price increases that she did not want to put into writing, stating: "██████████████████████████████."

2681.  On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015. One of the options discussed was a price increase. ██████ – aware that Patel had been in discussions with Aprahamian and had "███" regarding the Taro price increase on Carbamazepine (and other drugs) – stated: "████████████████████████████████████████ ██████████████████████████████████████."  In fact, Patel had communicated with Aprahamian earlier that same day for more than nine minutes.

2682.  One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium Tablets ("Warfarin").  Also known by the brand name Coumadin, Warfarin is a blood thinner medication used to treat and prevent blood clots.

2683.  As of June 2014, there were three competitors in the market for Warfarin: Teva, Taro and Zydus.  Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014.  In the days between the Taro and Zydus price increases for Warfarin, Teva, Taro and Zydus coordinated through various phone communications with each other, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

2684.  On June 13, 2014 – the date of the Zydus increase on Warfarin – Teva was presented with an offer from a customer for a one-time buy on that drug.  Patel responded that "████████████████████████████████████████."  Later

675

that same day, Patel sent an internal e-mail ale1iing her group, including her supervisor ███████,
about a list of drugs on which Teva planned to raise prices. A number of them – including
Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution,
Fluocinonide Cream, Emollient Cream, Gel and Ointment, and Warfarin Sodium Tablets –
included the notation "████████████" as the reason for the increase. For that list of drugs,
Patel directed that "███████████████████████." Patel's directive
meant that Teva would not seek to compete for market share against Taro or Zydus when
approached by customers due to those competitors' price increases.

2685. On June 18, 2014, Patel sent that same list to the entire sales team at Teva,
informing them of the status of Teva's next price increase. She noted that Teva had already been
"██████████████████████████████████." Patel
continued: "█████████████████████████████████
██████████████████████████████████████████
████." Finally, Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

2686. Some of the "████████" referred to by Patel was gathered during a phone
conversation she had with Aprahamian of Taro the day before, on June 17, 2014, which lasted
more than fifteen minutes.

2687. The next day, Patel continued to gather "████████" and made concerted efforts
to simultaneously coordinate with both Aprahamian and Green at Zydus. The timing and duration
of those phone calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

2688.  On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets.  As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

### 3.   Zydus

2689.  In addition to their agreement on Warfarin, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle Capsules.

2690.  Topiramate Sprinkle Capsules, also known by the brand name Topamax, is a medication used to treat seizures caused by epilepsy, and also to treat migraine headaches.  As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate, while Actavis had just 3% of the market.

2691.  In April 2014, Zydus raised its price for Topiramate Sprinkle Capsules.  Patel was in frequent communication with Green at the time of the Zydus price increase.

2692.  In the days leading up to the June 13 Zydus price increase on Warfarin, which is discussed more fully above, Kevin Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

2693.   Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle Capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin became effective, and after the conversations noted above – Patel added Topiramate Sprinkle Capsules to Teva's price increase list, with a notation: "██████████ ████." Two days before that – the same day that Green had extensive phone calls with both Rekenthaler and Patel – Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle Capsules.

2694.   Teva followed the Zydus price increase for Topiramate Sprinkle Capsules on August 28, 2014.  As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

4.   Competitors Follow Teva

2695.   For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

2696.   For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs: Amoxicillin/Potassium Clavulanate Chewable Tablets; Diclofenac Potassium Tablets; and Penicillin V Potassium Tablets.  Following the normal pattern, Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three minutes.

2697.  Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate Tablets.  Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21 and November 25, 2014.

2698.  Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase.  For example, on October 15, 2014 – approximately six weeks before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices.  Patel's initial response to the customer was: "███████████████████████████████████████ ████████████████████████████████████████████████████████"  In a subsequent internal discussion, Patel expressed how difficult it was to actually keep track of all of Teva's different collusive agreements, saying: "███████████████████████████████████████ ███████████████████████████████████."

2699.  Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium Tablets.  Rekenthaler coordinated that price increase with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

**L.**  **January 28, 2015 Price Increases: Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, Propranolol**

2700.  Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva.  She left her position in the pricing department to take on the role of Director of National Accounts at Teva.  Her new position meant new responsibilities, necessitating more

frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

2701.   When Patel left the pricing department at Teva her position was not re-filled. ███████, Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

2702.   On January 28, 2015, Teva raised prices on a number of different drugs.  Teva's price increase spreadsheet – now maintained by ██████ at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor -DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor -Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

2703.   Consistent with their normal pattern, Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015.   The relevant phone communications between Teva and several of its competitors related to these drugs are set forth below:

| Par: Rekenthaler speaks to M.B. (Par) on 1/26 (14 minutes); Rekenthaler speaks to J.H. (VP of Sales at Par) on 1/28 (2 calls) | Amneal: Patel speaks to S.R.(1) on 1/6  (51 minute call) | Taro: Patel speaks to Aprahamian two times on 1/9/15 | Dr. Reddy's: Patel speaks to V.B. in June through October 2014 when Dr. Reddy's increases prices (see below) |
|---|---|---|---|

| Product Description | Competitors |
|---|---|
| BETHANECHOL CHLORIDE TABLETS | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | Mylan (41.8%) |
| ESTRADIOL TABLETS | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

| Actavis: Rekenthaler speaks to M. Falkin on 1/13, 1/14 (2 calls) and 1/16 | Sandoz: Patel speaks to CW-1 (Sandoz) on 1/22 (12 minute call) | Mylan: Rekenthaler speaks to J. Nesta on 1/14 (2 calls) and 1/20 |
|---|---|---|

2704.  Upon information and belief, Patel also spoke in-person with many of these competitors.  For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015).  These industry events were all well-attended by Teva's competitors.

2705.  Some specific examples of Teva's coordination with competitors about its January 28, 2015 price increases are set forth below.

1.  <u>Ciprofloxacin HCL and Glimepiride</u>

2706.  Ciprofloxacin HCL Tablets, also known by various brand names including Cetraxal, Otiprio and Ciloxan, is an antibiotic that fights bacteria in the body.  It is used to treat

different types of bacterial infections, including skin infections, bone and joint infections, respiratory or sinus infections, urinary tract infections, and certain types of diarrhea.

2707.   Glimepiride Tablets, also known by the brand name Amaryl, is a medication used to control high blood sugar in people with type 2 diabetes.

2708.   Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014.  The increases to the Ciprofloxacin HCL WAC were 201% – 533% depending on the dosage strength.   The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

2709.   In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, ▮▮▮▮▮, a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases, including calls on July 10, 18, 21, 22, and 24.

2710.   ▮▮▮ continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases.  The two exchanged four text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

2711.   Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase.  On the same day that Teva sent its price increase notices out to its customers, ▮▮▮▮, a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's). Although unclear how ▮▮▮▮ obtained this information, the subject line of the e-mail clearly identified the information as "▮▮▮▮▮▮."  In her message to several other Dr. Reddy's colleagues, ▮▮▮▮ stated:



2712.  ███████████████, a senior marketing executive at Dr. Reddy's, replied: "████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████."  Dr. Reddy's anticipated that Teva would follow its price increases based on the understanding that had been reached between ████ and Patel during their various conversations.

2713.  In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL and Glimepiride – during its next round of price increases on January 28, 2015.  In the interim, ████ and Patel continued to communicate, exchanging four text messages on October 10, 2014.

2714.  Actavis – the only other quality competitor in the market for Ciprofloxacin HCL – increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In the days leading up to the Actavis price increase, Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine minutes) and once on December 18, 2014.

2715.  When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly.  That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list.  That list included many drugs that Dr. Reddy's did not market.

2.    Griseofulvin

2716.    Griseofulvin Microsize, also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair and nails that do not respond to creams or lotions. The medication is sold in several formulations, including tablets and suspension, and works by stopping the growth of fungi.

2717.    Throughout 2013, Rising had a virtual monopoly on the Griseofulvin tablet market, with Valeant Pharmaceuticals maintaining only a small percentage of the share.  On October 1 2013, Sandoz began planning its launch into the tablet market.  On October 1 and October 2, CW-2 of Rising exchanged several calls with CW-3 and ████████, a Sandoz sales executive, during which they discussed pricing for Griseofulvin and the allocation of market share to the new entrant, Sandoz. So that Sandoz could get its fair share, Rising ultimately agreed to concede Cardinal, CVS, McKesson, and Wal-Mart.  After Rising conceded the Cardinal account in late November, CW-2 and CW-3 spoke again Sandoz confirmed that it would not seek additional share.

2718.    On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin Microsize Oral Suspension.  In the days leading up to September 9, 2014, Patel and Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis to coordinate the increase. Some of those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

2719.   The Actavis price increase for Griseofulvin became effective on October 6, 2014.

2720.   Teva promptly added Griseofulvin to its own price increase list, with the notation "████████████████" as the reason for the price increase.

2721.   Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015.  As discussed above, in the days leading up to that price increase Rekenthaler of Teva and Falkin of Actavis coordinated frequently.  Teva's price increase for Griseofulvin Microsize Oral Suspension matched Actavis's WAC pricing exactly.

2722.   Additionally, Sandoz and Rising coordinated a price increase on Griseofulvin tablets at the same time as Teva and Actavis were coordinating the increase on the suspension formulation.  Rising increased its prices in October 2014, and CW-2 communicated this to CW-3.  Although Sandoz did not follow the price increase until August 2015 due to price protection penalties in certain contracts, it complied with the fair share agreement and did not take market share from Rising after it announced the price increase.

## XV.   AFTER SUCCESSFULLY COLLUDING, DEFENDANTS' QUALITY RANKINGS IMPROVE

2723.   A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014.  This updated list reflected changes in Teva's conspiratorial relationships.

2724.   Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Defendants Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period.  These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co- conspirators that Teva could trust to adhere to the illegal agreements.

A. **Apotex**

2725.   Apotex, for instance, was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.

2726.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with ████████, a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate.

2727.   As noted above, Patel revised her May 2013 price increase list on May 29, 2013 to add, *inter alia*, Pravastatin.  The day before – May 28 – Apotex increased its price on Pravastatin by over 100%.  Apotex's new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

2728.   In the days leading up to Patel's decision to add Pravastatin to her list of price increase candidates – and Apotex actually increasing its prices – Patel communicated frequently with ██████ at Apotex.  Between May 20 and May 24, 2013, the two spoke five times.

2729.   Teva ultimately raised its prices on Pravastatin – to follow Glenmark, Apotex and Zydus – on August 9, 2013.  In the days leading up to the Teva price increase, Patel spoke to ██████ at Apotex three times to coordinate.

2730.   At the same time that Teva raised its prices on Pravastatin in August 2013, it also increased its pricing on Doxazosin Mesylate.  Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases.  Apotex itself had increased the price of this drug on July 23, 2013. ██████ of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

2731.  Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired ███████ as a senior executive.  Rekenthaler of Teva and █████████ began communicating regularly after ███████ was hired by Apotex.  There is no record that they had ever communicated by phone before that.

2732.  That relationship continued through 2014.  On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%.  Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline.  In the weeks leading up to Teva's price increase, Rekenthaler of Teva engaged in numerous communications with ███████ at Apotex.  The two spoke twice on March 7, 2014, for two and three minutes, respectively.  They spoke again on March 20 for four minutes, and again on March 25 for two minutes.  A week after Teva increased its price – on April 11, 2014 – they spoke again for five minutes.  During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

2733.  As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

**B.  <u>Zydus</u>**

2734.  Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period.  While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus's increase was more personnel- oriented: Kevin Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in

November 2013.  With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy.

2735.   Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus's entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin (May – June 2014), and Etodolac ER (May – July 2014).

2736.   Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets.  Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014.  With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "█████ █████," namely Zydus.

2737.   In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases.  On June 19, 2014 – four days before Zydus increased its prices – Green and Patel spoke four times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three times.

2738.   Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets.  On June 11, 2014, the two men spoke for eight minutes.  On August 20, the two exchanged an additional pair of phone calls.

2739.   Patel and Rekenthaler did not communicate with Green in isolation.  The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green.  In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office.  After either one of them engaged in a phone call with a competitor, he or she would be

sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

2740.   Even before Green joined Zydus in November 2013, Teva had some success in coordinating price increases with Zydus.  As discussed above, Patel decided to add Pravastatin to her price increase list only after determining that Zydus agreed to the increase.  In the week leading up to Patel's decision to revise her price increase list to include Pravastatin, Green (still at Teva) spoke to █████████ and ██████████, both senior executives at Zydus.

2741.   Just two weeks later, on June 14, 2013, Zydus increased its price on Pravastatin by over 150%.  Green similarly had numerous conversations with Zydus executives in the week prior to that company's Pravastatin increase, as shown in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:12:00 |
| 6/10/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:02:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |

2742.   As noted above, Teva ultimately raised its prices on Pravastatin on August 9, 2013.  At that time, Patel recommended that Teva follow the competitors that had already raised their prices, including Zydus.  Prior to Teva raising its prices on August 9, 2013, Green spoke to █████ ████ at Zydus three times – twice on August 4, 2013, and once on August 5.

## C.    <u>Heritage</u>

2743.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013.  Initially, Patel gave Heritage a

ranking of "0."  However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

2744.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Jason Malek.  After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013.  From that date until July 25, 2014, the two spoke by phone at least 37 times.

### D.   Lupin

2745.   In Patel's initial May 2013 quality competitor ranking list, Defendant Lupin was given a ranking of +2.  When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

2746.   Defendant Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans.  From May 2013 through April 2014, for example, Patel and Berthold spoke at least 76 times by phone.  Green, while still at Teva, also had a very strong relationship with Berthold.  As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

2747.   As discussed more fully above, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following drugs: Cefdinir Oral Suspension and Capsules, Cefprozil Tablets, and Pravastatin.  Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

2748.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at

Teva to communicate with regarding a price increase for the drug Cephalexin Oral Suspension. As discussed above, in October 2013 Berthold called Rekenthaler and ███████████, a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin Oral Suspension. When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

2749.  Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014. Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

**E.**   **Par**

2750.  In Patel's initial May 2013 quality competitor ranking list, Co-conspirator Par was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

2751.  Par rose in the rankings largely because of several strong relationships between executives at the two companies. For example, ███████████, a national sales executive at Teva, had a strong relationship with ███████████, a senior sales executive at Par. The two began communicating by telephone in September 2013. Between September 2013 and May 2014, the two spoke at least twenty-seven times by phone.

2752.  Similarly, Rekenthaler at Teva had a very strong relationship with another senior executive at Par, ███████████, Rekenthaler spoke with █████ frequently throughout 2013 and 2014. From the beginning of 2013 through May 2014, Rekenthaler spoke to █████ at Par at least thirty-two times by phone.

2753.   Patel was well aware of these strong relationships, and relied on the information that ███████████ and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs.   One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets.   Patel forwarded the e-mail to ███████████ with three question marks.   ███████████ responded immediately: "███████████."   The message that ███████████ had left was for ██████ at Par, and the two executives spoke five times that same day.   After these calls with ██████, ███████████ responded back to Patel saying: "███████████████████████████████████████ ███████████."

2754.   The following Monday, Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol) to Rekenthaler, saying: "███████████████████ ██████."   One minute after receiving that e-mail, Rekenthaler called ███████████, at Par and the two spoke for eighteen minutes.   Shortly after hanging up the phone with ██████, Rekenthaler sent another e-mail to Patel, stating: "███████████████████████████."   Rekenthaler spoke to ██████ again later that afternoon for three minutes.

2755.   After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

2756.   As discussed more fully above, Teva continued to conspire with Par on various market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

### F.    <u>Greenstone</u>

2757.   Greenstone was not a highly-ranked competitor when Patel first created the quality competitor ranking list in May 2013.  Patel had, at that time, given Greenstone a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Greenstone improved to a +1 ranking.

2758.   One of the reasons for Greenstone's improvement in the rankings was Patel's developing relationship with ███████████, a national account executive at Greenstone.  Patel and ██████ were former co-workers at ABC, and had a longstanding relationship.  From the time Patel started her employment at Teva in April 2013, through the time that she updated the quality competitor rankings in May 2014, Patel and ██████ communicated by phone or text at least 66 times.  Patel also spoke to ██████'s supervisor, Jill Nailor of Greenstone, numerous times in early 2014 to coordinate Greenstone and Teva price increases and customer allocation agreements.

2759.   Patel and ██████ of Greenstone spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: July 3, 2013 – the day of Teva's price increase on Fluconazole; December 2, 2013 the day that Greenstone sent notices to customers of its price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone.

2760.   Given the willingness of Greenstone's executives to coordinate price increases with Teva, Patel increased Greenstone's quality competitor ranking in May 2014.

### G.     Amneal

2761.   In Patel's initial May 2013 quality of competitor ranking list, Defendant Amneal was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

2762.   One of the reasons why Defendant Amneal rose in the rankings was because of several strong relationships between executives at the two companies.  For example, Rekenthaler of Teva had a strong relationship with ████████████, a senior sales executive at Amneal.  From May 2013 to May 2014, they spoke eight times by phone, and attended many trade association meetings and customer conferences together as well.  Rekenthaler and ██████ were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers."  (Green and Ostaficiuk were also participants.) As noted above, Rekenthaler and ██████ coordinated price increases on Ranitidine HCL in May 2013.  The two coordinated again with respect to Warfarin Sodium tablets several times between May and August 2014.  (██████ also spoke with ████████████ of Zydus, another manufacturer of Warfarin Sodium, days before his August conversation with Rekenthaler).  And after a brief exit by Amneal from the Warfarin Sodium market in late 2014, ██████ spoke with Rekenthaler again in early March 2015, days before Amneal reentered the market at a higher price than it had charged just months earlier.

2763.   Similarly, Patel also developed strong relationships with two Amneal executives: ████████████, a senior sales and finance executive at Amneal, and ██████.  As discussed above, Patel and ██████ coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

2764.   Patel also spoke to ▆▆▆ regarding Norethindrone Acetate in September 2014, and continued to communicate with ▆▆▆ into at least 2015 – sometimes using alternative forms of communication.   In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct.   In the message exchange below (relating to a drug not identified in this Complaint), ▆▆▆ informed Patel that Amneal would concede one customer – Econdisc ("E") – so long as Amneal could retain another large customer, Red Oak Sourcing ("RO"):



2765.   On the day of this message exchange, Patel and ▆▆▆ also spoke by phone for nearly five minutes.

**H.**     **Rising – Hydroxyzine Pamoate & Diflunisal Tablets**

2766.   In Patel's initial May 2013 quality competitor ranking list, Rising was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

2767.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising.  At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate.  Teva was one of the competitors already in that market.   During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

2768.   Later, in March 2014, CW-2 sought to return the favor.   At that time, Rising experienced supply problems for the drug Diflunisal Tablets – a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

2769.   On April 4, 2014, Teva increased the price on Diflunisal Tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%).  In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases.  The two spoke by phone twice on March 17, 2014 and once on March 31.

2770.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know.  Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal.  Consistent with the fair share understanding discussed above, and the rules of engagement that were generally followed in the industry, CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal Tablets. Its new pricing matched Teva's WAC price increase from April 2014.

2771.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Patel to increase Rising's quality competitor ranking in May 2014.

I.   **Breckenridge**

2772.   In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1.  When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

2773.   Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

2774.   For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Mimvey and Cyproheptadine HCL Tablets.  In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with ███████, a sales

executive at Breckenridge.   The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six minutes.

2775.   On April 4, 2014, Teva followed the Breckenridge price increases on Mimvey Tablets (increasing the WAC pricing by over 100%) and Cyproheptadine HCL Tablets (increasing the WAC pricing by over 90%), to match Breckenridge's WAC pricing on both products.   Teva raised prices even higher on its customer contracts.   Teva increased the contract pricing of Mimvey by as much as 393%, and the contract pricing of Cyproheptadine HCL Tablets by as much as 526%, depending on the dosage strength.

2776.   As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge.   Rekenthaler spoke to █████ at Breckenridge on January 15, 2014 – the day after Patel sent her first list of "█████████████ █████ to █████ – for nineteen minutes.   Similarly, Patel spoke with █████████ – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer.   After her discussions with ███████, Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

2777.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

**J.**   **Glenmark**

2778.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Defendant Glenmark, for example, declined slightly in the rankings.   In Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3.   When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

2779.   The reason that Defendant Glenmark declined in the rankings was because Patel lost her most valuable relationship at that company – CW-5.  CW-5 left Glenmark in April 2014. In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message 121 times. They also communicated frequently using an encrypted messaging application, WhatsApp.  As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including: Adapalene, Nabumetone, Fluconazole Tablets, Ranitidine, Moexipril, Moexipril HCTZ and Pravastatin.

2780.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company.  For instance, Patel exchanged 44 phone calls or text messages with ███████████, a sales and marketing executive at Glenmark, between May 2013 and July 2015.  Similarly, Patel exchanged 36 calls with Jim Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014.  As discussed more fully above, Patel continued to coordinate with ████████ and Brown throughout 2014 on several drugs, including Kariva and Gabapentin Tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### K.    A Commitment to the Overarching Conspiracy Was Instrumental to the Success of the Price-Fixing Agreements

2781.   As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market.  When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose.  These "fair share" principles were the foundation upon which the price increases were built.  So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price.  In short, competition resulted in

lower prices; and as far as Defendants were concerned, nobody won in that scenario.  Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to punish the party that took the price increase.  Often, the competitor would then follow with a comparable price increase of its own.

2782.   There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Defendant Teva was approached by a large retail customer in May 2013 to bid on a drug for which Greenstone had increased prices, Green expressed caution stating: "██████████████████████████████."  Teva later declined to bid on the business.

2783.   The concept of "fair share" and price increases went hand in hand.  For example, as discussed above the ongoing understanding between Defendants Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase.  The same was true for the understanding between Sandoz and Mylan.  As discussed above, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – *i.e.*, Mylan did not want Sandoz to steal its business by underbidding its customers.  Similarly, Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies.  Almost invariably, he would conclude the conversations with phrases like "████████████████████ ██████████████████████████████."

2784.   Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway.  So long as the competitor knew before it was approached by customers that

the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business.   Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

**L.** **"Quality Competitor" Rankings Relate to Price Increases, But Even "Low Quality" Competitors Comply With the Overarching Conspiracy**

2785.   As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox."

**1.** Camber and Teva Fix Prices on Ranitidine HCL

2786.   When Patel first created the quality of competitor rankings in early May 2013, she gave Defendant Camber a ranking of -2.   When Patel revised those rankings one year later in May 2014, Camber's ranking did not change.   It remained one of the lowest ranked of all of Teva's competitors.

2787.   Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

2788.   This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

2789.   One of those drugs was Raloxifene Hydrochloride Tablets ("Raloxifene"), also known by the brand name Evista – a drug used in the treatment of osteoporosis in postmenopausal women.

2790.   Teva had begun marketing Raloxifene in March of that year. Actavis had received approval to begin marketing Raloxifene in 2014 as well, but had not yet entered by September 2014.

2791.   The other drug was a generic form of Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir. Generic Combivir is used in the treatment of human immunodeficiency virus (HIV).  Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo and Lupin.  As discussed more fully above, Defendants Teva, Lupin and Aurobindo agreed to divvy up the generic Combivir market in 2012 when Teva was losing exclusivity on that drug.

2792.   As the anticipated product launches for Raloxifene approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market.  On September 9, 2014, Rekenthaler had a twenty-six minute phone call with ███████, a senior sales and marketing executive at Actavis.   A short time later, a Teva executive told colleagues that she had "████████████████████████████████."

2793.   Teva's discussions with Actavis escalated over the coming week.  On September 10, Rekenthaler exchanged two calls with Falkin of Actavis lasting fifteen minutes and one minute, respectively.   On September 11, the men talked for ten more minutes.   On September 16, Rekenthaler spoke by phone a total of six times with different Actavis personnel, including one call with ████████ lasting thirty-four minutes.

2794.   The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene business, ███████████ of Teva replied in the affirmative.  Rekenthaler then shared the information he had gathered through his communications

with competitors: "████████████████████████████████████████████████████

████████████████████████████████████████." That same day, on September

17, 2014, Camber sent an offer for Raloxifene to a large Teva customer, Econdisc.

2795.   Rekenthaler and Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent

the next three days – September 17 through September 19 – playing golf during the day and

socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

2796.   On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two

minutes.  The next day, Rekenthaler initiated a series of four phone calls with Ostaficiuk.  The two

spoke for a total of thirty minutes that day.  Notably, these are the first identified phone calls ever

between the two competitors.  As a result, Camber sent a revised offer to its potential customer

that same afternoon, containing modified prices for Raloxifene.

2797.   On September 24, Patel discussed a Raloxifene allocation strategy with her Teva

colleagues in light of Camber's offer to the large Teva customer, Econdisc.  She emphasized

Camber's expressed commitment to the overarching conspiracy among the competitors – and

conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk –

stating: "████████████████████████████████████████████████████████

████████████."'"

2798.   As a part of this discussion, ████████ considered whether Teva should just concede

Econdisc to Camber, and seek to recover that market share with another customer.  At 9:07 a.m.

that morning, Patel informed her supervisor ████████  and numerous others at Teva, that

Rekenthaler planned to discuss the matter with Camber:



2799.   Indeed, at 9:28 a.m. that morning, Rekenthaler called Ostaficiuk and the two spoke for two minutes.  They spoke two more times that day, including one call that lasted eight minutes.

2800.   Some of these calls also related to Camber's entry into the market for generic Combivir.  Teva and Lupin were already in the market for generic Combivir, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market.  At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

2801.   On that same day, Berthold also spoke with ▮▮▮▮▮, a senior operations executive at Aurobindo, for more than eighteen minutes, to close the loop on the generic Combivir communications.

2802.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene market, and aimed with the information Rekenthaler had gathered from Camber's President, ▮▮▮▮▮ concluded: "▮▮▮▮▮

█████████████████████████████████████████████

████████████████ .” Rekenthaler and Ostaficiuk spoke again twice that day.

2803.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene product, but stressed that the company would not bid on any additional Teva accounts "███████████████████████████

████████ ."

2804.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene, the generic version of Evista. Rekenthaler called Ostaficiuk that day, for a short one minute call.

2805.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene or generic Combivir.  As a result of this communication, on Monday September 29, 2014 Ostaficiuk sent the following e-mail to his colleagues at Camber:

| Message | |
|---|---|
| From: | Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| on behalf of | Kon Ostaficiuk |
| Sent: | 9/29/2014 5:27:43 PM |
| To: | ███████ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=████ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=████ |
| CC: | ████████ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=████ |
| Subject: | RE: McKesson -- dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers...

Not even a "bad price"!

Please acknowledge...We do not want to upset them more!

Thank you,
Kon

2806.   ████████████ , a senior sales executive at Camber, replied: "████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████████.”  She also

added that “█████████████████████████████████████████████████

███████.” Ostaficiuk replied: “███████████████████████████████████

███████.”

2807.   About a week later, on October 7, 2014, a large Teva customer informed a Teva

sales representative that Camber had made an unsolicited bid for its Raloxifene business. ███████

███████, a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva,

including Rekenthaler, notifying them of her conversation with the customer, and expressing

surprise given the agreement Teva had previously reached with Camber: “███████████████████

███████████████████” Based on his prior conversations with Ostaficiuk, Rekenthaler doubted

that Camber made an offer to another Teva customer, stating: “███████████████████████████

███████”

2808.   ███████ of Teva “█████████████████” to the customer that “███████████████████

███████████████” and Teva would be surprised if Camber had intended to make an offer to the

customer.   After further discussion with the customer, Teva staff learned that it was a

misunderstanding.   Camber never actually made the offer, but had instead complied with its

agreement with Teva.

2809.   The fair share agreement continued to govern as usual until mid-December 2014,

when Camber learned of supply problems at Teva on Raloxifene.  A Camber employee described

the prospect of Teva being on backorder for this drug as a “███████████.”  Expressing her

understanding of the rules of the conspiracy, she pointed out: “█████████████████████████

█████████████████████.” Ostaficiuk responded optimistically, but cautiously: “███████████████

█████████████████████████████████.”

## XVI.  **CONSCIOUSNESS OF GUILT**

2810.  The Defendants were aware that their conduct was illegal.  They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.  There are numerous examples, discussed throughout this Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional information that they could only convey personally.  This was part of a consistent effort by these individuals, as well as individuals at other corporate Defendants, to avoid putting incriminating information in writing, in order to evade detection.

2811.  Teva was aware of the antitrust laws, and paid them lip service in its Corporate Code of Conduct.  For example, Teva's Code of Conduct from the summer of 2013 states specifically:



2812.  But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

2813.   For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place.  Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Ara Aprahamian at Taro.

2814.   As Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor, ██████████ – a senior marketing executive at Teva – on May 1, 2013.  That ranking included, within the category of "██████████," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin.  The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

2815.  With ██████ 's approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases.  She also routinely provided ██████ with intelligence that she had received from her communications with competitors.  For example, when Patel sent her very first formal "██████" spreadsheet to ██████ on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, "██████████."  For the drug Adapalene Gel, Patel noted that there were "██████████" – even though Taro had

not yet increased its prices for Adapalene Gel.  Patel had obtained this competitively sensitive information directly from her communications with competitors.

2816.  ▉▉▉▉▉  immediately forwarded that information to Maureen Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Patel provided for each drug.  As discussed more fully above, Teva raised prices on those drugs (and others) on July 3, 2013.

2817.  Cavanaugh was well aware that Patel was communicating with competitors about price increases, and making recommendations based on those communications, because Patel told her so directly.  For example, during a 2013 meeting of Teva sales and pricing personnel where Cavanaugh was present, Patel was discussing her communications with certain competitors about price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said.  Not once, however, did Cavanaugh ever tell Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

2818.  Patel continued to send intelligence that she had obtained from competitors to her supervisor, ▉▉▉▉▉.  On August 7, 2013, Patel sent him a summary list of drugs slated for a price increase on August 9, 2013.  In the "▉▉▉▉▉▉▉▉▉▉" column, Patel again included specific information that could only have come from her communications with competitors, including:

| Product Category | Reason for Increase |
|---|---|
| ETODOLAC ER TABLETS | Follow Taro (likely to be this week with IR) |
| ETODOLAC TABLETS | Follow Sandoz; Taro likely to follow this week |
| PRAVASTATIN TABLETS | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. |

2819.   This time, ▓▓▓▓ – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:

> Under reasons, I would change to the following:
>
> 1. Etodolac ER : Follow Taro
> 2. Etodolac : Follow Sandoz; Taro increase anticipated.
> 3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

2820.   As discussed more fully above, Teva increased prices on those three drugs two days later.  Not once did ▓▓▓▓ ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

2821.   Patel also spoke regularly to both Rekenthaler and Green about each other's communications with competitors.  Patel was aware that both Rekenthaler and Green were communicating with competitors, sometimes at her direction.  Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

2822.   Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal, and took steps to avoid any evidence of his wrongdoing.  For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called CW-2 back immediately and they had a three minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied.  Understanding, however, that it was improper to share competitively sensitive pricing information

with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

2823.  As another example, when Kevin Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only "███." Again, this was done to avoid putting any potentially incriminating communications in writing. Patel learned this technique from Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

2824.  Armando Kellum of Sandoz was also aware that what he and others at Sandoz were doing was illegal. Kellum had received antitrust training, and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws.  Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability.  As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

2825.  Similarly, Jill Nailor of Greenstone instructed her subordinates to avoid putting any sensitive market intelligence in writing.

## XVII.  THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION

2826.  Defendants' anticompetitive conduct alleged in the Complaint constitutes a conspiracy to fix prices and engage in market customer allocation, which is a per se violation of Section 1 of the Sherman Act.  Therefore, Plaintiffs need not define a relevant market.  There are,

however, features of the industry relevant to this case that show both: (i) that the industry is susceptible to collusion, and (ii) that the price increases were in fact the result of collusion and not the result of conscious parallelism.

2827.  Indeed, the U.S. market for each of the Price-Fixed Generic Drugs has been characterized by numerous factors that facilitated Defendants' conspiracy, including: (i) industry concentration; (ii) sufficient numbers to drive competition; (iii) substantial barriers to entry; (iv) demand inelasticity; (v) lack of substitutes; (vi) interchangeability; (vii) absence of non-conspiring competitors; (viii) opportunities for contact and an extremely high level of inter-firm communications; (ix) the magnitude of the price increases; and (x) the reimbursement of generic drugs purchases by third parties.

2828.  Since 2005, consolidation has reduced the number of competitors in the generic drug industry, which has rendered the market ripe for collusion.  For example: Teva acquired Ivax Corporation in 2006, Barr Laboratories in 2008 (including Defendant Pliva), Ratiopharm (Germany's second largest generic drug producer) in 2010, and Allergan's generics business (including Actavis) in 2016; Watson Pharmaceuticals acquired Andrx Corporation in 2006; Endo acquired Qualitest in 2010; Perrigo acquired Paddock Laboratories, Inc. in 2011; and Sandoz acquired Fougera in 2012.  As a result of the industry-wide consolidation, for each of the Price-Fixed Generic Drugs, there were between two and ten manufacturers of the generic drugs for sale in the United States during the time period relevant to Plaintiffs' claims, thus rendering the market for each drug concentrated.

2829.  Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supracompetitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supracompetitive prices.  Costs of manufacture, intellectual property, and

expenses related to regulatory oversight create substantial barriers to entry in the generic pharmaceutical industry.

2830.  Each of the Price-Fixed Generic Drugs is medically necessary to the health and well-being of the patient for whom it is prescribed.  For that reason, each demonstrates substantial demand inelasticity.  Indeed, notwithstanding the substantial price increases alleged in this Complaint, demand for each of the Price-Fixed Generic Drugs dropped very little following the increase in price.

2831.  There are a lack of available substitute products for each of the Price-Fixed Generic Drugs, because patients face substantial barriers to switching to other drugs, and because patients often face little incentive to switch as a result of the disconnect described in ¶ 107.

2832.  Because a generic drug must be the therapeutic equivalent of its branded counterpart, each generic drug that is approved for sale in the United States is interchangeable with each other generic drug of the same dosage strength.  For example, a 40 mg tablet of Pravastatin manufactured by Glenmark is interchangeable with a 40 mg tablet of Pravastatin manufactured by Teva.  Accordingly, each of the Price-Fixed Generic Drugs is highly interchangeable from Defendant to Defendant, and the only way that a Defendant can gain market share is by competing on price.

2833.  The Defendants control the markets for each of the Price-Fixed Generic Drugs, which enables them to increase prices without losing market share to non-conspirators.

2834.  As alleged throughout this Complaint, there was a high level of interfirm communications within the generic pharmaceutical industry, and numerous opportunities for such communications through various trade association and similar meetings.

2835.   The magnitude of the price increases involved in this case further differentiates them from parallel price increases.

2836.   As noted above, there are unique features of the generic drug industry, including the fact that reimbursement for generic drugs to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of the a pharmaceutical's generic equivalent versions.   There is therefore, in the absence of collusion, an enhanced incentive to compete on price within this reimbursement system.

## XVIII.   DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ONGOING

2837.   As a proximate result of this conspiracy, and during the time period relevant to Plaintiffs' claims, Defendants and co-conspirators charged Plaintiffs and others in the United States supracompetitive prices (*i.e.*, prices above a competitive level) for each of the Price-Fixed Generic Drugs.

2838.   Defendants and co-conspirators' conspiracy alleged in this Complaint overcharged Plaintiffs on the Price-Fixed Generic Drugs that Plaintiffs directly purchased from one or more Defendants and co-conspirators.   Even in those instances in which Plaintiffs were able to negotiate Defendants down from the full overcharge agreed to by conspirators, Defendants' agreements still impacted and artificially elevated the prices paid by Plaintiffs, because each Defendant knew that Plaintiffs would not be able to obtain a competitive price from the Defendant's competitors for each Price-Fixed Generic Drug.   Defendants also knew that any new entrants to the market would also follow the conspiracy pricing (or even seek to increase it further) based on the conspiracy's overarching market allocation agreement.

2839.   As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014 (but prices remained steadily and artificially high).  This was not a coincidence. Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

2840.   In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015.  In its report, Sandoz found that "██████████████████████████████████████████."  Specifically, the report stated: "████████████████████████████████████████████████ ████████████████████████████████████████████████."

2841.   The report went on to state that "████████████████████████ ██████████████."  The following graphic, which was included in the Sandoz report, actually demonstrates that the number of price increases started to decline dramatically after the second quarter of 2014 – the same time that the States commenced their non-public investigation:



2842.   The massive price spikes in the industry may have declined, but the already-high prices for most of these drugs did not go down.  To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

2843.   As alleged in this Complaint, during the conspiracy, Defendants and co-conspirators applied the "fair share" overarching agreement to each of the Price-Fixed Generic Drugs.  They were successful in achieving price increases on numerous drugs and on allocating markets for all Price-Fixed Generic Drugs, which enabled them to impose supracompetitive prices on Plaintiffs and others.   Defendants' coordinated price increases and market allocation agreements provided them with a higher, unified starting point negotiating prices with Plaintiffs and others for each Price-Fixed Generic Drug than would have resulted if each Defendant had independently and unilaterally set its own price increases for each Price-Fixed Generic Drug.

2844.   The conspiracy alleged in this Complaint remains in either force of effect (or both) as of the date Plaintiffs filed this Complaint and Defendants continue to charge Plaintiffs supracompetitive prices for each Price-Fixed Generic Drug as a result of the conspiracy alleged in this Complaint.

## XIX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

2845.   Discovery is necessary to determine the full scope of the conspiracy, including the time frame, products, and participants.  Plaintiffs reserve the right to amend or supplement this Complaint to add other Defendants, claims, time period, products, or other allegations based upon discovery and further investigation.  Plaintiffs also reserve the right to amend this Complaint in accordance with Orders from the Court, including – but in no way limited to – any Order setting cases or claims for trial in MDL 2724.  This includes any amendment that may be needed to narrow

any claim or count in this Complaint to further align, if necessary, with bellwether claim(s) set for trial by this Court.

## XX.   TOLLING OF THE STATUTE OF LIMITATIONS

2846.   The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Complaint were tolled because of one or more of the following events:

(a)   The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of each of the Price-Fixed Generic Drugs tolled the running of the statute of limitations on Plaintiffs' claims;

(b)   On December 12, 2016, the DOJ filed an Information charging Glazer with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of generic Doxycycline and Glyburide sold in the United States.   The Glazer criminal proceedings, and the Malek criminal proceedings that were filed one day later, toll the running of the statutes of limitation on Plaintiffs' claims during the criminal proceedings and for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i).   Further, each of the subsequent criminal enforcement actions filed by DOJ also tolls the running of the statutes of limitation on Plaintiffs' claims under § 16(i); and/or

(c)   Defendants' affirmative and fraudulent concealment of the conspiracy prevented Plaintiffs from having notice of their claims more than four years before filing this Complaint, and tolled the statute of limitations on Plaintiffs' claims.

2847.   Each of the overt acts in furtherance of the conspiracy alleged in this Complaint was done for the purpose of concealing the conspiracy and preventing Plaintiffs and other purchasers of generic drugs from learning about the conspiracy's existence.   Accordingly,

Plaintiffs did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims.  More than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators fraudulently concealed the existence of each Plaintiff's antitrust claim so that each Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

2848.   During the time period relevant to Plaintiffs' claims, including the time period more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators concealed the existence of Plaintiffs' antitrust claims from Plaintiffs as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below.  As a result, Plaintiffs did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of their antitrust claims more than four years before filing this Complaint.

2849.   During the time period relevant to Plaintiffs' claims, Plaintiffs exercised diligence in an effort to ensure that the prices that they were paying Defendants for each generic drug that is the subject of claims in this Complaint were competitive.  For example, Plaintiffs frequently submitted requests for competitive bids on each of the Price-Fixed Generic Drugs to Defendants.  Unbeknownst to Plaintiffs, Defendants shared these requests for quotations and took steps to coordinate with their conspirators to ensure that the bids they provided in response to these requests were rigged and were not competitive.

2850.   Notwithstanding the self-concealing nature of their conspiracy, during the time period relevant to Plaintiffs' claims, including more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators affirmatively misled Plaintiffs by wrongfully and

affirmatively concealing the existence of Plaintiffs' antitrust claims from Plaintiffs.  In addition to the many overt acts alleged above that were undertaken for the purpose of concealing the conspiracy, Defendants took additional steps to conceal their illegal conduct from Plaintiffs and others.  For example:

(a)     During the conspiracy alleged in this Complaint, and as alleged above, Defendants and co-conspirators spoke and met in secret to affirmatively conceal the existence of the conspiracy from Plaintiffs and others.  For each of the numerous meetings between Defendants alleged in this Complaint, Defendants took steps to either conceal the existence of the meeting from Plaintiffs or others, or to create a pretextual explanation for why the meeting occurred.

(b)     During the conspiracy alleged in this Complaint, Defendants made false and pretextual statements about the bids they provided to Plaintiffs and others in response to requests from Plaintiffs and others for competitive bids.  For example, upon information and belief, when Cardinal requested that Heritage provide a competitive bid for Nimodipine in June 2012, Heritage made representations to Cardinal that the sham bid that Heritage submitted in response (and that Heritage had coordinated with Sun and Caraco in advance) was the lowest price that Heritage could provide.  In reality, Heritage could have manufactured and sold the drug for substantially less than it quoted to Cardinal, but Heritage had agreed in advance with Sun and Caraco that Heritage would not submit a competitive price in response to Cardinal's request.  Accordingly, Heritage's false statements to Cardinal were intended to conceal from all purchasers of Nimodipine (and all other generic drugs) the existence of the conspiracy.

(c)     During the conspiracy alleged in this Complaint, Defendants took steps to ensure that their communications in furtherance of the conspiracy were not recorded in writing. For example, on April 19, 2013, Malek instructed his employees at Heritage not to keep in writing

719

any evidence of the agreements that Heritage was negotiating (and that it would soon reach) with other Defendants relating to the Zoledronic Acid (and other drugs).  Similarly, during the July 1, 2014 telephone conversation in which a senior sales executive at Heritage discussed the collusive price increases of Glyburide and Fosinopril HCTZ with a senior sales executive at Citron, the Citron representative told the Heritage representative not to communicate with Citron through e-mail.

(d)     During the conspiracy alleged in this Complaint, Defendants took steps to confine knowledge of the conspiracy to a small group of senior executives for the purpose (and with the effect) of concealing the conspiracy's existence.  For example, during the same July 1, 2014 telephone conversation between Heritage and Citron, the Citron representative told the Heritage representative to communicate with a specifically designated employee of Citron that was fully briefed on the conspiracy.

(e)     During the conspiracy alleged in this Complaint, Defendants discussed and coordinated the timing of their price increase announcements for the purpose of making each price increase seem like it was each Defendant's independent decision to raise prices even though, in reality, it was not.  For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine.  For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz issued its matching price increase on May 23, 2014.  Also on May 23, 2014, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering the announcement of these price increases, Sandoz and Mylan intended to convince generic drug purchasers such as Plaintiffs and others that the latter price increase was the independent response to the initial price increase.  As the allegations in this Complaint make clear

though, Defendants actively discussed, coordinated, and agreed to these price increases in secret, in order to conceal the existence of the conspiracy.

2851.   During the conspiracy, including more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiffs; and Plaintiffs were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

2852.   As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, each Plaintiff did not have actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led any Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this Complaint, more than four years before Plaintiffs filed this Complaint.  Before then, no Plaintiff was aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in this Complaint.

### A.    <u>Spoliation of Evidence</u>

2853.   Many of the individual participants, and other employees of the various corporate Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

2854.   For example, Nisha Patel produced text messages – in response to the States' subpoena – going back as far as early 2014.  Prior to producing those text messages, however, Patel had deleted all of her text communications with competitors from the same time period, including many text messages with Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor,

Rekenthaler and Sullivan; and many other text messages with employees of Dr. Reddy's, Glenmark (including CW-5), Greenstone (including ██████████), Par, Sandoz, Upsher-Smith and Zydus.

2855.   Patel deleted these text messages after a conversation with Rekenthaler in early 2015, when Rekenthaler warned Patel to be careful about communicating with competitors. Rekenthaler was aware of the government investigations that had been commenced, and told Patel that the government was showing up on people's doorsteps.  Sometime after that, Patel deleted her text messages with competitors.

2856.   Defendant Apotex also destroyed an entire custodial file for one of its key employees (██████████, a senior sales executive), after the States requested it through an investigatory subpoena in July 2017.  As discussed above, ██████ was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings.  After the States' subpoena was issued, Defendant Apotex destroyed ██████ custodial file – and did not inform the States that it had done so for over a year.

## B.   <u>Obstruction of Justice</u>

2857.   Many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response.

2858.   For example, when the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Defendant Apotex.  Rekenthaler then immediately called Cavanaugh and Christine ██████ another senior Teva executive.  Rekenthaler spoke several times

to Cavanaugh before then calling his own attorney and speaking twice.  Later that day, Patel called

Rekenthaler two more times to coordinate her response to the government.

2859.  Other Defendants took similar action in response to events in the States'
investigation.  Several were speaking frequently at or around the time a subpoena was issued, or
when the States were engaging in substantive discussions with their counsel.  As just one example,
on July 17, 2018 the States sent a subpoena to Grauso, through his counsel.  That same day, Grauso
spoke to Aprahamian for more than twelve minutes.  The States then set up a conference call with
Grauso's counsel for July 25, 2018.  The day before that call – July 24, 2018 – Aprahamian spoke
to his lawyer, and then shortly thereafter called Grauso.  The next day, shortly after a conversation
between the States and counsel for Grauso, Aprahamian and Grauso spoke again, this time for
nearly seven minutes.

2860.  Accordingly, Defendants and their co-conspirators' fraudulent concealment of their
unlawful conduct tolled the statute of limitations for each of Plaintiffs' claims.

2861.  Plaintiffs' claims have been brought within the applicable statute of limitations
period.

## XXI.  **ANTITRUST VIOLATIONS**

### A.  **Count One – Overarching Conspiracy on all Price-Fixed Generic Drugs Against all Defendants**

2862.  Plaintiffs incorporate by reference ¶¶ 1 through 2861 above.

2863.  By 2010, as alleged above, the market for manufacture, pricing and sale of Price-
Fixed Generic Drugs had become conducive to cartelization.   The Defendants' efforts to
manipulate the pricing and sale of some Price-Fixed Generic Drugs as alleged above infected and
over time spread to the pricing and sale of all Price-Fixed Generic Drugs as alleged above.
Beginning at a time yet to be determined, but no later than June 2011, and continuing in force or

effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Price-Fixed Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2864.   Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits.   This objective was a common goal among all the Defendants.   In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Price-Fixed Generic Drugs.

2865.   Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Price-Fixed Generic Drugs in order to achieve supracompetitive profits.   Defendants were able to reach this common goal by adopting a set of "rules" that all Defendants followed.   These rules – the "fair share" principles – involved an agreement or understanding as to the market allocation for each Defendant for each generic drug identified in this Complaint.   Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1.   Each Defendants' knowledge of the overarching conspiracy is further established by the fact that each Defendant identified in this Complaint followed the "fair share" rules of the Conspiracy, both by applying the fair share market allocation principles, and also by agreeing not to undercut each other's price increases by adding

customers when a competitors' price increase was pending.  Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

2866.   For example, Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases.  Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that they had worked so hard to achieve.  Indeed, rather than compete, these competitors began working on implementing price increases of their own.

2867.   Every Defendant intended to join the all-Price-Fixed Generic Drugs conspiracy.

2868.   All Defendants named in this Complaint engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants sold fewer Price-Fixed Generic Drugs than others.  However, the participation of all Defendants in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured.  Absent the participation of all Defendants, the conspiracy would have been thwarted because it would have been in the independent interests of each manufacturers to increase their market share by competing on price.  A single overarching market allocation agreement facilitated all of the collusive agreements alleged in this Complaint, and this overarching agreement was negotiated and policed through the industry meetings attended by all Defendants.  In this way, and for the reasons explained below in ¶¶ 2870 to 2877, there was substantial overlap between all Defendants in the overarching conspiracy.

2869.   By joining the all-Price-Fixed Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the success of the

all-Price-Fixed Generic Drugs Conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint were interdependent for at least six reasons.

2870. First, every agreement on each of the Price-Fixed Generics was interdependent because every agreement was the byproduct of the same overlapping overarching market allocation agreement. Indeed, the interdependent nature of these agreements was what allowed the Defendants to enforce and police every agreement reached in furtherance of the all-Price-Fixed Generics Conspiracy. For example, Defendants with a proportionately smaller market shares of certain drugs agreed not to compete for additional market share in return for an agreement that their competitors would not compete for additional market share of other drugs for which they enjoyed a proportionately larger market share. Further, because each Defendant knew that its market share was safe from competition, market share itself became a fungible commodity that could be traded. For example, as alleged in ¶ 1047, Mylan agreed to concede market share for Doxycycline to Heritage in consideration for Heritage conceding market share to Mylan for a second generic drug.

2871. The overarching all-Price-Fixed Generics conspiracy also benefitted Defendants that manufactured just a few, or even just one of the Price-Fixed Generics. For example, as alleged in ¶¶ 1463-1468, when Strides sought to reenter the market for Hydralazine in 2014, it knew to approach Heritage and arrange to receive market share. Because Strides knew that Heritage would concede a customer to Strides, Strides was able to put in a bid to that customers at a supracompetitive price, comfortable in the knowledge that Heritage would concede the account and the inflated bid would be accepted. Similarly, when Mayne entered the Doxy DR market that had been cartelized by Heritage and Mylan, the overarching conspiracy allowed Defendants to reach an agreement that allocated to Mayne a percentage of the market and prevented price

competition that would have disturbed the prevailing supracompetitive prices on Doxy DR. The portion of Doxy DR sales allocated to Mayne by agreement with Heritage and Mylan yielded profits sufficient to compensate Mayne for not competing on price to gain sales of Doxy DR at the supracompetitive price level.

2872.   In this manner, the existence of the overarching conspiracy was what enabled it to continue. Each member of the conspiracy was able to allocate sufficient sales to the extremely high-margin drugs identified in this Complaint as subject to the conspiracy, which incentivized each conspirator's adherence to the scheme. Absent this incentive, non-conspiring manufacturers would have acted in their unilateral self-interests by competing on price and gaining market share. For example, the existence of the overarching conspiracy allowed Actavis to persuade Breckenridge to lead a series of collusive price increases on Propranolol capsules and to persuade Defendant Epic to raise its prices by more than 1000% on Ursodiol, notwithstanding the fact that the actions taken by Breckenridge and Epic were against their respective self-interests and would not have been taken absent collusion. Similarly, the existence of the overarching conspiracy facilitated the ability of Defendants, including Actavis, Mylan, and Teva, to reach an agreement with Defendant Lupin to triple its prices on Pravastatin. And, the overarching conspiracy facilitated the collusive agreement of Defendants Morton Grove and Wockhardt to raise prices on Clobetasol, and Teligent's collusive agreement to raise prices on Econazole. Although some Defendants were the primary facilitators of the collusive conduct alleged in this Complaint, the success of the overarching conspiracy was also dependent on the agreement (or understanding) that the other Defendants would participate in the overarching conspiracy as well. For example, Breckenridge's participation in the conspiracy was dependent on its knowledge – gained in part from attending the many industry events alleged in Section VIII, *supra* – that each of the

Defendants would follow the conspiracy's supracompetitive pricing and market allocation agreements in the event that any entered the market for Propranolol.

2873. Second, the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented. For example, as alleged in ¶ 1400, Teva declined to offer a competitive bid to a customer that sought Glyburide based not only on its agreement with Heritage on Glyburide, but also based on its collusion with Heritage on other drugs discussed in this Complaint. In other words, Teva knew that undercutting the conspiratorial price increase on Glyburide would impact not only Glyburide, but also the conspiratorial price increases on other drugs. Because most Defendants manufactured multiple Price-Fixed Generic Drugs, a manufacturer who cheated on the conspiracy as to one Price-Fixed Generic Drug would be subject or susceptible to punishment by the cartel with respect to accounts for that drug, along with each of the other Price-Fixed Generic Drugs that the cheater manufactured. Thus, the overarching conspiracy enhanced Defendants' ability to enforce the conspiracy, both for conspirators that manufactured many Price-Fixed Generic Drugs, and for those that manufactured just one. For example, Mayne (which manufactured only Doxycycline and Oxy/APAP) knew that Mylan and Heritage had an added incentive to follow through on the unlawful agreements on Doxycycline, which helped to ensure that Mayne also committed to the conspiracy. Indeed, Mylan and Heritage shared a strong incentive to reward Mayne for its adherence to the overarching conspiracy.

2874. Third, and along the same lines, the coordination of price increases and market allocation agreements across multiple Price-Fixed Generic Drugs allowed Defendants to police individual conspiratorial agreements and better conceal the conspiracy from Plaintiffs and others.

For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine.  For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz increased its matching price increase on May 23, 2014.  That same day, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering these price increases in a "my turn, your turn" fashion, Sandoz and Mylan were able to ensure that each would follow through with its promise to increase prices (as they had unlawfully agreed), while avoiding announcing price increases on the same day or extremely close in time.  And for the same reasons explained in ¶¶ 2870-2873, the ability of Defendants such as Sandoz and Mylan to compel each other's compliance with the unlawful agreement helped to ensure that other Defendants, some of whom manufactured fewer drugs – such as Lannett or West-Ward – would also commit to the unlawful agreement, because they were promised a sufficient volume of profitable sales to compensate for their forbearance.

2875.  Fourth, each successful conspiratorial price fixing agreement helped the Defendants by reducing the quantity produced of the drug, which in turn reduced demand for the raw materials required to manufacture that drug.  Because all of the drugs involved in the conspiracy shared common inputs such as binding agents, the reduction in supply of Propranolol (for example) helped to reduce the demand for these inputs, which reduced the cost to produce not only Propranolol, but also each of the other Price-Fixed Generic Drug that also used the same binding agents.

2876.  Fifth, with each successful price increase, Defendants were able to commit a portion of their production capacity to a drug priced substantially above marginal cost.  However, successful price increases also incentivized other manufacturers to substitute capacity towards the high margin drugs.  Accordingly, it was necessary for Defendants to implement the numerous

conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supracompetitive profits.  Further, in the instances, if any, that Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug.  For example, Fougera stopped production of Fluocinonide in January 2015, after the collusive price increase had been implemented on the drug.  Similarly, Teva discontinued production of Doxy Hyclate in May 2013, after the collusive price increase had been implemented on the drug.

2877.  Sixth, certain of the Price-Fixed Generic Drugs are subject to a degree of long-run demand-side substitution.  For example, the topical corticosteroids – Fluocinonide, Desonide, and Clobetasol – are all used for similar purposes.  The same is true of the oral diabetes drugs (Glipizide, Glyburide, Glyburide-Metformin, and Metformin ER).  Accordingly, the success of certain of the conspiratorial price increases for the Price-Fixed Generic Drugs were relevant to the long-term success of other of the conspiratorial price increases.

2878.  The contract, combination and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2879.  The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(c)      To control the production and/or sale of the Price-Fixed Generic Drugs to Plaintiffs and others in the United States; and/or

(d)      To earn supracompetitive profits on the price of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States that resulted from the collusion alleged in this Complaint.

2880.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)      They agreed to exchange, and did exchange, current and future price information about the Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of the Price-Fixed Generic Drugs;

(b)      They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Price-Fixed Generic Drugs sold in the United States;

(c)      They agreed on prices, price levels, and/or production levels of the Price-Fixed Generic Drugs in the United States; and/or

(d)      They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2881.   Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Price-Fixed Generic Drugs to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging

confidential information on the pricing and/or sale of the Price-Fixed Generic Drugs to Plaintiffs and/or others in the United States.

2882.   As a result of this conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)      Price competition in the sale of the Price-Fixed Generic Drugs among Defendants to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)      Prices for the Price-Fixed Generic Drugs sold by Defendants to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)      Plaintiffs and other direct purchasers of the Price-Fixed Generic Drugs produced and sold by Defendants have been deprived of the benefit of free and open competition.

2883.   Each Plaintiff and/or its assignor has been injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of the Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

**B.      Count Two (Pled in the Alternative to Count One) Against Teva, Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, and Zydus**

2884.   Plaintiffs incorporate by reference ¶¶ 1 through 2861 above.

2885.   For the purposes of this Count, the term "Specified Price-Fixed Generic Drugs" means:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets
Amphetamine/ Dextroamphetamine ER (aka Mixed Amphetamine Salts)
Amphetamine/ Dextroamphetamine IR
Azithromycin Oral Suspension
Azithromycin Suspension
Baclofen Tablets
Benazepril HCTZ
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Buspirone Hydrochloride Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clomipramine
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules

Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir
Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fenofibrate
Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Glyburide
Griseofulvin Suspension
Haloperidol
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets

Lamivudine/Zidovudine (generic Combivir)
Levothyroxine
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tizanidine
Trifluoperazine HCL
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Valsartan HCTZ
Warfarin Sodium Tablets

2886.   For the purposes of this Count, the term "Defendants" means Teva, Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, and Zydus. For the the purpose of this Count, Heritage and its officers – including Jason Malek and Jeffrey Glazer – are a co-conspirator.

2887.   The market for manufacture, pricing and sale of the Specified Price-Fixed Generic Drugs was conducive to cartelization.  Beginning in 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Specified Price-Fixed Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2888.  Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Specified Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits.  This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Specified Price-Fixed Generic Drugs.

2889.  Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Specified Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Specified Price-Fixed Generic Drugs in order to achieve supracompetitive profits.   Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the

same meetings and social gatherings, including the industry meetings alleged in Exhibit 1.  Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

2890.  Every Defendant intended to join the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs.

2891.  Teva engaged in the conduct alleged in this Complaint and was a central catalyst for the implementation of the conspiracy.  However, all Defendants and co-conspirators engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants sold fewer Price-Fixed Generic Drugs than Teva.  However, the participation of all Defendants in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured.

2892.  By joining the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs conspiracy, the Defendants and their co-conspirators became interdependent upon one another, in that their respective benefit depended on the success of overarching conspiracy.  Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint with respect to the Specified Price-Fixed Generic Drugs were interdependent for the reasons explained above in Count One.

2893.  The contract, combination and conspiracy among Defendants and their conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2894.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)      To fix, stabilize, maintain, and/or raise prices of the Specified Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(b)      To allocate customers, the volume of sales, and/or market shares of the Specified Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(c)      To control the production and/or sale of the Specified Price-Fixed Generic Drugs to Plaintiffs and others in the United States; and/or

(d)      To earn supra-competitive profits on the price of the Specified Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States that resulted from the collusion alleged in this Complaint.

2895.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)      They agreed to exchange, and did exchange, current and future price information about the Specified Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of the Specified Price-Fixed Generic Drugs;

(b)      They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Specified Price-Fixed Generic Drugs sold in the United States;

(c)      They agreed on prices, price levels, and/or production levels of the Specified Price-Fixed Generic Drugs in the United States; and/or

(d)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2896.  Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Specified Price-Fixed Generic Drugs to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Specified Price-Fixed Generic Drugs to Plaintiffs and/or others in the United States.

2897.  As a result of this conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of the Specified Price-Fixed Generic Drugs among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)     Prices for the Specified Price-Fixed Generic Drugs sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of the Specified Price-Fixed Generic Drugs produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

2898.  Each Plaintiff and/or its assignor has been injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained.  Each Plaintiff's

injury as a direct purchaser of the Specified Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

  **C.**  <u>**Counts Three through One Hundred Ninety (Individual Conspiracies)**</u>

  2899. Plaintiffs incorporate by reference ¶¶ 1 through 2861 above.

  2900. The individual product conspiracies alleged in Counts Three through One Hundred Ninety involve only the specified individual generic drug and the specified Defendants, as indicated on the table below. For the purposes of Counts Three through One Hundred Ninety, the term "Defendants" refers to only those companies identified in each individual Count.

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 3 | Acetazolamide | Heritage, Lannett, Taro, Teva, Zydus | Spring 2012 to the present |
| 4 | Adapalene | Glenmark, Perrigo, Sandoz, Taro, Teva | May 2013 to present |
| 5 | Albuterol | Mylan, Sun | March 2013 to the present |
| 6 | Alclometasone Dipropionate | Glenmark, Sandoz, Taro | April 2013 to the present |
| 7 | Allopurinol | Actavis, Dr. Reddy's, Mylan, Par, Qualitest/Endo | May 2014 to present |
| 8 | Amantadine HCL | Lannett, Sandoz, Upsher-Smith | December 2011 to present |
| 9 | Amiloride HCL/HCTZ Tablets | Mylan, Teva | May 2013 to present |
| 10 | Amitriptyline | Mylan, Par, Qualitest/Endo, Sandoz | May 2014 to present |
| 11 | Ammonium Lactate | Actavis, Perrigo, Taro | April 2013 to the present |
| 12 | Amoxicillin/Clavulanate Chewable Tablets | Sandoz, Teva | August 2014 to present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|-----------|-------------|
| 13 | Amphetamine/Dextroamphetamine (aka Mixed Amphetamine Salts) | Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, Teva | June 2012 to present |
| 14 | Atenolol Chlorthalidone | Actavis, Mylan | March 2014 to present |
| 15 | Azithromycin | Greenstone, Teva | November 2013 to present |
| 16 | Baclofen | Lannett, Par, Qualitest/Endo, Teva, Upsher-Smith | February 2014 to present |
| 17 | Balsalazide Disodium | Apotex, West-Ward | January 2014 to present |
| 18 | Benazepril HCTZ | Mylan, Sandoz | August 2013 to present |
| 19 | Betamethasone Dipropionate (including Augmented and CBD formulations) | Actavis, Perrigo, Sandoz, Taro | November 2010 to the present |
| 20 | Betamethasone Valerate | Actavis, G&W, Taro, Teva, Sandoz | November 2010 to the present |
| 21 | Bethanechol Chloride Tablets | Amneal, Teva | January 2015 to present |
| 22 | Bromocriptine Mesylate | Mylan, Perrigo, Sandoz | December 2012 to the present |
| 23 | Budesonide DR Capsules | Mylan, Par, Teva | April 2014 to present |
| 24 | Budesonide Inhalation | Actavis, Sandoz, Teva | February 2015 to present |
| 25 | Bumetanide Tablets | Sandoz, Teva | April 2014 to the present |
| 26 | Buspirone Hydrochloride Tablets | Actavis, Mylan, Teva | July 2012 to the present |
| 27 | Butorphanol Tartrate | Apotex, Mylan, West-Ward, | December 2013 to present |
| 28 | Cabergoline | Greenstone, Par, Teva | December 2014 to present |
| 29 | Calcipotriene | G&W, Sandoz | Hi-Tech, Impax, Sandoz |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 30 | Calcipotriene Betamethasone Dipropionate Ointment | Perrigo, Sandoz | February 2014 to the present |
| 31 | Capecitabine | Mylan, Teva | January 2014 to the Present |
| 32 | Captopril | Mylan, West-Ward, Wockhardt | May 2013 to present |
| 33 | Carbamazepine | Apotex, Sandoz, Taro, Teva, Torrent | May 2013 to present |
| 34 | Cefdinir | Lupin, Sandoz, Teva | May 2013 to present |
| 35 | Cefpodoxime Proxetil | Aurobindo, Sandoz | January 2013 to the present |
| 36 | Cefprozil Tablets | Lupin, Sandoz, Teva | May 2013 to present |
| 37 | Cefuroxime Axetil | Aurobindo, Citron, Lupin | December 2013 to present |
| 38 | Celecoxib | Actavis, Teva | November 2014 to present |
| 39 | Cephalexin Suspension | Lupin, Teva | October 2013 to the present |
| 40 | Chlorpromazine HCL | Mylan, Sandoz, Upsher-Smith | August 2011 to the present |
| 41 | Cholestyramine | Par, Sandoz, Upsher-Smith | May 2013 to the present |
| 42 | Ciclopirox | Actavis, Fougera/Sandoz, Glenmark, G&W, Perrigo, and Taro | September 2011 to the present |
| 43 | Cimetidine Tablets | Mylan, Teva | May 2013 to present |
| 44 | Ciprofloxacin HCL Tablets | Actavis, Dr. Reddy's, Teva | August 2014 to present |
| 45 | Clarithromycin ER Tablets | Actavis, Teva, Zydus | April 2014 to present |
| 46 | Clemastine Fumarate Tablets | Sandoz, Teva | August 2013 to the present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 47 | Clindamycin Phosphate | Actavis, Greenstone, Perrigo, Pfizer, Sandoz, Taro | November 2010 to the present |
| 48 | Clobetasol | Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, Wockhardt | June 2014 to the present |
| 49 | Clomipramine | Mylan, Sandoz, Taro | May 2013 to the present |
| 50 | Clonidine TTS Patch | Actavis, Mylan, Teva | October 2012 to the present |
| 51 | Clotrimazole | Glenmark, Sandoz, Taro, Teva | May 2014 to present |
| 52 | Cyproheptadine HCL Tablets | Breckenridge, Impax, Teva | November 2013 to present |
| 53 | Desmopressin Acetate Tablets | Actavis, Teva | August 2014 to present |
| 54 | Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Actavis, Glenmark, Teva | May 2014 to present |
| 55 | Desonide | Actavis, Fougera, Perrigo, Sandoz, Taro | May 2013 to the present |
| 56 | Desoximetasone | Glenmark, Sandoz, Taro | August 2012 to the present |
| 57 | Dexmethylphenidate HCL ER Capsules | Par, Sandoz, Teva | February 2014 to the present |
| 58 | Dextroamphetamine Sulfate ER | Actavis, Aurobindo, Impax, Mallinckrodt, Teva | June 2014 to present |
| 59 | Diclofenac Potassium Tablets | Mylan, Sandoz, Teva | August 2013 to present |
| 60 | Dicloxacillin Sodium Capsules | Sandoz, Teva | April 2014 to the present |
| 61 | Diflunisal Tablets | Teva, Rising | April 2014 to present |
| 62 | Digoxin | Impax, Lannett, Mylan, Par, West-Ward | October 2013 to the present |
| 63 | Diltiazem HCL Tablets | Mylan, Teva | May 2013 to present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|-----------|-------------|
| 64 | Diphenoxylate Atropine | Mylan, Greenstone | April 2014 to present |
| 65 | Disopyramide Phosphate Capsules | Actavis, Teva | July 2013 to the present |
| 66 | Divalproex ER | Dr. Reddy's, Mylan, Par, Zydus | June 2013 to the present |
| 67 | Doxazosin Mesylate Tablets | Apotex, Greenstone, Mylan, Par, Teva | May 2013 to present |
| 68 | Doxycycline | Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun, West-Ward | October 2012 to the present |
| 69 | Drospirenone and ethinyl estradiol (Ocella) | Actavis, Lupin, Teva | May 2013 to present |
| 70 | Econazole | Sandoz, Perrigo, Taro, Teligent | June 2014 to the present |
| 71 | Enalapril Maleate Tablets | Mylan, Taro, Teva, Valeant, Wockhardt | July 2013 to present |
| 72 | Entecavir | Par, Teva | September 2014 to present |
| 73 | Epitol Tablets | Apotex, Taro, Teva | August 2014 to present |
| 74 | Eplerenone | Greenstone, Pfizer, Sandoz | April 2014 to the present |
| 75 | Erythromycin Solution | Sandoz, Perrigo, Wockhardt | May 2011 to the present |
| 76 | Estazolam Tablets | Actavis, Teva | April 2014 to present |
| 77 | Estradiol Tablets | Actavis, Mylan, Teva | May 2013 to present |
| 78 | Estradiol/Norethindrone Acetate Tablets (Mimvey) | Actavis, Breckenridge, Mylan, Teva | July 2012 to the present |
| 79 | Ethambutol HCL Tablets | G&W, Lupin, Teva, VersaPharm | November 2012 to present |
| 80 | Ethinyl estradiol and levonorgestrel (Portia and Jolessa) | Sandoz, Teva | May 2012 to the Present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 81 | Ethosuximide | Teva, Versapharm | April 2014 to present |
| 82 | Etodolac | Apotex, Taro, Teva, Sandoz, Zydus | July 2013 to present |
| 83 | Fenofibrate | Lupin, Mylan, Perrigo, Teva, Zydus | February 2013 to present |
| 84 | Fluconazole Tablets | Citron, Dr. Reddy's, Glenmark, Greenstone, Teva | May 2013 to present |
| 85 | Fluocinolone Acetonide | G&W, Sandoz, Taro, Teligent | December 2011 to present |
| 86 | Fluocinonide | Actavis, G&W, Glenmark, Sandoz, Taro, Teva, Valeant | March 2013 to present |
| 87 | Fluoxetine HCL Tablets | Mylan, Par, Teva | January 2015 to present |
| 88 | Flurbiprofen Tablets | Mylan, Teva | May 2013 to present |
| 89 | Flutamide Capsules | Actavis, Par, Teva | August 2014 to present |
| 90 | Fluticasone Propionate | Glenmark, Perrigo, Sandoz, Taro | July 2012 to the present |
| 91 | Fluvastatin Sodium Capsules | Mylan, Teva | April 2014 to present |
| 92 | Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, Sandoz | April 2014 to the present |
| 93 | Gabapentin Tablets | Aurobindo, Glenmark, Teva | October 2014 to present |
| 94 | Glimepiride Tablets | Dr. Reddy's, Teva | August 2014 to present |
| 95 | Glipizide | Heritage, Mylan, Teva | April 2014 to the present |
| 96 | Glyburide | Aurobindo, Citron, Heritage, Teva | April 2014 to the present |
| 97 | Glyburide-Metformin | Actavis, Aurobindo, Citron, Heritage, Teva | April 2014 to the present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 98 | Griseofulvin | Actavis, Sandoz, Teva, Valeant | September 2014 to the present |
| 99 | Halobetasol | G&W, Perrigo, Sandoz, Taro | September 2012 to the present |
| 100 | Haloperidol | Mylan, Sandoz, Zydus | August 2013 to the present |
| 101 | Hydralazine | Camber, Glenmark, Heritage, Par, Strides, Teva | August 2014 to the present |
| 102 | Hydrocortisone Acetate | G&W, Perrigo | June 2013 to the present |
| 103 | Hydrocortisone Valerate | G&W, Perrigo, Taro | August 2013 to the present |
| 104 | Hydroxyurea Capsules | Par, Teva | August 2014 to the present |
| 105 | Hydroxyzine Pamoate Capsules | Actavis, Rising, Sandoz, Teva | October 2013 to the present |
| 106 | Imiquimod | Perrigo, Sandoz, Taro | April 2010 to the present |
| 107 | Irbesartan | Lupin, Teva | March 2012 to present |
| 108 | Isoniazid | Sandoz, Teva | June 2013 to the march present |
| 109 | Isosorbide Dinitrate | Par, Sandoz, West-Ward | July 2012 to present |
| 110 | Ketoconazole | Apotex, G&W, Mylan, Sandoz, Taro, Teva | February 2014 to the present |
| 111 | Ketoprofen Capsules | Mylan, Teva | July 2013 to the present |
| 112 | Ketorolac Tromethamine Tablets | Mylan, Teva | July 2013 to the present |
| 113 | Labetalol HCL Tablets | Actavis, Alvogen, Par, Sandoz, Teva | July 2012 to the present |
| 114 | Lamivudine/Zidovudine (generic Combivir) | Aurobindo, Camber, Lupin, Teva | May 2012 to the present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|-----------|-------------|
| 115 | Latanoprost | Akorn, Greenstone, Pfizer, Sandoz, Valeant | March 2012 to the present |
| 116 | Leflunomide | Apotex, Heritage, Teva | April 2014 to the present |
| 117 | Levothyroxine | Lannett, Mylan, Sandoz | August 2013 to the present |
| 118 | Lidocaine HCL Ointment | Hi-Tech, Sandoz, Taro | November 2011 to the present |
| 119 | Lidocaine-Prilocaine | Akorn, Fougera, Hi-Tech, Impax, Sandoz | March 2014 to present |
| 120 | Loperamide HCL Capsules | Mylan, Teva | April 2014 to the present |
| 121 | Medroxyprogesterone Tablets | Greenstone, Teva | November 2013 to the present |
| 122 | Meprobamate | Dr. Reddy's, Heritage | March 2013 to the present |
| 123 | Metformin ER | Actavis, Amneal, Lupin, Sun, Teva | July 2015 to the present |
| 124 | Methadone HCL | Mallinckrodt, West-Ward | October 2014 to Present |
| 125 | Methazolamide | Perrigo, Sandoz | June 2014 to the present |
| 126 | Methotrexate Tablets | Mylan, Par, Qualitest/Endo, Teva, West-Ward | February 2013 to present |
| 127 | Methylphenidate | Actavis, Impax,  Mallinckrodt, Par, Sandoz, Sun | February 2013 to the present |
| 128 | Methylprednisolone | Breckenridge, Cadista, Greenstone, Par, Qualitest/Endo, Sandoz | February 2011 to the present |
| 129 | Metronidazole | Actavis, G&W, Impax, Sandoz, Taro, Teva, and Valeant | Summer 2011 to the present |
| 130 | Moexipril HCL Tablets | Glenmark, Teva | May 2013 to present |
| 131 | Moexipril HCL/HCTZ Tablets | Glenmark, Teva | May 2013 to present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 132 | Mometasone Furoate | G&W, Glenmark | May 2013 to the present |
| 133 | Nabumetone Tablets | Actavis, Glenmark, Sandoz, Teva | May 2013 to present |
| 134 | Nadolol Tablets | Greenstone, Mylan, Sandoz, Teva | May 2013 to present |
| 135 | Nafcillin | Aurobindo, Sandoz | December 2012 to the present |
| 136 | Naproxen Sodium | Amneal, Glenmark | April 2015 to present |
| 137 | Niacin ER Tablets | Lupin, Teva, Zydus | March 2014 to the present |
| 138 | Nimodipine | Heritage, Sun | June 2012 to the present |
| 139 | Nitrofurantoin MAC Capsules | Alvogen, Mylan, Teva | July 2012 to the present |
| 140 | Norethindrone Acetate | Amneal, Glenmark, Teva | September 2014 to the present |
| 141 | Norethindrone/ethinyl estradiol (Balziva) | Lupin, Teva | January 2014 to the present |
| 142 | Nortriptyline HCL Capsules | Actavis, Taro, Teva | November 2013 to the present |
| 143 | Nystatin | Actavis, Heritage, Par, Qualitest/Endo, Perrigo, Sandoz, Sun, Taro, Teva | Summer 2011 to the present |
| 144 | Nystatin Triamcinolone | Actavis, Sandoz, Taro | November 2012 to the present |
| 145 | Omega-3-Acid Ethyl Esters | Apotex, Par, Teva | June 2014 to the present |
| 146 | Ondansetron | Glenmark, Teva | May 2013 to present |
| 147 | Oxacillin Sodium | Aurobindo, Sandoz | May 2013 to the present |
| 148 | Oxaprozin Tablets | Dr. Reddy's, Greenstone, Sandoz, Teva | July 2012 to the present |

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 149 | Oxybutynin Chloride Tablets | Apotex, Par, Qualitest/Endo, Teva, Upsher-Smith | April 2013 to the present |
| 150 | Oxycodone/Acetaminophen | Actavis, Alvogen, Amneal, Aurobindo, Endo, Mallinckrodt, Mayne, Par, Qualitest/Endo | June 2012 to the present |
| 151 | Paricalcitol | Dr. Reddy's, Teva, Zydus | March 2014 to the present |
| 152 | Paromomycin | Heritage, Sun | April 2014 to the present |
| 153 | Penicillin VK Tablets | Aurobindo, Greenstone, Sandoz, Teva | August 2014 to the present |
| 154 | Pentoxifylline Tablets | Apotex, Mylan, Teva, Valeant | April 2014 to the present |
| 155 | Permethrin | Actavis, Perrigo, Mylan | May 2010 to present |
| 156 | Perphenazine | Par, Qualitest/Endo, Sandoz | July 2009 to present |
| 157 | Phenytoin Sodium | Amneal, Mylan, Sun, Taro | April 2014 to the present |
| 158 | Pilocarpine HCL | Lannett, Actavis, Impax | December 2013 to present |
| 159 | Pioglitazone HCL Metformin | Aurobindo, Mylan, Sandoz, Teva, Torrent | February 2013 to the present |
| 160 | Piroxicam | Greenstone, Mylan, Teva | March 2014 to the present |
| 161 | Potassium Chloride | Actavis, Mylan, Sandoz, Upsher-Smith, Zydus | July 2010 to the present |
| 162 | Pravastatin | Apotex, Glenmark, Lupin, Mylan, Teva, Zydus | May 2013 to the present |
| 163 | Prazosin HCL Capsules | Mylan, Teva | May 2013 to the present |
| 164 | Prednisolone Acetate | Sandoz, Greenstone | August 2013 to Present |
| 165 | Prednisone | Actavis, Cadista, Par, Qualitest/Endo, West-Ward | Spring 2013 to present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|-----------|-------------|
| 166 | Prochlorperazine | Cadista, G&W, Mylan, Perrigo, Sandoz, Teva | May 2014 to the present |
| 167 | Promethazine HCL | Actavis, G&W, Perrigo | September 2012 to the present |
| 168 | Propranolol | Actavis, Breckenridge, Heritage, Mylan, Par, Teva, Upsher-Smith | November 2013 to the present |
| 169 | Raloxifene HCL Tablets | Teva, Camber | September 2014 to the present |
| 170 | Ranitidine HCL | Amneal, Dr. Reddy's, Glenmark, Sandoz, Teva | May 2013 to the present |
| 171 | Spironolactone HCTZ | Greenstone, Mylan, Sun | February 2013 to present |
| 172 | Tacrolimus Ointment | Perrigo, Sandoz | August 2014 to the present |
| 173 | Tamoxifen Citrate Tablets | Actavis, Mylan, Teva | March 2014 to the present |
| 174 | Temozolomide | Sandoz, Teva | July 2013 to the Present |
| 175 | Terconazole Cream | Actavis, Sandoz, Taro | May 2013 to the present |
| 176 | Theophylline ER | Heritage, Teva | February 2014 to the present |
| 177 | Timolol Maleate | Sandoz, Valeant | January 2014 to present |
| 178 | Tizanidine | Apotex, Dr. Reddy's, Mylan, Sandoz, Sun | May 2013 to the present |
| 179 | Tobramycin | Sandoz, Teva | October 2013 to the Present |
| 180 | Tolmetin Sodium Capsules | Mylan, Teva | May 2013 to present |
| 181 | Tolterodine | Greenstone, Mylan, Teva | December 2013 to the Present |
| 182 | Topiramate Sprinkle Capsules | Actavis, Teva, Zydus | April 2014 to the present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 183 | Triamcinolone Acetonide | Par, Perrigo, Sandoz, Taro | July 2010 to the present |
| 184 | Triamterene HCTZ | Actavis, Apotex, Lannett, Mylan, Sandoz | 2011 to the present |
| 185 | Trifluoperazine HCL | Mylan, Sandoz | January 2013 to the present |
| 186 | Ursodiol | Actavis, Epic, Lannett | May 2014 to the present |
| 187 | Valsartan HCTZ | Mylan, Sandoz | September 2012 to the present |
| 188 | Verapamil | Actavis, Heritage, Mylan | April 2014 to the present |
| 189 | Warfarin Sodium Tablets | Amneal, Taro, Teva, Zydus | June 2014 to the present |
| 190 | Zoledronic Acid | Dr. Reddy's, Heritage | January 2013 to the present |

2901.   Beginning on or about the time referenced in the table below, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the generic drug referenced on the table above in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2902.   The contract, combination, and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of the specified generic drug in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2903.   The course, pattern, and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of the specified generic drug sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of the specified generic drug sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of the specified generic drug and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of the specified generic drug sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

2904.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about the specified generic drug sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of the specified generic drug;

(b)     They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the specified generic drug sold in the United States;

(c)     They agreed on prices, price levels, and/or production levels of the specified generic drug sold in the United States; and/or

(d)     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2905. Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of

each the specified generic drug to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the specified generic drug to Plaintiffs and/or others in the United States.

2906.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)   Price competition in the sale of the specified generic drug among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)   Prices for the specified generic drug sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained, and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)   Plaintiffs and other direct purchasers of the specified generic drug produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

2907.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of the specified generic drug is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## XXII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A.      A jury verdict in the amount of the compensatory damages sustained by each Plaintiff.

B.      A judgment against Defendants, jointly and severally, by the Court, in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs, and interest as allowable by law.

C.      A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices which facilitate those violations.

D.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  April 1, 2024     Respectfully submitted,

By: _____
   Richard Alan Arnold, Esquire
   William J. Blechman, Esquire
   Scott E. Perwin, Esquire
   Anna T. Neill, Esquire
   Samuel J. Randall, Esquire
   Michael A. Ponzoli, Esquire
   Joshua B. Gray, Esquire
   KENNY NACHWALTER, P.A.
   1441 Brickell Avenue
   Suite 1100
   Miami, Florida  33131
   Tel:   (305) 373-1000
   Fax:   (305) 372-1861
   E-mail:  rarnold@knpa.com
      wblechman@knpa.com
      sperwin@knpa.com
      aneill@knpa.com
      srandall@knpa.com
      mponzoli@knpa.com

      jgray@knpa.com

   ***Counsel for Plaintiffs***

668922

753